## Bed Assignment Associated View

| Status | Inmate | Bed | Start Date | End Date |
|---|---|---|---|---|
| Active | James Roberts | DIV08-3E-6-1 | 5/26/2016 4:00 PM | |
| Inactive | James Roberts | DIV08-3E-5-2 | 5/22/2016 7:30 PM | 5/26/2016 4:00 PM |
| Inactive | James Roberts | DIV08-3A-10-2 | 4/15/2016 10:20 PM | 5/22/2016 7:30 PM |
| Inactive | James Roberts | DIV08-3A-6-1 | 4/7/2016 5:30 PM | 4/15/2016 10:20 PM |
| Inactive | James Roberts | DIV08-3A-6-1 | 12/16/2015 4:30 PM | 12/16/2015 4:30 PM |
| Inactive | James Roberts | DIV08-3E-6-1 | 12/16/2015 4:30 PM | 4/7/2016 5:30 PM |
| Inactive | James Roberts | DIV08-3A-10-1 | 8/12/2015 9:30 AM | 12/16/2015 4:30 PM |
| Inactive | James Roberts | DIV08-3E-10-X1 | 5/13/2015 2:00 PM | 8/12/2015 9:30 AM |
| Inactive | James Roberts | DIV08-3A-10-1 | 3/29/2015 8:00 AM | 5/13/2015 1:00 PM |
| Inactive | James Roberts | DIV08-4A-10-X1 | 3/18/2015 5:30 PM | 3/29/2015 8:00 AM |
| Inactive | James Roberts | DIV08-3A-6-1 | 3/15/2015 12:00 PM | 3/18/2015 5:30 PM |
| Inactive | James Roberts | DIV08-3A-7-1 | 3/15/2015 5:00 AM | 3/15/2015 12:00 PM |
| Inactive | James Roberts | DIV 15-HP-HOSPITAL-GENERAL | 3/14/2015 7:30 PM | 3/15/2015 12:00 AM |
| Inactive | James Roberts | DIV08-3A-7-2 | 2/12/2015 12:30 PM | 3/14/2015 7:00 PM |
| Inactive | James Roberts | DIV08-3A-1-X1 | 12/7/2014 5:30 PM | 2/12/2015 12:30 PM |
| Inactive | James Roberts | DIV08-3E-10-2 | 11/18/2014 11:00 AM | 12/7/2014 5:00 PM |
| Inactive | James Roberts | DIV08-3E-6-1 | 10/31/2014 10:00 PM | 11/18/2014 10:58 AM |
| Inactive | James Roberts | DIV08-3E-10-2 | 9/26/2014 12:00 AM | 10/31/2014 9:30 PM |

Plaintiff's Exhibit 1 Page 1

## Historical Bed Assignment Associated View

| Inmate | Booking | Class Date | Bed | Facility |
|---|---|---|---|---|
| James Roberts | 20140910003 | 9/10/2014 | DIV1- | DIV1 |
| James Roberts | 20140910003 | 9/10/2014 | DIV15-HP | DIV15 |
| James Roberts | 20140910003 | 9/10/2014 | DIV8-3W-DR | DIV8 |
| James Roberts | 20140910003 | 9/24/2014 | DIV08-3G-3-D5-X3 | DIV08 |
| James Roberts | 20140910003 | 9/25/2014 | DIV08-3E-3-2-1 | DIV08 |
| James Roberts | 20140910003 | 9/26/2014 | DIV08-3E-3-10-2 | DIV08 |

Plaintiff's Exhibit 1 Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) Civil No. 10 C 2946 |
| COOK COUNTY, ILLINOIS; | ) |
| THOMAS DART, COOK COUNTY | ) |
| SHERIFF (in his official capacity); | ) |
| TODD H. STROGER, COOK COUNTY | ) |
| BOARD PRESIDENT (in his official capacity); | ) |
| COOK COUNTY BOARD OF | ) |
| COMMISSIONERS (in their official capacity); | ) |
| | ) |
| DEFENDANTS. | ) |

## AGREED ORDER

### I.  INTRODUCTION

1.   On February 16, 2007, the Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the Northern District of Illinois (collectively, "United States") notified Cook County officials of their intention to investigate conditions of confinement at the Cook County Jail ("the Facility"), pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").

2.   On June 18-22, 2007 and July 23-27, 2007, the United States toured the Facility with consultants in the fields of use of force, corrections, correctional medical care, correctional mental health care, fire safety, and environmental health.

3.   Throughout the course of the investigation, the United States received complete cooperation and access to all facilities and documents from the Cook County Board of Commissioners and the Cook County Sheriff's Office.

1

9.   The purpose of this Agreed Order is to protect the constitutional rights of the inmates detained at the Facility.  The terms and requirements of this Agreed Order will be interpreted to be consistent with the measures necessary to protect the constitutional rights of inmates and are not meant to expand or contract the constitutional rights of inmates at the Facility.

### II.  DEFINITIONS

10.   "The Facility" shall refer to the Cook County Jail, located at 2700 South California Avenue, Chicago, Illinois  60608, and shall include Divisions I-VI, VIII-XI, Cermak Health Services Building, the Receiving, Classification, and Diagnostics Center ("RCDC"), the Residential Treatment Unit ("RTU"), as well as any building that is built, leased, or otherwise used, to replace or supplement the Facility.

11.   "DOJ" shall refer to the United States Department of Justice, which represents the United States in this matter.

12.   "Effective date" shall mean the date the Agreed Order is signed and entered by the Court.

13.   "Exigent circumstances" shall mean unexpected events or unforeseen occurrences giving rise to an emergency situation that can, in the short term, be remedied only by departing from what would otherwise be required by this Agreed Order.  The overpopulation of the Facility with inmates as the result of a continuing and steady rise in inmate population over time is not an "unexpected event" or "unforeseen occurrence" within the meaning of this definition.

14.   "Hot-bunk," addressed in provision 32.l(iii), means the practice of assigning more than one inmate at the Facility to a single bed, so that the two (or more) inmates assigned to that bed must sleep on the bed in shifts.

15.   "Include" or "including" shall mean "include, but not be limited to" or "including, but not limited to."

16.   "Inmate" or "inmates" shall be construed broadly to refer to one or more individuals detained at, or otherwise housed, held, or confined at the Facility.

17.   "Infirmary" shall mean the areas located on the second and third floors of the Cermak Building at the Facility, or any successor facility designed to replace these areas.

18.   Consistent with, or in accordance with, the term "generally accepted correctional

3

4.   On July 11, 2008, the United States issued a findings letter pursuant to 42 U.S.C. § 1997 that concluded that certain conditions at the Facility violate the constitutional rights of individuals confined at the Facility.  The findings letter and the conclusions therein are contested by Defendants.  Furthermore, by entering into this Agreed Order, Defendants to this action do not waive the right to contest the July 11, 2008 findings letter or any of the conclusions set forth therein.

5.   Defendants in this action are Cook County, Illinois; the Cook County Sheriff, Thomas Dart (in his official capacity); the Cook County Board President, Todd H. Stroger (in his official capacity); the Cook County Board of Commissioners (in their official capacities); and their successors, contractors, and agents (collectively, "Defendants").  Currently, all corrections and security functions at the Facility are administered by the Cook County Department of Corrections ("CCDOC") under the Cook County Sheriff.  Health care services at the Facility are provided by Cermak Health Services of Cook County ("Cermak"), a public entity that is administered by the Cook County Health and Hospitals System Board.  Maintenance responsibilities for the Facility's physical plant are handled by the Cook County Department of Facilities Management ("DFM").  Defendants shall ensure that all Cook County agencies will take any actions necessary to comply with the provisions of this Agreed Order.

6.   The United States District Court for the Northern District of Illinois ("Court") has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 42 U.S.C. § 1997.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

7.   For the purposes of this lawsuit and in order to settle this matter, Defendants consent to the entry of a finding that the conditions at the Facility necessitate the remedial measures contained in this Agreed Order.  As indicated in Section VII of this Agreed Order, the parties consent to a finding that this Agreed Order complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

8.   No person or entity is intended to be a third-party beneficiary of the provisions of this Agreed Order for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreed Order.  This Agreed Order does not create and shall not be the basis of a cause of action for any non-party.  This Agreed Order is not intended to impair or expand the right of any person or organization to seek relief against Defendants or their officials, employees, or agents for their conduct.  This Agreed Order does not alter legal standards governing any such claims, including those standards established by Illinois law.

2

standards" shall mean those industry standards accepted by a majority of correctional professionals or organizations in the relevant subject area.

19.   "Licensed Correctional Medical Technician" means an individual licensed as Emergency Medical Technician by the Illinois Department of Public Health.

20.   "Qualified Medical Professional" shall mean a licensed physician, licensed physician assistant, or a licensed nurse practitioner, who is currently licensed by the State of Illinois to deliver those health care services he or she has undertaken to provide.

21.   "Qualified Medical Staff" shall refer to Qualified Medical Professionals and Qualified Nursing Staff.

22.   "Qualified Mental Health Professional" shall refer to an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work or psychiatric nursing, who is currently licensed by the State of Illinois to deliver those mental health services he or she has undertaken to provide.

23.   "Qualified Mental Health Staff" shall refer to individuals with a minimum of a bachelor's degree and two years of experience providing mental health services.

24.   "Qualified Nursing Staff" means registered nurses and licensed practical nurses currently licensed by the State of Illinois to deliver those health services they have undertaken to provide.

25.   "Serious suicide attempt" means a suicide attempt that is considered to be either potentially life-threatening or that required medical treatment for serious harm.

26.   "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness.

27.   "Suicide Precautions" means any level of watch, observation, or measures to prevent self-harm.

28.   "Train" means to instruct in the skills addressed to a level that the trainee has the demonstrated proficiency to implement those skills as, and when called for, in the training.  "Trained" means to have achieved such proficiency.

29.   "Use of force," means the application of physical, chemical, or mechanical measures on

4

Plaintiff's Exhibit 2 Page 1

an inmate. "Use of force" shall not include unrestssed handcuffing or unrestssed shackling of inmates for movement purposes.

30. Throughout this Agreed Order, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance: "Substantial Compliance" indicates that the relevant Defendant(s) has achieved compliance with most or all components of the relevant provision of the Agreed Order. "Partial Compliance" indicates that compliance has been achieved on some of the components of the relevant provision of the Agreed Order, but significant work remains. "Non-compliance" indicates that most or all of the components of the Agreed Order provision have not yet been met.

### III.  SUBSTANTIVE PROVISIONS

Defendants shall take any actions necessary to comply with the substantive provisions of the Agreed Order listed below.  The primary responsibility of each substantive provision is assigned to CCDOC, Cermak, or the DFM, respectively.  The Parties recognize that there are a number of ways to achieve constitutional minima.  In determining compliance with the substantive provisions of this Agreed Order, consideration shall be given to the operational requirements of the Facility and the policies and practices employed by CCDOC, Cermak, and DFM.

### A.  PROTECTION FROM HARM

31. Use of Force by Staff

a. CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

b. CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:

(1) use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;

(2) use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or

5

(8) note whether a use of force was videotaped.  If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

e. CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

f. CCDOC shall ensure that senior management review of uses of force includes:

(1) a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;

(2) the inmate disciplinary report, if any, associated with the use of force; and

(3) the incident report, if any, associated with the use of force.

g. CCDOC shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

h. When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

i. CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

7

staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;

(3) use of force as punishment or retaliation;

(4) use of force involving striking, hitting, or punching a restrained and non-combative inmate;

(5) use of force against an inmate after the inmate has ceased to offer resistance and is under control;

(6) use of choke holds on an inmate, unless lethal force is justified; and

(7) use of inappropriate or excessive force.

c. CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

d. CCDOC shall require that use of force reports:

(1) be written in specific terms in order to capture the details of the incident;

(2) contain an accurate account of the events leading to the use of force incident;

(3) include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;

(4) note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;

(5) describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;

(6) contain the date and time medical attention was actually provided;

(7) describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and

6

(1) a tracking number;
(2) the inmate(s) name;
(3) housing assignment;
(4) date;
(5) type of incident;
(6) injuries (if applicable);
(7) medical care provided (if applicable);
(8) staff involved;
(9) reviewing supervisor;
(10) external reviews and results (if applicable);
(11) remedy taken (if appropriate); and
(12) administrative sign-off.

j. CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.

k. CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses.  Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.  CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

l. CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

m. Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

(1) engaged in inappropriate or excessive use of force;

(2) failed to report or report accurately the use of force;

8

Plaintiff's Exhibit 2 Page 2

    (3)    retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or

    (4)    interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

n.    Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

o.    CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

p.    CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

    (1)    CCDOC shall maintain an effective and comprehensive use of force training program.

    (2)    CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.

    (3)    CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

q.    CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

r.    Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

s.    Cermak shall ensure that, when providing medical treatment or assessment to an

9

---

housing units, and document the results of their inspections.

e.    Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

f.    CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

g.    CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed.

h.    CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

i.    CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

j.    CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units.

k.    CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order.

11

---

inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

t.    Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:

    (1)    report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and

    (2)    adequately document the matter in the inmate's medical record.

32.    Safety and Supervision

a.    CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.

b.    CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.

c.    CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

d.    CCDOC shall ensure that security supervisors conduct daily rounds in the inmate

10

---

l.    Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

m.    When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

33.    Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

b.    CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

c.    CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:

    i.    By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 newly qualified correctional officers (in addition to

12

Plaintiff's Exhibit 2 Page 3   Page 12

those on duty as of December 31, 2009).

ii.   By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

d.   The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

e.   Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

f.   If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

g.   If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:

(1)   Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;

13

34.   Incidents and Referrals

a.   CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

b.   CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

c.   CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:

(1)   incident tracking number;
(2)   the inmate(s) name;
(3)   housing assignment;
(4)   date;
(5)   type of incident;
(6)   injuries (if applicable);
(7)   medical care (if applicable);
(8)   primary and secondary staff involved;
(9)   reviewing supervisor;
(10)   external reviews and results (if applicable);
(11)   remedy taken (if appropriate); and
(12)   administrative sign-off.

d.   CCDOC shall require prompt administrative review of incident reports.  Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

e.   CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

15

(2)   Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and

(3)   Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

h.   CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

i.   Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

j.   CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

14

f.   CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

g.   CCDOC shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

35.   Investigations

Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.   CCDOC shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

b.   Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

c.   CCDOC shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question.

d.   CCDOC shall ensure that all investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

e.   CCDOC shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the

16

Plaintiff's Exhibit 2 Page 4

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 7 of 561 PageID #:72

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 28 of 138 PageID #:395    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 30 of 138 PageID #:397

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 17 of 60    Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 19 of 60

investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

f.    CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

g.    CCDOC shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations.

36.    Inmate Disciplinary Process

a.    CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

b.    CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

c.    CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards. In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency. For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

d.    CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which

17

38.    Inmate Grievance Procedure

a.    CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards. These policies and procedures should be applicable and standardized across all the Facility divisions.

b.    CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

c.    CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

d.    CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

39.    Access to Information

a.    CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

b.    CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

40.    CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

19

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 29 of 138 PageID #:396    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 31 of 138 PageID #:398

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 18 of 60    Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 20 of 60

disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

e.    CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

f.    CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

37.    Classification

a.    CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

b.    CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

c.    CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

d.    CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

e.    CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

18

**B.    HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH**

41.    Inter-Agency Agreement

a.    CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

42.    Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a.    Cermak shall develop and implement medical care policies, procedures, and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

(1)    access to medical care;
(2)    continuity of medication;
(3)    infection control;
(4)    medication administration;
(5)    intoxication and detoxification;
(6)    documentation and record-keeping;
(7)    disease prevention;
(8)    sick call triage and physician review;
(9)    intake screening;
(10)    chronic disease management;
(11)    comprehensive health assessments;
(12)    mental health;
(13)    women's health;
(14)    quality management;

20

Plaintiff's Exhibit 2 Page 5

(15)    emergent response;
(16)    infirmary care;
(17)    placement in medical housing units;
(18)    handling of grievances relating to health care;
(19)    mortality review; and
(20)    care for patients returning from off-site referrals.

b.    Cermak shall develop and implement policies, procedures, and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests.  Such policies, procedures, and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

43.    Medical Facilities

a.    CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

(1)    intake screening;
(2)    sick call;
(3)    medical and mental health assessment;
(4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)    acute, chronic, and emergency mental health care.

b.    Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

(1)    intake screening;
(2)    sick call;
(3)    medical and mental health assessment;
(4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)    acute, chronic, and emergency mental health care.

c.    Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees, as identified by Cermak staff, including:

21

extent possible in the current Facility.

44.    Staffing, Training, Supervision, and Leadership

a.    Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:

(1)    Medical care; and
(2)    Mental health care.

b.    Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:

(1)    Qualified Medical Staff; and
(2)    Qualified Mental Health Staff.

c.    Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates.  All such staff shall receive documented orientation and in-service training on relevant topics, including:

(1)    Provision of health care in a correctional setting and Facility-specific issues; and
(2)    Suicide prevention, and identification and care of inmates with mental illness.

d.    Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e.    Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure.  Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

(1)    Medical staff; and
(2)    Mental health staff.

23

(1)    intake screening;
(2)    sick call;
(3)    medical and mental health assessment;
(4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)    acute, chronic, and emergency mental health care.

d.    Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms.  Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

e.    Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

f.    CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.  Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

g.    Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care.  Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.  Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h.    Cook County shall build out, remodel, or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i.    Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order.  It is expected that the project will be complete within nine months of the effective date of this Agreed Order.  Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the

22

f.    Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal.  Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.    CCDOC will provide, to all Cermak staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.    Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

g.    Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

(1)    Medical staff; and
(2)    Mental health staff.

45.    Intake Screening

a.    Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b.    Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable

24

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 9 of 561 PageID #:74

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 36 of 138 PageID #:403    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 38 of 138 PageID #:405

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 25 of 60          Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 27 of 60

medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

(1) medical, surgical, and mental health history, including current or recent medications, including psychotropic medications;
(2) history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;
(3) current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;
(4) history of substance abuse and treatment;
(5) pregnancy;
(6) history and symptoms of communicable disease;
(7) suicide risk history; and
(8) history of mental illness and treatment, including medication and hospitalization.

c. Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

(1) past suicidal ideation and/or attempts;
(2) current ideation, threat, or plan;
(3) prior mental illness treatment or hospitalization;
(4) recent significant loss, such as the death of a family member or close friend;
(5) previously identified suicide risk during any prior confinement at CCDOC;
(6) any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;
(8) psychotropic medication history; and
(9) alcohol and other substance use and withdrawal history.

d. Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

25

or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed.  If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

46.    Emergency Care

a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:

(1) Medical emergencies;
(2) Mental health emergencies; and
(3) Drug and alcohol withdrawal.

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

(1) Medical emergencies;
(2) Mental health emergencies; and
(3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

(1) Medical emergencies; and
(2) Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

(1) Medical emergencies; and
(2) Mental health emergencies.

27

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 37 of 138 PageID #:404    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 39 of 138 PageID #:406

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 26 of 60          Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 28 of 60

e. If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f. Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health screenings:

(1) Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;
(2) Current or recent prescription medications and dosage, including psychotropic medications;
(3) Current injuries or evidence of trauma;
(4) Significantly abnormal vital signs, as defined by Cermak's policies and procedures;
(5) Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;
(6) Pregnancy;
(7) Symptoms of communicable disease; and
(8) History of mental illness or treatment, including medication and/or hospitalization.

g. Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h. Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i. Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental health needs can be obtained in a timely manner, as medically appropriate.  Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional

26

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

47.    Record Keeping

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible, and systematically organized.  All clinical encounters and reviews of inmates should be documented in the inmates' records.

c. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care.  Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

48.    Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident.  At a minimum, CCDOC's contribution to mortality and morbidity reviews shall

28

Plaintiff's Exhibit 2 Page 7

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 10 of 561 PageID #:75

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 40 of 138 PageID #:407          Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 42 of 138 PageID #:409

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 29 of 60                    Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 31 of 60

include:

(1) critical review and analysis of the correctional circumstances surrounding the incident;
(2) critical review of the correctional procedures relevant to the incident;
(3) synopsis of all relevant training received by involved correctional staff;
(4) possible precipitating correctional factors leading to the incident; and
(5) recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c. Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

(1) critical review and analysis of the circumstances surrounding the incident;
(2) critical review of the procedures relevant to the incident;
(3) synopsis of all relevant training received by involved staff;
(4) pertinent medical and mental health services/reports involving the victim;
(5) possible precipitating factors leading to the incident; and
(6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d. Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

49. Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**C.   MEDICAL CARE**

50. Health Assessments

a. Cermak shall ensure that Qualified Medical Professionals attempt to elicit the

29

51. Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

52. Chronic care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma, and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically

31

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 41 of 138 PageID #:408          Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 43 of 138 PageID #:410

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 30 of 60                    Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 32 of 60

amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b. Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c. Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d. CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e. Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

30

appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

53. Treatment and Management of Communicable Disease

a. Cermak shall maintain adequate testing, monitoring, and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment, and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB, and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

32

**Plaintiff's Exhibit 2 Page 8**

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 11 of 561 PageID #:76

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 44 of 138 PageID #:411          Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 46 of 138 PageID #:413

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 33 of 60          Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 35 of 60

e.    Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f.    Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

g.    Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable disease.

h.    Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

54.    Access to Health Care

a.    CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b.    Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c.    Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

(1)    written medical and mental health care slips available in English, Spanish, and other languages, as needed;

(2)    opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

(3)    opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.    Cermak shall ensure that the sick call process includes confidential collection,

33

56.    Medication Administration

a.    Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b.    Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c.    Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates, and is recorded concurrently with distribution.

d.    Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e.    When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.    When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.    When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.    When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.    Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.    Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger

35

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 45 of 138 PageID #:412          Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 47 of 138 PageID #:414

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 34 of 60          Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 36 of 60

logging, and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.    Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.    Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.    Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

55.    Follow-Up Care

a.    Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b.    Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions for acute care visits, and, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

34

Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.    CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.    When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m.    CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

57.    Specialty Care

a.    Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b.    Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c.    Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.    Cermak shall maintain a current log of all inmates who have been referred for

36

Plaintiff's Exhibit 2 Page 9

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 12 of 561 PageID #:77

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 48 of 138 PageID #:415     Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 50 of 138 PageID #:417

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 37 of 60     Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 39 of 60

outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

c.   Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

58.   Dental Care

a.   Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care.  Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay.  Dental care shall not be limited to extractions.

b.   Cermak shall ensure adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**D.   MENTAL HEALTH CARE**

59.   Assessment and Treatment

a.   Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.

b.   Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs.  Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

c.   Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental

37

currently receiving mental health care.

j.   When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.

k.   In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.

l.   Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation.  Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health.  During these regular rounds, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.

m.   Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication.  Cermak shall create such a log within six months of the date this Agreed Order is entered.  The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment.  Each clinician shall have ready access to a current log listing any prescribed medication and dosages

39

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 49 of 138 PageID #:416     Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 51 of 138 PageID #:418

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 38 of 60     Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 40 of 60

Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.  Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association.  If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment.  Cermak shall adequately document the mental health evaluation in the inmate's medical record.

d.   Cermak shall ensure clinically appropriate and timely treatment for inmates whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.

e.   Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.

f.   Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.

g.   Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness.  This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming.  Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.

h.   Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.

i.   Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates

38

for inmates on psychotropic medications.  In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.

n.   Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.  An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration.  Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration.  Seclusion or restraint orders should include sufficient criteria for release.

o.   Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates.  Crisis services shall not be limited to administrative segregation or observation status.

p.   Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.

60.   Psychotherapeutic Medication Administration

a.   Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment.  Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

b.   Cermak shall ensure timely implementation of physician orders for medication and laboratory tests.  Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.

**E.   SUICIDE PREVENTION MEASURES**

61.   Suicide Prevention Policy

a.   CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and

40

Plaintiff's Exhibit 2 Page 10

monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

b.  Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

c.  The suicide prevention policy shall include, at a minimum, the following provisions:

(1)  an operational description of the requirements for both pre-service and annual in-service training;
(2)  intake screening/assessment;
(3)  communication;
(4)  housing;
(5)  observation;
(6)  intervention; and
(7)  mortality and morbidity review.

62.  Suicide Precautions

a.  CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.

b.  Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.

c.  CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.

d.  Cermak shall develop and implement policies and procedures for suicide

41

precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.

63.  Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.

64.  Suicide Risk Assessments

a.  Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

b.  Cermak shall ensure that the risk assessment shall include the following:

(1)  description of the antecedent events and precipitating factors;
(2)  mental status examination;
(3)  previous psychiatric and suicide risk history;
(4)  level of lethality;
(5)  current medication and diagnosis; and
(6)  recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record.

65.  Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.

66.  Suicide Prevention Policies

a.  CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

42

b.  Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

67.  DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars.

68.  Suicide Prevention Training

a.  Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:

(1)  the suicide prevention policy as revised consistent with this Agreed Order;
(2)  why facility environments may contribute to suicidal behavior;
(3)  potential predisposing factors to suicide;
(4)  high risk suicide periods;
(5)  warning signs and symptoms of suicidal behavior;
(6)  observation techniques;
(7)  searches of inmates who are placed on Suicide Precautions;
(8)  case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);
(9)  mock demonstrations regarding the proper response to a suicide attempt; and
(10)  the proper use of emergency equipment, including suicide cut-down tools.

43

b.  Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c.  Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

69.  CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.

70.  Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future indexes of suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.

F.  FIRE AND LIFE SAFETY

71.  CCDOC and DFM shall work together to develop and implement a comprehensive fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the fire prevention authority having jurisdiction. The fire safety plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

72.  CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and

44

location of inmates who were moved as part of the drills.

73. DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

74. DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM should develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

75. CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

76. CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance.

77. DFM shall develop and implement an annual preventative maintenance program concerning security devices such as door locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.

78. CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

79. CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

80. DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

45

h. CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed.

i. CCDOC shall ensure that all inmates have access to needed hygiene supplies.

j. CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correctional standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

k. DFM shall develop a policy on hazardous materials storage, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

l. CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

m. CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses.

n. CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemicals shall be removed from housing areas after use.

o. CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

47

81. CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

82. CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

**G.     SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

a. DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

b. CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing areas.

c. DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.

d. CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

e. DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on an annual basis for non-automated systems.

f. CCDOC shall notify DFM of any visible obstructions to the ventilation system.

g. Cook County shall ensure adequate lighting in all inmate housing and work areas.

46

84. Sanitary Laundry Procedures

a. CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards.  To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

b. CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.

c. CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

d. CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

e. CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

85. Food Service

a. CCDOC shall ensure that food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

b. CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

c. CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

d. CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

48

Plaintiff's Exhibit 2 Page 12

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 15 of 561 PageID #:80

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 60 of 138 PageID #:427     Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 62 of 138 PageID #:429

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 49 of 60     Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 51 of 60

e.    CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

## H.    QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

86.    Quality Management and Performance Measurement

a.    Defendants shall develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to Defendant.

b.    Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c.    CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d.    Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative analysis and trending over time.

e.    DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and

49

limitations, listed below, as the Monitors. The parties reserve the right to object for good cause to members of the Monitoring Teams.

D.    Monitor Access: The Monitors shall have full and complete access to the Facility, all Facility records, inmate medical records, staff, and inmates. Defendants shall direct all employees to cooperate fully with the Monitors. All non-public information obtained by the Monitors shall be maintained in a confidential manner.

E.    Monitor Ex Parte Communications: The Monitors shall be permitted to initiate and receive ex parte communications with all parties.

F.    Limitations on Public Disclosures by Monitors: Except as required or authorized by the terms of this Agreed Order or the parties acting together, the Monitors shall not: make any public statements (at a conference or otherwise) or issue findings with regard to any act or omission of Defendants or their agents, representatives or employees, or disclose nonpublic information provided to the Monitors pursuant to this Agreed Order. Any press statement made by the Monitors regarding his or her employment must first be approved in writing by all parties. The Monitors shall not testify in any other litigation or proceeding with regard to any act or omission of Defendants or any of their agents, representatives, or employees related to this Agreed Order, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreed Order. Reports issued by the Monitors shall not be admissible against Defendants in any proceeding other than a proceeding related to the enforcement of this Agreed Order by Defendants or DOJ. Unless such conflict is waived by the parties, the Monitors shall not accept employment or provide consulting services that would present a conflict of interest with the Monitors' responsibilities under this Agreed Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Defendants, their departments, officers, agents or employees. The Monitors are not a State/County or local agency or an agent thereof, and accordingly the records maintained by the Monitors shall not be deemed public records subject to public inspection. Neither the Monitors nor any person or entity hired or otherwise retained by the Monitors to assist in furthering any provision of this Agreed Order shall be liable for any claim, lawsuit or demand arising out of the Monitors' performance pursuant to this Agreed Order. This provision does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreed Order.

G.    Monitors' Reports: The Monitors shall file with the Court and provide the parties with reports describing the steps taken by Defendants to implement this Agreed Order and evaluate the extent to which Defendants have complied with each substantive provision

51

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 61 of 138 PageID #:428     Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 63 of 138 PageID #:430

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 50 of 60     Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 52 of 60

implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

## IV.    MONITORING

A.    Monitor Selection: The parties have jointly selected Ms. Susan McCampbell to serve as the monitor for the CCDOC corrections provisions of the Agreed Order ("Corrections Monitor"). The parties have jointly selected Dr. Ronald Shansky to serve as the monitor for the medical provisions of this Agreed Order ("Medical Monitor"). The parties have jointly selected Dr. Jeffrey Metzner to serve as the monitor for the mental health provisions of this Agreed Order ("Mental Health Monitor"). The parties have jointly selected Mr. Harry Greanwatzke to serve as monitor for the physical plant (§§ III.F and III.G), DFM, and Capital Planning provisions of this Agreed Order ("Physical Plant Monitor"). With provisions that involve overlap between two disciplines, such as § III.B, Elements Common to Medical and Mental Health, the relevant Monitors shall coordinate in order to determine the proper manner for the necessary compliance assessment. Should any of the monitor positions become vacant and the parties cannot agree on a replacement, the parties shall recommend candidates to the Court, and the Court will appoint the Monitor. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitors' activities, reports, findings, or recommendations. The cost for the Monitors' fees and expenses shall be borne by Defendants. The selection of the Monitors shall be conducted solely pursuant to the procedures set forth in this Agreed Order, and will not be governed by any formal or legal procurement requirements. The Monitors may be terminated only for good cause, unrelated to the Monitors' findings or recommendations, and only with prior notice to, and approval of, the parties or by Court order. Should all the parties agree that a Monitor is not fulfilling his or her duties in accordance with this Agreed Order, the parties may petition the Court for the Monitor's immediate removal and replacement. One party may unilaterally petition the Court for the Monitor's removal for good cause, and the other parties will have the opportunity to respond to the petition.

B.    Monitor Qualifications: The Monitors shall have appropriate experience and education or training related to the subject areas covered in this Agreed Order.

C.    Monitoring Team: The Monitors may hire or consult with such additional qualified staff as necessary to fulfill the duties required by the Agreed Order ("Monitoring Teams"). The Monitors are ultimately responsible for the findings regarding compliance. The Monitoring Teams will be subject to all the same access rights and confidentiality

50

of the Agreed Order. The Monitors shall issue an initial report four months after the effective date of this Agreed Order, and then every six months thereafter, unless both parties otherwise agree in writing. The reports shall be provided to the parties in draft form for comment at least two weeks prior to their issuance. These reports shall be written with due regard for the privacy interests of individual inmates and staff and the interest of Defendants in protecting against disclosure of non-public information.

H.    Compliance Assessments: In each Monitors' report, the Monitors shall evaluate the status of compliance for each relevant provision of the Agreed Order using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance. In order to assess compliance, the Monitors shall review a sufficient number of pertinent documents to accurately assess current conditions; interview all pertinent staff; and interview a sufficient number of inmates to accurately assess current conditions. The Monitors shall be responsible for independently verifying representations from Defendants regarding progress toward compliance, examining supporting documentation where applicable. Each Monitor's report shall describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings.

I.    Budget: The parties acknowledge that compliance with certain provisions of this Agreed Order will require additional expenditure of funds. The parties also acknowledge that the budget for CCDOC, Cermak, and DFM is subject to approval by the Cook County Board of Commissioners.

J.    Monitors' Budget: Defendants shall provide the Monitors with a budget sufficient to allow the Monitors to carry out the responsibilities described in this Agreed Order. The Monitors shall pay the members of the Monitoring Teams out of this budget. Prior to selection for the Monitors' positions, each Monitor candidate proposed a reasonable, estimated budget sufficient to cover the responsibilities described in this Agreed Order.

K.    Technical Assistance by the Monitors: The Monitors shall provide Defendants with technical assistance as requested by Defendants.

## V.    REPORTING REQUIREMENTS AND RIGHT OF ACCESS

A.    Defendants shall each submit semiannual compliance reports to DOJ and the Monitors, the first of which shall be filed within six months of the date of this Agreed Order. Thereafter, the semiannual reports shall be filed 15 days after the termination of each six-month period thereafter until the Agreed Order is terminated.

52

Plaintiff's Exhibit 2 Page 13

Case: 1:16-cv-05560 Document #: 27-2 Filed: 04/19/17 Page 16 of 561 PageID #:81

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 64 of 138 PageID #:431    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 66 of 138 PageID #:433

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 53 of 60        Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 55 of 60

B.  Each compliance report shall describe the actions Defendants have taken during the reporting period to implement this Agreed Order and shall make specific reference to the Agreed Order provisions being implemented.

C.  Defendants shall maintain sufficient records to document that the requirements of this Agreed Order are being properly implemented and shall make such records available to DOJ at reasonable times for inspection and copying. In addition, Defendants shall maintain and submit upon request records or other documents to verify that they have taken such actions as described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, and incident reports) and will also provide all documents reasonably requested by DOJ.

D.  DOJ and its attorneys, consultants, and agents shall have unrestricted access to the Facility, inmates, staff (including CCDOC, DFM, and Cermak staff, or staff from any other outside medical or mental health services provider), and documents as reasonably necessary to address issues affected by this Agreed Order.

E.  Within 30 days of receipt of written questions from DOJ concerning Defendants' compliance with the requirements of this Agreed Order, Defendants shall provide DOJ with written answers and any requested documents.

F.  CCDOC and Cook County shall each appoint a compliance coordinator to oversee compliance with this Agreed Order and to serve as a point of contact.

G.  Whenever any Defendant invokes exigent circumstances to take action that departs from what would otherwise be the requirements of this Agreed Order, that Defendant shall, immediately upon taking such action, notify the Monitors and DOJ of the exigent circumstances relied upon, the corresponding action taken, what it believes will be the duration of such circumstances and such action, and the steps it is taking to attempt to limit the duration of such action to as short a term as practicable.

## VI. ENFORCEMENT

A.  During the period that the Agreed Order is in force, if any of the Monitors or DOJ determines that a Defendant has not made material progress toward substantial compliance with a significant obligation under the Agreed Order, and such failure constitutes a violation of inmates' constitutional rights, DOJ may, but is not required to, seek enforcement of the Agreed Order in Court.

B.  Prior to taking judicial action to enforce the Agreed Order, DOJ shall give Defendants

53

that substantial compliance for all subcomponents of each provision in the full substantive section is achieved and maintained for the requisite 18-month period. In addition, if the responsible Defendant has substantially complied with all of the provisions assigned to it in a full substantive section of the Agreed Order (for example, CCDOC could substantially comply with all of the provisions specifically assigned to it in § III.C: Medical Care), and has maintained Substantial Compliance with all of those provisions for at least 18 months, those provisions may conclude independently of the rest of the Agreed Order. The burden shall be on the Defendant(s) to demonstrate this level of compliance. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-compliance shall not constitute Substantial Compliance.

D.  The parties agree that every two years following the effective date of this Agreed Order, the Court shall conduct a status conference regarding the status of Defendants' compliance with this Agreed Order.

E.  Failure by any party to enforce this entire Agreed Order or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreed Order.

F.  If any unforeseen circumstance occurs that causes a failure to timely carry-out any requirements of this Agreed Order, Defendants shall notify DOJ in writing within 20 calendar days after Defendants become aware of the unforseen circumstance and its impact on the Defendant's ability to perform under the Agreed Order. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. Defendants shall implement all reasonable measures to avoid or minimize any such failure.

G.  This Agreed Order shall constitute the entire integrated Agreed Order of the parties. With the exception of DOJ's findings letter, referenced in provision I.4 herein, and any DOJ technical assistance recommendations, no prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this litigation or in any other proceeding.

H.  Nothing herein shall be deemed, construed, or interpreted as an admission of liability by Defendants. Neither this Agreed Order, nor any part thereof, shall be admissible against Defendants except in a proceeding involving the parties to this Agreed Order. Furthermore, by entering into this Agreed Order, Defendants do not waive the right to

55

Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 65 of 138 PageID #:432    Case: 1:15-cv-00825 Document #: 66 Filed: 02/10/16 Page 67 of 138 PageID #:434

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 54 of 60        Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 56 of 60

written notice of its intent to seek enforcement of the Agreed Order, and the parties shall engage in good-faith discussions to resolve the dispute.

C.  The relevant Defendant(s) shall have 30 days from the date of such notice to cure the failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the parties) and provide DOJ with sufficient proof of its cure. At the end of the 30-day period (or such additional time as is reasonable due to the nature of the issue and agreed upon by the parties), in the event that DOJ determines that the failure has not been cured, DOJ may seek judicial action without further notice. DOJ commits to work in good faith with Defendants to avoid enforcement actions.

D.  The terms of this Agreed Order are not subject to state or federal court enforcement by anyone other than DOJ.

E.  In case of an emergency posing an immediate threat to the health or safety of an inmate or staff member at the Facility, however, DOJ may omit the notice and cure requirements herein before seeking enforcement of the Agreed Order.

## VII. CONSTRUCTION, IMPLEMENTATION AND TERMINATION

A.  Defendants shall implement all reforms within their areas of responsibility, as designated within the provisions of this Agreed Order, that are necessary to effectuate this Agreed Order. The implementation of this Agreed Order will begin immediately upon the effective date.

B.  Except where otherwise agreed to under a specific provision of this Agreed Order, Defendants shall implement all provisions of this Agreed Order within 180 days of the entry of this Agreed Order.

C.  This Agreed Order shall terminate when Defendants have achieved substantial compliance with each of the provisions of the Agreed Order and have maintained Substantial Compliance with the Agreed Order for a period of 18 months. The parties anticipate that Defendants will have achieved substantial compliance with all provisions of the Agreed Order within four years of the Agreed Order's Effective Date and sustained compliance with each such provision for at least 18 months. The parties agree that a full substantive section of the Agreed Order (§ III.A: Protection from Harm, § III.B: Health Care Services, § III.C: Medical Care, § III.D: Mental Health Care, § III.E Suicide Prevention Measures, § III.F: Fire and Life Safety, § III.G: Sanitation and Environmental Conditions, or § III.H: Quality Management and Performance Measurement) may conclude independently of the rest of the Agreed Order in the event

54

contest the July 11, 2008 findings letter or any of the conclusions set forth therein.

I.  The Agreed Order shall be applicable to, and binding upon, all parties, their officers, agents, employees, assigns, and their successors in office.

J.  Each party shall bear the cost of its fees and expenses incurred in connection with this cause.

K.  In the event that any provision of this Agreed Order is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreed Order.

### VIII. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

A.  For the purposes of this Agreed Order only and in order to settle this matter, the parties stipulate that this Agreed Order complies in all respects with the provisions of 18 U.S.C. § 3626(a). The parties further stipulate and agree that the prospective relief in this Agreed Order is narrowly drawn, extends no further than necessary to correct the violations of federal rights alleged by the United States, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the parties agree and represent that the Agreed Order complies in all respects with the provisions of 18 U.S.C. § 3626(a).

B.  The issue of liability has not been litigated.

C.  This Agreed Order is not intended to have any preclusive effect except between the parties. Should the issue of the preclusive effect of this Agreed Order be raised, the parties agree to certify that this Agreed Order was intended to have no such preclusive effect.

56

Plaintiff's Exhibit 2 Page 14

Case 1:10-cv-02946  Document 3-1  Filed 05/13/10  Page 57 of 60

**FOR THE UNITED STATES:**

PATRICK J. FITZGERALD
United States Attorney
Northern District of Illinois

PATRICK JOHNSON
JOAN LASER
Assistant United States Attorneys
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5327
patrick.johnson2@usdoj.gov

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

ROY L. AUSTIN, JR.
Deputy Assistant Attorney General
Civil Rights Division

JUDY C. PRESTON
Acting Chief
Special Litigation Section

KERRY KRENTLER DEAN
DAVID DEUTSCH
COREY SANDERS
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, D.C.  20530
(202) 514-1841
kerry.k.dean@usdoj.gov

57

Case 1:10-cv-02946  Document 3-1  Filed 05/13/10  Page 59 of 60

**FOR THE DEFENDANT SHERIFF:**

THOMAS DART
Cook County Sheriff

DANIEL F. GALLAGHER
Querrey & Harrow
175 W. Jackson Boulevard, Ste. 1600
Chicago, IL 60604-2827
(312) 540-7674
dgallagher@querrey.com
Attorney for Cook County Sheriff

59

Case 1:10-cv-02946  Document 3-1  Filed 05/13/10  Page 58 of 60

**FOR THE DEFENDANTS COOK COUNTY, IL
AND THE COOK COUNTY BOARD OF
COMMISSIONERS:**

TODD H. STROGER
President
Cook County Board of Commissioners

PATRICK T. DRISCOLL, JR.
Chief, Civil Actions Bureau
Office of the Cook County State's Attorney
66 W. Washington
Chicago, IL  60602
(312) 603-3378
pdrisco@cookcountygov.com
Attorney for Cook County

58

Case 1:10-cv-02946  Document 3-1  Filed 05/13/10  Page 60 of 60

SO ORDERED this _____ day of _____, 2010:


UNITED STATES DISTRICT COURT JUDGE
NORTHERN DISTRICT OF ILLINOIS

60

Plaintiff's Exhibit 2 Page 15



# Individual Inmate Report

| Booking # | Inmate Full Name | Date of Birth | Race | Gender | Height | Weight |
|---|---|---|---|---|---|---|
| 2014-0910003 | Roberts, James | | BK | Male | 606 | 212 |

| Booked Date | Housing Location | Visiting Day / Time | | Bail Amount |
|---|---|---|---|---|
| 09/10/2014 | DIV08-4E-10-X2 | Sunday | 3:30p - 8:30p | *NO BOND* |

**Charges**

720 ILCS 5/9-1(a)(1)
MURDER/INTENT TO KILL/INJURE

| Next Court Date | Court House Location |
|---|---|
| 04/18/2017 | Criminal Courts Building Criminal Courts Building |

,

Good news!!! You can now expedite the bonding process by emailing
ccso.bonds@cookcountyil.gov before you come to the CCDOC. When we receive the
email, we will begin getting the release paperwork together, which could cut down on
your wait time. Your email must include the following:

- Your Full Name
- Your contact information (Phone Number and / or email address)
- Inmate's Full Name (from the inmate report above)
- Booking Number (from the inmate report above)
- Inmate Date of Birth (from the inmate report above)



**\*Please apply using Internet Explorer on a desktop/laptop computer only. A cellphone or tablet cannot be used to apply.**

Register online to visit.

OR

Download Printable form

Plaintiff's Exhibit 3 Page 1

**Exhibit 4**

APPENDIX A TO SUBPART 101–19.6—UNIFORM FEDERAL ACCESSIBILITY STANDARDS

## TABLE OF CONTENTS

### UNIFORM FEDERAL ACCESSIBILITY STANDARDS

1. PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.1 Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.2 Provisions for Adults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3. MISCELLANEOUS INSTRUCTIONS AND DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . 2

    3.1 Graphic Conventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.2 Dimensional Tolerances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.3 Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.4 General Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.5 Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4. ACCESSIBLE ELEMENTS AND SPACES: SCOPE AND TECHNICAL REQUIREMENTS. . . . . . 4

    4.1 Minimum Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        4.1.1 Accessible Sites and Exterior Facilities: New Construction. . . . . . . . . . . . . 4
        4.1.2 Accessible Buildings: New Construction. . . . . . . . . . . . . . . . . . . . . . . . . . 5
        4.1.3 Accessible Housing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        4.1.4 Occupancy Classifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        4.1.5 Accessible Buildings: Additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        4.1.6 Accessible Buildings: Alterations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        4.1.7 Accessible Buildings: Historic Preservation. . . . . . . . . . . . . . . . . . . . . . . . 13

    4.2 Space Allowances and Reach Ranges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.3 Accessible Route . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.4 Protruding Objects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    4.5 Ground and Floor Surfaces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    4.6 Parking and Passenger Loading Zones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    4.7 Curb Ramps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    4.8 Ramps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    4.9 Stairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.10 Elevators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    4.11 Platform Lifts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    4.12 Windows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    4.13 Doors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    4.14 Entrances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    4.15 Drinking Fountains and Water Coolers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    4.16 Water Closets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    4.17 Toilet Stalls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    4.18 Urinals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    4.19 Lavatories and Mirrors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    4.20 Bathtubs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    4.21 Shower Stalls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    4.22 Toilet Rooms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    4.23 Bathrooms, Bathing Facilities, and Shower Rooms . . . . . . . . . . . . . . . . . . . . 44
    4.24 Sinks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    4.25 Storage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Plaintiff's Exhibit 4                                                    Page 1

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**TABLE OF CONTENTS**

**UNIFORM FEDERAL ACCESSIBILITY STANDARDS**

4.26 Handrails, Grab Bars, Tub and Shower Seats .................................................... 45
4.27 Controls and Operating Mechanisms .................................................... 45
4.28 Alarms .................................................... 45
4.29 Tactile Warnings .................................................... 46
4.30 Signage .................................................... 47
4.31 Telephones .................................................... 47
4.32 Seating, Tables, and Work Surfaces .................................................... 48
4.33 Assembly Areas .................................................... 49
4.34 Dwelling Units .................................................... 49

5. RESTAURANTS AND CAFETERIAS. .................................................... 57

6. HEALTH CARE. .................................................... 57

7. MERCANTILE. .................................................... 57

8. LIBRARIES. .................................................... 58

9. POSTAL FACILITIES. .................................................... 58

APPENDIX .................................................... 60

INDEX .................................................... 70

145

Plaintiff's Exhibit 4                                                          Page 2

        

## 1. PURPOSE.

*This document sets standards for facility accessibility by physically handicapped persons for Federal and federally-funded facilities. These standards are to be applied during the design, construction, and alteration of buildings and facilities to the extent required by the Architectural Barriers Act of 1968, as amended.*

*The technical provisions of these standards are the same as those of the American National Standard Institute's document A117.1-1980, except as noted in this text and on figures by italics.*

## 2. GENERAL.

**2.1 Authority.** *These standards were jointly developed by the General Services Administration, the Department of Housing and Urban Development, the Department of Defense, and the United States Postal Service, under the authority of sections 2, 3, 4, and 4a, respectively, of the Architectural Barriers Act of 1968, as amended. Pub. L. No. 90-480, 42 U.S.C. 4151-4157.*

**2.2 Provisions For Adults.** *The specifications in these standards are based upon adult dimensions and anthropometrics.*

## 3. MISCELLANEOUS INSTRUCTIONS AND DEFINITIONS.

**3.1 Graphic Conventions.** Graphic conventions are shown in Table 1. Dimensions that are not marked "minimum" or "maximum" are absolute, unless otherwise indicated in the text or captions.

**3.2 Dimensional Tolerances.** All dimensions are subject to conventional building industry tolerances for field conditions.

**3.3 Notes.** The text of *these standards* does not contain notes or footnotes. Additional information, explanations, and advisory materials are located in the Appendix. Paragraphs marked with an asterisk have related, nonmandatory material in the Appendix. In the Appendix, the corresponding paragraph numbers are preceded by an A.

**3.4 General Terminology.**

comply with. Meet one or more specifications of this standard.

if, if...then. Denotes a specification that applies only when the conditions described are present.

may. Denotes an option or alternative.

**Table 1**
**Graphic Conventions**

| Convention | Description |
| --- | --- |
| | Typical dimension line showing U.S. customary units (in inches) above the line and SI units (in millimeters) below |
| | Dimensions for short distances indicated on extended line |
| | Dimension line showing alternate dimensions required |
| | Direction of approach |
| max | Maximum |
| min | Minimum |
| | Boundary of clear floor area |
| | Centerline |



2

Federal Property Management Regulations          Subpt. 101–19.6, App. A

### 3.5 Definitions

shall. Denotes a mandatory specification or requirement.

should. Denotes an advisory specification or recommendation.

**3.5 Definitions.** The following terms shall, for the purpose of *these standards*, have the meaning indicated in this section.

Access Aisle. An accessible pedestrian space between elements, such as parking spaces, seating, and desks, that provides clearances appropriate for use of the elements.

Accessible. Describes a site, building, facility, or portion thereof that complies with *these standards* and that can be approached, entered, and used by physically disabled people.

Accessible Element. An *element* specified by *these standards* (for example, telephone, controls, and the like).

Accessible Route. A continuous unobstructed path connecting all accessible elements and spaces in a building or facility. Interior accessible routes may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures. Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps, and lifts.

*Accessible Space. Space that complies with these standards.*

Adaptability. The ability of certain building *spaces and* elements, such as kitchen counters, sinks, and grab bars, to be *added or* altered so as to accommodate the needs of either disabled or nondisabled *persons*, or to accommodate the needs of persons with different types or degrees of disability.

Addition. An expansion, extension, or increase in the *gross floor area of a building or facility.*

Administrative Authority. A governmental agency that adopts or enforces regulations and standards for the design, construction, or alteration of buildings and facilities.

Alteration. As applied to a building or structure, means a change or rearrangement in the structural parts or elements, or in the means of egress or in moving from one location or position to another. It does not include normal maintenance, repair, reroofing, interior decoration, or changes to mechanical and electrical systems.

Assembly Area. A room or space accommodating fifty or more individuals for religious, recreational, educational, political, social, or amusement purposes, or for the consumption of food and drink, including all connected rooms or spaces with a common means of egress and ingress. Such areas as conference rooms would have to be accessible in accordance with other parts of this standard but would not have to meet all of the criteria associated with assembly areas.

Automatic Door. A door equipped with a power-operated mechanism and controls that open and close the door automatically upon receipt of a momentary actuating signal. The switch that begins the automatic cycle may be a photoelectric device, floor mat, or manual switch mounted on or near the door itself (see power-assisted door).

Circulation Path. An exterior or interior way of passage from one place to another for pedestrians, including, but not limited to, walks, hallways, courtyards, stairways, and stair landings.

Clear. Unobstructed.

Common Use. Refers to those interior and exterior rooms, spaces, or elements that are made available for the use of a restricted group of people (for example, residents of an apartment building, the occupants of an office building, or the guests of such residents or occupants).

Cross Slope. The slope that is perpendicular to the direction of travel (see running slope).

Curb Ramp. A short ramp cutting through a curb or built up to it.

Dwelling Unit. A single unit of residence which provides a kitchen or food preparation area, in addition to rooms and spaces for living, bathing, sleeping, and the like. A single family home is a dwelling unit, and dwelling units are to be found in such housing types as townhouses and apartment buildings.

Egress, Means of. An accessible route of exit that meets all applicable code specifications of the regulatory building agency having jurisdiction over the building or facility.

*Element. An architectural or mechanical component of a building, facility, space, or site, e.g., telephone, curb ramp, door, drinking fountain, seating, water closet.*

*Entrance. Any access point to a building or portion of building or facility used for the purpose of entering. An entrance includes the approach walk, the vertical access leading to the entrance platform, the entrance platform itself, vestibules if provided, the entry door(s) or gate(s), and the hardware of the entry door(s) or gate(s). The principal entrance of a building or facility is the main door through which most people enter.*

*Essential Features. Those elements and spaces that make a building or facility usable by, or serve the needs of, its occupants or users. Essential features include but are not limited to entrances, toilet rooms, and accessible routes. Essential features do not include those spaces that house the major activities for which the building or facility is intended, such as classrooms and offices.*

*Extraordinary Repair. The replacement or renewal of any element of an existing building or facility for purposes other than normal maintenance.*

3

147

Plaintiff's Exhibit 4                                          Page 4

### 3.5 Definitions

*Facility.* All or any portion of a building, structure, or area, including the site on which such building, structure or area is located, wherein specific services are provided or activities performed.

*Full and Fair Cash Value.* Full and fair cash value is calculated for the estimated date on which work will commence on a project and means:

   (1) The assessed valuation of a building or facility as recorded in the assessor's office of the municipality and as equalized at one hundred percent (100%) valuation, or
   (2) The replacement cost, or
   (3) The fair market value.

*Functional Spaces.* The rooms and spaces in a building or facility that house the major activities for which the building or facility is intended.

*Housing.* A building, facility, or portion thereof, excluding inpatient health care facilities, that contains one or more dwelling units or sleeping accommodations. Housing may include, but is not limited to, one and two-family dwellings, apartments, group homes, hotels, motels, dormitories, and mobile homes.

*Marked Crossing.* A crosswalk or other identified path intended for pedestrian use in crossing a vehicular way.

*Multifamily Dwelling.* Any building containing more than two dwelling units.

*Operable Part.* A part of a piece of equipment or appliance used to insert or withdraw objects, or to activate, deactivate, or adjust the equipment or appliance (for example, coin slot, pushbutton, handle).

*Physically Handicapped.* An individual who has a physical impairment, including impaired sensory, manual, or speaking abilities, which results in a functional limitation in access to and use of a building or facility.

*Power-assisted Door.* A door used for human passage with a mechanism that helps to open the door, or relieve the opening resistance of a door, upon the activation of a switch or a continued force applied to the door itself. If the switch or door is released, such doors immediately begin to close or close completely within 3 to 30 seconds (see automatic door).

*Public Use.* Describes interior or exterior rooms or spaces that are made available to the general public. Public use may be provided at a building or facility that is privately or publicly owned.

*Ramp.* A walking surface in an accessible space that has a running slope greater than 1:20.

*Running Slope.* The slope that is parallel to the direction of travel (see cross slope).

*Service Entrance.* An entrance intended primarily for delivery of services.

*Signage.* Verbal, symbolic, *tactile*, and pictorial information.

*Site.* A parcel of land bounded by a property line or a designated portion of a public right-of-way.

*Site Improvement.* Landscaping, paving for pedestrian and vehicular ways, outdoor lighting, recreational facilities, and the like, added to a site.

*Sleeping Accommodations.* Rooms in which people sleep, for example, dormitory and hotel or motel guest rooms.

*Space.* A definable area, e.g., toilet room, hall, assembly area, entrance, storage room, alcove, court-yard, or lobby.

*Structural Impracticability.* Changes having little likelihood of being accomplished without removing or altering a load-bearing structural member and/or incurring an increased cost of 50 percent or more of the value of the element of the building or facility involved.

*Tactile.* Describes an object that can be perceived using the sense of touch.

*Tactile Warning.* A standardized surface texture applied to or built into walking surfaces or other elements to warn visually impaired people of hazards in the path of travel.

*Temporary.* Applies to facilities that are not of permanent construction but are extensively used or essential for public use for a given (short) period of time, for example, temporary classrooms or classroom buildings at schools and colleges, or facilities around a major construction site to make passage accessible, usable, and safe for everybody. Structures directly associated with the actual processes of major construction, such as porto potties, scaffolding, bridging, trailers, and the like, are not included. *Temporary* as applied to elements means installed for less than 6 months and not required for safety reasons.

*Vehicular Way.* A route intended for vehicular traffic, such as a street, driveway, or parking lot.

*Walk.* An exterior pathway with a prepared surface intended for pedestrian use, including general pedestrian areas such as plazas and courts.

## 4. ACCESSIBLE ELEMENTS AND SPACES: SCOPE AND TECHNICAL REQUIREMENTS.

### 4.1 Minimum Requirements.

**4.1.1 Accessible Sites and Exterior Facilities:** *New Construction.* An accessible site shall meet the following minimum requirements:

   (1) At least one accessible route complying with 4.3 shall be provided *within the boundary of the site* from public transportation stops, accessible parking

4

148

Federal Property Management Regulations          Subpt. 101–19.6, App. A

spaces, passenger loading zones if provided, and public streets or sidewalks to an accessible building entrance.

(2) At least one accessible route complying with 4.3 shall connect accessible buildings, facilities, elements, and spaces that are on the same site.

(3) All objects that protrude from surfaces or posts into circulation paths shall comply with 4.4.

(4) Ground surfaces along accessible routes and in accessible spaces shall comply with 4.5.

(5) (a) *If parking spaces are provided for employees or visitors, or both, then accessible spaces, complying with 4.6, shall be provided in each such parking area in conformance with the following table:*

| Total Parking in Lot | Required Minimum Number of Accessible Spaces |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | * |
| 1001 and over | ** |

* 2 percent of total.
** 20 plus 1 for each 100 over 1000.

*EXCEPTION:  The total number of accessible parking spaces may be distributed among parking lots, if greater accessibility is achieved.*

*EXCEPTION:  This does not apply to parking provided for official government vehicles owned or leased by the government and used exclusively for government purposes.*

(b) *If passenger loading zones are provided, then at least one passenger loading zone shall comply with 4.6.5.*

(c) *Parking spaces for side lift vans are accessible parking spaces and may be used to meet the requirements of this paragraph.*

(d) *Parking spaces at accessible housing complying with 4.6 shall be provided in accordance with the following:*

(i) *Where parking is provided for all residents, one accessible parking space shall be provided for each accessible dwelling unit; and*

(ii) *Where parking is provided for only a portion of the residents, an accessible parking space shall be provided on request of the occupant of an accessible dwelling unit;*

(iii) *Where parking is provided for visitors, 2 percent of the spaces, or at least one, shall be accessible.*

(e) *Parking spaces at health care facilities complying with 4.6 shall be provided in accordance with the following:*

(i) *General health care facilities, employee and visitor parking:  Comply with Table 4.1.1(5)(a);*

(ii) *Outpatient facilities:  10 percent of the total number of parking spaces provided;*

(iii) *Spinal cord injury facilities, employee and visitor parking: 20 percent of total parking spaces provided.*

(6) *If toilet facilities are provided on a site, then each such public or common use toilet facility shall comply with 4.22.  If bathing facilities are provided on a site, then each such public or common use bathing facility shall comply with 4.23.*

*EXCEPTION:  These provisions are not mandatory for single user portable toilet or bathing units clustered at a single location; however, at least one toilet unit complying with 4.22 or one bathing unit complying with 4.23 should be installed at each location whenever standard units are provided.*

**(7) All signs shall comply with 4.30.1, 4.30.2 and 4.30.3. Elements and spaces of accessible facilities which shall comply with 4.30.5 and shall be identified by the International Symbol of Accessibility are:**

(a) *Parking spaces designated as reserved for physically handicapped people;*
(b) *passenger loading zones;*
(c) *accessible entrances;*
(d) *accessible toilet and bathing facilities.*

**4.1.2 Accessible Buildings:** *New Construction.* Accessible buildings and facilities shall meet the following minimum requirements:

(1) At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility.

(2) All objects that overhang circulation paths shall comply with 4.4.

(3) Ground and floor surfaces along accessible routes and in accessible rooms and spaces shall comply with 4.5.

(4) Stairs connecting levels that are not connected by an elevator shall comply with 4.9.

(5) One passenger elevator complying with 4.10 shall serve each level in all multi-story buildings and facilities. If more than one elevator is provided, each elevator shall comply with 4.10.

5

149

Subpt. 101–19.6, App. A                41 CFR Ch. 101 (7–1–97 Edition)

### 4.1.2 Accessible Buildings: New Construction

*EXCEPTION: Elevator pits, elevator penthouses, mechanical rooms, piping or equipment catwalks are excepted from this requirement.*

*EXCEPTION: Accessible ramps complying with 4.8 or, if no other alternative is feasible, accessible platform lifts complying with 4.11 may be used in lieu of an elevator.*

(6) Windows. *(Reserved).*

(7) Doors:

(a) *At each accessible entrance to a building or facility, at least one door shall comply with 4.13.*

(b) *Within a building or facility, at least one door at each accessible space shall comply with 4.13.*

(c) *Each door that is an element of an accessible route shall comply with 4.13.*

(d) *Each door required by 4.3.10, Egress, shall comply with 4.13.*

*EXCEPTION: In multiple-story buildings and facilities where at-grade egress from each floor is impossible, either of the following is permitted: the provision within each story of approved fire and smoke partitions that create horizontal exits, or, the provision within each floor of areas of refuge approved by agencies having authority for safety.*

(8) *At least one principal entrance at each grade floor level to a building or facility shall comply with 4.14, Entrances. When a building or facility has entrances which normally serve any of the following functions: transportation facilities, passenger loading zones, accessible parking facilities, taxi stands, public streets and sidewalks, or accessible interior vertical access, then at least one of the entrances serving each such function shall comply with 4.14, Entrances. Because entrances also serve as emergency exits, whose proximity to all parts of buildings and facilities is essential, it is preferable that all or most exits be accessible.*

(9) *If drinking fountains or water coolers are provided, approximately 50 percent of those provided on each floor shall comply with 4.15 and shall be on an accessible route. If only one drinking fountain or water cooler is provided on any floor, it shall comply with 4.15.*

(10) *If toilet facilities are provided, then each public and common use toilet room shall comply with 4.22. Other toilet rooms shall be adaptable. If bathing facilities are provided, then each public and common use bathroom shall comply with 4.23. Accessible toilet rooms and bathing facilities shall be on an accessible route.*

(11) *If storage facilities such as cabinets, shelves, closets, and drawers are provided in accessible spaces, at least one of each type provided shall contain storage space complying with 4.25. Additional storage may be provided outside of the dimensions shown in Fig. 38.*

(12) Controls and operating mechanisms in accessible spaces, along accessible routes, or as parts of accessible elements (for example, light switches and dispenser controls) shall comply with 4.27.

(13) *If emergency warning systems are provided, then they shall include both audible alarms complying with 4.28.2 and visual alarms complying with 4.28.3. In facilities with sleeping accommodations, the sleeping accommodations shall have an alarm system complying with 4.28.4. Emergency warning systems in health care facilities may be modified to suit standard health care alarm design practice.*

(14) Tactile warnings shall be provided at hazardous conditions as specified in 4.29.3.

**(15) If signs are provided, they shall comply with 4.30.1, 4.30.2 and 4.30.3. In addition, permanent signage that identifies rooms and spaces shall also comply with 4.30.4 and 4.30.6.**

*EXCEPTION: The provisions of 4.30.4 are not mandatory for temporary information on room and space signage, such as current occupant's name, provided the permanent room or space identification complies with 4.30.4.*

(16) Public telephones:

(a) *If public telephones are provided, then accessible public telephones shall comply with 4.31, Telephones, and the following table:*

| Number of public telephones provided on each floor: | Number of telephones required to be accessible:* |
|---|---|
| 1 or more single unit installations | 1 per floor |
| 1 bank** | 1 per floor |
| 2 or more banks** | 1 per bank. Accessible unit may be installed as a single unit in proximity (either visible or with signage) to the bank. At least one accessible telephone per floor shall meet the requirements for a forward reach telephone.*** |

*Additional public telephones may be installed at any height. Unless otherwise specified, accessible telephones may be either forward or side reach telephones.

**A bank consists of two or more adjacent public telephones, often installed as a unit.

6

150

Federal Property Management Regulations          Subpt. 101–19.6, App. A

***EXCEPTION: For exterior installations only, if dial tone first service is not available, then a side reach telephone may be installed instead of the required forward reach telephone (i.e., one telephone in proximity to each bank shall comply with 4.31).

(b) At least one of the public telephones complying with 4.31, Telephones, shall be equipped with a volume control. The installation of additional volume controls is encouraged, and these may be installed on any public telephone provided.

(17) If fixed or built-in seating, tables, or work surfaces are provided in accessible spaces, at least 5 percent, but always at least one, of seating spaces, tables, or work surfaces shall comply with 4.32.

(18) Assembly areas:

(a) If places of assembly are provided, they shall comply with the following table:

| Capacity of Seating & Assembly Areas | Number of Required Wheelchair Locations |
|---|---|
| 50 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1,000 | * |
| over 1,000 | ** |

* 2 percent of total.
** 20 plus 1 for each 100 over 1,000.

(b) Assembly areas with audio-amplification systems shall have a listening system complying with 4.33 to assist a reasonable number of people, but no fewer than two, with severe hearing loss. For assembly areas without amplification systems and for spaces used primarily as meeting and conference rooms, a permanently installed or portable listening system shall be provided. If portable systems are used for conference or meeting rooms, the system may serve more than one room.

4.1.3 Accessible Housing. Accessible housing shall comply with the requirements of 4.1 and 4.34 except as noted below:

(1) Elevators: Where provided, elevators shall comply with 4.10. Elevators or other accessible means of vertical movement are not required in residential facilities when:

(a) No accessible dwelling units are located above or below the accessible grade level; and

(b) At least one of each type of common area and amenity provided for use of residents and visitors is available at the accessible grade level.

(2) Entrances: Entrances complying with 4.14 shall be provided as necessary to achieve access to and egress from buildings and facilities.

EXCEPTION: In projects consisting of one-to-four family dwellings where accessible entrances would be extraordinarily costly due to site conditions or local code restrictions, accessible entrances are required only to those buildings containing accessible dwelling units.

(3) Common Areas: At least one of each type of common area and amenity in each project shall be accessible and shall be located on an accessible route to any accessible dwelling unit.

4.1.4 Occupancy Classifications. Buildings and facilities shall comply with these standards to the extent noted in this section for various occupancy classifications, unless otherwise modified by a special application section. Occupancy classifications, and the facilities covered under each category include, but are not necessarily limited to, the listing which follows:

(1) General Exceptions. Accessibility is not required to elevator pits, elevator penthouses, mechanical rooms, piping or equipment catwalks, lookout galleries, electrical and telephone closets, and general utility rooms.

(2) Military Exclusions. The following facilities need not be designed to be accessible, but accessibility is recommended since the intended use of the facility may change with time.

(a) Unaccompanied personnel housing, closed messes, vehicle and aircraft maintenance facilities, where all work is performed by able-bodied military personnel and, in general, all facilities which are intended for use or occupancy by able-bodied military personnel only.

(b) Those portions of Reserve and National Guard facilities which are designed and constructed primarily for use by able-bodied military personnel. This exclusion does not apply to those portions of a building or facility which may be open to the public or which may be used by the public during the conduct of normal business or which may be used by physically handicapped persons employed or seeking employment at such building or facility. These portions of the building or facility shall be accessible.

(c) Where the number of accessible spaces required is determined by the design capacity of a facility (such as parking or assembly areas), the number of able-bodied military persons used in determining the design capacity need not be counted when computing the number of accessible spaces required.

(3) Military Housing. In the case of military housing, which is primarily available for able-bodied military personnel and their dependents, at least 5

7

Plaintiff's Exhibit 4

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.1.4 Occupancy Classifications**

percent of the total but at least one unit (on an installation-by-installation basis) of all housing constructed will be designed and built to be either accessible or readily and easily modifiable to be accessible, but in any event, modification of individual units (including the making of adaptations), will be accomplished on a high priority basis when a requirement is identified. Common areas such as walks, streets, parking and play areas, and common entrances to multi-unit facilities shall be designed and built to be accessible.

**(4) Assembly.** Assembly occupancy includes, among others, the use of a building or structure, or a portion thereof, for the gathering together of persons for purposes such as civic, social or religious functions, recreation, food or drink consumption, or awaiting transportation. A room or space used for assembly purposes by less than fifty (50) persons and accessory to another occupancy shall be included as a part of that major occupancy. For purposes of these standards, assembly occupancies shall include the following:

| Facilities | Application |
|---|---|
| Amusement arcades | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |
| Amusement park structures | |
| Arenas | |
| Armories | |
| Art galleries | |
| Auditoriums | |
| Banquet halls | |
| Bleachers | |
| Bowling alleys | |
| Carnivals | |
| Churches | |
| Clubs | |
| Community halls | |
| Courtrooms (public areas) | |
| Dance halls | |
| Drive-in theaters | |
| Exhibition halls | |
| Fairs | |
| Funeral parlors | |
| Grandstands | |
| Gymnasiums | |
| Motion picture theaters | |
| Indoor & outdoor swimming pools | |
| Indoor & outdoor tennis courts | |
| Lecture halls | |
| Libraries* | |
| Museums | |
| Night clubs | |
| Passenger stations | |
| Pool & billiard halls | |
| Restaurants** | |
| Skating rinks | |

| Facilities | Application |
|---|---|
| Stadiums | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |
| Taverns & bars | |
| Television studios admitting audiences | |
| Theaters | |

*See Part 8 for special applications.
**See Part 5 for special applications.

**(5) Business.** Business occupancy includes, among others, the use of a building or structure, or a portion thereof, for office, professional or service type transactions, including storage of records and accounts.

| Facilities | Application |
|---|---|
| Animal hospitals, kennels, pounds | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |
| Automobile and other motor vehicle showrooms | |
| Banks | |
| Barber shops | |
| Beauty shops | |
| Car wash | |
| Civic administration | |
| Clinic, outpatient | |
| Dry cleaning | |
| Educational above 12th grade | |
| Electronic data processing | |
| Fire stations | |
| Florists & nurseries | |
| Laboratories: testing & research | |
| Laundries | |
| Motor vehicle service stations | |
| Police stations | |
| Post offices* | |
| Print shops | |
| Professional services: attorney, dentist, physician, engineer, etc. | |
| Radio & T.V. stations | |
| Telephone exchanges | |

*See Part 9 for special applications.

**(6) Educational.** Educational occupancy includes, among others, the use of a building or structure, or portion thereof, by six or more persons at any time for educational purposes through the 12th grade.

Schools for business or vocational training shall conform to the requirements of the trade, vocation or business taught.

8

152

Federal Property Management Regulations          Subpt. 101–19.6, App. A

### 4.1.4 Occupancy Classifications

| Facilities | Application |
|---|---|
| Academies<br>Kindergarten<br>Nursery schools<br>Schools | All areas shall comply. |

**(7) Factory Industrial.** *Factory industrial occupancy includes, among others, the use of a building or structure, or portion thereof, for assembling, disassembling, fabricating, finishing, manufacturing, packaging, processing or other operations that are not classified as a Hazardous Occupancy.*

| Facilities | Application |
|---|---|
| Aircraft<br>Appliances<br>Athletic equipment<br>Automobile and other<br>  motor vehicle<br>Bakeries<br>Beverages<br>Bicycles<br>Boats, building<br>Brick and masonry<br>Broom or brush<br>Business machines<br>Canvas or similar<br>Cameras and photo<br>  equipment<br>Carpets & rugs, including<br>  cleaning<br>Ceramic products<br>Clothing<br>Construction &<br>  agricultural machinery<br>Disinfectants<br>Dry cleaning & dyeing<br>Electronics<br>Engines, including<br>  rebuilding<br>Film, photographic<br>Food processing<br>Foundries<br>Furniture<br>Glass products<br>Gypsum<br>Hemp products<br>Ice<br>Jute products<br>Laundries<br>Leather products<br>Machinery<br>Metal<br>Motion pictures &<br>  television film<br>Musical instruments<br>Optical goods<br>Paper products<br>Plastic products | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |

| Facilities | Application |
|---|---|
| Printing or publishing<br>Recreational vehicles<br>Refuse incineration<br>Shoes<br>Soaps & detergents<br>Steel products:<br>  fabrication, assembly<br>Textiles<br>Tobacco<br>Trailers<br>Upholstering<br>Wood, distribution<br>Millwork<br>Woodworking, cabinet<br>Postal mail:<br>  processing facilities* | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |

*See Part 9 for special applications.

**(8) Hazardous.** *Hazardous occupancy includes, among others, the use of a building or structure, or a portion thereof, that involves the manufacturing, processing, generation or storage of corrosive, highly toxic, highly combustible, flammable or explosive materials that constitute a high fire or explosive hazard, including loose combustible fibers, dust and unstable materials.*

| Facilities | Application |
|---|---|
| Combustible dust<br>Combustible fibers<br>Combustible liquid<br>Corrosive liquids<br>Explosive material<br>Flammable gas<br>Flammable liquid<br>Liquified petroleum gas<br>Nitromethane<br>Oxidizing materials<br>Organic peroxide | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |

**(9) Institutional.** *Institutional occupancy includes, among others, the use of a building or structure, or any portion thereof, in which people have physical or medical treatment or care, or in which the liberty of the occupants is restricted. Institutional occupancies shall include the following subgroups:*

*(a) Institutional occupancies for the care of children, including:*

| Facilities | Application |
|---|---|
| Child care<br>  facilities | All public use, common use, or areas which may result in employment of physically handicapped persons. |

9

153

Subpt. 101–19.6, App. A          41 CFR Ch. 101 (7–1–97 Edition)

### 4.1.4 Occupancy Classifications

| | |
|---|---|
| (b) Institutional occupancies used for medical or other treatment or care of persons, some of whom are suffering from physical or mental illness, disease or infirmity, including: | |

| Facilities | Application |
|---|---|
| Long Term Care Facilities: (including Skilled Nursing Facilities, Intermediate Care Facilities, Bed & Care, and Nursing Homes). | At least 50 percent of patient toilets and bedrooms; all public use, common use or areas which may result in employment of physically handicapped persons. |
| Outpatient Facilities: | All patient toilets and bedrooms, all public use, common use, or areas which may result in employment of physically handicapped persons. |

Hospital*:

| Facilities | Application |
|---|---|
| General Purpose Hospital: | At least 10 percent of patient toilets and bedrooms, all public use, common use, or areas which may result in employment of physically handicapped persons. |
| Special Purpose Hospital: (Hospitals that treat conditions that affect mobility). | All patient toilets and bedrooms, all public use, common use, or areas which may result in employment of physically handicapped persons. |

* See Part 6 for special applications.

(c) Institutional occupancies where the occupants are under some degree of restraint or restriction for security reasons including:

| Facilities | Application |
|---|---|
| Jails Prisons Reformatories Other detention or correctional facilities | 5 percent of residential units available, or at least one unit, whichever is greater; all common use, visitor use, or areas which may result in employment of physically handicapped persons. |

(10) Mercantile*. Mercantile occupancy includes, among others, all buildings and structures or parts thereof, for the display and sale of merchandise, and involving stocks of goods, wares or merchandise incidental to such purposes and accessible to the public.

| Facilities | Application |
|---|---|
| Department stores Drug stores Markets Retail stores Shopping centers Sales rooms | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons. |

* See Part 7 for special applications.

(11) Residential. Residential occupancy includes, among others, the use of a building or structure, or portion thereof, for sleeping accommodations when not classed as an institutional occupancy. Residential occupancies shall comply with the requirements of 4.1 and 4.34 except as follows:

(a) Residential occupancies where the occupants are primarily transient in nature (less than 30 days) including:

| Facilities | Application |
|---|---|
| Hotels Motels Boarding houses | 5 percent of the total units, or at least one, whichever is greater, and all public use, common use, and areas which may result in employment of physically handicapped persons. |

(b) Residential occupancies in multiple dwellings where the occupants are primarily permanent in nature, including:

| Facilities | Application |
|---|---|
| Multifamily housing (Apartment houses): | |
| Federally assisted | 5 percent of the total, or at least one unit, whichever is greater, in projects of 15 or more dwelling units, or as determined by the appropriate Federal agency following a local needs assessment conducted by local government bodies or states under applicable regulations. |
| Federally owned | 5 percent of the total, or at least one unit, whichever is greater. |
| Dormitories | 5 percent of the total, or at least one unit, whichever is greater. |

10

Federal Property Management Regulations          Subpt. 101-19.6, App. A

**4.1.5 Accessible Buildings: Additions**

(c) Residential occupancies in one (1) and two (2) family dwellings where the occupancies are primarily permanent in nature and not classified as preceding residential categories or as institutional.

| Facilities | Application |
|---|---|
| One and two family dwelling: | |
| Federally assisted, rental | 5 percent of the total, or at least one unit, whichever is greater, in projects of 15 or more dwelling units, or as determined by the appropriate Federal agency following a local needs assessment conducted by local government bodies or states under applicable regulations. |
| Federally assisted, homeownership | To be determined by home buyer. |
| Federally owned | 5 percent of the total, or at least one unit, whichever is greater. |

**(12) Storage.** Storage occupancy includes, among others, the use of a building or structure, or portion thereof, for storage that is not classified as a Hazardous Occupancy.

| Facilities | Application |
|---|---|
| Metal desks | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons shall comply. |
| Electrical coils | |
| Electrical motors | |
| Dry cell batteries | |
| Metal parts | |
| Empty cans | |
| Stoves | |
| Washers & Dryers | |
| Metal cabinets | |
| Glass bottles with noncombustible liquid | |
| Mirrors | |
| Foods in noncombustible containers | |
| Frozen foods | |
| Meats | |
| Fresh fruits and vegetables | |
| Dairy products | |
| Beer or wine up to 12 percent alcohol | |
| Distribution transformers | |

| Facilities | Application |
|---|---|
| Cement in bags | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons shall comply. |
| Electrical insulators | |
| Gypsum board | |
| Inert pigments | |
| Dry insecticides | |

**(13) Utility and Miscellaneous.** Utility and miscellaneous occupancies include, among others, accessory buildings and structures, such as:

| Facilities | Application |
|---|---|
| Fences over 6 ft. high | All areas for which the intended use will require public access or which may result in employment of physically handicapped persons shall comply. |
| Tanks | |
| Cooling towers | |
| Retaining walls | |
| Buildings of less than 1,000 sq. ft. such as: | |
| Private garages | |
| Carports | |
| Sheds | |
| Agricultural buildings | |

**4.1.5 Accessible Buildings: Additions.** Each addition to an existing building shall comply with 4.1.1 to 4.1.4 of 4.1, Minimum Requirements, except as follows:

(1) **Entrances.** If a new addition to a building or facility does not have an entrance, then at least one entrance in the existing building or facility shall comply with 4.1.4, Entrances.

(2) **Accessible route.** If the only accessible entrance to the addition is located in the existing building or facility, then at least one accessible route shall comply with 4.3, Accessible Route, and shall provide access through the existing building or facility to all rooms, elements, and spaces in the new addition.

(3) **Toilet and bathing facilities.** If there are no toilet rooms and bathing facilities in the addition and these facilities are provided in the existing building, then at least one toilet and bathing facility in the existing building shall comply with 4.22, Toilet Rooms, or 4.23, Bathrooms, Bathing Facilities, and Shower Rooms.

(4) **Elements, spaces, and common areas.** If elements, spaces, or common areas are located in the existing building and they are not provided in the addition, then consideration should be given toward making those elements, spaces, and common areas accessible in the existing building.

11

Plaintiff's Exhibit 4                                          Page 12

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

### 4.1.5 Accessible Buildings: Additions

EXCEPTIONS: Mechanical rooms, storage areas, and other such minor additions which normally are not frequented by the public or employees of the facility are excepted from 4.1.5.

(5) Housing: (Reserved).

### 4.1.6 Accessible Buildings: Alterations.

(1) General. Alterations to existing buildings or facilities shall comply with the following:

(a) If existing elements, spaces, essential features, or common areas are altered, then each such altered element, space, feature, or area shall comply with the applicable provisions of 4.1.1 to 4.1.4 of 4.1, Minimum Requirements.

(b) If power-driven vertical access equipment (e.g., escalator) is planned or installed where none existed previously, or if new stairs (other than stairs installed to meet emergency exit requirements) requiring major structural changes are planned or installed where none existed previously, then a means of accessible vertical access shall be provided that complies with 4.7, Curb Ramps; 4.8, Ramps; 4.10, Elevators; or 4.11, Platform Lifts; except to the extent where it is structurally impracticable in transit facilities.

(c) If alterations of single elements, when considered together, amount to an alteration of a space of a building or facility, the entire space shall be made accessible.

(d) No alteration of an existing element, space, or area of a building shall impose a requirement for greater accessibility than that which would be required for new construction. For example, if the elevators and stairs in a building are being altered and the elevators are, in turn, being made accessible, then no accessibility modifications are required to the stairs connecting levels connected by the elevator.

(e) If the alteration work is limited solely to the electrical, mechanical, or plumbing system and does not involve the alteration of any elements and spaces required to be accessible under these standards, then 4.1.6(3) does not apply.

(f) No new accessibility alterations will be required of existing elements or spaces previously constructed or altered in compliance with earlier standards issued pursuant to the Architectural Barriers Act of 1968, as amended.

(g) Mechanical rooms and other spaces which normally are not frequented by the public or employees of the building or facility or which by nature of their use are not required by the Architectural Barriers Act to be accessible are excepted from the requirements of 4.1.6.

(2) Where a building or facility is vacated and it is totally altered, then it shall be altered to comply with

4.1.1 to 4.1.5 of 4.1, Minimum Requirements, except to the extent where it is structurally impracticable.

(3) Where substantial alteration occurs to a building or facility, then each element or space that is altered or added shall comply with the applicable provisions of 4.1.1 to 4.1.4 of 4.1, Minimum Requirements, except to the extent where it is structurally impracticable. The altered building or facility shall contain:

(a) At least one accessible route complying with 4.3, Accessible Route, and 4.1.6(a);

(b) At least one accessible entrance complying with 4.14, Entrances. If additional entrances are altered then they shall comply with 4.1.6(a); and

(c) The following toilet facilities, whichever is greater:

(i) At least one toilet facility for each sex in the altered building complying with 4.22, Toilet Rooms, and 4.23, Bathrooms, Bathing Facilities, and Shower Rooms.

(ii) At least one toilet facility for each sex on each substantially altered floor, where such facilities are provided, complying with 4.22, Toilet Rooms; and 4.23, Bathrooms, Bathing Facilities, and Shower Rooms.

(d) In making the determination as to what constitutes "substantial alteration," the agency issuing standards for the facility shall consider the total cost of all alterations (including but not limited to electrical, mechanical, plumbing, and structural changes) for a building or facility within any twelve (12) month period. For guidance in implementing this provision, an alteration to any building or facility is to be considered substantial if the total cost for this twelve month period amounts to 50 percent or more of the full and fair cash value of the building as defined in 3.5.

EXCEPTION: If the cost of the elements and spaces required by 4.1.6(3)(a), (b), or (c) exceeds 15 percent of the total cost of all other alterations, then a schedule may be established by the standard-setting and/or funding agency to provide the required improvements within a 5-year period.

EXCEPTION: Consideration shall be given to providing accessible elements and spaces in each altered building or facility complying with:

(i)    4.6, Parking and Passenger Loading Zones,
(ii)   4.15, Drinking Fountains and Water Coolers,
(iii)  4.25, Storage,
(iv)   4.28, Alarms,
(v)    4.31, Telephones,
(vi)   4.32, Seating, Tables, and Work Surfaces,
(vii)  4.33, Assembly Areas.

(4) Special technical provisions for alterations to existing buildings or facilities:

12

156

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

(a) *Ramps. Curb ramps and ramps to be con-structed on existing sites or in existing buildings or facilities may have slopes and rises as shown in Table 2 if space limitations prohibit the use of a 1:12 slope or less.*

**Table 2**
**Allowable Ramp Dimensions for Construction in Existing Sites, Buildings, and Facilities**

| Slope* | Maximum Rise | | Maximum Run | |
|---|---|---|---|---|
| | in | mm | ft | m |
| Steeper than 1:10 but no steeper than 1:8 | 3 | 75 | 2 | 0.6 |
| Steeper than 1:12 but no steeper than 1:10 | 6 | 150 | 5 | 1.5 |

*A slope steeper than 1:8 not allowed.

(b) *Stairs. Full extension of stair handrails shall not be required in alterations where such extensions would be hazardous or impossible due to plan configuration.*

(c) *Elevators.*

(i) *If a safety door edge is provided in existing automatic elevators, then the automatic door reopen-ing devices may be omitted (see 4.10.6).*

(ii) *Where existing shaft or structural elements prohibit strict compliance with 4.10.9, then the minimum floor area dimensions may be reduced by the minimum amount necessary, but in no case shall they be less than 48 in by 48 in (1220 mm by 1220 mm).*

(d) *Doors.*

(i) *Where existing elements prohibit strict com-pliance with the clearance requirements of 4.13.5, a projection of 5/8 in (16 mm) maximum will be per-mitted for the latch side door stop.*

(ii) *If existing thresholds measure 3/4 in (19 mm) high or less, and are beveled or modified to provide a beveled edge on each side, then they may be retained.*

(e) *Toilet rooms. Where alterations to existing facilities make strict compliance with 4.22 and 4.23 structurally impracticable, the addition of one "unisex" toilet per floor containing one water closet complying with 4.16 and one lavatory complying with 4.19, located adjacent to existing toilet facilities, will be acceptable in lieu of making existing toilet facilities for each sex accessible.*

EXCEPTION: *In instances of alteration work where provision of a standard stall (Fig. 30(a)) is structurally impracticable or where plumbing code requirements prevent combining existing stalls to provide space, an alternate stall (Fig. 30(b)) may be provided in lieu of the standard stall.*

(f) *Assembly areas.*

(i) *In alterations where it is structurally impractic-able to disperse seating throughout the assembly area, seating may be located in collected areas as structurally feasible. Seating shall adjoin an access-ible route that also serves as a means of emergency egress.*

(ii) *In alterations where it is structurally imprac-ticable to alter all performing areas to be on an accessible route, then at least one of each type shall be made accessible.*

(5) *Housing. (Reserved).*

**4.1.7 Accessible Buildings: Historic Preservation.**

(1) *Applicability.*

(a) *As a general rule, the accessibility provisions of part 4 shall be applied to "qualified" historic buildings and facilities. "Qualified" buildings or facilities are those buildings and facilities that are eligible for listing in the National Register of Historic Places, or such properties designated as historic under a statute of the appropriate state or local government body. Comments of the Advisory Council on Historic Preservation shall be obtained when required by Section 106 of the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 and 36 CFR Part 800, before any alteration to a qualified historic building.*

(b) *The Advisory Council shall determine, on a case-by-case basis, whether provisions required by part 4 for accessible routes (exterior and interior), ramps, entrances, toilets, parking, and displays and signage, would threaten or destroy the historic significance of the building or facility.*

(c) *If the Advisory Council determines that any of the accessibility requirements for features listed in 4.1.7(1) would threaten or destroy the historic significance of a building or facility, then the special application provisions of 4.1.7(2) for that fea-ture may be utilized. The special application pro-visions listed under 4.1.7(2) may only be utilized following a written determination by the Advisory Council that application of a requirement contained in part 4 would threaten or destroy the historic integrity of a qualified building or facility.*

Plaintiff's Exhibit 4

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.1.7 Accessible Buildings: Historic Preservation**

**(2) Historic Preservation: Minimum Requirements.**

(a) At least one accessible route complying with 4.3 from a site access point to an accessible entrance shall be provided.

EXCEPTION: A ramp with a slope no greater than 1:6 for a run not to exceed 2 ft (610 mm) may be used as part of an accessible route at an entrance.

(b) At least one accessible entrance which is used by the public complying with 4.14 shall be provided.

EXCEPTION: If it is determined that no entrance used by the public can comply with 4.14, then access at any entrance not used by the general public but open (unlocked) with directional signs at the primary entrance may be used.

(c) If toilets are provided, then at least one toilet facility complying with 4.22 and 4.1.6 shall be provided along an accessible route that complies with 4.3. Such toilet facility may be "unisex" in design.

(d) Accessible routes from an accessible entrance to all publicly used spaces on at least the level of the accessible entrance shall be provided. Access should be provided to all levels of a building or facility in compliance with 4.1 whenever practical.

(e) Displays and written information, documents, etc., should be located where they can be seen by a seated person. Exhibits and signage displayed horizontally, e.g., books, should be no higher than 44 in (1120 mm) above the floor surface.

**4.2 Space Allowance and Reach Ranges**

**4.2.1* Wheelchair Passage Width.** The minimum clear width for single wheelchair passage shall be 32 in (815 mm) at a point and 36 in (915 mm) continuously (see Fig. 1 and 24(e)).

**4.2.2 Width for Wheelchair Passing.** The minimum width for two wheelchairs to pass is 60 in (1525 mm) (see Fig. 2).

**4.2.3* Wheelchair Turning Space.** The space required for a wheelchair to make a 180-degree turn is a clear space of 60 in (1525 mm) diameter (see Fig. 3(a)) or a T-shaped space (see Fig. 3(b)).

**4.2.4* Clear Floor or Ground Space for Wheelchairs.**

**4.2.4.1 Size and Approach.** The minimum clear floor or ground space required to accommodate a single, stationary wheelchair occupant is 30 in by 48 in (760 mm by 1220 mm) (see Fig. 4(a)). The minimum clear floor or ground space for wheelchairs may be positioned for forward or parallel approach to an object



**Fig. 1**
**Minimum Clear Width**
**for Single Wheelchair**



**Fig. 2**
**Minimum Clear Width**
**for Two Wheelchairs**

14

158

Plaintiff's Exhibit 4                                              Page 15

Federal Property Management Regulations          Subpt. 101–19.6, App. A

4.3 Accessible Route



**(a)**
60-in (1525-mm)-Diameter Space

**(b)**
T-Shaped Space for 180° Turns

**Fig. 3**
**Wheelchair Turning Space**

(see Fig. 4(b) and (c)). Clear floor or ground space for wheelchairs may be part of the knee space required under some objects.

**4.2.4.2 Relationship of Maneuvering Clearance to Wheelchair Spaces.** One full unobstructed side of the clear floor or ground space for a wheelchair shall adjoin or overlap an accessible route or adjoin another wheelchair clear floor space. If a clear floor space is located in an alcove or otherwise confined on all or part of three sides, additional maneuvering clearances shall be provided as shown in Fig. 4(d) and (e).

**4.2.4.3 Surfaces for Wheelchair Spaces.** Clear floor or ground spaces for wheelchairs shall comply with 4.5.

**4.2.5 Forward Reach.** If the clear floor space only allows forward approach to an object, the maximum high forward reach allowed shall be 48 in (1220 mm) (see Fig. 5(a)). *The minimum low forward reach is 15 in (380 mm).* If the high forward reach is over an obstruction, reach and clearances shall be as shown in Fig. 5(b).

**4.2.6\* Side Reach.** If the clear floor space allows parallel approach by a person in a wheelchair, the maximum high side reach allowed shall be 54 in (1370 mm) and the low side reach shall be no less than 9 in (230 mm) above the floor (Fig. 6(a) and (b)).

If the side reach is over an obstruction, the reach and clearances shall be as shown in Fig. 6(c).

**4.3 Accessible Route.**

**4.3.1\* General.** All walks, halls, corridors, aisles, and other spaces that are part of an accessible route shall comply with 4.3.

**4.3.2 Location.**

(1) At least one accessible route *within the boundary of the site* shall be provided from public transportation stops, accessible parking, and accessible passenger loading zones, and public streets or sidewalks to the accessible building entrance they serve.

(2) At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site.

(3) At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility.

(4) An accessible route shall connect at least one accessible entrance of each accessible dwelling unit with those exterior and interior spaces and facilities that serve the accessible dwelling unit.

15

159

Subpt. 101–19.6, App. A                                    41 CFR Ch. 101 (7–1–97 Edition)

**4.3 Accessible Route**



NOTE: x ≤ 24 in (610 mm).

NOTE: x ≤ 15 in (380 mm).

**(d)**
Clear Floor Space in Alcoves

NOTE: If x > 24 in (610 mm), then additional maneuvering clearance of 6 in (150 mm) shall be provided as shown.

NOTE: If x > 15 in (380 mm), then an additional maneuvering clearance of 12 in (305 mm) shall be provided as shown.

**(e)**
Additional Maneuvering Clearances for Alcoves

**Fig. 4**
**Minimum Clear Floor Space for Wheelchairs**

16

160

Plaintiff's Exhibit 4                                                          Page 17

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.3 Accessible Route**



**(a)**
**High Forward Reach Limit**

NOTE: x shall be ≤ 25 in (635 mm); z shall be ≥ x. When x < 20 in (510 mm), then y shall be 48 in (1220 mm) maximum.
When x is 20 to 25 in (510 to 635 mm), then y shall be 44 in (1120 mm) maximum.

**(b)**
**Maximum Forward Reach over an Obstruction**

**Fig. 5**
**Forward Reach**

17

161

**4.3 Accessible Route**



**Fig. 6**
**Side Reach**

**4.3.3 Width.** The minimum clear width of an accessible route shall be 36 in (915 mm) except at doors (see 4.13.5). If a person in a wheelchair must make a turn around an obstruction, the minimum clear width of the accessible route shall be as shown in Fig. 7.

**4.3.4 Passing Space.** If an accessible route has less than 60 in (1525 mm) clear width, then passing spaces at least 60 in by 60 in (1525 mm by 1525 mm) shall be located at reasonable intervals not to exceed 200 ft (61 m). A T-intersection of two corridors or walks is an acceptable passing place.

**4.3.5 Head Room.** Accessible routes shall comply with 4.4.2.

**4.3.6 Surface Textures.** The surface of an accessible route shall comply with 4.5.

**4.3.7 Slope.** An accessible route with a running slope greater than 1:20 is a ramp and shall comply with 4.8. Nowhere shall the cross slope of an accessible route exceed 1:50.

18

Federal Property Management Regulations          Subpt. 101–19.6, App. A

4.3 Accessible Route



Fig. 7
Width of Accessible Route

**4.3.8 Changes in Levels.** Changes in levels along an accessible route shall comply with 4.5.2. If an accessible route has changes in level greater than 1/2 in (13 mm), then a curb ramp, ramp, elevator, or platform lift shall be provided that complies with 4.7, 4.8, 4.10, or 4.11, respectively. Stairs shall not be part of an accessible route.

**4.3.9 Doors.** Doors along an accessible route shall comply with 4.13.

**4.3.10° Egress.** Accessible routes serving any

accessible space or element shall also serve as a means of egress for emergencies or connect to an accessible place of refuge. Such accessible routes and places of refuge shall comply with the requirements of the administrative authority having jurisdiction. *Where fire code provisions require more than one means of egress from any space or room, then more than one accessible means of egress shall also be provided for handicapped people. Arrange egress so as to be readily accessible from all accessible rooms and spaces.*

19

163

### 4.4 Protruding Objects



**(a)**
**Walking Parallel to a Wall**

**(b)**
**Walking Perpendicular to a Wall**

**Fig. 8**
**Protruding Objects**

**4.4 Protruding Objects.**

**4.4.1\* General.** Objects projecting from walls (for example, telephones) with their leading edges between 27 in and 80 in (685 mm and 2030 mm) above the finished floor shall protrude no more than 4 in (100 mm) into walks, halls, corridors, passageways, or aisles (see Fig. 8(a)). Objects mounted with their leading edges at or below 27 in (685 mm) above the finished floor may protrude any amount (see Fig. 8(a) and (b)). Free-standing objects mounted on posts or pylons may overhang 12 in (305 mm) maximum from 27 in to 80 in (685 mm to 2030 mm) above the ground or finished floor (see Fig. 8(c) and (d)). Protruding objects shall not reduce the clear width of an accessible route or maneuvering space (see Fig. 8(e)).

**4.4.2 Head Room.** Walks, halls, corridors, passageways, aisles, or other circulation spaces shall have 80 in (2030 mm) minimum clear head room (see Fig. 8(a)). *If vertical clearance of an area adjoining an accessible route is reduced to less than 80 in (nominal dimension), a barrier to warn blind or visually-impaired persons shall be provided (see Fig. 8(c)).*

20

164

Federal Property Management Regulations                Subpt. 101–19.6, App. A



4.4 Protruding Objects

Fig. 8
Protruding Objects (Continued)

21

165

**4.4 Protruding Objects**



**(e)**
**Example of Protection around Wall-Mounted Objects and Measurements of Clear Widths**

**Fig. 8**
**Protruding Objects** *(Continued)*

**4.5 Ground and Floor Surfaces.**

**4.5.1\* General.** Ground and floor surfaces along accessible routes and in accessible rooms and spaces, including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, *slip-resistant*, and shall comply with 4.5.

**4.5.2 Changes in Level.** Changes in level up to 1/4 in (6 mm) may be vertical and without edge treatment *(see Fig. 7(c))*. Changes in level between 1/4 in and 1/2 in (6 mm and 13 mm) shall be beveled with a slope no greater than 1:2 *(see Fig. 7(d))*. Changes in level greater than 1/2 in (13 mm) shall be accomplished by means of a ramp that complies with 4.7 or 4.8.

**4.5.3\* Carpet.** If carpet or carpet tile is used on a ground or floor surface, then it shall be securely attached; have a firm cushion, pad, or backing or no cushion or pad; and have a level loop, textured loop, level cut pile, or level cut/uncut pile texture. The maximum pile height shall be 1/2 in (13 mm). Exposed edges of carpet shall be fastened to floor surfaces and have trim along the entire length of the exposed edge. Carpet edge trim shall comply with 4.5.2. *If carpet tile is used on an accessible ground or floor surface, it shall have a maximum combined thickness of pile, cushion, and backing height of 1/2 in (13 mm) (see Fig. 8(l)).*

**4.5.4 Gratings.** If gratings are located in walking surfaces, then they shall have spaces no greater than 1/2 in (13 mm) wide in one direction *(see Fig. 8(g))*. If gratings have elongated openings, then they shall be placed so that the long dimension is perpendicular to the dominant direction of travel *(see Fig. 8(h))*.

22

Plaintiff's Exhibit 4

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

**4.6 Parking and Passenger Loading Zones**



**4.6 Parking and Passenger Loading Zones.**

**4.6.1 Minimum Number.** *Parking spaces required to be accessible by 4.1 shall comply with 4.6.2 through 4.6.4. Passenger loading zones required to be accessible by 4.1 shall comply with 4.6.5 and 4.6.6.*

**4.6.2 Location.** Parking spaces for disabled people and accessible passenger loading zones that serve a particular building shall be *the spaces or zones located closest to the nearest accessible entrance on an accessible route.* In separate parking structures or lots that do not serve a particular building, parking spaces for disabled people shall be located on the shortest possible circulation route to an accessible pedestrian entrance of the parking facility.

**4.6.3* Parking Spaces.** Parking spaces for disabled people shall be at least 96 in (2440 mm) wide and shall have an adjacent access aisle 60 in (1525 mm) wide minimum (see Fig. 9). Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. Two accessible parking spaces may share a common access aisle. Parked vehicle overhangs shall not reduce the clear width of an accessible circulation route. *Parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 in all directions.*

EXCEPTION: If accessible parking spaces for vans designed for handicapped persons are provided, each should have an adjacent access aisle at least 96 in (2440 mm) wide complying with 4.5, Ground and Floor Surfaces.

**4.6.4* Signage.** Accessible parking spaces shall be designated as reserved for the disabled by a sign showing the symbol of accessibility (see 4.30.5). Such signs shall not be obscured by a vehicle parked in the space.

Fig. 8(f)
Carpet Tile Thickness

Fig. 8(g)
Gratings

Fig. 8(h)
Grating Orientation

Fig. 9
Dimensions of Parking Spaces

23

167

Plaintiff's Exhibit 4

### 4.6 Parking and Passenger Loading Zones



**Fig. 10**
**Access Aisle at Passenger Loading Zones**

**4.6.5 Passenger Loading Zones.** Passenger load-ing zones shall provide an access aisle at least 60 in (1525 mm) wide and 20 ft (6 m) long adjacent and parallel to the vehicle pull-up space (see Fig. 10). If there are curbs between the access aisle and the vehicle pull-up space, then a curb ramp complying with 4.7 shall be provided. Vehicle standing spaces and access aisles shall be level with surface slopes not exceeding 1:50 in all directions.

**4.6.6 Vertical Clearance.** *Provide minimum vertical clearances of 114 in at accessible passenger loading zones and along vehicle access routes to such areas from site entrances. If accessible van parking spaces are provided, then the minimum vertical clearance should be 114 in.*

### 4.7 Curb Ramps.

**4.7.1 Location.** Curb ramps complying with 4.7 shall be provided wherever an accessible route crosses a curb.

**4.7.2 Slope.** Slopes of curb ramps shall comply with 4.8.2. The slope shall be measured as shown in Fig. 11. *Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes. Maximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20.*

**Fig. 11**
**Measurement of Curb Ramp Slopes**

**Fig. 12**
**Sides of Curb Ramps**

24

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

4.8 Ramps

**4.7.3 Width.** The minimum width of a curb ramp shall be 36 in (915 mm), exclusive of flared sides.

**4.7.4 Surface.** Surfaces of curb ramps shall comply with 4.5.

**4.7.5 Sides of Curb Ramps.** If a curb ramp is located where pedestrians must walk across the ramp, *or where it is not protected by handrails or guardrails,* then it shall have flared sides; the maximum slope of the flare shall be 1:10 (see Fig. 12(a)). Curb ramps with returned curbs may be used where pedestrians would not normally walk across the ramp (see Fig. 12(b)).

**4.7.6 Built-up Curb Ramps.** Built-up curb ramps shall be located so that they do not project into vehicular traffic lanes (see Fig. 13).



**Fig. 13
Built-up Curb Ramp**

**4.7.7 Warning Textures.** *(Removed and reserved).*

**4.7.8 Obstructions.** Curb ramps shall be located or protected to prevent their obstruction by parked vehicles.

**4.7.9 Location at Marked Crossings.** Curb ramps at marked crossings shall be wholly contained within the markings, excluding any flared sides (see Fig. 15).

**4.7.10 Diagonal Curb Ramps.** If diagonal (or corner type) curb ramps have returned curbs or other well-defined edges, such edges shall be parallel to the direction of pedestrian flow. The bottom of diagonal curb ramps shall have 48 in (1220 mm) minimum clear space as shown in Fig. 15(c) and (d). If diagonal curb ramps are provided at marked crossings, the 48 in (1220 mm) clear space shall be within the markings (see Fig. 15(c) and (d)). If diagonal curb ramps have flared sides, they shall also have at least a 24 in (610 mm) long segment of straight curb located on each side of the curb ramp and within the marked crossing (see Fig. 15(c)).

**4.7.11 Islands.** Any raised islands in crossings shall be cut through level with the street or have curb ramps at both sides and a level area at least 48 in (1220 mm) long in the part of the island intersected by the crossings (see Fig. 15(a) and (b)).

**4.7.12 Uncurbed Intersections.** *(Removed and reserved).*

**4.8 Ramps.**

**4.8.1\* General.** Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp and shall comply with 4.8.

**4.8.2\* Slope and Rise.** The least possible slope shall be used for any ramp. The maximum slope of a ramp in new construction shall be 1:12. The maximum rise for any run shall be 30 in (760 mm) (see Fig. 16). Curb ramps and ramps to be constructed on existing sites or in existing buildings or facilities may have slopes and rises as shown in Table 2 if space limitations prohibit the use of a 1:12 slope or less *(see 4.1.6).*

**4.8.3 Clear Width.** The minimum clear width of a ramp shall be 36 in (915 mm).

**4.8.4 Landings.** Ramps shall have level landings at the bottom and top of each run. Landings shall have the following features:

(1) The landing shall be at least as wide as the ramp run leading to it.

(2) The landing length shall be a minimum of 60 in (1525 mm) clear.

(3) If ramps change direction at landings, the minimum landing size shall be 60 in by 60 in (1525 mm by 1525 mm).

(4) If a doorway is located at a landing, then the area in front of the doorway shall comply with 4.13.6.

**4.8.5\* Handrails.** If a ramp has a rise greater than 6 in (250 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides. Handrails are not required on curb ramps. Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be provided along both sides of ramp segments. The inside handrail on switchback or dogleg ramps shall always be continuous.

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface.

(3) The clear space between the handrail and the wall shall be 1-1/2 in (38 mm).

(4) Gripping surfaces shall be continuous.

(5) *Top of handrail gripping surfaces shall be mounted between 30 in and 34 in (760 mm and 865 mm) above ramp surfaces.*

(6) *Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.*

(7) *Handrails shall not rotate within their fittings.*

25

**4.8 Ramps**



**Fig. 15**
**Curb Ramps at Marked Crossings**

26

Plaintiff's Exhibit 4                                          Page 27

Federal Property Management Regulations      Subpt. 101–19.6, App. A

**4.9 Stairs**



**Fig. 16**
**Components of a Single Ramp Run and Sample Ramp Dimensions**

**4.8.6 Cross Slope and Surfaces.** The cross slope of ramp surfaces shall be no greater than 1:50. Ramp surfaces shall comply with 4.5.

**4.8.7 Edge Protection.** Ramps and landings with drop-offs shall have curbs, walls, railings, or projecting surfaces that prevent people from slipping off the ramp. Curbs shall be a minimum of 2 in (50 mm) high (see Fig. 17).

**4.8.8 Outdoor Conditions.** Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces.

**4.9 Stairs.**

**4.9.1 Minimum Number.** Stairs required to be accessible by 4.1 shall comply with 4.9.

**4.9.2 Treads and Risers.** On any given flight of stairs, all steps shall have uniform riser heights and uniform tread widths. Stair treads shall be no less than 11 in (280 mm) wide, measured from riser to riser (see Fig. 18(a)). Open risers are not permitted on accessible routes.

**4.9.3 Nosings.** The undersides of nosings shall not be abrupt. The radius of curvature at the leading edge of the tread shall be no greater than 1/2 in (13 mm). Risers shall be sloped or the underside of the nosing shall have an angle not less than 60 degrees from the horizontal. Nosings shall project no more than 1-1/2 in (38 mm) (see Fig. 18).

**4.9.4 Handrails.** Stairways shall have handrails at both sides of all stairs. Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be continuous along both sides of stairs. The inside handrail on switchback or dogleg stairs shall always be continuous (see Fig. 19(a) and (b)).

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top riser and at least 12 in (305 mm) plus the width of one tread beyond the bottom riser. At the top, the extension shall be parallel with the floor or ground surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal (see Fig. 19(c) and (d)). Handrail extensions shall comply with 4.4.

(3) The clear space between handrails and wall shall be 1-1/2 in (38 mm).

(4) Gripping surfaces shall be uninterrupted by newel posts, other construction elements, or obstructions.

(5) Top of handrail gripping surface shall be mounted between 30 in and 34 in (760 mm and 865 mm) above stair nosings.

(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.

(7) Handrails shall not rotate within their fittings.

**4.9.5 Tactile Warnings at Stairs.** (Removed and reserved).

**4.9.6 Outdoor Conditions.** Outdoor stairs and their approaches shall be designed so that water will not accumulate on walking surfaces.

27

171

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.9 Stairs**



Fig. 17
Examples of Edge Protection and Handrail Extensions

Fig. 18
Usable Tread Width and Examples of Acceptable Nosings

28

172

Federal Property Management Regulations        Subpt. 101–19.6, App. A

**4.9 Stairs**



(a)
Plan

(b)
Elevation of Center Handrail

(c)
Extension at Bottom of Run

(d)
Extension at Top of Run

*NOTE:*
*X is the 12 in minimum handrail extension required*
*at each top riser.*

*Y is the minimum handrail extension of 12 in plus the*
*width of one tread that is required at each bottom riser.*

**Fig. 19**
**Stair Handrails**

29

Plaintiff's Exhibit 4

## 4.10 Elevators

### 4.10 Elevators.

**4.10.1 General.** *Accessible* elevators shall be on an accessible route and shall comply with 4.10 and with the American National Standard Safety Code for Elevators, Dumbwaiters, Escalators, and Moving Walks, ANSI A17.1-1978 and A17.1a-1979. This standard does not preclude the use of residential or fully enclosed wheelchair lifts when appropriate and approved by administrative authorities. *Freight elevators shall not be considered as meeting the requirements of this section, unless the only elevators provided are used as combination passenger and freight elevators for the public and employees.*

**4.10.2 Automatic Operation.** Elevator operation shall be automatic. Each car shall be equipped with a self-leveling feature that will automatically bring the car to floor landings within a tolerance of 1/2 in (13 mm) under rated loading to zero loading conditions. This self-leveling feature shall be automatic and independent of the operating device and shall correct the over-travel or undertravel.

**4.10.3 Hall Call Buttons.** Call buttons in elevator lobbies and halls shall be centered at 42 in (1065 mm) above the floor. Such call buttons shall have visual signals to indicate when each call is registered and when each call is answered. Call buttons shall be a minimum of 3/4 in (19 mm) in the smallest dimension. The button designating the up direction shall be on top (see Fig. 20). *Buttons shall be raised or flush. Objects mounted beneath hall call buttons shall not project into the elevator lobby more than 4 in (100 mm).*

**4.10.4 Hall Lanterns.** A visible and audible signal shall be provided at each hoistway entrance to indicate which car is answering a call. Audible signals shall sound once for the up direction and twice for the down direction or shall have verbal annunciators that say "up" or "down." Visible signals shall have the following features:

(1) Hall lantern fixtures shall be mounted so that their centerline is at least 72 in (1830 mm) above the lobby floor.

(2) Visual elements shall be at least 2-1/2 in (64 mm) in the smallest dimension.

(3) Signals shall be visible from the vicinity of the hall call button. In-car lanterns located in cars, visible from the vicinity of hall call buttons, and conforming to the above requirements, shall be acceptable (see Fig. 20).

**4.10.5 *Raised* Characters on Hoistway Entrances.** All elevator hoistway entrances shall have raised floor designations provided on both jambs. The centerline of the characters shall be 60 in (1525 mm) from the floor. Such characters shall be 2 in (50 mm) high and shall comply with 4.30. Permanently applied plates are acceptable if they are permanently fixed to the jambs. (See Fig. 20).



NOTE: The automatic door reopening device is activated if an object passes through either line A or line B. Line A and line B represent the vertical locations of the door reopening device not requiring contact.

**Fig. 20
Hoistway and Elevator Entrances**

**4.10.6" Door Protective and Reopening Device.** Elevator doors shall open and close automatically. They shall be provided with a reopening device that will stop and reopen a car door and hoistway door automatically if the door becomes obstructed by an object or person. The device shall be capable of completing these operations without requiring contact for an obstruction passing through the opening at heights of 5 in and 29 in (125 mm and 735 mm) from the floor (see Fig. 20). Door reopening devices shall remain effective for at least 20 seconds. After such an interval, doors may close in accordance with the requirements of ANSI A17.1-1978 and A17.1a-1979.

**4.10.7" Door and Signal Timing for Hall Calls.** The minimum acceptable time from notification that a car is answering a call until the doors of that car start to close shall be calculated from the following equation:

$$T = \frac{D}{1.5 \, ft/s} \quad \text{or} \quad T = \frac{D}{445 \, mm/s}$$

where T = total time in seconds and D = distance (in feet or millimeters) from a point in the lobby or corridor 60 in (1525 mm) directly in front of the farthest

30

174

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.10 Elevators**

call button controlling that car to the centerline of its hoistway door (see Fig. 21). For cars with in-car lanterns, T begins when the lantern is visible from the vicinity of hall call buttons and an audible signal is sounded. *The minimum acceptable notification time shall be 5 seconds.*



**Fig. 21**
**Graph of Timing Equation**

**4.10.8 Door Delay for Car Calls.** The minimum time for elevator doors to remain fully open in response to a car call shall be 3 seconds.

**4.10.9 Floor Plan of Elevator Cars.** The floor area of elevator cars shall provide space for wheelchair users to enter the car, maneuver within reach of controls, and exit from the car. Acceptable door opening and inside dimensions shall be as shown in Fig. 22. The clearance between the car platform sill and the edge of any hoistway landing shall be no greater than 1-1/4 in (32 mm).

**4.10.10 Floor Surfaces.** Floor surfaces shall comply with 4.5.

**4.10.11 Illumination Levels.** The level of illumination at the car controls, platform, and car threshold and landing sill shall be at least 5 footcandles (53.8 lux).

**4.10.12* Car Controls.** Elevator control panels shall have the following features:

(1) Buttons. All control buttons shall be at least 3/4 in (19 mm) in their smallest dimension. They may be raised or flush.

(2) Tactile and Visual Control Indicators. All control buttons shall be designated by raised standard alphabet characters for letters, arabic characters for numerals, or standard symbols as shown in Fig. 23(a), and as required in ANSI A17.1-1978 and A17.1-1979. Raised characters and symbols shall comply with 4.30. The call button for the main entry floor shall be



**Fig. 22**
**Minimum Dimensions of Elevator Cars**

designated by a raised star at the left of the floor designation (see Fig. 23(a)). All *raised* designations for control buttons shall be placed immediately to the left of the button to which they apply. Applied plates, permanently attached, are an acceptable means to provide raised control designations. Floor buttons shall be provided with visual indicators to show when each call is registered. The visual indicators shall be extinguished when each call is answered.

(3) Height. All floor buttons shall be no higher than 48 in *(1220 mm), unless there is a substantial increase in cost, in which case the maximum mounting height may be increased to 54 in (1370 mm), above the floor. Emergency controls, including the emergency alarm and emergency stop, shall be grouped at the bottom of the panel and shall have their centerlines no less than 35 in (890 mm) above the floor (see Fig. 23(a) and (b)).*

31

175

Plaintiff's Exhibit 4                                    Page 32

### 4.10 Elevators



Fig. 23
Car Controls

(4) Location. Controls shall be located on a front wall if cars have center opening doors, and at the side wall or at the front wall next to the door if cars have side opening doors (see Fig. 23(c) and (d)).

**4.10.13° Car Position Indicators.** In elevator cars, a visual car position indicator shall be provided above the car control panel or over the door to show the position of the elevator in the hoistway. As the car passes or stops at a floor served by the elevators, the corresponding numerals shall illuminate, and an audible signal shall sound. Numerals shall be a minimum of 1/2 in (13 mm) high. The audible signal shall be no less than 20 decibels with a frequency no higher than

1500 Hz. An automatic verbal announcement of the floor number at which a car stops or which a car passes may be substituted for the audible signal.

**4.10.14° Emergency Communications.** If provided, emergency two-way communication systems between the elevator and a point outside the hoistway shall comply with ANSI A17.1-1978 and A17.1a-1979. The highest operable part of a two-way communication system shall be a maximum of 48 in (1220 mm) from the floor of the car. It shall be identified by a raised or recessed symbol and lettering complying with 4.30 and located adjacent to the device. If the system uses a handset, then the length of the cord from the panel to

32

176

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

**4.13 Doors**

the handset shall be at least 29 in (735 mm). *If the system is located in a closed compartment, the compartment door hardware shall conform to 4.27, Controls and Operating Mechanisms. The emergency intercommunication system shall not require voice communication.*

**4.11\* Platform Lifts.**

**4.11.1 Location.** *Platform lifts permitted by 4.1 shall comply with the requirements of 4.11.*

**4.11.2 Other Requirements.** If platform lifts are used, they shall comply with 4.2.4, 4.5, 4.27, and the applicable safety regulations of administrative authorities having jurisdiction.

**4.11.3 Entrance.** *If platform lifts are used, then they should facilitate unassisted entry and exit from the lift in compliance with 4.11.2.*

**4.12 Windows.** *(Reserved).*

**4.13 Doors.**

**4.13.1 General.** *Doors required to be accessible by 4.1 shall comply with the requirements of 4.13.*

**4.13.2 Revolving Doors and Turnstiles.** Revolving doors or turnstiles shall not be the only means of passage at an accessible entrance or along an accessible route. An accessible gate or door shall be provided adjacent to the turnstile or revolving door and shall be so designed as to facilitate the same use pattern.

**4.13.3 Gates.** Gates, including ticket gates, shall meet all applicable specifications of 4.13.

**4.13.4 Double-Leaf Doorways.** If doorways have two *independently operated* door leaves, then at least one leaf shall meet the specifications in 4.13.5 and 4.13.6. That leaf shall be an active leaf.

**4.13.5 Clear Width.** Doorways shall have a minimum clear opening of 32 in (815 mm) with the door open 90 degrees, measured between the face of the door and the stop (see Fig. 24(a), (b), (c), and (d)). Openings more than 24 in (610 mm) in depth shall comply with 4.2.1 and 4.3.3 (see Fig. 24(e)).

*EXCEPTION: Doors not requiring full user passage, such as shallow closets, may have the clear opening reduced to 20 in (510 mm) minimum.*



(a)
Detail

(b)
Hinged Door

(c)
Sliding Door

(d)
Folding Door

(e)
Maximum Doorway Depth

**Fig. 24**
**Clear Doorway Width and Depth**

33

177

**4.13 Doors**



(a)
Front Approaches — Swinging Doors

NOTE: x = 12 in (305 mm) if door has both a closer and latch.

NOTE: x = 36 in (915 mm) minimum if y = 60 in (1525 mm); x = 42 in (1065 mm) minimum if y = 54 in (1370 mm).

(b)
Hinge Side Approaches — Swinging Doors

NOTE: y = 48 in (1220 mm) minimum if door has both a latch and closer.

NOTE: y = 54 in (1370 mm) minimum if door has closer.

NOTE: y = 48 in (1220 mm) minimum if door has closer.

(c)
Latch Side Approaches — Swinging Doors

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

Fig. 25
Maneuvering Clearances at Doors

34

Plaintiff's Exhibit 4

Federal Property Management Regulations                Subpt. 101–19.6, App. A

**4.13 Doors**



(d) Front Approach — Sliding Doors and Folding Doors

(e) Slide Side Approach — Sliding Doors and Folding Doors

(f) Latch Side Approach — Sliding Doors and Folding Doors

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

**Fig. 25**
**Maneuvering Clearances at Doors** *(Continued)*



**Fig. 26**
**Two Hinged Doors in Series**

35

179

## 4.13 Doors

**4.13.6 Maneuvering Clearances at Doors.** Minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear. Entry doors to acute care hospital bedrooms for in-patients shall be exempted from the requirement for space at the latch side of the door (see dimension "x" in Fig. 25) if the door is at least 44 in (1120 mm) wide.

**4.13.7 Two Doors in Series.** The minimum space between two hinged or pivoted doors in series shall be 48 in (1220 mm) plus the width of any door swinging into the space. Doors in series shall swing either in the same direction or away from the space between the doors (see Fig. 26).

**4.13.8° Thresholds at Doorways.** Thresholds at doorways shall not exceed 3/4 in (19 mm) in height for exterior sliding doors or 1/2 in (13 mm) for other types of doors. Raised thresholds and floor level changes at accessible doorways shall be beveled with a slope no greater than 1:2 (see 4.5.2).

**4.13.9° Door Hardware.** Handles, pulls, latches, locks, and other operating devices on accessible doors shall have a shape that is easy to grasp with one hand and does not require tight grasping, tight pinching, or twisting of the wrist to operate. Lever-operated mechanisms, push-type mechanisms, and U-shaped handles are acceptable designs. When sliding doors are fully open, operating hardware shall be exposed and usable from both sides. In dwelling units, only doors at accessible entrances to the unit itself shall comply with the requirements of this paragraph. Doors to hazardous areas shall have hardware complying with 4.29.3. *Mount no hardware required for accessible door passage higher than 48 in (1220 mm) above finished floor.*

**4.13.10° Door Closers.** If a door has a closer, then the sweep period of the closer shall be adjusted so that from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 in (75 mm) from the latch, measured to the leading edge of the door.

**4.13.11° Door Opening Force.** The maximum force for pushing or pulling open a door shall be as follows:

(1) Fire doors shall have the minimum opening force allowable by the appropriate administrative authority.

(2) Other doors.

(a) exterior hinged doors: *(Reserved).*

(b) interior hinged doors: 5 lbf (22.2N)

(c) sliding or folding doors: 5 lbf (22.2N)

These forces do not apply to the force required to retract latch bolts or disengage other devices that may hold the door in a closed position.

**4.13.12° Automatic Doors and Power-Assisted Doors.** If an automatic door is used, then it shall comply with American National Standard for Power-Operated Doors, ANSI A156.10-1979. Slowly opening, low-powered, automatic doors shall be considered a type of custom design installation as described in paragraph 1.1.1 of ANSI A156.10-1979. Such doors shall not open to back check faster than 3 seconds and shall require no more than 15 lbf (66.6N) to stop door movement. If a power-assisted door is used, its door-opening force shall comply with 4.13.11 and its closing speed shall conform to the requirements in section 10 of ANSI A156.10-1979.

### 4.14 Entrances.

**4.14.1 Minimum Number.** *Entrances required to be accessible by 4.1* shall be part of an accessible route and shall comply with 4.3. Such entrances shall be connected by an accessible route to public transportation stops, to accessible parking and passenger loading zones, and to public streets or sidewalks if available (see 4.3.2(1)). They shall also be connected by an accessible route to all accessible spaces or elements within the building or facility.

**4.14.2 Service Entrances.** A service entrance shall not be the sole accessible entrance unless it is the only entrance to a building or facility (for example, in a factory or garage).

### 4.15 Drinking Fountains and Water Coolers.

**4.15.1 Minimum Number.** *Drinking fountains or water coolers required to be accessible by 4.1* shall comply with 4.15.

**4.15.2° Spout Height.** Spouts shall be no higher than 36 in (915 mm), measured from the floor or ground surfaces to the spout outlet (see Fig. 27(a)).

**4.15.3 Spout Location.** The spouts of drinking fountains and water coolers shall be at the front of the unit and shall direct the water flow in a trajectory that is parallel or nearly parallel to the front of the unit. The spout shall provide a flow of water at least 4 in (100 mm) high so as to allow the insertion of a cup or glass under the flow of water.

**4.15.4 Controls.** Controls shall comply with 4.27.4. *Unit controls shall be front mounted or side mounted near the front edge.*

**4.15.5 Clearances.**

(1) Wall- and post-mounted cantilevered units shall have a clear knee space between the bottom of the apron and the floor or ground at least 27 in (685 mm) high, 30 in (760 mm) wide, and 17 in to 19 in (430 mm to 485 mm) deep (see Fig. 27(a) and (b)). Such units shall also have a minimum clear floor space 30 in by 48 in (760 mm by 1220 mm) to allow a person in a wheelchair to approach the unit facing forward.

36

180

Federal Property Management Regulations                    Subpt. 101-19.6, App. A

(2) Free-standing or built-in units not having a clear space under them shall have a clear floor space at least 30 in by 48 in (760 mm by 1220 mm) that allows a person in a wheelchair to make a parallel approach to the unit (see Fig. 27(c) and (d)). This clear floor space shall comply with 4.2.4.

**4.16 Water Closets.**

**4.16.1 General.** Accessible water closets shall comply with 4.16. For water closets in *accessible dwelling units*, see 4.34.5.2.

**4.16.2 Clear Floor Space.** Clear floor space for water closets not in stalls shall comply with Fig. 28. Clear floor space may be arranged to allow either a left-handed or right-handed approach.

**4.16.3\* Height.** The height of water closets shall be 17 in to 19 in (430 mm to 485 mm), measured to the top of the toilet seat (see Fig. 29(b)). *Seats shall not be sprung to return to a lifted position.*

**4.16.4\* Grab Bars.** Grab bars for water closets not located in stalls shall comply with Fig. 29 and 4.26.



Fig. 27
Drinking Fountains and Water Coolers

37

181

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.16 Water Closets**



**4.16.5* Flush Controls.** Flush controls shall be hand operated or automatic and shall comply with 4.27. Controls for flush valves shall be mounted on the wide side of toilet areas no more than 44 in (1120 mm) above the floor.

**4.16.6 Dispensers.** Toilet paper dispensers shall be installed within reach, as shown in Fig. 29(b). Dispensers that control delivery, or that do not permit continuous paper flow, shall not be used.

**4.17 Toilet Stalls.**

**4.17.1 Location.** Accessible toilet stalls shall be on an accessible route and shall meet the requirements of 4.17.

**4.17.2 Water Closets.** Water closets in accessible stalls shall comply with 4.16.

**4.17.3 Size and Arrangement.** The size and arrangement of toilet stalls shall comply with Fig. 30(a). Toilet stalls with a minimum depth of 56 in (1420 mm) (see Fig. 30(a)) shall have wall-mounted water closets. If the depth of toilet stalls is increased at least 3 in (75 mm), then a floor-mounted water closet may be used. Arrangements shown for stalls may be reversed to allow either a left- or right-hand approach.

EXCEPTION: In instances of alteration work where provision of a standard stall (Fig. 30(a)) is structurally impracticable or where plumbing code requirements prevent combining existing stalls to provide space, an alternate stall (Fig. 30(b)) may be provided in lieu of the standard stall.

**4.17.4 Toe Clearances.** In standard stalls, the front partition and at least one side partition shall provide a toe clearance of at least 9 in (230 mm) above the floor. If the depth of the stall is greater than 60 in (1525 mm), then the toe clearance is not required.

38

182

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.17 Toilet Stalls**



Fig. 30
Toilet Stalls

183

## 4.17 Toilet Stalls

**4.17.5° Doors.** Toilet stall doors shall comply with 4.13. *If toilet stall approach is from the latch side of the stall door, clearance between the door side of the stall and any obstruction may be reduced to a minimum of 42 in (1065 mm).*

**4.17.6 Grab Bars.** Grab bars complying with the length and positioning shown in Fig. 30(a), (b), (c), and (d) shall be provided. Grab bars may be mounted with any desired method as long as they have a gripping surface at the locations shown and do not obstruct the required clear floor area. Grab bars shall comply with 4.26.

## 4.18 Urinals

**4.18.1 General.** Accessible urinals shall comply with 4.18.

**4.18.2 Height.** Urinals shall be stall-type or wall-hung with an elongated rim at a maximum of 17 in (430 mm) above the floor.

**4.18.3 Clear Floor Space.** A clear floor space 30 in by 48 in (760 mm by 1220 mm) shall be provided in front of urinals to allow forward approach. This clear space shall adjoin or overlap an accessible route and shall comply with 4.2.4. *Urinal shields that do not extend beyond the front edge of the urinal rim may be provided with 29 in (735 mm) clearance between them.*

**4.18.4 Flush Controls.** Flush controls shall be hand operated or automatic, and shall comply with 4.27.4, and shall be mounted no more than 44 in (1120 mm) above the floor.

## 4.19 Lavatories and Mirrors.

**4.19.1 General.** The requirements of 4.19 shall apply to lavatory fixtures, vanities, and built-in lavatories.

**4.19.2 Height and Clearances.** Lavatories shall be mounted with *the rim or counter surface no higher than 34 in (865 mm) above the finished floor. Pro-*vide a clearance of at least 29 in (735 mm) from the floor to the bottom of the apron. Knee and toe clearance shall comply with Fig. 31.

**4.19.3 Clear Floor Space.** A clear floor space 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 shall be provided in front of a lavatory to allow forward approach. Such clear floor space shall adjoin or overlap an accessible route and shall extend a maximum of 19 in (485 mm) underneath the lavatory (see Fig. 32).

**4.19.4 Exposed Pipes and Surfaces.** Hot water and drain pipes under lavatories shall be insulated or otherwise covered. There shall be no sharp or abrasive surfaces under lavatories.

**4.19.5 Faucets.** Faucets shall comply with 4.27.4. Lever-operated, push-type, and electronically controlled mechanisms are examples of acceptable designs. Self-closing valves are allowed if the faucet remains open for at least 10 seconds.

**4.19.6° Mirrors.** Mirrors shall be mounted with the bottom edge of *the reflecting surface* no higher than 40 in (1015 mm) from the floor (see Fig. 31).

## 4.20 Bathtubs.

**4.20.1 General.** Accessible bathtubs shall comply with 4.20. For bathtubs in *accessible* dwelling units, see 4.34.5.4.

**4.20.2 Floor Space.** Clear floor space in front of bathtubs shall be as shown in Fig. 33.

**4.20.3 Seat.** An in-tub seat or a seat at the head end of the tub shall be provided as shown in Fig. 33 and 34. The structural strength of seats and their attachments shall comply with 4.26.3. Seats shall be mounted securely and shall not slip during use.

**4.20.4 Grab Bars.** Grab bars complying with 4.26 shall be provided as shown in Fig. 33 and 34.



**Fig. 31**
**Lavatory Clearances**

**Fig. 32**
**Clear Floor Space at Lavatories**

40

Plaintiff's Exhibit 4      Page 41

Federal Property Management Regulations          Subpt. 101-19.6, App. A



4.20 Bathtubs

Fig. 33
Clear Floor Space at Bathtubs

Fig. 34
Grab Bars at Bathtubs

41

185

**4.20 Bathtubs**

**4.20.5 Controls.** Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 34.

**4.20.6 Shower Unit.** A shower spray unit with a hose at least 60 in (1525 mm) long that can be used as a fixed shower head or as a hand-held shower shall be provided.

**4.20.7 Bathtub Enclosures.** If provided, enclosures for bathtubs shall not obstruct controls or transfer from wheelchairs onto bathtub seats or into tubs. Enclosures on bathtubs shall not have tracks mounted on their rims.

**4.21 Shower Stalls.**

**4.21.1\* General.** Accessible shower stalls shall comply with 4.21. For shower stalls in *accessible* dwelling units, see 4.34.5.5.

**4.21.2 Size and Clearances.** Shower stall size and clear floor space shall comply with Fig. 35(a) or (b). The shower stall in Fig. 35(a) shall be 36 in by 36 in (915 mm by 915 mm). The shower stall in Fig. 35(b) will fit into the space required for a bathtub.

**4.21.3 Seat.** A seat shall be provided in shower stalls 36 in by 36 in (915 mm by 915 mm) and shall be as shown in Fig. 36. The seat shall be mounted 17 in to 19 in (430 mm to 485 mm) from the bathroom floor and shall extend the full depth of the stall. The seat shall be on the wall opposite the controls. The structural strength of seats and their attachments shall comply with 4.26.3.

**4.21.4 Grab Bars.** Grab bars complying with 4.26 shall be provided as shown in Fig. 37.

**4.21.5 Controls.** Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 37. In shower stalls 36 in by 36 in (915 mm by 915 mm), all controls, faucets, and the shower unit shall be mounted on the side wall opposite the seat.

**4.21.6 Shower Unit.** A shower spray unit with a hose at least 60 in (1525 mm) long that can be used as a fixed shower head or as a hand-held shower shall be provided.



**(a)**
36-in by 36-in
(915-mm by 915-mm) Stall

**(b)**
30-in by 60-in
(760-mm by 1525-mm) Stall

**Fig. 35
Shower Size and Clearances**

42

186

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.22  Toilet Rooms**



EXCEPTION: In unmonitored facilities where vandalism is a consideration, a fixed shower head mounted at 48 in (1220 mm) above the shower floor may be used in lieu of a hand-held shower head.

**4.21.7  Curbs.** If provided, curbs in shower stalls 36 in by 36 in (915 mm by 915 mm) shall be no higher than 1/2 in (13 mm). Shower stalls that are 30 in by 60 in (760 mm by 1525 mm) shall not have curbs.

**4.21.8  Shower Enclosures.** If provided, enclosures for shower stalls shall not obstruct controls or obstruct transfer from wheelchairs onto shower seats.

**4.22  Toilet Rooms.**

**4.22.1  Minimum Number.** Toilet facilities required to be accessible by 4.1 shall comply with 4.22. Accessible toilet rooms shall be on an accessible route.

**4.22.2  Doors.** All doors to accessible toilet rooms shall comply with 4.13. Doors shall not swing into the clear floor space required for any fixture.

**Fig. 36**
**Shower Seat Design**

(a)
36-in by 36-in (915-mm by 915-mm) Stall

(b)
30-in by 60-in (760-mm by 1525-mm) Stall
**Fig. 37**
**Grab Bars at Shower Stalls**

43

187

Plaintiff's Exhibit 4                                        Page 44

## 4.22 Toilet Rooms

**4.22.3 Clear Floor Space.** The accessible fixtures and controls required in 4.22.4, 4.22.5, 4.22.6, and 4.22.7 shall be on an accessible route. An unobstructed turning space complying with 4.2.3 shall be provided within an accessible toilet room. The clear floor space at fixtures and controls, the accessible route, and the turning space may overlap.

*EXCEPTION: In toilet rooms with only one water closet and one lavatory, a clear floor space of 30 in by 60 in (815 mm by 1525 mm) may be used in lieu of the unobstructed turning space.*

**4.22.4 Water Closets.** If toilet stalls are provided, then at least one shall comply with 4.17; its water closet shall comply with 4.16. If water closets are not in stalls, then at least one shall comply with 4.16.

**4.22.5 Urinals.** If urinals are provided, *then* at least one shall comply with 4.18.

**4.22.6 Lavatories and Mirrors.** If lavatories and mirrors are provided, *then* at least one of each shall comply with 4.19.

**4.22.7 Controls and Dispensers.** If controls, dispensers, receptacles, or other equipment is provided, then at least one of each shall be on an accessible route and shall comply with 4.27.

## 4.23 Bathrooms, Bathing Facilities, and Shower Rooms.

**4.23.1 Minimum Number.** Bathrooms, bathing facilities, or shower rooms *required to be accessible by 4.1* shall comply with 4.23 and shall be on an accessible route. For adaptable bathrooms in accessible dwelling units, see 4.34.5.

**4.23.2 Doors.** Doors to accessible bathrooms shall comply with 4.13. Doors shall not swing into the floor space required for any fixture.

**4.23.3 Clear Floor Space.** The accessible fixtures and controls required in 4.23.4, 4.23.5, 4.23.6, 4.23.7, 4.23.8, and 4.23.9 shall be on an accessible route. An unobstructed turning space complying with 4.2.3 shall be provided within an accessible bathroom. The clear floor spaces at fixtures and controls, the accessible route, and the turning space may overlap.

*EXCEPTION: In bathrooms with only one water closet, one lavatory, and one bathtub or shower, a clear floor space of 30 in by 60 in (760 mm by 1525 mm) may be used in lieu of the unobstructed turning space.*

**4.23.4 Water Closets.** If toilet stalls are provided, then at least one shall comply with 4.17; its water closet shall comply with 4.16. If water closets are not in stalls, then at least one shall comply with 4.16.

**4.23.5 Urinals.** If urinals are provided, then at least one shall comply with 4.18.

**4.23.6 Lavatories and Mirrors.** If lavatories and mirrors are provided, then at least one of each shall comply with 4.19.

**4.23.7 Controls and Dispensers.** If controls, dispensers, receptacles, or other equipment is provided, then at least one of each shall be on an accessible route and shall comply with 4.27.

**4.23.8 Bathing and Shower Facilities.** If tubs or showers are provided, then at least one accessible tub that complies with 4.20 or at least one accessible shower that complies with 4.21 shall be provided.

**4.23.9\* Medicine Cabinets.** If medicine cabinets are provided, at least one shall be located with a usable shelf no higher than 44 in (1120 mm) above the floor space. The floor space shall comply with 4.2.4.

## 4.24 Sinks.

**4.24.1 General.** *Sinks required to be accessible by 4.1* shall comply with 4.24. Sinks in kitchens of accessible dwelling units shall comply with 4.34.6.5.

**4.24.2 Height.** Sinks shall be mounted with the counter or rim no higher than 34 in (865 mm) from the floor.

**4.24.3 Knee Clearance.** Knee clearance that is *at least 27 in (685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep shall be provided underneath sinks.*

**4.24.4 Depth.** Each sink shall be a maximum of 6-1/2 in (165 mm) deep.

**4.24.5 Clear Floor Space.** A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 shall be provided in front of a sink to allow forward approach. The clear floor space shall be on an accessible route and shall extend a maximum of 19 in (485 mm) underneath the sink (see Fig. 32).

**4.24.6 Exposed Pipes and Surfaces.** Hot water and drain pipes exposed under sinks shall be insulated or otherwise covered. There shall be no sharp or abrasive surfaces under sinks.

**4.24.7 Faucets.** Faucets shall comply with 4.27.4. Lever-operated, push-type, touch-type, or electronically controlled mechanisms are acceptable designs.

## 4.25 Storage.

**4.25.1 General.** *Fixed storage facilities such as cabinets, shelves, closets, and drawers required to be accessible by 4.1* shall comply with 4.25.

**4.25.2 Clear Floor Space.** A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 that allows either a forward or parallel approach by a person using a wheelchair shall be provided at accessible storage facilities.

**4.25.3 Height.** Accessible storage spaces shall be within at least one of the reach ranges specified in 4.2.5 and 4.2.6. Clothes rods shall be a maximum of 54 in (1370 mm) from the floor (see Fig. 38).

**4.25.4 Hardware.** Hardware for accessible storage facilities shall comply with 4.27.4. Touch latches and U-shaped pulls are acceptable.

44

Plaintiff's Exhibit 4                    Page 45

Federal Property Management Regulations          Subpt. 101–19.6, App. A



**Fig. 38
Storage Shelves and Closets**

### 4.26 Handrails, Grab Bars, and Tub and Shower Seats.

**4.26.1\* General.** All handrails, grab bars, and tub and shower seats *required to be accessible by 4.1, 4.8, or 4.9* shall comply with 4.26

**4.26.2\* Size and Spacing of Grab Bars and Handrails.** The diameter or width of the gripping surfaces of a handrail or grab bar shall be 1-1/4 in to 1-1/2 in (32 mm to 38 mm), or the shape shall provide an equivalent gripping surface. If handrails or grab bars are mounted adjacent to a wall, the space between the wall and the grab bar shall be 1-1/2 in (38 mm) (see Fig. 39(a), (b), and (c)). Handrails may be located in a recess if the recess is a maximum of 3 in (75 mm) deep and extends at least 18 in (455 mm) above the top of the rail (see Fig. 39(d)).

**4.26.3 Structural Strength.** The structural strength of grab bars, tub and shower seats, fasteners, and mounting devices shall meet the following specification:

(1) Bending stress in a grab bar or seat induced by the maximum bending moment from the application of 250 lbf (1112N) shall be less than the allowable stress for the material of the grab bar or seat.

(2) Shear stress induced in a grab bar or seat by the application of 250 lbf (1112N) shall be less than the allowable shear stress for the material of the grab bar or seat. If the connection between the grab bar or seat and its mounting bracket or other support is considered to be fully restrained, then direct and torsional shear stresses shall be totaled for the combined shear stress, which shall not exceed the allowable shear stress.

(3) Shear force induced in a fastener or mounting device from the application of 250 lbf (1112N) shall be less than the allowable lateral load of either the fastener or mounting device or the supporting structure, whichever is the smaller allowable load.

(4) Tensile force induced in a fastener by a direct tension force of 250 lbf (1112N) plus the maximum moment from the application of 250 lbf (1112N) shall be less than the allowable withdrawal and the supporting structure.

(5) Grab bars shall not rotate within their fittings.

**4.26.4 Eliminating Hazards.** A handrail or grab bar and any wall or other surface adjacent to it shall be free of any sharp or abrasive elements. Edges shall have a minimum radius of 1/8 in (3.2 mm).

### 4.27 Controls and Operating Mechanisms.

**4.27.1 General.** Controls and operating mechanisms *required to be accessible by 4.1* shall comply with 4.27.

**4.27.2 Clear Floor Space.** Clear floor space complying with 4.2.4 that allows a forward or a parallel approach by a person using a wheelchair shall be provided at controls, dispensers, receptacles, and other operable equipment.

**4.27.3\* Height.** The highest operable part of all controls, dispensers, receptacles, and other operable equipment shall be placed within at least one of the reach ranges specified in 4.2.5 and 4.2.6. Except where the use of special equipment dictates otherwise, electrical and communications system receptacles on walls shall be mounted no less than 15 in (380 mm) above the floor.

**4.27.4 Operation.** Controls and operating mechanisms shall be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate controls shall be no greater than 5 lbf (22.2 N).

### 4.28 Alarms.

**4.28.1 General.** *Alarm systems required to be accessible by 4.1* shall comply with 4.28.

**4.28.2\* Audible Alarms.** If provided, audible emergency alarms shall produce a sound that exceeds the prevailing equivalent sound level in the room or space by at least 15 decibels or exceeds any maximum sound level with a duration of 30 seconds by 5 decibels, whichever is louder. Sound levels for alarm signals shall not exceed 120 decibels.

**4.28.3\* Visual Alarms.** If provided, electrically powered internally illuminated emergency exit signs shall flash as a visual emergency alarm in conjunction with audible emergency alarms. The flashing frequency of visual alarm devices shall be less than 5 Hz. If such alarms use electricity from the building as a power source, then they shall be installed on the same system as the audible emergency alarms.

45

189

**4.28 Alarms**



(a)
Handrail

(b)
Handrail

(c)
Handrail

(e)
Grab Bar

(d)
Handrail

**Fig. 39
Size and Spacing of Handrails and Grab Bars**

EXCEPTIONS:

(1) Visual alarm devices that are mounted adjacent to emergency exit signs may be used in lieu of flashing exit signs.

(2) Specialized systems utilizing advanced technology may be substituted for the visual systems specified above if equivalent protection is afforded handicapped users of the building or facility.

**4.28.4\* Auxiliary Alarms.** Accessible sleeping accommodations shall have a visual alarm connected to the building emergency alarm system or shall have a standard 110-volt electrical receptacle into which such an alarm could be connected. Instructions for use of the auxiliary alarm or connection shall be provided.

**4.29 Tactile Warnings.**

**4.29.1 General.** Tactile warnings required to be accessible by 4.1 shall comply with 4.29.

**4.29.2\* Tactile Warnings on Walking Surfaces.** (Reserved).

46

190

Plaintiff's Exhibit 4                                             Page 47

Federal Property Management Regulations      Subpt. 101–19.6, App. A

**4.31 Telephones**

**4.29.3\* Tactile Warnings on Doors to Hazardous Areas.** Doors that lead to areas that might prove dangerous to a blind person (for example, doors to loading platforms, boiler rooms, stages, and the like) shall be made identifiable to the touch by a textured surface on the door handle, knob, pull, or other operating hardware. This textured surface may be made by knurling or roughing or by a material applied to the contact surface. Such textured surfaces shall not be provided for emergency exit doors or any doors other than those to hazardous areas.

**4.29.4 Tactile Warnings at Stairs.** *(Reserved).*

**4.29.5\* Tactile Warnings at Hazardous Vehicular Areas.** *(Reserved).*

**4.29.6\* Tactile Warnings at Reflecting Pools.** *(Reserved).*

**4.29.7\* Standardization.** Textured surfaces for tactile *door* warnings shall be standard within a building, facility, site, or complex of buildings.

**4.30 Signage.**

**4.30.1\* General.** *Signage shall comply with 4.30 as specified in 4.1.*

**4.30.2\* Character Proportion.** Letters and numbers on signs shall have a width-to-height ratio between 3:5 and 1:1 and a stroke width-to-height ratio between 1:5 and 1:10.

**4.30.3\* Color Contrast.** Characters and symbols shall contrast with their background — either light characters on a dark background or dark characters on a light background.

**4.30.4\* Raised Characters or Symbols.** Letters and numbers on signs shall be raised 1/32 in (0.8 mm) minimum and shall be sans serif characters. Raised characters or symbols shall be at least 5/8 in (16 mm) high, but no higher than 2 in (50 mm). Symbols or pictographs on signs shall be raised 1/32 in (0.8 mm) minimum.

**4.30.5 Symbols of Accessibility.** Accessible facilities *required to be identified by 4.1, shall* use the international symbol of accessibility. The symbol shall be displayed as shown in Fig. 43.

**4.30.6** *Mounting Location and Height. Interior signage shall be located alongside the door on the latch side and shall be mounted at a height of between 54 in and 66 in (1370 mm and 1675 mm) above the finished floor.*

**4.31 Telephones.**

**4.31.1 General.** *Public telephones required to be accessible by 4.1 shall comply with 4.31.*

**4.31.2 Clear Floor or Ground Space.** A clear floor or ground space at least 30 in by 48 in (760 mm by 1220 mm) that allows either a forward or parallel approach by a person using a wheelchair shall be provided at telephones (see Fig. 44). The clear floor or



(a)
Proportions



(b)
Display Conditions

**Fig. 43**
**International Symbol of Accessibility**

ground space shall comply with 4.2.4. Bases, enclosures, and fixed seats shall not impede approaches to telephones by people who use wheelchairs.

**4.31.3\* Mounting Height.** The highest operable part of the telephone shall be within the reach ranges specified in 4.2.5 or 4.2.6.

**4.31.4** *Protruding Objects. Telephones shall comply with 4.4.*

**4.31.5\* Equipment for Hearing Impaired People.** Telephones shall be equipped with a receiver that generates a magnetic field in the area of the receiver cap. *Volume controls shall be provided in accordance with 4.1.2.*

**4.31.6 Controls.** Telephones shall have pushbutton controls where service for such equipment is available.

**4.31.7 Telephone Books.** Telephone books, if provided, shall be located *in a position that complies with the reach ranges specified in 4.2.5 and 4.2.6.*

47

191

### 4.31 Telephones



**Fig. 44**
**Mounting Heights and Clearances for Telephones**

**4.31.8 Cord Length.** The cord from the telephone to the handset shall be at least 29 in (735 mm) long.

**4.32 Seating, Tables, and Work Surfaces.**

**4.32.1 Minimum Number.** Fixed or built-in seating, tables, or work surfaces required to be accessible by 4.1 shall comply with 4.32.

**4.32.2 Seating.** If seating spaces for people in wheelchairs are provided at tables, counters, or work surfaces, clear floor space complying with 4.2.4 shall be provided. Such clear floor space shall not overlap knee space by more than 19 in (485 mm) (see Fig. 45).

**4.32.3 Knee Clearances.** If seating for people in wheelchairs is provided at tables, counters, and work surfaces, knee spaces at least 27 in (685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep shall be provided (see Fig. 45).

48

192

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

4.34 Dwelling Units



accessible path of travel

**Fig. 45**
**Minimum Clearances for Seating and Tables**

**4.32.4° Height of Work Surfaces.** The tops of tables and work surfaces shall be from 28 in to 34 in (710 mm to 865 mm) from the floor or ground.

**4.33 Assembly Areas.**

**4.33.1 Minimum Number.** *Assembly and associated areas required to be accessible by 4.1 shall comply with 4.33.*

**4.33.2° Size of Wheelchair Locations.** Each wheelchair location shall provide minimum clear ground or floor spaces as shown in Fig. 46.

**4.33.3° Placement of Wheelchair Locations.** Wheelchair areas shall be an integral part of any fixed seating plan and shall be dispersed throughout the seating area. They shall adjoin an accessible route that also serves as a means of egress in case of emergency and shall be located to provide lines of sight comparable to those for all viewing areas.

*EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.*

**4.33.4 Surfaces.** The ground or floor at wheelchair locations shall be level and shall comply with 4.5.

**4.33.5 Access to Performing Areas.** An accessible route shall connect wheelchair seating locations with performing areas, including stages, arena floors, dressing rooms, locker rooms, and other spaces used by performers.

**4.33.6° Placement of Listening Systems.** If the listening system provided serves individual fixed seats, then such seats shall be located within a 50 ft (15 m) viewing distance of the stage or playing area and shall have a complete view of the stage or playing area.

**4.33.7° Types of Listening Systems.** Audio loops and radio frequency systems are two acceptable types of listening systems.

**4.34 Dwelling Units.**

**4.34.1 General.** The requirements of 4.34 apply to dwelling units *required to be accessible by 4.1.*

**4.34.2° Minimum Requirements.** An accessible dwelling unit shall be on an accessible route. An accessible dwelling unit shall have the following accessible elements and spaces as a minimum:

(1) Common spaces and facilities serving individual accessible dwelling units (for example, entry walks, trash disposal facilities, and mail boxes) shall comply with 4.2 through 4.33.

49

193

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.34 Dwelling Units**



(a)
Forward or Rear Access

(b)
Side Access

**Fig. 46**
**Space Requirements for Wheelchair**
**Seating Spaces in Series**

(2) Accessible spaces shall have maneuvering space complying with 4.2.2 and 4.2.3 and surfaces complying with 4.5.

(3) At least one accessible route complying with 4.3 shall connect the accessible entrances with all accessible spaces and elements within the dwelling units.

(4) See 4.1.1(5)(d) — Parking.

(5) Removed and reserved.

(6) Doors to and in accessible spaces that are intended for passage shall comply with 4.13, except that the provisions of 4.13.9 apply only to the doors at accessible entrances to the unit itself.

(7) At least one accessible entrance to the dwelling unit shall comply with 4.14.

(8) Storage in accessible spaces in dwelling units, including cabinets, shelves, closets, and drawers, shall comply with 4.25.

(9) All controls in accessible spaces shall comply with 4.27. Those portions of heating, ventilating, and airconditioning equipment requiring regular, periodic maintenance and adjustment by the resident of a dwelling shall be accessible to people in wheelchairs. If air distribution registers must be placed in or close to ceilings for proper air circulation, this specification shall not apply to the registers.

(10) Emergency alarms as required by 4.1 and complying with 4.28.4 shall be provided in the dwelling unit.

(11) Removed and reserved.

(12) At least one full bathroom shall comply with 4.34.5. A full bathroom shall include a water closet, a lavatory, and a bathtub or a shower.

(13) The kitchen shall comply with 4.34.6.

(14) If laundry facilities are provided, they shall comply with 4.34.7.

(15) The following spaces shall be accessible and shall be on an accessible route:

(a) The living area.

(b) The dining area.

(c) The sleeping area, or the bedroom in one bedroom dwelling units, or at least two bedrooms or sleeping spaces in dwelling units with two or more bedrooms.

(d) Patios, terraces, balconies, carports, and garages, if provided with the dwelling unit.

**4.34.3 Adaptability.** The specifications for 4.34.5 and 4.34.6 include the concept of adaptability. Accessible dwelling units may be designed for either permanent accessibility or adaptability.

**4.34.4 Consumer Information.** To ensure that the existence of adaptable features will be known to the owner or occupant of a dwelling, the following con-

50

194

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.34 Dwelling Units**

sumer information shall be provided in each *adaptable dwelling unit available for occupancy:*

(1) Notification of the alternate heights available for the kitchen counter and sink, and the existence of removable cabinets and bases, if provided, under counters, sinks, and lavatories.

(2) Notification of the provisions for the installation of grab bars at toilets, bathtubs, and showers.

(3) Notification that the dwelling unit is equipped to have a visual emergency alarm installed.

(4) Identification of the location where information and instructions are available for changing the height of counters, removing cabinets and bases, installing a visual emergency alarm system, and installing grab bars.

(5) Notification that the dwelling unit has been designed in accordance with this *Uniform Federal Accessibility Standards.*

In addition, the *parties who will be responsible for making adaptations* shall be provided with the following information:

(1) Instructions for adjusting the kitchen counter and sink heights and for removing cabinets.

(2) A scale drawing showing methods and locations for the installation of grab bars.

(3) A scale drawing showing the location of adjustable or replaceable counter areas and removable cabinets.

(4) Identification of the location of any equipment and parts required for adjusting or replacing counter tops, cabinets, and sinks.

(5) Instructions for installing a visual emergency alarm system, if the dwelling unit is equipped for such an installation.

**4.34.5° Bathrooms.** *Accessible or adaptable* bathrooms shall be on an accessible route and shall comply with the requirements of 4.34.5.

**4.34.5.1 Doors.** Doors shall not swing into the clear floor space required for any fixture.

**4.34.5.2 Water Closets.**

(1) Clear floor space at the water closet shall be as shown in Fig. 47(a). The water closet may be located with the clear area at either the right or left side of the toilet.

(2) The height of the water closet shall be at least 15 in (380 mm), *and no more than 19 in (485 mm),* measured to the top of the toilet seat.

(3) Structural reinforcement or other provisions that will allow installation of grab bars shall be provided in the locations shown in Fig. 47(b). If provided, grab bars shall be installed as shown in Fig. 29 and shall comply with 4.26.

(4) The toilet paper dispenser shall be installed within reach as shown in Fig. 47(b).

**4.34.5.3 Lavatory, Mirrors, and Medicine Cabinets.**

(1) The lavatory and mirrors shall comply with 4.22.6.

(2) If a cabinet is provided under the lavatory in adaptable bathrooms, then it shall be removable to provide the clearances specified in 4.22.6.

(3) If a medicine cabinet is provided above the lavatory, then the bottom of the medicine cabinet shall be located with a usable shelf no higher than 44 in (1120 mm) above the floor.

**4.34.5.4 Bathtubs.** If a bathtub is provided, then it shall have the following features:

(1) Floor space. Clear floor space at bathtubs shall be as shown in Fig. 33.

(2) Seat. An in-tub seat or a seat at the head end of the tub shall be provided as shown in Fig. 33 and 34. The structural strength of seats and their attachments shall comply with 4.26.3. Seats shall be mounted securely and shall not slip during use.

(3) Grab bars. Structural reinforcement or other provisions that will allow installation of grab bars shall be provided in the locations shown in Fig. 48. If provided, grab bars shall be installed as shown in Fig. 34 and shall comply with 4.26.

(4) Controls. Faucets and other controls shall be located as shown in Fig. 34 and shall comply with 4.27.4.

(5) Shower unit. A shower spray unit with a hose at least 60 in (1525 mm) long that can be used as a fixed shower head or as a hand-held shower shall be provided.

**4.34.5.5 Showers.** If a shower is provided, it shall have the following features:

(1) Size and clearances. Shower stall size and clear floor space shall comply with either Fig. 35(a) or (b). The shower stall in Fig. 35(a) shall be 36 in by 36 in (915 mm by 915 mm). The shower stall in Fig. 35(b) will fit into the same space as a standard 60 in (1525 mm) long bathtub.

(2) Seat. A seat shall be provided in the shower stall in Fig. 35(a) as shown in Fig. 36. The seat shall be 17 in to 19 in (430 mm to 485 mm) high measured from the bathroom floor and shall extend the full depth of the stall. The seat shall be on the wall opposite the controls. The structural strength of seats and their attachments shall comply with 4.26.3. Seats shall be mounted securely and shall not slip during use.

(3) Grab bars. Structural reinforcement or other provisions that will allow installation of grab bars shall be provided in the locations shown in Fig. 49. If provided, grab bars shall be installed as shown in Fig. 37 and shall comply with 4.26.

51

Plaintiff's Exhibit 4

Subpt. 101–19.6, App. A                41 CFR Ch. 101 (7–1–97 Edition)

**4.34 Dwelling Units**



(a)
Clear Floor Space for Adaptable Bathrooms

NOTE: The hatched areas are reinforced to receive grab bars.

(b)
Reinforced Areas for Installation of Grab Bars

**Fig. 47**
**Water Closets in Adaptable Bathrooms**

52

196

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**4.34 Dwelling Units**



NOTE: The hatched areas are reinforced to receive grab bars.

**Fig. 48**
**Location of Grab Bars and Controls of Adaptable Bathtubs**

(4) Controls. Faucets and other controls shall be located as shown in Fig. 37 and shall comply with 4.27.4. In the shower stall in Fig. 35(a), all controls, faucets, and the shower unit shall be mounted on the side wall opposite the seat.

(5) Shower unit. A shower spray unit with a hose at least 60 in (1525 mm) long that can be used as a fixed shower head at various heights or as a hand-held shower shall be provided.

**4.34.5.6 Bathtub and Shower Enclosures.** Enclosures for bathtubs or shower stalls shall not obstruct controls or transfer from wheelchairs onto shower or bathtub seats. Enclosures on bathtubs shall not have tracks mounted on their rims.

**4.34.5.7 Clear Floor Space.** Clear floor space at fixtures may overlap.

**4.34.6 Kitchens.** *Accessible or adaptable* kitchens and their components shall be on an accessible route and shall comply with the requirements of 4.34.6.

**4.34.6.1° Clearance.** Clearances between all opposing base cabinets, counter tops, appliances, or walls shall be 40 in (1015 mm) minimum, except in U-shaped kitchens, where such clearance shall be 60 in (1525 mm) minimum.

**4.34.6.2 Clear Floor Space.** A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 that allows either a forward or a parallel approach by a person in a wheelchair shall be provided at all appliances in the kitchen, including the range or cooktop, oven, refrigerator/freezer, dishwasher, and trash compactor. Laundry equipment located in the kitchen shall comply with 4.34.7.

53

Plaintiff's Exhibit 4                                    Page 54

**4.34 Dwelling Units**



(a)
36-in by 36-in (915-mm by 915-mm) Stall

(b)
30-in by 60-in (750-mm by 1525-mm) Stall
NOTE: The hatched areas are reinforced to receive grab bars.
**Fig. 49**
**Location of Grab Bars and Controls of Adaptable Showers**

(a)
Before Removal of Cabinets and Base

(b)
Cabinets and Base Removed and Height Alternatives
**Fig. 50**
**Counter Work Surface**

54

198

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

**4.34 Dwelling Units**

**4.34.6.3 Controls.** All controls in kitchens shall comply with 4.27.

**4.34.6.4 Work Surfaces.** At least one 30 in (760 mm) section of counter shall provide a work surface that complies with the following requirements (see Fig. 50):

(1) The counter shall be *mounted at a maximum height of 34 in (865 mm) above the floor, measured from the floor to the top of the counter surface, or shall be adjustable or replaceable as a unit to provide alternative heights of 28 in, 32 in, and 36 in (710 mm, 815 mm, and 915 mm), measured from the top of the counter surface.*

(2) Base cabinets, if provided, shall be removable under the full 30 in (760 mm) minimum frontage of the counter. The finished floor shall extend under the counter to the wall.

(3) Counter thickness and supporting structure shall be 2 in (50 mm) maximum over the required clear area.

(4) A clear floor space 30 in by 48 in (760 mm by 1220 mm) shall allow a forward approach to the counter. Nineteen inches (485 mm) maximum of the clear floor space may extend underneath the counter. The knee space shall have a minimum clear width of 30 in (760 mm) and a minimum clear depth of 19 in (485 mm).

(5) There shall be no sharp or abrasive surfaces under such counters.

**4.34.6.5\* Sink.** The sink and surrounding counter shall comply with the following requirements (see Fig. 51):

(1) The sink and surrounding counter shall be *mounted at a maximum height of 34 in (865 mm) above the floor, measured from the floor to the top of the counter surface, or shall be adjustable or replaceable as a unit to provide alternative heights of 28 in, 32 in, and 36 in (710 mm, 815 mm, and 915 mm),* measured from the floor to the top of the counter surface or sink rim. The total width of sink and counter area shall be 30 in (760 mm).

(2) Rough-in plumbing shall be located to accept connections of supply and drain pipes for sinks mounted at the height of 28 in (710 mm).

(3) The depth of a sink bowl shall be no greater than 6-1/2 in (165 mm). Only one bowl of double- or triple-bowl sinks needs to meet this requirement.

(4) Faucets shall comply with 4:27.4. Lever-operated or push-type mechanisms are two acceptable designs.

(5) Base cabinets, if provided, shall be removable under the full 30 in (760 mm) minimum frontage of the sink and surrounding counter. The finished flooring shall extend under the counter to the wall.



**(a)**
**Before Removal of Cabinets and Base**

**(b)**
**Cabinets and Base Removed
and Height Alternatives**
**Fig. 51
Kitchen Sink**

(6) Counter thickness and supporting structure shall be 2 in (50 mm) maximum over the required clear space.

(7) A clear floor space 30 in by 48 in (760 mm by 1220 mm) shall allow forward approach to the sink. Nineteen inches (485 mm) maximum of the clear floor space may extend underneath the sink. The knee space shall have a clear width of 30 in (760 mm) and a clear depth of 19 in (485 mm).

(8) There shall be no sharp or abrasive surfaces under sinks. Hot water and drain pipes under sinks shall be insulated or otherwise covered.

**4.34.6.6\* Ranges and Cooktops.** Ranges and cooktops shall comply with 4.34.6.2 and 4.34.6.3. If ovens or cooktops have knee spaces underneath, then they shall be insulated or otherwise protected on the exposed contact surfaces to prevent burns, abrasions, or electrical shock. The clear floor space may overlap the knee space, if provided, by 19 in (485 mm) maximum. The location of controls for ranges and cooktops shall not require reaching across burners.

55

199

## 4.34 Dwelling Units

**4.34.6.7* Ovens.** Ovens shall comply with 4.34.6.2 and 4.34.6.3. Ovens shall be of the self-cleaning type or be located adjacent to an adjustable height counter with knee space below (see Fig. 52). For side-opening ovens, the door latch side shall be next to the open counter space, and there shall be a pull-out shelf under the oven extending the full width of the oven and pulling out not less than 10 in (255 mm) when fully extended. Ovens shall have controls on front panels; they may be located on either side of the door.

**4.34.6.8* Refrigerator/Freezers.** Refrigerator/ freezers shall comply with 4.34.6.3. *Provision shall be made for refrigerators which are:*

(1) Of the vertical side-by-side refrigerator/freezer type; or

(2) Of the over-and-under type and meet the following requirements:

(a) Have at least 50 percent of the freezer space below 54 in (1370 mm) above the floor.

(b) Have 100 percent of the refrigerator space and controls below 54 in (1370 mm).

Freezers with less than 100 percent of the storage volume within the limits specified in 4.2.5 or 4.2.6 shall be the self-defrosting type.

**4.34.6.9 Dishwashers.** Dishwashers shall comply with 4.34.6.2 and 4.34.6.3. Dishwashers shall have all rack space accessible from the front of the machine for loading and unloading dishes.

**4.34.6.10* Kitchen Storage.** Cabinets, drawers, and shelf areas shall comply with 4.25 and shall have the following features:

(1) Maximum height shall be 48 in (1220 mm) for at least one shelf of all cabinets and storage shelves mounted above work counters (see Fig. 50).

(2) Door pulls or handles for wall cabinets shall be mounted as close to the bottom of cabinet doors as possible. Door pulls or handles for base cabinets shall be mounted as close to the top of cabinet doors as possible.

**4.34.7 Laundry Facilities.** If laundry equipment is provided within individual accessible dwelling units, or if separate laundry facilities serve one or more accessible dwelling units, then they shall meet the requirements of 4.34.7.1 through 4.34.7.3.

**4.34.7.1 Location.** Laundry facilities and laundry equipment shall be on an accessible route.

**4.34.7.2 Washing Machines and Clothes Dryers.** Washing machines and clothes dryers in common use laundry rooms shall be front loading.

**4.34.7.3 Controls.** Laundry equipment shall comply with 4.27.





(a)
Side-Hinged Door

(b)
Bottom-Hinged Door

SYMBOL KEY:
1. Countertop or wall-mounted oven.
2. Pull-out board preferred with side-opening door.
3. Clear open space.
4. Bottom-hinged door.

**Fig. 52**
**Ovens without Self-Cleaning Feature**



**Fig. 53**
**Food Service Lines**

56

Plaintiff's Exhibit 4                                                    Page 57

Federal Property Management Regulations          Subpt. 101–19.6, App. A

7.0 Mercantile

## 5. RESTAURANTS AND CAFETERIAS.

**5.1 General.** In addition to the requirements of 4.1 to 4.33, the design of at least 5 percent of all fixed seating or tables in a restaurant or cafeteria shall comply with 4.32. Access aisles between tables shall comply with 4.3. Where practical, accessible tables should be distributed throughout the space or facility. In restaurants or cafeterias where there are mezzanine levels, loggias, or raised platforms, accessibility to all such spaces is not required providing that the same services and decorative character are provided in spaces located on accessible routes.

**5.2 Food Service Lines.** Food service lines shall have a minimum clear width of 36 in (915 mm), with a preferred clear width of 42 in (1065 mm) where passage of stopped wheelchairs by pedestrians is desired. Tray slides shall be mounted no higher than 34 in (865 mm) above the floor. If self-service shelves are provided, a reasonable portion must be within the ranges shown in Fig. 53.

**5.3 Tableware Areas.** Install tableware, dishware, condiment, food and beverage display shelves, and dispensing devices in compliance with 4.2 (see Fig. 54).

**5.4 Vending Machines.** Install vending machines in compliance with 4.27.

## 6. HEALTH CARE.

**6.1 General.** In addition to the requirements of 4.1 to 4.33, Health Care buildings and facilities shall comply with 6.

**6.2 Entrances.** At least one accessible entrance that complies with 4.14 shall be protected from the

weather by canopy or roof overhang. Such entrances shall incorporate a passenger loading zone that complies with 4.6.5 (see 4.13.6).

**6.3 Patient Bedrooms.** Provide accessible patient bedrooms in compliance with 4. Accessible patient bedrooms shall comply with the following:

(1) Each bedroom shall have a turning space that complies with 4.2.3. and preferably that is located near the entrance.

(2) Each one-bed room shall have a minimum clear floor space of 36 in (915 mm) along each side of the bed, and 42 in (1065 mm) between the foot of the bed and the wall.

(3) Each two-bed room shall have a minimum clear floor space of 42 in (1065 mm), preferably 48 in (1220 mm), between the foot of the bed and the wall; 36 in (915 mm) between the side of the bed and the wall; and 48 in (1220 mm) between beds.

(4) Each four-bed room shall have a minimum clear floor space of 48 in (1220 mm) from the foot of the bed to the foot of the opposing bed; 36 in (915 mm) between the side of the bed and the wall; and 48 in (1220 mm) between beds.

(5) Each bedroom shall have a door that complies with 4.13.

**6.4 Patient Toilet Rooms.** Provide each patient bedroom that is required to be accessible with an accessible toilet room that complies with 4.22 or 4.23.

## 7. MERCANTILE.

**7.1 General.** In addition to the requirements of 4.1 to 4.33, the design of all areas used for business transactions with the public shall comply with 7.

**7.2 Service Counters.** Where service counters exceeding 36 in (915 mm) in height are provided for standing sales or distribution of goods to the public, an auxiliary counter or a portion of the main counter shall be provided with a maximum height of between 28 in to 34 in (710 mm to 865 mm) above the floor in compliance with 4.32.4.

**7.3 Check-Out Aisles.** At least one accessible check-out aisle shall be provided in buildings or facilities with check-out aisles. Clear aisle width shall comply with 4.2.1 and maximum adjoining counter height shall not exceed 36 in (915 mm) above the floor.

**7.4 Security Bollards.** Any device used to prevent the removal of shopping carts from store premises shall not prevent access or egress to those in wheelchairs. An alternate entry that is equally convenient to that provided for the ambulatory population is acceptable.



**Fig. 54**
**Tableware Areas**

54 max 1370

57

201

**8.0 Libraries**



**Fig. 55**
**Card Catalog**



**Fig. 56**
**Stacks**

## 8. | LIBRARIES.

**8.1 General.** In addition to the requirements of 4.1 to 4.33, the design of all public areas of a library shall comply with 8, including reading and study areas, stacks, reference rooms, reserve areas, and special facilities or collections. As provided, elements such as public toilet rooms, telephones, and parking shall be accessible.

**8.2 Reading and Study Areas.** At least 5 percent or a minimum of one of each element of fixed seating, tables, or study carrels shall comply with 4.2 and 4.32. Clearances between fixed accessible tables and study carrels shall comply with 4.3.

**8.3 Check-Out Areas.** At least one lane at each check-out area shall comply with 4.32. Any traffic control or book security gates or turnstiles shall comply with 4.13.

**8.4 Card Catalogs.** Minimum clear aisle space at card catalogs, magazine displays, or reference stacks shall comply with Fig. 55. Maximum reach height shall comply with 4.2, with a height of 48 in (1220 mm) preferred, irrespective of reach allowed.

**8.5 Stacks.** Minimum clear aisle width between stacks shall comply with 4.3, with a minimum clear aisle width of 42 in (1065 mm) preferred where possible. Shelf height in stack areas is unrestricted (see Fig. 56).

## 9. | POSTAL FACILITIES.

**9.1 General.** In addition to the requirements of 4.1 to 4.33, the design of U.S. postal facilities shall comply with the requirements of 9. In addition, employee toilet rooms, water fountains, lunchrooms, lounges, attendance-recording equipment, medical treatment rooms, emergency signals, and switches and controls shall be made accessible or adaptable in accordance with the requirements of these standards.

**9.2* Post Office Lobbies.** Where writing desks or tables are provided, a minimum of at least one writing desk or table that complies with 4.32 must be provided. Clear passageways in front of customer service counters shall be not less than 48 in (1220 mm) clear width to permit maneuvering of a wheelchair. Letter drops shall be mounted at heights that comply with 4.2.

(1) All fixed partitions must be installed to withstand a 250-pound force applied at any point and from any direction. Avoid designs that call for, or may necessitate, non-fixed partitions in circulation routes of handicapped people.

(2) Walls where handrails are provided for handicapped people must be capable of supporting handrails designed to support a 250-pound pull force in any direction.

58

Plaintiff's Exhibit 4

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**9.0 Postal Facilities**

**9.3 Self-Service Postal Centers.** *Parcel post depositories, stamp vending machines, multi-commodity vending machines, and currency-coin changing machines shall be installed so that the operating mechanisms of all machines comply with 4.2 and 4.27. All mechanisms must be installed to permit close parallel approach by a wheelchair user.*

**9.4 Post Office Boxes.** *At least 5 percent of the post office boxes in a facility shall be accessible to wheelchair users. The total number of accessible post office boxes provided shall include a representative number of each of the standard USPS boxes currently being installed. Accessible post office boxes shall be located in the second or third set of modules from the floor, approximately 12 in to 36 in (305 mm to 915 mm) above the finished floor. Aisles between post office boxes shall be a minimum of 66 in (1675 mm) clear width.*

**9.5 Locker Rooms.** *Lockers in easily accessible areas must be provided for use by handicapped*

*people. When double-tier lockers are used, only the bottom row of lockers may be assigned for use by wheelchair users. When full length lockers are used, all hooks, shelves, etc., intended for use by people in wheelchairs shall be located no higher than 48 in (1220 mm) above the finished floor. Lockers intended for use by handicapped people shall be equipped with latches and latch handles that comply with 4.27. Unobstructed aisle space in front of lockers used by handicapped people shall be a minimum of 42 in (1065 mm) clear width.*

**9.6 Attendance-Recording Equipment.** *Time clocks, card racks, log books, and other work assignment or attendance-recording equipment used by people in wheelchairs must be installed at a height no more than 48 in (1220 mm) above the finished floor. Counter space at check-in areas must be no more than 36 in (915 mm) above the finished floor.*

59

203

**Appendix**

## APPENDIX

This appendix contains additional information that should help the designer to understand the minimum requirements of the standard or to design buildings or facilities for greater accessibility. The paragraph numbers correspond to the sections or paragraphs of the standard to which the material relates and are therefore not consecutive (for example, A4.2.1 contains additional information relevant to 4.2.1). Sections for which additional material appears in this appendix have been indicated by an asterisk.

### A4.2 Space Allowances and Reach Ranges.

#### A4.2.1 Wheelchair Passage Width.

(1) Space Requirements for Wheelchairs. Most wheelchair users need a 30 in (760 mm) clear opening width for doorways, gates, and the like, when the latter are entered head-on. If the wheelchair user is unfamiliar with a building, if competing traffic is heavy, if sudden or frequent movements are needed, or if the wheelchair must be turned at an opening, then greater clear widths are needed. For most situations, the addition of an inch of leeway on either side is sufficient. Thus, a minimum clear width of 32 in (815 mm) will provide adequate clearance. However, when an opening or a restriction in a passageway is more than 24 in (610 mm) long, it is essentially a passageway and must be at least 36 in (915 mm) wide.

(2) Space Requirements for Use of Walking Aids. Although people who use walking aids can maneuver through clear width openings of 32 in (815 mm), they need 36 in (915 mm) wide passageways and walks for comfortable gaits. Crutch tips, often extending down at a wide angle, are a hazard in narrow passageways where they might not be seen by other pedestrians. Thus, the 36 in (915 mm) width provides a safety allowance both for the disabled person and for others.

(3) Space Requirements for Passing. Able-bodied people in winter clothing, walking straight ahead with arms swinging, need 32 in (815 mm) of width, which includes 2 in (50 mm) on either side for sway, and another 1 in (25 mm) tolerance on either side for clearing nearby objects or other pedestrians. Almost all wheelchair users and those who use walking aids can also manage within this 32 in (815 mm) width for short distances. Thus, two streams of traffic can pass in 64 in (1625 mm) in a comfortable flow. Sixty inches (1525 mm) provide a minimum width for a somewhat more restricted flow. If the clear width is less than 60 in (1525 mm), two wheelchair users will not be able to pass but will have to seek a wider place for passing. Forty-eight inches (1220 mm) is the minimum width needed for an ambulatory person to pass a nonambulatory or semiambulatory person. Within this 48 in (1220 mm) width, the ambulatory person will have to twist to pass a wheelchair user, a person with a



**Fig. A1**
**Minimum Passage Width for One Wheelchair and One Ambulatory Person**

seeing eye dog, or a semiambulatory person. There will be little leeway for swaying or missteps (see Fig. A1).

#### A4.2.3 Wheelchair Turning Space. This standard specifies a minimum space of 60 in (1525 mm) diameter for a pivoting 180-degree turn of a wheelchair. This space is usually satisfactory for turning around, but many people will not be able to turn without repeated tries and bumping into surrounding objects. The space shown in Fig. A2 will allow most wheelchair users to complete U-turns without difficulty.

#### A4.2.4 Clear Floor or Ground Space for Wheelchairs. The wheelchair and user shown in Fig. A3 represent typical dimensions for a large adult male. The space requirements in this standard are based upon maneuvering clearances that will accommodate most larger wheelchairs. Fig. A3 provides a uniform reference for design not covered by this standard.

#### A4.2.5 & A4.2.6 Reach. *Reach ranges for persons seated in wheelchairs may be further clarified by Fig. A3(a). These drawings approximate in the plan view information shown in Fig. 4, 5, and 6 in other views.*

### A4.3 Accessible Route.

#### A4.3.1 General.

(1) Travel Distances. Many disabled people can move at only very slow speeds; for many, traveling 200 ft (61 m) could take about 2 minutes. This assumes a rate of about 1.5 ft/s (455 mm/s) on level ground. It also assumes that the traveler would move continuously. However, on trips over 100 ft (30 m), disabled people are apt to rest frequently, which substantially increases their trip times. Resting periods of 2 minutes for every 100 ft (30 m) can be used to estimate travel times for people with severely limited stamina. In

60

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

**A4.4 Protruding Objects**



**Fig. A2**
**Space Needed for Smooth U-Turn in a Wheelchair**

**Fig. A3**
**Dimensions of Adult-Sized Wheelchairs**

NOTE: Footrests may extend further for very large people.

**Fig. A3 (a)**

inclement weather, slow progress and resting can greatly increase a disabled person's exposure to the elements.

(2) Sites. Level, indirect routes or those with running slopes lower than 1:20 can sometimes provide more convenience than direct routes with maximum allowable slopes or with ramps.

**A4.3.10 Egress.** In buildings where physically handicapped people are regularly employed or are residents, an emergency management plan for their evacuation also plays an essential role in fire safety.

**A4.4 Protruding Objects.**

**A4.4.1 General.** Guide dogs are trained to recognize and avoid hazards. However, most people with severe impairments of vision use the long cane as an aid to mobility. The two principal cane techniques are the touch technique, where the cane arcs from side to side and touches points outside both shoulders; and the diagonal technique, where the cane is held in a stationary position diagonally across the body with the cane tip touching or just above the

61

205

## A4.4 Protruding Objects



**Fig. A4
Cane Technique**

ground at a point outside one shoulder and the handle or grip extending to a point outside the other shoulder. The touch technique is used primarily in uncontrolled areas, while the diagonal technique is used primarily in certain limited, controlled, and familiar environments. Cane users are often trained to use both techniques.

Potential hazardous objects are noticed only if they fall within the detection range of canes (see Fig. A4). Visually impaired people walking toward an object can detect an overhang if its lowest surface is not higher than 27 in (685 mm). When walking alongside project-

ing objects, they cannot detect overhangs. Since proper cane and guide dog techniques keep people away from the edge of a path or from walks, a slight overhang of no more than 4 in (100 mm) is not hazardous.

## A4.5 Ground and Floor Surfaces.

**A4.5.1 General.** Ambulant and semiambulant people who have difficulty maintaining balance and those with restricted gaits are particularly sensitive to slipping and tripping hazards. For such people, a stable and regular surface is necessary for safe walking, particularly on stairs. Wheelchairs can be propelled most easily on surfaces that are hard, stable, and regular. Soft, loose surfaces such as shag carpet, loose sand, and wet clay, and irregular surfaces, such as cobblestones, can significantly impede wheelchair movement.

Slip resistance is based on the frictional force necessary to keep a shoe heel or crutch tip from slipping on a walking surface under the conditions of use likely to be found on the surface. Although it is known that the static coefficient of friction is the basis of slip resistance, there is not as yet a generally accepted method to evaluate the slip resistance of walking surfaces.

Cross slopes on walks and ground or floor surfaces can cause considerable difficulty in propelling a wheelchair in a straight line.

**A4.5.3 Carpet.** Much more needs to be done in developing both quantitative and qualitative criteria for carpeting. However, certain functional characteristics are well established. When both carpet and padding are used, it is desirable to have minimum movement (preferably none) between the floor and the pad and the pad and the carpet, which would allow the carpet to hump or warp. In heavily trafficked areas, a thick, soft (plush) pad or cushion, particularly in combination with long carpet pile, makes it difficult for individuals in wheelchairs and those with other ambulatory disabilities to get about. This should not preclude their use in specific areas where traffic is light. Firm carpeting can be achieved through proper selection and combination of pad and carpet, sometimes with the elimination of the pad or cushion, and with proper installation.

## A4.6 Parking and Passenger Loading Zones.

**A4.6.3 Parking Spaces.** High-top vans, which disabled people or transportation services often use, require higher clearances in parking garages than automobiles. *When optional van spaces are provided within a garage, only the spaces themselves and a vehicle route to them require the specified clearances.*

**A4.6.4 Signage.** Signs designating parking places for disabled people can be seen from a driver's seat if the signs are mounted high enough above the ground and located at the front of a parking space.

62

206

Federal Property Management Regulations        Subpt. 101–19.6, App. A

A4.13 Doors

## A4.8 Ramps.

**A4.8.1 General.** Ramps are essential for wheelchair users if elevators or lifts are not available to connect different levels. However, some people who use walking aids have difficulty with ramps and prefer stairs.

**A4.8.2 Slope and Rise.** The ability to manage an incline is related to both its slope and its length. Wheelchair users with disabilities affecting arms or with low stamina have serious difficulty using inclines. Most ambulatory people and most people who use wheelchairs can manage a slope of 1:16. Many people cannot manage a slope of 1:12 for 30 ft (9 m). Many people who have difficulty negotiating very long ramps at relatively shallow slopes can manage very short ramps at steeper slopes.

**A4.8.5 Handrails.** The requirements for stair and ramp handrails in this standard are for adults. When children are principal users in a building or facility, a second set of handrails at an appropriate height can assist them and aid in preventing accidents.

## A4.10 Elevators.

**A4.10.6 Door Protective and Reopening Device.** The required door reopening device would hold the door open for 20 seconds if the doorway remains unobstructed. After 20 seconds, the door may begin to close. However, if designed in accordance with ANSI A17.1-1978, the door closing movement could still be stopped if a person or object exerts sufficient force at any point on the door edge.

**A4.10.7 Door and Signal Timing for Hall Calls.** This paragraph allows variation in the location of call buttons, advance time for warning signals, and the door-holding period used to meet the time requirement.

**A4.10.12 Car Controls.** Industry-wide standardization of elevator control panel design would make all elevators significantly more convenient for use by people with severe visual impairments.

In many cases, it will be possible to locate the highest control on elevator panels within 48 in (1220 mm) from the floor.

**A4.10.13 Car Position Indicators.** A special button may be provided that would activate the audible signal within the given elevator only for the desired trip, rather than maintaining the audible signal in constant operation.

**A4.10.14 Emergency Communications.** A device that requires no handset is easier to use by people who have difficulty reaching.

## A4.11 Platform Lifts.

Platform lifts include porch lifts and other devices used for short-distance, vertical transportation of people in

wheelchairs. At the present time, generally recognized safety standards for such lifts have not been developed. Care should be taken in selecting and installing lifts to ensure that they are free from hazards to users or to other individuals who may be in the vicinity where they are being operated.

## A4.13 Doors.

**A4.13.8 Thresholds at Doorways.** Thresholds and surface height changes in doorways are particularly inconvenient for wheelchair users who also have low stamina or restrictions in arm movement, because complex maneuvering is required to get over the level change while operating the door.

**A4.13.9 Door Hardware.** Some disabled persons must push against a door with their chair or walker to open it. Applied kickplates on doors with closers can reduce required maintenance by withstanding abuse from wheelchairs and canes. To be effective, they should cover the door width, less approximately 2 in (51 mm), up to a height of 16 in (405 mm) from its bottom edge and be centered across the top.

**A4.13.10 Door Closers.** Closers with delayed action features give a person more time to maneuver through doorways. They are particularly useful on frequently used interior doors such as entrances to toilet rooms.

**A4.13.11 Door Opening Force.** Although most people with disabilities can exert at least 5 lbf (22.2N), both pushing and pulling from a stationary position, a few people with severe disabilities cannot exert even 3 lbf (13.3N). Although some people cannot manage the allowable forces in this standard and many others have difficulty, door closers must have certain minimum closing forces to close doors satisfactorily. Forces for pushing or pulling doors open are measured with a push-pull scale under the following conditions:

(1) Hinged doors: Force applied perpendicular to the door at the door opener or 30 in (760 mm) from the hinged side, whichever is farther from the hinge.

(2) Sliding or folding doors: Force applied parallel to the door at the door pull or latch.

(3) Application of force: Apply force gradually so that the applied force does not exceed the resistance of the door.

In high-rise buildings, air-pressure differentials may require a modification of this specification in order to meet the functional intent.

**A4.13.12 Automatic Doors and Power-Assisted Doors.** Sliding automatic doors do not need guard rails and are more convenient for wheelchair users and visually impaired people to use. If slowly opening automatic doors can be reactuated before their closing cycle is completed, they will be more convenient in busy doorways.

63

Plaintiff's Exhibit 4                                    Page 64

**A4.15  Drinking Fountains and Water Coolers**

### A4.15  Drinking Fountains and Water Coolers.

**A4.15.2** *Drinking fountains with two spouts can assist both handicapped people and those people who find it difficult to bend over.*

### A4.16  Water Closets.

**A4.16.3  Height.** Preferences for toilet seat heights vary considerably among disabled people. Higher seat heights may be an advantage to some ambulatory disabled people but a disadvantage for wheelchair

users and others. Toilet seats 18 in (455 mm) high seem to be a reasonable compromise. Thick seats and filler rings are available to adapt standard fixtures to these requirements.

**A4.16.4  Grab Bars.** Fig. A5(a) and (b) show the diagonal and side approaches most commonly used to transfer from a wheelchair to a water closet. Some wheelchair users can transfer from the front of the toilet, while others use a 90-degree approach. Most people who use the two additional approaches can also use either the diagonal approach or the side approach.



**(a)**
**Diagonal Approach**

1. Takes transfer position, swings footrest out of the way, sets brakes.
2. Removes armrest, transfers.
3. Moves wheelchair out of the way, changes position (some people fold chair or pivot it 90° to the toilet).
4. Positions on toilet, releases brake.

**(b)**
**Side Approach**

1. Takes transfer position, removes armrest, sets brakes.
2. Transfers.
3. Positions on toilet.

**Fig. A5**
**Wheelchair Transfers**

64

Plaintiff's Exhibit 4                                                    Page 65

Federal Property Management Regulations          Subpt. 101–19.6, App. A

A4.29 Tactile Warnings

**A4.16.5 Flush Controls.** Flush valves and related plumbing can be located behind walls or to the side of the toilet, or a toilet seat lid can be provided if plumbing fittings are directly behind the toilet seat. Such designs reduce the chance of injury and imbalance caused by leaning back against the fittings. Flush controls for tank-type toilets have a standardized mounting location on the left side of the tank (facing the tank). Tanks can be obtained by special order with controls mounted on the right side. If administrative authorities require flush controls for flush valves to be located in a position that conflicts with the location of the rear grab bar, then that bar may be split or shifted toward the wide side of the toilet area.

**A4.17  Toilet Stalls.**

**A4.17.5  Doors.** To make it easier for wheelchair users to close toilet stall doors, doors can be provided with closers, spring hinges, or a pull bar mounted on the inside surface of the door near the hinge side.

**A4.19  Lavatories and Mirrors.**

**A4.19.6  Mirrors.** If mirrors are to be used by both ambulatory people and wheelchair users, then they must be at least 74 in (1880 mm) high at their topmost edge. A single full length mirror can accommodate all people, including children.

**A4.21  Shower Stalls.**

**A4.21.1  General.** Shower stalls that are 36 in by 36 in (915 mm by 915 mm) wide provide additional safety to people who have difficulty maintaining balance because all grab bars and walls are within easy reach. Seated people use the walls of 36 in by 36 in (915 mm by 915 mm) showers for back support. Shower stalls that are 60 in (1525 mm) wide and have no curb may increase usability of a bathroom by wheelchair users because the shower area provides additional maneuvering space.

**A4.23  Bathrooms, Bathing Facilities, and Shower Rooms.**

**A4.23.9  Medicine Cabinets.** Other alternatives for storing medical and personal care items are very useful to disabled people. Shelves, drawers, and floor-mounted cabinets can be provided within the reach ranges of disabled people.

**A4.26  Handrails, Grab Bars, and Tub and Shower Seats.**

**A4.26.1  General.** Many disabled people rely heavily upon grab bars and handrails to maintain balance and prevent serious falls. Many people brace their forearms between supports and walls to give them more leverage and stability in maintaining balance or for lifting. The maximum grab bar clearance of 1-1/2 in (38 mm) required in this standard is a safety clearance to prevent injuries from arms slipping through the opening. It also provides adequate gripping room.

**A4.26.2  Size and Spacing of Grab Bars and Handrails.** This specification allows for alternate shapes of handrails as long as they allow an opposing grip similar to that provided by a circular section of 1-1/4 in to 1-1/2 in (32 mm to 38 mm).

**A4.27  Controls and Operating Mechanisms.**

**A4.27.3  Height.** Fig. A6 further illustrates mandatory and advisory control mounting height provisions for typical equipment. Note distinction between built-in equipment (considered real property) and movable equipment (considered chattel, and not covered by the Architectural Barriers Act of 1968).

**A4.28  Alarms.**

**A4.28.2  Audible Alarms.** Audible emergency signals must have an intensity and frequency that can attract the attention of individuals who have partial hearing loss. People over 60 years of age generally have difficulty perceiving frequencies higher than 10,000 Hz.

**A4.28.3  Visual Alarms.** The specifications in this section do not preclude the use of zoned or coded alarm systems. In zoned systems, the emergency exit lights in an area will flash whenever an audible signal rings in the area.

**A4.28.4  Auxiliary Alarms.** Locating visual emergency alarms in rooms where deaf individuals may work or reside alone can ensure that they will always be warned when an emergency alarm is activated. To be effective, such devices must be located and oriented so that they will spread signals and reflections throughout a space or raise the overall light level sharply. The amount and type of light necessary to wake a deaf person from a sound sleep in a dark room will vary depending on a number of factors, including the size and configuration of the room, the distance between the source and the person, whether or not the light flashes, and the cycle of flashing. A 150-watt flashing bulb can be effective under some conditions. Certain devices currently available are designed specifically as visual alarms for deaf people. Deaf people may not need accessibility features other than the emergency alarm connections and communications devices. Thus, rooms in addition to those accessible for wheelchair users also should be equipped with emergency visual alarms or connections.

**A4.29  Tactile Warnings.**

**A4.29.2  Tactile Warnings on Walking Surfaces.** (Reserved).

**A4.29.3  Tactile Warnings on Doors to Hazardous Areas.** Tactile signals for hand reception are useful if it is certain that the signals will be touched.

**A4.29.5  Tactile Warnings at Hazardous Vehicular Areas.** (Reserved).

65

209

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**4.29 Tactile Warnings**



**Fig. A6**
**Control Reach Limitations**

**A4.29.6 Tactile Warnings at Reflecting Pools.** (Reserved).

**A4.29.7 Standardization.** Too many tactile warnings or lack of standardization weakens their usefulness. Tactile signals can also be visual signals to guide dogs, since dogs can be trained to respond to a large variety of visual cues.

**A4.30 Signage.**

**A4.30.1 General.** In building complexes where finding locations independently on a routine basis may be a necessity (for example, college campuses), tactile maps or prerecorded instructions can be very helpful to visually impaired people. Several maps and auditory instructions have been developed and tested for specific applications. The type of map or instructions used must be based on the information to be communicated, which depends highly on the type of buildings or users.

Landmarks that can easily be distinguished by visually impaired individuals are useful as orientation cues. Such cues include changes in illumination level, bright colors, unique patterns, wall murals, location of special equipment, or other architectural features (for example, an exterior view).

Many people with disabilities have limitations in movement of their head and reduced peripheral vision. Thus, signage positioned perpendicular to the path of travel is easiest for them to notice. People can generally distinguish signage within an angle of 30 degrees to either side of the centerline of their face without moving their head.

**A4.30.2 Character Proportion.** The legibility of printed characters is a function of the viewing distance, character height, the ratio of the stroke width to the height of the character, the contrast of color between character and background, and print font. The size of characters must be based upon the intended viewing distance. A severely nearsighted person may have to be much closer to see a character of a given size accurately than a person with normal visual acuity.

**A4.30.3 Color Contrast.** The greatest readability is usually achieved through the use of light-colored characters or symbols on a dark background.

**A4.30.4 Raised or Indented Characters or Symbols.** Signs with descriptive materials about public buildings, monuments, and objects of cultural interest can be raised or incised letters. However, a sighted guide or audio-tape device is often a more effective way to present such information. Raised characters are easier to feel at small sizes and are not susceptible to maintenance problems as are indented characters, which can fill with dirt, cleaning compounds, and the like.

Braille characters can be used in addition to standard alphabet characters and numbers. Placing braille

66

210

Federal Property Management Regulations                    Subpt. 101–19.6, App. A

A4.33 Assembly Areas

characters to the left of standard characters makes them more convenient to read. Standard dot sizing and spacing as used in braille publications are acceptable. Raised borders around raised characters can make them confusing to read unless the border is set far away from the characters.

### A4.31 Telephones.

**A4.31.3 Mounting Height.** In localities where the dial-tone first system is in operation, calls can be placed at a coin telephone through the operator without inserting coins. The operator button is located at a height of 46 in (1170 mm) if the coin slot of the telephone is at 54 in (1370 mm).

A generally available public telephone with a coin slot mounted lower on the equipment would allow universal installation of telephones at a height of 48 in (1220 mm) or less to all operable parts.

**A4.31.5 Equipment for Hearing Impaired People.** Other aids for people with hearing impairments are telephones, teleprinter, and other telephonic devices that can be used to transmit printed messages through telephone lines to a teletype printer or television monitor.

### A4.32 Seating, Tables, and Work Surfaces.

**A4.32.4 Height of Work Surfaces.** Different types of work require different work surface heights for comfort and optimal performance. Light detailed work such as writing requires a work surface close to elbow height for a standing person. Heavy manual work such as rolling dough requires a work surface height about 10 in (255 mm) below elbow height for a standing person. The principle of a high work surface height for light detailed work and a low work surface for heavy manual work also applies for seated persons; however, the limiting condition for seated manual work is clearance under the work surface.

Table A1 shows convenient work surface heights for seated persons. The great variety of heights for comfort and optimal performance indicates a need for alternatives or a compromise in height if people who stand and people who sit will be using the same counter area.

### A4.33 Assembly Areas.

**A4.33.2 Size of Wheelchair Locations.** Spaces large enough for two wheelchairs allow people who are coming to a performance together to sit together.

**A4.33.3 Placement of Wheelchair Locations.** The location of wheelchair areas can be planned so that a variety of positions within the seating area are provided. This will allow choice in viewing and price categories.

**A4.33.6 Placement of Listening Systems.** A distance of 50 ft (15 m) allows a person to distinguish performers' facial expressions.

**Table A1
Convenient Heights of
Work Surfaces for Seated People***

| Conditions of Use | Short Women in | Short Women mm | Tall Men in | Tall Men mm |
|---|---|---|---|---|
| **Seated in a wheelchair:** | | | | |
| Manual work: | | | | |
| Desk or removable armrests | 26 | 660 | 30 | 760 |
| Fixed, full-size armrests† | 32‡ | 815 | 32‡ | 815 |
| Light, detailed work: | | | | |
| Desk or removable armrests | 29 | 735 | 34 | 865 |
| Fixed, full-size armrests† | 32‡ | 815 | 34 | 865 |
| **Seated in a 16-in (405-mm) high chair:** | | | | |
| Manual work | 26 | 660 | 27 | 685 |
| Light, detailed work | 28 | 710 | 31 | 785 |

*All dimensions are based on a work surface thickness of 1-1/2 in (38 mm) and a clearance of 1-1/2 in (38 mm) between legs and the underside of a work surface.

†This type of wheelchair arm does not interfere with the positioning of a wheelchair under a work surface.

‡This dimension is limited by the height of the armrests: a lower height would be preferable. Some people in this group prefer lower work surfaces, which require positioning the wheelchair back from the edge of the counter.

**A4.33.7 Types of Listening Systems.** A listening system that can be used from any seat in a seating area is the most flexible way to meet this specification. Earphone jacks with variable volume controls can benefit only people who have slight hearing losses and do not help people with hearing aids. At the present time, audio loops are the most feasible type of listening system for people who use hearing aids, but people without hearing aids or those with hearing aids not equipped with inductive pickups cannot use them. Loops can be portable and moved to various locations within a room. Moreover, for little cost, they can serve a large area within a seating area. Radio frequency systems can be extremely effective and inexpensive. People without hearing aids can use them, but people with hearing aids need custom-designed equipment to use them as they are presently designed. If hearing aids had a jack to allow a by-pass of microphones, then radio frequency systems would be suitable for people with and without hearing aids. Some listening systems may be subject to interference from other equipment and feedback from hearing aids of people who are using the systems. Such interference can be controlled by careful engineering design that anticipates feedback and sources of interference in the surrounding area.

67

211

**A4.34  Dwelling Units**

---

## A4.34  Dwelling Units.

**A4.34.2  Minimum Requirements.** Handicapped people who live in accessible dwelling units of multi-family buildings or housing projects will want to participate in all on-site social activities, including visiting neighbors in their dwelling units. Hence, any circulation paths among all dwelling units and among all on-site facilities should be as accessible as possible. An accessible second exit to dwelling units provides an extra margin of safety in a fire.

**A4.34.5  Bathrooms.** Although not required by these specifications, it is important to install grab bars at toilets, bathtubs, and showers if it is known that a dwelling unit will be occupied by elderly or severely disabled people.

### A4.34.6  Kitchens.

**A4.34.6.1  Clearance.** The minimum clearances provide satisfactory maneuvering spaces for wheelchairs only if cabinets are removed at the sink.

**A4.34.6.5  Sink.** Installing a sink with a drain at the rear so that plumbing is as close to the wall as possible can provide additional clear knee space for wheelchair users.

**A4.34.6.6  Ranges and Cooktops.** Although not required for minimum accessibility, countertop range units in a counter with adjustable heights can be an added convenience for wheelchair users.

**A4.34.6.7  Ovens.** Countertop or wall-mounted ovens with side-opening doors are easier for people in wheelchairs to use. Clear spaces at least 30 in (760

mm) wide under counters at the side of ovens are an added convenience. The pullout board or fixed shelf under side-opening oven doors provides a resting place for heavy items being moved from the oven to a counter.

**A4.34.6.8  Refrigerator/Freezers.** Side-by-side refrigerator/freezers provide the most usable freezer compartments. Locating refrigerators so that their doors can swing back 180 degrees is more convenient for wheelchair users.

**A4.34.6.10  Kitchen Storage.** Full height cabinets or tall cabinets can be provided rather than cabinets mounted over work counters. Additional storage space located conveniently adjacent to kitchens can be provided to make up for space lost when cabinets under counters are removed.

## A9.  Postal Facilities.

**A9.2  Post Office Lobbies.** *Furniture as chattel is not covered under the Architectural Barriers Act of 1968, but the requirements for lobby furniture and equipment are imposed by the United States Postal Service for greater accessibility in its customer lobbies.*

---

Note: Unedited copies of the American National Standards Institute standard, A117.1-1980, "Specifications for Making Buildings and Facilities Accessible to and Usable by Physically Handicapped People," are available from the American National Standards Institute, Inc., 1430 Broadway, New York, New York 10018.

68

Plaintiff's Exhibit 4                                                                 Page 69

Federal Property Management Regulations          Subpt. 101–19.6, App. A

Access Aisles

## INDEX

**ACCESS AISLES**
Definition of ......................................................................................... 3.5
Parking & Passenger Loading Zones ........................................... 4.6.3, 4.6.5
Restaurants & Cafeterias ...................................................................... 5.1

**ACCESS TO PERFORMING ARTS** (See PERFORMING AREAS)

**ACCESSIBLE ROUTE** (See also ACCESS AISLE; CIRCULATION PATH/ROUTE) ........................ **4.3, A4.3\***
Assembly Area ....................................................................... 4.33.3, 4.33.5
Bathrooms, Bathing Facilities & Shower Rooms ................................... 4.23.1
Curb Ramps .............................................................................. 4.7.1, 4.7.2
Definition of ......................................................................................... 3.5
Doors ............................................................................................ 4.13.2
Dwelling Units: Bathrooms ................................................................ 4.34.5
Dwelling Units: Laundry Facilities .................................................... 4.34.7.1
Dwelling Units: Kitchens ................................................................. 4.34.6
Dwelling Units: Minimum Requirements ............ 4.34.2, (3), (15), 4.34.5, 4.34.6, 4.34.7
Elevators ....................................................................................... 4.10.1
Entrances ...................................................................................... 4.14.1
Ground & Floor Surfaces .................................................................... 4.5.1
Head Room ....................................................................................... 4.3.5
Historic Preservation: Applicability ............................................... 4.1.7(1)(b)
Lavatories & Mirrors .......................................................................... 4.19.3
Minimum Number: Additions ............................................................ 4.1.5(2)
Minimum Number: Alterations ..................................... 4.1.6(3),(4), (4)(f)(i), (ii)
Minimum Number: Historic Preservation ..................... 4.1.7, (2)(a),(c),(d)
Minimum Number: Housing .............................................................. 4.1.3(3)
Minimum Number: New Construction ................. 4.1.2(1),(3),(7)(c),(9),(10),(12)
Minimum Number: Sites & Exterior Facilities .............. 4.1.1(1),(2),(4)
Parking & Passenger Loading Zones .................................... 4.6.2, 4.6.3
Protruding Objects ................................................................... 4.4.1, 4.4.2
Ramps ............................................................................................. 4.8.1
Restaurants & Cafeterias ...................................................................... 5.1
Sinks .............................................................................................. 4.24.5
Space Allowances & Reach Ranges ................................................... 4.2.4.2
Stairs ............................................................................................... 4.9.2
Toilet Rooms .................................................. 4.22.1, 4.22.3, 4.22.7
Toilet Stalls ................................................................................... 4.17.1
Urinals .......................................................................................... 4.18.3

**ADAPTABILITY** (See also DWELLING UNITS; KITCHENS)
Adaptable Features: Consumer Information ......................................... 4.34.4
Adaptability .................................................................................... 4.34.3
Definition of ......................................................................................... 3.5
Occupancy Classification: Military Housing ...................................... 4.1.4(3)

**ADAPTABLE BATHROOMS** (See DWELLING UNITS)

**ADAPTABLE KITCHENS** (See KITCHENS)

**ADDITIONS**
Definition of ......................................................................................... 3.5
Minimum Number: Additions ............................................................... 4.1.5

**ADMINISTRATIVE AUTHORITY/AUTHORITIES**
Accessible Route: Areas of Refuge .................................................... 4.3.10
Definition of ......................................................................................... 3.5
Fire Door Opening Force .......................................................... 4.13.11(1)
Location of Flush Controls ............................................................... A4.16.5
Platform Lifts: Safety Regulations .................................................. 4.11.2
Toilet Stalls: Plumbing Code Requirements ...................................... 4.17.3
Use of Residential or Enclosed Wheelchair Lifts ............................ 4.10.1

**ALARMS** ............................................................................ **4.28, A4.28**
Audible Alarms ............................................ 4.1.2(13), 4.28.2, 4.28.3, A4.28.2

*Bold denotes major sections of Uniform Federal Accessibility Standards
70

213

**Bedrooms**

---

**ALARMS** (CONTINUED)

Audible Signal (See ELEVATORS)
Auxiliary Alarms ............................................................................................... 4.28.4
Alarms in Dwelling Units (See DWELLING UNITS)
Emergency Alarms (See EMERGENCY WARNING SYSTEMS)
Minimum Number: Alterations ............................................................................... 4.1.6(3)(d)(iv)
Visual Alarms ................................................................................... 4.1.2(13), 4.28.3, A4.28.3

**ALTERATIONS**

Definition of ...................................................................................................... 3.5
Historic Preservation: Applicability ....................................................................... 4.1.7(1)(a)
Minimum Number: Alterations .............................................................................. 4.1.6
Toilet Stalls: Exceptions ...................................................................................... 4.17.3

**ASSEMBLY AREAS** (See also CONFERENCE ROOMS; MEETING ROOMS; SEATING, TABLES & WORK
   SURFACES; PERFORMING AREAS) ............................................................. 4.33, A4.33

Access to Performing Areas (See PERFORMING AREAS)
Balconies ......................................................................................................... 4.33.3
Definition of ...................................................................................................... 3.5
Egress (See EGRESS)
Fixed Seating Plan .............................................................................................. 4.33.3
Minimum Number: Alterations ................................................................. 4.1.6(3)(d)(vii), (4)(f)
Minimum Number: New Construction ..................................................................... 4.1.2(18)
Occupancy Classification: Assembly ...................................................................... 4.1.4(4)
Occupancy Classification: Military Exclusions ......................................................... 4.1.4(2)(c)
Placement of Listening Systems (See LISTENING SYSTEMS)
Placement of Wheelchair Seating Areas ................................................... 4.33.3, A4.33.3
Size of Wheelchair Locations ................................................................. 4.33.2, A4.33.2
Surfaces (See GROUND & FLOOR SURFACES)
Types of Listening Systems (See LISTENING SYSTEMS)

**ASSEMBLY OCCUPANCY** ............................................................................. 4.1.4(4)

**AUDIO-AMPLIFICATION SYSTEMS** (See also LISTENING SYSTEMS)

Auditory Instructions .......................................................................... A4.30.1, A4.30.4
Minimum Number: New Construction ..................................................................... 4.1.2(18)(b)
Types of Listening Systems (See LISTENING SYSTEMS)

**AUTOMATIC DOORS** (See DOORS)

**BALCONIES** (See ASSEMBLY AREAS; DWELLING UNITS)

**BATHROOMS, BATHING FACILITIES & SHOWER ROOMS** (See also BATHTUBS) ........................ 4.23

Bathing & Shower Facilities: Minimum Number ...................................................... 4.23.8
Bathrooms in Dwelling Units (See DWELLING UNITS)
Clear Floor Space ............................................................................................... 4.23.3
Controls & Dispensers (See CONTROLS & OPERATING MECHANISMS)
Doors (See DOORS)
Lavatories & Mirrors: Minimum Number ................................................................ 4.23.6
Medicine Cabinets: Minimum Number ...................................................... 4.23.9, A4.23.9
Medicine Cabinets in Dwelling Units (See DWELLING UNITS)
Minimum Number: Additions ................................................................................ 4.1.5(3)
Minimum Number: Alterations .............................................................................. 4.1.6(3)(c)
Minimum Number: New Construction ..................................................................... 4.1.2(10)
Minimum Number: New Construction/Bathing Facilities ................................ 4.1.1(6), (7)(d)
Urinals: Minimum Number .................................................................................... 4.23.5
Water Closets: Minimum Number ........................................................................... 4.23.4

**BATHTUBS** (See also BATHROOMS, BATHING FACILITIES & SHOWER ROOMS; SHOWER STALLS) ........... 4.20

Bathtub Enclosures ............................................................................................. 4.20.7
Bathtub Enclosures in Dwelling Units (See DWELLING UNITS)
Clear Floor Space ............................................................................................... 4.23.3
Controls (See CONTROLS & OPERATING MECHANISMS)
Grab Bars (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
In-tub Seats ........................................................................... 4.20.3, 4.20.7, 4.26.3
Shower Unit (See SHOWER SPRAY UNITS)

**BEDROOMS** (See DWELLING UNITS; HEALTH CARE)

71

214

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Business Occupancy**

BUSINESS OCCUPANCY ................................................................. 4.1.4(5)

CABINETS
  Cabinets for Kitchens (See KITCHENS)
  Medicine Cabinets (See BATHROOMS, BATHING FACILITIES & SHOWER ROOMS)
  Occupancy Classification: Factory Industrial ............................................. 4.1.4(7)
  Storage Cabinets (See STORAGE)

CAFETERIAS (See RESTAURANTS & CAFETERIAS)

CARD CATALOGS (See LIBRARIES)

CARPET (See also GROUND & FLOOR SURFACES)
  Occupancy Classification: Factory Industrial ............................................. 4.1.4(7)
  Carpet & Carpet Tile .......................................................... 4.5.3, A4.5.3

CARPET TILE (See CARPET)

CARPORTS (See DWELLING UNITS)

CHANGES IN LEVELS (See also ELEVATORS; STAIRS; PLATFORM LIFTS)
  Accessible Route ................................................................... 4.3.8
  Ground & Floor Surfaces ............................................................ 4.5.2
  Thresholds at Doorways .................................................. 4.13.8, A4.13.8

CHARACTER PROPORTION (See SIGNAGE)

CHECK-OUT AISLES (See MERCANTILE)

CHILD CARE FACILITIES
  Occupancy Classification: Institutional .................................................. 4.1.4(9)

CIRCULATION PATH/ROUTE (See also ACCESS AISLE; ACCESSIBLE ROUTE)
  Definition of ....................................................................... 3.5
  Dwelling Units .................................................................. A4.34.2
  Head Room ........................................................................ 4.4.2
  Location of Parking & Passenger Loading Zones ........................................ 4.6.2
  Minimum Number: New Construction .................................................. 4.1.2(2)
  Minimum Number: Sites & Exterior Facilities ............................................ 4.1.1(3)
  Parking Spaces (See PARKING & PASSENGER LOADING ZONES)
  Post Office Lobbies ................................................................. 9.2(1)

CLEAR FLOOR SPACE FOR WHEELCHAIRS (See CLEARANCES FOR WHEELCHAIRS)

CLEAR KNEE SPACE (See KNEE & TOE CLEARANCE)

CLEAR WIDTH (See CLEARANCES FOR WHEELCHAIRS)

CLEARANCES FOR WHEELCHAIRS (See also GROUND & FLOOR SURFACES; REACH RANGES)
  Clear Floor Space for Wheelchair .............................................. 4.2.4, A4.2.4
  Maneuvering Clearances ........................................ 4.2.4.2, 4.10.9, 4.13.6, 9.2
  Minimum Clear Width ............................................................. 4.2.4.1
  Obstructed Turning Space ........................................................... 4.3.3
  Passing Space ...................................................................... 4.3.4
  Passing Width ................................................................ 4.2.1, A4.2.1
  Turning Space ................................................................ 4.2.3, A4.2.3
  Unobstructed Aisle Space ............................................................ 9.5
  Unobstructed Turning Space ............................................. 4.2.3, 4.22.3, 4.23.3
  Width for Wheelchair Passing ........................................................ 4.2.2

CLOTHES DRYERS (See DWELLING UNITS)

CLOTHES RODS (See STORAGE)

COLOR CONTRAST (See SIGNAGE)

COMMON AREAS/SPACES (See COMMON USE)

COMMON USE (See also STREETS & SIDEWALKS)
  Common Areas/Spaces ............................ 4.1.4(3), 4.1.5(4), 4.1.6(1)(e), 4.34.2(1)
  Definition of ....................................................................... 3.5
  Laundry Facilities (See DWELLING UNITS)
  Minimum Number: Housing ...................................................... 4.1.3(1)(b)
  Minimum Number: New Construction ................................................ 4.1.2(10)

72

215

Subpt. 101–19.6, App. A                                    41 CFR Ch. 101 (7–1–97 Edition)

**Detention Facilities**

**COMMON USE** (CONTINUED)

Minimum Number: Sites & Exterior Facilities ........................................................ 4.1.1(6)
Occupancy Classification: Institutional ........................................................ 4.1.4(9)(a), (b), (c)
Occupancy Classification: Residential ........................................................ 4.1.4(11)(a)
Parking Spaces ........................................................ 4.6.3

**COMMUNICATION SYSTEMS** (See EMERGENCY COMMUNICATION SYSTEMS; SIGNAGE)

**CONFERENCE ROOMS**

Definition of (See Assembly Areas) ........................................................ 3.5
Minimum Number: New Construction ........................................................ 4.1.2(18)(b)

**CONSUMER INFORMATION** (See DWELLING UNITS)

**CONTROLS & DISPENSERS** (See CONTROLS & OPERATING MECHANISMS; DISPENSERS)

**CONTROLS & OPERATING MECHANISMS** ........................................................ **4.27, A4.27**

Bathrooms, Bathing Facilities & Shower Rooms: Controls & Dispensers .................... 4.23.7
Bathtub Controls in Dwelling Units ........................................................ 4.34.5.4(4)
Clear Floor Space at Controls & Dispensers ........................................................ 4.27.2
Definition of (See Operable Part) ........................................................ 3.5
Door Hardware ........................................................ 4.13.9, A4.13.9
Drinking Fountains & Water Coolers: Controls ........................................................ 4.15.4
Elevator Emergency Communication Controls ........................................................ 4.10.14
Highest Operable Part of Controls & Dispensers ........................................................ 4.27.3, A4.27.3
Kitchen Controls ........................................................ 4.34.6.5
Laundry Controls ........................................................ 4.34.7.3
Lavatory Faucets (See FAUCETS)
Minimum Number: New Construction ........................................................ 4.1.2(12)
Minimum Requirements: Housing ........................................................ 4.34.2(9)
Operable Equipment ........................................................ 4.27.2, 4.27.3
Operation of Controls & Operating Mechanisms ........................................................ 4.27.4
Oven Controls ........................................................ 4.34.6.6, 4.34.7
Postal Facilities Switches & Controls ........................................................ 9.1
Shower Controls in Dwelling Units ........................................................ 4.34.5.5(4)
Shower Stall Controls ........................................................ 4.21.5
Sink Faucets (See FAUCETS)
Storage Hardware ........................................................ 4.25.4
Telephone Controls (See TELEPHONES)
Toilet Room Controls & Dispensers ........................................................ 4.16.6, 4.22.7
Urinal Flush Controls ........................................................ 4.18.4
Water Closet Flush Controls ........................................................ 4.16.5, A4.16.5
Water Closet Dispensers in Dwelling Units ........................................................ 4.34.5.2(4)

**COOKTOPS** (See KITCHENS)

**CORRECTIONAL FACILITIES** ........................................................ 4.1.4(9)(c)

**CROSS SLOPES** (See RAMPS)

**CURB RAMPS** (See also RAMPS) ........................................................ **4.7**

Built-up Curb Ramps ........................................................ 4.7.6
Changes in Levels Along Accessible Routes ........................................................ 4.3.8
Curbs ........................................................ 4.6.5, 4.7.1, 4.7.5, 4.7.10, 4.8.7
Diagonal Curb Ramps ........................................................ 4.7.10
Definition of ........................................................ 3.5
Islands (Traffic) ........................................................ 4.7.11
Location ........................................................ 4.7.1
Location of Marked Crossings ........................................................ 4.7.9
Minimum Number: Alterations ........................................................ 4.1.6(1)(b), (4)(a)
Obstructions by Parked Vehicles ........................................................ 4.7.8
Passenger Loading Zones ........................................................ 4.6.5
Sides of Curb Ramps ........................................................ 4.7.5
Slopes & Rises ........................................................ 4.8.2
Surfaces (See GROUND & FLOOR SURFACES)
Uncurbed Intersections ........................................................ 4.7.12
Width ........................................................ 4.7.3

**CURBS** (See CURB RAMPS)

**DETENTION FACILITIES** (See CORRECTIONAL FACILITIES)

73

Plaintiff's Exhibit 4                                            Page 73

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Dining Areas**

**DINING AREAS** (See DWELLING UNITS)

**DIRECTIONAL SIGNS** (See SIGNAGE)

**DISHWASHERS** (See KITCHENS)

**DISPENSERS** (See CONTROLS & OPERATING MECHANISMS)

**DISPLAYS**
Historic Preservation: Applicability .................................................................................. 4.1.7(1)(b)
Libraries .................................................................................................................. 8.4
Minimum Number: Historic Preservation ................................................................................ 4.1.7(2)(e)
Occupancy Classification: Mercantile ................................................................................. 4.1.4(10)
Restaurants & Cafeterias .................................................................................................. 5.3

**DOOR & SIGNAL TIMING FOR HALL CALLS** (See ELEVATORS)

**DOOR CLOSERS** (See ELEVATORS; DOORS)

**DOOR DELAY FOR CAR CALLS** (See ELEVATORS)

**DOOR HARDWARE** (See CONTROLS & OPERATING MECHANISMS)

**DOOR PROTECTIVE & REOPENING DEVICES** (See ELEVATORS)

**DOORS** (See also ELEVATORS; ENTRANCES) ......................................................... **4.13, A4.13**
Accessible Route: Doors .................................................................................................. 4.3.9
Automatic Doors & Power-Assisted Doors ........................................................... 4.13.12, A4.13.12
Bathrooms, Bathing Facilities & Shower Rooms: Doors ................................................................ 4.23.2
Clear Opening Width at Doorways ....................................................................... 4.13.5, A4.2.1
Definition of (See Automatic, Door, Entrance, Power-Assisted Door) ................................................ 3.5
Door Closers ........................................................................................... 4.13.10, A4.13.10
Door Opening Force ...................................................................................... 4.13.11, A4.13.11
Doors to Hazardous Areas (See TACTILE WARNINGS)
Doors to Patients' Bedrooms ............................................................................................ 6.3(5)
Double-leaf Doorways ................................................................................................... 4.13.4
Dwelling Units: Doors ................................................................. 4.34.5.1, 4.34.5.2(6)
Entry Doors to Acute Care Hospital Rooms ............................................................................. 4.13.6
Exterior Hinged Doors .................................................................................... 4.13.11(2)(a)
Exterior Sliding Doors ................................................................................................. 4.13.8
Fire Doors ......................................................................................................... 4.13.11(1)
Gates ................................................................................................................ 4.13.3
Hardware (See CONTROLS & OPERATING MECHANISMS)
Hinged Doors ................................................................... 4.13.11(2)(a),(b), A4.13.11(1)
Interior Hinged Doors .................................................................................... 4.13.11(2)(b)
Maneuvering Clearances at Doors .......................................................................... 4.13.6, 4.13.6
Minimum Number: Alterations .................................................................................... 4.1.6(4)(d)
Minimum Number: New Construction .................................................................................. 4.1.2(7)
Revolving Doors & Turnstiles .................................................................................. 4.13.2, 8.3
Sliding Doors ......................................................................................... A4.13.11(2)
Thresholds at Doorways .................................................................................. 4.13.8, A4.13.8
Toilet Room Doors ..................................................................................................... 4.22.2
Toilet Stall Doors ......................................................................................... 4.17.5, A4.17.5
Two Doors in Series ..................................................................................................... 4.13.7

**DRESSING ROOMS** (See PERFORMING AREAS)

**DRINKING FOUNTAINS & WATER COOLERS** ........................................................ **4.15, A4.15**
Clearances .............................................................................................................. 4.15.5
Controls (See CONTROLS & OPERATING MECHANISMS)
Knee Clearance (See KNEE & TOE CLEARANCE)
Minimum Number: Alterations ............................................................................... 4.1.6(3)(d)(ii)
Minimum Number: New Construction ................................................................................ 4.1.2(9)
Postal Facilities .......................................................................................................... 9.1
Spout Height .............................................................................................. 4.15.2, A4.15.2
Spout Location ............................................................................................................ 4.15.3

**DWELLING UNITS** (See also EGRESS; ENTRANCES; FIXTURES; REACH RANGES; SEATING, TABLES & WORK
        SURFACES; WATER CLOSETS) ..................................................... **4.34, A4.34**
Accessible Route .............................................................................................. 4.3.2(3), (4)
Adaptable Bathrooms ..................................................................................... 4.34.5, A4.34.5

74

217

Subpt. 101–19.6, App. A                              41 CFR Ch. 101 (7–1–97 Edition)

**Egress**

DWELLING UNITS (CONTINUED)

Adaptability ........................................................................................... 4.34.3
Alarms ............................................................................ 4.34.2(10), 4.34.4(3)
Balconies .................................................................................... 4.34.2(15)(d)
Base Cabinets (See KITCHENS)
Bathrooms .................................................... 4.34.2(12), 4.34.4(2), 4.34.5, A4.34.5
Bathtubs ................................ 4.34.2(12), 4.34.4(2), 4.34.5.4, 4.34.6, A4.34.5
Bathtub Enclosures .............................................................................. 4.34.5.6
Bathtub Seats .................................................................................. 4.34.5.4(2)
Bathtub & Shower Faucets (See FAUCETS)
Bedrooms ...................................................................................... 4.34.2(15)(c)
Cabinets: Minimum Requirements ............................................................ 4.34.2(8)
Carports ....................................................................... 4.1.4(13), 4.34.2(15)(d)
Clothes Dryers ..................................................................................... 4.34.7.2
Common Spaces & Facilities ................................................................. 4.34.2(1)
Consumer Information .............................................................................. 4.34.4
Controls (See CONTROLS & OPERATING MECHANISMS)
Definition of (See also Housing, Multi-family Dwelling) ................................. 3.5
Dining Areas .................................................................................. 4.34.2(15)(b)
Doors (See DOORS)
Emergency Warning Systems (See EMERGENCY WARNING SYSTEMS)
Entrances .............................................................................. 4.34.2(3), (6), (7)
Exits ....................................................................................................... A4.34.2
Faucets (See FAUCETS)
Fixed or Hand-held Shower Units (See SHOWER SPRAY UNITS)
Garages (See GARAGES)
Grab Bars (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Height of Water Closets ....................................................................... 4.34.5.2(2)
In-Tub Seats ...................................................................................... 4.34.5.4(2)
Kitchens (See KITCHENS)
Laundry Facilities ................. 4.34.2(14), 4.34.6.2, 4.34.7, 4.34.7.1, 4.34.7.2, 4.34.7.3
Lavatories (See LAVATORIES & MIRRORS)
Living Rooms ................................................................................ 4.34.2(15)(a)
Medicine Cabinets ............................................................................... 4.34.5.3
Minimum Number: Housing ....................................................................... 4.1.3
Minimum Number: Sites & Exterior Facilities ........................... 4.1.1(5)(d)(1),(2)
Mirrors (See LAVATORIES & MIRRORS)
Occupancy Classification: Residential ..................................... 4.1.4(11)(b), (c)
Parking (See PARKING & PASSENGER LOADING ZONES)
Patios ............................................................................................ 4.34.2(15)(d)
Showers .................................................... 4.34.2(12), 4.34.4(2),4.34.5
Shower Enclosures ............................................................................... 4.34.5.6
Shower Stalls .................................. 4.34.2(12), 4.34.4(2), 4.34.5.5, 4.34.5.6, A4.34.5
Shower Seats ..................................................................................... 4.34.5.5(2)
Sinks (See SINKS)
Sink Knee Clearance (See KNEE & TOE CLEARANCE)
Sleeping Areas .............................................................................. 4.34.2(15)(c)
Spaces .............................................................................................. 4.34.2(2)
Storage .............................................................................................. 4.34.2(8)
Structural Reinforcement ............................ 4.34.5.2(3), 4.34.5.4(3),4.34.5.5(3)
Terraces ........................................................................................ 4.34.2(15)(d)
Water Closets ..................................................................................... 4.34.5.2
Washing Machines ................................................................................ 4.34.7.2

EDUCATIONAL OCCUPANCY

Occupancy Classification: Business ......................................................... 4.1.4(5)
Occupancy Classification: Educational ..................................................... 4.1.4(6)

EGRESS (See also ENTRANCES; EXITS)

Accessible Route: Egress ...................................................................... 4.3.10
Assembly Areas: Placement of Wheelchairs ............................................. 4.33.3
Definition of ............................................................................................. 3.5
Fire Safety .......................................................................................... A4.3.10
Mercantile: Security Bollards ....................................................................... 7.4
Minimum Number: Alterations ...................................................... 4.1.6(4)(f)(ii)
Minimum Number: Dwelling Units ......................................................... 4.1.3(2)
Minimum Number: New Construction ...................................................... 4.1.2(7)(d)

75

218

Federal Property Management Regulations          Subpt. 101–19.6, App. A

## Elements & Spaces

**ELEMENTS & SPACES** (See Specific Element and/or Specific Space)

Accessible Elements & Spaces: Scope & Technical Requirements ............................................. 4
Definition of (See Accessible Element, Element, Functional Spaces, Space) ............................ 3.5

**ELEVATORS** (See also CLEARANCES FOR WHEELCHAIRS; SIGNAGE; TACTILE WARNINGS) .......... 4.10, A4.10

Accessible Routes: Changes in Levels ...................................................................................... 4.3.8
Audible Signal ........................................................ 4.10.4, 4.10.7, 4.10.13, A4.10.13
Automatic Doors .................................................................................................. 4.10.6, A4.10.6
Automatic Operation .......................................................................................................... 4.10.2
Car Controls ...................................................................... 4.10.11, 4.10.12, A4.10.12
Car Position Indicators ..................................................................... 4.10.13, A4.10.13
Control Buttons ................................................................................... 4.10.12, A4.10.12
Control Panels ...................................................................................... 4.10.12, A4.10.12
Door Closers ........................................................................................... 4.10.6, A4.10.6
Door Delay for Car Calls ................................................................................................. 4.10.8
Door Protective & Reopening Devices ................................... 4.1.6(4)(c)(ii), 4.10.6, A4.10.6
Door & Signal Timing for Hall Calls ................................................................ 4.10.7, A4.10.7
Elevator Penthouses ..................................................................................... 4.1.2(5), 4.1.4(1)
Emergency Alarms (See EMERGENCY WARNING SYSTEMS)
Emergency Communications (See EMERGENCY COMMUNICATION SYSTEMS)
Emergency Communication Controls (See CONTROLS & OPERATING MECHANISMS)
Emergency Controls ................................................................................................... 4.10.12(3)
Floor Plan of Elevator Cars ............................................................................................. 4.10.9
Freight Elevators ............................................................................................................. 4.10.1
Hall Call Buttons ....................................... 4.10.3, 4.10.4(3), 4.10.7, A4.10.7
Hall Lanterns ................................................................................................................. 4.10.4
Hoistway Entrances .............................................................................. 4.10.4, 4.10.5
Illumination Levels ...................................................................................................... 4.10.11
Intercommunication Systems (See EMERGENCY COMMUNICATION SYSTEMS)
Location of Car Controls ............................................................................................. 4.10.12(4)
Minimum Number: Housing ............................................................................................ 4.1.3(1)
Minimum Number: Alterations .......................................... 4.1.6(1)(b), (d), (4)(c)
Minimum Number: New Construction ...................................................................... 4.1.2(4)(5)
Occupancy Classification: General Exceptions .......................................................... 4.1.4(1)
Raised Characters on Hoistway Entrances ...................................................................... 4.10.5
Recessed Characters ................................................................................................... 4.10.14
Surfaces (See GROUND & FLOOR SURFACES)
Tactile Control Indicators ........................................................................................ 4.10.12(2)
Visible Signal ...................................... 4.10.3, 4.10.4.-(3), 4.10.12(2), 4.10.13
Visual Control Indicators .................................................................. 4.10.12(2), 4.10.13

**EMERGENCY COMMUNICATION SYSTEMS** (See also EMERGENCY WARNING SYSTEMS)

Elevator Communication Systems ...................................................... 4.10.14, A4.10.14
Intercommunication Systems ................................................................................... 4.10.14

**EMERGENCY CONTROLS** (See ELEVATORS)

**EMERGENCY WARNING SYSTEMS** (See also EMERGENCY COMMUNICATION SYSTEMS)

Audible Alarms (See ALARMS)
Auxiliary Alarms (See ALARMS)
Emergency Alarms ...................................................... 4.10.12(3), 4.28.3, A4.28.3
Minimum Number: New Construction ..................................................................... 4.1.2(13)
Minimum Requirements: Dwelling Units ................................................................ 4.34.2(10)
Postal Facilities: Emergency Signal .................................................................................. 9.1
Tactile Warnings on Doors to Hazardous Areas (See TACTILE WARNINGS)
Visual Alarms (See ALARMS)

**EMPLOYEE PARKING** (See PARKING & PASSENGER LOADING ZONES)

**ENTRANCES** ............................................................................................................... 4.14

Accessible Route: Location ........................................................... 4.3.2(1), (3), (4)
Definition of ...................................................................................................................... 3.5
Door Hardware (See CONTROLS & OPERATING MECHANISMS)
Entrances in Dwelling Units (See DWELLING UNITS)
Health Care Entrances ........................................................................................... 6.2, 6.3(1)
Historic Preservation: Applicability .......................................................................... 4.1.7(1)(b)
Minimum Number: Accessible Housing ........................................................................ 4.1.3(2)
Minimum Number: Additions .......................................................................... 4.1.5(1), (2)

76

219

**Factory Industrial Occupancy**

**ENTRANCES** (CONTINUED)

Minimum Number: Alterations .................................................................................... 4.1.6(3)(b)
Minimum Number: Historic Preservation ............................................................ 4.1.7(2)(a), (b), (d)
Minimum Number: New Construction ........................................................... 4.1.2(1), (7)(a), (8)
Minimum Number: Sites & Exterior Facilities ...................................................... 4.1.1(1), (7)(c)
Occupancy Classification: Military Housing .................................................................... 4.1.4(3)
Parking & Passenger Loading Zones (See PARKING & PASSENGER LOADING ZONES)
Revolving Doors & Turnstiles (See DOORS)
Service Entrances .......................................................................................... 3.5, 4.14.2

**EQUIPMENT CATWALKS**

Minimum Number: New Construction ............................................................................. 4.1.2(5)
Occupancy Classification: General Exceptions .................................................................. 4.1.4(1)

**EQUIPMENT FOR HEARING IMPAIRED** (See HEARING IMPAIRED)

**ESSENTIAL FEATURES**

Definition of ............................................................................................................ 3.5
Minimum Number: Alterations ............................................................................. 4.1.6(1)(a)

**EXCEPTIONS**

Assembly Areas: Placement of Wheelchair Locations ............................................................ 4.33.3
Bathrooms, Bathing Facilities & Shower Rooms: Clear Floor Space ............................................ 4.23.3
Dwelling Units: Doors ........................................................................................... 4.34.2(6)
Dwelling Units: Kitchen Clearances ............................................................................ 4.34.6.1
Highest Operable Part of Controls ............................................................................... 4.27.3
Minimum Number: Accessible Housing: Entrances ............................................................... 4.1.3(2)
Minimum Number: Additions: Elements & Spaces ............................................................... 4.1.5(4)
Minimum Number: Alterations: Mechanical Rooms ............................................................... 4.1.6(g)
Minimum Number: Alterations: Structurally Impracticable ............................................ 4.1.6(2), (3), (d)
Minimum Number: Alterations: Toilet Rooms ............................................................... 4.1.6(4)(e)
Minimum Number: Alterations: Vertical Access ............................................................ 4.1.6(1)(b)
Minimum Number: Historic Preservation: Entrances ........................................................ 4.1.7(2)(b)
Minimum Number: Historic Preservation: Slope of Ramps .................................................... 4.1.7(2)(a)
Minimum Number: New Construction: Egress ................................................................... 4.1.2(7)
Minimum Number: New Construction: Elevators ................................................................ 4.1.2(5)
Minimum Number: New Construction: Temporary Information .................................................. 4.1.2(15)
Minimum Number: New Construction: Telephone: Reach Range ................................................ 4.1.2(16)
Minimum Number: Sites & Exterior Facilities: Parking Spaces ............................................ 4.1.1(5)(a)
Minimum Number: Sites & Exterior Facilities: Toilet Facilities ......................................... 4.1.1(6)
Occupancy Classification: General Exceptions .................................................................. 4.1.4(1)
Parking Spaces .................................................................................................... 4.6.3
Shower Stalls: Shower Spray Unit ................................................................................ 4.21.6
Toilet Rooms: Clear Floor Space ................................................................................. 4.22.3
Toilet Stalls .................................................................................................... 4.17.3
Visual Alarms ............................................................................................. 4.28.3(1), (2)

**EXITS** (See also EGRESS)

Dwelling Units: Exits (See DWELLING UNITS)
Minimum Number: New Construction ............................................................................. 4.1.2(8)
Doors to Hazardous Areas (See TACTILE WARNINGS)

**EXTERIOR** (See also SITES & EXTERIOR FACILITIES)

Accessible Route: Location ..................................................................................... 4.3.2(4)
Definition of (See Accessible Route, Circulation Path, Common Use, Public Use, Walk) ............................ 3.5
Finding Locations of Buildings ................................................................................. A4.30.1
Historic Preservation: Applicability ...................................................................... 4.1.7(1)(b)

**EXTERIOR HINGED OR SLIDING DOORS** (See DOORS)

**EXTRAORDINARY REPAIR**

Definition of ......................................................................................................... 3.5

**FACILITY** (See also Specific Occupancy Classification)

Definition of ......................................................................................................... 3.5

**FACTORY INDUSTRIAL OCCUPANCY**

Occupancy Classification: Factory Industrial ................................................................... 4.1.4(7)
Service Entrances (See ENTRANCES)

77

Plaintiff's Exhibit 4                                                    Page 77

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Faucets**

**FAUCETS** (See also BATHROOMS, BATHING FACILITIES & SHOWER ROOMS)
Bathtubs ........................................................................................................ 4.20.5
Bathtubs in Dwelling Units ............................................................................ 4.34.5.4(4)
Lavatories & Mirrors ...................................................................................... 4.19.5
Shower Stalls ................................................................................................. 4.21.5
Showers in Dwelling Units ............................................................................ 4.34.5.5(4)
Sinks .............................................................................................................. 4.24.7
Sinks in Dwelling Units (See SINKS)

**FIRE DOORS** (See DOORS)

**FIXED OR BUILT-IN SEATING**
Assembly Areas: Placement of Wheelchair Locations ..................................... 4.33.3
Assembly Areas: Placement of Listening Systems ........................................... 4.33.6
Library Seating & Tables ................................................................................ 8.2
Minimum Number: New Construction ............................................................. 4.1.2(17)
Restaurants & Cafeterias ............................................................................... 5.1
Telephones: Clear Floor or Ground Space ..................................................... 4.31.2

**FIXTURES**
Clear Floor Space ........................................................ 4.22.3, 4.23.3, 4.34.5.1
Hall Lantern Fixtures (See ELEVATORS)
Lavatories & Mirrors (See LAVATORIES & MIRRORS)

**FLOOR SURFACES** (See GROUND & FLOOR SURFACES)

**FLUSH CONTROLS** (See CONTROLS)

**FOOD SERVICE LINES** (See RESTAURANTS & CAFETERIAS)

**FORWARD APPROACH** (See REACH RANGES)

**FREE STANDING OBJECTS**
Drinking Fountains & Water Coolers .............................................................. 4.15.5(2)
Protruding Objects ........................................................................................ 4.4.1

**FREEZERS** (See KITCHENS)

**FULL & FAIR CASH VALUE**
Definition of ................................................................................................... 3.5
Minimum Number: Alterations ....................................................................... 4.1.6(3)(d)

**FUNCTIONAL SPACE**
Definition of ................................................................................................... 3.5

**GATES**
Accessible Gates ........................................................................................... 4.13.3
Check-out Areas (See LIBRARIES)
Revolving Doors & Turnstiles (See DOORS)
Wheelchair Passage Width ............................................................................ A4.2.1(1)

**GARAGES** (See also PARKING & PASSENGER LOADING ZONES)
Service Entrances (See ENTRANCES)
Dwelling Units: Minimum Requirements ......................................................... 4.34.2(15)(d)
Occupancy Classification: Utility & Miscellaneous ........................................ 4.1.4(13)
Parking Spaces in Garages ............................................................................ A4.6.3

**GRAB BARS** (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)

**GRATINGS** (See GROUND & FLOOR SURFACES)

**GRIPPING SURFACES** (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)

**GROUND & FLOOR SURFACES** ......................................................... 4.5, A4.5
Accessible Route: Surface Textures ............................................................... 4.3.6
Assembly Areas: Surfaces .............................................................................. 4.33.4
Carpet (See CARPET)
Changes in Levels .......................................................................................... 4.5.2
Clear Floor or Ground Space for Wheelchairs ............................................... 4.2.4.3
Curb Ramp Surfaces ...................................................................................... 4.7.4
Dwelling Units: Minimum Requirements ......................................................... 4.34.2(2)
78

Plaintiff's Exhibit 4

Page 78

**Hearing Impaired**

GROUND & FLOOR SURFACES (CONTINUED)
Elevators: Floor Surfaces ................................................................................. 4.10.10
Gratings ....................................................................................................... 4.5.4
Minimum Number: New Construction .............................................................. 4.1.2(3)
Minimum Number: Sites & Exterior Facilities .................................................. 4.1.1(4)
Outdoor Ramp Conditions .............................................................................. 4.8.8
Outdoor Stairs Conditions .............................................................................. 4.9.6
Street & Sidewalk Surfaces ............................................................................ 4.5.1, 4.5.4

HALL CALL BUTTONS & LANTERNS (See ELEVATORS)

HAND-HELD SHOWER UNITS (See SHOWER SPRAY UNITS)

HANDRAILS, GRAB BARS & TUB & SHOWER SEATS ................................................ 4.26, A4.26
Adaptable Bathrooms ........................ 4.34.3, 4.34.4(2), 4.34.5, 4.34.5.2(3), 4.34.5.4(3), 4.34.5.5(3), A4.34.5
Bathtub Grab Bars & Seats ............................................................................. 4.20.3, 4.20.4
Bathtubs in Dwelling Units: Seats & Grab Bars ................................................ 4.34.5.4(2), (3)
Eliminating Hazards ...................................................................................... 4.26.4
Gripping Surfaces .......................................... 4.8.5(4), 4.9.4(4), (5), 4.17.6, 4.26.2
Handrails at Ramps ....................................................................................... 4.8.5, A4.8.5
Handrails for Stairs ....................................................................................... 4.9.4, A4.8.5
Minimum Number: Alterations ....................................................................... 4.1.6(4)(b)
Minimum Number: Dwelling Units ...................... 4.34.2(12), 4.34.5, 4.34.5.2(3), 4.34.5.4, 4.34.5.5
Minimum Number: Grab Bars ....................... 4.16.1, 4.16.4, 4.17.1, 4.17.6. 4.20.1, 4.20.4, 4.21.1, 4.21.4
Minimum Number: Handrails ................................................ 4.8.1, 4.8.5, 4.9.1, 4.9.4
Minimum Number: Shower Seats ................................... 4.20.1, 4.20.3, 4.21.1, 4.21.3
Post Office Lobby Handrails ............................................................................ 9.2(2)
Shower Stalls: Seats & Grab Bars ................................................................... 4.21.3, 4.21.4
Showers in Dwelling Units ............................................................................. 4.34.5.5(2), (3)
Size & Spacing of Grab Bars & Handrails ......................................................... 4.26.2, A4.26.2
Structural Strength ....................................................................................... 4.26.3
Toilet Stalls: Grab Bars ................................................................................. 4.17.6
Water Closet Grab Bars ................................................................................. 4.16.4, A4.16.4
Water Closets in Dwelling Units: Grab Bars ..................................................... 4.34.5.2(3)

HARDWARE (See CONTROLS & OPERATING MECHANISMS)

HAZARDOUS AREAS (See TACTILE WARNINGS)

HAZARDOUS VEHICULAR AREAS (See TACTILE WARNINGS)

HAZARDOUS OCCUPANCY
Occupancy Classification: Factory Industrial .................................................... 4.1.4(7)
Occupancy Classification: Hazardous ............................................................... 4.1.4(8)
Occupancy Classification: Storage ................................................................... 4.1.4(12)

HEAD ROOM
Accessible Route ........................................................................................... 4.3.5
Protruding Objects ........................................................................................ 4.4.2

HEALTH CARE ........................................................................................................ 6.
Doors to Patient Bedrooms (See DOORS)
Entrances (See ENTRANCES)
Entry Doors to Acute Care Hospital Rooms (See DOORS)
Hospitals ....................................................................................... 4.1.4(9)(b), 4.13.6
Long-term Care Facilities ............................................................................... 4.1.4(9)
Minimum Number: New Construction ............................................................... 4.1.2(13)
Minimum Number: Sites & Exterior Facilities .................................................. 4.1.1(5)(e)
Occupancy Classification: Business ................................................................. 4.1.4(9)
Occupancy Classification: Institutional ............................................. 4.1.4(9), (a), (b)
Outpatient Facilities .................................................... 4.1.1(5)(e), 4.1.4(5), (9)(b)
Patient Bedrooms .......................................................................................... 6.3
Patient Toilet Rooms ..................................................................................... 6.4.

HEARING IMPAIRED
Auxiliary Alarms (See ALARMS)
Dwelling Unit: Consumer Information ............................................................. 4.34.4(3), (4)
Equipment for Hearing Impaired .................... 4.28.2, 4.28.3, 4.28.4, 4.31.5, 4.34.4(3), (4), A4.31.5
Listening Systems (See LISTENING SYSTEMS)
Minimum Number: New Construction ............................................................... 4.1.2(16)(b), (18)(b)

Plaintiff's Exhibit 4

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Hearing Impaired**

---

**HEARING IMPAIRED (CONTINUED)**
Telephones .................................................................................................. 4.31.5, A4.31.5
Visual Alarms (See ALARMS)
**HINGED DOOR (See DOORS)**

**HISTORIC PRESERVATION** ................................................................................... **4.17**

**HOSPITALS (See HEALTH CARE)**

**HOUSING (See also DWELLING UNITS)**
Definition of ................................................................................................. 3.5
Minimum Number: Additions (Reserved) .................................................................. 4.1.5(5)
Minimum Number: Housing .................................................................................. 4.1.3
Minimum Number: Sites & Exterior Facilities .............................................................. 4.1.1(5)(d)
Occupancy Classification: Military Exclusions .............................................................. 4.1.4(2)(a)
Occupancy Classification: Military Housing ................................................................. 4.1.4(3)
Occupancy Classification: Residential ...................................................................... 4.1.4(11)
**ILLUMINATION LEVELS (See ELEVATORS; SIGNAGE)**

**INCISED & INDENTED CHARACTERS (See SIGNAGE)**

**INSTITUTIONAL OCCUPANCY**
Occupancy Classification: Institutional ..................................................................... 4.1.4(9)
Occupancy Classification: Residential ...................................................................... 4.1.4(11)
**INTERCOMMUNICATION SYSTEMS (See EMERGENCY COMMUNICATION SYSTEMS)**

**INTERNATIONAL SYMBOL OF ACCESSIBILITY**
Minimum Number: Sites & Exterior Facilities .............................................................. 4.1.1(7)
Parking & Passenger Loading Zones: Signage (See PARKING & PASSENGER LOADING ZONES)
Symbol of Accessibility ...................................................................................... 4.30.5
**INTERSECTIONS (See CURB RAMPS)**

**INTERIOR HINGED DOORS (See DOORS)**

**INTERIOR SIGNAGE MOUNTING HEIGHT & LOCATIONS (See SIGNAGE)**

**JAILS (See CORRECTIONAL FACILITIES)**

**KITCHENS (See also DWELLING UNITS)** ..................................................... **4.34.6, A4.34.6**
Adaptable Features: Consumer Information ............................................. 4.34.4(1), (3), (4)
Base Cabinets ................................ 4.34.4(1),(3),(4), 4.34.6.1, 4.34.6.4(2), 4.34.6.10(2), A4.34.6.5(5), A4.34.6.10
Cabinets .......................................................... 4.34.2(8), 4.34.4(1),(3),(4), A4.34.6.10
Clear Floor Space ............................................................................... 4.34.6.2
Clearance ........................................................................... 4.34.6.1, A4.34.6.1
Controls (See CONTROLS & OPERATING MECHANISMS)
Counter Work Surfaces .......................................................................... 4.34.6.4
Dishwashers ......................................................................... 4.34.6.2, 4.34.6.9
Height of Work Surfaces ....................................................... 4.34.4(1), (4), 4.34.6.4, (1)
Kitchen Storage ......................................................... 4.34.6.10, (1), (2), A4.34.6.10
Minimum Requirements ........................................................... 4.34.2(13), 4.34.6
Ovens ........................................................................ 4.34.6.6, 4.34.6.7, A4.34.6.7
Ranges/Cooktops ....................................................... 4.34.6.2, 4.34.6.6, A4.34.6.6
Refrigerator/Freezers .................................... 4.34.6.2, 4.34.6.8, (1),(2), A4.34.6.8
Sinks (See SINKS)
**KITCHEN STORAGE (See KITCHENS)**

**KNEE & TOE CLEARANCES**
Clear Knee Space ........................................................... 4.2.4.1, 4.15.5, (1)
Drinking Fountains: Knee Clearance ......................................................... 4.15.5(1)
Lavatories & Mirrors ........................................................................... 4.19.2
Seating, Tables & Work Surfaces ................................................... 4.32.2, 4.32.3
Sinks: Knee Clearance ......................................................................... 4.24.3
Sinks: Knee Clearance in Dwelling Units ........................................ 4.34.6.5(7), A4.34.6.5
Toilet Stalls: Toe Clearance .................................................................. 4.17.4
**KNURLING (See TACTILE WARNINGS)**

Plaintiff's Exhibit 4                                                    Page 80

Subpt. 101–19.6, App. A                    41 CFR Ch. 101 (7–1–97 Edition)

**Military**

LANDINGS (See RAMPS)

LAUNDRY FACILITIES (See DWELLING UNITS)

LAVATORIES & MIRRORS ................................................................. **4.19, A4.19**
   Adaptability: Consumer Information ...................................................... 4.34.4(1)
   Built-in Lavatories .......................................................................... 4.19.1
   Bathrooms, Bathing Facilities & Shower Rooms: Clear Floor Space ..................... 4.23.3
   Clear Floor Space .......................................................................... 4.19.3
   Dwelling Units: Lavatory, Mirrors & Medicine Cabinets ............................... 4.34.5.3
   Exposed Pipes & Surfaces ................................................................ 4.19.4
   Faucets (See FAUCETS)
   Height & Clearances
   Knee & Toe Clearances (See KNEE & TOE CLEARANCES)
   Lavatory Fixtures .......................................................... 4.19.5, 4.22.3, 4.23.3
   Lavatory Height ............................................................................ 4.19.2
   Lavatory Vanities .......................................................................... 4.19.1
   Minimum Number: Alterations ......................................................... 4.1.6(4)(e)
   Minimum Number: Lavatories & Mirrors .......................... 4.19.1, 4.22.6, 4.23.6
   Minimum Requirements: Dwelling Units .......................................... 4.34.2(12)
   Mirrors .................................................... 4.1.4(12), 4.19.6, A4.19.6
   Toilet Rooms .............................................................................. 4.22.6

LIBRARIES ................................................................................ **8.**
   Card Catalogs ............................................................................. 8.4
   Check-out Areas .......................................................................... 8.3
   Minimum Number ...................................................................... 8.1, 8.2
   Public Toilet Rooms (See TOILET ROOMS)
   Occupancy Classification: Assembly ..................................................... 4.1.4(4)
   Reading & Study Areas .................................................................. 8.1.2
   Stacks ............................................................................ 8.1, 8.4, 8.5

LIFTS (See PLATFORM LIFTS)

LISTENING SYSTEMS (See also AUDIO-AMPLIFICATION SYSTEMS)
   Minimum Number: New Construction ................................................ 4.1.2(18)(b)
   Placement of Listening Systems .................................................. 4.33.6, A4.33.6
   Types of Listening Systems ...................................................... 4.33.7, A4.33.7

LIVING ROOMS (See DWELLING UNITS)

LOCKER ROOMS (See PERFORMING AREAS; POSTAL FACILITIES)

LONG-TERM CARE FACILITIES (See HEALTH CARE)

MANEUVERING CLEARANCES AT DOORS (See DOORS)

MARKED CROSSINGS (See CURB RAMPS)

MECHANICAL ROOMS
   Minimum Number: Additions ............................................................ 4.1.5(4)
   Minimum Number: Alterations ...................................................... 4.1.6(1)(g)
   Minimum Number: New Construction .................................................... 4.1.2(5)
   Occupancy Classification: General Exceptions ......................................... 4.1.4(1)

MEDICINE CABINETS (See BATHROOMS, BATHING FACILITIES & SHOWER ROOMS; DWELLING UNITS)

MEETING ROOMS (See ASSEMBLY AREAS)

MERCANTILE ............................................................................. **7.**
   Check-out Aisles .......................................................................... 7.3
   Minimum Number: New Construction .................................................... 7.1
   Occupancy Classification: Mercantile ................................................ 4.1.4(10)
   Security Bollards (See EGRESS)
   Service Counters .......................................................................... 7.2

MERCANTILE OCCUPANCY .......................................................... 4.1.4(10)

MILITARY
   Occupancy Classification: Military Exclusions .......................... 4.1.4(2), (a), (b), (c)
   Occupancy Classification: Military Housing ............................................ 4.1.4(3)

81

Plaintiff's Exhibit 4                                          Page 81

Federal Property Management Regulations — Subpt. 101–19.6, App. A

## Minimum Number

**MINIMUM NUMBER (See also MINIMUM REQUIREMENTS)** ........................................................... **4.1**
   Minimum Number: Additions .................................................................................. 4.1.5
   Minimum Number: Alterations ................................................................................ 4.1.6
   Minimum Number: Bathing & Shower Facilities .......................................................... 4.23.8
   Minimum Number: Controls & Dispensers .......................................................... 4.22.7, 4.23.7
   Minimum Number: Historic Preservation ................................................................... 4.1.7
   Minimum Number: Housing ................................................................................... 4.1.3
   Minimum Number: Lavatories & Mirrors ........................................................... 4.22.6, 4.23.6
   Minimum Number: Medicine Cabinets ...................................................................... 4.23.9
   Minimum Number: New Construction ....................................................................... 4.1.2
   Minimum Number: Sites & Exterior Facilities .............................................................. 4.1.1
   Minimum Number: Urinals .......................................................................... 4.22.5, 4.23.5
   Minimum Number: Water Closets ................................................................... 4.22.4, 4.23.4

**MINIMUM REQUIREMENTS (See DWELLING UNITS; KITCHENS)**

**MIRRORS (See LAVATORIES & MIRRORS)**

**MULTI-STORY BUILDING**
   Minimum Number: New Construction ...................................................................... 4.1.2(5)

**NEW CONSTRUCTION**
   Minimum Number: New Construction ....................................................................... 4.1.2
   Minimum Number: Sites & Exterior Facilities .............................................................. 4.1.1
   Minimum Slope of Ramps: New Construction ............................................................... 4.8.2

**NOSINGS (See STAIRS)**

**OCCUPANCY CLASSIFICATIONS (See also Specific Classification)** ......................................... **4.1.4**

**OUTDOOR RAMPS (See RAMPS)**

**OUTDOOR STAIRS (See STAIRS)**

**OUTPATIENT FACILITIES (See HEALTH CARE)**

**OVENS (See KITCHENS)**

**PARALLEL APPROACH (See REACH RANGES)**

**PARKING & PASSENGER LOADING ZONES** ............................................................. **4.6, A4.6**
   Accessible Route Locations ............................................................................... 4.3.2(1)
   Employee Parking: Minimum Number ....................................... 4.1.1(5)(a), (e), (1), (3)
   Entrances ..................................................................... 4.6.2, 4.6.3, 4.14.1
   Health Care ................................................................................................. 6.2
   Historic Preservation: Applicability ............................................................... 4.1.7(1)(b)
   Libraries .................................................................................................... 8.1
   Location .................................................................................................... 4.6.2
   Minimum Number: Alterations .................................................................... 4.1.6(3)(d)(i)
   Minimum Number: New Construction .................................................................... 4.1.2(8)
   Minimum Number: Sites & Exterior Facilities ...................................................... 4.1.1(1), (5)
   Minimum Requirements: Parking in Dwelling Units ....................................................... 4.34.2(4)
   Occupancy Classification: Military Exclusions: Parking .................................................. 4.1.4(2)(c)
   Occupancy Classification: Military Housing: Parking ...................................................... 4.1.4(3)
   Parking Lots: Minimum Number ..................................................................... 4.1.1(5)(e)
   Parking Spaces ................................................ 4.1.1(1), (7)(a), 4.6.3, A4.6.3
   Parking Spaces: Minimum Number ............... 4.1.1, (5)(a), (c), (d), (i)(ii), (e), (i)(ii)(iii), 7(a)
   Passenger Loading Zones ................................................... 4.1.1(1), (7)(b), 4.6.5
   Passenger Loading Zones: Minimum Number ........................................................ 4.1.1(5)(b)
   Signage ..................................................................................................... 4.6.4
   Vertical Clearance ......................................................................................... 4.6.6
   Visitor Parking: Minimum Number .................................................... 4.1.1(5)(a), (d)(3), (e)

**PASSING SPACE (See CLEARANCES FOR WHEELCHAIRS)**

**PATIENT BEDROOMS (See HEALTH CARE)**

**PATIOS (See DWELLING UNITS)**

**PERFORMING AREAS**
   Access to Performing Arts ................................................................................. 4.33.5
   Dressing Rooms ........................................................................................... 4.33.5

82

225

Subpt. 101–19.6, App. A          41 CFR Ch. 101 (7–1–97 Edition)

**Reach Ranges**

**PERFORMING AREAS** (CONTINUED)
Minimum Number ........................................................................ 4.33.1
Minimum Number: Alterations .................................................... 4.1.6(4)(f)(iii)
Stages ...................................................................................... 4.29.3, 4.33.5

**PHYSICALLY HANDICAPPED**
Definition of ............................................................................. 3.5

**PLATFORM LIFTS** ................................................................... **4.11, A4.11**
Accessible Route: Changes in Levels ....................................... 4.10.1
Minimum Number: Alterations .................................................... 4.1.6(b)
Minimum Number: New Construction ......................................... 4.1.2(5)
Wheelchair Lifts ....................................................................... 4.10.1

**POSTAL FACILITIES** ................................................................ **9., A9.2**
Attendance-Recording Equipment ............................................. 9.6
Employee Toilet Rooms (See TOILET ROOMS)
Handrails (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Letter Drops, Customer Service Desks, Tables or Counters ........ 9.2
Locker Rooms .......................................................................... 9.5
Post Office Boxes ..................................................................... 9.4
Post Office Lobbies .................................................................. 9.2
Self-Service Postal Centers ..................................................... 9.3
Switches & Controls (See CONTROLS & OPERATING MECHANISMS)

**POWER-ASSISTED DOORS** (See DOORS)

**PRISONS** (See CORRECTIONAL FACILITIES)

**PROTRUDING OBJECTS** ............................................................ **4.4, A4.4**
Head Room ............................................................................. 4.4.2
Minimum Number: New Construction ......................................... 4.1.2(2)
Minimum Number: Sites & Exterior Facilities ............................. 4.1.1(3)
Telephones .............................................................................. 4.31.4

**PUBLIC TELEPHONES** (See TELEPHONES)

**PUBLIC STREETS & SIDEWALKS** (See STREETS & SIDEWALKS)

**RAISED CHARACTERS** (See SIGNAGE)

**RAMPS** (See also CURB RAMPS) .............................................. **4.8, A4.8**
Accessible Routes: Changes in levels ....................................... 4.3.8
Accessible Routes: Sites .......................................................... A4.3.1(2)
Clear Width ............................................................................. 4.8.3
Cross Slope ............................................................................ 3.5, 4.3.7, 4.8.6, A4.5.1
Definition of ............................................................................ 3.5
Edge Protection ...................................................................... 4.8.7
Handrails (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Historic Preservation: Applicability ........................................... 4.1.7(1)(b)
Landings ................................................................................. 4.8.4, 4.8.7
Minimum Number: Alterations .................................................... 4.1.6(1)(b)
Minimum Number: Historic Preservation .................................... 4.1.7(2)(a)
Minimum Number: New Construction ......................................... 4.1.2(5)
Outdoor Conditions ................................................................. 4.8.8
Running Slope ......................................................................... 3.5, 4.3.7, A4.3.1(2)
Rise ........................................................................................ 4.8.2, 4.8.5, A4.8.2
Slopes .................................................................................... 4.1.6(4)(a), 4.1.7(2)(a), 4.5.2, 4.6.3, 4.6.5
Surfaces (See GROUND & FLOOR SURFACES)

**RANGES/COOKTOPS** (See KITCHENS)

**REACH RANGES**
Forward Approach (See also Approach to Specific Element) ....... 4.2.4.1, 4.2.5
Forward Reach ........................................................................ 4.2.5, A4.2.5
Minimum Number: New Construction: Reach Ranges .................. 4.1.2(16)(a)
Parallel Approach (See also Approach to Specific Element) ........ 4.2.4.1, 4.2.6
Reach Obstructions .................................................................. 4.2.5, 4.2.6
Side Reach .............................................................................. 4.2.6

83

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Reading & Study Areas**

READING & STUDY AREAS (See LIBRARIES)

RECESSED CHARACTERS (See ELEVATORS)

REFLECTING POOLS (See TACTILE WARNINGS)

REFRIGERATOR/FREEZERS (See KITCHENS)

RESIDENTIAL OCCUPANCY ......................................................... 4.1.4(11)

RESTAURANTS/CAFETERIAS ......................................................... 5.
    Displays (See DISPLAYS)
    Food Service Lines .......................................................... 5.2
    Minimum Number ........................................................... 5.1
    Occupancy Classification: Assembly .......................................... 4.1.4(4)
    Tableware Areas ............................................................ 5.3
    Vending Machines ........................................................... 5.4

REVOLVING DOORS & TURNSTILES (See DOORS)

RISE (See RAMPS)

RUNNING SLOPE (See RAMPS)

SEATS (See FIXED OR BUILT-IN SEATING; SEATING, TABLES & WORK SURFACES; HANDRAILS, GRAB BARS,
    TUB & SHOWER SEATS)

SEATING SPACES (See also FIXED OR BUILT-IN SEATING; SEATING, TABLES & WORK SURFACES)

SEATING, TABLES & WORK SURFACES (See FIXED OR BUILT-IN SEATING) ...................... 4.32, A4.32
    Bathtub Seats (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
    Bathtub Seats in Dwelling Units (See DWELLING UNITS)
    Counter Work Surfaces in Kitchens (See KITCHENS)
    Fixed Seats for Telephones (See TELEPHONES)
    Letter Drops, Customer Service Desks, Tables or Counters (See POSTAL FACILITIES)
    Height of Work Surfaces ..................................................... 4.32.4, A4.32.4
    Knee Clearance (See KNEE & TOE CLEARANCES)
    Library Seating & Tables .................................................... 8.2
    Minimum Number: Alterations ............................................... 4.1.6(3)(d)(vi), (4)(f)(i)
    Minimum Number: New Construction .......................................... 4.1.2(17), (18)
    Placement of Wheelchairs in Seating Areas (See ASSEMBLY AREAS)
    Ranges & Cooktop Surfaces (See KITCHENS)
    Restaurant Seating .......................................................... 5.1
    Seating Spaces ............................................................. 4.32.2
    Shower Seats (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
    Shower Seats in Dwelling Units (See DWELLING UNITS)

SECURITY BOLLARDS (See EGRESS)

SELF-SERVICE POSTAL CENTERS (See POSTAL FACILITIES)

SERVICE COUNTERS (See MERCANTILE)

SERVICE ENTRANCES (See ENTRANCES)

SHOWER FACILITIES/SHOWERS (See BATHROOMS, BATHING FACILITIES & SHOWER ROOMS; DWELLING UNITS)

SHOWER SPRAY UNITS
    Bathtubs: Fixed or Hand-held Shower Units .................................... 4.20.6
    Dwelling Units: Fixed or Hand-held Shower Units .............................. 4.34.5.4(5), 4.34.5.5(5)
    Shower Stalls: Fixed or Hand-held Shower Units ............................... 4.21.6

SHOWER STALLS ........................................................... 4.21
    Controls (See CONTROLS & OPERATING MECHANISMS)
    Curbs in Shower Stalls ..................................................... 4.21.7, A4.21.1
    Handrails (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
    Shower Enclosures .......................................................... 4.21.8
    Shower Seats (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)

SIDE REACH (See REACH RANGES)

SIDES OF CURB RAMPS (See CURB RAMPS)

SIDEWALKS (See STREETS & SIDEWALKS)

84

Plaintiff's Exhibit 4                                          Page 84

**Storage**

**SIGNAGE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4.30, A4.30**
Character Proportion . . . . . . . . . . . . . . . . . . . . . 4.10.5, 4.30.2, 4.30.4, A4.30.2, A4.30.4
Color Contrast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.30.3, A4.30.3
Definition of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.5
Directional Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.7(2)(b)
Historic Preservation: Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.7(1)(b)
Incised or Raised Characters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.30.4, A4.30.4
Indented Characters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.30.4, A4.30.4
Interior Signage Mounting Height . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.7(2)(e), 4.30.6
Interior Signage Mounting Locations . . . . . . . . 4.1.2(15), (16), 4.1.7(2)(e), 4.30.6, A4.30.1
Illumination Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4.30.1
Minimum Number: Historic Preservation . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.7(2)(b),(e)
Minimum Number: New Construction . . . . . . . . . . . . . . . . . . . . . 4.1.2(15), (16)(a)
Parking & Passenger Loading Zones: Signage . . . . . . . . . . . . . . . . . . . . . . . . 4.6.4
Stroke Width . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.30.2, 4.30.4, A4.30.2
Symbol of Accessibility (See INTERNATIONAL SYMBOL OF ACCESSIBILITY)

**SINKS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4.24**
Adaptability: Consumer Information . . . . . . . . . . . . . . . . . . . . 4.34.4(1), (4), (5)
Clear Floor Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.24.5
Depth of Sink Bowl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.24.4, 4.34.6.5(3)
Exposed Pipes & Surfaces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.24.6
Faucets (See FAUCETS)
Height . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.24.2, 4.34.4(1), (5), 4.34.6.5(1)
Sinks in Dwelling Units . . . . . . . . . . . . . . . . . . . . . . . . . . 4.34.6.5, 4.34.6.1, 5
Sink Knee Clearance (See KNEE & TOE CLEARANCES)

**SITES & EXTERIOR FACILITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4.1.1**
Definition of (See Site) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.5

**SLEEPING AREAS (See DWELLING UNITS)**

**SLEEPING ACCOMMODATIONS (See also DWELLING UNITS; HEALTH CARE)**
Auxiliary Alarms (See ALARMS)
Minimum Number: New Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.2(13)
Occupancy Classification: Residential . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.4(11)

**SLIDING DOORS (See DOORS)**

**SLOPES (See RAMPS)**

**SPACES (See ELEMENTS & SPACES)**

**STACKS (See LIBRARIES)**

**STAGES (See PERFORMING AREAS)**

**STAIRS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4.9**
Accessible Route: Changes in Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.3.8
Ground & Floor Surfaces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.5.1, A4.5.1
Handrails (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Minimum Number: Alterations . . . . . . . . . . . . . . . . . . 4.1.6(1)(b), (d), (4)(b)
Minimum Number: New Construction . . . . . . . . . . . . . . . . . . . . . . . . . 4.1.2(4)
Nosings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.9.3
Outdoor Stairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.9.6
Ramps: General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4.8.1, A4.8.5
Risers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.9.2, 4.9.3, 4.9.4(2)
Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.9.2
Tactile Warnings at Stairs (See TACTILE WARNINGS)
Treads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.9.2

**STEPS (See STAIRS)**

**STORAGE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4.25**
Clothes Rods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.25.3
Clear Floor Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.25.2
Fixed Storage Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.25.1
Height . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.25.3
Hardware (See CONTROLS & OPERATING MECHANISMS)
Kitchen Storage (See KITCHENS)

85

Plaintiff's Exhibit 4

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Storage**

STORAGE (CONTINUED)
Minimum Number: Additions .............................................................................. 4.1.5(4)
Minimum Number: Alterations ................................................................... 4.1.6(3)(d)(iii)
Minimum Number: New Construction ....................................................................... 4.1.2(11)
Occupancy Classification: Business ........................................................................ 4.1.4(5)
Occupancy Classification: Hazardous ...................................................................... 4.1.4(8)
Occupancy Classification: Storage ......................................................................... 4.1.4(12)
Storage Cabinets ........................................................ 4.1.2(11), 4.1.4(12), 4.25.1
Storage in Dwelling Units (See DWELLING UNITS)

STORAGE OCCUPANCY ................................................................................ 4.1.4(12)

STREETS & SIDEWALKS
Accessible Route: General ................................................................................ 4.3.1
Accessible Route: Location ............................................................................ 4.3.2(1)
Curb Ramps: Islands ..................................................................................... 4.7.11
Curb Ramp Transitions .................................................................................. 4.7.2
Definition of (See Common Use, Public Use, Vehicular Way, Walk) ................................. 3.5
Entrances .................................................................................................. 4.14.1
Gratings .................................................................................................... 4.5.4
Minimum Number: New Construction ..................................................................... 4.1.2(8)
Minimum Number: Sites & Exterior Facilities ............................................................ 4.1.1(1)
Minimum Requirements: Dwelling Units ................................................................ 4.34.2(1)
Occupancy Classification: Military Housing .............................................................. 4.1.4(3)
Outdoor Conditions ...................................................................... 4.8.8, 4.9.6
Tactile Warnings on Walking Surfaces (See TACTILE WARNINGS)
Surfaces (See GROUND & FLOOR SURFACES)
Walks ....................................................................................................... 4.3.4

STROKE WIDTH (See SIGNAGE)

STRUCTURALLY IMPRACTICABLE/STRUCTURAL IMPRACTICABILITY
Definition of ............................................................................................... 3.5
Minimum Number: Alterations .......................... 4.1.6(2),(3), (4)(c)(iii), (e), (f)(i), (ii)
Toilet Stalls: Exception .................................................................................. 4.17.3

STRUCTURAL REINFORCEMENT (See DWELLING UNITS)

STRUCTURAL STRENGTH (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)

SURFACE TEXTURES (See TACTILE WARNINGS)

SYMBOL OF ACCESSIBILITY (See INTERNATIONAL SYMBOL OF ACCESSIBILITY)

TABLES (See SEATING, TABLES & WORK SURFACES)

TABLEWARE AREAS (See RESTAURANTS)

TACTILE CONTROL INDICATORS (See ELEVATORS)

TACTILE WARNINGS .................................................................................... **4.29**
Definition of (See also Tactile) ............................................................................. 3.5
Elevators: Tactile & Visual Control Indicators ......................................................... 4.10.12(2)
Knurling .................................................................................................... 4.29.3
Minimum Number: New Construction ................................................................... 4.1.2(14)
Tactile Warnings at Hazardous Vehicular Areas (Reserved) ................................ 4.29.5, A4.29.5
Tactile Warnings at Reflecting Pools (Reserved) ....................................................... 4.29.6
Tactile Warnings at Stairs (Reserved) ......................................................... 4.9.5, 4.29.4
Tactile Warnings on Doors to Hazardous Areas ............................................... 4.29.3, 4.29.7
Tactile Warnings on Walking Surfaces (Reserved) ...................................................... 4.29.7
Textured Surfaces ........................................................................... 4.29.3, 4.29.7
Warning Textures on Curb Ramps (Reserved) ........................................................... 4.7.7

TAXI STANDS
Minimum Number: New Construction ..................................................................... 4.1.2(8)

TELEPHONES .............................................................................................. **4.31**
Clear Floor Space ........................................................................................ 4.31.2
Fixed Seats ............................................................................................... 4.31.2
Mounting Height of Operable Equipment .................................................... 4.31.3, A4.31.3
Minimum Number: Alterations ................................................................... 4.1.6(3)(d)(v)
86

Plaintiff's Exhibit 4

Urinals

**TELEPHONES** (CONTINUED)

Minimum Number: New Construction .................................................... 4.1.2(16)
Occupancy Classification: Business .................................................... 4.1.4(5)
Occupancy Classification: General Exceptions ........................................ 4.1.4(1)
Protruding Objects .................................................................... 4.4.1
Public Telephones .......................................................... 4.1.2(16), 4.31.1
Push Button Controls .................................................................. 4.31.1
Telephone Banks .................................................................. 4.1.2(16)(a)
Telephone Books/Directories .......................................................... 4.31.7
Telephone Cord Length ................................................................ 4.31.8
Telephone Cord Length in Elevators .................................................. 4.10.14
Volume Controls .......................................... 4.1.2(16) (b), 4.31.5, A4.33.7

**TELEPHONE BANKS** (See TELEPHONES)

**TERRACES** (See DWELLING UNITS)

**TRAFFIC ISLANDS** (See CURB RAMPS)

**THRESHOLDS AT DOORWAYS** (See DOORS)

**TOE CLEARANCE** (See KNEE & TOE CLEARANCES)

**TOILET FACILITIES** (See TOILET ROOMS)

**TOILET ROOMS** .......................................................................... **4.22**

Bathrooms in Dwelling Units (See DWELLING UNITS).
Clear Floor Space ..................................................................... 4.22.3
Controls (See CONTROLS & OPERATING MECHANISMS)
Doors (See DOORS)
Employee Toilet Rooms: Postal Facilities ................................................ 9.1
Historic Preservation: Applicability .............................................. 4.1.7(1)(b)
Lavatories & Mirrors (See LAVATORIES & MIRRORS)
Minimum Number: Additions ......................................................... 4.1.5(3)
Minimum Number: Alterations ................................ 4.1.6(3)(c)(i), (ii), (4)(e)
Minimum Number: Historic Preservation ........................................... 4.1.7(2)(c)
Minimum Number: New Construction ................................................. 4.1.2(10)
Minimum Number: Sites & Exterior Facilities .............................. 4.1.1(6), (7)
Patient Toilet Rooms (See HEALTH CARE)
Public Toilet Rooms: Libraries ......................................................... 8.1
Unisex Toilets ........................................... 4.1.6(4)(e), 4.1.7(2)(c)
Urinals (See URINALS)
Water Closets (See WATER CLOSETS)

**TOILET STALL** (See also DOORS) ............................................. **4.17, A4.17**

Grab Bars (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Toilet Stall Doors (See DOORS)
Toilet Stalls in Bathrooms, Bathing Facilities & Shower Rooms ..................... 4.23.4
Toe Clearance (See KNEE & TOE CLEARANCES)
Seats (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
Water Closets in Toilet Stalls .......................... 4.16, 4.17.2, 4.22.4

**TRANSIT FACILITIES**

Minimum Number: Alterations: Transit Facilities ................................. 4.1.6(1)(b)
Minimum Number: New Construction .................................................. 4.1.2(8)

**TREADS** (See STAIRS)

**TURNSTILES** (See DOORS)

**UNCURBED INTERSECTIONS** (See CURB RAMPS)

**UNOBSTRUCTED TURNING SPACES** (See CLEARANCES FOR WHEELCHAIRS)

**URINALS** ............................................................................... **4.18**

Clear Floor Space ..................................................................... 4.18.3
Controls (See CONTROLS & OPERATING MECHANISMS)
Height ................................................................................ 4.18.2
Minimum Number: Bathrooms, Bathing Facilities & Shower Rooms ..................... 4.23.5
Minimum Number: Toilet Rooms ....................................................... 4.22.5
Shields .............................................................................. 4.18.3
Urinals in Toilet Rooms .............................................................. 4.22.5

87

230

Federal Property Management Regulations          Subpt. 101–19.6, App. A

**Utility & Miscellaneous Occupancy**

UTILITY & MISCELLANEOUS OCCUPANCY .................................................... 4.1.4(13)

VANITIES (See LAVATORIES & MIRRORS)

VANS
   Parking Spaces ................................................... 4.1.1(5)(c), 4.6.3, A4.6.3
   Vertical Clearance .......................................................................... 4.6.6

VEHICULAR AREAS/WAYS
   Definition of (See also Marked Crossing, Site Improvement) ....................... 3.5
   Built up Curb Ramp Location (See CURB RAMPS)
   Tactile Warnings at Hazardous Vehicular Areas (See TACTILE WARNINGS)

VENDING MACHINES (See RESTAURANTS; POSTAL FACILITIES)

VERTICAL ACCESS
   Definition of (See Entrance) ............................................................. 3.5
   Minimum Number: Alterations ...................................................... 4.1.6(b)
   Minimum Number: New Construction ............................................. 4.1.2(B)
   Vertical Access Equipment ......................................................... 4.1.6(b)

VERTICAL CLEARANCE (See PARKING & PASSENGER LOADING ZONES)

VISITOR PARKING (See PARKING & PASSENGER LOADING ZONES)

VISUAL ALARMS (See ALARMS)

VISUAL CONTROL INDICATORS (See ELEVATORS)

VOLUME CONTROLS (See TELEPHONES)

WALKS (See STREETS & SIDEWALKS)

WARNING TEXTURES (See TACTILE WARNINGS)

WASHING MACHINES (See DWELLING UNITS)

WATER CLOSETS ................................................................... **4.16, A4.16**
   Bathrooms, Bathing Facilities & Shower Rooms with Water Closets ......... 4.23.2, 4.23.4
   Clear Floor Space ..................................................................... 4.16.2
   Controls & OPERATING MECHANISMS)
   Floor-mounted Water Closets ........................................................ 4.17.3
   Grab Bars (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
   Height of Water Closets ........................................ 4.16.3, 4.17.3, A4.16.3
   Minimum Number: Alterations .................................................... 4.1.6(4)(e)
   Seats (See HANDRAILS, GRAB BARS & TUB & SHOWER SEATS)
   Toilet Rooms with Water Closets ................................................ 4.22.3, 4.22.4
   Toilet Stalls with Water Closets ................................................. 4.17.2, 4.17.3
   Wall-mounted Water Closets ......................................................... 4.17.3
   Water Closets in Dwelling Units (See DWELLING UNITS)

WHEELCHAIR LIFTS (See PLATFORM LIFTS)

WHEELCHAIR MANEUVERING, PASSING & TURNING CLEARANCES (See CLEARANCES FOR WHEELCHAIRS)

WINDOWS (Reserved) .................................................................... **4.12**

WORK SURFACES (See SEATING, TABLES & WORK SURFACES)

88

[49 FR 31532 and 31625, Aug. 7, 1984, as amended at 50 FR 49046, Nov. 29, 1985; 54 FR 12628, Mar. 28, 1989]

Plaintiff's Exhibit 4                                           Page 88

**Exhibit 5**

## code of federal regulations

reprint

## Department of Justice

The 1991 Standards were in effect for new construction and alterations until March 14, 2012. The Department's **2010 ADA Standards for Accessible Design** were published September 15, 2010 and became effective on March 15, 2012.

# 28 CFR Part 36

**Revised as of July 1, 1994**

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities

**Excerpt from 28 CFR Part 36:**

# ADA Standards for Accessible Design



APPENDIX A TO PART 36 -- STANDARDS FOR ACCESSIBLE DESIGN

# ADA ACCESSIBILITY GUIDELINES
# FOR BUILDINGS AND FACILITIES
# TABLE OF CONTENTS

1. **PURPOSE** ........................................................................... 1

2. **GENERAL** ........................................................................... 1

   2.1 Provisions for Adults ............................................................ 1
   2.2* Equivalent Facilitation. ....................................................... 1

3. **MISCELLANEOUS INSTRUCTIONS AND DEFINITIONS** .................... 1

   3.1 Graphic Conventions ............................................................ 1
   3.2 Dimensional Tolerances ......................................................... 2
   3.3 Notes ............................................................................. 2
   3.4 General Terminology ............................................................ 2
   3.5 Definitions ...................................................................... 2

4. **ACCESSIBLE ELEMENTS AND SPACES:**
   **SCOPE AND TECHNICAL REQUIREMENTS** ..................................... 5

   4.1 Minimum Requirements ......................................................... 5

      4.1.1* Application ............................................................... 5
      4.1.2 Accessible Sites and Exterior Facilities: New Construction ................... 5
      4.1.3 Accessible Buildings: New Construction ................................... 7
      4.1.4 (Reserved) ............................................................... 10
      4.1.5 Accessible Buildings: Additions ......................................... 10
      4.1.6 Accessible Buildings: Alterations. ...................................... 11
      4.1.7 Accessible Buildings: Historic Preservation ............................. 13

   4.2 Space Allowance and Reach Ranges ............................................ 14
   4.3 Accessible Route ............................................................... 15
   4.4 Protruding Objects ............................................................. 21
   4.5 Ground and Floor Surfaces ..................................................... 22
   4.6 Parking and Passenger Loading Zones .......................................... 24
   4.7 Curb Ramps .................................................................... 26
   4.8 Ramps ......................................................................... 27
   4.9 Stairs ......................................................................... 30
   4.10 Elevators ..................................................................... 30

i

Plaintiff's Exhibit 5

Case: 1:13-cv-05556 Document #: 276-3 Filed: 04/29/17 Page 111 of 561 PageID #:476
Case: 1:13-cv-05556 Document #: 276-3 Filed: 05/29/15 Page 93 of 182 PageID #:472

**Department of Justice**                                    **Pt. 36, App. A**

4.11 Platform Lifts (Wheelchair Lifts) ........................................................ 36
4.12 Windows ........................................................................................... 36
4.13 Doors ............................................................................................... 36
4.14 Entrances .......................................................................................... 40
4.15 Drinking Fountains and Water Coolers ............................................. 40
4.16 Water Closets .................................................................................... 40
4.17 Toilet Stalls ....................................................................................... 41
4.18 Urinals .............................................................................................. 44
4.19 Lavatories and Mirrors ...................................................................... 44
4.20 Bathtubs ........................................................................................... 45
4.21 Shower Stalls ..................................................................................... 45
4.22 Toilet Rooms ..................................................................................... 45
4.23 Bathrooms, Bathing Facilities, and Shower Rooms .......................... 48
4.24 Sinks ................................................................................................. 49
4.25 Storage .............................................................................................. 49
4.26 Handrails, Grab Bars, and Tub and Shower Seats ........................... 50
4.27 Controls and Operating Mechanisms ............................................... 51
4.28 Alarms ............................................................................................... 52
4.29 Detectable Warnings .......................................................................... 53
4.30 Signage .............................................................................................. 53
4.31 Telephones ........................................................................................ 54
4.32 Fixed or Built-in Seating and Tables ................................................ 56
4.33 Assembly Areas ................................................................................. 56
4.34 Automated Teller Machines ............................................................... 58
4.35 Dressing and Fitting Rooms .............................................................. 58

5. **RESTAURANTS AND CAFETERIAS** ............................................... 59

6. **MEDICAL CARE FACILITIES** ....................................................... 60

7. **BUSINESS AND MERCANTILE** ..................................................... 61

8. **LIBRARIES** ................................................................................. 62

9. **ACCESSIBLE TRANSIENT LODGING** ........................................... 63

10. **TRANSPORTATION FACILITIES** .................................................. 67

**APPENDIX** ..................................................................................... A1

| 1. | **PURPOSE.** |

*This document sets guidelines for accessibility to places of public accommodation and commercial facilities by individuals with disabilities. These guidelines are to be applied during the design, construction, and alteration of such buildings and facilities to the extent required by regulations issued by Federal agencies, including the Department of Justice, under the Americans with Disabilities Act of 1990.*

*The technical specifications 4.2 through 4.35, of these guidelines are the same as those of the American National Standard Institute's document A117.1-1980, except as noted in this text by italics. However, sections 4.1.1 through 4.1.7 and sections 5 through 10 are different from ANSI A117.1 in their entirety and are printed in standard type.*

*The illustrations and text of ANSI A117.1 are reproduced with permission from the American National Standards Institute. Copies of the standard may be purchased from the American National Standards Institute at 1430 Broadway, New York, New York 10018.*

| 2. | **GENERAL.** |

**2.1 Provisions for Adults.** *The specifications in these guidelines are based upon adult dimensions and anthropometrics.*

**2.2\* Equivalent Facilitation.** *Departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility.*

| 3. | **MISCELLANEOUS INSTRUCTIONS AND DEFINITIONS.** |

**3.1 Graphic Conventions.** Graphic conventions are shown in Table 1. Dimensions that are not marked minimum or maximum are absolute, unless otherwise indicated in the text or captions.

Table 1
Graphic Conventions



| Convention | Description |
| --- | --- |
| 36 / 915 | Typical dimension line showing U.S. customary units (in inches) above the line and SI units (in millimeters) below |
| 9 / 230 | Dimensions for short distances indicated on extended line |
| 9  36 / 230  915 | Dimension line showing alternate dimensions required |
| | Direction of approach |
| max | Maximum |
| min | Minimum |
| •••••••••••••••••• | Boundary of clear floor area |
| — — — — — ₡ | Centerline |

1

Plaintiff's Exhibit 5                                                    Page 4

**3.2 Dimensional Tolerances.** All dimensions are subject to conventional building industry tolerances for field conditions.

**3.3 Notes.** The text of *these guidelines* does not contain notes or footnotes. Additional information, explanations, and advisory materials are located in the Appendix. Paragraphs marked with an asterisk have related, nonmandatory material in the Appendix. In the Appendix, the corresponding paragraph numbers are preceded by an A.

### 3.4 General Terminology.

comply with. Meet one or more specifications of *these guidelines*.

if, if ... then. Denotes a specification that applies only when the conditions described are present.

may. Denotes an option or alternative.

shall. Denotes a mandatory specification or requirement.

should. Denotes an advisory specification or recommendation.

### 3.5 Definitions.

**Access Aisle.** An accessible pedestrian space between elements, such as parking spaces, seating, and desks, that provides clearances appropriate for use of the elements.

**Accessible.** Describes a site, building, facility, or portion thereof that complies with *these guidelines*.

**Accessible Element.** An *element* specified by these *guidelines* (for example, telephone, controls, and the like).

**Accessible Route.** A continuous unobstructed path connecting all accessible elements and spaces of a building or facility. Interior accessible routes may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures. Exterior accessible routes may include parking access aisles, curb ramps, *crosswalks at vehicular ways*, walks, ramps, and lifts.

**Accessible Space.** *Space that complies with these guidelines.*

**Adaptability.** The ability of certain building spaces and elements, such as kitchen counters, sinks, and grab bars, to be added or altered so as to accommodate the needs of *individuals with or without disabilities* or to accommodate the needs of persons with different types or degrees of disability.

**Addition.** *An expansion, extension, or increase in the gross floor area of a building or facility.*

**Administrative Authority.** A governmental agency that adopts or enforces regulations and *guidelines* for the design, construction, or *alteration* of buildings and facilities.

**Alteration.** *An alteration is a change to a building or facility made by, on behalf of, or for the use of a public accommodation or commercial facility, that affects or could affect the usability of the building or facility or part thereof. Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement of the structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.*

**Area of Rescue Assistance.** *An area, which has direct access to an exit, where people who are unable to use stairs may remain temporarily in safety to await further instructions or assistance during emergency evacuation.*

**Assembly Area.** A room or space accommodating a *group of* individuals for recreational, educational, political, social, or amusement purposes, or for the consumption of food and drink.

**Automatic Door.** A door equipped with a power-operated mechanism and controls that open and close the door automatically upon receipt of a momentary actuating signal. The switch that begins the automatic cycle may be a photoelectric device, floor mat, or manual switch (see power-assisted door).

2

Plaintiff's Exhibit 5                    Page 5

**Building.** Any structure used and intended for supporting or sheltering any use or occupancy.

**Circulation Path.** An exterior or interior way of passage from one place to another for pedestrians, including, but not limited to, walks, hallways, courtyards, stairways, and stair landings.

**Clear.** Unobstructed.

**Clear Floor Space.** *The minimum unobstructed floor or ground space required to accommodate a single, stationary wheelchair and occupant.*

**Closed Circuit Telephone.** *A telephone with dedicated line(s) such as a house phone, courtesy phone or phone that must be used to gain entrance to a facility.*

**Common Use.** Refers to those interior and exterior rooms, spaces, or elements that are made available for the use of a restricted group of people (for example, *occupants of a homeless shelter*, the occupants of an office building, or the guests of such occupants).

**Cross Slope.** The slope that is perpendicular to the direction of travel (see running slope).

**Curb Ramp.** A short ramp cutting through a curb or built up to it.

**Detectable Warning.** *A standardized surface feature built in or applied to walking surfaces or other elements to warn visually impaired people of hazards on a circulation path.*

**Dwelling Unit.** A single unit which provides a kitchen or food preparation area, in addition to rooms and spaces for living, bathing, sleeping, and the like. *Dwelling units include a single family home or a townhouse used as a transient group home; an apartment building used as a shelter; guestrooms in a hotel that provide sleeping accommodations and food preparation areas; and other similar facilities used on a transient basis. For purposes of these guidelines, use of the term "Dwelling Unit" does not imply the unit is used as a residence.*

**Egress, Means of.** *A continuous and unobstructed way of exit travel from any point in a building or facility to a public way. A means of egress comprises vertical and horizontal travel and may include intervening room spaces, doorways, hallways, corridors, passageways, balconies, ramps, stairs, enclosures, lobbies, horizontal exits, courts and yards. An accessible means of egress is one that complies with these guidelines and does not include stairs, steps, or escalators. Areas of rescue assistance or evacuation elevators may be included as part of accessible means of egress.*

**Element.** *An architectural or mechanical component of a building, facility, space, or site, e.g., telephone, curb ramp, door, drinking fountain, seating, or water closet.*

**Entrance.** *Any access point to a building or portion of a building or facility used for the purpose of entering. An entrance includes the approach walk, the vertical access leading to the entrance platform, the entrance platform itself, vestibules if provided, the entry door(s) or gate(s), and the hardware of the entry door(s) or gate(s).*

**Facility.** *All or any portion of buildings, structures, site improvements, complexes, equipment, roads, walks, passageways, parking lots, or other real or personal property located on a site.*

**Ground Floor.** *Any occupiable floor less than one story above or below grade with direct access to grade. A building or facility always has at least one ground floor and may have more than one ground floor as where a split level entrance has been provided or where a building is built into a hillside.*

**Mezzanine or Mezzanine Floor.** *That portion of a story which is an intermediate floor level placed within the story and having occupiable space above and below its floor.*

**Marked Crossing.** A crosswalk or other identified path intended for pedestrian use in crossing a vehicular way.

**Multifamily Dwelling.** Any building containing more than two dwelling units.

**Occupiable.** *A room or enclosed space designed for human occupancy in which individuals congregate for amusement, educational or similar purposes, or in which occupants are engaged at labor, and which is equipped with means of egress, light, and ventilation.*

3

Plaintiff's Exhibit 5                                                        Page 6

**Department of Justice**                                   **Pt. 36, App. A**

### 3.5 Definitions

**Operable Part.** A part of a piece of equipment or appliance used to insert or withdraw objects, or to activate, deactivate, or adjust the equipment or appliance (for example, coin slot, pushbutton, handle).

**Path of Travel.** *(Reserved).*

**Power-assisted Door.** A door used *for human passage* with a mechanism that helps to open the door, or relieves the opening resistance of a door, upon the activation of a switch or a continued force applied to the door itself.

**Public Use.** Describes interior or exterior rooms or spaces that are made available to the general public. Public use may be provided at a building or facility that is privately or publicly owned.

**Ramp.** A walking surface which has a running slope greater than 1:20.

**Running Slope.** The slope that is parallel to the direction of travel (see cross slope).

**Service Entrance.** An entrance intended primarily for delivery of goods or services.

**Signage.** *Displayed* verbal, symbolic, *tactile*, and pictorial information.

**Site.** A parcel of land bounded by a property line or a designated portion of a public right-of-way.

**Site Improvement.** Landscaping, paving for pedestrian and vehicular ways, outdoor lighting, recreational facilities, and the like, added to a site.

**Sleeping Accommodations.** Rooms in which people sleep; for example, dormitory and hotel or motel guest rooms or suites.

**Space.** *A definable area, e.g., room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby.*

**Story.** *That portion of a building included between the upper surface of a floor and upper surface of the floor or roof next above. If such*

*portion of a building does not include occupiable space, it is not considered a story for purposes of these guidelines. There may be more than one floor level within a story as in the case of a mezzanine or mezzanines.*

**Structural Frame.** The structural frame shall be considered to be the columns and the girders, beams, trusses and spandrels having direct connections to the columns and all other members which are essential to the stability of the building as a whole.

**Tactile.** Describes an object that can be perceived using the sense of touch.

**Text Telephone.** *Machinery or equipment that employs interactive graphic (i.e., typed) communications through the transmission of coded signals across the standard telephone network. Text telephones can include, for example, devices known as TDD's (telecommunication display devices or telecommunication devices for deaf persons) or computers.*

**Transient Lodging.** *A building, facility, or portion thereof, excluding inpatient medical care facilities, that contains one or more dwelling units or sleeping accommodations. Transient lodging may include, but is not limited to, resorts, group homes, hotels, motels, and dormitories.*

**Vehicular Way.** A route intended for vehicular traffic, such as a street, driveway, or parking lot.

**Walk.** An exterior pathway with a prepared surface intended for pedestrian use, including general pedestrian areas such as plazas and courts.

NOTE: Sections 4.1.1 through 4.1.7 are different from ANSI A117.1 in their entirety and are printed in standard type (ANSI A117.1 does not include scoping provisions).

4

Plaintiff's Exhibit 5                                   Page 7

Case: 1:18-cv-05566 Document #: 276-2 Filed: 04/29/17 Page 116 of 561 PageID #:431
Case: 1:13-cv-02356 Document #: 76-3 Filed: 05/29/15 Page 96 of 181 PageID #:

Pt. 36, App. A                                      28 CFR Ch. I (7-1-94 Edition)

**4.0 Accessible Elements and Spaces: Scope and Technical Requirements**

# 4. ACCESSIBLE ELEMENTS AND SPACES: SCOPE AND TECHNICAL REQUIREMENTS.

## 4.1 Minimum Requirements

### 4.1.1* Application.

(1) General. All areas of newly designed or newly constructed buildings and facilities required to be accessible by 4.1.2 and 4.1.3 and altered portions of existing buildings and facilities required to be accessible by 4.1.6 shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.

(2) Application Based on Building Use. Special application sections 5 through 10 provide additional requirements for restaurants and cafeterias, medical care facilities, business and mercantile, libraries, accessible transient lodging, and transportation facilities. When a building or facility contains more than one use covered by a special application section, each portion shall comply with the requirements for that use.

(3)* Areas Used Only by Employees as Work Areas. Areas that are used only as work areas shall be designed and constructed so that individuals with disabilities can approach, enter, and exit the areas. These guidelines do not require that any areas used only as work areas be constructed to permit maneuvering within the work area or be constructed or equipped (i.e., with racks or shelves) to be accessible.

(4) Temporary Structures. These guidelines cover temporary buildings or facilities as well as permanent facilities. Temporary buildings and facilities are not of permanent construction but are extensively used or are essential for public use for a period of time. Examples of temporary buildings or facilities covered by these guidelines include, but are not limited to: reviewing stands, temporary classrooms, bleacher areas, exhibit areas, temporary banking facilities, temporary health screening services, or temporary safe pedestrian passageways around a construction site. Structures, sites and equipment directly associated with the actual processes of construction, such as scaffolding, bridging, materials hoists, or construction trailers are not included.

(5) General Exceptions.

(a) In new construction, a person or entity is not required to meet fully the requirements of these guidelines where that person or entity can demonstrate that it is structurally impracticable to do so. Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features. If full compliance with the requirements of these guidelines is structurally impracticable, a person or entity shall comply with the requirements to the extent it is not structurally impracticable. Any portion of the building or facility which can be made accessible shall comply to the extent that it is not structurally impracticable.

(b) Accessibility is not required to (i) observation galleries used primarily for security purposes; or (ii) in non-occupiable spaces accessed only by ladders, catwalks, crawl spaces, very narrow passageways, or freight (non-passenger) elevators, and frequented only by service personnel for repair purposes; such spaces include, but are not limited to, elevator pits, elevator penthouses, piping or equipment catwalks.

### 4.1.2 Accessible Sites and Exterior Facilities: New Construction. An accessible site shall meet the following minimum requirements:

(1) At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance.

(2) At least one accessible route complying with 4.3 shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site.

(3) All objects that protrude from surfaces or posts into circulation paths shall comply with 4.4.

5

Plaintiff's Exhibit 5                                      Page 8

Case: 1:16-cv-05566 Document #: 26-3 Filed: 05/29/17 Page 117 of 561 PageID #:482
Case: 1:13-cv-02386 Document #: 76-3 Filed: 05/29/15 Page 99 of 181 PageID #:478

**Department of Justice**

**Pt. 36, App. A**

**4.1.2 Accessible Sites and Exterior Facilities: New Construction**

(4) Ground surfaces along accessible routes and in accessible spaces shall comply with 4.5.

(5) (a) If parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with 4.6 shall be provided in each such parking area in conformance with the table below. Spaces required by the table need not be provided in the particular lot. They may be provided in a different location if equivalent or greater accessibility, in terms of distance from an accessible entrance, cost and convenience is ensured.

| Total Parking in Lot | Required Minimum Number of Accessible Spaces |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | 2 percent of total |
| 1001 and over | 20, plus 1 for each 100 over 1000 |

Except as provided in (b), access aisles adjacent to accessible spaces shall be 60 in (1525 mm) wide minimum.

(b) One in every eight accessible spaces, but not less than one, shall be served by an access aisle 96 in (2440 mm) wide minimum and shall be designated "van accessible" as required by 4.6.4. The vertical clearance at such spaces shall comply with 4.6.5. All such spaces may be grouped on one level of a parking structure.

EXCEPTION: Provision of all required parking spaces in conformance with "Universal Parking Design" (see appendix A4.6.3) is permitted.

(c) If passenger loading zones are provided, then at least one passenger loading zone shall comply with 4.6.6.

(d) At facilities providing medical care and other services for persons with mobility impairments, parking spaces complying with 4.6 shall be provided in accordance with

4.1.2(5)(a) except as follows:

(i) Outpatient units and facilities: 10 percent of the total number of parking spaces provided serving each such outpatient unit or facility;

(ii) Units and facilities that specialize in treatment or services for persons with mobility impairments: 20 percent of the total number of parking spaces provided serving each such unit or facility.

(e)* Valet parking: Valet parking facilities shall provide a passenger loading zone complying with 4.6.6 located on an accessible route to the entrance of the facility. Paragraphs 5(a), 5(b), and 5(d) of this section do not apply to valet parking facilities.

(6) If toilet facilities are provided on a site, then each such public or common use toilet facility shall comply with 4.22. If bathing facilities are provided on a site, then each such public or common use bathing facility shall comply with 4.23.

For single user portable toilet or bathing units clustered at a single location, at least 5% but no less than one toilet unit or bathing unit complying with 4.22 or 4.23 shall be installed at each cluster whenever typical inaccessible units are provided.

Accessible units shall be identified by the International Symbol of Accessibility.

EXCEPTION: Portable toilet units at construction sites used exclusively by construction personnel are not required to comply with 4.1.2(6).

(7) Building Signage. Signs which designate permanent rooms and spaces shall comply with 4.30.1, 4.30.4, 4.30.5 and 4.30.6. Other signs which provide direction to, or information about, functional spaces of the building shall comply with 4.30.1, 4.30.2, 4.30.3, and 4.30.5. Elements and spaces of accessible facilities which shall be identified by the International Symbol of Accessibility and which shall comply with 4.30.7 are:

(a) Parking spaces designated as reserved for individuals with disabilities;

6

Plaintiff's Exhibit 5

(b) Accessible passenger loading zones;

(c) Accessible entrances when not all are accessible (inaccessible entrances shall have directional signage to indicate the route to the nearest accessible entrance);

(d) Accessible toilet and bathing facilities when not all are accessible.

**4.1.3 Accessible Buildings: New Construction.** Accessible buildings and facilities shall meet the following minimum requirements:

(1) At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility.

(2) All objects that overhang or protrude into circulation paths shall comply with 4.4.

(3) Ground and floor surfaces along accessible routes and in accessible rooms and spaces shall comply with 4.5.

(4) Interior and exterior stairs connecting levels that are not connected by an elevator, ramp, or other accessible means of vertical access shall comply with 4.9.

(5)* One passenger elevator complying with 4.10 shall serve each level, including mezzanines, in all multi-story buildings and facilities unless exempted below. If more than one elevator is provided, each full passenger elevator shall comply with 4.10.

EXCEPTION 1: Elevators are not required in facilities that are less than three stories or that have less than 3000 square feet per story unless the building is a shopping center, a shopping mall, or the professional office of a health care provider, or another type of facility as determined by the Attorney General. The elevator exemption set forth in this paragraph does not obviate or limit in any way the obligation to comply with the other accessibility requirements established in section 4.1.3. For example, floors above or below the accessible ground floor must meet the requirements of this section except for elevator service. If toilet or bathing facilities are provided on a level not served by an elevator, then toilet or bathing facilities must be provided on the accessible ground floor. In new construction if a building or facility is eligible for this exemption but a full passenger elevator is nonetheless planned, that elevator shall meet the requirements of 4.10 and shall serve each level in the building. A full passenger elevator that provides service from a garage to only one level of a building or facility is not required to serve other levels.

EXCEPTION 2: Elevator pits, elevator penthouses, mechanical rooms, piping or equipment catwalks are exempted from this requirement.

EXCEPTION 3: Accessible ramps complying with 4.8 may be used in lieu of an elevator.

EXCEPTION 4: Platform lifts (wheelchair lifts) complying with 4.11 of this guideline and applicable state or local codes may be used in lieu of an elevator only under the following conditions:

(a) To provide an accessible route to a performing area in an assembly occupancy. (b) To comply with the wheelchair viewing position line-of-sight and dispersion requirements of 4.33.3.

(c) To provide access to incidental occupiable spaces and rooms which are not open to the general public and which house no more than five persons, including but not limited to equipment control rooms and projection booths.

(d) To provide access where existing site constraints or other constraints make use of a ramp or an elevator infeasible.

(6) Windows: (Reserved).

(7) Doors:

(a) At each accessible entrance to a building or facility, at least one door shall comply with 4.13.

(b) Within a building or facility, at least one door at each accessible space shall comply with 4.13.

(c) Each door that is an element of an accessible route shall comply with 4.13.

7

Plaintiff's Exhibit 5

**Department of Justice**                                    **Pt. 36, App. A**

**4.1.3 Accessible Buildings: New Construction**

**(d)** Each door required by 4.3.10, Egress, shall comply with 4.13.

**(8)** In new construction, at a minimum, the requirements in (a) and (b) below shall be satisfied independently:

**(a)(i)** At least 50% of all public entrances (excluding those in (b) below) must be accessible. At least one must be a ground floor entrance. Public entrances are any entrances that are not loading or service entrances.

**(ii)** Accessible entrances must be provided in a number at least equivalent to the number of exits required by the applicable building/fire codes. (This paragraph does not require an increase in the total number of entrances planned for a facility.)

**(iii)** An accessible entrance must be provided to each tenancy in a facility (for example, individual stores in a strip shopping center).

One entrance may be considered as meeting more than one of the requirements in (a). Where feasible, accessible entrances shall be the entrances used by the majority of people visiting or working in the building.

**(b)(i)** In addition, if direct access is provided for pedestrians from an enclosed parking garage to the building, at least one direct entrance from the garage to the building must be accessible.

**(ii)** If access is provided for pedestrians from a pedestrian tunnel or elevated walkway, one entrance to the building from each tunnel or walkway must be accessible.

One entrance may be considered as meeting more than one of the requirements in (b).

Because entrances also serve as emergency exits whose proximity to all parts of buildings and facilities is essential, it is preferable that all entrances be accessible.

**(c)** If the only entrance to a building, or tenancy in a facility, is a service entrance, that entrance shall be accessible.

**(d)** Entrances which are not accessible shall have directional signage complying with 4.30.1, 4.30.2, 4.30.3, and 4.30.5, which indicates the location of the nearest accessible entrance.

**(9)*** In buildings or facilities, or portions of buildings or facilities, required to be accessible, accessible means of egress shall be provided in the same number as required for exits by local building/life safety regulations. Where a required exit from an occupiable level above or below a level of accessible exit discharge is not accessible, an area of rescue assistance shall be provided on each such level (in a number equal to that of inaccessible required exits). Areas of rescue assistance shall comply with 4.3.11. A horizontal exit, meeting the requirements of local building/life safety regulations, shall satisfy the requirement for an area of rescue assistance.

EXCEPTION: Areas of rescue assistance are not required in buildings or facilities having a supervised automatic sprinkler system.

**(10)*** Drinking Fountains:

**(a)** Where only one drinking fountain is provided on a floor there shall be a drinking fountain which is accessible to individuals who use wheelchairs in accordance with 4.15 and one accessible to those who have difficulty bending or stooping. (This can be accommodated by the use of a "hi-lo" fountain; by providing one fountain accessible to those who use wheelchairs and one fountain at a standard height convenient for those who have difficulty bending; by providing a fountain accessible under 4.15 and a water cooler; or by such other means as would achieve the required accessibility for each group on each floor.)

**(b)** Where more than one drinking fountain or water cooler is provided on a floor, 50% of those provided shall comply with 4.15 and shall be on an accessible route.

**(11)** Toilet Facilities: If toilet rooms are provided, then each public and common use toilet room shall comply with 4.22. Other toilet rooms provided for the use of occupants of specific spaces (i.e., a private toilet room for the occupant of a private office) shall be adaptable. If bathing rooms are provided, then each public and common use bathroom shall comply with 4.23. Accessible toilet rooms and bathing facilities shall be on an accessible route.

8

Plaintiff's Exhibit 5                                    Page 11

### 4.1.3 Accessible Buildings: New Construction

(12) Storage, Shelving and Display Units:

(a) If fixed or built-in storage facilities such as cabinets, shelves, closets, and drawers are provided in accessible spaces, at least one of each type provided shall contain storage space complying with 4.25. Additional storage may be provided outside of the dimensions required by 4.25.

(b) Shelves or display units allowing self-service by customers in mercantile occupancies shall be located on an accessible route complying with 4.3. Requirements for accessible reach range do not apply.

(13) Controls and operating mechanisms in accessible spaces, along accessible routes, or as parts of accessible elements (for example, light switches and dispenser controls) shall comply with 4.27.

(14) If emergency warning systems are provided, then they shall include both audible alarms and visual alarms complying with 4.28. Sleeping accommodations required to comply with 9.3 shall have an alarm system complying with 4.28. Emergency warning systems in medical care facilities may be modified to suit standard health care alarm design practice.

(15) Detectable warnings shall be provided at locations as specified in 4.29.

(16) Building Signage:

(a) Signs which designate permanent rooms and spaces shall comply with 4.30.1, 4.30.4, 4.30.5 and 4.30.6.

(b) Other signs which provide direction to or information about functional spaces of the building shall comply with 4.30.1, 4.30.2, 4.30.3, and 4.30.5.

EXCEPTION: Building directories, menus, and all other signs which are temporary are not required to comply.

(17) Public telephones:

(a) If public pay telephones, public closed circuit telephones, or other public telephones are provided, then they shall comply with 4.31.2 through 4.31.8 to the extent required by the following table:

| Number of each type of telephone provided on each floor | Number of telephones required to comply with 4.31.2 through 4.31.8[1] |
|---|---|
| 1 or more single unit | 1 per floor |
| 1 bank[2] | 1 per floor |
| 2 or more banks[2] | 1 per bank. Accessible unit may be installed as a single unit in proximity (either visible or with signage) to the bank. At least one public telephone per floor shall meet the requirements for a forward reach telephone[3]. |

[1] Additional public telephones may be installed at any height. Unless otherwise specified, accessible telephones may be either forward or side reach telephones.

[2] A bank consists of two or more adjacent public telephones, often installed as a unit.

[3] EXCEPTION: For exterior installations only, if dial tone first service is available, then a side reach telephone may be installed instead of the required forward reach telephone (i.e., one telephone in proximity to each bank shall comply with 4.31).

(b)* All telephones required to be accessible and complying with 4.31.2 through 4.31.8 shall be equipped with a volume control. In addition, 25 percent, but never less than one, of all other public telephones provided shall be equipped with a volume control and shall be dispersed among all types of public telephones, including closed circuit telephones, throughout the building or facility. Signage complying with applicable provisions of 4.30.7 shall be provided.

(c) The following shall be provided in accordance with 4.31.9:

(i) if a total number of four or more public pay telephones (including both interior and exterior phones) is provided at a site, and at least one is in an interior location, then at least one interior public text telephone shall be provided.

(ii) if an interior public pay telephone is provided in a stadium or arena, in a convention center, in a hotel with a convention center, or

9

**Department of Justice**                    **Pt. 36, App. A**

### 4.1.3 Accessible Buildings: New Construction

in a covered mall, at least one interior public text telephone shall be provided in the facility.

   (iii) if a public pay telephone is located in or adjacent to a hospital emergency room, hospital recovery room, or hospital waiting room, one public text telephone shall be provided at each such location.

   (d) Where a bank of telephones in the interior of a building consists of three or more public pay telephones, at least one public pay telephone in each such bank shall be equipped with a shelf and outlet in compliance with 4.31.9(2).

   (18) If fixed or built-in seating or tables (including, but not limited to, study carrels and student laboratory stations), are provided in accessible public or common use areas, at least five percent (5%), but not less than one, of the fixed or built-in seating areas or tables shall comply with 4.32. An accessible route shall lead to and through such fixed or built-in seating areas, or tables.

   (19)* Assembly areas:

   (a) In places of assembly with fixed seating accessible wheelchair locations shall comply with 4.33.2, 4.33.3, and 4.33.4 and shall be provided consistent with the following table:

| Capacity of Seating in Assembly Areas | Number of Required Wheelchair Locations |
|---|---|
| 4 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 300 | 4 |
| 301 to 500 | 6 |
| over 500 | 6, plus 1 additional space for each total seating capacity increase of 100 |

In addition, one percent, but not less than one, of all fixed seats shall be aisle seats with no armrests on the aisle side, or removable or folding armrests on the aisle side. Each such seat shall be identified by a sign or marker. Signage notifying patrons of the availability of such seats shall be posted at the ticket office. Aisle seats are not required to comply with 4.33.4.

   (b) This paragraph applies to assembly areas where audible communications are integral to the use of the space (e.g., concert and lecture halls, playhouses and movietheaters, meeting rooms, etc.). Such assembly areas, if (1) they accommodate at least 50 persons, or if they have audio-amplification systems, and (2) they have fixed seating, shall have a permanently installed assistive listening system complying with 4.33. For other assembly areas, a permanently installed assistive listening system, or an adequate number of electrical outlets or other supplementary wiring necessary to support a portable assistive listening system shall be provided. The minimum number of receivers to be provided shall be equal to 4 percent of the total number of seats, but in no case less than two. Signage complying with applicable provisions of 4.30 shall be installed to notify patrons of the availability of a listening system.

   (20) Where automated teller machines (ATMs) are provided, each ATM shall comply with the requirements of 4.34 except where two or more are provided at a location, then only one must comply.

EXCEPTION: Drive-up-only automated teller machines are not required to comply with 4.27.2, 4.27.3 and 4.34.3.

   (21) Where dressing and fitting rooms are provided for use by the general public, patients, customers or employees, 5 percent, but never less than one, of dressing rooms for each type of use in each cluster of dressing rooms shall be accessible and shall comply with 4.35.

Examples of types of dressing rooms are those serving different genders or distinct and different functions as in different treatment or examination facilities.

**4.1.4** (Reserved).

**4.1.5 Accessible Buildings: Additions.**
Each addition to an existing building or facility shall be regarded as an alteration. Each space or element added to the existing building or facility shall comply with the applicable provisions of 4.1.1 to 4.1.3, Minimum Requirements (for New Construction) and the applicable technical specifications of 4.2 through 4.35 and sections 5 through 10. Each addition that

10

Plaintiff's Exhibit 5

affects or could affect the usability of an area containing a primary function shall comply with 4.1.6(2).

**4.1.6 Accessible Buildings: Alterations.**

(1) General. Alterations to existing buildings and facilities shall comply with the following:

(a) No alteration shall be undertaken which decreases or has the effect of decreasing accessibility or usability of a building or facility below the requirements for new construction at the time of alteration.

(b) If existing elements, spaces, or common areas are altered, then each such altered element, space, feature, or area shall comply with the applicable provisions of 4.1.1 to 4.1.3 Minimum Requirements (for New Construction). If the applicable provision for new construction requires that an element, space, or common area be on an accessible route, the altered element, space, or common area is not required to be on an accessible route except as provided in 4.1.6(2) (Alterations to an Area Containing a Primary Function.)

(c) If alterations of single elements, when considered together, amount to an alteration of a room or space in a building or facility, the entire space shall be made accessible.

(d) No alteration of an existing element, space, or area of a building or facility shall impose a requirement for greater accessibility than that which would be required for new construction. For example, if the elevators and stairs in a building are being altered and the elevators are, in turn, being made accessible, then no accessibility modifications are required to the stairs connecting levels connected by the elevator. If stair modifications to correct unsafe conditions are required by other codes, the modifications shall be done in compliance with these guidelines unless technically infeasible.

(e) At least one interior public text telephone complying with 4.31.9 shall be provided if:

(i) alterations to existing buildings or facilities with less than four exterior or interior public pay telephones would increase the total number to four or more telephones with at least one in an interior location; or

(ii) alterations to one or more exterior or interior public pay telephones occur in an existing building or facility with four or more public telephones with at least one in an interior location.

(f) If an escalator or stair is planned or installed where none existed previously and major structural modifications are necessary for such installation, then a means of accessible vertical access shall be provided that complies with the applicable provisions of 4.7, 4.8, 4.10, or 4.11.

(g) In alterations, the requirements of 4.1.3(9), 4.3.10 and 4.3.11 do not apply.

(h)* Entrances: If a planned alteration entails alterations to an entrance, and the building has an accessible entrance, the entrance being altered is not required to comply with 4.1.3(8), except to the extent required by 4.1.6(2). If a particular entrance is not made accessible, appropriate accessible signage indicating the location of the nearest accessible entrance(s) shall be installed at or near the inaccessible entrance, such that a person with disabilities will not be required to retrace the approach route from the inaccessible entrance.

(i) If the alteration work is limited solely to the electrical, mechanical, or plumbing system, or to hazardous material abatement, or automatic sprinkler retrofitting, and does not involve the alteration of any elements or spaces required to be accessible under these guidelines, then 4.1.6(2) does not apply.

(j) EXCEPTION: In alteration work, if compliance with 4.1.6 is technically infeasible, the alteration shall provide accessibility to the maximum extent feasible. Any elements or features of the building or facility that are being altered and can be made accessible shall be made accessible within the scope of the alteration.

<u>Technically Infeasible.</u> Means, with respect to an alteration of a building or a facility, that it has little likelihood of being accomplished because existing structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame; or because other existing physical or site constraints prohibit modification or addition of elements, spaces, or

11

Plaintiff's Exhibit 5

**Department of Justice**                                              **Pt. 36, App. A**

**4.1.6 Accessible Buildings: Alterations**

features which are in full and strict compliance with the minimum requirements for new construction and which are necessary to provide accessibility.

(k) EXCEPTION:

(i) These guidelines do not require the installation of an elevator in an altered facility that is less than three stories or has less than 3,000 square feet per story unless the building is a shopping center, a shopping mall, the professional office of a health care provider, or another type of facility as determined by the Attorney General.

(ii) The exemption provided in paragraph (i) does not obviate or limit in any way the obligation to comply with the other accessibility requirements established in these guidelines. For example, alterations to floors above or below the ground floor must be accessible regardless of whether the altered facility has an elevator. If a facility subject to the elevator exemption set forth in paragraph (i) nonetheless has a full passenger elevator, that elevator shall meet, to the maximum extent feasible, the accessibility requirements of these guidelines.

(2) Alterations to an Area Containing a Primary Function: In addition to the requirements of 4.1.6(1), an alteration that affects or could affect the usability of or access to an area containing a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities, unless such alterations are disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

(3) Special Technical Provisions for Alterations to Existing Buildings and Facilities:

(a) Ramps: Curb ramps and interior or exterior ramps to be constructed on sites or in existing buildings or facilities where space limitations prohibit the use of a 1:12 slope or less may have slopes and rises as follows:

(i) A slope between 1:10 and 1:12 is allowed for a maximum rise of 6 inches.

(ii) A slope between 1:8 and 1:10 is allowed for a maximum rise of 3 inches. A slope steeper than 1:8 is not allowed.

(b) Stairs: Full extension of handrails at stairs shall not be required in alterations where such extensions would be hazardous or impossible due to plan configuration.

(c) Elevators:

(i) If safety door edges are provided in existing automatic elevators, automatic door reopening devices may be omitted (see 4.10.6).

(ii) Where existing shaft configuration or technical infeasibility prohibits strict compliance with 4.10.9, the minimum car plan dimensions may be reduced by the minimum amount necessary, but in no case shall the inside car area be smaller than 48 in by 48 in.

(iii) Equivalent facilitation may be provided with an elevator car of different dimensions when usability can be demonstrated and when all other elements required to be accessible comply with the applicable provisions of 4.10. For example, an elevator of 47 in by 69 in (1195 mm by 1755 mm) with a door opening on the narrow dimension, could accommodate the standard wheelchair clearances shown in Figure 4.

(d) Doors:

(i) Where it is technically infeasible to comply with clear opening width requirements of 4.13.5, a projection of 5/8 in maximum will be permitted for the latch side stop.

(ii) If existing thresholds are 3/4 in high or less, and have (or are modified to have) a beveled edge on each side, they may remain.

(e) Toilet Rooms:

(i) Where it is technically infeasible to comply with 4.22 or 4.23, the installation of at least one unisex toilet/bathroom per floor, located in the same area as existing toilet facilities, will be permitted in lieu of modifying existing toilet facilities to be accessible. Each unisex toilet room shall contain one water closet complying with 4.16 and one lavatory complying with 4.19, and the door shall have a privacy latch.

12

Plaintiff's Exhibit 5

(ii) Where it is technically infeasible to install a required standard stall (Fig. 30(a)), or where other codes prohibit reduction of the fixture count (i.e., removal of a water closet in order to create a double-wide stall), either alternate stall (Fig.30(b)) may be provided in lieu of the standard stall.

(iii) When existing toilet or bathing facilities are being altered and are not made accessible, signage complying with 4.30.1, 4.30.2, 4.30.3, 4.30.5, and 4.30.7 shall be provided indicating the location of the nearest accessible toilet or bathing facility within the facility.

(f) Assembly Areas:

(i) Where it is technically infeasible to disperse accessible seating throughout an altered assembly area, accessible seating areas may be clustered. Each accessible seating area shall have provisions for companion seating and shall be located on an accessible route that also serves as a means of emergency egress.

(ii) Where it is technically infeasible to alter all performing areas to be on an accessible route, at least one of each type of performing area shall be made accessible.

(g) Platform Lifts (Wheelchair Lifts): In alterations, platform lifts (wheelchair lifts) complying with 4.11 and applicable state or local codes may be used as part of an accessible route. The use of lifts is not limited to the four conditions in exception 4 of 4.1.3(5)

(h) Dressing Rooms: In alterations where technical infeasibility can be demonstrated, one dressing room for each sex on each level shall be made accessible. Where only unisex dressing rooms are provided, accessible unisex dressing rooms may be used to fulfill this requirement.

**4.1.7 Accessible Buildings: Historic Preservation.**

(1) Applicability:

(a) General Rule. Alterations to a qualified historic building or facility shall comply with 4.1.6 Accessible Buildings: Alterations, the applicable technical specifications of 4.2

through 4.35 and the applicable special application sections 5 through 10 unless it is determined in accordance with the procedures in 4.1.7(2) that compliance with the requirements for accessible routes (exterior and interior), ramps, entrances, or toilets would threaten or destroy the historic significance of the building or facility in which case the alternative requirements in 4.1.7(3) may be used for the feature.

EXCEPTION: (Reserved).

(b) Definition. A qualified historic building or facility is a building or facility that is:

(i) Listed in or eligible for listing in the National Register of Historic Places; or

(ii) Designated as historic under an appropriate State or local law.

(2) Procedures:

(a) Alterations to Qualified Historic Buildings and Facilities Subject to Section 106 of the National Historic Preservation Act:

(i) Section 106 Process. Section 106 of the National Historic Preservation Act (16 U.S.C. 470 f) requires that a Federal agency with jurisdiction over a Federal, federally assisted, or federally licensed undertaking consider the effects of the agency's undertaking on buildings and facilities listed in or eligible for listing in the National Register of Historic Places and give the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking prior to approval of the undertaking.

(ii) ADA Application. Where alterations are undertaken to a qualified historic building or facility that is subject to section 106 of the National Historic Preservation Act, the Federal agency with jurisdiction over the undertaking shall follow the section 106 process. If the State Historic Preservation Officer or Advisory Council on Historic Preservation agrees that compliance with the requirements for accessible routes (exterior and interior), ramps, entrances, or toilets would threaten or destroy the historic significance of the building or facility, the alternative requirements in 4.1.7(3) may be used for the feature.

13

Plaintiff's Exhibit 5

**Department of Justice**                                        **Pt. 36, App. A**

### 4.2 Space Allowance and Reach Ranges

(b) Alterations to Qualified Historic Buildings and Facilities Not Subject to Section 106 of the National Historic Preservation Act. Where alterations are undertaken to a qualified historic building or facility that is not subject to section 106 of the National Historic Preservation Act, if the entity undertaking the alterations believes that compliance with the requirements for accessible routes (exterior and interior), ramps, entrances, or toilets would threaten or destroy the historic significance of the building or facility and that the alternative requirements in 4.1.7(3) should be used for the feature, the entity should consult with the State Historic Preservation Officer. If the State Historic Preservation Officer agrees that compliance with the accessibility requirements for accessible routes (exterior and interior), ramps, entrances or toilets would threaten or destroy the historical significance of the building or facility, the alternative requirements in 4.1.7(3) may be used.

(c) Consultation With Interested Persons. Interested persons should be invited to participate in the consultation process, including State or local accessibility officials, individuals with disabilities, and organizations representing individuals with disabilities.

(d) Certified Local Government Historic Preservation Programs. Where the State Historic Preservation Officer has delegated the consultation responsibility for purposes of this section to a local government historic preservation program that has been certified in accordance with section 101(c) of the National Historic Preservation Act of 1966 (16 U.S.C. 470a (c)) and implementing regulations (36 CFR 61.5), the responsibility may be carried out by the appropriate local government body or official.

(3) Historic Preservation: Minimum Requirements:

(a) At least one accessible route complying with 4.3 from a site access point to an accessible entrance shall be provided.

EXCEPTION: A ramp with a slope no greater than 1:6 for a run not to exceed 2 ft (610 mm) may be used as part of an accessible route to an entrance.

(b) At least one accessible entrance complying with 4.14 which is used by the public shall be provided.

EXCEPTION: If it is determined that no entrance used by the public can comply with 4.14, then access at any entrance not used by the general public but open (unlocked) with directional signage at the primary entrance may be used. The accessible entrance shall also have a notification system. Where security is a problem, remote monitoring may be used.

(c) If toilets are provided, then at least one toilet facility complying with 4.22 and 4.1.6 shall be provided along an accessible route that complies with 4.3. Such toilet facility may be unisex in design.

(d) Accessible routes from an accessible entrance to all publicly used spaces on at least the level of the accessible entrance shall be provided. Access shall be provided to all levels of a building or facility in compliance with 4.1 whenever practical.

(e) Displays and written information, documents, etc., should be located where they can be seen by a seated person. Exhibits and signage displayed horizontally (e.g., open books), should be no higher than 44 in (1120 mm) above the floor surface.

NOTE: The technical provisions of sections 4.2 through 4.35 are the same as those of the American National Standard Institute's document A117.1-1980, except as noted in the text.

### 4.2 Space Allowance and Reach Ranges.

**4.2.1\* Wheelchair Passage Width.** The minimum clear width for single wheelchair passage shall be 32 in (815 mm) at a point and 36 in (915 mm) continuously (see Fig. 1 and 24(e)).

**4.2.2 Width for Wheelchair Passing.** The minimum width for two wheelchairs to pass is 60 in (1525 mm) (see Fig. 2).

**4.2.3\* Wheelchair Turning Space.** The space required for a wheelchair to make a 180-degree turn is a clear space of 60 in (1525 mm)

14

505

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 126 of 561 PageID #:487

diameter (see Fig. 3(a)) or a T-shaped space (see Fig. 3(b)).

**4.2.4* Clear Floor or Ground Space for Wheelchairs.**

**4.2.4.1 Size and Approach.** The minimum clear floor or ground space required to accommodate a single, stationary wheelchair and occupant is 30 in by 48 in (760 mm by 1220 mm) (see Fig. 4(a)). The minimum clear floor or ground space for wheelchairs may be positioned for forward or parallel approach to an object (see Fig. 4(b) and (c)). Clear floor or ground space for wheelchairs may be part of the knee space required under some objects.

**4.2.4.2 Relationship of Maneuvering Clearance to Wheelchair Spaces.** One full unobstructed side of the clear floor or ground space for a wheelchair shall adjoin or overlap an accessible route or adjoin another wheelchair clear floor space. If a clear floor space is located in an alcove or otherwise confined on all or part of three sides, additional maneuvering clearances shall be provided as shown in Fig. 4(d) and (e).

**4.2.4.3 Surfaces for Wheelchair Spaces.** Clear floor or ground spaces for wheelchairs shall comply with 4.5.

**4.2.5* Forward Reach.** If the clear floor space only allows forward approach to an object, the maximum high forward reach allowed shall be 48 in (1220 mm) (see Fig. 5(a)). *The minimum low forward reach is 15 in (380 mm).* If the high forward reach is over an obstruction, reach and clearances shall be as shown in Fig. 5(b).

**4.2.6* Side Reach.** If the clear floor space allows parallel approach by a person in a wheelchair, the maximum high side reach allowed shall be 54 in (1370 mm) and the low side reach shall be no less than 9 in (230 mm) above the floor (Fig. 6(a) and (b)). If the side reach is over an obstruction, the reach and clearances shall be as shown in Fig 6(c).

**4.3 Accessible Route.**

**4.3.1* General.** All walks, halls, corridors, aisles, *skywalks, tunnels,* and other spaces



Fig. 1
Minimum Clear Width
for Single Wheelchair

Fig. 2
Minimum Clear Width
for Two Wheelchairs

15

Plaintiff's Exhibit 5                                                          Page 18

**Department of Justice**                                    **Pt. 36, App. A**

**4.3 Accessible Route**

that are part of an accessible route shall comply with 4.3.

**4.3.2 Location.**

(1) At least one accessible route within the boundary of the site shall be provided from public transportation stops, accessible parking, and accessible passenger loading zones, and public streets or sidewalks to the accessible building entrance they serve. The accessible route shall, to the maximum extent feasible, coincide with the route for the general public.

(2) At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site.

(3) At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility.

(4) An accessible route shall connect at least one accessible entrance of each accessible

dwelling unit with those exterior and interior spaces and facilities that serve the accessible dwelling unit.

**4.3.3 Width.** The minimum clear width of an accessible route shall be 36 in (915 mm) except at doors (see 4.13.5 and 4.13.6). If a person in a wheelchair must make a turn around an obstruction, the minimum clear width of the accessible route shall be as shown in Fig. 7(a) and (b).

**4.3.4 Passing Space.** If an accessible route has less than 60 in (1525 mm) clear width, then passing spaces at least 60 in by 60 in (1525 mm by 1525 mm) shall be located at reasonable intervals not to exceed 200 ft (61 m). A T-intersection of two corridors or walks is an acceptable passing place.

**4.3.5 Head Room.** Accessible routes shall comply with 4.4.2.

**4.3.6 Surface Textures.** The surface of an accessible route shall comply with 4.5.



(a)
60-in (1525-mm)-Diameter Space

(b)
T-Shaped Space for 180° Turns

Fig. 3
Wheelchair Turning Space

16

Plaintiff's Exhibit 5                                    Page 19



**(a)** Clear Floor Space

**(b)** Forward Approach

**(c)** Parallel Approach

NOTE: x ≤ 24 in (610 mm).

NOTE: x ≤ 15 in (380 mm).

**(d)** Clear Floor Space in Alcoves

NOTE: If x > 24 in (610 mm), then an additional maneuvering clearance of 6 in (150 mm) shall be provided as shown.

NOTE: If x > 15 in (380 mm), then an additional maneuvering clearance of 12 in (305 mm) shall be provided as shown.

**(e)** Additional Maneuvering Clearances for Alcoves

Fig. 4
Minimum Clear Floor Space for Wheelchairs

17

Plaintiff's Exhibit 5                                          Page 20

**Department of Justice**

Pt. 36, App. A

**4.3 Accessible Route**



(a)
High Forward Reach Limit

NOTE: x shall be ≤ 25 in (635 mm); z shall be ≥ x. When x < 20 in (510 mm), then y shall be 48 in (1220 mm) maximum. When x is 20 to 25 in (510 to 635 mm), then y shall be 44 in (1120 mm) maximum.

(b)
Maximum Forward Reach over an Obstruction

**Fig. 5**
**Forward Reach**

18

Plaintiff's Exhibit 5



Fig. 6
Side Reach

**4.3.7 Slope.** An accessible route with a running slope greater than 1:20 is a ramp and shall comply with 4.8. Nowhere shall the cross slope of an accessible route exceed 1:50.

**4.3.8 Changes in Levels.** Changes in levels along an accessible route shall comply with 4.5.2. If an accessible route has changes in level greater than 1/2 in (13 mm), then a curb ramp, ramp, elevator, or platform lift *(as permitted in 4.1.3 and 4.1.6)* shall be provided that complies with 4.7, 4.8, 4.10, or 4.11, respectively. An accessible route does not include stairs, steps, or escalators. See definition of "egress, means of" in 3.5.

**4.3.9 Doors.** Doors along an accessible route shall comply with 4.13.

19

Plaintiff's Exhibit 5                                              Page 22

**Department of Justice**                                    **Pt. 36, App. A**

**4.3.10\* Egress**



NOTE: Dimensions shown apply when x < 48 in (1220 mm).

(a)
90° Turn

(b)
Turns around an Obstruction

(c)
Changes in level

(d)
Changes in level

Fig. 7
Accessible Route

**4.3.10\* Egress.** Accessible routes serving any accessible space or element shall also serve as a means of egress for emergencies or connect to an accessible area of *rescue assistance.*

**4.3.11 Areas of Rescue Assistance.**

**4.3.11.1 Location and Construction.** *An area of rescue assistance shall be one of the following:*

*(1) A portion of a stairway landing within a smokeproof enclosure (complying with local requirements).*

*(2) A portion of an exterior exit balcony located immediately adjacent to an exit stairway when the balcony complies with local requirements for exterior exit balconies. Openings to the interior of the building located within 20 feet (6 m) of the area of rescue*

20

Plaintiff's Exhibit 5                                        Page 23

*assistance shall be protected with fire assemblies having a three-fourths hour fire protection rating.*

*(3) A portion of a one-hour fire-resistive corridor (complying with local requirements for fire-resistive construction and for openings) located immediately adjacent to an exit enclosure.*

*(4) A vestibule located immediately adjacent to an exit enclosure and constructed to the same fire-resistive standards as required for corridors and openings.*

*(5) A portion of a stairway landing within an exit enclosure which is vented to the exterior and is separated from the interior of the building with not less than one-hour fire-resistive doors.*

*(6) When approved by the appropriate local authority, an area or a room which is separated from other portions of the building by a smoke barrier. Smoke barriers shall have a fire-resis-tive rating of not less than one hour and shall completely enclose the area or room. Doors in the smoke barrier shall be tight-fitting smoke- and draft-control assemblies having a fire-protection rating of not less than 20 minutes and shall be self-closing or automatic closing. The area or room shall be provided with an exit directly to an exit enclosure. Where the room or area exits into an exit enclosure which is required to be of more than one-hour fire-resistive construction, the room or area shall have the same fire-resistive construction, including the same opening protection, as required for the adjacent exit enclosure.*

*(7) An elevator lobby when elevator shafts and adjacent lobbies are pressurized as required for smokeproof enclosures by local regulations and when complying with requirements herein for size, communication, and signage. Such pressurization system shall be activated by smoke detectors on each floor located in a manner approved by the appropriate local authority. Pressurization equipment and its duct work within the building shall be separated from other portions of the building by a minimum two-hour fire-resistive construction.*

**4.3.11.2 Size.** *Each area of rescue assistance shall provide at least two accessible areas each being not less than 30 inches by 48 inches (760 mm by 1220 mm). The area of*

*rescue assistance shall not encroach on any required exit width. The total number of such 30-inch by 48-inch (760 mm by 1220 mm) areas per story shall be not less than one for every 200 persons of calculated occupant load served by the area of rescue assistance.*

EXCEPTION: *The appropriate local authority may reduce the minimum number of 30-inch by 48-inch (760 mm by 1220 mm) areas to one for each area of rescue assistance on floors where the occupant load is less than 200.*

**4.3.11.3\* Stairway Width.** *Each stairway adjacent to an area of rescue assistance shall have a minimum clear width of 48 inches between handrails.*

**4.3.11.4\* Two-way Communication.** *A method of two-way communication, with both visible and audible signals, shall be provided between each area of rescue assistance and the primary entry. The fire department or appropriate local authority may approve a location other than the primary entry.*

**4.3.11.5 Identification.** *Each area of rescue assistance shall be identified by a sign which states "AREA OF RESCUE ASSISTANCE" and displays the international symbol of accessibility. The sign shall be illuminated when exit sign illumination is required. Signage shall also be installed at all inaccessible exits and where otherwise necessary to clearly indicate the direction to areas of rescue assistance. In each area of rescue assistance, instructions on the use of the area under emergency conditions shall be posted adjoining the two-way communication system.*

## 4.4 Protruding Objects.

**4.4.1\* General.** Objects projecting from walls (for example, telephones) with their leading edges between 27 in and 80 in (685 mm and 2030 mm) above the finished floor shall protrude no more than 4 in (100 mm) into walks, halls, corridors, passageways, or aisles (see Fig. 8(a)). Objects mounted with their leading edges at or below 27 in (685 mm) above the finished floor may protrude any amount (see Fig. 8(a) and (b)). Free-standing objects mounted on posts or pylons may overhang 12 in (305 mm) maximum from 27 in to 80 in (685 mm to 2030 mm) above the ground or finished floor (see Fig.

21

Plaintiff's Exhibit 5                                      Page 24

**Department of Justice**                                                            **Pt. 36, App. A**

**4.4 Protruding Objects**



*Fig. 8 (a)*
*Walking Parallel to a Wall*



*Fig. 8 (b)*
*Walking Perpendicular to a Wall*

**Fig. 8**
**Protruding Objects**

8(c) and (d)). Protruding objects shall not reduce the clear width of an accessible route or maneuvering space (see Fig. 8(e)).

**4.4.2 Head Room.** Walks, halls, corridors, passageways, aisles, or other circulation spaces shall have 80 in (2030 mm) minimum clear head room (see Fig. 8(a)). *If vertical clearance of an area adjoining an accessible route is reduced to less than 80 in (nominal dimension), a barrier to warn blind or visually-impaired persons shall be provided (see Fig. 8(c-1)).*

**4.5 Ground and Floor Surfaces.**

**4.5.1* General.** Ground and floor surfaces along accessible routes and in accessible rooms and spaces including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, slip-resistant, and shall comply with 4.5.

**4.5.2 Changes in Level.** Changes in level up to 1/4 in (6 mm) may be vertical and without edge treatment *(see Fig. 7(c) )*. Changes in level between 1/4 in and 1/2 in (6 mm and 13 mm)

22

Plaintiff's Exhibit 5



Fig. 8 (c) Free-Standing Overhanging Objects

Fig. 8 (c-1) Overhead Hazards

Fig. 8 (d)
Objects Mounted on Posts or Pylons

Fig. 8
Protruding Objects (Continued)

23

Plaintiff's Exhibit 5

Page 26

**Department of Justice**                                    **Pt. 36, App. A**

**4.5 Ground and Floor Surfaces**



*Fig. 8 (e)*
*Example of Protection around Wall-Mounted Objects and Measurements of Clear Widths*

**Fig. 8**
**Protruding Objects** *(Continued)*

shall be beveled with a slope no greater than 1:2 *(see Fig. 7(d) )*. Changes in level greater than 1/2 in (13 mm) shall be accomplished by means of a ramp that complies with 4.7 or 4.8.

**4.5.3\* Carpet.** If carpet or carpet tile is used on a ground or floor surface, then it shall be securely attached; have a firm cushion, pad, or backing, or no cushion or pad; and have a level loop, textured loop, level cut pile, or level cut/uncut pile texture. The maximum pile *thickness* shall be 1/2 in (13 mm) (see Fig. 8(f)). Exposed edges of carpet shall be fastened to floor surfaces and have trim along the entire length of the exposed edge. Carpet edge trim shall comply with 4.5.2.

**4.5.4 Gratings.** If gratings are located in walking surfaces, then they shall have spaces no greater than 1/2 in (13 mm) wide in one direction *(see Fig. 8(g))*. If gratings have elongated openings, then they shall be placed so that the long dimension is perpendicular to the dominant direction of travel *(see Fig. 8(h))*.

**4.6 Parking and Passenger Loading Zones.**

**4.6.1 Minimum Number.** *Parking spaces required to be accessible by 4.1 shall comply with 4.6.2 through 4.6.5. Passenger loading zones required to be accessible by 4.1 shall comply with 4.6.5 and 4.6.6.*

24

Plaintiff's Exhibit 5                                    Page 27

Case: 1:16-cv-05560 Document #: 76-3 Filed: 04/29/17 Page 136 of 561 PageID #:207



Fig. 8 (f)
Carpet Pile Thickness

Fig. 8 (g)
Gratings

Fig. 8 (h)
Grating Orientation

**4.6.2 Location.** *Accessible parking spaces serving* a particular building shall be located on the shortest accessible route of travel *from adjacent parking* to an accessible entrance. I*n parking facilities* that do not serve a particular building, *accessible parking* shall be located on the shortest accessible route *of travel* to an accessible pedestrian entrance of the parking facility. *In buildings with multiple accessible entrances with adjacent parking, accessible parking spaces shall be dispersed and located closest to the accessible entrances.*

**4.6.3\* Parking Spaces.** *Accessible* parking spaces shall be at least 96 in (2440 mm) wide. Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. Two accessible parking spaces may share a common access aisle (see Fig. 9). Parked vehicle overhangs shall not reduce the clear width of an accessible route. *Parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions.*

**4.6.4\* Signage.** Accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility (see 4.30.7). *Spaces complying with 4.1.2(5)(b) shall have an additional sign "Van-Accessible" mounted below the symbol of accessibility. Such signs shall be located so they cannot be* obscured by a vehicle parked in the space.

**4.6.5\* Vertical Clearance.** *Provide minimum vertical clearance of 114 in (2895 mm) at accessible passenger loading zones and along at least one vehicle access route to such areas from site entrance(s) and exit(s). At parking spaces complying with 4.1.2(5)(b), provide minimum vertical clearance of 98 in (2490 mm) at the parking space and along at least one vehicle access route to such spaces from site entrance(s) and exit(s).*

**4.6.6 Passenger Loading Zones.** Passenger loading zones shall provide an access aisle at least *60* in *(1525 mm)* wide and 20 ft *(240 in)(6100 mm)* long adjacent and parallel to the vehicle pull-up space (see Fig. 10). If there are curbs between the access aisle and the vehicle pull-up space, then a curb ramp complying with 4.7 shall be provided. *Vehicle standing spaces and access aisles shall be level with surface*

25

Plaintiff's Exhibit 5        Page 28

**Department of Justice**                                          **Pt. 36, App. A**

**4.7 Curb Ramps**



accessible route

96 min
2440

60 min or 96 min for VANS
1525

96 min
2440

252 min
6400

Fig. 9
Dimensions of Parking Spaces

*slopes not exceeding 1:50 (2%) in all directions.*

### 4.7 Curb Ramps.

**4.7.1 Location.** Curb ramps complying with 4.7 shall be provided wherever an accessible route crosses a curb.

**4.7.2 Slope.** Slopes of curb ramps shall comply with 4.8.2. The slope shall be measured as shown in Fig. 11. *Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes. Maximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20.*

**4.7.3 Width.** The minimum width of a curb ramp shall be 36 in (915 mm), exclusive of flared sides.

**4.7.4 Surface.** Surfaces of curb ramps shall comply with 4.5.

**4.7.5 Sides of Curb Ramps.** If a curb ramp is located where pedestrians must walk across the ramp, *or where it is not protected by handrails or guardrails,* it shall have flared sides; the maximum slope of the flare shall be 1:10 (see Fig. 12(a)). Curb ramps with returned

curbs may be used where pedestrians would not normally walk across the ramp (see Fig. 12(b)).

**4.7.6 Built-up Curb Ramps.** Built-up curb ramps shall be located so that they do not project into vehicular traffic lanes (see Fig. 13).

**4.7.7 Detectable Warnings.** A curb ramp shall have a detectable warning complying with 4.29.2. *The detectable warning shall extend* the full width and depth of the curb ramp.

**4.7.8 Obstructions.** Curb ramps shall be located or protected to prevent their obstruction by parked vehicles.

**4.7.9 Location at Marked Crossings.** Curb ramps at marked crossings shall be wholly contained within the markings, excluding any flared sides (see Fig. 15).

**4.7.10 Diagonal Curb Ramps.** If diagonal (or corner type) curb ramps have returned curbs or other well-defined edges, such edges shall be parallel to the direction of pedestrian flow. The bottom of diagonal curb ramps shall have 48 in (1220 mm) minimum clear space as shown in Fig. 15(c) and (d). If diagonal curb ramps are provided at marked crossings, the 48 in (1220 mm) clear space shall be within the markings (see Fig. 15(c) and (d)). If diagonal curb ramps have flared sides, they shall also have at least a 24 in (610 mm) long segment of straight curb located on each side of the curb ramp and within the marked crossing (see Fig. 15(c)).



60 min
1525

240 min
6100

Fig. 10
Access Aisle at Passenger Loading Zones

26

Plaintiff's Exhibit 5                                          Page 29



Fig. 11
Measurement of Curb Ramp Slopes

(a)
Flared Sides

(b)
Returned Curb

*If X is less than 48 in, then the slope of the flared side shall not exceed 1:12.*

Fig. 12
Sides of Curb Ramps

**4.7.11 Islands.** Any raised islands in crossings shall be cut through level with the street or have curb ramps at both sides and a level area at least 48 in (1220 mm) between the curb ramps in the part of the island intersected by the crossings (see Fig. 15(a) and (b)).

**4.8 Ramps.**

**4.8.1* General.** Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp and shall comply with 4.8.

**4.8.2* Slope and Rise.** The least possible slope shall be used for any ramp. The maximum slope of a ramp in new construction shall be 1:12. The maximum rise for any run shall be 30 in (760 mm) (see Fig. 16). Curb ramps and



Fig. 13
Built-Up Curb Ramp

ramps to be constructed on existing sites or in existing buildings or facilities may have slopes and rises as *allowed in 4.1.6(3)(a)* if space limitations prohibit the use of a 1:12 slope or less.

27

Plaintiff's Exhibit 5

**Department of Justice**

**4.8 Ramps**



**Fig. 15**
**Curb Ramps at Marked Crossings**

28

Plaintiff's Exhibit 5



**Fig. 16**
Components of a Single Ramp Run and Sample Ramp Dimensions

**4.8.3 Clear Width.** The minimum clear width of a ramp shall be 36 in (915 mm).

**4.8.4\* Landings.** Ramps shall have level landings at bottom and top of each ramp and each ramp run. Landings shall have the following features:

(1) The landing shall be at least as wide as the ramp run leading to it.

(2) The landing length shall be a minimum of 60 in (1525 mm) clear.

(3) If ramps change direction at landings, the minimum landing size shall be 60 in by 60 in (1525 mm by 1525 mm).

(4) If a doorway is located at a landing, then the area in front of the doorway shall comply with 4.13.6.

**4.8.5\* Handrails.** If a ramp run has a rise greater than 6 in (150 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides. Handrails are not required on curb ramps or *adjacent to seating in assembly areas.* Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be provided along both sides of ramp segments. The inside handrail on switchback or dogleg ramps shall always be continuous.

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface (see Fig. 17).

(3) The clear space between the handrail and the wall shall be 1 - 1/2 in (38 mm).

(4) Gripping surfaces shall be continuous.

*(5) Top of handrail gripping surfaces shall be mounted between 34 in and 38 in (865 mm and 965 mm) above ramp surfaces.*

*(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.*

*(7) Handrails shall not rotate within their fittings.*

**4.8.6 Cross Slope and Surfaces.** The cross slope of ramp surfaces shall be no greater than 1:50. Ramp surfaces shall comply with 4.5.

29

Plaintiff's Exhibit 5

**4.9 Stairs**

**4.8.7 Edge Protection.** Ramps and landings with drop-offs shall have curbs, walls, railings, or projecting surfaces that prevent people from slipping off the ramp. Curbs shall be a minimum of 2 in (50 mm) high (see Fig. 17).

**4.8.8 Outdoor Conditions.** Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces.

**4.9 Stairs.**

**4.9.1* Minimum Number.** *Stairs required to be accessible by 4.1 shall comply with 4.9.*

**4.9.2 Treads and Risers.** On any given flight of stairs, all steps shall have uniform riser heights and uniform tread widths. Stair treads shall be no less than 11 in (280 mm) wide, measured from riser to riser (see Fig. 18(a)). *Open risers are not permitted.*

**4.9.3 Nosings.** The undersides of nosings shall not be abrupt. The radius of curvature at the leading edge of the tread shall be no greater than 1/2 in (13 mm). Risers shall be sloped or the underside of the nosing shall have an angle not less than 60 degrees from the horizontal. Nosings shall project no more than 1-1/2 in (38 mm) (see Fig. 18).

**4.9.4 Handrails.** Stairways shall have handrails at both sides of all stairs. Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be continuous along both sides of stairs. The inside handrail on switchback or dogleg stairs shall always be continuous (see Fig. 19(a) and (b)).

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top riser and at least 12 in (305 mm) plus the width of one tread beyond the bottom riser. At the top, the extension shall be parallel with the floor or ground surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal (see Fig. 19(c) and (d)). Handrail extensions shall comply with 4.4.

(3) The clear space between handrails and wall shall be 1-1/2 in (38 mm).

(4) Gripping surfaces shall be uninterrupted by newel posts, other construction elements, or obstructions.

*(5) Top of handrail gripping surface shall be mounted between 34 in and 38 in (865 mm and 965 mm) above stair nosings.*

*(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall or post.*

*(7) Handrails shall not rotate within their fittings.*

**4.9.5 Detectable Warnings at Stairs.** *(Reserved).*

**4.9.6 Outdoor Conditions.** Outdoor stairs and their approaches shall be designed so that water will not accumulate on walking surfaces.

**4.10 Elevators.**

**4.10.1 General.** *Accessible* elevators shall be on an accessible route and shall comply with 4.10 and with the *ASME A17.1-1990,* Safety Code for Elevators and Escalators. *Freight elevators shall not be considered as meeting the requirements of this section unless the only elevators provided are used as combination passenger and freight elevators for the public and employees.*

**4.10.2 Automatic Operation.** Elevator operation shall be automatic. Each car shall be equipped with a self-leveling feature that will automatically bring the car to floor landings within a tolerance of 1/2 in (13 mm) under rated loading to zero loading conditions. This self-leveling feature shall be automatic and independent of the operating device and shall correct the overtravel or undertravel.

**4.10.3 Hall Call Buttons.** Call buttons in elevator lobbies and halls shall be centered at 42 in (1065 mm) above the floor. Such call buttons shall have visual signals to indicate when each call is registered and when each call is answered. Call buttons shall be a minimum of 3/4 in (19 mm) in the smallest dimension. The button designating the up direction shall be on top. (See Fig. 20.) *Buttons shall be raised or flush. Objects mounted beneath hall call buttons shall not project into the elevator lobby more than 4 in (100 mm).*

30

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 142 of 561 PageID #:803



**Fig. 17**
Examples of Edge Protection and Handrail Extensions

**Fig. 18**
Usable Tread Width and Examples of Acceptable Nosings

(a) Flush Riser

(b) Angled Nosing

(c) Rounded Nosing

Plaintiff's Exhibit 5

Page 34

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 143 of 561 PageID #:804



**(a)**
**Plan**

**(b)**
**Elevation of Center Handrail**

**(c)**
**Extension at Bottom of Run**

**(d)**
**Extension at Top of Run**

NOTE:
X is the 12 in minimum handrail extension required
   at each top riser.
Y is the minimum handrail extension of 12 in plus the
   width of one tread that is required at each bottom riser.

**Fig. 19**
**Stair Handrails**

32

Plaintiff's Exhibit 5                                                           Page 35

Case: 1:16-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 144 of 561 PageID #:809



NOTE: The automatic door reopening device is activated if an object passes through either line A or line B. Line A and line B represent the vertical locations of the door reopening device not requiring contact.

Fig. 20
Hoistway and Elevator Entrances

**4.10.4 Hall Lanterns.** A visible and audible signal shall be provided at each hoistway entrance to indicate which car is answering a call. Audible signals shall sound once for the up direction and twice for the down direction or shall have verbal annunciators that say "up" or "down." Visible signals shall have the following features:

   (1) Hall lantern fixtures shall be mounted so that their centerline is at least 72 in (1830 mm) above the lobby floor. (See Fig. 20.)

   (2) Visual elements shall be at least 2-1/2 in (64 mm) in the smallest dimension.

   (3) Signals shall be visible from the vicinity of the hall call button (see Fig. 20). In-car lanterns located in cars, visible from the vicinity of hall call buttons, and conforming to the above requirements, shall be acceptable.

**4.10.5 *Raised and Braille* Characters on Hoistway Entrances.** All elevator hoistway entrances shall have *raised and Braille* floor designations provided on both jambs. The centerline of the characters shall be 60 in (1525 mm) *above finish* floor. Such characters shall be 2 in (50 mm) high and shall comply with 4.30.4. Permanently applied plates are acceptable if they are permanently fixed to the jambs. (See Fig. 20).

**4.10.6* Door Protective and Reopening Device.** Elevator doors shall open and close automatically. They shall be provided with a reopening device that will stop and reopen a car door and hoistway door automatically if the door becomes obstructed by an object or person. The device shall be capable of completing these operations without requiring contact for an obstruction passing through the opening at heights of 5 in and 29 in (125 mm and 735 mm) above finish floor (see Fig. 20). Door reopening devices shall remain effective for at least 20 seconds. After such an interval, doors may close in accordance with the requirements of *ASME A17.1-1990.*

**4.10.7* Door and Signal Timing for Hall Calls.** The minimum acceptable time from notification that a car is answering a call until the doors of that car start to close shall be calculated from the following equation:

$$T = D/(1.5 \text{ ft/s}) \text{ or } T = D/(445 \text{ mm/s})$$

where T total time in seconds and D distance (in feet or millimeters) from a point in the lobby or corridor 60 in (1525 mm) directly in front of the farthest call button controlling that car to the centerline of its hoistway door (see Fig. 21). For cars with in-car lanterns, T begins when the lantern is visible from the vicinity of hall call buttons and an audible signal is sounded. *The minimum acceptable notification time shall be 5 seconds.*

**4.10.8 Door Delay for Car Calls.** The minimum time for elevator doors to remain fully open in response to a car call shall be 3 seconds.

**4.10.9 Floor Plan of Elevator Cars.** The floor area of elevator cars shall provide space for wheelchair users to enter the car, maneuver

33

Plaintiff's Exhibit 5

**Department of Justice**                                    Pt. 36, App. A

### 4.10.12 Car Controls



Fig. 21
Graph of Timing Equation



(a)

(b)
Fig. 22
Minimum Dimensions of Elevator Cars

within reach of controls, and exit from the car. Acceptable door opening and inside dimensions shall be as shown in Fig. 22. The clearance between the car platform sill and the edge of any hoistway landing shall be no greater than 1-1/4 in (32 mm).

**4.10.10 Floor Surfaces.** Floor surfaces shall comply with 4.5.

**4.10.11 Illumination Levels.** The level of illumination at the car controls, platform, and car threshold and landing sill shall be at least 5 footcandles (53.8 lux).

**4.10.12\* Car Controls.** Elevator control panels shall have the following features:

(1) Buttons. All control buttons shall be at least 3/4 in (19 mm) in their smallest dimension. They *shall* be *raised* or flush.

(2) Tactile, Braille, and Visual Control Indicators. All control buttons shall be designated by Braille and by raised standard alphabet characters for letters, arabic characters for numerals, or standard symbols as shown in Fig. 23(a), and as required in ASME A17.1-1990. Raised and Braille characters and symbols shall comply with 4.30. The call button for the main entry floor shall be designated by a raised star at the left of the floor designation (see Fig. 23(a)). All raised designations for control buttons shall be placed immediately to the left of the button to which they apply. Applied plates, permanently

attached, are an acceptable means to provide raised control designations. Floor buttons shall be provided with visual indicators to show when each call is registered. The visual indicators shall be extinguished when each call is answered.

(3) Height. All floor buttons shall be no higher than 54 in (1370 mm) above the *finish floor for side approach and 48 in (1220 mm) for front approach.* Emergency controls, including the emergency alarm and emergency stop, shall be grouped at the bottom of the panel and shall have their centerlines no less than 35 in (890 mm) above the finish floor (see Fig. 23(a) and (b)).

34

Plaintiff's Exhibit 5                                    Page 37

Case: 1:16-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 146 of 561 PageID #:807



(a)
**Panel Detail**

(b)
*Car Control Height*

(c)
**Alternate Locations of Panel
with Center Opening Door**

(d)
**Alternate Locations of Panel
with Side Opening Door**

**Fig. 23
Car Controls**

(4) Location. Controls shall be located on a front wall if cars have center opening doors, and at the side wall or at the front wall next to the door if cars have side opening doors (see Fig. 23(c) and (d)).

**4.10.13\* Car Position Indicators.** In elevator cars, a visual car position indicator shall be provided above the car control panel or over the door to show the position of the elevator in the hoistway. As the car passes or stops at a floor served by the elevators, the corresponding numerals shall illuminate,

and an audible signal shall sound. Numerals shall be a minimum of 1/2 in (13 mm) high. The audible signal shall be no less than 20 decibels with a frequency no higher than 1500 Hz. An automatic verbal announcement of the floor number at which a car stops or which a car passes may be substituted for the audible signal.

**4.10.14\* Emergency Communications.** If provided, emergency two-way communication systems between the elevator and a point outside the hoistway shall comply with ASME

35

Plaintiff's Exhibit 5

**Department of Justice**  Pt. 36, App. A

**4.11 Platform Lifts (Wheelchair Lifts)**

*A17.1-1990.* The highest operable part of a two-way communication system shall be a maximum of 48 in (1220 mm) from the floor of the car. It shall be identified by a raised symbol and lettering complying with 4.30 and located adjacent to the device. If the system uses a handset then the length of the cord from the panel to the handset shall be at least 29 in (735 mm). If the system is located in a closed compartment the compartment door hardware shall conform to 4.27, Controls and Operating Mechanisms. The emergency intercommunication system shall not require voice communication.

**4.11 Platform Lifts *(Wheelchair Lifts).***

**4.11.1 Location.** *Platform lifts (wheelchair lifts) permitted by 4.1 shall comply with the requirements of 4.11.*

**4.11.2\* Other Requirements.** If platform lifts *(wheelchair lifts)* are used, they shall comply with 4.2.4, 4.5, 4.27, and *ASME A17.1 Safety Code for Elevators and Escalators, Section XX, 1990.*

**4.11.3 Entrance.** *If platform lifts are used then they shall facilitate unassisted entry, operation, and exit from the lift in compliance with 4.11.2.*

**4.12 Windows.**

**4.12.1\* General.** *(Reserved).*

**4.12.2\* Window Hardware.** *(Reserved).*

**4.13 Doors.**

**4.13.1 General.** *Doors required to be accessible by 4.1 shall comply with the requirements of 4.13.*

**4.13.2 Revolving Doors and Turnstiles.** Revolving doors or turnstiles shall not be the only means of passage at an accessible entrance or along an accessible route. *An accessible gate or door shall be provided adjacent to the turnstile or revolving door and shall be so designed as to facilitate the same use pattern.*

**4.13.3 Gates.** Gates, including ticket gates, shall meet all applicable specifications of 4.13.

**4.13.4 Double-Leaf Doorways.** If doorways have two *independently operated* door leaves, then at least one leaf shall meet the specifications in 4.13.5 and 4.13.6. That leaf shall be an active leaf.

**4.13.5 Clear Width.** Doorways shall have a minimum clear opening of 32 in (815 mm) with the door open 90 degrees, measured between the face of the door and the *opposite* stop (see Fig. 24(a), (b), (c), and (d)). Openings more than 24 in (610 mm) in depth shall comply with 4.2.1 and 4.3.3 (see Fig. 24(e)).

*EXCEPTION: Doors not requiring full user passage, such as shallow closets, may have the clear opening reduced to 20 in (510 mm) minimum.*

**4.13.6 Maneuvering Clearances at Doors.** Minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear.

*EXCEPTION:* Entry doors to acute care hospital bedrooms for in-patients shall be exempted from the requirement for space at the latch side of the door (see dimension "x" in Fig. 25) if the door is at least 44 in (1120 mm) wide.

**4.13.7 Two Doors in Series.** The minimum space between two hinged or pivoted doors in series shall be 48 in (1220 mm) plus the width of any door swinging into the space. Doors in series shall swing either in the same direction or away from the space between the doors (see Fig. 26).

**4.13.8\* Thresholds at Doorways.** Thresholds at doorways shall not exceed 3/4 in (19 mm) in height for exterior sliding doors or 1/2 in (13 mm) for other types of doors. Raised thresholds and floor level changes at accessible doorways shall be beveled with a slope no greater than 1:2 (see 4.5.2).

**4.13.9\* Door Hardware.** Handles, pulls, latches, locks, and other operating devices on accessible doors shall have a shape that is

36

Plaintiff's Exhibit 5



Fig. 24
Clear Doorway Width and Depth

easy to grasp with one hand and does not require tight grasping, tight pinching, or twisting of the wrist to operate. Lever-operated mechanisms, push-type mechanisms, and U-shaped handles are acceptable designs. When sliding doors are fully open, operating hardware shall be exposed and usable from both sides. *Hardware required for accessible door passage shall be mounted no higher than 48 in (1220 mm) above finished floor.*

**4.13.10\* Door Closers.** If a door has a closer, then the sweep period of the closer shall be adjusted so that from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 in (75 mm) from the latch, measured to the leading edge of the door.

**4.13.11\* Door Opening Force.** The maximum force for pushing or pulling open a door shall be as follows:

   (1) Fire doors shall have the minimum opening force allowable by the appropriate administrative authority.

   (2) Other doors.

   (a) exterior hinged doors: (Reserved).

   (b) interior hinged doors: 5 lbf (22.2N)

   (c) sliding or folding doors: 5 lbf (22.2N)

These forces do not apply to the force required to retract latch bolts or disengage other devices that may hold the door in a closed position.

37

Plaintiff's Exhibit 5                                    Page 40

**Department of Justice**                                    **Pt. 36, App. A**

**4.13 Doors**



NOTE: x = 12 in (305 mm) if door has both a closer and latch.

**(a)**
**Front Approaches — Swinging Doors**

NOTE: x = 36 in (915 mm) minimum if y = 60 in (1525 mm); x = 42 in (1065 mm) minimum if y = 54 in (1370 mm).

NOTE: y = 48 in (1220 mm) minimum if door has both a latch and closer.

**(b)**
**Hinge Side Approaches — Swinging Doors**

NOTE: y = 54 in (1370 mm) minimum if door has closer.

NOTE: y = 48 in (1220 mm) minimum if door has closer.

**(c)**
**Latch Side Approaches — Swinging Doors**

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

**Fig. 25**
**Maneuvering Clearances at Doors**

38

Plaintiff's Exhibit 5                                    Page 41



**(d)**
Front Approach — Sliding Doors and Folding Doors

**(e)**
Slide Side Approach — Sliding Doors and Folding Doors

**(f)**
Latch Side Approach — Sliding Doors and Folding Doors

NOTE: All doors in alcoves shall comply with the clearances for front approaches.

Fig. 25
Maneuvering Clearances at Doors (Continued)

Fig. 26
Two Hinged Doors in Series

39

Plaintiff's Exhibit 5                                      Page 42

**Department of Justice** Pt. 36, App. A

4.14 Entrances

**4.13.12* Automatic Doors and Power-Assisted Doors.** If an automatic door is used, then it shall comply with *ANSI/BHMA A156.10-1985*. Slowly opening, *low-powered,* automatic doors shall comply with *ANSI A156.19-1984*. Such doors shall not open to back check faster than 3 seconds and shall require no more than 15 lbf (66.6N) to stop door movement. If a power-assisted door is used, its door-opening force shall comply with 4.13.11 and its closing shall conform to the requirements in *ANSI A156.19-1984*.

**4.14 Entrances.**

**4.14.1 Minimum Number.** *Entrances required to be accessible by 4.1* shall be part of an accessible route complying with 4.3. Such entrances shall be connected by an accessible route to public transportation stops, to accessible parking and passenger loading zones, and to public streets or sidewalks if available (see 4.3.2(1)). They shall also be connected by an accessible route to all accessible spaces or elements within the building or facility.

**4.14.2 Service Entrances.** A service entrance shall not be the sole accessible entrance unless it is the only entrance to a building or facility (for example, in a factory or garage).

**4.15 Drinking Fountains and Water Coolers.**

**4.15.1 Minimum Number.** Drinking fountains or water coolers required to be accessible by 4.1 shall comply with 4.15.

**4.15.2* Spout Height.** Spouts shall be no higher than 36 in (915 mm), measured from the floor or ground surfaces to the spout outlet (see Fig. 27(a)).

**4.15.3 Spout Location.** The spouts of drinking fountains and water coolers shall be at the front of the unit and shall direct the water flow in a trajectory that is parallel or nearly parallel to the front of the unit. The spout shall provide a flow of water at least 4 in (100 mm) high so as to allow the insertion of a cup or glass under the flow of water. *On an accessible drinking fountain with a round or* oval bowl, the spout must be positioned so the flow of water is within 3 in (75 mm) of the front edge of the fountain.

**4.15.4 Controls.** Controls shall comply with 4.27.4. *Unit controls shall be front mounted or side mounted near the front edge.*

**4.15.5 Clearances.**

(1) Wall- and post-mounted cantilevered units shall have a clear knee space between the bottom of the apron and the floor or ground at least 27 in (685 mm) high, 30 in (760 mm) wide, and 17 in to 19 in (430 mm to 485 mm) deep (see Fig. 27(a) and (b)). Such units shall also have a minimum clear floor space 30 in by 48 in (760 mm by 1220 mm) to allow a person in a wheelchair to approach the unit facing forward.

(2) Free-standing or built-in units not having a clear space under them shall have a clear floor space at least 30 in by 48 in (760 mm by 1220 mm) that allows a person in a wheelchair to make a parallel approach to the unit (see Fig. 27(c) and (d)). This clear floor space shall comply with 4.2.4.

**4.16 Water Closets.**

**4.16.1 General.** Accessible water closets shall comply with 4.16.

**4.16.2 Clear Floor Space.** Clear floor space for water closets not in stalls shall comply with Fig. 28. Clear floor space may be arranged to allow either a left-handed or right-handed approach.

**4.16.3* Height.** The height of water closets shall be 17 in to 19 in (430 mm to 485 mm), measured to the top of the toilet seat (see Fig. 29(b)). *Seats shall not be sprung to return to a lifted position.*

**4.16.4* Grab Bars.** Grab bars for water closets not located in stalls shall comply with 4.26 and Fig. 29. *The grab bar behind the water closet shall be 36 in (915 mm) minimum.*

**4.16.5* Flush Controls.** Flush controls shall be hand operated *or automatic* and shall comply with 4.27.4. Controls for flush valves

40

Plaintiff's Exhibit 5

shall be mounted on the wide side of toilet areas no more than 44 in (1120 mm) above the floor.

**4.16.6 Dispensers.** Toilet paper dispensers shall be installed within reach, as shown in Fig. 29(b). *Dispensers that control delivery, or that do not permit continuous paper flow, shall not be used.*

**4.17 Toilet Stalls.**

**4.17.1 Location.** Accessible toilet stalls shall be on an accessible route and shall meet the requirements of 4.17.

**4.17.2 Water Closets.** Water closets in accessible stalls shall comply with 4.16.



Fig. 27
Drinking Fountains and Water Coolers

41

Plaintiff's Exhibit 5                                    Page 44

**Department of Justice**                                    Pt. 36, App. A

**4.17 Toilet Stalls**



Fig. 28
Clear Floor Space at Water Closets

Fig. 29
Grab Bars at Water Closets

**4.17.3\* Size and Arrangement.** The size and arrangement of the standard toilet stall shall comply with Fig. 30(a), Standard Stall. Standard toilet stalls with a minimum depth of 56 in (1420 mm) (see Fig. 30(a)) shall have wall-mounted water closets. If the depth of a standard toilet stall is increased at least 3 in (75 mm), then a floor-mounted water closet may be used. Arrangements shown for standard toilet stalls may be reversed to allow either a left- or right-hand approach. Additional stalls shall be provided in conformance with 4.22.4.

*EXCEPTION: In instances of alteration work where provision of a standard stall (Fig. 30(a))* *is technically infeasible or where plumbing code requirements prevent combining existing stalls to provide space, either alternate stall (Fig. 30(b)) may be provided in lieu of the standard stall.*

**4.17.4 Toe Clearances.** In standard stalls, the front partition and at least one side partition shall provide a toe clearance of at least 9 in (230 mm) above the floor. If the depth of the stall is greater than 60 in (1525 mm), then the toe clearance is not required.

**4.17.5\* Doors.** Toilet stall doors, including door hardware, shall comply with 4.13. If toilet stall approach is from the latch side of the stall *door, clearance between the door side of the*

42

Plaintiff's Exhibit 5



Fig. 30
Toilet Stalls

43

Plaintiff's Exhibit 5                                    Page 46

**Department of Justice**                    **Pt. 36, App. A**

**4.19 Lavatories and Mirrors**

---

*stall and any obstruction may be reduced to a minimum of 42 in (1065 mm) (Fig. 30).*

**4.17.6 Grab Bars.** Grab bars complying with the length and positioning shown in Fig. 30(a), (b), (c), and (d) shall be provided. Grab bars may be mounted with any desired method as long as they have a gripping surface at the locations shown and do not obstruct the required clear floor area. Grab bars shall comply with 4.26.

## 4.18 Urinals.

**4.18.1 General.** Accessible urinals shall comply with 4.18.

**4.18.2 Height.** Urinals shall be stall-type or wall-hung with an elongated rim at a maximum of 17 in (430 mm) above the finish floor.

**4.18.3 Clear Floor Space.** A clear floor space 30 in by 48 in (760 mm by 1220 mm) shall be provided in front of urinals to allow forward approach. This clear space shall adjoin or overlap an accessible route and shall comply with 4.2.4. *Urinal shields that do not extend beyond the front edge of the urinal rim may be provided with 29 in (735 mm) clearance between them.*

**4.18.4 Flush Controls.** Flush controls shall be hand operated or automatic, and shall comply with 4.27.4, and shall be mounted no more than 44 in (1120 mm) above the finish floor.

## 4.19 Lavatories and Mirrors.

**4.19.1 General.** The requirements of 4.19 shall apply to lavatory fixtures, vanities, and built-in lavatories.

**4.19.2 Height and Clearances.** Lavatories shall be mounted with *the rim or counter surface no higher than 34 in (865 mm) above the finish floor.* Provide a clearance of at least 29 in (735 mm) above the finish floor to the bottom of the apron. Knee and toe clearance shall comply with Fig. 31.

**4.19.3 Clear Floor Space.** A clear floor space 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 shall be provided in front of a lavatory to allow forward approach. Such clear floor space shall adjoin or overlap an accessible route and shall extend a maximum of 19 in (485 mm) underneath the lavatory (see Fig. 32).

**4.19.4 Exposed Pipes and Surfaces.** Hot water and drain pipes under lavatories shall be insulated or otherwise *configured to protect against contact.* There shall be no sharp or abrasive surfaces under lavatories.

**4.19.5 Faucets.** Faucets shall comply with 4.27.4. Lever-operated, push-type, and electronically controlled mechanisms are examples of acceptable designs. *If self-closing*



Fig. 31
Lavatory Clearances



Fig. 32
Clear Floor Space at Lavatories

44

Plaintiff's Exhibit 5

valves are used the faucet shall remain open for at least 10 seconds.

**4.19.6\* Mirrors.** Mirrors shall be mounted with the bottom edge *of the reflecting surface* no higher than 40 in (1015 mm) *above the finish* floor (see Fig. 31).

## 4.20 Bathtubs.

**4.20.1 General.** Accessible bathtubs shall comply with 4.20.

**4.20.2 Floor Space.** Clear floor space in front of bathtubs shall be as shown in Fig. 33.

**4.20.3 Seat.** An in-tub seat or a seat at the head end of the tub shall be provided as shown in Fig. 33 and 34. The structural strength of seats and their attachments shall comply with 4.26.3. Seats shall be mounted securely and shall not slip during use.

**4.20.4 Grab Bars.** Grab bars complying with 4.26 shall be provided as shown in Fig. 33 and 34.

**4.20.5 Controls.** Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 34.

**4.20.6 Shower Unit.** A shower spray unit with a hose at least 60 in (1525 mm) long that can be used both as a fixed shower head and as a hand-held shower shall be provided.

**4.20.7 Bathtub Enclosures.** If provided, enclosures for bathtubs shall not obstruct controls or transfer from wheelchairs onto bathtub seats or into tubs. Enclosures on bathtubs shall not have tracks mounted on their rims.

## 4.21 Shower Stalls.

**4.21.1\* General.** Accessible shower stalls shall comply with 4.21.

**4.21.2 Size and Clearances.** Except as specified in 9.1.2, shower stall size and clear floor space shall comply with Fig. 35(a) or (b). The shower stall in Fig. 35(a) shall be 36 in by 36 in (915 mm by 915 mm). Shower stalls required by 9.1.2 shall comply with Fig. 57(a)

or (b). The shower stall in Fig. 35(b) will fit into the space required for a bathtub.

**4.21.3 Seat.** A seat shall be provided in shower stalls 36 in by 36 in (915 mm by 915 mm) and shall be as shown in Fig. 36. The seat shall be mounted 17 in to 19 in (430 mm to 485 mm) from the bathroom floor and shall extend the full depth of the stall. In a 36 in by 36 in (915 mm by 915 mm) shower stall, the seat shall be on the wall opposite the controls. *Where a fixed seat is provided in a 30 in by 60 in minimum (760 mm by 1525 mm) shower stall, it shall be a folding type and shall be mounted on the wall adjacent to the controls as shown in Fig. 57.* The structural strength of seats and their attachments shall comply with 4.26.3.

**4.21.4 Grab Bars.** Grab bars complying with 4.26 shall be provided as shown in Fig. 37.

**4.21.5 Controls.** Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 37. In shower stalls 36 in by 36 in (915 mm by 915 mm), all controls, faucets, and the shower unit shall be mounted on the side wall opposite the seat.

**4.21.6 Shower Unit.** A shower spray unit with a hose at least 60 in (1525 mm) long that can be used both as a fixed shower head and as a hand-held shower shall be provided.

*EXCEPTION: In unmonitored facilities where vandalism is a consideration, a fixed shower head mounted at 48 in (1220 mm) above the shower floor may be used in lieu of a hand-held shower head.*

**4.21.7 Curbs.** If provided, curbs in shower stalls 36 in by 36 in (915 mm by 915 mm) shall be no higher than 1/2 in (13 mm). Shower stalls that are 30 in by 60 in (760 mm by 1525 mm) minimum shall not have curbs.

**4.21.8 Shower Enclosures.** If provided, enclosures for shower stalls shall not obstruct controls or obstruct transfer from wheelchairs onto shower seats.

## 4.22 Toilet Rooms.

**4.22.1 Minimum Number.** *Toilet facilities required to be accessible by 4.1 shall comply*

45

**Department of Justice**

**Pt. 36, App. A**

**4.21 Shower Stalls**



SYMBOL KEY:
- Shower controls
◁ Shower head
Drain

(a)
With Seat in Tub

(b)
With Seat at Head of Tub

Fig. 33
Clear Floor Space at Bathtubs

(a)
With Seat in Tub

(b)
With Seat at Head of Tub

Fig. 34
Grab Bars at Bathtubs

46

Plaintiff's Exhibit 5

Case: 1:16-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 158 of 561 PageID #:839

*with 4.22.* Accessible toilet rooms shall be on an accessible route.

**4.22.2 Doors.** All doors to accessible toilet rooms shall comply with 4.13. Doors shall not swing into the clear floor space required for any fixture.

**4.22.3\* Clear Floor Space.** The accessible fixtures and controls required in 4.22.4, 4.22.5, 4.22.6, and 4.22.7 shall be on an accessible route. An unobstructed turning space complying with 4.2.3 shall be provided within an accessible toilet room. The clear floor space at fixtures and controls, the accessible route, and the turning space may overlap.

**4.22.4 Water Closets.** If toilet stalls are provided, then at least one shall be a standard toilet stall complying with 4.17; *where 6 or more stalls are provided, in addition to the stall complying with 4.17.3, at least one stall 36 in (915 mm) wide with an outward swinging, self-closing door and parallel grab bars complying with Fig. 30(d) and 4.26 shall be provided. Water closets in such stalls* shall comply with 4.16. If water closets are not in stalls, then at least one shall comply with 4.16.

**4.22.5 Urinals.** If urinals are provided, *then* at least one shall comply with 4.18.

**4.22.6 Lavatories and Mirrors.** If lavatories and mirrors are provided, *then* at least one of each shall comply with 4.19.

**4.22.7 Controls and Dispensers.** If controls, dispensers, receptacles, or other



**Fig. 35**
**Shower Size and Clearances**

47

Plaintiff's Exhibit 5

Page 50

**Department of Justice**                                            **Pt. 36, App. A**

### 4.23 Bathrooms, Bathing Facilities, and Shower Rooms



**Fig. 36**
**Shower Seat Design**

equipment are provided, *then* at least one of each shall be on an accessible route and shall comply with 4.27.

## 4.23 Bathrooms, Bathing Facilities, and Shower Rooms.

**4.23.1 Minimum Number.** Bathrooms, bathing facilities, or shower rooms *required to be accessible by 4.1* shall comply with 4.23 and shall be on an accessible route.

**4.23.2 Doors.** Doors to accessible bathrooms shall comply with 4.13. Doors shall not swing into the floor space required for any fixture.

**4.23.3* Clear Floor Space.** The accessible fixtures and controls required in 4.23.4, 4.23.5, 4.23.6, 4.23.7, 4.23.8, and 4.23.9 shall be on an accessible route. An unobstructed turning



NOTE: Shower head and control area may be on back (long) wall (as shown) or on either side wall.

(b)
30-in by 60-in (760-mm by 1525-mm) Stall

**Fig. 37**
**Grab Bars at Shower Stalls**

48

Plaintiff's Exhibit 5                                             Page 51

Case: 1:16-cv-02560 Document #: 76-3 Filed: 05/29/15 Page 160 of 561 PageID #:825

space complying with 4.2.3 shall be provided within an accessible bathroom. The clear floor spaces at fixtures and controls, the accessible route, and the turning space may overlap.

**4.23.4 Water Closets.** If toilet stalls are provided, then at least one shall be a standard toilet stall complying with 4.17; *where 6 or more stalls are provided, in addition to the stall complying with 4.17.3, at least one stall 36 in (915 mm) wide with an outward swinging, self-closing door and parallel grab bars complying with Fig. 30(d) and 4.26 shall be provided. Water closets in such stalls* shall comply with 4.16. If water closets are not in stalls, then at least one shall comply with 4.16.

**4.23.5 Urinals.** If urinals are provided, then at least one shall comply with 4.18.

**4.23.6 Lavatories and Mirrors.** If lavatories and mirrors are provided, then at least one of each shall comply with 4.19.

**4.23.7 Controls and Dispensers.** If controls, dispensers, receptacles, or other equipment *are provided, then* at least one of each shall be on an accessible route and shall comply with 4.27.

**4.23.8 Bathing and Shower Facilities.** If tubs or showers are provided, then at least one accessible tub that complies with 4.20 or at least one accessible shower that complies with 4.21 shall be provided.

**4.23.9\* Medicine Cabinets.** If medicine cabinets are provided, at least one shall be located with a usable shelf no higher than 44 in (1120 mm) above the floor space. The floor space shall comply with 4.2.4.

**4.24 Sinks.**

**4.24.1 General.** Sinks *required to be accessible by 4.1* shall comply with 4.24.

**4.24.2 Height.** Sinks shall be mounted with the counter or rim no higher than 34 in (865 mm) *above the finish* floor.

**4.24.3 Knee Clearance.** Knee clearance that is at least 27 in (685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep shall be pro-

vided underneath sinks.

**4.24.4 Depth.** Each sink shall be a maximum of 6-1/2 in (165 mm) deep.

**4.24.5 Clear Floor Space.** A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 shall be provided in front of a sink to allow forward approach. The clear floor space shall be on an accessible route and shall extend a maximum of 19 in (485 mm) underneath the sink (see Fig. 32).

**4.24.6 Exposed Pipes and Surfaces.** Hot water and drain pipes exposed under sinks shall be insulated or otherwise *configured so as to protect against contact.* There shall be no sharp or abrasive surfaces under sinks.

**4.24.7 Faucets.** Faucets shall comply with 4.27.4. Lever-operated, push-type, touch-type, or electronically controlled mechanisms are acceptable designs.

**4.25 Storage.**

**4.25.1 General.** *Fixed* storage facilities such as cabinets, shelves, closets, and drawers *required to be accessible by 4.1* shall comply with 4.25.

**4.25.2 Clear Floor Space.** A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 that allows either a forward or parallel approach by a person using a wheelchair shall be provided at accessible storage facilities.

**4.25.3 Height.** Accessible storage spaces shall be within at least one of the reach ranges specified in 4.2.5 and 4.2.6 *(see Fig. 5 and Fig 6).* Clothes rods or shelves shall be a maximum of 54 in (1370 mm) *above the finish floor for a side approach. Where the distance from the wheelchair to the clothes rod or shelf exceeds 10 in (255 mm) (as in closets without accessible doors) the height and depth to the rod or shelf shall comply with Fig. 38(a) and Fig. 38(b).*

**4.25.4 Hardware.** Hardware for accessible storage facilities shall comply with 4.27.4. Touch latches and U-shaped pulls are acceptable.

49

Plaintiff's Exhibit 5

Page 52

**Department of Justice**          **Pt. 36, App. A**

### 4.26 Handrails, Grab Bars, and Tub and Shower Seats



(a) Shelves          (b) Closets

Fig. 38
Storage Shelves and Closets

### 4.26 Handrails, Grab Bars, and Tub and Shower Seats.

**4.26.1\* General.** All handrails, grab bars, and tub and shower seats *required to be accessible by 4.1, 4.8, 4.9, 4.16, 4.17, 4.20 or 4.21* shall comply with 4.26.

**4.26.2\* Size and Spacing of Grab Bars and Handrails.** The diameter or width of the gripping surfaces of a handrail or grab bar shall be 1-1/4 in to 1-1/2 in (32 mm to 38 mm), or the shape shall provide an equivalent gripping surface. If handrails or grab bars are mounted adjacent to a wall, the space between the wall and the grab bar shall be 1-1/2 in (38 mm) (see Fig. 39(a), (b), (c), and (e)). Handrails may be located in a recess if the recess is a maximum of 3 in (75 mm) deep and extends at least 18 in (455 mm) above the top of the rail (see Fig. 39(d)).

**4.26.3 Structural Strength.** The structural strength of grab bars, tub and shower seats, fasteners, and mounting devices shall meet the following specification:

(1) Bending stress in a grab bar or seat induced by the maximum bending moment from the application of 250 lbf (1112N) shall be less than the allowable stress for the material of the grab bar or seat.

(2) Shear stress induced in a grab bar or seat by the application of 250 lbf (1112N) shall be less than the allowable shear stress for the material of the grab bar or seat. If the connection between the grab bar or seat and its mounting bracket or other support is considered to be fully restrained, then direct and torsional shear stresses shall be totaled for the combined shear stress, which shall not exceed the allowable shear stress.

(3) Shear force induced in a fastener or mounting device from the application of 250 lbf (1112N) shall be less than the allowable lateral load of either the fastener or mounting device or the supporting structure, whichever is the smaller allowable load.

(4) Tensile force induced in a fastener by a direct tension force of 250 lbf (1112N) plus the maximum moment from the application of 250 lbf (1112N) shall be less than the allowable withdrawal load between the fastener and the supporting structure.

(5) Grab bars shall not rotate within their fittings.

50

Plaintiff's Exhibit 5
         Page 53

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 162 of 561 PageID #:823

**4.26 Handrails, Grab Bars, and Tub and Shower Seats**



**Fig. 39**
Size and Spacing of Handrails and Grab Bars

**4.26.4 Eliminating Hazards.** A handrail or grab bar and any wall or other surface adjacent to it shall be free of any sharp or abrasive elements. Edges shall have a minimum radius of 1/8 in (3.2 mm).

## 4.27 Controls and Operating Mechanisms.

**4.27.1 General.** Controls and operating mechanisms required to be accessible by 4.1 shall comply with 4.27.

51

Plaintiff's Exhibit 5         Page 54

**Department of Justice**                                    **Pt. 36, App. A**

**4.27.2 Clear Floor Space.** Clear floor space complying with 4.2.4 that allows a forward or a parallel approach by a person using a wheelchair shall be provided at controls, dispensers, receptacles, and other operable equipment.

**4.27.3\* Height.** The highest operable part of controls, dispensers, receptacles, and other operable equipment shall be placed within at least one of the reach ranges specified in 4.2.5 and 4.2.6. Electrical and communications system receptacles on walls shall be mounted no less than 15 in (380 mm) above the floor.

*EXCEPTION: These requirements do not apply where the use of special equipment dictates otherwise or where electrical and communications systems receptacles are not normally intended for use by building occupants.*

**4.27.4 Operation.** Controls and operating mechanisms shall be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate controls shall be no greater than 5 lbf (22.2 N).

**4.28 Alarms.**

**4.28.1 General.** *Alarm systems required to be accessible by 4.1 shall comply with 4.28. At a minimum, visual signal appliances shall be provided in buildings and facilities in each of the following areas: restrooms and any other general usage areas (e.g., meeting rooms), hallways, lobbies, and any other area for common use.*

**4.28.2\* Audible Alarms.** If provided, audible emergency alarms shall produce a sound that exceeds the prevailing equivalent sound level in the room or space by at least 15 *dbA* or exceeds any maximum sound level with a duration of *60* seconds by 5 dbA, whichever is louder. Sound levels for alarm signals shall not exceed 120 *dbA.*

**4.28.3\* Visual Alarms.** *Visual alarm signal appliances shall be integrated into the building or facility alarm system. If single station audible alarms are provided then single station visual alarm signals shall be provided. Visual alarm signals shall have the following minimum photometric and location features:*

*(1) The lamp shall be a xenon strobe type or equivalent.*

*(2) The color shall be clear or nominal white (i.e., unfiltered or clear filtered white light).*

*(3) The maximum pulse duration shall be two-tenths of one second (0.2 sec) with a maximum duty cycle of 40 percent. The pulse duration is defined as the time interval between initial and final points of 10 percent of maximum signal.*

*(4) The intensity shall be a minimum of 75 candela.*

*(5) The flash rate shall be a minimum of 1 Hz and a maximum of 3 Hz.*

*(6) The appliance shall be placed 80 in (2030 mm) above the highest floor level within the space or 6 in (152 mm) below the ceiling, whichever is lower.*

*(7) In general, no place in any room or space required to have a visual signal appliance shall be more than 50 ft (15 m) from the signal (in the horizontal plane). In large rooms and spaces exceeding 100 ft (30 m) across, without obstructions 6 ft (2 m) above the finish floor, such as auditoriums, devices may be placed around the perimeter, spaced a maximum 100 ft (30 m) apart, in lieu of suspending appliances from the ceiling.*

*(8) No place in common corridors or hallways in which visual alarm signalling appliances are required shall be more than 50 ft (15 m) from the signal.*

**4.28.4\* Auxiliary Alarms.** *Units and* sleeping accommodations shall have a visual alarm connected to the building emergency alarm system or shall have a standard 110-volt electrical receptacle into which such an alarm can be connected and a means *by which a signal from the building emergency alarm system can trigger such an auxiliary alarm. When visual alarms are in place the signal shall be visible in all areas of the unit or room.* Instructions for use of the auxiliary alarm or receptacle shall be provided.

52

Plaintiff's Exhibit 5                                        Page 55

## 4.29 Detectable Warnings.

**4.29.1 General.** *Detectable* warnings *required by 4.1 and 4.7* shall comply with 4.29.

**4.29.2\* Detectable Warnings on Walking Surfaces.** *Detectable* warnings shall consist *of raised truncated domes with a diameter of nominal 0.9 in (23 mm), a height of nominal 0.2 in (5 mm) and a center-to-center spacing of nominal 2.35 in (60 mm) and shall contrast visually with adjoining surfaces, either light-on-dark, or dark-on-light.*

*The material used to provide contrast shall be an integral part of the walking surface. Detectable warnings used on interior surfaces shall differ from adjoining walking surfaces in resiliency or sound-on-cane contact.*

## 4.29.3 *Detectable* Warnings on Doors To Hazardous Areas. *(Reserved).*

## 4.29.4 *Detectable* Warnings at Stairs. *(Reserved).*

**4.29.5 Detectable Warnings at Hazardous Vehicular Areas.** If a walk crosses or adjoins a vehicular way, *and the walking surfaces are not separated by curbs,* railings, or other *elements between the pedestrian areas and vehicular areas,* the boundary between the areas shall be defined by a continuous *detectable* warning *which is* 36 in (915 mm) wide, complying with 4.29.2.

**4.29.6 Detectable Warnings at Reflecting Pools.** The edges of reflecting pools shall be protected by railings, walls, curbs, or *detectable* warnings complying with 4.29.2.

**4.29.7 Standardization.** *(Reserved).*

## 4.30 Signage.

**4.30.1\* General.** *Signage required to be accessible by 4.1 shall comply with the applicable provisions of 4.30.*

**4.30.2\* Character Proportion.** Letters and numbers on signs shall have a width-to-height ratio between 3:5 and 1:1 and a stroke-width-to-height ratio between 1:5 and 1:10.

**4.30.3 *Character Height.*** *Characters and numbers on signs shall be sized according to the viewing distance from which they are to be read. The minimum height is measured using an upper case X. Lower case characters are permitted.*

| *Height Above Finished Floor* | *Minimum Character Height* |
| --- | --- |
| Suspended or Projected Overhead in compliance with 4.4.2 | 3 in (75 mm) minimum |

**4.30.4\* Raised *and Brailled* Characters and Pictorial Symbol Signs (Pictograms).** Letters and numerals shall be raised 1/32 in, upper case, sans serif or *simple serif type and shall be accompanied with Grade 2 Braille.* Raised characters shall be at least 5/8 in (16 mm) high, but no higher than 2 in (50 mm). *Pictograms shall be accompanied by the equivalent verbal description placed directly below the pictogram. The border dimension of the pictogram shall be 6 in (152 mm) minimum in height.*

**4.30.5\* *Finish and Contrast.*** *The characters and background of signs shall be eggshell, matte, or other non-glare finish.* Characters and symbols shall contrast with their background --either light characters on a dark background or dark characters on a light background.

**4.30.6 *Mounting Location and Height.*** *Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in (1525 mm) above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in (76 mm) of signage without encountering protruding objects or standing within the swing of a door.*

## 4.30.7\* Symbols of Accessibility.

*(1) Facilities and elements required to be identified as accessible by 4.1 shall use the international symbol of accessibility. The*

53

Plaintiff's Exhibit 5                                    Page 56

**Department of Justice**                                          Pt. 36, App. A

**4.30 Signage**



(a)
Proportions
International Symbol of Accessibility

(b)
Display Conditions
International Symbol of Accessibility

(c)
International TDD Symbol

(d)
International Symbol of Access for Hearing Loss

Fig. 43
International Symbols

symbol shall be displayed as shown in Fig. 43(a) and (b).

*(2) Volume Control Telephones. Telephones required to have a volume control by 4.1.3(17)(b) shall be identified by a sign containing a depiction of a telephone handset with radiating sound waves.*

*(3) Text Telephones. Text telephones required by 4.1.3(17)(c) shall be identified by the international TDD symbol (Fig 43(c)). In addition, if a facility has a public text telephone, directional signage indicating the location of the nearest text telephone shall be placed adjacent to all banks of telephones which do not contain a text telephone. Such directional signage shall include the international TDD symbol. If a facility has no banks of telephones, the directional signage shall be provided at the entrance (e.g., in a building directory).*

*(4) Assistive Listening Systems. In assembly areas where permanently installed assistive listening systems are required by 4.1.3(19)(b) the availability of such systems shall be identified with signage that includes the international symbol of access for hearing loss (Fig 43(d)).*

**4.30.8\* Illumination Levels.** *(Reserved).*

## 4.31 Telephones.

**4.31.1 General.** Public telephones *required to be accessible by 4.1* shall comply with 4.31.

**4.31.2 Clear Floor or Ground Space.** A clear floor or ground space at least 30 in by 48 in (760 mm by 1220 mm) that allows either a forward or parallel approach by a person using a wheelchair shall be provided at telephones (see Fig. 44). The clear floor or ground space shall comply with 4.2.4. Bases, enclosures, and fixed seats shall not impede approaches to telephones by people who use wheelchairs.

**4.31.3\* Mounting Height.** The highest operable part of the telephone shall be within the reach ranges specified in 4.2.5 or 4.2.6.

**4.31.4 Protruding Objects.** *Telephones shall comply with 4.4.*

Plaintiff's Exhibit 5

Case: 1:15-cv-05560 Document #: 76-3 Filed: 04/29/17 Page 166 of 561 PageID #:827



**Fig. 44**
**Mounting Heights and Clearances for Telephones**

### 4.31.5 Hearing Aid Compatible and Volume Control Telephones Required by 4.1.

(1) Telephones shall be hearing aid compatible.

(2) Volume controls, *capable of a minimum of 12 dbA and a maximum of 18 dbA above* *normal, shall be provided in accordance with 4.1.3. If an automatic reset is provided then 18 dbA may be exceeded.*

**4.31.6 Controls.** Telephones shall have pushbutton controls where service for such equipment is available.

55

Plaintiff's Exhibit 5

Page 58

**Department of Justice**                                    **Pt. 36, App. A**

## 4.32 *Fixed or Built-in* Seating and Tables

**4.31.7 Telephone Books.** Telephone books, if provided, shall be located *in a position that complies with the reach ranges specified in 4.2.5 and 4.2.6.*

**4.31.8 Cord Length.** The cord from the telephone to the handset shall be at least 29 in (735 mm) long.

### 4.31.9* Text Telephones Required by 4.1.

(1) Text telephones used with a pay telephone shall be permanently affixed within, or adjacent to, the telephone enclosure. If an acoustic coupler is used, the telephone cord shall be sufficiently long to allow connection of the text telephone and the telephone receiver.

(2) Pay telephones designed to accommodate a portable text telephone shall be equipped with a shelf and an electrical outlet within or adjacent to the telephone enclosure. The telephone handset shall be capable of being placed flush on the surface of the shelf. The shelf shall be capable of accommodating a text telephone and shall have 6 in (152 mm) minimum vertical clearance in the area where the text telephone is to be placed.

(3) Equivalent facilitation may be provided. For example, a portable text telephone may be made available in a hotel at the registration desk if it is available on a 24-hour basis for use with nearby public pay telephones. In this instance, at least one pay telephone shall comply with paragraph 2 of this section. In addition, if an acoustic coupler is used, the telephone handset cord shall be sufficiently long so as to allow connection of the text telephone and the telephone receiver. Directional signage shall be provided and shall comply with 4.30.7.

### 4.32 *Fixed or Built-in* Seating and Tables.

**4.32.1 Minimum Number.** Fixed or built-in seating or tables *required to be accessible by 4.1* shall comply with 4.32.

**4.32.2 Seating.** If seating spaces for people in wheelchairs are provided at fixed tables or counters, clear floor space complying with 4.2.4 shall be provided. Such clear floor space shall

not overlap knee space by more than 19 in (485 mm) (see Fig. 45).

**4.32.3 Knee Clearances.** If seating for people in wheelchairs is provided at tables *or* counters, knee spaces at least 27 in (685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep shall be provided (see Fig. 45).

**4.32.4* Height of Tables or Counters.** The tops of *accessible* tables and counters shall be from 28 in to 34 in (710 mm to 865 mm) *above the finish* floor or ground.

### 4.33 Assembly Areas.

**4.33.1 Minimum Number.** Assembly and associated areas required to be accessible by 4.1 shall comply with 4.33.

**4.33.2* Size of Wheelchair Locations.** Each wheelchair location shall provide minimum clear ground or floor spaces as shown in Fig. 46.

**4.33.3* Placement of Wheelchair Locations.** Wheelchair areas shall be an integral part of any fixed seating plan and shall be *provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.* They shall adjoin an accessible route that also serves as a means of egress in case of emergency. *At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.*

EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

**4.33.4 Surfaces.** The ground or floor at wheelchair locations shall be level and shall comply with 4.5.

56

Plaintiff's Exhibit 5                                        Page 59

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 168 of 561 PageID #:838



Fig. 45
Minimum Clearances for Seating and Tables

(a)
Forward or Rear Access

(b)
Side Access

Fig. 46
Space Requirements for Wheelchair
Seating Spaces in Series

Plaintiff's Exhibit 5

**Department of Justice**        Pt. 36, App. A

**4.33.5 Access to Performing Areas**

**4.33.5 Access to Performing Areas.**
An accessible route shall connect wheelchair seating locations with performing areas, including stages, arena floors, dressing rooms, locker rooms, and other spaces used by performers.

**4.33.6* Placement of Listening Systems.**
If the listening system provided serves individual fixed seats, then such seats shall be located within a 50 ft (15 m) viewing distance of the stage or playing area and shall have a complete view of the stage or playing area.

**4.33.7* Types of Listening Systems.**
*Assistive listening systems (ALS) are intended to augment standard public address and audio systems by providing signals which can be received directly by persons with special receivers or their own hearing aids and which eliminate or filter background noise. The type of assistive listening system appropriate for a particular application depends on the characteristics of the setting, the nature of the program, and the intended audience. Magnetic induction loops, infra-red and radio frequency systems are types of listening systems which are appropriate for various applications.*

## 4.34 Automated Teller Machines.

**4.34.1 General.** *Each automated teller machine required to be accessible by 4.1.3 shall be on an accessible route and shall comply with 4.34.*

**4.34.2 Clear Floor Space.** *The automated teller machine shall be located so that clear floor space complying with 4.2.4 is provided to allow a person using a wheelchair to make a forward approach, a parallel approach, or both, to the machine.*

## 4.34.3 Reach Ranges.

*(1) Forward Approach Only. If only a forward approach is possible, operable parts of all controls shall be placed within the forward reach range specified in 4.2.5.*

*(2) Parallel Approach Only. If only a parallel approach is possible, operable parts of controls shall be placed as follows:*

*(a) Reach Depth Not More Than 10 in (255 mm). Where the reach depth to the operable parts of all controls as measured from the vertical plane perpendicular to the edge of the*

*unobstructed clear floor space at the farthest protrusion of the automated teller machine or surround is not more than 10 in (255 mm), the maximum height above the finished floor or grade shall be 54 in (1370 mm).*

*(b) Reach Depth More Than 10 in (255 mm). Where the reach depth to the operable parts of any control as measured from the vertical plane perpendicular to the edge of the unobstructed clear floor space at the farthest protrusion of the automated teller machine or surround is more than 10 in (255 mm), the maximum height above the finished floor or grade shall be as follows:*

| Reach Depth | | Maximum Height | |
|---|---|---|---|
| *In* | *Mm* | *In* | *Mm* |
| *10* | *255* | *54* | *1370* |
| *11* | *280* | *53 1/2* | *1360* |
| *12* | *305* | *53* | *1345* |
| *13* | *330* | *52 1/2* | *1335* |
| *14* | *355* | *51 1/2* | *1310* |
| *15* | *380* | *51* | *1295* |
| *16* | *405* | *50 1/2* | *1285* |
| *17* | *430* | *50* | *1270* |
| *18* | *455* | *49 1/2* | *1255* |
| *19* | *485* | *49* | *1245* |
| *20* | *510* | *48 1/2* | *1230* |
| *21* | *535* | *47 1/2* | *1205* |
| *22* | *560* | *47* | *1195* |
| *23* | *585* | *46 1/2* | *1180* |
| *24* | *610* | *46* | *1170* |

*(3) Forward and Parallel Approach. If both a forward and parallel approach are possible, operable parts of controls shall be placed within at least one of the reach ranges in paragraphs (1) or (2) of this section.*

*(4) Bins. Where bins are provided, for envelopes, waste paper, or other purposes, at least one of each type provided shall comply with the applicable reach ranges in paragraph (1), (2), or (3) of this section.*

*EXCEPTION: Where a function can be performed in a substantially equivalent manner by using an alternate control, only one of the controls needed to perform that function is required to comply with this section. If the controls are identified by tactile markings, such markings shall be provided on both controls.*

**4.34.4 Controls.** *Controls for user activation shall comply with 4.27.4.*

58

Plaintiff's Exhibit 5
       Page 61

Case: 1:16-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 152 of 561 PageID #:835

**4.34.5 Equipment for Persons with Vision Impairments.** Instructions and all information for use shall be made accessible to and independently usable by persons with vision impairments.

## 4.35 Dressing and Fitting Rooms.

**4.35.1 General.** Dressing and fitting rooms required to be accessible by 4.1 shall comply with 4.35 and shall be on an accessible route.

**4.35.2 Clear Floor Space.** A clear floor space allowing a person using a wheelchair to make a 180-degree turn shall be provided in every accessible dressing room entered through a swinging or sliding door. No door shall swing into any part of the turning space. Turning space shall not be required in a private dressing room entered through a curtained opening at least 32 in (815 mm) wide if clear floor space complying with section 4.2 renders the dressing room usable by a person using a wheelchair.

**4.35.3 Doors.** All doors to accessible dressing rooms shall be in compliance with section 4.13.

**4.35.4 Bench.** Every accessible dressing room shall have a 24 in by 48 in (610 mm by 1220 mm) bench fixed to the wall along the longer dimension. The bench shall be mounted 17 in to 19 in (430 mm to 485 mm) above the finish floor. Clear floor space shall be provided alongside the bench to allow a person using a wheelchair to make a parallel transfer onto the bench. The structural strength of the bench and attachments shall comply with 4.26.3. Where installed in conjunction with showers, swimming pools, or other wet locations, water shall not accumulate upon the surface of the bench and the bench shall have a slip-resistant surface.

**4.35.5 Mirror.** Where mirrors are provided in dressing rooms of the same use, then in an accessible dressing room, a full-length mirror, measuring at least 18 in wide by 54 in high (460 mm by 1370 mm), shall be mounted in a position affording a view to a person on the bench as well as to a person in a standing position.

NOTE: Sections 4.1.1 through 4.1.7 and sections 5 through 10 are different from ANSI A117.1 in their entirety and are printed in standard type.

58A

## 5. RESTAURANTS AND CAFETERIAS.

**5.1\* General.** Except as specified or modified in this section, restaurants and cafeterias shall comply with the requirements of 4.1 to 4.35. Where fixed tables (or dining counters where food is consumed but there is no service) are provided, at least 5 percent, but not less than one, of the fixed tables (or a portion of the dining counter) shall be accessible and shall comply with 4.32 as required in 4.1.3(18). In establishments where separate areas are designated for smoking and non-smoking patrons, the required number of accessible fixed tables (or counters) shall be proportionally distributed between the smoking and non-smoking areas. In new construction, and where practicable in alterations, accessible fixed tables (or counters) shall be distributed throughout the space or facility.

**5.2 Counters and Bars.** Where food or drink is served at counters exceeding 34 in (865 mm) in height for consumption by customers seated on stools or standing at the counter, a portion of the main counter which is 60 in (1525 mm) in length minimum shall be provided in compliance with 4.32 or service shall be available at accessible tables within the same area.

**5.3 Access Aisles.** All accessible fixed tables shall be accessible by means of an access aisle at least 36 in (915 mm) clear between parallel edges of tables or between a wall and the table edges.

**5.4 Dining Areas.** In new construction, all dining areas, including raised or sunken dining areas, loggias, and outdoor seating areas, shall be accessible. In non-elevator buildings, an accessible means of vertical access to the mezzanine is not required under the following conditions: 1) the area of mezzanine seating measures no more than 33 percent of the area of the total accessible seating area; 2) the same services and decor are provided in an accessible space usable by the general public; and, 3) the accessible areas are not restricted to use by people with disabilities. In alterations, accessibility to raised or sunken dining areas, or to all parts of outdoor seating areas is not required provided that the same services and decor are provided in an accessible space usable by the general public and are not restricted to use by people with disabilities.

**5.5 Food Service Lines.** Food service lines shall have a minimum clear width of 36 in (915 mm), with a preferred clear width of 42 in (1065 mm) to allow passage around a person using a wheelchair. Tray slides shall be mounted no higher than 34 in (865 mm) above the floor (see Fig. 53). If self-service shelves are



Fig. 53
Food Service Lines



Fig. 54
Tableware Areas

59

Plaintiff's Exhibit 5                                    Page 63

## 6.0 Medical Care Facilities

provided, at least 50 percent of each type must be within reach ranges specified in 4.2.5 and 4.2.6.

**5.6 Tableware and Condiment Areas.** Self-service shelves and dispensing devices for tableware, dishware, condiments, food and beverages shall be installed to comply with 4.2 (see Fig. 54).

**5.7 Raised Platforms.** In banquet rooms or spaces where a head table or speaker's lectern is located on a raised platform, the platform shall be accessible in compliance with 4.8 or 4.11. Open edges of a raised platform shall be protected by placement of tables or by a curb.

**5.8 Vending Machines and Other Equipment.** Spaces for vending machines and other equipment shall comply with 4.2 and shall be located on an accessible route.

**5.9 Quiet Areas.** (Reserved).

## 6. MEDICAL CARE FACILITIES.

**6.1 General.** Medical care facilities included in this section are those in which people receive physical or medical treatment or care and where persons may need assistance in responding to an emergency and where the period of stay may exceed twenty-four hours. In addition to the requirements of 4.1 through 4.35, medical care facilities and buildings shall comply with 6.

(1) Hospitals - general purpose hospitals, psychiatric facilities, detoxification facilities -- At least 10 percent of patient bedrooms and toilets, and all public use and common use areas are required to be designed and constructed to be accessible.

(2) Hospitals and rehabilitation facilities that specialize in treating conditions that affect mobility, or units within either that specialize in treating conditions that affect mobility - All patient bedrooms and toilets, and all public use and common use areas are required to be designed and constructed to be accessible.

(3) Long term care facilities, nursing homes -- At least 50 percent of patient bedrooms and toilets, and all public use and common use areas are required to be designed and constructed to be accessible.

(4) Alterations to patient bedrooms.

(a) When patient bedrooms are being added or altered as part of a planned renovation of an entire wing, a department, or other discrete area of an existing medical facility, a percentage of the patient bedrooms that are being added or altered shall comply with 6.3. The percentage of accessible rooms provided shall be consistent with the percentage of rooms required to be accessible by the applicable requirements of 6.1(1), 6.1(2), or 6.1(3), until the number of accessible patient bedrooms in the facility equals the overall number that would be required if the facility were newly constructed. (For example, if 20 patient bedrooms are being altered in the obstetrics department of a hospital, 2 of the altered rooms must be made accessible. If, within the same hospital, 20 patient bedrooms are being altered in a unit that specializes in treating mobility impairments, all of the altered rooms must be made accessible.) Where toilet/bathrooms are part of patient bedrooms which are added or altered and required to be accessible, each such patient toilet/bathroom shall comply with 6.4.

(b) When patient bedrooms are being added or altered individually, and not as part of an alteration of the entire area, the altered patient bedrooms shall comply with 6.3, unless either: a) the number of accessible rooms provided in the department or area containing the altered patient bedroom equals the number of accessible patient bedrooms that would be required if the percentage requirements of 6.1(1), 6.1(2), or 6.1(3) were applied to that department or area; or b) the number of accessible patient bedrooms in the facility equals the overall number that would be required if the facility were newly constructed. Where toilet/bathrooms are part of patient bedrooms which are added or altered and required to be accessible, each such toilet/bathroom shall comply with 6.4.

60

**6.2 Entrances.** At least one accessible entrance that complies with 4.14 shall be protected from the weather by canopy or roof overhang. Such entrances shall incorporate a passenger loading zone that complies with 4.6.6.

**6.3 Patient Bedrooms.** Provide accessible patient bedrooms in compliance with 4.1 through 4.35. Accessible patient bedrooms shall comply with the following:

(1) Each bedroom shall have a door that complies with 4.13.

EXCEPTION: Entry doors to acute care hospital bedrooms for in-patients shall be exempted from the requirement in 4.13.6 for maneuvering space at the latch side of the door if the door is at least 44 in (1120 mm) wide.

(2) Each bedroom shall have adequate space to provide a maneuvering space that complies with 4.2.3. In rooms with 2 beds, it is preferable that this space be located between beds.

(3) Each bedroom shall have adequate space to provide a minimum clear floor space of 36 in (915 mm) along each side of the bed and to provide an accessible route complying with 4.3.3 to each side of each bed.

**6.4 Patient Toilet Rooms.** Where toilet/bath rooms are provided as a part of a patient bedroom, each patient bedroom that is required to be accessible shall have an accessible toilet/bath room that complies with 4.22 or 4.23 and shall be on an accessible route.

| 7. | **BUSINESS AND MERCANTILE.** |
|----|------------------------------|

**7.1 General.** In addition to the requirements of 4.1 to 4.35, the design of all areas used for business transactions with the public shall comply with 7.

**7.2 Sales and Service Counters, Teller Windows, Information Counters.**

(1) In department stores and miscellaneous retail stores where counters have cash registers and are provided for sales or distribution of goods or services to the public, at least one of each type shall have a portion of the counter which is at least 36 in (915mm) in length with a maximum height of 36 in (915 mm) above the finish floor. It shall be on an accessible route complying with 4.3. The accessible counters must be dispersed throughout the building or facility. In alterations where it is technically infeasible to provide an accessible counter, an auxiliary counter meeting these requirements may be provided.

(2) At ticketing counters, teller stations in a bank, registration counters in hotels and motels, box office ticket counters, and other counters that may not have a cash register but at which goods or services are sold or distributed, either:

(i) a portion of the main counter which is a minimum of 36 in (915 mm) in length shall be provided with a maximum height of 36 in (915 mm); or

(ii) an auxiliary counter with a maximum height of 36 in (915 mm) in close proximity to the main counter shall be provided; or

(iii) equivalent facilitation shall be provided (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with disabilities can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).

All accessible sales and service counters shall be on an accessible route complying with 4.3.

(3)* Assistive Listening Devices. (Reserved)

61

Plaintiff's Exhibit 5

### 7.3* Check-out Aisles.

(1) In new construction, accessible check-out aisles shall be provided in conformance with the table below:

| Total Check-out Aisles of Each Design | Minimum Number of Accessible Check-out Aisles (of each design) |
|---|---|
| 1 - 4 | 1 |
| 5 - 8 | 2 |
| 8 - 15 | 3 |
| over 15 | 3, plus 20% of additional aisles |

EXCEPTION: In new construction, where the selling space is under 5000 square feet, only one check-out aisle is required to be accessible.

EXCEPTION: In alterations, at least one check-out aisle shall be accessible in facilities under 5000 square feet of selling space. In facilities of 5000 or more square feet of selling space, at least one of each design of check-out aisle shall be made accessible when altered until the number of accessible check-out aisles of each design equals the number required in new construction.

Examples of check-out aisles of different "design" include those which are specifically designed to serve different functions. Different "design" includes but is not limited to the following features - length of belt or no belt; or permanent signage designating the aisle as an express lane.

(2) Clear aisle width for accessible check-out aisles shall comply with 4.2.1 and maximum adjoining counter height shall not exceed 38 in (965 mm) above the finish floor. The top of the lip shall not exceed 40 in (1015 mm) above the finish floor.

(3) Signage identifying accessible check-out aisles shall comply with 4.30.7 and shall be mounted above the check-out aisle in the same location where the check-out number or type of check-out is displayed.

### 7.4 Security Bollards. Any device used to prevent the removal of shopping carts from store premises shall not prevent access or egress to people in wheelchairs. An alternate

entry that is equally convenient to that provided for the ambulatory population is acceptable.

### 8. LIBRARIES.

### 8.1 General. In addition to the requirements of 4.1 to 4.35, the design of all public areas of a library shall comply with 8, including reading and study areas, stacks, reference rooms, reserve areas, and special facilities or collections.

### 8.2 Reading and Study Areas. At least 5 percent or a minimum of one of each element of fixed seating, tables, or study carrels shall comply with 4.2 and 4.32. Clearances between fixed accessible tables and between study carrels shall comply with 4.3.

### 8.3 Check-Out Areas. At least one lane at each check-out area shall comply with 7.2(1). Any traffic control or book security gates or turnstiles shall comply with 4.13.

### 8.4 Card Catalogs and Magazine Displays. Minimum clear aisle space at card catalogs and magazine displays shall comply with Fig. 55. Maximum reach height shall comply with 4.2, with a height of 48 in (1220 mm) preferred irrespective of approach allowed.

### 8.5 Stacks. Minimum clear aisle width between stacks shall comply with 4.3, with a minimum clear aisle width of 42 in (1065 mm) preferred where possible. Shelf height in stack areas is unrestricted (see Fig. 56).

**Department of Justice**

**Pt. 36, App. A**

**9.0 Accessible Transient Lodging**



Fig. 55
Card Catalog



Fig. 56
Stacks

### 9. ACCESSIBLE TRANSIENT LODGING.

(1) Except as specified in the special technical provisions of this section, accessible transient lodging shall comply with the applicable requirements of 4.1 through 4.35. Transient lodging includes facilities or portions thereof used for sleeping accommodations, when not classed as a medical care facility.

### 9.1 Hotels, Motels, Inns, Boarding Houses, Dormitories, Resorts and Other Similar Places of Transient Lodging.

**9.1.1 General.** All public use and common use areas are required to be designed and constructed to comply with section 4 (Accessible Elements and Spaces: Scope and Technical Requirements).

EXCEPTION: Sections 9.1 through 9.4 do not apply to an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor.

**9.1.2 Accessible Units, Sleeping Rooms, and Suites.** Accessible sleeping rooms or suites that comply with the requirements of 9.2 (Requirements for Accessible Units, Sleeping Rooms, and Suites) shall be provided in conformance with the table below. In addition, in hotels, of 50 or more sleeping rooms or suites, additional accessible sleeping rooms or suites that include a roll-in shower shall also be provided in conformance with the table below. Such accommodations shall comply with the requirements of 9.2, 4.21, and Figure 57(a) or (b).

63

Plaintiff's Exhibit 5

**9.1.3 Sleeping Accommodations for Persons with Hearing Impairments**



Fig. 57
Roll-in Shower with Folding Seat

| Number of Rooms | Accessible Rooms | Rooms with Roll-in Showers |
|---|---|---|
| 1 to 25 | 1 | |
| 26 to 50 | 2 | |
| 51 to 75 | 3 | 1 |
| 76 to 100 | 4 | 1 |
| 101 to 150 | 5 | 2 |
| 151 to 200 | 6 | 2 |
| 201 to 300 | 7 | 3 |
| 301 to 400 | 8 | 4 |
| 401 to 500 | 9 | 4, plus one for each additional 100 over 400 |
| 501 to 1000 | 2% of total | |
| 1001 and over | 20 plus 1 for each 100 over 1000 | |

**9.1.3 Sleeping Accommodations for Persons with Hearing Impairments.**
In addition to those accessible sleeping rooms and suites required by 9.1.2, sleeping rooms and suites that comply with 9.3 (Visual Alarms, Notification Devices, and Telephones) shall be provided in conformance with the following table:

| Number of Elements | Accessible Elements |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | 2% of total |
| 1001 and over | 20 plus 1 for each 100 over 1000 |

64

Plaintiff's Exhibit 5                                    Page 68

### 9.1.4 Classes of Sleeping Accommodations.

(1) In order to provide persons with disabilities a range of options equivalent to those available to other persons served by the facility, sleeping rooms and suites required to be accessible by 9.1.2 shall be dispersed among the various classes of sleeping accommodations available to patrons of the place of transient lodging. Factors to be considered include room size, cost, amenities provided, and the number of beds provided.

(2) Equivalent Facilitation. For purposes of this section, it shall be deemed equivalent facilitation if the operator of a facility elects to limit construction of accessible rooms to those intended for multiple occupancy, provided that such rooms are made available at the cost of a single occupancy room to an individual with disabilities who requests a single-occupancy room.

### 9.1.5. Alterations to Accessible Units, Sleeping Rooms, and Suites. When sleeping rooms are being altered in an existing facility, or portion thereof, subject to the requirements of this section, at least one sleeping room or suite that complies with the requirements of 9.2 (Requirements for Accessible Units, Sleeping Rooms, and Suites) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms provided equals the number required to be accessible with 9.1.2. In addition, at least one sleeping room or suite that complies with the requirements of 9.3 (Visual Alarms, Notification Devices, and Telephones) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms equals the number required to be accessible by 9.1.3.

## 9.2 Requirements for Accessible Units, Sleeping Rooms and Suites.

**9.2.1 General.** Units, sleeping rooms, and suites required to be accessible by 9.1 shall comply with 9.2.

**9.2.2 Minimum Requirements.** An accessible unit, sleeping room or suite shall be on an accessible route complying with 4.3 and have the following accessible elements and spaces.

(1) Accessible sleeping rooms shall have a 36 in (915 mm) clear width maneuvering space located along both sides of a bed, except that where two beds are provided, this requirement can be met by providing a 36 in (915 mm) wide maneuvering space located between the two beds.

(2) An accessible route complying with 4.3 shall connect all accessible spaces and elements, including telephones, within the unit, sleeping room, or suite. This is not intended to require an elevator in multi-story units as long as the spaces identified in 9.2.2(6) and (7) are on accessible levels and the accessible sleeping area is suitable for dual occupancy.

(3) Doors and doorways designed to allow passage into and within all sleeping rooms, suites or other covered units shall comply with 4.13.

(4) If fixed or built-in storage facilities such as cabinets, shelves, closets, and drawers are provided in accessible spaces, at least one of each type provided shall contain storage space complying with 4.25. Additional storage may be provided outside of the dimensions required by 4.25.

(5) All controls in accessible units, sleeping rooms, and suites shall comply with 4.27.

(6) Where provided as part of an accessible unit, sleeping room, or suite, the following spaces shall be accessible and shall be on an accessible route:

(a) the living area.

(b) the dining area.

(c) at least one sleeping area.

(d) patios, terraces, or balconies.

EXCEPTION: The requirements of 4.13.8 and 4.3.8 do not apply where it is necessary to utilize a higher door threshold or a change in level to protect the integrity of the unit from wind/water damage. Where this exception results in patios, terraces or balconies that are not at an accessible level, equivalent facilitation

65

Plaintiff's Exhibit 5        Page 69

### 9.3 Visual Alarms, Notification Devices and Telephones

shall be provided. (E.g., Equivalent facilitation at a hotel patio or balcony might consist of providing raised decking or a ramp to provide accessibility).

(e) at least one full bathroom (i.e., one with a water closet, a lavatory, and a bathtub or shower).

(f) if only half baths are provided, at least one half bath. (g) carports, garages or parking spaces.

(7) Kitchens, Kitchenettes, or Wet Bars. When provided as accessory to a sleeping room or suite, kitchens, kitchenettes, wet bars, or similar amenities shall be accessible. Clear floor space for a front or parallel approach to cabinets, counters, sinks, and appliances shall be provided to comply with 4.2.4. Countertops and sinks shall be mounted at a maximum height of 34 in (865 mm) above the floor. At least fifty percent of shelf space in cabinets or refrigerator/freezers shall be within the reach ranges of 4.2.5 or 4.2.6 and space shall be designed to allow for the operation of cabinet and/or appliance doors so that all cabinets and appliances are accessible and usable. Controls and operating mechanisms shall comply with 4.27.

(8) Sleeping room accommodations for persons with hearing impairments required by 9.1 and complying with 9.3 shall be provided in the accessible sleeping room or suite.

### 9.3 Visual Alarms, Notification Devices and Telephones.

**9.3.1 General.** In sleeping rooms required to comply with this section, auxiliary visual alarms shall be provided and shall comply with 4.28.4. Visual notification devices shall also be provided in units, sleeping rooms and suites to alert room occupants of incoming telephone calls and a door knock or bell. Notification devices shall not be connected to auxiliary visual alarm signal appliances. Permanently installed telephones shall have volume controls complying with 4.31.5; an accessible electrical outlet within 4 ft (1220 mm) of a telephone connection shall be provided to facilitate the use of a text telephone.

**9.3.2 Equivalent Facilitation.** For purposes of this section, equivalent facilitation shall include the installation of electrical outlets (including outlets connected to a facility's central alarm system) and telephone wiring in sleeping rooms and suites to enable persons with hearing impairments to utilize portable visual alarms and communication devices provided by the operator of the facility.

**9.4 Other Sleeping Rooms and Suites.** Doors and doorways designed to allow passage into and within all sleeping units or other covered units shall comply with 4.13.5.

### 9.5 Transient Lodging in Homeless Shelters, Halfway Houses, Transient Group Homes, and Other Social Service Establishments.

**9.5.1 New Construction.** In new construction all public use and common use areas are required to be designed and constructed to comply with section 4. At least one of each type of amenity (such as washers, dryers and similar equipment installed for the use of occupants) in each common area shall be accessible and shall be located on an accessible route to any accessible unit or sleeping accommodation.

EXCEPTION: Where elevators are not provided as allowed in 4.1.3(5), accessible amenities are not required on inaccessible floors as long as one of each type is provided in common areas on accessible floors.

**9.5.2 Alterations.**

(1) Social service establishments which are not homeless shelters:

(a) The provisions of 9.5.3 and 9.1.5 shall apply to sleeping rooms and beds.

(b) Alteration of other areas shall be consistent with the new construction provisions of 9.5.1.

(2) Homeless shelters. If the following elements are altered, the following requirements apply:

66

Plaintiff's Exhibit 5

(a) at least one public entrance shall allow a person with mobility impairments to approach, enter and exit including a minimum clear door width of 32 in (815 mm).

(b) sleeping space for homeless persons as provided in the scoping provisions of 9.1.2 shall include doors to the sleeping area with a minimum clear width of 32 in (815 mm) and maneuvering space around the beds for persons with mobility impairments complying with 9.2.2(1).

(c) at least one toilet room for each gender or one unisex toilet room shall have a minimum clear door width of 32 in (815 mm), minimum turning space complying with 4.2.3, one water closet complying with 4.16, one lavatory complying with 4.19 and the door shall have a privacy latch; and, if provided, at least one tub or shower shall comply with 4.20 or 4.21, respectively.

(d) at least one common area which a person with mobility impairments can approach, enter and exit including a minimum clear door width of 32 in (815 mm).

(e) at least one route connecting elements (a), (b), (c) and (d) which a person with mobility impairments can use including minimum clear width of 36 in (915 mm), passing space complying with 4.3.4, turning space complying with 4.2.3 and changes in levels complying with 4.3.8.

(f) homeless shelters can comply with the provisions of (a)-(e) by providing the above elements on one accessible floor.

**9.5.3. Accessible Sleeping Accommodations in New Construction.** Accessible sleeping rooms shall be provided in conformance with the table in 9.1.2 and shall comply with 9.2 Accessible Units, Sleeping Rooms and Suites (where the items are provided). Additional sleeping rooms that comply with 9.3 Sleeping Accommodations for Persons with Hearing Impairments shall be provided in conformance with the table provided in 9.1.3.

In facilities with multi-bed rooms or spaces, a percentage of the beds equal to the table provided in 9.1.2 shall comply with 9.2.2(1).

## 10. TRANSPORTATION FACILITIES

**10.1 General.** Every station, bus stop, bus stop pad, terminal, building or other transportation facility, shall comply with the applicable provisions of 4.1 through 4.35, sections 5 through 9, and the applicable provisions of this section. The exceptions for elevators in 4.1.3(5) exception 1 and 4.1.6(1)(k) do not apply to a terminal, depot, or other station used for specified public transportation, or an airport passenger terminal, or facilities subject to Title II.

## 10.2 Bus Stops and Terminals.

### 10.2.1 New Construction.

(1) Where new bus stop pads are constructed at bus stops, bays or other areas where a lift or ramp is to be deployed, they shall have a firm, stable surface; a minimum clear length of 96 inches (measured from the curb or vehicle roadway edge) and a minimum clear width of 60 inches (measured parallel to the vehicle roadway) to the maximum extent allowed by legal or site constraints; and shall be connected to streets, sidewalks or pedestrian paths by an accessible route complying with 4.3 and 4.4. The slope of the pad parallel to the roadway shall, to the extent practicable, be the same as the roadway. For water drainage, a maximum slope of 1:50 (2%) perpendicular to the roadway is allowed.

(2) Where provided, new or replaced bus shelters shall be installed or positioned so as to permit a wheelchair or mobility aid user to enter from the public way and to reach a location, having a minimum clear floor area of 30 inches by 48 inches, entirely within the perimeter of the shelter. Such shelters shall be connected by an accessible route to the boarding area provided under paragraph (1) of this section.

(3) Where provided, all new bus route identification signs shall comply with 4.30.5. In addition, to the maximum extent practicable, all new bus route identification signs shall comply with 4.30.2 and 4.30.3. Signs that are

67

Plaintiff's Exhibit 5

### 10.3 Fixed Facilities and Stations

sized to the maximum dimensions permitted under legitimate local, state or federal regulations or ordinances shall be considered in compliance with 4.30.2 and 4.30.3 for purposes of this section.

EXCEPTION: Bus schedules, timetables, or maps that are posted at the bus stop or bus bay are not required to comply with this provision.

#### 10.2.2 Bus Stop Siting and Alterations.

(1) Bus stop sites shall be chosen such that, to the maximum extent practicable, the areas where lifts or ramps are to be deployed comply with section 10.2.1(1) and (2).

(2) When new bus route identification signs are installed or old signs are replaced, they shall comply with the requirements of 10.2.1(3).

### 10.3 Fixed Facilities and Stations.

#### 10.3.1 New Construction. New stations in rapid rail, light rail, commuter rail, intercity bus, intercity rail, high speed rail, and other fixed guideway systems (e.g., automated guideway transit, monorails, etc.) shall comply with the following provisions, as applicable.

(1) Elements such as ramps, elevators or other circulation devices, fare vending or other ticketing areas, and fare collection areas shall be placed to minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public. The circulation path, including an accessible entrance and an accessible route, for persons with disabilities shall, to the maximum extent practicable, coincide with the circulation path for the general public. Where the circulation path is different, signage complying with 4.30.1, 4.30.2, 4.30.3, 4.30.5, and 4.30.7(1) shall be provided to indicate direction to and identify the accessible entrance and accessible route.

(2) In lieu of compliance with 4.1.3(8), at least one entrance to each station shall comply with 4.14, Entrances. If different entrances to a station serve different transportation fixed routes or groups of fixed routes, at least one entrance serving each group or route shall

comply with 4.14, Entrances. All accessible entrance shall, to the maximum extent practicable, coincide with those used by the majority of the general public.

(3) Direct connections to commercial, retail, or residential facilities shall have an accessible route complying with 4.3 from the point of connection to boarding platforms and all transportation system elements used by the public. Any elements provided to facilitate future direct connections shall be on an accessible route connecting boarding platforms and all transportation system elements used by the public.

(4) Where signs are provided at entrances to stations identifying the station or the entrance, or both, at least one sign at each entrance shall comply with 4.30.4 and 4.30.6. Such signs shall be placed in uniform locations at entrances within the transit system to the maximum extent practicable.

EXCEPTION: Where the station has no defined entrance, but signage is provided, then the accessible signage shall be placed in a central location.

(5) Stations covered by this section shall have identification signs complying with 4.30.1, 4.30.2, 4.30.3, and 4.30.5. Signs shall be placed at frequent intervals and shall be clearly visible from within the vehicle on both sides when not obstructed by another train. When station identification signs are placed close to vehicle windows (i.e., on the side opposite from boarding) each shall have the top of the highest letter or symbol below the top of the vehicle window and the bottom of the lowest letter or symbol above the horizontal mid-line of the vehicle window.

(6) Lists of stations, routes, or destinations served by the station and located on boarding areas, platforms, or mezzanines shall comply with 4.30.1, 4.30.2, 4.30.3, and 4.30.5. A minimum of one sign identifying the specific station and complying with 4.30.4 and 4.30.6 shall be provided on each platform or boarding area. All signs referenced in this paragraph shall, to the maximum extent practicable, be placed in uniform locations within the transit system.

68

Plaintiff's Exhibit 5

### 10.3 Fixed Facilities and Stations

(7)* Automatic fare vending, collection and adjustment (e.g., add-fare) systems shall comply with 4.34.2, 4.34.3, 4.34.4, and 4.34.5. At each accessible entrance such devices shall be located on an accessible route. If self-service fare collection devices are provided for the use of the general public, at least one accessible device for entering, and at least one for exiting, unless one device serves both functions, shall be provided at each accessible point of entry or exit. Accessible fare collection devices shall have a minimum clear opening width of 32 in; shall permit passage of a wheel-chair; and, where provided, coin or card slots and controls necessary for operation shall comply with 4.27. Gates which must be pushed open by wheelchair or mobility aid users shall have a smooth continuous surface extending from 2 inches above the floor to 27 inches above the floor and shall comply with 4.13. Where the circulation path does not coincide with that used by the general public, accessible fare collection systems shall be located at or adjacent to the accessible point of entry or exit.

(8) Platform edges bordering a drop-off and not protected by platform screens or guard rails shall have a detectable warning. Such detectable warnings shall comply with 4.29.2 and shall be 24 inches wide running the full length of the platform drop-off.

(9) In stations covered by this section, rail-to-platform height in new stations shall be coordinated with the floor height of new vehicles so that the vertical difference, measured when the vehicle is at rest, is within plus or minus 5/8 inch under normal passen-ger load conditions. For rapid rail, light rail, commuter rail, high speed rail, and intercity rail systems in new stations, the horizontal gap, measured when the new vehicle is at rest, shall be no greater than 3 in. For slow moving automated guideway "people mover" transit systems, the horizontal gap in new stations shall be no greater than 1 in.

EXCEPTION 1: Existing vehicles operating in new stations may have a vertical difference with respect to the new platform within plus or minus 1-1/2 in.

EXCEPTION 2: In light rail, commuter rail and intercity rail systems where it is not operation-ally or structurally feasible to meet the horizontal gap or vertical difference

requirements, mini-high platforms, car-borne or platform-mounted lifts, ramps or bridge plates, or similar manually deployed devices, meeting the applicable requirements of 36 C.F.R. part 1192, or 49 C.F.R. part 38 shall suffice.

(10) Stations shall not be designed or constructed so as to require persons with disabilities to board or alight from a vehicle at a location other than one used by the general public.

(11) Illumination levels in the areas where signage is located shall be uniform and shall minimize glare on signs. Lighting along circulation routes shall be of a type and configuration to provide uniform illumination.

(12) Text Telephones: The following shall be provided in accordance with 4.31.9:

(a) If an interior public pay telephone is provided in a transit facility (as defined by the Department of Transportation) at least one interior public text telephone shall be provided in the station.

(b) Where four or more public pay tele-phones serve a particular entrance to a rail station and at least one is in an interior location, at least one interior public text telephone shall be provided to serve that entrance. Compliance with this section constitutes compliance with section 4.1.3(17)(c).

(13) Where it is necessary to cross tracks to reach boarding platforms, the route surface shall be level and flush with the rail top at the outer edge and between rails, except for a maximum 2-1/2 inch gap on the inner edge of each rail to permit passage of wheel flanges. Such crossings shall comply with 4.29.5. Where gap reduction is not practicable, an above-grade or below-grade accessible route shall be provided.

(14) Where public address systems are provided to convey information to the public in terminals, stations, or other fixed facilities, a means of conveying the same or equivalent information to persons with hearing loss or who are deaf shall be provided.

69

Plaintiff's Exhibit 5

**10.3.2 Existing Facilities: Key Stations**

(15) Where clocks are provided for use by the general public, the clock face shall be uncluttered so that its elements are clearly visible. Hands, numerals, and/or digits shall contrast with the background either light-on-dark or dark-on-light. Where clocks are mounted overhead, numerals and/or digits shall comply with 4.30.3. Clocks shall be placed in uniform locations throughout the facility and system to the maximum extent practicable.

(16) Where provided in below grade stations, escalators shall have a minimum clear width of 32 inches. At the top and bottom of each escalator run, at least two contiguous treads shall be level beyond the comb plate before the risers begin to form. All escalator treads shall be marked by a strip of clearly contrasting color, 2 inches in width, placed parallel to and on the nose of each step. The strip shall be of a material that is at least as slip resistant as the remainder of the tread. The edge of the tread shall be apparent from both ascending and descending directions.

(17) Where provided, elevators shall be glazed or have transparent panels to allow an unobstructed view both in to and out of the car. Elevators shall comply with 4.10.

EXCEPTION: Elevator cars with a clear floor area in which a 60 inch diameter circle can be inscribed may be substituted for the minimum car dimensions of 4.10, Fig. 22.

(18) Where provided, ticketing areas shall permit persons with disabilities to obtain a ticket and check baggage and shall comply with 7.2.

(19) Where provided, baggage check-in and retrieval systems shall be on an accessible route complying with 4.3, and shall have space immediately adjacent complying with 4.2. If unattended security barriers are provided, at least one gate shall comply with 4.13. Gates which must be pushed open by wheelchair or mobility aid users shall have a smooth continuous surface extending from 2 inches above the floor to 27 inches above the floor.

**10.3.2 Existing Facilities: Key Stations.**

(1) Rapid, light and commuter rail key stations, as defined under criteria established by the Department of Transportation in subpart C of 49 CFR part 37 and existing intercity rail stations shall provide at least one accessible route from an accessible entrance to those areas necessary for use of the transportation system.

(2) The accessible route required by 10.3.2(1) shall include the features specified in 10.3.1(1), (4)-(9), (11)-(15), and (17)-(19).

(3) Where technical infeasability in existing stations requires the accessible route to lead from the public way to a paid area of the transit system, an accessible fare collection system, complying with 10.3.1(7), shall be provided along such accessible route.

(4) In light rail, rapid rail and commuter rail key stations, the platform or a portion thereof and the vehicle floor shall be coordinated so that the vertical difference, measured when the vehicle is at rest, is within plus or minus 1-1/2 inches under all normal passenger load conditions, and the horizontal gap, measured when the vehicle is at rest, is no greater than 3 inches for at least one door of each vehicle or car required to be accessible by 49 CFR part 37.

EXCEPTION 1: Existing vehicles retrofitted to meet the requirements of 49 CFR 37.93 (one-car-per-train rule) shall be coordinated with the platform such that, for at least one door, the vertical difference between the vehicle floor and the platform, measured when the vehicle is at rest with 50% normal passenger capacity, is within plus or minus 2 inches and the horizontal gap is no greater than 4 inches.

EXCEPTION 2: Where it is not structurally or operationally feasible to meet the horizontal gap or vertical difference requirements, mini-high platforms, car-borne or platform mounted lifts, ramps or bridge plates, or similar manually deployed devices, meeting the applicable requirements of 36 CFR part 1192, or 49 CFR part 38, shall suffice.

70

Plaintiff's Exhibit 5

(5) New direct connections to commercial, retail, or residential facilities shall, to the maximum extent feasible, have an accessible route complying with 4.3 from the point of connection to boarding platforms and all transportation system elements used by the public. Any elements provided to facilitate future direct connections shall be on an accessible route connecting boarding plat-forms and all transportation system elements used by the public.

### 10.3.3 Existing Facilities: Alterations.

(1) For the purpose of complying with 4.1.6(2) Alterations to an Area Containing a Primary Function, an area of primary function shall be as defined by applicable provisions of 49 C.F.R. 37.43(c) (Department of Transportation's ADA Rule) or 28 C.F.R. 36.403 (Department of Justice's ADA Rule).

## 10.4 Airports.

### 10.4.1 New Construction.

(1) Elements such as ramps, elevators or other vertical circulation devices, ticketing areas, security checkpoints, or passenger waiting areas shall be placed to minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public.

(2) The circulation path, including an acces-sible entrance and an accessible route, for persons with disabilities shall, to the maxi-mum extent practicable, coincide with the circulation path for the general public. Where the circulation path is different, directional signage complying with 4.30.1, 4.30.2, 4.30.3 and 4.30.5 shall be provided which indicates the location of the nearest accessible entrance and its accessible route.

(3) Ticketing areas shall permit persons with disabilities to obtain a ticket and check baggage and shall comply with 7.2.

(4) Where public pay telephones are pro-vided, and at least one is at an interior loca-tion, a public text telephone shall be provided in compliance with 4.31.9. Additionally, if four or more public pay telephones are located in

any of the following locations, at least one public text telephone shall also be provided in that location:

(a) a main terminal outside the security areas;

(b) a concourse within the security areas; or

(c) a baggage claim area in a terminal.

Compliance with this section constitutes compliance with section 4.1.3(17)(c).

(5) Baggage check-in and retrieval systems shall be on an accessible route complying with 4.3, and shall have space immediately adjacent complying with 4.2.4. If unattended security barriers are provided, at least one gate shall comply with 4.13. Gates which must be pushed open by wheelchair or mobility aid users shall have a smooth continuous surface extending from 2 inches above the floor to 27 inches above the floor.

(6) Terminal information systems which broadcast information to the general public through a public address system shall provide a means to provide the same or equivalent information to persons with a hearing loss or who are deaf. Such methods may include, but are not limited to, visual paging systems using video monitors and computer technology. For persons with certain types of hearing loss such methods may include, but are not limited to, an assistive listening system complying with 4.33.7.

(7) Where clocks are provided for use by the general public the clock face shall be unclut-tered so that its elements are clearly visible. Hands, numerals, and/or digits shall contrast with their background either light-on-dark or dark-on-light. Where clocks are mounted overhead, numerals and/or digits shall comply with 4.30.3. Clocks shall be placed in uniform locations throughout the facility to the maxi-mum extent practicable.

(8) Security Systems. (Reserved).

## 10.5 Boat and Ferry Docks.
(Reserved).

71

Plaintiff's Exhibit 5                                                    Page 75

# APPENDIX

This appendix contains *materials of an advisory nature* and provides additional information that should help the reader to understand the minimum requirements of the *guidelines* or to design buildings or facilities for greater accessibility. The paragraph numbers correspond to the sections or paragraphs of the *guidelines* to which the material relates and are therefore not consecutive (for example, A4.2.1 contains additional information relevant to 4.2.1). Sections *of the guidelines* for which additional material appears in this appendix have been indicated by an asterisk. *Nothing in this appendix shall in any way obviate any obligation to comply with the requirements of the guidelines itself.*

*A2.2 Equivalent Facilitation. Specific examples of equivalent facilitation are found in the following sections:*

| | |
|---|---|
| 4.1.6(3)(c) | *Elevators in Alterations* |
| 4.31.9 | *Text Telephones* |
| 7.2 | *Sales and Service Counters, Teller Windows, Information Counters* |
| 9.1.4 | *Classes of Sleeping Accommodations* |
| 9.2.2(6)(d) | *Requirements for Accessible Units, Sleeping Rooms, and Suites* |

## A4.1.1  Application.

*A4.1.1(3) Areas Used Only by Employees as Work Areas. Where there are a series of individual work stations of the same type (e.g., laboratories, service counters, ticket booths), 5%, but not less than one, of each type of work station should be constructed so that an individual with disabilities can maneuver within the work stations. Rooms housing individual offices in a typical office building must meet the requirements of the guidelines concerning doors, accessible routes, etc. but do not need to allow for maneuvering space around individual desks. Modifications required to permit maneuvering within the work area may be accomplished as a reasonable accommodation to individual employees with disabilities under Title I of the ADA. Consideration should also be given to placing shelves in employee work areas at a convenient height for accessibility or*

installing commercially available shelving that is adjustable so that reasonable accommodations can be made in the future.

*If work stations are made accessible they should comply with the applicable provisions of 4.2 through 4.35.*

## A4.1.2 Accessible Sites and Exterior Facilities: New Construction.

*A4.1.2(5)(e) Valet Parking. Valet parking is not always usable by individuals with disabilities. For instance, an individual may use a type of vehicle controls that render the regular controls inoperable or the driver's seat in a van may be removed. In these situations, another person cannot park the vehicle. It is recommended that some self-parking spaces be provided at valet parking facilities for individuals whose vehicles cannot be parked by another person and that such spaces be located on an accessible route to the entrance of the facility.*

## A4.1.3 Accessible Buildings: New Construction.

*A4.1.3(5) Only full passenger elevators are covered by the accessibility provisions of 4.10. Materials and equipment hoists, freight elevators not intended for passenger use, dumbwaiters, and construction elevators are not covered by these guidelines. If a building is exempt from the elevator requirement, it is not necessary to provide a platform lift or other means of vertical access in lieu of an elevator.*

Under Exception 4, platform lifts are allowed where existing conditions make it impractical to install a ramp or elevator. Such conditions generally occur where it is essential to provide access to small raised or lowered areas where space may not be available for a ramp. Examples include, but are not limited to, raised pharmacy platforms, commercial offices raised above a sales floor, or radio and news booths.

*A4.1.3(9) Supervised automatic sprinkler systems have built in signals for monitoring features of the system such as the opening and closing of water control valves, the power supplies for needed pumps, water tank levels, and for indicating conditions that will impair the satisfactory operation of the sprinkler system.*

A1

Plaintiff's Exhibit 5                                        Page 76

**Department of Justice** Pt. 36, App. A

A4.2 Space Allowances and Reach Ranges

---

*Because of these monitoring features, supervised automatic sprinkler systems have a high level of satisfactory performance and response to fire conditions.*

***A4.1.3(10)*** *If an odd number of drinking fountains is provided on a floor, the requirement in 4.1.3(10)(b) may be met by rounding down the odd number to an even number and calculating 50% of the even number. When more than one drinking fountain on a floor is required to comply with 4.15, those fountains should be dispersed to allow wheelchair users convenient access. For example, in a large facility such as a convention center that has water fountains at several locations on a floor, the accessible water fountains should be located so that wheelchair users do not have to travel a greater distance than other people to use a drinking fountain.*

***A4.1.3(17)(b)*** *In addition to the requirements of section 4.1.3(17)(b), the installation of additional volume controls is encouraged. Volume controls may be installed on any telephone.*

***A4.1.3(19)(a)*** *Readily removable or folding seating units may be installed in lieu of providing an open space for wheelchair users. Folding seating units are usually two fixed seats that can be easily folded into a fixed center bar to allow for one or two open spaces for wheelchair users when necessary. These units are more easily adapted than removable seats which generally require the seat to be removed in advance by the facility management.*

*Either a sign or a marker placed on seating with removable or folding arm rests is required by this section. Consideration should be given for ensuring identification of such seats in a darkened theater. For example, a marker which contrasts (light on dark or dark on light) and which also reflects light could be placed on the side of such seating so as to be visible in a lighted auditorium and also to reflect light from a flashlight.*

### A4.1.6 Accessible Buildings: Alterations.

***A4.1.6(1)(h)*** *When an entrance is being altered, it is preferable that those entrances being altered be made accessible to the extent feasible.*

## A4.2 Space Allowances and Reach Ranges.

### A4.2.1 Wheelchair Passage Width.

(1) Space Requirements for Wheelchairs. Many persons who use wheelchairs need a 30 in (760 mm) clear opening width for doorways, gates, and the like, when the latter are entered head-on. If the person is unfamiliar with a building, if competing traffic is heavy, if sudden or frequent movements are needed, or if the wheelchair must be turned at an opening, then greater clear widths are needed. For most situations, the addition of an inch of leeway on either side is sufficient. Thus, a minimum clear width of 32 in (815 mm) will provide adequate clearance. However, when an opening or a restriction in a passageway is more than 24 in (610 mm) long, it is essentially a passageway and must be at least 36 in (915 mm) wide.

(2) Space Requirements for Use of Walking Aids. Although people who use walking aids can maneuver through clear width openings of 32 in (815 mm), they need 36 in (915 mm) wide passageways and walks for comfortable gaits. Crutch tips, often extending down at a wide angle, are a hazard in narrow passageways where they might not be seen by other pedestrians. Thus, the 36 in (915 mm) width provides a safety allowance both for the person *with a disability* and for others.

(3) Space Requirements for Passing. Able-bodied *persons* in winter clothing, walking



Fig. A1
Minimum Passage Width for One Wheelchair
and One Ambulatory Person

A2

Plaintiff's Exhibit 5

Case: 1:15-cv-05560 Document #: 76-3 Filed: 05/29/15 Page 186 of 561 PageID #:847

**A4.2 Space Allowances and Reach Ranges**



Fig. A2
Space Needed for Smooth U-Turn in a Wheelchair

straight ahead with arms swinging, need 32 in (815 mm) of width, which includes 2 in (50 mm) on either side for sway, and another 1 in (25 mm) tolerance on either side for clearing nearby objects or other pedestrians. Almost all wheelchair users and those who use walking aids can also manage within this 32 in (815 mm) width for short distances. Thus, two streams of traffic can pass in 64 in (1625 mm) in a comfortable flow. Sixty inches (1525 mm) provides a minimum width for a somewhat more restricted flow. If the clear width is less than 60 in (1525 mm), two wheelchair users will not be able to pass but will have to seek a wider place for passing. Forty-eight inches (1220 mm) is the minimum width needed for an ambulatory person to pass a nonambulatory or semi-ambulatory person. Within this 48 in (1220 mm) width, the ambulatory person will have to twist to pass a wheelchair user, a person with a service animal, or a





NOTE: Footrests may extend further for tall people

Fig. A3
Dimensions of Adult-Sized Wheelchairs



Fig. A3 (a)

A3

Plaintiff's Exhibit 5              Page 78

**Department of Justice**

A4.3 Accessible Route

semi-ambulatory person. There will be little leeway for swaying or missteps (see Fig. A1).

**A4.2.3 Wheelchair Turning Space.** *These guidelines specify* a minimum space of 60 in (1525 mm) diameter *or a 60 in by 60 in (1525 mm by 1525 mm) T-shaped space* for a pivoting 180-degree turn of a wheelchair. This space is usually satisfactory for turning around, but many people will not be able to turn without repeated tries and bumping into surrounding objects. The space shown in Fig. A2 will allow most wheelchair users to complete U-turns without difficulty.

**A4.2.4 Clear Floor or Ground Space for Wheelchairs.** The wheelchair and user shown in Fig. A3 represent typical dimensions for a large adult male. The space requirements in this *guideline* are based upon maneuvering clearances that will accommodate most wheelchairs. Fig. A3 provides a uniform reference for design not covered by this *guideline*.

**A4.2.5 & A4.2.6 Reach.** *Reach ranges for persons seated in wheelchairs may be further clarified by Fig. A3(a). These drawings approximate in the plan view the information shown in Fig. 4, 5, and 6.*

## A4.3 Accessible Route.

**A4.3.1 General.**

(1) Travel Distances. Many people with mobility impairments can move at only very slow speeds; for many, traveling 200 ft (61 m) could take about 2 minutes. This assumes a rate of about 1.5 ft/s (455 mm/s) on level ground. It also assumes that the traveler would move continuously. However, on trips over 100 ft (30 m), disabled people are apt to rest frequently, which substantially increases their trip times. Resting periods of 2 minutes for every 100 ft (30 m) can be used to estimate travel times for people with severely limited stamina. In inclement weather, slow progress and resting can greatly increase a disabled person's exposure to the elements.

(2) Sites. Level, indirect routes or those with running slopes lower than 1:20 can sometimes provide more convenience than direct routes with maximum allowable slopes or with ramps.



Fig. A4
Cane Technique

**A4.3.10 Egress.** Because people with disabilities may visit, be employed or be a resident in any building, emergency management plans with specific provisions to ensure their safe evacuation also play an essential role in fire safety and life safety.

**A4.3.11.3 Stairway Width.** *A 48 in (1220 mm) wide exit stairway is needed to allow assisted evacuation (e.g., carrying a person in a wheelchair) without encroaching on the exit path for ambulatory persons.*

A4

Plaintiff's Exhibit 5

*A4.3.11.4 Two-way Communication. It is essential that emergency communication not be dependent on voice communications alone because the safety of people with hearing or speech impairments could be jeopardized. The visible signal requirement could be satisfied with something as simple as a button in the area of rescue assistance that lights, indicating that help is on the way, when the message is answered at the point of entry.*

## A4.4 Protruding Objects.

**A4.4.1 General.** *Service animals* are trained to recognize and avoid hazards. However, most people with severe impairments of vision use the long cane as an aid to mobility. The two principal cane techniques are the touch technique, where the cane arcs from side to side and touches points outside both shoulders; and the diagonal technique, where the cane is held in a stationary position diagonally across the body with the cane tip touching or just above the ground at a point outside one shoulder and the handle or grip extending to a point outside the other shoulder. The touch technique is used primarily in uncontrolled areas, while the diagonal technique is used primarily in certain limited, controlled, and familiar environments. Cane users are often trained to use both techniques.

Potential hazardous objects are noticed only if they fall within the detection range of canes (see Fig. A4). Visually impaired people walking toward an object can detect an overhang if its lowest surface is not higher than 27 in (685 mm). When walking alongside *protruding* objects, they cannot detect overhangs. Since proper cane and *service animal* techniques keep people away from the edge of a path or from walls, a slight overhang of no more than 4 in (100 mm) is not hazardous.

## A4.5 Ground and Floor Surfaces.

**A4.5.1 General.** *People who have difficulty walking or* maintaining balance *or who use crutches, canes, or walkers,* and those with restricted gaits are particularly sensitive to slipping and tripping hazards. For such people, a stable and regular surface is necessary for safe walking, particularly on stairs. Wheelchairs can be propelled most easily on surfaces that are hard, stable, and regular. Soft loose surfaces such as shag carpet, loose sand or gravel, wet clay, and irregular surfaces such as cobblestones can significantly impede wheelchair movement.

Slip resistance is based on the frictional force necessary to keep a shoe heel or crutch tip from slipping on a walking surface under conditions likely to be found on the surface. *While the* <u>dynamic</u> *coefficient of friction during walking varies in a complex and non-uniform way, the* <u>static</u> *coefficient of friction, which can be measured in several ways, provides a close approximation of the slip resistance of a surface. Contrary to popular belief, some slippage is* <u>necessary</u> *to walking, especially for persons with restricted gaits; a truly "non-slip" surface could not be negotiated.*

*The Occupational Safety and Health Administration recommends that walking surfaces have a static coefficient of friction of 0.5. A research project sponsored by the Architectural and Transportation Barriers Compliance Board (Access Board) conducted tests with persons with disabilities and concluded that a higher coefficient of friction was needed by such persons. A static coefficient of friction of 0.6 is recommended for accessible routes and 0.8 for ramps.*

*It is recognized that the coefficient of friction varies considerably due to the presence of contaminants, water, floor finishes, and other factors not under the control of the designer or builder and not subject to design and construction guidelines and that compliance would be difficult to measure on the building site. Nevertheless, many common building materials suitable for flooring are now labeled with information on the static coefficient of friction. While it may not be possible to compare one product directly with another, or to guarantee a constant measure, builders and designers are encouraged to specify materials with appropriate values. As more products include information on slip resistance, improved uniformity in measurement and specification is likely. The Access Board's advisory guidelines on Slip Resistant Surfaces provides additional information on this subject.*

*Cross slopes on walks and ground or floor surfaces can cause considerable difficulty in propelling a wheelchair in a straight line.*

A5

**Department of Justice**                                                    **Pt. 36, App. A**

**A4.6 Parking and Passenger Loading Zones**

---

**A4.5.3 Carpet.** Much more needs to be done in developing both quantitative and qualitative criteria for carpeting *(i.e., problems associated with texture and weave need to be studied).* However, certain functional characteristics are well established. When both carpet and padding are used, it is desirable to have minimum movement (preferably none) between the floor and the pad and the pad and the carpet which would allow the carpet to hump or warp. In heavily trafficked areas, a thick, soft (plush) pad or cushion, particularly in combination with long carpet pile, makes it difficult for individuals in wheelchairs and those with other ambulatory disabilities to get about. Firm carpeting can be achieved through proper selection and combination of pad and carpet, sometimes with the elimination of the pad or cushion, and with proper installation. *Carpeting designed with a weave that causes a zig-zag effect when wheeled across is strongly discouraged.*

## A4.6 Parking and Passenger Loading Zones.

**A4.6.3 Parking Spaces.** *The increasing use of vans with side-mounted lifts or ramps by persons with disabilities has necessitated some revisions in specifications for parking spaces and adjacent access aisles. The typical accessible parking space is 96 in (2440 mm) wide with an adjacent 60 in (1525 mm) access aisle. However, this aisle does not permit lifts or ramps to be deployed and still leave room for a person using a wheelchair or other mobility aid to exit the lift platform or ramp. In tests conducted with actual lift/van/ wheelchair combinations, (under a Board-sponsored Accessible Parking and Loading Zones Project) researchers found that a space and aisle totaling almost 204 in (5180 mm) wide was needed to deploy a lift and exit conveniently. The "van accessible" parking space required by these guidelines provides a 96 in (2440 mm) wide space with a 96 in (2440 mm) adjacent access aisle which is just wide enough to maneuver and exit from a side mounted lift. If a 96 in (2440 mm) access aisle is placed between two spaces, two "van accessible" spaces are created. Alternatively, if the wide access aisle is provided at the end of a row (an area often unused), it may be possible to provide the wide access aisle without additional space (see Fig. A5(a)).*

*A sign is needed to alert van users to the presence of the wider aisle, but the space is not intended to be restricted only to vans.*

*"Universal" Parking Space Design. An alternative to the provision of a percentage of spaces with a wide aisle, and the associated need to include additional signage, is the use of what has been called the "universal" parking space design. Under this design, all accessible spaces are 132 in (3350 mm) wide with a 60 in (1525 mm) access aisle (see Fig. A5(b)). One advantage to this design is that*



*(a)*
*Van Accessible Space at End Row*



*(b)*
*Universal Parking Space Design*

Fig. A5
Parking Space Alternatives

A6

Plaintiff's Exhibit 5

*no additional signage is needed because all spaces can accommodate a van with a side-mounted lift or ramp. Also, there is no competition between cars and vans for spaces since all spaces can accommodate either. Furthermore, the wider space permits vehicles to park to one side or the other within the 132 in (3350 mm) space to allow persons to exit and enter the vehicle on either the driver or passenger side, although, in some cases, this would require exiting or entering without a marked access aisle.*

*An essential consideration for any design is having the access aisle level with the parking space. Since a person with a disability, using a lift or ramp, must maneuver within the access aisle, the aisle cannot include a ramp or sloped area. The access aisle must be connected to an accessible route to the appropriate accessible entrance of a building or facility. The parking access aisle must either blend with the accessible route or have a curb ramp complying with 4.7. Such a curb ramp opening must be located within the access aisle boundaries, not within the parking space boundaries. Unfortunately, many facilities are designed with a ramp that is blocked when any vehicle parks in the accessible space. Also, the required dimensions of the access aisle cannot be restricted by planters, curbs or wheel stops.*

**A4.6.4 Signage.** Signs designating parking places for disabled people can be seen from a driver's seat if the signs are mounted high enough above the ground and located at the front of a parking space.

**A4.6.5 Vertical Clearance.** High-top vans, which disabled people or transportation services often use, require higher clearances in parking garages than automobiles.

**A4.8 Ramps.**

**A4.8.1 General.** Ramps are essential for wheelchair users if elevators or lifts are not available to connect different levels. However, some people who use walking aids have difficulty with ramps and prefer stairs.

**A4.8.2 Slope and Rise.** *Ramp slopes between 1:16 and 1:20 are preferred.* The ability to manage an incline is related to both its slope and its length. Wheelchair users with

disabilities affecting their arms or with low stamina have serious difficulty using inclines. Most ambulatory people and most people who use wheelchairs can manage a slope of 1:16. Many people cannot manage a slope of 1:12 for 30 ft (9 m).

**A4.8.4 Landings.** *Level landings are essential toward maintaining an aggregate slope that complies with these guidelines. A ramp landing that is not level causes individuals using wheelchairs to tip backward or bottom out when the ramp is approached.*

**A4.8.5 Handrails.** The requirements for stair and ramp handrails in this guideline are for adults. When children are principal users in a building or facility, a second set of handrails at an appropriate height can assist them and aid in preventing accidents.

**A4.9 Stairs.**

**A4.9.1 Minimum Number.** *Only interior and exterior stairs connecting levels that are not connected by an elevator, ramp, or other accessible means of vertical access have to comply with 4.9.*

**A4.10 Elevators.**

**A4.10.6 Door Protective and Reopening Device.** The required door reopening device would hold the door open for 20 seconds if the doorway remains obstructed. After 20 seconds, the door may begin to close. However, if designed in accordance with *ASME A17.1-1990*, the door closing movement could still be stopped if a person or object exerts sufficient force at any point on the door edge.

**A4.10.7 Door and Signal Timing for Hall Calls.** This paragraph allows variation in the location of call buttons, advance time for warning signals, and the door-holding period used to meet the time requirement.

**A4.10.12 Car Controls.** Industry-wide standardization of elevator control panel design would make all elevators significantly more convenient for use by people with severe visual impairments. In many cases, it will be possible to locate the highest control on elevator panels within 48 in (1220 mm) from the floor.

A7

Plaintiff's Exhibit 5

**Department of Justice**                                    **Pt. 36, App. A**

A4.11 Platform Lifts (Wheelchair Lifts)

**A4.10.13 Car Position Indicators.** A special button may be provided that would activate the audible signal within the given elevator only for the desired trip, rather than maintaining the audible signal in constant operation.

**A4.10.14 Emergency Communications.** A device that requires no handset is easier to use by people who have difficulty reaching. *Also, small handles on handset compartment doors are not usable by people who have difficulty grasping.*

*Ideally, emergency two-way communication systems should provide both voice and visual display intercommunication so that persons with hearing impairments and persons with vision impairments can receive information regarding the status of a rescue. A voice intercommunication system cannot be the only means of communication because it is not accessible to people with speech and hearing impairments. While a voice intercommunication system is not required, at a minimum, the system should provide both an audio and visual indication that a rescue is on the way.*

**A4.11 Platform Lifts (Wheelchair Lifts).**

**A4.11.2 Other Requirements.** *Inclined stairway chairlifts, and inclined and vertical platform lifts (wheelchair lifts) are available* for short-distance, vertical transportation of people with disabilities. Care should be taken in selecting lifts *as some lifts are not equally suitable for use by both wheelchair users and semi-ambulatory individuals.*

**A4.12 Windows.**

**A4.12.1 General.** *Windows intended to be operated by occupants in accessible spaces should comply with 4.12.*

**A4.12.2 Window Hardware.** *Windows requiring pushing, pulling, or lifting to open (for example, double-hung, sliding, or casement and awning units without cranks) should require no more than 5 lbf (22.2 N) to open or close. Locks, cranks, and other window hardware should comply with 4.27.*

**A4.13 Doors.**

**A4.13.8 Thresholds at Doorways.** Thresholds and surface height changes in doorways are particularly inconvenient for wheelchair users who also have low stamina or restrictions in arm movement because complex maneuvering is required to get over the level change while operating the door.

**A4.13.9 Door Hardware.** Some disabled persons must push against a door with their chair or walker to open it. Applied kickplates on doors with closers can reduce required maintenance by withstanding abuse from wheelchairs and canes. To be effective, they should cover the door width, less approximately 2 in (51 mm), up to a height of 16 in (405 mm) from its bottom edge and be centered across the *width of the door.*

**A4.13.10 Door Closers.** Closers with delayed action features give a person more time to maneuver through doorways. They are particularly useful on frequently used interior doors such as entrances to toilet rooms.

**A4.13.11 Door Opening Force.** Although most people with disabilities can exert at least 5 lbf (22.2N), both pushing and pulling from a stationary position, a few people with severe disabilities cannot exert 3 lbf (13.13N). Although some people cannot manage the allowable forces in this guideline and many others have difficulty, door closers must have certain minimum closing forces to close doors satisfactorily. Forces for pushing or pulling doors open are measured with a push-pull scale under the following conditions:

(1) Hinged doors: Force applied perpendicular to the door at the door opener or 30 in (760 mm) from the hinged side, whichever is farther from the hinge.

(2) Sliding or folding doors: Force applied parallel to the door at the door pull or latch.

(3) Application of force: Apply force gradually so that the applied force does not exceed the resistance of the door. In high-rise buildings, air-pressure differentials may require a modification of this specification in order to meet the functional intent.

A8

Plaintiff's Exhibit 5

---

**A4.13.12 Automatic Doors and Power-Assisted Doors.** Sliding automatic doors do not need guard rails and are more convenient for wheelchair users and visually impaired people to use. If slowly opening automatic doors can be reactivated before their closing cycle is completed, they will be more convenient in busy doorways.

**A4.15 Drinking Fountains and Water Coolers.**

**A4.15.2 Spout Height.** *Two drinking fountains, mounted side by side or on a single post, are usable by people with disabilities and people who find it difficult to bend over.*

---


1 Takes transfer position, swings footrest out of the way, sets brakes.


2 Removes armrest, transfers.


3 Moves wheelchair out of the way, changes position (some people fold chair or pivot it 90° to the toilet).


4 Positions on toilet, releases brake.

(a)
Diagonal Approach


1 Takes transfer position, removes armrest, sets brakes.


2 Transfers.


3 Positions on toilet.

(b)
Side Approach

Fig. A6
Wheelchair Transfers

A9

Plaintiff's Exhibit 5                                    Page 84

**Department of Justice**                                    **Pt. 36, App. A**

A4.16 Water Closets

## A4.16 Water Closets.

**A4.16.3 Height.** Height preferences for toilet seats vary considerably among disabled people. Higher seat heights may be an advantage to some ambulatory disabled people, but are often a disadvantage for wheelchair users and others. Toilet seats 18 in (455 mm) high seem to be a reasonable compromise. Thick seats and filler rings are available to adapt standard fixtures to these requirements.

**A4.16.4 Grab Bars.** Fig. A6(a) and (b) show the diagonal and side approaches most commonly used to transfer from a wheelchair to a water closet. Some wheelchair users can transfer from the front of the toilet while others use a 90-degree approach. Most people who use the two additional approaches can also use either the diagonal approach or the side approach.

**A4.16.5 Flush Controls.** Flush valves and related plumbing can be located behind walls or to the side of the toilet, or a toilet seat lid can be provided if plumbing fittings are directly behind the toilet seat. Such designs reduce the chance of injury and imbalance caused by leaning back against the fittings. Flush controls for tank-type toilets have a standardized mounting location on the left side of the tank (facing the tank). Tanks can be obtained by special order with controls mounted on the right side. If administrative authorities require flush controls for flush valves to be located in a position that conflicts with the location of the rear grab bar, then that bar may be split or shifted toward the wide side of the toilet area.

## A4.17 Toilet Stalls.

***A4.17.3 Size and Arrangement.** This section requires use of the 60 in (1525 mm) standard stall (Figure 30(a)) and permits the 36 in (915 mm) or 48 in (1220 mm) wide alternate stall (Figure 30(b)) only in alterations where provision of the standard stall is technically infeasible or where local plumbing codes prohibit reduction in the number of fixtures. A standard stall provides a clear space on one side of the water closet to enable persons who use wheelchairs to perform a side or diagonal transfer from the wheelchair to the water closet. However, some persons with disabilities who use mobility aids such as walkers, canes or crutches are better able*

*to use the two parallel grab bars in the 36 in (915 mm) wide alternate stall to achieve a standing position.*

*In large toilet rooms, where six or more toilet stalls are provided, it is therefore required that a 36 in (915 mm) wide stall with parallel grab bars be provided in addition to the standard stall required in new construction. The 36 in (915 mm) width is necessary to achieve proper use of the grab bars; wider stalls would position the grab bars too far apart to be easily used and narrower stalls would position the grab bars too close to the water closet. Since the stall is primarily intended for use by persons using canes, crutches and walkers, the length of the stall could be conventional. The door, however, must swing outward to ensure a usable space for people who use crutches or walkers.*

**A4.17.5 Doors.** To make it easier for wheelchair users to close toilet stall doors, doors can be provided with closers, spring hinges, or a pull bar mounted on the inside surface of the door near the hinge side.

## A4.19 Lavatories and Mirrors.

**A4.19.6 Mirrors.** If mirrors are to be used by both ambulatory people and wheelchair users, then they must be at least 74 in (1880 mm) high at their topmost edge. A single full length mirror can accommodate all people, including children.

## A4.21 Shower Stalls.

**A4.21.1 General.** Shower stalls that are 36 in by 36 in (915 mm by 915 mm) wide provide additional safety to people who have difficulty maintaining balance because all grab bars and walls are within easy reach. Seated people use the walls of 36 in by 36 in (915 mm by 915 mm) showers for back support. Shower stalls that are 60 in (1525 mm) wide and have no curb may increase usability of a bathroom by wheelchair users because the shower area provides additional maneuvering space.

## A4.22 Toilet Rooms.

***A4.22.3 Clear Floor Space.** In many small facilities, single-user restrooms may be the only facilities provided for all building users.*

A10

Plaintiff's Exhibit 5                                        Page 85

*In addition, the guidelines allow the use of "unisex" or "family" accessible toilet rooms in alterations when technical infeasibility can be demonstrated. Experience has shown that the provision of accessible "unisex" or single-user restrooms is a reasonable way to provide access for wheelchair users and any attendants, especially when attendants are of the opposite sex. Since these facilities have proven so useful, it is often considered advantageous to install a "unisex" toilet room in new facilities in addition to making the multi-stall restrooms accessible, especially in shopping malls, large auditoriums, and convention centers.*

*Figure 28 (section 4.16) provides minimum clear floor space dimensions for toilets in accessible "unisex" toilet rooms. The dotted lines designate the minimum clear floor space, depending on the direction of approach, required for wheelchair users to transfer onto the water closet. The dimensions of 48 in (1220 mm) and 60 in (1525 mm), respectively, correspond to the space required for the two common transfer approaches utilized by wheelchair users (see Fig. A6). It is important to keep in mind that the placement of the lavatory to the immediate side of the water closet will preclude the side approach transfer illustrated in Figure A6(b).*

*To accommodate the side transfer, the space adjacent to the water closet must remain clear of obstruction for 42 in (1065 mm) from the centerline of the toilet (Figure 28) and the lavatory must not be located within this clear space. A turning circle or T-turn, the clear floor space at the lavatory, and maneuvering space at the door must be considered when determining the possible wall locations. A privacy latch or other accessible means of ensuring privacy during use should be provided at the door.*

*RECOMMENDATIONS:*

*1. In new construction, accessible single-user restrooms may be desirable in some situations because they can accommodate a wide variety of building users. However, they cannot be used in lieu of making the multi-stall toilet rooms accessible as required.*

*2. Where strict compliance to the guidelines for accessible toilet facilities is technically infeasible in the alteration of existing facilities, accessible "unisex" toilets are a reasonable alternative.*

*3. In designing accessible single-user restrooms, the provisions of adequate space to allow a side transfer will provide accommodation to the largest number of wheelchair users.*



*Fig. A7*

A11

Plaintiff's Exhibit 5                                    Page 86

**Department of Justice**                    **Pt. 36, App. A**

A4.23 Bathrooms, Bathing Facilities, and Shower Rooms

**A4.23 Bathrooms, Bathing Facilities, and Shower Rooms.**

***A4.23.3 Clear Floor Space.*** *Figure A7 shows two possible configurations of a toilet room with a roll-in shower. The specific shower shown is designed to fit exactly within the dimensions of a standard bathtub. Since the shower does not have a lip, the floor space can be used for required maneuvering space. This would permit a toilet room to be smaller than would be permitted with a bathtub and still provide enough floor space to be considered accessible. This design can provide accessibility in facilities where space is at a premium (i.e., hotels and medical care facilities). The alternate roll-in shower (Fig. 57b) also provides sufficient room for the "T-turn" and does not require plumbing to be on more than one wall.*

**A4.23.9 Medicine Cabinets.** Other alternatives for storing medical and personal care items are very useful to disabled people. Shelves, drawers, and floor-mounted cabinets can be provided within the reach ranges of disabled people.

**A4.26 Handrails, Grab Bars, and Tub and Shower Seats.**

**A4.26.1 General.** Many disabled people rely heavily upon grab bars and handrails to maintain balance and prevent serious falls. Many people brace their forearms between supports and walls to give them more leverage and stability in maintaining balance or for lifting. The grab bar clearance of 1-1/2 in (38 mm) required in this guideline is a safety clearance to prevent injuries resulting from arms slipping through the openings. It also provides adequate gripping room.

**A4.26.2 Size and Spacing of Grab Bars and Handrails.** This specification allows for alternate shapes of handrails as long as they allow an opposing grip similar to that provided by a circular section of 1-1/4 in to 1-1/2 in (32 mm to 38 mm).

***A4.27 Controls and Operating Mechanisms.***

***A4.27.3 Height.*** *Fig. A8 further illustrates*



Fig. A8
Control Reach Limitations

A12

Plaintiff's Exhibit 5

*mandatory and advisory control mounting height provisions for typical equipment.*

*Electrical receptacles installed to serve individual appliances and not intended for regular or frequent use by building occupants are not required to be mounted within the specified reach ranges. Examples would be receptacles installed specifically for wall-mounted clocks, refrigerators, and microwave ovens.*

## A4.28 Alarms.

**A4.28.2 Audible Alarms.** Audible emergency signals must have an intensity and frequency that can attract the attention of individuals who have partial hearing loss. People over 60 years of age generally have difficulty perceiving frequencies higher than 10,000 Hz. *An alarm signal which has a periodic element to its signal, such as single stroke bells (clang-pause-clang- pause), hi-low (up-down-up-down) and fast whoop (on-off-on-off) are best. Avoid continuous or reverberating tones. Select a signal which has a sound characterized by three or four clear tones without a great deal of "noise" in between.*

**A4.28.3 Visual Alarms.** The specifications in this section do not preclude the use of zoned or coded alarm systems.

**A4.28.4 Auxiliary Alarms.** Locating visual emergency alarms in rooms where persons who are deaf may work or reside alone can ensure that they will always be warned when an emergency alarm is activated. To be effective, such devices must be located and oriented so that they will spread signals and reflections throughout a space or raise the overall light level sharply. *However, visual alarms alone are not necessarily the best means to alert sleepers. A study conducted by Underwriters Laboratory (UL) concluded that a flashing light more than seven times brighter was required (110 candela v. 15 candela, at the same distance) to awaken sleepers as was needed to alert awake subjects in a normal daytime illuminated room.*

*For hotel and other rooms where people are likely to be asleep, a signal-activated vibrator placed between mattress and box spring or under a pillow was found by UL to be much more effective in alerting sleepers. Many readily available devices are sound-activated*

*so that they could respond to an alarm clock, clock radio, wake-up telephone call or room smoke detector. Activation by a building alarm system can either be accomplished by a separate circuit activating an auditory alarm which would, in turn, trigger the vibrator or by a signal transmitted through the ordinary 110-volt outlet. Transmission of signals through the power line is relatively simple and is the basis of common, inexpensive remote light control systems sold in many department and electronic stores for home use. So-called "wireless" intercoms operate on the same principal.*

## A4.29 *Detectable* Warnings.

**A4.29.2 *Detectable* Warnings on Walking Surfaces.** *The material used to provide contrast should contrast by at least 70%. Contrast in percent is determined by:*

$$Contrast = [(B1 - B2)/B1] \times 100$$

*where B1 = light reflectance value (LRV) of the lighter area and B2 = light reflectance value (LRV) of the darker area.*

*Note that in any application both white and black are never absolute; thus, B1 never equals 100 and B2 is always greater than 0.*

## A4.30 Signage.

**A4.30.1 General.** In building complexes where finding locations independently on a routine basis may be a necessity (for example, college campuses), tactile maps or prerecorded instructions can be very helpful to visually impaired people. Several maps and auditory instructions have been developed and tested for specific applications. The type of map or instructions used must be based on the information to be communicated, which depends highly on the type of buildings or users.

Landmarks that can easily be distinguished by visually impaired individuals are useful as orientation cues. Such cues include changes in illumination level, bright colors, unique patterns, wall murals, location of special equipment or other architectural features.

Many people with disabilities have limitations in movement of their heads and reduced peripheral vision. Thus, signage positioned

A13

Plaintiff's Exhibit 5

**Department of Justice**                                          **Pt. 36, App. A**

A4.30 Signage

perpendicular to the path of travel is easiest for them to notice. People can generally distinguish signage within an angle of 30 degrees to either side of the centerlines of their faces without moving their heads.

**A4.30.2 Character Proportion.** The legibility of printed characters is a function of the viewing distance, character height, the ratio of the stroke width to the height of the character, the contrast of color between character and background, and print font. The size of characters must be based upon the intended viewing distance. A severely nearsighted person may have to be much closer to recognize a character of a given size than a person with normal visual acuity.

**A4.30.4 Raised *and Brailled* Characters *and Pictorial Symbol Signs (Pictograms).* *The standard dimensions for literary Braille are as follows:***

| | |
|---|---|
| *Dot diameter* | *.059 in.* |
| *Inter-dot spacing* | *.090 in.* |
| *Horizontal separation between cells* | *.241 in.* |
| *Vertical separation between cells* | *.395 in.* |

Raised borders around *signs containing* raised characters may make them confusing to read unless the border is set far away from the characters. *Accessible signage with descriptive materials about public buildings, monuments, and objects of cultural interest may not provide sufficiently detailed and meaningful information. Interpretive guides, audio tape devices, or other methods may be more effective in presenting such information.*

**A4.30.5 Finish and Contrast.** *An eggshell finish (11 to 19 degree gloss on 60 degree glossimeter) is recommended. Research indicates that signs are more legible for persons with low vision when characters contrast with their background by at least 70 percent. Contrast in percent shall be determined by:*

$$Contrast = [(B1 - B2)/B1] \times 100$$

*where B1 = light reflectance value (LRV) of the lighter area and B2 = light reflectance value (LRV) of the darker area.*

*Note that in any application both white and black are never absolute; thus, B1 never equals 100 and B2 is always greater than 0.*

The greatest readability is usually achieved through the use of light-colored characters or symbols on a dark background.

**A4.30.7 Symbols of Accessibility for Different Types of Listening Systems.** *Paragraph 4 of this section requires signage indicating the availability of an assistive listening system. An appropriate message should be displayed with the international symbol of access for hearing loss since this symbol conveys general accessibility for people with hearing loss. Some suggestions are:*

<div align="center">

*INFRARED
ASSISTIVE LISTENING SYSTEM
AVAILABLE
----PLEASE ASK----*

*AUDIO LOOP IN USE
TURN T-SWITCH FOR
BETTER HEARING
----OR ASK FOR HELP----*

*FM
ASSISTIVE LISTENING
SYSTEM AVAILABLE
----PLEASE ASK----*

</div>

*The symbol may be used to notify persons of the availability of other auxiliary aids and services such as: real time captioning, captioned note taking, sign language interpreters, and oral interpreters.*

**A4.30.8 Illumination Levels.** *Illumination levels on the sign surface shall be in the 100 to 300 lux range (10 to 30 footcandles) and shall be uniform over the sign surface. Signs shall be located such that the illumination level on the surface of the sign is not significantly exceeded by the ambient light or visible bright lighting source behind or in front of the sign.*

A14

## A4.31 Telephones.

**A4.31.3 Mounting Height.** In localities where the dial-tone first system is in operation, calls can be placed at a coin telephone through the operator without inserting coins. The operator button is located at a height of 46 in (1170 mm) if the coin slot of the telephone is at 54 in (1370 mm). A generally available public telephone with a coin slot mounted lower on the equipment would allow universal installation of telephones at a height of 48 in (1220 mm) or less at all operable parts.

*A4.31.9 Text Telephones. A public text telephone may be an integrated text telephone pay phone unit or a conventional portable text telephone that is permanently affixed within, or adjacent to, the telephone enclosure. In order to be usable with a pay phone, a text telephone which is not a single integrated text telephone pay phone unit will require a shelf large enough (10 in (255mm) wide by 10 in (255 mm) deep with a 6 in (150 mm) vertical clearance minimum) to accommodate the device, an electrical outlet, and a power cord. Movable or portable text telephones may be used to provide equivalent facilitation. A text telephone should be readily available so that a person using it may access the text telephone easily and conveniently. As currently designed pocket-type text telephones for personal use do not accommodate a wide range of users. Such devices would not be considered substantially equivalent to conventional text telephones. However, in the future as technology develops this could change.*

## A4.32 *Fixed or Built-in* Seating and Tables.

**A4.32.4 Height of *Tables or Counters.*** Different types of work require different *table or counter* heights for comfort and optimal performance. Light detailed work such as writing requires a *table or counter* close to elbow height for a standing person. Heavy manual work such as rolling dough requires a counter or table height about 10 in (255 mm) below elbow height for a standing person. This principle of *high/low table or counter heights* also applies for seated persons; however, the limiting condition for seated manual work is clearance under the *table or counter.*

Table A1 shows convenient counter heights for seated persons. The great variety of heights for comfort and optimal performance indicates a need for alternatives or a compromise in height if people who stand and people who sit will be using the same counter area.

**Table A1**
**Convenient Heights of Tables and Counters for Seated People[1]**

| Conditions of Use | Short Women in mm | | Tall Men in mm | |
|---|---|---|---|---|
| **Seated in a wheelchair:** | | | | |
| **Manual work-** | | | | |
| Desk or removable armrests | 26 | 660 | 30 | 760 |
| Fixed, full-size armrests[2] | 32[3] | 815 | 32[3] | 815 |
| **Light, detailed work:** | | | | |
| Desk or removable armrests | 29 | 735 | 34 | 865 |
| Fixed, full-size armrests[2] | 32[3] | 815 | 34 | 865 |
| **Seated in a 16 in (405 mm) high chair:** | | | | |
| Manual work | 26 | 660 | 27 | 685 |
| Light, detailed work | 28 | 710 | 31 | 785 |

[1]All dimensions are based on a work-surface thickness of 1 1/2 in (38 mm) and a clearance of 1 1/2 in (38 mm) between legs and the underside of a work surface.

[2]This type of wheelchair arm does not interfere with the positioning of a wheelchair under a work surface.

[3]This dimension is limited by the height of the armrests: a lower height would be preferable. Some people in this group prefer lower work surfaces, which require positioning the wheelchair back from the edge of the counter.

## A4.33 Assembly Areas.

**A4.33.2 Size of Wheelchair Locations.** Spaces large enough for two wheelchairs allow people who are coming to a performance together to sit together.

**A4.33.3 Placement of Wheelchair Locations.** The location of wheelchair areas can be planned so that a variety of positions

A15

Plaintiff's Exhibit 5                                    Page 90

**Department of Justice**                                    **Pt. 36, App. A**

Table A2. Summary of Assistive Listening Devices

within the seating area are provided. This will allow choice in viewing and price categories.

*Building/life safety codes set minimum distances between rows of fixed seats with consideration of the number of seats in a row, the exit aisle width and arrangement, and the location of exit doors. "Continental" seating, with a greater number of seats per row and a*

*commensurate increase in row spacing and exit doors, facilitates emergency egress for all people and increases ease of access to mid-row seats especially for people who walk with difficulty. Consideration of this positive attribute of "continental" seating should be included along with all other factors in the design of fixed seating areas.*

### Table A2. Summary of Assistive Listening Devices

| System | Advantages | Disadvantages | Typical Applications |
|---|---|---|---|
| **Induction Loop** Transmitter: Transducer wired to induction loop around listening area. Receiver: Self-contained induction receiver or personal hearing aid with telecoil. | **Cost-Effective** **Low Maintenance** **Easy to use** **Unobtrusive** **May be possible to integrate into existing public address system.** **Some hearing aids can function as receivers.** | **Signal spills over to adjacent rooms.** **Susceptible to electrical interference.** **Limited portability** **Inconsistent signal strength** **Head position affects signal strength.** **Lack of standards for induction coil performance.** | **Meeting areas** **Theaters** **Churches and Temples** **Conference rooms** **Classrooms** **TV viewing** |
| **FM** Transmitter: Flashlight-sized worn by speaker. Receiver: With personal hearing aid via DAI or induction neck-loop and telecoil; or self-contain-ed with earphone(s). | **Highly portable** **Different channels allow use by different groups within the same room.** **High user mobility** **Variable for large range of hearing losses.** | **High cost of receivers** **Equipment fragile** **Equipment obtrusive** **High maintenance** **Expensive to maintain** **Custom fitting to individual user may be required.** | **Classrooms** **Tour groups** **Meeting areas** **Outdoor events** **One-on-one** |
| **Infrared** Transmitter: Emitter in line-of- sight with receiver. Receiver: Self-contained. Or with personal hearing aid via DAI or induction neckloop and telecoil. | **Easy to use** **Insures privacy or confidentiality** **Moderate cost** **Can often be integrated into existing public address system.** | **Line-of-sight required between emitter and receiver.** **Ineffective outdoors** **Limited portability** **Requires installation** | **Theaters** **Churches and Temples** **Auditoriums** **Meetings requiring confidentiality** **TV viewing** |

Source: Rehab Brief, National Institute on Disability and Rehabilitation Research, Washington, DC, Vol. XII, No. 10, (1990).

A16

Plaintiff's Exhibit 5

Case: 1:16-cv-05560 Document #: 76-3 Filed: 04/29/15 Page 200 of 561 PageID #:865

**A4.33.6 Placement of Listening Systems.** A distance of 50 ft (15 m) allows a person to distinguish performers' facial expressions.

**A4.33.7 Types of Listening Systems.** *An assistive listening system appropriate for an assembly area for a group of persons or where the specific individuals are not known in advance, such as a playhouse, lecture hall or movie theater, may be different from the system appropriate for a particular individual provided as an auxiliary aid or as part of a reasonable accommodation. The appropriate device for an individual is the type that individual can use, whereas the appropriate system for an assembly area will necessarily be geared toward the "average" or aggregate needs of various indi-viduals.* A listening system that can be used from any seat in a seating area is the most flexible way to meet this specification. Earphone jacks with variable volume controls can benefit only people who have slight hearing loss and do not help people who use hearing aids. At the present time, *magnetic induction* loops are the most feasible type of listening system for people who use hearing aids *equipped with "T-coils,"* but people without hearing aids or those with hearing aids not equipped with inductive pick-ups cannot use them *without special receivers.* Radio frequency systems can be extremely effective and inexpensive. People without hearing aids can use them, but people with hearing aids need a special receiver to use them as they are presently designed. If hearing aids had a jack to allow a by-pass of microphones, then radio frequency systems would be suitable for people with and without hearing aids. Some listening systems may be subject to interference from other equipment and feedback from hearing aids of people who are using the systems. Such interference can be controll-ed by careful engineering design that anticipates feedback sources in the surrounding area.

*Table A2, reprinted from a National Institute of Disability and Rehabilitation Research "Rehab Brief," shows some of the advantages and disad-vantages of different types of assistive listening systems. In addition, the Architectural and Transportation Barriers Compliance Board (Access Board) has published a pamphlet on Assistive Listening Systems which lists demon-stration centers across the country where technical assistance can be obtained in selecting and installing appropriate systems. The state of*

*New York has also adopted a detailed technical specification which may be useful.*

## A5.0 Restaurants and Cafeterias.

**A5.1 General.** *Dining counters (where there is no service) are typically found in small carry-out restaurants, bakeries, or coffee shops and may only be a narrow eating surface attached to a wall. This section requires that where such a dining counter is provided, a portion of the counter shall be at the required accessible height.*

## A7.0 Business and Mercantile.

**A7.2(3) Assistive Listening Devices.** *At all sales and service counters, teller windows, box offices, and information kiosks where a physical barrier separates service personnel and customers, it is recommended that at least one permanently installed assistive listening device comply-ing with 4.33 be provided at each location or series. Where assistive listening devices are installed, signage should be provided identifying those stations which are so equipped.*

**A7.3 Check-out Aisles.** *Section 7.2 refers to counters without aisles; section 7.3 concerns check-out aisles. A counter without an aisle (7.2) can be approached from more than one direction such as in a convenience store. In order to use a check-out aisle (7.3), customers must enter a defined area (an aisle) at a particular point, pay for goods, and exit at a particular point.*

## A10.3 Fixed Facilities and Stations

**A10.3.1(7) Route Signs.** *One means of making control buttons on fare vending ma-chines usable by persons with vision impair-ments is to raise them above the surrounding surface. Those activated by a mechanical motion are likely to be more detectable. If farecard vending. collection, and adjustment devices are designed to accommodate farecards having one tactually distinctive corner, then a person who has a vision impairment will insert the card with greater ease. Token collection devices that are designed to accommodate tokens which are perforated can allow a person to distinguish more readily between tokens and common coins. Thoughtful placement of accessible gates and fare vending machines in relation to inaccessible devices will make their use and detection easier for all persons with disabilities.*

[56 FR 35592, July 26, 1991, as amended by Order No. 1679-93, 58 FR 17522, Apr. 5, 1993; Order No. 1836-94, 59 FR 2675, Jan. 18, 1994]

A17

**Exhibit 6**

**DEPARTMENT OF JUSTICE**

**Attorney General**

**28 CFR Part 42**

**Nondiscrimination Based on Handicap in Federally Assisted Programs—Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914**

**AGENCY:** Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** This subpart establishes procedures and policies to assure nondiscrimination based on handicap in programs and activities receiving Federal financial assistance from the Department of Justice. The subpart is designed to comply with section 504 of the Rehabilitation Act of 1973 as amended, and Executive Order 11914, which relate to nondiscrimination against handicapped persons in programs receiving or benefitting from Federal financial assistance.

**EFFECTIVE DATE:** July 3, 1980.

**FOR FURTHER INFORMATION CONTACT:** (1) For Federal assistance programs administered by the Law Enforcement Assistance Administration (LEAA), the National Institute of Justice (NIJ), the Bureau of Justice Statistics (BJS), the Office of Justice Assistance, Research, and Statistics (OJARS), and the Office of Juvenile Justice and Delinquency Prevention (OJJDP): Thomas J. Madden, General Counsel, Office of Justice Assistance, Research, and Statistics, telephone: 202/724-7792.

(2) For other Department of Justice Federal assistance programs: Robert N. Dempsey, Federal Enforcement Section, Civil Rights Division, Telephone: (202) 633-2374.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Department of Justice hereby adds Subpart G to Part 42 of the Department regulations to implement section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), as amended by section 111(a) of the Rehabilitation Act Amendments of 1974 (29 U.S.C. 706) (Supp. V 1975), and section 120(a) of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. 95-602, 92 Stat. 2955 (1978) (hereinafter the Rehabilitation Act Amendments of 1978), with regard to Federal financial assistance administered by this Department. Section 504 provides, in pertinent part, that "no otherwise qualified handicapped individual in the United States * * * shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *."

The subpart is intended to insure that the Department's federally assisted programs and activities are operated without discrimination on the basis of handicap. The subpart defines and forbids acts of discrimination against qualified handicapped persons in employment and in the operation of programs and activities receiving assistance from the Department. As employers, recipients are required to make reasonable accommodations to the handicaps of applicants and employees unless the accommodations would impose undue hardships on the operation of the recipients' programs. As providers of services, recipients are required (1) to make programs operating in existing facilities readily accessible to and usable by handicapped persons, (2) to insure that new facilities are constructed to be readily accessible to and usable by handicapped persons, and (3) to operate their programs in a manner which provides for the full and nondiscriminatory participation of eligible handicapped persons.

This rule is, in part, in response to Executive Order 11914 (41 FR 17871, April 28, 1976), which (1) delegates the coordination of government-wide enforcement of section 504 to the Department of Health, Education, and Welfare and (2) directs each Federal agency providing Federal financial assistance to "issue rules, regulations, and directives, consistent with the standards and procedures established by the Secretary of Health, Education and Welfare." The Secretary established such standards and procedures, effective January 13, 1978 (43 FR 2132, January 13, 1978) (hereinafter "guidelines"). The Department's rule is intended to be consistent with the HEW guidelines and the HEW section 504 rule (42 FR 22676 (May 4, 1977); 45 CFR 84.1 (1979)).

Executive Order 12044, 43 FR 12661 (March 24, 1978), whose objective is to improve government regulations, requires that "regulations shall be as simple and clear as possible." Following that standard, the subject departs, where appropriate, from the language (but not the substance) of the HEW section 504 rule where clarification appears desirable to give further guidance to applicants and recipients of Federal financial assistance administered by the Department.

Although the wording may differ, the Department intends no substantive difference between its language and the corresponding language of the HEW section 504 rule and guidelines.

Executive Order 12044 also requires Executive branch agencies to prepare Regulatory Analyses for regulations that may have major economic consequences. The Order defines major economic consequences as (1) an annual effect on the economy of $100 million dollars or more (for example, compliance costs that exceed $100 million dollars) or a stricter requirement if the agency head so determines, or (2) major increases in costs or prices for individual industries, levels of government or geographic regions.

The Department's Notice of Proposed Rulemaking (44 FR 54950, September 21, 1979) requested public comment on the issue of compliance costs and asked for the submission of available cost studies regarding structural and nonstructural modifications to provide for the participation of handicapped persons in programs relevant to this subpart. The public comments received on the matter of costs did not change the Department's earlier view that the compliance costs would not result in major economic consequences within the meaning of Executive Order 12044 and that, accordingly, a Regulatory Analysis would be neither required nor advisable at this time. In the event the Department's experience in implementing this rule indicates that compliance costs exceed anticipated levels, the Department will again review the propriety of undertaking a regulatory analysis.

The anticipated costs of recipients of Department of Justice financial assistance appear to be concentrated in three areas: (1) The removal of architectural barriers; (2) the elimination of communications barriers; and (3) the making of reasonable accommodations to the handicapping conditions of otherwise qualified handicapped persons as employees of recipients.

*Architectural Barriers.* Structural changes for program accessibility are necessary primarily for persons with severe mobility-related handicaps—persons who cannot climb stairs or step over curbs, cannot open heavy doors, cannot travel without wheelchairs, and the like. Almost all these persons use wheelchairs or walkers. With respect to compliance costs associated with structural modifications, it is crucial to keep the following compliance standards in mind. First, under the requirements of the subpart, structural changes in existing facilities are required only where there is no other

**Plaintiffs' Exhibit 6**

Federal Register / Vol. 45, No. 108 / Tuesday, June 3, 1980 / Rules and Regulations 37621

feasible way to make the recipient's program accessible to handicapped persons. For existing facilities, the key requirement is not a barrier free environment, but program accessibility (see illustrative examples set forth in Appendix B, Section C, *infra.*). Second, not every existing facility or part of a facility in a program receiving Federal financial assistance from the Department must be accessible to handicapped persons. The subpart requires only that, when viewed in its entirety, the program is readily accessible to handicapped persons. Where physical access to buildings for handicapped persons requires the construction of ramps, HEW has found "after consultation with experts in the field, that outside ramps to buildings can be constructed quickly and at relatively low cost." 42 FR 22690 (May 4, 1977). Whether the simple installation of ramps and appropriate restroom facilities in buildings will suffice depends upon the design of the facility, the nature and location of the program, and the availability of nonstructural modifications to provide program accessibility.

As to new construction, the available evidence indicates that compliance costs directly attributable to this subpart may be modest for the following reasons.

First, all 50 States have architectural barriers statutes covering publicly funded buildings (where most DOJ recipients are located), while at least 22 States additionally cover privately funded public buildings. The statutes of all 50 States cover new construction, while 35 States also cover renovations and alterations.[1] Thus, since the issue is whether the proposed Department regulations will themselves cause a "major" economic impact, it is noteworthy that much of what is required by this subpart in terms of preventing architectural barriers to handicapped persons already is required by existing State law. Hence, to this extent the incremental Department impact on recipients would appear to be significantly reduced.

Second, this subpart requires that design or construction of new facilities, or alteration of existing facilities, conform with the "American National Standard Specifications for Making Buildings and Facilities Accessible to, and Usable by, the Physically Handicapped," published by the American National Standards Institute, Inc. (ANSI). (§ 42.522(b)). At least twenty-seven States have already adopted the ANSI standards in their codes.[2]

Third, the Architectural Barriers Act of 1968, as amended, 42 U.S.C.A. 4151 *et seq.*, requires that all buildings and facilities "financed in whole or in part by a grant or a loan made by the United States after August 12, 1968" are to be accessible to and usable by the physically handicapped, 42 U.S.C.A. 4151, "if the building or facility is subject to standards for design, construction or alteration issued under the law authorizing the grant or loan." 41 CFR 101–19.602(a)(3) (General Services Administration regulations). LEAA has construed the Architectural Barriers Act as covering all its Part E grants for construction of correctional institutions and facilities. See 42 U.S.C. 3750–3750d (Repealed Dec. 27, 1979 by Pub. L. 96–157, 93 Stat. 1167). The Justice System Improvement Act of 1979, Pub. L. 96–157, 93 Stat. 1167, prohibits LEAA from providing financial assistance to new construction programs (Sec. 404(c)(3)).

Finally, applicants for Department assistance may have previously received Federal financial assistance from other Federal agencies, thereby requiring their compliance with § 504 independent of this subpart. For example, LEAA has provided financial assistance to institutions of higher learning that also receive funds from HEW.[3] Also, a substantial portion of Federal revenue sharing money has been annually allocated by State and local units of government to public safety (*i.e.,* police and fire protection). The revenue sharing funds are provided under the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C.A. 1221 *et seq.,* which was amended in 1976 to make section 504 of the Rehabilitation Act applicable to programs funded with revenue sharing monies received by State and local units of government after January 1, 1977.

*Communications Barriers.* One obvious example of eliminating communications barriers would be the installation of teletypewriters (TTY's) in law enforcement and fire protection agencies to enable hearing and speaking impaired persons to communicate effectively with such agencies. The TTY is a telecommunications device that adapts the telephone to the needs of persons with hearing and speaking impairments. The cost of a TTY is relatively modest and would be even less so where a TTY is shared by a number of public agencies hooked up to a central TTY number.

The use of qualified interpreters in various settings (e.g., police interrogations, court proceedings, correctional rehabilitation programs) who are, when possible, certified by a recognized certification agency, is another important method of ameliorating the communications barriers experienced by speaking and hearing-impaired individuals. A recipient's need for an interpreter is usually not on a continuing basis, and the overall compliance cost would not be substantial.

*Employment.* The subpart prohibits discrimination in employment against handicapped persons by recipients of Department financial assistance and, further, requires that recipients make "reasonable accommodations" to the handicaps of otherwise qualified applicants or incumbent employees. A reasonable accommodation in a given employment situation depends upon many variables involving the recipient, the job, and the handicapped employee. The Department, like its recipients, will have to deal with this issue on a case-by-case basis. However, HEW's economic impact statement on the compliance costs of section 504 for its recipients concluded that "our analysis strongly suggests that in the large majority of cases enforcement of reasonable accommodation will not result in any significant cost increase for employers." 41 FR 20332 (May 17, 1976). There is nothing to suggest a different result for employers functioning in programs receiving financial assistance from the Department of Justice.

The Department programs covered by section 504 are set forth in Appendix A to this subpart. An analysis of the final rule is set forth in Appendix B.

## II. Rulemaking History

On September 21, 1979 the Department published a Notice of Proposed Rulemaking setting forth proposed regulations for public comment (44 FR 54950). The initial 90-day comment period was extended until January 4, 1980 to provide for additional public participation. (44 FR 76303, December 26, 1979) On November 27, 1979 a public meeting was held in Washington, D.C. to hear oral testimony from interested persons on the proposed rule.

A total of more than 60 comments were received and have been analyzed. Both the written comments and the views expressed at the public meeting have illuminated the complex issues involved in implementing section 504 in an effective and workable fashion. The

---

[1] *Amicus.* pp. 46–47 July/August 1978, National Center for Law and the Handicapped.

[2] *Amicus, id.*

[3] Section 305 of the Education Organization Act (Pub. L. No. 96–88, 93 Stat. 688), effective October 17, 1979, transferred LEAA's student loan and grant programs to the new Department of Education.

**Plaintiffs' Exhibit 6**                                    **Page 2**

**37622**     Federal Register / Vol. 45, No. 108 / Tuesday, June 3, 1980 / Rules and Regulations

Department's response to the comments of interested parties and the explanation for significant changes in the proposed rule are set forth in the section-by-section analysis of the rule that appears as Appendix B to the rule. As that analysis explains, some provisions in the proposed rule have been eliminated as duplicative, unnecessary, or otherwise inappropriate; others have been shortened or clarified. The goal throughout has been to design a rule that preserves the essential elements of an effective program for ending discrimination, while avoiding the imposition of unnecessary or counterproductive administrative obligations on recipients.

In consideration of the foregoing, Part 42 of Title 28 of CFR is amended by adding a new Subpart G reading as set forth below.

Dated: May 16, 1980.

Benjamin R. Civiletti,

*Attorney General.*

**Subpart G—Nondiscrimination Based on Handicap in Federally Assisted Programs—Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914**

**General Provisions**

Sec.
42.501  Purpose.
42.502  Application.
42.503  Discrimination prohibited.
42.504  Assurances required.
42.505  Administrative requirements for recipients.

**Employment**

42.510  Discrimination prohibited.
42.511  Reasonable accommodation.
42.512  Employment criteria.
42.513  Preemployment inquiries.

**Program Accessibility**

42.520  Discrimination prohibited.
42.521  Existing facilities.
42.522  New construction.

**Procedures**

42.530  Procedures.

**Definitions**

42.540  Definitions.

Appendix A: Federal financial assistance of the Department of Justice to which this subpart applies.
Appendix B: Analysis of Final Rule.
Appendix C: Department regulations under Title VI of the Civil Rights Act of 1964 (28 CFR 42.106–42.110) which apply to this subpart.
Appendix D: OJARS regulations under the Omnibus Crime Control and Safe Streets Act, as amended, which apply to this subpart (28 CFR §§ 42.205 and 42.206).

Authority: Sec. 504, Rehabilitation Act of 1973, Pub. L. 93–112, 87 Stat. 394 (29 U.S.C. 794); Sec. 111(a), Rehabilitation Act Amendments of 1974, Pub. L. 93–516, 88 Stat.

1619 (29 U.S.C. 706); Sec. 120(a), Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. 95–602, 92 Stat. 2955 (1978); Executive Order 11914, April 28, 1976, and 45 CFR Part 85.

**General Provisions**

**§ 42.501  Purpose.**

The purpose of this subpart is to implement section 504 of the Rehabilitation Act of 1973, as amended, which prohibits discrimination on the basis of handicap in any program receiving Federal financial assistance.

**§ 42.502  Application.**

This subpart applies to each recipient of Federal financial assistance from the Department of Justice and to each program receiving or benefiting from such assistance. The requirements of this subpart do not apply to the ultimate beneficiaries of Federal financial assistance in the program receiving Federal financial assistance.

**§ 42.503  Discrimination prohibited.**

(a) *General.* No qualified handicapped person shall, solely on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program receiving or benefiting from Federal financial assistance.

(b) *Discriminatory actions prohibited.* (1) A recipient may not discriminate on the basis of handicap in the following ways directly or through contractual, licensing, or other arrangements under any program receiving Federal financial assistance:

(i) Deny a qualified handicapped person the opportunity accorded others to participate in the program receiving Federal financial assistance;

(ii) Deny a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program receiving Federal financial assistance;

(iii) Provide different or separate assistance to handicapped persons or classes of handicapped persons than is provided to others unless such action is necessary to provide qualified handicapped persons or classes of handicapped persons with assistance as effective as that provided to others;

(iv) Deny a qualified handicapped person an equal opportunity to participate in the program by providing services to the program;

(v) Deny a qualified handicapped person an opportunity to participate as a member of a planning or advisory body;

(vi) Permit the participation in the program of agencies, organizations or

persons which discriminate against the handicapped beneficiaries in the recipient's program;

(vii) Intimidate or retaliate against any individual, whether handicapped or not, for the purpose of interfering with any right secured by section 504 or this subpart.

(2) A recipient may not deny a qualified handicapped person the opportunity to participate in any program receiving Federal financial assistance on the ground that other specialized programs for handicapped persons are available.

(3) A recipient may not, directly or through contractual, licensing, or other arrangements, utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, defeat or substantially impair accomplishment of the objectives of the recipient's program with respect to handicapped persons, or perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

(4) A recipient may not, in determining the location or design of a facility, make selections that either purposely or in effect discriminate on the basis of handicap or defeat or substantially impair the accomplishment of the objectives of the program with respect to handicapped persons.

(5) A recipient is prohibited from discriminating on the basis of handicap in a program operating without Federal financial assistance where such action would discriminate against the handicapped beneficiaries or participants in any program of the recipient receiving Federal financial assistance.

(6) Any program not otherwise receiving Federal financial assistance but using a facility provided with the aid of Federal financial assistance after the effective date of this subpart is prohibited from discriminating on the basis of handicap.

(c) The exclusion of nonhandicapped persons or specified classes of handicapped persons from programs limited by Federal statute or executive order to handicapped persons or a different class of handicapped persons is not prohibited by this subpart.

(d) Recipients shall administer programs in the most integrated setting appropriate to the needs of qualified handicapped persons.

(e) Recipients shall insure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing.

(f) A recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program receiving Federal financial assistance. Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices. Attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature are not required under this section. Departmental officials may require recipients employing fewer than fifteen persons to provide auxiliary aids when this would not significantly impair the ability of the recipient to provide its benefits or services.

(g) The enumeration of specific forms of prohibited discrimination in this subpart is not exhaustive but only illustrative.

### § 42.504 Assurances required.

(a) *Assurances.* Every application for Federal financial assistance covered by this subpart shall contain an assurance that the program will be conducted in compliance with the requirements of section 504 and this subpart. Each agency within the Department that provides Federal financial assistance shall specify the form of the foregoing assurance for each of its assistance programs and shall require applicants for Department financial assistance to obtain like assurances from subgrantees, contractors and subcontractors, transferees, successors in interest, and others connected with the program. Each Department agency shall specify the extent to which an applicant will be required to confirm that the assurances provided by secondary recipients are being honored. Each assurance shall include provisions giving notice that the United States has a right to seek judicial enforcement of section 504 and the assurance.

(b) *Assurances from government agencies.* Assurances from agencies of State and local governments shall extend to any other agency of the same governmental unit if the policies of the other agency will affect the program for which Federal financial assistance is requested.

(c) *Assurances from institutions.* The assurances required with respect to any institution or facility shall be applicable to the entire institution or facility.

(d) *Duration of obligation.* Where the Federal financial assistance is to provide or is in the form of real or personal property, the assurance will obligate the recipient and any transferee for the period during which the property is being used for the purpose for which the Federal financial assistance is extended or for another purpose involving the provisions of similar benefits, or for as long as the recipient retains ownership or possession of the property, whichever is longer. In all other cases the assurance will obligate the recipient for the period during which Federal financial assistance is extended.

(e) *Covenants.* With respect to any transfer of real property, the transfer document shall contain a covenant running with the land assuring nondiscrimination on the condition described in paragraph (d). Where the property is obtained from the Federal Government, the covenant may also include a condition coupled with a right to be reserved by the Department to revert title to the property in the event of a breach of the covenant.

(f) *Remedies.* The failure to secure either an assurance or a sufficient assurance from a recipient shall not impair the right of the Department to enforce the requirements of section 504 and this subpart.

### § 42.505 Administrative requirements for recipients.

(a) *Remedial action.* If the Department finds that a recipient has discriminated against persons on the basis of handicap in violation of section 504 or this subpart, the recipient shall take the remedial action the Department considers necessary to overcome the effects of the discrimination. This may include remedial action with respect to handicapped persons who are no longer participants in the recipient's program but who were participants in the program when such discrimination occurred, and with respect to handicapped persons who would have been participants in the program had the discrimination not occurred.

(b) *Voluntary action.* A recipient may take steps, in addition to the requirements of this subpart, to increase the participation of qualified handicapped persons in the recipient's program.

(c) *Self-evaluation.* (1) A recipient shall, within one year of the effective date of this subpart, evaluate and modify its policies and practices that do not meet the requirements of this subpart. During this process the recipient shall seek the advice and assistance of interested persons, including handicapped persons or organizations representing handicapped persons. During this period and thereafter the recipient shall take any necessary remedial steps to eliminate the effects of discrimination that resulted from adherence to these policies and practices.

(2) A recipient employing fifty or more persons and receiving Federal financial assistance from the Department of $25,000 or more shall, for at least three years following completion of the evaluation required under paragraph (c)(1) of this section, maintain on file, make available for public inspection, and provide to the Department on request: (i) a list of the interested persons consulted, (ii) a description of areas examined and problems identified, and (iii) a description of modifications made and remedial steps taken.

(d) *Designation of responsible employee.* A recipient employing fifty or more persons and receiving Federal financial assistance from the Department of $25,000 or more shall designate at least one person to coordinate compliance with this subpart.

(e) *Adoption of grievance procedures.* A recipient employing fifty or more persons and receiving Federal financial assistance from the Department of $25,000 or more shall adopt grievance procedures that incorporate due process standards *(e.g.* adequate notice, fair hearing) and provide for the prompt and equitable resolution of complaints alleging any action prohibited by this subpart. Such procedures need not be established with respect to complaints from applicants for employment. An employee may file a complaint with the Department without having first used the recipient's grievance procedures.

(f) *Notice.* (1) A recipient employing fifty or more persons and receiving Federal financial assistance from the Department of more than $25,000 shall, on a continuing basis, notify participants, beneficiaries, applicants, employees and unions or professional organizations holding collective bargaining or professional agreements with the recipient that it does not discriminate on the basis of handicap in violation of section 504 and this subpart. The notification shall state, where appropriate, that the recipient does not discriminate in its programs with respect to access, treatment or employment. The notification shall also include identification of the person responsible for coordinating compliance with this subpart and where to file section 504 complaints with the Department and, where applicable, with the recipient. A recipient shall make the initial notification required by this paragraph within 90 days of the effective date of this subpart. Methods

of initial and continuing notification may include the posting of notices, publication in newspapers and magazines, placement of notices in recipients' publication, and distribution of memoranda or other written communications.

(2) Recruitment materials or publications containing general information that a recipient makes available to participants, beneficiaries, applicants, or employees shall include a policy statement of nondiscrimination on the basis of handicap.

(g) The Department may require any recipient with fewer than fifty employees and receiving less than $25,000 in Federal financial assistance to comply with paragraphs (c)(2) and (d)–(f) of this section.

(h) The obligation to comply with this subpart is not affected by State or local law or requirement or limited employment opportunities for handicapped persons in any occupation or profession.

**Employment**

### § 42.510    Discrimination prohibited.

(a) *General.* (1) No qualified handicapped person shall on the basis of handicap be subjected to discrimination in employment under any program receiving or benefiting from Federal financial assistance.

(2) A recipient shall make all decisions concerning employment under any program receiving Federal financial assistance in a manner which insures that discrimination on the basis of handicap does not occur and may not limit, segregate, or classify applicants or employees in any way that adversely affects their opportunities or status because of handicap.

(3) A recipient may not participate in a contractual or other relationship that has the effect of subjecting qualified handicapped applicants or employees to discrimination prohibited by this section. The relationships referred to in this paragraph include relationships with employment and referral agencies, labor unions, organizations providing or administering fringe benefits to employees of the recipient, and organizations providing training and apprenticeship programs, and with civil service agencies in State or local units of government.

(b) *Specific activities.* The prohibition against discrimination in employment applies to the following activities:

(1) Recruitment, advertising, and application processing;

(2) Hiring, upgrading, promotion, award of tenure, demotion, transfer,

layoff, termination, right of return from layoff and rehiring;

(3) Pay and any other form of compensation and changes in compensation, including fringe benefits available by virtue of employment, whether or not administered by the recipient;

(4) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(5) Leaves of absence, sick leave, or any other leave;

(6) Selection and financial support for training, including apprenticeship, professional meetings, conferences, and selection for leaves of absence to pursue training;

(7) Employer-sponsored activities, including social or recreational programs; and

(8) Any other term, condition, or privilege of employment.

(c) In offering employment or promotions to handicapped individuals, recipients may not reduce the amount of compensation offered because of any disability income, pension or other benefit the applicant or employee receives from another source.

(d) A recipient's obligation to comply with this section is not affected by any inconsistent term of any collective bargaining agreement to which it is a party.

### § 42.511    Reasonable accommodation.

(a) A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate, based on the individual assessment of the applicant or employee, that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include making facilities used by employees readily accessible to and usable by handicapped persons, job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices (*e.g.*, telecommunication or other telephone devices), the provisions of readers or qualified interpreters, and other similar actions.

(c) Whether an accommodation would impose an undue hardship on the operation of a recipient's program depends upon a case-by-case analysis weighing factors that include:

(1) The overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget;

(2) The type of the recipient's operation, including the composition and structure of the recipient's workforce; and

(3) The nature and cost of the accommodation needed.

A reasonable accommodation may require a recipient to bear more than an insignificant economic cost in making allowance for the handicap of a qualified applicant or employee and to accept minor inconvenience which does not bear on the ability of the handicapped individual to perform the essential duties of the job.

### § 42.512    Employment criteria.

(a) A recipient may not use any employment test or other selection criterion that tends to screen out handicapped persons unless: (1) The test score or other selection criterion, as used by the recipient, is shown to be job-related for the position in question, and (2) alternative job-related tests or criteria that tend to screen out fewer handicapped persons are not shown by the appropriate Department officials to be available.

(b) A recipient shall administer tests using procedures (*e.g.*, auxiliary aids such as readers for visually-impaired persons or qualified sign language interpreters for hearing-impaired persons) that accommodate the special problems of handicapped persons to the fullest extent, consistent with the objectives of the test. When a test is administered to an applicant or employee who has a handicap that impairs sensory, manual, or speaking skills, the test results must accurately reflect the applicant's or employee's job skills, aptitude, or whatever other factor the test purports to measure, rather than reflecting the applicant's or employee's impaired sensory, manual, or speaking skills (except where those skills are the factors that the test purports to measure).

### § 42.513    Preemployment inquiries.

(a) Except as provided in paragraphs (b) and (c) of this section, a recipient may not conduct a preemployment medical examination and may not make preemployment inquiry of an applicant as to whether the applicant is a handicapped person or as to the nature or severity of a handicap. A recipient may, however, make preemployment inquiry into an applicant's ability to perform job-related functions.

(b) When a recipient is taking remedial action to correct the effects of past discrimination pursuant to § 42.505(a) of this subpart, when a recipient is taking voluntary action to overcome the effects of conditions that

resulted in limited participation in its Federally assisted program or activity pursuant to § 42.505(b) of this subpart, or when a recipient is taking affirmative action pursuant to section 503 of the Act, the recipient may invite applicants for employment to indicate whether and to what extent they are handicapped, *Provided* That:

(1) The recipient states clearly on any written questionnaire used for this purpose or makes clear orally if no written questionnaire is used that the information requested is intended for use solely in connection with its remedial action obligations or its voluntary efforts;

(2) The recipient states clearly that the information is being requested on a voluntary basis, that it will be kept confidential as provided in paragraph (d) of this section, that refusal to provide it will not subject the applicant or employee to any adverse treatment, and that it will be used only in accordance with this part.

(c) Nothing in this section shall prohibit a recipient from conditioning an offer of employment on the results of a medical examination conducted prior to the employee's entrance on duty. *Provided* That: (1) All entering employees are subjected to such an examination regardless of handicap, and (2) the results of such an examination are used only in accordance with the requirements of this subpart.

(d) The applicant's medical record shall be collected and maintained on separate forms and kept confidential, except that the following persons may be informed:

(1) Supervisors and managers regarding restrictions on the work of handicapped persons and necessary accommodations;

(2) First aid and safety personnel if the condition might require emergency treatment; and

(3) Government officials investigating compliance with the Act upon request for relevant information.

**Program Accessibility**

**§ 42.520   Discrimination prohibited.**

Recipients shall insure that no qualified handicapped person is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under any program receiving Federal financial assistance because the recipient's facilities are inaccessible to or unusable by handicapped persons.

**§ 42.521   Existing facilities.**

(a) *Program accessibility.* A recipient shall operate each program to which this subpart applies so that the program,

when viewed in its entirety, is readily accessible to and usable by handicapped persons. This section does not require a recipient to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons.

(b) *Compliance procedures.* A recipient may comply with the requirement of paragraph (a) of this section through acquisition or redesign of equipment, reassignment of services to accessible buildings, assignment of aids to beneficiaries, delivery of services at alternate accessible sites, alteration of existing facilities, or any other method that results in making its program accessible to its program accessible to handicapped persons. A recipient is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with paragraph (a) of this section. In choosing among methods for meeting the requirement of paragraph (a), a recipient shall give priority to those methods that offer programs to handicapped persons in the most integrated setting appropriate to obtain the full benefits of the program.

(c) *Small providers.* If a recipient with fewer than fifteen employees finds, after consultation with a handicapped person seeking its services, that there is no method of complying with § 42.521(a) other than making a significant alteration in its existing facilities, the recipient may, as an alternative, refer the handicapped person to other available providers of those services that are accessible.

(d) *Time period.* A recipient shall comply with the requirement of paragraph (a) within ninety days of the effective date of this subpart. However, where structural changes in facilities are necessary, such changes shall be made as expeditiously as possible and shall be completed no later than three years from the effective date of this subpart. If structural changes to facilities are necessary, a recipient shall, within six months of the effective date of this subpart, develop a written plan setting forth the steps that will be taken to complete the changes together with a schedule for making the changes. The plan shall be developed with the assistance of interested persons, including handicapped persons or organizations representing handicapped persons and shall be made available for public inspection. The plan shall, at a minimum:

(1) Identify physical obstacles in the recipient's facilities that limit the accessibility of its program to handicapped persons;

(2) Describe in detail the methods that will be used to make the facilities accessible;

(3) Specify the schedule for taking the steps necessary to achieve full program accessibility and, if the time period of the transition plan is longer than one year, identify the steps that will be taken during each year of the transition period; and

(4) Indicate the person responsible for implementation of the plan.

(e) *Notice.* The recipient shall adopt and implement procedures to insure that interested persons, including mentally retarded persons or persons with impaired vision or hearing, special learning problems, or other disabilities, can obtain information as to the existence and location of services, activities, and facilities that are accessible to and usable by handicapped persons.

**§ 42.522   New construction.**

(a) *Design and construction.* Each new facility constructed by, on behalf of, or for the use of a recipient shall be designed and constructed in such a manner that the facility is readily accessible to and usable by handicapped persons, if the construction was commenced after the effective date of this subpart. Any alterations to existing facilities shall, to the maximum extent feasible, be made in an accessible manner. Any alterations to existing facilities shall, to the maximum extent feasible, be made in an accessible manner.

(b) *American National Standards Institute accessibility standards.* Design, construction, or alteration of facilities in conformance with the "American National Standard Specifications for Making Buildings and Facilities Accessible to, and Usable by, the Physically Handicapped" published by the American National Standards Institute, Inc. (ANSI A 117.1–1961 (R1971)),[4] which is incorporated by reference in this subpart, shall constitute compliance with paragraph (a) of this section. Departures from particular requirements of those standards by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility is provided.

---

[4] Incorporation by reference provisions approved by the Director of the Federal Register on May 21, 1980. copies obtainable from American National Standards Institute. Inc., 1430 Broadway, New York, N.Y. 10018. (212/354–3300). A copy is also on file at the Office of the Federal Register.

**37626**     Federal Register / Vol. 45, No. 108 / Tuesday, June 3, 1980 / Rules· and Regulations

**Procedures**

**§ 42.530 Procedures.**

(a) The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 (28 CFR 42.106–42.110) apply to this subpart except that the provision contained in § 42.110(e) and § 42.108(c)(3) which requires the Attorney General's approval before the imposition of any sanction against a recipient does not apply to programs funded by LEAA, NIJ, BJS, OJARS and OJJDP. The applicable provisions contain requirements for compliance information (§ 42.106), conduct of investigations (§ 42.107), procedure for effecting compliance (§ 42.108), hearings (§ 42.109), and decisions and notices (§ 42.110). (See Appendix C).

(b) In the case of programs funded by LEAA, NIJ, BJS, OJARS and OJJDP, the timetables and standards for investigation of complaints and for the conduct of compliance reviews contained in § 42.205(c)(1)–(c)(3) and § 42.206 (c) and (d) are applicable to this subpart except that any finding of noncompliance shall be enforced as provided in paragraph (a) of this section. (See Appendix D).

(c) In the case of programs funded by LEAA, NIJ, BJS, OJARS and OJJDP, the refusal to provide requested information under paragraph (a) above and § 42.106 will be enforced pursuant to the provisions of section 803(a) of Title I of the Omnibus Crime Control and Safe Streets Act, as amended by the Justice System Improvement Act of 1979, Pub. L. 96–157, 93 Stat. 1167.

(d) For acts of discrimination occurring prior to the effective date of this subpart, the 180-day limitation period for filing of complaints (§ 42.107 of this Title) will apply from that date.

(e) The Department will investigate complaints alleging discrimination in violation of section 504 occurring prior to the effective date of this subpart where the language of the statute or HEW's interagency guidelines (43 FR 2132, January 13, 1978) implementing Executive Order 11914 (41 FR 17871, April 28, 1976) provided notice that the challenged policy or practice was unlawful.

**Definitions**

**§ 42.540 Definitions.**

As used in this subpart the term:

(a) "The Act" means the Rehabilitation Act of 1973, Pub. L. 93–112, as amended (29 U.S.C. 701 et seq.).

(b) "Section 504" means section 504 of the Act (29 U.S.C. 794).

(c) "Department" means the Department of Justice.

(d) "LEAA" means the Law Enforcement Assistance Administration; "NIJ" means the National Institute of Justice; "BJS" means the Bureau of Justice Statistics; "OJARS" means the Office of Justice Assistance, Research and Statistics; "OJJDP" means Office of Juvenile Justice and Delinquency Prevention.

(e) "Recipient" means any State or unit of local goverment, any instrumentality of a State or unit of local government, any public or private agency, institution, organization, or other public or private entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

(f) "Federal financial assistance" means any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:

(1) Funds;

(2) Services of Federal personnel;

(3) Real and personal property or any interest in or use of such property, including:

(i) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government;

(4) Any other thing of value by way of grant, loan, contract or cooperative agreement.

(g) "Facility" means all or any portion of buildings, structures, equipment, roads, walks, parking lots, or other real or personal property or interest in such property.

(h) The term "program" means the operations of the agency or organizational unit of government receiving or substantially benefiting from the Federal assistance awarded, e.g., a police department or department of corrections.

(i) "Ultimate beneficiary" is one among a class of persons who are entitled to benefit from, or otherwise participate in, programs receiving Federal financial assistance and to whom the protections of this subpart extend. The ultimate beneficiary class may be the general public or some narrower group of persons.

(j) "Benefit" includes provision of services, financial aid or disposition

(i.e., treatment, handling, decision, sentencing, confinement, or other prescription of conduct).

(k) "Handicapped Person". (1) "Handicapped person" means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others. (2) As used in this subpart the phrase:

(i) "Physical or mental impairment" means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive; genitourinary; hemic and lymphatic; skin; and endocrine; (B) any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and drug and alcohol abuse.

(ii) "Major life activities" mean functions such as caring for one's self, performing manual tasks walking, seeing, hearing, speaking, breathing, learning, and working.

(iii) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(iv) "Is regarded as having an impairment" means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) has none of the impairments defined in paragraph (k)(2)(i) of this section but is treated by a recipient as having such an impairment.

(l) "Qualified handicapped person" means: (1) With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question; (2) With respect to services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

(m) "Handicap" means any condition or characteristic that renders a person a handicapped person as defined in paragraph (k) of this section.

(n) "Drug abuse" means (1) the use of any drug or substance listed by the Department of Justice in 21 CFR 1308.11, under authority of the Controlled Substances Act, 21 U.S.C. 801, as a controlled substance unavailable for prescription because (i) the drug or substance has a high potential for abuse, (ii) the drug or other substance has no currently accepted medical use in treatment in the United States, (iii) there is a lack of accepted safety for use of the drug or other substance under medical supervision; (2) the misuse of any drug or substance listed by the Department of Justice in 21 CFR 1308.12-.15 under authority of the Controlled Substances Act as a controlled substance available for prescription. Examples of (1) include certain opiates and opiate derivatives (e.g., heroin) and hallucinogenic substances (e.g., marihuana, mescaline, peyote) and depressants (e.g., methaqualone). Examples of (2) include opium, coca leaves, methadone, amphetamines and barbituates.

(o) "Alcohol abuse" includes alcoholism but also means any misuse of alcohol which demonstrably interferes with a person's health, interpersonal relations or working.

**Appendix A—Federal Financial Assistance of the Department of Justice to Which this Subpart Applies**

1. Assistance provided by LEAA, NIJ, BJS, OJARS and OJJDP under Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Justice System Improvement Act of 1979, Pub. L. 96-157, 93 Stat. 1167, and the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. 5601 et seq. as amended.

2. Assistance provided by the Federal Bureau of Investigation through its National Academy and law enforcement training activities and laboratory facilities under the Omnibus Crime Control and Safe Streets Act of 1968, as amended.

3. Assistance provided by the Bureau of Prisons through its National Institute of Corrections for training programs under the Juvenile Justice and Delinquency Prevention Act, as amended, 18 U.S.C. 4351-4353.

4. Assistance provided by the Drug Enforcement Administration under the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. 801 et seq.

5. Assistance provided by the Attorney General for antitrust enforcement under section 116 of the Crime Control Act of 1976, 42 U.S.C. 3739.[5]

6. Assistance provided by the Department under the Disputes Resolution Act, Pub. L. 96-190, 94 Stat. 17.

7. Assistance provided by the Department under the State and Local Drug Strike Force Grant Program, Pub. L. 96-68, Title II, 93 Stat. 419.

**Appendix B—Analysis of Final Rule**

*A. General Provisions*

This subpart prohibits discrimination on the basis of handicap in any program, activity or facility receiving Federal financial assistance (§ 42.501). Section 504 protects not only the ultimate beneficiaries of Federal assistance statutes (e.g., students, prisoners, general public) as identified in the Federal grant statutes directly or by inference, but also nonbeneficiary participants (e.g., employees working in the program receiving Federal financial assistance regardless of whether a primary objective of the Federal assistance includes providing employment opportunities). The subpart applies to all Federal assistance programs administered by the Department and requires all recipients of such assistance to comply with the requirements of the subpart (§ 42.502). The subpart not only applies to grants, contracts and cooperative agreements entered into after the effective date of the subpart, but also applies to any Federal financial assistance previously extended which continues at the time the subpart becomes effective.

The subpart sets forth a variety of illustrative examples to identify conduct which is unlawfully discriminatory and requirements to maintain Federally assisted programs free of unlawful discrimination (§ 42.503). Prohibited conduct includes arbitrary acts of exclusion or other invidious discrimination (§ 42.503(b)(1)(i)), refusal to provide specialized assistance to qualified handicapped persons (§ 42.503(b)(1)(ii)), refusal to permit qualified handicapped persons to participate in a Federal assistance program in providing services (e.g., excluding qualified handicapped persons as contractors). The subpart also prohibits any agency, organization or person that discriminates against handicapped beneficiaries from participating in Federal assistance programs (§ 42.503(b)(1)(v)). A recipient may not discriminate against handicapped persons in its non-Federally funded programs if such action would discriminate against handicapped beneficiaries and participants in the recipient's Federally supported programs (§ 42.503(b)(5)). Further, no program conducted in a facility provided with Federal aid, after the effective date of section 504, can discriminate on the basis of handicap (§ 42.503(b)(6)). Also, a recipient may be required to provide auxiliary aids (e.g., qualified interpreters for speaking and

hearing-impaired persons, and readers for sight-impaired persons) under appropriate circumstances (§ 42.503(f)).

The primary thrust of these illustrative examples is to emphasize the Federal policy that qualified handicapped beneficiaries and participants (e.g., employees) in Federally assisted programs are to be treated no differently than nonhandicapped beneficiaries and participants where such different treatment would materially impair the handicapped persons' ability to receive benefits or participate on an equal footing with non-handicapped persons. Thus "a recipient may not, directly or through contractual, licensing, or other arrangements, utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap" (§ 42.503(b)(3)). This provision gives notice that, ordinarily, a recipient's obligation under section 504 is broader than the mere avoidance of direct discrimination and encompasses an obligation to assure that second-tier recipients (e.g., organizations receiving Federal financial assistance through the primary recipient) also adhere to the requirements of section 504. Accordingly, Criminal Justice Councils (CJC's) established under Part D of Title I of the Omnibus Crime Control and Safe Streets Act, as amended by the Justice System Improvement Act of 1979, have a continuing obligation to insure that second-tier recipients receiving Federal financial assistance through the SPA's comply with section 504 and this subpart. The subpart requires an applicant for Federal financial assistance to execute an assurance of compliance with section 504 and this subpart, and obtain similar assurances from second-tier recipients (§ 42.504(a)-(c)). This is a change from the proposed rule which gave an appropriate Department official discretion to determine the extent a primary recipient would be obligated to obtain assurances from secondary recipients. Some commentators believed the flexible standard in the proposed rule was unwarranted in view of the clear statutory responsibility of second-tier recipients to comply with section 504.

Under certain circumstances it may be necessary to obtain assurances not only from second-tier recipients but also from vendors of services participating in a program receiving Federal financial assistance where such services affect the ultimate beneficiaries (e.g., community-based facilities operating under Federal assistance contracts to provide services to beneficiaries).

Assurances from State or local recipient government agencies shall extend to other agencies of the same governmental unit if the policies or practices of the other agency affect the Federal assistance program of the recipient agency (§ 42.504(b)). Assurances from institutions or facilities (e.g., law enforcement agencies, prisons, court systems) shall cover the entire institution or facility (§ 42.504(c)).

The subpart specifies the duration of the recipient's section 504 obligation (§ 42.504(d)) and notes that the failure to secure an assurance from a recipient does not impair the right of the Department to enforce the requirements of section 504 and this subpart because a recipient's obligation is statutory as well as contractual (§ 42.504(f)).

---

[5] Congress has not appropriated funds for this program for Fiscal Year 1980 which ends September 30, 1980. The Department made its last grants under the program by September 30, 1979.

Each recipient is required to evaluate and modify any of its policies which does not meet the requirements of the subpart (§ 42.505(c)(1)), and each recipient employing a minimum of fifty employees and receiving Federal financial assistance from the Department of $25,000 or more must maintain a record of the self-evaluation (§ 42.505(c)(2)), designate an employee to coordinate compliance with the subpart (§ 42.505(d)). adopt grievance procedures which incorporate due process standards (§ 42.505(e)) and provide notice on a continuing basis that it does not discriminate on the basis of handicap (§ 42.505(f)).

The HEW section 504 rule provides that any recipient employing fifteen or more persons is required to adopt these procedures (45 CFR 84.6(c)(2), 84.7, 84.8(a)). Some commentators expressed concern that the Department established a less encompassing procedural standard than HEW. The Department's numerical and monetary standard used in this subpart is identical to that used by LEAA, the Department's major grant agency, in its "Equal Employment Opportunity Program Guidelines" (28 CFR 42.301 et seq.) directed to its recipients and which requires the formulation, implementation and maintenance of a written equal employment opportunity program relating to employment practices affecting minority persons and women. It is appropriate that the Department maintain a consistent approach in ensuring the rights of the various categories of persons protected by Federal law. Further, it should be noted that the Department's action is consistent with the HEW guidelines for the development of Federal agency section 504 regulations which are substantially less exacting than the procedures adopted by the Department for its own programs. The guidelines impose no minimum numerical standard (45 CFR 85.5(b)). Finally, this subpart provides that "the Department may require any recipient with fewer than fifty employees and receiving less than $25,000 in Federal financial assistance to comply" with the procedural standards (§ 42.505(g)). Of course, recipients having fewer than fifty employees and receiving less than $25,000 in Department assistance are bound by section 504 and all the substantive and procedural requirements of this subpart which do not explicitly exempt such recipients.

The Department adopted one commentator's recommendation that notice be given in § 42.505(d) that employees may file complaints with the Department without having first used the recipients' grievance procedure mechanisms. Additionally, the notice requirements of § 42.505(f)(1) now provide examples of initial and continuing notification (e.g., posters, magazines and memoranda). Further, a new requirement has been added to provide that all recipients must provide notice to the public on where to file section 504 complaints with the Department and, where applicable, with the recipient concerning the recipients' programs.

The subpart also provides that a recipient's obligation to comply with the subpart is not affected by inconsistent State and local laws or the limited employment opportunities for handicapped persons in any occupation or profession (§ 42.505(h)).

## B. Employment

HEW has construed section 504 to prohibit employment discrimination against handicapped persons in all programs receiving Federal financial assistance. See HEW's section 504 regulations, 42 FR 22680 (May 4, 1977) and 45 CFR 84.11 (1978). Several courts have construed section 504 to cover employment discrimination. See, e.g., Duran v. City of Tampa, 430 F. Supp. 75 (M.D. Fla. 1977), Drennon v. Philadelphia General Hospital, 428 F. Supp. 809 (E.D. Pa. 1977), Granet v. Los Angeles Community College District, No. CV 78–1823–ALS (Kx) (C.D. Cal., Dec. 29, 1978) (order granting dismissal). To date, two courts of appeals have taken a narrower view. See in Trageser v. Libbie Rehabilitation Center, Inc., 590 F. 2d 87 (4th Cir. 1978), cert. den., 442 U.S. 947 (1979); Carmi v. Metropolitan St. Louis Sewer District, No. 79–1325, — F. 2d — (8th Cir. May 6, 1980). In Trageser the court held that employment discrimination is prohibited by section 504 only to the extent that it is prohibited by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (1970). Title VI, which prohibits racial discrimination in programs receiving Federal financial assistance, covers employment discrimination only (1) "where a primary objective of the Federal financial assistance is to provide employment" (section 604 of Title VI, 42 U.S.C. 2000–3 (1970)), or (2) when the recipient's employment discrimination results in discrimination against the ultimate beneficiaries of the program receiving Federal financial assistance (see Caulfield v. Board of Education, 583 F. 2d 605 (2d Cir. 1978)). Neither of these factors was present in Trageser.

The court's decision appears to rest solely on the language of section 120(a) of the Rehabilitation Act Amendments of 1978, which provides that "the remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available" to persons aggrieved because of section 504 violations. Accordingly, "in the absence of legislative history to the contrary," the court held that section 120(a) of the Rehabilitation Act Amendments of 1978 incorporated the limitations of Title VI coverage as to employment discrimination. Id. at 89.

The court, in its analysis, did not focus on the remedial purpose of section 504 to provide broad protections to handicapped persons. Nor did the court consider the legislative histories of the Rehabilitation Act of 1973 and its subsequent amendments, which reflect the continuing congressional concern for the employment problems of handicapped persons. See, e.g., S. Rep. No. 93–318, 93d Cong., 1st Sess. 18–19, 70 (1973); S. Rep. No. 93–319, 93d Cong., 1st Sess. 2, 8 (1973); H.R. Rep. No. 95–1149, 95th Cong., 2d Sess. 16, 18, 23–29, 34, 38, 42–43 (1978); S. Rep. No. 95–890, 95th Cong., 2d Sess. 8, 13, 20–21, 27, 36 (1978); H.R. Conf. Rep. No. 95–1780, 95th Cong., 2d Sess. 80–81, 94–96, 98, 102 (1978). Further, the legislative history of section 120(a), which apparently was not brought to the attention of the court, indicates that the provision was not intended to limit the scope of section 504, but was merely a legislative ratification of HEW's enforcement procedures under section 504.

Section 120(a) was originally a provision in S. 2600 (95th Cong., 2d Sess., section 118(a) (1978)), the Senate version of the Rehabilitation Amendments of 1978 reported by the Senate Committee on Human Resources on May 15, 1978. The Committee stated, with respect to section 120(a):

It is the committee's understanding that the regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under section 504 conform with those promulgated under Title VI. Thus, *this amendment codifies existing practice as a specific statutory requirement*. (Sen. Rep. No. 95–890, 95th Cong., 2d Sess. 19 (1978).) (Emphasis added)

In view of the legislative history of the Rehabilitation Act of 1973 and its amendments, HEW's administrative construction, the remedial nature of section 504 and the legislative history of section 120(a), the Department believes that the employment practices of recipients of Federal financial assistance are covered by section 504 regardless of the purpose of the assistance, and the Department's proposed regulations reflect this view (§§ 42.510–42.513).[6] However, Trageser is the controlling rule for Maryland, North Carolina, South Carolina, Virginia and West Virginia, the five States comprising the Fourth Circuit; and Cermi is the controlling law for Arkansas, Iowa, Minnesota, Missouri, Nebraska, North Dakota and South Dakota, the seven States comprising the Eighth Circuit. Accordingly, the provisions of this subpart relating to employment will be enforced in the Fourth and Eighth Circuit States only where employment is a primary objective of the Federal financial assistance or where discrimination against employees affects the beneficiaries of the assistance.

It should be noted that § 42.510(e) of the proposed rule was deleted and is now incorporated in § 42.510(a)(3) of the final rule for the reason that § 42.510(e) was largely duplicative of § 42.510(a)(3). The subpart requires that recipients make a reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee. If a qualified handicapped applicant or employee is denied a job or is terminated, the burden is on the employer to show, based on the individual assessment of the applicant or employee, that the accommodation would impose an undue hardship on the operation of its program. The subpart suggests examples of reasonable accommodations (e.g., job restructuring, modified work schedules, acquisition or modification of equipment or devices) (§ 42.511(b)) but recognizes that the determination of whether an accommodation presents an undue hardship depends on a case-by-case analysis weighing factors such as the overall size of the recipient's program with respect to the number of employees, number and type of facilities, and size of budget; the type of the

---

[6] In *Cermi* v. *Metropolitan St. Louis Sewer District, supra,* the three-judge panel adopted the view of *Trageser.* At least one Federal district court has declined to follow the *Trageser* ruling. See *Hort* v. *County of Alameda,* No. C–79–0091 WHO (N.D. Cal. Sept. 5, 1979).

recipient's operation, including the composition and structure of the recipient's workforce; and the nature and cost of the accommodation needed (§ 42.511[c](1)–(5)). The Department believes that the fact that an accommodation's cost would be more than nominal does not by itself justify refusal of the accommodation.

The use of the "reasonable accommodation/undue hardship" standard in determining the issue of reasonable accommodation is drawn from the HEW section 504 rule (45 CFR 84.12(a), (c)) and represents a change from the language (but not the substance) of the Department's proposed rule. Some commentators believed the Department's departure from the HEW language in order to broaden the concept of reasonable accommodation resulted in weakening that standard. In the interest of eliminating this perception and to promote uniformity, the Department has adopted the HEW language.

The proposed rule places an obligation on the recipient to use job-related tests or other job-related selection criteria which screen out the fewest qualified handicapped persons and to "administer tests using procedures (e.g., auxiliary aids such as readers for visually-impaired persons or qualified interpreters for hearing-impaired persons) which accommodate the special problems of handicapped persons to the fullest extent, consistent with the objectives of the test" (§ 42.512). Thus an oral test given to an applicant with a speech impediment would be improper where the essential functions of the job do not require clear speech. Where physical agility and visual acuity are necessary to perform the essential functions of a job, tests measuring those factors are permitted. To further clarify this obligation the Department has, at the recommendation of several commentators, added language to § 42.512 drawn from the HEW section 504 rule (see 45 CFR 84.13(b)) to the effect that tests are to measure job qualifications and not impaired sensory, manual, or speaking skills, except where those skills are the factors that the test purports to measure.

A recipient is prohibited from making pre-employment inquiry regarding an applicant's physical or mental handicaps except where the recipient is taking remedial or voluntary action under § 42.505(a) or (b) of this subpart, affirmative action under section 503 of the Act, or conducting a permissible pre-employment physical examination. Under such circumstances, response to the inquiries must be voluntary and certain safeguards (e.g., confidentiality) must be maintained by the employer (§ 42.513(b)). Recipients may, of course, inquire about an applicant's ability to perform job-related functions. Accordingly, for example, questions regarding the ability to drive a car, shoot a gun, or work steadily over long periods of time or in situations of emergency or stress are proper questions for the job of police officer, while questions as to whether the applicant has epilepsy or a heart condition are not permitted. An employer may, of course, ask whether the applicant can perform a particular job without endangering the applicant or others. Further, an application form containing a checklist of diseases and conditions is not permitted.

However, nothing in this subpart prohibits an employer from setting forth validated medical requirements in recruitment material. Medical examinations are permitted, after a conditional job offer has been made, if the examinations are administered to all entering employees in a nondiscriminatory manner and the results are treated on a confidential basis (§§ 42.513(a) and (b)). An applicant can only be considered to have failed a medical examination if the applicant's medical condition, even with reasonable accommodation, would prevent the applicant from performing the essential functions of the job.

The ban on pre-employment inquiry regarding physical or mental handicaps is required under the HEW standards for the development of Federal agency section 504 regulations. See 45 CFR 85.55, 43 FR 2132, 2138 (January 13, 1978). Its purpose is to insure that job decisions are not infected with non-job related considerations. For example, an applicant for the position of police officer completes the application process, the written examination, and the oral interview satisfactorily and is offered the position conditioned on the successful completion of a medical examination. The medical exam reveals that the applicant has a history of epilepsy. At this point the police department must make a decision whether the behavioral manifestations of the applicant's particular handicap would prevent the applicant from performing the essential functions of the job.

One virtue of this standard is that it makes it possible to determine whether the reason for not hiring a handicapped person is because of handicap. We also believe that legitimate purposes for obtaining such information are fulfilled as well at this later stage in the hiring process.

The misunderstanding of this section apparent in many comments makes it important to emphasize again that this provision does not prohibit taking job-related conditions into account in making employment decisions, nor does it preclude a recipient from obtaining information as to such conditions. It merely affects the time at which and the manner in which the information may be obtained. (HEW Final Rule, Implementation of Executive Order 11914, 43 FR 2132, 2135, January 13, 1978).

Of course, where pre-employment job-related questions disclose an inability to perform a job as a result of a handicap, a decision not to employ may be made on that basis. Where recipients conduct extensive background security checks for prospective employees, a conditional offer of employment could be made contingent upon successfully passing both a medical examination and background check. The medical examination could occur first and if the applicant did not pass it, there would be no need for the background check. The results of the medical examination must, of course, remain confidential and could not be given to the person conducting the background check.

## C. Physical and Other Accessibility to Programs

The subpart prohibits the exclusion of qualified handicapped persons from Federally assisted programs because a

recipient's facilities are not readily accessible or usable. The recipient is not required to have each of its existing facilities or every part of a facility accessible to and usable by handicapped persons. The requirement is that the program, when viewed in its entirety, must be readily accessible to and usable by handicapped persons. Structural changes may be unnecessary where other less costly or burdensome methods may be equally effective. Whatever method is chosen to meet physical accessibility and usability requirements, it is essential that Federally assisted programs be offered to qualified handicapped persons in the most integrated setting appropriate to obtain the full benefits of the program (§ 42.521(b)). (As used below, the term "accessibility" incorporates "usability."

Physical accessibility is probably the area of greatest concern to recipients because of the perceived economic cost associated with the elimination of such barriers. It has been HEW's experience that its recipients have erroneously exaggerated the actual cost of compliance due, in part, to a misunderstanding of the extent to which structural changes are required under section 504.[7] The following illustrations may serve to underscore the options available to recipients for moderating the costs of compliance while providing full program accessibility to qualified handicapped persons. These illustrations also serve to alert recipients that attaining program accessibility need not involve the removal of all architectural barriers.

The examples which follow also set forth a number of situations in which recipients are required under this subpart to provide auxiliary aids (§ 42.503(f)) to remove communications barriers that prevent accessibility to Federally assisted programs. These examples are included as the result of a number of comments which recommended that the Department provide additional guidance in this area.

1. Law Enforcement Agencies. These agencies include municipal police departments, sheriffs' offices, state highway patrols, regional law enforcement agencies, campus police and fire protection agencies. Such agencies, as recipients of Department assistance, must make the programs they operate readily accessible to the handicapped beneficiaries of the programs (e.g., the general public the law enforcement agency is required to serve). With respect to members of the general public who require police assistance, an initial question regarding program accessibility is, for example, whether a wheelchair user requires physical accessibility to the law enforcement agency to obtain the benefits of the agency's programs. Frequently, requests for assistance are initiated by telephone, and law enforcement assistance is often provided away from the agency's facility. Some law enforcement operations ordinarily require citizens to appear at the law enforcement agency's facility (e.g., obtaining a gun license;

---

[7] A Summary of Information On The Costs To All HEW Grantees of Achieving Program Accessibility Under Section 504 Of The Rehabilitation Act. Office of the Secretary, Department of Health, Education and Welfare (July 11, 1979).

viewing a line-up; examining physical evidence). However, with respect to wheelchair users or others having severe mobility-related handicaps, law enforcement agencies could accommodate the physical limitations of such persons by making home visits or visits to alternate accessible sites. Whether such special accommodations in all cases would enable those with severe mobility-related handicaps to participate effectively in the benefits of a law enforcement agency's programs would depend upon the nature of the benefit provided. While the subpart requires that services be provided in the most integrated setting appropriate, that standard has no apparent application where the service provided is essentially personal (one-on-one) rather than general (e.g., educational programs).

Law enforcement agencies should provide for the availability of qualified interpreters (certified, where possible, by a recognized certification agency) to assist the agencies when dealing with hearing-impaired persons. Where the hearing-impaired person uses American Sign Language for communication, the term "qualified interpreter" would mean an interpreter skilled in communicating in American Sign Language. It is the responsibility of the law enforcement agency to determine whether the hearing impaired person uses American Sign Language or Signed English to communicate.

If a hearing-impaired person is arrested, the arresting officer's *Miranda* [*] warning should be communicated to the arrestee on a printed form approved for such use by the law enforcement agency where thee is no qualified interpreter immediately available and communication is otherwise inadequate. The form should also advise the arrestee that the law enforcement agency has an obligation under Federal law to offer an interpreter to the arrestee without cost and that the agency will defer interrogation pending the appearance of an interpreter.

Law enforcement agencies are also required to install TTY's or equivalent mechanisms (as the technology advances) to enable persons with hearing and speaking impairments to communicate effectively with such agencies. Law enforcement agencies may be hooked up to a central TTY number shared by a number of public agencies if experience shows that this procedure does not materially delay the transmittal of emergency communications to the agencies.

2. *Detention and Correctional Agencies and Facilities.* These agencies include jails, prisons, reformatories and training schools, work camps, reception and diagnostic centers, pre-release and work release facilities, and community-based facilities. Where local or State policy prohibits the detention or incarceration of wheelchair users, no structural modification to detention or correctional facilities to accommodate wheelchair users is required. Where there is no such exclusionary policy, structural modifications may be unnecessary where alternate accessible facilities are available (e.g., short term detention in the prisoner's home or at a medical facility). Where local

[*] *Miranda v. Arizona.* 384 U.S. 436 (1966).

policy precludes alternate detention facilities, a detention agency would be required to make structural modifications to accommodate detainees or prisoners in wheelchairs. In such circumstances, however, not every detention facility of the agency would have to become accessible. Only a sufficient number of detention cells need be accessible to wheelchair users as can be reasonably expected to be detained based on the agency's prior experience. A different problem arises, however, when accessibility requirements are imposed on small, independently operated community based facilities used, for example, for the placement of juveniles in a home setting. A metropolitan area may have a number of such homes. Each such home receiving assistance from the Department with fewer than fifteen employees is not required to be accessible to handicapped persons as long as a sufficient number of homes are accessible in the service area. If a home, after consultation with the handicapped person concerned, determines that its facilities are not accessible to such person because of the person's handicapping condition, it is the responsibility of the home to locate an accessible home providing equivalent services (§ 42.522(c)).

All detention and correctional agencies must provide accessibility for handicapped visitors (e.g., accessible visiting rooms, restrooms) since the prisoner's right to receive visitors is an element of the program administered by the agencies. Where a facility's visitation area is inaccessible to the handicapped, a detention or correctional agency has the option to (a) house the prisoner in a facility which is accessible to handicapped visitors, (b) move the prisoner to an alternate, accessible area either within or outside the facility for visits from wheelchair users, (c) make structural modifications to make the visitation area accessible. It should be kept in mind that the benefit provided is the right to visit rather than the right to visit in any particular area.

Facilities available to all inmates or detainees, such as classrooms, infirmary, laundry, dining areas, recreation areas, work areas, and chapels, must be readily accessible to any handicapped person who is confined to that facility. Beyond insuring the physical accessibility of facilities, detention and correctional agencies must insure that their programs and activities are accessible to handicapped persons. For example, correctional agencies should provide for the availability of qualified interpreters (certified, where possible, by a recognized certification agency) to enable hearing impaired inmates to participate on an equal basis with nonhandicapped inmates in the rehabilitation programs offered by the correctional agencies (e.g., educational programs).

Correctional officials should take into account any handicaps which inmates may have in classifying them. In making housing and program assignments, such officials must be mindful of the vulnerability of some handicapped inmates to physical and other abuse by other inmates. The existence of a handicap alone should not, however, be the basis for segregation of such inmates in institutions or any part thereof where other

arrangements can be made to satisfy safety, security and other needs of the handicapped inmate.

3. *Court Agencies.* These agencies include State and local court systems. Wheelchair users may participate in court trials as judges, jurors, plaintiffs, defendants, witnesses or be present as spectators. Full accessibility is required for such participants.

Where a county has but one courtroom situated on the third floor of a country courthouse having no elevator, and where one of the participants in a trial is a wheelchair user, the court has the following options: (a) moving the court, for the duration of the trial, to accessible quarters in or outside of the courthouse; (b) moving the court permanently to existing accessible quarters; or (c) making those structural modifications in the existing courtroom necessary to provide accessibility to the handicapped participant.

In a large court system, where there are numerous courtrooms, cases involving wheelchair users can be assigned to a courtroom that has been made fully accessible. There is no requirement that all courtrooms be made fully accessible, although it would appear that areas of all courtrooms set aside for the general public should be readily accessible to wheelchair users.

Court systems receiving Federal financial assistance shall provide for the availability of qualified interpreters for civil and criminal court proceedings involving persons with hearing or speaking impairments. (Where a recipient has an obligation to provide qualified interpreters under this subpart the recipient has the corresponding responsibility to pay for the services of the interpreter).

Where the courts provide specialized assistance with respect to court proceedings, the courts are required to insure that handicapped persons are able to participate in such assistance on an equal basis with nonhandicapped persons. For example, in cases where the courts appoint counsel for indigents, the courts under this subpart are also required to assign qualified interpreters (certified, where possible, by recognized certification agencies) in cases involving indigent defendants with hearing or speaking impairments to aid the communication between client and attorney. The availability of interpreting services to the indigent defendant would be required for all phases of the preparation and presentation of the defendant's case. The courts may establish some reasonable guidelines on the use of interpreter services that would not adversely affect the ability of the defendant and the defendant's attorney to develop and present the defendant's case. Caution should be exercised that the guidelines reflect the requirement of section 504 and this subpart that handicapped persons received access to programs receiving Federal financial assistance equal to that of nonhandicapped persons.

While handicapped participants in trials may require appropriate auxiliary aids depending on the nature of the handicap, courts would not be required to provide such aids to participants for purposes unconnected with the litigation process. For example,

**Plaintiffs' Exhibit 6**                                    **Page 11**

where medically necessary, a defendant with a severe heart condition would have the right to have a qualified attendant provided by the court during the defendant's appearance in court or elsewhere pursuant to an order of the court (e.g., a subpoena), but not at the defendant's customary place of residence.

Court witnesses with hearing or speaking impairments have the right, independent of the rights of defendants, to have interpreters available to them for their testimony.

4. *Prosecution and Defense Agencies.* Prosecution agencies include State attorneys general and district, county and city attorneys. The programs administered by such agencies must be readily accessible to handicapped persons. As with other programs assisted by the Department, such agencies need not make structural changes in the facilities where there are feasible options (e.g., home visits, delivery of services at alternate accessible sites) for providing the full benefits of the program to handicapped beneficiaries.

New facilities and altered portions of existing facilities must be designed and constructed in such manner as to make them readily accessible to handicapped persons if groundbreaking begins after the effective date of this subpart (§ 42.522). It is not necessary that all cells or housing units in new detention and correctional facilities be constructed to accommodate handicapped detainees or inmates. Only a sufficient percentage of the cells or housing units need be accessible and usable by handicapped persons as can reasonably be expected to be incarcerated based on the history of the handicapped detainee or inmate population in the recipient's jurisdiction. If there is a local or State policy not to incarcerate wheelchair users in its institutions, this subpart would not require creation of prison cells accessible to wheelchair users. If, however, a sufficient number of cells or housing units is not available at any particular time to house all handicapped inmates or detainees, it would be a violation of this subpart to place a handicapped person in a cell which is not accessible to such person. In such exceptional circumstances, assignment of aides to assist the handicapped person may suffice to make additional cells usable.

*D. Southeastern Community College v. Davis, 442 U.S. 397 (1979).*

This subpart requires that (1) employers make reasonable accommodation to the handicaps of qualified handicapped applicants or employees, and that (2) programs be readily accessible to and usable by qualified handicapped persons. These requirements must be read in the light of *Southeastern Community College v. Davis, 442 U.S. 397 (1979),* where the Supreme Court first considered the reach of section 504 of the Rehabilitation Act.

*Davis* held that section 504 did not require the petitioner college to make fundamental alterations to its registered nurses' training program in order to accommodate the severe hearing loss of respondent who had applied for admission to the program as a student. The Court held that the respondent failed to meet the legitimate and necessary physical requirements of the program, established by petitioner, and, hence, was not qualified to participate in the program. The Court noted that the section 504 regulations of the Department of Health, Education, and Welfare (45 CFR § 84.3(k)(3) (1978)) reinforced the Court's conclusion that the respondent was not qualified to be a student in petitioner's training program. *Id.* at 406. Section 84.3(k)(3) of Title 45 provides that, as to postsecondary and vocational services, a "qualified handicapped person" means "a or participation in the recipient's educational program or activity." An explanatory note to the HEW regulations defines "technical standards" as "all nonacademic admissions criteria * * * essential to participation in the program in question." 45 CFR Part 84, App. A, at p. 405.

While the HEW section 504 regulations relating to postsecondary education require recipients to modify any academic requirements that might discriminate against qualified handicapped persons and, further, require the provision of educational "auxiliary aids" (e.g., taped texts, interpreters, classroom equipment, readers in libraries) (45 CFR 84.44 (a), (d)) where necessary to avoid discrimination, the Court noted these regulatory provisions did not require fundamental programmatic and personal service adjustments needed by the respondent.

First, the Court noted that petitioner's training program required "the ability to understand speech without reliance on lipreading" to ensure "patient safety during the clinical phase of the program," and that the respondent would require the "close individual attention by a nursing instructor" in order to participate effectively in clinical work. *Id.* at 407, 409. However, the HEW regulation requiring auxiliary aids specifically excludes "attendants, individually prescribed devices, readers for personal use or other study, or other devices or services of a personal nature." 45 CFR 84.44(d)(2). Accordingly, in the Court's view, the law did not require the petitioner to provide respondent with an attendant nursing instructor since, in the context of a clinical program where each student would be required to deal individually with patients, this would have constituted "services of a personal nature." Hence the respondent could not qualify for the clinical segment of the training program and would be confined to taking academic courses only.

Second, academic "modifications" set forth in the HEW regulation include (but are not necessarily limited to):

changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted (45 CFR 84.44).

However, as the Court saw it, such required modifications did not encompass a curricular change which waived effective participation in a critical component of a degree program in registered nursing. "Whatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives." *Id.* at 410.

While rejecting respondent's gloss on section 504 and HEW's implementing regulations, the Court inferentially upheld the HEW regulation mandating modification in admission criteria for qualified handicapped persons by noting that "situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory." *Id.* at 412–13.

This subpart is consistent with the holding in *Davis* for it prohibits discrimination only against qualified handicapped persons in the Department's Federally assisted programs and activities. Section 42.540(1) defines "qualified handicapped persons" as follows:

(1) With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question.

(2) With respect to services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

The critical consideration in determining whether a handicapped person qualifies for participation in a program or activity receiving assistance from the Department is whether a particular physical or mental ability is a necessary prerequisite for effective participation, or whether that ability is only said to be necessary because a recipient of Federal funds has not given adequate consideration to the ways in which stated requirements may be modified in order to permit participation by handicapped persons.

*E. Procedures*

The Department has adopted the Title VI complaint and enforcement procedures for use in implementing section 504 except that OJARS will not be required to obtain the Attorney General's approval before the imposition of any sanctions against a recipient. This is consistent with OJARS' practice in enforcing the civil rights provisions of the Omnibus Crime Control and Safe Streets Act, as amended by the Justice System Improvement Act of 1979, Pub. L. 96-157, sec. 815(c), 93 Stat. 1206.

In conformity with HEW's Policy Interpretations 1 and 2 (43 FR 18631 (May 1, 1978)), the 180-day time limitation for filing complaints (§ 42.107 of this Title) alleging discriminatory acts which occurred prior to the effective date of this subpart will not begin to run until that date (§ 42.530(d)). Further, the Department will investigate alleged discriminatory acts which occurred and ended prior to the effective day of this subpart where it is shown that the language of section 504 of HEW's interagency guidelines (43 FR 2132, January 13, 1978) implementing Executive Order 11914 (41 FR 17871, April 28, 1976) provided sufficient notice that the challanged activity was unlawful (§ 42.530(e)).

As to remedies, section 120(a) of the Rehabilitation Act Amendments of 1978 authorizes the payment of attorneys' fees to the prevailing party "in any action or proceeding to enforce or charge a violation of this title" (Title V). Accordingly, it is clear that there is a private right of action under section 504. "The availability of attorneys' fees should assist in vindicating private rights of action * * * arising ur der section * * *

504." Sen. Rep. No. 95–890, 95th Cong., 2d Sess. (1978). *Cf. Cannon* v. *University of Chicago.* 441 U.S. 677 (1979). Nothing in this subpart requires the referral of a complaint against a recipient to the Department for action as a legal prerequisite for filing a lawsuit against the recipient.

The term "recipient" (§ 42.540(e)) in LEAA programs includes State and local governments, Criminal Justice Councils, Local Offices, criminal justice coordinating councils, nonprofit institutions, contractors, under grants and any other recipient of LEAA funds. Recipients in Federal Bureau of Investigation programs include law enforcement agencies serving municipalities, counties or States. Recipients in Federal assistance programs of the National Institute of Corrections of the Bureau of Prisons include States, general units of local government, as well as public and private agencies, educational institutions and organizations and individuals involved in the development, implementation or operation of correctional programs and services. Recipients in Drug Enforcement Administration programs include State and local governments, officials of law enforcement agencies and forensic laboratories. A recipient not only includes a primary recipient (*i.e.*, a recipient which receives Federal financial assistance from a Federal agency directly) but also a second-tier recipient (*i.e.*, a recipient which receives Federal financial assistance through the primary recipient). The term does not include the ultimate beneficiaries of the program (*i.e.*, those for whom the Federal financial assistance is designed to benefit).

The term "Federal financial assistance" (§ 42.540(f)) includes any arrangement by which the Department provides or makes available funds, property, services, or anything of value by way of grants, contracts, loans or cooperative agreements including subgrants and contracts under grants. It does not include licenses, for example, since licenses are not Federal assistance grants, contracts, loans or cooperative agreements. Nor does the term include direct Federal procurement contracts. Procurement contracts are generally used whenever the principal purpose of the transaction is the acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government. Federal assistance contracts, grants, loans and cooperative agreements are used whenever the principal purpose of the transaction is to accomplish a public purpose authorized by Federal statute.

A "program" (§ 42.540(h)) includes any activity or facility receiving Federal financial assistance whether such benefits are provided directly with the aid of Federal financial assistance or with the aid of any non-Federal assistance required to meet the conditions of Federal financial assistance. The term "program" includes activities where payments are made by a Federal agency to ultimate beneficiaries on condition of their participation in a program conducted by a recipient. The receipt of Federal financial assistance by, for example, a law enforcement agency or department of corrections, makes section 504 and this

subpart applicable to all operations of the recipient agency or department although the Federal financial assistance may have been used in only certain of the activities or operations of the agency or department.

Drug and alcohol abuse are "physical or mental impairments" within the meaning of section 7(6) of the Rehabilitation Act of 1973, as amended. Accordingly, drug and alcohol abusers are handicapped under section 504 if their impairment substantially limits one of their major life activities (§ 42.540(k)(2)(i)(C)). "Drug abuse" in this subpart is defined as (1) the *use* of any drug or substance listed by the Department (21 CFR 1308.11) under authority of the Controlled Substances Act (21 U.S.C. 801), as a controlled substance unavailable for prescription, or (2) the *misuse* of any drug or substance listed by the Department (21 CFR 1308.12–15) as a controlled substance available for prescription. Examples of (1) include certain opiates and opiate derivatives (*e.g.*, heroin) and hallucinogenic substances (*e.g.*, marihuana, mescaline, peyote) and depressants (*e.g.*, methaqualone). Examples of (2) include opium, coca leaves, methadone, amphetamines and barbiturates.

While Congress did not specifically address the problems of drug and alcohol abuse in enacting section 504, the committees which considered the Rehabilitation Act of 1973 were made aware of HEW's long-standing practice of treating drug and alcohol abusers as eligible for rehabilitation services under the Vocational Rehabilitation Act. Further, Congress has expressed its concern regarding discrimination against drug and alcohol abusers by providing that a person may not be denied Federal civilian employment or a Federal license solely on the ground of prior drug abuse (Drug Abuse Office and Treatment Act of 1972, 21 U.S.C. 1101, 1180(c)(1) or prior alcohol abuse or alcoholism) (Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, 42 U.S.C. 4541, 4561(c)(1)). These nondiscrimination provisions cover the employment practices of all Federal law enforcement agencies with the exception of the national security agencies (*i.e.*, the Federal Bureau of Investigation, the Central Intelligence Agency and the National Security Agency, and positions designated as sensitive in other agencies for purposes of national security). Of course, section 504 covers present drug and alcohol use as well (*e.g.*, legal methadone maintenance). An individual who is otherwise qualified could not be excluded, for example, from a job in a program receiving Federal financial assistance solely because the applicant's current drug or alcohol use is allegedly a handicapping condition, unless it is shown that such drug and alcohol use impairs the applicant's ability to perform the job in question.

In section 122(a)(6) of the Rehabilitation Act Amendments of 1978, Congress specifically provided that, with respect to employment covered by section 504, the term handicapped individual "does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose

employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others." This amendment, in effect, made no substantive change in section 504 protections because persons whose current use of drugs and alcohol resulted in such behavioral characteristics would have been disqualified for employment even prior to the amendment. But the amendment does under-score the fact that this subpart does not require employers or program administrators to ignore drug and alcohol abuse in making determinations whether a handicapped individual is qualified for employment or other participation in a Federal assistance program. The subpart holds only that handicapped persons, as well as others, should be assessed on the basis of their behavior. A recipient employer may consider for all applicants, including drug and alcohol abusers, past personnel records, absenteeism, disruptive, abusive or dangerous behavior, violations of the law or work rules, or unsatisfactory work performance. Where such factors are absent, the fact that an individual once abused drugs or alcohol does not permit an employer to assume that a danger to safety would result in employing the person.

This subpart does not preclude a recipient employer from rejecting a handicapped applicant for legitimate reasons other than his or her handicap. For example, a recipient employer is not required to hire as a law enforcement officer a drug abuser who continues to violate laws prohibiting the use, possession or sale of drugs if the rejection is based on the violation of the law and not the handicap.

In the case of past drug abuse, each case must be judged on its own merits. With respect to employment, employers may weigh the following:

(1) patterns of use;
(2) kind of drug used;
(3) for each kind of drug used, the date started and the last date used;
(4) circumstances at the start of drug use;
(5) circumstances at the time of discontinuance of drug use;
(6) nature of treatment and prognosis;
(7) social behavior and attitude since discontinuance of drug use;
(8) history of previous rehabilitation efforts. Many of these same factors would be relevant in assessing the employability of those with records of past alcohol abuse.

Some commentators expressed concern that the Department's discussion of drug and alcohol abuse which accompanies the Department's proposed rule suggested that, unlike other handicapping conditions, the Department would permit pre-employment inquiry into drug and alcohol abuse. That preception is erroneous. Section 42.513 of this subpart generally prohibits a recipient's pre-employment inquiry regarding an applicant's physical or mental handicaps. The same standard is applicable to a recipient's inquiry regarding an applicant's current or past drug or alcohol use or abuse. A recipient, of course, may condition an offer of employment on the results of a medical examination given to all applicants. Once a recipient makes such a conditional offer, inquiry regarding

**Plaintiffs' Exhibit 6**                                                                    **Page 13**

**37633**

drug and alcohol use. like any other handicap. may be made as part of the medical examination. If the outcome of the medical examination results in the withdrawal of the offer of employment, it is clear that the reason for not hiring the applicant is because of handicap, real or perceived. Accordingly, the recipient would then be required to justify such action under the relevant provisions of this subpart.

Some commentators were concerned that inquiry into past drug abuse at any stage of the employment process would discourage persons with drug abuse backgrounds from seeking employment and would serve as a basis for employer rejection of such applicants. That possibility, of course, exists for all job applicants with handicapping conditions, and there is no basis for making an exception with respect to drug and alcohol abuse. Further, the listing of the above suggested factors which employers may weigh in this subpart regarding an applicant with a drug use or abuse background is not an attempt by the Department to single out this handicapping condition for more intensive scrutiny than other handicapping conditions, but only an effort to establish useful guidelines in determining the employability of an applicant with a drug use of abuse background. These are the same factors used by Federal agencies in implementing the nondiscrimination provision of the Drug Abuse Office and Treatment Act of 1972 which prohibits the denial of Federal civilian employment solely on the ground of prior drug abuse.

*F. Request for Comments*

In its Notice of Proposed Rulemaking the Department requested comment on certain issues (44 FR 54957–58). To the extent these matters are not already addressed in the above analysis, they remain under review by the Department.

**Appendix C—Department Regulations Under Title VI of the Civil Rights Act of 1964 (28 CFR 42.106–42.110) Which Apply to This Subpart**

**§ 42.106 Compliance information.**

(a) *Cooperation and assistance.* Each responsible Department official shall. to the fullest extent practicable, seek the cooperation of recipients in obtaining compliance with this subpart and shall provide assistance and guidance to recipients to help them comply voluntarily with this subpart.

(b) *Compliance reports.* Each recipient shall keep such records and submit to the responsible Department official or his designee timely, complete, and accurate compliance reports at such times. and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this subpart. In general, recipients shall have available for the Department racial and ethnic data showing the extent to which members of minority groups are beneficiaries of federally assisted programs. In the case of any program under which a primary recipient extends Federal financial assistance to any

other recipient or subcontracts with any other person or group, such other recipient shall also submit such compliance reports to the primary recipient as may be necessary to enable the primary recipient to carry out its obligations under this subpart.

(c) *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities, as may be pertinent to ascertain compliance with this subpart. Whenever any information required of a recipient is in the exclusive possession of any other agency, institution, or person and that agency, institution, or person fails or refuses to furnish that information, the recipient shall so certify in its report and set forth the efforts which it has made to obtain the information.

(d) *Information to beneficiaries and participants.* Each recipient shall make available to participants, beneficiaries, and other interested persons such information regarding the provisions of this subpart and its applicability to the program under which the recipient receives Federal financial assistance, and make such information available to them in such manner, as the responsible Department official finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this subpart. [Order No. 365–66, 31 FR 10265, July 29, 1966, as amended by Order No. 519–73, 38 FR 17955, July 5, 1973]

**§ 42.107 Conduct of investigations**

(a) *Periodic compliance reviews.* The responsible Department official or his designee shall from time to time review the practices of recipients to determine whether they are complying with this subpart.

(b) *Complaints.* Any person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this subpart may by himself or by a representative file with the responsible Department official or his designee a written complaint. A complaint must be filed not later than 180 days from the date of the alleged discrimination, unless the time for filing is extended by the responsible Department official or his designee.

(c) *Investigations.* The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this subpart. The investigation should include. whenever appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this subpart occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this subpart.

(d) *Resolution of matters.* (1) If an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this subpart, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be

resolved by informal means, action will be taken as provided for in § 42.108.

(2) If an investigation does not warrant action pursuant to paragraph (d)(1) of this section, the responsible Department official or his designee will so inform the recipient and the complainant, if any, in writing.

(e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this subpart, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subpart. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purpose of this subpart, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder.

(Order No. 368–66, 31 FR 10265, July 29, 1966, as amended by Order No. 519–73, 38 FR 17955, July 5, 1973)

**§ 42.108 Procedure for effecting compliance.**

(a) *General.* If there appears to be a failure or threatened failure to comply with this subpart and if the noncompliance or threatened noncompliance cannot be corrected by informal means, the responsible Department official may suspend or terminate, or refuse to grant or continue, Federal financial assistance, or use any other means authorized by law, to induce compliance with this subpart. Such other means include, but are not limited to, (1) appropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.

(b) *Noncompliance with assurance requirement.* If an applicant or recipient fails or refuses to furnish an assurance required under § 42.105, or fails or refuses to comply with the provisions of the assurance it has furnished, or otherwise fails or refuses to comply with any requirement imposed by or pursuant to Title VI or this subpart, Federal financial assistance may be suspended, terminated, or refused in accordance with the procedures of Title VI and this subpart. The Department shall not be required to provide assistance in such a case during the pendency of administrative proceedings under this subpart, except that the Department will continue assistance during the pendency of such proceedings whenever such assistance is due and payable pursuant to a final commitment made or an application finally approved prior to the effective date of this subpart.

(c) *Termination of or refusal to grant or to continue Federal financial assistance.* No order suspending, terminating, or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the

**37634**    Federal Register / Vol. 45, No. 108 / Tuesday, June 3, 1980 / Rules and Regulations

record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this subpart, (3) the action has been approved by the Attorney General pursuant to § 42.110, and (4) the expiration of 30 days after the Attorney General has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.

(d) *Other means authorized by law.* No action to effect compliance by any other means authorized by law shall be taken until (1) the responsible Department official has determined that compliance cannot be secured by voluntary means, (2) the action has been approved by the Attorney General, and (3) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance.

### § 42.109 Hearings.

(a) *Opportunity for hearing.* Whenever an opportunity for a hearing is required by § 42.108(c), reasonable notice shall be given by registered or certified mail, return receipt requested, to the affected applicant or recipient. That notice shall advise the applicant or recipient of the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for that action. The notice shall (1) fix a date, not less than 20 days after the date of such notice, within which the applicant or recipient may request that the responsible Department official schedule the matter for hearing or (2) advise the applicant or recipient that a hearing concerning the matter in question has been scheduled and advise the applicant or recipient of the place and time of that hearing. The time and place so fixed shall be reasonable and shall be subject to change for cause. The complainant, if any, shall be advised of the time and place of the hearing. An applicant or recipient may waive a hearing and submit written information and argument for the record. The failure of an applicant or recipient to request a hearing under this paragraph or to appear at a hearing for which a date has been set shall be deemed to be a waiver of the right to a hearing afforded by section 602 of the Act and § 42.108(c) and consent to the making of a decision on the basis of such information as is available.

(b) *Time and place of hearing.* Hearings shall be held at the offices of the Department in Washington, D.C., at a time fixed by the responsible Department official, unless he determines that the convenience of the applicant or recipient or of the Department requires that another place be selected. Hearings shall be held before the responsible Department official or, at his discretion, before a hearing examiner designated in accordance with 5 U.S.C. 3105 and 3344 (section 11 of the Administrative Procedure Act).

(c) *Right to counsel.* In all proceedings under this section, the applicant or recipient and the Department shall have the right to be represented by counsel.

(d) *Procedures, evidence, and record.* (1) The hearing, decision, and any administrative review thereof shall be conducted in conformity with 5 U.S.C. 554–557 (sections 5–8 of the Administrative Procedure Act), and in accordance with such rules of procedure as are proper (and not inconsistent with this section) relating to the conduct of the hearing, giving of notices subsequent to those provided for in paragraph (a) of this section, taking of testimony, exhibits, arguments and briefs, requests for findings, and other related matters. Both the Department and the applicant or recipient shall be entitled to introduce all relevant evidence on the issues as stated in the notice for hearing or as determined by the officer conducting the hearing.

(2) Technical rules of evidence shall not apply to hearings conducted pursuant to this subpart, but rules or principles designed to assure production of the most credible evidence available and to subject testimony to test by cross-examination shall be applied whenever reasonably necessary by the officer conducting the hearing. The hearing officer may exclude irrelevant, immaterial, or unduly repetitious evidence. All documents and other evidence offered or taken for the record shall be open to examination by the parties and opportunity shall be given to refute facts and arguments advanced on either side of the issues. A transcript shall be made of the oral evidence except to the extent the substance thereof is stipulated for the record. All decisions shall be based upon the hearing record and written findings shall be made.

(e) *Consolidated or joint hearings.* In cases in which the same or related facts are asserted to constitute noncompliance with this subpart with respect to two or more programs to which this subpart applies, or noncompliance with this subpart and the regulations of one or more other Federal Departments or agencies issued under Title VI of the Act, the Attorney General may, by agreement with such other departments or agencies, whenever appropriate, provide for the conduct of consolidated or joint hearings, and for the application to such hearings of rules of procedure not inconsistent with this subpart. Final decisions in such cases, insofar as this subpart is concerned, shall be made in accordance with § 42.110.

[Order No. 365–66, 31 FR 10265, July 29, 1966, as amended by Order No. 519–73, 38 FR 17955, July 5, 1973]

### § 42.110 Decisions and notices.

(a) *Decisions by person other than the responsible Department official.* If the hearing is held by a hearing examiner, such hearing examiner shall either make an initial decision, if so authorized, or certify the entire record, including his recommended findings and proposed decision to the responsible Department official for a final decision and a copy of such initial decision or certification shall be mailed to the applicant or recipient. Whenever the initial decision is made by the hearing examiner, the applicant of recipient may, within 30 days of the mailing of such notice of initial decision, file with the responsible Department official his exceptions to the initial decision, with his reasons therefor. In the absence of exceptions, the responsible Department official may on his own motion, within 45 days after the initial decision, serve on the applicant or recipient a notice that he will review the decision. Upon filing of such exceptions, or of such notice of review, the responsible Department official shall review the initial decision and issue his own decision thereon including the reasons therefor. In the absence of either exceptions or a notice of review the initial decision shall constitute the final decision of the responsible Department official.

(b) *Decisions on the record or on review by the responsible Department official.* Whenever a record is certified to the responsible Department official for decision or he reviews the decision of a hearing examiner pursuant to paragraph (a) of this section, or whenever the responsible Department official conducts the hearing the applicant or recipient shall be given a reasonable opportunity to file with him briefs or other written statements of its contentions, and a copy of the final decision of the responsible Department official shall be given in writing to the applicant or recipient and to the complainant, if any.

(c) *Decisions on the record whenever a hearing is waived.* Whenever a hearing is waived pursuant to § 42.109(a), a decision shall be made by the responsible Department official on the record and a copy of such decision shall be given in writing to the applicant or recipient and to the complainant, if any.

(d) *Rulings required.* Each decision of a hearing officer or responsible Department official shall set forth his ruling on each finding, conclusion, or exception presented and shall identify the requirement or requirements imposed by or pursuant to this subpart with which it is found that the applicant or recipient has failed to comply.

(e) *Approval by Attorney General.* Any final decision of a responsible Department official (other than the Attorney General) which provides for the suspension or termination of, or the refusal to grant or continue Federal financial assistance, or the imposition of any other sanction available under this subpart or the Act, shall promptly be transmitted to the Attorney General who may approve such decision, vacate it, or remit or mitigate any sanction imposed.

(f) *Content of orders.* The final decision may provide for suspension or termination of, or refusal to grant or continue, Federal financial assistance, in whole or in part, under the program involved and may contain such terms, conditions, and other provisions as are consistent with and will effectuate the purposes of the Act and this subpart including provisions designed to assure that

no Federal financial assistance will thereafter be extended under such program to the applicant or recipient determined by such decision to be in default in its performance of an assurance given by it pursuant to this subpart or to have otherwise failed to comply with this subpart unless and until it corrects its noncompliance and satisfies the responsible Department official that it will fully comply with this subpart.

(g) *Post-termination proceedings.* (1) An applicant or recipient adversely affected by an order issued under paragraph (f) of this section shall be restored to full eligibility to receive Federal financial assistance if it satisfies the terms and conditions of that order for such eligibility or if it brings itself into compliance with this subpart and provides reasonable assurance that it will fully comply with this subpart.

(2) Any applicant or recipient adversely affected by an order entered pursuant to paragraph (f) of this section may at any time request the responsible Department official to restore fully its eligibility to receive Federal financial assistance. Any such request shall be supported by information showing that the applicant or recipient has met the requirements of paragraph (g)(1) of this section. If the responsible Department official denies any such request, the applicant or recipient may submit a request for a hearing in writing specifying why it believes such official to have been in error. It shall thereupon be given an expeditious hearing with a decision on the record, in accordance with rules of procedure issued by the responsible Department official. The applicant or recipient will be restored to such eligibility if it proves at such a hearing that it satisfied the requirements of paragraph (g)(1) of this section. While proceedings under this paragraph are pending sanctions imposed by the order issued under paragraph (f) of this section shall remain in effect.

(Order No. 365-66. 31 FR 10265 July 29, 1966, as amended by Order No. 519-73, 38 FR 17956, July 5, 1973)

Appendix D—OJARS' Regulations Under the Omnibus Crime Control and Safe Streets Act, as Amended Which Apply to This Subpart (28 CFR 42.205 and 42.206)

§ 42.205   Complaint investigation.

(a) The Administration shall investigate complaints that allege a violation of:

(1) Section 518(c)(1) of the Crime Control Act;

(2) Section 262(b) of the Juvenile Justice Act; or

(3) This subpart.

(b) No complaint will be investigated if it is received more than one year after the date of the alleged discrimination, unless the time for filing is extended by the Administrator for good cause shown.

(c) The Administration shall conduct investigations of complaints as follows:

(1) Within 21 days of receipt of a complaint the Administration shall:

(i) Ascertain whether it has jurisdiction under paragraphs (a) and (b) of this section;

(ii) If jurisdiction if found, notify the recipient alleged to be discriminating of its receipt of the complaint; and

(iii) Initiate the investigation.

(2) The investigation will ordinarily be initiated by a letter requesting data pertinent to the complaint and advising the recipient of:

(i) The nature of the complaint, and with the written consent of the complainant, the identity of the complainant.

(ii) The programs or activities affected by the complaint;

(iii) The opportunity to make, at any time prior to receipt of the Administration's findings, a documentary submission, responding to, rebutting, or denying the allegations made in the complaint; and

(iv) The schedule under which the complaint will be investigated and a determination of compliance or noncompliance made.

Copies of this letter will also be sent to the chief executive of the appropriate unit(s) of government, and to the appropriate SPA.

(3) Within 150 days or, where an onsite investigation is required, within 175 days after the initiation of the investigation, the Administration shall advise the complainant, the recipient, the chief executive(s) of the appropriate unit(s) of government, and the appropriate SPA, of:

(i) Its preliminary findings;

(ii) Where appropriate, its recommendations for compliance, and

(iii) If it is likely that satisfactory resolution of the complaint can be obtained, the opportunity to request the Administration to engage in voluntary compliance negotiations prior to the Administrator's determination of compliance or noncompliance.

(4) If, within 30 days, the Administration's recommendations for compliance are not met, or voluntary compliance is not secured, the matter will be forwarded to the Administrator for a determination of compliance or noncompliance. The determination shall be made no later than 14 days after the conclusion of the 30-day period. If the Administrator makes a determination of noncompliance with section 518(c) of the Crime Control Act, or section 262(b) of the Juvenile Justice Act, the Administration shall institute administrative proceedings pursuant to § 42.210, et. seq.

(5) If the complainant or another party, other than the Attorney General, has filed suit in Federal or State court alleging the same discrimination alleged in a complaint to LEAA, and, during LEAA's investigation, the trial of that suit would be in progress. LEAA will suspend its investigation and monitor the litigation through the court docket and contacts with the complainant. Upon receipt of notice that the court has made a finding of

discrimination within the meaning of § 42.210, the Administration will institute administrative proceedings pursuant to § 42.210, et seq.

(6) The time limits listed in paragraphs (c)(1) through (c)(5) of this section shall be appropriately adjusted where LEAA requests another Federal agency or another branch of the Department of Justice to act on the complaint. LEAA will monitor the progress of the matter through liaison with the other agency. Where the request to act does not result in timely resolution of the matter, LEAA will institute appropriate proceedings pursuant to this section.

§ 42.206   Compliance reviews.

(a) The Administration shall periodically conduct compliance reviews of selected recipients of LEAA assistance.

(b) The Administration shall seek to review those recipients which appear to have the most serious equal employment opportunity problems, or the greatest disparity in the delivery of services to the white and nonwhite, or male and female communities they serve. Selection for review shall be made on the basis of:

(1) The relative disparity between the percentage of minorities, or women, in the relevant labor market, and the percentage of minorities, or women employed by the recipient;

(2) The percentage of women and minorities in the population receiving project benefits;

(3) The number and nature of discrimination complaints filed against a recipient with LEAA or other Federal agencies;

(4) The scope of the problems revealed by an investigation commenced on the basis of a complaint filed with the Administration against a recipient; and

(5) The amount of assistance provided to the recipient.

(c) Within 15 days after selection of a recipient for review, the Administration shall inform the recipient that it has been selected and will initiate the review. The review will ordinarily be initiated by a letter requesting data pertinent to the review and advising the recipient of:

(1) The practices to be reviewed;

(2) The programs or activities affected by the review;

(3) The opportunity to make, at any time prior to receipt of the Administration's findings, a documentary submission responding to the Administration, explaining validating or otherwise addressing the practices under review; and

(4) The schedule under which the review will be conducted and a determination of compliance or non-compliance made.

Copies of this letter will also be sent to the chief executive of the appropriate unit(s) of government, and to the appropriate SPA.

(d) Within 150 days or, where an onsite investigation is required within 175 days after the initiation of the review, the Administration shall advise the recipient, the chief executives of the appropriate unit(s) of government, and the appropriate SPA, of:

(1) Its preliminary findings;

(2) Where appropriate, its recommendations for compliance; and

(3) The opportunity to request the Administration to engage in voluntary compliance negotiations prior to the Administrator's determination of compliance or non-compliance.

(e) If, within 30 days, the Administration's recommendations for compliance are not met, or voluntary compliance is not secured, the matter will be forwarded to the Administrator for a determination of compliance or non-compliance. The determination shall be made no later than 14 days after the conclusion of the 30-day negotiation period. If the Administrator makes a determination of non-compliance with section 518(c) of the Crime Control Act, or section 262(b) of the Juvenile Justice Act, the Administration shall institute administrative proceedings pursuant to § 42.210, et seq.

[FR Doc. 80-15889 Filed 6-2-80; 8:45 am]

**BILLING CODE 4410-01-M**

**Exhibit 7**

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



**Americans with Disabilities Act**
**Section 504 of the Rehabilitation Act**

# ADA/Section 504 Design Guide:

## Accessible Cells in Correctional Facilities

Many inmates in State and local correctional facilities have mobility disabilities and need to be housed in accessible cells. Yet, many correctional facilities do not have enough cells that are accessible to inmates with disabilities. Federal laws protect people with disabilities from discrimination by State and local governments, including entities that own or operate correctional facilities. All such entities are covered by the Americans with Disabilities Act of 1990 (ADA), and those that receive Federal funds are also covered by section 504 of the Rehabilitation Act. These laws prohibit discrimination against persons with disabilities, including inmates who use wheelchairs, scooters, walkers, or other mobility devices. While all aspects of law enforcement and correctional services are covered by these laws - including facilities, employment, transportation, and other activities, programs, and services - this guide focuses on the prevention of discrimination against inmates with mobility disabilities through the design of accessible cells.

### Security
Accessible cells do not compromise the security of prison personnel. In fact, having accessible cells increases security because they allow inmates with mobility disabilities to function independently, minimizing the need for assistance from guards.

### Basic Features
Inmates with disabilities - including those who use wheelchairs - need to be able to enter their cells and move around inside them, using the cells' features without assistance. What makes this possible? Careful planning and design will incorporate elements such as a wider entrance door, adequate clear floor space, appropriate placement and models of fixtures and furniture, and grab bars.

### Location or Dispersion of Cells
Dispersing accessible cells throughout a facility ensures that inmates with disabilities are able to be housed with inmates of the same classification levels. Generally, inmates with disabilities who are not ill do not need to be housed in a medical ward.

### Furniture and Cell Features
Accessible cells need to contain the same features as other cells for inmates housed at the same classification level. For instance, where other cells contain writing desks, accessible writing desks are needed in accessible cells.



**Clear floor spaces for inmates who use mobility devices**

## Room Layout and General Features

**Accessible lavatory with knee and toe space below, faucet controls usable with a loosely closed fist, clear floor space for front approach, and lowered mirror.**

**Doors with 32 inches of clear opening width (when a sliding door is fully opened or a hinged door is open 90 degrees). Clear floor space is required in front of the door.**

**Accessible toilet with rear and side grab bars, clear floor space for wheelchair transfer, and an accessible flush valve.**



**Bed with clear floor space for a side approach next to bed.**

**Desk with knee and toe space and clear floor space for front approach.**

**Appropriate clear floor space (shown by dashed lines) is needed adjacent to each cell feature (see page 1 diagrams on clear floor space). As shown in this drawing, the clear floor spaces for each element may overlap. Inmates with a mobility disability should be able to use, and move without obstruction among, the easily accessible features of their cells. There needs to be adequate turning space within the cell -- either a 60-inch-diameter circle or a T-shaped turn area.
(See page 5 for diagrams on turning space.)**

**Note:**
Some features shown in this document may be inappropriate for cells where inmate suicide is a concern. See the notes for features specifically designed to minimize suicide risk, while providing accessibility for inmates with mobility disabilities.

**2**

# Features of an Accessible Toilet



**Grab bars:** Horizontal grab bars are needed for stabilization and assistance during a transfer from a wheelchair.

**Rear grab bar:** There is a grab bar behind the toilet that is at least 36 inches long and from 33 to 36 inches above the floor.

**Side grab bar:** There is a grab bar on the adjacent side wall that is at least 40 inches long and from 33 to 36 inches above the floor.

**Flush valve** is located in reach range and is operable without tight grasping, twisting, or pinching.

**Toilet paper:** If a toilet paper dispenser is provided, it needs to be located in an accessible location and be operable using one hand. If traditional toilet paper holders are not used, loose sheets of toilet paper are acceptable.

**Toilet seat height:** The toilet seat needs to be from 17 to 19 inches above the floor to permit transfers to and from wheelchairs.

**Toilet centerline:** The toilet bowl needs to be centered 18 inches from the side wall, so that inmates with disabilities can use the side grab bar.

**Clear floor space:** Adequate space is provided to approach the toilet from a variety of wheelchair transfer positions (for example, front, diagonal, or side approaches). Generally, the toilet needs to be placed within a 60-inch-wide by 59-inch-deep clear area of the floor.

**Note:**
Grab bars can be designed so they do not increase suicide risk. As shown, there are several ways for grab bars to be designed with adequate gripping surfaces, while ensuring that nothing can be tied onto them.



**Profiles of accessible grab bars with suicide prevention feature.**

**3**

## Features of Accessible Lavatories and Mirrors

**Mirrors:** If provided, mirrors need to be mounted with the bottom edge of the reflecting surface no higher than 40 inches above the floor.

**Faucets:** Faucet handles or controls need to be usable with one loosely closed fist, because some people with disabilities can use only one hand and cannot grasp or twist faucets. Lever-operated, push-type mechanisms, and U-shaped handles are acceptable designs.



**Lavatory knee clearance:** To allow persons who use wheelchairs to pull under the lavatory and to use the faucet hardware, the following features need to be provided -- a 29-inch-high clearance under the front edge of the lavatory, the top of the bowl mounted no higher than 34 inches above the floor, a 27-inch-high clearance for knee space extending at least 8 inches from the front of the lavatory, and a 9-inch-high toe space extending not more than 6 inches from the back wall.

**Clear floor space** is needed for a forward approach to the lavatory.

**Burn protection:** To protect against leg burns, hot water and drain pipes need to be covered or otherwise configured to protect against contact. Some people with disabilities have little or no sensation in their legs and can be burned without knowing it.

**Note:**

In every instance, regardless of toilet and lavatory configuration, adequate space needs to be provided for inmates who use wheelchairs to transfer onto and off of the toilet.

**4**

## Features of Accessible Furniture



**Desk size:** If provided, the writing surface of desks and writing tables is no higher than 34 inches. To provide adequate knee and leg clearance, desks and writing tables need to have at least 30 inches of knee width, 29 inches of knee height, and 19 inches of leg depth.

**Beds:** Providing beds at an appropriate height, generally from 17 to 19 inches, facilitates transfers to and from wheelchairs. In some cases, an appropriately mounted grab bar can assist an inmate to transfer between the bed and a wheelchair.

**Bed transfer space:** A 30-inch by 48-inch clear floor space facilitates transfer from a wheelchair to the bed.

**Desk clear floor space:** If provided, desks and writing tables need to have a 30-inch by 48-inch clear floor space that extends 19 inches under the desk and any fixed seat needs to be removable.

**All furniture placed in accessible cells for the use of inmates with disabilities needs to be accessible.**



**60-inch (1525mm) Diameter Space**

**T-Shaped Space for 180° Turns**

For more information about the Americans with Disabilities Act (ADA), please visit the Department of Justice's Home Page, **www.ada.gov**, or call us on the ADA Information Line.

**800-514-0301 (voice)**
**800-514-0383 (TTY)**

Reproduction is encouraged.

**5**

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



# Enforcing the ADA:

## A Status Report from the Department of Justice

## October 2004 - March 2005

This Status Report covers the ADA activities of the Department of Justice during the fourth quarter (October - December) of 2004 and the first quarter (January - March) of 2005. This report, previous status reports, and a wide range of other ADA information are available through the Department's ADA Home Page on the World Wide Web (see page 14). The symbol (**) indicates that the document is available on the ADA Home Page.

INSIDE...

ADA Litigation ............................................... 2
Formal Settlement Agreements ................... 6
Other Settlements ........................................ 8
Mediation ....................................................... 9
Certification ................................................. 12
Technical Assistance ..................................... 14
Other Sources of ADA Information ........... 17
How to File Complaints .............................. 18

**2005, Issue 1**

Plaintiff's Exhibit 8

Case: 1:16-cv-05599 Document #: 272 Filed: 04/02/07 Page 226 of 561 PageID #:891
Case: 1:13-cv-02856 Document #: 76-5 Filed: 05/29/15 Page 3 of 40 PageID #:588

ENFORCEMENT/LITIGATION

> The Americans with Disabilities Act (ADA) is a comprehensive civil rights law for people with disabilities. The Department of Justice enforces the ADA's requirements in three areas --
>
> Title I:  Employment practices by units of State and local government
>
> Title II:  Programs, services, and activities of State and local government
>
> Title III:  Public accommodations and commercial facilities

# I. Enforcement

**Through lawsuits and both formal and informal settlement agreements, the Department has achieved greater access for individuals with disabilities in thousands of cases.  Under general rules governing lawsuits brought by the Federal Government, the Department of Justice may not file a lawsuit unless it has first unsuccessfully attempted to settle the dispute through negotiations.**

## A. Litigation

**The Department may file lawsuits in Federal court to enforce the ADA and may obtain court orders including compensatory damages and back pay to remedy discrimination.  Under title III the Department may also obtain civil penalties of up to $55,000 for the first violation and $110,000 for any subsequent violation.**

### 1. Decisions

**Third Circuit Bars Private Damages Claim Against State Prison System** -- The U.S. Court of Appeals for the Third Circuit ruled in <u>Cochran v. Pinchak</u> that the ADA's abrogation of sovereign immunity allowing private title II suits against States is unconstitutional with respect to a suit brought by a New Jersey inmate who is legally blind.  The complaint, which included a damages claim against the New Jersey Department of Corrections, alleged that the prison system had temporarily denied his access to talking books, a talking watch, a usable lock, and his walking cane.  The court ruled that, given the wide latitude granted by the Supreme Court to prison officials to create prison policies and anticipate security issues, abrogation of immunity would be inappropriate in this particular case because the title II accommodation requirements go far beyond any equal protection rights asserted by the plaintiff.

**District Court Allows U.S. HIV Lawsuit to Continue Despite Dismissal of Individual Claims** -- The U.S. District Court for the Eastern District of Pennsylvania ruled that, even though the individual plaintiff's ADA lawsuit had to be dismissed because it was filed too late under the State statute of limitations, the claims brought by the Department of Justice could continue because the State time limit for filing suit does not apply to the Federal Government.  The Department intervened in <u>Smith v. City of</u>

ENFORCEMENT/LITIGATION

Philadelphia, a lawsuit brought by an individual with HIV who claims that Philadelphia violated the ADA by discriminating against him in the provision of emergency medical services. The Department's complaint alleged that after the plaintiff began experiencing severe chest pain his partner called 9-1-1. Emergency medical technicians arrived on the scene and, after being informed of plaintiff's HIV status, allegedly refused to provide the prehospital care that would have been reasonable and appropriate under the circumstances. The plaintiff alleged that they refused to touch him to assess his condition or to give him physical assistance in getting him out of his home and into the ambulance. He alleged that on the way to the hospital he was verbally harassed and insulted because of his HIV status. The Department's complaint asked the court for an order to prevent the fire department from discriminating against individuals with HIV and for an award of compensatory damages for the complainant.

## 2. New Lawsuits

**The Department initiated or intervened in the following lawsuits.**

### Title II

**Dillworth v. City of Detroit** -- The Department moved to intervene in a lawsuit filed in the U.S. District Court for the Eastern District of Michigan, challenging the inaccessibility of Detroit's public transportation system. The Department's complaint alleged that the City of Detroit failed to maintain and repair the wheelchair lifts of the city's fixed-route bus system, denying individuals with disabilities an equal opportunity to benefit from public transportation. The complaint described situations where individuals who use wheelchairs were allegedly forced to wait, often 30 minutes or more, while multiple buses with inoperable lifts passed them by, often leaving them stranded as they attempted

**Department Seeks Supreme Court Review of Prison Decision** -- The Department asked the Supreme Court to review the Eleventh Circuit decision in Goodman v. Ray, which held that private title II suits against State prisons are barred by sovereign immunity. The Solicitor General argued in the Department's brief that the Court should agree to review the decision in order to resolve the conflict between the Ninth Circuit, which upheld the constitutionality of individual title II suits against State prisons in Phiffer v. Columbia River Correctional and the Eleventh Circuit decision in Goodman, which held such suits unconstitutional. Since the petition for review was filed, the Third Circuit also ruled, as noted under "Decisions," above, that an individual prisoner's claim for damages was barred by sovereign immunity. In its petition, the Department argued that the Eleventh Circuit decision in Goodman was wrong because it was inconsistent with the Supreme Court's decision in Tennessee v. Lane, which upheld the constitutionality of individual title II suits against State court systems. The petition asserted that title II is an appropriate congressional response to the history of constitutional violations against persons with disabilities in prisons. The plaintiff, who has paraplegia and uses a wheelchair, alleged that his cell was too small for him to maneuver his wheelchair, making it impossible for him to access his bed, toilet, and shower without assistance, and that assistance was often denied. He also claimed that the prison's barriers prevented him from using the prison library, attending religious services, and participating in a wide range of counseling, education, and vocational training programs.

Plaintiff's Exhibit 8      Page 3

to get to work, church, medical appointments, grocery shopping, and numerous other essential destinations. The complaint also alleged that Detroit has approximately 120 buses with lifts that have not been working for more than six months and that the city does not intend to make the needed repairs.

**Defending the Constitutionality of Title II** -- The Department intervened in four additional lawsuits to defend the constitutionality of title II of the ADA. In Tennessee v. Lane the Supreme Court upheld the constitutionality of title II in cases involving the fundamental right of access to courts. The Department intervened in the following cases to support title II's constitutionality in other areas as indicated --

### Courts of Appeals

Roe v. Johnson (2d Circuit)(attorney licensing)

Bill M. v. Nebraska Department of Health and Human Services Finance and Support (8th Circuit)(institutionalization)

Constantine v. Rectors and Visitors of George Mason University (4th Circuit) (law school testing accommodations and retaliation)

### District Court

Birdsong v. Perdue (N.D. Georgia) (institutionalization)

## 3. Amicus Briefs

**The Department files briefs in selected ADA cases in which it is not a party in order to guide courts in interpreting the ADA.**

### Title II

**George v. Bay Area Rapid Transit District** -- The Department filed an amicus brief in the U.S. Court of Appeals for the Ninth Circuit in order to defend the Department of Transportation's (DOT) regulations implementing title II of the ADA in public transportation. Plaintiffs filed suit against the Bay Area Rapid Transit District (BART) alleging that public entrances at four BART stations were inaccessible to persons with vision impairments. The U.S. District Court for the Northern District of California ruled that the DOT regulations, as applied to accessible routes, were invalid because they were not adequate to ensure that the required accessible route would be accessible to individuals who are blind or who have low vision. The Department argued on appeal that the DOT regulations were a reasonable interpretation of the ADA because the government carefully considered the needs of people who are blind or who have low vision and issued rules that, taken as a whole, address the obligation of public transportation facilities to provide access to these individuals.

### Title III

**Spector v. Norwegian Cruise Lines, Ltd** -- The Solicitor General filed an amicus brief in the Supreme Court in Spector v. Norwegian Cruise Lines, Ltd., arguing that cruise ships sailing under foreign flags are covered by the ADA when operating in U.S. ports. The plaintiffs, who are individuals with mobility disabilities and their nondisabled companions, filed suit under the ADA alleging that the cruise line discriminated against them on a cruise from Houston, Texas, by imposing a surcharge for an accessible cabin; by failing to remove architectural barriers to ship facilities and services, such as public restrooms, restaurants, swimming pools, and elevators; and by failing to make reasonable modifications in policies needed to include people with disabilities in the ship's emergency evacuation procedures. The Supreme Court is reviewing the decision of the U.S. Court of Appeals for the Fifth Circuit in this case, which held that title III does not

Plaintiff's Exhibit 8      Page 4

Case: 1:16-cv-05569 Document #: 272 Filed: 04/03/17 Page 229 of 561 PageID #:5294
Case: 1:13-cv-02856 Document #: 76-5 Filed: 05/29/15 Page 49 of 40 PageID #:591

ENFORCEMENT/LITIGATION

apply to foreign-flag cruise ships even when they voluntarily enter U.S. ports to receive passengers. Relying on general international law principles that domestic law may not be applied to foreign-flag ships without specific evidence of congressional intent to do so, the Fifth Circuit found no indication either in the statutory text or the legislative history that Congress intended title III to apply to foreign-flag cruise ships. This Fifth Circuit decision is in conflict with an earlier decision of the Eleventh Circuit in <u>Stevens v. Premier Cruises, Inc.</u> which agreed with the Department's amicus brief in that case arguing that foreign-flag ships operating in U.S. ports are covered by title III. In the Supreme Court, the Department argued, as it did in the courts of appeals, that the ADA applies to foreign-flag cruise ships when they voluntarily enter U.S. ports to receive passengers and that such coverage does not result in an unlawful extraterritorial application of the statute because the discrimination occurs in U.S. internal waters.

## 4. Consent Decrees

**Some litigation is resolved at the time the suit is filed or afterwards by means of a negotiated consent decree. Consent decrees are monitored and enforced by the Federal court in which they are entered.**

### Title III

** U.S. v. Fairview Health Services** -- The United States Attorney's Office for the District of Minnesota entered a consent decree with Fairview Health Services settling a lawsuit alleging that Fairview failed to provide qualified sign language interpreters and other services to deaf patients. Under the agreement, Fairview agreed to hire one or more qualified sign language interpreters who will be available 24 hours a day, seven days a week, to provide effective communication at each of the five Fairview hospitals and agreed

---

**Cinemark Theater Chain Will Provide Comparable Wheelchair Seating in Stadium-Style Movie Theaters** -- The Department of Justice and Cinemark USA, Inc., agreed to a consent decree in the U.S. District Court for the Northern District of Ohio that will dramatically improve the moviegoing experience for people who use wheelchairs and for their companions at Cinemark stadium-style movie theaters across the United States. The agreement brings an end to <u>U.S. v. Cinemark USA, Inc.</u>, a lawsuit challenging Cinemark's construction of stadium-style movie theaters that failed to provide persons who use wheelchairs with lines of sight comparable to those of the general public. These theaters often required wheelchair users and their companions to sit at the very front of the theaters directly under the screen. Under the consent decree, all future construction of Cinemark theaters will be designed in accordance with plans approved by the Department with wheelchair seating near the middle of the auditorium. In existing theaters, Cinemark agreed to move wheelchair seating farther back from the screen in over 100 auditoriums in 14 existing complexes within the Sixth Circuit (including Ohio, Michigan, Kentucky, Tennessee) and in theaters located in a number of other States as well, including Utah, Illinois, New York, California, and Oregon. In addition, Cinemark will add wheelchair spaces and companion seats in dozens of theaters across the country, allowing persons using wheelchairs and their companions to sit shoulder-to-shoulder next to each other on the same level, like other patrons, and to enjoy unobstructed views.

---

Plaintiff's Exhibit 8       Page 5

Case: 1:16-cv-05569 Document #: 272 Filed: 04/12/17 Page 230 of 561 PageID #:295
Case: 1:13-cv-02859 Document #: 76-5 Filed: 05/29/15 Page 9 of 40 PageID #:592

ENFORCEMENT/LITIGATION/FORMAL SETTLEMENT AGREEMENTS

to pay $188,000 in damages to four complainants and a $20,000 civil penalty to the United States. Fairview will also rewrite its hospital policy and procedures to bring them into compliance with the ADA, develop patient and visitor information and notices in forms that are accessible to deaf and hard-of-hearing patients, and conduct comprehensive training of hospital personnel.

## B. Formal Settlement Agreements

**The Department sometimes resolves cases without filing a lawsuit by means of formal written settlement agreements.**

### Title II

**\*\* Project Civic Access Agreements Signed by Seven More Communities** -- The Department has signed seven additional agreements under its Project Civic Access initiative, a wide-ranging effort to ensure that cities, counties, towns, and villages throughout the United States comply with the ADA. The new agreements cover --

    Sedona, Arizona;
    Hutchinson, Kansas;
    San Luis Obispo, California;
    Cheshire County, New Hampshire;
    Washington County, Utah;
    Carpinteria, California; and
    Missoula County, Montana

The goal of Project Civic Access is to ensure that people with disabilities have an equal opportunity to participate in civic life. Departmental investigators, attorneys, and architects survey State and local government facilities and programs across the country for the purpose of identifying modifications needed to comply with ADA requirements. Depending on the circumstances in each community, the agreements address specific areas where access can be improved. To date, 111 Project Civic Access agreements have been signed. Each community agreed to take specific steps, depending on local circumstances, to make core government functions more accessible to people with disabilities. The agreements have improved access to many aspects of civic life including, courthouses, libraries, parks, sidewalks, and other facilities, and address a wide range of accessibility issues, such as employment, voting, law enforcement activities, and emergency preparedness and response.

**Nevada State Welfare Division, Las Vegas, Nevada** -- The Department entered an agreement with the Nevada State Welfare Division to resolve two complaints alleging that the Welfare Division failed to provide qualified interpreters necessary to ensure effective communication with individuals with disabilities in the services, programs, and activities of the Welfare Division. The agreement requires the Welfare Division to establish and maintain a system for providing appropriate auxiliary aids and services, including qualified interpreters, whenever necessary both during regular hours and for after-hours emergencies to secure effective communication between its staff, agency clients, and their companions, as defined in the agreement.

**Clackamas County Sheriff's Office, Oregon City, Oregon** -- The Department reached an agreement with the Clackamas County Sheriff's Office resolving a complaint that the county violated title II by failing to provide effective communication with an inmate who is deaf. The county agreed to provide appropriate auxiliary aids, including qualified interpreters, and to designate an official to carry out this policy. The county also agreed to provide telephones with volume controls for prisoners with hearing loss and TTYs for prisoners with speech or hearing disabilities

Case: 1:16-cv-05599 Document #: 272 Filed: 04/12/17 Page 231 of 561 PageID #:3296
Case: 1:13-cv-02858 Document #: 76-5 Filed: 05/29/15 Page 3 of 40 PageID #:593

ENFORCEMENT/FORMAL SETTLEMENT AGREEMENTS

who need them to communicate by telephone. The county will also permit prisoners with hearing disabilities to buy or use visual and tactile alarm clocks whenever other prisoners are permitted to buy or use alarm clocks, to provide televisions with closed captioning features for use by prisoners with hearing disabilities whenever other prisoners are permitted access to television, and to provide hearing aid batteries for prisoners who use hearing aids during the period of their detention.

### Title III

**Dr. Robila Ashfaq, Irvine, California** -- The Department reached an agreement with a California physician, a solo practitioner in family medicine, resolving a complaint alleging unequal treatment for people with disabilities. The complainant, an individual with paraplegia who uses a wheelchair, alleged that at her first office visit her husband helped her onto the examination table and that for subsequent visits over the course of a year she was examined in her wheelchair. When it came time for her annual physical, which would require use of an examination table, she asked the doctor to borrow or purchase an adjustable exam table or a lift to facilitate her transfer to the existing table. The doctor informed her that he no longer wished her to continue as her patient and that she could not provide an accessible table or lift because of budget constraints. Under the settlement, the doctor agreed to provide equal access by purchasing an accessible, adjustable height examination table; pay the complainant $1000; adopt an ADA nondiscrimination policy; attend training for herself and her staff on the requirements of the ADA; and ensure that, when scheduling an appointment, her staff will ask the patient if he or she will need any special assistance, modification of policy, or auxiliary aid or service at the examination because of a disability.

** **Blue Plate Café, Memphis, Tennessee** -- The U.S. Attorney's Office for the Western District of Tennessee entered a settlement with the owner and operator of two Blue Plate Café restaurants, resolving a complaint that at one of the locations an individual accompanied by a service animal was not allowed to enter the restaurant. Under the agreement the owner will ensure access to individuals with disabilities accompanied by service animals at both restaurants, post its nondiscrimination policy at the entrances and employee areas, give a copy of the policy to each employee, and pay $3,500 in damages to the complainant and a $1,000 civil penalty to the U.S. Government.

**Natural Bridge, Virginia** -- The Depart-ment entered into a settlement agreement with A & M Investments, Inc., and Marshall Management, Inc., the owners and operators of the Natural Bridge complex, to ensure that persons with disabilities have equal access to the many attractions and accommodations of historic Natural Bridge, Virginia. The agreement is in response to a complaint that the Natural Bridge Inn and Conference Center did not provide adequate accessible guest-rooms. The agreement requires one fully accessible sleeping room in the 18-room Stonewall Inn, two in the 34-room Cottages, and five additional fully accessible sleeping rooms in the 121-room Natural Bridge Inn. It also requires a number of additional rooms to have notification devices for persons who are deaf or hard of hearing, including visual door knockers, TTY's, and visual alarms. In addition, the agreement requires accessible parking, service counters, ATM's, public telephones, and toilet rooms in the Natural Bridge Gift Shop and Bridge Entrance Building and requires accessibility modifications in a number of other facilities including the wax museum.

Plaintiff's Exhibit 8

Case: 1:16-cv-05529 Document #: 272 Filed: 04/12/17 Page 232 of 561 PageID #:9207
Case: 1:13-cv-02856 Document #: 76-5 Filed: 05/29/15 Page 3 of 40 PageID #:594

ENFORCEMENT/OTHER SETTLEMENTS

# C.  Other Settlements

**The Department resolves numerous cases without litigation or a formal settlement agreement.  In some instances, the public accommodation, commercial facility, or State or local government promptly agrees to take the necessary actions to achieve compliance.  In others, extensive negotiations are required. Following are some examples of what has been accomplished through informal settlements.**

**The U.S. Attorneys obtained informal settlements in the following cases --**

**District of Arizona** -- An individual who is deaf complained that an urgent care medical clinic failed to provide sign language interpreters and other auxiliary aids to ensure effective communication.  The facility adopted a written effective communication policy, posted notice of the policy in the waiting room, entered into contracts with local interpreting agencies, and provided ADA training to its staff.

**Northern District of Iowa** -- An individual who uses a motorized wheelchair complained that an Iowa city police department threatened to ticket him for using a motorized wheelchair on city streets.  The individual was riding in the street because there were no curb cuts and sidewalks in some parts of the city.  The city agreed to refrain from ticketing wheelchair users for riding in streets where no sidewalks or curb ramps exist, and to install curb ramps throughout the city.

**Southern District of Mississippi** -- An individual who uses a wheelchair complained that the office of a health care provider was inaccessible.  The landlord constructed a ramp; provided two new parking spaces with appropriate signage; created an accessible route from the accessible parking spaces to the office entrance; modified the landing, ramp, and handrails at the office entrance; removed the threshold plate and smoothed the floor surface at the entrance to the restroom; and relocated the toilet flush valve to the left side of the tank.

A wheelchair user complained that an insurance company office failed to remove barriers and to comply with the ADA in making alterations.  The insurance office paved the public parking lot at the front of the building and designated two accessible parking spaces, one of which is designated as van accessible; installed a ramp from the accessible parking spaces in the public parking lot to the building's front entrance; eliminated the four-inch change in level at the front door threshold; modified one of the restrooms in the new addition and designated it as a unisex accessible restroom; replaced all exterior and interior door hardware with accessible door hardware; paved the employee parking lot in the rear of the building and designated one van-accessible parking space in that lot; and eliminated the 13" level change from the employee parking lot to the building's rear entrance.

An individual who uses a wheelchair complained that a county board of supervisors did not make a community center that was used as a polling place accessible.  The community center subsequently burned down, and the county designated the fire hall as a replacement polling place.  The U.S. Attorney's Office reviewed proposed plans to make the fire hall accessible and negotiated additional changes to the facility, including the addition of two accessible parking spaces with an access aisle; the provision of accessible signage for the parking spaces; the installation of a ramp, hand rails, and a landing; and the removal of a protruding object from the accessible route.

Case 1:13-cv-05500 Document #27-5 Filed 04/30/15 Page 233 of 561 PageID #:888
Case 1:13-cv-02936 Document #76-5 Filed 05/29/15 Page 10 of 401 PageID #:509

ENFORCEMENT/OTHER SETTLEMENTS/MEDIATION

**Eastern District of Louisiana** -- An individual who uses a wheelchair complained that a New Orleans theater was not accessible. The theater agreed to ensure that accessible parking spots are reserved for use by people with disabilities; to maintain accessible routes to all features of the facility; to modify steep curb cuts and outdoor emergency egress ramps in order to have the proper slope; to modify lobby features, such as the condiment island and nearby display shelves, to make them accessible to persons using wheelchairs; to replace armrests on one percent of the aisle seats in each theater with armrests that swivel up and out of the way; to make modifications to the wheelchair accessible bathroom stalls; and to purchase additional assistive listening devices.

**Western District of Missouri** -- Two individuals who use wheelchairs complained that a county courthouse was not accessible. The county installed an elevator to provide access to its zoning hearing room and its courtrooms located on the second floor.

**Northern District of New York** -- An individual complained that the owners of an office building often locked the accessible entrance. The office building owners agreed to keep the accessible entrance unlocked during office hours.

# II. Mediation

Under a contract with the Department of Justice, The Key Bridge Foundation receives referrals of complaints under titles II and III for mediation by professional mediators who have been trained in the legal requirements of the ADA. An increasing number of people with disabilities and disability rights organizations are specifically requesting the Department to refer their complaints to mediation. More than 400 professional mediators are available nationwide to mediate ADA cases. Over 75 percent of the cases in which mediation has been completed have been successfully resolved. Following are recent examples of results reached through mediation.

- An individual with a hearing impairment complained that a Missouri hotel was inaccessible. The hotel agreed to purchase six kits containing portable alarms, door and telephone notification devices, and TTYs for use by guests who are deaf or hard of hearing. The hotel further agreed to reimburse the complainant for 50 percent of her room charges.

- A wheelchair user complained that a Connecticut town allowed restaurants to use public sidewalks to provide outdoor seating, creating barriers for people who use wheelchairs or other mobility devices. The town worked with the restaurant owners and the local chamber of commerce to advise them about the need for unobstructed accessible routes and drafted a local ordinance to provide for and maintain sidewalk accessibility.

- The husband of a wheelchair user complained that a Washington ski tour company arranged a trip that included inaccessible hotel and transportation accommodations. The owner of the company agreed to speak directly to any individual with a disability for whom he was making trip arrangements and to

Plaintiff's Exhibit 8

Case 1:13-cv-02996 Document #27-5 Filed 04/30/15 Page 234 of 561 PageID #509
Case 1:13-cv-02996 Document #276-5 Filed 05/29/15 Page 11 of 401 PageID #509

MEDIATION

confirm, in advance of the travel, that the arrangements would meet the accessibility needs of the traveler. In addition, the tour operator provided the complainant and his family a free week at a condo in the ski area that was the destination of the original trip.

- In North Carolina, an individual with a disability who uses a service animal complained that hotel employees questioned her disability and challenged her right to bring the service animal into the hotel. The hotel provided ADA and sensitivity training to its employees and posted a copy of its ADA nondiscrimination policy at the front desk. The hotel also posted a sign at the hotel entrance welcoming guests with service animals, provided a letter of apology, and paid the complainant $4,000.

- In Pennsylvania, an individual who is deaf complained that a doctor's office refused to provide sign language interpreter services, and made her pay for an interpreter she needed for an office visit. The office agreed to amend its preappointment letter to patients to include a statement that the practice would provide sign language interpreter services upon request. The office also provided a letter of apology to the complainant, reimbursed her for the full cost of the interpreter services, and paid her $750 in compensation.

- In New Jersey, a man who is deaf complained that a hotel did not have accessible telephones, doorbells, and alarms and that hotel employees did not use the TTY at the front desk to communicate with guests who are deaf. The hotel directed employees to use the existing TTY at the front desk and provided training on how to use it. The hotel purchased four each of the following devices: TTYs, visual alarms connected to

the building's emergency system, visual notification devices for incoming phone calls and room doorbells, and closed-caption television decoders. The hotel also agreed to provide ADA and sensitivity training to all employees.

- Relatives of a wheelchair user complained that a North Carolina restaurant lacked accessible restroom facilities. With technical assistance from a local independent living center and the local building inspector, the restaurant constructed a unisex accessible restroom, installed one van-accessible and two standard accessible parking spaces, and created an accessible path of travel from the parking area to the restaurant entrance.

- In California, a couple with mobility impairments complained that a cruise line did not honor a free-upgrade promotion because none of the cabins in the "upgrade class" were accessible. The cruise line agreed to offer accessible rooms from a comparable upgrade class and to provide additional training on the ADA to key management staff. It also agreed to provide a free 10-day cruise to the couple as compensation.

- In Georgia, a deaf individual complained that a doctor's office refused to provide her an interpreter for an appointment. The office agreed to provide appropriate auxiliary aids and entered into a contract with an interpreting service. In addition, the office posted signage indicating that assistance will be provided to persons with disabilities upon request.

- In California, an individual with a mobility disability complained that a theater did not have accessible restrooms. The theater adjusted the front doors to both the men's and women's restrooms and installed raised toilet seats. The theater also agreed to provide additional accessible restroom

Case 1:16-cv-05560 Document #: 27-5 Filed: 04/06/17 Page 235 of 561 PageID #:800
Case 1:13-cv-02896 Document #: 76-5 Filed: 05/29/15 Page 32 of 40 PageID #:537

MEDIATION

signage and to run an announcement on the movie screen prior to each film explaining restroom locations. The theater also provided the complainant with complimentary movie tickets.

- In Tennessee, a couple complained that a hotel refused to honor their reservation upon learning that one of them uses a service animal, forcing them to find lodging elsewhere. The hotel agreed to apologize to the couple and to train its staff to carry out the requirements of the ADA. In addition, the hotel reimbursed the couple for the cost of substitute lodging as well for phone calls and postage required to make the change. Finally, the hotel extended an offer for a complimentary room for two nights.

- A wheelchair user complained that, despite reserving an accessible room and reconfirming it shortly before her arrival, the desk clerk at a California hotel gave her an inaccessible room. The hotel agreed to retrain all desk clerks on procedures for holding guaranteed reservations and terminated the employee who changed the guaranteed reservation. It also agreed to make arrangements and pay for an accessible room at another hotel in the event a reserved accessible room is unavailable. Further, the hotel agreed to hire a trainer with expertise in ADA compliance to conduct an ADA workshop for managers of all properties in the hotel chain at their next annual conference, and to pay the complainant a $1,500 consulting fee to incorporate her experiences and suggestions in the training. In addition, the hotel paid $7,500 to the complainant for her suffering and embarrassment.

- A wheelchair user in Florida complained that a cinema complex with ten movie theaters did not provide accessible seating or doors in the individual theaters and failed to provide accessible restrooms.

The cinema removed existing seats and installed accessible seating in a variety of locations within each theater and signage to identify the location of the accessible seating. The respondent agreed to modify the stalls in both the men's and women's restrooms to make them accessible and to reduce the door opening force on all restroom and auditorium doors.

- A wheelchair user in Washington attended a stadium sporting event and complained that standing patrons were crowding the accessible seating area from behind and that vendors were using the accessible seating area as a walkway between seating sections and as a place to store the items they were selling. The stadium agreed to train ushers to keep space behind accessible seating areas clear and to instruct vendors to use alternate paths between seating sections and not to store their goods in accessible seating areas. In addition, the stadium agreed to allow the complainant to buy a preferred seating package, including accessible seats, for fewer games than is normally required.

- In Massachusetts, an individual with a mobility impairment complained that a public golf course's policies excluded people with disabilities unnecessarily by restricting cart access to certain parts of the course. The golf course agreed to modify the existing policy and developed a written policy providing persons with mobility disabilities access by golf cart to specified areas otherwise off limits. The respondent also apologized to the complainant and offered him a pass for a complimentary round of golf.

- In Florida, a wheelchair user complained that he had requested an accessible room at a hotel but did not receive one at check-in. The hotel agreed to make several changes to its reservations policy to ensure that guests requesting accessible rooms

Plaintiff's Exhibit 8

Case 1:16-cv-05590 Document #: 27-5 Filed: 04/96/17 Page 236 of 561 PageID #:801
Case 1:13-cv-02996 Document #: 76-5 Filed: 05/29/15 Page 13 of 401 PageID #:598

MEDIATION/CERTIFICATION

actually receive them. Individuals making reservations with the hotel who request an accessible room will be offered a "personal planning" follow-up contact to provide detailed information about the accessible features at the hotel and provide an opportunity for guests to relate any additional specific requests. Any additional information from "personal planning" follow-ups will be conveyed to check-in staff.

- A deaf couple in Nevada complained that a health care provider in a remote area did not provide a sign language interpreter for an appointment. The doctor agreed to provide interpreters when requested and the parties worked together to identify potential interpreters in the area. In addition, the doctor agreed to write a letter to all the other medical practitioners in the area about how to provide effective communication to persons who are deaf and hard of hearing and including contact information for local interpreters.

- In Texas, a wheelchair user and her young daughter complained that although they had reserved an accessible room, there appeared to be no accessible features at the hotel when they arrived. The hotel sent a written apology to the daughter and reimbursed the mother $700 for expenses incurred in finding alternative lodging. The hotel modified four guestrooms to make them accessible. Three additional rooms were added to the capital plan to be rebuilt with roll-in showers. In addition, the hotel modified the ballroom to make it accessible, including installation of a vertical wheelchair lift between two levels and lowering a section of the bar to make it accessible. The hotel also gutted and rebuilt restrooms in the lobby and sixth floor ballroom to be accessible and provided all staff members with training on the requirements of the ADA.

# III. Certification of State and Local Accessibility Requirements

**The ADA requires that newly constructed or altered places of public accommodation and commercial facilities comply with title III of the ADA, including the ADA Standards for Accessible Design (ADA Standards). The Justice Department is authorized to certify that State and local accessibility requirements, which are often established through building codes, meet or exceed the ADA's accessibility requirements. In any lawsuit that might be brought, an entity that complies with a certified State or local code can offer that compliance as rebuttable evidence of compliance with the ADA.**

In implementing its certification authority, the Department works closely with State and local officials, providing, as needed, detailed technical assistance to facilitate efforts to bring those accessibility requirements into accord with the ADA Standards. In addition, the Department responds to requests from private entities for review of the accessibility provisions of model codes and standards, and provides informal guidance regarding the extent to which they are consistent with the minimum accessibility requirements of the ADA.

Case 1:13-cv-06586 Document #: 27-5 Filed: 04/30/15 Page 237 of 561 PageID #:802
Case 1:13-cv-02996 Document #: 76-5 Filed: 05/29/15 Page 14 of 401 PageID #:599

CERTIFICATION

The States of Texas, Maine, Florida and Maryland currently have accessibility codes certified by the Department of Justice. The State of Washington recently implemented new accessibility requirements that replace the accessibility code certified previously by the Department. Requests from the States of California, Indiana, New Jersey, North Carolina and Utah for certification are pending before the Department. Recent certification-related activity includes --

**North Carolina** -- North Carolina officials were notified of the Department's preliminary determination of equivalency for the North Carolina Accessibility Code (NCAC). Prior to making a final determination regarding the NCAC, the Department will publish notices in the Federal Register of the preliminary determination of equivalency, and request comments in writing and at informal public hearings in North Carolina and Washington, D.C. After considering all of the comments and consulting with the U.S. Access Board, the Department will issue a final determination for the NCAC and publish a notice of the final determination in the Federal Register.

**Utah** -- The Division received a request for certification of Utah's newly adopted accessibility requirements for public accommodations and commercial facilities. This request updated and supplemented the State's pending request for certification review, which was based upon accessibility requirements in effect in Utah as of August 2003. In 2004 the State revised its accessibility code and conducted a public hearing in January 2005 regarding the State's intention to request ADA certification for the new code.

**Michigan** -- The Division received a request from Michigan for technical assistance in evaluating the consistency of the current Michigan accessibility code with the ADA's new construction and alterations requirements for public accommodations and commercial facilities. Michigan officials plan to utilize the Department's technical assistance in preparing a future request for certification for Michigan's accessibility code.

**Model Code Organization** -- The Division received a request from the International Code Council (ICC) for technical guidance regarding the extent to which the model accessibility code provisions of the 2003 edition of the International Building Code (IBC) are consistent with the new construction and alterations requirements of title III of the ADA.

Case 1:16-cv-05560 Document #: 27-5 Filed: 04/19/17 Page 238 of 561 PageID #:803
Case 1:13-cv-02996 Document #: 76-5 Filed: 05/29/15 Page 39 of 401 PageID #:600

TECHNICAL ASSISTANCE

# IV. Technical Assistance

**The ADA requires the Department of Justice to provide technical assistance to businesses, State and local governments, and individuals with rights or responsibilities under the law. The Department provides education and technical assistance through a variety of means to encourage voluntary compliance. Our activities include providing direct technical assistance and guidance to the public through our ADA Website, ADA Information Line, and ADA Fax on Demand; developing and disseminating technical assistance materials to the public; undertaking outreach initiatives; and coordinating ADA technical assistance governmentwide.**

## ADA Website

The Department's ADA Website on the Internet's World Wide Web provides direct access at anytime to ADA information offered by the Department and by other Federal agencies.

The ADA Home Page (www.ada.gov) is the entry point to the website. It provides direct access to --

- ADA regulations and technical assistance materials in English and Spanish (which may be viewed online or downloaded for later use),

- electronic versions of the ADA Standards for Accessible Design, including illustrations and hyperlinked cross-references,

- selected ADA legal documents, settlement agreements, and technical assistance letters,

- the ADA Business Connection, including ADA Business Briefs in English and Spanish,

- an online ordering form for the ADA Technical Assistance CD-ROM,

- links to the Department's press releases, and

- links to Internet web pages of other Federal agencies and Federal grantees that contain ADA information.

The ADA Website also provides information about --

- the toll-free ADA Information Line,

- the Department's ADA enforcement activities,

- the ADA technical assistance program,

- certification of State and local building codes,

- proposed changes in ADA regulations and requirements, and

- the ADA mediation program.

Plaintiff's Exhibit 8

Case 1:16-cv-05569 Document #27-5 Filed 04/20/15 Page 239 of 561 PageID #594
Case 1:13-cv-02996 Document #76-5 Filed 05/29/15 Page 38 of 401 PageID #601

TECHNICAL ASSISTANCE

**\*\* ADA Website Adds Two New Videos** -- Two new accessible streaming videos, -- "Ten Small Business Mistakes" and "The ADA Signing Ceremony," now appear on the ADA Website (www.ada.gov). Available in both open-captioned and audio-described versions, the videos can be viewed easily through either a dial-up or a broadband internet connection. "Ten Small Business Mistakes" identifies common mistakes that small businesses make when trying to comply with the ADA and addresses the importance and value of doing business with 50 million people with disabilities. "The ADA Signing Ceremony" shows the speech delivered by President George H. W. Bush when signing the ADA into law on the White House lawn on July 26, 1990.

**\*\* New Publication Addresses Accessible Cells in Correctional Facilities** -- The Section's newest technical assistance publication, "ADA/Section 504 Design Guide: Accessible Cells in Correctional Facilities*,"* provides guidance to the wide range of persons and entities involved in the design of correctional facilities, including law enforcement organizations, wardens and correctional officers, sheriffs, parole and probation officers, architecture firms, construction companies, and plumbing and fixture manufacturers that specialize in the design of justice-related facilities. Copies can be ordered through the ADA Information Line or downloaded from the ADA Website (www.ada.gov).

## ADA Information Line

The Department of Justice operates a toll-free ADA Information Line to provide information and publications to the public about the requirements of the ADA. Automated service, which allows callers to order publications by mail or fax, is available 24 hours a day, seven days a week. ADA specialists are available on Monday, Tuesday, Wednesday, and Friday from 9:30 a.m. until 5:30 p.m. and on Thursday from 12:30 p.m. until 5:30 p.m. (Eastern Time). Foreign language service is also available.

To obtain general ADA information, get answers to technical questions, order free ADA materials, or ask about filing a complaint, please call:

    800-514-0301 (voice)
    800-514-0383 (TTY)

## ADA Fax On Demand

The ADA Information Line Fax Delivery Service allows the public to obtain free ADA information by fax 24 hours a day, seven days a week. By calling the number above and following the directions, callers can select from among 34 different ADA technical assistance publications and receive the information, usually within minutes, directly on their fax machines or computer fax/ modems. A list of available documents and their code numbers may also be ordered through the ADA Information Line.

## Publications and Documents

Copies of the Department's ADA regulations and publications, including the Technical Assistance Manuals for titles II and III, can be obtained by calling the ADA Information Line, visiting the ADA Home Page, or writing to the address listed below. All materials are available in standard print as well as large

---

**Department Issues Updated Technical Assistance CD** -- The Department has produced a new edition of its popular technical assistance CD featuring three recently produced ADA publications -- "Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings," "Communicating with Guests Who Are Deaf or Hard of Hearing in Hotels, Motels, and Other Places of Transient Lodging," and the "ADA Checklist for Polling Places." These publications, along with updates of other materials, have been added to the collection of ADA documents that were contained in the previous CD, including the Department's ADA regulations, the ADA Standards for Accessible Design, the Title II and Title III Technical Assistance Manuals, a large collection of ADA technical assistance publications, and a complete set of the ADA status reports, "Enforcing the ADA," dating from 1994. From a home page on the CD, users with personal computers can select, view, and print the files in the same manner as from a web site. All publications are provided in WordPerfect and text formats for users who prefer these formats. Most of the publications can also be viewed in Acrobat (PDF) format which looks the same as the original printed version. To order the updated CD online, please go to the ADA Home Page (www.ada.gov) and select the link for the CD. To order by telephone, please call the ADA Information Line, 800-514-0301 (voice) or 800-514-0383 (TTY).

---

print, Braille, audiotape, or computer disk for persons with disabilities.

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Disability Rights Section - NYAV
Washington, D.C. 20530

Some publications are available in foreign languages. For further information please call the ADA Information Line.

Copies of the legal documents and settlement agreements mentioned in this publication can be obtained by writing to --

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
FOIA Branch, NALC Room 311
Washington, D.C. 20530

Fax: 202-514-6195

Currently, the FOI/PA Branch maintains approximately 10,000 pages of ADA material. The records are available at a cost of $0.10 per page (first 100 pages free). Please make your requests as specific as possible in order to minimize your costs.

The FOI/PA Branch also provides access to ADA materials on the World Wide Web (www.usdoj.gov). A link to search or visit this website is provided from the ADA Home Page.

Case 1:16-cv-05560 Document #: 27-5 Filed: 04/90/15 Page 241 of 561 PageID #:806
Case 1:13-cv-02996 Document #: 76-5 Filed: 05/29/13 Page 48 of 401 PageID #:603

OTHER SOURCES OF INFORMATION

# V. Other Sources of ADA Information

The **Equal Employment Opportunity Commission** offers technical assistance to the public concerning the employment provisions of title I of the ADA.

ADA publications
800-669-3362 (voice)
800-800-3302 (TTY)

ADA questions
800-669-4000 (voice)
800-669-6820 (TTY)

www.eeoc.gov

The **Federal Communications Commission** offers technical assistance to the public concerning the communication provisions of title IV of the ADA.

ADA publications and questions
888-225-5322 (voice)
888-835-5322 (TTY)

www.fcc.gov/cgb/dro

**U.S. Department of Transportation, Federal Transit Administration**

ADA Assistance Line for regulations and complaints
888-446-4511 (voice/relay)

www.fta.dot.gov/ada

The **U.S. Architectural and Transportation Barriers Compliance Board**, or **Access Board**, offers technical assistance to the public on the ADA Accessibility Guidelines.

ADA publications and questions
800-872-2253 (voice)
800-993-2822 (TTY)

www.access-board.gov

The **ADA and IT Technical Assistance Centers** are funded by the U.S. Department of Education through the National Institute on Disability and Rehabilitation Research (NIDRR) in ten regions of the country to provide resources and technical assistance on the ADA.

ADA technical assistance
800-949-4232 (voice & TTY)

www.adata.org

**Project ACTION** is funded by the U.S. Department of Transportation to provide ADA information and publications on making transportation accessible.

Information on accessible transportation
800-659-6428 (voice/relay)

www.projectaction.org

The **Job Accommodation Network (JAN)** is a free telephone consulting service funded by the U.S. Department of Labor. It provides information and advice to employers and people with disabilities on reasonable accommodation in the workplace.

Information on workplace accommodation
800-526-7234 (voice & TTY)

www.jan.wvu.edu

Plaintiff's Exhibit 8

Case 1:16-cv-05560 Document #: 27-5 Filed: 04/90/17 Page 242 of 561 PageID #:807
Case 1:13-cv-02996 Document #: 76-5 Filed: 05/29/13 Page 43 of 401 PageID #:604

HOW TO FILE COMPLAINS

# VI. How to File Complaints

## Title I

Complaints about violations of title I (employment) by units of State and local government or by private employers should be filed with the Equal Employment Opportunity Commission. Call 800-669-4000 (voice) or 800-669-6820 (TTY) to reach the field office in your area.

## Titles II and III

Complaints about violations of title II by units of State and local government or violations of title III by public accommodations and commercial facilities should be filed with --

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Disability Rights Section - NYAV
Washington, D.C. 20530

If you wish your complaint to be considered for referral to the Department's ADA Mediation Program, please mark "Attention: Mediation" on the outside of the envelope.

The Attorney General has determined that publication of this periodical is necessary in the transaction of the public business required by law of the Department of Justice.

Transcript of the Testimony of
**MICHAEL GUMM**

**Date:** May 11, 2016

**Case:** WADE VS. DART

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

MICHAEL GUMM
May 11, 2016

Page 2

```
 1   A P P E A R A N C E S :
 2
 3           THE LAW OFFICES OF:
             THOMAS G. MORRISSEY
 4       BY:  MR. THOMAS G. MORRISSEY
             MR. PATRICK MORRISSEY
 5           10150 South Western Avenue
             Chicago, Illinois 60643
 6           (773) 233-7900
             tgmorrisseylaw@gmail.com
 7           patrick1920@gmail.com
 8           Appeared on behalf of the
             Plaintiff;
 9
             THE LAW OFFICES OF:
10           COOK COUNTY STATE'S ATTORNEY
             CIVIL ACTIONS BUREAU
11
         BY:  MS. JACQUELINE B. CARROLL
12           500 Daley Center
             Chicago, Illinois 60602
13           (312) 603-5450
             jcarroll@cookcountygov.com
14
             Appeared on behalf of the
15           Defendant, Cook County;
16           THE LAW OFFICES OF:
             COOK COUNTY STATE'S ATTORNEY
17           CIVIL ACTIONS BUREAU
18       BY:  MR. NICHOLAS CUMMINGS
             500 Daley Center
19           Chicago, Illinois 60602
             (312) 603-6638
20           nicholas.cummings@cookcountyil.gov
21           Appeared on behalf of the
             Defendant, Sheriff Thomas
22           Dart;
23
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

CARL WADE,                      )
                                )
          Plaintiff,            )
                                )
          vs.                   )   No. 15-cv-10644
                                )
THOMAS DART, Sheriff of         )
Cook County, and COOK          )
COUNTY, ILLINOIS,              )
                                )
          Defendants.          )
```

This is the deposition of MICHAEL GUMM,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before PEGGY A. ANDERSON, a Certified Shorthand
Reporter of the State of Illinois, at Daley
Center, Suite 500, Chicago, Illinois, on
May 11, 2016, at 10:30 a.m.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 3

```
 1                  I N D E X
     WITNESS                              PAGE
 2
     MICHAEL GUMM
 3
     DIRECT EXAMINATION BY
 4   MR. MORRISSEY:                       5-210
 5   CROSS-EXAMINATION BY
     MR. CUMMINGS:                        211-221
 6
     CROSS-EXAMINATION
 7   MS. CARROLL:                         221-224
     REDIRECT EXAMINATION BY
 8   MR. MORRISSEY:                       224-236
 9
     RECROSS-EXAMINATION BY
10   MS. CARROLL:                         236-237
11   FURTHER REDIRECT EXAMINATION BY
     MR. MORRISSEY:                       237-238
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 1

## Page 4

MICHAEL GUMM
May 11, 2016

Page 4

```
 1              E X H I B I T S
 2    MARKED                              PAGE
 3    PLAINTIFF'S EXHIBIT NO. 1             6
 4    PLAINTIFF'S EXHIBIT NO. 2            36
 5    PLAINTIFF'S EXHIBIT NO. 3            38
 6    PLAINTIFF'S EXHIBIT NO. 3-A          45
 7    PLAINTIFF'S EXHIBIT NO. 4            51
 8    PLAINTIFF'S EXHIBIT NO. 5            66
 9    PLAINTIFF'S EXHIBIT NO. 6            86
10    PLAINTIFF'S EXHIBIT NO. 7           116
11    PLAINTIFF'S EXHIBIT NO. 8           118
12    PLAINTIFF'S EXHIBIT NO. 9 (Not marked)
13    PLAINTIFF'S EXHIBIT NO. 10          139
14
15
16        C E R T I F I E D   Q U E S T I O N S
17
18    LINE                               PAGE
19    14                                   17
20    20                                   32
21    18                                   33
22    5                                    34
23    6                                    73
24                       *******
```

TOOMEY REPORTING
312-853-0648

## Page 6

MICHAEL GUMM
May 11, 2016

Page 6

```
 1    Cook County government?
 2        A    ADA compliance project director.
 3        Q    How long have you been with the Cook
 4    County government?
 5        A    Coming up on two years in June.
 6        Q    Are you licensed in the state of
 7    Illinois as an architect?
 8        A    No.
 9        Q    Have you taken any examinations in
10    the State of Illinois to become licensed?
11        A    No.  Since I'm licensed in other
12    states, I don't have to take the examination
13    again.
14        Q    Have you sought to become licensed in
15    the state of Illinois?
16        A    Not yet, no.
17                   (WHEREUPON, Plaintiff's
18                   Exhibit No. 1 was marked
19                   for identification.)
20    BY MR. MORRISSEY:
21        Q    Showing you what is being marked as
22    Plaintiff's Exhibit Number 1 --
23             MR. MORRISSEY:  I don't have -- I
24    have a couple copies.  I have one copy,
```

TOOMEY REPORTING
312-853-0648

## Page 5

MICHAEL GUMM
May 11, 2016

Page 5

```
 1                   (WHEREUPON, the witness
 2                   was first duly sworn.)
 3             MR. MORRISSEY:  This is the
 4    deposition of Michael Gumm taken pursuant
 5    to notice and continued at the State's
 6    Attorney's office at their request that
 7    we're here today.
 8             Mr. Gumm, I'm going to ask you a
 9    series of questions in regards to your
10    position with the County.  I'd ask you to
11    answer orally so the court reporter can
12    take down your response; is that
13    understood?
14             THE WITNESS:  Yes, it is.
15    WHEREUPON:
16                   MICHAEL GUMM,
17    called as a witness herein, having been first
18    duly sworn, was examined and testified as
19    follows:
20        D I R E C T   E X A M I N A T I O N
21             BY MR. MORRISSEY:
22        Q    State your full name for the record?
23        A    Michael Gumm, G-u-m-m.
24        Q    What is your current title with the
```

TOOMEY REPORTING
312-853-0648

## Page 7

MICHAEL GUMM
May 11, 2016

Page 7

```
 1    actually, if you could share a copy.
 2    BY MR. MORRISSEY:
 3        Q    Showing you what's been marked as
 4    Exhibit Number 1, it's a Standard Job
 5    Description for the compliance project
 6    director; do you see that document?
 7        A    Yes, I do.
 8        Q    Did you apply for that position with
 9    Cook County?
10        A    Yes, I did.
11        Q    Does that Job Summary and Typical
12    Duties accurately describe your position as the
13    compliance project director?
14        A    It describes some of the duties that
15    I have.  This was a newly created position; and
16    since being hired, the project -- My director
17    told me that they took a stab at what the
18    requirements would be, but it would be defined
19    as I went along.  So there are some things that
20    are in here that are, and some things that are
21    not part of my duties.
22        Q    Let me ask you specifically when we
23    look at the job summary, it says in part:
24    Ensures engineering and architectural designs
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 2

MICHAEL GUMM
May 11, 2016

Page 8

1  of Cook County capital projects are integrated
2  and comply with ADA requirements.  Is that part
3  of what you do as the compliance project
4  director?
5      A    For engineering and architectural
6  designs, we hire architects and engineers to
7  provide drawings, but I assure that the ADA
8  requirements are integrated in those.
9      Q    To what extent do you review design
10 drawings for capital projects at the jail and
11 the criminal courthouses in Cook County?
12     MR. CUMMINGS:  Object to the form of
13   the question.
14     MS. CARROLL:  Same.
15 BY THE WITNESS:
16     A    Can you describe to me what you mean
17 by "review"?  I'm not sure exactly what you're
18 asking.
19 BY MR. MORRISSEY:
20     Q    What I'm asking is what do you do
21 when you review design drawings for capital
22 projects at the jail and the courthouses?
23     A    I look at the drawings and the
24 details for compliance with ADA standards.  We

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 10

1  BY MR. MORRISSEY:
2      Q    To what extent do you provide
3  oversight of accessibility components of
4  capital improvements, remodeling and renovation
5  projects at the jail and Cook County?
6      A    What do you mean "to what extent"?
7      Q    All right.  The job description
8  states:  Oversight of accessibility components
9  of all capital improvements, remodeling and
10 renovation projects.  Specifically in regards
11 to the Cook County Jail and the courthouses, to
12 what extent do you oversee the accessibility
13 components of remodeling and renovation
14 projects?
15     MS. CARROLL:  And I'm going to object
16   to this line of questioning in terms of
17   courthouses.  There is only one courthouse
18   involved in this particular case.
19     MR. CUMMINGS:  Join in that.
20 BY THE WITNESS:
21     A    As far as Leighton Criminal
22 Courthouse, I oversee projects, accessibility
23 projects, that are developed by me and answer
24 questions that are proposed to me by Facilities

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 9

1  have ANSI A117.1 and if it's in the city of
2  Chicago, the City of Chicago Accessibility
3  Standard.
4      Q    Do you also look at the 2010 ADA
5  Accessibility?
6      A    That's the ADA, yes, that's part of
7  the ADA.
8      Q    Monitors and evaluate capital
9  improvement projects; develops the scope of
10 work; selects -- I'm sorry, let me rephrase it.
11     To what extent do you review
12 construction documents for compliance under the
13 ADA?
14     MR. CUMMINGS:  Objection to the form
15   of the question.  It's vague in terms of
16   construction documents; but if you can
17   understand what he's asking, you can
18   answer.
19 BY THE WITNESS:
20     A    Construction documents are those that
21 are developed and issued by our consulting
22 architectural engineers.  It's the same
23 documents that you just asked me previously.
24

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 11

1  Management who may be installing some
2  accessible elements.
3  BY MR. MORRISSEY:
4      Q    What projects over at Leighton
5  Courthouse are you overseeing?
6      A    I'm overseeing the renovation of the
7  entire holding cell areas in the building.
8      Q    What projects have you or are you
9  overseeing at the Cook County Jail?
10     A    As far as Cermak goes, it is the
11 lower level holding area separation, the
12 installation of floors, an isolation room
13 repadding.  I believe that's all for Cermak,
14 yeah.
15     Q    Have you overseen the renovation of
16 Cermak's third floor?
17     A    Describe what you mean by renovation
18 of third floor.
19     Q    Well, since you've joined Cook
20 County, have there been any renovations to Cook
21 County Cermak's third floor?
22     A    No.
23     Q    There have been no renovations?
24     A    There have not been any performed

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 3

MICHAEL GUMM
May 11, 2016

Page 12

1  since I have joined the County.
2      Q   Has any work been done to renovate
3  the third floor of Cermak since you began
4  working for Cook County in July of 2014?
5      MR. CUMMINGS:  Objection, asked and
6  answered.  You just asked the same
7  question.
8  BY THE WITNESS:
9      A   Since June of 2014 when I started,
10 there has not been any renovation work to
11 complete during that period of time regarding
12 ADA accessibility.
13 BY MR. MORRISSEY:
14     Q   Do you oversee the construction work
15 on any other projects for Cook County?
16     A   Yes.
17     Q   What other projects have you
18 overseen?
19     A   How is that relevant to Cermak or
20 this case?
21     Q   Sir, I'm asking you the questions.
22     A   And I'm trying to answer the
23 questions regarding --
24     Q   All right, answer the question.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 13

1      MS. CARROLL:  And I'll object for the
2  record in terms of it has no importance on
3  this case, but I will let you answer this
4  question.
5  BY THE WITNESS:
6      A   Can you repeat it, please?
7      MR. MORRISSEY:  Repeat the question.
8          (WHEREUPON, the record
9          was read as requested.)
10 BY THE WITNESS:
11     A   Have I overseen?  What other
12 projects?
13 BY MR. MORRISSEY:
14     Q   Right.
15     MR. CUMMINGS:  I'm going to object to
16 the form of the question in terms of vague.
17 Do you mean overall throughout his career
18 or just with Cook County?  You can answer.
19 BY THE WITNESS:
20     A   There are numerous projects that I
21 have overseen and that I'm currently
22 overseeing.
23 BY MR. MORRISSEY:
24     Q   Well, tell me.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 14

1      A   There are ADA projects.  There are
2  wireless and wired infrastructure projects.
3  There are recreational facility projects.
4  Those are the types of projects.
5      Q   Have you overseen any other
6  courthouse buildings as the ADA compliance
7  director since joining Cook County?
8      MS. CARROLL:  And I'm going to object
9  to this line of questioning in terms of I
10 did write a letter saying that this
11 deposition is about the Wade case and not
12 about the Lacy case, about the other
13 courthouses.  So whether he's a compliance
14 director, he can answer; but in terms of
15 any specifics, I will object for the record
16 and then have him not answer.
17     MR. MORRISSEY:  That's fine.
18 BY MR. MORRISSEY:
19     Q   You can answer the question, sir.
20     A   My attorney has directed me not to
21 answer that question.
22     Q   She has not.
23     A   Yes, she has.
24     MS. CARROLL:  You can answer if you

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 15

1  have overseen, just not what you've
2  overseen.
3  BY THE WITNESS:
4      A   Yes, I have.
5  BY MR. MORRISSEY:
6      Q   Have you overseen any other projects
7  at Cook County Jail?
8      MR. CUMMINGS:  Objection to the form
9  of the question.  If you understand what
10 he's asking, you can answer.
11 BY MR. MORRISSEY:
12     Q   Other than what you described in
13 regards to Cermak's lower level, have you
14 overseen or reviewed any ADA projects at the
15 Cook County Jail?
16     A   Yes.
17     Q   What projects have you overseen or
18 reviewed?
19     A   There are buildings other than
20 Cermak, RTU and --
21     Q   Such as what?
22     A   ADA compliance projects.
23     Q   Describe them for me.
24     MS. CARROLL:  You know what, again, I

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 4

MICHAEL GUMM
May 11, 2016

Page 16

```
 1   don't know what this has to do with this
 2   case.  So I'm going to object for the
 3   record and later ask that you strike any
 4   testimony that is not about this case.
 5          MR. CUMMINGS:  If we could go off the
 6   record for just a second, please.
 7          MR. MORRISSEY:  No, we're staying on
 8   the record.
 9          MR. CUMMINGS:  No, I have a question
10   I would like to ask off the record.  Is
11   that fine?
12          MR. MORRISSEY:  Do you want to ask
13   Mr. Gumm off the record?
14          MR. CUMMINGS:  No, I want to ask the
15   attorneys off the record.
16          MR. MORRISSEY:  Okay.
17                  (WHEREUPON, a discussion
18                  was had off the record.)
19   BY MR. MORRISSEY:
20      Q    You can answer, Mr. Gumm.
21      A    Repeat the question, please.
22                  (WHEREUPON, the record
23                  was read as requested.)
24          MR. CUMMINGS:  I'm just going to
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 17

```
 1   object to the line of questioning as not
 2   being proportionately related to the claims
 3   of this particular case.
 4          The Plaintiff was out of custody
 5   within three or four months of Mr. Gumm
 6   coming on.  So if you have a project that
 7   you oversaw up until October of 2014, feel
 8   free to answer; but anything outside of
 9   that, I would say it's beyond the scope of
10   this case.
11   BY THE WITNESS:
12      A    It's beyond the scope of this case.
13   BY MR. MORRISSEY:
14      Q    **** Mr. Gumm, you're being deposed.
15   You don't have the opportunity to object.  I
16   asked you what projects have you reviewed or
17   overseen at Cook County Jail?
18      A    And my attorney has advised me not to
19   answer any questions that are beyond the scope
20   of this case.
21          MR. MORRISSEY:  Are you advising him
22   not to answer about Cook County Jail?
23          MS. CARROLL:  Beyond the scope of
24   this case?  Sure.
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 18

```
 1          MR. MORRISSEY:  You're going to tell
 2   him not to respond to that answer -- to
 3   that question?
 4          MS. CARROLL:  Re-ask the question in
 5   an appropriate manner about this case,
 6   sure.
 7          MR. MORRISSEY:  You can repeat the
 8   question.
 9                  (WHEREUPON, the record
10                  was read as requested.)
11   BY THE WITNESS:
12      A    Again, my attorney advised me not to
13   answer outside the scope of this case.
14          MR. MORRISSEY:  Are you going to
15   advise him not to answer?
16          MS. CARROLL:  It depends on the type
17   of -- That question is extremely vague and
18   overly broad; and I did write you a letter
19   saying that I wanted you to stick to the
20   topics in this case.
21          MR. MORRISSEY:  Yesterday, you turned
22   over documents in response to my production
23   request --
24          MS. CARROLL:  Correct.
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 19

```
 1          MR. MORRISSEY:  -- which included
 2   information in regards to the government's,
 3   the United States government's, agreement
 4   with Cook County to make certain facilities
 5   accessible.
 6          You also turned over documents
 7   which Mr. Gumm apparently signed in regards
 8   to the implementation plan in regards to
 9   their agreement with the U.S. Department of
10   Justice.
11          Those things are all pertinent
12   and relevant to this lawsuit, and they were
13   turned over by you in response to our
14   discovery request.
15          MS. CARROLL:  That is correct.
16          MR. MORRISSEY:  So if you are going
17   to now preclude me from asking questions in
18   regards to renovation projects at the Cook
19   County Jail, I'm going to certify the
20   questions and ask the Court to require this
21   gentleman to return and be redeposed and
22   grant us attorneys' fees.
23          MS. CARROLL:  You could ask whatever
24   you want as long as it has to do with this
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 5

MICHAEL GUMM
May 11, 2016

Page 20

1  case. What I turned over was relevant to
2  this case. When you start asking questions
3  that are beyond the scope of this case,
4  because I know you're asking about Lacy and
5  I know you're asking about Clemons and I
6  know you're asking about all your other
7  cases because that's what you do in
8  depositions.
9      If you want to be more specific,
10 I will have him answer the questions
11 regarding the RTU and Cermak infirmary like
12 I wrote in my letter that that's what he is
13 here for.
14     MR. MORRISSEY: Well, he has been --
15     MS. CARROLL: You have deposed him
16 several times.
17     MR. MORRISSEY: Do you intend to have
18 this gentleman testify as an expert for you
19 in the Wade case?
20     MS. CARROLL: Right now, he was not
21 disclosed as an expert. We don't have
22 expert testimony. We have only two months
23 to do all --
24     MR. MORRISSEY: My question is

MICHAEL GUMM
May 11, 2016

Page 22

1  off the record and I had that discussion.
2      My understanding is that this is
3  not an expert deposition. This is a fact
4  deposition for Mr. Wade's case.
5      MR. MORRISSEY: All right, to the
6  extent that you intend to have Mr. Gumm
7  offer any expert testimony in Wade, I'm
8  going to have to redepose him prior to the
9  trial; is that understood?
10     MS. CARROLL: Absolutely not.
11     MR. MORRISSEY: All right, then I
12 would ask you to allow us to ask about his
13 professional background and what he intends
14 to offer in regards to expert testimony if
15 you intend to --
16     MS. CARROLL: You're not
17 understanding. He is here to talk about
18 the Cermak infirmary and RTU, which is
19 about the Wade case.
20     Do you want to explain to a judge
21 that you're asking questions that have
22 nothing to do with this case, go ahead.
23 Certify the question and tell the judge it
24 has absolutely nothing to do with this

MICHAEL GUMM
May 11, 2016

Page 21

1  simple. Do you intend to allow Mr. -- to
2  present Mr. Gumm as an expert in regards to
3  ADA compliance at the trial?
4      MS. CARROLL: Can we go off the
5  record?
6      MR. MORRISSEY: No, we're on the
7  record.
8      MS. CARROLL: No, I'm not answering
9  your question. I don't have to. I'm not
10 being deposed here.
11     MR. MORRISSEY: Well, then if you
12 can't answer that, then I should be allowed
13 to ask him about his background.
14     MR. CUMMINGS: You are not asking
15 questions about background.
16     MR. MORRISSEY: I certainly am.
17     MR. CUMMINGS: You're asking about
18 specific projects that he oversaw while
19 he's been employed with Cook County.
20     MS. CARROLL: Which is a fishing
21 expedition for your other cases.
22     MR. CUMMINGS: Now, I understand your
23 concern if he is being offered as an
24 expert, which is why I asked for us to go

MICHAEL GUMM
May 11, 2016

Page 23

1  case.
2      MR. MORRISSEY: You're not going to
3  allow him to be redeposed if you intend to
4  call him as an expert; is that your
5  position? Is that your position?
6      MS. CARROLL: That's not what I'm
7  saying at all, and I'm not saying anything
8  like this on the record. I am saying he
9  can testify about the RTU and he can
10 testify about Cermak infirmary and he can
11 testify about Leighton. That is what he is
12 being presented for, to talk about the ADA
13 regarding those locations. Ask questions
14 about those locations, and he will answer
15 them. I said this in a letter beforehand.
16 I didn't have to go through all
17 this like we do every single time when you
18 try to fish for other cases, so go ahead,
19 that's fine. Tell the judge.
20     MR. MORRISSEY: All right, we'll
21 certify the questions that you won't answer
22 any questions in regards to your
23 involvement in renovation projects at the
24 Cook County Jail.

Plaintiff's Exhibit 9 Page 6

MICHAEL GUMM
May 11, 2016

Page 24

```
1        MS. CARROLL:  That's not what he
2    testified to.  That is a misstatement of
3    what he testified to.
4  BY MR. MORRISSEY:
5        Q    All right, my question is will you
6    tell me what projects in addition to the
7    lower level of Cermak you have participated in at the
8    Cook County Jail in regards to ADA compliance?
9        MR. CUMMINGS:  And I will restate my
10   objection and, for the record, I will read
11   26 (b)(1) that unless otherwise limited by
12   Court order, the scope in discovery is as
13   follows:  The parties may obtain discovery
14   regarding any nonprivileged matter that is
15   relevant to any party's claim or defense
16   and proportional to the needs of the case
17   considering importance of the issues and
18   stake in the action, the amount in
19   controversy, the parties' relative access
20   to relevant information, the parties'
21   resources, the importance of discovery in
22   resolving the issues and whether the burden
23   or extent of the proposed discovery
24   outweighed its likely benefits.
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 25

```
1        Mr. Wade was incarcerated at Cook
2    County Jail from August 16, 2014 until
3    October of 2014.  So that is what's at
4    stake in this action.
5        So, Mr. Gumm, if you have
6    information regarding those dates or even
7    shortly thereafter in 2014, we'd be
8    interested.
9  BY MR. MORRISSEY:
10       Q    Can you answer the question,
11   Mr. Gumm?
12       A    I have done projects at Cook County
13   Jail other than the facilities that we're
14   talking about in this case, yes.
15       Q    All right, what projects have you
16   done?
17       A    I have done various types of
18   projects.
19       Q    Well, describe them for me, please.
20       MS. CARROLL:  You know what, again,
21   if it doesn't have to do with the Cermak
22   infirmary or Leighton, it has to do with
23   other cases, then I will instruct you not
24   to answer unless it has to do with what's
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 26

```
1    at issue in this case.
2  BY MR. MORRISSEY:
3        Q    Have you ever seen the ramp in
4    Cermak?
5        MR. CUMMINGS:  Objection to the form
6    of the question.
7        MS. CARROLL:  In Cermak?
8  BY MR. MORRISSEY:
9        Q    Is there a ramp in Cermak?
10       MR. CUMMINGS:  Objection to the form
11   of the question.
12  BY THE WITNESS:
13       A    What part of Cermak.
14  BY MR. MORRISSEY:
15       Q    In the lower level of Cermak, is
16   there a ramp?
17       A    To my understanding there's a few of
18   them.
19       Q    Have you participated as the ADA
20   compliance director in regards to any
21   renovations of the ramps in Cermak?
22       MS. CARROLL:  You know what, I'm
23   going to object for the record in the sense
24   that that has nothing to do with this case.
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 27

```
1        There are no allegations that he had any
2    issues on ramps in Cermak.
3  BY MR. MORRISSEY:
4        Q    Well, you can answer.
5        A    I am not aware of any projects that
6    have taken place on the ramps in Cermak.
7        MS. CARROLL:  And I will ask that
8    this not be used in any other cases like
9    you usually do because this answer has
10   nothing to do with this case.
11  BY MR. MORRISSEY:
12       Q    In August and September of 2014,
13   where were prisoners staged when they went to
14   the Leighton Court Building?
15       A    I believe prisoners --
16       Q    Inmates at the Cook County Jail, when
17   they were awaiting to go to the Leighton Court
18   Building for court appearances, where were they
19   staged?
20       A    Waiting to come in various buildings.
21       Q    All right, what buildings?
22       A    Their housing buildings, to my
23   knowledge.
24       Q    After they were taken from their
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 7

Page 28

1  housing assignment, were they brought to
2  Division 5 prior to departing for the Leighton
3  Court Building?
4      A    Some, I believe.
5      Q    Do you know if any prisoners who are
6  housed in the Cook County Jail were not
7  filtered through Division 5 prior to going to
8  the Leighton Courthouse?
9      A    I have no knowledge of that.
10     Q    Was there an area in the basement of
11 Division 5 where prisoners, inmates of the Cook
12 County Jail, were held prior to appearing for
13 court hearings at the Leighton Court Building?
14     A    I believe some were staged there.
15     Q    Where in the basement of Division 5?
16     A    In the basement of Division 5.
17     Q    I asked you where in the basement of
18 Division 5 were inmates of the Cook County Jail
19 staged prior to attending court at Leighton?
20     A    In the bullpens in Division 5 in the
21 basement.
22     Q    Was there a bullpen in August and
23 September of 2014 that was labeled 34/5?
24     A    Yes.

Page 29

1      Q    Was that one of the bullpens where
2  prisoners, inmates at the Cook County Jail,
3  were staged prior to appearing at the Leighton
4  Courthouse?
5      A    That's one of them.
6      Q    What other bullpens were used in
7  August and September in the basement of
8  Division 5 for prisoners who were going to the
9  Leighton Courthouse for hearing?
10     A    The bullpens in the same adjacent
11 area.
12     Q    To your knowledge, were wheelchair
13 inmates staged in Bullpen 34/5 in August and
14 September of 2014 prior to attending court at
15 Leighton?
16     A    I have no direct knowledge of it.
17     Q    To your knowledge, was that one of
18 the bullpens used to stage wheelchair-bound
19 detainees in August and September of 2014 prior
20 to them attending court hearings at Leighton?
21     MR. CUMMINGS:  Objection, asked and
22     answered.
23 BY THE WITNESS:
24     A    At that period of time, I have no

Page 30

1  direct knowledge of the exact locations that
2  wheelchair-bound detainees were staged.
3  BY MR. MORRISSEY:
4      Q    Do you intend to offer any testimony
5  after August or September of 2014 in regards to
6  renovations at the Leighton Court Building in
7  this case?
8      MR. CUMMINGS:  Objection to the form
9      of the question.
10 BY THE WITNESS:
11     A    If I'm asked the questions, I guess.
12 BY MR. MORRISSEY:
13     Q    So you'll be testifying at the trial
14 in regards to future renovation projects at the
15 Cook County Leighton Court Building?
16     MS. CARROLL:  I'm going to object to
17     that question because how does he know what
18     he's going to be testifying to or not?
19     MR. MORRISSEY:  I will ask you.
20     MS. CARROLL:  I'm not being deposed,
21     and I'm not answering on the record for
22     anything.
23 BY MR. MORRISSEY:
24     Q    So are you aware of any future

Page 31

1  renovation programs at the Leighton Court
2  Building to make the building accessible for
3  wheelchair-bound detainees?
4      A    Yes, I believe I already told you
5  that.
6      Q    What are there -- Has there been any
7  construction since you joined Cook County in
8  June of 2014 to the present in order to make
9  the Leighton Courthouse Building accessible for
10 wheelchair-bound inmates?
11     MS. CARROLL:  I'm going to object to
12     the extent that this has to do with the
13     Lacy case and has absolutely nothing to do
14     with this case.  If he wants to talk about
15     what was going on when Wade was there,
16     that's fine; but I don't want you to start
17     to ask questions about Lacy.  That's a
18     completely different case.
19     MR. MORRISSEY:  Well, you're not
20     going to allow him to testify in regards to
21     any projects that -- at the Leighton Court
22     Building that have taken place after
23     October of 2014; is that correct?
24     MR. CUMMINGS:  It's a subsequent

Plaintiff's Exhibit 9 Page 8

MICHAEL GUMM
May 11, 2016

Page 32

```
 1    remedial measure, Tom.  I mean --
 2         MS. CARROLL:  I'm not saying anything
 3    on the record.  I'm not being deposed here.
 4    BY MR. MORRISSEY:
 5         Q    So, Mr. Gumm, what -- Strike that.
 6         MR. CUMMINGS:  Can we go off the
 7    record for a second, Tom, please?
 8         MR. MORRISSEY:  No, we're on the
 9    record.  We're on the record.
10         MR. CUMMINGS:  I'm asking to talk to
11    you.
12         MR. MORRISSEY:  All right, go ahead.
13         MR. CUMMINGS:  Can we go off the
14    record?
15         MR. MORRISSEY:  Go ahead.
16              (WHEREUPON, a discussion
17               was had off the record.)
18    BY MR. MORRISSEY:
19         Q    We're going to certify the questions
20    as follows:  **** What design drawings are
21    currently in place for renovating the Leighton
22    Court Building?
23         MS. CARROLL:  And I object because
24    this is directly about the Lacy case.  This
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 34

```
 1    what you're asking there.  Do you mean all
 2    over Leighton or do you mean Bullpen 34/5
 3    or what exactly do you mean?
 4    BY MR. MORRISSEY:
 5         Q    **** Well, the question pertains to
 6    other than Bullpen 34/5, assuming that there
 7    have been design drawings presented by an
 8    outside architectural firm, has any work taken
 9    place to make the Leighton Court Building
10    accessible for prisoners?
11         MS. CARROLL:  And, again, I think you
12    got completely mixed up what the law is and
13    what's going on.  This is not the Lacy
14    case.  If you want to depose him in Lacy,
15    you can.  If Maureen allows it, if the
16    judge allows it, that's up to them.  It has
17    nothing to do with me.
18         MR. MORRISSEY:  All right, we're
19    going to certify the question.
20         MS. CARROLL:  But, again, this has
21    nothing to do with the Wade case
22    whatsoever.  And, therefore, I think it's
23    an absolutely improper question to ask and
24    I asked you not to go into Lacy questions.
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 33

```
 1    is something that's ongoing in Lacy versus
 2    Dart, which is under Judge Gettleman, has
 3    nothing to do with Wade who was only in the
 4    capacity of the Cook County Department of
 5    Corrections for six weeks, only went to
 6    Leighton about five times between August
 7    and October of 2014; and therefore has no
 8    relevance in this case, and I've already
 9    told Mr. Morrissey on several occasions
10    that I was presenting him for what happened
11    in the Wade case.  That's what Mr. Gumm is
12    for.
13         MR. MORRISSEY:  This is a discovery
14    deposition.  I'm going to also ask the
15    question, which if you object, I'm going to
16    certify.
17    BY MR. MORRISSEY:
18         Q    **** Has any work taken place
19    pursuant to any design drawings for renovation
20    of the Leighton Court Building to make it
21    accessible?
22         MR. MORRISSEY:  Do you object?
23         MS. CARROLL:  Objection, that's a
24    very vague question.  I'm not exactly sure
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 35

```
 1         MR. MORRISSEY:  All right, will you --
 2    So you're going to -- I'm going to certify
 3    for --
 4         MS. CARROLL:  Go ahead.
 5         MR. MORRISSEY:  -- purposes of this
 6    deposition my questions that pertain to any
 7    future renovation projects to make the
 8    Leighton Court Building accessible for
 9    prisoners, and it's my understanding the
10    Sheriff's attorney and the County's
11    attorney are going to instruct the person
12    not to answer.
13         MR. CUMMINGS:  That's not correct.
14    The Sheriff's attorney can't really
15    instruct anybody not to answer; but the
16    fact of the matter remains that future
17    projects that have not been undertaken are
18    not relevant to this case.
19         MR. MORRISSEY:  All right, is that
20    your position, Jackie, that you're not
21    going to allow the witness to testify to
22    any ongoing future projects to renovate
23    Leighton to make it accessible for
24    handicapped prisoners?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 9

MICHAEL GUMM
May 11, 2016

Page 36

1    MS. CARROLL:  That misstates a lot
2  but, yes, when it comes to questions that
3  are directly involved in Lacy versus Dart,
4  Judge Gettleman's case, that has to do with
5  the ongoing renovation of Leighton that
6  have absolutely nothing to do with Carl
7  Wade and his six weeks that he was in the
8  CCDOC, I am instructing my client not to
9  answer them for this deposition in the Carl
10  Wade case.  So ask the Judge --
11    MR. MORRISSEY:  So we'll certify
12  those questions.
13    MS. CARROLL:  Go ahead and try to
14  explain to the judge why it is at all
15  relevant in this case and why you're not
16  trying to fish for the Lacy case.
17          (WHEREUPON, Plaintiff's
18           Exhibit No. 2 was marked
19           for identification.)
20  BY MR. MORRISSEY:
21    Q    I'm showing you what has been marked
22  as Plaintiff's Exhibit Number 2.  I would ask
23  you to take a look at that document, please.
24    MR. CUMMINGS:  Which document?  You

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 38

1    Q    The RCDC, correct, the old RCDC?
2    A    That's what it says here, yes.
3    Q    Is it your understanding that a work
4  order was placed in May of 2014 to add grab
5  bars to Bullpen 34/5?
6    A    I see a date on here of May 6, 2014
7  at 7:45 a.m.
8    Q    Does that pertain to Bullpen 34/5?
9    A    It says location, Male Bullpen 34.
10    Q    Okay.  And that was prior to your
11  beginning work for the County, correct?
12    A    Yes.
13          (WHEREUPON, Plaintiff's
14           Group Exhibit No. 3 was
15           marked for identification.)
16  BY MR. MORRISSEY:
17    Q    I'm going to show you, sir, a group
18  exhibit that's marked as Exhibit 3.  I would
19  ask you to take a look at it; and if you want
20  to take a moment, we can Xerox it for
21  Mr. Cummings.
22    MS. CARROLL:  Do you only have his
23  copy?
24    MR. MORRISSEY:  I just have -- I told

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 37

1  don't have enough copies?  Oh, it's a Lacy
2  document.
3    MS. CARROLL:  Oh, is this a Lacy
4  document?
5  BY MR. MORRISSEY:
6    Q    Do you recognize that document as a
7  work order for Bullpen 34/5?
8    A    No, I'm not involved in work orders.
9  This is Facilities Management.
10    Q    Do you recognize that as a document
11  from Facilities Management?
12    A    Yes, it is from Facilities
13  Management.
14    MR. CUMMINGS:  For the record, at the
15  bottom of the document, it's a Sheriff's
16  document actually.  It's a document from
17  the Sheriff sent to Facilities Management,
18  but you can go ahead and continue to ask
19  questions about it.
20  BY MR. MORRISSEY:
21    Q    Is that document related to the
22  installation of ADA handicap grab bars in the
23  Division 5 RCDC?
24    A    It's related to Division 5, yes.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 39

1  you, I wasn't --
2    MR. CUMMINGS:  We know.  Is that a
3  document that Jacqueline turned over
4  because I brought my own copy?
5    MS. CARROLL:  And I gave you another
6  copy, too.  So what --
7    MR. MORRISSEY:  It may or may not be
8  the documents that Jackie turned over.  Why
9  don't we make copies?
10    MS. CARROLL:  Wait a second.  These
11  are not anything that I have turned over.
12  So what case is this from?
13    MR. MORRISSEY:  We're not responding.
14    MS. CARROLL:  Okay.
15    MR. MORRISSEY:  It was just part of
16  our Rule 26 disclosures.  We'll take a
17  break.
18          (WHEREUPON, a short
19           break was had.)
20  BY MR. MORRISSEY:
21    Q    Mr. Gumm, was Bullpen 34/5 altered in
22  2014 to 2015 to make it ADA compliant?
23    A    They were ADA --
24    Q    Yes or no?  Yes or no, was Bullpen

TOOMEY REPORTING
312-853-0648

## Page 40

MICHAEL GUMM
May 11, 2016

```
 1    34/5 altered in -- between 2014 and 2015 to
 2    make it ADA compliant?
 3             MS. CARROLL:  Objection to the form
 4        of the question.
 5    BY THE WITNESS:
 6        A    Yes, it was altered and there were
 7    ADA elements that were put -- installed in that
 8    bullpen to assist with accessibility to the
 9    fixtures.
10    BY MR. MORRISSEY:
11        Q    Turning to Group Exhibit 3, it's a
12    document that --
13             MS. CARROLL:  These are the Lacy
14        documents.
15    BY MR. MORRISSEY:
16        Q    That is marked CC685, is that a
17    document that you drafted on October 2nd, 2014?
18        A    It has from Michael Gumm, so -- and
19    it has my name at the bottom of the first
20    section of the document.
21        Q    So from Michael Gumm to the point
22    where in that document on CC685 where your ADA
23    compliance director is, you authored that,
24    correct?
```

TOOMEY REPORTING
312-853-0648

## Page 41

MICHAEL GUMM
May 11, 2016

```
 1        A    Yes.
 2        Q    And who is Jacob Billis -- Bilski?
 3        A    Bilqis Jacobs-El?
 4        Q    Yeah.
 5        A    She is the director of Facilities
 6    Management.
 7        Q    When did you inspect Bullpen 34 prior
 8    to drafting this memorandum?
 9        A    I don't recall the exact date.  It
10    was late September of 2014.
11             MS. CARROLL:  I'm going to object to
12        the term memorandum because it's not a
13        memorandum.  It's clearly an e-mail, just
14        for the record.
15    BY MR. MORRISSEY:
16        Q    Now, did you -- Why did you state to
17    make Bullpen 34 compliant, those items, 1
18    through 7?  Why did you make that statement?
19        A    I didn't state to make it bullpen
20    compliance.  I said for ADA compliance
21    alterations.
22        Q    Okay.
23        A    That's a different -- There's a
24    difference in that.
```

TOOMEY REPORTING
312-853-0648

## Page 42

MICHAEL GUMM
May 11, 2016

```
 1        Q    What did you mean when you said ADA
 2    compliance alterations?
 3        A    That means these are elements that we
 4    can do to make the lavatory and the toilet
 5    accessible.
 6        Q    What do you mean by "elements"?
 7        A    Elements are grab bars, mirrors,
 8    sinks, faucets, toilets, mirrors, paper towel
 9    dispensers, dryers, trash cans, their desks,
10    tables, they're individual elements.
11        Q    In order to make it compliant under
12    the ADA?
13        A    In order to provide ADA-compliant
14    elements.
15        Q    Below that, you say Bullpen 31, is
16    that another bullpen down in the RCDC?
17        A    Yes, it's adjacent to 34.
18        Q    You said Bullpen 31 can also become
19    ADA compliant.  Now, was your intent in regards
20    to Bullpen 34 to make it ADA compliant?
21        A    The intent was to, as it states in
22    here, to provide ADA-compliant elements.
23        Q    So your intent was not to make
24    Bullpen 34 ADA compliant; is that your
```

TOOMEY REPORTING
312-853-0648

## Page 43

MICHAEL GUMM
May 11, 2016

```
 1    testimony?
 2             MS. CARROLL:  Objection to the form
 3        of the question.  Misstates his testimony.
 4    BY THE WITNESS:
 5        A    ADA compliance is not determined upon
 6    just the physical features, and I think that
 7    you don't fully understand what ADA compliance
 8    really means.
 9    BY MR. MORRISSEY:
10        Q    My question is after you took --
11    after the County took the seven steps that you
12    outlined, was Bullpen 34/5 fully compliant, to
13    your knowledge, with the 2010 standards?
14        A    These elements meet the 2010
15    standards that I've outlined.
16        Q    Now, you state Bullpen 31 can also
17    become ADA compliant by installing a new
18    combination toilet.  The clearance for toilet
19    area, cell doors and path to travel in these
20    bullpens already meet the ADA requirements.
21             When you use the plural there, did
22    you mean that the clearance space in Bullpen
23    34/5 for the toilet met ADA requirements?
24        A    It's obvious that the subject of that
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 11

Page 44

1  sentence --
2      Q    I'm asking.
3      A    -- or that combination is Bullpen 31.
4      Q    So when you use the plural for
5  bullpens, you meant only Bullpen 31?
6      MS. CARROLL:  Objection, form.
7  BY THE WITNESS:
8      A    The clearances for the toilet area,
9  cell door and path of travel in these bullpens
10 already meet.  That means both 34 and 31.
11 BY MR. MORRISSEY:
12     Q    What clearance space was required
13 under the 2010 ADA standards for the toilet
14 area?
15     MS. CARROLL:  Objection to the form
16     of the question.  Do you mean specifically
17     Bullpen 34/5?
18 BY MR. MORRISSEY:
19     Q    I'm asking in regards to the 2010 ADA
20 standards, what clearance was required for
21 Bullpen 34/5 for the toilet area?
22     A    60 inches wide from the side wall and
23 56 inches from the back wall.
24     MR. MORRISSEY:  Do we have extra

Page 45

1  copies of this document you gave me today?
2      MS. CARROLL:  I gave you a copy.  We
3      have them.  You just tell me what number it
4      is.
5      MR. MORRISSEY:  It's 71R1.  It's
6      Wade 355.
7      MS. CARROLL:  355?
8      MR. MORRISSEY:  Can I mark yours,
9      Jackie?
10     MS. CARROLL:  Sure.
11     MR. MORRISSEY:  I only have one copy.
12         (WHEREUPON, Plaintiff's
13         Exhibit No. 3-A was marked
14         for identification.)
15 BY MR. MORRISSEY:
16     Q    Showing you what has been marked 3-A.
17 It's Wade 355.  I will ask you to look at that
18 document and tell me what it purports to
19 represent.
20     A    That represents a partial drawing of
21 the RTU facility, Division 8.
22     Q    This is not Bullpen 34/5?
23     A    No, it is not.  It says right at the
24 bottom.  It says RTU RCDC Facility, and it's

Page 46

1  dated 8/11/2011.
2      Q    Okay.
3      A    And it's from Roula Architects and
4  Associates.
5      Q    In your e-mail on October 2nd, you
6  refer to Section 504 Accessibility Cells in
7  Correctional Facilities?
8      A    What page are you on.
9      Q    I'm looking at Group Exhibit 3, Bates
10 Stamp 685.
11     A    Okay.
12     Q    Do you see where you refer to -- you
13 made an attachment to your e-mail.  Do you see
14 that?
15     A    Section 504 Accessible Cells in
16 Correctional Facilities, yes.
17     Q    Why did you attach that for
18 Ms. Jacobs?
19     A    For her information.
20     Q    Turning to your attachment to your
21 e-mail, ADA Section 504, Design Guides, I'd ask
22 you to look at what's Bates Stamped 689, and
23 there's a diagram -- There is a notation in
24 regards to clear floor space on Bates stamp

Page 47

1  689, which is Page 3 of those design guides; do
2  you see that?
3      A    Yes.
4      Q    And it talks about transfer positions
5  to toilets; do you see that?
6      A    Yes.
7      Q    As a compliance director for the
8  County, do you agree that the 2010 standards
9  for clear space require adequate space to
10 approach the toilet from a variety of
11 wheelchair transfer positions including front,
12 diagonal and side approach?
13     A    Yes.
14     Q    What is a front approach to a toilet?
15     A    It is where the wheelchair is facing
16 the toilet head on.
17     Q    Turning to Page 2 of the design
18 guidelines, in the bottom right-hand corner,
19 look at the portion of the Design Guidelines.
20 Does it discuss appropriate clear floor space;
21 do you see that?
22     A    Yes, I do.
23     MR. CUMMINGS:  I'm going to object
24     only because the particular page talks

Plaintiff's Exhibit 9 Page 12

MICHAEL GUMM
May 11, 2016

Page 48

1    about cell layout, and we're talking about
2    a bullpen.  In any event, you can answer
3    the question.
4    BY MR. MORRISSEY:
5        Q    Why do the design guidelines require
6    adequate space for a prisoner or a detainee to
7    turn in a cell?
8        A    **Otherwise, they wouldn't be able to**
9    **turn.  That's obvious.**
10       Q    Do you agree that there must be
11   adequate turning space within a cell which is
12   either a 60-inch diameter circle or a T-shaped
13   turn area?
14       A    **Yes.**
15           MR. CUMMINGS:  Can we take a break
16   real quick?  I need one.
17                       (WHEREUPON, a short
18                       break was had.)
19   BY MR. MORRISSEY:
20       Q    Okay.  Does the entry area to a cell
21   also have to have adequate turning space?
22           MR. CUMMINGS:  Objection to the form
23   of the question.
24           MS. CARROLL:  Same.  I'm confused by

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 49

1    it.
2    BY THE WITNESS:
3        A    **It has to have clear floor space in**
4    **front of the door.**
5    BY MR. MORRISSEY:
6        Q    So by "clear floor space," you mean a
7    60-inch diameter?
8        A    **No.  Clear floor space is separate**
9    **from turning area.**
10       Q    Does the Design Guidelines, which are
11   on Page 687 through 691, on Page 691, does it
12   describe clear floor space?
13       A    **Yeah, there are different sizes of**
14   **clear floor space.**
15       Q    Is there a clear floor space for a
16   bed transfer?
17       A    **Yes.**
18       Q    And what is that?
19       A    **30 by 48.**
20           THE REPORTER:  30 by 48?
21           THE WITNESS:  Yeah, those are in
22   inches.
23   BY MR. MORRISSEY:
24       Q    Do the diagrams in Group Exhibit 3 on

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 50

1    Page 691 describe two different turning spaces
2    for wheelchair --
3        A    **At the bottom, yes.**
4        Q    And those are -- It's either the
5    T-shaped space for a 180-degree turn or the
6    60-inch diameter space, correct?
7        A    **Yes.**
8        Q    Do the guidelines provide for any
9    other manner of space, clear space for turning?
10           MS. CARROLL:  Objection to the form.
11   BY THE WITNESS:
12       A    **Typically, those are the two, the two**
13   **turning spaces.**
14   BY MR. MORRISSEY:
15       Q    To your knowledge, are there any
16   other turning spaces provided for under the ADA
17   2010 standards?
18       A    **That are laid out with dimensions?**
19   **Those are the two standard ones.**
20       Q    And why are there design standards
21   for bed transfer space?
22       A    **Well, it's to park a wheelchair next**
23   **to it so that the occupant can transfer.**
24       Q    And are there also design standards

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 51

1    for desk and writing tables?
2        A    **There are clear floor space areas.**
3        Q    Is that also described on Group
4    Exhibit 3, Bates Stamp 691?
5        A    **For desk and for beds, yes.**
6        Q    You're familiar with the 2010
7    standard?
8        A    **Yes.**
9        Q    ADA standards.
10       A    **By the way, this document is -- was a**
11   **pamphlet that was published by the Department**
12   **of Justice in 2004 and issued for federal**
13   **prisons in 2006, and this particular document**
14   **is not part of the 2010 standards.  All of the**
15   **dimensions for correctional facilities are**
16   **outlined in the 2010 standards.**
17       Q    I'm showing you what's been marked as
18   Plaintiff's Exhibit Number 4 -- I'm sorry.  I
19   take that back.  I have got the wrong sticker
20   on here.
21                       (WHEREUPON, Plaintiff's
22                       Exhibit No. 4 was marked
23                       for identification.)
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 13

Page 52

1  BY MR. MORRISSEY:
2      Q      Showing you what's marked as
3  Plaintiff's Exhibit Number 4, do you recognize
4  that document?
5      A      It is an incomplete copy of the 2010
6  Standards for Accessible Design.
7      Q      If we look at Exhibit 4, Section
8  604.31, does it describe the clear space around
9  a water closet?
10         MR. CUMMINGS:  I'm sorry.  Can you
11     repeat which --
12         MS. CARROLL:  What page?
13         THE WITNESS:  Page 10.
14         MR. CUMMINGS:  Thank you.
15         MR. MORRISSEY:  On Exhibit 4, page 8.
16         MS. CARROLL:  This is from Lacy?
17         MR. MORRISSEY:  This is the 2010 ADA
18     standards for accessibility.  That's what
19     it is.
20  BY MR. MORRISSEY:
21     Q      Does 604.3.1 apply to toilets or
22  water closet locations?
23     A      I'm sorry.  Can you repeat that,
24  please?

Page 54

1  Correctional Facilities is no longer the
2  applicable standard?
3      A      What I'm saying is that this design
4  guide was issued, published in Two Thousand, I
5  believe, six and it was at the time for federal
6  prisons and jails and that the 2010 standards
7  adopted or added a section for jails and
8  correctional facilities, which outlines it.  So
9  this particular document is not a part of it.
10  It is outlined directly in the text of the
11  standard.  That's what I'm telling you.  In
12  other words, it's the history of the document.
13     Q      So I'm clear, Exhibit 3, the
14  ADA/Section 504 Design Guide are still
15  applicable to clearance space around a toilet?
16     A      The 2010 design standards are
17  applicable.
18     Q      Does the 2010 ADA standard provide
19  for the same clear space around a toilet?
20     A      Yes.  Does the 2010 ADA standards still
21     Q      Does the 2010 ADA standards still
22  require an adequate approach for a toilet to
23  include a variety of wheelchair transfer
24  positions?

Page 53

1      Q      You can repeat it, Peggy?
2                  (WHEREUPON, the record
3                   was read as requested.)
4  BY THE WITNESS:
5      A      604.3.1 talks about the clearance
6  around water closet.
7  BY MR. MORRISSEY:
8      Q      And do you agree that that's the
9  standard?
10     A      That's what it says here.
11     Q      60 inches by --
12     A      56.
13     Q      -- 58?  Does it say 58?
14     A      56 inches.  It is actually detailed
15  on page 10, upper left, 60 by 56.
16     Q      I'm looking at page 9.  Maybe we're
17  not looking at the same thing.
18     A      I did but there is a line through the
19  56 where you thought it said 58, and I'm just
20  correcting you by showing you that it says 56
21  on the diagram.
22     Q      Okay.  Now, is it your testimony that
23  what we looked at in 3-A or 3, the ADA/Section
24  504 Design Guide, Guide for Accessible Cells in

Page 55

1      A      Yes.
2      Q      So that would include a front
3  diagonal or side approach?
4      A      Front angled or side approach.
5      Q      And that would be the 2010 ADA
6  standards applied for prisoners in regards to
7  the variety of wheelchair transfer positions?
8      A      Yes.
9      Q      And do the 2010 standards that are
10  outlined in the 504 Design Guide also apply to
11  bed transfer space?
12     A      Yes.
13     Q      And the 2010 ADA standards that we
14  discussed in regards to Exhibit 3 also carry
15  forth the two shaped -- two different spaces
16  for turning?
17     A      Yes.
18     Q      Either the diameter space or the
19  T-shaped space?
20     A      Yes.
21     Q      And do the 2010 ADA standards also
22  provide for desk clearance space in a
23  correctional facility of 30 inches by 48?
24     A      Yes.

MICHAEL GUMM
May 11, 2016

Page 56

1    Q    Now, when you -- In regards to
2  Bullpen 34/5, did you in -- prior to writing
3  this e-mail on October 2nd, 2014 measure the
4  clearance space for the toilet area in Bullpen
5  34/5?
6    A    I had not been there prior.
7    Q    You mentioned that prior to drafting
8  this e-mail on October 2nd, 2014 that you
9  inspected Bullpen 34?
10   A    Yes, in late September.  Yes.
11   Q    When you inspected it, did you
12 measure for the clearance space in front of the
13 toilet?
14   A    Yes.
15   Q    Why did you do that?
16   A    Towards the end of September.
17   Q    No, why?  Why did you do that?
18   A    To see -- There was a fixed wall
19 that's there, a cement filled block wall that
20 is a distance away from the back wall; and I
21 wanted to know what that distance was.
22   Q    When you inspected it in August of --
23 August or September of 2014, were there any
24 existing grab bars in Bullpen 34/5?

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 57

1    A    Yes.
2    Q    Describe the grab bars when you
3  inspected it in September of 2014?
4    A    There was a 42-inch in length on the
5  side wall and a 36-inch in length on the rear
6  wall.
7    Q    Why did you on October 2nd, 2014 say
8  that in order to make Bullpen 34 compliant,
9  there was a need to install a 42-inch grab bar
10 on the side wall next to the toilet?
11   A    Because that's a standard
12 specification.
13   Q    When you looked at it in September of
14 2014, it didn't have the standard
15 specifications?
16   A    It had a 42-inch, but it was not
17 installed at the correct height.
18   Q    In September of 2014, was the 36-inch
19 grab bar on the back of the toilet the correct
20 height?
21   A    No.
22   Q    Was the side wall grab bar, was it 18
23 inches from the center point of the toilet?
24   A    The grab bar doesn't have a specified

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 58

1  distance from the toilet.
2    Q    Is there a specification in regards
3  to the toilet being 18 inches from the side
4  wall to the center?
5    A    There is a specification for new
6  construction, alterations and renovations, not
7  for existing conditions.
8    Q    In September of 2014, was the center
9  point of the toilet 18 inches from the side
10 wall?
11   A    It was not required to meet that
12 standard.
13   Q    No, the question is not whether it
14 was required --
15   A    Well, you're making --
16   Q    No, my question -- Answer my
17 question.  Listen to my question.  My question
18 is when you inspected it in September of 2014,
19 was the center point of the toilet 18 inches
20 from the side wall?
21   A    The center point of the toilet on
22 that fixture did not have to meet the 2010
23 standards for new construction, alterations and
24 renovations.

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 59

1    Q    That wasn't my question.  My question
2  is an objective question.  When you inspected
3  it at some point in September of 2014, was the
4  center point of the toilet 18 inches from the
5  side wall?
6    A    It did not meet the 2010 standards
7  for alterations.
8    Q    How many inches from the center point
9  of the toilet was the side wall?
10   A    I don't remember.
11   Q    Could it have been more than 20
12 inches?
13   A    I don't remember.
14   Q    Was it 18 inches?
15      MR. CUMMINGS:  Objection, asked and
16      answered.
17      MS. CARROLL:  Yeah.
18 BY THE WITNESS:
19   A    I already said it didn't meet the
20 2010 standards for alterations, new
21 construction or renovation and it's not
22 required to.
23 BY MR. MORRISSEY:
24   Q    Was the toilet seat 17 to 19 inches?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 15

MICHAEL GUMM
May 11, 2016

Page 60

1    A    Again, it's not required to meet the
2  standard.
3    Q    What was the height -- What was
4  required under the -- either the 2010 standards
5  or the 1991 standards for a toilet to be ADA
6  compliant?
7         MR. CUMMINGS:  Objection, assumes
8    facts not in evidence.
9         MS. CARROLL:  Compound.
10        MR. CUMMINGS:  Foundation.
11  BY THE WITNESS:
12   A    There are a lot of measurements to
13  determine whether it meets the standard for new
14  construction, alterations or renovations.
15  BY MR. MORRISSEY:
16   Q    Let's go back to Exhibit Number 3 for
17  a moment, the design guidelines.  If we look at
18  Exhibit 3, Page 3, the guidelines, 689, there's
19  a statement Toilet Seat Height.  The toilet
20  seat needs to be from 17 to 19 inches above the
21  floor to permit transfer to and from
22  wheelchairs; do you see that?
23   A    That's what it states, yes.
24   Q    When you inspected Bullpen 34/5, was

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 62

1    A    I don't recall making any.
2    Q    Was -- You didn't answer my question.
3         MS. CARROLL:  Yes, he did.
4  BY MR. MORRISSEY:
5    Q    When you went out and assessed
6  Bullpen 34/5 in September of 2014, was the
7  toilet seat height between 17 to 19 inches
8  above the floor?
9    A    I do not recall what the measurement
10  was.
11   Q    To your knowledge, in September of
12  2014, were wheelchair detainees held in Bullpen
13  34/5?
14   A    At that time, I don't recall where
15  they were held.  I was just starting to
16  understand some of the procedures that the jail
17  had at the time.
18   Q    Was there a mirror when you went out
19  in September of 2014 to assess Bullpen 34/5?
20   A    Yes, there was.
21   Q    Was the mirror 40 inches minimum from
22  the floor?
23   A    I don't recall what the measurement
24  was.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 61

1  the toilet seat height between 17 inches to 19
2  inches?
3    A    And what I'm telling you is that the
4  fixtures there were pre-ADA, were not required
5  to meet the 2010 or the '91 standards.
6    Q    My question, you're not answering my
7  question.  My question is you went out there
8  sometime in September of 2014 and took
9  measurements, correct?
10   A    Yes.
11   Q    Did you write down your measurements?
12   A    I don't recall if I did or not.  I
13  don't remember.
14   Q    Is it your practice as an architect
15  when you inspect an area for ADA compliance to
16  write down your notes from that inspection?
17   A    The word inspect insinuates something
18  other than going out and assessing.
19   Q    When you assess an area as an
20  architect, as the ADA compliance director, do
21  you make notes when you assess an area?
22   A    Sometimes, sometimes not.
23   Q    Do you recall whether you made any
24  notes from your assessment of Bullpen 34/5?

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 63

1    Q    When you went out to assess in
2  September of 2014, did you take measurements in
3  regards to the turning area, turning space, in
4  Bullpen 34/5?
5    A    I measured the clear path space and
6  turning areas.
7    Q    Why would you have measured, made
8  that measurement when you did the assessment?
9    A    To see if there were any obstructions
10  of detainees getting to the intended change of
11  fixtures.
12   Q    Why is it important to do that
13  assessment?
14   A    If they can't get to it, they can't
15  use it.  That's why it's important.
16   Q    What standard were you using when you
17  made that assessment?
18   A    The 2010 because that's -- If you're
19  going to make a change, that's what you have to
20  follow.
21   Q    Well, if you made a -- When there was
22  a -- you were altering physically the toilet in
23  Bullpen 34/5, correct?
24   A    I --

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 16

MICHAEL GUMM
May 11, 2016

Page 64

1    MS. CARROLL: Objection to timeframe.
2  BY MR. MORRISSEY:
3    Q    In September, October of 2014?
4    A    Yes, we were changing the existing
5  toilet out for a new toilet.
6    Q    When you changed out -- When the
7  County changed out the toilet in 34/5, was it
8  required under the 2010 standard to provide for
9  clear space around the toilet?
10   A    If you were just changing out
11 fixtures and not moving the location of it, no,
12 it's not required because it's a mechanical --
13 It falls under the mechanical exception.
14   Q    Where in the 2010 ADA standards is
15 that provided for?
16   A    In the 2010 standard.
17   Q    Where? Where specifically?
18   A    I don't have it in front of me, so I
19 can't point it out to you; and what you gave me
20 is incomplete.
21   Q    Do you have -- What type of phone do
22 you have, sir?
23   MS. CARROLL: Objection, relevance.
24

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 66

1    MS. CARROLL: How long is this
2  deposition going to last?
3    MR. CUMMINGS: You never know.
4    MR. MORRISSEY: There's the answer.
5  Nick gave you the answer.
6    MR. CUMMINGS: I think I only have
7  the room till 3:00, though, just so you
8  know. I don't think anybody is coming in,
9  though.
10   MR. MORRISSEY: We can go down on the
11 south side and continue it.
12   (WHEREUPON, Plaintiff's
13   Exhibit No. 5 was marked
14   for identification.)
15 BY MR. MORRISSEY:
16   Q    I will show you what has been marked
17 as Exhibit Number 5. I'd ask you to take a
18 look at it for a moment.
19   MS. CARROLL: This is also the Lacy
20   case.
21   MR. CUMMINGS: Uh-huh.
22 BY THE WITNESS:
23   A    Okay.
24

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 65

1  BY MR. MORRISSEY:
2    Q    Do you have access to the internet on
3  your phone?
4    A    Yes.
5    Q    Will you take a moment to pull up the
6  2010 ADA standards on your internet --
7    A    I would but I do not have my phone
8  with me.
9    MR. CUMMINGS: I'm sure Patrick has
10   it.
11   MR. PATRICK MORRISSEY: Here you go.
12 BY THE WITNESS:
13   A    You are going to want me to flip
14 through this whole thing on this little phone?
15   Q    Yeah, go ahead.
16   A    Good luck.
17   (WHEREUPON, the phone
18   was tendered back to
19   counsel).
20 BY THE WITNESS:
21   A    I'm not using that small device.
22 BY MR. MORRISSEY:
23   Q    When we take a break at lunch, you
24 can look at it?

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 67

1  BY MR. MORRISSEY:
2    Q    Do you know a Mr. James Banks?
3    A    Yes, I know him.
4    Q    Who is Mr. Banks?
5    A    He is the assistant chief that was
6  responsible for the Leighton Courthouse for the
7  Sheriff's staff.
8    Q    By the way, what documents did you
9  look at today or in the last week or so in
10 regards to accessibility for wheelchair-bound
11 detainees at the Department of Corrections?
12   A    I'm not sure I understand. Are they
13 DOC --
14   Q    Let me rephrase the question.
15   A    Okay.
16   Q    In the last ten days prior to this
17 deposition, did you look at any documents in
18 regards to accessibility issues at the Cook
19 County Jail or at the Leighton Courthouse?
20   A    Are you talking about DOC or ones
21 that I have in my possession or what -- I'm not
22 understanding. I mean, it's really broad.
23   Q    From May 1st to the present, have you
24 reviewed any documents in regards to the Cook

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 17

MICHAEL GUMM
May 11, 2016

Page 68

1  County jail in your position as the compliance
2  director.
3      MR. CUMMINGS:  I'm going to make an
4  objection.  It's vague, foundation, not
5  really proportional to the claims in this
6  case unless you are asking about documents
7  from the time period relevant to this case;
8  but if you understand what he's asking.
9  BY THE WITNESS:
10     **A    Are they documents relevant to this**
11  **case?**
12  BY MR. MORRISSEY:
13     Q    Well, the question is any documents.
14  Have you looked at any documents --
15     **A    I have looked at a lot of documents.**
16     Q    -- since May 1st of 2016 to the
17  present in regards to ADA issues at the Cook
18  County Jail?
19     **A    I have looked at a lot of documents.**
20     Q    What documents in that 11-day time
21  period have you looked at in regards to Cook
22  County Jail's accessible --
23     **A    I'm not sure I can sit here and name**
24  **all the documents that I have looked at.**

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 69

1      Q    In the last 11 days?
2      **A    Yeah, I have looked at a lot of**
3  **documents.**
4      Q    Such as?  Name a few.
5      **A    Let's see.  I have looked at floor**
6  **plans.**
7      Q    Floor plans of what portion of the
8  Cook County Jail?
9      **A    Cermak and Division 8 RTU.  I have**
10  **looked at e-mails that I have supplied to our**
11  **attorney that have been turned over.**
12     Q    What e-mails that you drafted have
13  you looked at in the last ten days?
14     **A    What do you mean, "what e-mails"?**
15     Q    You said you looked at certain
16  e-mails in regards to --
17     **A    Related to this case, yes.**
18     Q    In regards to the Wade case?
19     **A    Related to the request of documents**
20  **that were supplied by you that was passed**
21  **through my attorney.**
22     Q    So you in the last ten days went
23  through County records in order to produce
24  records in the Wade case; is that correct?

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 70

1      MR. CUMMINGS:  Objection, misstates
2  the testimony.
3      MR. MORRISSEY:  Well, I'm asking.
4      MR. CUMMINGS:  You can answer.
5  BY THE WITNESS:
6      **A    I went through documents that are**
7  **accessible to me.**
8  BY MR. MORRISSEY:
9      Q    And do you access records through
10  your e-mail account?
11     **A    Yes, I do.**
12     Q    How do you access documents -- how
13  did you access documents in your e-mail account
14  which you determined were relevant for
15  accessibility for Mr. Wade in this case?
16     MR. CUMMINGS:  Objection to the form
17  of the question, also misstates testimony.
18  You can answer.
19     MS. CARROLL:  Join.
20  BY THE WITNESS:
21     **A    I was asked to produce e-mails to and**
22  **from Dave Badali and Marlene Fuentes.**
23  BY MR. MORRISSEY:
24     Q    Any other documents that you reviewed

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 71

1  or produced prior to this deposition?
2      **A    I reviewed questions and responses**
3  **to -- from the DOJ and to the DOJ on the**
4  **design and construction of the RTU, Division 8.**
5  **I reviewed the request for project to initiate --**
6  **to the board of commissioners to initiate the**
7  **design and construction of RTU, Division 8.**
8  **That's the highlights of what's related to this**
9  **case.**
10     Q    Did you review the opinion by Judge
11  Tharp in the Clemons case prior to testifying
12  today?
13     **A    During this time period, no.**
14     Q    You have reviewed Judge Tharp's
15  opinion in the Clemons versus Dart case --
16     **A    Yes.**
17     Q    -- is that correct?  Have you
18  reviewed Judge Gettleman's opinion in the Lacy
19  case or opinions in the Lacy case?
20     **A    Yes.**
21     Q    Within the last two weeks, have you
22  reviewed --
23     **A    No.**
24     Q    Well, you have to let me ask the

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 72

1  questions.  Going back to Exhibit Number 5,
2  Mr. Banks begins his memorandum -- Do you know
3  Eddie Avant?
4      **A    Yes, I have met him.**
5      Q    What is his position with the jail?
6      **A    He's the chief of courts.**
7      Q    Have you discussed with Mr. Avant
8  accessibility for wheelchair-assisted prisoners
9  at the courthouses?
10          MS. CARROLL:  Objection, timeframe,
11     relevance to this case.
12          MR. MORRISSEY:  This case involves
13     accessibility at the court building for
14     Mr. Wade.
15          MR. CUMMINGS:  Between August of 2014
16     and October of 2014, so.
17          MR. MORRISSEY:  It also -- You're not
18     going to allow him to answer?
19          MS. CARROLL:  It depends on the
20     question.  It was a very vague, broad
21     question.
22          MR. CUMMINGS:  There was an objection
23     to timeframe.  So we're just trying to ask
24     about the timeframe, that's all.

MICHAEL GUMM
May 11, 2016

Page 74

1  "accessibility"?
2      Q    Handicapped toilets for prisoners
3  attending court at the Leighton Court Building,
4  ADA compliance at Leighton for wheelchair-bound
5  prisoners?
6      **A    Did I talk to him about the toilets,
7  no.**
8      Q    Did you talk to Mr. Avant in the year
9  2014 about ADA compliance issues at Leighton?
10     **A    We talked about -- We talked about
11 compliance issues and remedies.**
12     Q    Do you know how many times in the
13 year 2014 you talked to Mr. Avant --
14     **A    I don't recall.**
15     Q    -- about ADA compliant issues?
16     **A    I don't recall.**
17     Q    Did you talk to Mr. Avant in regards
18 to holding cells in Leighton not being in
19 compliance with ADA?
20         MS. CARROLL:  Objection to form,
21     foundation.
22 BY THE WITNESS:
23     **A    I think I've said that I talked to
24 Mr. Avant about ADA issues in the Leighton**

MICHAEL GUMM
May 11, 2016

Page 73

1  BY MR. MORRISSEY:
2      Q    Go ahead.  Can you answer the
3  question?
4      **A    I have talked to Mr. Avant about
5  planned alterations to the Leighton Courthouse.**
6      Q    **** When was the last time you spoke
7  with Mr. Avant in regards to planned
8  renovations at the Leighton Court Building?
9          MS. CARROLL:  Again, this has to do
10     with the Lacy case, directly on point with
11     the Lacy case.  It has nothing to do with
12     Mr. Wade whose already been out of IDOC for
13     how long now?
14         MR. CUMMINGS:  Since October 2014.
15         MS. CARROLL:  So I'm going to
16     instruct him not to answer.
17         MR. MORRISSEY:  We'll certify the
18     question.
19         MS. CARROLL:  Go ahead.
20 BY MR. MORRISSEY:
21     Q    Prior to -- In 2014, did you talk to
22 Eddie Avant about accessibility in the Leighton
23 Court Building?
24     **A    Can you define what you mean by**

MICHAEL GUMM
May 11, 2016

Page 75

1  Court Building.
2      Q    Did that include holding cells in the
3  Leighton Court Building?
4      **A    It was all holding cells.**
5      Q    Did you talk to Mr. Banks in the year
6  2014 about holding cells in the Leighton Court
7  Building?
8      **A    He was present when I talked to
9  Mr. Avant.**
10     Q    Who else was present when you talked
11 to Mr. Avant in regards to holding cells in the
12 Leighton Court Building?
13     **A    I forget their names.  One was
14 Officer Johnson -- or Jackson.  I'm sorry, not
15 Johnson.  Jackson.  And Mike -- I can't
16 remember his last name and one other gentleman
17 that I had met for the first time.**
18     Q    When was the first time you inspected
19 holding cells in the Leighton Court Building
20 after joining the Cook County government?
21         MR. CUMMINGS:  I'm going to object to
22     this line of questioning as not being
23     proportionate to claims of Mr. Wade because
24     there's not any claims regarding holding

Plaintiff's Exhibit 9 Page 19

MICHAEL GUMM
May 11, 2016

Page 76

```
 1      cells at Leighton, but you can answer the
 2      question.
 3  BY THE WITNESS:
 4      A    Again, inspect is not the correct
 5  word.
 6  BY MR. MORRISSEY:
 7      Q    Well, when did you physically visit
 8  holding cells in the Leighton Court Building
 9  for the first time as the compliance director
10  for Cook County?
11      A    The last week of June 2014, it was a
12  week after I started.
13      Q    Did you visit -- Do you want to use
14  the word visit instead of inspect?
15      A    Absolutely.
16      Q    Did you visit the holding cells
17  behind Bond Court 101 in June of 2014?
18      A    Yes, we went to the bond court area.
19      Q    Prior to going to the bond courtroom,
20  did you visit the ramp leading from the jail up
21  to the holding cell in Courtroom 101?
22      A    The ramp, are you talking about on
23  the bridge.
24      Q    What do you -- How do you define
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 78

```
 1      A    No.
 2      Q    -- when you visited in late June of
 3  2010?
 4      A    No, I did not.
 5      Q    Was the seat height between 17 and 19
 6  inches under the 1991 to 2010 standards?
 7           MS. CARROLL:  Objection, asked and
 8      answered.
 9  BY THE WITNESS:
10      A    Are you asking what the '91 standards
11  are compared to the 2010?
12  BY MR. MORRISSEY:
13      Q    Let's go to the 2010 standards, the
14  required height is between 17 and 19 inches
15  from the toilet seat for the height of the
16  toilet, correct?
17      A    Yes.
18      Q    When you visited in late June of
19  2010, were the toilets in the holding cells
20  behind Courtroom 101 between 17 and 19 inches?
21           MS. CARROLL:  Objection, asked and
22      answered, twice.
23           MR. MORRISSEY:  He didn't answer that
24      question.
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 77

```
 1  bridge?
 2      A    Lower level holding area, staging
 3  area.
 4      Q    When you visited in late June of 2014
 5  the holding cells in 101, did -- were there
 6  grab bars in the holding cells?
 7      A    No.
 8      Q    Were there toilets -- how many --
 9  Strike that.  How many holing cells are behind
10  Courtroom 101?
11      A    I don't recall off the top of my
12  head.
13      Q    Did any of the holding cells have
14  grab bars for wheelchair assistance?
15      A    Not that I observed, no.
16      Q    Did any of the holding cells have
17  toilets that complied with the 2010 standard
18  for toilet seat height, 17 to 19 inches?
19      A    Since the building was constructed in
20  the late 1920s and the fixtures are pre-ADA,
21  they do not have to meet the 2010 standards for
22  alterations, renovations or new construction.
23      Q    Did you measure the seat height of
24  the toilets --
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 79

```
 1  BY THE WITNESS:
 2      A    Yes, I did.  I didn't measure.
 3  BY MR. MORRISSEY:
 4      Q    You did not measure?
 5      A    I did not measure anything on that
 6  visit.
 7      Q    So you don't know.  Were the public
 8  areas for Courtroom 101 accessible in June of
 9  2014?
10      A    I don't know.
11      Q    Have you ever visited the public
12  areas of the Leighton Court Building as the ADA
13  director for the County?
14      A    I have been there, but I have not
15  visited them for any ADA assessment.
16      Q    Do you know whether or not the -- as
17  the ADA director, whether the public washrooms
18  in Leighton are ADA accessible?
19      A    I know that there are some, but I
20  can't tell you which ones.
21      Q    When you visited in late June of
22  2014, did you visit in addition to Courtroom
23  101's holding cell, did you visit any other
24  holding cells in Leighton?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 20

MICHAEL GUMM
May 11, 2016

Page 80

```
 1      A    Yes.
 2      Q    What other holding cells did you
 3 visit?
 4      A    We started at the bridge, the lower
 5 level.  We went through the first floor, third
 6 floor and the fourth or fifth floor.  I'm not
 7 sure which.
 8      Q    Did you inspect the holding -- or did
 9 you visit the holding cells on the first, third
10 and fifth floors?
11      A    I think I just said that.
12      Q    Did the holding cells have toilets
13 that were in compliance with the 2010
14 standards?
15           MS. CARROLL:  I'm going to object in
16 the sense that Mr. Wade did not attend any
17 of these.  He was in Courtroom 704 I
18 believe it was.  So therefore, there is
19 absolutely no relevance to this line of
20 questioning.
21           MR. MORRISSEY:  There certainly is.
22 Are you going to concede --
23           MR. CUMMINGS:  How is it relevant?
24           MR. MORRISSEY:  Let me finish mine.
```

MICHAEL GUMM
May 11, 2016

Page 81

```
 1 Are you going to concede that the County
 2 had notice that the Leighton Court Building
 3 was not accessible --
 4           MS. CARROLL:  No.
 5           MR. MORRISSEY:  -- in August and
 6 September of 2014?
 7           MS. CARROLL:  No.
 8           MR. MORRISSEY:  Then I should be
 9 allowed to ask him these questions.
10           MS. CARROLL:  No, because there's no
11 relevance to a courtroom that he's not even
12 been in.  Ask about the courtroom he's been
13 in if you want.
14           MR. MORRISSEY:  In regards to notice
15 to the County.
16           MR. CUMMINGS:  It doesn't matter.  He
17 could still have notice if it was 704.  It
18 doesn't matter.  So under your line of
19 questioning -- Let me get this on the
20 record.  Under your line of questioning, if
21 two -- the first floor and second floor
22 were not accessible but the seventh floor
23 was, what difference does it fucking make?
24 So just ask about the seventh floor.  Just
```

MICHAEL GUMM
May 11, 2016

Page 82

```
 1 ask about the seventh floor.  It would save
 2 us all some time.
 3           MS. CARROLL:  Tom, can you please ask
 4 relevant questions?  It's already been an
 5 hour and 45 minutes and half of the
 6 questions are not relevant to this case.
 7 It's relevant to Lacy.
 8           MR. MORRISSEY:  Are you going to --
 9           MS. CARROLL:  If you explain the
10 relevance --
11           MR. MORRISSEY:  It's relevant in
12 regards to Mr. Gumm's position as the ADA
13 director for the County in regards to his
14 notice and the notice of the County in
15 regards to the accessibility of the
16 Leighton Court Building.  That's why it's
17 relevant.
18 BY MR. MORRISSEY:
19      Q    Were any of the holding cells --
20           MR. CUMMINGS:  Wait.  Wait.  Wait.
21 Okay, I object to this question for
22 foundation because you still haven't -- You
23 haven't decided -- First of all, it hadn't
24 been established that the building itself --
```

MICHAEL GUMM
May 11, 2016

Page 83

```
 1 It hasn't been established the building
 2 itself needed to be accessible in the first
 3 place, but go ahead and ask your fucking
 4 question.
 5 BY MR. MORRISSEY:
 6      Q    Were any of the holding cells that
 7 you visited in late June of 2014 accessible for
 8 handicapped persons?
 9      A    Since I wasn't there to assess
10 accessibility but to have a first walkthrough,
11 at that time, there was no determination.
12      Q    What accommodations when you visited
13 the first, third and fifth floor holding cells
14 behind the courtrooms were there for
15 wheelchair-bound detainees?
16      A    I don't know.  It was my first visit
17 there.  I was just learning -- It was the first
18 time I had ever been through it.
19      Q    Did you also inspect the Leighton
20 Court Building in -- on October 22nd, 2014 with
21 Maureen Reagan?
22      A    If that's the date that you had them
23 come there, then I was with them while they
24 were doing their assessment.
```

Plaintiff's Exhibit 9 Page 21

MICHAEL GUMM
May 11, 2016

Page 84

1    Q    When you inspected the -- When you
2 were part of the inspection group on 22nd,
3 2014, was part of the inspection the ramps
4 which lead from the bridge to the holding cells
5 for Courtroom 101?
6        MS. CARROLL:  And this is the
7        inspection that was part of the Lacy case
8        with Judge Gettleman?  That's yes?  Was
9        that --
10       THE WITNESS:  Yeah, that was it.
11 BY MR. MORRISSEY:
12    Q    Can you answer the question?
13    **A    That was the inspection for the Lacy**
14 **case, yes.**
15    Q    So was part of the inspection the
16 ramps?
17    **A    For the Lacy case, yes.**
18    Q    And did you review the report
19 prepared by Maureen Reagan in the Lacy case in
20 regards to the conditions of the ramp that
21 leads from the bridge to the Courtroom 101?
22    **A    The report for the Lacy case, yes.**
23    Q    And did you agree that the slope of
24 the ramp -- and would that be the north ramp

---

MICHAEL GUMM
May 11, 2016

Page 85

1 that leads from the bridge to the holding cells
2 for 101?
3        MR. CUMMINGS:  Object to foundation.
4 BY THE WITNESS:
5    **A    The ramp leads to the elevator that**
6 **goes to all floors.**
7 BY MR. MORRISSEY:
8    Q    But there are two ramps on the
9 bridge, right?
10    **A    Yes.**
11    Q    There is a south ramp and there's a
12 north ramp, correct?
13    **A    Yes.**
14    Q    Does the north ramp lead to the
15 elevator for the holding cells in 101?
16    **A    They lead to all the holding cells on**
17 **the north side of the building.**
18    Q    Is Courtroom 101 on the north side of
19 the building?
20    **A    Yes.**
21    Q    Do you agree -- what -- Do you agree
22 with Ms. Regan's finding in regards to the
23 slope level of the north ramp?
24    **A    I had no objection.**

---

MICHAEL GUMM
May 11, 2016

Page 86

1    Q    By "no objection," you mean you would
2 agree with her measurements?
3    **A    No, I have no objections to it.**
4    Q    I'm going to show you what's been
5 marked as Plaintiff's Exhibit Number 6.
6        (WHEREUPON, Plaintiff's
7        Exhibit No. 6 was marked
8        for identification.)
9 BY MR. MORRISSEY:
10    Q    It's a group exhibit, and it contains
11 eight pages and then some photographs.  I would
12 ask you to take a look at that for a moment.
13       MR. CUMMINGS:  I'm going to object to
14       foundation in that while the witness has
15       testified he's reviewed the document, he is
16       not the author of the document and the
17       author of the document has not been
18       disclosed in this case.
19 BY MR. MORRISSEY:
20    Q    You have seen this report before,
21 correct?
22    **A    Yes.**
23    Q    And --
24    **A    I have seen it for the Lacy case.**

---

MICHAEL GUMM
May 11, 2016

Page 87

1    Q    The first page of Group Exhibit 6
2 pertains to the bridge, correct?
3    **A    Yes.**
4    Q    And what is meant by a ramp running
5 slope as an architect?
6    **A    Running slope is the horizontal**
7 **distance compared to the vertical distance or**
8 **the vertical rise.**
9    Q    Do either the 2010 ADA standards or
10 the 1991 ADA standards have requirements in
11 regards to the running slope?
12       MR. CUMMINGS:  Object to foundation.
13       Again, it has not been established whether
14       or not this building is required to meet
15       either one of those standards, but you can
16       answer the question.
17 BY THE WITNESS:
18    **A    The '91 and the 2010 standards have**
19 **slope requirements for new construction,**
20 **alterations or renovations.**
21 BY MR. MORRISSEY:
22    Q    What are those requirements?
23    **A    Maximum of one to twelve, one rise to**
24 **twelve inches of run.**

Plaintiff's Exhibit 9 Page 22

MICHAEL GUMM
May 11, 2016

Page 88

1    Q    Does the north ramp comply with --
2  does the north ramp have a one-to-twelve ratio
3  as far as slope?
4    A    **No.  It's not required to meet the**
5  **'91 or 2010 standards.**
6    Q    Does the 1991 or the 2010 have
7  standards in regards to ramp handrails?
8    A    **Does it have handrails, no.**
9    Q    No.  The question is under the 2010
10 ADA standards or the 1991 standards, are there
11 requirements in regards to handrails for ramps?
12   A    **For new construction, alterations and**
13 **renovations, there are.**
14   Q    In September and August of 2014, did
15 the north ramp, which led to the elevator for
16 Courtroom 101 have handrails?
17   A    **No.**
18   Q    Does either the 1991 or the 2010 ADA
19 standards have requirements in regards to an
20 intermediate landing for ramps?
21   A    **For new construction, alterations and**
22 **renovations if you make changes, yes.**
23   Q    What are those standards?
24   A    **It's a max run, maximum run of 30**

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 89

1  **feet before there is an intermediate landing.**
2    Q    In August and September of 2014, did
3  the north ramp provide for that intermediate
4  landing?
5    A    **Since it was constructed prior to any**
6  **ADA standards, it was not required but it does**
7  **not have one.**
8    Q    Turning to the Group Exhibit Number
9  6, the first photograph which is marked as
10 Reagan Exhibit 2, page 9; do you see that
11 document?
12   A    **Yes.**
13   Q    Does that appear to be a picture of
14 one of the ramps?
15        MR. CUMMINGS:  Object to foundation.
16        MR. MORRISSEY:  Let me rephrase it.
17 BY MR. MORRISSEY:
18   Q    In Group Exhibit Number 6, Photograph
19 LEI0137, does that appear to be a photograph of
20 one of the ramps off the bridge in the Leighton
21 Court Building?
22   A    **No.**
23        MR. CUMMINGS:  Object to foundation.
24        You can answer.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 90

1  BY THE WITNESS:
2    A    **No, it's both ramps.**
3  BY MR. MORRISSEY:
4    Q    So that's the north and the south
5  ramps?
6    A    **It's standing at the top of the south**
7  **ramp looking north.**
8    Q    And if we turn to page 10, is that
9  another photograph of both ramps off the bridge
10 in the Leighton Court Building?
11        MR. CUMMINGS:  Objection, foundation.
12 BY THE WITNESS:
13   A    **Yes, it's taken from the top of the**
14 **north ramp looking south.**
15 BY MR. MORRISSEY:
16   Q    In August and September of 2014, did
17 you ever observe Carl Wade go up or down the
18 north ramp of the Leighton Court Building?
19   A    **I don't know who Carl Wade is.**
20   Q    Do you have any personal knowledge in
21 regards to how Mr. Carl Wade got up and down
22 the ramps --
23   A    **If I --**
24   Q    Let me finish.  Do you have any

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 91

1  personal knowledge in regards to how Mr. Carl
2  Wade in August and September would have gone up
3  the north ramp to the holding cells in 101,
4  Courtroom 101?
5    A    **Since I said I don't know him, I have**
6  **no personal knowledge of how he would or not.**
7    Q    Have you looked at any documents
8  maintained by the Cook County Sheriff or the
9  County which reflect how Mr. Wade got up and
10 down the north ramp when he attended Courtroom
11 101 in August and September?
12   A    **I have not looked at any documents,**
13 **no.**
14   Q    Have you seen any videotapes of
15 Mr. Carl Wade going either up or down the north
16 ramp at the Leighton Court Building?
17   A    **Again, I don't know Mr. Wade.**
18   Q    In August or September of 2014, were
19 you ever physically present when a wheelchair
20 person went up and down the ramp?
21   A    **Yes.**
22   Q    Did you ever see a wheelchair-bound
23 detainee go up the ramp in August -- Strike
24 that.

TOOMEY REPORTING
312-853-0648

Page 92

1       In August of 2014, what is the name
2  of -- or names of the wheelchair-bound
3  detainees that you saw go up the ramp at the
4  Leighton Court Building?
5     A   I do not know their names.
6     Q   Do you know the names of any
7  correctional officer that was present when a
8  wheelchair-bound prisoner went up or down the
9  ramp at the Leighton Court Building in August
10  or September of 2014?
11     A   No.
12     Q   Did you take any -- When were you
13  present in August or September of 2014 when a
14  wheelchair-bound detainee went up or down the
15  ramp at the court building?
16     A   I don't recall during that specific
17  time.
18     Q   How many days were you present in the
19  ramp area of the Leighton Court Building in
20  August of 2014?
21     A   I don't recall.
22     Q   More than one day?
23     A   Probably, but I don't recall.
24     Q   Did you -- Had you measured the ramp

Page 93

1  in August of 2014?
2     A   No.
3     Q   In September of 2014, how many days
4  were you present physically present in the ramp
5  area?
6     A   I don't recall.
7     Q   For what period of time in August of
8  2014 did -- how much time did you spend in the
9  ramp area of the Leighton Court Building?
10     MS. CARROLL:  Objection, asked and
11     answered about five times.
12  BY THE WITNESS:
13     A   I don't recall.
14  BY MR. MORRISSEY:
15     Q   How much -- I mean, were you there
16  for five minutes? an hour, two hours?
17     A   It varied.
18     Q   What was the maximum amount of time
19  you spent in August of 2014 in the ramp area of
20  the Leighton Court Building?
21     A   Probably an hour, hour and a half.
22     Q   Who was present with you when you
23  were in the ramp area of the Leighton Court
24  Building in August of 2014?

Page 94

1     A   I don't recall.  I don't recall who
2  all was present.
3     Q   During that one hour to an hour and a
4  half that you were present in August of 2014 --
5     A   I didn't say I was present.  You just
6  asked me what was the longest time I spent on
7  the bridge.  I didn't say it was in August of
8  '14.
9     Q   In what month in the year 2014 did
10  you spend an hour or more in the --
11     A   I don't recall what month.
12     Q   Could it have been after October --
13     A   I've been there so many times.
14     Q   Could it have been after October of
15  2014?
16     A   I don't recall.  I have been there so
17  many times.
18     Q   What were you doing when you were
19  standing or physically present in the ramp area
20  of the Leighton Court Building in August of
21  2014?
22     A   Several things.  I was making
23  observations.  I was looking at possible
24  remedies to physical elements, alteration

Page 95

1  possibilities.  There was a lot of things I was
2  doing there.
3     Q   Did you make any notes in regards to
4  your -- the time you were in the Leighton ramp
5  in August of 2014?
6     A   No.
7     Q   Did you make any drawings --
8     A   No.
9     Q   -- in regards to -- Let me finish my
10  question -- in regards to the time you were in
11  the Leighton ramp area in August of 2014?
12     A   No, I did not make any drawings.
13     Q   Did you see wheelchair-bound
14  detainees going up the ramps unassisted in
15  August of 2014?
16     A   In August of 2014, I don't recall a
17  specific time and most -- I don't believe I
18  ever saw a detainee going up the ramp
19  unassisted.
20     Q   Did you see wheelchair-bound
21  detainees going down either the north or south
22  ramp in August of 2014 unassisted?
23     A   In August, I don't recall, but I have
24  seen wheelchair-bound detainees going down the

Plaintiff's Exhibit 9 Page 24

Page 96

1  ramp, and they were never unassisted.

2      Q  Have you, at any point, reviewed

3  videotapes of prisoners going up or down the

4  ramps at the Leighton Court Building?

5      A  Reviewed, no.

6      Q  Have you seen them either in court

7  or --

8      A  In the Lacy case, yes, but that's the

9  Lacy case.

10     Q  So that's different from the Wade

11  case as far as prisoners going up and down

12  ramps; is that your testimony?

13     A  No, it just -- it wasn't --

14     MR. CUMMINGS:  Do you need a class

15  member in Lacy?

16  BY MR. MORRISSEY:

17     Q  Go back to the --

18     A  I'm not sure --

19     MS. CARROLL:  Wade is a declarant in

20  Lacy.

21     MR. CUMMINGS:  Can we take a break?

22     MR. MORRISSEY:  No, we're -- If you

23  want to take a break, go ahead.

24

Page 97

1      (WHEREUPON, a short

2      break was had.)

3  BY MR. MORRISSEY:

4     Q  Going back to the ramp, when you

5  first visited in June of 2014, were you aware

6  at that time that the ramp didn't comply with

7  the 2010 and 1991 slope requirements?

8     A  I was aware that it didn't have to

9  because it was preexisting and that it most

10  likely was going to be steeper than what the

11  standards state.

12     Q  What did you do as the ADA director

13  in June of 2014 when you discovered that the

14  ramp presented a problem for

15  wheelchair-assisted prisoners?

16     MR. CUMMINGS:  Objection to the form

17  of the question.

18     MS. CARROLL:  Same.

19     MR. CUMMINGS:  Assumes there was a

20  problem.

21  BY THE WITNESS:

22     A  At that time, there was already a

23  request in from the Sheriff's Office to alter

24  all of the holding cells in Leighton, and we

Page 98

1  ensured that it was in the capital plan moving

2  forward.

3  BY MR. MORRISSEY:

4     Q  What did you personally do as the ADA

5  director when you discovered the ramp appeared

6  to be steeper than the 2010 standard required?

7     A  Are you asking that if I went in and

8  dug it out and corrected it or something?  I

9  don't understand what you're asking.

10     Q  My question is what did you

11  personally do as the director?

12     A  I personally made sure that we had

13  the funding and the resources to make the

14  corrections.

15     Q  Between June of 2014 and August and

16  September of 2014, was the ramp corrected,

17  physically corrected?

18     MR. CUMMINGS:  Objection to the form

19  of the question.  It assumes it must be

20  corrected.  You can answer.

21  BY THE WITNESS:

22     A  Well, since your expert report from

23  the Lacy case is dated 11/3 of 2014, I think

24  that's outside the timeframe that you just

Page 99

1  expressed.

2  BY MR. MORRISSEY:

3     Q  Can you answer the question?

4     A  I just did.

5     Q  Was any physical renovation done to

6  the ramp after you discovered it in June of

7  2014 through the end of September of 2014, yes

8  or no?

9     A  I just answered it.  Your expert

10  report gives the measurement and the slope that

11  is dated in November, and this is all from the

12  Lacy case.

13     Q  So nothing was done physically

14  between the time of June until --

15     A  I've answered that like four times in

16  a row now.

17     Q  Well, it's a yes or no.

18     A  No, it's not.

19     Q  Pardon?

20     A  No, it's not.

21     Q  Well, going back to your --

22     A  Because you don't understand the ADA.

23  That's why.

24     Q  Going back to your job description,

Plaintiff's Exhibit 9 Page 25

MICHAEL GUMM
May 11, 2016

Page 100

1   Mr. Gumm.
2       A    Yes.
3       Q    If you look at Exhibit Number 1 for a
4   moment, it states your typical duties involve --
5   include develop ADA program policies,
6   procedures and guidelines; do you see that?
7       MR. CUMMINGS:  I'm going to object to
8   the form of the question because it talks
9   about typical duties, but you can answer.
10  BY THE WITNESS:
11      A    Where do you see it?  I'm not finding
12  it.
13  BY MR. MORRISSEY:
14      Q    On page 1 of the standard job
15  description for the compliance project
16  director; do you see that?
17      MR. CUMMINGS:  It talks about typical
18  duties.
19  BY THE WITNESS:
20      A    Develop ADA program, policies,
21  procedures and guidelines and that's in
22  reference to the Department of Capital
23  Planning, which I work for, and is not for the
24  Sheriff's department.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 101

1   BY MR. MORRISSEY:
2       Q    Have you developed any programs or
3   policies for the Sheriff's Department in
4   regards to the ramp at --
5       A    Again --
6       Q    Let me finish.  Have you, yes or not,
7   developed any programs or policies in regards
8   to the accessibility of the ramp at the
9   Leighton Court Building?
10      A    Yes.
11      Q    What programs -- When did you develop
12  the program or policy?
13      A    It was developed at the end of June
14  of 2014.
15      Q    What policy did you develop in the
16  end of June of 2014 for the Sheriff's Office?
17      A    I don't develop policies for the
18  Sheriff's Department, and I think you know that
19  from the Lacy case.
20      Q    You said that you -- As the ADA
21  compliance project director in June of 2014,
22  you participated in a policy with the Sheriff's
23  Office in regards to the ramp at Leighton?
24      A    No.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 102

1       Q    Have you done anything since joining
2   as the ADA compliance project director in
3   regards to developing policies for the
4   Sheriff's Office?
5       A    I just told you.  I don't develop
6   policies for the Sheriff's Department, and you
7   know that from the Lacy case.
8       Q    Have you as the ADA compliance
9   project director provided any training to
10  Sheriff's employees in regards to the ramp at
11  the Lacy (sic) court building?
12      A    Again, I do not provide training to
13  the Sheriff's Department.  You know that.
14      Q    Did you provide any training to the
15  nursing staff in Cermak as the ADA compliance
16  director?
17      A    I do not provide training for Health
18  and Hospitals or the Sheriff's Department.  All
19  of this job description is for the Department
20  of Capital Planning.
21      Q    Have you reviewed any training
22  programs within Cermak to overcome physical
23  barriers at Cermak?
24      A    Again, this job description does not

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 103

1   cover that, and I do not have the authority.
2       Q    So the answer is you have not
3   reviewed any training programs at Cermak for
4   nurses to overcome physical barriers for
5   prisoners at the jail?
6       MS. CARROLL:  Objection to the form
7   of the question.  It misstates his
8   testimony, is irrelevant to this case.
9   BY MR. MORRISSEY:
10      Q    You can answer, sir.
11      A    Since they are not within the
12  Department of Capital Planning and Policy, it
13  is beyond my job description to do that; and I
14  think you can realize that by reading this.
15      Q    Do you know whether or not Cermak has
16  any training programs for nurses in regards to
17  providing assistance to wheelchair-bound
18  detainees overcoming barriers for prisoners at
19  the jail?
20      A    Why should I know that if it's not
21  within my job description and purview and
22  authority like I just told you?
23      Q    So the answer is, no, you don't know
24  if there's training programs?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 26

MICHAEL GUMM
May 11, 2016

Page 104

1    **A    How would I know?  Why would I know?**

2        Q    As the ADA compliance director, do

3    you know whether or not the Sheriff in August

4    or September of 2014 had developed any programs

5    or training to help wheelchair-bound detainees

6    overcome the barriers involving the ramp going

7    up and down at Leighton?

8        **A    During what time period?**

9        Q    August and September of 2014?

10       **A    I know that Marlene Fuentes was**

11   **working on some policies and procedures that**

12   **affected that, yes.**

13       Q    Do you know whether or not -- Strike

14   that.

15       **A    If you're trying to get that nothing**

16   **was done, that's totally wrong.**

17           MR. MORRISSEY:  Do you want to take a

18       20-minute break so the court reporter can

19       take a break and we can take a break?

20           MR. CUMMINGS:  Sure.

21           MR. MORRISSEY:  Why don't we take a

22       half hour break, and we'll come back at

23       1:15.  Will that be sufficient?

24           MS. CARROLL:  That's fine.

---

MICHAEL GUMM
May 11, 2016

Page 105

1           (WHEREUPON, a short

2               break was had.)

3    BY MR. MORRISSEY:

4        Q    Mr. Gumm, I call your attention again

5    to that Exhibit 6, Maureen Regan's report, and

6    ask you, again, to look at Photographs 137 and

7    it looks like 5069.

8        **A    Okay.**

9        Q    Those are the ramps, again, at the

10   Leighton Court Building, correct?

11       **A    Yes.**

12       Q    Do you agree that the -- that those

13   ramps could present a barrier to a wheelchair

14   user?

15           MR. CUMMINGS:  Objection to the form

16       of the question, incomplete hypothetical.

17   BY THE WITNESS:

18       **A    It would be deemed a physical**

19   **barrier.**

20   BY MR. MORRISSEY:

21       Q    By "a physical barrier," you're

22   referring to under the ADA, it would be a

23   physical barrier?

24       **A    Under the ADA, it would be a barrier**

---

MICHAEL GUMM
May 11, 2016

Page 106

1    **physical in nature, but it does not necessarily**

2    **mean that it denies them access to the**

3    **programs.**

4        Q    You reviewed some records in regards

5    to Carl Wade, correct?

6        **A    To what?**

7        Q    In regards to Carl Wade?

8        **A    What kind of records are you talking**

9    **about?**

10       Q    I'm asking you, did you review some

11   records in regards to the Plaintiff in this

12   case, Carl Wade?

13       **A    About him?**

14       Q    Yes.

15       **A    No.**

16       Q    Assuming Carl Wade is a paraplegic

17   and is wheelchair-bound, could the ramps

18   leading up to the court building at Leighton

19   present a barrier to a wheelchair --

20       **A    Possible.**

21       Q    And would a wheelchair user be

22   covered under the ADA?

23           MR. CUMMINGS:  Objection to the form

24       of the question, incomplete hypothetical.

---

MICHAEL GUMM
May 11, 2016

Page 107

1        You can answer.

2            MR. MORRISSEY:  Let me rephrase that.

3    BY MR. MORRISSEY:

4        Q    Could a wheelchair-assisted person be

5    considered a disabled person under the ADA?

6            MR. CUMMINGS:  Objection to the form

7        of the question, incomplete hypothetical.

8        You can answer.

9    BY THE WITNESS:

10       **A    There are what's known as obvious**

11   **disabilities and someone in a wheelchair would**

12   **obviously have a disability and they would then**

13   **be covered under the ADA.**

14           MR. CUMMINGS:  I have one more

15       objection just for the record.  This

16       witness is not being presented as an

17       expert.  So whether or not -- His opinion

18       on a question that's related to a legal

19       conclusion is not proper.

20   BY MR. MORRISSEY:

21       Q    Does a wheelchair user have the same

22   right to access -- to use the ramps at Leighton

23   as an able-body person under the ADA?

24           MR. CUMMINGS:  Objection to the form

Plaintiff's Exhibit 9 Page 27

MICHAEL GUMM
May 11, 2016

Page 108

1    of the question, but you can answer.

2    BY THE WITNESS:

3         **A      What do you mean the same right?**

4    BY MR. MORRISSEY:

5         Q    Well, under the ADA, would Mr. Wade,

6    if he was indeed in a wheelchair, have the same

7    entitlement to go up and down the ramps at

8    Leighton as an able-body prisoner?

9         MR. CUMMINGS:  Objection to the form

10        of the question.

11   BY THE WITNESS:

12        **A      An individual covered the ADA is**

13   **afforded the same opportunity to access**

14   **programs, services and activities that are**

15   **provided by the public entity.**

16   BY MR. MORRISSEY:

17        Q    So access to the ramp could be

18   considered part of a program or services

19   provided by Cook County or the Sheriff,

20   correct?

21        **A      It's part of the pathway to get to**

22   **those programs and services.**

23        Q    It's your position that the Leighton

24   Court Building was built prior to the enactment

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 110

1    or not the Sheriff or Cook County provided a

2    reasonable accomodation for wheelchair-assisted

3    prisoners to go up and down the ramps?

4         MS. CARROLL:  I'm going to tell you

5         not to answer until he --

6         MR. CUMMINGS:  I have an objection on

7         behalf of the Sheriff in that Carl Wade was

8         not in custody in June of 2014.  So it's

9         beyond the scope of the claims in this

10        case.

11        MS. CARROLL:  For the record, because

12        my throat is on fire, I have given

13        authority for Nick to make objections on

14        behalf of the County as well in case I

15        can't chime in on time.

16   BY THE WITNESS:

17        **A      In June of 2014, I don't know.  I was**

18   **new to the County and just learning.**

19   BY MR. MORRISSEY:

20        Q    In August of 2014, did

21   wheelchair-bound detainees such as Carl Wade

22   have a right to a reasonable accomodation to go

23   up and down the ramps at the Leighton

24   Courthouse?

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 109

1    of the ADA, correct?

2         **A      Yes, it's a fact.**

3         Q    Does the ADA Act for buildings that

4    are built prior to 1991, do government entities

5    still have to provide any access to disabled

6    individuals for programs and services?

7         **A      They have to provide equal access or**

8    **not -- they have to provide equal -- excuse me,**

9    **equal opportunity to their programs, services**

10   **and accomodation.**

11        Q    And would that be considered a

12   reasonable accomodation under the ADA?

13        MR. CUMMINGS:  Objection to the form

14        of the question.

15        MS. CARROLL:  Objection to form.

16        MR. MORRISSEY:  Well, let me rephrase

17        the question.

18   BY MR. MORRISSEY:

19        Q    Under the ADA, would Mr. Wade if he

20   was a wheelchair user be entitled to some

21   reasonable accomodation to go up and down the

22   ramps at Leighton in order to attend court?

23        **A      Yes.**

24        Q    In June of 2014, do you know whether

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 111

1         MR. CUMMINGS:  Objection, assumes

2         facts not in evidence.  You can answer.

3    BY THE WITNESS:

4         **A      They would have -- Yeah, they would**

5    **need an accomodation or they could request the**

6    **accomodation.**

7    BY MR. MORRISSEY:

8         Q    As you sit here today, in September

9    of 2014, were you aware of what reasonable

10   accomodation was provided by the County or the

11   Sheriff's Office for wheelchair-bound detainees

12   going up and down the ramp to court at

13   Leighton?

14        MR. CUMMINGS:  I'm sorry, what was

15        the timeframe again?

16        MS. CARROLL:  September of 2014.

17   BY THE WITNESS:

18        **A      I know that -- I'm not -- I don't**

19   **recall the exact timeframe, but I know that the**

20   **accomodation that was provided was officers**

21   **pushing wheelchair detainees up and down the**

22   **ramps.**

23   BY MR. MORRISSEY:

24        Q    Do you have a specific recollection

TOOMEY REPORTING
312-853-0648

Page 112

1  in September of 2014 whether all
2  wheelchair-bound detainees going to and from
3  the Leighton court up and down the ramps were
4  pushed up and down?
5      A   I was not out there on a daily basis,
6  and I was not part of the supervision of the
7  operation of the ramp and the movement of
8  detainees.  That's beyond my role.
9      Q   Now, going back -- Going back to
10 Exhibit Number 2, which I believe encompasses
11 Bullpen 34/5 -- No, I'm sorry.  Maybe it's
12 Exhibit 3.  I think it's Exhibit 3.  Part of
13 Exhibit 3 was the 504 Design Guidelines for
14 Accessible Cells in Correctional Facilities?
15     A   Issued by the DOJ for federal
16 prisons.
17     Q   Correct.  You recall we looked at
18 Page 691 in regards to diagrams which provide
19 for the turning space within a cell?
20     A   It is turning space, not necessarily
21 within a cell.
22     Q   Well, if we look on Page 688 --
23 Strike that.  If we look at 691, there are two
24 diagrams in regards to turning space in a

Page 113

1  detention holding cell, correct?
2      A   There are diagrams of two turning --
3  two different types of turning space.
4      Q   One is the diameter space, correct,
5  and the other is the T-shaped space for a
6  180-degree turn?
7      A   Yes.
8      Q   Now, you inferred that there was
9  another turning space that is allowed under the
10 ADA?
11     A   I didn't infer that.
12     Q   To your knowledge, under the 504
13 Design Guides, are there any other examples of
14 turning space in a holding cell for prisoners?
15         MS. CARROLL:  Objection to the form
16     of the question.  He said -- Objection to
17     form.
18 BY THE WITNESS:
19     A   These are the two that are outlined
20 in the standards.
21 BY MR. MORRISSEY:
22     Q   Under the 2010 ADA requirements, are
23 there any other examples other than the
24 diameter of space or the T-shaped space for

Page 114

1  turning space within a holding cell?
2      A   There are alternatives allowed and
3  exceptions that are within the 2010 standards.
4      Q   Where can we find those in the 2010
5  ADA guidelines?
6      A   One of them is Equivalent
7  Facilitation and New Designs in Technology.  So
8  the guidelines don't limit you to just what's
9  in the standards; but if there are improvements
10 in design or technology or aids, then those
11 would be allowed beyond what is shown in the
12 standards; and there's exceptions for technical
13 and feasibility that if space, an existing
14 space, is tight and doesn't allow strict
15 conformance to the standards that you're
16 allowed to make the improvements to the most
17 extent feasible.  So those are exceptions.
18     Q   When you talk about equivalent or
19 improved technology, under that requirement or
20 standard, the turning space would be equal or
21 greater than what's provided in the --
22     A   It has to be equal to --
23     Q   To the diameter of space or T-shaped
24 space, 180 degrees for turning?

Page 115

1      A   It has to be equal to or greater
2  than.
3      Q   Can you provide me an example where
4  the equivalent or improved technology has been
5  allowed under the ADA?
6      A   What does that have to do with this
7  case?  I don't understand.
8      Q   That's a question for you.
9          MR. CUMMINGS:  I'm going to object to
10     the form of the question.  It's also vague
11     and broad; but if you understand what he is
12     asking, you can answer.
13 BY THE WITNESS:
14     A   There's -- I don't -- There are a
15 multitude of possibilities that you could come
16 up with for different avenues of movement that
17 don't necessarily have to be a circle or a T,
18 and it is well-beyond expressing what those are
19 in this setting.
20     Q   I'm going to show you now a diagram
21 of the third floor of Cermak.  It's going to be
22 marked as Exhibit 7.
23
24

MICHAEL GUMM
May 11, 2016

Page 116

1          (WHEREUPON, Plaintiff's
2          Exhibit No. 7 was marked
3          for identification.)
4    BY MR. MORRISSEY:
5        Q    Showing you what has been marked as
6    Exhibit Number 7, do you recognize that
7    document?
8          MS. CARROLL:  Do you have a copy or
9    is this something that I gave you?
10          MR. MORRISSEY:  Here you go.
11          MS. CARROLL:  Is this something I
12    gave you?  Deposition Exhibit Number 3, so
13    this was in another deposition?
14          MR. MORRISSEY:  It's an exhibit.
15    BY MR. MORRISSEY:
16        Q    Do you recognize that floor plan?
17          MR. CUMMINGS:  I believe this was
18    disclosed in Harper possibly, which is not
19    part of your 26-day disclosure.
20    BY MR. MORRISSEY:
21        Q    Do you recognize that document, sir?
22        A    This is a drawing of an existing
23    conditions floor plan, Cermak, third floor.
24        Q    Do you know what -- the date when

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 117

1    this diagram was prepared?
2        A    Yes.
3        Q    When?  What year?
4        A    As you can see in the title block, it
5    was in the year of 2013.
6          MR. CUMMINGS:  Can we take just a
7    moment?  I think I have a larger version of
8    this somewhere.
9          MR. MORRISSEY:  Oh, good.  Do you
10    have a couple of them?
11          MR. CUMMINGS:  No.  Patrick has the
12    one from Harper, which is what you're
13    looking at right now, which is why it's
14    been previously marked as Defense Exhibit 3.
15          (WHEREUPON, a short
16          break was had.)
17    BY MR. MORRISSEY:
18        Q    Going back to the infamous Bullpen
19    34/5 --
20          MS. CARROLL:  Still?  He was barely
21    there.  Tom, you're wasting Michael Gumm's
22    time.  Can we actually talk about what's
23    going on in our case, please?
24

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 118

1    BY MR. MORRISSEY:
2        Q    34/5, it's just a quick question.
3    When you laid out in your e-mail on October 2nd
4    the seven steps to make Bullpen 34 ADA
5    compliant, you had already determined that
6    there was enough clear space around the toilet
7    and the path of travel in that bullpen,
8    correct?
9        A    That's what the e-mail indicates.
10          (WHEREUPON, Plaintiff's
11          Exhibit No. 8 was marked
12          for identification.)
13    BY MR. MORRISSEY:
14        Q    Now, going to -- I'm going to show
15    you what's marked as Plaintiff's Exhibit Number
16    8.  It's a document --
17        A    What are we doing with 7?
18          MR. CUMMINGS:  Don't.
19          THE WITNESS:  I'm sorry?
20    BY MR. MORRISSEY:
21        Q    It's a document that's titled ADA
22    Equipt (sic) Rooms in Cermak.
23          MS. CARROLL:  You didn't bring
24    copies?  And that's from another case.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 119

1    BY MR. MORRISSEY:
2        Q    Do you see that document?
3        A    I see it.
4        Q    Now, was it your understanding that
5    in 2014, those were the rooms that Mr. -- Do
6    you know Mr. Badali?
7        A    Yes.
8        Q    What was Mr. Badali's position in
9    January of 2014?
10        A    He was the facilities manager for
11    Cermak and RTU Division 8.
12        Q    Is he still with the County, to your
13    knowledge?
14        A    No, he's not.
15        Q    When you came in to the County in
16    June of 2014, did you have an opportunity to
17    inspect or visit the third floor of Cermak?
18        A    Since I came into employ, yes, I've
19    had opportunities to visit third floor of
20    Cermak.
21        Q    Do you agree that at least in the
22    start of January of 2014, Mr. Badali's list of
23    ADA equipped rooms in Cermak was accurate?
24        A    I don't believe it is a full list.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 30

MICHAEL GUMM
May 11, 2016

Page 120

```
 1       Q     Looking at the -- Going back to
 2   Exhibit 7, the diagram of the third floor of
 3   Cermak.
 4       A     Okay.
 5       Q     Can you show me on that diagram where
 6   Room 3205 -- I believe it's 3205 West is
 7   located?
 8       A     It is -- There are two sections to
 9   the building with a link in between.  The
10   northern half contains 3-North and 3-West and
11   3205 is on the south wall of this northern
12   building.
13       Q     Will you circle 3205?
14       MR. CUMMINGS:  I don't know if you
15       want him to circle it.  You might want to
16       reuse it in another dep at some point.
17       MS. CARROLL:  It already has circles
18       with 3215 from the other dep.
19   BY MR. MORRISSEY:
20       Q     Does Exhibit 7 have a circle around
21   Room 3205?
22       A     No, but it does on 3213 and 3215 --
23       Q     Will you circle and put your --
24       A     -- and 3231.
```

MICHAEL GUMM
May 11, 2016

Page 121

```
 1       Q     And put your initials on the Room
 2   3205 for me?
 3       A     Do you have a pen?
 4       MR. CUMMINGS:  Just for the record,
 5       this document has not been disclosed in
 6       this particular case prior to today.
 7   BY THE WITNESS:
 8       A     (Witness indicating.)
 9   BY MR. MORRISSEY:
10       Q     Now, looking at -- Does this diagram
11   in Diagram 7 indicate the rooms on -- how
12   many -- Strike that.
13             How many rooms on 3-West in 2013 had
14   an ADA accessible -- Strike that.  How many
15   rooms on 3-West were ADA accessible in 2013?
16       A     I believe one.
17       Q     And what room was that?
18       A     That would be 3215.
19       Q     And your understanding in 2013, what
20   constituted an accessible room on 3-West?
21       MR. CUMMINGS:  I'm going to object to
22       timeframe because Mr. Wade wasn't in
23       custody in 2013.
24   BY THE WITNESS:
```

MICHAEL GUMM
May 11, 2016

Page 122

```
 1       A     Well, I want to make a correction.
 2   3215 has a -- has been upgraded with some of
 3   the elements, accessible elements.  What makes
 4   any of the rooms accessible are accommodations
 5   that are given to overcome any of the physical
 6   barriers.  There is a difference between ADA
 7   accessibility and ADA accessible elements.
 8       Q     What do you mean by "ADA elements"?
 9       A     Well, a toilet that meets the current
10   standards would be an ADA accessible element, a
11   sink that meets the current standards, grab
12   bars, the proper length and mounted height, any
13   single item that meets the 2010 standards if
14   you have altered them is an ADA accessible
15   element.
16             What makes things ADA compliant is if
17   there are physical barriers, the accommodations
18   that are made to provide the equal opportunity
19   for equality.
20       Q     Going back to what you described --
21   let me -- Let me strike that question.
22             Under the 2010 guidelines, does it
23   discuss and enumerate using the word ADA
24   elements, toilets, sinks, grab bars?
```

MICHAEL GUMM
May 11, 2016

Page 123

```
 1       A     All of the elements that are
 2   described in there are ADA compliant.
 3       Q     But does it use the word elements
 4   under the 2010 guidelines?
 5       A     Yes.
 6       Q     So based upon your understanding of
 7   the ADA, a room could be ADA compliant if there
 8   were other avenues for a disabled person to
 9   overcome physical barriers?
10       A     That is the definition of ADA
11   accessible compliance.
12       Q     Under the 2010 or the 1991 Act, is
13   clear space around a toilet one of the ADA
14   elements?
15       MR. CUMMINGS:  Objection to the form
16       of the question.
17   BY THE WITNESS:
18       A     It is an avenue to approach
19   individually an element.
20   BY MR. MORRISSEY:
21       Q     So a requirement under the 2010
22   guidelines is that there must be -- we've
23   already discussed it, but there must be clear
24   space around the toilet?
```

Plaintiff's Exhibit 9 Page 31

MICHAEL GUMM
May 11, 2016

Page 124

1    A    On new construction, alterations or
2  renovations but not in existing spaces prior to
3  1990.
4    Q    To your understanding, the Cermak
5  building was constructed or finished in 1998?
6    A    Yes.
7    Q    So that was after the passage of the
8  ADA?
9    A    Yes.  And it met the standards, the
10 1992 standards.
11   Q    Looking at the diagram, Exhibit
12 Number 7, in the year 2013, did 3205 in the
13 west wing have the ADA element of an accessible
14 toilet?
15   A    No.
16   Q    Did the room have a sink that was an
17 element required by the ADA?
18   A    No.  Oh -- okay.
19   Q    Did it have grab bars in 2013 which
20 was an element required by the ADA?
21   A    This room did not but not all rooms
22 are required to have all of those elements.
23 There is -- For this type of facility, there is
24 a percentage of all of the rooms that must be

---

MICHAEL GUMM
May 11, 2016

Page 125

1  met and Cermak did meet that minimum standard.
2    Q    But you would agree that in 2013,
3  3205 West was not one of the rooms in Cermak
4  that had the required ADA elements?
5    A    It did not have the ADA elements in
6  it.
7    Q    In August and September of 2014, did
8  Room 3205 have the required ADA elements
9  involving the toilet, sink, grab bars and clear
10 space around the toilet?
11   A    You're throwing a word in there that
12 is improper, and that word is required.  What
13 was required of the facility was to have a
14 certain percentage of rooms, not that every
15 room was required.
16        So saying that it is a required
17 element is inaccurate and it's a
18 misrepresentation of the ADA, and it shows a
19 lack of understanding of it, quite frankly.
20   Q    Well, let's ask a different question,
21 Mr. Gumm, since I don't have the expertise that
22 you have.  I'm not an architect.
23        In August and September of 2014, as
24 the ADA compliance director for the County, did

---

MICHAEL GUMM
May 11, 2016

Page 126

1  Room 3205 have grab bars around the toilet?
2    A    No.
3    Q    Did it have a sink that was ADA --
4  Strike that.  Did it have a sink that met the
5  guidelines that we looked at previously for an
6  accessible cell?
7        MS. CARROLL:  Objection, form.
8  BY THE WITNESS:
9    A    I will shortcut all of the questions
10 you are going to be coming with.  This room did
11 not have any of -- any elements in it in the
12 toileting area that met the '92 or the 2010
13 standards, but it wasn't required to.
14 BY MR. MORRISSEY:
15   Q    Did Room 3215 have all the elements
16 in the year 2013 required under the 1992 ADA
17 guidelines?
18        MR. CUMMINGS:  Objection, timeframe.
19        MS. CARROLL:  Yeah, considering
20        Mr. Wade was not at the CCDOC in 2013.  You
21        can answer.
22 BY THE WITNESS:
23   A    In 2013, there were alterations in
24 the toileting area of --

---

MICHAEL GUMM
May 11, 2016

Page 127

1  BY MR. MORRISSEY:
2    Q    Can you answer yes or no?  Answer yes
3  or no to that question.
4    A    Well, you're asking for an entire
5  year, okay.
6    Q    Well, let's start off at the
7  beginning of the year.  Well, let me ask you a
8  preliminary question.
9        In the year 2013, were there
10 alterations, to your knowledge, done to the
11 Room 3215 in Cermak?
12   A    There were drawings indicating that
13 alterations were to take place --
14   Q    Prior to --
15   A    -- in 3215.
16   Q    All right, prior to those
17 alterations, did Room 3215 meet all of the 1992
18 ADA element standards?
19   A    Yes.
20   Q    Did it meet all of the 2010 element
21 standards?
22   A    There were changes in the 2010
23 standards from the 1992; and as such, since
24 these met the '92 standard, they were not

Plaintiff's Exhibit 9 Page 32

MICHAEL GUMM
May 11, 2016

Page 128

1  required to be upgraded but was chosen to be
2  upgraded.
3       Q   Going back to the Room 3205, are you
4  aware that that's the room that Mr. Wade was
5  assigned to between August 16th, 2014 and
6  August 21st, 2014?
7       A   I don't recall the date, but I recall
8  the room number.
9            MR. CUMMINGS:  That's not going to be
10           of any help either, Tom, because the
11           Sheriff documents don't show any room
12           numbers.  We are just going on his dep.
13           MR. MORRISSEY:  Do you acknowledge --
14           MS. CARROLL:  We know that he was in
15           3205.
16           MR. MORRISSEY:  All right.
17  BY MR. MORRISSEY:
18       Q   Assuming Mr. Wade in August of 2014
19  was in a wheelchair, was he entitled to the
20  same services and programs as an inmate at the
21  jail as an able-body person?
22       A   He's entitled the same opportunity as
23  an able-body person who has an opportunity.
24       Q   Would the use of a toilet for a

MICHAEL GUMM
May 11, 2016

Page 130

1  required to house Mr. Wade in an accessible
2  room at the jail?
3            MR. CUMMINGS:  Objection to the form
4       of the question.
5            MS. CARROLL:  Same.
6            MR. CUMMINGS:  Also scope for this
7       witness.
8  BY THE WITNESS:
9       A   My belief --
10  BY MR. MORRISSEY:
11       Q   Well, as the ADA director for the
12  County, can you answer that?
13       A   You are incorrectly stating that.
14  I'm not the ADA director for the County.  I am
15  the ADA compliance director in the Department
16  of Capital Planning.  So I do not cover the
17  forest preserve.  I do not give direction to
18  Health and Hospitals or the Sheriff's
19  department or any other department outside of
20  the president's office.  So I think you have a
21  misunderstanding of my role in the County.
22            Okay, second of all, assignments of
23  rooms would depend upon the doctors'
24  assessments, not mine.

MICHAEL GUMM
May 11, 2016

Page 129

1  wheelchair-bound detainee or an able-body
2  person be one of the programs and services
3  provided by Cermak or for the County for an
4  inmate?
5            MR. CUMMINGS:  Objection, that calls
6       for a legal conclusion.  This is not an
7       expert deposition.  His opinion is not
8       relevant but you can answer if you know the
9       answer.
10  BY THE WITNESS:
11       A   Yes, daily activities are one of the
12  expectations of the ADA.
13  BY MR. MORRISSEY:
14       Q   Assuming for the moment that Room
15  3205 -- that the toilet in Room 3205 presented
16  a barrier for Mr. Wade to use the toilet, would
17  he be entitled to some reasonable accomodation
18  under the ADA?
19       A   If he was -- if he -- If he required
20  to use the toilet and if he was unable, he
21  would be expected to have an accomodation to
22  overcome the barrier.
23       Q   If, as you say, Cermak's building was
24  built in 1998, was the County or the Sheriff

MICHAEL GUMM
May 11, 2016

Page 131

1       Q   Does the ADA cover where a prisoner
2  should be housed in a correctional facility?
3       A   It covers that they should be given
4  the opportunity to access the programs,
5  services and activities provided.  I have
6  another answer for you, which --
7       Q   Well, you don't have a chance to come
8  up with other answers.
9            MS. CARROLL:  Not in that way.
10  BY MR. MORRISSEY:
11       Q   All right, if you want to, go ahead.
12       A   Jails, correctional facilities, are
13  exempt from the ADA except as determined by the
14  Department of Justice or the attorney general,
15  and it says it right in the 2010 standards.  So
16  it's the Department of Justice that can
17  determine the standards at which the
18  correctional facilities are judged.
19       Q   What type of reasonable accomodation
20  would a wheelchair-bound detainee such as
21  Mr. Wade housed in Room 3205 be entitled to as
22  far as accessing a toilet?
23            MR. CUMMINGS:  Objection, calls for
24       speculation, incomplete hypothetical,

Plaintiff's Exhibit 9 Page 33

MICHAEL GUMM
May 11, 2016

Page 132

```
 1        assumes facts not in evidence; but you can
 2        answer the question.
 3   BY THE WITNESS:
 4        A    He would be -- He would have to be
 5   afforded the opportunity to use toileting
 6   facilities.
 7   BY MR. MORRISSEY:
 8        Q    As the -- In your position with the
 9   County in August of 2014, what reasonable
10   accommodation was provided to a prisoner such
11   as Mr. Wade placed in an inaccessible housing
12   unit in Cermak?
13             MR. CUMMINGS:  Objection to the form
14        of the question.  Also calls for incomplete --
15        speculation, incomplete hypothetical,
16        foundation.
17             MS. CARROLL:  And unit verus cell.
18             MR. CUMMINGS:  You can answer.
19   BY THE WITNESS:
20        A    I know that each room has a call bell
21   for the nursing staff, and I would assume that
22   the nursing staff would then provide the
23   assistance to use the facilities to access the
24   program of toileting.
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 133

```
 1   BY MR. MORRISSEY:
 2        Q    You previously said you don't train
 3   the nursing staff --
 4        A    Correct.
 5        Q    -- to provide accessibility, and you
 6   have no personal knowledge whether or not the
 7   nursing staff does provide assistance for a
 8   wheelchair-bound detainee in an inaccessible
 9   room?
10        A    Now you're making assumptions.
11        Q    Do you want me to rephrase the
12   question?
13        A    I have seen the nurses assisting
14   detainees there and detainees with
15   disabilities, and I have also knowledge from
16   reading Plaintiffs' depositions in other cases
17   that the nursing staff helped at any time that
18   they were asked.
19        Q    Which case are you referring to in
20   regards to depositions where Plaintiffs have
21   stated that a nurse has assisted them with
22   toileting?
23        A    You didn't say toileting before.  You
24   had just asked about assistance.
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 134

```
 1        Q    Do you recall reviewing any
 2   deposition testimony of a wheelchair-bound
 3   detainee where a nurse provided assistance in
 4   toileting?
 5        A    In toileting specifically, no.
 6        Q    Do you have any specific recollection
 7   of any deposition by a plaintiff in regards to
 8   a nurse providing assistance in transferring
 9   from a wheelchair to a shower chair in Cermak?
10        A    That's the same question in a
11   different form because that's still assisting
12   with toileting, which is a general concept of
13   getting to the toilet, using it and getting
14   back to their chair.
15        Q    If we separate toileting from taking
16   a shower, those are two separate functions?
17        A    Correct.
18        Q    Do you recall any plaintiff
19   testifying in a deposition that a nurse or an
20   aide assisted him or her in taking a shower?
21        A    Yes.
22        Q    And what deposition?
23        A    Clemons and you gave the deposition.
24        Q    In Clemons, isn't it correct that the
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 135

```
 1   reference was to a sponge bath in the bed?
 2        A    No.
 3        Q    No?  Okay.  Do you have personal
 4   knowledge of seeing a member of the nursing
 5   staff enter into one of the cells in Cermak and
 6   assist a prisoner transferring from a
 7   wheelchair to the toilet?
 8        A    I have answered that already.
 9        Q    No, you haven't.
10        A    Yes, I have.
11        Q    That question wasn't asked of you.
12   Sir, will you answer the question?
13        A    Yes, it's just a different form of
14   the same question that I've answered, and the
15   answer is that I have not personally seen a
16   nurse assisting a detainee with a disability
17   toileting.  That's a general answer for the
18   same three questions.
19        Q    You mentioned you read some
20   depositions of plaintiffs in wheelchair ADA
21   cases?
22        A    Yes.
23        Q    What depositions have you had an
24   opportunity to read?
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 136

```
 1      A    Clemons -- I can't remember the
 2  others if there were others, but I remember
 3  Clemons clearly because it was talking about
 4  Cermak.
 5      Q    Do you know if Cermak has a policy
 6  requiring the nursing staff to assist
 7  wheelchair-bound detainees toileting?
 8          MR. CUMMINGS:  Objection, outside the
 9          scope of this witness' knowledge but you
10          can answer, if you know.
11  BY THE WITNESS:
12      A    Again, I think we've answered that
13  that I don't have anything to do with
14  supervising or training or assisting nurses.
15  BY MR. MORRISSEY:
16      Q    From your review of Clemons'
17  deposition, explain how Mr. Clemons was
18  assisted in either toileting or showering while
19  an inmate at the Cook County Department of
20  Corrections?
21          MR. CUMMINGS:  Objection, relevance,
22          not proportional to the claims in this
23          case.  If you want to give him a
24          hypothetical, it's fine; but what happened
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 137

```
 1  in Clemons is not relevant to this case.
 2  BY MR. MORRISSEY:
 3      Q    You can answer.
 4      A    In Clemons' deposition, he, himself,
 5  stated that the nurse assisted him with
 6  showering in the isolation cell shower,
 7  transferring from his bed to a wheelchair to
 8  the shower and back to the bed.
 9      Q    Is your sole understanding that
10  nurses assist wheelchair-bound detainees who
11  are showering or toileting based upon reviews
12  of plaintiffs' deposition testimony?
13          MS. CARROLL:  Objection to the form
14          of the question.  Again, it has absolutely
15          nothing to do with this case or Carl Wade.
16          It has to do with your other cases.  He was
17          just saying that --
18          MR. MORRISSEY:  Well, you can make an
19          objection.  You can't make a speaking
20          objection.
21          MS. CARROLL:  I can.
22          MR. MORRISSEY:  No, you can't.
23          MS. CARROLL:  Yeah, I can.
24          MR. CUMMINGS:  Technically, all
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 138

```
 1  objection are speaking.
 2          MR. MORRISSEY:  You got me there.
 3  BY THE WITNESS:
 4      A    Okay, we were talking about a single
 5  incident from a deposition that I was
 6  testifying, and you have now jumped it to a
 7  general conclusion.
 8  BY MR. MORRISSEY:
 9      Q    Other than reviewing Mr. Clemons'
10  deposition, what other knowledge do you have
11  that the nursing staff assist wheelchair-bound
12  detainees housed in inaccessible rooms at
13  Cermak?
14      A    Cermak, specifically none, but my
15  wife is a nurse and I have interacted with
16  numerous nurses in the profession of
17  healthcare, and their sole purpose is to assist
18  their patients and provide patient care, which
19  that is a standard of patient care.
20          MR. MORRISSEY:  Can we go off the
21          record here?
22                       (WHEREUPON, a discussion
23                       was had off the record.)
24
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 139

```
 1                       (WHEREUPON, Plaintiff's
 2                       Exhibit No. 10 was marked
 3                       for identification.)
 4  BY MR. MORRISSEY:
 5      Q    I'm going to show you what's marked
 6  as Plaintiff's Exhibit Number 10.  Showing you
 7  what's been marked as Plaintiff's Exhibit 10,
 8  it's a group exhibit.  It includes discovery
 9  responses by the Sheriff and Cook County, some
10  of which were tendered late last night.
11          MS. CARROLL:  Nothing was tendered
12          late last night.  It was tendered at 10:00
13          in the morning yesterday.
14          MR. CUMMINGS:  Since you only seem to
15          have the one copy --
16          MR. MORRISSEY:  Do you want to run a
17          copy of the whole thing, go ahead.
18          MR. CUMMINGS:  Well, I would like to
19          know what you are going to use, and I can
20          try and print it out.
21          MS. CARROLL:  Are you using all of
22          it?
23          MR. CUMMINGS:  What are you going to
24          use?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 35

MICHAEL GUMM
May 11, 2016

Page 140

1    MR. MORRISSEY: Well, we're going to
2  go to the implementation plan.
3    MR. CUMMINGS: Okay, I have that
4  already.
5    MR. MORRISSEY: All right.
6    MS. CARROLL: Do we have a Bates
7  stamp number on it?
8    MR. MORRISSEY: We do.
9  BY MR. MORRISSEY:
10    Q  I'm going to ask you to turn to page
11  284 on this group exhibit. It's a document
12  entitled Implementation Plan: Accessibility
13  Provisions of Agreed Order, U.S. versus Cook
14  County and it goes from Bates Stamp 284 through
15  291; do you see that document?
16    A  Yes.
17    Q  And, in fact, if we look at 291 -- or
18  actually, I'm sorry, 292, there's a spot for
19  your signature?
20    A  Yes.
21    Q  I assume that you reviewed this
22  document before?
23    A  Yes, but this appears -- I don't know
24  if this is the final or not because it's not

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 141

1  signed by anybody. So as far as I'm concerned,
2  it's a draft copy.
3    Q  But in any event, you signed --
4    A  Not this document.
5    Q  A document that said Implementation
6  Plan?
7    A  A document, but not this one.
8    Q  When was the document executed by you
9  roughly, in what year?
10    A  Are we talking about this document or
11  another document.
12    Q  Well, we'll establish whether or not
13  there's a different version at some point?
14    A  At some point, but you're going to
15  ask me whether I signed this or not. Obviously
16  I didn't because I didn't sign it. There's no
17  signatures from anybody.
18    Q  This document was turned over in this
19  case, CC Wade 284. So it was turned over by
20  your attorney.
21    MR. MORRISSEY: I assume that this is
22  a final version; is that correct,
23  Ms. Carroll?
24    MS. CARROLL: I thought I had given

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 142

1  the final version that was sent to me, but
2  I don't know. We were having problems with
3  the printer. I'm not sure which one -- if
4  this is the final version or not. If it's
5  not the final version because it's not
6  signed, I will try and get the final
7  version for you.
8    MR. CUMMINGS: Why don't you ask if
9  it's substantially similar.
10  BY MR. MORRISSEY:
11    Q  Looking at this document, does it
12  appear to be substantially similar to what was
13  turned over yesterday by your attorney in the
14  Wade case?
15    MR. CUMMINGS: To the one you signed.
16    MS. CARROLL: To the one you signed.
17    MR. CUMMINGS: There we go.
18  BY THE WITNESS:
19    A  It has the basic format, but there
20  may be some substantial or significant changes
21  to it from the final version.
22  BY MR. MORRISSEY:
23    Q  Looking at the first page of that
24  implementation plan, are you aware that Cook

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 143

1  County entered into an agreement -- agreed
2  order with the U.S. Department of Justice --
3    A  Yes.
4    Q  -- in 2010?
5    A  Yes.
6    Q  And part of that agreed order --
7    A  Well, it started in May 2010.
8    Q  Okay. Part of that agreed order
9  provided that Cook County shall build out,
10  remodel or renovate clinical space as needed to
11  provide appropriate housing for inmates with
12  disabilities?
13    A  Yes.
14    Q  Are you aware that --
15    A  And I can add that those alterations
16  were directed by the Department of Justice and
17  complied with by the County.
18    Q  Are you aware that the United States
19  Department of Justice sent a letter on May 10th
20  2012 to Cook County and the Sheriff to address
21  violations under the ADA?
22    A  I'm also aware what led to that.
23    Q  Yes or no?
24    A  I'm aware what led to that was the

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 144

1  Sheriff inviting the Department of Justice to
2  do an assessment and to provide feedback and --
3      Q   Mr. Gumm, my question required a yes
4  or no.  My question was are you aware that the
5  United States Department of Justice sent a
6  letter on May 10th, 2012 to address violations
7  of the ADA at the Cook County Jail?
8      A   Do you have the letter because I
9  don't know the exact date.
10     Q   Well, if we look at Paragraph C on
11  what's the first page of this implementation
12  plan --
13     A   Okay.
14     Q   -- it says in order to comply with
15  these provisions of the agreed order and to
16  address the violations noted in the United
17  States Department of Justice letter of findings
18  dated May 10th, 2012, Cook County has taken and
19  will continue to take the actions required
20  under this implementation plan.
21     A   Yes.
22         MR. CUMMINGS:  Tom, I'm going to only
23     object briefly because this obviously took
24     place prior to Mr. Gumm's employment with

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 145

1      the County.  So if you're stipulating or at
2      least insinuating that the facts or
3      whatever is in this document are true
4      because you're asking him to acknowledge
5      that that happened.
6  BY MR. MORRISSEY:
7      Q   Well, you signed an implementation
8  plan, correct?
9      A   Yes.
10     Q   Part of the implementation plan
11  involved resolving some of the findings by the
12  United States Department of Justice given in
13  May of 2012?
14     A   Yes, and the County has complied.
15     Q   Under the implementation plan, did
16  the County hire you as the ADA compliance
17  officer?
18         MS. CARROLL:  Objection to the form
19     of the question and misrepresents past
20     testimony.
21         MR. CUMMINGS:  Also misrepresents the
22     documents of -- again, assuming that that
23     question is based on the document.
24

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 146

1  BY MR. MORRISSEY:
2      Q   Well, if we look at the next page on
3  285 under F (sic), the last sentence:  In
4  addition, Capital Planning hired an ADA
5  compliance officer who has been and will
6  continue to be responsible for evaluating and
7  addressing ADA issues.
8         MS. CARROLL:  Yes, Capital Planning.
9         MR. CUMMINGS:  That would be him.
10  BY MR. MORRISSEY:
11     Q   Are you the person that they hired.
12     A   I am.
13     Q   Was the County required to implement
14  this agreement within two years?
15     A   Yes.
16     Q   Did the implementation plan permit
17  the use of shower chairs in Cermak?
18     A   Yes.
19     Q   Did that permission to use shower
20  chairs also require Cermak to train staff to
21  provide assistance when necessary to transfer
22  from a wheelchair to a shower chair?
23         MS. CARROLL:  Objection, form.
24  BY THE WITNESS:

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 147

1      A   My signature on this was to have a
2  signatory for Capital Planning to comply with
3  the Capital Planning portion of the
4  implementation plan.
5          There's also other signatures that
6  are responsible for other areas of the
7  implementation plan; and as testified earlier,
8  I do not have any direct control over training
9  of nursing staff.
10     Q   I didn't ask you that.
11     A   Or anything with the nursing staff.
12         MR. MORRISSEY:  Can you repeat the
13     question?
14  BY MR. MORRISSEY:
15     Q   Maybe you can answer it then.
16     A   And what page are you on when
17  you're --
18         MR. CUMMINGS:  He's probably asking
19     about 287, Subparagraph B at the top.  So
20     my objection would be that it's outside the
21     scope of this particular witness'
22     knowledge.
23  BY MR. MORRISSEY:
24     Q   Calling your attention to what

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 37

Page 148

1  Mr. Cummings wants you to look at on Page 287,
2  what's been marked as Wade 287, under the
3  Implementation Plan, do you see where it says
4  CCDOC and Cermak will ensure that staff is
5  trained to provide safe operation of the shower
6  chair with inmates, including assisted
7  transfer, as needed?
8      A   I see that it says that, yes.
9      Q   Is that your understanding of the
10 Justice Department's requirement when using a
11 shower chair for a wheelchair-bound person in
12 the shower?
13         MR. CUMMINGS:  Objection to the form
14 of the question.  You can answer.
15 BY THE WITNESS:
16     A   The words that you are using are
17 misrepresenting.  You're saying DOC required.
18 This is an agreement between DOC, and it's a
19 joint agreement, not a requirement.  So it's
20 different than -- It's different than what a
21 requirement is because it is a joint agreed
22 order.
23 BY MR. MORRISSEY:
24     Q   Are there any consequences, to your

Page 150

1      Q   The question is personal knowledge.
2      A   So are you asking me personally or in
3  my position as an agent of the County.
4      Q   I'm asking you personally.  Do you
5  have any personal knowledge whether or not the
6  nursing staff has received training to assist
7  inmates transferring from a wheelchair to a
8  shower chair when taking a shower?
9         MS. CARROLL:  Objection, form.
10 BY THE WITNESS:
11     A   Again, I have answered that by saying
12 I don't have control over the nursing staff or
13 any of their training.  That is a Sheriff's
14 Department responsibility.
15        MR. CUMMINGS:  Well, objection to
16 that.
17        THE WITNESS:  No?
18        MR. CUMMINGS:  No.  And with that
19 answer, I need to take a break.
20 BY THE WITNESS:
21     A   Oh, no, it's Health and Hospitals.
22             (WHEREUPON, a short
23             break was had.)
24

Page 149

1  knowledge, if the Defendants don't comply with
2  the implementation plan?
3      A   To my knowledge, this has already
4  been complied with.
5      Q   Do you know if the nursing staff has
6  received any training as far as assisting
7  inmates transferring from their wheelchair to a
8  shower chair in the shower?
9      A   The knowledge I have is that all the
10 elements of the implementation plan has been
11 complied with successfully with the Department
12 of Justice.
13     Q   Do you have any personal knowledge
14 whether or not the nursing staff has been
15 trained to assist wheelchair-bound detainees
16 transferring from a wheelchair to a shower
17 chair?
18        MR. CUMMINGS:  Objection, asked and
19 answered.
20 BY THE WITNESS:
21     A   Yes.  If the agreed implementation
22 plan has been fully achieved, then I would
23 assume that, yes, all of the items in there
24 have been complied with.

Page 151

1  BY MR. MORRISSEY:
2      Q   On August 16, 2014 --
3         MS. CARROLL:  Are we back on?
4         MR. MORRISSEY:  Yeah.
5         MS. CARROLL:  Okay.
6  BY MR. MORRISSEY:
7      Q   On August 16, 2014, do you know why
8  Mr. Wade was not assigned to the quote,
9  unquote, handicapped accessible room, 3215?
10        MR. CUMMINGS:  Objection, outside the
11    scope and knowledge of this witness.  If
12    you happen to know, you can answer.
13 BY THE WITNESS:
14     A   You got me.  I have nothing to do
15 with it.
16 BY MR. MORRISSEY:
17     Q   As the ADA director for Capital
18 Planning, do you know why the Sheriff or the
19 Cermak employees would place Mr. Wade in 3205
20 instead of 3215 on August 16, 2014?
21        MR. CUMMINGS:  Objection to the form
22    of the question.  You can answer.
23        MS. CARROLL:  Same objection.
24

MICHAEL GUMM
May 11, 2016

Page 152

1 BY THE WITNESS:
2      A    Again, I have no knowledge why
3 anybody is assigned a room for any reason, and
4 I have no responsibility or authority in that
5 realm.
6 BY MR. MORRISSEY:
7      Q    You mentioned that you've reviewed
8 deposition testimony of other plaintiffs in
9 wheelchair ADA cases, correct?
10     A    Yeah, yes.
11     Q    Do you have knowledge that other
12 wheelchair-assisted prisoners had been placed
13 in the nonADA rooms in Cermak?
14         MR. CUMMINGS:  Objection, timeframe.
15 BY MR. MORRISSEY:
16     Q    In 2014?
17     A    I know that there have been
18 wheelchair-bound detainees that have been put
19 in rooms that are not designated with the ADA
20 elements, the elements that met the '92
21 standards.
22     Q    Do you know why wheelchair-assisted
23 prisoners in the year 2014 were placed in
24 hospital rooms that didn't comply with the ADA

MICHAEL GUMM
May 11, 2016

Page 154

1 description for the Department of Capital
2 Planning, not for other departments and
3 directing them.
4      Q    Looking at Page 316 in Wade, which
5 was turned over yesterday.
6      A    What page?
7      Q    The last page of group exhibit -- is
8 it 7?  Is it 9?  Group Exhibit 10.
9         MR. CUMMINGS:  It's not the last
10 page, but yes.
11 BY MR. MORRISSEY:
12     Q    It's CC Wade 316?
13     A    Yeah.
14     Q    Have you seen this document before?
15     A    I saw it this morning for the very
16 first time.
17     Q    Do you know who was responsible for
18 preparing it?
19     A    No, I do not.
20     Q    Do you know if -- when you looked at,
21 is it accurate in regards to the -- in
22 September of 2015, the rooms in Cermak that
23 were ADA accessible?
24         MR. CUMMINGS:  Objection to the form

MICHAEL GUMM
May 11, 2016

Page 153

1 elements of either 1992 or 2010?
2      A    Again, I would have no reason to know
3 why.
4      Q    Have you -- Did you do any
5 investigation as the ADA director to find out
6 why wheelchair-assisted prisoners were placed
7 in Cermak rooms in the year 2014 which didn't
8 have the ADA elements?
9         MR. CUMMINGS:  I'm going to object to
10 the question.  It's outside the scope of
11 the witness.  It's the last question I'm
12 going to sort of accept to being asked
13 before I tell the witness not to answer
14 because he has no knowledge.  He's already
15 testified four or five times.
16 BY MR. MORRISSEY:
17     Q    Let him --
18     A    Again, we go back to the time that
19 you were questioning me about my job
20 description, and you're making assumptions that
21 this is a Countywide over the over the Sheriff,
22 over Health and Hospitals, over the forest
23 preserve, over every entity in the Cook County
24 and that is totally erroneous.  This is a job

MICHAEL GUMM
May 11, 2016

Page 155

1      of the question, but you can answer.
2 BY THE WITNESS:
3      A    A cursory review of it, it seems to
4 be in order.
5 BY MR. MORRISSEY:
6      Q    Does this also include rooms that are
7 in the RTU?
8      A    No, it does not.  It just says Cermak
9 Infirmary.
10     Q    Room 3205 is not on the list as being
11 one of the ADA rooms?
12     A    It is not designated as one that has
13 the ADA accessible elements.
14     Q    Have you personally seen what's
15 labeled Cook County Jail Accessibility
16 Evaluation?
17     A    Pardon?
18     Q    Have you seen a document which is
19 described as -- which is titled Cook County
20 Jail Accessibility Evaluation?
21         MR. CUMMINGS:  You mean this one,
22 Tom?
23         MR. MORRISSEY:  I believe so.
24

Plaintiff's Exhibit 9 Page 39

MICHAEL GUMM
May 11, 2016

Page 156

```
1    BY THE WITNESS:
2        A    What page is that?
3    BY MR. MORRISSEY:
4        Q    They're pages 293 to 311 in Group
5    Exhibit 10?
6        A    Yes.
7        Q    When was the first time you saw that
8    document?
9        A    It would have been, I believe, in
10   July or August of 2014 I was made aware of it.
11       Q    Is the information contained in this
12   Cook County Jail Accessibility Evaluation, is
13   this part of the findings that the Justice
14   Department made?
15       A    This is the findings, yes.
16       Q    So is this called the Barriers
17   Report?
18       A    Yes, it is.
19            MS. CARROLL:  This is dated 4/24/14
20   on the bottom?
21            MR. MORRISSEY:  That's correct.
22   BY THE WITNESS:
23       A    This is not the final one.
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 158

```
1    BY MR. MORRISSEY:
2        Q    Have you ever visited or inspected
3    Division 2, Dorms N and M?
4            MS. CARROLL:  You know what, we're
5        going to object because Carl Wade has not
6        testified that he had any problems on
7        Division 2, M or N when he was there, which
8        was the last time he was incarcerated,
9        which was prior to 2013.  This case has
10       nothing to do with Division 2, Dorm 2 and
11       I'm going to instruct him not to answer.
12           MR. MORRISSEY:  Is it going to be your
13       position -- Is it going to be your position
14       at trial --
15           MS. CARROLL:  We're not going to talk
16       about --
17           MR. MORRISSEY:  Is it your position
18       at trial that Cermak was overcrowded.
19       Therefore, he was placed in Room 3205.
20           MS. CARROLL:  That has nothing to do
21       with anything.
22           MR. MORRISSEY:  Is that your
23       position?
24           MS. CARROLL:  That has nothing to do
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 157

```
1    BY MR. MORRISSEY:
2        Q    What date is on the final barrier?
3        A    8/31 of '14.
4        Q    How does it differ from the
5    April 24, 2014 Barrier Report?
6        A    I'm not sure how it differs except
7    more updated form.  This was a reporting form
8    back to the Department of Justice on the
9    progress.  So there are progressive working
10   documents.
11       Q    Does this document reflect
12   accessibility on third floor west of Cermak?
13       A    I believe it covers that.
14       Q    On what page would 3-West be covered?
15       A    Okay, it starts on page 11 of 19, and
16   Cermak goes through into page 14 of 19.
17       Q    Where specifically do they mention
18   3-West?
19           MR. CUMMINGS:  You mean 3-West?
20           MR. MORRISSEY:  3-West.
21   BY THE WITNESS:
22       A    I don't see a heading for 3-West.  I
23   don't see a heading specifically for 3-West.
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 159

```
1        with anything.
2            MR. MORRISSEY:  Is it your position
3        or not?
4            MR. CUMMINGS:  You have the answers
5        to the interrogatories.
6            MR. MORRISSEY:  And you said that in
7        your interrogatories.
8            MR. CUMMINGS:  Nobody said it was
9        overcrowded in our interrogatories.  We
10       said the rooms were already occupied, so
11       they put him in 3205.
12               Our position at trial is that
13       Carl Wade was on electronic monitoring and
14       he was at home, and he decided to escape.
15       In which case, he had to come to the
16       custody of the Sheriff and the Sheriff had
17       to make room for him because he was being
18       held no bail; and as a result they put him
19       in Cermak --
20   BY MR. MORRISSEY:
21       Q    Were Dorms M and N in August and
22   September of 2014 in Division 2 used to hold
23   wheelchair-bound detainees?
24       A    When?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 40

MICHAEL GUMM
May 11, 2016

Page 160

```
 1      Q    In August and September of 2014?
 2           MS. CARROLL:  You can answer this
 3      sole question.  Any follow-ups that have
 4      nothing to do with Wade, you are not to
 5      answer.  This question you can answer.
 6  BY THE WITNESS:
 7      A    I have no idea who was housed in Dorm
 8  2.
 9  BY MR. MORRISSEY:
10      Q    Does the report, the Cook County
11  Accessibility Evaluation Report address
12  Division 2?
13      A    Yes.
14      Q    What page is that?
15      A    Division --
16      Q    2, Dorms M and N?
17      A    Division 2, Dorm 2?
18      Q    Yes, Dorm 2, correct?
19      A    That starts on page 5, and ends on
20  Page 6.
21           MR. CUMMINGS:  It's 297, 298.
22  BY THE WITNESS:
23      A    297, 298.
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 162

```
 1  think it was in '14.
 2      Q    Did you go into the tiers?
 3      A    I went into a couple of them, yes.
 4      Q    Did any of the tiers have ADA
 5  accessible elements?
 6           MS. CARROLL:  I'm going to object,
 7      again.  Carl Wade said he had absolutely no
 8      problems the last time he was at the Cook
 9      County Jail when he was in Division 2, Dorm
10      2.  He had absolutely no problems
11      whatsoever, toileting, showering, any of
12      those things.
13           So this line of questioning has
14      nothing to do with this case.  He actually
15      wanted to go to Division 2, Dorm 2 as he
16      testified in his deposition.
17           MR. MORRISSEY:  Right.
18           MS. CARROLL:  But as for where he was
19      housed, he was housed in the RTU and the
20      Cermak infirmary; and as I stated in my
21      letter to you, we were not going to go into
22      Division 2, Dorm 2.
23           MR. MORRISSEY:  Well, do you want me
24      to certify the question?
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 161

```
 1  BY MR. MORRISSEY:
 2      Q    Do you know if in Division 2, Dorm 2,
 3  M and N, there were alterations in the year
 4  2013 to make it ADA accessible?
 5           MR. CUMMINGS:  I'm going to object
 6      only because it's not clear from this
 7      document that it was done in M and N, but
 8      you can go ahead and answer.
 9  BY THE WITNESS:
10      A    Division 2, Dorm 2, is indicated as
11  typical housing dormitories, which means that
12  it was applied to all of the tiers within it.
13  BY MR. MORRISSEY:
14      Q    How many wheelchair-bound detainees
15  could Tier M hold at any one time?
16      A    I don't know.
17      Q    Have you ever visited Tier M in
18  Building 2, Division 2?
19      A    I have been in Division 2, Dorm 2.  I
20  don't recall the specific dorms.
21      Q    What floor were you in?
22      A    I was on floors 1 and 2.
23      Q    Was that in 2014?
24      A    It was late '14 or early '15.  I
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 163

```
 1           MS. CARROLL:  Go ahead.
 2           MR. MORRISSEY:  Because --
 3           MS. CARROLL:  Go ahead.
 4           MR. MORRISSEY:  You're going to --
 5      well, let me ask the question because
 6      you're going to make an argument or the
 7      Sheriff is going to make an argument that
 8      there was no other space than Room 3205 or
 9      the RTU to place Mr. Wade.
10           MR. CUMMINGS:  So if that's the
11      argument, why are you asking that of
12      Mr. Gumm.
13           MR. MORRISSEY:  Well, I'm asking him
14      whether or not there were facilities in
15      Division 2 to house wheelchair-bound
16      detainees in the year 2014.
17           MR. CUMMINGS:  And he's already
18      answered that he doesn't know.
19           MR. MORRISSEY:  Well, no, he hasn't
20      answered that.
21           MR. CUMMINGS:  Yes.
22           MS. CARROLL:  He did.
23           MR. MORRISSEY:  He did not.
24
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 164

1  BY MR. MORRISSEY:
2  Q   I asked him are there elements in --
3  on the first floor of Division 2, Dorm 2 which
4  have ADA elements?
5  A   The very simple answer is if you read
6  the document, that is typical for all dorms
7  what was done and you can read what was done.
8  Q   So the response is what?
9  A   That it's there on the document as
10 anyone can read.
11 Q   Do they have an accessible toilet
12 in --
13 A   What does the document say?
14 Q   Well, you can look at the document.
15 You're the expert and tell me.
16 MS. CARROLL:  Again, none of this is
17 remotely relevant to Mr. Wade, and I would
18 like to believe that you're not going to
19 try to use this in your other cases like
20 you usually do, which is highly unethical
21 and I'm asking you not to ask these
22 questions of Mr. Gumm considering it has
23 nothing to do with Mr. Wade and you're just
24 wasting time.

---

MICHAEL GUMM
May 11, 2016

Page 165

1  BY THE WITNESS:
2  A   Do you want me to read everything
3  that was done or addressed?  Tables, shower
4  grab bars, accessible shower, lavatory knee
5  space, toilet seat were all addressed.
6  BY MR. MORRISSEY:
7  Q   And that's in Division 2 --
8  A   Division 2, Dorm 2.
9  Q   -- Dorm 2?
10 A   Yes.
11 Q   Do you know how many beds were in
12 Division 2, Dorm 2's wings?
13 A   No.
14 Q   Approximately 30; would that be a
15 fair estimate?
16 A   I just said I have no idea.  I don't
17 know.
18 Q   Do you have any idea how many
19 wheelchair-bound detainees could be housed in
20 Division 2, Dorm 2 in August of 2014?
21 A   You've asked me that before, and my
22 answer was no.
23 Q   Now, let's talk about the RTU for a
24 moment.  Are you aware that Mr. Wade was housed

---

MICHAEL GUMM
May 11, 2016

Page 166

1  in the RTU, Dorm 3-D?
2  A   3-D?
3  Q   3-D as in dog?
4  A   No.
5  Q   Are you familiar with the RTU in
6  Dorm 3, 3-D as in dog?
7  A   I am familiar with the RTU.  I am not
8  as familiar with the Sheriff's numbering system
9  because it differs from the floor plans.
10 Q   Do you know if there are any dorms in
11 the RTU that are accessible?
12 A   Yes.
13 Q   Showing you what's in front of you in
14 Group Exhibit 10, Wade 342?
15 A   It only goes to 316.  In Exhibit 10?
16 Q   Ms. Carroll has it in front of you,
17 Wade 342 of Exhibit 10.
18 MS. CARROLL:  It's not an exhibit.
19 A   It's not in Exhibit 10.
20 Q   Well, can we mark that as Exhibit
21 Number 11?  Can I have that back, please?
22 Calling your attention to Group Exhibit 10,
23 what is marked as CC Wade 342 for a moment.
24 A   Oh, it's out of sequence.  Okay,

---

MICHAEL GUMM
May 11, 2016

Page 167

1  sorry.
2  Q   Is that a diagram of the third floor
3  of the RTU building?
4  A   That is a floor plan of the third
5  floor RTU Building, Division 8.
6  Q   Is it dated?
7  MR. CUMMINGS:  If it is, we couldn't
8  see it.
9  BY THE WITNESS:
10 A   Boy, there are several dates on it.
11 BY MR. MORRISSEY:
12 Q   What are some of the dates?
13 A   I can't read them from this copy.
14 Q   Have you previously seen floor plans
15 of the third floor of the RTU?
16 A   Yes.
17 Q   Where approximately is Dorm 3-D?
18 A   I don't know the Sheriff's numbering
19 system because it differs from these plans.
20 Q   Do you know looking at the plan,
21 which is part of Group Exhibit 10 for the third
22 floor, do you know where dorm -- the dorms are
23 located?
24 A   Yes, the tiers?

**MICHAEL GUMM**
**May 11, 2016**

Page 168

1  Q   The tiers.
2  **A   Yes, there's tiers, and cell blocks.**
3  Q   How many tiers are there on the third
4  floor of the RTU?
5  **A   Six.**
6  Q   Are they numbered, to the best of
7  your knowledge?
8  **A   The rooms are numbered, yes.**
9  Q   Do each of the dorms on the third
10 floor of the RTU have accessible elements?
11 **A   Yes.**
12 Q   What do you mean by having accessible
13 elements?
14 **A   They have elements within the tiers**
15 **that are useable by those with disabilities.**
16 Q   Do you know if any of the elements --
17 Do you know if in -- Strike that.
18 In August and September of 2014, do
19 you know if some of the elements in the dorms
20 on the third floor for bed clearance were not
21 consistent for -- under the 2010 standards?
22 MR. CUMMINGS:  Objection to the form
23 of the question, but you can answer.
24

---

**MICHAEL GUMM**
**May 11, 2016**

Page 170

1  you can answer if understand what he's
2  talking about.
3  BY THE WITNESS:
4  **A   The dorms are built to meet the**
5  **standards, and it is -- meets all of the**
6  **circulation, the housing requirements, the**
7  **toileting, the showering, the telephone, it**
8  **meets the standards.  So I'm not sure what it**
9  **is that you're really asking.**
10 BY MR. MORRISSEY:
11 Q   Well, the question was do you have
12 any personal knowledge of there being any
13 barriers, for instance, the desks that are
14 physically in the dorms on the third floor of
15 the RTU building not being accessible to
16 wheelchair-bound detainees?
17 MS. CARROLL:  Objection, form.
18 BY THE WITNESS:
19 **A   Again, it's a misunderstanding of**
20 **what design meeting the 2010 is, but there are**
21 **going to be desks and stuff that is meant -- or**
22 **that are built for able-bodied, and there are**
23 **also desks and elements that are built for**
24 **disabled individuals.**

---

**MICHAEL GUMM**
**May 11, 2016**

Page 169

1  BY THE WITNESS:
2  **A   Does it meet the requirements of the**
3  **2010 standards, yes, it does.**
4  BY MR. MORRISSEY:
5  Q   Were there any barriers that you're
6  aware of in August and September of 2010 in the
7  six dorms on the third floor of the RTU
8  building?
9  **A   Okay, there's something that you**
10 **obviously don't understand is that any building**
11 **when it is built, to meet the standards, will**
12 **always have barriers whether it's a new**
13 **building or not.**
14 Q   That's not my question.
15 **A   So it's obvious that not everything --**
16 **not every element within the building is an**
17 **accessible element.**
18 Q   All right, but what I'm asking you --
19 I asked you do you have personal knowledge of
20 any barriers in the dorms on the third floor of
21 the RTU building in September and August of
22 2014?
23 MR. CUMMINGS:  I'm going to object to
24 the form of the question.  It's vague but

---

**MICHAEL GUMM**
**May 11, 2016**

Page 171

1  BY MR. MORRISSEY:
2  Q   Have you received any grievances or
3  reviewed any grievances as -- in your position
4  with the County in regards to barriers on the
5  third floor of the RTU from wheelchair-bound
6  detainees?
7  **A   I don't review grievances from the**
8  **department.**
9  Q   Have you looked at any grievances or
10 consulted or spoken to Marlene Fuentes in
11 regards to grievances concerning barriers on
12 the third floor of the RTU?
13 MS. CARROLL:  Objection, compound.
14 BY THE WITNESS:
15 **A   I have spoken to Marlene Fuentes**
16 **about items that can be addressed to improve**
17 **the accessibility or some of the elements**
18 **within the --**
19 BY MR. MORRISSEY:
20 Q   All right.
21 **A   And it's to add expansion and**
22 **capacity to the building.**
23 Q   On the third floor of the RTU, how
24 many wheelchair-bound detainees can be housed

Plaintiff's Exhibit 9 Page 43

MICHAEL GUMM
May 11, 2016

Page 172

```
 1   in each of the dorms?
 2       A    In each of the tiers, there are two.
 3       Q    By "two," you mean there are two beds
 4   in each of the dorms that can accommodate a
 5   wheelchair-bound detainee?
 6       A    Two beds and a desk.
 7           MR. CUMMINGS:  Objection to the form
 8       of the question, but you can answer.
 9   BY THE WITNESS:
10       A    Two beds and desk combinations.
11   BY MR. MORRISSEY:
12       Q    On the diagram, which is in front of
13   you, can you circle in each of the dorms the
14   two beds that are designated to be used by
15   wheelchair-bound detainees?
16           MR. CUMMINGS:  I'm going to object to
17       foundation because it's not clear.  The
18       document is so small.  We can't see the
19       date.  I'm not sure this is the final
20       drawing; but if you know where they are,
21       you can circle them.
22   BY THE WITNESS:
23       A    I know where they are.
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 174

```
 1           MR. CUMMINGS:  In each tier?
 2           THE WITNESS:  In each tier.  It's
 3       somewhere around that number.
 4   BY MR. MORRISSEY:
 5       Q    How many beds in each dorm on the
 6   third floor of the RTU are there?
 7       A    I don't recall the exact number.
 8       Q    For the -- You mentioned the two beds
 9   in each dorm are designated for
10   wheelchair-assisted prisoners, correct?
11       A    Two beds in each dorm are designated
12   as beds for individuals with disabilities.
13       Q    Do you know if the other beds in the
14   dorms have tables or chairs that could be an
15   obstruction -- could be a barrier for a
16   wheelchair-bound detainee transferring to a
17   bed?
18       A    This is to the point I was getting to
19   before is all buildings, brand new buildings,
20   will have elements in there that are barriers.
21   It's just not understanding what design and
22   meeting the ADA are all about?
23       Q    You're not answering my questions.
24       A    Yes, I am.  You're just not
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 173

```
 1   BY MR. MORRISSEY:
 2       Q    Okay.
 3       A    And they are those two (indicating),
 4   okay?
 5       Q    Okay.  Could I look and see what you
 6   have marked?
 7       A    (Document tendered.)
 8       Q    So on the third floor of the RTU,
 9   twelve beds have been designated to be used by
10   disabled individuals?
11       A    Twelve beds were designed to
12   accommodate individuals with disabilities.
13       Q    In each of the six dorms on the third
14   floor of the RTU, how many toilets are
15   designated for having the elements that are
16   accessible for a wheelchair-bound prisoner?
17       A    One in each tier.
18       Q    In each of the dorms on the third
19   floor of the RTU, how many tables are
20   designated to be used by wheelchair-bound
21   detainees?
22       A    They were indicated -- They've been
23   indicated at the ends of the tables, and there
24   are -- I believe there are six tables.
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 175

```
 1   understanding the correct answer.
 2       Q    Well, we're not communicating,
 3   Mr. Gumm.  My question -- Let me ask you the
 4   question.  Are some of the beds in the dorms --
 5   Are there barriers adjacent to the beds in the
 6   RTU that could be a barrier to a
 7   wheelchair-bound detainee transferring to a
 8   bed?
 9           MS. CARROLL:  Objection, form,
10       foundation, makes no sense.
11   BY THE WITNESS:
12       A    Again, every building -- This was
13   built to meet the ADA standards and was
14   reviewed by the Department of Justice during it
15   and meets the standards and every building
16   brand new will have barriers that could -- or
17   elements that could be a barrier to an
18   individual with a disability.
19   BY MR. MORRISSEY:
20       Q    Do you have personal knowledge that
21   the Sheriff or Cermak only assigns wheelchair-
22   assisted prisoners to the two beds in each dorm
23   that are accessible?
24       A    We have been down this road before.
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 44

MICHAEL GUMM
May 11, 2016

Page 176

1    I have no knowledge of anywhere on the DOC that
2    has to do with bed assignments and who gets
3    what bed.
4         Q    If a wheelchair-bound detainee was
5    assigned to, let's say, 3-D, the third dorm on
6    the RTU and he was assigned to one of the
7    nonaccessible beds, to your knowledge, are
8    there barriers that would -- may not provide
9    clear space to transfer from a wheelchair to
10   the bed?
11        MR. CUMMINGS:  Objection to the form
12   of the question in terms of accessible, in
13   terms of accessibility, but you can answer.
14        MS. CARROLL:  And also, he has
15   already stated he doesn't know what 3-D is.
16   BY THE WITNESS:
17        A    Well, any of the tiers does have
18   clearance to transfer to any of the beds.
19   BY MR. MORRISSEY:
20        Q    Have you as the ADA coordinator and
21   director approved any changes to the third
22   floor of the RTU to make it -- to make greater
23   accessibility?
24        MR. CUMMINGS:  Objection to the form

---

MICHAEL GUMM
May 11, 2016

Page 177

1    of the question.
2    BY THE WITNESS:
3         A    What do you mean "approved"?
4         MR. CUMMINGS:  Also timeframe.
5    Sorry.
6         MR. MORRISSEY:  Let me rephrase the
7    question.
8    BY MR. MORRISSEY:
9         Q    To your knowledge, since joining Cook
10   County, have there been any alterations on the
11   third floor of the RTU to create greater
12   accessibility for prisoners?
13        A    There have not.
14        Q    Are there any plans to create
15   additional accessibility in the dorms on the
16   third floor of the RTU?
17        A    Yes.
18        Q    What plans are there?
19        MR. CUMMINGS:  Objection, timeframe
20   and also outside the scope of this case.
21   If we're talking about future plans, I
22   would direct you not to answer.
23   BY MR. MORRISSEY:
24        Q    Well, you can answer.

---

MICHAEL GUMM
May 11, 2016

Page 178

1         MS. CARROLL:  Well, can you re-ask
2    the question?
3         MR. MORRISSEY:  You can read it.
4         (WHEREUPON, the record
5         was read as requested.)
6         MS. CARROLL:  Yeah, I'm going to
7    instruct him not to answer because that
8    doesn't have to do with the Wade case.
9         MR. MORRISSEY:  Well, Ms. Carroll --
10        MS. CARROLL:  Yeah.
11        MR. MORRISSEY:  -- I believe the man,
12   Mr. Wade, grieved about conditions in the
13   RTU, which included barriers that presented --
14   were presented to him in the housing
15   setting.  So I think it is relative and
16   probative.
17        MS. CARROLL:  That was in 2014.  He
18   was there for six weeks.
19        MR. MORRISSEY:  This case is 2014.
20        MS. CARROLL:  Correct.
21        MR. MORRISSEY:  Right, so I'm trying
22   to ask this gentleman about plans in
23   regards to creating greater accessibility.
24        MS. CARROLL:  He already said it was

---

MICHAEL GUMM
May 11, 2016

Page 179

1    accessible.  So the purpose of asking that
2    question is for other cases and not this
3    case because it doesn't affect Mr. Wade.
4         MR. MORRISSEY:  You may have your
5    thoughts, but it certainly has a burying on
6    whether or not Mr. Wade was provided an
7    accessible setting when he was assigned to
8    Dorm 3-D.
9    BY THE WITNESS:
10        A    In fact, he was provided an
11   accessible setting because every tier was
12   accessible.
13   BY MR. MORRISSEY:
14        Q    You don't know what bed Mr. Wade was
15   assigned to?
16        A    I don't know what bed he was assigned
17   to, but the dorm -- the tier in and of itself
18   is accessible and provides an accessible
19   environment.
20        Q    Can each dorm accommodate more than
21   two wheelchair-bound detainees?
22        A    It depends.
23        Q    What does it depend upon?
24        A    It depends upon where they're

Plaintiff's Exhibit 9 Page 45

MICHAEL GUMM
May 11, 2016

Page 180

1  assigned, and the only barrier that would be
2  presented would be the stool at the desk; and
3  if they are provided an alternate accomodation
4  which it is, then they can be.
5      Q   Why would the stool for the bench
6  present a barrier to a wheelchair-bound
7  detainee?
8      A   Because it's attached to the concrete
9  floor.  It's not moveable.
10     Q   Are there any beds on the third floor
11 of -- the third floor of dorms of the RTU that
12 do not allow a clear transfer space to the bed
13 for a wheelchair-bound detainee?
14     A   Not that I'm aware of.  The transfer
15 for space is 30 by 48, and I believe all of the
16 beds will accommodate a 30 by 48 area to
17 transfer onto the bed.
18     Q   Are you familiar with the segregation
19 cells in the RTU?
20     A   Yes.
21     Q   Are you familiar with segregation
22 cell 3A-1?
23     A   I'm not sure I can identify which one
24 that is.

MICHAEL GUMM
May 11, 2016

Page 181

1      Q   Looking at 342, does it reflect
2  segregation cells on the third floor of Cermak?
3      A   Yes, on the west end of the building.
4      Q   Can you -- How many segregation cells
5  are there on the third floor of the RTU?
6      MR. CUMMINGS:  I'm going to object to
7  the form of the question in terms of
8  segregation.  I believe it's just cell
9  blocks.
10 BY THE WITNESS:
11     A   Cell blocks.  There are nine per cell
12 block, and there are two cell blocks.
13 BY MR. MORRISSEY:
14     Q   Are there ten rather?
15     A   Ten, yes, thank you.
16     Q   So there's ten cell blocks, correct?
17     THE WITNESS:  Thank you, Patrick.
18 BY THE WITNESS:
19     A   Ten on each, so a total of 20.
20 BY MR. MORRISSEY:
21     Q   So on the third floor, there's ten
22 cell blocks; and on the fourth floor, there are
23 also ten cell blocks?
24     A   Yes, the floors mirror each other.

MICHAEL GUMM
May 11, 2016

Page 182

1      Q   Is there a common day room for the
2  ten cell blocks on the third floor?
3      A   Yes.
4      Q   In each of the ten cell blocks on the
5  third floor of the RTU building, does it have
6  the required ADA elements?
7      A   Yes.
8      Q   So each of the cells --
9      A   You didn't ask that.  You asked if
10 the cell block had --
11     Q   Well, let me rephrase it then.  Do
12 each of the cells -- all right, you caught me
13 there.
14     MR. CUMMINGS:  If I can just for a
15 second.  I'm looking at this diagram --
16     MR. MORRISSEY:  Do you want to sit at
17 the table over here and you can pose the
18 questions.
19     MR. CUMMINGS:  The diagram identified
20 in the cell block area, in one of the cells
21 there are four beds.
22     MR. MORRISSEY:  Mr. Cummings, are we
23 taking your deposition?
24     MR. CUMMINGS:  No.  What I'm saying

MICHAEL GUMM
May 11, 2016

Page 183

1  is the final drawings should only reflect
2  two is my understanding.  This diagram has
3  four.
4      MR. MORRISSEY:  Do you want to get
5  the final drawing if it's back in your
6  room.
7      MR. CUMMINGS:  I don't have it.  I
8  have presented a similar document to
9  Patrick before, and I was told Joan Kunz
10 said it was the wrong one and you have
11 already deposed her.
12 BY THE WITNESS:
13     A   I'm familiar with the final product.
14 BY MR. MORRISSEY:
15     Q   The ten single cells on the third
16 floor of the RTU, do each of those cells have
17 the required ADA elements?
18     MR. CUMMINGS:  Objection to the form
19 of the question.
20 BY THE WITNESS:
21     A   You're using the word required.
22 BY MR. MORRISSEY:
23     Q   Let me rephrase it then.  How many
24 cells, single cells, on the third floor of the

Plaintiff's Exhibit 9 Page 46

MICHAEL GUMM
May 11, 2016

Page 184

1  RTU have grab bars, elevated toilets, clear
2  floor space around the toilet, the 2010
3  standards.
4      A    Two cells have the grab bars and all
5  of the cells have the toilets and sinks.
6      Q    In 2014 -- In 2014, in August of
7  2014, how many cells on the third floor had all
8  of the elements under the 2010 ADA act?
9      A    I just answered that.  Two cells had
10  the grab bars, and all of the cells have
11  toilets and sinks.
12      Q    Which two cells in August and
13  September of 2010 had grab bars?
14      A    According to this is Cell 1 and Cell
15  5 in each of the cell blocks.
16      Q    I'd have you take a look at that
17  again.  Does it appear that Cell 10 is the cell
18  that has the grab bars?
19      A    That's the big one in the corner.
20      Q    And that's what, cell --
21      A    5.
22      Q    Okay.
23      A    And Cell 1 by the stairs.
24      Q    So would it be fair to say that only

MICHAEL GUMM
May 11, 2016

Page 185

1  Cells 1 and 5 were designated to be used for
2  wheelchair-assisted prisoners?
3          MR. CUMMINGS:  Objection.
4          MS. CARROLL:  Objection, form.
5  BY THE WITNESS:
6      A    No, that's not a fair statement.
7  BY MR. MORRISSEY:
8      Q    If the other eight cells lack grab
9  bars, would that present a barrier -- could
10  that present a barrier for a wheelchair-bound
11  detainee?
12      A    It depends upon their ability.
13      Q    Under the ADA, would all ten -- would
14  the -- who makes the determination whether or
15  not --
16      A    I have been through this.  I don't
17  know who gets assigned to what room.
18      Q    The eight tiers in August and
19  September of 2010 lacking grab bars, would it
20  be fair to say that they do not meet all the
21  requirements under the 2010 ADA standards?
22      A    That is not a fair statement.
23      Q    Why not?
24      A    Because not all cells are required to

MICHAEL GUMM
May 11, 2016

Page 186

1  meet all of the standards.
2      Q    Only 10 percent are required,
3  correct?
4      A    Ahhh, you learned something.
5      Q    Would the eight cells in August and
6  September of 2014 lacking grab bars -- Let me
7  ask a preliminary question.  Are there 20
8  cells, individuals cells on the third floor of
9  the RTU building?
10      A    There are 20, two-person cells in the
11  two cell blocks, ten in each.
12      Q    And would it be correct to say four
13  out of the 20 -- Strike that.  Two out of the
14  20 cells on the third floor of the RTU building
15  have grab bars --
16      A    Yes.
17      Q    -- under the ADA standards?
18          MS. CARROLL:  Wait.  Can you repeat
19      that?
20  BY THE WITNESS:
21      A    They have grab bars that meet the
22  standards.
23  BY MR. MORRISSEY:
24      Q    Okay, the other 18 cells on the third

MICHAEL GUMM
May 11, 2016

Page 187

1  floor of the RTU lack grab bars?
2      A    Which does not determine --
3      Q    Is that true?
4      A    That's true but that doesn't mean
5  they don't -- they deny someone their civil
6  rights by eliminating their opportunity for
7  equal access.
8      Q    How then does a person assigned to a
9  cell -- Strike that.  How does a
10  wheelchair-bound detainee assigned to one of
11  the 18 cells on the third floor of the RTU have
12  equal access to a toilet if there are no grab
13  bars?
14      A    Well, there's a toilet in each cell,
15  okay, and it depends upon their ability to
16  whether they can use that or not, but there's
17  also I have been told a policy that if they
18  cannot use it without the use of grab bars,
19  they are to notify the deputy and they will
20  take them to the day room toilet for use, which
21  meets their accomodation under the ADA.
22      Q    Where do you base that knowledge?
23      A    On the ADA.
24      Q    No, who told you that you only need

Plaintiff's Exhibit 9 Page 47

MICHAEL GUMM
May 11, 2016

Page 188

1    to knock and you can gain access to one of the
2    dayroom toilets?
3         A    I have been told by I believe it was
4    Sabrina, and I can't remember --
5         MR. CUMMINGS:  I don't remember her
6    last name.
7    BY THE WITNESS:
8         A    Rodriguez -- No.
9         MS. CARROLL:  Sabrina.
10   BY THE WITNESS:
11        A    Sabrina.  She's the Sheriff's ADA
12   coordinator or compliance --
13   BY MR. MORRISSEY:
14        Q    How long has she been with the
15   County?
16        A    I have been told by her that there is
17   a written policy that the deputy is to escort
18   them to the dayroom toilet if they notify them
19   that they cannot use the provided facilities
20   within the cell, and I have no idea how long
21   she has been with the County.
22        Q    Do you have any idea whether or not
23   that policy was in place in August or September
24   of 2014?

MICHAEL GUMM
May 11, 2016

Page 189

1         A    My understanding it was in place when
2    the building opened, but that's my
3    understanding.
4         Q    Based upon what?
5         A    I just told you, what I have been
6    relayed to by the Sheriff's ADA compliance
7    officer.
8         Q    Sabrina?
9         A    Sabrina.
10        Q    And Ms. Fuentes was the ADA
11   coordinator before her, correct?
12        A    Yes.
13        Q    And she was the ADA coordinator in
14   2014?
15        A    Yes.
16        Q    So based upon Sabrina's understanding
17   and what Ms. Fuentes understands --
18        A    No.
19        Q    Strike that.
20        A    Sabrina is the one that is in charge
21   of all of that.  It's her job to know.
22        Q    Have you ever done anything to verify
23   that the Sheriff's procedure or practice is to
24   provide access for a wheelchair-bound detainee

MICHAEL GUMM
May 11, 2016

Page 190

1    in the dayroom if their cell is not equipped
2    with grab bars?
3         A    Well, I was just told of that the
4    other day.  So it was the first I learned of
5    the policy when I asked.
6         Q    Okay.  Do you know what period of the
7    day on the third floor of the RTU individuals
8    that are in segregation are locked up?
9         A    I have no idea.
10        Q    Have you -- Strike that.  Are you
11   familiar with the psych tiers on the third
12   floor of the RTU building?
13        MS. CARROLL:  What do psych tiers
14   have to do with this case?
15   BY MR. MORRISSEY:
16        Q    Are the psych tiers on the third
17   floor of the RTU building?
18        A    I don't know.  I know that there are
19   psych tiers within the RTU, but I'm not sure
20   where they are located.
21        Q    Do you know the location of Room
22   3E-3-6-1 on the diagram?
23        A    That's the sheriff's numbering, and
24   I'm not familiar with it.

MICHAEL GUMM
May 11, 2016

Page 191

1         Q    Would you know whether or not a --
2    Would you know whether or not a toilet --
3    Strike that.
4         You mentioned that in each of the
5    dorms on the third floor of the RTU, there's
6    one ADA accessible toilet, correct?
7         A    I'm sorry.  Can you repeat that?
8         Q    You testified that there's one toilet
9    in each of the six dorms on the third floor of
10   the RTU, correct?
11        A    Yes.
12        Q    Do you have knowledge that in August
13   or September of 2014, the room -- the dorm that
14   Mr. Wade was assigned to, the toilet -- the ADA
15   toilet was broken?
16        A    I have no idea, no.  That's a
17   maintenance issue; and just because it's broken
18   does not mean it's a violation of the ADA.
19   Things break.
20        Q    Do you have any knowledge in August
21   and September of 2014 -- Strike that.
22        Were you present on the third floor
23   of Cermak in August and September of 2014?
24        A    Again, I testified before I don't

Plaintiff's Exhibit 9 Page 48

MICHAEL GUMM
May 11, 2016

Page 192

1   recall that specific time period of whether I
2   was or wasn't.
3       Q   When you inspected or visited the
4   third floor of Cermak in the year 2014, did you
5   see at times more than four wheelchair-bound
6   detainees placed in a living cell?
7       A   No.
8       Q   Do you have knowledge whether or not
9   Cermak was overcrowded with prisoners in August
10  and September of 2014?
11      A   I have no direct knowledge, no.
12      Q   Do you have indirect knowledge of the
13  living units being overcrowded in Cermak in
14  August of 2014?
15      MS. CARROLL:  Objection, form.
16  BY THE WITNESS:
17      A   I've been told at times that they --
18  that the tiers were -- or the dorms were full,
19  but I don't know which ones and what timeframe.
20  BY MR. MORRISSEY:
21      Q   All right.  Who told you that?
22      A   Dave Badali was the facility manager
23  for Cermak.
24      Q   Were you present with Marlene Fuentes

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 194

1   BY MR. MORRISSEY:
2       Q   I'm giving you a time period in
3   September of 2014.  When you were present with
4   Ms. Fuentes --
5       A   Can you narrow exactly what time,
6   what day or what subject she specifically --
7       MR. MORRISSEY:  Go off the record.
8           (WHEREUPON, a discussion
9           was had off the record.)
10      MR. MORRISSEY:  Back on the record.
11  Mr. Cummings is giving me helpful hints.
12  BY MR. MORRISSEY:
13      Q   Were you present in September of 2014
14  when Ms. Fuentes discussed accessibility in the
15  court buildings with prisoners?
16      MS. CARROLL:  Again, objection,
17      vague.  That's not the question.
18  BY THE WITNESS:
19      A   In the court buildings, no.
20      MR. MORRISSEY:  All right.  Let's
21      take a break.
22      THE WITNESS:  I can help you out with
23      an answer to get to the question that you
24      need to ask.

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 193

1   when she spoke to wheelchair-bound detainees in
2   September of 2014?
3       MR. CUMMINGS:  Objection to the form
4       of the question.  It's vague.
5   BY THE WITNESS:
6       A   About what?
7   BY MR. MORRISSEY:
8       Q   About wheelchair accessibility at the
9   jail or in the court building?
10      MR. CUMMINGS:  Also more foundation,
11      but you can answer if you understand what
12      he's talking about.
13  BY THE WITNESS:
14      A   Well, I know that she spoke to the
15  detainees a lot about ADA and accessibility.
16  BY MR. MORRISSEY:
17      Q   My question is in August and
18  September of 2014, were you present when
19  Marlene Fuentes spoke to prisoners in the RTU?
20      MR. CUMMINGS:  Objection, foundation.
21  BY THE WITNESS:
22      A   She spoke to them multiple times a
23  day for a long time.  How do I know what time
24  you're talking about?

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 195

1       MR. MORRISSEY:  Well, we will catch
2       that in a few minutes or maybe in the next
3       deposition.
4           (WHEREUPON, a short
5           break was had.)
6   BY MR. MORRISSEY:
7       Q   Looking at Group Exhibit 10, there's
8   certain e-mails from you in regards to capital
9   improvements in the RTU.
10      A   Okay.
11      Q   Did you turn those over to your
12  attorney yesterday?
13      MS. CARROLL:  Not yesterday.
14  BY MR. MORRISSEY:
15      Q   Or within the last two weeks?
16      A   I turned them over to my attorney.
17      MS. CARROLL:  And FYI, I did try to
18      send it to you the day before, but it
19      wasn't attaching when I sent the responses.
20      THE WITNESS:  Well, this is
21      completely out of order.
22  BY MR. MORRISSEY:
23      Q   Looking at for one moment, there's an
24  e-mail, Wade 319, can you pull that up?

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 196

1    A    Well, I'm trying because they're not
2  in order.  Okay, 319.  I got 319.
3    Q    And you sent an e-mail to Marlene
4  Fuentes, correct?
5    A    Yes.
6    Q    And the subject was RTU/RCDC ADA
7  Grievances?
8    A    Yes.
9    Q    And what's OCPP?
10   A    That is it the -- At that time, it
11 was the Office of Capital Planning and Policy,
12 which is now the Department of Capital Planning
13 and Policy because our bureau changed names and
14 merged with a couple other offices.  So OCPP
15 and DCPP are the same thing.
16   Q    Division 8, ADA Grievance Response
17 Final Document.  Is that a document that you
18 authored on September 4th, 2014?
19   A    It's on Page 320, yes.
20   Q    And you were responding to grievances
21 or providing assistance in regards to grievances
22 responding to grievances to Ms. Fuentes in
23 responding to grievances in regards to the new
24 Division 8?
25       MS. CARROLL:  Objection, form,

MICHAEL GUMM
May 11, 2016

Page 197

1    compound.
2  BY THE WITNESS:
3    A    No.
4  BY MR. MORRISSEY:
5    Q    What is the purpose of --
6    A    She told me that she had grievances,
7  and I asked her to inform me what the subjects
8  of the grievances were and that is what
9  developed this document, and these are the
10 seven things that she listed to me as the
11 subjects of some of the -- or of the grievances
12 that she had received to that date.
13   Q    In looking at your summary of the
14 grievances that were provided by Ms. Fuentes,
15 there were grievances that addressed desk and
16 tables that prevented use, correct, by
17 wheelchair-assisted prisoners?
18       MS. CARROLL:  Objection, form.
19 BY THE WITNESS:
20   A    No, it just says desk table has
21 stationary concrete that prevents use, and
22 these are just grievances.  They're not
23 substantiated.
24

MICHAEL GUMM
May 11, 2016

Page 198

1  BY MR. MORRISSEY:
2    Q    All right, did you inspect or visit
3  the RTU to see whether or not, in fact, some of
4  the desks and tables in the dorms in the RTU
5  did present a barrier to wheelchair
6  individuals?
7    A    I went to the RTU to look at what was
8  there, what was built; and from that, I made my
9  assessment.
10   Q    Did you find that some of the desks
11 and tables presented a barrier for wheelchair
12 detainees?
13   A    I think we have been down this road
14 that there are elements in any building that
15 will prevent -- will provide a barrier but that
16 does not mean that the building or the facility
17 or the room is not ADA compliant.
18   Q    Including the RTU?
19   A    Including the RTU, any building.
20   Q    Were you asked to determine the
21 number of wheelchair users that could be placed
22 in a dorm in the RTU?
23   A    Pardon?
24   Q    Were some of the grievances about the

MICHAEL GUMM
May 11, 2016

Page 199

1  fact that there were more wheelchair users in a
2  dorm than the dorm was built to accommodate?
3    A    That was not reflected in this
4  memorandum.
5    Q    Well, Number 5 is determining the
6  maximum number of wheelchairs per tier; do you
7  see that?
8    A    Uh-huh.
9    Q    What did you mean by that?
10   A    That means that it's a calculation.
11 It's the number of beds and the percentage and
12 determining whether the number of beds was
13 provided to meet the percentage of required
14 total beds.  That's what that means.
15   Q    In every building at the jail, was
16 there a requirement -- every new building that
17 came online after 2010, is there a requirement
18 that 10 percent have to be accessible for --
19 under the ADA?
20   A    To be honest, I can't remember the
21 exact percentage.  I know that it was at 3
22 percent at one time and 5 percent; and I can't
23 remember if it went to 10 or not, but there's a
24 percentage.

Plaintiff's Exhibit 9 Page 50

MICHAEL GUMM
May 11, 2016

Page 200

1    Q    Let's assume that under the 2010
2  guidelines that anything that was altered or
3  built after 2010 required 10 percent of the
4  beds to be accessible for detainees?
5    A    Okay.
6    Q    If the jail or the Sheriff in August
7  or September transferred all their wheelchair
8  prisoners into -- onto the third floor of the
9  new RTU, would that be permissible?
10        MS. CARROLL:  Objection, form,
11     incomplete hypothetical.
12        MR. CUMMINGS:  Join.
13  BY MR. MORRISSEY:
14    Q    Let me rephrase it.
15  BY MR. MORRISSEY:
16    Q    If there were 12 beds in the dorms on
17  the third floor of the RTU in September of 2014
18  and the Sheriff decided to transfer and place
19  50 wheelchair-bound detainees in those dorms,
20  is that contrary to the spirit of the 2010
21  guidelines?
22    A    Well, it would be contrary to the
23  spirit of the 2010 ADA to put them in a room
24  without any equal access for opportunity to use

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 202

1  determined that Carl Wade needed assistance as
2  a wheelchair-bound detainee when he was
3  incarcerated on the third floor of Cermak,
4  would it be a violation of the ADA to place
5  Mr. Wade in a hospital room that didn't have
6  the ADA elements?
7        MR. CUMMINGS:  Objection to the form
8     of the question, incomplete hypothetical,
9     vague, because we don't know what you mean
10     by assistance; but you can answer.
11  BY THE WITNESS:
12    A    It's an open-ended question that
13  doesn't have a correct answer, which you're
14  looking for a correct answer because you don't
15  understand what the ADA is about then.  That
16  question just expresses that misunderstanding.
17    Q    What does the -- Strike that.  In
18  September of 2014, did the eating tables in the
19  new RTU, were they accessible in the dorms?
20        MS. CARROLL:  Objection, asked and
21     answered.
22        MR. CUMMINGS:  Also objection to the
23     form of the question.
24  BY THE WITNESS:

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 201

1  the programs as everyone else.
2        As it all boils down to, it boils
3  down to abilities, individual ability.  It's
4  not a group thing.  It's an individual's
5  assessment and their individual needs.
6        So if they have -- you know, in the
7  building they have ten that are paraplegic or
8  quadriplegic and five of those can transfer to
9  a toilet without the assistance of grab bars,
10  they are still afforded the opportunity to use
11  it and is not a violation of their ADA civil
12  rights.
13        Just because the grab bars aren't
14  there doesn't mean it's a violation.
15    Q    Who made -- To your knowledge, who
16  makes the decision at the jail in regards to
17  what ADA elements are needed by each prisoner,
18  wheelchair-bound prisoner?
19    A    I have no idea.
20    Q    If Dr. Defuniak in August of 2014 --
21  Do you know Dr. Defuniak?
22    A    I know who -- Yes, I think I met him
23  once.
24    Q    If in August of 2014 it was

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 203

1    A    Again, it depends upon the
2  individual's abilities and accessories and
3  accommodations.  Just because a table may or
4  may not meet standards does not mean that it
5  does not accommodate for the program.
6    Q    If we turn to page -- the second page
7  of your memorandum on September 4th, 2014,
8  under 5, Determine the Maximum Number of
9  Wheelchairs Per Tier.
10    A    Yes.
11    Q    And you made this statement:  The
12  maximum number of wheelchairs per tier is
13  determined by the number of accessible beds,
14  desks and table space provided in the tier.
15  Available accomodation in other tiers should be
16  considered prior to populating maximized tiers.
17  What did you mean by that?
18    A    That means that if there's available
19  space in other tiers that is within the same
20  security classification and they are able to
21  place them in another tier rather than placing
22  them in another bed, then that should be
23  considered; but it's not my position to direct
24  them.  That is the purview of the Sheriff and

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 51

MICHAEL GUMM
May 11, 2016

Page 204

```
1   Health and Hospitals and whoever makes the bed
2   assignments and has those issues under
3   consideration.
4        Q    Would the same be true in regards to
5   placement in Cermak living quarters in August
6   of 2014, assuming when Mr. Wade, Carl Wade,
7   came into Cermak on August 16, 2014 the room or
8   rooms on 3-West which contained the ADA
9   elements was overcrowded --
10       MR. CUMMINGS:  Objection.
11  BY MR. MORRISSEY:
12       Q    -- should the Sheriff or the medical
13  staff have considered placing Mr. Wade in some
14  other area of the jail that could accommodate
15  his needs?
16       MS. CARROLL:  Objection, incomplete
17       hypothetical.
18       MR. CUMMINGS:  Also beyond the scope
19       and he's not been designated as an expert
20       in this case.  So his opinion is not
21       relevant but you can answer.
22  BY THE WITNESS:
23       A    Again, I'm not privy to all the facts
24  in the case to even try to lend an opinion or a
```

MICHAEL GUMM
May 11, 2016

Page 205

```
1   recommendation in that.  If you don't have all
2   the facts, you can't make a determination.
3   BY MR. MORRISSEY:
4        Q    Well, what decisions or what
5   information did you have in regards to your
6   suggestion under Number 5?
7        A    That is a general statement and
8   recommendation.  It, again, does not take into
9   account all of the other factors that go into
10  deciding who goes where.
11       Q    So that general recommendation for
12  the RTU if a particular dorm was over-populated
13  with wheelchair-bound detainees could also be
14  your general recommendation for Cermak if the
15  Cermak facility was overcrowded.  A general
16  recommendation by you as the ADA director would
17  be to consider other spaces?
18       A    No, again, you're taking my position
19  out of context of my responsibilities in the
20  County and trying to give me more power than
21  what I have.  Thank you very much.  Do I get a
22  raise with that?
23       Again, it is a general broad
24  statement of what I believe is common sense,
```

MICHAEL GUMM
May 11, 2016

Page 206

```
1   but it has nothing to do and has no bearing on
2   the particulars of a single individual's case.
3        Q    Why did you make the recommendation
4   in this memo on September 4th, 2014 if the RTU
5   dorms were over populated with wheelchair-bound
6   detainees?
7        MS. CARROLL:  Objection.
8        MR. CUMMINGS:  Objection to the form
9        of the question, misstates the testimony.
10       MS. CARROLL:  Incomplete
11       hypothetical.
12  BY THE WITNESS:
13       A    Again, it's a general recommendation
14  without the consideration of any particulars.
15  BY MR. MORRISSEY:
16       Q    Did you discuss this with Marlene
17  Fuentes before you sent it?
18       A    No, I sent it to her as my opinion
19  and recommendations.
20       Q    After you sent this memorandum to
21  Marlene Fuentes, did you discuss it with her?
22       A    Yes.
23       Q    And when did you discuss it with
24  Marlene Fuentes?
```

MICHAEL GUMM
May 11, 2016

Page 207

```
1        A    Within a few days.
2        Q    Did you discuss -- Who else was
3   present?
4        A    The telephone.
5        Q    Was anybody else on it?
6        A    No.
7        Q    Did you discuss your recommendation
8   in regards to the maximum number of wheelchairs
9   per tier?
10       A    We discussed each point but, again,
11  that was a general overview statement without a
12  consideration of particulars.
13       Q    What was Ms. Fuentes response to your
14  Number 5 about the maximum number of
15  wheelchairs per tier in the new RTU?
16       MS. CARROLL:  Assumes facts not in
17       evidence, objection.
18  BY THE WITNESS:
19       A    Again, it depends upon the
20  particulars of each individual's case.
21  BY MR. MORRISSEY:
22       Q    Calling your attention to an e-mail
23  that you prepared on November 24, 2014 to
24  Ms. Fuentes -- I'm sorry.  Ms. Fuentes sent you
```

Plaintiff's Exhibit 9 Page 52

MICHAEL GUMM
May 11, 2016

Page 208

1  an e-mail on November 24th, 2014?

2      A    What page are you on, please?

3      Q    317 and I gather it's your response.

4  Okay, I'm sorry.  Turn to Wade 317.

5      A    Okay.

6      Q    In there, do you send an e-mail to

7  Marlene in regards to proposed scope of work

8  for the RTU?

9      A    Yes.

10      Q    Why did you suggest the work that's

11  under your scope of work?

12      A    Because I felt that meeting the

13  minimum standards or slightly over the minimum

14  standards was not enough for the future in

15  housing the detainees and that there was going

16  to be -- I project there's going to be more

17  space that needs to be allocated towards those

18  individuals.

19        So my proposal was to expand the

20  capacity of disabled detainees in the RTU since

21  that was going to be the primary location of

22  detainees that are lower security.

23      Q    Do you know whether or not this work

24  was ever done?

---

MICHAEL GUMM
May 11, 2016

Page 209

1      A    It's going -- Actually, today the

2  Cook County Board is approving our new JOC

3  contract, which this will be included in.

4      Q    What else is included in the JOC

5  contract?

6      MS. CARROLL:  Again, it's beyond the

7  scope, not relevant to this case.

8      MR. MORRISSEY:  Well, it is.

9      MS. CARROLL:  No, no, it's not.

10  BY THE WITNESS:

11      A    The JOC contract --

12      MS. CARROLL:  Don't answer.

13      MR. MORRISSEY:  He's eager to talk

14  about it.

15  BY THE WITNESS:

16      A    It's benign.  It's the hiring of the

17  contractors to do future work.  That's all it

18  is.

19  BY MR. MORRISSEY:

20      Q    At Cermak?

21      A    Everywhere that capital planning does

22  work.  It is a program.

23      Q    Mr. Gumm, are you going to be on

24  vacation on June 14th or through June 16th?

---

MICHAEL GUMM
May 11, 2016

Page 210

1      A    I'm going to be out of town the 17th

2  and 18th, and I was hoping the 16th but I'm

3  aware of the dates.

4      Q    Is that work related that you will be

5  out of town?

6      A    No.

7      Q    Are you going to be in town on

8  August 1st, 2016?

9      A    No.

10      Q    Will you be in town September 7th?

11      A    To my knowledge, I will be.  Unless I

12  plan something real quick.

13      Q    So you are not planning any vacation

14  between September 7th and September 20th?

15      A    I have no vacation plans during that

16  time.

17      MR. MORRISSEY:  I have nothing

18  further.

19      MR. CUMMINGS:  I would like to go

20  ahead and make a record that the relevance

21  of Mr. Gumm's availability for August 1st

22  and September 7th have no bearing on this

23  case.

24      MS. CARROLL:  It has directly to do

---

MICHAEL GUMM
May 11, 2016

Page 211

1  with the Lacy case, which you have been

2  fishing for this entire time, and I'm sure

3  the judge will be very appreciative of what

4  you've done.

5      MR. CUMMINGS:  It's not surprising

6  but it's also low brow to ask the witness

7  that on the record to try and trap him in

8  some sort of whatever in order to -- after

9  it has already been represented that he's

10  not available for trial on those dates.

11      In any event, Mr. Gumm, I'm going

12  to ask you some questions on behalf of the

13  Sheriff.

14     C R O S S - E X A M I N A T I O N

15        BY MR. CUMMINGS:

16      Q    Much, much earlier in the day, you

17  testified as to what elements are under the

18  ADA; do you recall that testimony?

19      A    Yes.

20      Q    And are these elements meant to

21  provide opportunities to access -- Well, let me

22  back up.

23      So the grab bars, are those

24  elements -- the point of those elements to

Plaintiff's Exhibit 9 Page 53

Page 212

1  provide an opportunity to access a toilet for
2  somebody who is disabled?
3      A    They are accessible elements that
4  assist in providing opportunities to access the
5  program services.
6      Q    And additionally, are the
7  requirements -- not the requirements but the
8  specifications of some of these elements with
9  regard to sinks, are those in order to provide
10 opportunity to access or to make use of a sink
11 for a disabled individual?
12     A    Yes.
13     Q    You also provided testimony regarding
14 clear floor space required for beds; do you
15 recall that?
16     A    Yes.
17     Q    Do the beds in the RTU's dorm areas
18 meet this criteria for the beds?
19     A    I believe all of them have the clear
20 floor space for transfer for beds.
21     Q    What about the cell blocks, inside
22 the cell blocks?
23     A    Those also.
24     Q    Do you know when Division 5 was built

Page 213

1  at the jail?
2      A    No, I do not.  What's the -- No.
3      Q    To the best of your knowledge, were
4  any renovations to that building required in
5  order to meet ADA standards?  If you don't
6  know, that's fine.
7      A    They were -- Physical barriers are
8  not required to be altered.  Public entities
9  under Title II have the opportunity to provide
10 accommodations to overcome barriers before
11 altering them.
12     Q    But Cook County made renovations at
13 least to Cell 34/5 anyway; isn't that right?
14     A    Yes.
15     Q    Now, there was a lot of testimony, a
16 lot of questions about Bullpen 34/5.  When you
17 first joined Cook County, some renovations had
18 already been done; is that fair to say, to that
19 particular cell?
20     A    To?
21     Q    34/5.
22     A    There were grab bars, if I recall.
23     Q    And you took steps to ensure that
24 they were actually redone to meet the 2010

Page 214

1  standards; is that correct?
2      A    I learned that they were -- that
3  Facilities Management was going to alter it and
4  the director of Facilities Management reached
5  out to me to review the work that was being
6  done.  I visited the site and gave them a
7  report back on what it would take to provide
8  those elements they were planning on changing
9  to meet the standards.
10     Q    Now, you testified earlier, and I
11 can't recall which exhibit it was; but you
12 testified that there was clear floor space in
13 those bullpens in the, I guess, the basement of
14 Leighton Courthouse; do you recall that?
15     A    There was --
16     Q    Clear floor space to the toilets in
17 the bullpens even though they did not have grab
18 bars?
19     A    Are you talking about 34/5 or --
20     Q    I can't recall if it was 34/5 or if
21 it was in the bullpen of Leighton, but I'm
22 trying to find the exhibit.
23     A    I think all we talked about before
24 for bullpens was 34/5 and, yes, there was clear

Page 215

1  floor space for that and Bullpen 31.
2      Q    There was an e-mail that you drafted
3  that was referenced earlier.  I'm not sure if
4  you have all the exhibits.
5      A    Yes, I remember it.
6      Q    There was -- 34/5 was referenced; do
7  you recall that?
8      A    And 31.
9      Q    And 31?
10     A    Yes.
11     Q    And you said that that -- 31, there
12 was also clear floor space for the toilet in
13 that area; is that right?
14     A    Clear path and clear floor space to
15 get to and use the facilities.
16     Q    Was that clear path to allow a
17 wheelchair to the front or the side, if you
18 recall?
19     A    I believe it was all around --
20     Q    Okay.
21     A    -- the clear floor space for the
22 toilet area.
23     Q    You were also asked questions about
24 toilets or grab bars in the bullpens behind

MICHAEL GUMM
May 11, 2016

Page 216

1  Room 101; is that right?
2      A   Yes.
3      Q   And whether or not the toilets were
4  17 to 19 inches high; is that correct?
5      A   Yes.
6      Q   Do you know whether or not the
7  toilets in any of those bullpens had floor
8  space to allow a wheelchair to either approach
9  on the side or in the front?
10     A   I don't recall.
11     Q   If an individual in a wheelchair who
12 did not need to mount the toilet to use it
13 needed to access the toilet either in Bullpen
14 31 or in the bullpens behind Room 101, would
15 they be considered useable or accessible to
16 that detainee?
17     A   If the detainee -- I missed the part
18 about the detainee.
19     Q   Did not need to mount the toilet in
20 order to --
21     A   If they did not need to transfer, if
22 there's clear floor space to any toilet, then
23 that toilet would be accessible to him if they
24 did not need to transfer.

---

MICHAEL GUMM
May 11, 2016

Page 218

1  was not contemplated when the building was
2  built; is that fair to say?
3      A   Correct.
4      Q   The Rehabilitation Act was not
5  contemplated when the building was built; is
6  that fair to say?
7      A   Yes.
8      Q   With respect to those ramps, do you
9  know whether or not any detainees were denied
10 access to any programs and/or services of
11 either the Sheriff or Cook County as a result
12 of those ramps?
13     A   I'm not aware of any.
14     Q   You were asked a question about
15 whether or not disabled individuals are
16 entitled to opportunity -- I'm sorry.  You gave
17 an answer concerning that disabled individuals
18 are entitled to opportunities to programs,
19 services and activities of a public entity; do
20 you recall that line of questioning?
21     A   Yes.
22     Q   Does that include changes to policies
23 and procedures in order to provide access?
24     A   Yes.  You can modify policies and

---

MICHAEL GUMM
May 11, 2016

Page 217

1      Q   So if a detainee used a straight
2  catheter and could sit in their chair, insert
3  the catheter and make use of the catheter to
4  urinate, would that toilet be accessible?
5      A   If there was clear floor space, yes.
6  It accommodates -- They made accomodation and
7  have access to the program.
8      Q   To the best of your knowledge, is the
9  Leighton Courthouse required to have elements
10 that meet the ADA standards either from 1991 or
11 2010?
12     A   Leighton Courthouse was built in the
13 late 1920s and did not have any standards to
14 meet at the time.  So it is an existing
15 facility; and you would have to meet the
16 standards of either the '92 or the 2010 when
17 you make any changes, alterations or
18 renovations in that particular space.
19     Q   Well, we were asked several
20 questions about the ramp at Leighton and the
21 slope; do you recall those?
22     A   Yes.
23     Q   That ramp and the slope -- that ramp
24 itself was not contemplated when the -- The ADA

---

MICHAEL GUMM
May 11, 2016

Page 219

1  procedures without substantially altering the
2  essence of the program to make accommodations.
3      Q   So it doesn't always require physical
4  alteration or even technical improvement in
5  order to provide accommodations?
6      A   Yes.  Title II for public entities,
7  even though elements might be readily
8  achievable or altering might be readily
9  achievable does not have to if they can
10 accommodate through alterations of their
11 program services or activities.
12     Q   We had some discussion about the RTU.
13 Do you know when the RTU opened in 2014, opened
14 to individuals assigned to wheelchairs at the
15 Cook County Jail?
16     A   I believe it opened in August of
17 2014.
18     Q   And the RTU has the elements required
19 to provide accessibility to toilet, sinks,
20 showers; is that right?
21     A   Yes, it meets the standards.
22     Q   And these elements are present
23 throughout the building?
24     A   Yes.

Plaintiff's Exhibit 9 Page 55

## Page 220

MICHAEL GUMM
May 11, 2016

Page 220

```
1       Q    And these standards would have been
2   to the 2010 standards for the ADA?
3       A    Yes, 2010 design standards.
4       Q    Would providing adult diapers be an
5   accomodation for a person who suffers from
6   urinary and bladder incontinence?
7       A    I would assume so.
8       Q    What about bowel incontinence?
9       A    I would assume so.
10      Q    You were asked some questions about
11  whether or not nurses assisted detainees with
12  showering at Cermak; do you recall those
13  questions?
14      A    Yes.
15      Q    To the best of your knowledge, even
16  if nurses do not assist detainees in showering,
17  are detainees afforded an opportunity to
18  shower?
19      A    Yes.
20      Q    Do you know how they are provided
21  that opportunity?
22      A    In the dorms, there are gang showers
23  and the gang showers were altered with -- or
24  they added a low head, a 48-inch heed so that
```

TOOMEY REPORTING
312-853-0648

## Page 221

MICHAEL GUMM
May 11, 2016

Page 221

```
1   they can take showers.
2       Q    And in the RTU, are Floors 2, 3 and 4
3   mirrors of each other in terms of design?
4       A    Yes.  3 and 4 are, 2 is partially.
5       Q    And do you know whether or not the
6   second floor is designated for women or female
7   detainees?
8       A    I do not know the designations.
9           MR. CUMMINGS:  I have no other
10      questions.
11       C R O S S - E X A M I N A T I O N
12          BY MS. CARROLL:
13      Q    You are a licensed architect in other
14  states?
15      A    Yes.
16      Q    Which states?
17      A    North Carolina, Iowa and Wisconsin.
18      Q    ADA -- I'm sorry.  My voice is almost
19  gone -- but ADA renovations were completed in
20  2013 for the Cermak infirmary; is that correct?
21      A    Yes.
22      Q    Let's see.  We had talked earlier
23  about being -- a detainee being able to do
24  either a circle or a T-shape regarding the
```

TOOMEY REPORTING
312-853-0648

## Page 222

MICHAEL GUMM
May 11, 2016

Page 222

```
1   clear floor space?
2       A    For mobility, yes.
3       Q    For mobility.  It's an "or," not an
4   "and," a circle and a T-shape.  It's a circle
5   or T-shape, correct?
6       A    You can use either one.
7       Q    Okay.  And in terms of -- I'm trying
8   to remember where this was, but you had talked
9   about grab bars had been placed in I think it
10  was Bullpen 34/5, but you had wanted it moved.
11  Was it moved about an inch or what?
12      A    They were moved about three inches, I
13  believe.
14      Q    Okay.
15      A    They were raised.
16      Q    They were raised.  Were there any
17  other elements added or changed in the
18  tunnel/bullpen area of Leighton Division 5, the
19  old female lockup?
20      A    Can you repeat that, please?
21      Q    Are there -- Can you say it because I
22  can't?
23  BY MR. CUMMINGS:
24      Q    Were there any other elements added
```

TOOMEY REPORTING
312-853-0648

## Page 223

MICHAEL GUMM
May 11, 2016

Page 223

```
1   or changed in the bullpen or tunnel area
2   between Leighton and Division 5?  And I'm
3   specifically trying to reference the juvenile
4   or old female lockup.
5       A    Yes.
6       Q    What were those elements that were
7   added or altered?
8           MR. MORRISSEY:  Objection, as far as
9       the time period.
10          MR. CUMMINGS:  Well, I will get to
11      that.
12          MR. MORRISSEY:  Well, what time
13      period are we talking about?
14          MR. CUMMINGS:  If he can answer the
15      question, I will ask him when that was
16      done, but it's something that's already
17      been done, so.
18  BY THE WITNESS:
19      A    Yes, there were alterations made.  It
20  was adding grab bars and the removal of a wall
21  that presented a side transfer barrier.
22      Q    And when was that done?
23      A    That was in the fall of 2014.
24          MR. CUMMINGS:  I have nothing else.
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 56

MICHAEL GUMM
May 11, 2016

Page 224

```
 1        MS. CARROLL:  Thank you.
 2   R E D I R E C T   E X A M I N A T I O N
 3        BY MR. MORRISSEY:
 4    Q    The renovation of the old female
 5   lockup toilet, did that fully comply with the
 6   2010 element-by-element requirements?
 7    A    The element by element absolutely.
 8    Q    So there was enough clear floor
 9   space?
10    A    Yes.
11    Q    And wasn't that done in -- and
12   actually, wasn't additional work done in the
13   winter or spring of 2015 to that female holding
14   cell -- Strike that.
15             Wasn't that work actually done in
16   January or March 2015, the removal of the wall
17   and grab bars?
18    A    No, it was done prior to January
19   because the Lacy trial started in January, and
20   that was an issue at the Lacy trial.
21    Q    Did it start in December of 2014?
22    A    I don't recall the exact date that it
23   started.
24    Q    Was it after October 2014?
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 226

```
 1    A    Yes.
 2    Q    And access to a courtroom or court
 3   holding cell toilet, is that part of the
 4   programs and services provided by either the
 5   Sheriff or the County?
 6        MR. CUMMINGS:  Objection, outside the
 7        scope of this witness' knowledge; but if
 8        you know, you can answer.
 9   BY THE WITNESS:
10    A    There are toilets in the holding
11   cells on the floors behind the courts.
12   BY MR. MORRISSEY:
13    Q    And that's a program or services
14   provided by the County?
15    A    Yes.
16    Q    Did the wheelchair-bound detainees,
17   did they have entitlement in August and
18   September to use toilet facilities when
19   attending court?
20    A    What do you mean "entitlement"?
21    Q    Well, let me rephrase that.  Under
22   the ADA, is one of the programs or services
23   provided by the County you said was a toilet
24   for prisoners going to court, correct?
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 225

```
 1    A    I believe so.
 2    Q    So did you change out the combination
 3   toilet, sink in the bullpen that was in the old
 4   female receiving area of the bridge?
 5    A    No.
 6    Q    So the lavatory was still
 7   inaccessible for a wheelchair-bound detainee?
 8        MS. CARROLL:  Objection to the form
 9        of the question, misstates his testimony.
10   BY MR. MORRISSEY:
11    Q    By lavatory I mean sink.
12    A    It was an existing element and you
13   can make modifications to assist and improve
14   accessibility by an element at a time.
15             So if you're trying to say that it's
16   a violation of the ADA, that is not correct.
17    Q    Well, just for clarification, those
18   alterations or changes were made after October
19   of 2014 to your belief?
20    A    I believe so.
21    Q    Going back to Bullpen 34/5 for a
22   moment, in August or September of 2014, did
23   able-body prisoners who were attending court at
24   Leighton have access to toilets?
```

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 227

```
 1        MR. CUMMINGS:  Objection, misstates
 2        the testimony.
 3   BY THE WITNESS:
 4    A    I'm sorry.  Can you repeat it?
 5   BY MR. MORRISSEY:
 6    Q    Sure.  You stated that for prisoners
 7   attending court at Leighton, one of the
 8   programs or services provided to them were
 9   toilets in the holding cells behind the
10   courtrooms?
11    A    Yes.
12    Q    Under the ADA, wheelchair-bound
13   detainees are considered disabled, correct, may
14   be considered disabled?
15    A    Yes.
16    Q    Your memo to -- October 2nd, 2014
17   laid out certain alterations to Bullpen 34/5,
18   correct?
19    A    It laid out the elements that
20   Facilities Management was going to alter.
21    Q    What reasonable accommodations for
22   toileting in August and September of 2014 was
23   provided to wheelchair-bound detainees waiting
24   to go to court in the Leighton building?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 57

Page 228

1    A    I don't know all of them, but I know
2  that there were -- that they were taken to
3  facilities that they could use or they could be
4  provided a commode chair that would assist them
5  in using facilities.
6    Q    How do you personally know in August
7  or September of 2014 when wheelchair-bound
8  detainees were brought down to Division 5, the
9  receiving area, there were reasonable
10 accommodations made for them to use a toilet?
11   A    Because I asked the sergeant in
12 charge of that area what the procedures were
13 and what the accommodations were.
14   Q    And what is the name of the sergeant?
15   A    I don't recall.
16   Q    When did you have the conversation
17 with the person?
18   A    When I visited Bullpen 34/5.
19        MS. CARROLL:  All this was covered in
20 Lacy several times, Tom.
21 BY MR. MORRISSEY:
22   Q    Did you ever see a member of the
23 Sheriff's Office bring a wheelchair-bound
24 detainee to a toilet in August or September of

Page 229

1  2013 -- 2014?
2    A    I occasionally saw wheel-bound
3  detainees -- wheelchair-bound detainees in
4  those areas and didn't -- I was there for other
5  reasons, but they were generally pretty
6  stationary at the time and weren't moving
7  because they were in the process of being
8  transferred.
9    Q    Where were they located?
10   A    I saw some around Bullpen 34/5.  I
11 saw some on the bridge, and I saw some in
12 transport.
13   Q    What do you mean by around Bullpen
14 34/5?
15        MS. CARROLL:  Again, we have
16 discussed this so many times in Lacy, I
17 don't know why you are asking these
18 questions again.
19        MR. MORRISSEY:  Because Wade --
20 BY MR. MORRISSEY:
21   Q    Just go ahead.  You can answer.
22        MR. CUMMINGS:  I don't think there
23 was any contention that Wade was not put in
24 a bullpen, but you can go ahead and ask him

Page 230

1        if he knows.
2  BY THE WITNESS:
3    A    Question again.
4        MR. MORRISSEY:  Repeat the question,
5  please.
6        (WHEREUPON, the record
7        was read as requested.)
8  BY THE WITNESS:
9    A    They were sitting in a chair either
10 just outside or adjacent to.
11 BY MR. MORRISSEY:
12   Q    Did you see wheelchair-bound
13 detainees in August and September in the
14 hallway outside of Bullpen 34/5?
15   A    I can't tell you the exact timeframe.
16   Q    Mr. Cummings asked you about
17 providing diapers to wheelchair-bound
18 detainees, correct?
19   A    Uh-huh.
20   Q    Assuming a wheelchair-bound detainee
21 could use the toilet to defecate and there was
22 no toilet provided for them when they attended
23 court in Leighton, in your opinion, as the ADA
24 coordinator for the County, is providing

Page 231

1  diapers for that wheelchair-bound detainee a
2  reasonable accomodation by the Sheriff?
3        MR. CUMMINGS:  Objection.
4        MS. CARROLL:  Incomplete
5  hypothetical, completely misstates
6  testimony.
7        MR. CUMMINGS:  And misstates the
8  question that I asked.  I asked of someone
9  who had bowel incontinence specifically.
10 BY THE WITNESS:
11   A    He asked about incontinence and a
12 diaper would be reasonable for incontinence.
13 BY MR. MORRISSEY:
14   Q    My question is the providing of
15 diapers for a wheelchair-bound detainee waiting
16 to go to Leighton, is that considered a
17 reasonable accomodation?
18   A    I didn't say that and I didn't state
19 it, and I wasn't even remotely close to that
20 premiss.
21   Q    So a wheelchair-bound detainee in
22 August and September while awaiting for a court
23 appearance should have been provided assistance
24 from the Sheriff in using the bathroom?

Plaintiff's Exhibit 9 Page 58

Page 232

1    MR. CUMMINGS:  Objection to the form
2  of the question.
3    MS. CARROLL:  Objection.
4  BY THE WITNESS:
5    A   **The ADA requires the opportunity**
6  **so -- and how that accomodation is handled is**
7  **up to the covered agency.**
8  BY MR. MORRISSEY:
9    Q   Do you know -- Do you have personal
10  knowledge whether or not the Sheriff in August
11  or September of 2014 provided any assistance
12  for wheelchair-bound detainees attending court?
13    MR. CUMMINGS:  Objection to the form
14  of the question.
15    MS. CARROLL:  Vague.
16  BY THE WITNESS:
17    A   **The knowledge that I have is through**
18  **the conversation I had with the sergeant in**
19  **charge of the area.**
20  BY MR. MORRISSEY:
21    Q   And did he tell you?
22    A   **He told me that they take them to the**
23  **toilet or wheel them to an appropriate toilet**
24  **where they can have accommodations to use them.**

Page 233

1    Q   In September of 2014 in the lower
2  level of Division 5 at the RCDC, were there
3  bathrooms that were ADA accessible?
4    MR. CUMMINGS:  Objection to the form
5  of the question.
6  BY THE WITNESS:
7    A   **Again, you're using the term ADA**
8  **accessible.**
9  BY MR. MORRISSEY:
10    Q   Let me rephrase it.  In September of
11  2014, in September, were there holding cells
12  with bathrooms that had elements for ADA
13  accessibility?
14    A   **They had some elements.**
15    Q   And which bullpens are you referring
16  to?
17    A   **34/5.**
18    Q   Any other?
19    A   **And did you give a timeframe with**
20  **that?**
21    Q   September of 2014.
22    A   **The grab bars were there, I believe,**
23  **at that time.**
24    Q   Were they the right height as

Page 234

1  required under --
2    A   **Again, I have been through this, no.**
3    MR. CUMMINGS:  Objection, asked and
4  answered.
5  BY MR. MORRISSEY:
6    Q   They were not?
7    A   **No, I told you that, but they were**
8  **useable.**
9    MR. CUMMINGS:  Let the record reflect
10  that Patrick thinks something is hilarious.
11    MR. MORRISSEY:  We will take a break
12  for one minute.
13    (WHEREUPON, a short
14    break was had.)
15  BY MR. MORRISSEY:
16    Q   Mr. Gumm, you mentioned in regards to
17  Bullpen 34/5 in September of 2014 from your
18  conversation with the sergeant that there was a
19  commode chair in the vicinity?
20    A   **There were -- I believe there was a**
21  **commode chair.  In fact, I saw a commode chair**
22  **in the staging area to the bridge that was**
23  **wheeled down with the detainee if they went to**
24  **Bullpen 34/5.**

Page 235

1    Q   Was it a -- Did it have wheels?
2    A   **Yes, it did.**
3    Q   Did it have any warnings on it on the
4  commode chair?
5    A   **We have been through this on Lacy.**
6    MS. CARROLL:  Oh, my God, this is
7  beyond the scope of any type of redirect.
8  It's absolutely -- has nothing to do with
9  this case.  It has to do with Lacy.  He's
10  testified to this how many times in Lacy,
11  three times?  We're just wasting time right
12  now.  You could answer.
13  BY THE WITNESS:
14    A   **There are labels on the commode**
15  **chair.**
16  BY MR. MORRISSEY:
17    Q   And was there a warning saying not to
18  use without assistance?
19    A   **There is a sticker that says not to,**
20  **but I did call the manufacturer and discuss**
21  **that fact with them.**
22    Q   So the sticker, again, said don't use
23  without assistance, correct?
24    A   **That's the wording that's on it, yes.**

Plaintiff's Exhibit 9 Page 59

Page 236

```
 1        Q    Do you know whether there was nursing
 2   staff in the lower level of the RCDC for
 3   wheelchair detainees going to and from court?
 4        A    I don't know.
 5        Q    Do you know if the sergeants provided
 6   any assistance in using the commode chair?
 7        A    I don't know.
 8             MR. MORRISSEY:  I have nothing
 9   further.
10             MS. CARROLL:  Hold on one second.
11   R E C R O S S - E X A M I N A T I O N
12             BY MS. CARROLL:
13        Q    Did you talk to the manufacturer
14   about the commode chair?
15        A    Yes, I did.
16        Q    What did the manufacturer say to you?
17        A    I asked him the purpose of the
18   sticker, and they said that it was to tell the
19   user that they needed to have assistance; and I
20   asked if it was required, and they said that if
21   the person had the ability to transfer on their
22   own that they could do that and that would be
23   fine.  And I said is the assistance required
24   and they said, no, it is not, that it is
```

Page 237

```
 1   basically a liability, what I would call a CYA
 2   of liability.
 3             FURTHER REDIRECT EXAMINATION
 4             BY MR. MORRISSEY:
 5        Q    What was the name of that
 6   representative from the manufacturer?
 7        A    I don't remember her name.
 8        Q    What date did you have that
 9   conversation?
10        A    The exact date?
11        Q    Yes.
12        A    I don't recall the --
13        Q    Did you note -- make any notes from
14   that conversation?
15        A    I did at the time, yes.
16        Q    Was the Lacy case filed at that
17   point?
18        A    Yes.
19        Q    Where did you keep your notes?
20        A    In my office.
21        Q    Do you know if that commode chair
22   whether the arms came down or not?
23        A    They were fixed for security reasons.
24        Q    Who did you inform about the
```

Page 238

```
 1   conversation?
 2        A    My attorneys and -- yeah.
 3             MR. MORRISSEY:  I have nothing
 4   further.
 5             MS. CARROLL:  We'll reserve -- I
 6   mean, we'll waive.
 7
 8             FURTHER DEPONENT SAITH NOT....
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 239

```
 1   STATE OF ILLINOIS )
 2                     )  ss:
 3   COUNTY OF C O O K )
 4             I, Peggy A. Anderson, a Certified
 5   Shorthand Reporter in the State of Illinois do
 6   hereby certify:
 7             That previous to the commencement of
 8   the examination of the witness, the witness was
 9   duly sworn to testify the whole truth
10   concerning the matters herein;
11             That the foregoing deposition
12   transcript was reported stenographically by me,
13   was thereafter reduced to typewriting under my
14   personal direction, and constitutes a true
15   record of the testimony given and the
16   proceedings had;
17             That the said deposition was taken
18   before me at the time and place specified;
19             That the said deposition was
20   adjourned as stated herein;
21             That I am not a relative or employee
22   or attorney or counsel, nor a relative or
23   employee of such attorney or counsel for any of
24   the parties hereto, nor interested directly or
25   indirectly in the outcome of this action.
```

Plaintiff's Exhibit 9 Page 60

MICHAEL GUMM
May 11, 2016

Page 240

```
 1              IN WITNESS WHEREOF, I do hereunto set
 2    my hand at Chicago, Illinois, this 20th day of
 3    May, 2016.
 4
 5
 6
 7
 8            Peggy A. Anderson
 9            Certified Shorthand Reporter
10            License No. 084-003813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 2

| | | | | |
|---|---|---|---|---|
| 185:13,21 | address | 143:1,6,8 | alter 97:23 | ansi 9:1 | 155:1 |
| 186:17 | 143:20 | 144:15 | 214:3 | answer 5:11 | 158:11 |
| 187:21,23 | 144:6,16 | 148:21 | 227:20 | 9:18 10:23 | 160:2,5,5 |
| 188:11 | 160:11 | 149:21 | alteration | 12:22,24 | 161:8 164:5 |
| 189:6,10,13 | addressed | agreement | 94:24 219:4 | 13:3,18 | 165:22 |
| 191:6,14,18 | 165:3,5 | 19:3,9 | alterations | 14:14,16,19 | 168:23 |
| 193:15 | 171:16 | 143:1 | 41:21 42:2 | 14:21,24 | 170:1 172:8 |
| 196:6,16 | 197:15 | 146:14 | 58:6,23 | 15:10 16:20 | 175:1 |
| 198:17 | addressing | 148:18,19 | 59:7,20 | 17:8,19,22 | 176:13 |
| 199:19 | 146:7 | ahead 22:22 | 60:14 73:5 | 18:2,13,15 | 177:22,24 |
| 200:23 | adequate | 43:18 32:12 | 77:22 87:20 | 20:10 21:12 | 178:7 |
| 201:11,17 | 47:9 48:6 | 32:15 35:4 | 88:12,21 | 23:14,21 | 193:11 |
| 202:4,6,15 | 48:11,21 | 36:13 37:18 | 124:1 | 25:10,24 | 194:23 |
| 204:8 | 54:22 | 65:15 73:2 | altered 39:21 | 27:4,9 | 202:10,13 |
| 205:16 | adjacent | 73:19 83:3 | 127:10,13 | 35:12,15 | 202:14 |
| 211:18 | 29:10 42:17 | 96:23 | 127:17 | 36:9 48:2 | 204:21 |
| 213:5 | 175:5 | 141:13 | 143:15 | 58:16 62:2 | 209:12 |
| 217:10,24 | 230:10 | 139:17 | 161:3 | 66:4,5 70:4 | 218:17 |
| 220:2 | adjourned | 161:8 163:1 | 177:10 | 70:18 72:18 | 223:14 |
| 221:18,19 | 239:19 | 163:3 | 217:17 | 73:2,16 | 226:8 |
| 225:16 | adopted 54:7 | 210:20 | 219:10 | 76:1 78:23 | 229:21 |
| 226:22 | adult 220:4 | 229:21,24 | 223:19 | 84:12 87:16 | 235:12 |
| 227:12 | advise 18:15 | ahhh 186:4 | 225:18 | 89:24 98:20 | answered |
| 230:23 | advised | aide 134:20 | 227:17 | 99:3 100:9 | 12:6 29:22 |
| 232:5 233:3 | 17:18 18:12 | aids 114:10 | 100:2,10,23 | 103:2,10,23 | 59:16 78:8 |
| 233:7,12 | advising | allegations | 40:1,6 | 107:1,8 | 78:22 93:11 |
| adacompli... | 17:21 | 122:14 | | 108:1 110:5 | 195:19 |
| 42:13,22 | affect 179:3 | allocated | 200:2 213:8 | 111:2 | 135:8,14 |
| add 38:4 | afforded | 208:17 | 220:23 | 115:12 | 136:12 |
| 143:15 | 108:13 | allow 21:1 | 221:9 | 126:21 | 149:19 |
| 171:21 | 132:5 | 22:12 23:3 | altering | 129:12 | 150:11 |
| added 54:7 | 201:10 | 31:20 35:21 | 63:22 | 129:8,9 | 163:18,20 |
| 220:24 | 220:17 | 72:18 | 213:8 | 130:12 | 184:9 |
| 222:17,24 | agency 232:7 | 114:14 | 179:16 | 136:13 132:2 | 202:21 |
| 223:7 | agent 150:3 | 180:12 | alternate | 132:18 | 234:4 |
| adding | agree 47:8 | allowed | 180:3 | 135:12,15 | answering |
| 223:20 | 48:10 53:8 | 216:8 | alternatives | 135:17 | 21:8 30:21 |
| addition 24:6 | 84:23 85:21 | allowing | 114:2 | 136:19 | 61:4 184:9 |
| 79:22 146:4 | 85:21 86:2 | 21:12 81:9 | amount | 41:13 | answers |
| additional | 105:12 | 113:9 114:2 | 24:18 93:18 | 147:15 | 131:8 159:4 |
| 177:15 | 139:18 | 114:11,16 | 148:14 | 148:14 | anybody |
| 234:12 | 125:22 | 115:5 | 115:1 239:3 | 150:19 | 35:15 66:8 |
| additionally | agreed | allows 34:15 | 240:8 | 151:12,22 | 141:1,17 |
| 212:6 | 140:13 | 34:16 | angled 55:4 | 153:13 | 152:3 207:5 |

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 1

| A | | | | | |
|---|---|---|---|---|---|
| a117 9:1 | 216:13 | 122:3,4,7 | accommod... | actions 2:10 | 105:22,24 |
| abilities | 217:7 | 122:10,14 | 132:10 | 2:17 144:19 | 106:22 |
| 201:3 203:2 | 218:10,23 | 123:11 | accommod... | activities | 107:5,13,23 |
| ability | 225:24 | 124:13 | 83:12 122:4 | 108:14 | 108:5,12 |
| 185:12 | 226:2 | 126:6 130:1 | 122:17 | 109:1,3,12 | 109:1,3,12 |
| 187:15 | accessibility | 151:9 | 203:3 | 129:11 | 109:19 |
| 201:3 | 9:2,5 10:3,8 | 154:23 | 213:10 | 131:5 | 113:10,22 |
| 236:21 | 10:12,22 | 155:13 | 219:2,5 | 133:10,22 | 114:5 115:5 |
| able 48:8 | 12:12 40:8 | 161:4 162:5 | 227:21 | 134:5 15:6 | 118:4,21 |
| 203:20 | 46:6 52:18 | 164:11 | 228:10,13 | ada 6:2 8:2,7 | 119:23 |
| 221:23 | 67:10,18 | 165:4 | 232:24 | 8:24 9:4,6,7 | 121:14,15 |
| abledbodied | 70:15 72:8 | 166:11 | accomodati... | 12:6,6,7,8 | 122:6,7,8 |
| 170:22 | 72:13 73:22 | 168:10,12 | 109:12,21 | 122:10,14 | 122:10,14 |
| ablebody | 74:1 82:15 | 169:17 | 110:2,22 | 12:6,16,24 | 123:2,7,7 |
| 107:23 | 83:10 101:8 | 170:15 | 111:5,6,10 | 15:14,22 | 123:10,13 |
| 108:8 | 122:7 133:5 | 173:16 | 111:20 | 21:23 23:12 | 124:8,13,17 |
| 128:21,23 | 140:12 | 175:23 | 129:17,21 | 37:22 39:22 | 124:20 |
| 129:1 | 155:15,20 | 176:12 | 131:19 | 39:23 40:2 | 125:3 |
| 225:23 | 156:12 | 179:11,11 | 180:2 | 40:7,22 | 125:18,24 |
| absolutely | 157:12 | 179:12,18 | 187:21 | 41:20 42:1 | 126:3,16 |
| 22:10,24 | 160:11 | 179:18 | 203:15 | 42:12,19,20 | 127:18 |
| 31:13 34:23 | 171:17 | 181:3 | 205:9 | 42:24 43:5 | 129:12,18 |
| 36:6 76:15 | 176:13,23 | 187:16 | accurate | 43:7,17,20 | 130:1,14 |
| 80:19 | 177:12,15 | 188:11 | 50:16 51:9 | 43:23 44:13 | 130:15 |
| 137:14 | 178:23 | 191:6 | 52:17 53:23 | 44:19 46:21 | 133:5 |
| 167:7,10 | 193:8,15 | 199:18 | 231:2,17 | 45:19 66:19 | 134:18 |
| 224:7 235:8 | 199:18 | 199:2 203:5 | 43:7,17,20 | 9:13 12:12 | 135:6 |
| accept 153:12 | 177:12,15 | 200:4 | 232:3 | 12:6,6 44:5 | 136:6,10 |
| access 24:19 | 178:23 | 212:3 | accurately | 60:5 61:15 | 146:4,7 |
| 65:2 70:9 | 219:19 | 216:15,23 | 7:12 | 61:20 64:14 | 146:4,7 |
| 70:12,13 | 11:2 19:5 | 217:4 233:13 | 65:6 68:17 | 64:11 65:22 | 151:17 |
| 106:2 | 131:22 | 233:8 | 65:5,13,21 | 144:7 | 152:19,24 |
| 107:22 | accessories | accessing | 74:4,9,15 | 74:19,24 | 153:5,8 |
| 108:13,17 | 203:2 | 219:8,9 | 79:12,15,17 | 79:18 82:12 | 154:2 |
| 109:5,7 | 62:5 46:15 | achieved | 79:18 82:12 | 87:9,10 | 155:11,13 |
| 115:14 | 52:6 53:24 | 172:4 | 80:10 | 88:10,18 | 161:4 162:4 |
| 132:23 | 68:22 70:7 | acknowledge | 145:4 | 89:6 97:12 | 164:4 |
| 187:7,12 | 79:8,18 | 128:13 | 89:6 97:12 | 97:19 98:19 | 142:13 |
| 188:1 | 81:3,22 | 179:20 | 98:9 106:10 | 110:1,4,14 | 142:13 |
| 189:24 | 83:2,7 | 180:16 | 115:12 | 114:1 | 145:6 |
| 200:24 | 112:14 | 199:2 203:5 | 127:4 145:4 | 149:15 | 195:12,16 |
| 211:21 | 121:14,15 | action 24:18 | 150:6 212:4 | 150:5 212:4 | 239:21,22 |
| 212:1,4,10 | 121:20 | 217:6 | 25:4 239:24 | 104:2 | 238:2 |

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 3

| | | | | |
|---|---|---|---|---|
| anyway | april 157:5 | 17:16 21:24 | 169:18 | 77:14 | 145:22 |
| 213:13 | architect 6:7 | 28:17 29:21 | 170:9 179:1 | 103:17 | 204:6 |
| apparently | 61:14,20 | 30:11 34:24 | 229:17 | 132:23 | 230:20 |
| 19:7 | 87:5 125:22 | 59:15 70:21 | assess 61:19 | 133:7 | assumptions |
| appear 89:13 | 221:13 | 78:7,21 | 61:21 62:19 | 133:24 | 133:10 |
| 89:19 | architects 8:6 | 93:10 94:6 | 63:1 83:9 | 146:21 | 153:20 |
| 142:12 | 46:3 | 133:18,24 | assessed 62:5 | 196:21 | assure 8:7 |
| 184:17 | architectural | 135:11 | assessing | 201:9 202:1 | attach 46:17 |
| appearance | area 11:11 | assessing | 61:18 | 202:10 | attached |
| 231:23 | 9:22 34:8 | 153:21 | assessment | attaching | attaching |
| appearances | 155:22 | 164:2 | 61:24 63:8 | 232:11 | 235:18,23 |
| 27:18 | 28:10 29:11 | 165:21 | 63:13,17 | 235:18,23 | 236:6,19,23 |
| appeared 2:8 | 43:19 44:8 | 169:19 | 79:15 83:24 | 236:6,19,23 | assistant 67:5 |
| 2:14,21 | 44:14,21 | 182:9 190:5 | 144:2 198:9 | assistant 67:5 | 46:13,20 |
| 98:5 | 48:13,20 | 197:7 | 201:5 | attend 80:16 | attend 80:16 |
| appearing | 49:9 56:4 | 198:20 | assessments | 133:21 | 109:22 |
| 28:12 29:3 | 61:15,19,21 | 202:20 | 130:24 | 134:20 | attended |
| appears | 63:3 76:18 | 215:23 | assigned | attend 48:9 | 91:10 |
| 140:23 | 77:2,3 | 217:19 | 128:5 151:8 | 175:22 | 230:22 |
| applicable | 92:19 93:5 | 218:14 | 152:3 176:5 | 175:22 | attending |
| 54:2,15,17 | 93:9,19,23 | 220:10 | 176:6 179:7 | 236:12 | 28:19 29:14 |
| applied 55:6 | 94:19 95:11 | 228:11 | 179:15,16 | 163:13 | 29:20 74:3 |
| 161:12 | 126:12,24 | 230:16 | 180:1 | 133:13 | 225:23 |
| apply 7:8 | 180:16 | 231:8,8,11 | 185:17 | 134:11 | 226:19 |
| 52:21 55:10 | 182:20 | 234:3 | 187:8,10 | 135:16 | 227:7 |
| appreciate | 204:14 | 87:18 | 191:14 | 146:8 | attention |
| 211:3 | 215:13,22 | asking 8:18 | 219:14 | 149:6 | 105:4 |
| approach | 222:18 | 8:20 9:17 | assignment | associates | 147:24 |
| 141:12,14 | 223:1 225:4 | 12:21 15:10 | 28:1 | 46:6 | 166:22 |
| 54:22 55:3 | 228:9,12 | 19:17 20:2 | assignments | assume | 207:22 |
| 55:4 123:18 | 232:19 | 20:4,5,6 | 130:22 | 132:21 | attorney 2:10 |
| 216:8 | 234:22 | 21:14,17 | 176:2 204:2 | 207:22 | 2:16 14:20 |
| appropriate | 214:17 | 22:21 32:10 | assigns | 141:21 | 17:18 18:12 |
| 18:5 47:20 | 51:2 63:6 | 34:1 44:2 | 175:21 | 149:21 | 35:10,11,14 |
| 143:11 | 79:8,12 | 44:19 68:6 | 240:3 | 200:1 220:7 | 69:11,21 |
| 232:23 | 147:6 | 68:8 70:3 | 135:6 166:8 | assumes 60:7 | 131:14 |
| approved | 212:17 | 78:10 98:7 | 137:10 | 97:19 98:19 | 142:13 |
| 176:21 | 229:4 | 98:9 106:10 | assuming | 111:1 132:1 | 142:13 |
| 177:3 | arent 201:13 | 115:12 | 149:15 | | 195:3 |
| approving | argument | 127:4 145:4 | 127:4 145:4 | 34:6 106:16 | 195:12,16 |
| 209:2 | 163:6,7,11 | 147:18 | 216:16 | 16:15 19:21 | 239:21,22 |
| approxima... | arms 237:22 | 150:2,4 | 225:13 | | 238:2 |
| 165:14 | asked 9:23 | 163:11,13 | assistance | 219:4 | attorneys 5:6 |
| 167:17 | 12:5,6 | 164:21 | 129:14 | | |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 61

## MICHAEL GUMM — May 11, 2016 — Page 4

**august** 25:2 27:12 28:22 29:7,13,19 30:5 33:6 56:22,23 72:15 81:5 88:14 89:2 90:16 91:2 91:11,18,23 92:1,9,13 92:20 93:1 93:7,19,24 94:4,7,20 95:5,11,15 95:16,22,23 98:15 104:3 104:9 110:20 125:7,23 128:5,6,18 132:9 151:2 151:7,20 156:10 159:21 160:1 165:20 169:6,21 184:6,12 185:18 186:5 188:23 191:12,20 191:23 192:9,14 193:17 200:6 201:20,24 204:5,7 210:8,21 213:3 217:8 225:22 226:17 227:22 228:6,24 230:13 231:22 232:10
**author** 86:16 86:17
**authored** 40:23 196:18
**authority** 103:1,22 110:13 152:4
**availability** 210:21
**available** 203:15,18 211:10
**avant** 72:3,7 73:4,7,22 74:8,13,17 74:24 75:9 75:11
**avenue** 2:5 123:18
**avenues** 115:16 123:8
**awaiting** 21:13,15 22:13
**aware** 27:5 30:24 97:5 97:8 111:9 128:4 142:24 143:14,18 143:22,24 144:4 156:10 165:6 169:6 180:14 210:3 218:13

**B**

**b** 2:11 4:1 24:11 147:19
**back** 44:23 51:19 56:20 57:9 60:16 65:18 72:1 96:17 97:4 99:21,24 104:22 112:9,9 117:18 120:1 122:20 128:3 134:14 137:8 151:3 153:18 157:8 162:20 183:5 194:10 212:4 214:7 221:13
**background** 21:13,15 22:13
**badali** 70:22 119:6 192:22
**badalis** 119:8 165:4 184:1 184:4,10,13 184:18 185:9,19 186:6,15,21 187:1,13,18 190:2 201:9 201:13 213:22
**bail** 159:11
**banks** 67:2,4 72:2 75:5
**bar** 57:9,19 57:22,24
**barely** 117:20
**barrier** 105:13,19 105:21,23 105:24 106:19 129:16,22 157:2,5 174:15 175:6,17 180:1,6 185:9,10 198:5,11,15 223:21
**barriers** 102:23 103:4,18 120:1 122:20 123:9
**barters** 46:9,22
**base** 187:22
**based** 123:6
**basement** 28:10,15,16 28:17,21 29:7 214:13,16
**basic** 142:19
**basically** 237:1
**basis** 112:5
**bath** 135:1
**bathroom** 231:24
**bathrooms** 233:3,12 234:11,24
**bearing** 206:1
**bed** 49:16 50:21 55:11 135:1 137:7 148:6 174:17 178:20 184:4,10,13 185:9 186:1,8,9 190:20 200:1 201:11 203:22 210:1 211:21 212:13 213:1
**beds** 51:5 165:11
214:18 215:2 222:9 223:20 224:17 233:22 172:3,6,10 172:14 173:9,11 174:5,8,11 174:18,24 175:4,5,22 176:7,21 180:1,6 181:21 191:1 199:4 200:4,16 203:13 212:14,17 212:18,20 213:1,14
**began** 1:23
**beginning** 38:11 127:7
**behalf** 2:8,14 2:21 110:7 110:14 110:19
**believe** 130:9 225:19

## MICHAEL GUMM — May 11, 2016 — Page 6

**career** 13:17
**carl** 13:16 36:9 90:17 90:19,21 91:1,15 106:5,7,12 106:16 110:7,21 137:15 158:5 159:13 162:7 202:1 204:6
**carolina** 221:17
**carroll** 2:11 3:7,10 8:14 10:15 13:1 14:8,24 15:24 17:23 18:4,16,24 19:15,23 20:15,20 21:4,8,20 22:10,16 23:6 24:1 26:22 27:7 30:16,20 31:11 32:2 32:23 33:23 34:11,20 35:4 36:1 36:13 37:3 38:22 39:5 39:10,14 40:3,13 41:11 43:2 44:6,15 45:2,7,10 52:12,16 59:17 60:9 62:3 64:1 64:23 66:1 66:19 70:19 72:10,19 73:9,15,19 17:20,24 81:4,7,10 82:3,9 84:6 93:10 96:19 97:18 103:6 104:24 105:1,19 108:7,20 116:8 117:6 117:11,15 119:6,13 120:10,13 121:14,22 122:6,22,24 123:2 124:3 126:7,19 127:16 128:4,11 129:7,15 130:5 131:9 131:19,23 132:10,24 133:11 134:20,23 135:21 137:1,15 139:8 140:14,18 142:16 143:15,18 146:15 148:12,16 150:9 151:3 151:11,22 152:9,12,14 153:16,22 154:12 156:8,15 159:1,4,9 159:15,18 160:16 161:23 162:4,17 163:4,6 164:10,16 165:1,9 167:10,17 170:1 171:13 173:18 179:5 176:14 178:1,6,9 178:20,24 181:6,13 182:10 184:8 186:10,17 189:1,13,17 190:15,19 193:6,11,13 195:13,17 196:24 197:18,21 198:7 200:10 200:12,14 200:22 202:12,15,18 203:22 204:14 205:24 206:2,8,12 207:9,13 209:7,10,13 211:16,19 223:24 224:14,15 226:3,5,15 226:7,21 228:1,6,10 229:20,24 230:7 231:2 232:5,11,15 233:1,5,7 234:17,24 235:2,6,11 235:17,21 236:3,7,11 237:2,9,15 237:19,23
**carl's** 207:12
**case** 10:18 12:20 13:3 14:11,12 16:2,4 17:3 17:24 18:5 18:13,20 19:13 20:1 20:2,12,20 21:24 24:12 24:17 26:7 26:24 27:10 30:7 31:13 31:14,18
**carry** 55:14
**case** 10:18 12:20 13:3 14:11,12 16:2,4 17:3 17:24 18:5 18:13,20
237:16 207:20 202:19 20:7 217:2,3,5 144:23 154:12 166:23 40:22 15:7 148:4 140:16 181:4,24 193:23 223:11 233:4
187:9,14 188:20 190:1 192:6 212:21,22 213:13,19 222:24 224:14 226:3 cells 46:6,15 53:24 74:18 75:2,4,6,11 75:19 76:1 76:8,16 77:5,6,9,13 79:24 80:2 80:9,12 82:19 83:6 83:13 84:4 85:1,15,16 85:23 91:3 93:3,9,22 95:24 110:1 102:18,15 116:2,7,16 181:4 181:11,18 183:24 184:8 184:16 185:13 186:5,8 186:14 187:11 222:11 226:11 center 16:19 center 1:17 2:12,18 57:23 58:4 58:8,19,21 59:4,8
**cermak** 11:10

## MICHAEL GUMM — May 11, 2016 — Page 5

212:19 215:19 219:16 222:13 225:1,20 233:22 234:20
**bell** 132:20
**bench** 180:5
**benefits** 24:24
**benign** 209:16
**best** 168:6 213:3 217:8 220:15
**beyond** 17:9 17:12,19,23 20:3 103:13 110:9 112:8 114:11 204:18 209:6 235:7
**big** 184:19
**bilis** 41:2
**bigis** 41:3
**bilski** 41:2
**bladder** 220:6
**block** 56:19 117:4
**bleed** 181:12 181:20,22 181:23 182:2,4 184:15 213:21,22
**board** 71:6
**boils** 201:2,2
**bond** 76:17 76:18,19
**bottom** 37:15 40:19 45:24 47:18 50:3 156:20
**bowel** 220:8 231:9
**boy** 167:10
**brand** 174:19 175:16
**break** 39:17 39:19 48:15 54:10 71:12 72:13 73:8 73:23 74:3 75:1,3,7,12 75:19 76:8 77:19 79:12 81:2 82:16 82:24 83:1 83:20 85:17 85:19 87:14 89:21 90:10 90:18 91:16 92:4,9,15 92:19 93:9 93:20,24 94:20 96:4 101:9 102:11 105:10 106:18 108:24 120:9,12 124:5 126:23 161:18 167:3,5 169:8,10,13 169:16,21 170:15 171:22 175:12,15 181:3 182:5 186:9,14 189:2 190:12,17
**briefly** 144:23 bringing 118:23 228:23 broad 18:18 67:22 72:20 175:12,15 181:3 182:5 186:9,14 189:2 190:12,17
**broke** 191:15,17
**brought** 28:1
39:4 228:8 211:6 143:9 111:7 27:14,18 28:3,13 30:6,15 31:2,9,22 34:9 35:8 72:13 73:8 73:23 74:3 75:1,3,7,12 75:19 76:8 77:19 79:12 81:2 82:16 82:24 83:20 85:19 87:14 89:21 90:10 90:18 91:16 92:4,9,15 92:19 93:9 93:20,24 94:20 96:4 101:9 102:11 105:10 106:18 108:24 120:9,12 124:5 126:23 161:18 167:3,5 169:8,10,13 169:16,21 170:15 171:22 175:12,15 181:3 182:5 186:9,14 189:2 190:12,17
19:9 198:14,16 198:19 199:15,16 201:7 213:4 216:1,5 219:23 221:23 225:21 227:17 229:22 230:14 234:1,2,18 145:16 174:19,19 194:15,19 201:6 204:9 205:3 212:14 214:22 216:1,7 216:14,14 218:2,5
**buildings** 14:6 15:19 27:20,21,22 223:1 225:21 227:17 228:18 229:2 230:14 234:14,24
**bulbs** 210:9
**bulbous** 28:20 29:1 29:6,10,18 43:20 44:5 44:9 214:13 214:17,24 216:14 233:15
**burden** 24:22
**bureau** 2:10 2:17 196:13
**burying** 179:5
117:18 118:4,7 213:16 215:2 216:12 216:13 220:22 217:7 218:16 218:18,23 221:8,15 223:3 224:15 230:21 231:20 235:20

**C**

**c** 2:1 4:16 5:20 144:10 211:14 221:11 224:2 236:11 199:10 105:4 132:20 235:20
237:1 118:4,7 213:16 215:2 216:12 147:24 166:22 207:22 53:6 221:14,20 155:6 17:6 66:8 218:2,5 102:24 156:15 146:6,14 147:2,3 151:17 136:3 136:17 134:23,24 136:7
**calculation** 199:10
**call** 23:4 105:4 132:20 235:20
**care** 138:18 139:19

## MICHAEL GUMM — May 11, 2016 — Page 7

11:13 12:3 12:19 15:20 20:11 22:18 23:10 24:7 25:2,6 26:7,9,13 26:15,21 27:2,6 69:9 102:15,22 103:23 115:21 116:23 118:22 119:5 120:3 124:4 125:1,3 127:11 129:3 132:12 134:9 135:5 136:4,5 138:13,14 146:17,20 148:4 151:19 152:13 154:22 155:8 157:12,16 158:18 159:19 162:20 181:2 191:23 192:4,9,13 202:3 204:5,7 205:14,15 209:20
**certmain** 220:12 221:20
**cermaks** 11:16,21 15:3 19:23 26:15,21 27:2,6 69:9 102:15 124:14 195:8 227:17
**certain** 19:4 69:15 31:2,9,22 34:9 9:15 123:22 154:24 64:4,10 21:16 80:21 179:5 239:3 240:9 32:11 36:11 134:9 135:15 162:24 239:5 14:14 14:18,6 100:2 123:18 124:19 124:20 179:22 9:2,2 240:2 176:21 22:16,16 17:2,10 175:13 45:3,5,17 44:21 45:22 48:2 56:2,4 57:8 60:24 61:24 62:10 63:4,8 67:4,7 196:13
**certify** 19:19
**chair** 134:9
**chance** 131:7
**change** 63:19 64:7 196:13
**changed** 64:6
**changes** 88:22
**changing** 64:4,10
**charge** 189:20
**chicago** 1:17 2:5,12,19 9:2,2 240:2
**chief** 61:5
**chime** 110:15
**chosen** 128:1
**circle** 48:12
**circles** 120:17
**circulation** 170:6
**city** 9:1,2
**civil** 1:12
**chairs** 146:17
**claim** 24:15
**claims** 17:2
**class** 96:14
**classification** 12:23
**clear** 46:24 47:9,19 49:14,15 50:9 51:2 54:9 64:9 123:7 125:9 161:6 216:22 217:5 228:8 231:19 209:6 230:16 240:6 217:18 8:21 9:8 10:4,9 98:1 100:12 100:20 103:12 110:16 146:4,8 147:2,3 146:20 136:3 136:17 134:23,24 136:7
**clearance** 71:6
**clearances** 44:8
**clearly** 41:13
**client** 36:8 138:9
**clinical** 31:18 34:12
**close** 231:19
**closet** 52:9,22
**comb** 2:6,7,13 8:3,24 9:12 49:14,15 52:8 54:13 54:19 63:5 55:6 17:6 66:8 146:5 136:3
**coming** 6:5 17:6 66:8
**commence** 15:24
**commission** 71:6
**commode** 228:4
**communica...** 132:1 123:2,7 198:17
**compared** 78:11 87:7
**complete** 12:11
**completed** 221:19
**completely** 31:18 34:12 195:22 231:5
**compliance** 6:2 7:5,13 8:3,24 9:12
**combination** 14:6,13 15:22 21:3 24:8 26:20 40:23 41:20 41:20 42:2 43:5,7 47:7 61:15,20 68:1 74:4,9 74:11,19 100:15 101:22 102:8,15 249:20,22 24:8 26:20 136:3
**compliant** 39:22 40:2 41:17 42:11 42:19,20,24 43:11,17 57:8 60:6 74:15 118:5 122:16 123:2,7 198:17
**complicated** 77:17
**computer** 131:7
**communica...** 132:1
145:14

Plaintiff's Exhibit 9 Page 62

MICHAEL GUMM
May 11, 2016

Page 8

| | | | | | |
|---|---|---|---|---|---|
| 149:4,11,24 | 206:14 | 217:24 | 31:7 33:4 | correct 18:24 | correcting |
| comply 8:2 | 207:12 | 218:1,5 | 67:18,24 | 19:15 31:23 | 53:20 |
| 88:1 97:6 | considered | contention | 68:17,21 | 35:13 38:1 | correction |
| 144:14 | 107:5 | 229:23 | 69:8 75:20 | 38:11 40:24 | 122:1 |
| 147:2 149:1 | 108:18 | context | 76:10 91:8 | 50:6 57:17 | correctional |
| 152:24 | 109:11 | 205:19 | 108:19 | 57:19 61:9 | 46:7,16 |
| 224:5 | 203:16,23 | continue | 110:1 | 63:23 69:24 | 51:15 54:1 |
| components | 204:13 | 37:18 66:11 | 136:19 | 71:17 76:4 | 54:8 55:23 |
| 10:3,8,13 | 216:15 | 144:19 | 139:9 | 78:16 85:12 | 92:7 112:14 |
| compound | 227:13,14 | 146:6 | 140:13 | 86:21 87:2 | 131:2,12,18 |
| 60:9 171:13 | 231:16 | continued | 142:24 | 105:10 | corrections |
| 197:1 | considering | 5:5 | 143:9,20 | 106:5 | 33:5 67:11 |
| concede | 24:17 | contract | 144:6 | 108:20 | 98:14 |
| 80:22 81:1 | 126:19 | 209:3,5,11 | 153:23 | 109:1 | 136:20 |
| concept | 164:22 | contractors | 155:15,19 | 112:17 | couldnt |
| 134:12 | consistent | 209:17 | 156:12 | 113:1,4 | 167:7 |
| concern | 123:5 | contrary | 160:10 | 118:13 134:7 | counsel 65:19 |
| 21:23 | constituted | 200:20,22 | 162:8 177:9 | 134:17,24 | 239:21,22 |
| concerned | 121:20 | control 147:8 | 209:2 | 141:22 | county 1:7,7 |
| 141:1 | constitutes | 150:12 | 213:12,17 | 145:8 152:9 | 2:10,15,16 |
| concerning | 239:13 | controversy | 218:11 | 156:21 | 5:10 6:1,4 |
| 171:11 | constructed | 24:19 | 219:15 | 160:18 | 7:9 8:1,11 |
| 218:17 | 77:19 89:5 | conversation | cookcounty... | 174:10 | 10:5,11 |
| 77:9 | 124:5 | 228:16 | 2:13 | 175:1 | 11:9,20,21 |
| conclusion | construction | 232:18 | cookcountyil | 178:20 | 12:1,4,15 |
| 107:19 | 9:12,16,20 | 234:18 | 2:20 | 181:16 | 13:18 14:7 |
| 129:6 138:7 | 12:14 31:7 | 237:9,14 | coordinator | 186:3,12 | 15:7,15 |
| concrete | 58:6,23 | cook 1:7,7 | 176:20 | 189:11 | 17:17,22 |
| 180:8 | 59:21 60:14 | 2:10,15,16 | 188:12 | 191:6,10 | 19:4,19 |
| 197:21 | 71:4,7 | 6:1,3 7:9 | 189:11,13 | 194:6 | 21:19 23:24 |
| conditions | 77:22 87:19 | 8:1,11 10:5 | 204:6 | 197:16 | 24:8 25:2 |
| 58:7 84:20 | 88:12,21 | 10:11 11:9 | copies 6:24 | 202:13,14 | 25:12 27:16 |
| 116:23 | 124:1 | 11:20 | 37:1 39:9 | 214:1 216:4 | 28:6,12,18 |
| 178:12 | consulted | 11:20 | 45:1 118:24 | 218:3 | 29:2 30:15 |
| conformance | 171:10 | 12:4,15 | copy 6:24 7:1 | 221:20 | 31:7 33:4 |
| 114:15 | consulting | 13:18 14:7 | 38:23 39:4 | 222:5 | 38:11 43:11 |
| confused | 9:21 | 15:7,15 | 39:6 45:2 | 225:16 | 47:8 64:7 |
| 48:24 | contained | 17:17,22 | 45:11 52:5 | 226:24 | 67:19 68:1 |
| consequence... | 156:11 | 19:4,18 | 116:8 | 227:13,18 | 68:18,22 |
| 148:24 | 204:8 | 21:19 23:24 | 139:15,17 | 230:18 | 69:8,23 |
| consider | contains | 24:8 25:1 | 141:2 | 235:3 | 75:20 76:10 |
| 205:17 | 86:10 | 25:12 27:16 | 167:13 | corrected | 79:13 81:1 |
| considerati... | 120:10 | 28:6,11,18 | corner 47:18 | 98:8,16,17 | 81:15 82:13 |
| 204:3 | contemplat... | 29:2 30:15 | 98:20 | 98:20 | 82:14 91:8 |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 10

| | | | | | |
|---|---|---|---|---|---|
| 128:7 144:9 | decisions | 144:1,5,17 | 162:16 | 114:10 | 189:24 |
| 157:2 | 205:4 | 145:12 | 182:23 | 170:20 | 202:2 |
| 172:19 | declarant | 146:3 | 195:3 | 174:21 | 216:16,17 |
| 197:12 | 96:19 | 150:14 | 239:10,16 | 220:3 221:3 | 216:18 |
| 224:22 | deemed | 154:1 | 239:18 | designated | 217:1 |
| 237:8,10 | 108:15 | depositions | 239:18 | 152:19 | 221:23 |
| dated 46:1 | defecate | 157:8 171:8 | 1:14 20:8 | 155:12 | 225:7 |
| 98:23 99:11 | 230:21 | 175:14 | 133:16 | 172:14 | 228:24 |
| 144:18 | defendant | 196:12 | 135:20,23 | 173:9,15,20 | 230:20 |
| 156:19 | 2:15,21 | departments | 173:9 | 174:9,11 | 231:1,15,21 |
| 167:6 | defendants | 148:10 | 174:9,11 | 185:1 | 234:23 |
| dates 25:6 | 1:8 149:1 | 154:2 | 188:17 | 204:19 | detainees |
| 167:10,12 | defense 24:15 | depend | 189:3 | 221:6 | 29:19 30:2 |
| 210:3 | 117:14 | 130:23 | 8:16 11:17 | designations | 31:3 62:12 |
| 211:10 | define 73:24 | 179:23 | 15:23 25:19 | 221:8 | 63:10 67:11 |
| dave 70:22 | 76:24 | depends | 49:12 50:1 | designed | 83:15 92:3 |
| 192:22 | defined 7:18 | 49:12 52:8 | 52:8 57:2 | 133:1 | 95:14,21,24 |
| 182:1 | 18:16 72:19 | 52:8 57:2 | 173:11 | 10:4 | 104:5 |
| 197:20 | definition | depicts | 122:20 | desk 51:1,5 | 112:20 |
| 190:4,7 | 201:20,21 | 187:15 | 203:1 | 55:22 172:16 | 111:11,21 |
| 193:23 | degrees | 203:1 | 123:2 | 212:8 | 112:8 |
| 194:6 | 114:24 | deponent | 180:2 | 180:2 | 133:14,14 |
| 195:18 | denied 218:15 | 238:8 | 7:14 | 197:15,20 | 136:7 |
| 211:16 | denies 106:2 | depose 34:14 | 197:15,20 | description | 137:10 |
| 240:2 | deny 187:5 | deposed | description | 7:5 10:7 | 138:12 |
| dayroom | dep 120:16 | 17:14 20:15 | 99:24 | 170:13,21 | 141:19 |
| 188:2,18 | 120:18 | 21:10 30:20 | 100:15 | 170:16 | 152:18 |
| 190:1 | 18:12 | 32:3 183:11 | 102:19,24 | 203:14 | 159:23 |
| days 67:16 | departing | deposition | 130:6 | detailed | 161:14 |
| 69:1,13,22 | 19:9 33:4 | 1:1 5:4 | 153:20 | 161:14 | 165:19 |
| 92:18 93:3 | department | 14:11 22:3 | 154:1 | detail 8:24 | 170:16 |
| 207:1 | 19:9 33:4 | 22:4 33:14 | design 8:9,21 | detainee 48:6 | 170:16 |
| depp 196:15 | 51:11 67:11 | 35:6 36:9 | 32:20 33:19 | 91:23 92:14 | 171:6,24 |
| december | 100:22,24 | 66:2 67:17 | 34:7 46:21 | 95:18 129:1 | 172:15 |
| 224:21 | 101:3,18 | 71:1 116:12 | 41:7,17,19 | 131:20 | 173:21 |
| deciding | 102:6,13,18 | 116:13 | 131:20 | 133:8 134:3 | 192:6 193:1 |
| 82:23 | 103:19 | 129:7 134:2 | 50:20,24 | 135:16 | 192:5 |
| 159:14 | 102:12 | 134:7,19,22 | 52:6 53:24 | 172:9 | 193:15 |
| 200:18 | 103:15,19 | 134:23 | 54:3,14,16 | 174:16 | 198:12 |
| 205:10 | 134:6 | 173:12,14 | 71:4,7 | 180:7,13 | 200:4,19 |
| decision | 131:14,16 | 137:4,12 | 112:13 | 185:11 | 205:13 |
| 201:16 | 143:2,16,19 | 138:5,10 | 112:13 | 185:11 | 206:6 |
| | | | | | 208:15,20 |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 9

| | | | | | |
|---|---|---|---|---|---|
| 91:9 108:19 | 27:17,18 | 10:24 | cummings | 120:14 | 193:3,10,20 |
| 110:1,14,18 | 28:3,13,13 | 214:14 | 2:18,20 3:5 | 121:4,21 | 194:11 |
| 111:10 | 28:19 29:14 | 217:9,12 | 8:12 9:14 | 123:15 | 200:12 |
| 119:12,15 | 29:20 30:6 | courthouses | 10:19 12:5 | 126:18 | 202:7,22 |
| 125:24 | 30:15 31:1 | 8:11,22 | 13:15 15:8 | 128:9 129:5 | 204:10,18 |
| 129:3,24 | 31:21 32:22 | 10:11,17 | 16:5,9,14 | 130:3,6 | 206:8 |
| 130:12,14 | 33:20 34:9 | 14:13 72:9 | 16:24 21:14 | 131:23 | 210:19 |
| 130:21 | 35:8 72:13 | courtroom | 21:17,22 | 132:13,18 | 211:5,15 |
| 132:9 | 73:8,23 | 76:19,21 | 24:9 26:5 | 136:8,21 | 221:9 |
| 136:19 | 74:3,3 75:1 | 77:10 78:20 | 26:10 29:21 | 137:24 | 222:23 |
| 139:9 | 75:3,6,12 | 79:8,22 | 30:8 31:24 | 139:14,18 | 223:10,14 |
| 140:14 | 75:19 76:8 | 80:7 81:11 | 32:6,10,13 | 139:23 | 223:24 |
| 143:1,9,17 | 76:17,18 | 81:12 84:5 | 35:13 36:24 | 140:3 142:8 | 226:6 227:1 |
| 143:20 | 79:12 81:2 | 84:21 85:18 | 37:14 38:21 | 142:15,17 | 229:22 |
| 150:3 | 82:16 83:20 | 88:16 91:4 | 39:2 47:23 | 144:22 | 230:16 |
| 153:23 | 92:19 93:19 | 91:10 226:2 | 48:15,22 | 145:21 | 231:3,7 |
| 155:15,19 | 93:20,23 | courtrooms | 52:10,14 | 146:9 | 232:1,13 |
| 156:12 | 94:20 96:4 | 83:14 | 59:15 60:7 | 147:18 | 233:4 234:3 |
| 160:10 | 96:6 101:9 | 227:10 | 60:10 69:5 | 148:1,13 | 234:9 |
| 162:9 171:4 | 102:11 | courts 1:13 | 66:3,6,21 | 149:18 | current 5:24 |
| 177:10 | 104:18 | 72:6 226:11 | 68:3 70:1,4 | 150:15,18 | 122:9,11 |
| 188:15,21 | 105:10 | cover 103:1 | 70:16 72:15 | 151:10,21 | currently |
| 205:20 | 106:18 | 130:16 | 72:22 73:14 | 152:14 | 13:21 32:21 |
| 209:2 | 108:24 | 131:1 | 75:21 80:23 | 153:9 154:9 | cursory |
| 213:12,17 | 109:22 | covered | 81:16 82:20 | 154:24 | 155:3 |
| 218:11 | 111:12 | 106:22 | 85:3 86:13 | 155:21 | custody 17:4 |
| 219:15 | 112:13 119:9 | 107:13 | 87:12 89:15 | 157:19 | 110:8 |
| 226:5,14,23 | 194:15,19 | 108:12 | 89:23 90:11 | 159:4,8 | 121:23 |
| 230:24 | 225:23 | 229:14 | 94:14,21 | 160:21 | 136:6 |
| 239:2 | 226:12,19,24 | 232:7 | 96:8 97:16 | 161:5 | cya 237:1 |
| | 227:7,24 | covers 151:3 | 98:18 100:7 | 163:10,17 | |
| countys | 230:23 | create 177:11 | 100:17 | 163:21 | D |
| 35:10 | 231:22 | 177:14 | 105:15 | 167:7 | d 3:1 4:16 |
| countywide | 232:12 | created 7:15 | 106:23 | 168:22 | 5:20 224:2 |
| 153:21 | 236:3 | creating | 107:6,14,24 | 169:23 | daily 112:5 |
| couple 6:21 | | 178:23 | 112:7 116:8 | 174:1 | 129:11 |
| 117:10 | courthouse | 109:13 | 110:6 111:1 | 176:11,24 | daley 1:16 |
| 162:3 | 10:17,12 | criminal 8:11 | 11:22 | 180:6 | 2:12,18 |
| 196:14 | 11:5 14:6 | 10:21 | 115:9 | 182:14,19 | date 3:6 |
| court 1:1 | 28:8 29:4,9 | criteria | 116:17 | 183:7,18 | 41:9 83:22 |
| 30:16 | 31:9 67:6 | 212:18 | 117:6,11 | 182:22,24 | 116:24 |
| 24:12 27:14 | 67:19 73:5 | crossexami... | 118:18 | 183:3 188:5 | |
| | | 3:5,6 | | | |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 11

| | | | | | |
|---|---|---|---|---|---|
| 208:22 | device 65:21 | difference | 76:9 79:13 | discovered | 161:2,10,18 |
| 218:9 | diagonal | 41:24 81:23 | 79:17 82:13 | 97:13 98:5 | 161:19 |
| 220:11,16 | 47:12 55:3 | 122:6 | 97:12 98:5 | 99:6 | 162:9,15,22 |
| 220:17 | diagram | different | 99:6 | discovery | 163:15 |
| 221:21 | 46:23 53:21 | 31:18 41:23 | 100:16 | 10:13 | 164:3 165:7 |
| 226:16 | 1:5:20 | 49:13 56:1 | 101:21 | 24:13,21,23 | 165:8,12,20 |
| 227:13,23 | 117:1 120:2 | 55:15 96:10 | 102:2,9,16 | 33:13 139:8 | 167:5 |
| 228:8 229:3 | 120:5 | 113:3 | 104:22 | discuss 47:20 | 196:16,23 |
| 229:3 | 121:10,11 | 115:16 | 123:16 | 122:23 | 212:24 |
| 230:13,18 | 124:11 | 125:20 | 130:11,14 | 206:16,21 | 222:18 |
| 232:12 | 167:2 | 134:11 | 130:15 | 206:23 | 223:2 228:8 |
| 236:3 | 172:12 | 135:13 | 151:17 | 235:20 | 233:2 |
| detention | 182:15,19 | 141:13 | 153:5 | doc 67:13,20 | |
| 113:1 | 183:2 | 148:20,20 | 176:21 | 148:17,18 | |
| 220:6 | differs 157:6 | 205:16 | 214:4 | 123:23 | doctors |
| 83:11 | diagrams | 166:9 | 167:19 | disabilities | 130:23 |
| 185:14 | 49:24 | 167:19 | disabilities | 107:11 | document 7:6 |
| 205:2 | 112:18,24 | 113:4 | 50:18 51:15 | 207:10 | 36:23,24 |
| determine | 113:2 | direct 3:3 | 143:12 | 229:16 | 37:2,4,6,10 |
| 60:13 | diameter | 148:12 | direct 3:3 | discussion | 37:15,16,16 |
| 131:17 | 48:12 49:7 | 29:16 30:1 | 143:12 | 32:16 | 37:21 39:3 |
| 198:10 | 29:16 30:1 | 148:8 | directly | 16:17 22:1 | 40:12,17,20 |
| 203:8 | 113:4,24 | 177:22 | 212:2,11 | 118:2 | 40:22 45:1 |
| determined | diaper | 192:11 | 218:15,17 | 138:22 | 45:18 51:10 |
| 138:5 | 231:12 | 203:23 | 227:13,14 | 219:12 | 51:13 52:4 |
| 138:7 | diapers 220:4 | 14:20 | 54:10 73:10 | 42:9 | 54:9 12 |
| 213:13 | 230:17 | 143:16 | 227:13,14 | dispensers | 156:8 |
| 213:13 | 231:1,15 | disabled | 223:14 | 42:9 | 86:15,16,17 |
| 218:11 | dident 23:16 | 107:5 109:5 | | distance | 89:11 116:7 |
| determining | | direction | 56:20,21 | 86:15,16,17 | |
| 199:5,12 | 59:19 62:2 | 170:24 | 113:1 | 58:1 | |
| develop | 78:23 79:2 | 239:13 | 113:1 | district 1:1,1 | 116:16,21 |
| 100:5,20 | 94:5,7 97:6 | division 1:2 | 170:24 | 1:13 | 118:16,23 |
| 101:11,15 | 97:8 113:11 | 32:24 36:3 | division 1:2 | 119:2 121:5 | |
| 101:17 | 113:24 | 218:15,17 | 32:24 36:3 | 140:11,15 | |
| 102:5 | 133:23 | 210:24 | 54:10 73:10 | 140:22 | |
| developed | 141:16 | disclosed | 227:13,14 | 141:4,5,7,8 | |
| 9:21 10:23 | 147:10 | 239:23 | 153:7 182:9 | 141:10,11 | |
| 101:2,7,13 | 152:7 182:9 | director 6:2 | 20:21 86:18 | 145:3,23 | |
| 102:13 | 153:17 | 7:6,13,16 | 116:18 | 154:14 | |
| 104:4 197:9 | 155:7 182:9 | 121:5 | 71:4,7 | 155:18 | |
| developing | 202:5 229:4 | 119:6 | 26:20 40:23 | 159:22 | 156:8 |
| 102:3 | 231:18,18 | disclosures | 36:19 | 161:7,15 | |
| develops 9:9 | differ 157:4 | 39:16 | 160:17 | 161:7 164:6 | |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 63

164:9,13,14
172:18
173:7 183:8
196:17,17
197:9
**documents**
9:12,16,20
9:23 18:22
19:6 39:8
40:14 67:8
67:17,24
68:6,10,13
68:14,15,19
68:20,24
69:3,19
70:6,12,13
70:24 91:7
91:12
128:11
145:22
157:10
**doesnt** 25:21
57:24 81:16
81:18
114:14
163:18
176:5
178:8 179:3
187:4
201:14
202:13
219:3
**dog** 166:3,6
**doing** 83:24
94:18 95:2
118:17
**doj** 71:3,3
112:15
**dont** 6:12,23
16:1 17:15
20:21 21:9
31:16 37:1
39:9 41:9
43:7 59:10

59:13 61:12
61:13 62:11
62:14,23
64:18 66:8
74:14,16
77:11 79:7
79:10 83:16
90:19 91:5
91:17 92:16
92:21,23
93:6,13
94:1,1,11
94:16 95:16
95:17,23
98:9 99:22
101:17
102:5
103:23
104:21
110:17
111:18
114:8 115:7
115:14,17
118:3
119:24
121:3
122:8
135:22
148:18 157:7
150:12
157:22,23
161:16,20
165:16
169:10
171:7 174:7
183:7
185:16
187:5 188:5

190:18
191:24
192:19
202:9,14
205:1
209:12
213:5
216:10
224:22
228:1,15
229:17,22
235:22
236:4,7
**door** 44:9
49:4
**doors** 43:19
**dorm** 158:10
160:7,17,18
161:2,10,19
162:9,15,22
164:3 165:8
165:9,12,20
166:1,6
167:17,22
174:5,9,11
175:22
176:5 179:8
179:17,20
191:13
198:22
199:2,2
205:12
212:17
**dormitories**
159:21
159:24
161:20
162:13
239:8
**duties** 7:12
7:14,21
100:4,9,18

169:7,20
170:4,14
172:1,4,13
173:13,18
174:14
175:17
177:15
180:11
191:5,9
192:18
206:10,19
202:19
206:5
220:22
**dr** 201:20,21
**dreft** 86:11
188:8,18
186:5
50:4 55:18
**drawing**
45:20
54:13 65:19
**drawings** 8:7
8:10,21,23
32:20 33:19
34:7 95:7
95:12
127:12
183:1
**dryers** 42:9
**dug** 98:8
**duly** 5:2,18
239:8
**duties** 7:12
7:14,21
100:4,9,18
     E
**e** 2:1,1 3:1
4:1,16,16

4:16 5:20
5:20 211:14
221:11
224:2,2,2
236:11,11
**eager** 209:13
**earlier** 147:7
211:16
214:10
215:3
**early** 161:24
214:22
**eating** 202:18
**eddie** 72:3
73:22
81:2 83:12
188:6
162:5 164:2
164:4
168:10,13
168:14,16
168:19
170:23
171:17
173:15
174:20
175:6
176:17
182:6
183:17
184:8
198:14
201:17
202:6 204:9
211:17,20
211:24,24
212:3,8
214:8 217:9
219:7,8,10
222:17,24
223:6
227:19
233:12,14
**elevated**

184:1
**elevator** 85:5
85:15 88:15
**eliminating**
187:6
**email** 41:13
46:5,13,21
56:3,8
70:10,13
118:3,9
195:24
196:3
207:22
208:1,6
219:5
**emails** 69:10
69:12,14,16
70:21 195:8
**employ**
1:19:18
**employed**
21:19
**employee**
239:20,22
**employees**
102:10
151:19
**employment**
144:24
**enactment**
108:24
**encompasses**
112:10
**ends** 160:19
173:23
**engineering**
7:24 8:5
**engineers** 8:6
9:22
**ensure** 148:4
213:23
**ensured** 98:1
**ensures** 7:24
**enter** 135:5

**entered** 143:1
**entire** 11:7
127:4 211:2
**entities** 109:4
213:8 219:6
**entitled**
109:20
129:23
129:17
131:21
140:12
218:16,18
**entitlement**
108:7
226:17,20
**entity** 108:15
153:23
218:19
**entry** 48:20
211:11
**evidence** 60:8
112:13
**enumerate**
122:23
**environment**
179:19
**equal** 109:7,8
109:9
114:20,22
115:1
122:18
185:12
200:24
**equality**
122:19
**equipped**
119:23
190:1
**equip**
118:22
**equivalent**
114:6,18
**erroneous**
153:24
**escape**
159:14

**escort** 188:17
**essence** 73:12
**establish**
141:12
**established**
82:24 83:1
87:13
**estimate**
165:15
**evaluate** 9:8
**evaluating**
146:6
**evaluation**
155:16,20
156:12
161:8
**event** 48:2
141:3
211:11
**evidence** 60:8
111:2 132:1
207:17
**exact** 30:11
41:9 111:19
144:9 174:7
199:21
222:22
230:15
237:10
**exactly** 8:17
33:24 34:3
194:5
**examination**
1:11 3:3,8
3:11 6:12
120:2,20
124:11
139:2,6,7,8
140:11
154:7,8
156:5
166:14,15
166:17,18
166:19,20
166:22

**exception**
64:13
**exceptions**
214:11,22
**exhibits**
215:4
**existing**
18:17
     F
**f** 4:16 146:3
**facilitation**
14:4
**facilities**
10:24 19:4
25:13 37:9
37:11,12,17
41:5 46:7
46:16 51:15
54:1,8
112:14
119:10
131:12,18
132:6,23
163:14
188:19
214:3,4
215:15
226:18
227:23
228:3,5
**facility** 14:3
45:21,24
55:23
124:23
125:13
131:2
192:22
198:16
205:15
217:15
**facing** 47:15
158:22

167:21
195:7
214:11,22
**extra** 44:24
**extremely**
18:17
     F
167:21
195:7
**exempt**
116:22
124:2
217:14
225:12
**expand**
208:19
**expansion**
171:21
**expectations**
129:12
**expected**
129:21
**expedition**
21:21
**expert** 20:18
20:21,22
21:2,24
22:3,7,14
23:4 98:22
99:9 107:17
117:23
123:9
**explain** 22:20
36:14 82:9
116:17
**expressed**
99:1
**expresses**
99:20
**expressing**
115:18
**extent** 8:9
9:11 10:2,6

198:3 199:1
234:21
235:21
**factors** 205:9
**facts** 60:8
111:2 132:1
145:2
204:23
205:2
207:16
**fair** 165:15
141:22
142:1,4,5,6
181:23
218:18
218:2,6
**fall** 223:23
**falls** 64:13
**familiar** 51:6
166:5,7,8
180:18,21
183:13
190:11,24
191:23
**far** 10:21
11:10 88:3
96:11
131:22
141:1 149:6
223:8
**faucets** 42:8
**feasibility**
114:13
**feasible**
114:17
**features** 43:6
**federal** 1:12
51:12 54:5
112:15
**feedback**
144:2

**222:19
223:4 224:4
223:14
225:4
225:4
**fifth** 80:6,10
83:13
111:2 132:1
145:2
**filed** 237:16
**filled** 56:19
**filtered** 28:7
**final** 140:24
141:22
142:21
156:23
157:2
172:19
183:1,5,13
196:17
111:4
153:15
198:10
214:22
144:7
16:14 17:7
16:13 23:19
26:17 27:2
96:6 140:14
212:14,20
215:16,22
228:3
227:11
144:24
211:19
180:9,10,11
197:11,16
196:23
100:3,10,6
**fixed** 56:18
184:2,7
186:8,14
190:7,14
202:3
200:17
211:16
212:14,20
215:13
215:21,22
228:3
**fixture** 58:22
**fixtures** 42:7
**flat** 63:13
**floor** 11:16
11:18,21
12:3,46,24
214:12,16
215:1,12,14
215:21,22
228:3

**followups**
160:3
**foreging**
103:8
**forest** 130:17
153:22
**forget** 75:13
**form** 8:12
9:14 13:16
15:8 26:5
26:10 30:8
40:3 43:2
44:6,15
48:22 50:10
70:16 74:20
97:16 98:18
100:8 103:6
105:15
106:18
113:4,6
107:6,24
108:9 109:2
113:15,17
113:21
123:15
126:7 130:3
134:11
135:13
135:19
139:24
143:1,8
144:10,13
146:23
147:18
151:21
152:16,24
155:17
181:7
183:18

**185:4
192:15
193:3
196:24
197:24
202:7,23
200:10
202:1,5
225:8 225:8
232:1,13
233:4
**format**
142:19
**forth** 55:15
**forward** 98:2
**foundation**
8:13 14:14
74:21 82:22
85:3 86:14
87:12 89:15
89:23 90:11
108:9
112:16
193:10
195:18
100:8 103:6
105:15
106:18
107:6,24
108:9 109:2
113:15,17
113:21
123:15
126:7 130:3
134:11
135:13
139:24
four 17:5
99:15
153:15
152:9
182:21
183:3
186:2
184:8
181:22
**fourth** 80:6
181:22
**frankly**
125:19
**free** 17:8
**front** 47:11
47:14 49:4
55:2,4
56:12 64:18
166:13,16
176:14
172:12
215:17
216:9

**fucking**
81:23 83:3
**fuentes** 70:22
104:10
171:15,21
189:10,17
192:24
193:19
194:4,14
196:4,21
197:14
206:17,21
206:24
207:13,24
full 5:22
119:24
192:18
**fully** 43:7,12
149:22
224:5
**functions**
134:16
**funding**
98:13
**further** 3:11
210:18
236:9 237:3
238:4,8
**future** 30:14
30:24 35:7
35:16,22
177:21
208:14
**fyi** 195:17
     G
**g** 2,3,4
**gain** 188:1
**gang** 220:22
220:23
**gather** 208:3
**general**

131:14
135:17
137:15
139:2,18
205:11,14
205:15,23
206:13
209:10
205:17,22
206:24
207:13,24
**generally**
139:20
196:4,21
197:14
206:17,21
226:24
207:13,24
226:24
227:3,24
209:6
179:10,21
182:12
221:24
223:16,18
224:20
**genuine** 76:8
**given** 110:12
210:18
236:9 237:3
238:4,8
145:18
239:4 239:8
**gives** 99:10
**giving** 194:2
194:11
**gmail** 2:6,7
**go** 16:5 21:4
21:24 22:22
23:16,18
34:24 35:4
36:13 37:18
60:16 65:11
47:23 61:18
63:19 65:13

78:13 83:3
90:17 91:23
92:3 96:17
96:23 108:7
205:11,14
205:15,23
206:13
110:21
103:3,22
104:16
131:11
138:20
96:11 97:4
197:10
101:9 108:1
88:13 91:15
95:14,18,21
95:24 96:3
96:11 97:4
197:10
142:17
96:11 97:4
143:18,20
163:1,3
159:9,20,21
117:18,23
210:19
118:14,14
124:1
122:11,24
124:19
129:9 136:1
136:9,21
145:23
153:7 161:17
147:5,23
165:4 184:1
134:6,23
184:6,24
190:2 201:9
210:7,10
176:22
232:2,17
224:1
232:22
**goes** 11:10
128:3,9,12
140:6,10
165:18,23
210:1,7
210:10,17
214:1
213:22
222:9
215:24
222:12
**guidelines**
47:18,19
48:9 49:10
50:8 60:17
60:18 100:6
100:12
112:13
**guides** 46:21
47:1 113:13

Plaintiff's Exhibit 9 Page 64

MICHAEL GUMM
May 11, 2016

Page 16

gumm 1:10 | happen | 133:17 | 77:16 78:19 | 27:22 28:1 | illinois 1:1,7
3:2 5:4,8,16 | 151:12 | helpful | 79:23,24 | 132:11 | 1:16,17 2:5
5:23,23 | happened | 194:11 | 80:2,8,9,12 | 143:21 | 2:12,19 6:7
16:13,20 | 33:10 | hereto 239:23,3 | 82:19 83:6 | 161:11 | 6:10,15
17:5,14 | 136:24 | hereunto | 83:13 84:4 | 170:6 | 239:1,4
19:7 21:2 | 145:5 | 240:1 | 85:1,15,16 | 178:14 | 240:2
22:6 25:5 | harper | hes 9:17 | 91:3 97:24 | 208:15 | isn 5:8 6:11
25:11 32:5 | 116:18 | 14:13 15:10 | 113:1,14 | hypothetical | 8:17,20
33:11 39:21 | 117:12 | 21:19 30:18 | 114:1 | 165:16 | 9:10 10:15
40:18,21 | hasnt 83:1 | 68:8 72:6 | 224:13 | 106:24 | 11:6 12:21
100:1 105:4 | 163:19 | 81:11,12 | 226:3,10 | 107:7 | 12:22 13:15
125:21 | havent 82:22 | 86:15 | 227:9 | 131:24 | 13:21 14:8
144:3 | 82:23 135:9 | 119:14 | 233:11 | 132:15 | 16:2,24
163:12 | head 47:16 | 128:22 | 136:24 | 136:24 | 19:19 21:8
164:22 | 77:12 | 147:18 | home 159:14 | 200:11 | 21:9 22:7
175:3 | 220:24 | 153:14 | honest | 202:8 | 23:6,7
209:23 | healing | 163:17 | 199:20 | 204:17 | 26:22 30:11
211:11 | 157:22,23 | 170:1 | hoping 210:2,2 | 206:11 | 30:16,20,21
234:16 | health 102:17 | 193:12 | horizontal | 231:5 | 31:11 32:2
gumms 82:12 | 150:20 | done:19 | 87:6 | | 32:3,10
117:21 | 150:21 | 209:13 | hospital | **I** | 33:14,15,24
144:24 | 153:22 | 211:9 235:9 | 152:24 | id 5:10 46:21 | 35:2 36:21
210:21 | 204:1 | high 216:4 | 202:5 | 66:17 | 37:8 38:17
| | highlights | hospitals | 184:16 | 41:11 44:2
**H** | hearing 89:9 | 138:17 | 102:18 | idea 160:7 | 44:19 46:9
h 4:1 | hearings | 71:8 | 130:18 | 165:16,18 | 47:23 48:24
habit 82:23 | 28:13 29:20 | highly 164:20 | 156:21 | 188:20,22 | 51:17,18
half 82:5 | heed 220:24 | hilarious | 152:22 | 190:9 | 52:10,23
93:21 94:4 | height 57:17 | 234:10 | 204:1 | 191:16 | 53:16,19
102:24 | 57:20 60:3 | hints 194:11 | hour 82:5 | 201:19 | 54:3,11,13
120:10 | 60:19 61:1 | hire 8:6 | 93:16,21,21 | identificati... | 61:3 65:9
hallway | 62:7 77:18 | 145:16 | 94:3,3,10 | 6:19 36:19 | 65:21 67:12
230:14 | 72:23 78:5 | hired 7:16 | 104:22 | 38:15 45:14 | 67:21 68:3
handicap | 78:14,15 | 146:4,11 | hours 93:16 | 51:23 66:14 | 68:23 70:3
37:22 | 122:12 | hiring 209:16 | house 130:1 | 86:8 116:3 | 73:15 75:14
handicapped | 233:24 | history 54:12 | 163:15 | 118:12 | 75:21 80:6
35:24 74:2 | held 28:12 | hold 159:22 | housed 28:6 | 139:3 | 80:15 86:14
83:8 151:9 | 62:12,15 | 161:8 | 131:2,2,21 | identified | 86:13 96:18
handled | 159:18 | holding 11:7 | 138:12 | 182:19 | 100:6,10
232:6 | help 104:5 | 11:11 74:18 | 160:7 | identify | 106:10
handrails | 128:10 | 75:2,4,6,11 | 162:9 20:19 | 106:8 | 110:4
88:7,8,11 | 194:22 | 75:19,24 | 165:19,24 | idoc 73:12 | 111:14,18
88:16 | helped | 76:8,16,21 | 171:24 | il 213:9 219:6 | 112:11
| | | 77:2,5,6,13 | housing | ill 13:1 | 115:9,20

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 18

involvement | jacqueline | joc 209:2,4 | 143:2,16,19 | 136:5,10 | 237:21
23:23 | 2:11 39:3 | 209:11 | 144:1,5,17 | 139:19 | knowledge
involves | jail 8:10,22 | johnson | 145:12 | 140:2 | 27:23 28:9
72:12 | 10:5,11 | 75:14,15 | 148:10 | 142:2 144:9 | 29:12,16,17
involving | 11:9 15:7 | join 10:19 | 149:5 151:7 | 149:5 151:7 | 30:1 43:13
104:6 125:9 | 15:15 17:17 | 70:19 | 156:3 | 151:12,18 | 50:15 62:11
iowa 221:17 | 17:22 19:19 | 200:12 | 156:13 | 152:17,22 | 90:20 91:1
irrelevant | 23:24 24:8 | joined 11:19 | 157:8 | 153:2 | 91:6 113:12
103:8 | 25:2,13 | 12:1 31:7 | 175:14 | juvenile | 119:13
isolation | 27:16 28:6 | 213:17 | | 154:17,20 | 119:23
11:12 137:6 | 28:12,18 | joining 14:7 | **K** | 158:4 161:2 | 123:24
issue 26:1 | 29:2 62:16 | 75:20 102:1 | k 239:2 | 227:6 239:1 | 130:10
191:17 | 62:19 68:1 | 177:9 | keep 237:19 | | 137:20
224:20 | 68:18 69:8 | joint 148:19 | kind 106:8 | **L** | 142:22
issued 9:21 | 72:5 76:20 | 148:21 | 107:8 176:8 | labeled 28:23 | 149:1,3,9
51:12 54:4 | 130:2 144:7 | judge 22:20 | 180:13 | 155:15 | 150:13
112:15 | 155:15,20 | 33:2 34:16 | know 15:24 | labels 235:14 | 151:11
issues 24:17 | 128:21 | 36:4,10,14 | 16:1 20:4,5 | | 152:2,11
24:22 27:2 | 162:9 193:9 | 71:10,14,18 | 20:6 25:20 | | 153:14
67:18 68:17 | 199:15 | 84:8 211:3 | 26:22 28:5 | | 158:7
74:9,11,15 | judged | 56:21 66:3 | 185:17 | 170:12
74:24 146:7 | 131:18 | 66:8 67:2,3 | 189:21 | 175:20
jacks 34:6,7 | 206:6 | 179:14,16 | 205:3 | 176:1,7
item 122:13 | 201:16 | 189:2 | 69:13 88:6 | 190:21 | 177:9
items 41:17 | judy 12:4 | 71:1 | 179:1 83:16 | 191:2 | 187:22
149:23 | jumped | 90:19 91:5 | 192:19 | 191:12,20
171:16 | 156:10 | 91:17 92:5 | 193:14,23 | 192:8,11,12
ive 33:3 | june 6:5 12:9 | 92:6 101:18 | 200:15 | 201:15
43:15 74:23 | 31:8 76:11 | 102:7,13 | 204:11,18 | 210:13
94:13 99:15 | 76:17 77:4 | 103:15,20 | 211:2 | 213:3 217:8
119:18 | 78:9,21 | 201:6,21,22 | 202:9 | 220:15
139:14 | 224:16,18 | 97:13 98:15 | 208:23 | 226:7
192:17 | 224:19 | 99:6,14 | 213:6 216:6 | 232:10,17
jcarroll 2:13 | 101:13,16 | 104:10,13 | 218:9 | known
jackie 35:20 | joan 183:9 | 101:21 | 109:18 | 130:10
jackson | hell 7:4,11,23 | 109:24 | 111:18,19 | 220:20 | 130:1
100:14 | 107:9 9:24 | 110:8,17 | 114:6 | 221:5,8 | kunz 183:9
jacob 41:2 | 100:14 | 119:16 | 119:6 | 226:8 228:1
jacobs 46:18 | 103:13,21 | 209:24,24 | 120:14 | 228:5 | **L**
jacobsel 41:3 | 153:19,24 | justice 19:10 | 128:6 | 229:17 | labeled 28:23
| 189:21 | 51:12 | 129:8 | 232:9 236:1 | 155:15
| | 131:13,16 | 220:2 | 234:6,4,5,7 | labels 235:14

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 17

118:14,19 | 142:24 | 59:14,24 | 118:9 | 19:2 24:20 | 11:12 37:22
121:21 | 144:11,20 | 60:20 61:1 | indicating | 25:6 46:19 | installed 40:7
15:22 | 145:7,10,15 | 61:2 62:7 | 121:8 | 156:11 | 57:17
130:14 | 146:16 | 62:21 77:18 | 127:12 | 205:5 | installing
139:5 | 147:4,7 | 78:6,14,20 | 173:3 | infrastruct... | 11:1 43:17
140:10,18 | 148:3 149:2 | 87:24 216:4 | indirect | 14:2 | instance
141:1 142:3 | 149:10,21 | 222:12 | 192:12 | initials 121:1 | 170:13
143:22,24 | incident | indicated | indirectly | initiate 71:5 | instruct
144:22 | 13:2 24:17 | 138:5 | 239:24 | 71:6 | 25:23 35:11
150:4 153:9 | 24:21 | include 54:23 | individual | inmate | 35:15 73:16
153:11 | important | 55:2 75:2 | 42:10 | 128:20 | 158:11
158:11 | 63:12,15 | 100:5 155:6 | 108:12 | 129:4 | 178:7
161:5 162:6 | improper | 218:22 | 175:18 | 136:19 | instructing
163:13 | 34:23 | included 19:1 | 201:3,5 | inmates | 36:8
164:21 | 125:12 | 178:13 | 212:11 | 27:16 28:11 | integrated
169:18,23 | improve | 203:24 | 216:11 | 28:18 29:2 | 8:1,8
170:8 | 171:16 | includes | individually | 29:13 31:10 | intend 20:17
172:16,19 | improved | 139:8 | 123:19 | 143:11 | 21:1 22:6
178:6,21 | 114:19 | including | individuals | 148:6 149:7 | 22:15 23:3
180:14,23 | 115:4 | 47:11 148:6 | 109:6 | 150:7 | 30:4
181:6 | improve... | 198:18,19 | 170:24 | inmate's | intended
182:15,24 | 9:9 219:4 | incomplete | 173:10,12 | 131:10 | 6:24
183:13 | incapacitated | 52:5 64:20 | 174:12 | inmates 61:19 | intends 22:13
190:19,24 | 10:4,9 | 105:16 | 186:8 190:7 | 61:17 | 23:13 217:8
192:1 194:17 | 114:9,16 | 107:7 | 198:6 201:4 | insinuating | intent 42:19
196:1 | 195:9 | 131:24 | 203:2 206:2 | 145:2 | 42:21,23
204:23 | inaccessible | 132:14,15 | 207:20 | inspect 41:7 | interested
207:24 | 112:1 | 200:11 | 208:18 | 61:15,17 | 25:8 239:23
208:4 210:1 | 133:8 | 202:8 | 218:15,17 | 76:4 | intermediate
210:21 211:2 | 138:12 | 204:16 | 219:14 | 80:8 83:19 | 88:20 89:1
211:11 | 225:7 | 206:10 | infamous | 119:17 | 89:3
214:21 | inaccurate | 231:4 | 117:18 | 198:2 | internet 65:2
215:3 | 125:17 | incontinence | inferred | inspected | 65:6
218:13,16 | incarcerated | 220:6,8 | 113:8 | 56:9,11,22 | interrogato...
221:18 | 25:1 158:8 | 231:9,11,12 | infected | 57:3 58:18 | 159:5,7,9
222:7 223:2 | 202:3 | incorrectly | 20:11 22:18 | 59:2,5,9 | investigation
227:4 | inch 222:11 | 130:13 | 23:10 25:22 | inspection | 153:1
| inches 44:22 | indicate | 155:9 | 56:10 61:16 | inviting
implement | 44:23 49:22 | 121:11 | 162:20 | 84:4,22 | 144:8
160:13 | 53:11,14 | indicated | 146:2 | 84:3,7,13 | invoke 100:4
implement... | 55:23 57:23 | 161:10 | inform 197:7 | 84:15 | involved
19:8 140:2 | 58:3,9,19 | 173:22,23 | 237:24 | install 57:9 | 10:18 36:3
141:5 | 59:4,8,12 | indicates | information | 10:18 38:11 | 37:8 145:11

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 19

lack 125:19 | lavatory 42:4 | 79:12,18,24 | license | longest 94:6 | 202:14
185:8 187:1 | 165:4 225:6 | 81:2 82:16 | 240:10 | look 7:23 | lot 36:1 60:12
lacking | 225:11 | 83:19 89:20 | licensed 6:6 | 8:23 9:4 | 68:15,19
185:19 | law 2:2,9,16 | 91:16 92:4 | 6:10,11,14 | 36:23 38:19 | 69:2 95:1
lacks | 34:12 | 92:9,19 | 221:23 | 45:17 46:22 | 193:15
lacy 14:12 | lawsuit 19:12 | 93:9,20,23 | limit 114:8 | 49:19 52:7 | low 211:6
lady 84:4 | layout 48:1 | 94:20 95:4 | limited 24:11 | 66:18 67:9 | lower 11:11
lake 83:14,16 | lead 84:4 | 95:11 96:4 | line 4:18 | 67:17 86:12 | 15:13 24:6
34:14,24 | leading 76:20 | 97:24 101:9 | 17:1 53:18 | 100:3 105:6 | 26:6 57:22
36:3,16 | 106:18 | 101:20 | 55:22 80:19 | 112:22,23 | 64:17 72:8
37:1,3 | leads 84:21 | 197:20 | 162:3 | 114:10 | 80:4 208:22
40:13 52:16 | 85:1,5 | 119:17 | 144:10 | 146:2 148:1 | 233:1 236:2
66:19 71:18 | learned | 106:18 | 218:20 | 160:6 | luck 65:16
71:19 73:10 | 186:4 190:4 | 107:22 | line 120:9 | 164:4 149:24 | lunch 65:23
73:11 82:7 | 214:2 | 108:8,23 | list 119:22,24 | 173:5 |
84:7,13,17 | learning | 109:22 | 155:10 | 184:16 | **M**
84:19,22 | 83:17 | 110:23 | listed 197:10 | 198:7 | m 1:18 5:20
86:24 96:8 | 110:18 | 111:13 | 198:7 | looked 53:23 | 38:7 158:3
96:9,15,20 | 143:22,24 | 112:3 | little 65:14 | 57:13 68:14 | 158:7
98:23 99:12 | leaning | 214:14,21 | living 192:6 | 68:15,19 | 159:21
101:7 | 143:22,24 | 217:9,12,20 | lock 240:11 | 62:24 69:2 | 160:16
102:7,11 | lease | 222:18 | lockdown | 69:15 91:7 | 161:3,7,15
211:1 | lei0137 89:19 | 225:24 | 167:23 | 91:12 | 161:17
224:19,20 | legion | 227:2,24 | 167:20 | 161:17 | 211:14
235:5,9,10 | leighton | 230:23 | 230:9 | 164:17 | 221:14
236:13 | 10:21 11:4 | 231:16 | looking 46:9 | 224:2
238:2 | 23:11 25:22 | located 38:9 | 53:16,17 | 266:3
laid 50:18 | 27:14,17 | 79:14,19 | 90:7,14 | maintained
118:3 | 28:2,8,13 | length 57:4,5 | 94:23 | 91:8
227:17,19 | 29:9,15,20 | 199:1 | 112:2 | maintenance
landing | 30:6,15 | 208:21 | 197:17
88:20 89:1 | 31:1,9,21 | letter 14:10 | 18:18 20:12 | making
28:14 | 32:21 33:6 | 23:15 | 141:13 | 58:15 62:1
large 117:7 | 33:20 34:7 | 144:6,8,17 | lockup | 64:2 133:10
larger 117:2 | 34:9 35:8 | 162:21 | 222:19 | 153:20
late 41:10 | 36:7,9 | level 11:11 | 124:11 | males 38:9
56:10 77:4 | 35:23 36:5 | 15:13 24:7 | 221:4 224:5 | man 178:11
77:20 78:2 | 67:6,19 | 73:5,3,22 | long 6:3 | 154:4 | management
83:7 139:10 | 74:3,4,9,18 | 80:5 85:23 | 19:24 66:1 | 167:20 | 11:1 37:9
139:12 | 74:24 75:3 | 233:2 236:2 | 80:2 188:14 | 181:1 | 37:11,13,17
161:24 | 75:6,12,19 | liability | 193:23 | 182:15 | 41:6 214:3
217:13 | 76:1,8 | 237:1,2 | longer 54:1 | 197:23 |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 65

MICHAEL GUMM
May 11, 2016

Page 20

| | | | | | |
|---|---|---|---|---|---|
| 214:4 | 35:16 81:16 | 199:10,14 | 170:20 | 62:21 125:1 | 165:24 |
| 227:20 | 81:18 | 203:18 | 174:22 | 208:13,13 | 166:23 |
| **manager** | **matters** | **meant** 44:5 | 208:12 | **minutes** | 195:23 |
| 119:10 | 239:9 | 87:4 170:21 | **meets** 60:13 | 234:12 | 225:22 |
| 192:22 | **maureen** | 211:20 | 122:9,11,13 | **minutes** 82:5 | **monitoring** |
| **manner** 18:5 | 34:15 83:21 | **measure** 32:1 | 109:5,8 | 93:16 195:2 | 159:13 |
| 50:9 | 84:19 105:5 | 56:3,12 | 175:15 | **mirror** 62:18 | **monitors** 9:8 |
| **manufactu...** | **max** 88:24 | 77:23 79:2 | 187:21 | 62:21 | **month** 94:9 |
| 235:20 | **maximized** | 79:4,5 | 219:21 | 181:24 | 94:11 |
| 236:13,16 | 203:16 | **measured** | **member** | **mirrors** 42:7 | **months** 17:5 |
| 237:6 | **maximum** | 63:5,7 | 96:15 135:4 | 42:8 221:3 | 20:22 |
| **march** | 87:23 88:24 | 92:24 | 228:22 | **misrepresc...** | **morning** |
| 224:16 | 93:18 199:6 | **measureme...** | **memo** 206:4 | 125:18 | 139:13 |
| **mark** 45:8 | 203:8,12 | 62:9,23 | 227:16 | **misrepresc...** | 154:15 |
| 166:20 | 207:8,14 | 63:8 99:10 | **memorand...** | 148:17 | **morrissey** 2:3 |
| **marked** 4:2 | **measureme...** | **measureme...** | 4:18,12,13 | **misrepresc...** | 2:4,4 3:4,4 |
| 4:12 6:18 | 10:6 11:17 | 60:12 61:9 | 72:2 199:4 | 145:19,21 | 3:11 5:2,21 |
| 6:21 7:3 | 13:17 32:1 | 61:11 63:2 | 203:7 | **missed** | 6:20,23 7:2 |
| 36:18,21 | 34:1,2,3 | 86:2 | 206:20 | 216:17 | 8:19 10:1 |
| 38:15,18 | 42:1,6 | **mechanical** | 216:18 | **misstatement** | 11:3 12:13 |
| 40:16 45:13 | 43:22 44:16 | 64:12,13 | 157:17 | 24:2 | 13:7,13,23 |
| 45:16 51:17 | 49:6 67:22 | **medical** | **mentioned** | **misstates** | 14:17,18 |
| 51:22 52:2 | 69:14 73:24 | 204:12 | 56:7 135:19 | 36:1 43:3 | 15:5,11 |
| 66:13,16 | 86:1 93:15 | **meet** 43:14 | 152:7 174:8 | 70:1,17 | 16:7,12,16 |
| 86:5,7 89:9 | 106:2 108:3 | 43:20 44:10 | 191:4 | 103:7 206:9 | 16:19 17:13 |
| 115:22 | 122:8 | 58:11,22 | 234:16 | 225:9 227:1 | 17:21 18:1 |
| 125:6,12 | 155:21 | 59:6,19 | **merged** | 231:5 | 18:7,14,22 |
| 117:14 | 157:19 | 60:1 61:5 | 237:1,7 | **misunderst...** | 19:1,16 |
| 118:11,15 | 168:12 | 77:21 87:14 | **met** 43:23 | 191:1,16 | 20:14,17,24 |
| 139:2,5,7 | 172:3 177:3 | 88:4 125:1 | 72:4 75:17 | 130:21 | 21:6,11,16 |
| 148:2 | 187:4 | 127:17,20 | 124:9 125:1 | 176:7 | 22:5,11 |
| 166:23 | 191:18 | 169:2,11 | 126:4,12 | 202:16 | 23:2,20 |
| 173:6 | 198:16 | 170:4 | 127:24 | **mixed** 34:12 | 24:4 25:9 |
| **marlene** | 199:9 | 175:13 | 127:20 | **mobility** | 26:2,8,14 |
| 70:22 | 201:14 | 185:20 | 201:22 | 222:3 | 27:3,11 |
| 104:10 | 202:9 203:4 | 186:1,21 | 199:13 | **modification...** | 30:3,12,19 |
| 171:10,15 | 203:17 | 199:13 | 203:4 | 225:13 | 30:23 31:19 |
| 192:24 | 225:11 | 203:4 | 5:23 40:18 | **modify** | 32:4,8,12 |
| 193:3 | 226:20 | 212:18 | 40:21 | 218:24 | 32:15,18 |
| 196:3 | 229:13 | 213:5,24 | 117:21 | **moment** | 33:9,13,17 |
| 206:16,21 | 234:13 | 214:9 | **mike** 75:15 | 38:20 60:17 | 33:22 34:4 |
| 206:24 | **means** 42:3 | 217:10,14 | **mine** 80:24 | 86:12 100:4 | 34:18 35:1 |
| 208:7 | 43:8 44:10 | 217:15 | 130:24 | 117:7 | 35:5,19 |
| **matter** 24:14 | 161:11 | **meeting** | **minimum** | 129:14 | 36:11,20 |

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 22

| | | | | | |
|---|---|---|---|---|---|
| **number** 6:22 | **nursing** | 33:23 40:3 | 177:19 | **occasions** | **okay** 16:16 |
| 7:4 36:22 | 102:15 | 43:2 44:6 | 183:18 | 183:14 | 38:10 39:14 |
| 45:3 51:18 | 132:21,22 | 44:15 48:22 | 185:3,4 | 185:3,4 | 41:22 46:2 |
| 52:3 60:16 | 133:3,7,17 | 50:10 59:15 | 192:15 | 50:23 | 46:11 48:20 |
| 66:17 72:1 | 135:4 136:6 | 60:7 64:1 | 193:8 | **occupant** | 53:22 66:23 |
| 86:5 89:8 | 138:11 | 64:23 68:4 | 194:16 | 159:10 | 67:15 82:21 |
| 89:18 100:3 | 147:9,11 | 70:1,16 | 196:24 | **occp** 196:9 | 105:8 120:4 |
| 112:10 | 149:5,14 | 72:10,22 | 197:18 | 196:14 | 124:18 |
| 116:6,12 | 150:6,12 | 74:20 78:7 | 200:10 | **october** 17:7 | 127:5 |
| 118:15 | 236:1 | 78:21 85:24 | 202:7,20,22 | 25:3 31:23 | 128:23 |
| 124:12 | | 86:1 90:11 | 204:10,16 | 33:7 40:17 | 135:3 138:4 |
| 128:8 139:6 | **O** | 93:10 97:16 | 206:7,8 | 46:5 56:3,8 | 140:3 143:8 |
| 140:7 | **o** 4:16 5:20 | 98:18 103:6 | 207:17 | 57:7 64:3 | 144:13 |
| 166:21 | 211:14,14 | 105:15 | 223:8 225:8 | 72:16 73:14 | 145:15 |
| 174:3,7 | 221:11,11 | 106:23 | 226:6 227:1 | 83:20 94:12 | 157:15 |
| 224:2 | 234:22 | 107:6,15,24 | 231:3 232:1 | 94:14 118:3 | 164:24 |
| 199:5,6,11 | 239:2,2 | 108:8 | 233:4 234:3 | 224:24 | 169:9 173:2 |
| 199:12 | **object** 8:12 | 109:13,15 | | 225:18 | 173:4,5 |
| 203:8,12,13 | 10:15 13:1 | 110:6 111:1 | **objections** | 227:16 | 184:22 |
| 207:8 | 13:15 14:8 | 113:1,6 | 86:3 110:13 | **offer** 22:7,14 | 187:15 |
| 208:17,18 | 14:15 16:2 | 123:15 | 123:15 | 30:4 | 190:6 |
| 207:14,14 | | 126:7,18 | 127:21 | **offered** 21:23 | 236:16 |
| **numbered** | 17:1,15 | 129:5 130:3 | 129:3 130:3 | 97:23 5:16 | 95:19 |
| 168:6,8 | 26:23 30:16 | 131:23 | 131:23 | 57:7 64:3 | 196:2 200:5 |
| **numbering** | 31:11 32:23 | 132:13 | 132:13 | 101:16,23 | 208:4,5 |
| 166:8 | 33:15,22 | 136:8,21 | 136:8,21 | 102:4 | 215:20 |
| 167:18 | 41:11 47:23 | 137:13,19 | 137:13,19 | 103:24 | 222:7,14 |
| 190:23 | 75:21 80:15 | 137:20 | 137:20 | 111:20 | **old** 38:1 |
| **numbers** | 82:21 85:3 | 138:1 | 138:1 | 196:11 | 222:19 |
| 128:12 | 86:13 87:12 | 150:19 | 150:19 | 222:20 | 223:4 224:4 |
| **numerous** | 89:15,23 | 146:23 | 146:23 | 223:6 | 225:3 |
| 13:20 | 100:7 115:9 | 147:20 | 147:20 | 225:8 | **once** 201:23 |
| 136:16 | 121:21 | 148:13 | 148:13 | **officer** 75:14 | **ones** 50:19 |
| **nurse** 133:21 | 148:18 | 149:18 | 92:7 145:17 | 67:20 79:20 |
| 134:3,8,19 | 144:13 | 159:15 | 166:5 83:4 | 192:19 |
| 135:16 | 153:9 158:5 | 160:5,15 | **officers** | **onetotwelve** |
| 137:5 | 161:5 162:6 | 169:23 | 111:20 | 66:8 |
| 138:15 | 169:23 | 151:23 | **offices** 2:2,9 | **ongoing** 33:1 |
| **nurses** 103:4 | 172:16 | 152:14 | **obviously** | 5:21 60:18 | 35:22 36:5 |
| 103:16 | 181:6 | 154:24 | 107:12 | **oh** 37:1,3 | **online** 199:17 |
| 133:13 | **objection** | 168:22 | 141:15 | 117:9 | **opened** 189:2 |
| 136:16 | 9:14 12:5 | 170:17 | 169:10 | 124:20 | 219:13,13 |
| 137:10 | 15:8 24:10 | 171:13 | **occasionally** | 150:21 | 219:16 |
| 218:16 | 26:5,10 | 172:7 175:9 | 166:20 | 166:24 | **openended** |
| | 29:21 30:8 | | 169:10 | 235:6 | |

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 21

| | | | | | |
|---|---|---|---|---|---|
| 37:5,20 | 116:4,10,14 | 164:1 165:6 | 233:9 234:5 | **narrow** 194:5 | 207:15 |
| 38:16,24 | 116:15,20 | 167:11 | 234:11,15 | **nature** 106:1 | 209:2 |
| 39:7,13,15 | 117:9,17 | 169:4 | 235:16 | **necessarily** | **newly** 7:15 |
| 39:20 40:10 | 118:1,13,20 | 170:10 | 236:8 237:4 | 106:1 | **nicholas** 2:20 |
| 40:15 41:15 | 119:1 | 171:13 | 238:3 | 112:20 | 2:20 |
| 43:9 44:11 | 120:19 | 172:11 | **dated** | 115:17 | **nick** 66:5 |
| 44:18,24 | 121:9 | 173:1 174:4 | **mount** | **necessary** | 110:13 |
| 45:5,8,11 | 123:20 | 175:19 | 216:12,19 | 146:21 | **night** 139:10 |
| 45:15 48:4 | 126:14 | 176:19 | **mounted** | **need** 48:16 | 139:12 |
| 48:19 49:5 | 127:1 | 177:6,8,23 | 122:12 | 57:9 96:14 | **nine** 181:11 |
| 49:23 50:14 | 128:13,16 | 178:9,9,11 | **moveable** | 111:5 | **nonaccessi...** |
| 52:5,12,17 | 128:17 | 178:19,21 | 180:9 | 150:19 | 176:7 |
| 52:20 53:7 | 129:13 | 179:4,13 | **moved** | 187:24 | **nonada** |
| 59:23 60:15 | 130:10 | 181:13,20 | 222:10,11 | 194:24 | 152:13 |
| 62:4 64:2 | 131:10 | 182:16,22 | **movement** | 216:12,19 | **nonprivileg...** |
| 65:11,11,22 | 132:7 133:1 | 183:4,14,22 | 112:7 | 216:21,24 | 24:14 |
| 66:4,10,15 | 136:15 | 185:7 | 115:16 | **needed** 83:2 | **north** 84:24 |
| 67:1 68:12 | 137:2,18,22 | 186:23 | **moving** 64:11 | 143:10 | 85:12,14,17 |
| 70:3,8,23 | 138:2,8,20 | 98:1 229:6 | 98:1 | 148:7 | 85:18,23 |
| 72:12,17 | 139:4,16 | 190:15 | **multiple** | 201:17 | 88:1,2,15 |
| 73:1,17,20 | 140:1,5,8,9 | 192:20 | 193:22 | 202:1 | 89:3 90:4,7 |
| 76:6 78:12 | 141:21 | 193:7,16 | **multitude** | 216:13 | 90:14,18 |
| 78:23 79:3 | 142:10,22 | 194:1,7,10 | 115:15 | 231:6 | 91:3,10,15 |
| 80:21,24 | 145:6 146:1 | 194:12,20 | | **needs** 24:16 | 95:21 |
| 81:5,8,14 | 146:10 | 195:1,6,14 | **N** | 60:20 201:5 | 221:17 |
| 82:8,11,18 | 147:12,14 | 195:22 | **n** 2:1 3:1 4:16 | 204:15 | **notary** 239:5 |
| 83:5 84:11 | 147:23 | 197:4 198:1 | 5:20,20 | 208:17 | **note** 237:13 |
| 85:7 86:9 | 148:23 | 200:13,15 | 158:3,7 | 209:14 | 40:19 68:23 |
| 86:19 87:21 | 150:1 154:6 | 204:11 | 159:21 | 76:4 | 69:4 75:16 |
| 89:16,17 | 151:16 | 205:3 | 160:16 | **new** 43:17 | 92:1 141:18 |
| 90:3,15 | 152:6,15 | 206:15 | 161:3,7 | 58:5,23 | 141:24 |
| 93:14 96:16 | 153:16 | 207:21 | 211:14,14 | 59:20 60:13 | 143:6,8 |
| 96:22 97:3 | 154:1 | 211:14,14 | 221:11,11 | 64:5 77:22 | 144:21 |
| 98:3 99:2 | 155:5,23 | 210:17 | 224:2,2 | 87:19 88:12 | 95:3 237:13 |
| 100:13 | 156:3,21 | 223:8,12 | 236:11,11 | 88:21 | 237:19 |
| 101:1 103:9 | 157:22 | 224:6 | **name** 5:22 | 110:18 | **notice** 5:5 |
| 104:17,21 | 158:1,12,17 | 225:10 | 40:19 68:23 | 114:7 124:1 | 81:2,14,17 |
| 105:3,20 | 158:22 | 226:12 | 69:4 75:16 | 169:12 | 82:14 94:16 |
| 107:2,3,20 | 159:2,6,20 | 227:5 | 92:1 188:6 | 174:19 | 96:10 |
| 108:4,16 | 160:9 161:1 | 228:21 | 213:3 234:7 | 187:19 | **notify** 187:19 |
| 109:16,18 | 161:13 | 229:19,20 | 234:17 | 188:18 | 188:18 |
| 110:19 | 162:17,23 | 230:4,11 | 235:5,7 | 196:22 | **november** |
| 111:7,23 | 163:2,4,13 | 231:13 | **names** 75:13 | 199:16 | 99:11 |
| 113:21 | 163:19,23 | 232:8,20 | 92:2,5,6 | 202:19 | 207:23 |
| | | | 196:13 | | 208:1 |

TOOMEY REPORTING
312-853-0648

---

MICHAEL GUMM
May 11, 2016

Page 23

| | | | | | |
|---|---|---|---|---|---|
| 202:12 | 148:22 | 205:15 | 157:16 | 147:21 | 199:21,24 |
| **operation** | 155:4 | **overly** 18:18 | 160:24 | 205:12 | **performed** |
| 112:7 148:5 | 195:21 | **overpopula...** | 160:20 | 213:19 | 11:24 |
| **opinion** | 196:2 211:8 | 205:12 | 159:6 | 217:18 | **period** 12:11 |
| 113:4 132:5 | 212:9 213:5 | **oversaw** 17:7 | **p.m.** | **particulars** | 29:24 68:7 |
| 107:17 | 216:20 | 21:18 | 208:2 | 206:2,14 | 68:21 71:13 |
| 129:7 | 218:23 | **oversee** 10:12 | **pages** 86:11 | 207:13 | 97:24 107:8 |
| 204:20 | 234:20 | 10:22 12:14 | 156:4 | **parties** 24:13 | 190:6 192:1 |
| 206:18 | **orders** 37:8 | **overseeing** | **pamphlet** | 24:19,20 | 194:2 223:9 |
| 230:23 | **outcome** | 11:5,6,9 | 51:11 | 238:23 | 238:23 |
| **opinions** | 239:24 | 13:22 | **paper** 42:8 | **party** 24:15 | **permissible** |
| 71:19 | **outlined** | **overseen** | **paragraph** | **passage** | 20:9 |
| **opportuniti...** | 43:12,15 | 11:15 12:18 | 144:10 | 200:4 | **permit** 60:21 |
| 119:19 | 51:16 54:10 | 13:11,21 | **paraplegic** | **passed** 69:20 | 146:19 |
| 121:18 | 55:10 | 14:5 15:1,2 | 106:16 | 148:19 | 146:16 |
| 211:24 | 113:19 | 15:6,14,17 | 210:7 | 64:9 63:5 | **person** 35:11 |
| 218:18 | **outlines** 54:8 | 17:17 | **pardon** 99:19 | 118:7 | 91:20 107:4 |
| **opportunity** | **outside** 17:8 | **oversight** | 157:17 | 215:14,16 | 107:5,23 |
| 17:15 | 18:13 34:8 | 10:3,8 | 198:23 | **pathway** | 155:23 |
| 108:13 | 98:24 | **overview** | **park** 50:22 | 119:21 | **personal** |
| 109:9 | 130:19 | 207:11 | **part** 72:1,23 | **patient** | 90:20 91:1 |
| 116:18 | 147:20 | | 73:8 91:4 | 138:18,19 | 91:6 133:6 |
| 122:18 | **outweighed** | **P** | 126:8 144:10 | 149:3 | 135:3 |
| 128:22,23 | 24:24 | **p** 2:1,1 | 117:21 | **patients** | **personally** |
| 131:4 132:5 | **overall** 13:17 | **page** 3:1 4:2 | 84:2,3,7,15 | 138:18 | 98:4,11,12 |
| 135:24 | **overcome** | 4:18 46:8 | 108:18,21 | 148:11 | 135:15 |
| 137:6 | 60:21 | 47:1,17,24 | 112:6,12 | **patrick** 2:4 | 150:2,4 |
| 186:24 | 89:10 90:8 | 49:11,11 | 116:19 | 187:8 220:5 | 150:24 |
| 212:1,10 | 100:14 | 50:1 52:12 | 181:17 | 220:7 | **persons** |
| 232:5 | 103:4 104:6 | 53:15,16 | **participate** | **patrick1920** | 135:13 |
| **orally** 5:11 | 112:18,22 | 60:18 87:1 | 199:22 | 2:7 | 149:13 |
| **order** 24:12 | 29:2 32:12 | 89:10 90:8 | 199:22 | **puppy** 1:15 | 150:19 |
| 31:8 37:7 | 213:10 | 100:14 | 149:2 | 226:3 | 169:19 |
| 38:4 42:11 | **overcoming** | 103:4 104:6 | 152:13 | **partial** 45:20 | 232:9 |
| 42:13 57:8 | 103:18 | 104:11,24 | **participated** | **partially** | 175:20 |
| 61:11,13 | **overdemanded** | **page** 121:3 | 24:7 26:19 | 224:24 | |
| 100:22 | 158:18 | 53:1 239:3 | 199:12 | 175:20 | |
| 109:22 | 159:9 192:9 | **participating** | 199:22 | **paste** | |
| 140:13 | 192:13 | 156:2 | 124:24 | | |
| 143:2,6,8 | 204:9 | 157:14,15 | 54:9 121:6 | 199:11,13 | 228:6 |
| 144:14,15 | | | | | |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 66

MICHAEL GUMM
May 11, 2016

Page 24

| | | | | |
|---|---|---|---|---|
| pertain 35:6 | 203:21 | 146:16 | 96:2 120:16 | possession |
| 38:8 | 239:17 | 147:4,7 | 141:13,14 | 67:21 |
| pertaining | placed 38:4 | 148:3 149:2 | 174:18 | presented |
| 1:14 | 132:11 | 149:10,22 | 207:10 | 115:1 115:15 |
| pertains 34:5 | 152:12,23 | 167:4,20 | 211:24 | possible |
| 87:2 | 153:6 | 210:12 | 237:17 | 94:23 |
| pertinent | 158:19 | planned 73:5 | policies 100:5 | 106:20 |
| 19:11 | 192:6 | 73:7 | 100:20 | possibly |
| phone 64:21 | 198:21 | planning | 101:3,7,17 | 116:18 |
| 65:3,7,14 | 222:9 | 100:23 | 102:3,6 | power 205:20 |
| 65:17 | placement | 102:20 | 104:11 | 221:3 |
| photograph | 204:5 | 103:12 | 218:22,24 | preceding 33:10 |
| 89:9,18,19 | placing | 130:16 | policy 101:12 | presenting |
| 90:9 | 203:21 | 146:4,8 | 101:15,22 | 130:17 |
| photographs | 204:13 | 147:2,3 | 103:12 | 153:23 |
| 86:11 105:6 | plaintiff 1:4 | 151:18 | 136:5 | presents |
| physical 43:6 | 1:11 2:8 | 154:2 | 187:17 | 118:7 |
| 94:24 99:5 | 17:4 106:11 | 196:11,12 | 188:17,23 | presiding |
| 102:22 | 134:7,18 | 209:21 | 190:5 | presiding |
| 103:4 | plaintiffs 4:3 | 210:13 | 196:1,3 | 130:20 |
| 105:18,21 | 4:4,5,6,7,8 | 214:8 | populated | pretty 229:5 |
| 105:23 | 4:9,10,11 | plans 166:2,5 | 206:5 | prevent |
| 106:1 122:5 | 4:12,13 | 166:9 | populating | 196:7 197:16 |
| 122:17 | 6:17,22 | 167:14,19 | 203:16 | prevents |
| 123:9 213:7 | 36:17,22 | 177:14,18 | portion 47:19 | 197:21 |
| 219:3 | 38:13 45:12 | 177:21 | 67:9 147:3 | previous |
| physically | 51:18,21 | 178:22 | pose 182:17 | 239:6 |
| 63:22 76:7 | 52:3 66:12 | 210:15 | position 5:10 | previously |
| 91:19 93:4 | 86:5,6 | please 13:6 | 7:8,12,15 | 9:23 117:14 |
| 94:19 98:17 | 116:1 | 16:6,21 | 23:5,5 | 126:5 133:2 |
| 99:13 | 118:10,15 | 25:19 32:7 | 35:20 68:1 | 167:14 |
| 170:14 | 133:16,20 | 36:23 52:24 | 68:17 75:8 | primary |
| picture 89:13 | 135:20 | 82:3 117:23 | 75:10 91:19 | 208:21 |
| place 27:6 | 137:12 | 108:23 | 92:7,13,18 | print 139:20 |
| 31:22 32:21 | 139:1,6,7 | 208:2 | 159:3 | printer 142:3 |
| 33:18 34:9 | 152:8 | 222:20 | 158:13,13 | prior 22:8 |
| 83:3 127:13 | plan 19:8 | 230:5 | 158:17,23 | 28:2,7,12 |
| 151:19 | 98:1 116:16 | plural 43:21 | 166:2 | 28:19 29:3 |
| 163:9 | 116:23 | 159:17 | 171:3 | 29:14,19 |
| 183:23 | 140:2,12 | 44:4 | 203:23 | 38:10 41:7 |
| 189:1 | 141:6 | point 40:21 | 191:22 | 56:2,6,7 |
| 200:18 | 144:12,20 | 57:23 58:9 | 196:24 | 67:16 71:1 |
| 202:4 | 145:8,10,15 | 58:19,21 | 198:24 | 71:11 73:21 |
| | | 64:19 73:10 | 54:24 55:7 | 76:19 89:5 |
| | | | positions | 108:24 |
| | | | 47:4,11 | |
| | | | 194:3,13 | |
| | | | 198:5 207:3 | |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 25

| | | | | |
|---|---|---|---|---|
| 109:4 121:6 | 147:18 | 101:7,11 | 136:22 | 134:3 143:9 | 138:17 |
| 124:2 | prohative | 102:22 | proportion... | 179:6,10 | 179:1 197:5 |
| 127:14,16 | 178:16 | 103:3,16,24 | 75:23 | 180:3 | 236:17 |
| 144:24 | problem | 104:4 106:3 | proportion... | 188:19 | purposes |
| 158:9 | 97:14,20 | 106:3,22 | 17:2 | 197:14 | 36:5 |
| 203:16 | problems | 109:6,9 | proposal | 199:13 | pursuant |
| 224:18 | 142:2 158:6 | 128:20 | 208:19 | 203:14 | 1:12 5:4 |
| prisoner 48:6 | 162:8,10 | 129:2 131:4 | proposed | 212:13 | 33:19 |
| 92:8 108:8 | procedure | 201:1 | 10:24 24:23 | 220:20 | purview |
| 131:1 | 1:13 189:23 | 218:10,18 | 208:7 | 226:4,14,23 | 103:21 |
| 132:10 | procedures | 226:4,22 | provide 8:7 | 227:8,23 | 203:24 |
| 135:6 | 6:20 100:6 | 227:8 | 10:2 42:13 | 228:4 | pushed 112:4 |
| 173:16 | 100:21 | progress | 42:22 50:8 | 230:22 | pushing |
| 201:17,18 | 104:11 | 157:9 | | 231:23 | 111:21 |
| prisoners | 218:23 | progressive | 64:8 89:3 | 232:11 | put 40:7 |
| 27:13,15 | 219:1 | 157:9 | 102:12,14 | 236:5 | 120:23 |
| 28:5,11 | 228:12 | project 6:2 | 102:17 | provides | 121:1 |
| 29:2,8 | proceedings | 7:5,13,16 | 109:5,7,8 | 179:18 | 152:18 |
| 34:10 35:9 | 239:15 | 8:3 17:6 | 112:18 | providing | 159:11,18 |
| 35:24 55:6 | process 229:7 | 112:18 | 115:3 | 103:17 | 200:23 |
| 72:8 74:2,5 | produce | 101:21 | 122:18 | 134:8 | 229:23 |
| 96:3,11 | 159:15 | 122:23 | 133:22 | 296 | required |
| 97:15 103:5 | produced | 208:16 | 133:5,7 | 212:4 220:4 | 44:11,20 |
| 103:18 | 71:1 | projects 8:1 | 138:18 | 230:17,24 | 58:11,14 |
| 110:3 | product | 8:10,22 9:9 | 143:11 | 231:14 | 59:22 60:1 |
| 113:14 | 183:13 | 10:5,10,14 | 164:2 | provisions | 60:4 61:4 |
| 152:12,23 | production | 10:22,23 | 146:21 | 140:13 | 62:1,9,14 |
| 153:6 | 18:22 | 11:4,8 | 148:5 176:8 | 144:15 | 62:19,24 |
| 174:10 | profession | 12:15,17 | 189:24 | psych 190:11 | 63:2,6,6 |
| 175:22 | 138:16 | 13:12,20 | 198:15 | 190:13,16 | 187:8 |
| 177:12 | professional | 14:1,2,3,4 | 211:21 | 190:19 | public 79:7 |
| 185:2 192:9 | 22:13 | 15:6,14,17 | 212:1,9 | 79:11,17 | public 79:7 |
| 193:19 | program | 15:22 17:16 | 212:19 | 108:15 | 79:11,17 |
| 194:15 | 100:5,20 | 19:18 21:18 | 218:23 | 113:23 | 108:15 |
| 197:17 | 101:12 | 23:23 24:6 | 219:5,19 | 123:9 144:6 | 113:23 |
| 200:8 | 108:18 | 31:21 35:7 | provided | 20:24 21:9 | 123:9 144:6 |
| 225:23 | 132:24 | 35:17,22 | 25:12,15,18 | 22:23 24:5 | 20:24 21:9 |
| 226:24 | 203:5 | 101:6 | 108:15,19 | 25:10 26:6 | 22:23 24:5 |
| 227:6 | 209:22 | 107:19 | 119:11 | 36:11 30:9 | 25:10 26:6 |
| prisons 51:13 | 212:5 217:7 | 122:12 | 111:10,20 | 30:17 33:15 | 36:11 30:9 |
| 54:6 112:16 | 219:2,11 | 122:13 | 114:21 | 33:24 34:5 | 30:17 33:15 |
| privy 204:23 | 226:13 | 129:3 131:5 | 132:10 | 34:19,23 | 33:24 34:5 |
| probably | programs | proper | purports | 40:4 43:3 | 34:19,23 |
| 92:23 93:21 | 31:1 101:2 | 107:19 | 45:18 | 43:10 44:16 | 40:4 43:3 |
| | | 122:12 | purpose | | |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 26

| | | | | |
|---|---|---|---|---|
| 48:3,23 | 162:24 | 71:2 72:1 | 93:23 94:19 | 165:2 | 94:1,1,11 |
| 58:13,16,17 | 163:5 | 81:9 82:4,6 | 95:4,11,18 | 167:11 | 94:16 95:16 |
| 58:17,17 | 168:23 | 126:9 | 95:22 96:1 | 178:3,5 | 95:23 |
| 59:1,1,2 | 169:14,24 | 135:18 | 97:4,6,14 | 230:7 | 111:19 |
| 61:6,7,7 | 170:11 | 164:22 | 98:7,10 | readily 219:7 | 112:17 |
| 62:2 67:14 | 172:8 175:3 | 174:23 | 99:6 101:4 | 219:8 | 128:7,7 |
| 68:13 70:17 | 175:4 | 182:18 | 101:8,23 | reading | 134:1,18 |
| 72:20,21 | 176:12 | 211:12 | 102:10 | 103:14 | 161:20 |
| 73:3,18 | 177:1,7 | 213:16 | 103:16 | 133:16 | 174:7 192:1 |
| 76:2 78:24 | 178:2 179:2 | 215:23 | 108:17 | regan 83:21 | 211:18 |
| 82:21 83:4 | 181:7 | 217:20 | 111:12 | 84:19 89:10 | 212:15 |
| 84:12 87:16 | 183:19 | 220:10,13 | 112:7 | real 48:16 | 214:20 |
| 88:9 95:10 | 186:7 193:4 | 221:10 | 217:20,23 | 210:12 | 215:7,18 |
| 97:17 98:10 | 193:17 | 229:18 | 217:23 | realize | 216:20 |
| 98:19 99:3 | 194:17,23 | 230:11 | 218:19 | 103:14 | 217:21 |
| 100:8 103:7 | 202:8,12,16 | 230:23 24:11 | 223:1 | really 35:14 | 218:10 |
| 105:16 | 202:23 | 231:2 | | 43:8 67:22 | 221:9 |
| 106:24 | 206:9 | quick 48:16 | ramps 26:21 | 217:1 | 223:22 |
| 107:7,18 | 218:14 | quit 129:1 | 26:21 | realm 152:5 | 226:12 |
| 108:14,19 | 223:5 | quite 125:19 | 89:14,20 | rear 57:5 | 227:21 |
| 109:14,17 | 225:9 230:3 | quote 151:8 | 90:2,5,9,22 | reask 18:4 | 228:15 |
| 113:16 | 230:4 231:8 | | 95:14 96:4 | 178:1 | 229:22 |
| 114:16 | 231:12,14 | **R** | 96:12 105:9 | reason 152:3 | 230:13,18 |
| 118:2 | 232:2,14 | r 2:1 4:16 | 105:13 | reasonable | 206:3,13 |
| 122:21 | 233:5 | 5:20 211:14 | 106:17 | 109:12,21 | 207:7 |
| 123:16 | questioning | 221:11 | 107:22 | 110:2,22 | recommen... |
| | 10:16 14:9 | 224:2,2 | 108:7 | 111:9 | 206:1,8,11 |
| raise 205:22 | 127:3,8 | 236:11,11 | 109:6 | 129:17 | 225:4 228:9 |
| 127:3,8 | raised 222:15 | 110:3,23 | 119:9 | 229:9 231:2 | 206:14 |
| 130:4 132:2 | 222:16 | 221:20 | 111:22 | 129:17 | 206:19 |
| 133:12 | 80:20 81:19 | ratio 88:2 | 132:9 | 227:21 | recommen... |
| 134:10 | 86:19 | 84:24,24 | 228:9 231:2 | 231:12,17 | 114:3 |
| 135:11,12 | 163:19 | 85:5,11,12 | 236:2 | 111:24 | 134:6 |
| 135:14 | 218:20 | 87:4 88:1,2 | 196:5 229:5 | 206:23 | recomment... |
| 137:14 | questions 5:9 | 89:17 90:14 | 237:23 | read 41:9 | 205:18,11 |
| 144:3,4 | 10:24 12:21 | 91:3,10,16 | 61:12,23 | 205:14,16 | |
| 145:19,23 | 12:23 17:19 | 91:4,24 | 62:1,9,14 | 206:3,13 | |
| 147:13 | 19:17,20 | 92:13,15 | 135:19,24 | 92:16,21,23 | |
| 148:14 | 20:2,10 | 93:3,9,15 | 24:10 53:3 | 93:6,13 | |
| 150:1 | 21:15 22:21 | 91:3,10,16 | 74:16 77:11 | | |
| 151:12 | 23:13,21,22 | 92:19,24 | 135:19,24 | | |
| 153:10,11 | 30:11 31:17 | 163:12 | 92:16,21,23 | | |
| 155:1 160:3 | 32:19 34:24 | 35:6 36:2 | 93:6,13 | | |
| 160:5 | 36:12 37:19 | 93:4,9,19 | 164:5,7,10 | | |

TOOMEY REPORTING
312-853-0648

MICHAEL GUMM
May 11, 2016

Page 27

| | | | | |
|---|---|---|---|---|
| 14:15 16:3 | 215:3,6 | 102:3,10 | 209:7 | 77:22 87:20 | 45:19 |
| 16:6,8,10 | referring | 103:16 | remains | 88:13,22 | representat... |
| 16:13,15,18 | 105:22 | 106:4,7,11 | 35:16 | 124:2 213:4 | 237:6 |
| 16:22 18:9 | 133:15 | 112:18,24 | remedial | 213:12,17 | represented |
| 21:5 72:21 | 233:13 | 120:3 | 32:1 | 217:18 | 211:19 |
| 23:8 24:10 | reflect 91:9 | 134:7 | remedies | 231:19 | represents |
| 26:23 30:21 | 171:1 | 154:21 | 74:11 94:24 | repadding | 42:16 |
| 32:3,7,9,9 | 181:1 181:1 | 171:4,11 | remember | 45:6 | request 5:6 |
| 32:14,17 | 234:9 | 178:23 | 59:10,13 | repeat 13:6,7 | 39:18 39:14 |
| 37:14 41:14 | reflected | 195:8 | 16:21 18:7 | 13:9 31:14 | 69:19 71:5 |
| 53:2 81:20 | 199:3 | 196:22 | 52:11,23 | 53:1 147:12 | 97:23 111:5 |
| 107:5 | regain 85:22 | 136:1,2 | 199:20,23 | requested | |
| 110:11 | 105:5 | 204:4 205:5 | 215:5 222:8 | 13:9 16:23 | |
| 121:4 | regard 221:9 | 207:8 208:7 | 237:7 | 18:10 53:3 | |
| 133:18 23 | regarding | 234:16 | 222:20 | 178:5 230:7 | |
| 178:4 194:7 | 12:11,23 | 240:22 | 227:4 230:4 | require 19:20 | |
| 194:9,10 | 20:11 23:13 | 218:4 | 143:10 | rephrase | |
| 210:20 | 24:14 25:6 | related 17:2 | remodeling | 9:10 67:14 | |
| 211:7 206:6 | 69:12 | 143:12 | 10:4,9,13 | 109:16 | |
| 234:9 | 221:24 | 91:22 | 210:4 | 133:11 | |
| 239:14 | 225:8 | 71:8 107:18 | remotely | required | |
| records 69:23 | regards 5:9 | 210:4 | 164:17 | 44:11,20 | |
| 69:24 70:9 | 10:10 15:13 | relative 24:19 | removal | 58:11,14 | |
| 106:4,8,11 | 19:2,7,8,18 | 178:15 | 62:9 63:24 | 59:22 60:1 | |
| recreational | 21:2 22:14 | 239:20,21 | 224:16 | 60:4 61:4 | |
| 143:4 | 23:22 24:8 | 224:16 | renovate 12:2 | 226:21 | |
| recrossexa... | 26:20 30:5 | relevance | 35:22 | 233:10 | |
| 3:9 | 30:14 31:20 | 42:16,24 | renovation | 78:4 37:14 | |
| redepased | 42:19 44:19 | 143:10 | 10:4,10,13 | 88:4 89:6 | |
| 22:8 | 46:24 55:6 | relevant | 11:6,15,17 | 105:5 | |
| redepased | 55:14 56:1 | 42:19 44:19 | 16:15 | 156:17 | |
| 19:21 23:3 | 58:2 63:3 | 210:20 | 140:10,11 | 125:13,15 | |
| redirect 3:8 | 60:14 68:22 | relet | 114:24 | 126:16 | |
| 3:11 235:7 | 68:17,21 | 12:19 19:12 | 12:10 19:18 | 160:10,11 | |
| 237:7 | 69:16,18 | 12:10 19:18 | 12:10 19:18 | 126:13,16 | |
| redone | 73:7 74:17 | 24:20 35:18 | 35:7 36:5 | 214:7 | |
| 213:24 | 75:11 81:14 | 36:15 68:7 | 35:7 36:5 | reported | |
| reduced | 82:12,13,15 | 68:10 70:14 | 59:21 99:5 | 129:19 | |
| 239:12 | 84:20 85:22 | 80:23 82:4 | 224:4 | 130:1 144:3 | |
| reference | 88:11,19 | 82:17 129:8 | renovations | reporter 1:16 | |
| 100:22 | 90:21 91:1 | 137:1 | 11:20,23 | 144:19 | |
| 135:1 223:3 | 95:3,9,10 | 164:17 | 26:21 30:6 | 239:4 240:9 | 146:13 |
| referenced | 101:4,7,23 | 204:21 | 60:14 73:8 | reporting | 182:6 |
| | | | | 157:7 | 186:2 |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 9 Page 67

MICHAEL GUMM
May 11, 2016

| | | | | |
|---|---|---|---|---|
| 199:13 | 208:3 | 22:11 23:20 | 125:8,15 | rtu 15:20 | 221:2 |
| 200:3 | responses | 24:5 25:15 | 126:10,10,15 | 20:11 22:18 | rtus 212:17 |
| 212:14 | 71:2 139:9 | 27:21 32:12 | 127:11,17 | 23:9 45:21 | rule 39:16 |
| 213:4,8 | 195:19 | 34:18 35:11 | 128:3,4,8 | 45:24 69:9 | rules 1:12 |
| 217:9 | responsibil... | 35:19 45:23 | 128:11 | 71:4,7 | run 87:24 |
| 219:18 | 205:19 | 85:9 107:22 | 129:14,15 | 119:11 | 88:24,24 |
| 234:1 | responsibil... | 109:12,20 | 130:2 | 155:7 | 139:16 |
| 236:20,23 | 150:14 | 110:22 | 131:21 | 162:19 | running 87:4 |
| requirement | 152:4 | 117:13 | 132:20 | 163:9 | 87:6,11 |
| 114:19 | responsible | 127:16 | 133:9 151:9 | 165:23 | |
| 123:21 | 67:6 146:6 | 128:16 | 152:3 | 166:1,5,7 | S |
| 148:10,19 | 147:6 | 131:11,15 | 155:10 | 166:11 | s 2:1 4:1,16 |
| 148:21 | 154:17 | 140:5 | 158:19 | 167:3,5,15 | 4:16 19:9 |
| 199:16,17 | restate 24:9 | 162:17 | 159:17 | 168:4,10 | 140:13 |
| requireme... | result 159:18 | 169:18 | 163:8 182:1 | 169:7,21 | 143:2 |
| 7:18 8:2,8 | 218:11 | 172:20 | 181:20 | 170:15 | 211:14,14 |
| 43:20,23 | return 19:21 | 178:21 | 185:17 | 171:5,12,23 | 221:11,11 |
| 87:10,19,22 | reuse 120:16 | 182:12 | 187:20 | 173:8,14,19 | 236:11,11 |
| 88:11,19 | review 8:9,17 | 192:21 | 190:21 | 174:6 175:6 | sabrina |
| 97:7 113:22 | 8:21 9:11 | 194:20 | 191:13 | 176:6,22 | 148:4,9,11 |
| 169:2 170:6 | 71:10 84:18 | 198:2 | 196:17 | 177:11,16 | 189:8,9,20 |
| 185:21 | 106:10 | 213:13 | 200:23 | 178:13 | 189:10 |
| 212:7,7 | 116:16 | 215:13 | 202:5 204:7 | 180:11,19 | sabrinas |
| 216:1 | 155:3 171:7 | 216:1 | 216:12 | 181:5 182:5 | 189:16 |
| requires | 214:5 | 219:20 | room 118:22 | 183:16 | safe 148:5 |
| 232:5 | reviewed | 233:24 | 119:5,23 | 184:1 186:9 | saith 238:8 |
| requiring | 15:14,18 | 235:11 | 121:11,13 | 186:14 | save 82:1 |
| 136:6 | 17:16 67:24 | righthand | 121:15 | san 92:3 | saw 92:3 |
| reserve 238:5 | 70:24 71:2 | 47:18 | 122:4 | 190:7,12,17 | 95:18 |
| resolving | 71:5,14,18 | rights 187:6 | 124:21,24 | 190:19 | 154:15 |
| 24:22 | 71:22 86:15 | 201:12 | 125:3,14 | 191:5,10 | 156:7 229:2 |
| 145:11 | 96:2,5 | rise 87:8,23 | 130:23 | 193:19 | 229:10,11 |
| resources | 102:21 | road 175:24 | 138:12 | 195:9 196:6 | 229:11 |
| 24:21 98:13 | 103:3 106:4 | 198:13 | 152:13 154 | 198:3,4,7 | 234:21 |
| respect 218:8 | 140:21 | rodriguez | 152:24 | 198:18,19 | saying 14:10 |
| respond 18:2 | 152:7 171:3 | 188:8 | 153:7 | 198:22 | 18:19 23:7 |
| responding | 175:14 | role 112:8 | 154:22 | 200:9,17 | 23:7,8 32:2 |
| 39:13 | reviewing | 130:21 | 155:6,11 | 202:19 | 54:3 125:16 |
| 196:20,22 | 134:1 138:9 | room 111:12 | 159:10 | 205:12 | 137:17 |
| response | reviews | 66:7 120:6 | 168:8 204:8 | 206:4 | 148:7 |
| 5:12 18:22 | 137:11 | 120:21 | roughly | 207:15 | 150:11 |
| 19:13 164:4,8 | right 10:7 | 121:1,17,20 | 141:9 | 208:8,20 | 182:24 |
| 19:16 | 12:24 13:14 | 123:7 | roula 46:3 | 219:12,13 | 219:18 |
| 207:13 | 20:20 22:5 | 124:16,21 | row 99:16 | 219:18 | |

MICHAEL GUMM
May 11, 2016

| | | | | |
|---|---|---|---|---|
| showing 6:21 | 122:13 | sole 137:9 | 113:24 | 57:12 58:2 | 27:19 28:14 |
| 7:3 36:21 | 138:4 | 138:17 | 114:1,13,14 | 58:6 | 28:19 29:14 |
| 45:16 51:17 | 183:15,24 | 141:23 | 114:23 | specification... | 29:13 30:2 |
| 52:2 53:20 | 206:2 | somebody | 114:24 | 57:15 212:8 | staging 77:2 |
| 116:5 139:6 | sink 212:1 | 212:2 | 118:6 | specifics | 234:22 |
| 140:14 | 124:16 | sorry 9:10 | 123:13,24 | 234:8 | stairs 184:23 |
| 235:19 | 212:10 | 51:18 52:10 | 125:10 | specified | stake 24:18 |
| shown | 125:9 126:3 | 52:23 75:14 | 143:10 | 57:24 | 57:24 |
| 114:11 | 212:10 | 111:14 | 163:8 165:5 | 239:17 | stamp 46:10 |
| shows 125:18 | 212:10 | 123:23 | 176:9 | speculation | 46:24 51:4 |
| 118:22 | sinks 42:6 | 118:19 | 180:12,15 | 131:24 | 140:7,14 |
| 146:3 | 122:24 | 140:18 | 184:2 | 132:15 | stamped |
| side 44:22 | 184:5,11 | 167:1 177:5 | 203:14,19 | speed 93:8 | 46:22 |
| 47:12 55:3 | 212:9 | 191:7 | 208:17 | 94:6 | standard 7:4 |
| 55:4 57:5 | 219:19 | 207:24 | 214:12,20 | spend 93:9 | 9:3 50:19 |
| 57:10,22 | sir 12:21 | 212:14 224:6 | 214:12,16 | 94:6 | 51:7 53:9 |
| 58:3,9,20 | 14:19 38:17 | 218:16 | 215:1,12,14 | 200:23 | 54:2,11,18 |
| 59:5,9 | 64:22 | 221:18 | 215:21 | spoke 73:6 | 57:11,14 |
| 66:11 85:17 | 103:18 | 221:17 | 216:8,22 | 193:1,14,19 | 60:13 63:16 |
| 85:18 | 116:21 | sort 153:12 | 217:13 | 193:22 | 64:8,16 |
| 215:17 | 135:12 | 211:8 | 222:1 224:9 | 194:6 | 66:6 73:18 |
| 216:9 | sit 68:23 | sought 6:14 | spaces 50:13 | spoken | 77:17 98:6 |
| 223:21 | 111:8 | south 2:5 | 50:13,16 | 171:10,15 | 100:14 |
| sign 141:16 | 182:16 | sign 141:16 | 55:15 124:2 | 174:20 | 114:20 |
| signatory | 90:4,6,14 | 205:17 | 205:17 | spool 140:18 | 125:1 |
| 147:2 | site 214:6 | 95:21 | speaking | spring | 127:24 |
| signature | sitting 230:9 | 120:11 | 137:19 | 224:13 | 138:19 |
| 140:19 | six 33:5 36:7 | 137:9 138:1 | 224:1 | ss 239:1 | standards |
| 147:1 | 54:5 168:5 | space 43:22 | specific 20:9 | stab 7:17 | 8:24 43:13 |
| signatures | 169:7 | 44:12 46:24 | 21:18 92:16 | 182:11 | 43:15 44:13 |
| 141:17 | 171:13 24:6 | 47:9,9,20 | 95:17 | 122:21,22 | 44:20 47:8 |
| 147:5 | 178:18 | 48:6,11,21 | 102:15 | 133:3,7,17 | 50:17,20,24 |
| signed 19:7 | 191:9 | 49:14,15 | 104:6 161:2 | 135:5 136:6 | 51:9,14,16 |
| 141:1,3,15 | sizes 49:13 | 134:6 161:20 | 161:20 | 136:8 | 52:6,8 |
| 142:6,15,16 | slightly | 50:21 51:2 | 192:1 | 181:11 | 54:6,16,21 |
| 145:7 | 208:13 | 52:8 54:15 | specifically | 146:20 | 55:6,9,13 |
| significant | slope 84:23 | 54:19 55:11 | 7:22 10:10 | 147:9,11 | 55:21 58:23 |
| 142:10 | 85:23 87:5 | 55:18,19,22 | 44:16 64:17 | 148:4 149:5 | 59:6 60:2 |
| similar 142:9 | 87:6,11,19 | 56:4,12 | 134:5 | 149:14 | 60:4,5 61:5 |
| 142:12 | 88:3 97:7 | 63:3,5 64:9 | 134:18 | 150:6,12 | 64:14 65:6 |
| 183:19 | 116:21 | 158:14 | 138:14 | 160:3 | 77:21 78:6 |
| single 21:1 | 217:21,23 | 159:1,2,20 | 157:17,23 | 236:2 | 78:11,15,18 |
| 164:5 | small 65:21 | 124:24 | 194:6 223:3 | stage 29:18 | 80:14 87:9 |
| single 23:17 | 172:18 | 113:3,4,5,9 | 231:9 | 30:19 | 87:10,15,18 |
| | | 113:14,24 | | staged 27:13 | |

MICHAEL GUMM
May 11, 2016

| | | | | |
|---|---|---|---|---|
| 45:23,24 | 237:23 | 144:5 | 193:2,18 | 118:4 | 189:6,23 |
| 53:10,20 | see 7:6 38:6 | 195:19 | 194:3,13 | 197:10 | 190:23 |
| 131:15 | 46:12,13 | 196:3 | 196:18 | seventh | 228:23 |
| 144:14 | 47:2,5,21 | 206:17,18 | 200:7,17 | 81:22,24 | shes 188:11 |
| 148:3,8 | 56:18 60:22 | 207:24 | 212:13 | 82:1 | 194:9 |
| 155:8 | 63:9 69:5 | 207:24 | 203:7 206:4 | shaped 55:15 | shart 39:18 |
| 197:20 | 89:10 91:22 | sentence 44:1 | 210:10,14 | share 7:1 | 48:17 97:1 |
| 219:18 | 95:13,20 | 146:3 | 210:14,22 | sheriff 1:6 | 105:1 |
| scope 9:9 | 100:6,11,16 | separate 49:8 | 225:22 | 2:21 37:17 | 117:15 |
| 17:9,12,19 | 117:4 119:2 | 134:15,16 | 226:18 | 91:8 104:3 | 150:22 |
| 17:23 18:13 | 119:3 | separation | 227:22 | 108:19 | 195:4 |
| 20:3 124:6 | 140:15 | 11:11 | 228:7,24 | 110:1,7 | 234:13 |
| 136:9 | 148:3,8 | september | 230:13 | 128:11 | shortcut |
| 151:11 | 157:22,23 | 27:12 28:23 | 231:22 | 129:24 | 126:9 |
| 153:10 | 172:18 | 29:7,14,19 | 232:11 | 129:24 | shorthand |
| 177:20 | 173:5 192:5 | 30:5 41:10 | 233:1,10,11 | 143:20 | 1:15 239:4 |
| 204:18 | 198:3 199:7 | 56:10,16,23 | 233:21 | 144:1 | 240:9 |
| 208:7,11 | 228:22 | 57:3,13,18 | 234:17 | 151:18 | shortly 25:7 |
| 209:7 226:7 | 235:8 | 59:3 61:8 | 234:17 | 153:3 | show 38:17 |
| 235:7 | seeing 135:4 | 62:6,11,19 | sequence | 161:18 | 66:16 86:4 |
| seat 59:24 | seen 26:3 | 63:2 64:3 | 164:24 | 159:16,16 | 115:20 |
| 60:19,20 | 86:20,24 | 89:2 90:16 | sergeant | 163:7 | 118:16 |
| 61:1 62:7 | 91:14 95:24 | 91:2,11,18 | 128:11 | 164:2 | 121:18 |
| 63:1 69:17 | 96:6 133:15 | 92:10,13 | 129:5 | 165:8 | 139:5 |
| 78:5,15 | 135:15 | 93:3 98:16 | series 5:9 | 218:11 | shower 134:9 |
| 165:5 | 154:14 | 99:7 100:4 | services | 218:14 | 134:16,20 |
| second 16:6 | 155:14,18 | 104:9 111:8 | 226:5 231:2 | 226:5 231:2 | 137:6,8 |
| 32:7 39:10 | 167:14 | 111:16 | 108:22 | 231:24 | 146:17,19 |
| 81:21 | segregation | 112:1 125:7 | 109:6,9 | 232:10 | 146:22 |
| 130:22 | 180:18,21 | 125:23 | 128:20 | 148:5,11,12 | 149:8,16 |
| 182:15 | 181:2,4,8 | 126:22 | 129:10 | 148:5,11,12 | 150:8,8 |
| 203:6 221:6 | 194:8 | 159:22 | 212:5 | 199:15 | 154:19 |
| 236:10 | selects 9:10 | 160:1 | 218:10,19 | 101:13,16,18 | 158:10 |
| section 40:20 | send 195:18 | 168:18 | 219:11 | 101:22 | 137:6,11 |
| 46:6,15,21 | 208:6 | 169:6,21 | 226:4,13,22 | 102:4,6,10 | 170:7 |
| 52:7 53:23 | sense 26:23 | 184:13 | 227:8 | 102:13,18 | 220:12,16 |
| 54:7,14 | 80:16 | 185:19 | set 240:1 | 111:11 | 220:21 |
| sections | 175:10 | 186:6 | setting | 138:10 | 229:10 |
| 120:8 | 186:6 | 188:23 | 115:19 | 150:13 | 229:21 |
| security | sent 37:17 | 191:13,21 | 178:15 | 166:8 | 230:10 |
| 203:20 | 142:1 | 191:23 | 178:15 | 167:18 | 220:22,23 |
| 142:3 | 143:19 | 192:18 | seven 43:11 | 188:11 | 221:1 |

MICHAEL GUMM
May 11, 2016

| | | | | |
|---|---|---|---|---|
| 88:5,7,10 | state 1:16 | 236:18 | suggest | 197:20 | 75:5 114:18 |
| 88:10,19,23 | 5:22 6:6,10 | stipulating | 208:10 | 203:3,14 | 117:12 |
| 89:6 97:11 | 6:15 41:16 | 145:1 | suggestion | tables 42:10 | 158:15 |
| 113:20 | 41:19 43:16 | stool 180:2,5 | 205:6 | 151:1 165:3 | 165:23 |
| 114:3,9,12 | 97:11 | 181:1 | suite 1:17 | 173:19,23 | 209:13 |
| 114:15 | 231:18 | 181:1 | summary | 173:24 | 236:13 |
| 122:10,11 | 239:1,4 | strict 114:14 | 7:11,23 | 174:14 | talked 73:4 |
| 123:14 | 95:13,20 | strike 16:3 | 197:13 | 197:16 | 74:10,10,13 |
| 124:9,10 | 137:5 | 32:5 77:9 | supervising | 198:4,11 | 74:23 75:8 |
| 126:13 | 162:20 | 91:23 | 136:14 | 202:18 | 75:10 |
| 127:18,21 | 176:15 | 104:13 | supervision | take 5:12 | 211:20 |
| 127:23 | 239:19 | 121:12,14 | 112:6 | 6:12 36:23 | 221:22 |
| 131:15,17 | 239:19 | 202:12 | supplied | 38:19,20 | 222:8 |
| 152:21 | statement | 203:11 | 69:10,20 | 39:16 48:15 | talking 25:14 |
| 168:10 | 41:18 60:19 | 186:13 | sure 8:17 | 51:19 63:2 | 48:1 67:20 |
| 169:3,11 | 185:6,22 | 186:17 | 17:24 18:6 | 65:5,23 | 76:22 106:8 |
| 170:5,8 | 203:11 | 203:21 | 186:6 | 66:17 86:12 | 136:3 138:4 |
| 175:13,15 | 205:7,24 | 187:9 | 65:9 67:12 | 92:12 96:21 | 188:13 |
| 184:1 | 187:9 | 207:16 | 92:18 96:21 | 141:10 | 210:18 |
| 185:21 | states 1:1,13 | 190:10 | 98:6 98:10 | 160:11 | 170:2 |
| 186:1,17,22 | 2:10,16 5:5 | 191:3,21 | 98:10 187:2 | 104:19,21 | 171:23 |
| 235:7 | 6:11 43:24 | 202:17 | 104:13 | 193:12,24 | 193:12,24 |
| 203:8 | 19:3 42:21 | 214:14 | 144:9 | 144:9 | 214:19 |
| 213:5 214:1 | 144:5,17 | staff 170:21 | 172:19 | 150:19 | 53:5 100:8 |
| 214:9 | 143:18 | subject 43:24 | 180:23 | 153:14 | technical |
| 217:10,13 | 144:5,7 | 194:6 196:6 | 190:19 | 186:20 | 114:12 |
| 217:16 | 145:12 | subjects | 211:2 215:3 | 187:20 | 114:12 |
| 219:21 | 221:14,16 | 197:7,11 | 227:6 | 194:21 | technically |
| 223:23 | 222:23 | 229:14 | surprising | 205:8 214:7 | 2:19 |
| standing 90:6 | 130:13 | 232:10 | 221:5 | 219:7 | 137:24 |
| 94:19 | stationary | subsequent | sworn 5:2,18 | 232:22 | technology |
| start 20:2 | 197:21 | 31:24 | 239:8 | 234:1 | 114:7,10,19 |
| 31:16 | 229:6 | substantial | system 16:8 | taken 1:11,14 | 114:8 |
| 119:22 | staying 16:7 | 142:20 | 167:19 | 5:4 6:9 27:6 | 116:4 |
| steeper 97:10 | steeper 97:10 | 108:6 | | 27:24 31:22 | 167:4 |
| 224:21 | 98:6 | substantially | T | 33:18 34:8 | 170:7 207:4 |
| started 12:9 | steograph... | 219:1 | t 4:1,16,16 | 140:11 | tell 13:24 |
| 76:12 80:4 | 239:11 | substantiat... | 5:20,20 | 141:18 | 18:1 22:23 |
| 143:7 | steps 43:11 | 197:23 | 114:11 | 228:2 | 23:19 24:6 |
| 204:23 | 113:23 | successfully | 219:11 | 221:24 | 45:3,18 |
| starting | 213:23 | 149:11 | 211:14 | 222:14 | 79:20 110:4 |
| 62:15 | stick 18:19 | suffers 220:5 | 239:16 | 223:12 31:14 | 153:13 |
| starts 157:15 | sticker 51:19 | sufficient | table 18:2,17 | 73:16,8,17 | 154:16 |
| 160:19 | 235:19,22 | 104:23 | table 18:17 | 74:6,8,17 | 230:15 |

MICHAEL GUMM
May 11, 2016

Page 32

| | | | | |
|---|---|---|---|---|
| 232:21 | 71:11 | 82:16 83:22 | 195:7,23 | 11:18,21 | throwing |
| 236:18 | 134:19 | 84:8 90:4 | 199:23 | 12:3 80:5,9 | 125:11 |
| telling 54:11 | 136:6 | 96:8,10 | 203:18 | 83:13 | tier 161:15 |
| 61:3 | testimony | 98:24 99:23 | 208:16 | 115:21 | 161:17 |
| ten 67:10 | 16:4 20:22 | 100:21 | 216:22 | 116:23 | 173:17 |
| 69:13,22 | 22:7,14 | 104:16,24 | theyre 42:10 | 119:17,19 | 174:1,2 |
| 181:14,15 | 30:4 43:1,3 | 107:18 | 156:4 | 120:2 | 179:11,17 |
| 181:16,19 | 53:22 70:2 | 112:8 115:8 | 179:24 | 157:12 | 199:6 203:9 |
| 181:21,23 | 70:17 96:12 | 118:9,21,24 | 196:1 | 167:2,4,15 | 203:12,14 |
| 182:2,4 | 103:8 134:2 | 128:4,9 | 197:22 | 167:21 | 203:21 |
| 183:15 | 137:12 | 134:10,11 | theyve | 168:3,9,20 | 207:9,15 |
| 185:13 | 145:20 | 135:17 | 173:22 | 169:7,20 | tiers 161:12 |
| 186:1 | 152:8 206:9 | 156:21 | thing 53:17 | 170:14 | 162:2,4 |
| 201:7 | 211:18 | 163:10 | 65:14 | 171:5,12,23 | 167:24 |
| tendered | 212:13 | 165:7 | 139:17 | 173:8,13,18 | 168:1,2,3 |
| 65:18 | 213:15 | 169:14 | 196:15 | 174:6 176:5 | 168:14 |
| 139:10,11 | 225:9 227:2 | 184:19,20 | 201:4 | 176:8 | 172:2 |
| 139:12 | 231:6 | 185:6 187:4 | things 7:19 | 177:11,16 | 176:17 |
| 173:7 | 239:14 | 189:2 | 7:20 19:11 | 180:10,11 | 185:21 |
| term 41:12 | text 54:10 | 190:23 | 94:22 95:1 | 181:2,5,21 | 190:11,13 |
| 233:7 | tgmorrisse... | 191:16 | 122:16 | 182:2,5 | 190:16,19 |
| terms 9:15 | 2:6 | 194:17 | 162:12 | 183:15,24 | 192:18 |
| 10:16 13:2 | thank 52:14 | 199:14 | 181:19 | 184:7 186:8 | 203:15,16 |
| 13:6 14:19 | 181:15,17 | 208:10 | 197:10 | 186:14,24 | 203:19 |
| 14:14 | 205:21 | 209:17 | think 34:11 | 187:11 | tight 114:14 |
| 176:12,13 | 224:1 | 213:6 | 34:22 43:6 | 190:7,11,16 | till 66:7 |
| 187:22 191:7 | tharp 71:11 | 223:16 | 66:6,8 | 191:5,9,22 | time 12:11 |
| 222:7 | tharps 71:14 | 226:13 | 74:23 80:11 | 192:4 200:8 | 23:17 29:24 |
| testified 5:18 | thats 9:6,6 | 235:24,24 | 98:23 | 200:17 | 54:5 62:14 |
| 24:2,3 | 11:13 14:17 | therex 26:17 | 101:18 | 202:3 | 62:17 68:7 |
| 86:15 147:7 | 20:7,12 | 41:23 46:23 | 103:14 | 207:14 | 68:20 71:13 |
| 153:15 | 23:6,19 | 60:18 66:4 | 112:12 | thing | 73:6 75:17 |
| 158:6 | 24:1 29:5 | 75:24 81:10 | 117:7 | 2:3,4,21 | 75:18 76:9 |
| 162:16 | 31:16,17 | 89:10 | 190:20 | thought | 82:2 83:11 |
| 191:8,24 | 33:11,11,23 | 103:24 | 136:12 | 54:9 | 83:18 92:17 |
| 211:17 | 34:16 35:13 | 114:12 | 162:1 | 141:24 | 93:7,8,18 |
| 214:10,12 | 38:2,18 | 115:14 | 178:15 | thoughts | 94:6 95:4 |
| 235:10 | 41:23 48:9 | 140:18 | 198:13 | 198:2 | 96:10,17 |
| testify 20:18 | 52:18 53:8 | 141:13,16 | thousand | 95:10,17 | 97:6,22 |
| 23:9,10,11 | 53:10 54:11 | 147:5 168:2 | 201:22 | three | 99:14 104:8 |
| 225:14 | 58:1,3,9,19 | 169:9 | 54:3 | 17:5 | 110:15 |
| 239:8 | 58:21 59:4 | 181:16,21 | 229:22 | 135:18 | 117:22 |
| testifying | 59:9,24 | 189:6 | thousands | 222:23 | 133:17 |
| 63:18,19 | 60:5,19,19 | 187:14,16 | 234:10 | 235:11 | 137:1 |
| 30:13,18 | 71:8 72:24 | 191:5,8 | third 111:13 | throat 110:12 | 153:18 |

MICHAEL GUMM
May 11, 2016

Page 34

| | | | | |
|---|---|---|---|---|
| twelve 87:23 | **U** | 132:17 | 168:15 | 234:19 | 96:19 106:5 |
| 87:24 173:9 | u 4:16 19:9 | united 11,13 | 216:15 | videotapes | 106:7,12,16 |
| 173:11 | 140:13 | 19:3 143:18 | 234:5 | 91:14 96:3 | 108:5 |
| twice 78:22 | 143:2 | 144:5,16 | user 105:14 | violation | 109:19 |
| two 6:5 20:22 | uhhuh 66:21 | 145:12 | 106:21 | 191:18 | 110:7,21 |
| 50:1,12,12 | 199:8 | units 192:13 | 107:21 | 201:11,14 | 126:20 |
| 50:19 54:4 | 230:19 | 105:3 | 109:20 | 202:4 | 126:24 |
| 55:15,15 | unable | unquote | 204:20 | 225:16 | 128:4,18 |
| 71:21 81:21 | 129:20 | 151:9 | 216:9 | violations | 129:16 |
| 85:8 93:16 | unassisted | updated | users 198:21 | 143:21 | 130:1 |
| 112:23 | 95:14,19,22 | 157:7 | 199:1 | 144:6,16 | 131:17,18 |
| 113:2,3,19 | 96:1 | upgraded | usually 27:9 | visit 76:7,13 | 132:11 |
| 120:8 | understand | 122:2 128:1 | 164:20 | 76:14,16,20 | 137:15 |
| 134:16 | 9:17 15:9 | 128:2 | | 79:6,22,23 | 141:19 |
| 146:14 | 21:22 43:7 | upper 53:15 | **V** | 80:3,9 | 142:14 |
| 172:2,3,3,6 | 62:16 67:12 | urinary | vacation | 83:16 | 148:2 151:8 |
| 172:10,14 | 68:8 98:9 | 209:24 | 210:13,15 | 119:17,19 | 141:19 |
| 173:3 174:8 | 99:22 115:7 | urinate 217:16 | vague 9:15 | 198:2 | 154:4,12 |
| 174:11 | 115:11 | 44:4 63:15 | 13:16 18:17 | visited 77:4 | 158:5 |
| 175:22 | 140:10 | 76:13 | 33:24 68:4 | 158:9 | 159:13 |
| 179:21 | 170:1 | 107:22 | 72:20 | 76:14,16,20 | 164:0 162:7 |
| 181:12 | 193:11 | 123:3 | 79:11,15,21 | 83:7,12 | 163:9 |
| 183:2 184:4 | 202:15 | 128:24 | 83:9 192:6 | 97:5 158:2 | 164:17,23 |
| 184:14 | 228:14 | 129:16,20 | 193:4 | 161:17 | 165:24 |
| 186:11,13 | 222:17 | 132:5,23 | 194:17 | 192:3 214:6 | 166:23 |
| 195:15 | 26:17 35:9 | 139:19,24 | 202:9 | 228:18 | 178:8,12 |
| twoperson | 38:3 67:22 | 146:17,19 | 232:15 | visor 221:18 | 179:3,5 |
| 186:10 | 194:4 | 164:19 | varied 93:17 | vs 1:5 | 191:14 |
| type 18:16 | 121:19 | 187:16,18 | variety 47:10 | | 192:23 |
| 64:21 | 123:6 124:4 | 187:18,20 | 54:23 55:7 | **W** | 202:1,5 |
| 124:23 | 125:19 | 168:19 | various 25:17 | wade 1:3 | 204:6,6,13 |
| 131:19 | 137:9 148:9 | 191:6,21 | 27:20 | 14:11 20:19 | 208:4 |
| 225:7 | 174:21 | 200:24 | verify 189:22 | 22:7,19 | 229:19,23 |
| types 14:4 | 175:1 183:2 | 201:10 | version 117:7 | 25:1 31:15 | wades 22:4 |
| 25:17 113:3 | 189:16 | 212:10 | 141:13,22 | 33:3,11 | wait 39:10 |
| typewriting | 191:11 | 215:15 | 142:1,4,5,7 | 34:21 36:7 | 82:20,20,20 |
| 239:12 | understands | 142:12 | 142:20 | 36:10 45:6 | 136:18 |
| typical 7:11 | 189:17 | useable | versus 33:1 | 45:17 69:18 | waiting 27:20 |
| 100:4,9,17 | understood | | 36:3 71:15 | 69:24 70:15 | 227:23 |
| 161:11 | 5:13 22:9 | | 140:13 | 72:14 73:12 | 231:9 |
| 164:6 | undertaken | | 228:3,30 | 75:23 80:16 | wake 238:6 |
| typically | 35:17 | | 234:22 | 90:17,19,21 | walkthrough |
| 50:12 | 230:24 | | 235:18,22 | 91:2,9,15 | 83:10 |
| | unethical | | vicinity | 91:17 96:10 | |
| | 164:20 | | | | |
| | unit 132:12 | | | | |

MICHAEL GUMM
May 11, 2016

Page 33

| | | | | |
|---|---|---|---|---|
| 154:16 | 219:6 | 216:19,22 | 192:17,21 | 180:12,14 | 104:15 |
| 156:7 158:8 | titled 118:21 | 216:23 | 197:6 | 180:17 | 178:21 |
| 161:15 | 155:19 | 217:4 | 232:22 | 200:18 | 196:1 |
| 162:8 | today 5:7 | 219:19 | 234:7 | 201:8 | 205:20 |
| 164:24 | 45:1 67:9 | 224:5 225:3 | tom 32:1,7 | 210:7,10 | 214:22 |
| 192:1 | 71:12 111:8 | 226:3,18,23 | 82:3 117:21 | 216:21,24 | 222:7 223:3 |
| 193:23,23 | 121:6 209:1 | 228:10,24 | 128:10 | 223:21 | 225:15 |
| 194:2,5 | toilet 42:4 | 230:21,22 | 144:22 | 236:21 | tshape |
| 196:10 | 43:18,18,23 | 232:23,23 | 155:22 | transferred | 221:24 |
| 199:22 | 44:8,13,21 | toileting | transferd | 200:7 229:8 | 222:4,5 |
| 210:16 | 47:10,14,16 | 126:12,24 | top 77:11 | transferring | tshaped |
| 211:2 | 54:15,19,22 | 132:3,24 | 90:6,13 | 134:8 135:6 | 48:12 50:5 |
| 217:14 | 56:4,13 | 133:22,23 | 134:13 | 137:7 149:7 | 55:19 113:5 |
| 223:9,12 | 57:10,19,23 | 134:4,5,12 | topics 18:20 | 149:16 | 113:24 |
| 225:14 | 58:1,3,9,19 | 134:15 | total 181:19 | 150:7 | 114:23 |
| 229:6 | 58:21 59:4 | 135:17 | 199:14 | 174:16 | tunnel |
| 233:23 | 59:9,24 | 136:7,18 | totally | 175:7 | 222:18 |
| 235:11 | 60:5,19,19 | 137:11 | 104:16 | transport | 223:1 |
| 237:15 | 61:1 62:7 | 153:24 | 153:24 | 221:2 | turn 48:7,9 |
| 239:17 | 63:22 64:5 | 170:7 | towel 42:8 | trap 211:17 | 48:13 50:5 |
| timeframe | 64:5,7,9 | 227:22 | town 210:1,5 | trash 42:9 | 90:8 113:6 |
| 64:1 72:10 | 77:18 78:15 | toilets 42:8 | travel 43:19 | travel 43:19 | 140:10 |
| 72:23,24 | 78:16 118:6 | 47:5 52:21 | 44:9 118:7 | 44:9 118:7 | 195:11 |
| 98:24 | 122:9 | 74:2,6 77:8 | train 133:2 | trial 21:3 | 203:6 208:4 |
| 111:15,19 | 123:13,24 | 77:17,24 | 146:20 | 22:9 30:13 | turned 18:21 |
| 112:22 | 124:14 | 78:19 80:12 | trained 148:5 | 58:14,18 | 19:6,13 |
| 126:18 | 125:9,10 | 122:24 | training | 159:12 | 20:1 39:3,8 |
| 152:14 | 126:1 | 137:14 | 102:9,12,14 | 211:10 | 39:11 69:11 |
| 177:4,19 | 128:24 | 184:1,5,11 | 102:17,21 | 226:24 | 141:18,19 |
| 192:19 | 129:15,16 | 188:2 | 103:3,16,24 | true 145:3 | 142:13 |
| 230:15 | 129:20 | 214:16 | 104:5 | 187:3,4 | 154:5 |
| 233:19 | 131:22 | 215:24 | 136:11 | 204:4 | 195:16 |
| times 20:16 | 134:13 | 216:3,7 | 147:8 149:4 | 199:15 | turning |
| 33:6 74:12 | 135:7 | 225:24 | 150:6,13 | truth 239:8 | 40:11 46:20 |
| 93:11 94:13 | 164:11 | 150:6,13 | transcript | try 23:18 | 47:17 48:11 |
| 94:17 99:15 | 165:5 184:2 | told 7:17 31:4 | 227:9 | 36:13 | 48:21 49:9 |
| 153:15 | 187:12,14 | 33:9 38:24 | transfer 47:4 | 139:20 | 50:1,9,13 |
| 192:5,17 | 187:20 | 102:5 | 47:11 49:16 | 142:6 | 50:16 51:8 |
| 193:22 | 188:18 | 103:22 | 50:21,23 | 164:19 | 50:16 55:16 |
| 229:16 | 191:14,15 | 183:9 | 54:23 55:7 | 195:1 | 63:3,3,6 |
| 235:10,11 | 215:12,22 | 187:17,24 | 55:11 60:21 | 204:24 | 89:8 112:19 |
| title 5:24 | 216:12,13 | 188:3,16 | 146:21 | 211:7 | 112:24 |
| 117:4 213:9 | | 189:5 190:3 | 176:18 | trying 12:22 | 113:3,9 |
| | | | | 36:16 72:23 | 114:1,20,24 |

MICHAEL GUMM
May 11, 2016

Page 35

| | | | | |
|---|---|---|---|---|
| wall 44:22,23 | 135:11 | 34:13 46:22 | 236:3 | 189:24 | 43:4 44:7 |
| 56:18,19,20 | 192:2 | 51:17 52:2 | wheelchair... | 192:5 193:1 | 49:2,21 |
| 57:5,6,10 | 195:19 | 71:8 86:4 | 72:8 97:15 | 200:19 | 50:11 52:13 |
| 57:22 58:4 | 224:11,12 | 107:10 | 107:4 110:2 | 201:18 | 53:4 59:18 |
| 58:10,20 | 224:13 | 107:11,13 | 114:8,21 | 202:2 | 60:11 65:12 |
| 59:5,9 | 231:19 | 117:22 | 152:12,22 | 205:13 | 65:20 66:22 |
| 120:11 | wasting | 118:15 | 153:6 | 206:5 225:7 | 68:9 70:5 |
| 232:20 | 117:21 | 139:5,7 | 166:24 | 226:13 | 70:24 78:2 |
| 224:16 | 164:24 | 144:11 | 197:17 | 227:12,23 | 76:3 78:9 |
| want 16:12 | 235:11 | 148:7 | wheelchair... | 228:7,23 | 79:11 84:10 |
| 16:14 19:24 | water 52:9,22 | 155:14 | 29:18 30:2 | 229:3 | 85:4 86:14 |
| 20:9 22:20 | 53:6 | 166:13 | 31:3,10 | 230:12,17 | 87:17 90:1 |
| 23:16 31:16 | way 51:10 | 196:9 213:2 | 167:18 | 230:20 | 90:12 93:12 |
| 34:14 38:19 | 67:8 131:9 | whatsoever | 83:15 91:22 | 231:1,15,21 | 97:21 98:21 |
| 65:13 76:13 | wed 25:7 | 34:22 | 92:2,8,14 | 232:12 | 100:10,19 |
| 81:13 96:23 | week 67:9 | 166:9 213:2 | 95:13,20,24 | wheelchairs | 100:15,19 |
| 104:17 | 76:11,12 | wheel 232:23 | 103:17 | 60:22 199:6 | 107:9,16 |
| 120:15,15 | weeks 33:5 | wheelbound | 104:5 | 203:9,12 | 108:2,11 |
| 122:1 | 36:7 71:21 | 229:17 | 141:20 | 207:8,15 | 119:14 |
| 131:11 | 178:18 | wheelchair | 110:21 | 110:14 | 113:7,17 |
| 133:11 | 195:15 | 29:12 47:11 | 111:22 | wheeled | 115:8 |
| 139:16 | 187:10 | 47:15 50:2 | 112:2 129:1 | 113:3 | 118:19 |
| 162:23 | went 7:19 | 50:22 54:23 | 131:20 | whereof | 121:7,8,24 |
| 165:2 | 27:13 33:5 | 77:14 91:19 | 136:7 | 240:1 | 126:8,22 |
| 183:4 | 61:7 62:5 | 105:3 | 137:10 | wide 44:22 | 127:9,22 |
| wanted 18:19 | 62:18 63:1 | 106:19,21 | 138:14 | wide 138:15 | 129:20 |
| 69:22 70:6 | 69:22 70:6 | 107:11,21 | 148:11 | wing 124:13 | 130:7,8 |
| 70:20 | 76:18 80:5 | 108:6 | 149:16 | wings 165:12 | 132:3,19 |
| 162:15 | 91:20 92:8 | 109:20 | 150:23 | winter | 132:24 |
| 222:10 | 92:14 98:7 | 111:21 | 159:23 | 224:13 | 138:3 |
| wants 31:11 | 162:3 198:7 | 134:9 135:7 | 153:15 | wired 14:2 | 142:18 |
| 148:1 | 199:23 | 134:9 135:7 | 165:19 | 142:18 | 144:24 |
| warning | 234:23 135:20 | 135:20 | 166:19 | wireless 14:2 | 146:24 |
| 235:17 | west 120:6 | 170:21 | 167:24 | wisconsin | 147:21 |
| warnings | 124:13 | 171:5,24 | 172:5,15 | 1:23 | 148:15 |
| 235:3 | 125:3 | 149:7,16 | 172:5,15 | witness 3:1 | 149:20 |
| washrooms | 157:12 | 150:7 152:9 | 172:5,15 | 5:1,14,17 | 150:10,17 |
| 79:17 | 181:3 | 175:21 | 174:16 | 90:8 | 151:11,13 |
| new 239:1 | western 2:5 | 176:9 193:8 | 175:7 176:4 | 10:20 12:8 | 152:3 |
| 59:1 83:9 | weve 123:22 | 198:5,11,21 | 179:21 | 13:5,10,19 | 155:2 156:1 |
| 96:13 | 136:12 | 199:1 200:7 | 180:6,13 | 18:11 26:12 | 155:12 156:1 |
| 121:22 | whats 7:3 | 216:8,11 | 182:9 10:10 | 29:23 30:10 | 156:10 |
| 126:13 | 25:3,24 | 216:8,11 | 187:10 | 35:21 40:5 | 157:21 |

Plaintiff's Exhibit 9 Page 69

**MICHAEL GUMM**
**May 11, 2016**

Page 36

| | | | | | |
|---|---|---|---|---|---|
| 160:6,22 | 183:21 | 65:15 69:2 | 127:4 | 139:6,7,12 | 204:7 |
| 161:9 165:1 | **wording** | 84:10 111:4 | 133:10 | 154:8 156:5 | **16th** 128:5 |
| 167:9 169:1 | 235:24 | 126:19 | 141:14 | 166:14,15 | 209:24 |
| 170:3,18 | **words** 54:12 | 137:23 | 145:1,4 | 166:17,19 | 210:2 |
| 171:14 | 148:16 | 151:4 | 147:17 | 166:22 | 17:4 19 59:24 |
| 172:9,22 | **work** 9:10 | 152:10 | 148:7 | 167:21 | 60:20 61:1 |
| 174:2 | 12:2,10,14 | 154:13 | 153:20 | 184:17 | 62:7 77:18 |
| 175:11 | 33:18 34:8 | 178:6,10 | 163:4,6 | 186:2 195:7 | 78:5,14,20 |
| 176:16 | 37:7,8 38:3 | 238:2 | 164:15,18 | 199:18,23 | 216:4 |
| 177:2 179:9 | 38:11 | **year** 74:8,13 | 164:23 | 200:3 | **17th** 210:1 |
| 180:12,20 | 100:23 | 75:5 94:9 | 169:5 170:9 | **101** 76:17,21 | **18** 4:21 57:22 |
| 181:18 | 208:7,10,11 | 117:3,5 | 174:23,24 | 77:5,10 | 58:3,9,19 |
| 183:12,20 | 208:23 | 124:12 | 183:21 | 78:20 79:8 | 59:4,14 |
| 185:5 | 209:17,22 | 126:16 | 193:24 | 84:5,21 | 186:24 |
| 186:20 | 210:4 214:5 | 127:5,7,9 | 202:13 | 85:2,15,18 | 187:11 |
| 188:7,10 | 224:12,15 | 141:9 | 205:18 | 88:16 91:3 | **180** 114:24 |
| 192:16 | **working** 12:4 | 152:23 | 215:15 | 91:4,11 | **180degree** |
| 193:5,13,21 | 104:11 | 153:7 161:13 | 233:7 | 216:1,14 | 50:5 113:6 |
| 194:18,22 | 157:9 | 163:16 | **youve** 11:19 | **10150** 2:5 | **18th** 210:2 |
| 195:20 | **wouldnt** 48:8 | 192:4 | 15:1 152:17 | **101s** 79:23 | **19** 59:24 |
| 197:2,19 | **write** 14:10 | **years** 6:5 | 165:21 | **10th** 143:19 | 60:20 61:1 |
| 202:11,24 | 18:18 61:11 | 146:14 | 211:4 | 144:6,18 | 62:7 77:18 |
| 204:22 | 61:16 | **yesterday** | | 11:18 46:1 | 78:5,14,20 |
| 206:12 | **writing** 51:1 | 18:21 | **Z** | 69:1 98:23 | 197:15,16 |
| 207:18 | 56:2 | 139:13 | | 157:15 | 216:4 |
| 209:10,15 | **written** | 142:13 | **0** | 166:21 | **1920s** 77:20 |
| 211:6 | 188:17 | 154:5 | **00** 66:7 | **116** 4:10 | 217:13 |
| 223:18 | **wrong** 51:19 | 195:12,13 | 139:12 | **118** 4:11 | **1990** 124:3 |
| 226:7,9 | 104:16 | **youll** 30:13 | **0848** 3813 | **11day** 68:20 | **1991** 60:5 |
| 227:3 230:2 | 183:10 | **youre** 8:17 | 240:10 | 160:19 | 78:6 87:10 |
| 230:8 | **wrote** 20:12 | 17:14 18:1 | | **137** 105:6 | 88:6,10,18 |
| 231:10 | | 20:4,5,6 | **1** | **139** 4:13 | 97:7 109:4 |
| 232:4,16 | **X** | 21:17 22:16 | **1** 4:3 6:18,22 | **14** 4:19 94:8 | 123:12 |
| 233:6 | **x** 3:1 4:1 5:20 | 22:21 23:2 | 7:4 9:1 | 156:19 | 217:10 |
| 235:13 | 211:14 | 31:19 34:1 | 24:11 41:17 | 157:3,16 | **1992** 124:10 |
| 239:7,7 | 221:11 | 35:2,20 | 52:21 53:5 | 161:24 | 126:16 |
| 240:1 | 224:2 | 36:15 51:6 | 100:3,14 | 162:1 | 127:17,23 |
| **women** 221:6 | 236:11 | 58:15 61:6 | 104:23 | **14th** 209:24 | 153:1 |
| **wont** 23:21 | **xerox** 38:20 | 63:18 72:17 | 161:22 | 15 104:23 | **1998** 124:5 |
| **word** 61:17 | | 98:9 104:15 | 184:14,23 | 161:24 | 129:24 |
| 76:5,14 | **Y** | 105:21 | 185:1 | **15cv10644** | 164:6 7:23 |
| 122:23 | **yeah** 11:14 | 114:15 | 10:1 18 4:13 | 1:5 | 68:16 210:8 |
| 123:3 | 41:4 49:13 | 117:12,21 | 52:13 53:15 | **1625** 2 151:2 | 210:21 |
| 125:11,12 | 49:21 59:17 | 125:11 | 90:8 139:2 | 151:7,20 | |

**MICHAEL GUMM**
**May 11, 2016**

Page 38

| | | | | | |
|---|---|---|---|---|---|
| 129:15,15 | 228:18 | 55:23 | 227:17 | **689** 46:22 | |
| 131:21 | 229:10,14 | 180:15,16 | 228:8,18 | 47:1 60:18 | |
| 151:19 | 230:14 | **48inch** | 229:10,14 | **691** 49:11,11 | |
| 155:10 | 233:17 | 220:24 | 230:14 | 50:1 51:4 | |
| 158:19 | 234:17,24 | **4th** 196:18 | 233:2,17 | 112:18,23 | |
| 159:11 | **342** 166:14 | 203:7 206:4 | 234:17,24 | | |
| 163:8 | 166:17,23 | | **50** 200:19 | **7** | |
| **3213** 120:22 | 181:1 | **5** | **500** 1:17 12:22 | **74** 4:10 38:7 | |
| **3215** 120:18 | **355** 45:6,7,17 | **5** 4:8,22 28:2 | 2:18 | 41:18 | |
| 33:4:21 | **36** 4:4 | 28:7,11,15 | **504** 46:6,15 | 115:22 | |
| **344**:22 28:23 | 167:17 | 28:16,18,20 | 46:21 53:24 | 116:2,6 | |
| 29:13 34:2 | 176:5,15 | 28:23 29:8 | 54:14 55:10 | 118:17 | |
| 34:6 37:7 | 179:8 | 29:13 34:2 | 112:13 | 120:2,20 | |
| 38:5,8,9 | **3e361** 190:20 | 60:24 61:24 | 113:12 | 121:11 | |
| 39:21 40:1 | **3north** | 62:6,13,19 | **5069** 105:7 | 124:12 | |
| 41:1,17 | 120:10 | 63:4,23 | **514**:7 | 154:8 | |
| 42:17,20,24 | **3west** 120:10 | 64:7 66:13 | **5210** 3:4 | **704** 80:17 | |
| 43:12,23 | 121:13,15 | 66:17 72:1 | **56** 44:23 | 81:17 | |
| 44:10,17,21 | 121:20 | 112:11 | 86:3 86:5,7 | **71** r1 45:5 | |
| 45:22 56:2 | 157:14,18 | 117:19 | 87:1 89:9 | 73 4:23 | |
| 56:5,9,24 | 157:19,20 | 118:2 | 89:18 105:5 | **773** 2:6 | |
| 57:8 60:24 | 157:22,23 | 160:20 | 160:20 | **7th** 210:10,14 | |
| 61:24 62:6 | 204:8 | 184:15,21 | **604** 44:22 | 210:22 | |
| 62:13,19 | | 185:1 199:5 | 53:11,15 | | |
| 63:4,23 | **4** | 199:22 | **6035** 4:50 2:13 | **8** | |
| 64:7 112:11 | **4** 4:7 51:18 | 204:8 53:21 | **6036** 638 2:19 | **84**:11 45:21 | |
| 117:19 | 51:22 52:3 | 207:14 | **604** 52:8,21 | 46:1 52:15 | |
| 118:2,4 | 52:7,15 | 212:24 | 53:5 | 69:9 71:4,7 | |
| 123:11,16 | 156:19 | 213:13,16 | **60602** 2:12 | 118:11,16 | |
| 213:21 | 221:2,4 | 213:21 | 2:19 | 119:11 | |
| 214:19,20 | **40** 62:21 | 214:19,20 | **60643** 2:5 | 157:3 167:5 | |
| 214:24 | **42inch** 57:4,9 | 214:24 | **60inch** 48:12 | 196:16,23 | |
| 215:6 | 57:16 | 215:6 | 49:7 50:6 | **86** 4:9 | |
| 222:10 | **45** 4:6 38:7 | **63** 4:4 | **664** 4:8 | | |
| 225:21 | 82:5 | **685** 46:10 | **685** 46:10 | **9** | |
| 227:17 | **48** 49:19,20 | **688** 112:22 | **688** 112:22 | **9** 4:2 53:16 | |

**MICHAEL GUMM**
**May 11, 2016**

Page 37

| | | | | | |
|---|---|---|---|---|---|
| **2** | 77:21 78:3 | 25:7 27:12 | 132:9 151:2 | 68:16 210:8 | 38:18 40:11 |
| **2** 4:4 36:18 | 78:6,11,13 | 28:23 29:14 | 151:7,20 | 210:3 | 46:9 47:1 |
| 36:22 47:17 | 78:19 80:13 | 29:19 30:5 | 152:16,23 | **20minute** | 49:24 51:4 |
| 89:10 | 87:9,18 | 31:8,23 | 153:7 | 104:18 | 52:21 53:5 |
| 112:10 | 88:5,6,9,18 | 33:7 38:4,6 | 156:10 | **20th** 210:14 | 53:23 54:13 |
| 158:3,7,10 | 97:7 98:6 | 39:22 40:1 | 157:5 | 240:2 | 55:14 60:16 |
| 158:10 | 113:22 | 40:17 41:10 | 159:22 | **211221** 3:5 | 60:18,18 |
| 159:22 | 114:3,4 | 56:3 58:18 | 160:1 | **21st** 128:6 | 66:7 98:23 |
| 160:8,12,16 | 122:13,22 | 57:3,7,14 | 161:23 | **221224** 3:7 | 112:12,12 |
| 160:17,17 | 123:4,12,21 | 57:18 58:8 | 163:16 | **224236** 3:3 | 112:13 |
| 160:18 | 126:12 | 58:18 59:3 | 165:20 | **22nd** 83:20 | 116:12 |
| 161:2,2,10 | 127:20,22 | 61:8 62:6 | 168:18 | 84:2 | 117:14 |
| 161:10,18 | 131:15 | 62:12,19 | 169:22 | **2337900** 2:6 | 166:6 |
| 161:18,19 | 143:4,7 | 63:2 64:3 | 178:17,19 | **236237** 3:10 | 199:21 |
| 161:19,22 | 153:1 | 72:15,16 | 184:6,6,7 | **237238** 3:11 | 201:2 |
| 162:9,10,15 | 168:21 | 73:14,21 | 186:6 | **24** 156:19 | 221:2,4 |
| 162:15,22 | 169:3,6 | 74:9,13 | 188:24 | 157:5 | **30** 1:18 49:19 |
| 162:22 | 174:20 | 75:6 76:11 | 189:14 | 207:23 | 49:20 55:23 |
| 163:15 | 184:2,8,13 | 76:17 77:4 | 191:13,21 | **24th** 208:1 | 88:24 |
| 164:3,3 | 185:19,21 | 79:9,22 | 191:23 | 26 24:11 | 165:14 |
| 165:7,8,8,9 | 199:17 | 81:6 83:7 | 192:4,10,14 | 39:16 | 180:15,16 |
| 165:12,20 | 200:1,3,20 | 83:20 84:3 | 193:2,18 | **31** 42:15,18 | **31** 42:15,18 |
| 165:20 | 200:23 | 88:14 89:2 | 194:3,13 | **26day** 116:19 | 43:16 44:3 |
| 221:2,4 | 213:24 | 90:16 91:18 | 196:18 | **284** 140:11 | 44:5,10 |
| **204** 4:20 59:11 | 217:11,16 | 92:1,10,13 | 200:17 | 140:14 | 52:8 157:3 |
| 181:19 | 220:2,3 | 92:20 93:1 | 201:20,24 | 141:19 | 215:1,8,9 |
| 186:7,10,13 | 224:6 | 93:3,8,19 | 202:18 | **287** 147:19 | 216:14 |
| 186:14 | **2011** 46:1 | 93:24 94:4 | 203:7 204:6 | 148:1,2 | **311** 156:4 |
| **2004** 51:12 | **2012** 143:20 | 94:9,15,21 | 204:7 206:4 | 194:10 15 | 156:17 215:2 |
| **2006** 51:13 | 144:6,18 | 95:5,11,15 | 207:23 | 140:17 | **316** 154:4,12 |
| **20** 10:9:4 | 145:13 | 95:16,22 | 208:1 | **292** 140:18 | 166:15 |
| 43:13,14 | **2013** 117:5 | 97:5,13 | 219:13,17 | **293** 156:4 | **317** 208:3,4 |
| 44:13,19 | 121:13,15 | 98:15,16,23 | 223:23 | **297** 160:21 | **319** 195:24 |
| 47:8 50:17 | 121:19,23 | 99:7,7 | 224:21,24 | 160:23 | 196:2,2 |
| 51:6,14,16 | 124:12,19 | 101:14,16 | 225:19,22 | **298** 160:21 | **32** 4:20 |
| 52:5,17 | 126:12 | 101:21 | 227:16,22 | 160:23 | **320** 196:19 |
| 54:6,16,18 | 126:16,20,24 | 104:4,9 | 228:7 229:1 | **2nd** 40:17 | **3205** 120:6,6 |
| 54:21 55:5 | 126:23 | 109:24 | 232:11 | 46:5 56:3,8 | 120:11,13 |
| 55:9,13,21 | 127:9 158:9 | 110:8,17,20 | 233:1,11,21 | 57:7 118:3 | 120:21 |
| 58:22 59:6 | 161:4 | 111:9,16 | 234:17 | 227:16 | 121:2 |
| 59:20 60:4 | 221:20 | 112:1 119:5 | **2015** 39:22 | **2s** 165:12 | 124:12 |
| 61:5 63:18 | 229:1 | 119:9,16,22 | 40:1 154:22 | | 125:3,8 |
| 64:8,14,16 | **2014** 12:4,9 | 125:7,23 | 224:13,16 | **3** | 128:1 |
| 65:6 77:17 | 17:7 25:2,3 | 125:6,18 | **2016** 1:18 | **3** 4:5 38:14 | 128:15 |

Plaintiff's Exhibit 9 Page 70

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Donnell Flora, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 1127 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Matthew F. Kennelly |
| Thomas Dart, Sheriff of Cook County, and | ) | |
| Cook County, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT COOK COUNTY'S RULE 26(a)(2)(C) DISCLOSURES**

Defendant Cook County, by and through its attorney, Anita Alvarez, State's Attorney of Cook County, through her assistant, David R. Condron, respectfully submits the following initial disclosures pursuant to FRCP 26(a)(2)(C).

A.      **Non-Retained Experts Who Will Provide Fact and Opinion Testimony**

1. **Michael Gumm**:  Gumm is the ADA Compliance Officer in the Cook County Office of Capital Planning and Policy. As ADA Compliance Director, Gumm's responsibilities include: identifying and directing projects that will improve accessibility to Cook County facilities; reviewing policies and procedures, and helping and advising in improving those policies and procedures toward accessibility

Gumm is familiar with the layout of Cermak Health Services, including the rooms in which Plaintiff was housed. Gumm will opine that Cermak, which was built in 1998 and was constructed in accordance with the 1991 ADA Standards, satisfies those standards. Gumm will also opine that the manner in which Cook County chose to accommodate Plaintiff's disability, namely providing a toilet chair in his room and a handicapped accessible shower chair in the communal shower and providing the services

of the nursing staff to assist Plaintiff with his bathing and use of the toilet was a reasonable accommodation or an appropriate manner to overcome any physical barriers to the toilets or showers. The nursing staff at Cermak was available on a 24/7 basis.

Gumm is also familiar with the layout of the Residential Treatment Unit (The RTU, Division 8 of the Cook County Department of Corrections) including the rooms and locations in which Plaintiff was housed. Gumm will opine that the RTU, which was built in 2013 and was constructed in accordance with the 2010 ADA Standards, satisfies those standards. Gumm will also opine that the layout and the manner in which Cook County chose to accommodate Plaintiff's disability, namely providing access to a handicapped accessible toilet and a handicapped accessible shower in addition to handicapped accessible programs and services were appropriate under the 2010 ADA standards at all locations where Plaintiff was housed in the RTU. Gumm will further opine that Plaintiff was also provided reasonable accommodations from the nursing staff that was available on a 24/7 basis at RTU for any additional assistance or access to accessible toilets, showers and programs and services. Mr. Gumm will further opine that rails are not required for beds in the RTU pursuant to the 2010 ADA standards.

Gumm is also familiar with the layout of the George Leighton Courthouse located at 2650 South California as well as the Jail facilities that lead to the Courthouse. The Leighton Courthouse was built before any ADA standards were in effect. Pretrial detainees use ramps to navigate to and from Court. Gumm will opine that Plaintiff was provided a reasonable accommodation because at all relevant times, procedures were in place at the Leighton Courthouse for Sheriff's Deputies to push Plaintiff up and down the ramps if needed. In addition, Gumm is familiar with the layout of the holding cells in the

basement of the Leighton Courthouse, including "bullpen 34/5." Gumm will opine that all relevant times, a portable commode chair was supplied for detainee use, including Plaintiff, to overcome the physical toilet barriers in the holding cells in the basement and was a reasonable accomodation. Additionally Gumm is familiar with the renovations that were complete to the toilet facilities in "Bullpen 34/5" were completed on or about March 24, 2015. Gumm will opine that these renovations to the toliet were appropriate under the 2010 ADA standards.

<div style="margin-left: 40%;">

Respectfully Submitted,
ANITA ALVAREZ
State's Attorney of Cook County
By: /s/ David R. Condron
David R. Condron (ARDC #6210034)
Assistant State's Attorney
69 West Washington Street
Suite 2030
Chicago, Illinois 60602
(312) 603-1427

</div>

## CERTIFICATE OF SERVICE

I, David R. Condron, Assistant State's Attorney, hereby certify that I served copies of Defendant County of Cook's Rule 26a1 disclosure via regular mail deposited in the US Mail postage prepaid at 69 West Washington Street, Chicago Illinois 60602 before 5 p.m. on August 15, 2016 to the parties listed below.

Patrick Morrissey
Thomas Morrissey
10150 S. Western Ave.
Rear Suite
Chicago, IL 60643
**Patrickmorrissey1920@gmail.com**
**tgmlaw@ameritech.net**

James Nichols, ASA
Cook County State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602

By:      /s/ David R. Condron_____
         David R. Condron

Plaintiff's Exhibit 10 Page 4

Transcript of the Testimony of
**SABRINA RIVERO-CANCHOLA**

**Date:** June 29, 2016

**Case:** HAROLD VAUGHN VS. THOMAS DART, ET AL.

TOOMEY REPORTING
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 2

```
 1    APPEARANCES:
 2         THOMAS G. MORRISSEY, LTD.
 3         BY:  MR. THOMAS G. MORRISSEY
                MR. PATRICK W. MORRISSEY
 4         10150 South Western Avenue
           Chicago, Illinois  60643
 5         (773) 233-7900
           tgmassistant@gmail.com
 6
                Representing the Plaintiffs;
 7
 8    STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
 9    BY:  MR. JAMES E. NICHOLS
           500 Richard J. Daley Center
10         Chicago, Illinois  60602
           (312) 603-3474
11         james.nichols2@cookcountyil.gov
12              Representing Sheriff of Cook County;
13
      STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
14
      BY:  MS. JACQUELINE CARROLL
15         69 West Washington Street
           Suite 2030
16         Chicago, Illinois  60602
           (312) 603-3474
17         jacqueline.carroll@cookcountyil.gov
18              AND
19    STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
20    BY:  MR. DAVID R. CONDRON
           500 Richard J. Daley Center
21         Chicago, Illinois  60602
           (312) 603-3368
22         David.Condron@cookcountyil.gov
23              Representing Cook County, Illinois.
24
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

HAROLD VAUGHN,                  )
                                )
            Plaintiff,          )
                                )
   vs.                          )  No. 15-cv-951
                                )
THOMAS DART, SHERIFF OF         )
COOK COUNTY, and COOK           )
COUNTY, ILLINOIS,               )
                                )
            Defendants.         )
DONNELL FLORA,                  )
            Plaintiff,          )
   vs.                          )  No. 15-cv-1127
THOMAS DART, SHERIFF OF         )
COOK COUNTY, and COOK           )
COUNTY, ILLINOIS,               )
            Defendants.         )
```

        The deposition of SABRINA RIVERO-CANCHOLA,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before EMILY TOMALA, CSR, a notary public
within and for the County of Cook and State of
Illinois, at 10150 South Western Avenue,
Chicago, Illinois, on the 29th day of June,
2016, at the hour of 2:00 o'clock p.m.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 3

```
 1                    I N D E X
      WITNESS                           EXAMINATION
 2
      SABRINA RIVERO-CANCHOLA
 3
 4      By Mr. Morrissey:               4-198
 5
 6
 7
 8
 9
10
11                  E X H I B I T S
      NUMBER                      MARKED FOR ID
12
      Plaintiff's Exhibit Nos. 1-13        4
13    Defendant's Exhibit Nos. 1 and 2     38
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 1

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 4

1    (Whereupon, the witness was duly
2    sworn.)
3    (Whereupon, Plaintiff's Exhibit
4    Nos. 1-13 were marked for
5    identification.)
6    MR. MORRISSEY:  This is a Rule 30(b)(6)
7    notice -- revised notice of deposition being
8    taken in Donnell Flora vs. Thomas Dart and
9    also in Harold Vaughn vs. Thomas Dart.
10    SABRINA RIVERO-CANCHOLA,
11    having been first duly sworn, was examined and
12    testified as follows:
13    DIRECT EXAMINATION
14    BY MR. MORRISSEY:
15    Q.   Will you please state your name for the
16    record, please?
17    **A.   My name is Sabrina Rivero-Canchola.**
18    Q.   I'm going to show you what's been
19    marked as Plaintiff's Exhibit No. 1.  It's the
20    revised notice of deposition in the Flora case
21    and ask you, have you seen that notice?
22    **A.   I have.**
23    Q.   Are you being produced by the Sheriff
24    of Cook County to respond to items 1 and 2 and

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 6

1    Q.   Do you know whether or not the cells
2    were in the same condition as they were when
3    Mr. Flora was a detainee at the Cook County
4    Department of Corrections?
5    **A.   Which cells?**
6    Q.   Let me rephrase the question.  At the
7    time of your recent inspection of the RTU in
8    Cermak in regards to Mr. Flora's housing
9    assignments, do you know whether or not any of
10    those cells have been altered since Mr. Flora
11    vacated those cells or dormitories?
12    MR. NICHOLS:  I'm not going to object.
13    I would just ask that for clarity, if you do
14    have an exhibit of Mr. Flora's housing
15    record, it may be a little bit easier for
16    her to answer the question.  No objection
17    but --
18    MR. MORRISSEY:  We'll get there.
19    BY MR. MORRISSEY:
20    Q.   Do you understand the question?
21    **A.   I understand the question.  I do not**
22    **believe they have been altered.**
23    Q.   Now, in addition, you're being called
24    to testify in regards to Harold Vaughn's

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 5

1    4(g) on that notice?
2    **A.   I am.**
3    Q.   What have you done in preparation for
4    sitting for this deposition in regards to
5    Mr. Flora as the sheriff's 30(b)(6) designee?
6    **A.   I have reviewed policies and**
7    **procedures.  I have reviewed Mr. Flora's bedding**
8    **assignments and alerts, and I have inspected**
9    **various cells within the Department of**
10    **Corrections.**
11    Q.   What policies and procedures did you
12    look at?
13    **A.   The sheriff's office policy with regard**
14    **to disabled detainees.**
15    Q.   And what number is that?
16    **A.   It's the 11.14, I think.**
17    Q.   Did you also look at -- 4(g) asked for
18    general order 24.15.8.  Did you look at that
19    general order also?
20    **A.   I did.**
21    Q.   When did you conduct your inspection of
22    the cells that Mr. Flora was assigned to?
23    **A.   It was during our RTU audits last week**
24    **I believe it was and a few weeks ago as well.**

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 7

1    30(b)(6) notice, correct?
2    **A.   Correct.**
3    Q.   I'm going to show you what's been
4    marked as Plaintiff's Exhibit No. 2.  It's the
5    notice -- revised notice for Mr. Vaughn, and
6    you're being called in regards to that notice to
7    respond to 1, 2, 4(g), and items 5(a) through
8    (e), correct?
9    **A.   Correct.**
10    Q.   What have you done prior to this day --
11    prior to today, what have you done to prepare to
12    represent the office of the sheriff in response
13    to this 30(b)(6) notice of dep for Mr. Vaughn?
14    **A.   I reviewed policies and procedures**
15    **along with Mr. Vaughn's bed assignments, alerts,**
16    **and I conducted an inspection of the cells.**
17    Q.   Again, the policies and procedures are
18    from sheriff's order 11, correct, and also the
19    general order 24?
20    **A.   Correct.**
21    Q.   Now, you mentioned you looked at
22    housing assignments for Mr. Flora.  And for
23    purposes of this deposition, we're going to be
24    asking questions about both notices.  You

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 2

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 8

1  understand that?
2      A.   I understand.
3      Q.   Showing you what has been marked as
4  Plaintiff's Exhibit No. 6, it's the historical
5  bed assignments, I believe, for Donnell Flora.
6  I'll ask you to take a look at that document.
7  In preparation for Mr. Flora's 30(b)(6) notice,
8  did you inspect the cells that are listed on
9  Exhibit 6?
10     A.   Yes.
11     Q.   In regards to Mr. Vaughn, I'm going to
12  show you what I have marked as 7-A and 7-B which
13  are identified as bed assignments, associated
14  views for Harold Vaughn.  I'll ask you whether
15  or not those are the cells or dormitories you
16  looked at for Mr. Vaughn in preparation for this
17  deposition?
18     A.   With the exception of the hospital
19  assignment, yes.
20     Q.   You mentioned that you have looked at
21  general order 24.14.8.0 which has been marked by
22  the plaintiffs as Plaintiff's Exhibit No. 3.
23  I'm going to show you the document.  Is this one
24  of the documents you looked at in preparation

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 9

1  for today's deposition?
2      A.   Yes.
3      Q.   Now, I believe your current position at
4  the Cook County Jail for the sheriff is you're
5  an ADA compliance officer?
6      A.   Correct.
7      Q.   I'll ask you to look at under Roman
8  numeral 8, 4, which is on page 4 of that
9  document.  Do you see that document?
10     A.   I do.
11     Q.   Now, when a prisoner enters the jail,
12  are you notified as the ADA compliance officer?
13     A.   Am I notified?
14     Q.   Yes.
15     A.   Can you clarify what you mean by
16  notified?
17     Q.   Sure.  If we look at Roman numeral
18  8, 4, it says:  Once notified that a subject may
19  be disabled, the RCDC supervisor shall, B,
20  notify the ADA compliance officer via email at
21  ccso.ada@cookcountyil.gov.  Is that the practice
22  and procedure of the sheriff's office to have
23  the RCDC supervisor notify you when a disabled
24  inmate enters the jail?

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 10

1      MR. NICHOLS:  I object to this question
2  as it's beyond the scope of the designation
3  of Ms. Rivero-Canchola in this particular
4  case.  Tom, if you could point to me in the
5  notice, then I'll withdraw the objection,
6  but there's nothing in your notice that
7  indicates that you want to be questioning --
8      MR. MORRISSEY:  If we look at --
9      MR. NICHOLS:  -- about this
10  particular --
11     MR. MORRISSEY:  Sure.  We've gone
12  through this.  On both Flora and Vaughn's
13  revised notice of deposition, it states
14  under 4(g), compliance with general order
15  24.15.8.8 adopted in August of 2014
16  including, but not limited to the
17  requirement to maintain a list of cells or
18  living units that can appropriately
19  accommodate individuals with qualified
20  disabilities.  So it was asked --
21     MR. NICHOLS:  No, the notice refers to
22  a completely different general order.
23  You're talking about the nondiscrimination
24  policy.

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 11

1      MR. MORRISSEY:  No, this is the general
2  order 24.  Isn't this the general order or
3  am I off?
4      MR. NICHOLS:  I think you're off.
5      MR. MORRISSEY:  I'm off?
6      MR. NICHOLS:  I'm going to object to
7  this question.  I'm going to instruct my
8  client not to answer questions about --
9      MR. MORRISSEY:  Judge Ellis made it
10  quite clear that if during the 30(b)(6)
11  notice that the individual deponent's
12  knowledge overlaps with the designation,
13  that she may be examined about those issues.
14     MR. NICHOLS:  I'm just going by the
15  notice that was prepared by you.  There's
16  nothing in your notice about this
17  particular --
18     MR. MORRISSEY:  Judge Ellis --
19     MR. NICHOLS:  What I understand what
20  Judge Ellis said, and I'm not trying to
21  flout, but I'm looking at your notice, and
22  your notice has nothing about this
23  particular policy.  Moreover,
24  Ms. Rivero-Canchola was not produced for the

Plaintiff's Exhibit 11 Page 3

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 12

1  purpose of responding to questions about
2  that particular policy.  If you want to
3  serve us with a revised notice, that's fine.
4     MR. MORRISSEY:  You're not going to
5  allow her to answer any of these questions?
6     MR. NICHOLS:  Not today because that's
7  not what she's designated for, and it's not
8  in your notice.
9     MR. MORRISSEY:  Judge Ellis indicated
10 that we should be allowed to ask questions
11 if her individual knowledge overlaps with
12 what she's been designated --
13    MR. NICHOLS:  I'm going to instruct my
14 client not to respond to questions about
15 this particular policy.  You haven't been
16 able to point to me anywhere in your notice
17 of deposition where you even refer to this
18 policy.
19    MR. MORRISSEY:  I respectfully disagree
20 because I think on the record, Judge Ellis
21 made it clear that if the person -- if the
22 deponent has personal knowledge, that we
23 should be allowed to ask questions about it.
24 And obviously she does.  She's indicated

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 14

1     MR. MORRISSEY:  Let's go off the
2  record.
3            (Whereupon, a discussion was had
4            off the record.)
5     MR. MORRISSEY:  Given that she
6  testified that she reviewed this general
7  order in preparation for this deposition, we
8  believe we're entitled to ask the questions.
9     MR. NICHOLS:  Ask away.  I'm
10 instructing my client not to answer any
11 questions about this order.  It's beyond the
12 scope of the notice.  It's beyond the scope
13 of what she was designated to respond to.
14 BY MR. MORRISSEY:
15    Q.  Are you familiar with the 2010 design
16 standards under the ADA?
17    A.  Yes.
18    Q.  Are you familiar with the time when
19 Cermak Health Services was constructed?
20    A.  Yes.
21    MS. CARROLL:  Objection to the form of
22 the question, Cermak Health Services.
23    MR. MORRISSEY:  Let me rephrase the
24 question.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 13

1  that she's the ADA compliance officer.
2     MR. NICHOLS:  I'm maintaining my
3  objection.  I'm instructing my client not to
4  answer questions about that particular
5  policy.
6     MR. MORRISSEY:  We're going to certify
7  it, and when we bring her back and we bring
8  it before Judge Ellis, we're going to be
9  requesting fees and costs for the time that
10 we're spending --
11    MS. CARROLL:  Tom, you deposed her for
12 3 hours just 2 weeks ago.  You haven't
13 thought to ask these questions then when you
14 could have.
15    MR. MORRISSEY:  That was not in this
16 case.
17    MR. NICHOLS:  There's nothing in the
18 notice, Tom.
19    MR. MORRISSEY:  We're certifying --
20    MS. CARROLL:  You're suing her and
21 trying to bring her in in I don't know how
22 many cases for depositions and wasting her
23 time.  So right now, if you want to certify
24 it, certify it.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 15

1  BY MR. MORRISSEY:
2     Q.  Are you familiar with the fact that
3  Cermak -- the Cermak infirmary was built on or
4  about the year 1998?
5     A.  On or about, yes.
6     Q.  And that was after the passage of the
7  ADA, correct?
8     A.  After the passage of the 1990 ADA?
9     Q.  Right.
10    A.  Yes.
11    Q.  And when the Cermak infirmary building
12 was built after 1997, it was subject to the 1991
13 ADA standards for design, correct?
14    MR. NICHOLS:  Objection to the extent
15 that the question calls for a legal
16 conclusion, but you can answer.
17    MR. MORRISSEY:  She's being produced by
18 the sheriff to respond to these questions.
19    MR. NICHOLS:  I maintain my objection,
20 but you can answer the question.
21    THE WITNESS:  What was the question?
22    MR. MORRISSEY:  Can you repeat the
23 question.
24

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 16

```
 1              (Whereupon, the record was read
 2              as requested.)
 3  BY THE WITNESS:
 4      A.    I don't know, Mr. Morrissey.  I believe
 5  that's a legal argument that you need to make.
 6  BY MR. MORRISSEY:
 7      Q.    I'm going to ask you to answer the
 8  question because you're being produced by the
 9  sheriff to testify to certain cells within
10  Cermak.  So to your understanding, were there
11  ADA standards for accessibility designs that
12  were promulgated after the passage of the ADA?
13      A.    Could you rephrase the question?
14      Q.    You don't understand the question?
15      A.    I asked you to rephrase the question.
16      Q.    What don't you understand about the
17  question?
18      A.    I asked you to rephrase the question.
19      Q.    I'm asking, what don't you understand
20  about the question?
21      A.    Would you like to repeat it?  We can
22  try that.
23              MR. MORRISSEY:  You can repeat it.
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 18

```
 1      Q.    No, in regards to -- does the Sheriff
 2  of Cook County -- is it the opinion of the
 3  Sheriff of Cook County that the 1991 design --
 4  let me rephrase that.  As the sheriff's
 5  representative, is it the position that the 1991
 6  ADA standards for accessible design do not apply
 7  to the Cook County Jail?
 8              MR. NICHOLS:  Objection to the form of
 9      the question to the extent that it's calling
10      for a legal conclusion, and, also, Tom, this
11      appears to be slightly beyond the scope of
12      the designation.  That being said, I'm going
13      to give you some leeway to ask a little bit
14      of questioning about the ADA standards, but
15      the actual notice is just simply asking for
16      the features that are inside of the cell,
17      not for testimony about what Sheriff Dart
18      thinks about the ADA standards.
19              MR. MORRISSEY:  It's not the sheriff
20      personally.  It's the sheriff's office.  And
21      what the notice provides is, why are the
22      cells in which Mr. Flora and Mr. Vaughn were
23      placed in, why do they accommodate their
24      disabilities and --
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 17

```
 1              (Whereupon, the record was read
 2              as requested.)
 3  BY THE WITNESS:
 4      A.    To my understanding, yes.
 5  BY MR. MORRISSEY:
 6      Q.    I'm showing you what has been marked as
 7  Plaintiff's Exhibit No. 4.  It's entitled the
 8  Department of Justice ADA Standards For
 9  Accessibility Designs and ask you if you have
10  seen this before or are aware that there are ADA
11  standards for accessibility under the 1991
12  standards?
13      A.    I believe there are, yes.
14      Q.    I would ask you to turn -- let me ask
15  you before we get to the actual document, these
16  are the 1991 standards, correct, as the document
17  on Exhibit 4 states, correct?
18      A.    As this document states, yes.
19      Q.    And you're aware that under the 1991
20  standards for accessible design, there were
21  certain requirements for the height of a toilet
22  seat to comply?
23      A.    With regards to correctional
24  facilities?  I don't believe there were.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 19

```
 1              MR. NICHOLS:  That's not what the
 2      notice says.  You're trying to imply a
 3      meaning into the notice, Tom, that's not
 4      there.  The notice specifically asks, the
 5      physical features that are in the room.  So
 6      there is some relevance to the ADA standards
 7      here, but what you're trying to ask is
 8      for -- it appears like you're asking for
 9      some sort of legal conclusion about
10      applicability of the ADA, and that's not
11      what Ms. Rivero-Canchola was designated to
12      talk about.
13              MR. MORRISSEY:  Can you repeat the
14      question and have her answer the question.
15              (Whereupon, the record was read
16              as requested.)
17              MR. NICHOLS:  Once again, I maintain my
18      objection.  Again, I'm going to allow the
19      witness to answer this question, but I just
20      don't see where in your notice it gives you
21      any kind of authority to ask these
22      particular questions of this witness in the
23      context of this deposition.  You can answer.
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 5

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 20

```
1    BY THE WITNESS:
2        A.   It is the sheriff's position -- the
3    sheriff's office position that the 1991
4    standards do not specifically say anything about
5    correctional facilities.
6    BY MR. MORRISSEY:
7        Q.   And, therefore, the sheriff and the
8    county when they built Cermak in 1997 or 1998
9    did not have to comply with these ADA standards
10   for accessible design?
11       MR. NICHOLS:  Objection to the form of
12   the question.  Cermak was not built by the
13   sheriff.  But you can answer the question.
14   BY THE WITNESS:
15       A.   The sheriff will leave that legal
16   argument to be made in court.
17   BY MR. MORRISSEY:
18       Q.   I'm asking you as a sheriff's
19   representative.  When Cermak was constructed in
20   1997 or 1998 and the sheriff began housing
21   inmates in Cermak, did the sheriff believe that
22   the 1991 standards for accessible design applied
23   to Cermak?
24       MR. NICHOLS:  Objection to the form.
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 22

```
1    you answer the question?
2        MR. NICHOLS:  Mr. Morrissey, that was
3    her answer.
4    BY MR. MORRISSEY:
5        Q.   Looking at 4.16.3 of the 1991
6    standards, there are requirements under the 1991
7    standards for a water closet.  Do you know what
8    a water closet is?
9        A.   I do.
10       Q.   What is a water closet?
11       A.   A water closet is a toilet/sink
12   combination generally.
13       Q.   Do you see under 4.16.3, there's a
14   standard in regards to the height of the water
15   closet shall be 17 inches to 19 inches measured
16   to the top of the toilet seat; do you see that?
17       A.   I see that.
18       Q.   ***Do you know whether or not when
19   Cermak was constructed, whether or not the
20   toilets inside the housing units complied with
21   that height standard?
22       MR. NICHOLS:  Objection to the extent
23   that the question is very overbroad as to
24   time frame and to the extent that it calls
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 21

```
1    Again, this calls for a legal conclusion.
2    Also, it's overbroad as to time frame in
3    this particular case.  Both Flora and Vaughn
4    were in the jail after 2012.  But you can
5    answer the question to the extent that you
6    know the answer.
7    BY THE WITNESS:
8        A.   I believe it's a legal conclusion that
9    I'm not willing to make at this time.
10   BY MR. MORRISSEY:
11       Q.   You can't object.  It's not your
12   position to object.
13       A.   Then I don't know the answer,
14   Mr. Morrissey.
15       Q.   As the sheriff's representative, you
16   don't know the answer?
17       A.   Do I know the answer whether or not
18   you're able to prove your case?  No, I do not.
19   I'll leave that to our legal counsel.
20       Q.   You know, if you have a problem with
21   the question, then I would ask your attorney to
22   make the objection.
23       A.   He did.
24       Q.   And he allowed you to answer.  So will
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 23

```
1    for a legal conclusion and to the extent
2    that it's beyond the scope of her
3    designation.  I'm instructing my client not
4    to answer questions about the ADA standards
5    and what they mean.  If you want to ask
6    questions about features in the cell as you
7    indicated in your notice, feel free.  I'm
8    instructing my client not to answer the
9    question.
10       MR. MORRISSEY:  We'll certify it.
11   BY MR. MORRISSEY:
12       Q.   Under water closet, is there -- under
13   4.16.4, is there a requirement for grab bars?
14       MR. NICHOLS:  Same objection.  I'm
15   instructing my client not to answer
16   questions about what the ADA regulations
17   require, what they mean.  It's not in the
18   notice, Tom.
19       MR. MORRISSEY:  I think you're drawing
20   a much narrower reading of that than is
21   logical, and we're going to ask her
22   specifically in regards to each room that
23   Mr. Vaughn and Mr. Flora were housed in
24   whether or not these standards were met or
```

Plaintiff's Exhibit 11 Page 6

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 24

1   not.  Do you understand that?
2       MR. NICHOLS:  I do.
3       MR. MORRISSEY:  And you have no
4   objection to that?
5       MR. NICHOLS:  I think that's probably a
6   better way to go is start talking about the
7   rooms where they were housed and ask about
8   the features in those rooms rather than
9   getting the witness to comment on what these
10  regulations mean.
11      MR. MORRISSEY:  Don't you agree that
12  the accommodations provided for disabled
13  people at the jail depend in part in regards
14  to the standards under the 1991 ADA act?
15      MR. NICHOLS:  It's not my deposition,
16  Tom.  It's your case to prove.
17      MR. MORRISSEY:  You're objecting to
18  very fundamental questions, and you're
19  delaying the deposition unnecessarily
20  because these are very simple
21  straightforward questions that apply to each
22  and every housing unit that Vaughn and Flora
23  were in.
24      MR. NICHOLS:  All I can do is look at

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 26

1   August 4, 2014, he was staged or housed in 3243?
2       **A.   I don't know what you're looking at,**
3   **Mr. Morrissey.**
4       Q.   Do you know where Mr. Flora was housed
5   between May 1, 2014, and August 4, 2014?
6       **A.   I don't see the date August 4 on**
7   **Exhibit 6.**
8       Q.   Do you see the date August 5, 2014?
9       **A.   I do.**
10      Q.   And between May 1 and August 5, 2014,
11  he was in 3-North, correct?
12      **A.   Correct.  That's what this says.**
13      Q.   Do you know what living unit he was in
14  in 3-North between that period of time?
15      **A.   From memory, I don't.  I would have to**
16  **review my records.**
17      Q.   Isn't it true that he was in room 3243?
18      **A.   From memory, I don't recall.**
19      Q.   Do you know if 3243 during that period
20  of time accommodated disabled individuals?
21      MR. NICHOLS:  Objection to the extent
22      that it calls for a legal conclusion, but
23      you can answer the question.
24      MS. CARROLL:  And form.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 25

1   your notice and know what your notice wants
2   to ask about.  You're implying a broader
3   meaning to the notice, Tom.
4       MS. CARROLL:  You're trying to get
5   legal conclusions here.
6       MR. MORRISSEY:  We'll continue.
7   BY MR. MORRISSEY:
8       Q.   Do the ADA requirements -- do the 1991
9   ADA standards for accessible design provide
10  standards for lavatories to your knowledge?
11      MR. NICHOLS:  Once again, I'm objecting
12      to this question.  Specifically you're
13      seeking legal conclusions here.  Your notice
14      seems to be looking more for facts.  And I'm
15      going to instruct my client not to respond
16      to this question.
17  BY MR. MORRISSEY:
18      Q.   We'll go to Mr. Flora.  If we look at
19  Exhibit No. 6, we have Flora's housing history,
20  correct?
21      **A.   His historical bed assignments,**
22  **correct.**
23      Q.   Now, if we look at Exhibit 6, does it
24  reflect that Mr. Flora between May 1, 2014, and

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 27

1       MR. MORRISSEY:  Let me rephrase the
2       question.
3   BY MR. MORRISSEY:
4       Q.   Prior to coming in here today, did you
5   look to determine where Mr. Flora was housed
6   between May of 2014 and August 4, 2014?
7       **A.   I did.**
8       Q.   Would anything refresh your memory as
9   far as where Mr. Flora was housed during that
10  period of time?
11      **A.   A full list of his bedding assignments**
12  **and the tier logs would.**
13      Q.   Where did you look to find out that
14  information?
15      **A.   At the records that we have.**
16      Q.   Where did you -- what records did you
17  look at?
18      **A.   The tier logs and full bedding**
19  **assignments.  Mr. Morrissey, you're referring me**
20  **to room 3243.  That isn't on your exhibit.**
21      Q.   That's not my question.  Is there
22  anything you can look at that would refresh your
23  memory that he was assigned to 3243?
24      **A.   Potentially, yes, our records.**

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 7

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 28

1     MR. MORRISSEY: We'll take a 5-minute
2   break, and you can call your office and find
3   out.
4          (Whereupon, a short break was
5           taken.)
6   BY MR. MORRISSEY:
7     Q.  Did you refresh your memory in regards
8   to what housing cell Mr. Flora was placed in
9   between May 1, 2014, and August 4, 2014?
10    **A.  We turned over those records to your**
11  **office.**
12    Q.  My question is, did you refresh your
13  memory?
14    **A.  I do not have those records with me**
15  **today, but we did turn them over in this case.**
16  **So you do know what rooms he was assigned to.**
17  **So if you're willing to provide me with that**
18  **document, I can tell you.**
19    Q.  Our notice provides as follows -- and I
20  would ask you to respond to the questions, and
21  don't argue with the person taking your
22  deposition.  Is that understood?  The question
23  number 1 which you're being called for by the
24  sheriff, the physical features including but not

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 29

1   limited to any fixed or immovable accommodations
2   provided to assist disabled detainees at sinks,
3   toilets, and showers of each housing assignment
4   whether described as a room, cell, or otherwise
5   to which plaintiff was assigned while detained
6   at the Cook County Jail from April 30, 2014, to
7   January 11, 2016.
8        Now, I'm asking you for the discrete
9   period of time right now between May 1, 2014,
10  and August 4, 2014.  What accommodations were
11  made to Mr. Flora as far as toileting during
12  that period of time?
13    **A.  Just to clarify, that's a different**
14  **question than you asked prior to the break, but**
15  **the accommodations that were provided to**
16  **Mr. Flora; is that the question?**
17    Q.  Do you want the question read back,
18  ma'am?
19    **A.  I'm asking you to clarify your**
20  **question.**
21    MR. MORRISSEY:  We'll read the question
22  back.
23          (Whereupon, the record was read
24           as requested.)

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 30

1   BY THE WITNESS:
2     **A.  As far as toileting depending on the**
3   **room that he was assigned to, he would either**
4   **have a toilet chair or an accessible toilet.**
5   BY MR. MORRISSEY:
6     Q.  Looking back at Exhibit 6, does it
7   reflect that he was on 3-North?
8     **A.  It does.**
9     Q.  During that period of time?
10    **A.  From May 1 to August 5, it does.**
11    Q.  What housing room on 3-North during
12  that period of time was accessible?
13    MR. NICHOLS:  Objection to the extent
14    that the question is a bit overbroad, Tom.
15    Would you mind rephrasing the question?
16  BY MR. MORRISSEY:
17    Q.  I'll ask you another question.  What
18  made a toilet accessible in May of 2014?
19    MR. NICHOLS:  Same objection.  It's
20    vague and overbroad.  However, you can
21    answer the question to the extent that you
22    know what he's asking.  These are your
23    questions, Tom, not mine.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 31

1   BY THE WITNESS:
2     **A.  In May of 2014, grab bars of a certain**
3   **height, a toilet seat of a certain height would**
4   **make that toilet accessible as well as clear**
5   **floor space around the toilet.**
6   BY MR. MORRISSEY:
7     Q.  In May of 2014 in order for a toilet to
8   be accessible, did it require a rear wall grab
9   bar?
10    MR. NICHOLS:  Objection to the extent
11    that the question is vague as to location.
12    Are you talking about a specific cell?  That
13    would be helpful.  Again, the notice refers
14    to where Flora was housed.  You're asking
15    about any toilet, Tom, so narrow the
16    question down to location.
17    MR. MORRISSEY:  That's a mindless
18    objection.  It really is.  She said
19    depending whether he was in an accessible
20    room or not; if he was in an inaccessible
21    room, I believe she said they could have a
22    portable toilet.  If he wasn't in an
23    accessible room, he would have a compliant
24    toilet.  So I'm asking her in order for --

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 8

Page 32

```
 1    assuming he was in an accessible room on
 2    3-North, what was the requirement for --
 3    Strike that.
 4    BY MR. MORRISSEY:
 5        Q.   Was there a requirement to have a grab
 6    bar against the rear wall of the toilet?
 7        MR. NICHOLS:  I'm also going to add
 8    another objection.  You're seeking a legal
 9    conclusion as well.  You're basically
10    rephrasing these questions to seek legal
11    conclusions from this witness.  Your notice
12    specifically asks for the features that were
13    in a cell.  That's what your notice
14    requests.  It's up to you to make sure that
15    your notice is specific enough to allow you
16    to ask the questions that you want to ask
17    now.  So if you want to ask about what was
18    in the cells where Mr. Flora was housed,
19    that's well within your notice.  This
20    question is in my opinion beyond the scope
21    of your notice.
22        MR. MORRISSEY:  You can answer the
23    question.
24        THE WITNESS:  What was the question?
```

Page 34

```
 1    ask about what were in the cells, go for it.
 2    BY MR. MORRISSEY:
 3        Q.   What do you mean by an accessible
 4    toilet in regards to grab bars?
 5        A.   Grab bars of a certain height and
 6    certain location.
 7        Q.   Do the grab bars have to be to the rear
 8    of the toilet in the sheriff's understanding of
 9    accessible toilet?
10        MR. NICHOLS:  Same objection.  Again,
11    you're asking questions that are calling for
12    legal conclusions and are beyond the scope
13    of the notice.  She wasn't designated to
14    respond to this.  I'm instructing her not to
15    answer that question.
16    BY MR. MORRISSEY:
17        Q.   Assuming Mr. Flora was in 3243 which
18    were requested in the admissions, did room 3243
19    have a rear grab bar in May of 2014?
20        A.   In May of 2014, I think it did.
21        Q.   Did the ADA 1991 design standards
22    require a certain length for that rear grab bar?
23        MR. NICHOLS:  Same objection, calls for
24    a legal conclusion.  It's beyond the scope
```

Page 33

```
 1    BY MR. MORRISSEY:
 2        Q.   In order for a toilet in a hospital
 3    cell in the jail to be accessible in May of
 4    2014, was there a requirement for there to be a
 5    rear wall grab bar?
 6        MR. NICHOLS:  Same objection, calls for
 7    a legal conclusion.  It's also beyond the
 8    scope of the notice.  I will allow you to
 9    answer this question to the extent that you
10    know offhand what the ADA requirements may
11    have been at that time.
12    BY THE WITNESS:
13        A.   I'm not sure there were any specific
14    requirements for hospital cells.  Can you
15    clarify what you mean by that?
16    BY MR. MORRISSEY:
17        Q.   For a toilet in 2014 -- in May of 2014,
18    was there a requirement for a rear wall grab
19    bar?
20        MR. NICHOLS:  Objection.  The question
21    is vague as to location, and it's seeking a
22    legal conclusion, and it's beyond the scope
23    of your notice.  I'm instructing my client
24    not to answer that question.  If you want to
```

Page 35

```
 1    of the notice.  You can answer to the extent
 2    that you know.
 3        MR. MORRISSEY:  Listen, Mr. Nichols,
 4    I've had it.  I think your objections are
 5    meritless.  We asked specifically in regards
 6    to the rooms, whether they accommodated the
 7    plaintiffs in this case.  The rules were
 8    specific in 1991 and thereafter for
 9    construction of buildings after 1991.  It's
10    perfectly permissible for me to ask these
11    questions, and I would ask you to stop
12    making these nonsensical objections.  Do you
13    understand?
14        MR. NICHOLS:  This is your notice, Tom.
15        MR. MORRISSEY:  Do you understand?
16    These are questions that are germane to the
17    notice.
18        MR. NICHOLS:  This is your notice.
19        MR. MORRISSEY:  I understand.  Will you
20    quit making objections that are pointless?
21        MR. NICHOLS:  They're not pointless
22    objections.
23        MS. CARROLL:  Then ask questions
24    pertaining to the notice.
```

Plaintiff's Exhibit 11 Page 9

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 36

1    MR. NICHOLS:  Ask questions pertaining
2 to the notice, and you'll get answers.  You
3 asked her questions that were pertinent, and
4 she answered it.  But you're asking
5 questions about whether or not these --
6 you're asking for legal conclusions, Tom,
7 and the notice -- I don't see anywhere in
8 the notice that allows you to ask these
9 questions.  Clearly we have a different
10 understanding of what the notice allows you
11 to ask, but my understanding --
12    MR. MORRISSEY:  You had an opportunity
13 in front of Judge Ellis and Judge Kinelly to
14 clarify what the notice requested, and you
15 didn't do that.  We have continued these
16 depositions for months on end, and I would
17 ask you to quit delaying the deposition.
18    MR. NICHOLS:  I'm actually at this
19 point, I'm going to enter into the record an
20 exhibit of a letter that I served upon you
21 on May 6, 2016.  And in this letter, both of
22 these letters, and I want to mark this as
23 Defendant's Exhibit 1 and 2 --
24    MR. MORRISSEY:  This isn't your

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 38

1         (Whereupon, Defendant's Exhibit
2          Nos. 1 and 2 were marked for
3          identification.)
4    MR. MORRISSEY:  Are you saying at this
5 late stage of this litigation that Mr. Flora
6 was not housed for this period of time in
7 3243?
8    MR. NICHOLS:  This is not my
9 deposition, Tom.
10    MR. MORRISSEY:  Are you quibbling with
11 whether or not Mr. Flora was in 3243?
12    MR. NICHOLS:  This is not my
13 deposition.
14    MR. MORRISSEY:  I understand.
15    MR. NICHOLS:  I'm not answering your
16 question.
17    MR. MORRISSEY:  Your client is
18 apparently aware that Mr. Flora was in 3243.
19    MR. NICHOLS:  This is not my
20 deposition, Tom.
21    MR. MORRISSEY:  We'll go to the next
22 date, and we'll see if you're going to
23 continue these pointless objections.
24

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 37

1 deposition.
2    MR. NICHOLS:  I'm going to because
3 you're telling me that my client did not
4 object to these questions when on May 6,
5 2016, we provided letters to you that object
6 to these very questions that you're asking.
7 So to the extent that you're saying there's
8 no objections, they're here in writing.  So,
9 yeah, I'm entering them into the record so
10 that it's clear --
11    MR. MORRISSEY:  Was that letter after
12 the court granted our motion requiring you
13 to go forth with this motion -- with these
14 depositions?
15    MR. NICHOLS:  Yes, it was.
16    MR. MORRISSEY:  And you didn't raise it
17 in front of Judge Kinelly before that.
18    MR. NICHOLS:  I raised these objections
19 in writing in a letter.  We maintain these
20 objections.  They're overbroad.  If you
21 think we waived them, that's your argument
22 to make.  But I would like to introduce
23 these 2 letters as exhibits into the record.
24

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 39

1 BY MR. MORRISSEY:
2    Q.  On August 6, 2014, was Donnell Flora
3 placed in room 3123 on 3-South?
4    **A.  From this document, it appears he was.**
5    Q.  And how long did he remain, as a
6 sheriff's representative, in 3123?
7    **A.  From this document, it appears 4 days**
8 **approximately.**
9    Q.  Can you describe the toilet that was --
10 let me rephrase the question.  When you examined
11 in the last week or 2 room 3123 in 3-South, had
12 it been altered since August of 2014 to your
13 knowledge?
14    **A.  To my knowledge, no.**
15    Q.  Describe the toilet in room 3123.
16    **A.  It was a standard correctional**
17 **sink/toilet combination.**
18    Q.  I'm showing you what has been marked as
19 Plaintiff's Exhibit No. 5.  It's an
20 accessibility assessment done by Maureen Regan
21 on November 25, 2014.  I'll ask you to look at
22 figure 3 on page 6 of 7 of Group Exhibit No. 5.
23 Does figure 3 in Group Exhibit No. 5 represent
24 the standard toilet/sink combination in Cermak?

Plaintiff's Exhibit 11 Page 10

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 40

1  A.  It does.

2  Q.  And when you went into 3123 recently,

3  did you find a toilet/sink combination similar

4  to that?

5  A.  Similar, yes.

6  Q.  Now, also, in room 3123, was there a

7  shower?

8  A.  There was.

9  Q.  And can you describe the shower that

10  was in room 3123 when you examined it about a

11  week ago?

12  A.  It was a standard correctional shower

13  for an isolation room.

14  Q.  So 3123 was an isolation room, correct?

15  A.  It was.

16  Q.  And looking at Group Exhibit No. 5,

17  figure 4, on page 6, does that fairly and

18  accurately depict the type of shower that you

19  found in room 3123 when you inspected it about a

20  week ago?

21  A.  I can't tell.  It's a dark photo.  I

22  can't see anything inside the shower.

23  Q.  Does the outside of it appear similar

24  to what you inspected in room 3123, the shower

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 41

1  in room 3123?

2  A.  From the quality of the photo, the only

3  thing I can see is the housing.

4  Q.  Describe that for me, the shower in

5  3123.

6  A.  It's a standard correctional shower for

7  an isolation room.

8  Q.  How wide was the door to the shower?

9  A.  I don't know.

10  Q.  Were there grab bars when you inspected

11  the 3123 shower?

12  A.  No.

13  Q.  Was there a chair -- a fixed chair or

14  bench in the shower in 3123?

15  A.  A fixed chair or bench?  Can you

16  explain what you mean by a fixed chair?

17  Q.  Was there any bench inside of the

18  shower in 3123?

19  A.  A bench?

20  Q.  Yes.

21  A.  No, there's no bench.

22  Q.  Was there a fixed -- a permanent chair

23  inside of 3123?

24  A.  Can you clarify what you mean by

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 42

1  permanent?

2  Q.  Yes.  Was there a chair that was

3  attached?  Did it become part of the shower

4  itself, nonmovable?

5  A.  Nonmovable, no.

6  Q.  What was the height of the faucet in

7  3123 when you inspected it about a week ago?

8  A.  I didn't measure the height of the

9  faucet.

10  Q.  As an ADA compliance officer, was it

11  the appropriate height to be accessible for a

12  wheelchairbound detainee?

13  MR. NICHOLS:  Objection to the extent

14  that it calls for a legal conclusion.  You

15  can answer.

16  BY THE WITNESS:

17  A.  I didn't inspect the height of the

18  shower.

19  BY MR. MORRISSEY:

20  Q.  As the sheriff's representative, could

21  a wheelchairbound detainee roll into the shower?

22  A.  It's possible they could.

23  Q.  What do you mean by possible?

24  A.  It's possible.  I didn't take

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 43

1  measurements of the width of the shower,

2  Mr. Morrissey.

3  Q.  Based upon your understanding of either

4  the -- Strike that.

5  Do you have an understanding of the 2010

6  design standards of the ADA?

7  A.  Yes, I do.

8  Q.  Showing you what's been marked as

9  Plaintiff's Exhibit No. 15, it's marked as ADA

10  Section 504 design guides.  Are you familiar

11  with those design guides put out by the United

12  States Justice Department?

13  A.  I am.

14  MR. NICHOLS:  Let's take a quick break

15  to let my client review this document.

16  MR. MORRISSEY:  She said she was

17  familiar with it.  We can take a few

18  moments.

19  (Whereupon, a short break was

20  taken.)

21  BY MR. MORRISSEY:

22  Q.  In room 2123 in August of 2014, what

23  fixed features of the toilet accommodated a

24  wheelchair-assisted prisoner?

Plaintiff's Exhibit 11 Page 11

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 44

1    MR. NICHOLS:  Objection to the form of
2  the question to the extent that it calls for
3  a legal conclusion.
4    MR. MORRISSEY:  Mr. Nichols, with all
5  deference to you, that's exactly what the
6  notice provides for.  So will you quit
7  making these pointless objections?
8    MR. NICHOLS:  They're not pointless.
9  I'm going to allow her to answer the
10  question, but I made my objection.
11    MR. MORRISSEY:  Well, if you don't,
12  we're going to call the judge.  We're going
13  to call Judge Kinelly.  You can answer.
14    THE WITNESS:  Can you repeat the
15  question?
16         (Whereupon, the record was read
17              as requested.)
18  BY THE WITNESS:
19    A.   I don't understand what you mean by
20  accommodated.  That's an individual assessment.
21  I don't know how to answer that without more
22  information.
23
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 45

1  BY MR. MORRISSEY:
2    Q.   The toilet inside of 3123 in August of
3  2014, how did the design accommodate a person as
4  far as using a wheelchair -- Strike that.
5         How did the design of the toilet in
6  room 3123 in August of 2014 accommodate a
7  detainee who was wheelchairbound?
8    MR. NICHOLS:  Objection to the form of
9    the question to the extent that it calls for
10    a legal conclusion.  I'm going to allow my
11    client to answer the question.
12  BY THE WITNESS:
13    A.   As I previously stated, I believe
14  whether or not a person is accommodated is an
15  individual assessment.  If you're asking me if
16  it matches the 504 design guide, then, no, 3123
17  did not match the 504 guide --
18  BY MR. MORRISSEY:
19    Q.   Is it the sheriff's position that it's
20  an individual determination by the sheriff
21  whether or not the design of the toilet in 3123
22  in August of 2014 accommodated Mr. Flora's
23  needs?
24    A.   Can you repeat the question?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 46

1         (Whereupon, the record was read
2              as requested.)
3    MR. NICHOLS:  Objection to the form of
4  the question, compound question, and
5  objection to the extent that it calls for a
6  legal conclusion.  You can answer the
7  question.
8  BY THE WITNESS:
9    A.   I don't understand your question,
10  Mr. Morrissey.  Can you rephrase it?
11  BY MR. MORRISSEY:
12    Q.   Sure.  In August of 2014, is it the
13  sheriff's position there were no fixed standards
14  in regards to whether the toilet in 3123 could
15  accommodate a wheelchairbound detainee?
16    MR. NICHOLS:  Objection to the extent
17    the question calls for a legal conclusion.
18    You can answer the question.
19  BY THE WITNESS:
20    A.   I don't understand your question.
21  BY MR. MORRISSEY:
22    Q.   As the sheriff's representative, did
23  the toilet in room 3123 have to meet any ADA
24  standards in order to accommodate a prisoner

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 47

1  such as Mr. Flora?
2    MR. NICHOLS:  Objection to the extent
3    the question calls for a legal conclusion.
4    You can answer.
5  BY THE WITNESS:
6    A.   It's the sheriff's position that we're
7  required to provide reasonable accommodations.
8  BY MR. MORRISSEY:
9    Q.   What reasonable accommodation -- you're
10  aware that Mr. Flora is wheelchairbound,
11  correct?
12    A.   I am.
13    Q.   And Mr. Flora is paralyzed, correct?
14    A.   I believe so.
15    Q.   What reasonable accommodation when
16  Mr. Flora was in 3123 did the sheriff provide in
17  regards to his toileting needs?
18    A.   The sheriff's office provided a toilet
19  chair to Mr. Flora.
20    Q.   Did the toilet -- did the toilet that
21  was a permanent fixture in 3123 provide a
22  reasonable accommodation for Mr. Flora's
23  toileting needs?
24    MR. NICHOLS:  Objection to the extent

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 12

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 48

1 that the question calls for a legal
2 conclusion. You can answer the question.
3 BY THE WITNESS:
4 **A. I don't understand your question.**
5 BY MR. MORRISSEY:
6 Q. Sure. There was a toilet inside of
7 3123 in August of 2014, correct?
8 **A. Correct.**
9 Q. Did that toilet in the sheriff's view
10 accommodate Mr. Flora's toileting needs?
11 MR. NICHOLS: Same objection. You can
12 answer.
13 BY THE WITNESS:
14 **A. The toilet with the toilet chair did**
15 **accommodate his needs, yes.**
16 BY MR. MORRISSEY:
17 Q. But my question was, did the toilet
18 alone, was that -- was the toilet alone that was
19 in 3123 at the time that Mr. Flora was housed
20 there, did that accommodate -- provide an
21 accommodation for Mr. Flora to use the toilet?
22 MR. NICHOLS: Same objection. You can
23 answer.
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 49

1 BY THE WITNESS:
2 **A. Did the toilet provide an**
3 **accommodation? I don't understand that**
4 **question.**
5 BY MR. MORRISSEY:
6 Q. Sure. Assuming that there was just the
7 toilet in 3123 when Mr. Flora was housed there,
8 did that toilet on its own provide a reasonable
9 accommodation to Mr. Flora?
10 MR. NICHOLS: Same objection. You can
11 answer the question.
12 BY THE WITNESS:
13 **A. If I had to speculate since that wasn't**
14 **the only accommodation provided, I would say**
15 **I don't know. It wasn't the only accomodation**
16 **provided.**
17 BY MR. MORRISSEY:
18 Q. Do you have personal knowledge -- did
19 the toilet in 3123 that was in that room in
20 August of 2014 have grab bars?
21 **A. It did not.**
22 Q. Was the seat height between 17 and 19
23 inches?
24 **A. I don't know.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 50

1 Q. Is the seat height currently between 17
2 and 19 inches in 3123 when you went in there in
3 preparation for this deposition?
4 **A. I didn't measure it.**
5 Q. Now, in regards to -- so it's your
6 position that -- does the sheriff have knowledge
7 that there was actually a portable toilet chair
8 in room 3123 during all times when Mr. Flora was
9 housed there?
10 **A. Can you repeat the question?**
11 Q. Sure. During the time -- during the
12 period between August 6, 2014, and August 10,
13 2014, was there always a portable toilet chair
14 in room 3123?
15 **A. There's always one available, yes.**
16 Q. My question is, was there always a
17 portable toilet chair inside room 3123 during
18 the period of time Mr. Flora occupied it?
19 **A. Was it always inside the room? I don't**
20 **know, Mr. Morrissey.**
21 Q. Does the sheriff know exactly what type
22 of portable chair was available to Mr. Flora at
23 times when he was housed in room 3123?
24 MR. NICHOLS: Tom, this is less of an

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 51

1 objection, more of a clarification. When
2 you use the term sheriff, I just want to
3 make sure you're referring to the sheriff's
4 office.
5 MR. MORRISSEY: Let me rephrase it.
6 BY MR. MORRISSEY:
7 Q. It's your testimony that there was --
8 there might have been a movable toilet chair for
9 use by Mr. Flora in room -- when he was
10 occupying 3123, correct?
11 **A. That's not my testimony.**
12 Q. Is it your testimony that there were
13 portable toilet chairs on 3-South in August of
14 2014?
15 **A. Yes, that's my testimony.**
16 Q. What type of portable toilet chairs
17 were on 3-South in August of 2014?
18 **A. What brand? I don't know.**
19 Q. Do you know what features that portable
20 toilet chair had?
21 **A. It was a toilet chair.**
22 Q. Do you know whether or not it complied
23 with any design standards promulgated by the
24 ADA?

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 52

1    MR. NICHOLS:  Objection to the extent
2    the question calls for a legal conclusion.
3    You may answer.
4    BY THE WITNESS:
5    A.  I don't believe the ADA promulgated any
6    design standards for toilet chairs.
7    BY MR. MORRISSEY:
8    Q.  Did you investigate to determine what
9    type of portable toilet chairs were available on
10   3-South in August of 2014?
11   A.  I believe they're the same ones that
12   are available now.
13   Q.  What do you base that representation
14   on?
15   A.  I don't believe we have changed the
16   type of toilet chair.
17   Q.  Do you know if the -- do you know what
18   accommodations were provided in 3123 for
19   Mr. Flora to take a shower between August 6,
20   2014, and August 10, 2014?
21   A.  In room 3123?
22   Q.  3123.
23   A.  There was a shower chair available.
24   Q.  Do you know whether or not the shower

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 53

1    chair -- do you know what type of shower chair
2    was available on 3-South in August of 2014 for
3    Mr. Flora to take a shower?
4    A.  I don't know the brand, but I'm sure we
5    can get you that information.
6    Q.  The deposition requires you to be able
7    to tell us in this deposition what features were
8    available?
9    A.  You didn't ask me about a feature.  You
10   asked me what kind.
11   Q.  The question is, the physical features
12   including but not limited to any fixed or
13   immovable accommodations provided to assist
14   disabled detainees at sinks, toilets, and
15   showers.  Tell me what physical features these
16   shower chairs had in August of 2014 while
17   Mr. Flora was in 3123.
18   A.  The physical feature is the toilet
19   chair.  It's a toilet chair.  I don't understand
20   your question.
21   Q.  Is it metal?  Is it plastic?
22   A.  I believe parts of it are metal.  Parts
23   of it are plastic.
24   Q.  As far as the shower chair, is it metal

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 54

1    or plastic?
2    A.  Parts of it are metal.  Parts of it are
3    plastic.  Parts of it are other materials.
4    Q.  Do you know whether or not that shower
5    chair was inside the room at all times?
6    A.  It was available at all times.
7    Q.  How would Mr. Flora been able to
8    request the -- Strike that.
9    In order to use the portable toilet
10   chair, did Mr. Flora have to request the chair?
11   A.  Yes.
12   Q.  How would Mr. Flora request the toilet
13   chair if he needed to use the bathroom?
14   A.  By saying, I request the toilet chair
15   to use the bathroom.
16   Q.  Would that be in writing?
17   A.  In writing?  No, Mr. Morrissey.
18   Q.  Again, how would a prisoner who is
19   assigned to 3123 in a wheelchair in August of
20   2014 request to use the portable toilet chair?
21   A.  By saying, I request to use the
22   portable toilet chair.
23   Q.  Are there doors that one enters and
24   leaves room 3123?

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 55

1    A.  Yes.
2    Q.  And at times, are the doors locked down
3    as far as you know?
4    A.  At times, they are.
5    Q.  If the door to 3123 was locked, how
6    would Mr. Flora have requested to use the
7    portable toilet chair?
8    A.  They're not soundproof.  He could ask.
9    Q.  So he would have to yell?
10   A.  No, he wouldn't have to yell.
11   Q.  Are there nurses always stationed
12   outside the door of 3123 to your knowledge
13   24 hours a day?
14   A.  There's a nursing station right outside
15   the door, yes.
16   Q.  And are there guards that are located
17   right outside the door of 3123?
18   A.  Are there guards?
19   Q.  Yes.
20   A.  There are correctional officers.
21   Q.  Are there correctional officers outside
22   the door?
23   A.  There are.
24   Q.  Was it the sheriff's policy in August

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 14

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 56

1　of 2014 to provide accommodations to
2　wheelchairbound detainees housed in 3123 by
3　providing a portable toilet chair?
4　　　A.　It's one accomodation that's provided,
5　yes.
6　　　Q.　And is one of the accommodations the
7　sheriff provides for a wheelchairbound detainee
8　housed in 3123 to require the person to request
9　to use the portable toilet chair?
10　　　MR. NICHOLS:　Objection to the extent
11　　that the question has already been asked and
12　　answered, but you can answer the question.
13　BY THE WITNESS:
14　　　A.　Yes, they have to request to use the
15　chair if it's not already in their room.
16　BY MR. MORRISSEY:
17　　　Q.　Is there any other form of
18　accommodation that the sheriff provided in
19　August of 2014 for a prisoner who was
20　wheelchairbound in 3123?
21　　　A.　As I previously stated, we provided
22　shower chairs as well.
23　　　Q.　And in order to use the shower chair,
24　the wheelchairbound prisoner in 3123 would have

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 58

1　Did the sink, as far as your understanding of
2　the 1991 ADA design standards, did that comply
3　with the 1991 lavatory design standards for the
4　sink?
5　　　MR. NICHOLS:　Objection to the extent
6　　that the question calls for a legal
7　　conclusion.　You can answer the question to
8　　the extent that you know.
9　BY THE WITNESS:
10　　　A.　To the extent that I know, the 1991
11　standards did not say anything about
12　correctional facilities.
13　BY MR. MORRISSEY:
14　　　Q.　That wasn't my question.　I'm not
15　asking about your legal understanding of whether
16　or not the 1991 ADA design standards applied to
17　correctional facilities.　I'm not.　My question
18　was broader than that.　Did the 1991 design
19　standards apply to sinks and lavatories?
20　　　MR. NICHOLS:　Objection to the extent
21　　the question calls for a legal conclusion
22　　and beyond the scope of the notice.　You can
23　　answer to the extent that you know.

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 57

1　to request the chair?
2　　　MR. NICHOLS:　Objection to the extent
3　　that the question has been asked and
4　　answered.　You can answer.
5　BY THE WITNESS:
6　　　A.　As I previously stated, yes, if it
7　wasn't already in the room.
8　BY MR. MORRISSEY:
9　　　Q.　Now, to your understanding, in room
10　3123 when you examined it a few weeks ago, was
11　there a desk inside that room?
12　　　A.　I don't recall seeing a desk.
13　　　Q.　Now, on August 10, 2014, was Mr. Flora
14　moved to room 3125 on 3-South?
15　　　A.　According to this document, yes.
16　　　Q.　Going back a moment in regards to 3123,
17　you mentioned that there was a sink inside of
18　3123 when you examined it a few weeks ago,
19　correct?
20　　　A.　A toilet/sink combination, yes.
21　　　Q.　And the sink and the toilet haven't
22　been altered since August of 2014, correct?
23　　　A.　Not to my knowledge.
24　　　Q.　What accommodations -- let me go back.

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 59

1　BY THE WITNESS:
2　　　A.　To the extent that I know, the 1991
3　standards applied to sinks and lavatories, but
4　did not specify within correctional facilities.
5　BY MR. MORRISSEY:
6　　　Q.　Based upon your understanding of the
7　1991 design standards for sinks, did the sink
8　that was and is in 3123, did that comply with
9　that standard?
10　　　MR. NICHOLS:　Objection to the form of
11　　the question to the extent that it calls for
12　　a legal conclusion.　Tom, would you like to
13　　rephrase the question?
14　　　MR. MORRISSEY:　No.
15　　　MR. NICHOLS:　You can answer to the
16　　extent that you know.
17　BY THE WITNESS:
18　　　A.　Mr. Morrissey, I'm maintaining my
19　answer that the design standards did not specify
20　whether or not they applied to correctional
21　facilities.
22　BY MR. MORRISSEY:
23　　　Q.　Do you know of any -- since you're a
24　lawyer, do you have any case law that would

Plaintiff's Exhibit 11 Page 15

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 60

1  support the sheriff's opinion that the 1991 ADA
2  standards for design do not apply to
3  correctional facilities?
4      MR. NICHOLS:  Objection to the extent
5      that the question calls for a legal
6      conclusion, and it's beyond the scope.  I'm
7      going to instruct my client not to answer.
8  BY MR. MORRISSEY:
9      Q.  As the sheriff's representative, do you
10 know of any case law which exempts the sheriff
11 from the 1991 design standards?
12     MR. NICHOLS:  Same objection.  I'm
13     instructing my client not to answer that.
14     That's your burden, Tom.
15 BY MR. MORRISSEY:
16     Q.  How did the physical feature of the
17 sink in room 3123 accommodate a wheelchairbound
18 detainee's ability to wash up and use the sink?
19     **A.  How did it accommodate their ability?**
20     Q.  Right.
21     **A.  It's a sink.  They wash their hands in**
22 **the sink, Mr. Morrissey.**
23     Q.  And there was no obstruction that would
24 prevent them from using the sink?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 61

1      **A.  There could be.**
2      Q.  What, if anything, did the sheriff do
3  to accommodate wheelchairbound detainees in
4  using the sink in room 3123?
5      MR. NICHOLS:  Objection.  The question
6      is vague.  Are we still talking about
7      Donnell Flora?
8      MR. MORRISSEY:  We're talking about
9      Donnell Flora.  We're going to go through
10     Donnell Flora, and we're going to go through
11     Mr. Vaughn for each of his --
12     MR. NICHOLS:  I just want to make sure
13     we're talking about Donnell Flora.  You can
14     answer the question.
15     THE WITNESS:  What was the question?
16         (Whereupon, the record was read
17             as requested.)
18 BY THE WITNESS:
19     **A.  I'm not aware of any issues with**
20 **Mr. Flora using the sink in 3123.**
21 BY MR. MORRISSEY:
22     Q.  That wasn't the question.  My question
23 was, how does the sheriff assist or accommodate
24 disabled detainees assigned to 3123 in using the

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 62

1  sink?
2      **A.  That would be an individual basis.**
3      Q.  The question is, how does the sheriff
4  accommodate disabled individuals assigned to
5  3123?
6      MR. NICHOLS:  Same objection.  The
7      question is vague.  Are we still talking
8      about Flora or just disabled people in
9      general?
10     MR. MORRISSEY:  Disabled detainees.
11     That's what the notice says.
12     MR. NICHOLS:  You can answer.
13 BY THE WITNESS:
14     **A.  Disabilities come in many forms as you**
15 **know.  It would be an individual assessment.**
16 BY MR. MORRISSEY:
17     Q.  Tell me different manners in which the
18 Sheriff of Cook County accommodates disabled
19 detainees using the sink in room 3123.
20     **A.  I'm not aware of anyone having**
21 **disabilities using the sink or inabilities to**
22 **use the sink in 3123, Mr. Morrissey.**
23     Q.  So you're not aware then of any
24 accommodations provided by the sheriff to

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 63

1  disabled detainees in using the sink in room
2  3123?
3      MR. NICHOLS:  Objection.  That
4      misstates her previous testimony.  You can
5      answer.
6  BY THE WITNESS:
7      **A.  I'm not aware of anyone having a**
8  **difficulty using the sink, so the accomodation**
9  **would be based on a difficulty using the sink.**
10 BY MR. MORRISSEY:
11     Q.  Is it your position that if a prisoner
12 assigned such as Mr. Flora to -- is it the
13 sheriff's position that Mr. Flora would have to
14 request an accommodation from the sheriff to use
15 the sink in room 3123?
16     MR. NICHOLS:  Less of an objection,
17     more of a clarification, when you use the
18     term sheriff, are you referring to the
19     sheriff's office?
20     MR. MORRISSEY:  When I do that in this
21     deposition, I don't mean Tom Dart.  I mean
22     the sheriff's office.
23     MR. NICHOLS:  Thank you.  You can
24     answer.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 64

1    THE WITNESS:  Can you repeat the
2  question?
3                (Whereupon, the record was read
4                as requested.)
5  BY THE WITNESS:
6    A.    No, that is not the sheriff's office
7  position.
8  BY MR. MORRISSEY:
9    Q.    What is the sheriff's office position
10  in regards to assisting or accommodating
11  disabled prisoners assigned to 3123 using the
12  sink?
13    A.    The sheriff's office position is to
14  provide reasonable accommodations.
15    Q.    And what are those reasonable
16  accommodations?
17    A.    We've never had to provide those
18  accommodations, so I don't know.
19    Q.    How has the sheriff -- does the sheriff
20  have any procedures or policies to accommodate
21  disabled prisoners in using the sink in room
22  3123 to overcome any physical barriers?
23          MR. NICHOLS:  Objection to the extent
24          that the question is beyond the scope of the

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 66

1    Q.    And he was in there until August 21,
2  correct?
3    A.    Correct.
4    Q.    And that again is in 3-South, correct?
5    A.    It is.
6    Q.    And 3-South had a toilet -- 3-South,
7  3125, had a toilet/sink combination similar, if
8  not identical to Plaintiff's Exhibit No. 5,
9  Maureen Regan's report, figure 3, on page 6?
10    A.    I don't have an Exhibit 5.
11    Q.    I'm sorry.  It's Exhibit 10.  I'm
12  sorry.  I'm wrong.  Go back.  It's Exhibit
13  No.  5.
14    A.    Okay.
15    Q.    In room 3125 on 3-South, there is a
16  toilet/sink combination similar to what's
17  depicted in the photograph on Exhibit 5, page 6,
18  figure 3?
19    A.    I believe there is, yes.
20    Q.    And also in that same room, there's a
21  shower that's similar to Exhibit 5, figure 4, in
22  Ms. Regan's report, correct?
23    A.    Again, it's hard to tell from the
24  quality of the photo, but it looks similar.

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 65

1  designation.  I'm instructing my client not
2  to answer that question.
3  BY MR. MORRISSEY:
4    Q.    Do you agree that the toilet could
5  present a physical barrier for a disabled
6  prisoner using the sink in room 3123?
7          MR. NICHOLS:  Objection to the extent
8          the question calls for a legal conclusion.
9          You may answer the question.
10  BY THE WITNESS:
11    A.    It's possible.
12  BY MR. MORRISSEY:
13    Q.    How then does the sheriff assist or
14  accommodate prisoners to overcome physical
15  barriers using the standard common sink and
16  toilet combination?
17    A.    Using the sink or the toilet?
18    Q.    The sink?
19    A.    We're not aware of anyone having a
20  physical barrier to the sink, Mr. Morrissey.
21    Q.    Moving right along, Mr. Flora was
22  transferred, I believe, on August 10 to 3125,
23  correct?
24    A.    Correct.

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 67

1    Q.    Can you tell me, are your answers going
2  to be the same in regards to 3125 as they were
3  to 3123 as far as accommodating a disabled
4  prisoner's use of a toilet in 3125?
5    A.    The accommodations available are the
6  same, yes.
7    Q.    So in order for a disabled prisoner
8  like Mr. Flora to use the toilet, the sheriff
9  would accommodate that need by Mr. Flora
10  requesting to use the portable toilet chair,
11  correct?
12          MR. NICHOLS:  Objection, asked and
13          answered.  You can answer.
14  BY THE WITNESS:
15    A.    If one was not already in his room,
16  yes.
17  BY MR. MORRISSEY:
18    Q.    And in order for Mr. Flora in 3125 to
19  use the shower, he could request a shower chair
20  from one of the guards or correctional officers
21  if the shower chair was not in the room,
22  correct?
23    A.    Correct.
24    Q.    And the shower, to the best of your

Plaintiff's Exhibit 11 Page 17

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 68

1  knowledge having inspected it recently, in 3125
2  does not have grab bars, correct?
3      **A.   It does not.**
4      Q.   And the toilet/sink combination doesn't
5  have grab bars, correct?
6      **A.   Correct.**
7      Q.   And 3125 hasn't been altered to your
8  knowledge since August of 2014, correct?
9      **A.   To my knowledge, no.**
10     Q.   And are you aware of any accommodations
11  provided to prisoners assigned -- disabled
12  prisoners assigned to 3125 in using the sink?
13     **A.   I'm not aware of any prisoners having**
14  **trouble using the sink in 3125.**
15     Q.   Now, looking again at that Exhibit
16  No. 6, Mr. Flora was transferred on at least
17  9/4/2014 to 9/23/2014, he was transferred over
18  to the new RTU, correct?
19     **A.   Correct.**
20     Q.   And he was placed in cell block 3-A,
21  correct?
22     **A.   Correct.**
23     Q.   And a week or 2 ago, you went over to
24  3-A to inspect the tier?

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 69

1      **A.   I've been over there on multiple**
2  **occasions, but, yes.**
3      Q.   How many cells are in 3-A of the RTU?
4      **A.   10 cells.**
5      Q.   Is there one cell that's designed to
6  be -- to comply with the 2010 design standards?
7      **A.   On 3-A?**
8          MR. NICHOLS:  Objection to the extent
9      that it calls for a legal conclusion.  You
10     can answer.
11  BY THE WITNESS:
12     **A.   Are we referring solely to 3-A?**
13  BY MR. MORRISSEY:
14     Q.   We're talking about 3-A, correct.
15     **A.   Yes, there is one cell.**
16     Q.   And that would be cell 10, correct?
17     **A.   Correct.**
18     Q.   Is it your understanding -- when was
19  the RTU constructed?
20     **A.   I don't recall when we broke ground.  I**
21  **believe it was around 2012 or 2013.**
22     Q.   Do the 2010 ADA design guidelines apply
23  to the RTU to the knowledge of the sheriff?
24          MR. NICHOLS:  Objection to the extent

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 70

1  the question calls for a legal conclusion.
2      You can answer.
3  BY THE WITNESS:
4      **A.   I believe it does.**
5  BY MR. MORRISSEY:
6      Q.   Looking at -- you have Exhibit 15 in
7  front of you, don't you?
8      **A.   I do.**
9      Q.   And Exhibit 15, if we look at page 3 of
10  Exhibit 15 of the 504 design guide of the ADA,
11  there's a diagram of a correctional toilet,
12  correct, and the --
13     **A.   Are you looking at page 2?**
14     Q.   I'm looking at what's marked as page 3.
15     **A.   Yes.**
16     Q.   If we go back to page 2, maybe that
17  will be a good place to start.  Does page 2 of
18  the 504 design guides reflect a clear opening
19  for the door of 32 inches?
20     **A.   It does.**
21     Q.   Do you know if all 10 cell blocks --
22  Strike that.
23          On 3-A, you mentioned there's 10 cells,
24  correct?

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 71

1      **A.   Correct.**
2      Q.   Do all 10 cells have the same size
3  opening for the doors?
4      **A.   I don't know.  I would have to review**
5  **my records.**
6      Q.   Do you know whether or not cell 3 has a
7  door width of 32 inches?
8      **A.   I don't know.  I would have to review**
9  **my records.**
10     Q.   Now, there is a dorm -- there's a cell
11  10 in the RTU 3-A, correct?
12     **A.   Correct.**
13     Q.   And does that comply with the 504
14  design guidelines?
15          MR. NICHOLS:  Objection to the extent
16      that the question calls for a legal
17      conclusion.  You can answer to the extent
18      that you know.
19  BY THE WITNESS:
20     **A.   I believe it does.**
21  BY MR. MORRISSEY:
22     Q.   In cell 10, are there side grab bars
23  for the toilet?
24     **A.   Yes, there is.**

Plaintiff's Exhibit 11 Page 18

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 72

```
1        Q.   And is there a grab bar on the side
2   wall that's at least 40 inches long?
3        A.   I believe there is.
4        Q.   And behind the toilet, is there also a
5   grab bar that's 33 by 36 inches?
6        A.   I didn't measure it, but I believe
7   there is.
8        Q.   Is there a reason as the sheriff's
9   representative why the design -- Strike that.
10            What is the understanding of the
11  sheriff of why there is a -- why there are
12  design guidelines under the ADA for side grab
13  bars?
14            MR. NICHOLS:  Do you understand the
15       question?
16            THE WITNESS:  No.
17  BY MR. MORRISSEY:
18       Q.   As the sheriff's representative, why
19  are there grab bars required under the 504
20  design guides for toilets?
21            MR. NICHOLS:  Objection to the extent
22       that it calls for a legal conclusion.  You
23       can answer the question.
24
```

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 73

```
1   BY THE WITNESS:
2        A.   It's to assist people to transfer to
3   the toilet.
4   BY MR. MORRISSEY:
5        Q.   Now, did you go in -- we mentioned that
6   Mr. Flora was in 3-A 3 -- tier block 3-A, cell
7   3, from September 4 to September 23, correct?
8        A.   No.  It was cell 7.
9        Q.   I'm sorry, cell 7.  Now, did you go
10  into cell 7 recently?
11       A.   Yes.
12       Q.   When you went into cell 7, did you
13  examine the toilet?
14       A.   I did.
15       Q.   Did the toilet have a rear side grab
16  bar?
17       A.   It did not.
18       Q.   Did it have a side grab bar?
19       A.   It did not.
20       Q.   Were there any bars to assist a
21  disabled prisoner to use the toilet in cell 7 on
22  cell block 3-A of the RTU?
23       A.   Were there any bars?
24       Q.   Yes.
```

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 74

```
1        A.   Do you mean grab bars?
2        Q.   Yes.
3        A.   I don't believe there are.
4        Q.   Now, in addition, in cell 7, 3-A, are
5   there at least 2 beds?
6        A.   There are.
7        Q.   Those are 2 fixed beds, correct?
8        A.   Correct.
9        Q.   And in between each bed, is there a
10  fixed desk, a concrete desk?
11       A.   I believe there is.
12       Q.   And in front of the fixed desk, is
13  there a fixed stool?
14       A.   I believe there is.
15            (Whereupon, there was a short
16            interruption.)
17  BY MR. MORRISSEY:
18       Q.   I believe I asked you whether or not
19  there was a desk inside of cell 7 on 3-A at the
20  RTU, and you answered yes.
21       A.   I did.
22       Q.   You also were asked about a fixed
23  concrete stool in front of the desk, correct?
24       A.   Yes.
```

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 75

```
1        Q.   And you agree that there is a fixed
2   concrete stool, correct?
3        A.   I believe there is, yes.
4        Q.   The sheriff's understanding of 504 of
5   the design guides, does that permit a fixed seat
6   in front of the desk in a cell?
7             MR. NICHOLS:  Objection to the extent
8        that the question calls for a legal
9        conclusion and objection to the form.  It's
10       a compound question.  You can answer to the
11       extent you know.
12  BY THE WITNESS:
13       A.   I don't know.
14  BY MR. MORRISSEY:
15       Q.   If we look at page 5 to refresh your
16  memory, there's a diagram of a desk.  Do you see
17  that?  Take a look at that for a moment.
18       A.   Okay.
19       Q.   As the sheriff's representative, would
20  you agree that the 504 design guides require
21  that any seating has to be nonpermanent; it has
22  to be removable?
23            MR. NICHOLS:  Objection to the extent
24       that the question calls for a legal
```

Plaintiff's Exhibit 11 Page 19

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 76

1    conclusion.  You can answer to the extent
2    that you know.
3  BY THE WITNESS:
4    **A.  I don't believe the design guide**
5  **provides for in your words any seating to not**
6  **have --**
7  BY MR. MORRISSEY:
8    Q.  Well, do you see the spot where it
9  talks about desk clear floor space?
10   **A.  I do.**
11   Q.  Does it say that any fixed seat needs
12 to be removable?  Do you see that?
13   **A.  In an accessible cell, yes.**
14   Q.  Is cell 7 in 3-A accessible?
15     MR. NICHOLS:  Objection to the extent
16     that it calls for a legal conclusion.  You
17     can answer.
18 BY THE WITNESS:
19   **A.  Cell 7 on 3-A is not one of the**
20 **accessible cells on the tier.**
21 BY MR. MORRISSEY:
22   Q.  And based upon your review of the
23 housing list, was Mr. Flora placed in this
24 inaccessible cell on 3-A, cell number 7, between

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 77

1  9/4/14 and 9/23/14?
2     MR. NICHOLS:  Objection, asked and
3     answered.  You can answer.
4  BY THE WITNESS:
5    **A.  He was placed on 3-A, cell 7, correct.**
6  BY MR. MORRISSEY:
7    Q.  During that period of time?
8    **A.  Yes.**
9    Q.  Now, I'm going to show you Group
10 Exhibit 11.  It's a series of photographs of a
11 cell on 3-A in Division 8.  Do you recognize
12 those photographs?
13   **A.  Do I recognize the photographs?**
14   Q.  Let me rephrase it.  Does Group Exhibit
15 15 fairly -- I'm sorry -- 11, does Group
16 Exhibit 11 fairly and accurately depict a cell
17 on 3-A of the RTU?
18     MR. NICHOLS:  I just want to object to
19     this exhibit to the extent that it hasn't
20     been disclosed or produced to me prior to
21     this deposition.  However, you can respond.
22 BY MR. MORRISSEY:
23   **A.  Does it fairly depict the cell?  I**
24 **don't know, Mr. Morrissey.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 78

1  BY MR. MORRISSEY:
2    Q.  Have you been in cell 3 on 3-A of the
3  RTU?
4    **A.  I thought we were talking about cell 7.**
5    Q.  I'm talking about cell 3 now.  Do you
6  recall a week or 2 ago inspecting cell 3 with
7  plaintiff's attorneys in the Wade case, correct?
8    **A.  I wasn't in cell 3, no.**
9    Q.  But you were with us?  You accompanied
10 us?
11   **A.  Outside in the dayroom, yes.**
12   Q.  Again, does picture -- do the pictures
13 in Group Exhibit 11 fairly and accurately depict
14 what a cell looks like in the RTU, 3?
15     MR. NICHOLS:  Objection to the extent
16     that I don't really see how cell 3 is
17     relevant to Mr. Flora.  However, you can
18     answer the question.
19 BY THE WITNESS:
20   **A.  Sure.**
21 BY MR. MORRISSEY:
22   Q.  And cell 7 on tier block 3-A also has 2
23 beds, concrete beds, in cell 7, correct, just
24 like the group exhibit in Group 11, correct?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 79

1    **A.  Just to clarify, Group 11 you said is**
2  **cell 3?**
3    Q.  Correct.
4    **A.  All the cell blocks have the same beds.**
5    Q.  And they also have the fixed concrete
6  stool that is in front of or underneath the
7  desk -- concrete desk?
8    **A.  Do they all have that?  No.**
9    Q.  Cell 7 just like cell 3 in the RTU,
10 tier 3, also, has a concrete stool in front of
11 the desk, correct?
12   **A.  Tier 3-A?**
13   Q.  Yes.
14   **A.  It does.**
15   Q.  Now, the housing record for Mr. Flora
16 indicates that from September 23, 2014, through
17 February of 2016, Mr. Flora was housed in
18 various dormitories on the third floor of the
19 RTU, correct?  Let me rephrase it.
20     Between September 23, 2014, and the time
21 of his release in February of 2016, was
22 Mr. Flora to your knowledge housed in
23 dormitories on the third floor of the RTU?
24   **A.  Can you repeat the dates you're asking**

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 80

1  me about?

2      Q.   September 23, 2014, to the time of his

3  release from the jail in February of 2016.

4      A.   And your question is?

5      Q.   Was he housed in dormitories on the

6  third floor of the RTU?

7      A.   The exhibit you provided doesn't have

8  all those dates.

9      Q.   I didn't ask you that.

10     A.   Well, without that record,

11 Mr. Morrissey, I couldn't answer that question.

12     Q.   Did you review any records in

13 preparation for today's deposition?

14     A.   I did, those that have already been

15 turned over to you.

16     Q.   And did you look at records in regards

17 to where he was housed after being in cell 7 in

18 3-A?

19     A.   I did.

20     Q.   And was he housed in dormitories on the

21 third floor?

22          MR. NICHOLS:  Objection, asked and

23     answered.  You can answer.

24

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 81

1  BY THE WITNESS:

2      A.   If you could refer me to what document

3  that you're talking about, that would be great.

4  BY MR. MORRISSEY:

5      Q.   What did you look at as far as

6  Mr. Flora's housing history?

7          MR. NICHOLS:  Objection, asked and

8     answered.

9  BY THE WITNESS:

10     A.   The complete housing history.  What you

11 provided was only part of what we turned over.

12 This is historical bed assignments.

13 BY MR. MORRISSEY:

14     Q.   Well, this apparently was never updated

15 by your attorney.  But from the documents that

16 you looked at, the more recent documents, where

17 else was Mr. Flora housed after being changed --

18 after he was moved from cell 7 in 3-A?

19     A.   He was housed in a variety of living

20 units.

21     Q.   And were those dormitories?

22     A.   Some of them were.

23     Q.   And was he also housed in cells?

24     A.   Possibly.  I would need to review my

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 82

1  records.

2      Q.   Now, the dormitories, how many

3  dormitories are there on the third floor?

4      A.   There are 6 dormitories on the third

5  floor.

6      Q.   Do each of the dorms have 2 beds which

7  are designed to be accessible for disabled

8  prisoners?

9          MR. NICHOLS:  Objection to the extent

10     that the question calls for a legal

11     conclusion.  You can answer.

12 BY THE WITNESS:

13     A.   2 of the beds are different from the

14 rest.

15 BY MR. MORRISSEY:

16     Q.   In each of the dorms?

17     A.   In each of the dorms.

18     Q.   What makes -- each of the dorms has how

19 many beds?

20     A.   39.

21     Q.   And 2 out of the 39 have an open spot

22 near the desk for a wheelchairbound person to

23 use the desk, correct?

24     A.   Open spot?

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 83

1      Q.   Let me rephrase the question.  Now,

2  looking at Exhibit No. 6, we find at least on

3  October 18, 2014, Mr. Flora was in dorm 3-F,

4  correct?

5      A.   Correct.

6      Q.   I'm going to show you a series of

7  pictures which we have marked Plaintiff's

8  Exhibit No. 12 of dorm 3-F.

9          MR. NICHOLS:  I just want to make a

10     standing objection to this exhibit.  These

11     pictures were never produced to me or the

12     county prior to this deposition.  You may

13     proceed.

14 BY MR. MORRISSEY:

15     Q.   Exhibit 12 are 5 pages of photographs

16 of the inside of dorm 3-F, correct?

17     A.   I don't know, Mr. Morrissey.  There's

18 no way for me to identify that.

19     Q.   If you look at page 4, for instance,

20 there's a bed, correct?

21     A.   Correct.

22     Q.   And on the bed, it's marked 3-F, number

23 4, correct?

24     A.   It looks like it might be.

Plaintiff's Exhibit 11 Page 21

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 84

1    Q.   So would that indicate to you that the
2  3-F means that it's the F dorm?
3    A.   Assuming that is an F, yes.
4    Q.   And you recall when you accompanied us
5  in the Wade case during the inspection --
6  actually, it was in Flora and Vaughn and Wade,
7  during the inspection when Mr. Nichols was off,
8  we inspected dorm F, correct?
9    A.   I believe so, yes.
10   Q.   And that was the only dorm that the
11 plaintiff's attorneys actually inspected,
12 correct?
13   A.   I don't recall.
14   Q.   If we look at -- assuming Exhibit 12
15 are pictures of the F dorm -- maybe Ms. Carroll
16 will vouch for the fact, she signed the
17 stipulation.  We had a stipulation when we did
18 the inspection that the F dorm -- the other
19 dorms, dorms 3 B, D, and H, had the same layout
20 as 3-F.  And Ms. Carroll, I believe, signed the
21 declaration, maybe Dave did.  Dave Condron
22 signed it.
23       Looking at Exhibit No. 12, do you see on
24 the second page, there appears to be a bed,

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 85

1  correct?
2    A.   Yes.
3    Q.   And there's tables to the right and
4  left of the bed, correct?
5    A.   Correct.
6    Q.   And if we look at Exhibit 12, page 4,
7  there's a bed 4 with tables to the right and
8  left, correct?
9    A.   Page 4?
10   Q.   Yes, of Group Exhibit 12.
11   A.   Yes.
12   Q.   And the difference between page 2 and 4
13 as far as the layout of the desk is on page 4,
14 there are concrete stools underneath the desk,
15 the tables, correct?
16   A.   On page 4, correct.
17   Q.   And page 2 appears to be 1 of the 2
18 beds in dorm 3-F that's considered wheelchair
19 accessible, correct?
20   A.   Correct.
21   Q.   Now, Mr. Vaughn, according to Exhibit
22 No. 6, when he was in 3-F, he was assigned to
23 bed 4, correct?
24   A.   Mr. Vaughn or --

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 86

1    Q.   I'm sorry, Mr. Flora.
2    A.   What was the question?
3    Q.   On at least October 18, 2014, Mr. Flora
4  was assigned to bed 4 in 3-F, correct, in dorm
5  3-F?
6    A.   From document Exhibit 6, it appears he
7  was.
8    Q.   And bed 4 is not one of the beds that's
9  designed to be accessible for a
10 wheelchair-assisted prisoner, correct?
11       MR. NICHOLS:  Objection to the extent
12   that the question calls for a legal
13   conclusion.  You can answer.
14 BY THE WITNESS:
15   A.   Was it designed to be accessible?  I
16 don't know.  That's a legal argument you have to
17 make, Mr. Morrissey.
18 BY MR. MORRISSEY:
19   Q.   As the sheriff's representative, does
20 the sheriff assign wheelchair-assisted prisoners
21 to beds similar to what's depicted in
22 Exhibit 12, page 2 and 3?
23       MR. NICHOLS:  Objection.  The question
24   is vague as to time frame and location.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 87

1        MR. MORRISSEY:  Let me rephrase it.
2  BY MR. MORRISSEY:
3    Q.   You'll agree that the bed that's
4  depicted on page 2 of Exhibit 12 and the bed
5  that's depicted in picture 3 are used at times
6  by the sheriff to house wheelchair-assisted
7  prisoners, correct?
8    A.   In picture 3?
9    Q.   2 and 3.
10   A.   Are you referring to pages 2 and 3?
11   Q.   Yes.
12   A.   Those appear to be beds we use, yes.
13   Q.   And those are specifically designed to
14 be used for people that are disabled, correct?
15   A.   Are they specifically designed for that
16 purpose?  They're designed to be used by
17 prisoners.
18   Q.   But under the 504 guidelines, the beds
19 that are depicted in pictures -- pages 2 and 3
20 don't have a fixed stool or chair in front of
21 the desk or the writing table, correct?
22   A.   On pages 2 and 3?
23   Q.   Yes.
24   A.   The beds pictured here do not have a

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 22

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 88

1    desk in front of it.
2        Q.   Whereas on page 4 for bed 4, there are
3    obstructions, concrete stools in front of the
4    writing tables, correct?
5        A.   There are obstructions, or there are
6    concrete stools?
7        Q.   There are concrete stools?
8        A.   There are concrete stools, yes.
9        Q.   And you would agree that those concrete
10   stools -- you as the sheriff's representative
11   would agree that the concrete stools may not
12   comply with the 504 design standards?
13            MR. NICHOLS:  Objection to the extent
14       that the question calls for a legal
15       conclusion.  You can answer.
16   BY THE WITNESS:
17       A.   Do I agree that these beds don't comply
18   with the design standards or --
19   BY MR. MORRISSEY:
20       Q.   As the sheriff's representative, are
21   there fixed seats that are adjacent to the desk
22   or writing tables depicted on page 4 of Group
23   Exhibit 12?
24            MR. NICHOLS:  Objection, asked and

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 89

1        answered.  You can answer.
2    BY THE WITNESS:
3        A.   In this picture, yes.
4            I would like to take a break now.
5            (Whereupon, a short break was
6            taken.)
7    BY MR. MORRISSEY:
8        Q.   In regards to dorm F when Mr. Flora was
9    assigned to bed 4, what fixed feature was
10   provided to Mr. Flora in order to write?
11       A.   What fixed feature?
12       Q.   Yes.
13       A.   A desk.
14       Q.   Given that there's -- you would agree
15   that there was a barrier in front of the desk in
16   4, correct?
17            MR. NICHOLS:  Objection to the extent
18       that the question calls for a legal
19       conclusion.
20            MR. MORRISSEY:  Let me rephrase it.
21   BY MR. MORRISSEY:
22       Q.   As the sheriff's representative, you
23   would agree that there was a barrier in front of
24   the table next to bed 4?

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 90

1            MR. NICHOLS:  Same objection.  You can
2        answer.
3    BY THE WITNESS:
4        A.   I would agree that there's a stool in
5    front of the table next to bed 4.
6    BY MR. MORRISSEY:
7        Q.   And the stool is not movable?
8        A.   It is not.
9        Q.   Were there any accommodations made to
10   Mr. Flora when he was assigned to bed 4 on dorm
11   3-F in order to write or to use the desk?
12       A.   I'm not sure that Mr. Flora had any
13   difficulty using the desk, Mr. Morrissey.
14       Q.   What accommodations are made from the
15   sheriff for disabled detainees assigned to a bed
16   like bed 4 on dorm 3 to write?
17       A.   Can you repeat your question?
18            (Whereupon, the record was read
19            as requested.)
20   BY THE WITNESS:
21       A.   What accommodations are provided to
22   detainees assigned to bed 4?
23
24

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 91

1    BY MR. MORRISSEY:
2        Q.   Or to other beds in the dorms that have
3    an obstruction in front of the table or desk?
4        A.   A stool in front of the table, they
5    could side transfer to the stool and use the
6    desk.  They can use any table within the
7    dayroom, or they can make a request for another
8    accommodation which we would review.
9        Q.   So the detainee would have to make a
10   request in order to be able to use the table?
11           MR. NICHOLS:  Objection to the extent
12       that it misstates her previous testimony.
13       You can answer.
14   BY THE WITNESS:
15       A.   To be able to use the table?
16   BY MR. MORRISSEY:
17       Q.   Let me rephrase the question for you.
18   What accommodation does the sheriff provide for
19   disabled detainees given bed 4 to use the side
20   table to the same extent that an able-bodied
21   person can use the side table?
22       A.   A detainee could transfer to the stool,
23   or they could use the table in the dayroom, or
24   they could request another accommodation which

Plaintiff's Exhibit 11 Page 23

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 92

1  we would review.
2      Q.   Now, you mentioned the tables in the
3  dayroom.  In Group Exhibit 12, there's
4  photographs of the tables that are in dorm F.
5  Do you see that?
6      A.   I see a picture that resembles the --
7      Q.   Does that picture fairly and accurately
8  depict the tables in the dayroom in dorm 3-F?
9      A.   I believe it does.
10     Q.   Are those tables designed to be
11  accessible for disabled prisoners?
12         MR. NICHOLS:  Objection to the extent
13     that it calls for a legal conclusion.  You
14     may answer the question.
15  BY THE WITNESS:
16     A.   I believe they are.
17  BY MR. MORRISSEY:
18     Q.   How are the tables depicted in Group
19  Exhibit 12, page 5, designed to be accessible
20  for wheelchairbound detainees?
21     A.   The detainee could transfer to the
22  chair.
23     Q.   Could a wheelchair detainee pull up to
24  the tables in the dayroom in 3-F?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 93

1      A.   I believe they could.
2      Q.   Now, your attorney has been given a
3  stipulation that followed our inspection last
4  week of the third floor of the RTU.  Do you
5  agree that in -- there are dorms 3 B, D, and H
6  on the third floor of the RTU?
7         MR. NICHOLS:  I just want to object to
8     this document to the extent it's my first
9     time seeing this document.  And as the
10    attorney of record in this case, I haven't
11    signed off on it.  I would at a minimum like
12    my client to have a chance to read this
13    document before you start asking questions.
14        MR. MORRISSEY:  Your fill in,
15    Mr. Cummings, signed off on it.  He actually
16    wrote this document.
17        MR. NICHOLS:  But he represents the
18    county and not Sheriff Dart.  I represent
19    Sheriff Dart.
20        MR. MORRISSEY:  She can take a moment
21    to look at it.
22        MR. NICHOLS:  Once again, I just want
23    to make it clear, I haven't signed off on
24    this.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 94

1  BY MR. MORRISSEY:
2      Q.   Are there dorms B, D, and H on the
3  third floor of the RTU in addition to F?
4      A.   There's B, C, D, G, H, and F.
5      Q.   Did B, C, D, H, and F all have at
6  least -- Strike that.
7         Did B, C, D, H, and F all have 39 beds?
8         MR. NICHOLS:  I'm going to object to
9     the relevance of this question.  It doesn't
10    appear to me just looking at Vaughn and
11    Flora's housing history, either of them were
12    ever in any of these dorms.  I understand
13    that the notice was pretty broad, but I'm
14    assuming that at least my reading of it is
15    limited to where they were actually housed.
16        MR. MORRISSEY:  We just received the
17    updated version of the housing for Flora, so
18    I just want to ask a couple quick questions.
19        MR. NICHOLS:  I'm going to maintain my
20    objection.  Why don't we just take a break
21    until you show me in the housing as to where
22    they were --
23        MR. MORRISSEY:  I don't want to waste
24    time right now.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 95

1  BY MR. MORRISSEY:
2      Q.   Let's go back to Mr. Vaughn for a
3  minute.  You previously looked at Exhibit 7-A
4  and 7-B of Mr. Vaughn, correct?
5      A.   I have 7-A.
6      Q.   You should have 7-B, too.
7      A.   And 7-B.
8      Q.   Now, looking at 7-B for a moment, does
9  that reflect that Mr. Vaughn between
10  November 16, 2013, and December 4, 2013, was
11  assigned to 3135 on 3-South?
12     A.   Can you repeat the dates that you're
13  referencing?
14     Q.   Sure.  November 16, 2013, to
15  December 4, 2013.
16     A.   November 16, 2013, he was assigned to
17  3-South, 3135.
18     Q.   And he was there until December 4,
19  2013?
20     A.   It appears he was.
21     Q.   And you recently were in 3135 prior to
22  this deposition?
23     A.   I was.
24     Q.   Can you tell me whether or not the

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 96

1   toilet in 3135 resembled the toilet that we
2   previously looked at in, I believe it was Regan
3   Exhibit No. 5?  Was it similar to, on page 6 of
4   Regan's report which is Exhibit 5 to this
5   deposition, figure 3, the combination
6   toilet/sink?
7       A.  It looks similar, yes.
8       Q.  And how did the toilet accommodate a
9   disabled person assigned to room 3135?
10          MR. NICHOLS:  Objection to the extent
11      the question calls for a legal conclusion.
12          MR. MORRISSEY:  Let me rephrase it.
13  BY MR. MORRISSEY:
14      Q.  How did the combination toilet/sink
15  found in 3135 accommodate the toileting needs of
16  a disabled detainee?
17      A.  Are you referring to Mr. Vaughn or any
18  disabled detainee?
19      Q.  I'm referring to a disabled detainee.
20      A.  What kind of disabled detainee?
21      Q.  I'm referring to a disabled person
22  under the ADA.
23      A.  Under the ADA, disability takes many
24  forms.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 98

1          MS. CARROLL:  And, also, if you want to
2      ask more specifically about wheelchairs.
3      When you say disabled, it can mean thousands
4      of different things.
5   BY MR. MORRISSEY:
6       Q.  The question -- and I think you're not
7   responding to the notice.  The notice
8   specifically says the physical features in 3135
9   which is one of the rooms we acknowledged -- we
10  determined Mr. Vaughn was in.  How does that
11  accommodate the toileting needs of a disabled
12  prisoner?
13          MR. NICHOLS:  Objection to the extent
14      the question calls for a legal conclusion.
15      You can answer the question.
16  BY THE WITNESS:
17      A.  Can I see the notice?  My answer,
18  Mr. Morrissey, is the same, that it would depend
19  on the disability of the detainee.
20  BY MR. MORRISSEY:
21      Q.  What do you mean by that?
22      A.  Within the ADA, a disability is
23  described as an impairment -- a major impairment
24  that substantially limits the life activity.  So

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 97

1       Q.  Can you answer the question?
2       A.  I answered the question.
3       Q.  You have not.
4       A.  Would you like to talk about Mr. Vaughn
5   which we're here to discuss?
6       Q.  No, I'm the one asking the questions.
7   If you'll allow me to ask it, we can move along
8   here.  The question is, how did the combination
9   toilet/sink found in room 3135 accommodate the
10  toileting needs of a disabled detainee housed in
11  that room?
12      A.  I cannot answer that question,
13  Mr. Morrissey, because you're not giving me
14  enough facts to answer that question.
15      Q.  The question is, for a disabled
16  detainee -- for a person to be found disabled
17  under the ADA, how did -- who in the sheriff's
18  office makes the determination what type of
19  accomodation a disabled prisoner needs who's
20  assigned to room 3135 on 3-South?
21          MR. NICHOLS:  Objection to the extent
22      that the question is beyond the scope of the
23      designation.  I'm instructing my client not
24      to answer that question.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 99

1   if you would like to ask with respect to Harold
2   Vaughn, I can answer that, but generally
3   broadly, I can't.
4       Q.  A life activity is -- we'll come back
5   to the general order here.  Would you agree that
6   a major life activity includes but is not
7   limited to being able to walk?
8          MR. NICHOLS:  Objection to the extent
9      the question calls for a legal conclusion,
10     but you can answer.
11  BY THE WITNESS:
12      A.  A major life activity is walking, yes.
13  BY MR. MORRISSEY:
14      Q.  And standing?
15      A.  Standing, yes.
16      Q.  How would the feature -- the physical
17  features in 3135 accommodate a disabled person
18  who has difficulty standing and walking as far
19  as toileting?
20      A.  Difficulty standing or walking or
21  substantially limited in standing or walking?
22      Q.  I'll rephrase the question for you, and
23  I don't know that it matters.
24      A.  I think it does matter, Mr. Morrissey,

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 25

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 100

1  because it's in the ADA.  Substantial
2  limitations are what applies, not difficulty.
3      Q.   Assuming for the moment -- let's take a
4  break.
5               (Whereupon, a short break was
6               taken.)
7      MR. MORRISSEY:  Back on the record.
8  BY MR. MORRISSEY:
9      Q.   The physical features in room 3135 for
10 a wheelchair-assisted prisoner, what are they?
11     A.   What do you mean by wheelchair
12 assisted?
13     Q.   A paralyzed person, assuming a person
14 is paralyzed, what physical features are present
15 in room 3135 to assist a paralyzed detainee to
16 toilet?
17     A.   As we previously discussed, the toilet
18 chair.
19     Q.   And to your knowledge in November of
20 2013, was there always a toilet chair in room
21 3135?
22     A.   What document are you referencing?  Are
23 we talking about Vaughn?
24     Q.   I'm talking about Vaughn.  It doesn't

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 101

1  matter whether it's Vaughn or somebody else.
2  We're asking about November of 2013.
3      MR. NICHOLS:  It does matter who you're
4      asking about especially since the notice is
5      captioned Harold Vaughn v. Sheriff Dart, but
6      proceed.
7  BY THE WITNESS:
8      A.   In November of 2013, there was always a
9  chair either in the room or outside the room to
10 assist with toileting.
11 BY MR. MORRISSEY:
12     Q.   Would a disabled person have to request
13 to use the portable toilet chair assuming they
14 had a toilet?
15     A.   As I previously stated, it would either
16 be in the room or they would have to request it,
17 yes.
18     Q.   Is there always a correctional guard
19 standing outside room 3135 to bring a toilet
20 chair into the room for a person who's disabled
21 to toilet?
22     A.   There is always a correctional guard in
23 the dayroom, yes.
24     Q.   Is there an intercom in room 3135 for a

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 102

1  prisoner to request the toilet chair?
2      A.   I don't recall if there's a call button
3  in that room.
4      Q.   Is there any physical feature in room
5  3135 to permit a disabled prisoner to use the
6  sink?
7      A.   I'm not aware of a disabled person
8  having any difficulty using the sink.
9      Q.   When you say you're not aware, you're
10 saying the sheriff is not aware of any prisoner
11 having difficulty using the sink when they were
12 housed in 3135; is that correct?
13     MR. NICHOLS:  Objection to the extent
14     that it misstates her previous testimony.
15     You can answer.
16 BY THE WITNESS:
17     A.   I don't recall the sheriff's office
18 being put on notice of any such difficulty.
19 BY MR. MORRISSEY:
20     Q.   Do you know what type of toilet chair
21 was available to be brought into room 3135 for a
22 disabled prisoner to toilet in November of 2013?
23     A.   As I previously stated, I don't know
24 the brand.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 103

1      Q.   Did the arms move up and down on that
2  portable chair, toilet chair in November of 2013
3  which was available to be used in 3135?
4      A.   There were some toilet chairs where the
5  arms did move, yes.
6      Q.   Do you know whether in November of 2013
7  when Vaughn was in 3135, whether the toilet
8  chair in use at that time, the arms would go up
9  and down?
10     A.   I don't know if the specific chair
11 Vaughn used had movable arms.
12     Q.   Do you know whether or not the toilet
13 chair in use on 3-South in November of 2013 had
14 wheels?
15     A.   It may have.
16     Q.   Do you know whether or not -- as the
17 sheriff's representative -- whether or not the
18 toilet chair in use on 3-South had wheels or
19 not?
20     A.   It may have, Mr. Morrissey.  There's
21 more than one different kind of chair.
22     Q.   Describe the different types of chairs
23 in use in November of 2013 on 3-South.
24     A.   There's a metal toilet chair with a

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 104

1   plastic seat.  There's a metal shower chair that
2   doubles as a toilet chair with a padded seat.
3        Q.   If Mr. Vaughn or another disabled
4   prisoner assigned to room 3135 requested a
5   portable toilet chair in order to toilet, would
6   a correctional officer assist the prisoner on
7   and off the portable toilet chair?
8            MR. NICHOLS:  Objection.  The question
9        is vague as to time frame.  You can answer.
10           MR. MORRISSEY:  Let me rephrase the
11       question.
12   BY MR. MORRISSEY:
13       Q.   Did one of the accommodations in
14   November of 2013 for accommodating a prisoner
15   toileting in 3135 include a sheriff's employee
16   assisting the person on and off the portable
17   toilet chair?
18       A.   A sheriff's employee, no.
19       Q.   Do you know whether or not the user
20   manual for the portable toilet chairs in use
21   on 3-F -- I'm sorry -- 3-South specified that
22   they could only be used with assistance?
23           MR. NICHOLS:  Objection to the extent
24       that the question is vague as to time frame.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 106

1   BY THE WITNESS:
2        A.   I don't believe the product label
3   referred to correctional officers.
4   BY MR. MORRISSEY:
5        Q.   Let me rephrase the question.  The
6   portable toilet chairs in use on 3-South in
7   November of 2013 included a warning that the
8   chair shouldn't be used without assistance,
9   correct?
10       A.   I disagree with the word warning.
11       Q.   There was a caution that indicated on
12   the chair or chairs that they should be used
13   with assistance, correct?
14       A.   There was a general product label, yes.
15       Q.   On the chairs themselves?
16       A.   Similar to lots of items, yes,
17   Mr. Morrissey.
18       Q.   Is it your testimony that one of the
19   accommodations for prisoners who were disabled
20   in 3135 was for a sheriff's employee to bring a
21   portable toilet chair into the room so a
22   disabled prisoner could toilet?
23       A.   A disabled prisoner?
24       Q.   Correct.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 105

1            MR. MORRISSEY:  Let me rephrase it.
2   BY MR. MORRISSEY:
3        Q.   Between November 16, 2013, and
4   December 4, 2013, do you know whether or not the
5   warranty or user manual for the toilet --
6   portable toilet chair or chairs used on 3-South
7   included a warning that the chair or chairs
8   should only be used with assistance?
9        A.   A product disclaimer may have been
10   included, yes.
11       Q.   Did the sheriff, based upon a warning
12   on the portable toilet chair, ensure that there
13   was always a correctional officer to assist a
14   prisoner on and off of the portable toilet chair
15   that was used on 3-South?
16           MR. NICHOLS:  Objection to the extent
17       that the question is vague as to time frame.
18       You can answer.
19           MR. MORRISSEY:  Again, it's between
20       November 16, 2013, and December 4, 2013.
21           THE WITNESS:  Can you repeat the
22       question?
23               (Whereupon, the record was read
24                as requested.)

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 107

1        A.   I don't know what you mean by that.
2        Q.   Let's use the very basic.  Assuming a
3   paralyzed prisoner was assigned to 3135, the
4   policy of the sheriff was to bring -- to have a
5   sheriff's employee bring the portable toilet
6   chair into the room if the person requested to
7   use it, correct?
8            MR. NICHOLS:  Objection.  The question
9        is vague as to time frame.
10           MR. MORRISSEY:  Again, Mr. Nichols,
11       we're talking about November 16, 2013, to
12       December 4, 2013.
13           MR. NICHOLS:  And I have an objection
14       to relevance.  Is Harold Vaughn paralyzed?
15       You can answer the question to the extent
16       that you know.
17           THE WITNESS:  Can you repeat the
18       question?
19               (Whereupon, the record was read
20                as requested.)
21           THE WITNESS:  Can you rephrase that
22       question, Mr. Morrissey?
23
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 27

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 108

```
1   BY MR. MORRISSEY:
2       Q.   What don't you understand about the
3   question?
4       A.   It's a compound question.  You're
5   asking several different things within a
6   question.
7       Q.   All right.  Hypothetically let's say
8   that a prisoner was assigned to 3135 during the
9   time period November 16, 2013, to December 4,
10  2013.  Do you understand that?
11      A.   I understand that.
12      Q.   Assuming that the prisoner assigned to
13  that room requested a toilet chair in order to
14  have a bowel movement, do you understand that?
15      A.   Assuming that the prisoner assigned to
16  that room needed a toilet chair to have a bowel
17  movement?
18      Q.   Do you understand that aspect?
19      A.   I think it's a big assumption to make
20  since the prisoner that you're referring to is
21  Harold Vaughn.  That's the one that was assigned
22  to the room.
23      Q.   Let's assume that there's a disabled
24  prisoner in there in that time period, okay?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 110

```
1       A.   It's everyone's responsibility.  It's
2   all of the staff's responsibility to provide
3   reasonable accommodations.
4       Q.   If the sheriff's employee on 3-South
5   brought the chair into room 3135, would the
6   sheriff's employee provide assistance to the
7   detainee for getting on and off the portable
8   toilet chair?
9           MR. NICHOLS:  Objection.  The question
10      is vague as to time frame.  You can answer.
11          MR. MORRISSEY:  Let me rephrase the
12      question.
13  BY MR. MORRISSEY:
14      Q.   Assuming a sheriff's employee brought a
15  portable toilet chair into room 3135 in November
16  of 2013 for the person to toilet, does part of
17  accommodations include the sheriff's employee
18  assisting the prisoner on and off the portable
19  toilet chair?
20      A.   Potentially.  It would also include
21  medical staff assisting if that assistance is
22  needed.
23      Q.   You seem to have some knowledge about
24  Harold Vaughn as the sheriff's representative?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 109

```
1       A.   What do you mean by disabled?
2       Q.   Somebody that's covered under the ADA,
3   all right?
4       A.   Somebody or Mr. Vaughn?
5       Q.   Just a person who's covered --
6       A.   A general person?
7       Q.   A general person covered under the ADA,
8   assuming that person covered under the ADA
9   requested a toilet chair from the sheriff's
10  employee, would the sheriff's employee bring the
11  chair into the room?
12          MR. NICHOLS:  Same objection.  You can
13      answer.
14  BY THE WITNESS:
15      A.   Covered by the ADA?  Lots of prisoners
16  are covered by the ADA.  If they needed a toilet
17  chair to assist them with toileting, it would be
18  provided either by a sheriff's employee, by a
19  county health employee, by anyone,
20  Mr. Morrissey.
21  BY MR. MORRISSEY:
22      Q.   Whose responsibility would it be in
23  November of 2013 if a detainee in room 3135
24  requested a toilet?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 111

```
1       A.   I have lots of knowledge of Harold
2   Vaughn.
3       Q.   In November of 2013, if Harold Vaughn
4   requested a portable toilet chair, would he have
5   been entitled to it under the sheriff's policy
6   when he was inside room 3135?
7           MR. NICHOLS:  Objection to the extent
8       the question calls for a legal conclusion.
9       You can answer.
10  BY THE WITNESS:
11      A.   Would he be entitled to it?  The
12  sheriff's policy is to provide reasonable
13  accommodation.  Do I believe Mr. Vaughn needed
14  that accommodation?  No, I do not.
15  BY MR. MORRISSEY:
16      Q.   The question is, as the sheriff's
17  representative, if Mr. Vaughn was assigned to
18  3135 in November of 2013 and he requested to use
19  a portable toilet chair, would he be entitled to
20  it under the sheriff's policies?
21          MR. NICHOLS:  Same objection and asked
22      and answered.  You can answer.
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 28

Page 112

```
1   BY THE WITNESS:
2        A.   I take issue with your word entitled.
3   BY MR. MORRISSEY:
4        Q.   What is your issue with the word
5   entitled?
6        A.   I don't believe it appears in the ADA,
7   Mr. Morrissey.  ADA is about reasonable
8   accommodations.
9        Q.   Let me rephrase it.  Would the sheriff
10  in November of 2013 have provided the
11  accommodation to Mr. Vaughn of bringing a
12  portable toilet chair into 3135 if he requested
13  it?
14       A.   If he requested it, they likely would.
15       Q.   Does the sheriff agree that Mr. Vaughn
16  is disabled under the ADA?
17            MR. NICHOLS:  Objection to the extent
18       that the question calls for a legal
19       conclusion.  I'm instructing my client not
20       to answer that question.
21  BY MR. MORRISSEY:
22       Q.   Does the sheriff make any evaluation
23  whether or not a prisoner is disabled -- Strike
24  that.
```

Page 114

```
1   BY MR. MORRISSEY:
2        Q.   Sure.  Let's assume in November of 2013
3   Mr. Vaughn was given -- had a medical order for
4   a walker when he was assigned to 3135, would he
5   then be entitled to an accommodation to use the
6   toilet by the sheriff?
7             MR. NICHOLS:  Objection to the extent
8        the question calls for a legal conclusion.
9        You can answer.
10  BY THE WITNESS:
11       A.   Everyone is allowed to use the toilet,
12  Mr. Morrissey.
13  BY MR. MORRISSEY:
14       Q.   Would he have been permitted the
15  accommodation of requesting to use a portable
16  toilet chair in order to toilet in 3135 if he
17  had been given a medical order for a walker?
18       A.   As I previously stated, yes.
19       Q.   If Mr. Vaughn had a medical order for a
20  wheelchair and was assigned to 3135, would he be
21  provided a portable toilet chair if he requested
22  it in order to toilet in that room?
23       A.   As I previously stated, more than
24  likely, yes.
```

Page 113

```
1             A prisoner that's assigned to 3135 like
2   Mr. Vaughn, is it up to the sheriff to determine
3   whether or not they receive an accommodation
4   under the ADA?
5             MR. NICHOLS:  Objection, asked and
6        answered.  You can answer the question.
7   BY THE WITNESS:
8        A.   Is it up to the sheriff to determine?
9   No.
10  BY MR. MORRISSEY:
11       Q.   Who makes that determination?
12       A.   A medical professional.
13       Q.   If a disabled prisoner is given a
14  walker to assist him with either walking or
15  standing, under the ADA, if that person requests
16  a portable toilet chair, is he given one?
17            MR. NICHOLS:  Objection.  The question
18       is vague as to time frame, and the question
19       calls for a legal conclusion.  You can
20       answer the question.
21  BY THE WITNESS:
22       A.   Can you rephrase the question?
23
24
```

Page 115

```
1        Q.   If Mr. Vaughn had an order for a
2   wheelchair in November of 2013, would he have
3   been assigned to room 3135 if the room did not
4   have an accessible toilet?
5             MR. NICHOLS:  Objection to the extent
6        that the question is beyond the scope of the
7        witness' designation.  I'm instructing her
8        not to answer that question.
9   BY THE WITNESS:
10       A.   My attorney has instructed me not to
11  answer the question.
12  BY MR. MORRISSEY:
13       Q.   Who from the sheriff determines if a
14  plaintiff assigned to, let's say, room 3135 will
15  receive a portable toilet chair or not?
16            MR. NICHOLS:  Objection to the extent
17       the question is vague as to time frame.  You
18       can answer.
19            MR. MORRISSEY:  Let me rephrase the
20       question.
21  BY MR. MORRISSEY:
22       Q.   Mr. Vaughn was in this room between
23  November 16, 2013, and December 4, 2013.  Was it
24  up to the tier officer on 3-South whether or not
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 116

1   to give Mr. Vaughn a portable toilet chair if he
2   requested it to toilet in room 3135?
3       A.   It's not up to the discretion of the
4   officer whether or not to provide a reasonable
5   accommodation.
6       Q.   Is it up to the ADA compliance officer
7   whether or not Mr. Vaughn should be given upon
8   request a portable toilet chair in room 3135 in
9   order to toilet?
10      A.   Can you rephrase the question?
11      Q.   No.  I can repeat it.
12      A.   If you can't rephrase it, then I can't
13  answer it.
14      Q.   Who within the sheriff's office makes
15  the decision whether a prisoner assigned to 3135
16  will receive upon request a portable toilet
17  chair to toilet?
18      A.   I don't understand the question.
19      Q.   Sure.  In November of -- what don't you
20  understand about it?
21      A.   It's confusing.  Who within the
22  sheriff's office decides whether or not to
23  provide a reasonable accommodation?
24      Q.   Sure.  You mentioned that for a

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 118

1       MR. NICHOLS:  Objection.  The question
2   is vague as to time frame.  You can answer.
3   BY THE WITNESS:
4       A.   I believe I have answered that
5   question.
6   BY MR. MORRISSEY:
7       Q.   I would like you to answer it, please.
8       A.   Again?  I'll answer it again.  A
9   medical professional determines whether or not a
10  person is disabled within the meaning of the
11  ADA, and we will provide reasonable
12  accommodations.  It's not up to the discretion
13  of an officer.
14      Q.   How does the sheriff find out that
15  determination by a medical officer?  Let me
16  rephrase it.  You said that the determination
17  whether a person is disabled or not is made by
18  the medical staff at the jail, correct?
19      A.   Medical professional, yes.
20      Q.   How does the sheriff learn that
21  information from the medical staff?
22      A.   Through medical alerts.
23      Q.   And if the medical alert indicates that
24  a person needs -- what medical alerts are

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 117

1   disabled person assigned to 3135, one of the
2   accommodations for a disabled person is to bring
3   in a portable toilet chair, correct?
4       A.   For a disabled person -- that's a
5   mischaracterization of what I said.
6       Q.   What did you say?
7       A.   You previously referred to paralyzed
8   prisoners and then switched topics to talk about
9   Mr. Vaughn.  So I'm having trouble following
10  your line of questioning.
11      Q.   I'm talking about somebody who
12  qualifies under the ADA.  Do you understand
13  that?
14      A.   I don't.
15      Q.   You don't?
16      A.   No, because there are a lot of people
17  who are qualified under the ADA that don't need
18  accessible toilets.
19      Q.   Let's assume that a person is qualified
20  under the ADA to have an accessible toilet.  Who
21  within the sheriff's office decides whether or
22  not the reasonable accommodation of providing a
23  portable toilet chair in 3135 is going to be
24  given or not?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 119

1   provided to the sheriff's office?
2       MR. NICHOLS:  Objection.  The question
3   is vague as to time frame.
4   BY MR. MORRISSEY:
5       Q.   In the period of time when Mr. Vaughn
6   has been housed in the jail, what medical alerts
7   are provided by the medical staff to the
8   sheriff's office?
9       A.   There are hundreds of medical alerts.
10      Q.   What medical alerts relevant to an ADA
11  toilet are provided by the medical staff to the
12  sheriff's office?
13      MR. NICHOLS:  Objection.  The question
14  is vague as to time frame.  You can answer.
15      MR. MORRISSEY:  The time frame is
16  between the time Mr. Vaughn came in and the
17  present because he'll still there.
18      THE WITNESS:  I don't understand your
19  question.
20  BY MR. MORRISSEY:
21      Q.   You said that the medical professionals
22  provide medical alerts to the sheriff's office
23  in regards to ADA issues, correct?
24      A.   In regards to a lot of issues.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 30

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 120

```
1    Q.  But I'm referring to ADA.  What type of
2  medical alerts does the medical staff provide
3  the sheriff in regards to an ADA toilet for
4  prisoners?
5    A.  There's no medical alert for an ADA
6  toilet.
7    Q.  How then does the sheriff determine
8  whether or not a prisoner -- Strike that.
9    From the medical alerts provided by the
10 medical staff, how does the sheriff determine
11 whether or not a prisoner should receive an
12 accommodation for toileting?
13   MR. NICHOLS:  Objection to the extent
14     that the question is vague as to time frame,
15     and it's probably beyond the scope of the
16     notice.  However, I will allow my client to
17     answer this one question.  You can answer.
18   THE WITNESS:  What was the question?
19     (Whereupon, the record was read
20      as requested.)
21 BY THE WITNESS:
22   A.  It's a collaborative effort.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 121

```
1  BY MR. MORRISSEY:
2    Q.  What alerts -- you said that the
3  medical alerts from the professional medical
4  staff are given to the sheriff when there's a
5  need to accommodate a prisoner toileting at the
6  jail?
7    A.  That's not what I said.
8    Q.  Does the sheriff defer to the medical
9  staff in regards to providing an accommodation
10 to prisoners in regards to toileting -- in
11 regards to requiring an accomodation for
12 toileting?
13   MR. NICHOLS:  Objection.  The question
14     is vague as to location and time frame.  You
15     can answer to the extent you know.
16 BY THE WITNESS:
17   A.  It's a collaborative effort.
18 BY MR. MORRISSEY:
19   Q.  What role does the sheriff have in
20 determining that a prisoner needs an
21 accommodation for toileting?
22   MR. NICHOLS:  Objection.  The question
23     is vague as to time frame --
24   MR. MORRISSEY:  The time frame covers
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 122

```
1  the time period that Mr. Vaughn has been in
2  the Cook County Jail.
3    MR. NICHOLS:  It's still vague as to
4  location.  You can answer the question.
5    THE WITNESS:  What was the question?
6    MR. MORRISSEY:  We'll take a break.
7      (Whereupon, a short break was
8       taken.)
9    MR. MORRISSEY:  Back on the record.
10 BY MR. MORRISSEY:
11   Q.  You agree that if a prisoner was
12 assigned to 3135 on 3-South and was paralyzed,
13 he could request the use of a portable toilet
14 chair to accommodate his toileting, correct?
15   A.  Correct.
16   Q.  In order for a paralyzed person
17 assigned to 3135 to use the toilet, he had to
18 request to use the portable chair under the
19 sheriff's policy, correct?
20   MR. NICHOLS:  Objection.  The question
21     is vague as to time frame, and I'm not sure
22     of the relevance of the question to either
23     of these cases as Mr. Flora was never in
24     3135.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 123

```
1    MR. MORRISSEY:  I'm talking about
2  Vaughn.
3    MR. NICHOLS:  Was Mr. Vaughn paralyzed?
4    MR. MORRISSEY:  You can answer.
5    MR. NICHOLS:  I'm going to maintain my
6  objections, but you can answer the question.
7    THE WITNESS:  What was the question?
8      (Whereupon, the record was read
9       as requested.)
10 BY THE WITNESS:
11   A.  The sheriff's policy does not
12 specifically speak to toilet chairs, but such a
13 request could be made if it wasn't already in
14 the room.
15 BY MR. MORRISSEY:
16   Q.  So I understand the sheriff's position,
17 if the sheriff placed him in 3135 -- a paralyzed
18 person in 3135 in November of 2013, the sheriff
19 would accommodate the person's toileting needs
20 by setting up a procedure where the person could
21 request to use a portable toilet chair, correct?
22   MR. NICHOLS:  Objection to the extent
23     that the question is vague as to time frame
24     and, again, I'm not sure of the relevance of
```

TOOMEY REPORTING
312-853-0648

Page 124

```
1    a paralyzed person since Harold Vaughn
2    wasn't paralyzed.  Also, you're asking
3    questions about policies which
4    Ms. Rivero-Canchola was not designated for
5    other than the one described in the notice
6    which you guys haven't asked about yet.  I'm
7    instructing my client not to answer the
8    question.
9        MR. MORRISSEY:  The question provides
10   in regards to rooms that Mr. Vaughn was
11   assigned to, and we're asking how a person
12   who's disabled assigned to that room is
13   given an accommodation if they need it.
14       MR. NICHOLS:  You actually asked about
15   a paralyzed person.
16       MR. MORRISSEY:  We'll just use the word
17   disabled then.
18   BY MR. MORRISSEY:
19   Q.   How does the sheriff -- Strike that.
20        It's the sheriff's policy as far as
21   accommodating a person who's disabled in room
22   3135 that they can request the use of a portable
23   toilet chair, correct?
24   A.   I don't know what you mean by disabled.
```

Page 125

```
1    Q.   That's what the notice says, disabled.
2    A.   Yes, it's your notice --
3    Q.   We'll take the extreme.  We'll say a
4    paralyzed wheelchairbound detainee.  It's the
5    sheriff's policy assuming the person is
6    paralyzed in a wheelchair and assigned by the
7    sheriff to 3135, the sheriff will provide an
8    accommodation for the person to toilet if they
9    request the use of a portable toilet chair,
10   correct?
11       MR. NICHOLS:  Objection to the
12   relevance of the question, and it's beyond
13   the scope of her designation.  I'm
14   instructing my client not to answer.
15       MR. MORRISSEY:  It says disabled.
16       MR. NICHOLS:  Mr. Vaughn is not
17   paralyzed.  Nothing in section 5 of the
18   notice refers to policies of the sheriff.
19   It's talking about accommodations.  It's
20   talking about physical features, immovable
21   features.
22   BY MR. MORRISSEY:
23   Q.   What accommodations for a person like
24   Mr. Vaughn who had a stroke and was assigned to
```

Page 126

```
1    3135 in November of 2013, what accommodations
2    did the sheriff provide for his toileting needs?
3        MR. NICHOLS:  Objection, asked and
4    answered.  You can answer.
5    BY THE WITNESS:
6    A.   I'm not sure Mr. Vaughn needed an
7    accommodation for his toileting needs, but the
8    toilet chairs are available either in the cell
9    or by request.
10   BY MR. MORRISSEY:
11   Q.   Are individuals that are considered
12   disabled as far as walking and standing under
13   the ADA assigned to rooms that are not ADA
14   accessible at the jail?
15       MR. NICHOLS:  Objection.  The question
16   is overbroad as to time frame and location.
17   I'm actually going to instruct my client not
18   to answer unless you can narrow down the
19   time frame and location.
20   BY MR. MORRISSEY:
21   Q.   Since you want to talk about
22   Mr. Vaughn, what medical alerts were given by
23   Cermak in regards to Mr. Vaughn?
24   A.   A variety of medical alerts.
```

Page 127

```
1    Q.   Was there a medical alert that he
2    should be given a wheelchair at times?
3    A.   At times, yes.
4    Q.   Was there a medical alert that he
5    should be given a wheelchair for long distance?
6    A.   At times, yes.
7    Q.   Was there a medical alert that he
8    should be given a walker?
9    A.   Possibly.
10   Q.   Were there medical alerts that he
11   should be assigned to the M-4 level of care at
12   the jail?
13   A.   Possibly.
14   Q.   And M-4 is the infirmary at the jail?
15   A.   I believe it is.
16   Q.   And that's the highest level of care at
17   the jail?
18   A.   I believe it is.
19   Q.   And M-3 is what?
20   A.   Would be the next step down.
21   Q.   Assuming that Mr. Vaughn was in -- what
22   is Mr. Vaughn currently?  Are there any medical
23   alerts that Mr. Vaughn currently has from
24   Cermak?
```

Plaintiff's Exhibit 11 Page 32

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 128

1    MR. NICHOLS:  Objection.  The question
2  is beyond the scope of the designation.
3  However, I will allow you to answer this
4  question.
5    THE WITNESS:  What was the question?
6  BY MR. MORRISSEY:
7    Q.   Are you aware of any medical alerts for
8  Mr. Vaughn currently?
9    MR. NICHOLS:  Same objection.  You can
10  answer the question.
11  BY THE WITNESS:
12    A.   I'm aware he has medical alerts, yes.
13  BY MR. MORRISSEY:
14    Q.   And including being assigned or ordered
15  a wheelchair?
16    A.   Being allowed the use of a wheelchair,
17  yes.
18    Q.   And is Mr. Vaughn currently assigned to
19  the RTU?
20    A.   He is.
21    Q.   Is Mr. Vaughn currently assigned to one
22  of the segregation cells in the RTU?
23    A.   No, he's not.
24    Q.   Is Mr. Vaughn currently assigned to one

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 129

1  of the protective custody dorms -- Strike that.
2    Is Mr. Vaughn currently assigned to a
3  protective custody cell in the RTU?
4    A.   He is.
5    Q.   Is Mr. Vaughn in tier 3, cell 7
6  currently?
7    A.   I don't believe he is.
8    Q.   What cell is he in?
9    A.   Possibly 8 or 9.  I'm not sure without
10  reviewing my records.
11    Q.   And that would be in tier 3?
12    A.   Tier 3-E.
13    Q.   Are either cells 8 or 9 where
14  Mr. Vaughn is currently housed considered
15  accessible cells?
16    A.   Where Mr. Vaughn is potentially housed?
17  It would depend on the nature of the disability.
18    Q.   You said that currently Mr. Vaughn has
19  a medical alert for a wheelchair?
20    A.   He does.
21    Q.   And he's either -- based upon your
22  review of his records, he's either --
23    MR. MORRISSEY:  Well, we'll take a
24  break.  We'll find out in a second.

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 130

1    (Whereupon, a short break was
2  taken.)
3  BY MR. MORRISSEY:
4    Q.   Does the sheriff's office maintain an
5  inmate locator on a website?
6    A.   Does the sheriff's office maintain
7  that?
8    Q.   Right.
9    A.   I don't know who maintains it.
10    Q.   You know that there's a DOC inmate
11  locator, correct?
12    A.   Yes, I do know that.
13    Q.   Showing you -- rather than printing it
14  out, I'll show you what the website shows where
15  Mr. Vaughn is currently located.
16    MR. NICHOLS:  Just for the record, the
17  witness is observing what appears to be a
18  web page of Sheriff Dart inmate locator, and
19  it appears that Harold Vaughn is on the
20  screen.
21  BY MR. MORRISSEY:
22    Q.   Does that reflect that Mr. Vaughn is on
23  the third floor, 3-E, in cell number 7?
24    A.   It does.

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 131

1    Q.   On the E tier, is there an accessible
2  cell on the E tier?
3    A.   There is.
4    Q.   What cell is that?
5    A.   That's cell 10.
6    Q.   And Mr. Vaughn is in cell 7, correct?
7    A.   That's what that screen says.  I'm not
8  sure it's updated.
9    Q.   And if we look at -- if we go back to
10  7-A or 7-B, does that reflect when Mr. Vaughn
11  came into cell 7?
12    A.   It does have a start date and an end
13  date, correct.
14    Q.   Showing you what's been marked as 7-C,
15  it's a bed assignment sheet.  I believe you
16  brought this in today.  It shows a start date on
17  3-E in cell 7 on May 10, 2016, correct?
18    A.   7-C or 7-A?
19    Q.   7-C.
20    A.   Is that the same as 7-A?
21    Q.   7-C.  I just handed it to you.
22    A.   I believe, yes, it's the same as 7-A.
23    Q.   So he's been in cell 7 since May 10,
24  2016, correct?

Plaintiff's Exhibit 11 Page 33

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 132

1    A.   From this sheet, it appears, yes.
2    Q.   Cell 7 is similar to -- cell 7 has a
3  toilet that does not have grab bars, correct?
4    A.   The toilet in cell 7 does not have grab
5  bars.
6    Q.   And the entry width of the door to
7  cell 7 is not 32 inches or wider; it's not a
8  32-inch clear opening width; isn't that correct?
9    A.   I don't know that.
10   Q.   The sheriff has received -- the
11 sheriff's office has received a medical alert --
12 currently has a medical alert that Mr. Vaughn
13 has a medical order for a wheelchair, correct?
14       MR. NICHOLS:  Objection, asked and
15    answered.  You can answer the question.
16 BY THE WITNESS:
17   A.   Mr. Vaughn has an alert to use a
18 wheelchair, yes.
19 BY MR. MORRISSEY:
20   Q.   And in cell 7, there's a fixed stool
21 that's in front of the writing desk, correct?
22   A.   Correct.
23   Q.   And 3-E, cell 10, the writing desk does
24 not have a fixed stool, correct?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 134

1  BY MR. MORRISSEY:
2    Q.   Today, June 29, 2016, if Mr. Vaughn
3  wants to use a toilet that has grab bars that's
4  compliant with the 504 design guides, he has to
5  make a request to the sheriff to use the dayroom
6  toilet; is that correct?
7    A.   Assuming he needs to use the dayroom
8  toilet, yes.
9    Q.   You're familiar with Judge Phillips'
10 (phonetic) opinion in the Clemmons vs. Sheriff
11 Dart case, correct, that was issued on March 9,
12 2016, correct?
13       MR. NICHOLS:  Objection.  The question
14    is beyond the scope of Ms. Rivero-Canchola's
15    designation.  I'm instructing her not to
16    answer that question.
17 BY MR. MORRISSEY:
18   Q.   Does the sheriff's office maintain
19 records -- medical records involving prisoners
20 separate and apart from Cermak?
21       MR. NICHOLS:  Objection to the extent
22    the question is well beyond the scope of the
23    witness' designation.  I'm instructing her
24    not to answer the question.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 133

1    A.   It does not.
2    Q.   If Mr. Vaughn today needs to use the
3  washroom when he's locked in his cell, in cell
4  7 -- Strike that.
5            Assuming Mr. Vaughn needs assistance to
6  use the toilet in room 7, what accommodation
7  does the sheriff provide Mr. Vaughn?
8    A.   Assuming he needs assistance, which
9  would be a very big assumption, he would be let
10 out into the dayroom to use the toilet or he
11 could use the toilet in his room.
12   Q.   If Mr. Vaughn needed to use a writing
13 table, what accommodation would be provided to
14 Mr. Vaughn in cell 7?
15   A.   Mr. Vaughn does not need an
16 accommodation to use the writing table.
17   Q.   Does Mr. Vaughn have to request from
18 the sheriff in order to use a toilet that
19 contains grab bars to assist in transferring on
20 and off the toilet?
21       MR. NICHOLS:  Objection.  The question
22    is vague as to time frame and location.
23
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 135

1  BY MR. MORRISSEY:
2    Q.   Is it your position that Mr. Vaughn
3  does not need an accommodation for toileting in
4  cell 7 of 3-E?
5    A.   It is my position that he does not need
6  such an accommodation, but we provide it.
7    Q.   Is it the sheriff's position?
8    A.   It is not the sheriff's position -- it
9  is the sheriff's position, Mr. Morrissey, that
10 he does not need such an accommodation, but we
11 do provide it.
12   Q.   What does the sheriff base the position
13 that after a medical -- there's been a medical
14 alert that Mr. Vaughn requires a wheelchair,
15 what does the sheriff base its opinion that he
16 does not require an accommodation for toileting
17 while he's housed in cell 7 in 3-E?
18   A.   The medical alert does not say that
19 Mr. Vaughn requires a wheelchair.
20   Q.   Does the medical alert provide an order
21 for Mr. Vaughn that he can have a wheelchair?
22   A.   It's a prescription to have a
23 wheelchair.
24   Q.   Given that there's a medical

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 34

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 136

1  prescription for Mr. Vaughn to be given a
2  wheelchair, what basis does the sheriff have
3  that Mr. Vaughn currently does not require an
4  accommodation for his toileting needs in cell 7?
5      A.   The basis is observation, observation
6  of Mr. Vaughn not needing a wheelchair.
7      Q.   Who made the observation that
8  Mr. Vaughn today, even though he has a medical
9  prescription for a wheelchair, does not need an
10 accommodation for toileting?
11     A.   Many entities within the sheriff's
12 office.
13     Q.   Who within the sheriff's office --
14     A.   As well as Cook County Health.
15     Q.   Who within the sheriff's office has
16 made the determination that --
17     A.   That wasn't your question,
18 Mr. Morrissey.
19     Q.   Well, let me give you the question.
20 Who within the sheriff's office has made a
21 determination that Mr. Vaughn does not require a
22 housing accommodation so that he can toilet?
23     A.   No one has made such a determination.
24     Q.   Can the sheriff's office override the

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 137

1  medical staff's determination that a prisoner is
2  entitled to or has an order for a wheelchair?
3      MR. NICHOLS:  Objection.  The question
4  is vague as to time frame, location.  It's
5  overbroad and beyond the scope --
6      MR. MORRISSEY:  Let me rephrase it.
7  BY MR. MORRISSEY:
8      Q.   Between November 16, 2013, and
9  December 4, 2013, when Mr. Vaughn was assigned
10 to 3135 in 3-South, was there a medical alert
11 for Mr. Vaughn in regards to standing or
12 walking?
13     A.   I don't know what document you're
14 referencing as far as 3135.
15     Q.   As the sheriff's representative, during
16 that period of time, 11/16/2013 to December 4,
17 2013, is it the sheriff's position that
18 Mr. Vaughn did not require an accommodation in a
19 housing unit that would provide him his
20 toileting needs?
21     A.   Can you repeat the question?
22              (Whereupon, the record was read
23               as requested.)
24     MR. NICHOLS:  Objection to the form of

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 138

1  the question and to the extent the question
2  seeks a legal conclusion.  You can answer
3  the question.
4  BY THE WITNESS:
5      A.   Mr. Vaughn was provided with an
6  accommodation whether or not there was a
7  determination made that he needed it.
8  BY MR. MORRISSEY:
9      Q.   The accommodation didn't provide him
10 with a housing unit that had an accessible
11 toilet, correct, under the 504 design standards?
12     A.   The accomodation was the toilet chair.
13     Q.   Is the accommodation of providing a
14 portable toilet chair, is that the same as
15 placing Mr. Vaughn in a room that had grab bars
16 around the toilet?
17     A.   It's a reasonable accommodation.
18     Q.   Does the sheriff consider that to be an
19 equivalent accommodation to provide Mr. Vaughn
20 in November of 2013 with a toilet chair upon
21 request when he was assigned to 3135 in lieu of
22 an accessible toilet chair under the ADA?
23     MR. NICHOLS:  Objection to the extent
24 the question --

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 139

1      MR. MORRISSEY:  Let me rephrase the
2  question.  You're right.
3  BY MR. MORRISSEY:
4      Q.   Does the sheriff consider providing --
5  does the sheriff's policy to provide a portable
6  toilet chair in the sheriff's opinion provide an
7  equivalent accommodation for Mr. Vaughn to being
8  placed in a room with an accessible toilet?
9      MR. NICHOLS:  Objection to the form.
10 It's a compound question.  Objection to the
11 extent that it calls for a legal conclusion.
12 You can answer the question to the extent
13 you know.
14 BY THE WITNESS:
15     A.   I don't understand the question,
16 Mr. Morrissey.
17 BY MR. MORRISSEY:
18     Q.   Sure.  The accommodation in November of
19 2013 when Mr. Vaughn was in 3135 was upon
20 request, he could receive a portable toilet
21 chair from a sheriff's employee, correct?
22     A.   If one wasn't available in the room, he
23 could request it.
24     Q.   Does the sheriff consider that policy

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 35

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 140

1  of providing a portable toilet chair to be
2  equivalent to placing Mr. Vaughn in a room that
3  had an accessible toilet with grab bars and the
4  appropriate elevated toilet?
5        MR. NICHOLS:  Objection to the extent
6     the question calls for a legal conclusion.
7     I'm instructing my client not to answer that
8     question as phrased.
9  BY MR. MORRISSEY:
10       Q.  Can you answer?
11       A.  My attorney instructed me not to answer
12  it.
13       Q.  In regards to the sink that was in
14  3135, what accommodation was provided for
15  Mr. Vaughn between November 16, 2013, and
16  December 4, 2013?
17       A.  I don't believe Mr. Vaughn requested
18  such an accommodation.  I believe he was able to
19  use the sink.
20       Q.  Does the sheriff have knowledge that
21  Mr. Vaughn was able to use the sink in the same
22  way that an able-bodied person could use it
23  between November 16, 2013, and December 4, 2013?
24       A.  As I previously stated, he didn't

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 141

1  request any such accommodation, so one would
2  assume he could use the sink.
3        Q.  Did Mr. Vaughn to your knowledge --
4  Strike that.
5            What accommodation was provided for
6  Mr. Vaughn when he was assigned to 3135 as far
7  as showering?
8        A.  As previously stated, a shower chair
9  was provided to inmates.
10       Q.  Do you know whether or not the shower
11  chair -- the accommodation that was provided for
12  showering for Mr. Vaughn in 3135 included
13  placing the shower chair inside the shower in
14  3135?
15       A.  I believe it did.
16       Q.  Do you know whether or not the shower
17  chair that was used in November of 2013 in room
18  3135 had wheels?
19       A.  I don't know which specific shower
20  chair he used.
21       Q.  Do you know whether or not the shower
22  chair that was used for prisoners in room 3135
23  had any warning or caution label on the chair?
24       A.  I don't know which specific shower

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 142

1  chair he used, but chairs often have product
2  disclaimers.
3        Q.  For the period of time December 4,
4  2013, to February 2, 2014, was Mr. Vaughn in
5  3119 in 3-South?
6        A.  Which exhibit are you referring to?
7        Q.  Exhibit 7.
8        A.  7-A, B, C?
9        Q.  If we look at 7-A for a moment -- do
10  you see on 7-B, it reflects that Harold Vaughn
11  was in cell 3119 on December 4, 2013?
12       A.  Yes.
13       Q.  Now, is 3119 on 3-South, is that
14  considered an accessible cell?
15       MR. NICHOLS:  Objection to the extent
16     that the question calls for a legal
17     conclusion.  You can answer.
18  BY THE WITNESS:
19       A.  Is it considered an accessible cell as
20  in is it modeled after the design standards?
21  No.
22  BY MR. MORRISSEY:
23       Q.  Does it have the combined toilet/sink
24  that's found on Exhibit 5, page 6, figure 3, in

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 143

1  Ms. Regan's assessment report?
2        A.  Similar, yes.
3        Q.  Did it have a shower component similar
4  to figure 4 in Exhibit 5?
5        A.  It's difficult to tell from the quality
6  of the picture, but it may be.
7        Q.  Did you inspect that as part of your
8  preparation for this deposition?
9        A.  Did I inspect your photo?
10       Q.  No.  Did you inspect room 3119?
11       A.  Yes.
12       Q.  During that period of time, December 4,
13  2013, when Mr. Vaughn was placed in 3119, were
14  there any medical alerts in regards to
15  wheelchairs or walkers being prescribed?
16       A.  Being prescribed to Mr. Vaughn?
17       Q.  Yeah.
18       A.  There may be.
19       Q.  Do you know whether or not there was
20  any reasonable accommodation for Mr. Vaughn on
21  using the toilet when he was assigned to 3119?
22       MR. NICHOLS:  Objection to the extent
23     the question calls for a legal conclusion.
24     You can answer.

Plaintiff's Exhibit 11 Page 36

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 144

1  BY THE WITNESS:
2      A.   I believe I have answered that
3  reasonable accommodations were provided to
4  Mr. Vaughn while he was on 3-South.
5  BY MR. MORRISSEY:
6      Q.   What type of accommodations were
7  provided for Mr. Vaughn when he was in 3119 as
8  far as toileting?
9      A.   A toilet chair.
10     Q.   Do you know whether or not -- what type
11  of toilet chair was used in 3119?
12     A.   As I previously stated, I do not know
13  the brand.
14     Q.   Do you know whether or not the chair
15  was in the room or in the hall or in the storage
16  closet on 3-South?
17     A.   With reference to what date?  What
18  time?
19     Q.   Between December 4, 2013, and
20  February 2, 2014?
21     A.   It was always available to him.
22     Q.   Could it have been in the storage
23  closet on 3-South?
24     A.   It's highly unlikely.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 145

1      Q.   Were you working during that period of
2  time as the ADA compliance officer?
3      A.   No, I wasn't, but I'm here as the
4  30(b)(6), correct, Mr. Morrissey?
5      Q.   Do you know whether there were any
6  warnings on the toilet chair that was available
7  to be brought into room 3119?
8          MS. CARROLL:  Objection to the form of
9      the question.
10  BY THE WITNESS:
11     A.   You have asked me that question no less
12  than 3 times now.
13  BY MR. MORRISSEY:
14     Q.   I didn't ask you about the portable
15  toilet chairs in use in 3119.
16     A.   The portable toilet chairs are the
17  same.  They're the same and, yes, they do
18  contain a product label.
19     Q.   A warning or cautionary about not using
20  it without assistance?
21     A.   A disclaimer typical to any product
22  label.
23     Q.   Does the sheriff follow the cautionary
24  or the warnings that are on the portable toilet

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 146

1  chairs in providing an accomodation for
2  prisoners that are assigned to cells like 3119
3  and request the toilet?
4          MR. NICHOLS:  Objection.  The question
5      is overbroad and vague as to time frame and,
6      also, it calls for a legal conclusion.  It's
7      beyond the scope of the notice.
8          MS. CARROLL:  Compound.
9          MR. NICHOLS:  I'll join county's
10     objection.  I'm instructing my client not to
11     answer the question.
12  BY MR. MORRISSEY:
13     Q.   What accommodations were provided for
14  Mr. Vaughn for showering when he was in 3119?
15     A.   As I previously stated, the shower
16  chair.
17     Q.   Was the shower chair always in 3119?
18     A.   As I previously stated, it was always
19  available to him.
20     Q.   How many shower chairs in December 2013
21  were on the floor of 3-South?
22     A.   I don't know.
23     Q.   How many wheelchair users were on
24  3-South in December of 2013?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 147

1          MR. NICHOLS:  Objection.  The question
2      is beyond the scope of the witness'
3      designation.  I'm instructing her not to
4      answer the question.
5  BY MR. MORRISSEY:
6      Q.   Between February 12, 2014, and May 2,
7  2014, was Mr. Vaughn assigned to 3125, if you
8  look at 7-B?
9      A.   Between February 2nd and May 2nd?
10     Q.   February 12, 2014, and May 2, 2014?
11     A.   As this document indicates, February --
12  I don't know which date you're referring to.
13     Q.   On February 12, 2014, was Mr. Vaughn
14  housed in 3125?
15     A.   On February 12, 2014, as this document
16  indicates, and I believe it speaks for itself,
17  yes.
18     Q.   And 3-South is an isolation wing on the
19  third floor of Cermak, correct?
20     A.   At times, it's used for isolation.
21     Q.   And the third floor of Cermak is
22  classified as M-4?
23     A.   At times, there are patients up there
24  that are M-4s.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 37

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 148

```
1    Q.   And what is M-4 again?
2         MR. NICHOLS:  Objection, asked and
3    answered.
4    BY THE WITNESS:
5         A.   I believe you explained that in your
6    record, Mr. Morrissey.  It's the most ill
7    patients usually.
8    BY MR. MORRISSEY:
9         Q.   Did Mr. Vaughn have a medical alert
10   when he was in room 3125 in regards to
11   wheelchairs or walkers or canes?
12        A.   He more than likely did.
13        Q.   When Mr. Vaughn was in 3125, was it the
14   practice of the sheriff to provide an
15   accommodation to prisoners needing to toilet --
16   Strike that.
17             Did the sheriff provide toilet chairs
18   without assistance to prisoners that were housed
19   in room 3125?
20        MR. NICHOLS:  Objection, vague as to
21   time frame.
22        MR. MORRISSEY:  In February of 2014.
23        MR. NICHOLS:  You can answer the
24   question.
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 150

```
1    providing assistance in getting on and off the
2    toilet?
3         MR. NICHOLS:  Objection.  The question
4    is vague as to location.  I'm going to
5    instruct my client not to answer that
6    question as phrased.  If you narrow it down
7    to location, I'll let her answer.
8    BY MR. MORRISSEY:
9         Q.   Did the sheriff between November of
10   2013 and February of 2014 provide portable
11   toilet chairs to inmates without also providing
12   assistance?
13        MR. NICHOLS:  Same objection.  The
14   question is vague as to location.
15        MR. MORRISSEY:  Locations are room
16   3135, 3119, and 3125 on 3-South during that
17   period of time.
18   BY THE WITNESS:
19        A.   They may have provided assistance.  The
20   medical staff may have provided assistance.
21   BY MR. MORRISSEY:
22        Q.   Does the sheriff know whether or not
23   his employees provide assistance or not?
24        MR. NICHOLS:  Objection.  The question
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 149

```
1    BY THE WITNESS:
2         A.   Did the sheriff's office provide toilet
3    chairs without assistance?
4    BY MR. MORRISSEY:
5         Q.   Let me rephrase it.  We talked about 3
6    different cells or housing units on 3-South,
7    3135, 3119, and 3125.  For each one of them, you
8    said that Mr. Vaughn could request a portable
9    toilet chair as an accommodation to toileting,
10   correct?
11        A.   If one was not already available in his
12   room, yes.
13        Q.   Did the sheriff -- was it the sheriff's
14   policy to provide those chairs without
15   assistance to the prisoner when he or she
16   toileted?
17        MR. NICHOLS:  Objection.  The question
18   is vague as to time frame, vague as to
19   location.
20   BY MR. MORRISSEY:
21        Q.   Between November of 2013 and February
22   of 2014, was it the practice as far as providing
23   a reasonable accommodation to provide a toilet
24   chair to the prisoner upon request without also
```

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 151

```
1    is vague as to time frame, vague as to
2    location --
3         MR. MORRISSEY:  Let me rephrase it.
4    BY MR. MORRISSEY:
5         Q.   Is it always the practice and policy of
6    the sheriff back in November of 2013 when
7    providing an accommodation for prisoners
8    requesting a portable toilet chair to also
9    provide assistance to get on and off the toilet?
10        MR. NICHOLS:  Objection.  The question
11   is beyond the scope of the witness'
12   designation.  I'm instructing her not to
13   answer that question.
14   BY MR. MORRISSEY:
15        Q.   Let's talk about room 3121.  I think
16   it's 3-South, again, May 2, 2014, to May 29,
17   2014.  Is that also a room that had a very
18   similar combination -- toilet/sink combination
19   which is depicted on Exhibit 5, page 6, figure 3
20   of Regan's report?
21        A.   Room 3121, does it have a toilet like
22   that?
23        Q.   Yes.
24        A.   No, it does not.
```

Plaintiff's Exhibit 11 Page 38

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 152

1    Q.   What type of toilet/sink combination is
2  found in room 3121?
3    A.   **It has a similar one with grab bars.**
4    Q.   Did it have grab bars in May of 2014?
5    A.   **It more than likely did.  I would have**
6  **to review my records.**
7    Q.   Were there any alterations at any time
8  by the sheriff or by the county to room 3121 to
9  add grab bars?
10   A.   **The sheriff doesn't make alterations.**
11   Q.   Did the county -- is the sheriff aware
12 that some additional grab bars were added to
13 3121 in the last 2 or 3 years?
14   A.   **They may have been.**
15   Q.   When was the last time you were in
16 3121?
17   A.   **A few weeks ago.**
18   Q.   Did it also have an accessible sink
19 when you walked into it?
20   A.   **I believe it did.  I would have to**
21 **review my records.**
22   Q.   May 29, 2014, to July 9, 2014, the
23 record reflects that he was assigned to room
24 3131 in 3-South.  Have you recently been in room

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 153

1  3131 in preparation for this dep?
2    A.   **In preparation for this dep, no; within**
3  **the last few weeks, though, yes.**
4    Q.   Does 3131 have a combination
5  toilet/sink which is similar to this depicted in
6  Plaintiff's Group Exhibit 5?
7    A.   **Similar, yes.**
8    Q.   What accommodation was provided to
9  Mr. Vaughn during that period of time to use the
10 toilet for toileting?
11   A.   **The same accommodation that was**
12 **provided in the other rooms that did not have a**
13 **toilet with grab bars; that would be a toilet**
14 **chair.**
15   Q.   Upon request?
16   A.   **If it's not already available in the**
17 **room.**
18   Q.   Would the same thing be true about
19 showering, that a portable shower chair would be
20 brought in to accommodate Mr. Vaughn when he was
21 housed in room 3131?
22   A.   **If it's not already available in the**
23 **room, yes.**
24   Q.   Could the shower chair and the toilet

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 154

1  chair back in May of 2014 been one in the same?
2    A.   **Possibly.**
3    Q.   If the toilet was mounted -- if the
4  portable toilet chair was mounted on the toilet
5  in 3131 in June of 2014, how would that chair be
6  used in the shower?
7    A.   **I don't understand what you mean by**
8  **mounted.**
9    Q.   Assuming there was a portable toilet
10 chair in use in room 3131 when Mr. Vaughn
11 occupied it between May 29, 2014, and July 9,
12 2014, who would be responsible for moving the
13 combination toilet, slash, shower chair from the
14 toilet into the shower?
15   A.   **If there was a toilet, slash, shower**
16 **chair available, the detainee could move it**
17 **themselves, or they could request assistance,**
18 **and the sheriff's policy is to provide**
19 **assistance.**
20   Q.   In regards to -- Mr. Vaughn was -- from
21 September 8, 2014, to November 30, 2014,
22 Mr. Vaughn was housed in the RTU, tier 3, cell
23 6, correct?
24   A.   **To which document are you referring?**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 155

1    Q.   If we look at Exhibit 7-B, you're going
2  to find it under 9/8/2014.
3    A.   **Right, but I believe you just gave a**
4  **different date.**
5    Q.   Pardon?
6    A.   **You gave a different date prior to**
7  **that, Mr. Morrissey.  You said May or something.**
8    Q.   I think it's September 8, 2014, to
9  November 30, 2014.  In any event, to your
10 recollection, have you been in tier 3, cell 6 --
11 3-A, cell 6 in preparation for the deposition?
12      MR. NICHOLS:  Objection.  The question
13 is vague as to location.
14 BY MR. MORRISSEY:
15   Q.   RTU, third tier, cell 6?
16   A.   **There's no third tier.**
17   Q.   Third floor, A tier, cell 6?
18   A.   **Tier 3-A, cell 6, yes, I've been in**
19 **that cell.**
20   Q.   Is that one of the cells that was
21 inspected in this case about a week ago?
22   A.   **I don't recall which cells were**
23 **inspected, Mr. Morrissey.**
24   Q.   To your recollection, that's an

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 39

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 156

```
 1   oversized room, correct?
 2       A.   I don't know what you mean by
 3   oversized.
 4       Q.   It's larger than the other 9 cells on
 5   3-A, correct?
 6       A.   I haven't measured it, but it appears
 7   to be larger.
 8       Q.   I'll show you what's been marked as
 9   13-A.  It's Group Exhibit 1 through 5.
10            MR. NICHOLS:  I'll have a standing
11       objection to this exhibit.  It was not
12       produced or disclosed to me or my client or
13       the county prior to this deposition.
14            MR. MORRISSEY:  It's fresh off the
15       printer.  They just came in yesterday.  If
16       you were prompt with your discovery
17       production, we would be very happy.
18            MR. NICHOLS:  I have to preserve the
19       record.  I haven't seen this until today.  I
20       have to make that clear.
21            MR. MORRISSEY:  We don't get these
22       things from you.
23            MR. NICHOLS:  I'm just saying, I have
24       to make my record.
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 157

```
 1   BY MR. MORRISSEY:
 2       Q.   Looking at 13-A which is Group Exhibit
 3   1 through 5, do those appear to be photographs
 4   of cell 6?
 5       A.   I don't know which cell they're
 6   photographs of, Mr. Morrissey.
 7       Q.   On the front page, on page 1, there's a
 8   number 6-A, correct?  Does that indicate that's
 9   cell 6?
10       A.   I don't know what that indicates.
11   Usually that's a security number for buzzing or
12   releasing of door.  I'm not sure it indicates
13   the cell number.
14       Q.   So this doesn't refresh your memory
15   about -- you mentioned that you believe that it
16   was one of the larger cells on 3-A, correct?
17       A.   I stated that it appears to be larger,
18   yes.
19       Q.   And did it have -- to your knowledge,
20   did 6-A have grab bars around the toilet?
21       A.   There's no cell 6-A.
22       Q.   Cell 6 in tier A, does it have grab
23   bars?
24       A.   There's no tier A.  There's 3-A.
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 158

```
 1       Q.   On the third floor in a tier, cell 6,
 2   inside of cell 6, are there grab bars?
 3       A.   On 3-A, cell 6, there are no grab bars.
 4       Q.   And Mr. Vaughn was assigned to that
 5   cell from September 8, 2014, to November 30,
 6   2014, correct?
 7       A.   I see that he was assigned there
 8   September 8, 2014.  I don't know where you're
 9   pulling the November 30th date from.
10       Q.   What accommodations with toileting were
11   provided to Mr. Vaughn when he was in cell 6?
12       A.   As I previously stated, at times, a
13   toilet chair was available; if not, they were
14   granted permission to come out into the dayroom
15   and use the dayroom toilet.
16       Q.   There are periods of time when
17   prisoners on tier 3-A are locked down, correct?
18            MR. NICHOLS:  Objection to the extent
19       that the question is beyond the scope of the
20       designation.  However, I will allow you to
21       answer the question.
22   BY THE WITNESS:
23       A.   Yes, in the jail, there are times when
24   prisoners are locked down.
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 159

```
 1   BY MR. MORRISSEY:
 2       Q.   In order to request to use the dayroom
 3   toilet, what would Mr. Vaughn have had to do?
 4       A.   He would have had to ask.
 5       Q.   Do you know if able-bodied prisoners
 6   that are assigned to 3-A have to ask permission
 7   to use the toilet?
 8       A.   To use the dayroom toilet, yes.
 9       Q.   To use the toilet inside their cell?
10       A.   No one has to ask permission to use the
11   toilet in their cell.
12       Q.   Between November 30, 2014, and
13   December 10, 2014, Mr. Vaughn was assigned to
14   cell -- going back to when he was assigned to
15   3-A, 6, did Mr. Vaughn have a medical alert in
16   regards to wheelchairs or a walker?
17       A.   Potentially.  I would have to review my
18   records.
19       Q.   From November 30, 2014, to December 10,
20   2014, was Mr. Vaughn assigned to Division 8,
21   tier 3-A, 7, cell 7?
22       A.   He was.
23       Q.   And cell 7 does not have grab bars
24   around the toilet, correct?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 40

Page 160

1    MR. NICHOLS:  Asked and answered.  We
2  already discussed this in relation to Flora
3  who was also in the same cell.
4    MR. MORRISSEY:  It's probably a
5  different time.  The sheriff might have been
6  prompt.  They might have done the right
7  thing because they got a bunch of grievances
8  about this.  So a conscientious public
9  servant would probably do the right thing
10  and put grab bars on.  So that's why I think
11  it's appropriate to ask about this time
12  period.
13    THE WITNESS:  You're so inappropriate,
14  Mr. Morrissey.  The sheriff does not remodel
15  facilities, and you know that.  And if you
16  would like to make a record on your personal
17  opinion, that's fine, but you're just
18  wasting everyone's time.
19  BY MR. MORRISSEY:
20    Q.    Again, at that time on November 30,
21  2014, were there grab bars in cell 7 around the
22  toilet?
23    A.    No.
24    Q.    On December 10, 2014, to February 10,

Page 162

1  correct?
2    A.    If Mr. Vaughn needed such an
3  accommodation, yes, one would be provided.
4    Q.    Upon request?
5    A.    If not already available, yes.
6    Q.    And do you know whether or not
7  Mr. Vaughn had a medical alert at that time
8  period?
9    A.    I believe I answered that question.
10    Q.    I'm asking at that time period,
11  December of 2014 to February of 2015.
12    A.    Possibly.
13    Q.    And that medical alert could include a
14  prescription for a wheelchair?
15    A.    It could include that.
16    Q.    Going forward, May 13, 2015, to
17  September 17, 2015, the record reflects that he
18  was in tier 3-E, cell number 9.  Do you see that
19  document?
20    A.    Which document are you referring to?
21    Q.    On the housing record.
22    A.    Which exhibit, Mr. Morrissey?
23    Q.    I think it's Exhibit A or B of 7.  Do
24  you see on Exhibit 7-A, we have Mr. Vaughn being

Page 161

1  2015, was Mr. Vaughn assigned to cell 9 in the
2  RTU, tier 3-A?
3    A.    It appears he was.
4    Q.    And I believe we have pictures.
5  Showing you what's been marked as 13-B, it's
6  Group Exhibit 1 through 5.  I'll ask you to look
7  at the last page on Group Exhibit 13-B.  Does
8  that appear to be the doorway to cell 9 in tier
9  3-E?
10    A.    I don't know, Mr. Morrissey.  That 9 is
11  not part of the photo.  You stamped that on
12  there.
13    Q.    Looking at Group Exhibit 13-B, does it
14  appear that on photograph 1, that fairly and
15  accurately depicts the type of sink and toilet
16  that exists in cell number 9?
17    A.    Possibly.
18    Q.    And cell number 9 on tier 3-A doesn't
19  have grab bars around the toilet, correct?
20    A.    It does not.
21    Q.    And for Mr. Vaughn, again, to use the
22  toilet, to seek an accommodation, he would have
23  to request a portable toilet chair to be brought
24  into the room or to use the dayroom toilet,

Page 163

1  assigned on May 13, 2015, to cell E on tier
2  3-E -- I'm sorry -- tier 9 on cell -- on tier
3  3-E?
4    A.    Tier 9 on tier 3-E, no.  Cell 9 on
5  tier 3-E, bed 1, yes.
6    Q.    And does 3-E, cell 9, have an
7  accessible toilet with grab bars around it?
8    MR. NICHOLS:  Objection to the extent
9  the question calls for a legal conclusion.
10  You can answer.
11    MR. MORRISSEY:  It's not a legal
12  conclusion.  It's a factual --
13    MR. NICHOLS:  The word accessible is a
14  term of art.
15  BY MR. MORRISSEY:
16    Q.    Does it have grab bars around the
17  toilet in cell number 9?
18    A.    Does it have grab bars?  No.
19    Q.    What accommodation was provided for
20  Mr. Vaughn when he was assigned to cell 9,
21  tier E for toileting?
22    A.    The same accommodation that was
23  provided in the other cells; a toilet chair if
24  needed; he may come out to the dayroom to use

Plaintiff's Exhibit 11 Page 41

Page 164

1  the toilet, if needed, but Mr. Vaughn can use
2  the toilet in his cell.
3      Q.  Who decides whether or not Mr. Vaughn
4  is allowed to use the dayroom toilet?
5      A.  It's a policy to allow them to come
6  out.
7      Q.  Do you know whether or not in the fall
8  of 2015, whether there was a medical alert for
9  Mr. Vaughn to be given -- prescribed a
10  wheelchair or a walker?
11      A.  Possibly.
12      Q.  During any time of Mr. Vaughn's
13  incarceration at the jail from 2014 to the
14  present, has there always been medical alerts
15  for Mr. Vaughn?
16      A.  Possibly.
17      Q.  And during that entire period of time
18  that he's been incarcerated at the jail, have
19  there been medical alerts allowing him to either
20  have a wheelchair or a walker prescribed for
21  him?
22      A.  During the entire time, I do not know.
23      Q.  Is there any procedure in the sheriff's
24  office to challenge Cermak's determination that

Page 165

1  a prisoner has been prescribed a wheelchair by
2  Cermak?
3          MR. NICHOLS:  Objection.  The question
4      is beyond the scope of the witness'
5      designation.  I'm instructing her not to
6      answer that question.
7          MR. MORRISSEY:  We'll take a few
8      moments.
9              (Whereupon, a short break was
10             taken.)
11  BY MR. MORRISSEY:
12      Q.  As the ADA coordinator -- we have gone
13  through in this deposition various housing
14  assignments for Mr. Flora while he was
15  incarcerated at the jail.  Has the sheriff
16  received any grievances from Mr. Flora or other
17  detainees assigned to those same housing units
18  that the housing units did not provide
19  accommodation for toileting?
20          MR. NICHOLS:  Objection.  The question
21      is beyond the scope of the witness'
22      designation.  I'm instructing her not to
23      answer that question.
24

Page 166

1  BY MR. MORRISSEY:
2      Q.  During the time that Mr. Flora was
3  incarcerated in those various housing cells,
4  were there any alterations done of those cells
5  that we went through to make them accessible for
6  disabled detainees?
7          MR. NICHOLS:  Objection.  The question
8      is vague as to location.  However, you can
9      answer to the extent that you know.
10  BY THE WITNESS:
11      A.  To the extent that I know, renovations
12  were made.  I don't know exact dates.  You would
13  have to ask the county that.  They would be best
14  to answer that question.
15  BY MR. MORRISSEY:
16      Q.  In regards to the RTU, in the RTU cells
17  where Mr. Flora and Mr. Vaughn have been housed,
18  have there been any alterations to those cells
19  to make them accessible for disabled detainees
20  to toilet?
21          MR. NICHOLS:  Objection to the extent
22      the question calls for a legal conclusion.
23      You can answer the question.
24          MR. CONDRON:  I'll join.

Page 167

1  BY THE WITNESS:
2      A.  Which cell are you referring to?
3  BY MR. MORRISSEY:
4      Q.  I'm referring to the cells that we went
5  through for Mr. Flora and Mr. Vaughn in the RTU.
6  Have any of those cells in the RTU been
7  renovated or altered to make those cells
8  accessible for disabled detainees in their
9  toileting needs?
10          MR. NICHOLS:  Same objection.  You can
11      answer.
12  BY THE WITNESS:
13      A.  Some of the cells were already
14  accessible for Mr. Vaughn and Mr. Flora.  I
15  don't know if any alterations were made during
16  that time period.  You should ask the county
17  that.
18  BY MR. MORRISSEY:
19      Q.  Does the sheriff maintain a list of
20  cells or living units that can appropriately
21  accommodate individuals with disabilities?
22      A.  The sheriff's office does, yes.
23      Q.  Who maintains that list?
24      A.  The receiving classification unit; I

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 168

```
 1   do.
 2       Q.  Is that list published?  Is it made
 3   available to members of the sheriff's office?
 4       A.  Is it published, or is it made
 5   available?
 6       Q.  Is it made available to employees of
 7   the sheriff?
 8       A.  Of course.
 9       Q.  Is it made available to members of the
10   Cermak medical staff?
11       A.  Absolutely.  That's not the list to
12   which I'm referring, just so you know.  I
13   believe the other list has also been turned
14   over.
15       MR. MORRISSEY:  Let's take a moment.
16           (Whereupon, a short break was
17            taken.)
18       MR. MORRISSEY:  Back on the record.
19   It's my understanding -- we had a
20   conversation off the record.  It's my
21   understanding that there's a list of cells
22   and living units that the sheriff believes
23   can accommodate individuals with
24   disabilities -- with qualified disabilities.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 170

```
 1   witness was involved in last week, and I
 2   think we basically provided the same
 3   information that she would intend to provide
 4   to you off of this list.
 5       MR. MORRISSEY:  We didn't inspect --
 6   for instance, we were going -- we agreed
 7   that Mr. Gum who works for the county was
 8   going to do some inspection and photographs
 9   of Cermak --
10       MR. CONDRON:  We're attempting to
11   create that.  I haven't gotten confirmation
12   that --
13       MR. MORRISSEY:  Well, given that
14   Mr. Gum and the county was going to agree to
15   that, we have agreed to put off the
16   inspection of Cermak pending the production
17   by Mr. Gum and the county of those pictures.
18       MR. CONDRON:  Again, I'm hopeful --
19       MR. MORRISSEY:  We're reserving our
20   right to -- obviously, when we go to trial,
21   we want to have pictures of these living
22   units in 3-South and 3-North where our
23   clients were housed and what the ADA
24   coordinator says is noncompliant housing, so
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 169

```
 1   We have not been tendered that document in
 2   discovery in either the Flora or the Vaughn
 3   case.  And part of the 30(b)(6) notices in
 4   both cases involve questions in regards to
 5   that list.  So we're going to ask to
 6   continue the deposition pending the
 7   production of that document.
 8       MR. NICHOLS:  And in response to that,
 9   Sheriff Dart objects to continuing this
10   deposition.  We have already been here for
11   several hours.  Sheriff Dart agrees to
12   produce the document in short order after
13   this deposition is concluded.
14       MR. MORRISSEY:  Prior to Mr. Burke's
15   deposition tomorrow?
16       THE WITNESS:  I can tell you what cells
17   they are.
18       MR. MORRISSEY:  That's not the issue.
19   The issue is we're entitled to that
20   document.
21       THE WITNESS:  You don't want to know
22   what they are?
23       MR. CONDRON:  I guess we join in the
24   objection.  We had an inspection that the
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 171

```
 1   we need those photographs.
 2       MR. NICHOLS:  Tom, I think you're
 3   mischaracterizing her testimony.
 4       MR. MORRISSEY:  We would like to have
 5   this list prior to -- an hour before we
 6   proceed with Mr. Burke's dep tomorrow.
 7       MR. NICHOLS:  Mr. Burke is not
 8   designated to respond to those questions,
 9   anyway.  I would request respectfully that
10   you go ahead and ask Ms. Rivero-Canchola
11   about the various cells --
12       MR. MORRISSEY:  What's the problem
13   giving us the document?
14       MR. NICHOLS:  The problem is that we're
15   sitting at your office at approximately
16   6:30.  I don't have access to anything.
17       MR. MORRISSEY:  Well, tomorrow morning
18   you'll be at your office, and you can
19   produce it.
20       MR. NICHOLS:  And if I do produce it,
21   it's not for the purpose of you asking Matt
22   Burke any questions about it because he
23   wasn't designated to respond to that topic.
24       MR. MORRISSEY:  So then we're going to
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 43

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 172

1  have to have this person come back to --
2        MR. NICHOLS:  You can continue the
3    deposition which we object to or you can
4    just proceed to ask her about the cells that
5    are on the list.
6        MR. MORRISSEY:  We're entitled to the
7    document, and discovery is going to close
8    tomorrow.  So that's why we're entitled to
9    it tomorrow.  We don't want to have to go in
10   after discovery closes and request the
11   document.
12       MR. NICHOLS:  I don't disagree you're
13   entitled to the document.
14       MR. MORRISSEY:  We're also entitled to
15   ask the 30(b)(6) representative about that
16   document.
17       MR. NICHOLS:  You're only entitled to
18   ask a 30(b)(6) representative about
19   documents for which they have been
20   designated to respond to.
21  BY MR. MORRISSEY:
22   Q.   What purpose does the sheriff maintain
23  a list of cells or living units that are
24  appropriate to accommodate individuals with

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 174

1  Sheriff's jail management system?
2    A.   I don't know, Mr. Morrissey, whoever
3  created the system potentially.
4    Q.   Is this system under the control of the
5  Cook County Sheriff?
6    A.   It is.
7    Q.   Is it under the control of the Cook
8  County government, namely, the Cermak providers
9  at the jail?
10       MR. CONDRON:  Objection, calls for
11   speculation.
12       MR. NICHOLS:  I'll join.  I'm actually
13   going to instruct my client not to answer
14   that question.
15       MR. MORRISSEY:  Why?
16       MR. NICHOLS:  Because she doesn't work
17   for Cermak.
18  BY MR. MORRISSEY:
19   Q.   Do you know whether or not Cermak has
20  access to the information that's in the
21  sheriff's jail management system in regards to
22  accessible housing units?
23   A.   Cermak has access to the Cook County
24  offender management system.

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 173

1  qualified disabilities?
2        MR. CONDRON:  Objection, vague, but you
3    can answer if you understand.
4  BY THE WITNESS:
5    A.   To comply with the ADA would be the
6  purpose, Mr. Morrissey.
7  BY MR. MORRISSEY:
8    Q.   What is the list called?
9    A.   It's not a list.  It's designations
10  within the Cook County offender management
11  system of which cells are accessible, and we
12  could put that in a list form for you as we have
13  in the past and turned over numerous times, and
14  I'm prepared to answer any question about any
15  accessible cell within RTU.
16   Q.   You say that the designated accessible
17  cells are in the jail management system, that
18  there's some entry in the jail management system
19  that has these designated accessible cells at
20  the jail, correct?
21   A.   In the Cook County offender management
22  system.
23   Q.   For what purpose -- who created -- who
24  entered this information in the Cook County

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 175

1    Q.   For what purpose is this information
2  maintained in your jail management system?
3        MR. NICHOLS:  Objection, asked and
4    answered.
5  BY THE WITNESS:
6    A.   The purpose of complying with the ADA.
7  BY MR. MORRISSEY:
8    Q.   What rooms or cells or divisions are
9  designated as living units that can
10  appropriately accommodate individuals with
11  qualified disabilities?
12   A.   What kind of disabilities?
13   Q.   Qualified disabilities.
14   A.   What kind of qualified disabilities?
15   Q.   The question is, people that have
16  mobility limitations.
17   A.   People with mobility limitations could
18  be across the compound.
19   Q.   What cells or housing units or living
20  units are contained in the jail management
21  system where inmates with disabilities can be
22  accommodated?
23   A.   All of them.  All of them are in the
24  jail management system, also known as the Cook

Plaintiff's Exhibit 11 Page 44

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 176

1  County offender management system.
2      Q.   Is it broken down in regards to
3  different types of disabilities so that, for
4  instance, are there certain divisions where
5  individuals with hearing loss are housed?
6          MR. NICHOLS:  Objection to the extent
7      the question is well beyond the scope of
8      either of these cases.
9          MR. MORRISSEY:  I can ask these
10     questions.  I don't have the document.  So I
11     don't know why you're objecting --
12         MR. NICHOLS:  I don't understand why
13     you're asking about hearing disabilities.
14         MR. MORRISSEY:  I'm just trying to get
15     to straight answers --
16         MR. NICHOLS:  We object to the extent
17     that you're asking questions -- you're
18     trying to use this deposition to get other
19     information about other cases you may be
20     litigating, and that's not going to happen.
21     Neither Vaughn or Flora are deaf.  They
22     don't allege that they're deaf --
23         MR. MORRISSEY:  They have mobility
24     limitations.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 178

1  Mr. Vaughn --
2      A.   Mr. Vaughn is not a permanent
3  wheelchair user.
4      Q.   You indicated that you had some
5  knowledge that Mr. Vaughn had a prescription for
6  a wheelchair over the last couple years,
7  correct?
8      A.   I did indicate that, for wheelchair
9  using, yes.
10     Q.   What are the variations as far as
11  prescriptions in your system for wheelchairs?
12         MR. NICHOLS:  Can we go off the record?
13     I'm going to allow her to answer the
14     question.  Let's go off the record, though.
15             (Whereupon, a discussion was had
16             off the record.)
17  BY MR. MORRISSEY:
18     Q.   If a person is considered by the
19  medical staff to require a permanent wheelchair,
20  what housing units, living units, cells are
21  listed -- indicated in the jail management
22  system for such a person?
23     A.   Which housing units or which cells or
24  which --

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 177

1  BY MR. MORRISSEY:
2      Q.   So what housing units, cells, or living
3  units are designated in this jail management
4  system for people with mobility limitations?
5      A.   I don't know what you mean by mobility
6  limitations.
7      Q.   Then we're going to continue the
8  deposition because you're being evasive.
9      A.   I'm not being evasive.  That term
10  doesn't exist within the ADA, Mr. Morrissey.  If
11  you want to ask me about wheelchairbound
12  detainees, that's a different question.
13     Q.   Individuals that are -- I'll define it
14  further.  Individuals that have a prescription
15  for a wheelchair, a walker, or a cane by the
16  Cermak medical providers, what cells, divisions,
17  living units are listed in your jail management
18  system for those people to accommodate them?
19     A.   There are different types of
20  prescriptions for wheelchairs, walkers, and
21  canes.  So I can't answer that question unless
22  you specify what information exactly you're
23  seeking.
24     Q.   A permanent wheelchair like

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 179

1      Q.   Let's start with housing units.  If a
2  person has a prescription for a permanent
3  wheelchair, what housing units?
4      A.   They could potentially be placed in
5  RTU.  They could potentially be placed in
6  Cermak.  They could potentially be placed in
7  Division 2, dorm 2.
8      Q.   In dorm 2 -- in Division 2, dorm 2, are
9  there 2 tiers where people who have a
10  prescription for a wheelchair could be placed?
11     A.   Potentially, yes.
12     Q.   And that would be tier M and N?
13     A.   That would be M house and N house, yes.
14     Q.   What is the capacity in M house?
15         MR. NICHOLS:  Objection.  The question
16     is beyond the scope of the witness'
17     designation.  I'm instructing her not to
18     answer.
19  BY MR. MORRISSEY:
20     Q.   Does the jail management system
21  indicate the capacity of the M tier?
22         MR. NICHOLS:  Objection.  The question
23     is beyond the scope of the designation.  I'm
24     instructing my client not to answer that

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 180

```
 1     question.
 2   BY MR. MORRISSEY:
 3     Q.   How many cells or living units are in
 4   dorm M in Division 2 that can accommodate a
 5   person who's been prescribed a wheelchair?
 6     A.   How many cells or living units?
 7   One, there's one living unit.
 8     Q.   There's one dorm.  How many beds are
 9   there in dorm M?
10     A.   I don't know, many.
11     Q.   Many?  More than 30?
12     A.   Potentially.
13     Q.   More than 45?
14     A.   I don't know.
15     Q.   Are all those beds in division M
16   appropriate to house a prisoner who has a
17   prescription for a wheelchair?
18          MR. NICHOLS:  Objection.  The question
19   is beyond the scope of the witness'
20   designation.  I'm instructing her not to
21   answer.
22          MR. MORRISSEY:  The designation asks
23   what cells or living units that can be an
24   appropriate accommodation for individuals
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 181

```
 1     with qualified disabilities.
 2          MR. NICHOLS:  It specifically says a
 3   list of cells or living units.  That's what
 4   the notice actually says, Tom.
 5          MR. MORRISSEY:  If you want to be --
 6   I'm asking her how many of those beds in
 7   dorm M -- or tier M of Division 2 can
 8   accommodate wheelchair people with
 9   prescriptions.
10          MR. NICHOLS:  You can answer the
11   question.
12   BY THE WITNESS:
13     A.   Depending on the type of prescription,
14   potentially all.
15   BY MR. MORRISSEY:
16     Q.   What type of prescriptions are there
17   for wheelchairs?
18          MR. NICHOLS:  Objection.  The question
19   is beyond the scope of the witness'
20   designation.
21   BY MR. MORRISSEY:
22     Q.   How many cells in the N tier in
23   Division 2, dorm 2, are there that can
24   accommodate individuals that have a prescription
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 182

```
 1     for a wheelchair?
 2     A.   There are no cells.
 3     Q.   How many beds in the N tier are there
 4   that can accommodate prisoners that have a
 5   prescription for a wheelchair?
 6     A.   Depending on the type of prescription,
 7   potentially all of them.
 8     Q.   In Cermak in 2014, how many beds were
 9   there on the third floor of Cermak that could
10   accommodate a person with a prescription for a
11   permanent wheelchair?
12     A.   In Cermak?
13     Q.   Yes.
14     A.   What area of Cermak?
15     Q.   Third floor.
16     A.   There's 6 rooms, group rooms, and
17   single cell rooms.
18     Q.   What rooms are there?  What are the
19   rooms?
20          MR. CONDRON:  Objection as to time
21   frame.
22   BY MR. MORRISSEY:
23     Q.   In 2014 -- before August of 2014, how
24   many rooms in Cermak were there that could
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 183

```
 1     accommodate prisoners with a wheelchair
 2   prescription?
 3          MR. NICHOLS:  Objection to time frame.
 4   It's overbroad.  So I'm going to object to
 5   the question as phrased and --
 6   BY MR. MORRISSEY:
 7     Q.   Prior to August of 2014, from -- I'll
 8   give you a time period.  From July of 2012 to
 9   August of 2014, how many rooms in Cermak could
10   accommodate prisoners with a wheelchair
11   prescription?
12     A.   I would have to review my records.  I
13   don't know when the construction was done.
14     Q.   What records would you review to
15   determine -- what construction are you referring
16   to?
17     A.   Construction that's been done within
18   Cermak at various times to upgrade the facility.
19     Q.   When was the construction done?
20     A.   On different dates.
21     Q.   Was it done between July of 2012 and
22   August of 2014?
23     A.   Potentially, and I believe Ms. Kunz
24   already went over this with you.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 184

```
 1        Q.   How many rooms in the RTU currently can
 2   accommodate prisoners with a prescription for a
 3   wheelchair?
 4             MR. NICHOLS:  The question is a little
 5        vague as to location.  However, I'm going to
 6        allow my client to answer that question.
 7   BY THE WITNESS:
 8        A.   How many rooms?
 9   BY MR. MORRISSEY:
10        Q.   Yes.
11        A.   I don't know what you mean by rooms.
12        Q.   How many living units in the new RTU
13   can accommodate prisoners that have a
14   prescription for a wheelchair?
15             MR. NICHOLS:  Same objection.  It's
16        vague as to location.  However, I'm going to
17        allow my client to answer that question.
18   BY THE WITNESS:
19        A.   Again, depending on the type of
20   wheelchair or wheelchair prescription,
21   potentially all of them, but as we have already
22   discussed, there are 2 cell blocks on RTU -- on
23   RTU third floor.  There's 1 accessible holding
24   cell in each cell block, and there are 2
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 185

```
 1   accessible beds on each dorm, information which
 2   you have already been provided.
 3   BY MR. MORRISSEY:
 4        Q.   Other than that on the third floor of
 5   the RTU, are there any other accessible cells or
 6   living units for a prisoner that's been
 7   prescribed a wheelchair?
 8             MR. NICHOLS:  Objection only to the
 9        extent that it exceeds the scope of the
10        notice.  Both Vaughn and Flora were housed
11        on the third floor.  As phrased, I'm going
12        to instruct my client not to answer that
13        question.
14             MORRISSEY:  It was limited to the
15        third floor of Cermak.
16             MR. NICHOLS:  Provided that limitation,
17        you can answer.
18   BY THE WITNESS:
19        A.   We weren't talking about Cermak.  We
20   were talking about the RTU.
21   BY MR. MORRISSEY:
22        Q.   I'm sorry.  I'm sorry.  I'm referring
23   to the RTU, third floor of the RTU.  Are there
24   any other cells or dorms on the third floor of
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 186

```
 1   Cermak that can accommodate a prisoner that's
 2   been prescribed a wheelchair?
 3        A.   Potentially.
 4        Q.   Which ones are those?  Is that in your
 5   computer?  Is that in the jail management
 6   system, other cells -- other than the -- the
 7   cells that are in -- cell 10 and the segregation
 8   and the protective custody units and the dorms,
 9   the 2 earmarked beds in each of the dorms on the
10   third floor of the RTU, are there any other
11   areas on the third floor of the RTU that are
12   listed or contained in the jail management
13   system as appropriate to accommodate individuals
14   who have been prescribed a wheelchair?
15             MR. NICHOLS:  Objection to the form of
16        the question.  It's quite a compound
17        question.  However, you can answer the
18        question.
19   BY THE WITNESS:
20        A.   I don't know which part I would be
21   answering, Mr. Morrissey.
22   BY MR. MORRISSEY:
23        Q.   You testified in the RTU on the third
24   floor that there are 2 cell blocks, right?  Each
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 187

```
 1   cell block has one accessible room, correct?
 2        A.   One accessible cell, yes.
 3        Q.   And you also testified that there are
 4   dorms on the third floor of the RTU, correct?
 5        A.   Correct.
 6        Q.   Each dorm has 2 beds that are
 7   accessible, correct?
 8        A.   Correct.
 9        Q.   Other than that on the third floor of
10   the RTU, are there any other areas where
11   individuals with a prescribed wheelchair can be
12   accommodated?
13        A.   Areas?  Yes.
14        Q.   Cells or living units?
15        A.   Those are all the living units.  We
16   went over all of them.  There are no more.
17        Q.   On your list, you said that you have a
18   list which we haven't been given --
19        A.   You have been given that.
20        Q.   -- are there any other -- well, your
21   lawyers have confirmed that we don't have the
22   document.
23             MR. NICHOLS:  In this case -- in these
24        cases.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 188

```
1   BY MR. MORRISSEY:
2       Q.  So on this jail management system,
3   other than what you have testified before, are
4   there any other cells or living units on the
5   third floor of the RTU which can accommodate
6   individuals who have been prescribed a
7   wheelchair?
8       A.  Potentially depending on the type of
9   prescription, yes.
10      Q.  What other cells or living units are
11  listed or contained in the jail management
12  system which can accommodate individuals who
13  have been prescribed a wheelchair?
14      A.  They're all listed in the jail
15  management system.
16      Q.  Every cell on the third floor of the
17  RTU is listed as being appropriate for
18  accommodating an individual who has been
19  prescribed a wheelchair, correct?
20      A.  Depending on the type of prescription,
21  yes.
22          MR. NICHOLS:  Objection, misstates the
23      testimony.
24
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 190

```
1           MR. NICHOLS:  Objection to the extent
2       that these questions are beyond the scope of
3       the witness' designation.  However, I will
4       allow her to answer this one question.  And
5       objection to the extent that it calls for
6       speculation.
7   BY THE WITNESS:
8       A.  It's a medical alert, yes.
9   BY MR. MORRISSEY:
10      Q.  So if Vaughn is currently in cell 7 and
11  has a medical alert for a routine wheelchair,
12  cell 7 is an appropriate accommodation for
13  Mr. Vaughn?
14          MR. NICHOLS:  Objection to the extent
15      the question calls for a legal conclusion.
16      You can answer the question.
17  BY THE WITNESS:
18      A.  I believe that cell is an appropriate
19  accommodation for Mr. Vaughn, yes.
20  BY MR. MORRISSEY:
21      Q.  And the other cells and living cell --
22  do you consult with medical -- Strike that.
23          Does the sheriff consult with medical
24  when they assign somebody like Mr. Vaughn who
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 189

```
1   BY MR. MORRISSEY:
2       Q.  What types of prescriptions are there
3   for wheelchairs?
4       A.  There's long distance, and there's
5   routine.
6       Q.  So if a person -- what is a routine
7   wheelchair?
8       A.  It means the inmate in most
9   circumstances is allowed to keep that chair on
10  the tier.
11      Q.  Would Vaughn fall into that category of
12  routine wheelchair?  Was he able to keep that
13  wheelchair in his cell?
14      A.  He's allowed to keep it in his cell,
15  yes.
16      Q.  So he's classified as routine.  The
17  other prescription is long distance?
18      A.  Yes.
19      Q.  What is a long distance wheelchair?
20      A.  Long distance is a transportation alert
21  which means this person may have trouble walking
22  long distances, so the accommodation is the
23  wheelchair for long distances.
24      Q.  And that's a medical alert by Cermak?
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 191

```
1   has a prescription for a routine wheelchair as
2   far as where he's actually placed in the RTU?
3           MR. NICHOLS:  Objection.  The question
4       is beyond the scope --
5           MR. MORRISSEY:  Let me rephrase it.
6           MR. CONDRON:  I'll join.
7           MR. MORRISSEY:  Let me rephrase it.
8   BY MR. MORRISSEY:
9       Q.  We have gone through the various
10  placements for Mr. Vaughn from November 16,
11  2013, to the present, correct?
12      A.  Yes.
13      Q.  He's been placed in 3135, 3119, 3125,
14  all on 3-South, correct?  And I might add, 3121.
15      A.  He's been placed on 3121, yes, 3105,
16  3133, 3125, as the document you produced states.
17      Q.  Assuming that Mr. Vaughn had a
18  prescription for a routine wheelchair, that
19  was -- those living cells on 3-South were
20  appropriate accommodations for Mr. Vaughn?
21          MR. NICHOLS:  Objection to the extent
22      the question calls for a legal conclusion.
23      You can answer.
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 48

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 192

```
1    BY THE WITNESS:
2         A.   Those cells are appropriate for
3    Mr. Vaughn.
4    BY MR. MORRISSEY:
5         Q.   Those cells that Mr. Vaughn was
6    assigned to on 3-South are appropriate cells for
7    individuals who have a prescription for a
8    routine wheelchair?
9              MR. NICHOLS:  Objection.  The question
10        is overbroad and vague as to time frame.  As
11        phrased, I'm instructing my client not to
12        answer that question.
13   BY MR. MORRISSEY:
14        Q.   In regards to the RTU, for a person
15   that has a routine wheelchair prescription, you
16   testified that Vaughn at times in the RTU was in
17   cell 7; in 3-A, he was in cell 9; in 3-E, he was
18   in cell 9; in 3-E, he was in cell 7.  Are all
19   those cells appropriate accommodations under the
20   ADA for a person that has a prescription for a
21   routine wheelchair?
22             MR. NICHOLS:  Objection.  As phrased,
23        the question was overbroad and vague as to
24        who you're actually talking about.  I'm
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 194

```
1    BY MR. MORRISSEY:
2         Q.   Other than the 2 cells in -- other than
3    cell 10 in tier 3-A and cell 10 in 3-E, are the
4    other tiers in 3-A and 3-E appropriate placement
5    for individuals who have a prescription by
6    medical staff at Cermak for a routine
7    wheelchair?
8              MR. NICHOLS:  Objection.  The question
9         is definitely calculated to seek a legal
10        conclusion.  It's beyond the scope of the
11        witness' designation.  As phrased, I'm going
12        to instruct my client not to answer.
13        However, if you want to narrow it down to
14        Harold Vaughn or Donnell Flora --
15             MR. MORRISSEY:  No.  The notice
16        provides --
17             MR. NICHOLS:  The notices are also
18        captioned Harold Vaughn and Donnell
19        Flora.
20             MR. MORRISSEY:  It doesn't make any
21        difference.  The notice -- the fact that --
22        the caption of the case -- the notice was
23        pretty broad.  It said what area in the RTU
24        can accommodate people who have
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 193

```
1    going to instruct my client not to answer as
2    phrased.  If you're talking about Harold
3    Vaughn, I'll let her answer.
4              MR. MORRISSEY:  Number 2 in the notice
5         provides the physical features including but
6         not limited to any fixed or immovable
7         accommodation provided to assist disabled
8         detainees at sinks, toilets, and showers in
9         each cell located in the residential
10        treatment unit.  It is not limited to
11        Mr. Vaughn.  I'm asking her --
12             MR. NICHOLS:  That's fine, but the
13        notice is captioned Harold Vaughn, and we
14        objected to the fact that these questions
15        are overbroad.
16             MR. MORRISSEY:  The court required you
17        to produce her and required her to respond
18        to these questions.
19             MR. NICHOLS:  We maintain those
20        objections.
21             MR. MORRISSEY:  You can maintain the
22        objection, but the question is, for the --
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 195

```
1    disabilities, and that's what I'm asking.
2         I'm asking in regards to --
3    BY MR. MORRISSEY:
4         Q.   Other than cell 10 in tiers 3-A and
5    3-E, are the other cells, cells 1 through 9, in
6    tier 3-A and cells 1 through 9 in tier E, are
7    they appropriate to accommodate people that have
8    a wheelchair prescription for routine matters by
9    Cermak?
10             MR. NICHOLS:  Objection.  The question
11        is calling for a legal conclusion.  So as
12        phrased, I'm instructing my client not to
13        answer.  It's too broad.
14             MR. MORRISSEY:  We'll go through it one
15        by one then.
16   BY MR. MORRISSEY:
17        Q.   In 3-A, cell number 1, is that a cell
18   that's in the jail management system that's
19   considered appropriate to accommodate a person
20   with a routine prescription from Cermak to
21   accommodate their disabilities?
22        A.   Potentially that's a fact-specific
23   inquiry and would depend on the detainee.
24        Q.   Cermak is the one that makes a factual
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 49

determination that the prisoner has a prescription for a routine wheelchair. Let's establish that, okay? So the question then is, can the sheriff use cell 1 in 3-A to accommodate a person who has a prescription from the medical staff, a routine prescription from the medical staff for a wheelchair?

MR. NICHOLS: Objection. The question calls for a legal conclusion. It's overbroad. As phrased, I'm instructing my client not to answer that, especially since neither Harold Vaughn or Donnell Flora were in the cell you're talking about.

BY MR. MORRISSEY:

Q. Does the medical staff inform the sheriff when they -- why they issue a prescription for a routine wheelchair?

MR. NICHOLS: Objection. The question is beyond the scope of the witness' designation. I'm instructing her not to answer that question.

BY MR. MORRISSEY:

Q. Is it up to the sheriff's office to decide whether to place a prisoner such as

Mr. Vaughn in an accessible cell such as cell number 10, 3-A, or not?

MR. NICHOLS: Objection. That question is beyond the scope of the witness' designation. That specific question appears more appropriate under item 3 of your notice.

MR. MORRISSEY: We'll take a break.

(Whereupon, a short break was taken.)

MR. MORRISSEY: The parties have conferred off the record and because there's some documents that haven't been produced as of yet, the parties have agreed to continue the deposition. The deponent will come back to our office on or before July 12 to continue the dep.

MR. NICHOLS: And just so the record is clear, the deponent offered to provide testimony to the document. However, it was deemed inadequate. Sheriff Dart will be producing the information referred to promptly so that this deposition can be continued at a later date on or before

July 12, 2016.

MR. MORRISSEY: All right. Thanks.

(Whereupon, the deposition was continued.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD VAUGHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 15-cv-951 |
| | ) | |
| THOMAS DART, SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |
| DONNELL FLORA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 15-cv-1127 |
| THOMAS DART, SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, | ) | |
| Defendants. | ) | |

I, SABRINA RIVERO-CANCHOLA, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on the 29th day of June 2016; that I have read the foregoing transcript of my deposition, consisting of pages 1 through 198 inclusive, and affix my signature to same.

______________________________
SABRINA RIVERO-CANCHOLA

Subscribed and sworn to
before me this day
of , 2016.

Notary Public

Page 200

```
 1    STATE OF ILLINOIS       )
 2                            )  SS.
 3    COUNTY OF C O O K       )
 4         I, EMILY TOMALA,  CSR, a notary public
 5    within and for the County of Cook County and
 6    State of Illinois, do hereby certify that
 7    heretofore, to-wit, on the 29th day of June,
 8    2016, SABRINA RIVERO-CANCHOLA personally
 9    appeared before me in a cause now pending and
10    undetermined in the Circuit Court of Cook
11    County, Illinois.
12         I further certify that the said SABRINA
13    RIVERO-CANCHOLA was first duly sworn to testify
14    the truth, the whole truth and nothing but the
15    truth in the cause aforesaid; that the testimony
16    then given by said witness was reported
17    stenographically by me in the presence of the
18    said witness, and afterwards reduced to
19    typewriting by Computer-Aided Transcription, and
20    the foregoing is a true and correct transcript
21    of the testimony so given by said witness as
22    aforesaid.
23         I further certify that the signature to
24    the foregoing deposition was reserved by counsel
```

Page 201

```
 1    for the respective parties.
 2         I further certify that I am not counsel
 3    for nor in any way related to the parties to
 4    this suit, nor am I in any way interested in the
 5    outcome thereof.
 6         IN TESTIMONY WHEREOF:  I have hereunto
 7    set my hand and affixed my notarial seal this
 8    11th day of July, 2016.
 9
10
11
12
13
14         EMILY TOMALA, CSR
15
16
17
18
19
20
21
22
23
24    LIC. NO. 084003736
```

Plaintiff's Exhibit 11 Page 51

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 3

39:20 44:20
45:12 62:15
143:1
assign 86:20
190:24
assigned 5:22
27:23 28:16
29:5 30:3
54:19 61:24
62:4 63:12
64:11 68:11
68:12 85:22
86:4 89:9
90:10,15,22
95:11,16
96:9 97:20
104:4 107:3
108:8,12,15
108:21
111:17
113:1 114:4
114:20
115:3,14
117:1
122:12,17
124:11,12
125:6,24
126:13
127:11
128:14,18
128:21,24
129:2 137:9
138:21
141:6
143:21
146:2 147:7
152:23
158:4,7
159:6,13,14
161:1 163:1
163:20
165:17

192:6
assignment
8:19 29:3
131:15
assignments
5:8 6:9 7:15
7:22 8:5,13
25:21 27:11
27:19 81:12
165:14
assist 29:2
53:13 61:23
63:13 73:2
73:20
100:15
101:10
104:6
105:13
106:10,21
113:14
133:19
193:7
assistance
104:22
105:8 106:8
106:13
attorney 2:8
2:13,19
21:21 81:15
93:2,10
115:10
140:11
attorneys
78:7 84:11
audits 5:23
august 10:15
26:1,5,6,8
26:10 27:6
28:9 29:10
30:10 39:2
39:12 43:22
45:2,6,22
46:12 48:7
49:20 50:12

108:23
114:2
117:19
141:2
assuming
32:1 34:17
49:6 84:3
84:14 94:14
100:3,13
101:13
107:2
108:12,15
109:8
110:14
125:5
127:21
133:5
134:7 154:9
191:17
assumption
108:19
attached 42:3
attempting
170:10
attorney 2:8
162:5 168:3
168:5,6,9
158:13
162:5 168:3
avenue 1:20
p.4
aware 17:10
17:19 38:18
47:10 61:19
62:20,23
63:7 68:19
68:10,13
102:7,9,10
128:7,12
152:11

51:17 52:10
52:19,20
53:2,16
54:19 55:24
56:19 57:13
57:22 65:22
66:1 68:8
182:23
183:7,9,22
authority
19:21
available
50:15,22
52:9,12,23
53:2,8 54:6
67:5 102:21
103:1 126:8
139:22
144:21
145:6
149:11
153:16,22
154:8 156:8
158:13
162:5 168:5
168:5,6,9
89:23
barriers
64:22 65:15
bars 23:13
31:2 34:4,5
34:7 41:10
49:20 68:2
68:5 71:22
72:13,19
72:20,23
74:1 132:3
132:5
133:19
134:3
138:15
140:3 152:3
142:1 146:7

94:2,4,5,7
142:8 145:4
162:23
169:3
172:15,18
back 13:7
29:17,22
30:6 57:16
57:24 66:12
70:16 95:2
99:4 100:7
122:9 131:9
151:6 154:1
159:14
168:18
172:1
197:15
bathroom
34:19,22
72:1,5
73:16,18
barrier 65:5
65:20 39:15
88:23
barriers
64:22 65:15
bars 23:13
centen 150:12
163:6
ceas 150:12
163:6
ceas 150:12

159:23
160:10,21
161:19
163:7,16,18
base 52:13
135:12,15
based 43:3
59:6 63:9
76:22
105:11
189:16
129:21
basic 107:2
basically
32:9 170:2
basis 62:3
136:2,5
bathroom
54:13,15
bed 7:15 8:5
8:13 25:21
74:9 81:12
189:16
186:9
chairs 51:13
51:16 52:6
56:22 103:4
103:22
104:20
105:6,7
client 11:8
12:14 13:3
14:10 23:3
43:15 45:11
67:1,13
65:1 93:12
chance 93:12
116:16
changed
12:9
chicago 1:21
2:4,10,16
140:7
146:10

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 5

132:20,23
133:3,3,14
135:4,17
136:4
142:11,14
142:19
154:22
155:10,11
155:15,17
155:18,19
157:4,5,9
157:13,21
157:22
158:1,2,3,5
159:21,23
163:3,21
161:1,8,16
161:18
162:18
163:1,2,4,6
163:17,20
173:15
182:17
187:1,2
188:19,13
190:10,12
190:18,21
192:7,17
192:18,18
193:9 194:3
194:3 195:4
195:17,17
196:4,13
cells 5:9,22
6:1,5,10,11
7:16 8:8,15

10:17 16:9
18:22 32:18
33:14 34:1
69:3,4
70:23 71:2
76:20 81:23
128:22
129:13,15
146:2 149:6
150:20
156:4
157:16
155:20,22
156:6,16
168:21
169:20
170:9,16
174:8,17,19
180:16
200:10,20
201:2
certifying
13:19
192:2,5,6
certify 13:6
218:20,21
24:22 271:9
55:13,17,22
52:16,23
53:1,19

20:12,19,21
20:23 22:19
23:4,7
26:23
34:13,14,20
54:22 55:7
56:3,9,15
56:23 57:1
61:10,19,21
67:10,19,21
87:20 92:22
100:18,20
101:9,13,20
103:2,2,8
103:10,13
103:18,21
103:24
104:1,2,5,7
104:13,18
106:9,11,17
106:8,12,21
107:6
108:6,12,18
112:12
113:9
114:16,21
115:15
118:16,17,18
117:3,23
122:11,13
122:23
124:23
138:12,14
138:20,22
140:1 141:8
141:11,13
141:22 142:4
142:1 144:9

53:19,24
54:5,10,10
54:13,14,20
146:16,17
149:9,24
151:8
153:14,19
153:24
154:1,14
154:10,13
154:16
158:13
161:23
162:1 163:1
163:13
189:9
chairs 51:13
51:16 52:6
189:6
189:6
189:16
186:9
chairs 51:13
51:16 52:6
56:22 103:4
103:22
104:20
105:6,7
client 11:8
12:14 13:3
14:10 23:3
43:15 45:11
67:1,13
65:1 93:12
chance 93:12
116:16

144:11,14
146:16,17
149:9,24
151:8
153:14,19
153:24
classification
167:24
classified
147:22
189:16
clear 11:10
12:21 31:4
37:10 70:18
176:2 180:2
clearly 36:9
clemmons
2:14
clean 110:8
client 11:8
12:14 13:3
14:10 23:3
43:15 45:11
67:1,13
65:1 93:12
chance 93:12
116:16
changed
12:9
chicago 1:21
2:4,10,16
140:7
146:10
circuit
200:10
circumstan...
174:13
179:24
184:6,19
civil 1:16
clarification
185:12
192:11

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 4

181:6 182:3
182:8 185:1
186:9 187:6
began 20:20
believe 5:24
6:22 8:5 9:3
14:8 16:4
17:13,24
20:21 21:8
31:21 45:13
47:14 52:5
52:11,15
53:22 65:22
66:19 69:21
70:4 71:20
72:3,6 74:3
74:11,14,18
75:3 76:4
84:9,20
92:9,16
93:1 96:2
106:2
111:13
112:6 118:4
127:15,18
140:17,18
144:2
147:16
148:5
152:20
155:3
157:15
161:4 162:9
168:13
183:23
190:18
believes
168:22
bench 41:14
41:15,17,19
41:21

best 67:24
166:13
better 24:6
beyond 10:1
144:12
18:11 23:2
32:20 33:7
33:22 34:12
34:24 58:22
60:6 64:24
97:22 115:6
125:12
128:2
134:14,22
137:5 146:7
147:2
151:11
176:23
180:19
181:19
190:2 191:4
194:10
196:19
197:4
big 108:19
133:9
bit 6:15 18:13
30:14
block 68:20
73:6,22
78:22
184:24
187:1
blocks 70:21
79:4 184:22
190:18
bodies
168:22
bowel 108:14
108:16
brand 51:18
53:4 102:24

144:13
break 28:2,4
29:14 43:14
43:19 89:4
89:5 94:20
100:4,5
122:6,7
129:24
130:1 165:9
168:16
197:8,9
bring 13:7,7
13:21
101:19
106:20
107:4,5
called 1:15
6:23 7:6
28:23 173:8
calling 18:9
34:11
calls 15:15
21:1 22:24
26:22 33:6
34:23 42:14
44:2 45:9
46:5,17
47:3 48:1
52:2 58:6
58:21 59:11
60:5 65:8
69:9 70:1
71:16 72:22
75:8,24
76:14 80:18
88:12 88:14
89:18 92:13
96:11 98:14
112:18
114:8
113:19
114:6
119:11

171:22
burkes
169:14
171:6
button 102:2
buzzing
157:11
C
c 94:4,5,7
142:8 200:3
calculated
194:9
cant 2:11
40:21,22
99:3 116:12
116:17
177:21
captioned
101:5
193:13
194:18
carrot 2:14
2:17 131:11
131:16
carroll 2:14
13:20 14:21
25:4 26:24
35:23 84:15
84:20 98:1
145:8 146:8
case 4:20
4:10 11:6
21:3,18
24:16 28:15
35:7 59:24
60:10 78:7
84:3 93:10
138:17
86:12 88:11
88:14 89:12
98:19,24
99:9 111:8
111:18
116:12

140:6
142:16
143:23
146:6 163:9
166:22
174:10
190:5,15
192:12
196:9
cane 177:15
canes 148:11
177:21
cant 2:11
40:21,22
99:3 116:12
caption
194:22
captioned
101:5
193:13
194:18
capacity
179:14,21
caption
194:22
ccase 4:20
4:10 11:6
21:3,18
24:16 28:15
35:7 59:24
cause 200:9
200:15
caution
106:11
141:23
cautionary
145:19,23
cert 9:21
cell 18:16
23:6 28:8
29:4 31:12
56:3,5,5
73:6,8,9,10
73:12,21,22
74:6,19
76:24 77:5
77:11,16,23
78:2,4,5,6,8
78:14,16,22
78:23 79:2
79:4,9
80:17 81:18
128:8 129:5
129:8

187:23
194:22
cases 13:22
122:23
169:4 176:8
176:19
187:24
category
189:11
cause 200:9
200:15
caution
106:11
141:23
cell 18:16
23:6 28:8
29:4 31:12
56:3,5,5
73:6,8,9,10
73:12,21,22
74:6,19
76:24 77:5
77:11,16,23
78:2,4,5,6,8
78:14,16,22
78:23 79:2
79:4,9
80:17 81:18
128:8 129:5
129:8

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 6

193:1
194:12
195:12
196:1
clients
170:23
close 172:7
closes 172:10
closet 22:7,8
22:10,11,15
59:8 69:6
71:13 88:12
88:17 173:5
collaborative
120:22
121:17
com 2:5
combination
22:12 39:17
39:24 40:3
57:20 65:16
66:7,16
68:4 96:5
96:14 97:8
151:18,18
152:1 153:4
154:13
combined
142:23
comma 27:7
99:4 158:14
163:24
164:5 172:1
197:15
coming 27:4
comment
24:9
common
65:15
complete
10:22
completely
compliance
9:5,12,20

10:14 13:1
42:10 116:6
145:2
compliant
92:13 96:11
98:14 99:9
111:8
complied
22:20 51:22
comply 17:22
20:9 58:2
138:22
complying
175:6
compound
46:4 75:10
91:22
94:6,6,7,14
44:2 46:10
19:10 191:1
195:11
178:18
183:15,17
183:19
compri...
200:19
concluded
75:9,7,10
85:14 88:3
86:6,7,8,9
199:21,1,8
23:1 26:22
condron 2:20
24:9
42:14 44:3
45:10 46:6
46:17 47:3
48:2 52:2
59:12 60:6
65:8 69:6
70:1 71:17
72:22 75:9

76:1,16
82:11 86:13
88:15 89:18
92:13 96:11
98:14 99:8
111:8
117:21
119:18
139:11
140:6
141:17
143:23
144:6 163:9
147:24
161:3 162:2
162:5 163:1
166:2
190:5,15
192:12
196:9
concrete
181:18
145:8 146:8
condron 2:20
24:9
contained
9:6 15:7,13
condron 2:20
42:14 44:3
condron 6:2
144:8
145:8
condron 2:20
contains
173:2
context 19:23
48:8 51:10
52:17,22
66:2,3,4,22
171:24

197:14,17
continued
36:15
197:24
198:4
continuing
70:12,24
71:1,11,12
73:7 74:7,8
74:23 75:2
75:77 78:7
78:23,24
79:3,11,19
82:23 83:4
83:21,23
84:13
85:1,4,5,8
85:15,16,19
107:7 117:3
107:7 117:3
154:19 20:19
109:11
200:5,10
112:3
122:14,15
122:19
123:21
125:12
130:11
131:6,13,17
132:3,8,13
132:12,21
132:24
136:6,11,12
137:18
139:11
145:4
147:10
149:10

67:11,22,23
68:2,5,6,8
68:18,19,21
68:22 69:14
69:16 70:7
70:12,24
71:1,11,12
73:7 74:7,8
74:23 75:2
75:77 78:7
78:23,24
79:3,11,19
82:23 83:4
83:21,23
84:13
85:1,4,5,8
85:15,16,19
conversation
168:20
75:78 78:7
78:23,24
correct 1:7,2
130:11
131:6,13,17
7:8,9,18,20
8:11,14,18
9:16 15:7,13
13:14
132:3,8,13
132:12,21
132:24
136:6,11,12
137:18
139:11
145:4
147:10
149:10

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 52

## Page 7

154:23 156:1,5 157:8,16 158:6,17 159:24 161:19 162:1 173:20 178:7 187:1 188:19 191:11,14 200:20
correctional 17:23 20:5 39:16 40:12 41:6 55:20 55:21 58:12 58:17 59:4 59:20 60:3 67:20 70:11 101:18,22 104:6 105:13 106:3
corrections 5:10 6:4
costs 13:9
couldnt 80:11
counsel 21:19 200:24 201:2
county 1:7,7 1:11,12,19 2:8,12,13 2:19,23 4:24 6:3 9:4 18:2,3,7 20:8 29:6 62:18 83:12 93:18 10:19 122:2

136:14 152:8,11 166:13 167:16 170:7,14,17 173:10,21 173:24 174:5,8,23 176:1 199:6 199:7,11,11 200:3,5,5 200:11
countys 146:9
couple 94:18 178:6
course 168:8
court 1:1 20:16 37:12 193:16 199:1 199:20
courts 1:17
covered 109:2,5,7,8 109:15,16
covers 121:24
create 170:11
created 173:23 174:3
csr 1:18 200:4 200:14
cummings 93:15
current 9:3
currently 50:1 127:22 62:17 23 122:23 128:8,18,21 128:24 129:2,6,14

129:18 130:15 132:12 136:3 184:1 190:10
custody 129:1,3 186:8

**D**
d 3:1 84:19 94:5 94:2,4 94:5,7
daley 2:9,20
dark 40:21
dart 1:6,11 4:8,9 18:17 63:21 93:18 93:19 101:5 130:18 134:11 169:9,11 197:21 199:6,10 199:12,13
date 26:6,8 38:22 131:12,13 131:16 144:17 147:12 155:4,6 158:9 197:24
dates 79:24 80:8 95:12 166:12 183:20
dave 84:21 84:21
david 2:20,22
day 1:21 7:10 55:13 199:15,20 200:7 201:8

dayroom 78:11 91:7 91:23 92:3 92:8,24 101:23 133:10 134:5,7 158:14,15 159:2,8 161:24 163:24 164:4
days 39:7
deaf 176:21 176:22
december 95:10,15,18 105:4,20 107:12 108:9 115:23 137:9,16 140:16,23 142:3,11 143:12 144:19 146:20,24 159:13,19 160:24 162:11
decide 196:24
decides 21:18
decision 116:15
declaration 84:21
deemed 197:21
defendants 11:11

36:23 38:1 199:8,12
defer 121:8
deference 44:5
define 177:13
definitely 194:9
delaying 24:19 36:17
dep 7:13 153:1,2 181:13 182:6 184:19 186:23
department 197:17
depend 24:13 98:18
depending 30:2 31:19 182:3
depends 12:22 195:23
depict 77:16,23 78:13 92:8
depicted 66:17 86:21 87:4,5,19 88:22 92:18 151:19 153:5
depicts 116:15
deponent 12:22 197:15,19 199:14
deponents 11:11

deposed 13:11
deposition 1:14 4:7,20 5:4 7:23 8:17 9:1 10:13 12:17 14:7 19:23 24:15,19 28:22 36:17 37:1 38:9 38:13,20 50:3 53:6,7 63:21 77:21 80:13 83:12 95:22 96:5 143:8 155:11 156:13 165:13 166:18,23 169:15 172:3 176:18 177:8 200:24
depositions 1:17 13:22 36:16 37:14 183:18,20 200:22
described 29:4 98:23 124:5
design 14:15 15:13 17:20 18:3,6 20:10,22 25:9 34:21 43:6,10,11

## Page 8

45:3,5,16 45:21 51:23 52:6 58:2,3 58:16,18 59:7,19 60:2,11 69:6,22 70:10,18 71:14 72:9 72:12,20 75:5,20 76:4 88:12 88:18 134:4 138:11 142:20
designated 12:7,12 14:13 19:11 34:13 124:4 171:8,23 172:20 173:16,19 175:9 177:13
designation 10:21 11:12 18:12 23:13 65:1 97:23 115:7 128:2 134:15,23 147:3 151:12 158:20 165:5,22 179:17,23 180:20,22 181:20 190:3 194:11 190:6 197:5
designations 173:9

designed 69:5 82:7 86:9,15 87:13,15,16 92:10,19 193:8
designee 5:5
designs 16:11
desk 57:11,12 74:10,10,12 74:19,23 75:6,16 76:9 79:7,7 79:11 82:22 85:14 87:21 88:1,21 89:13,15 90:11,13 91:3,6 132:21,23
detained 29:5
detention 6:3 42:12,21 45:17 46:15 56:7 91:9 91:22 92:21 92:23 96:16 96:18,19,20 97:10,16 98:19 100:15 100:7 125:4 154:16 154:18 60:18 61:13 61:24 62:10 62:19 63:1 90:15,22 91:19 92:20

165:17 166,6,19 167:8 177:12 193:8
determinat... 45:20 97:18 113:11 118:15,16 136:16,21 164:24 196:1
determine 27:5 52:8 113:2,8 120:7,10 183:15
determined 98:10
determines 115:13 118:9
determining 121:20
diagram 70:11 75:16 98:22 129:17
disabled 5:11 9:19,23 24:12 26:20 29:2 53:14 61:24 62:8,10,18 63:1 64:11 64:21 65:5 67:3,7 68:11 73:21 82:7 87:14 90:15 91:19 92:11 96:9 96:16,18,19

103:21,22 108:5 149:6 155:4,6 160:5 176:13 183:20
difficult 143:5
difficulty 63:8,9 90:13 99:18 99:20 100:2 102:8,11,18 104:7 106:23 113:13 direct 4:13
disabilities 10:20 18:24 62:14,21 162:7,21 168:24,24 173:1 175:13,14 175:21 176:3 181:1 195:1 182:17 82:7 127:5 154:20 172:12 126:12 127:10 170:1 181:24 82:7
disagree 12:19
disclaimer 105:9 145:21 142:2
disclosed 77:20
discovery 156:16 169:2 172:10 170:2

96:20,21 97:10,15,16 97:19 98:1 98:11 99:17 101:12,20 102:5,7,22 104:3 106:19,22 106:23 108:23 109:1 111:2,16 113:13 117:1,2,4 118:10,17 124:12,17 124:21,24 125:1,15 126:12 166:6,19 167:8 193:7 175:13,14 175:21 176:4 181:1 182:4 186:20 188:8 189:20 189:17 193:3 194:6 162:9,17 76:9 16 193:5 97:14

160:2 184:22
discussion 14:3 178:15
distance 127:5 189:4 189:17,19 189:20
distances 189:22,23
district 1:1,1 1:16 199:1 199:6 199:9,14
division 1:2 77:11 159:20 179:7,8 180:4,15 181:7,23 189:2
divisions 175:8 176:4 177:16
doc 130:10
document 8:6 8:23 9:9,9 9:11 17:15,16,18 28:18 39:4 39:7 43:15 47:2,13,16 50:18,22 51:9 52:19 53:3,17 54:7,10,12 55:6 57:13 56:9 61:1,20 62:8 63:12 63:23 64:9 64:24 69:5,22 84:6 84:6,21

## Page 9

191:16 197:20
documents 8:24 81:15 81:16 172:19 197:13
doesnt 68:4 80:7 94:9 100:24 152:10 157:14 167:23 173:10 194:20
donnell 1:9
4:8 8:5 39:2 61:7,9,10 61:13 194:14,18 196:12 197:13
dont 13:21 16:4,14,16 16:19 17:24 19:20,21,23 21:16 24:11 26:2,6,15 26:18 28:21 36:7 41:9 44:11,19,21 46:9,20 48:4 49:3 49:15,24 50:19 51:18 52:9,15 53:4,19 57:12 63:21 64:18 66:10 68:17 71:4,8 74:3 75:16 74:2 77:24 78:16

83:17 84:13 86:16 87:20 88:17 94:20 93:10 102:2,17,23 104:10 106:2 107:11 116:18,19 83:3,8,16 84:2,8,10 84:15,18 85:18 86:4 89:8 90:10 90:16 92:4 91:16,17 111:18 141:21 181:17 185:1 187:6 188:17 188:22 181:19 184:11 186:20 201:3,10 55:5,12,15 56:17,22

70:19 71:7 132:6 157:12 195:6 door 54:23 55:2 71:3 dorm 71:10 83:3,8,16 84:2,8,10 84:15,18 85:18 86:4 89:8 90:10 90:16 92:4 96:19 98:18 103:16 109:18 111:13 113:14 122:22 124:19 141:21 181:17 185:1 187:6 doubles 104:2 drawing 100:9 107:7 109:18,19 129:9 138:4 183:13 144:11 186:20 200:23
dually 4:1,11
dump 75:14 77:23 92:23

7:8 131:1,2 163:1,21 195:6 earmarked 186:9 easier 6:15 eastern 1:2 199:2 effort 120:22 121:17 either 30:3 43:3 94:11 80:19 101:9,15 109:18 113:14 122:22 124:19 164:19 169:2 176:8 173:18 equivalent 140:4 139:4 23 11:20 12:9 12:20 13:8 36:13 96:1 email 9:20 emily 1:18 94:2,12 201:4 employee 104:15,18 employees 125:3 150:23 168:6
ensure

105:12 enter 36:19 153:12 entered 173:24 entering 37:9 enters 9:11 9:24 54:23 entire 164:17 164:22 entities 136:11 entitled 14:8 17:7 111:5 111:11,19 112:2,5 114:5 137:2 169:19 172:6,8,13 172:14,17 173:18 177:9 177:19 entry 132:6 175:8 evasive 177:8 everyone 110:1 everyones 123:9 evidence 110:4,6,14 exactly 44:5 50:21 46:14

examine 17:7 examined 4:11 11:13 39:10 40:10 57:10,18 exceeds 185:9 exception 8:18 exempts 60:10 exhibit 3:12 3:13 4:3,19 6:14 7:4 8:4 8:9,22 17:7 17:22,23 172:14,17 180:23 38:1 39:19 39:22,23 40:16 43:9 46:16 61:13 66:12,17,21 68:15 70:6 70:9,10 77:10,14,16 77:19 78:13 78:24 80:7 83:23 84:14 84:23 85:6 85:6,21 95:3 96:3,4 96:11,15 139:9 145:8 151:19 156:9,11 157:2 161:6 161:7,13

## Page 10

162:22,23 162:24 exhibits 37:23 exist 177:10 exists 161:16 explain 41:16 explained 148:5 extent 18:9 21:5 18:9 23:1 26:22 30:13,21 31:10 33:9 35:1 37:7 42:13 44:2 45:9 46:5 46:16 47:2 47:24 52:1 58:5,8,10 58:20,23 59:2,11,16 60:4 64:23 69:24 71:11 74:7 77:19 78:15 82:9 86:11 88:13 89:17 91:11,20 92:12 93:8 98:19 99:8 102:13 104:23 105:15 107:11 111:7 112:17 114:7 115:5

115:16 120:13 121:15 137:18 161:14 163:1,23 128:14 131:8,10 138:1 148:15,16 142:15 142:17 149:18 149:24 149:24 149:24 153:18 117:24 20:5 58:12,17 69:3 60:3 160:5 17:24 20:5 58:12,17 69:24 71:11 62:5,8 83:1 86:16 88:10 89:11 96:5 106:12 103:21 157:17 107:19 131:18 132:3,23 133:14 138:9,14 140:24 143:4 145:10 147:20 195:5 97:14 factspecific 79:17 103:4 107:5 111:7 112:17 114:7 115:5

77:15,16,23 78:13 92:7 164:14 150:10 160:24 167:2 176:2 181:9 feel 23:7 14:15,18 43:17 134:9 72:9 far 27:9 29:11 30:2 64:15 55:3 58:1 67:3 81:5 85:13 99:18 124:20 126:12 130:4 134:19 142:14 76:3 95:6 95:17 76:11 79:5 87:20 88:21 100:9,14 125:20,21 193:5 floor 31:5 76:9 79:18 79:23 80:6 80:21 82:3 82:5 93:6 94:3 130:23

148:22 149:19,21 150:10 155:17 158:1 182:9 182:15 184:23 186:13 187:8 189:20 96:5 142:24 143:4 151:19 fill 93:14 find 27:13 28:2 40:3 83:2 10:12 18:22 21:3 24:23 24:24 25:19,22 25:8,24 27:22 48:10 fine 12:3 26:4 27:5,9 28:8 29:11 29:16 31:14 38:5,11,18 39:2 47:1 first 4:11 12:18 38:5,11,18 39:2 47:1 fixture 47:21 67:8,9,18 68:16 73:6 76:23 78:17 79:15,17,22 81:17 83:3 84:6 86:1,3

146:21 147:19,21 155:17 158:1 182:9 182:15 184:21 185:6 160:2 165:14,16 166:2,17 167:5,14 180:15 186:10,11 194:14,19 199:9 floras 5:7 6:8 6:14 8:7 8:8,10 18:20 21:5 29:22 22:18 25:4 29:8 28:8 29:16 31:14 38:5,11,18 39:24 47:1 following 117:9 follows 4:12 foregoing foreging 199:15 200:20,24 form 14:21 18:8 20:11 20:24 26:24 44:1 44:5 46:3 56:17 59:10 75:9 129:9 149:8 forms 62:14 forth 37:13 forward 162:16

Plaintiff's Exhibit 11 Page 53

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 11

| | | | | |
|---|---|---|---|---|
| found 40:19 | further | giving 97:13 | 177:7 | group 39:22 | 8:14 99:1 |
| 96:15 97:9 | 177:14 | 171:13 | 178:13 | 39:23 40:16 | 101:5 |
| 97:16 | 200:12,23 | gmail 2:5 | 183:4 184:5 | 77:9,14,15 | 107:14 |
| 142:24 | 201:2 | go 14:1 24:6 | 184:16 | 78:13,24,24 | 108:21 |
| 152:2 | | 25:18 34:1 | 185:11 | 79:1 85:10 | 110:24 |
| frame 21:2 | **G** | 37:13 38:21 | 193:1 | 80:22 92:3 | 111:1,3 |
| 22:24 86:24 | g 2:2,3 5:1,17 | 57:24 61:9 | 194:11 | 92:18 153:6 | 124:1 |
| 104:9,24 | 7:7 10:14 | 61:10 66:12 | good 77:10 | 156:9 157:2 | 130:19 |
| 105:17 | 94:4 | 70:16 73:5 | gotten 170:11 | 161:6,7,13 | 142:10 |
| 107:9 | general 5:18 | 73:9 95:2 | gov 2:11,17 | 182:16 | 193:2,13 |
| 110:10 | 5:19 7:19 | 103:8 131:9 | 2:22 9:21 | guard 101:18 | 194:14,18 |
| 113:18 | 8:21 10:14 | 170:20 | government | 101:22 | 196:12 |
| 115:17 | 10:22 171:10 | 171:10 | 174:8 | guards 15:11 | 199:3 |
| 118:2 119:3 | 11:2 14:6 | 172:9 | grab 23:13 | 55:18 67:20 | hasn't 68:7 |
| 119:14,15 | 62:9 99:5 | 178:12,14 | 31:2,8 32:5 | guess 169:23 | 77:19 |
| 120:24 | 106:14 | 195:14 | 33:5,18 | guide 45:16 | haven't 12:15 |
| 121:14,23 | 109:6,7 | going 4:18 | 34:4,5,7,19 | 45:17 70:10 | 13:12 57:21 |
| 121:24 | generally | 6:12 7:3,23 | 34:22 41:10 | 76:8 | 93:10,23 |
| 122:21 | 22:12 99:2 | 8:11,23 | 49:20 68:2 | guidelines | 124:6 156:6 |
| 123:23 | grammar | 11:6,7,14 | 68:5 72:12 | 69:22 71:14 | 156:9 |
| 126:16,19 | 35:16 | 12:4,13 | 72:1,5,12 | 72:12 87:18 | 170:11 |
| 128:3 | getting 24:9 | 13:6,8 16:7 | 72:19 73:15 | guides 43:10 | 187:18 |
| 137:4 146:5 | 110:7 150:1 | 18:12 19:18 | 73:18 74:1 | 43:11 70:18 | 197:13 |
| 149:18 | give 18:13 | 23:21 25:15 | 132:3,4 | 72:20 75:5 | health 14:19 |
| 151:1 | 116:1 | 32:7 36:19 | 133:19 | 74:20 134:14 | 14:22 |
| 182:21 | 116:19 | 37:2 38:22 | 134:3 | guilt 170:7,14 | 109:19 |
| 183:3 | 183:8 | 44:9,12,12 | 138:5 | 170:17 | 116:14 |
| 192:10 | given 14:5 | 45:10 57:16 | 140:3 152:3 | guys 134:6 | hearing |
| free 23:7 | 89:14 91:19 | 60:7 61:9 | 152:4,9,12 | | 176:5,13 |
| fresh 156:14 | 93:2 113:13 | 61:10 67:1 | 153:18 | **H** | height 17:21 |
| front 36:13 | 113:16 | 77:9 83:6 | 157:20,22 | h 3:10 84:19 | 22:14,21 |
| 37:17 70:7 | 114:3,17 | 94:8,19 | 158:2,3 | 93:5 94:2,4 | 31:3,3 34:5 |
| 74:12,23 | 116:7 | 117:23 | 159:23 | 94:5,7 | 42:6,8,11 |
| 75:6 79:6 | 117:24 | 123:5 | 160:19 | hall 144:15 | 42:17 49:22 |
| 79:10 87:20 | 121:4 | 126:17 | 161:19 | hand 201:7 | 50:1 |
| 88:1,3 | 124:13 | 150:4 155:1 | 163:7,16,18 | handed | hell 119:17 |
| 89:15,23 | 126:22 | 159:14 | granted | 163:1,21 | helpful 31:13 |
| 90:5 91:3,4 | 127:2,5,8 | 162:16 | 37:12 | hands 60:21 | heretofore |
| 132:21 | 135:24 | 169:5 170:6 | 158:14 | happen | 200:7 |
| 182:1 | 136:1 164:9 | 170:8,14 | great 81:3 | 176:20 | hereunto |
| full 27:11,18 | 170:13 | 171:24 | grievances | happy 156:17 | 201:7 |
| fundamental | 187:18,19 | 172:7 | 160:7 | hard 66:23 | heroin |
| 24:18 | 200:16,21 | 174:13 | 165:16 | harold 1:3 | 116:23 |
| | gives 19:20 | 176:20 | ground 69:20 | 4:9 6:24 | 128:23 |
| | | | | | 129:21,22 |

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 12

| | | | | | |
|---|---|---|---|---|---|
| 131:23 | 135:17 | identify | 60:6,12 | 179:17,23 | 105:7,10 |
| 133:3 | 147:14 | 83:18 | 61:19 62:20 | 180:20 | 106:7 |
| 135:17 | 148:18 | ill 8:6,14 9:7 | 63:7 65:1 | 181:6 183:4 | 141:12 |
| 164:18 | 153:21 | 10:5 21:19 | 66:11,11,12 | 184:5,16 | includes 99:6 |
| 189:14,16 | 154:22 | 30:17 39:14 | 68:13 70:14 | 185:1,22,22 | including |
| 191:2,13,15 | 166:17 | 99:22 118:8 | 73:9 77:9 | 185:22,22 | 10:16 28:24 |
| highest | 170:23 | 130:14 | 77:15 78:5 | 192:11,24 | 53:12 |
| 127:16 | 176:5 | 146:9 148:6 | 83:6 86:1 | 193:1 | 128:14 |
| highly 144:24 | 185:10 | 150:7 156:8 | 90:12 94:8 | 194:11 | 193:5 |
| historical 8:4 | housing 6:8 | 156:10 | 94:13,19 | 195:1,2,12 | inclusive |
| 25:21 81:12 | 6:14 7:22 | 161:6 | 96:19,21 | 196:10,20 | 199:16 |
| history 25:19 | 20:20 22:20 | 166:24 | 97:6,23 | innovable | indicate 84:1 |
| 81:6,10 | 24:22 25:19 | 174:12 | 100:24 | 29:1 53:13 | 157:8 178:8 |
| 94:11 | 28:8 29:3 | 177:13 | 102:7 | 125:20 | 179:21 |
| holding | 170:2 170:13 | 183:7 191:6 | 104:21 | 176:3 | indicated |
| 184:23 | 76:23 79:15 | 193:3 | 112:9 | impairment | 176:7 |
| hopeful | 81:6,10 | illinois 1:1,7 | 115:7 117:9 | 98:23,23 | 23:7 106:11 |
| 170:18 | 94:11,17,21 | 1:12,20,21 | 117:11 | 23:7 106:11 | 178:4,21 |
| hospital 8:18 | 136:22 | 2:4,8,10,13 | 120:1 | imply 79:2 | indicates |
| 33:2,14 | 137:19 | 2:16,19,21 | 122:21 | implying | 10:7 79:16 |
| hour 1:22 | 138:10 | 2:23 199:1 | 123:1,5,24 | 25:2 | 186:24 |
| 171:5 | 149:6 | 199:7,11 | 124:6 | inabilities | 80:1 122:6 |
| hours 13:12 | 162:21 | 200:1,6,11 | 125:13 | 11:8 | 147:11,16 |
| 55:13 | 165:13,17 | im 4:18 6:12 | 126:6,17 | inaccesible | 157:10,12 |
| 169:11 | 165:18 | 7:3 8:11,23 | 128:12 | individual | 168:21 |
| 179:13,13 | 170:24 | 11:5,6,7,14 | 129:1 131:7 | 11:11 12:11 | 168:21 |
| 179:14 | 174:22 | 12:13 13:2 | 140:7 145:3 | 44:20 45:15 | 186:24 |
| housed 23:23 | 175:19 | 13:3 14:9 | 146:10 | 45:20 62:2 | 147:11,16 |
| 24:7 26:1,4 | 177:2 | 16:7,19 | 146:13 | 62:15 | individuals |
| 27:5,9 | 178:20,23 | 17:6 18:12 | 151:12 | 168:18 | 10:19 26:20 |
| 31:14 32:18 | 179:1,3 | 19:18 20:18 | 156:23 | 165:15 | 62:4 126:11 |
| 38:6 48:19 | hundreds | 23:14 25:11 | 160:7 | 166:3 | 127:11,20 |
| 49:7 50:9 | 119:9 | 25:14 29:8 | 161:16 | incarcerated | 128:1 |
| 50:23 56:2 | hypothetical | 29:19 31:24 | 165:22 | 164:8 | 168:24 |
| 56:8 79:17 | 108:7 | 32:7 33:13 | 167:4 | 164:8 | 172:4 |
| 79:22 80:5 | | 33:23 34:14 | 168:12 | 164:8 | 172:4 |
| 80:17,20 | **I** | 36:18,19 | 170:18 | 71:1 72:2,5 | 180:24 |
| 81:17,19,23 | id 3:11 | 37:2 39:18 | 172:4 | 132:7 | 181:24 |
| 94:15 97:10 | identical 66:8 | 38:15 39:18 | 174:12 | 160:8 | 186:13 |
| 102:12 | identificati... | 44:9 45:10 | 176:14 | 164:15 | 187:11 |
| 119:6 | 4:5 38:3 | 53:4 58:14 | 177:9 | 110:17,20 | 188:6,12 |
| 129:14,16 | identified | 58:17 59:18 | 178:13 | 162:13,15 | 192:7 194:5 |
| | 8:13 | | | included | |

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 13

| | | | | |
|---|---|---|---|---|
| infirmary | 155:21,23 | intercom | 119:6 121:16 | k 200:3 | 137:13 |
| 15:3,11 | 127:14 | 101:24 | 122:2 | keep 189:9 | 139:13 |
| 127:14 | 78:6 | interested | 124:24 | 189:12,14 | 141:10,16 |
| inform | inspection | 201:4 | 127:12,14 | kind 19:21 | 141:19,21 |
| 196:15 | 5:21 6:7 | interruption | 128:12 | 53:10 96:20 | 141:24 |
| information | 7:16 84:5,7 | 74:16 | 130:19 | 103:21 | 143:19 |
| 27:14 44:22 | 84:18 93:3 | introduce | 164:13,18 | 175:12,14 | 144:10,12 |
| 53:5 118:21 | 169:24 | 37:22 | 165:15 | kinelly 36:13 | 144:14 |
| 170:3 | 170:8,16 | investigate | 170:3 | 37:17 44:13 | 145:5 |
| 173:24 | instance | 173:10 | 173:20 | know 6:1,9 | 146:22 |
| 174:20 | 83:19 170:6 | invoke 169:14 | 174:1,9,21 | 13:21 16:4 | 147:12 |
| 175:1 | 176:4 | involved | 175:2,20,24 | 21:6,13,16 | 150:22 |
| 177:22 | instruct 1:17 | 170:1 | 177:3,17 | 21:17,20 | 156:2 157:5 |
| 185:1 | 12:13 25:15 | involving | 178:21 | 22:7,18 | 157:10 |
| 197:22 | 60:7 126:17 | 134:19 | 179:20 | 25:1 26:2,4 | 158:8 159:5 |
| 199:21 | 74:24 | isnt 11:2 | 186:5,12 | 26:13,19 | 160:15 |
| inmate 9:24 | 174:13 | 26:17 27:20 | 188:2,11,14 | 28:16 30:22 | 161:10 |
| 130:5,10,18 | 185:12 | 188:2 136:4 | 195:18 | 33:10 35:2 | 162:6 164:7 |
| 189:8 | 193:1 | isolation | 134:18 | 41:9 44:21 | 164:22 |
| inmates | 194:12 | 40:13,14 | january 29:7 | 49:15,24 | 166:9,11,12 |
| 20:21 141:9 | instructed | 41:7 147:18 | 47:19 | 50:20,21 | 167:15 |
| 150:11 | 115:10 | 147:20 | join 146:9 | 51:18,19,22 | 168:12 |
| 175:21 | 140:11 | 166:24 | 174:12 | 54:3 54:4 | 169:23 |
| inquiry | issue 162:24 | 169:23 | 53:1 | 55:3 58:8 | 174:2,19 |
| 195:23 | 13:3 14:10 | 196:16 | 191:6 | 58:10,23 | 175:1 |
| inside 18:16 | 23:3,8,15 | issued 134:11 | judge 11:9,18 | 59:2,16,23 | 177:5 |
| 22:20 40:22 | 60:13 65:1 | issues 11:13 | 11:20 12:9 | 60:18 62:10 | 180:10,14 |
| 41:17,23 | 97:23 | 61:19 | 12:20 13:8 | 60:10 62:15 | 183:13 |
| 45:2 48:6 | 119:21 | 119:23,24 | 36:13,13 | 64:18 70:21 | 184:11 |
| 72:10 | 112:19 | item 199:6 | 37:17 44:12 | 71:4,6,8,18 | 186:20 |
| 54:5 57:11 | 115:7 124:7 | items 4:24 | 44:13 134:9 | 75:11,13 | knowledge |
| 57:17 74:19 | 125:14 | 7:7 106:16 | 146:3 | 76:2 77:24 | 11:12 12:11 |
| 83:16 111:6 | 152:4 95:9 | ive 35:4 69:1 | july 152:22 | 83:17 86:16 | 12:22 25:10 |
| 141:13 | 140:7 | 155:18 | 183:8,21 | 99:22 | 39:13,14 |
| 158:2 159:9 | 146:10 | | 197:16 | 100:23 | 49:18 50:6 |
| inspect 8:8 | 147:3 | **J** | 198:1 201:8 | 103:6,10,12 | 55:12 57:23 |
| 42:17 68:24 | 143:7,9,10 | j 2:9,20 | 114:18 | 103:16 | 63:3 |
| 143:7,9,10 | 165:22 | jacqueline | 143:14 | 104:10 | 69:23 79:22 |
| 170:5 | 179:17,24 | 2:14,17 | 159:15 | 105:4 107:1 | 100:19 |
| inspected 5:8 | 180:20 | jail 9:4,11,24 | 200:7 | 107:16 | 110:23 |
| 41:10 42:7 | 195:12 | 18:7 21:4 | 107:10 | 110:23 | 111:1 |
| 68:1 84:8 | 196:10,20 | 24:13 29:6 | justice 17:8 | 112:21 | 120:20 |
| 84:11 | intend 170:3 | 33:3 80:3 | 43:12 | 124:24 | 141:3 |
| | | 118:18 | | 130:9,10,12 | 157:19 |
| | | | **K** | 132:9 | |

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 14

| | | | | | |
|---|---|---|---|---|---|
| 178:5 | 52:2 58:6 | 176:24 | 180:23 | 25:23 27:5 | maam 29:18 |
| known | 58:15,21 | 177:4,6 | 181:3 | 27:13,17,22 | maintain |
| 175:24 | 59:12 60:5 | limited 10:16 | 184:12 | 39:21 70:9 | 10:17 15:19 |
| kunz 183:23 | 65:8 69:9 | 29:1 53:12 | 185:6 | 75:15,17 | 19:17 37:19 |
| | 70:1 71:16 | 94:15 99:7 | 187:4 13:18 | 80:16 81:5 | 94:19 123:5 |
| **L** | 72:22 75:8 | 99:21 | 188:4,10 | 83:19 84:14 | 134:6 |
| label 106:2 | 75:24 76:16 | 133:18 | 189:8 | 85:6 93:21 | 134:18 |
| 106:4 | 82:10 86:12 | 193:6,10 | 191:19 | 134:18 | 134:18 |
| 141:23 | 86:16 88:14 | limits 98:24 | line 117:10 | 131:9 142:9 | 167:19 |
| 145:18,22 | 89:18 92:13 | line 117:10 | 10:17 | 147:8 155:1 | 123:5 |
| 149:22 | 96:11 98:14 | 154:8 193:3 | 193:9 | 161:6 | 193:5 |
| larger 156:4 | 99:9 111:8 | lines 16:6 | located 55:16 | looked 7:21 | maintained |
| 156:7 | 99:14 111:8 | 166:8 184:5 | 55:17 | 143:3 | 7:5 |
| 157:16,17 | 112:18 | 184:14 96:7 | late 86:24 | looking 11:21 | maintains |
| late 38:5 | 113:19 | 33:21 34:6 | 96:2 | 22:5 25:14 | 130:9 |
| lavatories | 114:8 138:2 | looking 11:21 | late 86:24 | 130:9 | 167:23 |
| 25:10 58:19 | 139:11 | 22:5 25:14 | 96:2 | 40:16 68:15 | major 98:23 |
| 59:3 | 140:6 | 167:15 | lavatories | 70:6,13,14 | 13:19 |
| lawyer 59:24 | 142:16 | 172:23 | 25:10 58:19 | 83:2 84:23 | making |
| 60:10 | 143:23 | 126:16,19 | 59:3 | 94:10 95:8 | 35:12,20 |
| lawyer 59:24 | 163:11 | 128:18 18:3 | lawyer 59:24 | 152:7 | 44:7 |
| lawyers | 187:19 172:4 | 150:4,7,14 | 60:10 | 163:13 | management |
| 187:21 | 190:15 | 150:4,7,14 | lawyers | looks 66:23 | 173:10,17 |
| layout 84:19 | 191:22 | 151:2 | 187:21 | 78:14 83:24 | 173:18,21 |
| 85:13 | 194:9 | 180:4,9,15 | layout 84:19 | 96:7 | 174:1,21,24 |
| learn 118:20 | 194:15 | 181:21 | 85:13 | loss 176:5 | 175:2,20,24 |
| leave 20:15 | 196:9 | 155:13 | learn 118:20 | 117:16 | 176:1 178:8 |
| 21:19 | 196:9 | 84:16 | leave 20:15 | 117:16 | 177:17 |
| length 34:22 | 199:6 | 168:17 | 21:19 | locations | 179:20 |
| leaves 16:24 | 181:21 | listen 35:13 | length 34:22 | 150:15 | manager |
| leeway 18:13 | 155:13 | 35:15 | leaves 16:24 | locator 130:5 | 98:23 |
| left 85:4,8 | 177:6 | 16:8 | leeway 18:13 | 130:11,18 | 194:4 |
| legal 15:15 | 36:21 37:11 | 130:11,18 | left 85:4,8 | 106:16 | manners |
| 155:17 | 37:19 | locked 55:2,5 | legal 15:15 | 105:16 | 62:17 |
| 16:10 18:17 | letters 36:22 | 155:17 | 109:15 | 111:1 | manual |
| 19:9 20:15 | 37:5,23 | 16:10 18:17 | logical 23:21 | logged 29:14 | 104:20 |
| 21:1,8,19 | level 127:11 | logs 27:11,18 | logical 23:21 | long 93:15 | 105:5 |
| 25:13 26:22 | 121:24 | | logs 27:11,18 | 33:8 | march |
| 32:8,10 | 181:24 | | 167:20 | 72:2 127:5 | 134:11 |
| 33:7,22 | lieu 138:21 | | lieu 138:21 | 180:4,9,15 | mark 36:22 |
| 34:12,24 | life 98:24 | | life 98:24 | 181:21 | marked 3:1 |
| 36:6 42:14 | 99:4,6,12 | | 99:4,6,12 | look 5:12,17 | 4:4,19 7:4 |
| 44:3 45:10 | limitation | | limitation | 5:18 8:6 9:7 | |
| 46:6,17 | 65:2 | | look 5:12,17 | 9:17 10:8 | |
| 47:3 48:1 | 175:16,17 | | limitations | 24:24 25:18 | |
| | | | 180:3,6,7 | mds 147:24 | 4:4,19 7:4 |

Plaintiff's Exhibit 11 Page 54

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 15

| | | | | | |
|---|---|---|---|---|---|
| 8:3,12,21 | 110:21 | 26:15,18 | **moments** | 48:16 49:5 | 108:1 |
| 17:6 38:2 | 113:12 | 27:8,23 | 43:18 165:8 | 49:17 50:20 | 109:20,21 |
| 39:18 43:8 | 114:3,17,19 | 28:7,13 | **months** 36:16 | 51:5,6 52:7 | 110:11,13 |
| 43:9 70:14 | 118:9,15,18 | 75:16 | 49:17 50:20 | 54:17 56:16 | 111:15 |
| 83:7,22 | 118:19,21 | 157:14 | **morning** | 57:8 58:13 | 112:3,7,21 |
| 131:14 | 118:22,23 | **mentioned** | 171:17 | 59:5,14,18 | 113:10 |
| 156:8 161:5 | 118:24 | 7:21 8:20 | **morrissey** 2:2 | 59:22 60:8 | 114:1,12,13 |
| **match** 45:17 | 119:6,7,9 | 57:17 70:23 | 2:3,3 3:3 | 60:15,22 | 115:12,19 |
| **matches** | 119:10,11 | 73:5 92:2 | 4:6,14 6:18 | 61:8,21 | 115:21 |
| 45:16 | 119:21,22 | 116:24 | 6:19 10:8 | 10:11 11:1 | 116:9,17 |
| **materials** | 120:2,2,5,9 | 116:24 | 11:3,9,18 | 61:12,16,22 | 118:6 119:4 |
| 54:3 | 120:10 | 157:15 | 12:4,9,19 | 63:10,20 | 119:15,20 |
| **matt** 171:21 | 121:3,3,8 | **meritless** | 13:6,15,19 | 64:8 65:3 | 121:1,18,24 |
| **matter** 99:24 | 126:22,24 | 12:4,9,19 | 14:1,5,14 | 65:12,20 | 122:6,9,10 |
| 101:1,3 | 127:1,4,7 | **met** 23:24 | 14:23 15:1 | 67:17 69:13 | 123:1,4,15 |
| **matters** | 127:10,22 | **metal** 53:21 | 14:23 15:1 | 70:5 71:21 | 124:9,16,18 |
| 99:23 195:8 | 128:7,12 | 53:22,24 | 15:18 19:9 | 72:17 73:4 | 125:15,22 |
| **maureen** | 129:19 | 54:2 103:24 | 16:4,6,23 | 74:17 75:14 | 126:10,20 |
| 39:20 66:9 | 132:11,12 | 104:1 | 17:5 18:19 | 76:7,21 | 128:6,13 |
| **mean** 9:15 | 132:13 | **mind** 30:15 | 19:13 20:6 | 77:6,24 | 129:23 |
| 23:5,17 | 134:19 | **mindless** | 20:17 21:10 | 78:1,21 | 130:3,21 |
| 24:10 33:15 | 135:13,13 | 31:17 | 21:14 22:22 | 80:11 81:14 | 132:19 |
| 34:3 41:16 | 135:18,20 | **mine** 30:23 | 22:4 23:10 | 81:13 82:15 | 134:1,17 |
| 41:24 42:23 | 135:24 | **minimum** | 23:11,19 | 83:14,17 | 135:1,9 |
| 44:19 63:21 | 136:8 137:11 | 93:11 | 24:3,11,17 | 84:7 85:9 | 136:18 |
| 63:21 74:1 | 137:10 | **minute** 95:3 | 25:6,7,17 | 85:7,21 | 137:6,7 |
| 93:21 | 137:18 | **mischaract...** | 26:3 27:1,3 | 88:19 89:7 | 138:8 139:1 |
| 100:11 | 138:19 | 117:5 | 27:19 28:1 | 89:20,21 | 139:3,16,17 |
| 107:1 109:1 | 139:24 | **mischaract...** | 28:6 29:21 | 90:6,13 | 140:9 |
| 124:24 | 150:20 | 171:3 | 30:5,16 | 91:1,16 | 142:22 |
| 154:7 156:2 | 159:15 | **misstates** | 31:6,17 | 92:17 93:14 | 144:5 145:4 |
| 177:5 | 164:8,14,19 | 63:4 91:12 | 32:4,22 | 93:20 94:1 | 145:13 |
| 184:11 | 168:10 | 102:14 | 33:1,16 | 94:16,23 | 146:12 |
| **meaning** 19:3 | 172:16 | 188:22 | 34:2,16 | 95:1 96:12 | 147:5 148:6 |
| 25:3 118:10 | 178:19 | **mobility** | 36:12,24 | 96:13 97:13 | 148:8,22 |
| **means** 84:2 | 189:24 | 175:16,17 | 37:11,16 | 98:5,18,20 | 149:4,20 |
| 189:8,21 | 190:8,11,22 | 176:23 | 37:11,16 | 99:13,24 | 150:8,15,21 |
| **measure** 42:8 | 191:2,6,19 | 177:4,5 | 38:4,10,14 | 100:7 101:4 | 151:3,4,14 |
| 50:4 72:6 | 194:6 196:5 | **modeled** | 38:17,21 | 101:11 | 155:7,14,23 |
| **measured** | 196:6,15 | 142:20 | 39:1 42:19 | 102:19 | 156:14,21 |
| 22:15 156:6 | **meet** 46:23 | **moment** | 43:2,6,21 | 103:20 | 157:1,6 |
| **measureme...** | 57:16 75:17 | 57:16 75:17 | 44:4,11 | 104:10,12 | 159:1 160:4 |
| 43:1 | 93:20 95:8 | 93:20 95:8 | 45:1,18 | 105:12,19 | 160:14,19 |
| **medical** | 168:3,9 | 103:1 142:9 | 46:10,11,21 | 106:4,17 | 161:10 |
| | **memory** | 168:15 | 47:8 48:5 | 107:10,22 | 162:22 |

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 17

| | | | | | |
|---|---|---|---|---|---|
| 19:2,3,4,20 | 107:11 | **oath** 199:14 | 76:15 77:2 | 150:3,13,24 | **obstructions** |
| 23:7,18 | 108:9 | **object** 6:12 | 78:15 80:22 | 151:10 | 88:3,5 |
| 25:1,1,3,13 | 109:23 | 10:1 11:6 | 81:7 82:9 | 155:12 | **obviously** |
| 28:19 31:13 | 110:15 | 21:11,12 | 83:10 86:11 | 156:11 | 12:23 |
| 32:11,13,15 | 111:3,22 | 37:4,5 | 86:23 88:13 | 158:3,22 | **occasions** |
| 32:19,21 | 112:10 | 77:18 93:7 | 88:24 89:17 | 163:6 163:3 | 69:2 |
| 33:8,23 | 114:2 115:2 | 94:8 172:3 | 90:1 91:11 | 165:20 | **occupied** |
| 34:13 35:1 | 115:23 | 176:16 | 92:12 94:20 | 166:7,21 | 50:18 |
| 35:14,17,18 | 116:19 | 183:4 | 96:10 97:21 | 167:10 | **occupying** |
| 35:24 36:2 | 118:18 | **objecting** | 102:13 | 170:10 | 51:10 |
| 36:7,8,10 | 126:1 137:8 | 193:14 | 104:8,23 | 173:2 | **oclock** 1:22 |
| 36:14 44:6 | 138:20 | **objection** | 105:14 | 174:10 | **october** 83:3 |
| 58:22 62:11 | 139:18 | 24:17 25:11 | 108:8,13 | 175:3 176:6 | 86:3 |
| 94:13 98:7 | 140:15,23 | 176:11 | 107:8,13 | 179:15,22 | **offender** |
| 98:7,17 | 141:17 | **objection** | 109:12 | 180:18 | 86:3 |
| 101:14 | 149:21 | 6:16 10:5 | 110:9 111:7 | 181:18 | 173:10,21 |
| 102:18 | 150:9 151:6 | 13:3 14:21 | 111:21 | 182:3 | 174:24 |
| 120:16 | 154:21 | 15:14,19 | 112:17 | 183:3 | 175:8 |
| 124:5 125:1 | 159:9 158:8 | 18:8 19:18 | 113:5,17 | 184:15 | **offered** |
| 125:2,18 | 158:9 | 20:11,24 | 114:7 115:5 | 185:8 | 197:19 |
| 146:7 181:4 | 159:12,19 | 21:22 22:22 | 115:16 | 186:15 | **offhand** |
| 185:10 | 160:20 | 23:14 24:4 | 118:1 119:2 | 188:22 | 97:3 |
| 193:4,13 | 191:10 | 26:21 30:13 | 119:3 | 190:1,5,12 | **office** 5:13 |
| 194:15,21 | **number** 3:1 | 30:19 31:10 | 120:11,14 | 191:3,21 | 7:12 9:22 |
| 194:22 | 5:15 28:23 | 31:18 32:8 | 121:3,22 | 192:9,22 | 18:20 20:3 |
| 197:7 | 76:24 83:22 | 33:6,20 | 122:20 | 193:22 | 23:4 |
| **notices** 7:24 | 130:23 | 34:10,23 | 123:22 | 194:19 | **offices** |
| 169:3 | 157:8,11,13 | 42:13 44:1 | 125:11 | 195:10 | 47:18 51:4 |
| 194:17 | 161:16,18 | 44:10 45:8 | 126:3,15 | 196:8,18 | 63:19,22 |
| **notified** 9:12 | 162:18 | 46:3,5,16 | 128:1,9 | 197:3 | 64:6,9,13 |
| 9:13,16,18 | 163:17 | 47:2,24 | 132:14 | **objections** | 97:18 |
| **notify** 9:20 | 193:4 | 48:11,22 | 133:21 | 35:4,12,20 | 102:17 |
| 9:23 | 195:17 | 49:10 51:1 | 134:13,21 | 35:22 37:8 | 116:14,22 |
| **november** | 196:12 | 52:1 56:10 | 137:3,20 | 37:18,20 | 117:8,21 |
| 39:21 95:10 | **numeral** 9:8 | 57:2 58:5 | 138:23 | 38:23 44:7 | 119:1,8,12 |
| 95:14,16 | 9:17 | 58:20 59:10 | 139:8 143:7 | 123:6 | 119:22 |
| 190:19 | **numerous** | 60:4,12 | 145:5 | 193:20 | 130:4,6 |
| 101:2,8 | 173:15 | 61:5 62:6 | 145:15 | **objects** 169:9 | 132:1 |
| 102:22 | **nurses** 55:11 | 63:3,16 | 146:9 147:3 | **observation** | 134:18 |
| 103:2,6,13 | **nursing** | 64:23 65:7 | 145:8 146:4 | 136:5,5,7 | 136:12,13 |
| 103:8 | 55:14 | 67:12 69:8 | 146:10 | **observing** | 137:13,18 |
| 104:14 | | 69:24 71:15 | 147:1 148:2 | 130:17 | 146:24 |
| 105:3,20 | **O** | 72:21 75:7 | 148:20 | **obstruction** | 149:2 |
| 106:7 | **o** 200:3,3 | 75:9,22 | 150:19 | 60:23 91:3 | 164:24 |

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 16

| | | | | | |
|---|---|---|---|---|---|
| 163:11,15 | **movement** | 48:10,15 | 43:14 44:1 | 118:1 119:2 | 183:3 184:4 |
| 165:7,11 | 108:14,17 | 76:11 96:15 | 44:4,8 45:8 | 119:13 | 184:15 |
| 166:1,15 | **moving** 65:21 | 97:10,19 | 46:3,16 | 120:13 | 185:8,16 |
| 167:3,18 | 154:12 | 98:11 | 47:2,24 | 121:13,22 | 186:15 |
| 168:15,18 | **multiple** 69:1 | 121:8 | 48:11,22 | 122:3,20 | 187:23 |
| 169:14,18 | | 121:20 | 49:10 50:24 | 123:3,5,22 | 188:22 |
| 170:5,13,19 | **N** | 123:19 | 52:1 56:10 | 124:14 | 190:1,14 |
| 171:4,12,17 | **n** 3:1 179:12 | 126:2,7 | 57:2 58:5 | 125:11,16 | 191:3,21 |
| 171:24 | 179:13 | 133:2,5,8 | 58:20 59:10 | 126:3,15 | 192:9,22 |
| 172:6,14,21 | 181:22 | 134:7 136:4 | 59:15 60:4 | 128:1,9 | 193:12,19 |
| 173:6,7 | 182:3 | 137:20 | 60:12 61:5 | 130:16 | 194:8,17 |
| 174:2,15,18 | **narrow** 4:15,17 | 167:9 | 61:12 62:6 | 132:14 | 195:10 |
| 175:7 176:9 | **narrow** 31:15 | **neither** | 62:12 63:3 | 134:13,21 | 196:8,18 |
| 176:14,23 | 126:18 | 176:21 | 63:16,23 | 134:13,21 | 197:3 |
| 177:1,10 | 150:6 | 196:12 | 64:23 65:7 | 137:3,20 | 198:3 |
| 178:17 | 194:13 | **never** 64:17 | 67:12 69:8 | 138:23 | **notary** 1:18 |
| 179:19 | **narrower** | 81:14 83:11 | 69:24 71:15 | 139:9 140:5 | 199:22 |
| 180:2,22 | 23:20 | 122:23 | 72:14,21 | 142:15 | 200:4 |
| 181:5,15,21 | **nature** | **new** 68:18 | 75:7,23 | 143:22 | **notice** 4:7,7 |
| 182:22 | 129:17 | 184:12 | 76:15 77:2 | 146:4,9 | 4:20,21 5:1 |
| 183:6 184:9 | **near** 82:22 | **nichols** 2:9 | 77:18 78:15 | 146:17 | 7:1,5,5,6,13 |
| 185:3,14,21 | **need** 16:5 | 6:12 10:1,9 | 80:22 81:7 | 147:1 148:2 | 83:15 92:4 |
| 186:21,22 | 67:9 81:24 | 10:21 11:4 | 82:9 83:9 | 149:17 | 157:3,6 |
| 188:1 189:1 | 117:17 | 11:6,14,19 | 84:7 86:11 | 150:13,24 | 157:20 188:4 |
| 190:9,20 | 121:5 | 12:6,13 | 86:23 88:13 | 151:10 | **notices** |
| 191:5,7,8 | 124:13 | 14:9 15:14 | 88:24 90:1 | 152:11 | 7:18 171:6 |
| 192:4,13 | 133:15 | 15:19 18:8 | 91:12 93:7 | 154:1 | 181:19 |
| 193:4,16,21 | 135:3,5,10 | 19:11,17 | 93:12 93:13 | 156:21 | 182:6,10,10 |
| 194:1,15,20 | 136:9 171:11 | 20:11,24 | 94:8 96:1,3 | 157:1,8,11 | **notation** |
| 196:14,22 | 108:16 | 22:2,22 | 96:10 97:15 | 158:13 | 201:7 |
| 197:8,11 | 109:16 | 23:14 24:2 | 97:21 98:5 | 159:1 | |
| 198:2 | 110:22 | 25:11 26:21 | 99:13 98:7 | 166:7,21 | |
| **motion** 37:12 | 111:13 | 30:13,19 | 100:7 | 167:10 | |
| 37:13 | 126:6 | 31:10,17 | 102:13 | 170:4 | |
| **mounted** | 133:12 | 31:10 32:7 | 104:8,23 | 172:1 | |
| 154:3,4,8 | 138:7 162:2 | 33:6,20 | 105:14 | 172:17,22 | |
| **movable** 51:8 | 163:24 | 34:10,23 | 108:8,13 | 174:12,16 | |
| 90:7 103:11 | 164:1 | 35:3,14,18 | 109:12 | 174:2 | |
| **move** 97:7 | **needing** | 35:21 36:1 | 110:11 | 175:3,17 | |
| 103:9,15 | 136:6 | 36:18 37:2 | 112:17 | 174:7 115:5 | |
| 154:16 | **needs** 45:23 | 37:15,18 | 113:17 | 180:18 | |
| **moved** 57:14 | 47:17,23 | 38:9,12,15 | 114:7 115:6 | 181:2,10,18 | |
| 81:18 | | 38:19 42:13 | 115:16 | 18:15,21 | |

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 18

| | | | | | |
|---|---|---|---|---|---|
| 167:22 | 31:24 33:2 | **p** 1:22 | 13:4 19:22 | 162:8,10 | 125:5,8,23 |
| 168:3 | 46:24 54:9 | **padded** 104:2 | 21:3 | 164:17 | 140:22 |
| 171:15,18 | 56:23 67:7 | **page** 9:8 | **parties** | 167:16 | 172:1 |
| 196:23 | 90:11 91:10 | 39:22 40:17 | 197:11,14 | 173:8 | 179:2 180:5 |
| 197:11 | 99:5 104:5 | 66:9,17 | 201:1,3 | **periods** | 182:10 |
| **officer** 9:5,12 | 108:13 | 70:9,13,14 | **parts** 53:22 | 158:16 | 183:4 |
| 9:20 13:1 | 114:3,16,17 | 75:15 83:19 | 54:3 | **permanent** | **persons** |
| 186:4 | 105:13 | 118:10 | 85:9,12,13 | 41:22 42:1 | 123:19 |
| 105:13 | 114:19,22 | 84:24 85:6 | 15:8 16:12 | 47:21 | **pertaining** |
| 115:6,4,21 | 82:3 | 85:9,12,13 | 17:7 | 159:19 | 1:17 35:24 |
| 116:4,6 | 122:16 | 85:16,17 | **patients** | 178:2,19 | 36:1 |
| 118:13,15 | 132:3 | 86:22 87:4 | 147:23 | 179:9 | **pertinent** |
| 145:2 | 153:18 | 88:2,22 | 182:1 | 181:1 160:6 | 36:3 |
| **officers** 55:20 | 135:20 | 92:19 96:3 | 169:6 | **persist** 24:13 | **phillips** 134:9 |
| 55:21 67:20 | 137:3 159:2 | 137:3 159:2 | **patrick** 2:3 | 75:8 | **phonetic** |
| 69:3 | 169:12 | **parking** | **pending** | **permissible** | 134:10 |
| **okay** 66:14 | **ordered** | 151:19 | 169:6 | 93:3 | 183:20 |
| 75:18 | 128:14 | 157:7,7 | **peggy** 24:13 | 193:13 | **phone** 40:21 |
| 128:14 | 157:7,7 | 200:9 | 75:2 | **permission** | 41:2 66:24 |
| 196:3 | 201:5 | **pages** 83:15 | 62:8 74:3 | 158:14 | 143:9 |
| **once** 9:18 | **outside** 40:23 | 87:10,19,22 | 75:8 | 184:24 | **photograph** |
| 19:17 25:11 | 55:12,14,17 | 199:15 | 175:15,17 | 7:16 75:6 | 66:17 |
| 93:22 | 55:21 78:11 | **paralyzed** | 175:15,17 | 102:5 | 107:6 109:5 |
| **ones** 52:11 | 101:9,19 | 47:13 | 174:7 177:4 | **person** 12:21 | 73:11,12,13 |
| 186:4 | **overboard** | 100:13,14 | 28:21 45:3 | 28:21 45:3 | 83:15 92:4 |
| **opening** | 21:2 22:23 | 100:17 | 45:14 56:8 | 45:14 56:8 | 107:6 109:5 |
| 82:24 | 30:14,20 | 100:17,18 | 178:2 | **personal** | 141:2 66:19 |
| **open** 71:23 | 37:20 | 159:8 | 194:2 | 12:22 49:18 | 143:9 |
| 132:8 | **overcome** | 104:6 | 195:7 | 169:16 | **photograph** |
| **opinion** 18:2 | 137:5,8 | **perfectly** | 96:9,21 | 97:16 99:17 | 66:17 |
| 32:20 60:1 | 192:10,15 | 35:10 | 97:16 99:17 | 100:8,13 | 107:5 |
| 134:10 | 193:15 | **period** 26:14 | 100:12,20 | 102:7 | **photographs** |
| 155:15 | 196:10 | 123:3,17 | 102:7 | 104:16 | 72:10,12,13 |
| 139:6 | **overcoat** | 124:1,2,15 | 61:17 | 161:18 | 83:15 92:4 |
| 160:1 | 64:22 65:14 | 26:19 27:10 | 107:6 109:5 | **photographs** | 107:8 108:1 |
| **opportunity** | **overlaps** | 110:6 114:7 | **part** 24:13 | 109:6,7,8 | 170:8 178:1 |
| 36:12 | 11:12 12:11 | 161:11 | 38:6 50:12 | **phrased** | 178:17 171:1 |
| **order** 5:18,19 | **override** | 169:3 | 85:19 | 140:8 150:6 | |
| 7:19,8 | 169:3 | 142:3 | **particular** | 118:10,17 | |
| 8:21 10:14 | **oversized** | 118:10 | 103:3,10 | 185:11 | |
| 10:22 11:2 | 156:1,3 | **P** | 11:17,23 | 53:9 16:3 | 192:11,22 |
| 11:2 14:7 | | | 12:2,15 | 160:12 | 194:11 |
| 14:11 31:7 | **P** | | 12:2,15 | 124:21 | |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 55

SABRINA RIVERO-CANCHOLA
June 29, 2016

195:12
196:10
**physical** 19:5
28:24 53:11
53:15,18
60:16 64:22
65:5,14,20
98:8 99:16
100:9,14
102:4
125:20
193:5
**picture** 78:12
87:5,8 89:3
92:6,7
143:6
**pictured**
87:24
**pictures**
78:12 83:7
83:11 84:15
87:19 161:4
170:17,21
**place** 70:17
196:24
**placed** 18:23
28:8 39:3
68:20 76:23
75:23 157:17
143:3
149:13
179:4,5,6
179:10
191:2,13,15
**placement**
194:4
**placements**
191:10
**placing**
138:15
142:2
141:13
**plaintiff** 1:4
1:10 29:5

115:14
199:4,9
**plaintiffs** 2:6
3:12 4:3,19
7:4 8:4,22
8:22 17:7
35:7 39:19
43:9 66:8
78:7 83:7
84:11 153:6
**plastic** 53:21
53:23 54:1
54:3 104:1
**please** 4:15
4:16 118:7
**point** 10:4
113:16
114:15,21
115:15
116:1,8,16
117:3,23
122:13,18
125:9
138:14
139:5,20
140:1
145:14,16
145:24
149:8
150:10
151:8
153:19
154:9
161:23
124:20
**position** 9:3
18:5 20:2,3
21:12 45:19
46:13 47:6
50:6 63:11
63:13 64:7
64:9,13
123:16
135:2,5,7,8

50:13,17,22
51:13,16,19
52:9 54:9
54:20,22
55:7 56:3,9
67:10
**possible**
42:22,23,24
65:11
**possibly**
81:24 127:9
127:13
129:9 154:2
162:4
**potentially**
27:24
110:20
112:20
120:10
139:5
141:8
142:8
151:5
**preparation**
5:3 8:7,16
8:24 14:7
9:10 140:6
119:17
100:10
119:7
153:2
155:11
171:7,11
**prepared**
14:18
173:14
**prescribed**
143:15,16

135:9,12
137:15,17
**possible**
42:22,23,24
65:11
**possibly**
81:24 127:9
127:13
129:9 154:2
162:4
**potentially**
180:17
181:13,24
182:5,6,10
183:2,11
184:2,14,20
188:9,20
189:17
191:18
192:7,15,20
194:5 195:8
196:17
**prescriptions**
177:20
178:11
181:9,16
189:2
200:17
**present** 65:5
100:14
119:17
153:2
155:11
**prepare** 7:11
**prescribed**
143:15,16

165:1 180:5
185:7 186:2
186:14
187:1
188:6,13,19
**prescription**
135:22
136:1,9
136:19
162:14
177:14
178:5 179:2
179:10
180:17
181:13,24
182:5,6,10
183:2,11
184:2,14,20
188:9,20
189:17
191:18
192:7,15,20
194:5 195:8
196:17
**pretty** 94:13
189:2
200:17
**prevent**
60:24
**previous** 63:4

91:12
102:14
**previously**
45:13 56:21
57:6 95:3
96:2 100:17
101:15
102:23
114:18,23
117:7
140:24
141:8
146:15,18
158:12
**printer**
156:15
**printing**
130:13
**prior** 71:10,11
27:4 29:14
77:20 83:12
95:21 155:6
16:15
169:14
171:5 183:7
**prisoner** 9:11
43:24 46:24
54:18 56:19
56:24 63:11
65:6 67:7
73:21 86:10
97:19 98:12
100:10
102:1,5,10
102:22
104:4,6,14
115:4
143:14
108:12,15
108:20,24
110:18
112:23

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

113:1,13
116:15
120:8,11
121:5,20
122:11
137:1
149:15,24
165:1
180:16
185:6 186:1
196:1,24
**prisoners**
64:11,21
63:16 67:4
68:11,12,13
82:8 86:20
87:7,17
92:11
106:19
109:15
117:8 120:4
121:10
134:19
142:22
146:2
148:15,18
151:7
158:17,24
159:5 182:4
183:1,10
184:2,13
**probably**
24:5 120:15
160:4,9
**problem**
21:20
171:12,14
**procedure**
1:16 9:22
120:23
164:23
**procedures**
5:7,11 7:14
7:17 64:20

**proceed**
83:13 101:6
171:6 172:4
**produce**
169:12
171:19,20
193:17
**produced**
4:23 11:24
15:17 16:8
77:20 83:11
156:12
191:16
197:13
**producing**
197:22
**product**
105:9 106:2
106:19
142:1
145:18,21
**production**
156:17
169:7
170:16
**professional**
113:12
118:9,19
131:23
**professionals**
119:21
**prompt**
106:6
**promptly**
197:23
**promulgated**
16:12 51:23
52:5
**prove** 211:8
186:8
24:16

**provide** 25:9
28:17 47:7
47:16,21
48:20 49:2
51:6 58:12
64:14,17
91:18 110:2
110:6
111:12
116:4,23
118:11
119:22
120:2 125:7
126:2 133:7
135:6,11,20
137:19
138:9,19
139:5,6
148:14,17
149:2,14,23
150:10,23
151:9
153:6 157:2
158:16
160:8
161:24
162:4
166:24
168:19
172:16
197:19
**provided**
24:12 29:2
29:15 37:5
47:18 49:14
49:16 52:18
53:13 56:4
56:18,21
62:24 68:11
80:7 81:11
89:10 90:21
109:18
110:18
112:10
114:21
116:17,21
120:9
133:13
138:5
140:14

135:9,11
141:3,7
144:3,7
146:13
150:19,20
152:12 158:1
158:11
162:3
163:19,23
170:2 185:2
185:16
193:7
**providers**
174:8
177:16
**provides**
18:21 28:19
44:6 56:7
76:5 124:9
193:5
194:16
**providing**
56:3 117:22
66:24 143:5
question 6:6
6:16,20,21
20:12,13
21:5,21
22:1,23
22:9 31:7,9
25:16 26:23
27:2,21
29:12,14,16
29:14,16,17
29:20,21
30:14,15,17
30:21 31:11
31:16 32:20

7:23
**pursuant**
1:15
**put** 43:11
102:18
160:10
170:15
173:12

**Q**

qualified
10:19
117:17,19
168:24
173:1
175:11,13
175:14
193:1
**qualifies**
117:12
**quality** 41:2
66:24 143:5
**question** 6:6
6:16,20,21
20:12,13
21:5,21
22:1,23
22:9 31:7
25:16 26:23
27:2,21
29:12,14,16
29:14,16,17
29:20,21
30:14,15,17
30:21 31:11
31:16 32:20

32:23,24
33:9,20,24
34:15 38:16
39:10 44:2
44:10,15
45:9,11,24
46:4,4,7,9
50:10,16
52:2 53:11
53:20 56:11
56:12 57:3
58:6,7,14
58:17,21
59:11,13
60:5 61:5
61:14,15,22
61:22 62:3
62:7 64:2
64:24 65:2
65:8,9 70:1
71:16 72:15
72:23 75:8
75:10,24
78:18 80:4
80:11 82:10
83:1 86:2
86:12,23
88:14 89:18
90:17 91:17
92:14 94:9
96:11 97:1
97:2,8,12
97:14,15,22
97:24 98:6
98:14,15
99:22
104:8,11,24
105:17,22
106:5 107:8
107:15,18

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

107:22
108:3,4,6
110:9,12
111:8,16
112:18,20
113:6,17,18
113:20,22
114:8 115:6
115:8,11,17
115:20
116:10,18
118:1,5
119:2,13,19
120:14,17
120:18
121:13,22
122:4,5,20
122:22
123:6,7,23
124:9
125:12
126:15
128:1,4,5
128:10
132:15
133:21
134:13,16
134:22,24
136:17,19
137:3,21
137:8,13
138:24
139:2,10,12
139:15
140:6,8
142:16
143:21
145:3
146:4,11
147:1,4
148:24
149:17
150:3,6,14
150:24

151:10,13
151:12,20
158:19,21
162:9 163:9
35:16,23
36:1,3,5,9
37:4,6
93:13 94:18
97:6 124:3
169:4 171:8
171:22
174:14
175:15
176:7
190:2
193:14,18
177:12,21
178:14
179:15,22
184:11,18
186:6,7,9
190:2
191:3,15
196:3,8,18
197:16,24
197:11
162:9
166:21
102:5
109:19
103:20
120:11
139:20
134:19,19
152:6,21
159:18
183:12,14

**R**

**r** 2:20
**raise** 37:16
**raised** 37:18
**rede** 9:19,23
**read** 16:1
17:1 19:15
19:16 29:24
44:16 46:1
61:16 64:3
90:18 93:12
105:23
165:16
167:24
123:8
77:11,13
12:1,4,10
12:14,23
13:4,13
14:8,11
15:18 19:22
21:16,21
23:4,6,16
24:18,21
28:20 30:23

33:18 34:7
34:19,22
35:16,23
36:1,3,5,9
37:4,6
93:13 94:18
97:6 124:3
**reasonable**
47:7,9,15
47:22 49:8
64:14,15
171:22
112:12
122:9 123:8
130:16
137:22
148:6
152:23
169:2 172:3
**recall** 26:10
57:12 69:20
78:6 84:4
78:18 96:6
197:12,18
**records** 26:16
27:15,16,24
116:16
119:5
122:1,2
134:19,19
152:6,21
159:18
183:12,14

37:9,23
34:19,22
73:15
61:16 64:3
79:15 80:10
90:18 93:10
100:7
105:23
108:20
107:19
190:2
106:23
116:23
123:9 123:8
156:19,24
146:6 152:3
148:3 153:5
149:23
168:18,20
178:12,14
191:3
197:1,4,18
98:2
143:1
66:22 96:4
143:1
151:20
5:13
6:8,24 8:2
25:4
81:2
95:13
8:11 17:23
22:22 24:13
28:7 34:4
35:5 46:14

197:22
**referring**
27:19 51:3
63:18 69:12
87:10 96:17
96:19,21
108:20
120:1 142:6
**refers** 10:21
31:13
125:18
**reflect** 25:24
30:7 70:18
95:9 130:22
131:10
**reflects**
142:10
145:23
162:17
**refresh** 27:8
27:22 28:7
28:12 75:15
157:14
**regans** 66:9
66:22 96:4
143:1
**reduced**
200:14
**refer** 12:17
81:2
151:20
**reference**
5:13
6:24 8:2
25:4
81:2
95:13
**reference**
8:11 17:23
22:22 24:13
28:7 34:4
35:5 46:14

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 29, 2016

47:17 50:5
57:16 64:10
67:2 80:16
89:8 119:23
119:24
120:3 121:9
121:10,11
124:12,20
126:23
137:11
140:13
148:10
154:20
160:2
160:24
262:19
80:3
release 79:21
80:3
**relevance**
19:6 94:9
107:14
122:22
123:24
124:9 154:5
160:4,9
**relevant**
78:17
119:10
122:12
164:23
171:12,14
**remarkable**
1:16 9:22
**remodel**
160:14
**removable**
75:22 76:12

**renovated**
167:7
**renovations**
166:11
**repeat** 15:22
16:21,23
19:13 44:14
45:24 50:10
64:1 79:24
60:9 72:9
56:18,24
57:1 63:14
67:19 91:7
1:12,9
112:22
100:12,16
102:1 116:8
116:16
123:18
125:9 151:3
149:5 151:3
121:5 191:5
**rephrasing**
30:15 32:10
**report** 66:9
141:3
**reported**
200:16

**represent**
7:12 39:23
93:18
162:4 171:9
172:10
162:17
18:5 20:19
21:15 39:6
42:20 46:22
44:17 46:2
60:9 72:9
75:6 61:17
72:18 75:19
86:19 88:10
66:24 140:5
103:17
100:24
111:17
137:15
172:15,18
2:6,12,23
52:13
**request** 54:8
54:10,12,14
56:8,14
57:1 63:14
114:15
151:8
32:14
**require** 23:17
31:8 34:22
173:9 174:3
**required**
47:7 72:19
193:16,17
**requirement**
10:17 23:13
32:2,5 33:4

159:2
168:21
162:4 171:9
172:10
173:24
114:15
151:8
116:2
130:24
108:13
109:9,24
111:4,18
112:12,14
116:2
130:24
173:1
197:1
**requested**
46:14 54:24
71:13
**requesting**
56:12
13:9 67:10
114:15
151:8
**requests**
32:14
34:14 77:21
178:3
13:15
143:1
**require** 23:17
31:8 34:22
56:8 75:20
197:7,10
121:1
137:18
129:2
122:8 193:9
131:1
12:1 98:7
200:8,13
**requirement**
154:12
rest 82:14
review 26:16

**33:18**
requireme...
17:21 22:6
25:8 33:10
33:14
requires 53:6
135:14,19
**requiring**
37:12
121:1
**resembled**
96:1
**resembles**
92:6
**reserved**
4:20 7:5
163:13,23
**reserving**
170:19
**residential**
193:9
**respect** 9:11
**respectfully**
60:20 65:21
85:3,7
94:24 108:7
109:3 130:8
139:2 155:3
**respond**
7:12 160:9
**responsibil...**
109:22
121:23
**rivercanc...**
1:14 3:2
4:10,17
10:3 11:24
19:11 124:4
13:4 104:19
role 121:19
roll 42:21
roman 9:7,17
room 19:5

43:15 71:4
71:8 76:22
80:12 81:24
91:8 92:1
129:22
152:6,21
153:14,19
reviewed 5:6
5:7 7:14
14:6
**reviewing**
129:10
**revised** 4:7
9:6
170:15
**richard** 2:9
2:20
**right** 13:23
15:9 29:9
152:6
133:18,19
133:24 15:9
121:11
5:7 7:14
14:6
**responding**
109:22
121:23
12:1 98:7
200:8,13
roll 42:21
roman 9:7,17
room 19:5

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 56

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 23

23:22 26:17  138:15  78:3,14  170:24  157:11  set 201:7
27:20 29:4  139:8,22  79:9,19,23  181:2,4  see 9:9 19:20  setting
30:3,11  140:2  80:6 93:4,6  scope 16:2  22:13,16,17  123:20
31:20,21,23  141:17,22  94:3 128:19  14:12,12  26:6,8 36:7  sheet 131:15
32:1 34:18  143:10  128:22  18:11 23:2  38:22 40:22  132:1
39:3,11,15  144:15  129:3  32:20 33:8  41:3 75:16  sheriff 1:6,11
40:6,10,13  145:7  154:22  33:22 34:12  76:8,12  2:12 4:23
40:14,19,24  148:10,19  155:15  34:24 58:22  78:16 84:23  7:12 9:4
41:1,7  149:12  161:2  60:6 64:24  92:5,6  15:18 16:9
43:22 45:6  150:15  166:16,16  97:22 115:6  98:17  18:1,3,17
46:23 49:19  151:15,17  167:5,6  120:15  142:10  18:19 20:7
50:8,14,17  151:21  173:15  125:13  158:7  20:13,15,20
50:19,23  152:2,8,23  179:5 184:1  128:2  162:18,24  20:21 28:24
51:9 52:21  152:24  184:12,22  134:14,22  seeing 57:12  45:20 47:16
54:5,24  153:7,21  184:23  137:5 146:7  93:9  50:6,21
56:15 57:7  153:23  185:5,20,23  147:2  seek 32:10  51:2 56:7
57:9,11,14  154:10  185:23  151:11  161:22  56:18 60:10
60:17 61:4  156:1  186:10,11  158:19  194:9  61:2,23
62:19 63:1  161:20  186:23  165:4,21  seeking 25:13  62:3,18,24
63:15 64:21  187:1  187:4,10  176:7  32:8 33:21  63:14,18
65:6 66:15  rooms 24:7,8  188:5,17  179:16,23  177:23  64:19,19
66:20 67:15  28:16 35:6  191:2  180:19  seeks 138:2  65:13 67:8
67:21 96:9  98:9 124:10  192:14,16  181:19  seen 4:21  69:23 72:11
97:9,11,20  126:13  194:23  185:9 190:2  17:10  86:20 87:6
100:9,15,20  153:12  195:9 196:9  191:4  segregation  90:15 91:18
101:9,9,16  175:8  rules 1:15  194:10  128:22  93:18,19
101:19,20  182:16,16  35:7  196:19  101:5  101:5
101:24  182:17,18  _____  128:22  186:7  102:10
102:3,4,21  182:19,24  S  124:20  sure 9:17  105:11
104:4  183:9 184:1  s 3:10  131:7  134:20  107:4 112:9
106:21  184:8,11  sabrina 1:14  seat 201:7  separate  112:15,22
107:6  routine 189:5  3:2 4:10,17  seat 17:22  73:7,7  113:2,8
108:13,16  189:6,12,16  199:13,18  22:16 31:3  76:10,20,24  114:6
108:22  190:11  200:8,12  49:22 50:1  80:2 154:21  115:13
109:11,23  191:1,18  saying 37:7  75:5 76:11  155:8 158:5  118:14,20
110:5,15  192:8,15,21  38:4 54:14  104:1,2  158:8  120:3,7,10
111:6  194:6 195:8  54:21  seating 75:21  162:17  121:4,8,19
114:22  195:20  saw 196:2,6,17  76:5  164:19  121:13,15
115:3,3,14  196:2,6,17  18:24  series 77:10,18  165:8  132:21
115:22  rtu 5:23 6:7  says 9:18  83:6  167:9  133:7,18
116:2,8  68:18 69:3  19:2 26:12  servant 160:9  168:21  134:24
123:14  69:19,23  62:11 98:8  serve 12:3  169:6  135:2
124:12,21  71:11 73:22  125:1,15  served 36:20  170:22  139:12
133:6,11  74:20 77:17  131:7  services  172:10

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 25

standards  141:8  124:19  174:21,24  takes 96:23  102:14
14:16 15:13  144:17,18  129:1 133:4  175:2,21,24  talk 19:12  106:18
16:11 17:8  146:15,18  141:4  176:1 177:4  97:4 117:8  171:3
17:11,12,16  157:17  146:16  177:18  97:4 117:17  171:7
17:20 18:6  158:16  190:22  178:11,22  126:21  188:23
18:14,18  states 1:1,16  stroke 125:24  179:20  151:15  197:20
19:6 204:9  2:8,13,19  subject 9:18  186:6,13  talked 149:5  200:15,21
20:22,23  10:13 17:17  15:12  188:2,12,15  talking 10:23  201:6
22:7 23:4  17:18 43:12  subscribed  195:18  24:6 31:12  tgmassistant
23:24 24:14  191:16  199:19  ___  61:6,8,13  2:5
25:9,10  199:1  substantial  T  62:7 69:14  thank 63:23
34:21 43:6  station 55:14  100:1  t 3:10  78:4,5 81:3  thanks 198:2
46:13,24  stationed  substantially  table 87:21  100:23,24  thats 12:3,6
51:23 52:6  55:11  98:24 99:21  89:24 90:5  117:11  16:5 19:1,3
58:2,3,11  stenograph...  suing 13:20  91:3,4,6,10  123:1  19:10 24:5
58:16,19  200:17  suit 201:4  91:15,20,21  125:19,20  26:12 27:21
59:3,7,19  step 127:20  suite 2:15  91:23  185:19,20  32:13,19
60:2,11  stipulation  supervisor  133:13,16  192:24  37:21 44:5
69:6 88:12  84:17,17  9:19,23  tables 85:3,7  193:2  44:20 51:11
88:14  193:24  supports  85:15 88:4  196:1  51:15 56:4
138:11  stood 74:13  sure 9:17  88:22 92:2  194:6  60:14 62:11
standing  74:23 75:2  70:11 30:14  92:4,8,10  115:16  66:21 69:5
79:6,10  76:6,10  33:13 46:12  92:18,24  tell 28:18  75:2,8
83:10 99:14  87:20 90:4  48:6 49:6  take 8:6 28:1  40:21 53:7  85:18 86:8
99:15,18,20  90:7 91:4,5  50:11 51:13  42:24 43:14  53:15 62:17  86:16 87:3
99:21  91:22  53:4 61:12  43:17 52:19  95:24 143:5  87:5 108:21
100:1,19  93:23 94:24  78:20 90:12  53:3 75:17  169:16  108:23 109:8
113:15  stools 85:14  95:14 114:2  89:4 93:20  telling 37:3  114:7 121:7
126:12  88:3,6,7,8  116:19,24  94:20 100:3  tendered  125:1
137:1,8  88:10,11  122:22  112:2 122:6  199:6  131:5,7
131:12  stop 35:11  straight  125:3  term 51:2  131:16
179:1  116:15  139:18  129:23  63:18  132:21
state 1:19  118:17  157:12  165:7  163:14  134:2
4:15 200:1  straightfor...  switched  168:1  179:9  143:24
200:6  24:21  117:8  168:1 17:24  143:8  154:23
states 4:5:13  strike 32:3  sworn 4:2,11  43:20 89:6  text 16:9  157:8,11
56:21 57:6  43:4 45:4  199:14,19  100:6 122:8  text 16:9  160:10,17
58:17 62:11  74:2 76:22  200:13  130:2  testify 6:24  168:11
101:22  72:9 94:6  system  165:10  testimony  76:20 177:2
114:18,23  112:23  173:11,17  168:17  18:17 51:7  76:10 177:12
140:24  120:8  174:1,3,4  197:10  51:11,12,15  181:3

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 24

134:5,10  104:15,18  106:8  side 71:22  102:1  specifically
135:12,15  106:20  show 4:18 7:3  72:1,12  141:2  19:4 20:4
136:2  107:15 109:9  8:12,23  73:15,18  142:23  23:22 25:12
138:18  109:10,18  77:9 83:6  91:5,19,21  151:18  32:12 35:5
139:4,24  110:4,6,14  94:21  152:1,18  152:1,8  87:13,15
140:20  110:17,24  130:14  199:16  153:5  98:2,8
145:23  111:5,12,16  156:8  200:23  161:15  123:12
148:14,17  112:20  shower 40:7  signed 84:16  165:2,24  181:2
149:13  116:14,22  40:9,12,18  84:20,22  53:14 58:19  specified
150:9,22  117:21  40:22,24  93:11,15,23  59:3,7  104:21
151:6 152:8  118:19,12  41:4,6,8,11  similar 40:3  193:8  specify 59:4
160:5,14  119:22  41:14,18  40:5,23  sitting 5:4  59:19
162:13,16  122:19  42:3,18,21  66:7,16,21  59:19  177:22
165:15  123:11,16  43:1 52:19  66:24 86:21  size 71:2  speculate
167:19  124:20  96:3,7  94:3,7  slash 154:13  49:13
168:7,22  125:5 130:4  53:1,3,16  106:16  154:15  speculation
169:9,11  130:6  53:24 54:4  132:2 143:2  slightly 18:11  174:11
172:22  132:11  56:22,23  143:3  solely 69:12  190:6
174:5  134:18  66:21 67:19  151:18  somebody  spending
190:23  135:7,8,9  67:19,21,24  152:3 153:5  101:1 109:2  13:10
196:4,16  136:11,13  136:13,20  153:7  109:4  spot 76:8
197:21  136:15,20  141:10,13  simple 24:20  107:17  82:21,24
199:6,10  136:24  141:18,21  117:1 124:8  190:24  ss 200:2
199:6,10  136:24  141:24  single 182:17  sorry 66:11  staff 110:21
sheriffs 5:5  137:15,17  141:24  sink 22:11  66:12 73:9  118:18,21
5:13 7:18  139:5,6,21  144:23  66:17 77:20  77:15 86:1  119:7,11
9:22 18:4  140:4,22  143:3  39:17,24  77:15 86:1  120:2,10
18:20 20:2  154:18  146:15,17  40:3 57:17  104:21  120:2,10
20:3,18  164:23  146:20  57:20,21  163:2  121:4,9
21:15 34:8  167:22  153:19,24  58:1,4 59:7  soundproof  124:21
39:6 42:20  168:3 174:11  154:6,13,14  60:17,18,21  178:19  125:6,12,13
45:19 46:13  174:21  154:15  60:22,24  south 1:20  125:6,12,13
46:22 47:6  196:23  showering  61:4,20  196:7,9  124:23
47:18 48:9  shes 12:7,12  141:7,12  62:1,19,21  space 31:5  106:8 132:3
51:3 55:24  12:24 13:1  146:14  62:22 63:1  137:1  126:8 132:3
60:1,9  15:17  153:19  63:8,9,15  stage 38:5  136:8,23
63:13,19,22  short 28:4  showers 29:3  64:12,21  stage 38:5  133:10,11
64:6,9,13  43:19 74:15  53:15 193:8  65:6,15,17  staged 26:1  133:18,20
72:8,18  89:5 100:5  showing 8:3  65:18,20  stamped  136:16
75:4,19  122:7 130:1  17:6 39:18  66:7,16  161:11  136:22
86:19 88:10  165:9  43:8 130:13  66:12,16  specific 31:12  138:11,12
89:20 89:22  168:16  131:14  70:12 96:6  138:9,22  138:14,19
97:17  169:12  161:5  96:14 97:9  73:13 13:5  138:20,22
102:17  197:9  shows 130:14  102:6,8,11  73:21 96:1  138:20,22
103:17  131:16  140:13,19  197:5  96:1,6,8,14  140:1,3,4

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 26

183:17  thing 41:3  tier 27:12,18  113:18  today 7:11  100:17,20
185:6 186:1  153:18  68:24 73:6  116:17  12:6 27:4  101:13,14
189:24  160:7,9  76:20 78:22  118:2 119:3  28:15  101:19,21
193:12  things 98:4  79:10,12  119:5,14,15  131:24  102:1,20,22
195:11,18,18  158:5  119:16  119:16,19,23  133:2 134:2  102:3,24
195:22  156:22  129:5,11,12  120:24  136:8  103:12,18
thereof 201:5  think 5:16  131:1,2  121:14,23  156:19  104:8,24
theres 10:6  114:12,20  124:14,23  122:1,21  todays 9:11  104:17,20
11:15 13:17  23:19 24:5  155:10,15  122:1,21  80:13  105:5,6,12
22:13 37:7  34:20 35:4  155:16,17  123:23  toilet 17:21  105:6,9,12
41:21 50:15  37:21 98:6  155:18  126:16,19  22:11,16  105:9 14
55:14 66:20  99:24  157:22,24  157:22,24  30:4,4,18  106:6,21,22
70:11,21  108:19  158:1,17  158:16  31:3,4,5,7  107:5
71:10 75:16  151:15  159:21  142:3  31:15,22,24  108:13,16
167:3,20  155:8  161:2,8,18  143:12  32:6 33:2  109:9,16,24
83:3,7  160:10  162:18  144:18  33:17 34:4  110:8,15,16
89:14 90:4  162:23  163:1,2,2,4  145:2 146:5  34:8,9 39:9  110:19
92:3 94:4  170:2 171:2  163:4,5,21  148:21  39:15,17,24  111:4,19
102:2  173:6 180:5  174:21  149:2 150:17  40:3 43:23  112:12
103:20,24  194:19 198:3  179:18  181:7,22  452:5,21  113:16
104:1  79:23 80:6  182:1  151:1 152:7  48:14,17,18  114:16,20
128:8  80:21 82:3  189:10  153:9  47:18,20,20  114:16,21
120:5 121:4  82:4 93:4,6  194:3 195:6  153:9  48:14,17,18  116:1,2,8,9
130:10  94:3 130:23  tiers 179:9  160:5,11,18  48:21 49:2  116:1,2,8,9
132:20  147:19,21  times 179:18  161:20 166:2  49:7,8,19  116:17,18
133:12,14  155:15,16  194:1 195:4  162:7  50:2,13,17  117:3,20,23
155:16  155:17  time 6:7 13:9  162:7  51:8,13,16  119:11
157:7,21,24  158:1 182:9  13:23 14:18  164:12,17  51:20,21  120:3,18
158:22  158:1 182:9  21:2,9  164:2  52:6,9,16  122:13,17
160:1  182:4,23  22:24 26:14  166:2  52:6,9,16  123:12,21
173:18  185:4,14,15  26:20 27:10  167:16  53:18,19  124:23
180:7,8  185:23,24  91:18  168:1  54:9,12,14  124:23
181:6,16  186:11,12  38:12  169:12  54:20,22  125:8,9
184:23  186:23  33:11 38:6  192:10  55:7 56:3,9  126:8 132:3
189:4,4  187:4,9  48:19 50:11  times 50:8,23  57:20,21  133:10,11
197:12  188:5,16  50:18 77:7  57:2,4,6,8  133:18,20  133:10,11
theyre 35:21  thomas 1:6  79:20 80:2  55:4 67:4  66:6,7,16  133:18,20
37:8,20  1:11 2:2,3  86:24 93:9  67:4,8,10  136:16  136:16
44:8 52:11  4:8,9 199:6  94:24 103:8  145:12  68:4 70:11  136:22
48:9 53:18  97:8 103:6  14:7 147:20,23  71:23 72:4  138:11,12
145:17  thought  105:17  158:12,23  73:12,13,15  138:14,19
157:5  13:13 78:4  107:9 108:9  173:13  73:21 96:1  138:20,22
176:22  thousands  113:4  200:20  96:1,6,8,14  140:1,3,4
188:14  98:3  110:10  192:16  97:9 100:16  140:1,3,4

Plaintiff's Exhibit 11 Page 57

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 27

142:23
143:21
144:9,11
145:6,15,16
145:24
146:3
148:15,17
149:2,9,23
150:2,11
151:8,9,18
151:21
152:1 153:5
153:10,13
153:13,24
154:3,4,4,9
154:13,14
154:15
157:20
158:13,15
159:3,7,8,9
159:11,24
160:22
161:15,19
161:22,23
161:24
163:7,17,23
164:1,2,4
166:20
toileted 149:16
toileting 29:11 30:2
47:17,23
48:10 96:15
97:10 98:11
99:19
100:10
104:15
109:17
120:12
121:5,10,12
121:21
122:14
123:19

126:2,7
135:3,16
136:4,10
137:20
144:8 149:9
transfer 133:19
transportat...
189:20
treatment
193:10
trial 170:20
trouble 60:14
117:9
189:21
true 26:17
true 13:11,18
13:18 200:20
truth 200:14
200:14,15
try 30:12,14
30:23 31:15
35:14 36:6
39:25
50:24 59:12
60:14 63:21
171:2 181:4
turned 28:10
80:15 81:11
168:13
173:13
type 40:18
50:21 51:16
52:9,16
53:1 97:18
102:20
120:1 144:6
144:10
152:1
161:15
181:13,16
182:6
184:19
188:8,20
types 103:22

92:21
177:19
189:2
typewriting
200:19
typical
145:21

U
underneath
79:6 85:14
understand
6:20,21 8:1
8:2 11:19
16:14,16,19
46:9,20
48:4 49:3
53:19 72:14
94:12 108:2
108:10,11
108:14,18
116:18,20
117:12
119:18
123:16
139:15
154:7 173:3
176:12
understand...
16:10 17:4
34:8 36:10
36:11 43:3
43:5 57:9
58:1,15
59:6 69:18
72:10 75:4
168:19,21
understood
28:22
undetermi...
200:10

176:3
177:19
189:2
189:2
201:6
201:6
201:6
201:6

unit 24:22
26:13
137:19
138:10
167:24
180:7
193:10
united 1:1,16
43:11 199:1
units 10:18
22:20 81:20
149:6
165:17,18
167:20
168:22
172:23
174:22
175:9,19,20
178:20
179:1,3
180:3,6,23
181:3
184:12
185:6 186:8
187:14,15
188:4,10
unnecessar...
24:19
updated
81:14 94:17
181:8
upgrade
183:18
use 48:21
51:2,9 54:9
54:13,15,20
54:21 55:6
56:9,14,23
60:18 62:22
63:14,17
67:4,8,10

67:19 73:21
82:23 87:12
90:11 91:5
91:6,10,15
91:19,21,23
101:13
102:5 103:8
103:13,18
103:23
104:20
106:6 107:2
107:7
108:7
111:18
114:5,11,15
122:13,17
122:18
122:21
123:21
123:22
124:16,22
125:9
128:16
132:17
133:2,6,10
133:11,12
133:16,18
134:3,5,7
140:19,21
142:22
143:23
145:15
153:9
154:10
158:15
159:2,7,8,9
159:10
161:21,24
163:24
164:5
176:18
179:10
181:22
usable 148:7
157:11

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 29

127:2,5
128:15,16
129:19
132:13,18
135:14,19
135:21,23
136:2,6,9
137:2
146:23
162:14
164:10,20
165:1
177:15,24
178:3,6,8
178:19
180:5,17
181:8 182:1
182:5,11
183:19,23
190:11
191:1,18
192:8,15,21
194:7 195:8
196:2,7,17
wheelchair...
43:24 86:10
86:20 87:6
100:10
wheelchair...
42:12,21
45:7 46:15
47:24 56:10
56:7,20,24
60:17 61:3
82:22 92:20

125:4
177:11
wheelchairs
98:2 143:15
143:18
62:13 63:6
159:16
177:20
178:11
179:17
194:3
wheels
103:14,18
141:18
77:4,22
78:19 81:1
76:3,18
180:19
189:2 90:3
180:19
74:2 106:4
197:4
willing 21:9
112:1 113:7
wind 106:10
114:10
115:7,9
witness 3:1
171:13
120:18,21
123:10
126:5 128:5
131:10
131:14
130:17
165:9
99:10,11,16
96:1 170:7
140:15,16

145:10
147:2 148:4
149:1
149:18
wrong 66:12
wrote 93:16

X
x 3:1,10

Y
yeah 37:9
143:17
year 15:4
years 152:13
196:13

Z
yell 55:9,10
yesterday
166:15
youll 36:2
87:3 97:7
171:18
youre 6:23
7:6 9:4
10:23 11:4
12:4 13:20
16:8 17:19
19:2,7,8
21:18 23:19
24:17,18
25:2,4,12
26:2 27:19
28:17,23
31:14 32:8
32:9 34:11
36:4,6 37:3
37:6,7
38:22 45:15
59:23 62:23
79:24 81:3
95:12 97:13
98:6 101:3
102:9,9
108:4,20
124:2 134:9
137:13

133:12,16
wrong 66:12

139:2
141:17
145:1 158:8
160:13,17
171:2
172:12,17
176:11,13
176:17,17
177:8,22
192:24
192:3
196:13

0
0 8:21
00 1:22
084003726
201:24

1
1 13:13 4:19
4:24 7:7
25:24 26:5
26:9 28:9
28:23 29:9
30:18 36:3
156:9 157:3
157:7 161:6
161:14
163:5
184:23
195:5,6,17
196:3
10 50:12
52:20 57:13
65:22 66:11
69:4,16
70:2,10
71:2,11,22
131:5,17,23

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 28

V
v 101:5
vacated 6:11
vague 30:20
31:11 33:21
61:6 62:7
86:24 104:9
104:24
105:17
107:9
110:10
113:18
115:17
118:2 119:3
119:14
120:14
121:14,23
122:3,21
123:23
122:22
137:4 146:5
148:20
149:8,18
150:4,14
151:1,1
155:13
166:8 173:2
184:5,16
192:10,23
variations
178:10
variety 81:19
various 5:9
79:18
165:13
166:3
171:11
183:18
193:19,21
vaughn 1:3
4:9 7:5,13
8:21,14,16
18:22 21:3

23:23 24:22
61:11 84:6
85:21,24
94:10 95:2
95:4,9
96:17 97:4
98:10 99:2
100:1,15,17
101:1,5
103:7,11
104:3
107:14
108:21
109:4
110:14
111:2,3,13
111:17
112:11,15
112:23
113:2 114:3
114:19
115:1,22
116:1,7
117:9 119:5
119:16
121:12,23
121:23 124:1
124:10
126:6,22,23
127:21,22
127:23
128:8,18,21
128:25
129:2,5,14
129:16,18
130:22
131:6,10
132:12,17
132:25,7
133:2,5,24
133:13,14
134:2 135:2
135:14,19

13:21
136:1,3,6,8
136:21
137:9,11,18
138:15,19
139:7,19
140:2,15,17
140:25
141:3,6,12
142:4,10
143:13,16
143:20
144:4,7
146:14
147:7,13
148:9,13
149:8 153:9
153:20
154:10,20
154:22
158:4,11
159:3,13,15
159:20
161:1,21
162:2,7,24
163:13,14
163:6 164:1
164:3,9,20
165:16,24
166:15
166:6,22,24
167:5,14
169:2

waist 31:22
34:13 49:13
49:15 57:7
78:8 123:13
124:2
135:6
139:3 143:1
145:3
171:23
wait 10:7
12:2 13:23
23:5 29:17
32:16,17

33:24 36:22
51:2 61:12
77:18 83:9
93:7,22
94:18,23
98:1 126:21
169:21
170:21
172:9
177:11
181:5
194:13
wants 25:1
134:3
warning
105:7,11
106:7,10
141:23
171:17
warnings
145:6,24
warranty
105:5
wash 60:18
60:21
washington
2:15
washroom
133:3
wast 31:22
34:13 49:13
49:15 57:7
wasnt 94:23
wasting
13:22
water 22:7,8

22:10,11,14
51:2,6 52:2
77:18 83:9
93:7,22
94:18,23
98:1 126:21
web 130:18
website 130:5
130:14
week 5:23
39:11 40:11
40:20 42:7
68:23 78:6
93:4 155:21
170:1
weeks 5:24
13:12 57:10
57:18
152:17
153:3
went 40:2
51:24 52:6
52:8 67:7
167:4
183:24
187:16
wet 1:21
west 2:15
western 1:20
2:4
weve 10:11
64:17
whats 4:18
7:3 43:8
66:16 70:14
86:21
131:14
156:8 161:5
171:12
wheelchair
45:4 54:19
85:18 92:23
100:11
114:20
115:2 125:6

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 30

132:23
159:13,19
160:24,24
186:7 194:3
194:3 195:4
197:2
10150 1:20
2:14
11 5:16 7:18
29:77 7:10
77:15,16
73:23,24
79:1 137:16
113 3:12 4:4
11th 201:8
12 83:8,15
84:14,23
85:6,10
86:22 87:4
88:23 92:3
92:19 147:6
147:10,13
147:15
197:16
198:1
11a 156:9
13 156:7
157:2
13b 161:5,7
161:13
145 16 8:21
77:1,1
15 5:18 10:15
43:9 70:6,9
70:10 77:15
15cv1127
1:11 199:10
15cv951 1:5
199:6
16 22:5,13
23:13 95:10
95:14,16
105:3,20

107:11
108:9
115:23
116:15
116:22
191:10
49:22 50:1
162:17
162:17
18 83:3 86:3
19 22:15
49:22 50:2
194:2
198:199:16
1991 15:12
17:11,16,19
18:3,5 20:3
20:22 22:5
22:6 24:14
25:8 34:21
34:25 36:16
58:13,16,16
58:18 59:2
59:7 60:1
60:11
197:1 54:12
20:8,20
108:6
107:11,12
8:1,20
4:24 7:4,7
27:6,20
76:13,16,17
74:5,7 78:6
78:22 82:6
82:12,21
85:12,17,17
86:22 87:4
87:9,10,19
88:14,15
89:10,15,16
100:10,19
140:15,16

140:23,23
141:7
142:4,11
142:21
154:21
155:2,8,9
155:21
158:12,13
159:19,20
159:19,20
161:15
161:16
162:13
163:13
182:8,23,23
183:7,12
185:15
142:6,11,12
161:1
21 66:1
2123 43:22
23 68:17 73:7
77:1 79:16
79:20 80:2
2337900 2:5
245 18 7:19
245 18 5:9
2013 4:14,15
2014 10:15
25:24 26:1
26:5,5,8,10
27:6,6 28:9
28:9 30:11
30:21,22
31:2,7 33:4
33:17,17
34:9 36:21
39:12,12,21
43:22 45:3
45:15,16
46:12 48:7
49:20 50:12
50:13 51:14
52:10,20
53:2,16
54:20 56:1
56:19 57:13

140:23,23
141:7
142:4,11
142:21
154:1,5,11
154:12,21
154:21
155:2,8,9
155:21
158:12,13
159:12,13
159:18,19
159:20
161:15
161:16
162:13
164:13
182:8,23,23
183:7,12
185:15
142:6,11,12
161:1
2015 16:1,1
162:11,16
162:17
163:1 164:8
2016 1:22
29:7 36:21
37:5 79:17
79:21 80:3
131:17,24
134:21,22
198:1
199:11,24
200:8 201:8
2030 2:15
21 66:1
2123 43:22
23 68:17 73:7
77:1 79:16
79:20 80:2
2337900 2:5
245 18 7:19
29 134:2
151:22
152:22
154:22
29th 1:21
199:14
200:8
2nd 147:9,9

3
33:22 13:12
22:5,13
39:22,23
66:9,18
70:9,14
71:6 73:6,7
78:2,5,6,8
78:14,16
79:2,9,10
84:19 86:22
87:5,8,9,10
87:19,22
90:16 93:5
96:5 129:5
129:11
142:24
145:2
145:19
145:24
149:5
152:13
154:22
155:19
161:16
162:19
171:16
180:11
197:6
304 6 5:5 7:1
7:13 8:7
11:10 29:6
145:4
154:21
155:19 158:5
160:20
162:16
167:16
30th 158:9
3105 191:15
3119 142:5
142:11,13
143:1
143:11
145:7
145:7,15

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 11 Page 58

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 31

| | | | | |
|---|---|---|---|---|
| 146:2,14,17 | 68:14 147:7 | 150:16 | 163:6 | 151:19 |
| 149:7 | 147:14 | 191:13 | 192:17,18 | 153:6 156:9 |
| 150:16 | 148:10,13 | **32** 70:19 71:7 | 194:3,4 | 157:3 161:6 |
| 191:13 | 148:19 | 132:7 | 195:5 | **500** 2:9,20 |
| **312** 2:10,16 | 149:7 | **3243** 26:1,17 | **3f** 83:3,8,16 | **504** 43:10 |
| 2:21 | 150:16 | 26:19 27:20 | 83:22 84:2 | 45:16,17 |
| **3121** 151:15 | 191:13,16 | 27:23 34:17 | 84:20 85:18 | 70:10,18 |
| 151:21 | **3131** 152:24 | 34:18 38:7 | 85:22 86:4 | 71:13 72:19 |
| 152:2,8,13 | 153:1,4,21 | 38:11,18 | 86:5 90:11 | 75:4,20 |
| 152:16 | 154:5,10 | **32inch** 132:8 | 92:8,24 | 87:18 88:12 |
| 191:14,15 | **3133** 191:16 | **33** 72:5 | 104:21 | 134:4 |
| **3123** 39:3,6 | **3135** 95:11 | **36** 72:5 | **3north** 26:11 | 138:11 |
| 39:11,15 | 95:17,21 | **38** 3:13 | 26:14 30:7 | **5minute** 28:1 |
| 40:2,6,10 | 96:1,9,15 | **39** 82:20,21 | 30:11 32:2 | |
| 40:14,19,24 | 97:9,20 | 94:7 | 170:22 | **6** |
| 41:1,5,11 | 98:8 99:17 | **3a** 68:20,24 | **3south** 39:3 | **6** 4:6 5:5 7:1 |
| 41:14,18,23 | 100:9,15,21 | 69:3,7,12 | 39:11 51:13 | 7:13 8:4,7,9 |
| 42:7 45:2,6 | 101:19,24 | 69:14 70:23 | 51:17 52:10 | 11:10 25:19 |
| 45:16,21 | 102:5,12,21 | 71:11 73:6 | 53:2 57:14 | 25:23 26:7 |
| 46:14,23 | 103:3,7 | 73:6,22 | 66:4,6,6,15 | 30:6 36:21 |
| 47:16,21 | 104:4,15 | 74:4,19 | 95:11,17 | 37:4 39:2 |
| 48:7,19 | 106:20 | 76:14,19,24 | 97:20 | 39:22 40:17 |
| 49:7,19 | 107:3 108:8 | 77:5,11,17 | 103:13,18 | 50:12 52:19 |
| 50:2,8,14 | 109:23 | 78:2,22 | 103:23 | 66:9,17 |
| 50:17,23 | 110:5,15 | 79:12 80:18 | 104:21 | 68:16 82:4 |
| 51:10 52:18 | 111:6,18 | 81:18 | 105:6,15 | 83:2 85:22 |
| 52:21,22 | 112:12 | 155:11,18 | 106:6 110:4 | 86:6 96:3 |
| 53:17 54:19 | 113:1 114:4 | 156:5 | 115:24 | 142:24 |
| 54:24 55:5 | 114:16,20 | 157:16,24 | 122:12 | 145:4 |
| 55:12,17 | 115:3,14 | 158:3,17 | 137:10 | 151:19 |
| 56:2,8,20 | 116:2,8,15 | 159:6,15,21 | 142:5,13 | 154:23 |
| 56:24 57:10 | 117:1,23 | 161:2,18 | 144:4,16,23 | 155:10,11 |
| 57:16,18 | 122:12,17 | 192:17 | 146:21,24 | 155:15,17 |
| 59:8 60:17 | 122:24 | 194:3,4 | 147:18 | 155:18 |
| 61:4,20,24 | 123:17,18 | 195:4,6,17 | 149:6 | 157:4,9,22 |
| 62:5,19,22 | 124:22 | 196:4 197:2 | 150:16 | 158:1,2,3 |
| 63:2,15 | 125:7 126:1 | **3e** 129:12 | 151:16 | 158:11 |
| 64:11,22 | 137:10,14 | 130:23 | 152:24 | 159:15 |
| 65:6 67:3 | 138:21 | 131:17 | 170:22 | 169:3 |
| **3125** 57:14 | 139:19 | 132:23 | 191:14,19 | 171:16 |
| 65:22 66:7 | 140:14 | 135:4,17 | 192:6 | 172:15,18 |
| 66:15 67:2 | 141:6,12,14 | 161:9 | | 182:16 |
| 67:4,18 | 141:18,22 | 162:18 | **4** | **6033368** 2:21 |
| 68:1,7,12 | 149:7 | 163:2,3,4,5 | **4** 3:12 5:1,17 | **6033474** 2:10 |

Middle column additional entries:
**40** 72:2
**4198** 3:3
**45** 180:13

**5**
**5** 7:7 26:8,10
30:10 39:19
39:22,23
40:16 66:8
66:10,13,17
66:21 75:15
83:15 92:19
96:3,4
125:17
142:24
143:4

SABRINA RIVERO-CANCHOLA
June 29, 2016

Page 32

| | | | | |
|---|---|---|---|---|
| 2:16 | **7c** 131:14,18 | | | |
| **60602** 2:10 | 131:19,21 | | | |
| 2:16,21 | **8** | | | |
| **60643** 2:4 | **8** 5:18 8:21 | | | |
| **69** 2:15 | 9:8,18 | | | |
| **6a** 157:8,20 | 10:15,15 | | | |
| 157:21 | 77:11 129:9 | | | |
| **7** | 129:13 | | | |
| **7** 39:22 73:8 | 154:21 | | | |
| 73:9,10,12 | 155:2,8 | | | |
| 73:21 74:4 | 158:5,8 | | | |
| 74:19 76:14 | 159:20 | | | |
| 76:19,24 | **9** | | | |
| 77:5 78:4 | **9** 68:17,17 | | | |
| 78:22,23 | 77:1,1 | | | |
| 79:9 80:17 | 129:9,13 | | | |
| 81:18 129:5 | 134:11 | | | |
| 130:23 | 152:22 | | | |
| 131:6,11,17 | 154:11 | | | |
| 131:23 | 155:2 156:4 | | | |
| 132:2,2,4,7 | 161:1,8,10 | | | |
| 132:20 | 161:16,18 | | | |
| 133:4,6,14 | 162:18 | | | |
| 135:4,17 | 163:2,4,4,6 | | | |
| 136:4 142:7 | 163:17,20 | | | |
| 159:21,21 | 192:17,18 | | | |
| 159:23 | 195:5,6 | | | |
| 160:21 | | | | |
| 162:23 | | | | |
| 190:10,12 | | | | |
| 192:17,18 | | | | |
| **773** 2:5 | | | | |
| **7a** 8:12 95:3 | | | | |
| 95:5 131:10 | | | | |
| 131:18,20 | | | | |
| 131:22 | | | | |
| 142:8,9 | | | | |
| 162:24 | | | | |
| **7b** 8:12 95:4 | | | | |
| 95:6,7,8 | | | | |
| 131:10 | | | | |
| 142:10 | | | | |
| 147:8 155:1 | | | | |

Plaintiff's Exhibit 11 Page 59

Transcript of the Testimony of
**MATTHEW BURKE**

**Date:** September 23, 2016

**Case:** VAUGHN VS. DART, ET AL.

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---



MATTHEW BURKE
September 23, 2016

Page 199

```
 1   APPEARANCES:
 2        Mr. Thomas G. Morrissey
          Mr. Patrick W. Morrissey
 3        (Thomas G. Morrissey, Ltd.)
          10150 South Western Avenue
 4        Rear Suite
          Chicago, Illinois  60643
 5        Phone:  (773) 238-4235
          tgmorrissey@gmail.com
 6
 7             On behalf of the Plaintiffs;
 8        Mr. James E. Nichols
          (Assistant State's Attorney)
 9        Cook County State's Attorney's Office
          50 West Washington Street
10        Suite 500
          Chicago, Illinois 60602
11        Phone:  (312) 603-3474
          james.nichols2@cookcountyil.gov
12             On behalf of the Defendant Sheriff Thomas Dart;
13        Mr. David R. Condron
          (Assistant State's Attorney)
14        Cook County State's Attorney's Office
          50 West Washington Street
15        Suite 500
          Chicago, Illinois  60602
16        Phone:  (312) 603-3474
          dcondron@cookcountygov.com
17
18             On behalf of the Defendant Cook County,
          Illinois.
19
20
21             *     *     *     *     *     *
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 198

```
           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

HAROLD VAUGHN,                    )
                                  )
               Plaintiff,         )
                                  )
     vs.                          )  No. 15-cv-00951
                                  )
THOMAS DART, Sheriff of Cook      )  Part 3
County, and COOK COUNTY,          )
ILLINOIS,                         )
                                  )
               Defendants.        )
--------------------------------  )
DONNELL FLORA,                    )
                                  )
               Plaintiff,         )
                                  )
     vs.                          )  No. 15-cv-1127
                                  )
THOMAS DART, Sheriff of Cook      )
County, and COOK COUNTY,          )
ILLINOIS,                         )
                                  )
               Defendants.        )

        The continued deposition of MATTHEW BURKE,
before the HONORABLE JUDGE MATTHEW KENNELLY, called by
the Plaintiffs for examination, taken pursuant to notice
and pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Shelley M. Bostetter,
Certified Shorthand Reporter and Notary Public, at
219 South Dearborn Street, Suite 2188, Chicago, Illinois,
commencing at 9:30 a.m. on the 23rd day of September,
A.D., 2016.
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 200

```
 1                  I N D E X
 2   WITNESS                                    PAGE
 3   MATTHEW BURKE
 4        Direct Examination by Mr. Morrissey ....   4
 5
 6
 7                E X H I B I T S
 8   PLAINTIFFS' DEPOSITION EXHIBIT             PAGE
 9        A  ....................................   33
10        B  ....................................   37
11        F  ....................................   14
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 1

MATTHEW BURKE
September 23, 2016

Page 201

(Witness sworn.)

MR. MORRISSEY:  The deponent has already been sworn in, your Honor.

THE COURT:  Okay.

WHEREUPON:

MATTHEW BURKE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  State your full name, please.

A.  Matthew Burke, B U R K E.

Q.  Mr. Burke, since your -- This deposition was continued from August 4th, 2016.  Since that date, have you reviewed any documents regarding accessibility at the jail?

A.  I mean, I've reviewed the May 2012 letter from the disability rights section again.  I reviewed the implementation plan.  That's what I can think of off the top of my head.

Q.  Have you -- Other than reviewing the May 10th, 2012 letter and the implementation plan that came about after the DOJ's letter, have you done any additional investigation in regards to accessibility at the jail?

MATTHEW BURKE
September 23, 2016

Page 202

A.  I'm sorry.  That's a big question.  What do you mean by "investigation"?

Q.  Well, have you talked to anybody since August 4th, 2016 in regards to accessibility between 2012 and the present time for wheelchair users?

A.  Sabrina is in my office, so I've spoken to her in general about things.

Q.  And her last name again is?

A.  Rivera-Controllo (phonetic).

Q.  And she's your ADA coordinator?

A.  Yes.

Q.  And she works for you?

A.  In my office.  Yes.

Q.  Anybody else that you've spoken to?

A.  I spoke to AED or -- I'm sorry -- assistant executive director Jeff Johnson.

Q.  What was the nature of your conversation with Sabrina, the ADA -- Sabrina Rivera?

A.  I wanted to get clarification on the bed audits that she does.

Q.  And what was the nature of your conversation with Jeff Johnson, the assistant executive director?

A.  I wanted to get a better understanding of the classification process in RTU.

MATTHEW BURKE
September 23, 2016

Page 203

Q.  I'm going to ask you -- The RTU stands for what, residential treatment unit?

A.  Yes.

Q.  And is it true that on August 21st, 2014, approximately 88 wheelchair users were transferred from other parts of the jail to the RTU?

A.  I know that Cermak provided a list of AD detainees that were to be transferred.  I'm not certain whether all of them were wheelchair users or just had mobility impairments or other medical issues.

Q.  But as of August 21st, 2014, the sheriff began using the RTU to house wheelchair users?

A.  Correct.

Q.  And now I want to ask you questions prior to August 21st, 2014 in regards to wheelchair users, in particular the third floor of Cermak.

MR. NICHOLS:  Objection.  The question is beyond the scope.  The witness was not designated to discuss Cermak.

THE COURT:  What's the question again, Mr. Morrissey?

MR. MORRISSEY:  The question is --

THE COURT:  I'm just going to rule on the objections.  That's the easiest way to do it.

MR. MORRISSEY:  Sure.  The question --

MATTHEW BURKE
September 23, 2016

Page 204

Can you read back the question for the Court?

(Record read as requested.)

THE COURT:  So which of the topics does that relate to, Mr. Morrissey?

MR. MORRISSEY:  It relates to in our agreement, your Honor --

THE COURT:  The agreement is the thing in the letter?

MR. MORRISSEY:  Yeah.  The letter.  Does the Court have the letter?

THE COURT:  It's the May 6th letter?

MR. MORRISSEY:  Yeah.  It says after the justice department wrote their letter on May --

THE COURT:  I'm looking at the wrong letter.

MR. MORRISSEY:  -- May 10th, 2012.  The sheriff's conduct in regards to placing disabled inappropriate housing after 2010 to the present.  It's on the second page of the letter, Paragraph 4D.

THE COURT:  That's fine.  Got it.  Thank you.  I'm sorry for being so slow here.  Sheriff's conduct re: placing disabled inappropriate housing cells after 2010 to the present.  Okay.

The objection is overruled.

So do you have the question in mind?

Plaintiff's Exhibit 12 Page 2

MATTHEW BURKE
September 23, 2016

Page 205

1    MR. MORRISSEY:  I do.

2    THE COURT:  Just ask it again.

3    MR. MORRISSEY:  Sure.

4    BY MR. MORRISSEY:

5    Q.   Did the sheriff place wheelchair users on the

6    third floor of Cermak in the year 2014?

7    A.   **There were wheelchair-bound detainees on the**

8    **third floor of Cermak.  Yes.**

9    Q.   What did the sheriff do to provide wheelchair

10   users assigned to the third floor of Cermak with

11   accessible toilets and sinks in the year 2014?

12   MR. NICHOLS:  Objection, only to the extent that the

13   question exceeds the witness' designation.

14   THE COURT:  Overruled.

15   BY THE WITNESS:

16   A.   **In 2014, the room assignments would have been**

17   **made by Cermak Health Services, and so the sheriff's**

18   **office would follow those referrals and place detainees**

19   **where Cermak had designated them to be housed.**

20   Q.   So is it your position that in the year 2014,

21   the sheriff had no role in where wheelchair users were

22   housed on the third floor of Cermak?

23   MR. NICHOLS:  Objection, only to the extent that the

24   question misstates the witness' previous testimony.

---

MATTHEW BURKE
September 23, 2016

Page 207

1    appropriate housing.

2    Q.   By "housing," you mean the cell where the

3    wheelchair user would be placed, for instance, on 3

4    North?

5    A.   **Correct.**

6    Q.   How was the sheriff notified that a person was

7    a wheelchair user?

8    A.   **I believe that medical staff would place an**

9    **alert into the jail management system, which at the time**

10   **was the IMAX system.**

11   Q.   Would the sheriff's office make any independent

12   judgment whether a person was disabled and was prescribed

13   a wheelchair by Cermak?

14   A.   **I do not believe so.**

15   Q.   So the sheriff always relied on the Cermak

16   medical personnel to determine whether a person was

17   prescribed a wheelchair and therefore disabled?

18   A.   **Yes.  Cermak would be responsible for inputting**

19   **the wheelchair alert into the system after they conducted**

20   **their medical evaluation.**

21   Q.   What would the sheriff do, in the year 2014, to

22   ensure that wheelchair users were housed in cells on the

23   third floor of Cermak which had accessible toilets and

24   sinks?

---

MATTHEW BURKE
September 23, 2016

Page 206

1    THE COURT:  Yeah.  I think your question -- this

2    question was broader in time prior to discussion.

3    BY MR. MORRISSEY:

4    Q.   In 2014, what role did the sheriff's office

5    play in housing wheelchair users on the third floor of

6    Cermak?

7    A.   **We would get the housing referral from medical**

8    **staff and then place the inmates accordingly.**

9    Q.   Would Cermak designate the specific cell on,

10   let's say, 3 North, where a wheelchair user should be

11   placed?

12   A.   **That is my understanding.**

13   Q.   Who within Cermak would designate the exact

14   cell on 3 North where a wheelchair user would be placed?

15   MR. NICHOLS:  Objection, only to the extent the

16   question calls for speculation.

17   You can answer.

18   THE COURT:  Everything is if you know.

19   BY THE WITNESS:

20   A.   **My understanding is that there would be**

21   **collaboration between the nursing manager or some other**

22   **Cermak staff who was on the floor or the unit and with**

23   **staff from Cermak that was in the urgent care unit or**

24   **potentially the RTU, and they would determine the**

---

MATTHEW BURKE
September 23, 2016

Page 208

1    MR. NICHOLS:  Just a general relevancy objection.

2    The timeframe.  Mr. Flora wasn't in Cermak in 2012.

3    However, you can answer the question to the

4    extent that you know.

5    MR. MORRISSEY:  The question is 2014.

6    THE COURT:  2014.

7    MR. NICHOLS:  I'll withdraw that objection.

8    You can answer.

9    BY THE WITNESS:

10   A.   **Because there's limited space on the third**

11   **floor of Cermak, we would defer to Cermak staff on where**

12   **they thought the best housing assignment would be for a**

13   **particular individual.**

14   Q.   So if the sheriff -- Would anybody in the

15   sheriff's office alert Cermak if a wheelchair user was

16   placed in a cell on the third floor of Cermak which did

17   not provide an accessible toilet or sink?

18   A.   **I'm not aware of any particular instance where**

19   **someone from the sheriff's office would indicate to**

20   **Cermak that they felt the individual was not placed in an**

21   **accessible room.**

22   Q.   Were wheelchair users, in 2014, placed in

23   inaccessible cells on the third floor of Cermak?

24   A.   **My understanding is that you would have more**

Plaintiff's Exhibit 12 Page 3

MATTHEW BURKE
September 23, 2016

Page 209

1  detainees that had wheelchair alerts than could be placed
2  in rooms that had ADA accessible features.
3      Q.   So the answer is, to your knowledge, there were
4  wheelchair-assisted inmates placed on the third floor of
5  Cermak in rooms that didn't have accessible toilets and
6  sinks in the year 2014?
7      MR. NICHOLS:  Objection, only to the extent that it
8  mischaracterizes the witness' previous testimony.
9      THE COURT:  Overruled.
10     MR. NICHOLS:  I'm also going to object to the extent
11 that it calls for a legal conclusion in terms of the
12 definition of "accessible" and inaccessible."
13     THE COURT:  He's asking for a layperson's
14 definition.  I'll overrule both of them.
15 BY THE WITNESS:
16     A.   My understanding is that there would be times
17 when that could occur.
18     Q.   What did the sheriff do when the sheriff found
19 out that a wheelchair user was in a room which was not
20 accessible?  By "accessible," I mean a room that didn't
21 have grab bars around the toilet in the year 2014.
22     A.   I'm not aware of -- I'm not aware of any
23 particular instance of when this happened, so I'm not
24 sure what sheriff staff would have done.

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 210

1      Q.   So as the sheriff's designee, is it your
2  position -- is it the sheriff's position, in the year
3  2014, people prescribed with wheelchairs by Cermak were
4  not placed in inaccessible rooms on the third floor of
5  Cermak?
6      MR. NICHOLS:  Objection.  It mischaracterizes his
7  previous testimony.
8          You can answer.
9      THE COURT:  Overruled.  He's just asking him a
10 question.
11 BY THE WITNESS:
12     A.   I'm sorry.  Can you repeat the question or
13 rephrase it?
14     MR. MORRISSEY:  Can you read it back?
15          (Record read as requested?)
16 BY THE WITNESS:
17     A.   My understanding is that there could be times
18 when you had more people who were receiving medical
19 treatment that were also wheelchair-bound than we had
20 rooms that had the ADA accessible toilet.
21     Q.   What did the sheriff do in those circumstances
22 when the sheriff was aware that a wheelchair user was not
23 in an accessible room on the third floor of Cermak?
24     A.   We would need to defer to Cermak on what they

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 211

1  thought the best housing would be because the housing
2  would dictate what level of medical care that particular
3  individual could receive.
4      Q.   I'm showing you what we're going to mark as
5  Plaintiff's Exhibit F, which is the sheriff's answer to
6  plaintiffs' amended complaint.  And I'd ask you to look
7  at Paragraphs 8 and 9 of your answer to the complaint.
8      A.   (Witness complying.)
9      Q.   Is it the sheriff's position now that -- under
10 No. 8 -- that the sheriff was aware that there were not
11 sufficient ADA accessible housing units to provide an ADA
12 toilet and sink to an inmate at the jail?
13     MR. NICHOLS:  Do you understand the question?
14     THE WITNESS:  No.
15 BY MR. MORRISSEY:
16     Q.   Let me rephrase the question.
17          The allegation in Paragraph 8 was, At all times
18 relevant, the Cook County jail has not had a sufficient
19 number of ADA accessible housing units to house each
20 qualified individual with a disability who enters the
21 jail.  And the answer by the sheriff was they denied the
22 allegation contained in Paragraph 8.
23          We go on to Paragraph 9.  At all times
24 relevant, defendant sheriff of Cook County, has been

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 212

1  aware that Cook County jail has not had a sufficient
2  number of ADA accessible housing units for each qualified
3  individual with a disability who enters the jail.  And,
4  again, the sheriff denied the allegation.
5          My question is, did the sheriff have sufficient
6  ADA accessible housing units to house wheelchair users in
7  the year 2014?
8      A.   I know that renovations were made to Cermak in
9  2013.  And as a result of the renovations, I believe that
10 we were compliant with the ADA requirements of having --
11 I believe it might be 3 percent or 10 percent of the beds
12 or units -- having them ADA accessible.
13          So although there might have been times where
14 you had more people with wheelchairs than could be in
15 rooms that had the accessible toilets, it doesn't
16 necessarily mean that we did not have a sufficient number
17 according to the ADA.
18     Q.   Well, did you have a sufficient number of rooms
19 at the jail to house wheelchair users in the year 2014?
20     A.   I mean, this is a complicated question because
21 we had a sufficient number of rooms.  I mean, the
22 detainees that were in wheelchairs all had rooms that
23 were in the medical infirmary where they were being
24 provided the appropriate level of medical care.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 4

**MATTHEW BURKE**
September 23, 2016

Page 213

```
 1    Q.   No.  The question is -- Well, let me ask a
 2   preliminary question.
 3         Approximately how many wheelchair users were at
 4   the jail in 2014?
 5    A.   I don't know.
 6    Q.   Did you have sufficient space in the jail to
 7   provide an accessible room to all wheelchair users in the
 8   year 2014?  By "accessible," I mean a toilet that had a
 9   grab bar.
10    A.   I believe that there were times in 2014 prior
11   to moving to the RTU where there may have been inmates
12   with wheelchairs that were not in rooms, but I'm not
13   certain.
14    Q.   What about the year 2013?  Did you have
15   sufficient rooms in the jail to provide an accessible
16   cell for all wheelchair users?
17    MR. NICHOLS:  I'm just going to make a general
18   relevancy objection.  Mr. Flora entered the jail in 2014.
19    MR. MORRISSEY:  Well, this is a combined deposition
20   of Mr. Vaughn and Mr. Flora.  Mr. Vaughn came in in 2012.
21    MR. NICHOLS:  And just for the record, fact
22   discovery in Vaughn closed last month.  So I'll just make
23   it clear for the record that this deposition is pursuant
24   to this case and not Vaughn.
```

TOOMEY REPORTING
312-853-0648

---

**MATTHEW BURKE**
September 23, 2016

Page 214

```
 1    THE COURT:  I'm not -- That's Judge Ellis' case --
 2    MR. NICHOLS:  Yeah.
 3    MR. MORRISSEY:  Yes.
 4    THE COURT:  I'm not going to rule on anything
 5   related to that case.
 6    MR. MORRISSEY:  But -- But our agreement --
 7    THE COURT:  You can take that up with Judge Ellis.
 8         By the way, you keep talking it's counting
 9   against your 90 minutes.
10    MR. MORRISSEY:  I understand.
11    THE COURT:  I turn into a pumpkin at a certain
12   point.
13    MR. MORRISSEY:  I understand, your Honor.
14    THE COURT:  Okay.
15    MR. MORRISSEY:  Our agreement provides from 2010 to
16   the present.
17    MR. NICHOLS:  Correct.
18    MR. MORRISSEY:  So can he answer the question?
19    MR. NICHOLS:  Correct.  But that was assuming that
20   we were doing joint depositions for both cases.  We're
21   not anymore.
22    MR. MORRISSEY:  Well, this a joint deposition for
23   Vaughn also.
24    MR. NICHOLS:  Well, I object to that
```

TOOMEY REPORTING
312-853-0648

---

**MATTHEW BURKE**
September 23, 2016

Page 215

```
 1   characterization.
 2         However, Mr. Burke, you know, if you know the
 3   answer, you can answer the question.
 4         But my objection stands.
 5   BY THE WITNESS:
 6    A.   What I do know is that there were several
 7   renovations made to the Cermak building in 2013, which I
 8   believe increased the number of rooms with accessible
 9   toilets and sinks.  So I believe that the number of
10   wheelchair-bound detainees that were housed there was
11   probably -- depending on the number that you ever had at
12   one time, which fluctuated -- was greater in 2013 than it
13   would have been in 2014.  But I don't have the exact
14   numbers.
15    Q.   What did the sheriff do in 2014 when the
16   sheriff discovered that a wheelchair user was in a cell
17   that didn't have a toilet with grab bars?
18    A.   In 2014 we had been preparing to open the
19   residential treatment unit to M3s and wheelchair-bound
20   detainees.
21    Q.   My question -- For the wheelchair users in
22   2014, who were placed in cells that were not equipped
23   with a toilet with grab bars, what provision did the
24   sheriff provide those inmates to access the toilet?
```

TOOMEY REPORTING
312-853-0648

---

**MATTHEW BURKE**
September 23, 2016

Page 216

```
 1    A.   Without knowing of a specific instance on when
 2   there may have been someone in a cell that did not have
 3   the accessible toilet or sink, I wouldn't know.
 4         I don't know how many other inmates with
 5   wheelchairs were on the third floor of Cermak, so I don't
 6   know whether or not there were other available beds where
 7   a particular individual could be moved to.
 8    Q.   So as the sheriff's designee you can't answer
 9   that question?
10    MR. NICHOLS:  Objection to the extent that it
11   mischaracterizes his previous testimony.
12    THE COURT:  I think he gave you an answer.  Figure
13   it out.
14    MR. MORRISSEY:  All right.  We'll move on, Judge.
15   BY MR. MORRISSEY:
16    Q.   What did the sheriff do in the year 2014 to
17   provide wheelchair users who were in either protective
18   custody or in segregation with access to toilets and
19   sinks?
20    MR. NICHOLS:  Objection to the extent that the
21   question exceeds the scope of the notice and the witness'
22   designation.
23    THE COURT:  I don't know.  I mean, I don't see the
24   question as being limited to people who are not in
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 5

MATTHEW BURKE
September 23, 2016

Page 217

1  segregation or protective custody. So I don't know. If
2  there's something in the categories or in the letter of
3  the agreement, Mr. Nichols, let me know and I'll look at
4  it. It just says --
5  MR. MORRISSEY: Vaughn and Flora were both in
6  protective -- were both in --
7  THE COURT: Yeah. It just says inmates or
8  detainees. I don't think it says inmates or detainees
9  who are in the general population.
10  MR. NICHOLS: The agreement is silent as to that.
11  THE COURT: Okay. So the objection is overruled.
12  BY THE WITNESS:
13  **A.  For inmates that were either in segregation or**
14  **protective custody that had the wheelchair alerts, they**
15  **would be placed in one of the celled units in RTU. And**
16  **within the celled units there were two cells --**
17  Q.  Well, let me stop you right there. I'm asking
18  before the RTU was opened in August of 2014. What did
19  the sheriff do to place either a person in protective
20  custody in a wheelchair or in segregation in a cell with
21  an accessible toilet and sink?
22  **A.  I'm sorry. But anywhere on the compound or are**
23  **we referring just to the third floor of Cermak?**
24  Q.  I'm referring to wheelchair users in the year

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 218

1  2014 who were placed in segregation or protective custody
2  by the sheriff. Did the sheriff put them in 3 South on
3  the third floor of Cermak?
4  **A.  I believe that that would be one location where**
5  **they may be placed.**
6  Q.  What did the sheriff do if a prisoner was
7  placed in either protective custody or segregation in
8  3 South and was not placed in a cell with an accessible
9  toilet? Well, let me rephrase the question.
10  On 3 South in the year 2014, were wheelchair
11  users who were either in segregation or protective
12  custody placed in cells that did not have an accessible
13  toilet and sink?
14  **A.  I'm afraid I don't know.**
15  Q.  Pardon?
16  **A.  I'm afraid I don't know.**
17  Q.  Other than 3 South in the year 2014, where else
18  were wheelchair users in either protective custody or
19  segregation placed?
20  **A.  I'm not certain, but I believe that maybe some**
21  **detainees that were placed in segregation may have gone**
22  **to Division 10 if they did not have a wheelchair alert**
23  **that required them to be in the wheelchair at all times.**
24  Q.  Would you agree that when a wheelchair user was

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 219

1  placed in either segregation or protective custody, that
2  was a decision by the sheriff and not Cermak?
3  **A.  Yes.**
4  Q.  And it was the decision of the sheriff in the
5  year 2014 where to place wheelchair users who were either
6  in segregation or protective custody in a particular
7  cell?
8  **A.  My understanding is that for protective custody**
9  **and segregation and -- My understanding is that for**
10  **detainees in segregation or protective custody that had**
11  **an M4 alert and were in a wheelchair, that there were**
12  **certain places where they -- where inmates would**
13  **generally be housed. And I believe it was 3 South, but**
14  **I'm not certain. But --**
15  Q.  Were there -- I'm sorry. Are you finished?
16  **A.  No. But depending on the nature of the medical**
17  **care that the person was receiving, it was not certain**
18  **that they would always be there.**
19  **So Cermak staff and correctional staff might**
20  **collaborate and determine the more appropriate housing.**
21  Q.  Were there any cells on 3 South where
22  wheelchair users in protective custody or segregation
23  were placed that were accessible in the year 2014?
24  **A.  I'm not certain.**

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 220

1  Q.  Did the sheriff -- What steps did the sheriff
2  take in 2014 if a prisoner in a wheelchair was placed in
3  segregation or protective custody in 3 South and was not
4  provided with an accessible toilet with grab bars in a
5  cell?
6  MR. NICHOLS: Objection, only to the extent the
7  question has been asked and answered.
8  THE COURT: It sounds like it was asked and answered
9  and you got an answer for it a while ago.
10  So I'll sustain the objection.
11  BY MR. MORRISSEY:
12  Q.  I'm going to ask you questions now about the
13  opening of the RTU after August 21st, 2014 for wheelchair
14  users. At that time, in August of 2014, did the sheriff
15  have a written policy regarding assigning wheelchair
16  users to specific beds and dorms in the RTU?
17  **A.  There was no specific policy about the**
18  **assignment of beds in RTU.**
19  Q.  In each dorm in the RTU there were two beds
20  which were designated for wheelchair users. Is that your
21  understanding?
22  **A.  Yes. There were two beds that did not have the**
23  **concrete stool in front of the desk.**
24  Q.  What was -- If there was no written policy

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 6

MATTHEW BURKE
September 23, 2016

Page 221

1   after August 21st, 2014 in regards to placing wheelchair
2   users in dorms, what was the practice as far as assigning
3   wheelchair users to specific beds in the dorms?
4        A.   Cermak would place the wheelchair alert into
5   the system.  Then either the classification unit or the
6   residential treatment unit tiering officer would make the
7   particular bed assignment for an individual.
8        Q.   Were the tier officers for the dorms in the RTU
9   trained after August 21st, 2014 to assign wheelchair
10  users to the designated wheelchair beds in the dorms?
11       A.   Given the fact that you had more people in
12  wheelchairs than there may have been beds, my
13  understanding is they would do their best, given the
14  classification and the availability, to put them in those
15  beds.
16       Q.   Do you recall in your August 6th -- or
17  August 4th deposition, you acknowledged in the compliance
18  implementation plan that there were 66 accessible beds in
19  the RTU?
20       A.   Yes.
21       Q.   Were there more than 66 wheelchair users after
22  August 21st, 2014 in the RTU?
23       A.   I'm not certain.
24       Q.   And what do you base that there were not enough

---

MATTHEW BURKE
September 23, 2016

Page 223

1        THE WITNESS:  No.
2   BY MR. MORRISSEY:
3        Q.   In addition to the RTU after August 21st, 2014,
4   there were also -- there was other accessibility at the
5   jail to place wheelchair users?
6        A.   There were different areas in the jail where
7   there were accessible cells or living units.
8        Q.   If there were not sufficient accessible beds in
9   the dorms in the RTU after August 21st, 2014, did the
10  sheriff place wheelchair users in the other accessible
11  areas of the jail?
12       A.   The determination to move somebody to the RTU
13  would have been made by Cermak, and Cermak would make
14  that determination based on their medical assessment of
15  the person.
16            So if we had decided unilaterally to move
17  somebody to a different area of the jail, we would be
18  going against the housing and medical recommendations of
19  Cermak.
20       Q.   Was there a practice or procedure, if there was
21  not an accessible bed in the RTU, for the sheriff to
22  request the medical staff for permission to move a
23  wheelchair user to another location at the jail?
24       A.   I don't believe that we ever requested

---

MATTHEW BURKE
September 23, 2016

Page 222

1   accessible beds in the RTU to provide an accessible bed
2   to all wheelchair users?
3        A.   I think we need to make clear that that list
4   that went over -- or the list that designated the people
5   that were going over were generally going to either the
6   second or third floor of the RTU.  Not the entire
7   building.
8            The entire building had the 66 beds, but that
9   included the fifth floor which is for women, the fourth
10  floor which is for inmates receiving an intermediate
11  level of mental healthcare.
12           And so although I've never seen the actual
13  numbers of wheelchair-bound detainees who went to the
14  third floor during that move, it's my belief that there
15  were more -- if not on that first day, at least -- at
16  certain points after that than we actually had the beds
17  that did not either have that stool in front of the desk
18  or the cells that had the accessible toilets.
19       Q.   All right.  In addition, after the move to the
20  RTU on August 21st, 2014, the sheriff retained the
21  jail -- the accessible beds or cells in the Cermak,
22  correct?
23       MR. NICHOLS:  Do you understand the question?
24       MR. CONDRON:  Objection, vague.

---

MATTHEW BURKE
September 23, 2016

Page 224

1   permission to move somebody.  Like I said, that would be
2   substituting our judgment for theirs, and it would
3   probably lead to the person being placed in a setting
4   where they wouldn't get the level of medical care that
5   Cermak determined they needed.
6        Q.   So there was never a situation where the
7   sheriff, if a person was in an inaccessible cell or dorm
8   in the RTU, would request Cermak to collaborate and have
9   the person moved to another location?
10       MR. NICHOLS:  Objection to the extent the question
11  misstates the witness' previous testimony.
12       THE COURT:  Overruled.  It's a question.
13  BY THE WITNESS:
14       A.   There were other types of accommodations that
15  could be provided to those who may not have been in one
16  of the accessible -- in the beds without the stool in
17  front of the desk.
18       Q.   Who would then, at Cermak, would the sheriff
19  have had to ask permission to move a prisoner who was
20  wheelchair-bound to an accessible cell or dorm in another
21  location of the jail other than the RTU?
22       A.   I don't know specifically who we would ask.
23  Maybe Dr. Minnella (phonetic).
24       Q.   What did the -- In regards to the RTU and

Plaintiff's Exhibit 12 Page 7

MATTHEW BURKE
September 23, 2016

Page 225

1  people that were placed in protective custody or
2  segregation by the sheriff who were in wheelchairs, where
3  did the sheriff place them in the new RTU?
4      A.   The celled units would be used for those that
5  were in segregation or protective custody.
6      Q.   So that would be either Tier 3A or 3E?
7      A.   I believe that's right.
8      Q.   Was there any written direction given to the
9  tier officers in regards to what cell to put a wheelchair
10 user in who was in segregation in either Tier 3A or 3E?
11     A.   I'm not aware of any written direction.  No.
12     Q.   In each -- In Tier 3A there are ten cells?
13     A.   Correct.
14     Q.   Only one of them was accessible with an
15 accessible toilet?
16     A.   I thought it might have been two, but I'm not
17 certain.
18     Q.   And in 3E, again, there was only one cell out
19 of ten that had grab bars around the toilet?
20     A.   Like I said, I thought it was two, but I'm not
21 disputing it.
22     Q.   Was there a practice in the sheriff's office if
23 a wheelchair user was placed in protective custody or
24 segregation to ensure that person was placed in

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 226

1  one -- in a cell that was accessible around the -- with
2  grab bars?
3      A.   I believe the expectation would be that if
4  there was one available, then someone that was
5  wheelchair-bound would be placed in that.  If there was
6  not one available, then accommodations would be made.
7      Q.   When you say "the expectation," were tier
8  officers specifically trained to place wheelchair users
9  in segregation in accessible cells?
10     A.   I don't know if there was specific training to
11 that.
12     Q.   What procedures -- After the RTU was opened in
13 August 21, 2014, what procedures were in place to ensure
14 that wheelchair users placed in segregation or protective
15 custody were housed in cells which were accessible?
16     A.   The sheriff's ADA coordinator would make
17 frequent rounds to these living units and would speak to
18 those who had wheelchair alerts to see how everything was
19 going.
20          The ADA coordinator would also respond into all
21 grievances that anyone made alleging that they were not
22 placed into an accessible cell.
23          They would also -- The ADA coordinator would
24 also respond to requests to be placed into the ADA

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 227

1  accessible cells.
2      Q.   If a wheelchair user, after August of 2014,
3  complained that they were not in an accessible cell in
4  the RTU, would the ADA coordinator then have the power to
5  move that person to an accessible cell either in the RTU
6  or some other location in the jail?
7      A.   I do not believe that the ADA coordinator would
8  ever recommend moving someone out of the RTU.  But I
9  believe that the ADA coordinator, if they were able to
10 identify an open ADA bed, could make that recommendation
11 to divisional supervisors to have that person moved.
12     Q.   Was there a procedure then in place that the
13 person would be moved to an accessible bed in either the
14 RTU or another location in the jail?
15     A.   I don't believe there was a written procedure,
16 but I do believe that that did happen.
17     Q.   Between the time the justice department -- the
18 DOJ came out in May of 2010 up to the present, did the
19 jail have relationships with other prisons and jails to
20 house Cook County prisoners?
21          MR. NICHOLS:  Objection, only to the extent that the
22 question exceeds the scope of the notice and the witness'
23 designation.
24          THE COURT:  If you think it does, tell me how

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 228

1  you think it does so I understand.
2          MR. NICHOLS:  Well, in the actual notice of
3  deposition, there's nothing for which --
4          THE COURT REPORTER:  I'm sorry.  Can you speak up,
5  please?
6          MR. NICHOLS:  Oh.  Yes.
7          THE COURT:  I'll come over here so he's not talking
8  away from you.
9          MR. NICHOLS:  Mr. Burke was designated to respond to
10 Item 3, Item 4B, C, D and F of the notice.  There's
11 nothing in the notice that refers to sending detainees to
12 other facilities.  Any agreements that the sheriff may
13 have had with other facilities has just not been --
14         THE COURT:  And the question had to do with
15 facilities other than Cook County, Mr. Morrissey?
16         MR. MORRISSEY:  Right.  But our notice provided
17 oversight by Dart related to accessibility for detainees.
18         THE COURT:  And I think it's close enough.  The
19 objection is overruled.
20 BY THE WITNESS:
21     A.   I'm sorry.
22     Q.   Do you want me to --
23     A.   Yeah.  Try again.
24     Q.   Sure.  If the jail didn't have a spot for a

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 8

MATTHEW BURKE
September 23, 2016

Page 229

1   wheelchair user after the justice department's letter in
2   May of 2012, could the sheriff have moved the prisoner to
3   an outlying jail under your agreements with these other
4   facilities?
5       MR. NICHOLS:  Objection, form.
6       You can answer.
7   BY THE WITNESS:
8       A.   I --
9       Q.   Well, let me ask a preliminary question.
10          Between May of 2012 to the present, has the
11  sheriff moved prisoners because of overcrowding to other
12  jails in the State of Illinois?
13      **A.   We have moved inmates to other county jails**
14  **because of safety and security reasons and sometimes some**
15  **overcrowding issues.  Yes.**
16      Q.   Did the sheriff ever experience a situation,
17  between May of 2012 and the present, where the sheriff
18  did not have enough cells -- accessible cells for
19  wheelchair users?
20      **A.   As stated, I believe there were periods when**
21  **there were more people in wheelchairs in Cermak than**
22  **could be placed in the limited number of ADA accessible**
23  **cells.**
24      Q.   Did the sheriff ever make an attempt to

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 230

1   accommodate those wheelchair users by placing them in a
2   facility outside of Cook County jail?
3       **A.   No.**
4       Q.   Why not?
5       **A.   Just off the top of my head, I think it would**
6   **be -- I don't know if it would actually be discriminatory**
7   **towards those in wheelchairs to move them several hundred**
8   **miles away.**
9           **I'm also not certain whether or not some of**
10  **these other jails would have -- would be able to**
11  **accommodate the detainees.  And I don't know if it would**
12  **be the best for the individual medically.**
13      Q.   Did the sheriff ever make a request to any
14  other jail facility to accommodate wheelchair users
15  during that time period?
16      **A.   I don't believe so.  No.**
17      Q.   You're aware that Mr. Flora was housed on the
18  third floor of Cermak between May 1st, 2014 when he came
19  into the jail through August 21st, 2014?
20      **A.   Yes.**
21      Q.   I'm going to show you what's been marked as
22  Plaintiff's Exhibit A.  It's the Cook County answer to
23  request to admit.  And I'm going to ask you to look at
24  Paragraph 16 specifically in regards to the accessibility

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 231

1   on 3 North of Cermak.
2       **A.   (Witness complying.)**
3       Q.   Tell me when you're finished reading.
4       **A.   Okay.**
5       Q.   The County admitted that on 3 North where
6   Mr. Flora was housed, that only Room 3243 had at least
7   one grab bar at the time that he was housed in Cermak,
8   correct?
9       **A.   The answer states that defendant further admits**
10  **that no other room on 3 North had at least one grab bar**
11  **near the toilet during said timeframe.**
12      Q.   And it's your understanding, between May 1st,
13  2014 and August 21st, 2014, that Mr. Flora was housed on
14  the third floor of Cermak?
15      **A.   Correct.**
16      Q.   And he was not placed in the one room that had
17  some accessibility, Room 3243?
18      **A.   I'm not trying to be difficult, but I don't**
19  **know where exactly he was housed, so ...**
20      Q.   What did -- Assuming Mr. Flora was not placed
21  in 3243, what did the sheriff do during that time period
22  to provide Mr. Flora with access to a toilet and sink?
23      **A.   On 3 North you have nursing staff and medical**
24  **staff and correctional staff that are right there.  So I**

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 232

1   **believe if he ever needed assistance, there would be**
2   **people there who could assist.**
3       Q.   So is it the sheriff's position that, assuming
4   Mr. Flora was not in a cell which met the structural
5   requirements of the ADA, he could ask either a nurse or a
6   correctional officer for assistance?
7       **A.   Yes.  I believe he could.**
8       Q.   And if Mr. Flora, in that time period between
9   May 1st and August 21st, 2014, asked one of those
10  individuals, is it the sheriff's position that a portable
11  toilet, slash, shower chair would have been brought into
12  his room?
13      **A.   I don't know the exact layout of the room.  I**
14  **did not think that there were showers in the room, but**
15  **that there was a separate shower area.**
16      Q.   Well, let me rephrase it then.
17          Is it the sheriff's position that Mr. Flora
18  could always have requested from the staff on the third
19  floor of Cermak for assistance?  And by "assistance,"
20  that would have meant bringing him a portable commode
21  chair into his room.
22      MR. NICHOLS:  Objection to the form of the question.
23      MR. CONDRON:  I'll join.
24      MR. NICHOLS:  You can answer.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 9

MATTHEW BURKE
September 23, 2016

Page 233

1    THE COURT:  What's the problem with the form?

2    MR. NICHOLS:  It's a compound question.

3    THE COURT:  Now you know what the potential problem

4  with the form is.  You want to rephrase it?

5    MR. MORRISSEY:  Okay.

6  BY MR. MORRISSEY:

7    Q.  How did -- Assuming Mr. Flora was not in an

8  accessible room on 3 North, how did the sheriff

9  accommodate his need to toilet?

10    A.  I'm afraid I don't know the specifics of what

11  needs he had in terms of whether it would be one of the

12  chairs, if it would be assistant getting on -- assistance

13  getting onto the toilet by nursing staff.

14    Q.  Assuming Mr. Flora needed to use an accessible

15  toilet between May 1st, 2014 and August 21st, 2014, what

16  accommodation under the ADA was provided for him if he

17  was in an inaccessible cell?

18    MR. NICHOLS:  I just want to make clear for the

19  record that the ADA coordinator, Sabrina

20  Rivera-Controllo, was designated to answer these specific

21  questions with respect to accommodations in each

22  individual cell within Cermak.

23    However, to the extent that you know the answer

24  to these questions, do your best to try to answer.

MATTHEW BURKE
September 23, 2016

Page 234

1  BY THE WITNESS:

2    A.  My only understanding was that toilet chairs

3  could be provided or actual physical assistance by

4  medical staff.

5    Q.  I'm going to show you what's been marked as

6  Plaintiff's Exhibit B.  It's a grievance by Mr. Flora on

7  August 18th, 2014.  I'd ask you to take a look at that.

8  Is that a grievance form that's used at the jail?

9    A.  Yes.

10    Q.  I'd ask you to read his summary of his

11  complaint to yourself for a moment.

12    A.  (Witness complying.)

13    Q.  Did you have an opportunity to read that?

14    A.  Yes.

15    Q.  Now, the substance of his complaint is that he

16  was placed in an inaccessible cell in Cermak in the

17  summer of 2014, correct?

18    A.  Correct.

19    Q.  And who is Marlene Fuentas (phonetic)?

20    A.  She was the ADA coordinator at the time.

21    Q.  And she worked for you?

22    A.  Correct.

23    Q.  And you designated her to respond to all ADA

24  requests by wheelchair users at the jail?

MATTHEW BURKE
September 23, 2016

Page 235

1    A.  Yes.  As part of our policy, the ADA

2  coordinator would respond to ADA-related grievances.

3    Q.  And Ms. Fuentas, on August 26th, 2014,

4  responded to Mr. Flora's complaint that he was not placed

5  in an accessible cell in the summer of 2014, correct?

6    A.  Yes.  She responded.

7    Q.  And that was after he was moved to the RTU?

8    A.  Yes.

9    Q.  And in the body of her response, she said the

10  grievance is moot because Mr. Flora has been moved to

11  Division 8, 3C as of 8/21/14, correct?

12    A.  Yes.  I'm having trouble reading the next part.

13    Q.  The next part says, for future reference, there

14  are toilet, slash, shower chairs available on 3 South and

15  3 North at Cermak.  Please notify staff when you require

16  the use of one.  That's the response she gave -- the

17  official response she gave to Mr. Flora to his grievance?

18    A.  Correct.

19    Q.  And is that the policy -- Was that the policy

20  in August of 2014, if a wheelchair user was placed in an

21  inaccessible cell, he could request a portable toilet

22  chair?

23    MR. NICHOLS:  Objection to the extent that it's

24  vague.  Are we talking about Cermak and the RTU or just

MATTHEW BURKE
September 23, 2016

Page 236

1  Cermak?

2    MR. MORRISSEY:  I'm talking about the policy in

3  August of 2014.

4  BY THE WITNESS:

5    A.  In Cermak?

6    Q.  In the jail.

7    THE COURT:  He's not limiting it to a particular

8  location, if someone is in Division 10 or whatever.

9  BY THE WITNESS:

10    A.  Yeah.  They could request from staff if they

11  needed assistance.

12    Q.  Has that changed -- that policy changed since

13  August of 2014?  If a wheelchair user is placed in an

14  inaccessible cell at the jail, is it the policy that the

15  person -- the wheelchair user has to request assistance

16  from the sheriff?

17    A.  In Cermak they would request assistance from

18  Cermak staff, most likely.  And I'm not certain if

19  this -- if it occurs elsewhere or --

20    Q.  Is it the sheriff's position that if the

21  sheriff satisfies their ADA obligations to a wheelchair

22  user by having a policy whereby the wheelchair user can

23  request assistance if they're not in an accessible room,

24  and the sheriff will bring -- or the medical staff will

Plaintiff's Exhibit 12 Page 10

MATTHEW BURKE
September 23, 2016

Page 237

```
 1  bring a portable commode chair into the room?
 2      A.  My understanding is that that would be a
 3  measure that we could take to provide an accommodation.
 4  Yes.
 5      Q.  You're aware -- And that's the policy today?
 6      A.  The policy today is that we will do our best to
 7  accommodate someone's disability.
 8      Q.  And today, if a person who's wheelchair-bound
 9  is placed in an inaccessible cell by the sheriff, it's
10  still the policy that the person has to request
11  assistance?
12      A.  I'm afraid I don't know what you're getting at
13  here.  I don't --
14      Q.  Let me be specific.  If a wheelchair user is
15  placed in segregation in either 3A or 3E and not in the
16  accessible cell on either tier, what is the procedure of
17  the sheriff?
18      THE COURT:  With regard to toileting?
19      MR. MORRISSEY:  With regard to toileting.
20      MR. CONDRON:  My only objection would be are we
21  talking about currently?  Is that part of the notice?
22      THE COURT:  That's what he means.
23          You're asking today, right?
24      MR. MORRISSEY:  Right.
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 238

```
 1      THE COURT:  Right.
 2  BY THE WITNESS:
 3      A.  I'm afraid I'm not familiar with exactly how
 4  that would work today.  My understanding is that if we
 5  did not have an accessible cell available for somebody
 6  who used a wheelchair, I would imagine that they would
 7  request assistance to use the toilet.
 8          I do know that there have been cases or
 9  situations -- and I don't know the specifics -- where an
10  inmate would simply call out and say, Officer, I need to
11  use the bathroom.  And if they're in one of those cells,
12  the officer who's 15 to 20 feet away in an open area, not
13  behind a bubble or anything like that, would just come
14  and let the person out and they could use the accessible
15  toilet that's in the day room.
16      Q.  You're aware that Mr. Vaughn was in segregation
17  or protective custody this summer in the RTU?
18      MR. NICHOLS:  Objection, only to the extent that
19  fact discovery is closed on Vaughn.  I see you're trying
20  to elicit testimony pertaining to that case, but fact
21  discovery is closed.
22          I'm instructing my client not to answer.
23      MR. MORRISSEY:  I don't want to have to go back to
24  Judge Ellis, but this is a continuation of the Flora and
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 239

```
 1  Vaughn deposition.
 2      MR. NICHOLS:  Certainly, the fact discovery is
 3  closed in Vaughn, Mr. Morrissey.
 4      THE COURT:  I'm not going to weigh-in on that one.
 5  BY THE WITNESS:
 6      A.  I am aware that Mr. Vaughn was in segregation
 7  because I saw a video of him standing up and getting into
 8  a fight.
 9      Q.  What -- And he was prescribed a wheelchair by
10  Cermak?
11      MR. NICHOLS:  Same objection.  Same objection to all
12  these questions pertaining to Mr. Vaughn.  Again, fact
13  discovery is closed in that case.
14  BY MR. MORRISSEY:
15      Q.  After the justice department came out with
16  their letter in May of 2012, did Thomas Dart have weekly
17  meetings with management personnel at the jail at Cermak?
18      MR. NICHOLS:  Objection to the extent that the
19  question is beyond the scope of the notice and beyond the
20  scope of the witness' designation.
21      THE COURT:  You're asking about something current,
22  right?
23      MR. MORRISSEY:  Well, I'm asking from 2012 to the
24  present about sheriff's meetings and what the sheriff and
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 240

```
 1  his management team did or didn't do in regards to
 2  wheelchair users.
 3      MR. NICHOLS:  And I'm maintaining that objection.
 4      THE COURT:  Overruled.
 5  BY MR. MORRISSEY:
 6      Q.  Let me ask a preliminary question.
 7          In the year 2012, the sheriff, Tom Dart, would
 8  have weekly meetings with management personnel?
 9      A.  Yes.  He would hold weekly accountability
10  meetings, we called them.
11      Q.  And you would be present at those meetings as
12  the chief of staff?
13      A.  At the time I was, I believe, assistant general
14  counsel.  So not in my current role.
15      Q.  But you were involved in those meetings?
16      MR. NICHOLS:  Objection, only to the extent the
17  question may implicate attorney-client privilege.
18      THE COURT:  Whether he was in a meeting isn't
19  privileged, so ...
20  BY MR. MORRISSEY:
21      Q.  Well, let me --
22      A.  Yes.  I would attend.
23      Q.  And after the justice department's letter came
24  out in May of 2012, was the issue of providing
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 11

MATTHEW BURKE
September 23, 2016

Page 241

1 accessible -- accessibility to wheelchair users for the
2 jail discussed at those weekly meetings with Tom Dart
3 present?
4    A.   I do not recall that issue ever being raised at
5 one of the accountability meetings.
6    Q.   During the weekly meetings -- They continued to
7 the present, correct?
8    A.   No.  There are no more accountability meetings.
9    Q.   Well, are there sheriff's meetings which you
10 attend with Director Morrisay (phonetic)?
11    A.   Director who?
12    Q.   Morrisay?
13    A.   Morici?
14    Q.   Morici.
15    A.   Yes.  We meet every once in a while.
16    Q.   And that's on a regular basis?
17    A.   I wouldn't call it a regular basis, but ...
18    Q.   But at those meetings, you're present, Morici
19 is present, the director at the jail, the executive
20 director Jones is present?
21    A.   Correct.
22    Q.   The former director, Kara (phonetic) Smith,
23 sometimes is present?
24    A.   Sometimes.

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 242

1    Q.   And so it's a smaller group of management at
2 the jail, correct?
3    A.   Correct.
4    Q.   During any of those meetings, from 2012 to the
5 present, have there ever been any discussion in regards to
6 the need to provide accessibility for wheelchair users at
7 the jail?
8    A.   I don't recall that ever being a topic.
9    Q.   Has the department of justice's oversight in
10 regards to accessibility at the jail ever been discussed
11 at those weekly or periodic meetings with Tom Dart?
12    A.   I don't recall that ever being raised.
13    Q.   Has the need at those meetings to collaborate
14 with your medical partner at Cermak in regards to
15 wheelchair users and accessibility ever been discussed at
16 those meetings after the DOJ's letter came in?
17    A.   You're referring to the accountability meetings
18 or --
19    Q.   I'm referring to these meetings where the
20 chief -- where Tom Dart was present and either a more
21 broader group of people was initially present at those
22 meetings, and then later on where there was a closer-nit
23 group.  You said after 2014.  I narrowed it to a more
24 insular group of people.  My question is, at any of those

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 243

1 meetings, did the sheriff ever discuss the need or
2 anybody in the meetings ever discuss the need to
3 collaborate more fully with the Cermak personnel to make
4 sure that wheelchair users were provided accessibility at
5 the jail?
6    A.   I don't recall that ever being an issue in one
7 of those meetings.
8    Q.   At those meetings -- In all those meetings, was
9 there ever any discussion about the opening of the RTU at
10 the jail?
11    A.   I don't recall a specific meeting of where that
12 was discussed, but I imagine that we would have raised
13 the issue because it was important.
14    Q.   Did the transfer of wheelchair prisoners from
15 other locations of the jail to the new RTU ever get
16 discussed in those sheriff's meetings?
17    A.   I don't believe so.  No.
18    Q.   Did the fact that -- Did the issue of whether
19 or not the sheriff had sufficient space at the jail for
20 wheelchair users ever get discussed at those sheriff's
21 meetings?
22    A.   I don't believe so.  No.
23    Q.   Did you discuss at those meetings moving
24 prisoners from Cook County to other jails because of

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 244

1 overcrowding -- at those meetings?
2    A.   I don't believe so.  No.
3    Q.   It's the sheriff's position that the
4 responsibility for placing wheelchair users in
5 inaccessible housing at the jail was a decision made by
6 Cermak?
7    MR. NICHOLS:  Objection to the extent the question
8 has been asked and answered.
9    THE COURT:  Can you break it down in terms of time?
10    MR. MORRISSEY:  Yeah.
11 BY MR. MORRISSEY:
12    Q.   Prior to the opening of the RTU in August
13 of 2014, is it the sheriff's position that it was
14 Cermak's responsibility to place wheelchair users in
15 accessible cells?
16    MR. NICHOLS:  Same objection.
17    THE COURT:  That exact question wasn't asked.
18         Questions close to that were asked, but you can
19 answer that question.
20 BY THE WITNESS:
21    A.   As laid out in the agreed order and as laid out
22 in our interagency agreement, Cermak is responsible for
23 the medical evaluations and then determining appropriate
24 housing.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 12

MATTHEW BURKE
September 23, 2016

Page 245

```
 1     MR. MORRISSEY:  Could we take a one minute break?
 2  We're wrapping up, Judge.
 3     THE COURT:  Sure.
 4              (A short break was had.)
 5  BY MR. MORRISSEY:
 6     Q.   The summer of 2014 the sheriff had an ADA
 7  coordinator?
 8     A.   Correct.
 9     Q.   Did the sheriff's ADA coordinator have any
10  responsibility to tell you or other high management
11  people at the jail when wheelchair users were not in
12  accessible cells?
13     A.   I don't know if it was a -- she would have a
14  responsibility to raise serious concerns related to the
15  ADA or inmates with disabilities.
16     Q.   Does the sheriff consider it a serious concern
17  when a wheelchair user was placed in an inaccessible cell
18  in the summer of 2014?
19     A.   I would say that because historically detainees
20  with serious medical conditions who were in wheelchairs
21  had always been housed on the third floor of Cermak where
22  they were being provided with an intense level of medical
23  treatment with lots of medical staff around, that that
24  would not have been alarming.
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 247

```
 1  Mr. Burke's designation.  It's beyond the scope of the
 2  notice.
 3     THE COURT:  The problem is he had to break down the
 4  question because of the objection.  So the objection
 5  about disclosing the settlement is overruled because
 6  that's not what it asked for.  The prior question was
 7  within the scope of the time period because it had
 8  basically asked about, you know, a longer scope.
 9     So I think you're going to have to put the
10  whole question over again, Mr. Morrissey, rather than
11  trying to --
12     MR. MORRISSEY:  Okay.
13  BY MR. MORRISSEY:
14     Q.   In addition to between 2010 and the present,
15  the sheriff places wheelchair users in Division 2, M and
16  N?
17     MR. NICHOLS:  Same objections.  It's beyond the
18  scope of notice and the witness' designation.
19     THE COURT:  I disagree.  Paragraph 4D.  I'm looking
20  at the agreement.
21     Overruled.  Go ahead and answer.
22  BY THE WITNESS:
23     A.   Yes.  M and N house has been used to house
24  inmates in wheelchairs.
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 246

```
 1     Q.   Now, in addition to the third floor, the
 2  sheriff placed wheelchair users in Division 2, M and N,
 3  correct?
 4     A.   Yes.  Cermak would designate certain detainees
 5  to be placed in the M and N house.
 6     Q.   And that -- The Division 2, M and N, was
 7  renovated after the class action in Fitz' versus the
 8  Sheriff of Cook County?
 9     MR. NICHOLS:  Objection, only to the extent that the
10  case you're referring to ultimately was resolved via
11  settlement, and there was a confidentiality agreement
12  pertaining to that.
13     I don't know where you're going with this, but
14  I certainly do not want Mr. Burke commenting on --
15     MR. MORRISSEY:  It's a public document.
16     THE COURT:  What was the question?  State the
17  question again so I know what --
18  BY MR. MORRISSEY:
19     Q.   Division 2, Tiers M and N were renovated in
20  2008 after the Fitz versus the Sheriff Sheen case was
21  settled, correct?
22     MR. NICHOLS:  Objection, also to the extent that
23  this is well outside of the scope of the relevant time
24  period for Mr. Flora.  Also, it's beyond the scope of
```

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 248

```
 1     Q.   And that Cermak, in the summer of 2014, was
 2  being used by the sheriff to house wheelchair individuals
 3  that didn't have an M4 classification by the medical
 4  staff?
 5     A.   I'm not certain exactly what every person's
 6  medical classification was.
 7     Q.   What is M4?  What is your understanding of what
 8  M4 means?
 9     A.   It means the person is receiving -- or is
10  acutely medically --
11     Q.   And on August 21st, 2014 --
12     A.   I'm sorry.  Is receiving inpatient care, is the
13  best way to look at it.
14     Q.   Okay.  The RTU doesn't hold people, to your
15  understanding, that are receiving acute care; that's the
16  same care that's provided in Cermak?
17     A.   It's a step down.  They're M3 so it's the
18  intermediate level of care.
19     Q.   And Flora was transferred from Cermak, which
20  was the acute care building, to the RTU along with 31
21  other wheelchair users in Cermak to the RTU?
22     A.   I'm not certain if all 31 who were transferred
23  were in wheelchairs or not.  But I believe that was the
24  number that were transferred from Cermak.
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 13

MATTHEW BURKE
September 23, 2016

Page 249

1  Q.  So my question is, there were wheelchair users
2  that were housed by the sheriff in Cermak that didn't
3  require a high level of medical care -- weren't an M4
4  classification by Cermak?
5  **A.  I can only assume that Cermak was able to move**
6  **the people out of Cermak when the RTU was opened, because**
7  **the RTU was able to provide a certain level of care that**
8  **the other buildings at the time could not provide.**
9  Q.  Now, you mentioned this collaboration between
10  the sheriff and your medical team, Cermak, as far as
11  placing disabled people in housing at the jail, correct?
12  **A.  Correct.**
13  Q.  And that stems from the justice department's
14  consent decree in 2010?
15  **A.  I wouldn't necessarily say that.**
16  Q.  Well, the sheriff, Cermak and the justice
17  department agreed that disabled people should be placed
18  in appropriate housing at the jail?
19  **A.  As determined by Cermak.**
20  Q.  Okay.  And it was -- It's your position that
21  the sheriff and Cermak collaborated as far as placing
22  wheelchair users in housing at the jail?
23  **A.  My position is that Cermak will indicate the**
24  **appropriate housing, and we will invariably follow that**

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 250

1  **direction unless there are serious security or safety**
2  **concerns.  At which point we will raise those with Cermak**
3  **staff and collaborate with them to find the most**
4  **appropriate housing, taking into consideration their**
5  **medical needs, classification, other security and medical**
6  **concerns.**
7  Q.  I'd ask you to look at -- and this is the final
8  question -- the Cook County's answer to request to admit,
9  Paragraph 15.  And it states from August 30th, 2014 to
10  August 10th, 2014 [sic], the employees of the sheriff in
11  Cook County were jointly responsible for assigning
12  inmates to rooms on the third floor of -- the third floor
13  of Cermak's infirmary.  And Cook County denies that.  Do
14  you see that?
15  **A.  Uh-huh.**
16  Q.  So is it your position that Cook County was
17  solely responsible then for placing wheelchair users in
18  the summer of 2014 in rooms that didn't provide
19  accessible toilets?
20  MR. NICHOLS:  Objection.  Misstates the witness'
21  previous testimony.
22  MR. CONDRON:  I'll join in that objection.
23  THE COURT:  It's just a question.
24         You can answer.

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 251

1  MR. MORRISSEY:  Well, I'll ask it again.
2  BY MR. MORRISSEY:
3  Q.  Is it the sheriff's position that your medical
4  partner that was retained by the sheriff -- Well, strike
5  that.
6         The sheriff is responsible for the jail,
7  correct?
8  **A.  The sheriff is responsible for the safety and**
9  **security of the jail.**
10  Q.  And the sheriff is responsible for providing
11  medical care for prisoners at the jail?
12  **A.  As outlined in the agreed order and in our**
13  **interagency agreement, Cermak is responsible for**
14  **providing medical care.**
15  Q.  The Illinois statutes provide that the sheriff
16  is responsible for the healthcare of prisoners at the
17  jail?
18  MR. NICHOLS:  Objection.  The question is seeking a
19  legal conclusion.
20  THE COURT:  Overruled.  Seriously.
21         You're a lawyer, right?
22  THE WITNESS:  Yes.
23  THE COURT:  Yeah.  Okay.  You know, he's operating
24  pursuant to a certain set of statutes, so the objection

TOOMEY REPORTING
312-853-0648

MATTHEW BURKE
September 23, 2016

Page 252

1  is overruled.
2  BY THE WITNESS:
3  **A.  I'm saying in Cook County Cermak is responsible**
4  **for the medical --**
5  Q.  And my question --
6  THE COURT:  He's asking you about the Illinois
7  statute, and I would really like to be out of here, so
8  let's just keep to that question.
9  BY THE WITNESS:
10  **A.  Yes.  The Illinois statute states something**
11  **along the lines of that the sheriff is responsible for**
12  **the custody and care of the inmates.  Yes.**
13  Q.  And the sheriff retained Cermak to provide
14  healthcare at the jail?
15  **A.  I don't know if "retained" is the --**
16  THE COURT:  Do you have an understanding?  Do they
17  have an understanding with Cermak?
18  THE WITNESS:  They have an understanding.
19  BY MR. MORRISSEY:
20  Q.  And it's the sheriff's position that the
21  sheriff, as keeper of the jail, has no responsibility in
22  regards to where wheelchair users were placed in summer
23  of 2014 in regards to accessibility?
24  MR. NICHOLS:  Objection.  The question misstates the

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 14

## Page 253

1  witness' previous testimony.

2      THE COURT:  First of all, you're talking about

3  August 10th or whatever it is?

4      MR. MORRISSEY:  Yeah.

5      THE COURT:  I mean, it's argumentative.

6        It's sustained.

7      MR. MORRISSEY:  We're done.

8      THE COURT:  You're done?

9      MR. MORRISSEY:  We're done.

10     THE COURT:  Do you have any questions?

11     MR. NICHOLS:  I have no follow up.

12     THE COURT:  All right.  Thanks folks.

13     MR. MORRISSEY:  Thanks a lot, Judge.

14     MR. NICHOLS:  We'll reserve signature.

15         (Witness excused.)

## Page 255

1  UNITED STATES OF AMERICA    )
   NORTHERN DISTRICT OF ILLINOIS  )

2  EASTERN DIVISION            )  SS.
   STATE OF ILLINOIS           )

3  COUNTY OF COOK              )

4

5      I, Shelley M. Bostetter, Certified Shorthand

6  Reporter and Notary Public, do hereby certify that

7  MATTHEW BURKE was first duly sworn by me to testify to

8  the whole truth and that the continued above deposition

9  was reported stenographically by me and reduced to

10 typewriting under my personal direction.

11     I further certify that the said deposition was

12 taken at the time and place specified and that the taking

13 of said deposition commenced on the 23rd day of

14 September, A.D., 2016, at 9:30 o'clock a.m.

15     I further certify that I am not a relative or

16 employee or attorney or counsel of any of the parties,

17 nor a relative or employee of such attorney or counsel,

18 or financially interested directly or indirectly in this

19 action.

## Page 254

1     IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF ILLINOIS

3        EASTERN DIVISION
   HAROLD VAUGHN,                )

4             )
        Plaintiff,      )

5             )
     vs.                        )  No. 15-cv-00951

6             )
   THOMAS DART, Sheriff of Cook  )  Part 3

7  County, and COOK COUNTY,      )
   ILLINOIS,                     )

8             )
        Defendants.     )

9  --------------------------------)
   DONNELL FLORA,                )

10            )
        Plaintiff,      )

11            )
     vs.                        )  No. 15-cv-1127

12            )
   THOMAS DART, Sheriff of Cook  )

13 County, and COOK COUNTY,      )
   ILLINOIS,                     )

14            )
        Defendants.     )

15

16     I, MATTHEW BURKE, state that I have read the
   foregoing transcript of the continued testimony given by

17 me at my deposition on the 23rd day of September, 2016,
   and that said transcript constitutes a true and correct

18 record of the testimony given by me at said the
   deposition except as I have so indicated on the errata

19 sheets provided herein.

20          MATTHEW BURKE

21 No corrections (Please initial)
   Number of errata sheets submitted    (pgs.)

22 SUBSCRIBED AND SWORN to
   before me this    day

23 of             , 2016.

24

## Page 256

1      In witness whereof, I have hereunto set my hand

2  and affixed my seal of office at Chicago, Illinois, this

3  26th day of September, A.D., 2016.

4

5

6

7

8

9

10        SHELLEY M. BOSTETTER, CSR

11        TOOMEY REPORTING
          (312) 853-0648

12

13 CSR No. 084-004410

14

Plaintiff's Exhibit 12 Page 15

MATTHEW BURKE
September 23, 2016

Page 1

**A**
able 227:9
230:10
249:5,7
access 215:24
216:18
231:22
accessibility
201:15,24
202:4 223:4
228:17
230:24
231:17
241:1 242:6
242:10,15
243:4
252:23
accessible
205:11
207:23
208:17,21
209:2,5,12
209:20,20
210:11,19
212:2,6,12
212:15
213:7,8,15
215:8 216:3
217:21
218:8,12
219:23
220:4
221:18
222:1,11,18
222:21
223:7,8,10
224:16,20
225:14,15
226:1,9,15
226:22
227:1,3,5
227:13

229:18,22
233:14
235:5
236:23
237:16
238:5,14
241:1
244:15
245:12
250:19
accommod...
230:1,11,14
233:9 237:7
accommod...
233:16
237:3
accommod...
224:14
226:6
233:21
accountabl...
240:9 241:5
241:8
242:17
acknowled...
221:17
action 246:7
255:19
actual 222:12
228:2 234:3
acute 248:15
248:20
acutely
248:10
ad 203:7
ada 220:10
202:18
210:20
211:11,11
211:19
212:2,6,10
212:12,17
226:16,20

226:23,24
227:4,7,9
227:10
229:22
232:5
233:16,19
234:20,23
235:1
236:21
245:6,9,15
adarelated
235:2
addition
222:19
223:3 246:1
247:14
additional
201:23
admit 230:23
250:8
admits 231:9
admitted
231:5
aed 202:13
affixed 256:2
afraid 218:14
218:16
233:10
237:12
238:3
ago 220:9
agree 218:24
agreed
220:9 229:6
agreement
204:5,7
214:6,15
217:3,10
244:22
246:11
247:20
251:13

agreements
223:12
229:3
ahead 247:21
alarming
245:24
alert 207:9
207:19
208:15
218:22
219:11
221:4
alerts 209:11
217:14
216:18
218:8
209:3 210:8
alleging
221:12,22
amended
211:6
america
255:1
answer
206:17
208:3,8
209:3 210:8
211:5,7,21
214:18
215:3,3
216:8,12
220:9 229:6
221:17
219:9
220:22
231:9
223:24
233:20,23
238:22
234:19
251:17
259:8,24
answered
215:6

244:8
anybody
202:3,14
208:14
243:2
anymore
214:21
appearances
199:1
appropriate
207:1
212:24
219:20
224:23
249:18,24
250:4
approxima...
203:5 213:3
area 223:17
212:15
238:12
areas 223:6
223:11
argumenta...
253:5
asked 220:7,8
232:9 244:8
244:17,18
247:6,8
asking
209:13
210:9
217:17
217:23
219:22
239:21,23
252:6
assessment
240:17
assign 221:9
assigned
244:19
audits 202:19
205:10
assigning
220:15
221:2

250:11
assignment
208:12
220:18
221:7
assignments
205:16
assist 232:2
assistance
232:1,6,19
232:19
233:12
234:3
236:11,15
236:17,23
237:11
238:11
assistant
199:8,13
202:15,22
232:12
233:12,16
233:19
assume 249:5
assuming
214:19
231:20
232:3 233:7
233:14
attempt
229:24
attend
240:22
241:10
attorney
199:8,13
202:12,17
attorneyfil...
240:17
attorneys
199:8,14
audits 202:19
201:14
202:4 203:4

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 3

cermaks
244:14
250:13
certain 203:8
213:13
214:11
218:20
219:12,14
219:17,24
221:23
222:15
230:9
236:18
246:4 248:5
248:22
251:24
certainly
234:2
246:14
certified
199:19
255:5
certify 255:6
255:11,15
chair 232:11
232:21
235:22
237:1
chairs 233:11
234:2
235:14
changed
236:12,12
characteriz...
215:1
commenced
255:13
chicago
198:20
199:4,10,15
242:20
chief 240:12
242:20
circumstan...

210:21
civil 198:18
199:22
237:1
clarification
202:19
211:6,7
234:11,15
235:4
compliance
221:17
continuation
212:10
238:24
233:18
216:24
243:22
223:3
233:18
250:8
238:19,21
242:24
241:6
close 228:18
234:20
239:11
239:3,13
closenit
242:22
collaborate
224:8
224:5
242:13
243:3 250:3
collaborated
206:21
234:6
253:12
234:2
combined
199:13
213:19
238:13
250:22
255:13
commencing
198:20
commenting
246:22
246:14
commode
242:20
consent

237:1
complained
227:3
complaint
211:6,7
234:11,15
235:4
compliance
221:17
contained
211:22
continuation
212:10
238:24
continued
198:16
212:11
complicated
212:20
complying
211:8 231:12
concern
250:11
compound
217:22
consclusion
209:11
concerns
199:8,14,17
211:18,24
212:1
conclusion
227:20
concrete
220:23
conditions
250:11,13
condron
252:3 254:6
199:13
222:24
199:6,12
cook
216:6
199:16
198:20
226:6,20
250:20
227:4,7,9
238:23
227:4,7,9
consent

234:20
235:2 245:7
correct
203:13
207:5
214:17,19
222:22
225:13
231:8,15
234:17,18
234:22
235:5,11,18
241:7,21
242:2,3
243:8,16,23
198:6,15
correctional
219:19
231:24
232:12
corrections
254:20
counsel
199:2
240:14
255:16,17
counting
214:8
county 198:7
198:7,13,13
199:4,14,17
211:18,24
199:16
cookcountyui
227:20
coordinator
202:10
230:2,22
253:2,5,8
250:11,13
254:1
courts 198:18
csr 256:10,13

254:20
250:16
235:2 245:7
252:3 254:6
254:6,12,12
253:2,5,8
255:3
counts
250:8
court 198:1
240:1
203:19,22
204:1,3,7,9
204:11,14
204:19
205:2,14
206:1,18
208:6,209:9
210:9 214:1
214:4,7,11
214:14
216:12,23
217:1,4
218:18
219:19
220:8
228:14,15
232:9 240:6
246:1,6,16
248:23
249:14
254:2
courts 198:18
csr 256:10,13

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 2

203:11,15
217:18
220:13,14
221:1,9,16
221:17,22
222:20
223:3,9
226:13
227:2
230:19
231:13
229:9
233:15
234:7 235:3
235:20
236:3,13
234:12
248:11
250:9,10
253:3
availability
221:14
available
216:6 226:4
226:6
226:19,22
232:9
233:23
233:15
avenue 199:3
209:8,20,23
209:22,22
210:22
211:10
212:1
225:11
230:17
230:19
253:8
238:16
239:6

210:14
238:23
227:9
221:16
230:16
231:7,10
243:17,22
242:2
248:23
254:15,19
255:7
226:2
base 221:24
211:1
based 223:14
basically
247:8
230:12
basis 241:16
234:20
235:20
236:3,13
234:12
248:11
250:9,10
253:3
227:7,22
223:11
239:19,19
246:24
247:1,17
big 202:1
body 235:9
bostetter
198:19
255:5
250:10
break 244:9
245:1,4
247:3
began 203:11
behalf 199:6
199:12,17
belief 222:14
believe 207:8
207:14
212:9,11
213:10
223:24
228:1,13
building
215:7 222:7

227:7,9,15
221:16
229:20
230:16
231:7
239:16,17
200:3 201:6
201:12,13
215:2 228:9
246:14
254:15,19
255:7
242:8
248:20
buildings
249:8
burke 198:16
200:3 201:6
217:20
223:22 8
224:20
225:9,18
226:1,22
226:23,24
262:1,22
212:8 215:7
217:13
228:16
burkes 247:1

**C**
c 228:10
call 238:10
241:17
called 198:17
201:7
240:10
calls 206:16
209:11
cant 216:8
216:11
212:24
219:17
224:4
248:12,15
248:16,18
248:20
249:3,7
251:11,14
252:12
case 213:14
214:5,15
231:11
238:20
239:13
246:10,20
cases 214:20
238:8
categories
217:2
cell 206:9,14

207:2
208:16
213:16
215:16
216:24
217:20
218:8 219:7
224:20
225:9,18
226:1,22
226:23
216:12
219:11
221:4
248:19,24
250:4
203:1 213:5

**C**
c 228:10
call 238:10
241:17
called 198:17
201:7
233:17,22
234:16
235:6,14
237:9,16
238:5
234:17
247:1
celled 217:15
216:24
225:4
cells 244:21
207:22
212:24
219:17
224:4
248:12,15
248:16,18
248:20
249:3,7
cermak 203:7
203:16,18
205:6,8,10
205:17,19

205:22
206:6,9,13
206:22,23
207:15,23
208:11,15
209:5 210:6
208:2,3,17
208:15,18
210:5,23,24
210:6,7,20
212:8 215:7
217:13
227:11
217:23
218:13
219:21
221:4
222:1
243:21
243:24
243:13
244:5
243:1
228:9
233:16
243:14,16
251:1
253:1
254:1
251:2
252:1
231:11
239:23
239:16
243:9
248:11,17
249:11,20
250:1,7
251:1
252:2
251:3
253:5
249:2,4,5,6
249:10,16
249:12,21
249:14
249:12,21
251:6
251:3
252:3,13,17

TOOMEY REPORTING
312-853-0648

---

MATTHEW BURKE
September 23, 2016

Page 4

current
239:21
240:14
currently
237:21
custody
216:18
217:1,14,20
218:1,7,12
218:18
219:1,6,8
219:10,22
220:3 225:1
225:5,23
226:15
238:17
252:12

**D**
d 198:21
200:1
228:10
255:14
256:3
dart 198:6,12
199:12
228:17
242:9
249:17
departments
239:16
219:10,22
221:24
242:1,20
254:6,12
date 201:14
david 199:13
day 198:20
222:15
238:5
254:16,22
255:13
254:16,24
255:3
dendron
199:16
dearborn
199:20
decided

223:16
decision
219:2,4
244:5
decree 249:14
defendant
199:12,17
211:24
218:18
219:1,6,8
defendants
198:6,12,18
199:12,17,20
220:3 225:1
225:5,23
226:15
238:17
252:12
denied
205:13
211:2
212:4
denies 250:15
department
201:19
designee
204:13
216:6
226:20
227:1,14
departments
239:16
depending
215:11
219:16
deponent
218:21
deposition
222:13
255:16
198:1
200:8
213:19,23
214:22
198:20
decided

254:16,18
255:8,11,13
depositions
198:19
199:20
221:20
designate
224:20
designated
198:8,13
199:1,4,15
211:24
depositions
205:19
229:8
211:10
222:4 228:9
210:24
223:16,17
233:6
231:1
determined
231:8
231:23
determinat...
207:12,17
223:12,14
determine

206:24
219:20
224:16
249:19
determining
212:22
dictate 211:2
didnt 209:5
208:20
221:10
228:24
240:1 248:3
243:1,2,23
230:6
231:23
250:18
234:22
242:12
242:10,15
250:16
206:2 242:5
201:19
211:8,11
231:23
231:23
250:1
255:10
254:1
251:1
254:1,15
255:1
254:16,24
250:2
264:4
207:12,17
223:12,14
disagree

247:19
247:5
243:22
238:19,21
243:2 242:5
250:16
214:16,23
215:3
216:4,5,23
217:1
218:9
231:23
234:14
234:20
242:14,15
242:19
242:12
251:12
disagree

248:14
doing 214:20
doj 227:18
dojs 201:23
201:20
donnell 198:9
254:1
201:6
203:19,22
204:1,3,7,9
216:4,5,23
204:19
205:2,14
223:24
224:16
234:20
227:15
229:8
221:1
227:15
234:16,17
234:22
242:14,15
disagree

254:20
250:2
264:4
251:2
252:1
231:11
239:23
239:16
243:9
248:11,17
251:1
252:2
251:3
253:5
253:1
254:1
251:2
252:3,13,17

**E**
e 199:7 200:1
200:7
201:12

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 16

## Page 5

MATTHEW BURKE
September 23, 2016

easiest 203:23
eastern 198:2 254:2 255:2
either 216:17 217:13,19 218:7,11,18 219:1,5 221:5 222:5 222:17 225:6,10 227:5,13 232:5 237:15,16 242:20
elicit 238:20
ellis 214:1,7 238:24
employee 255:16,17
employees 250:10
ensure 207:22 225:24 226:13
entered 213:18
enters 211:20 212:3
entire 222:6 222:8
equipped 212:5
errata 254:18 254:21
evaluation 207:20
evaluations 244:23
exact 206:13 215:13 232:13 244:17

exactly 231:19 238:3 248:5
examination 198:17 200:4 201:9
examined 201:8
exceeds 205:13 216:21 227:22 243:18
executive 253:15
exhibit 200:8 211:5 230:22 234:6
expectation 226:3,7
experience 229:16
extent 205:12 206:15 208:4 209:7 210:20 216:10,20 220:6 224:10 230:6 231:23 235:2 238:18 239:18 240:16 244:7 246:9 246:22

**F**
f 200:11

211:5 228:10
facilities 228:12,13 245:3
facility 230:2 231:10
fact 213:21 221:11 238:19,20 239:2,12 243:18
familiar 238:3
far 221:2 249:10,21
features 209:2
federal 198:18
feet 238:12
felt 208:20
fifth 222:9
fight 239:8
figure 216:12
final 250:7
financially 255:18
find 250:3
fine 204:19
finished 219:15
first 201:7 222:15 253:2 255:3 253:23
fits 246:7,20
floor 203:16 205:6,8,10 205:22 206:5,22 207:23 208:11,16

208:23 209:4 210:4 210:13 216:5 217:23 218:23 222:22,10,14 230:18 231:14 232:13 232:22 242:9,10,14 243:18 250:12,12 flora 198:9 208:2

**G**
g 199:2,3
general 202:7 208:1 213:17 217:9 240:13
generally 219:13 222:5 getting 233:12,13 237:12 239:7
given 221:11 221:13 225:8 254:16,17
gladys 248:15 199:5 go 211:23 219:18 238:23 242:14 going 203:1 225:3 209:10 211:4 213:17

found 209:18
fourth 222:9
frank 207:20
frequent 226:17
front 220:23 222:17 224:17
fuentas 234:19 235:3
full 201:11
fully 243:3
further 231:9 255:11,15
future 235:13

greater 215:12
grievance 234:6,8 235:10,17
grievances 235:2 223:5
group 242:1 241:21,23 242:24

**H**
h 200:7
hand 256:1
happen 227:16
happened 209:23
harold 198:3
head 201:20 230:5
health 205:17
healthcare 222:11 251:16

214:4
220:12
222:5,5
223:18
226:19
230:21,23
234:5 239:4
246:13
247:9
gov 199:11
grab 209:21
213:9
215:17,23
220:4
225:19
226:2 231:7
231:10

## TOOMEY REPORTING
## 312-853-0648

---

## Page 6

MATTHEW BURKE
September 23, 2016

252:14
hereunto 256:1
hex 209:13 210:9 228:7 236:7 251:23
high 245:10 249:3
historically 249:15
hold 240:9 248:14
honor 201:3 204:6 214:13
honorable 226:15 213:22 217:3 211:19 212:6,19 227:20 246:5 247:23,23 248:2
housed 205:19,22 207:22 215:10 219:13 226:15 230:17 231:6,7,13 231:19 245:21 249:2
housing 204:17,21 248:2

212:2,6 219:20 223:18 244:5,24 249:11,18 249:22,24 236:7 hundred 202:10 221:23 225:11,16

**I**
id 211:6 234:7,10 250:7 231:18 234:5 235:12 236:2,18 238:3,3,22 239:4,23 240:9 247:19 248:5,12,22 252:3 imagine 238:6 243:12 imax 207:10 impairments 203:10 implement... 201:19,22 221:18 implicate 240:17 important 243:13 inaccessible 208:23 209:12 210:4 234:17

214:1,4 217:17,22 217:24 218:14,16 219:14,15 219:24 220:12 221:23 225:11,16 225:20 228:4,21 230:9,21,23 231:18 234:5 235:12 236:2,18 indicate 207:11 indicated 224:18 indirectly 255:18 individual 208:13,20 211:3,20 221:7 225:12 233:22 individuals 255:18 254:21 infirmary 212:23 250:13 initial 254:20 initially 204:22 inmate 211:12 238:10 inmates 206:8 209:4 213:11 215:6 217:9

234:16
235:21
236:14
237:9 244:5
247:20
inappropri...
204:16,21
250:12
222:9
inpatient
207:18
211:12,18
212:1,3,19
213:4,6,15
213:18
221:22
223:5,6,11
223:17,23
224:14,19
228:24
229:3 230:2
230:14,19
234:8,24
236:6,14
241:2,19
242:2,7,10
243:5,10,15
243:19
244:4
245:11
249:11,18
249:22
251:6,9,11
251:17
252:14,21
jails 227:19
229:12,13
230:14
243:24
james 199:7
199:11
jeff 202:16,22
229:15

item 228:10
229:19
ive 201:17
202:6
222:12

**J**
jail 201:16,24
230:9 207:9
211:12,18
211:21
212:1,3,19
213:4,6,15
213:18
221:22
223:5,6,11
223:17,23
224:14,19
228:24
229:3 230:2
230:14,19
234:8,24
236:6,14
241:2,19
242:2,7,10
243:5,10,15
243:19
244:4
245:11
249:11,18
249:22
251:6,9,11
251:17
252:14,21
johnson

## TOOMEY REPORTING
## 312-853-0648

---

## Page 7

MATTHEW BURKE
September 23, 2016

202:16,22
join 235:23
250:22
joint 214:20
214:22
jointly
250:11
jones 241:20
judge 198:17
214:1,4
238:24
252:15

judgment
207:12
justice
204:12
227:17
229:1
239:15
240:23
249:13,16
justices 242:9

**K**
k 201:12
kara 241:22
keep 214:8
252:8
keeper
252:21
kennedy
198:17
know 203:7
206:8
208:4 212:8
213:5 215:2
215:2,6
216:23
217:1,3
218:14,16

224:22
249:3,7
250:22
230:6,11
231:19
232:13
233:3,10,23
237:12
238:9,16
245:13
251:21
252:15
knowing
216:1
knowledge
209:3
230:16,21
208:1
244:21
layout 232:13
laypersons
209:13
legal 209:11
251:19
letter 201:17
201:22,23
204:8,9,10
205:16,19
207:14
level 211:2
212:24
224:6
245:22
248:18

249:3,7
limited
240:3
240:16,24
232:13
237:12
236:7
239:8,18
list 203:7
242:1 245:10
living 223:7
226:17
loan
206:21
207:18
208:4,9,10
210:20
212:21
213:8
216:23
217:6,23
lot 253:13
lots 245:23

**M**
m 198:19,20
246:2,5,6
246:9
247:15,23
255:5,14
248:17
m3n 215:19
m4 219:11
246:18

managing
240:3
242:24
management
231:23
239:4
242:14
244:23
245:10
manager
206:21
mark 211:4
209:3,10
marked
230:21
234:5
marlene
242:24
matthew
198:16,17
200:3 201:6
201:12
204:15
200:17
202:2 207:2
209:20
210:18
212:16,20
212:21
214:19,22
243:1,2,7,8
247:19,23
meant 232:20
248:8,9
measure
237:3
medical
203:10
206:7 207:8
207:16,20
210:18
211:2
212:23,24
244:18

214:24
232:14,18
233:13
224:4
232:13
242:14
244:21
245:20,22
245:3
250:20
250:20
244:9
249:3,10
251:3,11,14
252:4
250:5,5
251:13,14
252:4
240:18
260:18
meet 241:15
240:18
241:18
240:23,24
meetings
239:17,24
240:8,10,11
240:15
meets 237:3,8
242:6,14
243:10
241:22,18,24
244:19,18
242:4,11,13
243:23
meetings
244:1
211:15
211:18
213:14
214:3,6,12
214:18,22
216:14,15
217:5
mind 204:24
minnella
224:23

minute 245:1
minutes
205:24
minuses
224:9
mischaract...
209:8 210:6
misstates
205:24
misstated
210:14
mobility
203:10
moment
234:11
month
213:22
moot 235:10
morici
214:19
morrisay
241:10,12
241:18
morrisay
199:2,2,3
200:4 201:2
204:4 201:2
203:24
205:24
206:10
204:12
204:15,21
205:15,22
206:8,22
207:5
251:16
217:5
229:3
228:15,16

## TOOMEY REPORTING
## 312-853-0648

---

## Page 8

MATTHEW BURKE
September 23, 2016

233:5,6
236:2
237:19,24
238:23
239:3,14,23
240:5,20
244:10,11
245:13
246:15,18
247:10,12
247:13
248:5,23
252:19
253:4,7,9
223:12,16
222:14,19
223:12,16
224:1,21,24
241:8,13
244:4,10,14
227:5 230:7
246:5
moved 216:7
224:9
227:11,13
228:7,17,19
231:20
moving
211:2
227:8
243:23

necessarily
212:16
249:15
need 210:24
222:3 233:9
238:10
228:10
244:10,11
243:1,2
243:14
211:14,21
212:1,3,7
216:21
needs 233:11
250:5
never 222:12
224:6
new 225:3
243:15
nichols 199:7
203:17
227:5 230:7
205:12,23
206:15
206:8,1,7
229:4
227:11,13
210:6
211:13,21
214:2,17,19
216:24
217:3,10
217:3,10
217:3,10
227:13,20
229:15
nature
202:17,21
211:9
near 231:11

**N**
n 200:1 246:2
246:5,6,19
247:21,23
name 201:11
202:8
narrowed
223:2,18
234:24
238:18
239:2,11,18
248:17
244:7,16

246:9,22
247:17
250:20
225:2
252:6
253:11,14
north 206:10
232:1
207:4 231:1
231:5,10,23
233:8
235:15
northern
198:1 254:1
255:1
notary
198:19
220:6,10
222:24
objects
206:15
207:22
222:22
228:19
235:23
238:24
239:19
247:2,18
notified
207:6
216:10,20
217:3,10
notify 235:15
number
204:3
246:9,22
247:4,4
252:24

**O**
object 209:10
214:17
206:16,20
208:15,19
224:23
205:12,23
206:15
206:8,17
208:7,11
232:6
238:10,12
239:6
officer 221:6
232:6
236:10,12
225:9 226:8
official
209:19
oh 228:6
okay 201:4
204:22
214:14
217:11
231:4 233:5
239:11,24
239:18
240:3,16
244:7,16
246:9,22
247:4,4
occur 209:17
occurs
opportunity

236:19
233:13
255:14
199:14
202:6,13
220:9
207:11
208:15,19
206:7
204:23
205:12,23
206:15
226:5
238:10,6
229:16
overcrowdi...
229:11,15
244:4
overrule
243:2
overruled
204:23
officers 221:18
225:9 226:8
205:14
209:9 210:9
211:5,20
224:12
241:20
242:1
252:1
oversight
228:17
242:9

**P**
page 200:2,8
210:18
204:18
211:17,22
211:23
230:24
247:19
250:9
pardon
211:13
part 198:6

## TOOMEY REPORTING
## 312-853-0648

Plaintiff's Exhibit 12 Page 17

## Page 9

MATTHEW BURKE
September 23, 2016
Page 9

235:1,12,13
237:21
254:6
**particular**
203:16
208:13,18
209:23
211:2 216:7
219:6 221:7
236:7
**parties**
255:16
**partner**
242:14
251:4
**parts** 203:6
**patrick** 199:2
**people** 210:3
210:18
212:14
216:24
221:11
222:4 225:1
229:2
232:2
242:21,24
245:1,24
248:14
249:6,11,17
**percent**
212:11,11
**period**
230:15
231:21
232:8
246:24
247:7
**periodic**
242:11
**periods**
212:20
**permission**
223:22
224:1,19

**person** 207:6
207:12,16
217:19
219:17
223:15
223:7,9
225:24
227:5,11,13
236:15
237:8,10
238:14
248:9
**personal**
255:10
**personnel**
207:16
239:17
240:8 243:3
**persons**
226:24
**pertaining**
198:18
228:20
239:12
236:13
237:9,15
245:17
246:2,5
249:17
252:22
**places** 219:12
247:15
**placing**
204:16,21
221:1 230:1
244:4
249:11,21
250:17
**plaintiff**
198:4,10
254:4,10
235:5,10
**plaintiffs**
198:17
199:6 200:8
211:5,6

244:14
255:12
**plan**
204:19
206:11,14
207:3
208:16,20
208:22
209:1,4
210:4
215:22
217:15
218:1,5,7,8
218:12,19
218:21
219:1,23
220:17,24
220:22 224:3
225:1,23,24
236:2,12,14
236:22
237:5,6,10
**population**
217:9
**portable**
232:10,20
235:21
237:1
**position**
205:20
210:2,2
229:12
232:10,17
236:20
244:2
246:9
249:8
**potential**
233:3
**potentially**
206:24
**power** 227:4
251:11,16

225:22
**preliminary**
213:2 229:9
240:6
**preparing**
215:18
**prescribed**
207:12,17
210:3 239:9
**present** 202:5
204:17,22
214:16
227:18
229:10,17
239:24
240:11
241:3,7,18
241:19,20
241:23
242:5,20,21
247:14
**previous**
205:24
209:8 210:7
216:11
224:11
226:2,20
253:1
**prior** 203:14
232:10,17
236:2
213:10
244:12
247:6
**prisoner**
218:6 220:2
224:19
251:9
**prisoners**
227:20
222:1
231:22
241:14,24
251:11,16
**prisons**
227:19

**privilege**
240:17
**privileged**
240:19
**probably**
215:11
224:3
**problem**
233:1,3
247:3
**procedure**
198:18
223:20
227:12,15
237:16
**procedures**
226:12,13
**process**
202:24
**protective**
216:17
217:1,6,14
217:19
218:1,7,11
218:18
219:1,6,8
219:10,22
220:3 225:1
225:24
226:14
228:17
**provide**
205:9
208:17
211:11
213:7,15
214:14
248:12
250:18
251:15

TOOMEY REPORTING
312-853-0648

## Page 11

MATTHEW BURKE
September 23, 2016
Page 11

233:20
**role** 205:21
240:14
**room** 205:16
220:19
219:20
210:23
209:19,20
210:23
213:7 231:6
231:10,16
231:17
232:12,13
232:14,21
233:8
236:23
231:7
238:15
**rooms** 209:2
209:5 210:4
210:21
212:15,18
212:21,22
213:11,13
215:8
250:12,18
**rounds**
226:17
**rtn** 202:24
203:1,6,12
206:24
211:3
217:15,18
220:13,16
220:18,19
221:8,19,22
222:1,6,20
223:21
224:8,21,24
225:3
227:4,5,8
227:14
235:7,24

218:17
243:9,15
251:18
248:14,20
248:21
**segregation**
206:16
217:1,13,20
218:1,7,11
218:19,21
219:16,21
219:1,6,9
220:3 225:5,9,21
220:23 226:9
226:9,18,18
227:6,16
228:14
228:18,19
229:14
250:1,5
see 216:23
226:18
228:19
**S**
**sabrina**
202:6,18,18
233:19
**safety** 229:14
250:1 251:8
**satisfies**
236:21
212:15,21
**says** 204:12
217:4,7,8
235:13
**scope** 203:18
216:21
227:22
239:19,20
246:23,24
247:1,7,8
**seal** 256:2
**second**
204:17
226:9
220:13,16
228:19,24
221:8,19,22
222:1,6,20
223:9,12
234:8,21,24
225:1,24
**section**
201:18
**security**
229:14
250:1,5
226:18
228:19

254:21
**shelley**
251:18
255:5
256:10
**sheriff** 198:6
198:12
217:1,13,20
218:1,7,11
218:19,21
205:5,9,21
207:6,15,21
208:14
209:18,18
229:24
237:15
210:21,22
211:16
211:24
**shield** 251:6
216:16,17
221:24
245:9 251:3
215:24
216:16
253:6
254:14,16
219:4,2,4
229:2,4
250:1
**shes** 202:10
**shorthand**
251:20
279:17,24
230:13
234:5
**show** 230:21
234:5
237:9,17
239:24
240:7 243:1
246:2,8,20
**sheen** 246:20
**sheets** 254:18

248:2 249:2
237:3 245:1
238:15
231:5
241:16
248:10,17
252:11,13
252:21
254:6,12
256:1
212:9 226:6
221:24
**sheriffs**
204:15,20
205:17
206:4
200:7 201:1
216:19
**situation**
224:6
226:6
**situations**
238:9
**slash** 232:11
235:14
**slow** 204:20
**smaller** 242:1
243:16,20
244:3,13
245:9 251:3
252:20
234:1 238:5
**somebody**
**someones**
223:12,17
**sorry** 202:1
202:15
**sounds** 220:3
**south** 198:20
219:8,21,18
218:8,10,17
219:13,21
220:3

253:14
**silent** 217:10
**simply**
238:10
216:3
212:12
216:3
231:21
**sinks** 205:11
207:24
206:4 209:5,19
216:19
**situation**
224:6
226:6
**situations**
238:9
**slash** 232:11
235:14
**slow** 204:20
**smaller** 242:1
241:22
**solely** 250:17
**somebody**
243:16,20
244:3,13
245:9 251:3
252:20
**someones**
223:12,17
**sorry** 202:1
202:15
**sounds** 220:3
**south** 198:20
219:8,21,18
218:8,10,17
219:13,21
220:3
**signature**
220:3

TOOMEY REPORTING
312-853-0648

## Page 10

MATTHEW BURKE
September 23, 2016
Page 10

252:13
**provided**
203:7
212:21
220:4
224:15
228:16
233:16
234:3 243:4
245:22
248:16
254:18
**provides**
214:15
**providing**
240:24
251:10,14
**provision**
215:23
**public** 198:19
246:15
255:6
**pumpkin**
214:11
**pursuant**
198:17,18
213:23
251:24
**put** 218:3
221:14
225:9 247:9

**Q**
**qualified**
221:20
212:2
**question**
202:1
203:17,19
203:21,24
204:1,24
205:13,24
206:1,2,16
208:3,5

210:10,12
211:13,16
212:5,20
213:1,2
214:18
235:12
**really** 252:7
**rear** 199:4
**reasons**
229:14
**recall** 221:16
241:4 242:8
242:12
243:6,11
**receive** 211:3
**receiving**
210:18
219:17
222:10
248:9,12,15
227:8
**recommen...**
246:14
**recommen...**
227:10
**recommen...**
223:18
**record** 204:2
210:15
213:21,23
213:19
234:17
**reduced**
255:9
**reference**
235:13
253:10

**R**
**r** 199:13
**raise** 245:14
250:2
**raised** 241:4
243:12
**read** 204:1,2
210:14,15
234:10,13

244:15
**reading**
231:3
220:15
**regards**
201:24
202:4
203:15
204:16
221:1
224:24
225:9
**relate** 204:3
237:10
238:7 250:9
227:8
**recommen...**
246:11
227:17,19
246:16,17
247:4,6,10
249:1 250:8,
249:1 250:8
**referral**
246:7,19
**renovations**
212:8,9
212:9,19
**repeat** 210:12
242:17,19
246:10
**refers** 228:11
218:9
232:16

233:4
**reported**
255:9
**reporter**
198:19
228:4 235:6
**reporting**
235:9,16,17
**request**
223:22
224:24
225:9
234:23
230:13,23
236:12,15
236:17,23
237:10
238:7 250:8
**requested**
204:2
210:15
223:24
**requests**
224:6
234:24
**required**
218:3
212:10
222:19
225:23
230:2
**reserve**
253:14
**residential**
203:2
238:1
239:22
251:21
**respect**
233:21
**respond**
202:9

226:20,24
228:9
234:23
235:2
**responded**
206:18
235:4,6
**response**
235:9,16,17
**responsibil...**
244:4,14
245:10,14
252:21
**responsible**
207:18
244:22
250:10,14
251:6,8,10
251:13,16
**result** 212:9
**retained**
222:20
230:1
251:4
252:13,15
**reviewed**
201:15,17
201:18
**reviewing**
201:21
**right** 216:14
217:17
222:19
225:24
232:18
**rights** 201:18
**rivera** 202:18
**riveracontr...**
202:9

TOOMEY REPORTING
312-853-0648

## Page 12

MATTHEW BURKE
September 23, 2016
Page 12

235:14
**space** 208:10
213:6
243:19
**speak** 226:17
228:4
**specific** 206:9
216:1
220:16,17
221:3
226:10
229:3
**specifically**
224:22
226:8
230:24
**specifics**
213:10
238:9
**specified**
255:12
**speculation**
206:16
**spoke** 202:15
**spoken** 202:6
202:14
251:24
**spot** 228:24
**ss** 235:2
**staff** 206:8,22

236:24
245:23
245:24
248:4 250:3
**standing**
239:7
**stands** 203:1
217:4,18
**state** 201:11
229:12
246:16
245:16
250:6,10
**stated** 229:20
**states** 198:1
198:18
199:8,8,13
199:14
231:9 250:9
252:10
254:1,24
251:22
**statutes**
251:15,24
**stemp** 243:6
**stenograph...**
255:9
**step** 248:17
**steps** 220:1
**stool** 220:23
222:17
225:18
247:9,15
**street** 198:20
199:9,14
252:22
255:7
**structural**
232:4
**submitted**
254:21
213:13
234:4
236:10,18
**substance**

234:15
**substituting**
224:2
**sufficient**
211:11,18
212:1,5,16
212:18,21
213:6,15
226:24
221:23
**suite** 198:20
199:9,15
**summary**
234:10
**sure** 203:24
248:6
**supervisors**
201:8
227:11
**sure** 203:24
203:17
**sustain**
220:10
**sustained**
253:6
**sworn** 201:1
**system** 207:9
207:10,19
202:1
213:18
254:21
255:9

220:2 234:7
237:3 245:1
238:15
214:6
241:16
248:10,17
252:11,13
252:21
254:6,12
256:1
212:9 226:6
221:24
**talked** 202:3
**talking** 214:8
226:24
228:14
199:4,9,15
217:2 228:3
228:10
**theyre** 236:23
**thing** 204:7
**things** 202:7
**think** 201:19
206:1
206:2 207:9
217:8 222:3
227:24
**this** 227:17
**testified**
230:5
232:14
230:5
**testify** 255:7
**testimony**
201:8
243:24
208:7,24
216:11
206:5
202:8
234:8
246:10
221:23
206:23
**take** 214:7

198:12
199:2,3,12
199:16
254:6,12
**thought**
208:12
248:15,16
**theirs** 224:1
**theres** 208:10
217:2 228:3
**tier** 221:18
225:6,9,10
225:12
**tiering** 221:6
**tiers** 246:19
**timeframe**
202:8
**times** 209:16
210:17
211:17,23
212:13
**today** 237:5,6
248:23
**toilet** 208:17

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 12 Page 18

MATTHEW BURKE
September 23, 2016

Page 13

211:12
215:17,23
215:24
216:3
217:21
218:9,13
220:4
225:15,19
231:11,22
232:11
233:9,13,15
234:2
235:14,21
238:7,15
toileting 237:18,19
toilets 205:11
207:23
209:5
212:15
215:9
216:18
222:18
250:19
tom 240:7
241:2
242:11,20
toomey 256:11
top 201:20
230:5
topic 242:8
topics 204:3
trained 221:9
226:8
training 226:10
transcript 254:16,17
transfer 243:14
transferred 203:5,8

248:19,22
248:24
treatment 203:2
210:19
215:19
221:6
245:23
trouble 235:12
true 203:4
254:17
truth 255:8
try 228:23
233:24
trying 231:18
238:19
247:11
turn 214:11
two 217:16
220:19,22
225:16,20
types 224:14
typewriting 255:10

**U**
u 201:12
uhhuh 250:15
ultimately 246:10
understand 211:13
214:10,13
222:23
228:1
understand... 202:23
206:12,20
208:24
209:16
210:17
219:8,9

220:21
221:13
231:12
234:2 237:2
238:4 248:7
248:15
252:16,17
252:18
unilaterally 223:16
unit 203:2
206:22,23
215:19
220:14,16
198:18
254:1 255:1
units 211:11
211:19
212:2,6,12
217:15,16
223:7 225:4
226:17
221:10
206:23
use 233:14
235:16
238:7,11,14
user 206:10
206:14
207:3,7
208:15
209:19
210:22
215:16
218:24
223:23
225:10,23
227:2 229:1
235:20
236:13,15
236:22,22
237:14
245:17

users 202:5
205:5,9,12
203:15
205:5,10,21
206:5
207:22
208:22
212:6,19
213:3,7,16
215:21
216:17
217:24
218:11,18
219:5,22
220:14,16
220:20
221:2,3,10
221:21
222:2 223:5
223:10
226:8,14
229:19
230:1,14
234:24
240:2 241:1
242:6,15
243:4,20
244:4,14
245:11
246:2
247:15
248:21
249:1,22
250:17
252:22

**V**
vague 222:24
235:24
vaughn 198:3
213:20,20
213:22,24
214:23
217:5

238:16,19
239:1,3,6
239:12
254:3
versus 246:7
246:20
video 239:7
vs 198:5,11
254:5,11

**W**
w 199:2
want 203:14
228:22
233:4,18
238:23
246:14
wanted 202:19,23
washington 199:9,14
wasnt 208:2
244:17
way 203:23
214:8
248:13
weekly 239:16
240:8,9
241:2,6
242:11
weighin 239:4
went 222:4
222:13
west 199:9,14
western 199:3
whats 203:19
230:21
231:1 234:5
wheelchair 202:5 203:5
203:9,12,15

205:5,9,21
206:5,10,14
207:3,7,13
207:17,19
207:22
215:8,22
220:1,19
221:6,18,22
223:7,3,16
215:16,21
216:17
217:17,20
217:24
218:10,18
218:23
221:24
218:24
219:5,11,22
220:13,23
223:10,23
225:9,23
226:8,14,18
227:2 229:1
229:19
230:1,14
234:24
235:20
236:13,15
236:21,22
237:14
238:6 239:9
240:2 241:1
242:6,15
243:4,14,20
244:4,14
245:11,17
248:2,11
249:1,22

---

MATTHEW BURKE
September 23, 2016

Page 15

237:15
3c 235:11
3c 225:6,10
225:18
237:15

**4**
4 200:4
4a 248:20
4d 204:18
247:19
4th 201:14
202:4
221:17

**5**
50 199:9,14
500 199:9,15

**6**
6033474
199:10,16
60602 199:10
199:15
60643 199:4
66 221:18,21
222:8
6th 204:11
221:16

**7**
773 199:5

**8**
8 211:7,10,17
211:22
235:11,11
8530648
256:11
88 203:5

**9**
9 198:20
211:7,23
255:14

90 214:9

---

MATTHEW BURKE
September 23, 2016

Page 14

250:17
252:22
wheelchair... 209:4
wheelchair... 205:7
210:19
215:10,19
222:13
224:20
226:5 237:8
wheelchairs 210:3
212:14,22
213:12
216:5
221:12
225:2
230:7
245:20
247:24
248:23
whereof 256:1
whos 237:8
238:12
withdraw 208:7
witness 200:2
201:1,7
203:18
205:13,15
205:24
206:19
208:9 209:8
209:15
210:11,16
211:8,14
215:5
216:21
217:12
224:11,13

227:22
228:20
229:7 231:2
234:1,12
236:4,9
238:2 239:5
239:20
244:20
247:18,22
250:20
251:22
252:2,9,18
253:1,15
256:1
women 222:9
work 238:4
237:12,23
238:16,19
239:21
241:18
242:17
246:10,13
247:9
251:21
253:2,8
written 220:15,24
225:8,11
227:15
wrong 204:14
wrote 204:13

**X**
x 200:1,7

**Y**
yeah 204:9
204:12
206:1 214:2
217:7
228:23
236:10
244:10

251:23
253:4
year 205:6,11
205:20
207:21
209:6,21
210:2 212:7
212:19
213:8,14
216:16
217:24
218:10,17
219:5,23
240:7
218:10,17
219:5,23
240:7
231:3 237:5
237:12,23
238:16,19
239:21
241:18
242:17
246:10,13
247:9
251:21
253:2,8
youre 230:17
231:3 237:5
youve 202:14

**Z**

**0**
084000 4410
256:13

**1**
10 212:11
218:22
236:8
10150 199:3
10th 201:21
204:15
250:10
253:3
14 200:11
235:11

15 238:12
250:9
15cv00951
198:5 254:5
15cv1127
198:11
254:11
16 230:24
231:3
18th 234:7
1st 230:18
231:12
218:10,17
232:9
233:15

**2**
2 246:2,6,19
247:15
20 238:12
2008 246:20
2010 204:17
204:21
204:24
221:14
227:18
247:14
249:14
2012 201:17
201:22
202:4
202:15
208:2
213:20
229:2,10,17
239:16,23
240:7,24
2013 212:9
213:14
215:7,12
2014 203:4
203:11,15
205:6,11,16
205:20
206:4
220:13

208:5,6,22
209:6,21
210:3 212:7
212:19
213:4,8,10
213:18
215:15,18
217:18
218:1,10,17
219:5,23
220:2,13,14
221:1,9,22
222:20
223:3,9
226:13
227:2
230:18,19
231:13,13
232:9
233:15,15
234:7,17
235:3,5,20
236:3,13
242:23
244:13
245:6,18
248:1,11
250:9,10,18
252:23
2016 198:21
198:24
202:4
254:16,23
255:14
256:3
21 226:13
235:11
2188 199:20
219 198:20
21st 203:4,11
203:15
220:13

221:9,22
222:20
223:3,9
230:19
231:13
232:9
233:15
248:11
23rd 198:20
254:16
255:13
26th 235:3
256:3

**3**
3 198:6
206:10,14
207:3
212:11
218:2,8,10
218:17
219:13,21
220:3
228:10
231:1,5,10
231:23
233:8
235:14,15
256:6
30th 250:9
255:14
31 248:20,22
312 199:10
199:16
256:1
3243 231:6
231:17,21
33 200:9
37 200:10
3a 225:6,10
225:12

Plaintiff's Exhibit 12 Page 19

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
JAMES ROBERTS,               )
                             )
          Plaintiff,         )
                             )
     vs.                     )   No. 16-CV-5560
                             )
THOMAS DART, SHERIFF of COOK )   (Jury Demand)
COUNTY, and COOK COUNTY,     )
ILLINOIS,                    )
                             )
          Defendants.        )
```

The deposition of **JAMES ROBERTS**, taken pursuant to notice, before Dawn M. Lombardo, CSR No. 084-001879, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, at Cook County Department of Corrections, Division 08-RTU, 2700 South California Avenue, Chicago, Illinois, on **December 9, 2016**, commencing at approximately 12:45 o'clock p.m.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

3

I N D E X

| Witness: | Page |
|---|---|

JAMES ROBERTS

Examination by:

Ms. Carroll .................. 4
Mr. Morrissey ................ 112
Ms. Carroll .................. 117
Ms. Huff ..................... 118

E X H I B I T S

| Number | Marked for Identification |
|---|---|
| 1 | ....................................... 88 |

(Exhibit attached.)

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

2

APPEARANCES:

THOMAS G. MORRISSEY, LTD, by
MR. PATRICK W. MORRISSEY
10150 South Western Avenue
Suite Rear
Chicago, Illinois 60643
(773) 233-7900
appeared on behalf of the Plaintiff;

HONORABLE KIM FOXX, STATE'S ATTORNEY OF
COOK COUNTY, ILLINOIS, by
MS. JACQUELINE B. CARROLL
Assistant State's Attorney
Conflicts Counsel Unit
69 West Washington
Suite 2030
Chicago, Illinois 60602
(312) 603-1434
appeared on behalf of the Defendant
Cook County, Illinois;

HONORABLE KIM FOXX, STATE'S ATTORNEY OF
COOK COUNTY, ILLINOIS, by
MS. ANDREA L. HUFF
Assistant State's Attorney
Torts and Civil Rights Litigation
Richard J. Daley Center
50 West Washington Street
Room 500
Chicago, Illinois 60602
(312) 603-3473
appeared on behalf of the Defendant
Thomas Dart, Sheriff of Cook County.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

4

(Witness sworn.)

MS. CARROLL: Let the record reflect this is the deposition of the Plaintiff James Roberts in the case of James Roberts versus Dart, et al., 16 C 5560. My name is Assistant State's Attorney Jacqueline Carroll. I am with Andrea Huff who represents the Sheriff. I represent the County. And also here is Patrick Morrissey who is your attorney. This deposition will be conducted according to the Federal Rules of Civil Procedure and the Local Rules of the Northern District. We've convened pursuant to notice. Today is December 9th, 2016, and the time is approximately 12:45 p.m. This deposition is being taken at the Cook County Department of Corrections in the RTU in Chicago, Illinois.

**JAMES ROBERTS**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**EXAMINATION**

BY MS. CARROLL:

Q.   Can you please state and spell your full name for the record.

A.   My name is James, J-a-m-e-s, Samuel,

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 1

5

```
 1  Samuel, S-a-m-u-e-l, Roberts, R-o-b-e-r-t-s.
 2       Q.   Okay.  Have you ever been to a
 3  deposition before?
 4       A.   No.
 5       Q.   Okay.  Have you been told what a
 6  deposition is or how it works?
 7       A.   I've got a vague idea.
 8       Q.   Okay.  Let me explain some things.
 9  I'm going to ask you a series of questions, and
10  you are under oath, the same thing as in
11  criminal, where you have to tell the truth.
12  There's a court reporter here and she's taking
13  down everything that you're saying, and in the
14  end she'll have what's called a transcript of
15  what was discussed here.  So it's very important
16  that you understand the questions that I ask and
17  that you answer the questions that I ask.  If you
18  don't understand, let me know and I will rephrase
19  it.  If you need to take a break, let me know.
20  It's better -- if the answer is yes, it's better
21  to say yes than uh-huh or uhn-uhn, if it's no,
22  because then the transcript is unclear.
23            Are you prepared to answer my
24  questions today?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

7

```
 1       Q.   Okay.  What medications are you
 2  currently taking?
 3       A.   Warfarin and some high blood pressure
 4  medication.  It's just been changed recently,
 5  last week.
 6       Q.   Okay.  And how many milligrams of
 7  warfarin, do you know?
 8       A.   It varies.  Monday, Wednesday and
 9  Friday I believe it's 10 milligrams and the other
10  days it's 12 milligrams.
11       Q.   Did you take your warfarin today?
12       A.   Yes, I did.
13       Q.   And did you eat food today?
14       A.   I had breakfast, not lunch.
15       Q.   Okay.  And what time did you have
16  breakfast?
17       A.   Breakfast was at 4:30 this morning.
18       Q.   Then if we need to break and get you
19  food, we'll see, but if you need to take a break,
20  let me know.
21            Are you under the influence of any
22  drugs or alcohol at this time?
23       A.   No.
24       Q.   Do you understand that although no
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

6

```
 1       A.   Absolutely, yes.
 2       Q.   Okay.  Your attorney has informed me
 3  that you've been considered competent to testify;
 4  is that --
 5       MR. MORRISSEY:  I object.
 6  BY MS. CARROLL:
 7       Q.   Well, based on the BCX that it came
 8  back and you're able to testify correctly; is
 9  that correct?
10       MR. MORRISSEY:  You can ask Mr. Roberts if
11  he's able to testify today based on your
12  questions, but I am not his criminal lawyer.
13  We've spoken to Mr. Roberts' criminal defense
14  lawyer and we were advised that -- I produced him
15  today, so ...
16  BY MS. CARROLL:
17       Q.   Okay.  Is there anything that will
18  prevent you from giving me your full attention
19  today?
20       A.   No.
21       Q.   Are you under any type of medication
22  that will affect your memory or affect your
23  ability to tell the truth?
24       A.   No.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

8

```
 1  judge is present, this is a formal, legal
 2  proceeding, so --
 3       A.   Excuse me.  Could you start that all
 4  over?
 5       Q.   Okay.  Even though there's no judge,
 6  this is a formal, legal proceeding.  So do you
 7  understand that you're under the same legal
 8  obligation?
 9       A.   Sure.
10       Q.   Okay.  How did you prepare for your
11  deposition today?
12       A.   I didn't.
13       Q.   You didn't?
14       A.   I don't need to.  I've lived it.
15       Q.   Okay.  Did you talk to your attorney
16  without saying --
17       MR. MORRISSEY:  You can answer whether
18  we've had a conversation to prepare for today,
19  but you don't have to tell them what we
20  discussed.
21       THE WITNESS:  I've lived it, okay?
22  BY MS. CARROLL:
23       Q.   Did you talk to your attorney?
24       A.   Yes, I did.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 2

9

```
 1       Q.    Okay.  Did you review any documents?
 2       A.    No.
 3       Q.    Okay.  What is your age?
 4       A.    I'm 68.
 5       Q.    And what is your date of birth?
 6       A.         .
 7       Q.    And the last four digits of your
 8  Social?
 9       A.    It's 109 (inaudible) --
10       THE COURT REPORTER:  I'm sorry.  Can you
11  repeat that?
12       MS. CARROLL:  Well, you know what, we'll
13  redact the first part.  You could just do the
14  last --
15       MS. HUFF:  Could we just go off the record
16  for a second?
17                 (Discussion off the record.)
18       MS. HUFF:  Back on the record.
19  BY MS. CARROLL:
20       Q.    Do you have a valid driver's license?
21       A.    No.
22       Q.    Have you ever?
23       A.    Yes.
24       Q.    Okay.  And when did you stop having a
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

11

```
 1       A.    Absolutely.
 2       Q.    Okay.  And did you go through some
 3  type of rehabilitation program?
 4       A.    Absolutely.
 5       Q.    Where at?
 6       A.    I went through several treatment
 7  programs.  I was at J-CAP in New York.  That's on
 8  Sutphin Boulevard in Queens, New York.  I don't
 9  remember the program I went to in Brooklyn.  I
10  did a lot of outpatient AA and NA meetings and
11  church.
12       Q.    Okay.  What church?
13       A.    Christian Fellowship for All Nations,
14  Uptown Baptist.  I don't remember the other one.
15  Circulation's off.
16       Q.    Are you still involved with any of
17  those churches?
18       A.    I'm connected with Family Radio from
19  Oakland, California.  I've been doing street
20  evangelism for 40 years.
21       Q.    Okay.  Are you still married?
22       A.    Yes.
23       Q.    Okay.  How long have you been
24  married?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

10

```
 1  valid driver's license?
 2       A.    Over 22 years ago.
 3       Q.    Was there a reason for that?
 4       A.    Yeah.
 5       Q.    What was the reason?
 6       A.    The reason?  Running from my fears,
 7  drugs.
 8       Q.    Drugs?
 9       A.    Yeah.
10       Q.    Okay.  Did you have a drug problem at
11  some point?
12       A.    Absolutely.
13       Q.    What kind of drug problem?
14       A.    Total crisis.
15       Q.    Okay.  What drugs were you taking?
16       A.    I wasn't taking but one.
17       Q.    Which one?
18       A.    Cocaine.
19       Q.    Okay.  And how long did you take
20  cocaine?
21       A.    40 years.
22       Q.    And when did you stop?
23       A.    About four years ago.
24       Q.    Was that prior to your incarceration?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

12

```
 1       A.    Good question.  Close to three years.
 2       Q.    Three years?
 3       A.    Three.
 4       Q.    Okay.  And what is the name of your
 5  wife?
 6       A.    Cathy Azioni (phonetic) Roberts.
 7       Q.    And how long were you together before
 8  you got married?
 9       A.    Approximately two years.
10       THE COURT REPORTER:  Could you spell
11  Azioni?
12       THE WITNESS:  I don't know how to spell it.
13  BY MS. CARROLL:
14       Q.    Okay.  Do you have any children?
15       A.    Yes.  I have a son Ludwig van
16  Beethoven and I have a daughter Ionna (phonetic).
17       Q.    Can you spell Ionna?
18       A.    I don't remember.
19       Q.    Okay.
20       A.    My circulation's off.
21       Q.    Okay.  Your son -- how old is your
22  son?
23       A.    Beethoven should be about 37 right
24  now.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 3

13

```
1      Q.    And where does he live?
2      A.    He's in New York, Queens, New York.
3      Q.    Okay.  And your daughter?
4      A.    In Queens, New York.
5      Q.    How old?
6      A.    Ionna should be about 40.
7      Q.    Okay.  Were you married before?
8      A.    Yes, I was.
9      Q.    To their mother?
10     A.    No.
11     Q.    No?  Who is your ex-wife's name --
12 what was your ex-wife's name?
13     A.    Susanna.
14     Q.    You had said that your circulation
15 was off.  Can you explain that?
16     A.    I have thrombophlebitis.  In other
17 words, I throw blood clots.
18     THE COURT REPORTER:  Throw blood clots?
19     THE WITNESS:  I throw blood clots.  I
20 massaged one out of my leg this big (indicating).
21 BY MS. CARROLL:
22     Q.    Okay.  Does that affect your memory?
23     A.    It does.  It affects my memory, it
24 affects my coordination and everything.
```

15

```
1  this place?
2      A.    Approximately two years.
3      Q.    Two years?  And who did you live
4  with?
5      A.    My fiancee Cathy.
6      Q.    Was there anyone else in the house?
7      A.    No.
8      Q.    Was it -- you said it was apartment
9  1004.  How many levels was the apartment complex?
10     A.    22 levels.
11     Q.    And were you on the tenth floor?
12     A.    Yes.
13     Q.    Was there an elevator?
14     A.    Yes, absolutely.  There's two
15 elevators.
16     Q.    Okay.  Can you tell me, the bathroom
17 in that apartment did it have handrails?
18     A.    Yes, it did.
19     Q.    It did?
20     A.    Yes.
21     Q.    When did those handrails get put in?
22     A.    They were there when I moved in.  It
23 was handicapped accessible.
24     Q.    Okay.  At some point did you live in
```

14

```
1      Q.    Okay.  So will it affect your ability
2  to testify?
3      A.    No.
4      Q.    Okay.
5      A.    If it does, I'll let you know.
6      Q.    Okay.  If there's something that you
7  don't recall, you'll let me know?
8      A.    Yes.
9      Q.    Okay.  Can anyone declare you as a
10 dependent on a federal tax form?  Like do your
11 kids --
12     A.    No.
13     Q.    Okay.  Prior to your incarceration
14 where were you living?
15     A.    I was living at -- on Broadway.
16     Q.    Broadway and what?
17     A.    I can't remember.  I lived in
18 apartment 1004.  I don't remember the address.
19     Q.    Do you remember the cross street
20 approximately?
21     A.    I can't remember.
22     Q.    Okay.  Did you pay rent?
23     A.    Yes, I did.
24     Q.    Okay.  And how long did you live in
```

16

```
1  Pacific Garden Mission?
2      A.    Yes, I did.
3      Q.    When did you live there?
4      A.    That was -- when I first came to
5  Chicago about 22 years ago, I joined a program,
6  and then in the last three years.
7      Q.    In the last three years?
8      A.    In the last three years before I got
9  incarcerated I was at the Mission.
10     Q.    Okay.  Can we back up for a second?
11 Did you live at the Pacific Garden Mission before
12 the Broadway apartment or after the Broadway
13 apartment?
14     A.    Both.
15     Q.    So throughout the time that you were
16 at --
17     A.    I told you when I first came to
18 Chicago 22 years ago --
19     Q.    Correct.
20     A.    -- I came to Chicago to join the
21 Mission.
22     Q.    Okay.
23     A.    All right?  And I got my apartment
24 and I lost my apartment, and I returned back to
```

Plaintiff's Exhibit 13 Page 4

17

```
 1   the Mission.
 2       Q.    Okay.  When did you lose the
 3   apartment on Broadway?
 4       A.    Approximately I think about three
 5   years ago, three and a half years ago.
 6       Q.    How long were you living at the
 7   Pacific Garden Mission prior to your
 8   incarceration?
 9       A.    Maybe about nine months.
10       Q.    Okay.  And were you living there with
11   your wife Cathy?
12       A.    No.
13       Q.    Where was Cathy living?
14       A.    Cathy was -- she was at Cornerstone
15   and Sarah's Circle.
16       Q.    When you were living at the Pacific
17   Garden Mission, are there rooms or dormitories,
18   or how does that work?
19       A.    There's an auditorium and there's
20   also the dorms, the second floor, third floor
21   dorms.
22       Q.    Okay.  Did you have a regular set bed
23   or did you move around?
24       A.    It depends upon what time I chose to
```

19

```
 1       A.    No.
 2       Q.    No?
 3       A.    No.
 4       Q.    Were you able to use the bathroom?
 5       A.    Yeah.  But I'm telling you I had --
 6   but at that point I had my leg as well, but I
 7   said I had gangrene.
 8       Q.    Okay.  So this was prior to the
 9   amputation?
10       A.    Absolutely.
11       Q.    Since the amputation -- let me go
12   back.  Do you remember the date of the
13   amputation?
14       A.    No, I don't remember the exact date.
15       Q.    Okay.  What about the month or year?
16       A.    I don't remember.
17       Q.    Approximately how many years since
18   you had your leg?
19       A.    It's been over three years.
20       Q.    Over three years?
21       A.    Close to three years.
22       Q.    Okay.  Was that when you were living
23   at the Broadway apartment or when you were at
24   Pacific?
```

18

```
 1   get back to the Mission.
 2       Q.    Okay.
 3       A.    Sometimes I preferred to be
 4   downstairs in the open area.
 5       Q.    Okay.  Were you able to -- did you
 6   have any issues --
 7       A.    Yes, I did.
 8       Q.    -- getting on to your -- please
 9   explain those issues.
10       A.    They moved me upstairs, because with
11   my diabetes and it was out of control, and I was
12   suffering with gangrene, all right, and they
13   moved me upstairs to the second floor and
14   assigned me a bed.
15       Q.    Were the bathrooms handicapped
16   accessible at the Pacific Garden Mission?
17       A.    I had my scooter.  I had my scooter
18   that my church bought me.
19       Q.    Okay.
20       A.    All right?  And I had my scooter and
21   I drive my scooter to the bathroom area.  I get
22   off and do what I had to do and get back on my
23   scooter and return back to the bed.
24       Q.    Were there handrails?
```

20

```
 1       A.    That was at Pacific Garden Mission.
 2       Q.    Okay.  And where did you have your
 3   leg amputated?
 4       A.    At Weiss Hospital.
 5       Q.    And was it because of the gangrene or
 6   was it --
 7       A.    Gangrene, poor circulation, yes.
 8       Q.    Okay.  And which leg was amputated?
 9       A.    My right.
10       Q.    And up to what point?  Was it below
11   the knee?
12       A.    (Indicating.)
13       Q.    Okay.  So it's below the knee?
14       A.    Yes, it is.
15       Q.    Okay.  Did you get a prosthetic leg
16   when you were at Weiss?
17       A.    No.
18       Q.    No?
19       A.    I got a prosthetic leg when I was at
20   Continental Nursing Home.
21       Q.    And when were you at the Continental
22   Nursing Home?
23       A.    I was there before the amputation and
24   after the amputation.
```

Plaintiff's Exhibit 13 Page 5

21

```
1        Q.    For about how long, a week, two
2   weeks, a month, two months?
3        A.    I was there for an extended period.
4   I don't remember the exact amount of time though.
5        Q.    Okay.  I want to back up a little bit
6   and then we're going to circle back to this.
7              How far did you go in school?
8        A.    16 plus.
9        Q.    Like sophomore year, junior year?
10       A.    No.  I said college.
11       Q.    Oh, you went to college?
12       A.    16 plus.
13       Q.    Okay.  What college did you go to?
14       A.    Let's start off at River State
15   College, Utah State University and University of
16   Washington, a Husky.
17       Q.    Husky?  What year did you graduate?
18       A.    '73, 1973.
19       Q.    Okay.  And did you continue school
20   after that?
21       A.    No.
22       Q.    Okay.  What did you do after
23   graduating?
24       A.    Job developer, daycare center
```

22

```
1   director, team club advisor --
2        THE COURT REPORTER:  I'm sorry.  You have
3   to slow down.  Can you repeat that, please?
4        MR. MORRISSEY:  Yes.
5        THE WITNESS:  Job developer, daycare center
6   director, team club advisor.  I worked for the
7   United States Federal Government, team club
8   advisor, Catholic Charities and a street
9   evangelist.
10   BY MS. CARROLL:
11       Q.    And a street evangelist.  Which you
12   said you've been doing for several years?
13       A.    40.
14       Q.    What was your last job prior to your
15   incarceration?
16       A.    I haven't worked in over 25 years.
17       Q.    What was your last job prior to the
18   25 years?
19       A.    New York City Yellow Cab driver,
20   Midtown Manhattan.
21       Q.    When did you move to Chicago?
22       A.    22 years ago approximately.
23       Q.    Okay.  Have you had -- so you've had
24   no jobs since you came to Chicago; is that
```

23

```
1   correct?
2        A.    Street evangelism.
3        Q.    Street evangelism.  What do you mean
4   when you say "street evangelism"?
5        A.    I wish I would have brought my stuff.
6   I had a list of things from Family Radio, from
7   different ministries.  Also with the Jesus People
8   U.S.A., I'm a part of their organization.  I
9   would go to Cornerstone which had an Outreach
10   Program.  And Chris Ramsey ran the program, and
11   he would give me bibles, tracks and things like
12   that, all right, and I would go out on the street
13   and share the gospel and encourage people.
14       Q.    Did you get any compensation for
15   this, monetary compensation?
16       A.    People bless me, yeah, yeah.
17       Q.    Okay.  So --
18       A.    I didn't ask for it.
19       Q.    Not a salary.  It's just like if
20   people wanted to give you money, they would give
21   you money?
22       A.    Yes.
23       Q.    Okay.  Did you file any taxes or ...
24       A.    Absolutely not.
```

24

```
1        Q.    No.  Okay.
2              When is the last time you filed
3   taxes?
4        A.    I haven't filed no taxes in over 25
5   years at least, beyond there.
6        Q.    Okay.  Do you have any nicknames?
7        A.    No.
8        Q.    Does anybody call you anything at the
9   Jail?
10       A.    No.  I don't allow them to.
11       Q.    Okay.
12       A.    Oh, yes, I'm sorry, they do.
13       Q.    What do they call you?
14       A.    Hallelujah Man.  Hallelujah Man,
15   that's what I'm known as.
16       Q.    Has anyone ever called you Wheelchair
17   Pimp?
18       A.    I've called myself Wheelchair Pimp.
19       Q.    Okay.  Why do you call yourself
20   Wheelchair Pimp?
21       A.    Because that's what I was doing at
22   the time.
23       Q.    You were pimping?
24       A.    Absolutely, yes, I did.
```

Plaintiff's Exhibit 13 Page 6

```
 1      Q.    How long did you pimp for?
 2      A.    Over 40 years.
 3      Q.    So you were making some compensation
 4  but it was through pimping; is that correct?
 5      A.    I was making money if that's what
 6  you're asking.  Is that what you're asking?
 7      Q.    Yes.
 8      A.    Then keep it plain and flat to the
 9  wagon, okay?
10      Q.    Okay.  So you made money pimping for
11  about 40 years?
12      A.    Oh, yeah.
13      Q.    Okay.  About how much money would you
14  make, say, a month?
15      A.    I made over a million dollars, so, I
16  mean, you can calculate it, okay?
17      Q.    Okay.  And you were not paying taxes?
18      A.    No.
19      Q.    Okay.  And where did that money go?
20  Like how did you --
21      A.    In drugs.
22      Q.    In drugs.  Okay.
23            Have you ever filed any lawsuits
24  prior to your incarceration at the Cook County
```

```
 1  other places are there liens against you?
 2      A.    I don't know.
 3      Q.    Okay.  Do you know how any of your --
 4  your operation was paid for?
 5      A.    I assume through the insurance
 6  company.
 7      Q.    Okay.  Did you have a separate
 8  insurance besides the Medicare or Medicaid or
 9  whatever it was?
10      A.    No.
11      Q.    Okay.  Do you receive disability --
12  did you receive disability checks prior to your
13  incarceration?
14      A.    Yes, I did.
15      Q.    How long were you receiving
16  disability checks?
17      A.    I don't remember.
18      Q.    Okay.  Do you know approximately how
19  much you would receive a month in disability?
20      A.    Approximately about 800.
21      Q.    And was this prior to your
22  amputation or after?
23      A.    Long before my amputation.
24      Q.    And what was your disability prior to
```

```
 1  Jail?
 2      A.    No.
 3      Q.    Okay.  Was there ever a lawsuit
 4  against the City of Chicago?
 5      A.    No.
 6      Q.    Not for unlawful arrest or anything
 7  like that?
 8      A.    No.
 9      Q.    That could be a different James
10  Roberts?
11      A.    Sorry?
12      Q.    Could that be a different James
13  Roberts?
14      A.    It's definitely a different James
15  Roberts.
16      Q.    Okay.  Do you receive Medicaid or
17  Medicare or any other type of --
18      A.    I don't receive anything now.
19      Q.    Prior to your incarceration.
20      A.    Yes.
21      Q.    What did you receive?
22      A.    I received Medicaid -- one of them I
23  received.  I had a red, white and blue card.
24      Q.    Okay.  And at Weiss or any of the
```

```
 1  your amputation?
 2      A.    Thrombophlebitis.
 3      Q.    Okay.  And did you receive any type
 4  of SSI?
 5      A.    Yes.
 6      Q.    Okay.  And how much were you getting
 7  for that?
 8      A.    I just told you.
 9      Q.    Was that a combined -- a total of 800
10  for everything?
11      A.    (Indicating.)
12      Q.    Okay.  Have you ever testified
13  before?
14      A.    No.
15      Q.    Okay.  Have you ever been sued
16  before?
17      A.    No.
18      Q.    Have you ever signed any legal
19  documents before?
20      MR. MORRISSEY:  Object to the form of the
21  question.
22  BY MS. CARROLL:
23      Q.    How about this.  Have you ever signed
24  any legal documents in a case before?
```

Plaintiff's Exhibit 13 Page 7

29

```
 1        A.    I don't understand what you're
 2  saying.
 3        Q.    Okay.  How many other lawsuits do you
 4  currently have pending?
 5        A.    Four.
 6        Q.    Okay.  Can you tell me about the
 7  first one?
 8        A.    It should be Tapia, Cook County.
 9        THE COURT REPORTER:  Tapia?
10        MS. CARROLL:  Tapia.
11        THE WITNESS:  Sheriff Tapia throwing me out
12  of the wheelchair, that's right.
13  BY MS. CARROLL:
14        Q.    And when did you file that?
15        A.    Just recently because I didn't
16  understand the procedure.
17        Q.    And that would be 16 CV 10194?
18        MR. MORRISSEY:  If you know the case
19  number.
20  BY MS. CARROLL:
21        Q.    Do you know the case number?
22        A.    I don't know.
23        Q.    Okay.  And what are you asking for in
24  that Complaint?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

31

```
 1        A.    I don't know.
 2        Q.    Are they also for being in a
 3  wheelchair?
 4        A.    I don't know.
 5        Q.    Okay.  Did you look at the paperwork
 6  before he filled it out -- after he filled it out
 7  before he sent it in?
 8        A.    I was so sick with oxygen deprivation
 9  that in order for me to read I would have to take
10  another sheet of paper to make sure that I
11  didn't -- my vision didn't cross.  So no, I
12  didn't read it.
13        Q.    Okay.  Because he asked for
14  $75,000,000 in that.  Is that something that you
15  had told him to put down or that he put down?
16        A.    No, that's something he put down.
17        Q.    Okay.  So you were not expecting
18  $75,000,000 from that --
19        A.    Like I said, I was sick.
20        Q.    Okay.  There's another Complaint that
21  you filed that same day, 16 CV 10193, again to
22  Dr. Paul.  Do you recall that?
23        A.    Yeah, I definitely recall.
24        Q.    And what is that about?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

30

```
 1        A.    I didn't fill out that paperwork.
 2  Someone else did it for me.  I don't know what
 3  they asked for.  I don't remember.
 4        Q.    Okay.  Who filled out that paperwork?
 5        A.    Joseph Felton.
 6        Q.    F-e-l-t-o-n?
 7        A.    I'm not sure.  I think so, yeah.
 8        Q.    How do you know him?
 9        A.    He's incarcerated upstairs on the
10  third floor.
11        Q.    With you?
12        A.    No.  I'm on the fourth floor now.
13        Q.    Were you on the third floor when he
14  filled the paperwork for you?
15        A.    Yes.
16        Q.    Was he also in a wheelchair?
17        A.    Yes.
18        Q.    Do you know if he also has cases
19  against Cook County and the Sheriff?
20        A.    I'm sure he does.
21        Q.    Okay.  Has he told you that he does?
22        A.    Yeah.
23        Q.    Okay.  How many cases does he have
24  against Cook County?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

32

```
 1        A.    Malpractice, criminal malpractice.
 2        Q.    Okay.  And what did Dr. Paul do?
 3        A.    What didn't she do.
 4        Q.    What didn't she do?
 5        A.    That's more appropriate.  Number one,
 6  I'm on blood thinning medication and I hadn't
 7  been monitored in over a year.  Okay?  I'm on
 8  high blood pressure medication and hadn't been
 9  monitored and then denied doctor visits.  And I'm
10  right there in the cell and have no accessibility
11  to any medical at all.
12        Q.    Okay.  Are you saying that you
13  haven't had --
14        A.    Yes, I am.
15        Q.    For a year you haven't had --
16        A.    Hey, I'm saying I've been abused.
17  That's exactly what I'm saying.
18        Q.    Okay.  Are you saying that you
19  haven't had, let's see, like your vitals taken in
20  a year?
21        MR. MORRISSEY:  That mischaracterizes his
22  testimony.
23        MS. CARROLL:  I'm asking.
24
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 8

33

```
 1   BY MS. CARROLL:
 2        Q.    What are you saying that you didn't
 3   have in a year?
 4        A.    I've already said.
 5        Q.    I'm asking you to be more specific.
 6        MR. MORRISSEY:  If you can be more
 7   specific, Mr. Roberts.
 8        THE WITNESS:  All right.  Number one, okay,
 9   I go to Dr. Paul.  I'm in a wheelchair.  I'm
10   carrying my prosthetic, all right?  My limbs are
11   so swollen that I got microscopic lesions and I'm
12   asking her for help.
13   BY MS. CARROLL:
14        Q.    Okay.
15        A.    All right?  I have to lay down on a
16   hard cement slab, okay?
17        Q.    Um-hmm.
18        A.    A hard cement slab with nothing to
19   elevate.
20        Q.    Okay.
21        A.    All right?  I've been dealing with
22   this here issue since 1972, so I think I know
23   something about it, all right?  When my
24   circulation is correct, I took time between about
```

35

```
 1        MS. CARROLL:  Okay.  Yes, you're getting
 2   very heated, so let's --
 3        THE WITNESS:  I mean --
 4        MR. MORRISSEY:  Mr. Roberts --
 5        THE WITNESS:  I'm sorry.
 6        MR. MORRISSEY:  We're going to take a
 7   break.  Why don't we have a conversation.
 8        THE WITNESS:  I'm sorry.
 9             (Break taken.)
10        MS. CARROLL:  Back on the record.
11   BY MS. CARROLL:
12        Q.    There were some things that we'd like
13   to readdress regarding your location prior to
14   your incarceration.  Just for clarification,
15   because you said a few different things.  Where
16   were you living after your amputation?  And that
17   was -- was that approximately 2013?
18        A.    Say that again.
19        Q.    Were you amputated in 2013?  Does
20   that sound familiar to you?
21        A.    About three years ago?
22        Q.    I guess.
23        A.    Yeah.
24        Q.    Okay.  After that you stayed at
```

34

```
 1   four days to write it out.  I listed all medical
 2   problems.  I have a list of about 30 issues that
 3   need to be addressed.
 4        Q.    Okay.
 5        A.    I meet Dr. Paul, AKA Hitler, that's
 6   who she is.
 7        Q.    Okay.
 8        A.    All right?  Straight up concentration
 9   camp Hitler.
10        Q.    Okay.
11        A.    All right?  And she says to me,
12   Hello.  I've never seen you before.  How long
13   have you been incarcerated?  I don't know.  I
14   just got here.  Yeah?  Being elevated
15   circulation, oxygen clear.  All right?  What's
16   your problem?  I hand her a list.  It's 27 items
17   that I need addressed.  She looks at me like, Are
18   you crazy?  Oh, I can only address three, and she
19   didn't address any.  All right?  From then it was
20   downhill ever since.  It was a nightmare.  I mean
21   it was a sheer nightmare.  This place is a
22   nightmare.  I wouldn't treat my worst enemy the
23   way I've been treated in this place.
24        MR. MORRISSEY:  Why don't we take a break.
```

36

```
 1   Continental Nursing; is that correct?
 2        A.    Continental and Harmony Nursing.
 3        Q.    Okay.
 4        A.    Harmony Rehabilitation on Foster.
 5        Q.    On Foster.  About how long did you
 6   stay there?
 7        A.    At which place?
 8        Q.    At the Continental place.
 9        A.    Continental I don't remember.  It's
10   probably close to a year.
11        Q.    Okay.  So do you recall the date that
12   you were incarcerated here at the Cook County
13   Department of Corrections?
14        A.    Yeah.  Yeah.
15        Q.    What date was that?
16        A.    That was Sunday.  That was Sunday,
17   9-9-14.
18        Q.    Now, was that the date that you were
19   arrested or the date that you were brought here?
20        A.    I was arrested -- I'm not sure.  I
21   know I was arrested on Sunday.
22        Q.    Okay.
23        A.    All right?  And I came here three
24   days later.
```

Plaintiff's Exhibit 13 Page 9

37

1    Q.    Okay.  And where were you in between
2    those three days?
3         A.    I was at one of the Cook County's
4    hospitals.  I don't know which one.
5         Q.    And what are you here for?
6         A.    Attempt murder.
7         Q.    Okay.  Of?
8         A.    My wife.
9         Q.    Okay.  And are you no bail?
10        A.    Absolutely.
11        Q.    Okay.  So you were at a County
12   hospital for approximately three days and then
13   you came to --
14        A.    As far as I can remember, yeah.
15        Q.    Okay.  I want to go over some of your
16   other cases and then we'll go into since you've
17   been here.
18             So we talked about two cases, one
19   against Tapia and one against Dr. Paul.  What are
20   your other cases?
21        A.    The sheriff that just been
22   walking -- escorting you guys back, against him
23   for throwing me out the wheelchair on August the
24   18th of 2016 at 5:30 when I'm coming down here to

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

39

1         A.    The one that just escorted you guys
2    in and out.
3         Q.    Okay.  Because you have a case
4    against a Director Reyes.
5         A.    Yes, I did.
6         Q.    Is that a different case?
7         A.    It's the same case because he's
8    responsible.  He's over Reyes.
9         Q.    I don't understand what you just
10   said.
11        A.    The Director is over the sheriffs,
12   okay?
13        Q.    Okay.
14        A.    All right?  I had told you I did not
15   fill out any of this paperwork.  Felton filled
16   out the paperwork.
17        Q.    Okay.
18        A.    Felton wrote it up the way it's
19   written up.  I didn't write it up.
20        Q.    Okay.  And who is Sergeant Moore?
21        A.    Sergeant Moore is Sergeant Moore.
22        Q.    What did he do?
23        A.    He sprayed me.
24        Q.    What do you mean he sprayed you?

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

38

1    see Patrick.
2         Q.    And what do you mean he threw you out
3    of the wheelchair?
4         A.    He threw me out the wheelchair when I
5    came off the deck to go -- waiting to go and see
6    Patrick.
7         Q.    How did he throw you off of the
8    wheelchair?
9         A.    He grabbed it and snatched it from
10   under me, about my wife.
11        Q.    Okay.  Did you end up on the floor?
12        A.    Yes, I did.  It's on camera.
13        Q.    Okay.  And is Patrick representing
14   you in that case?
15        A.    No.
16        Q.    Is someone else representing you in
17   that case?
18        A.    I don't know.
19        Q.    Okay.  And what is that officer's
20   name?
21        A.    Reyes.
22        Q.    Are you talking about Director Reyes?
23        A.    I said Officer Reyes.
24        Q.    Officer Reyes?

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

40

1         A.    He sprayed me in the shower.
2         Q.    What did he spray you with?
3         A.    I don't know.
4         Q.    All right.
5         A.    I've never been sprayed before in my
6    life.
7         Q.    Okay.  Why did he spray you?
8         A.    Because he's a fool, that's why.
9         Q.    Okay.  Was there anything that
10   happened right beforehand?
11        A.    Absolutely not.  I was housed
12   alone, out alone, amputated, no upper body
13   strength, all right, in the shower.  The shower
14   is -- the seat is too low.  I'm six foot eight
15   and it's on a decline.  I have no upper body
16   strength.  The railings were too far away, all
17   right, and he came and he sprayed me when I asked
18   to speak to Superintendent Brown, all right,
19   about the abuse that was going on and the neglect
20   that was going on with me that I grieved.
21        Q.    Okay.
22        A.    All right?  And I got sprayed, all
23   right, all in my eyes, okay, all over my body and
24   all over my prosthetic device.  I couldn't move

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 10

41

1 or do anything. And then carried me down the
2 corridor naked and stripped me of all my human
3 dignity.
4     Q. Okay. Do you have any other
5 lawsuits?
6     A. Yes.
7     Q. What are the other lawsuits?
8     A. Against Gavin.
9     Q. Who's Gavin?
10     A. Sheriff Gavin.
11     Q. Who is Sheriff Gavin?
12     A. I don't know who he is. I know the
13 abuse I received.
14     Q. What did Sheriff Gavin do?
15     A. He threw me down at Cermak, Cermak
16 lab. I'm going down there. I'm already
17 bleeding. I'm hemorrhaging because of my blood
18 thinning medication which Dr. Paul was not
19 monitoring.
20     Q. Okay.
21     A. Winds up I'm hemorrhaging because of
22 it.
23     Q. Okay.
24     A. All right? And Gavin in the

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

43

1     DEPUTY SHERIFF: Are we looking for his
2 lunch?
3     MS. CARROLL: Yes.
4         (Exit Deputy Sheriff.)
5 BY MS. CARROLL:
6     Q. Okay.
7     A. I used to see a Sheriff's car, Cook
8 County Sheriff's car --
9     MR. MORRISSEY: I don't know if there's a
10 question pending.
11     THE WITNESS: Sorry.
12 BY MS. CARROLL:
13     Q. What date was this incident with
14 Gavin?
15     A. I don't remember. It's been maybe
16 about 16 months ago. It was during the summer.
17 It was spring, summer, somewhere around there.
18     Q. Okay. So about 2015?
19     A. I think so.
20     Q. Okay.
21     A. I grieved it. I know that.
22     Q. Okay. So you're aware of the
23 grievance process here at the Cook County
24 Department of Corrections?

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

42

1 laboratory -- I'm not -- I'm using my prosthetic
2 at this point.
3     Q. Okay.
4     A. All right? This is what triggered --
5 started this whole event with the problem with my
6 prosthetic.
7     Q. Okay.
8     A. Gavin -- I'm pulling the walker
9 because they tell me to go in. Gavin comes up in
10 the lab, grabs the walker and snatches it, him
11 and another white sheriff. I couldn't see his
12 name because they snatched my glasses off.
13 Snatches it, throws me off balance and I wind up
14 on the floor. They got me -- I had my glasses,
15 but at that time I had my glasses with tape
16 around my neck, and they're choking me and
17 dragging me and beating me and dragging me out
18 onto the video in the area downstairs. All
19 right? But for months I never correlated what
20 the significance of why Gavin was abusing me.
21     Q. Um-hmm.
22     A. But Gavin knew my wife.
23     Q. Okay.
24         (Enter Deputy Sheriff.)

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

44

1     A. I'm getting aware of it now.
2     Q. Approximately how many grievances
3 have you filed?
4     A. Quite a few.
5     Q. Quite a few. More than a hundred?
6     A. Quite a few.
7     Q. Would that be more than a hundred?
8     A. Yes.
9     Q. Okay. How often do you write a
10 grievance?
11     A. It depends upon how much negativity I
12 run into.
13     Q. Okay. And I'm going to ask you just
14 for the sake of -- I know that you have high
15 blood pleasure and I know that these questions
16 seem to be upsetting you and you're getting
17 angry, and I need you -- I want you to calm down
18 a little bit, you know, for your blood pressure
19 sake, okay?
20     Did you receive an inmate
21 handbook? Do you remember if you received an
22 inmate handbook?
23     A. I've got quite a few of them.
24     Q. Okay. So are you aware of the

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 11

45

```
1   appellate process as well for the grievances.
2        A.   I don't understand what you're
3   saying.
4        Q.   When you get your grievance, have you
5   ever appealed those grievances?
6        A.   Yes.
7        Q.   Okay.  And you're aware of how that
8   works?
9        A.   Not quite, no.
10       Q.   But it's in that handbook that you
11  received?
12       A.   No, it's not really.  No, it's not.
13  It's deleted.
14       Q.   It's deleted?
15       A.   Yes, it is.
16       Q.   Okay.  Are you also aware of Health
17  Service Request Forms?
18       A.   Yes, absolutely.
19       Q.   Okay.  How many of those do you think
20  you filed?
21       A.   Quite a few.
22       A.   More than 200?
23       A.   Absolutely.
24       Q.   Okay.  So you're aware of the process
```

47

```
1        Q.   Two words?
2        A.   Um-hmm.
3        Q.   Okay.  Ever at Norwegian Hospital?
4        A.   Absolutely.
5        Q.   Okay.  And what have you been
6   diagnosed with?
7        A.   I had -- when I went to Norwegian, I
8   had head trauma, poor circulation, oxygen
9   deprivation, Alzheimer's, dementia.
10       Q.   Okay.  Have you been officially
11  diagnosed with Alzheimer's or dementia?
12       MR. MORRISSEY:  If you know.
13       THE WITNESS:  No, I don't know.
14  BY MS. CARROLL:
15       Q.   You don't know.
16            And does that affect your memory?
17       A.   Yes, it does.  Normally under normal
18  circumstances I have a photographic memory.  Not
19  the way I am now.  I'm on total decline.
20       Q.   With the dementia, how long have you
21  had that?
22       A.   Since I've been here in Cook County.
23       Q.   Okay.  Prior?
24       A.   Yeah.  With the poor circulation,
```

46

```
1   for using a Health Service Request Form?
2        A.   Yeah.  If they answered the request
3   in the beginning and you not have to repeat it
4   over and over and over and over and over again,
5   there would be a lot less grievances and request
6   forms.
7        Q.   Okay.  Have you ever received
8   psychiatric care?
9        A.   Absolutely.
10       Q.   And where have you received
11  psychiatric care?
12       A.   Good question.  How about Alden
13  Lakeland.
14       Q.   Is that the same place or two
15  different places?
16       A.   It's the same.
17       Q.   Okay.
18       A.   All right.  Mid America under Dr. bin
19  Laden (phonetic).
20       Q.   Can you spell that?  Do you know how
21  to --
22       A.   No.
23       Q.   Okay.  Bin Laden?
24       A.   Laden.
```

48

```
1   yes.
2        Q.   Okay.  Prior to your most recent stay
3   at the Cook County Department of Corrections have
4   you been an inmate here before?
5        A.   No.
6        Q.   Have you ever been arrested before?
7        A.   Yes.
8        Q.   What have you been arrested for?
9            (Enter Deputy Sheriff.)
10       MR. MORRISSEY:  Thank you.
11       THE WITNESS:  Thank you, sir.
12           (Exit Deputy Sheriff.)
13  BY MS. CARROLL:
14       Q.   Do you want to take a break while you
15  eat?  Will you eat something just so that I know
16  you're okay?
17       A.   I'll eat the apple.
18       Q.   Okay.  I just wanted to make sure
19  because it's been a little while since you've
20  eaten.
21            When were you at Norwegian
22  Hospital, do you remember?
23       A.   Right after I lost my apartment.
24       Q.   Okay.  Do you recall when that was?
```

Plaintiff's Exhibit 13 Page 12

49

```
 1        A.    Maybe about four years ago.
 2        Q.    Okay.  What were your other arrests
 3   for?
 4        A.    I was arrested for assault.
 5        Q.    Okay.  Do you remember when that was?
 6        A.    Over 30 years ago.
 7        Q.    Were you arrested for battery in
 8   2003?
 9        A.    Yeah.  It was a lie.
10        Q.    Okay.  Did you get sentenced to
11   supervision for that?
12        A.    Sorry?
13        Q.    Did you get sentenced to supervision
14   for that?
15        A.    No.
16        Q.    You don't recall that?
17        A.    I didn't get sentenced.  The charges
18   were dropped.
19        Q.    Well, there's a few battery arrests.
20   Do you remember one in '03 where you got
21   supervision?
22        MR. MORRISSEY:  Do you remember, that is
23   the question.
24
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

51

```
 1        MR. MORRISSEY:  I'm going to instruct you
 2   not to talk about any potential criminal charges
 3   you have because of your Fifth Amendment right to
 4   not incriminate yourself.
 5        THE WITNESS:  Thank you.
 6        MS. CARROLL:  I'm not asking about that.
 7   I'm asking about the medication.
 8        MR. MORRISSEY:  All right.  But my client
 9   was deviating towards talking about his
10   interaction with his wife.
11        MS. CARROLL:  Okay.
12        MR. MORRISSEY:  You can answer the question
13   about the medication.
14        THE WITNESS:  I wasn't taking any
15   medication.
16   BY MS. CARROLL:
17        Q.    At Weiss.  Okay.
18              Is it possible that you were --
19   after your arrest for the attempted murder you
20   were at Illinois Masonic?  Does that sound
21   familiar to you?
22        A.    I don't know where I was at.
23        Q.    Okay.  Were you in a wheelchair at
24   the time?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

50

```
 1   BY MS. CARROLL:
 2        Q.    If you don't remember --
 3        A.    I don't remember.
 4        Q.    Okay.
 5        A.    You sure you got the same James
 6   Roberts?
 7        Q.    With that one it does appear to be
 8   so.
 9        A.    The height is six foot eight?  The
10   Height is six foot eight?  Because I was arrested
11   in New York when I was driving for the United
12   States Motor Pool, and there was a James Roberts
13   in Florida, all right, but it wasn't me.
14        Q.    Okay.  Okay.  It has the same IR but
15   maybe it's someone else.  We could look into
16   that.
17              When you entered Cook County, were
18   you on medication other than warfarin and --
19        A.    I had not received medication at all
20   'cause Weiss had kicked me out of the hospital.
21        Q.    Why did Weiss kick you out of the
22   hospital?
23        A.    Because I went to my church to get
24   help to get Cathy and I an apartment.  And --
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

52

```
 1        A.    I had my walker.
 2        Q.    You had a walker?
 3              And you had your prosthetic leg?
 4        A.    Yeah.
 5        Q.    Okay.  And were you able to use that
 6   walker?
 7        A.    Very limited, yes.
 8        Q.    Okay.  Did you own a wheelchair at
 9   that point?
10        A.    Absolutely.
11        Q.    Where was your wheelchair at the
12   time?
13        A.    It was in the repair shop because the
14   batteries were dead.
15        Q.    Okay.  When you first arrived at Cook
16   County on -- in September of 2014, do you
17   remember which division or room you were put in?
18        A.    I was in Cermak.
19        Q.    In Cermak?  3 West?
20        A.    I don't know.
21        Q.    Okay.  How long were you there?
22        A.    A month.
23        Q.    And do you remember which cell you
24   were in or room you were in?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 13

53

1     A.   I don't remember.

2     Q.   Did you keep your walker or did you

3 get a different walker?

4     A.   No, I didn't have my walker.

5     Q.   Okay.  Where was your walker?

6     A.   My walker was at Belmont and Western

7 with the rest of my property.

8     Q.   Did they give you a walker when you

9 got to Cook County?

10    A.   Yes.

11    Q.   Okay.  And did you get a wheelchair

12 for long distances?

13    A.   That was later.

14    Q.   Okay.  You don't recall that at the

15 very beginning you got a --

16    A.   No, I didn't.  I didn't have it, no.

17    Q.   Okay.  So the first time you went to

18 court after being incarcerated did you use a

19 wheelchair?

20    A.   I don't remember.

21    Q.   Okay.  Were you able to walk short

22 distances with your walker?

23    A.   Yes, very limited.

24    Q.   How limited?

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

54

1     A.   About 20 feet.

2     Q.   Can you still walk short distances

3 with a walker?

4     A.   No.

5     Q.   When did that stop?

6     A.   When my -- when the blood clot filter

7 that's inside of me started working in reverse.

8     Q.   And approximately when was that?

9     A.   Probably about nine or ten months

10 ago.

11    Q.   Okay.  So since, let's say, March?

12 You want to go with March of 2016?

13    A.   Go back further than that.

14    Q.   Okay.  So let's say January or

15 February of 2016 have you been able to do any

16 walking?

17    A.   No.

18    Q.   Can you -- with your prosthetic leg

19 could you walk?

20    A.   I could not only walk, I could praise

21 dance.

22    THE COURT REPORTER:  You could praise

23 dance?

24    THE WITNESS:  Praise dance, hallelujah.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

55

1 BY MS. CARROLL:

2    Q.   Can you dance?

3    A.   I sure can.

4    Q.   With your prosthetic.  When was the

5 last time you did that?

6    A.   I don't remember.  I had been in the

7 cell praising God, and the Holy Ghost came on to

8 me and I rejoiced to my Lord and Savior.  Don't

9 get me started, oh Lord.  Get me under control,

10 Jesus.

11    Q.   Okay.  So do you dance often in your

12 cell?

13    MR. MORRISSEY:  Object to the form of the

14 question.

15    MS. CARROLL:  I'm asking.

16    MR. MORRISSEY:  And there's a time frame.

17       You can answer.

18    THE WITNESS:  I praised.

19 BY MS. CARROLL:

20    Q.   You praised?

21    A.   I praised seven days a week, 365 days

22 a year for hours.

23 BY MS. CARROLL:

24    Q.   When is the last time that you

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

---

56

1 danced?

2    A.   It's been months.

3    Q.   How many months?

4    A.   I don't know.

5    Q.   Prior to February of 2016?

6    A.   I don't know.

7    Q.   Okay.  Do you dance often?

8    A.   When the Holy Ghost comes over me,

9 yes, if I can.

10    Q.   If you can.  Okay.

11       Do you still dance when the Holy

12 Ghost comes upon you?

13    A.   I dance like this in my chair now,

14 yeah (indicating).

15    Q.   Okay.  So you're moving a little bit

16 of your lower body and upper body?

17    A.   That's it, in my chair.

18    Q.   Okay.

19    A.   It's on camera.

20    Q.   I know.  I'm sure you're aware that

21 there's lots of videos of you dancing.

22    (Indicating.)

23    MR. MORRISSEY:  I think that

24 mischaracterizes the evidence produced in this

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 14

57

```
1    case.
2            MS. CARROLL:  Okay.
3            MR. MORRISSEY:  I mean there's only one
4    video of praise dancing.
5            MS. CARROLL:  Okay.
6    BY MS. CARROLL:
7        Q.    I believe a lot of people have maybe
8    witnessed you dancing in the RTU?
9        A.    Oh, yeah.  Yeah.
10       Q.    Is there ever music playing or is
11   it -- are you listening to music when you're
12   dancing?
13       A.    I'm listening to the -- there's a
14   praise and the worship and a oneness between me
15   and my Lord and Savior and Jehovah God.
16       Q.    Okay.
17       A.    I have a oneness.  I have a
18   relationship.
19       Q.    Okay.  Let's go back -- so you were
20   at Cermak for approximately one month.  Do you
21   have any recollection of your time in Cermak for
22   that one month in September to October 2014?
23       A.    Vaguely.
24       Q.    Okay.  What do you remember?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

58

```
1        A.    I remember having accidents on the
2    toilet.
3        Q.    Okay.
4        A.    I remember in a room I think with six
5    other roommates and defecation going from the
6    toilet to -- going from the bed to the toilet and
7    body waste all over the place and the guys
8    complaining.
9        Q.    Okay.
10       A.    I remember that.
11       Q.    During the one month that you were in
12   Cermak?
13       A.    Exactly.
14       Q.    Okay.
15       A.    Because I was sick.  I was sick.  I
16   hadn't had no medication, and everything -- my
17   whole system was way, way, way out of limits.
18       Q.    Did you get medication while you were
19   at Cermak?  Did the Cermak nurses give you
20   medication?
21       A.    They monitored me, yeah.
22       Q.    Okay.
23       A.    That was before I met Dr. Paul.
24       Q.    Okay.  Is she Cermak or is she RTU,
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

59

```
1    Dr. Paul?
2        A.    I don't know.
3        Q.    Okay.
4        A.    I have heard she's been all over the
5    place.
6        Q.    Okay.  Do you remember Dr. DeFuniak?
7        A.    Who?
8        Q.    Dr. DeFuniak.
9        A.    I don't even know who you're talking
10   about.
11       Q.    Okay.
12       A.    Never met no Dr. DeFuniak.
13       Q.    Okay.  Is it possible that you met
14   him, you just don't remember him?
15       A.    What does he look like?
16       Q.    He is a doctor.  He is --
17       A.    No, I don't remember.
18           MR. MORRISSEY:  Let her describe him.
19           MS. CARROLL:  That's okay.  I don't need to
20   describe him.
21           MR. MORRISSEY:  You can describe Dr. --
22           MS. CARROLL:  I don't need to describe Dr.
23   DeFuniak.
24           MR. MORRISSEY:  I think Mr. Roberts wanted
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

60

```
1    clarification.
2            THE WITNESS:  I didn't hear what you said.
3            MR. MORRISSEY:  Do you want Miss Carroll to
4    describe Dr. DeFuniak?
5            MS. CARROLL:  I'm not going to describe Dr.
6    DeFuniak.  Let's keep going.
7    BY MS. CARROLL:
8        Q.    When the RTU opened, did you get
9    transferred to the RTU?
10           MR. MORRISSEY:  Object to the --
11   mischaracterizes when the RTU opened.
12   BY MS. CARROLL:
13       Q.    When did you come to this fine
14   building, the RTU?
15       A.    A month after I arrived.
16       Q.    Okay.  So all those things that you
17   were talking about that happened in Cermak on 3
18   West where you were falling and defecating on the
19   floor --
20       A.    And all over the toilet.
21       Q.    -- and all over the toilet, did you
22   grieve at that time period?
23       A.    No.  I didn't understand anything
24   about any grievance process.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 15

61

1      Q.    What about the Health Service Request
2  Form, did you do that at the time?
3      A.    They don't have them at Cermak.
4      Q.    Okay.  Were you telling the doctors
5  that that's what was happening to you?
6      A.    I think I saw a doctor over there
7  once.
8      Q.    Okay.  Did you tell the doctor?
9      A.    I don't remember telling him, no.
10     Q.    Okay.  Did you tell the nurses that
11 that was what was happening?
12     A.    I was not cognitive enough to tell
13 them.
14     Q.    Have you ever been diagnosed with
15 issues with your bladder?
16     A.    Yeah, I've had bladder problems.
17     Q.    For how long?
18     A.    Extended.
19     Q.    Okay.  Do you currently?
20     A.    At times.
21     Q.    Okay.  Have you been given diapers or
22 given any catheter or anything?
23     A.    I haven't had no catheter, but yeah,
24 diapers, yes.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

62

1      Q.    How long have you been on diapers?
2      A.    I'm not on diapers now.
3      Q.    Okay.  But were you at some point
4  since being here at the Department of
5  Corrections?
6      A.    Yeah, I was -- I wouldn't -- I
7  wouldn't describe that, but the nurses brought me
8  diapers because I needed them.
9      Q.    Okay.  Was that here in the RTU or
10 was that in Cermak?
11     A.    That was here.
12     Q.    In the RTU?  Do you remember if that
13 was on the third floor or fourth floor or both?
14     A.    (Indicating.)
15     Q.    Third floor or fourth floor or both?
16     A.    Third floor.
17     Q.    Okay.  Ever in the fourth floor, or
18 no?
19     A.    No.
20     Q.    Okay.  So when you first transferred
21 to the RTU, do you remember what tier you were
22 on?
23     A.    No.
24     Q.    Okay.  Do you remember which cell you

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

63

1  were in?
2      A.    Yeah, I believe I was in Cell 3
3  first.
4      Q.    Okay.  Do you remember how long you
5  were in Cell 3?
6      A.    One day.
7      Q.    Okay.  And then do you remember where
8  you got transferred to?
9      A.    Yeah, because the Department of
10 Justice transferred me.
11     Q.    The DOJ transferred you?  How do you
12 know the DOJ transferred you?
13     A.    Because they were here, all right,
14 and I had just had an accident and diarrhea all
15 over the cell, and they showed up and they were
16 my life preserver.
17     Q.    Okay.  And is that when you got moved
18 to 3E, Cell 10?
19     A.    Um-hmm.
20     Q.    Yes?
21     A.    Yes.
22     Q.    Okay.  And what is Cell 10 like?  Is
23 it different than the other rooms, the other
24 cells?

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

64

1      A.    It has a rail by the toilet.
2      Q.    Just one or two?
3      A.    It has two.
4      Q.    Two?
5            Are you able to use the toilet in
6  Cell 10?
7      A.    Yes and no, depending upon my medical
8  condition.
9      Q.    Okay.  So sometimes you can't use the
10 rails because of your medical condition?
11     A.    Exactly.
12     Q.    What --
13     A.    I have trouble.
14     Q.    What type of medical condition are
15 you talking about?
16     A.    Poor circulation, oxygen deprivation
17 and losing balance.
18     Q.    Okay.  So would that cause you not to
19 be able to get on -- use the handrails?
20     A.    Yeah, because depends upon which side
21 of the Jail I'm on.  I'm right-handed, but the
22 way they got it designed it's for a left-handed
23 person.  All right?  And then if I'm not
24 receiving enough oxygen to my brain, my balance

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

65

1 is all off and I've fallen. I've had to have the
2 sheriffs -- Sheriff Clark and Sheriff Sandoval
3 actually save me, you know, in a dark cell
4 because I can't see.
5      Q.   Okay.
6      A.   The diabetes is poor circulation and
7 affects my eyes.
8      Q.   Okay.  You said something about you
9 have glasses.  I don't see you wearing them now.
10 Are they just on your -- they're around your
11 neck?
12      A.   Yes, right here.  Right here
13 (indicating).
14      Q.   Oh, okay.  I see them now.
15      MR. MORRISSEY:  I need to take a break.
16           (Break taken.)
17      MS. CARROLL:  We're back on the record.
18 BY MS. CARROLL:
19      Q.   There was just a little break.  We
20 allowed you to have some food.  Are you feeling
21 better I hope?
22      A.   Yeah.
23      Q.   Okay.  I need to ask you something
24 based on what you had said prior to the break.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

66

1           Have you been officially diagnosed
2 with Alzheimer's here in the Cook County
3 Department of Corrections?
4      A.   I think Dr. bin Laden (phonetic)
5 could answer that question better than I can.
6      Q.   Okay.  And was bin Laden at Stroger?
7      A.   No.
8      Q.   Where was she again?
9      A.   Not she, he.
10      Q.   He.
11      A.   What's that hospital?  It's on
12 Lawrence and Clark.
13      Q.   Is that Weiss?
14      A.   No, it's not Weiss, not Weiss.
15      Q.   Swedish Covenant?
16      A.   No.  I can't remember.
17      Q.   Okay.
18      A.   But he was at Alden -- Mid America.
19      Q.   Mid America?
20      A.   Yeah.
21      Q.   Okay.
22      A.   He has a practice there.
23      Q.   Okay.  Have there been any questions
24 that I've asked you that you have not been able

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

67

1 to understand?
2      A.   I'd like you to repeat what you just
3 said because you're slurring.
4      Q.   Am I slurring?  Okay.
5           Were there any questions that I've
6 asked you so far that you did not understand what
7 I was asking?
8      A.   No, I really don't think so.
9      Q.   Okay.  When you said I was slurring,
10 what do you mean by that?
11      A.   I'm talking about my hearing problem.
12      Q.   Your hearing problem.  Okay.  Let's
13 discuss that.
14           What is your hearing problem?
15      A.   I have nerve damage in both my ears.
16      Q.   Both?
17      A.   Yes.
18      Q.   Okay.
19      A.   One is more severe than the other.
20      Q.   Which is the more severe ear?
21      A.   My right.
22      Q.   And have you been diagnosed with
23 nerve damage in both of your ears?
24      A.   At Stroger Hospital, yes, and also at

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

68

1 Cermak.
2      Q.   And how does that affect your daily
3 living?
4      A.   If I'm in the cell, it's fine.  If
5 I'm out of the cell, it's hell.
6      Q.   Why is it hell?
7      A.   It makes cross talking, loud TV, loud
8 radio and clashing, and shutting down my
9 circulation.
10      Q.   Okay.
11      A.   Anxiety.  All that.
12      Q.   Anxiety?
13      A.   Yeah.
14      Q.   Okay.  So would you say it's like an
15 overstimulation issue?
16      MR. MORRISSEY:  Objection.
17      MS. CARROLL:  I'm asking.
18 BY MS. CARROLL:
19      Q.   Like when there's a lot going on
20 around you, that's when your hearing gets
21 affected?
22      A.   It's like confusing.  It's like
23 chaos.
24      Q.   Okay.  Have you been able to hear

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 17

69

1  everything that I have said today?
2      A.  I've asked you to repeat quite a few
3  things.
4      Q.  Okay.  Aside from that have you heard
5  everything I've said today?
6      A.  Reasonably, yes.
7      Q.  Okay.  Does it affect your ability to
8  have a conversation in a small room like we're in
9  now with a few people?
10     A.  That would bother me.
11     Q.  That would bother you?
12     A.  Yes, it would.
13     Q.  Why?
14     A.  Because of, number one, clarity,
15  things being muffled and distorted.
16     Q.  Okay.  What about the phone, are you
17  able to talk on the phone?
18     A.  Depending.
19     Q.  What does it depend on?
20     A.  The connection and how loud the phone
21  is.
22     Q.  Okay.  Is there a way to make the
23  phone louder?
24     A.  There's a button on the side of the

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

71

1  understand, no.
2      Q.  What do you mean you didn't
3  understand?
4      A.  I didn't understand because it was
5  all distorted.
6      Q.  What he was saying?
7      A.  Yes.  It was distorted.
8      Q.  Did you tell him that?
9      A.  Yes.  In fact, I hadn't even
10  recognized his voice it was that distorted.
11     Q.  Okay.  So did you end those
12  conversations or did you continue to tell him you
13  were having trouble understanding him?
14     A.  I tell him I'm having trouble, and
15  he'd tell me to call him back and try to get
16  another line.
17     Q.  Would you call on another line and be
18  able to reach him?
19     A.  I wouldn't be able to get through
20  because Cook County is nonsense.
21     Q.  Okay.  Did you ever get through and
22  have a conversation with him?
23     A.  Yeah.  In fact, if I got through, we
24  would wind up praying.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

70

1  phone.
2      Q.  Have you ever been unable to hear
3  someone on the other side of the phone?
4      A.  Quite a few times.
5      Q.  Okay.  How often do you make phone
6  calls?
7      A.  It depends.  If I'm -- because I --
8  excuse me.  I only reach my family and my other
9  attorney.
10     Q.  Okay.
11     A.  And I try sometimes twice a day if I
12  can't reach my brother.
13     Q.  Okay.  So would you say do you call
14  your brother about every day or every other day?
15     A.  No.  I call him when there's a need
16  to call him.
17     Q.  Okay.  Do you understand what he's
18  saying on the phone?
19     A.  Sometimes no.
20     Q.  Okay.
21     A.  All right?  Like when he was sharing
22  with me about his daughter dying, I didn't
23  understand.  When he was sharing with me about my
24  two -- my niece and nephew dying, I didn't

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

72

1      Q.  Okay.  Have you seen -- you said that
2  you saw doctors at Stroger and Cermak for your
3  hearing?
4      A.  Yeah, a year apart.
5      Q.  A year apart.
6          Do you remember their names?
7      A.  No.
8      Q.  Okay.  What they looked like?
9      A.  Both were females.
10     Q.  Okay.  Do you see a regular ENT?
11     A.  No.
12     Q.  Have you ever?
13     A.  About 14 months ago and about a month
14  ago.
15     Q.  And what is -- do you remember the
16  name of the doctor?
17     A.  No.
18     Q.  Male or female?
19     A.  Female, both.
20     Q.  Both?
21          And the time that you saw the ENT
22  a month ago, was it a full examination?
23     A.  No.  No.  It was basically retaking
24  of history because the time process had read out

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 18

73

1  and they had deleted my files, or something like
2  that, or it was in the archives and they didn't
3  retrieve it.  So it was just a retaking of
4  history.
5       Q.   Okay.  Have you ever been told that
6  you need a hearing aid?
7       A.   Yes.
8       Q.   When?
9       A.   16 months -- 14 to 16 months ago.
10      Q.   Who told you you needed a hearing
11  aid?
12      A.   At Stroger Hospital Ear, Nose and
13  Throat Clinic.
14      Q.   Did they specifically use the words
15  that you needed a hearing aid?
16      A.   I don't remember.
17      Q.   Okay.  Did they tell you they were
18  going to give you a hearing aid?
19      A.   They told me that Stroger Hospital
20  didn't have access to it, but that Dr. Paul would
21  have to put that in play.
22      Q.   Okay.  Did you ever get a hearing
23  aid?
24      A.   No.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

74

1       Q.   When you went to see the doctor a
2  month ago, did they tell you needed a hearing
3  aid?
4       A.   I had an infection in my ear and I
5  was prescribed medication.  And I was supposed to
6  be doing a follow-up visit which I haven't
7  arrived at yet.
8       Q.   Okay.  What kind of medication?
9       A.   I don't know what it was.  It's some
10  kind of ear drop.
11      Q.   Okay.  Have you been given -- have
12  you had your ears cleaned since being at the Cook
13  County Department of Corrections?  Have you had
14  your ears cleaned, professionally cleaned by a
15  doctor?
16      A.   No.
17      Q.   What about the ear wax removal drops?
18      A.   I had got that here at Cook County.
19      Q.   Okay.  Let's go back a little bit to
20  the different cells.
21           At some point in 2014 you were in
22  Cell 6 on I believe it was 3E.  Do you remember
23  Cell 6?
24      A.   Oh, I remember Cell 6 very well.

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

75

1       Q.   Okay.  Did you have any issues on
2  Cell 6?
3       A.   Yes.
4       Q.   What were your issues?
5       A.   Officer Clark had to save me from and
6  keep me from falling.
7       Q.   Okay.  Why were you falling?
8       A.   Because Cell 6 has no rails, no bars,
9  no safety, and I managed to get to the toilet and
10  I couldn't get up.  And I was trying to get up
11  and he had to come and stop me from falling, to
12  break my fall.
13      Q.   Okay.
14      A.   And helped me get back to my bed.
15      Q.   Okay.  Was that nighttime?
16      A.   About 3:00 o'clock in the morning.
17      Q.   3:00 in the morning?
18           And you said you have issues when
19  it's dark?
20      A.   Yes.  Yes.
21      Q.   Okay.  Have other officers come to
22  help you?
23      A.   Officer Sandoval in 3A, Cell 10.  All
24  right?  No rails or anything by the bed, poor

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

76

1  circulation, oxygen deprivation, and I'm falling.
2       Q.   Did you have the prosthetic at the
3  time?
4       A.   I don't remember, but I know he had
5  to help me to keep me from falling.
6       Q.   Okay.
7       A.   And he used to have to bring a
8  sanitizer and cleansers just about every other
9  day when he worked to clean up my cell -- for me
10  to clean up the cell.
11      Q.   Okay.
12      A.   Clark had to do the same thing, and
13  he had to get the sanitation crew to come in and
14  sanitize and clean my cell more than one
15  occasion.
16      Q.   Because you had accidents?
17      A.   Yes.
18      Q.   Okay.  Did you request to go back to
19  Cell 10 at some point?
20      A.   No.
21      Q.   Have you ever requested to be in Cell
22  10?
23      A.   No.  There's no requests in here.  I
24  am incarcerated.  I'm a pre-trial detainee with

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 19

77

```
 1   no rights, no.
 2        Q.     Through a grievance or a Health
 3   Service Request Form did you ask at any point to
 4   go back into Cell 10?
 5        A.     No.
 6        Q.     Okay.  What happened with your
 7   prosthesis?
 8        A.     A better question than that is, what
 9   happened with my lower limb extremity.
10        Q.     Okay.  What happened with your lower
11   limb extremity?
12        A.     All right.  I told you I have a
13   filter inside of me that started working in
14   reverse which has caused severe swelling in both
15   my lower extremities, microscopic lesions, okay,
16   and not being able to put it on.
17        Q.     So you were not able to put -- are
18   you saying that because of the issues you were
19   not able to always put on your prosthetic leg?
20        A.     I can't wear it.
21        Q.     Okay.
22        A.     I'd love to wear it.  I'd love to
23   right now get up and praise dance for you.
24        Q.     Were you given by -- do you remember
```

79

```
 1   spray from the Jail?
 2        A.     Yeah, I sure do.
 3        Q.     Okay.  Do you remember when you
 4   started having hearing issues?  Was that at the
 5   Jail or prior to being at the Jail?
 6        A.     Being here.
 7        Q.     Okay.  With your swelling did you
 8   have swelling issues prior to coming to the Jail
 9   or since being at the Jail?
10        A.     Since being here.  Since being thrown
11   down.
12        Q.     Which time?
13        A.     How about all of the times.  Because
14   every time -- in 1972 when I first developed
15   thrombophlebitis, it was after a motorcycle
16   accident.  Oil slick.  And the whole weight of
17   the bike, and my leg went like this (indicating).
18   All right?  And every time I fall, I always -- my
19   legs swell up.  And then they put a filter in me
20   and it hasn't been working in 26 years, at
21   Jamaica Hospital.
22        Q.     At Jamaica Hospital?
23        A.     At Jamaica Hospital.
24        Q.     And that's in Queens, right?
```

78

```
 1   the name Dr. McCarthy?  Does that name sound
 2   familiar to you?
 3        A.     Yes, I remember Dr. McCarthy.
 4        Q.     Do you remember her giving you
 5   special socks and insoles so that your prosthesis
 6   would fit better?
 7        A.     Um-hmm.
 8        Q.     Okay.  Did you wear the prosthesis
 9   after that?
10        A.     Very limited, yes.
11        Q.     How limited?
12        A.     Maybe for about two and a half weeks.
13        Q.     And then what happened?
14        A.     Swelling severe, calcium deposit.
15        Q.     Okay.
16        A.     Nerve damage.
17        Q.     Have you ever had problems smelling
18   with your nose?
19        A.     Yes.
20        Q.     What's that problem?
21        A.     Sorry?
22        Q.     What was wrong with your nose?
23        A.     I can't answer that.
24        Q.     Okay.  Do you remember getting nose
```

80

```
 1        A.     Yes, Queens, New York.
 2        Q.     Have you ever had your filter fixed?
 3        A.     No.  Cook County won't do it.  They
 4   don't let me see an expert.
 5        Q.     Okay.
 6        A.     They're denying me all my rights.
 7        Q.     Did you ever try to get your filter
 8   fixed in 26 years?
 9        A.     It wasn't bothering me until I came
10   here and being thrown down.
11        Q.     Okay.
12        A.     And developing all these blood clots.
13        Q.     Now, in your Complaint that started
14   this case it states that you have fallen several
15   times, suffered several injuries including
16   chipped teeth.  When did you chip your teeth?
17        A.     About 14 or 16 months ago.
18        Q.     Can you explain what happened that
19   led to that?
20        A.     Dark cell, poor circulation, and I
21   fell in the morning.
22        Q.     In the morning?
23        A.     Um-hmm.
24        Q.     Were you trying to use the toilet or
```

Plaintiff's Exhibit 13 Page 20

81

```
 1   were you just --
 2        A.    I was by the toilet.
 3        Q.    Were you trying to use it or just
 4   used it or --
 5        A.    I was trying to get to it.  I
 6   asked -- I grieved -- I asked 'em to change the
 7   light in my cell because of my medical.  Give me
 8   a separate light switch because of my medical
 9   condition.  Denied, denied, denied, denied,
10   denied.
11        Q.    Did you have a cellie at the time?
12        A.    No.
13        Q.    Okay.  How often do you have cellies?
14        A.    I don't have a cellie at all.
15        Q.    Okay.  When you said you were by the
16   toilet, were you about to use the toilet or you
17   just happened to be near the toilet?
18        A.    No.  I was trying to go to the
19   toilet.
20        Q.    Okay.  And do you remember which cell
21   you were in?
22        A.    10.
23        Q.    You were in Cell 10.  Okay.
24              Do you remember if it was
```

82

```
 1   3A or 3E?
 2        A.    No, sorry, it wasn't 10.  It was Cell
 3   7 and it was 3A.
 4        Q.    Did anyone find you after you fell?
 5        A.    The medical staff and the sheriff.
 6   The sheriff and medical.
 7        Q.    And what happened?
 8        A.    Went to the dentist a few days later.
 9   There's a three year waiting list to get to the
10   dentist.
11        Q.    And you got three days later?
12        A.    I went to the dentist three days
13   later, yes.
14        Q.    Do you remember if it was a male or a
15   female dentist?
16        A.    I don't remember.
17        Q.    What did the dentist do?
18        A.    Fixed the broken teeth.
19        Q.    Okay.  And have you seen the
20   dentist -- did you see the dentist before that
21   had happened?
22        A.    That was my first dental experience
23   at Cook County.
24        Q.    And have you seen a dentist since?
```

83

```
 1        A.    Yeah, I had a tooth extracted.  Had a
 2   wisdom tooth extracted.
 3        Q.    Any other time?
 4        A.    Yeah.  I just went to the dentist I
 5   think it was about a week and a half, two weeks
 6   ago because of severe swelling in my jaw,
 7   extremely sensitive.
 8        Q.    Okay.  Now, besides the chipped teeth
 9   and -- have you ever suffered any physical
10   injuries from any of these falls?
11        A.    Yeah, I did.  And the only problem
12   with that is I was refused medical attention.
13   But OPR came and they investigated in Cell 10,
14   3A.  I was on the bed and they saw me
15   hemorrhaging and said they're giving me medical
16   attention.  And that was just a spin to get what
17   they needed from me, and they left me the same
18   way, abandoned, denied.
19        Q.    Did you injure yourself?
20        A.    I had been thrown down by Gavin.
21        Q.    Oh, that's the time that you were
22   thrown down by Gavin?
23        A.    Absolutely.
24        Q.    Okay.  So you didn't actually fall?
```

84

```
 1        A.    I was thrown down.
 2        Q.    You were thrown down.  Okay.
 3        A.    The walker was snatched from me.
 4        Q.    Okay.  So of the nine times --
 5        A.    How about close to 11.
 6        Q.    Close to 11 now?
 7        A.    It was close to 11.
 8        Q.    When were the last two times?
 9        A.    I don't remember exactly, but I know
10   it was close to 11 -- 9 to 11 times.
11        Q.    Okay.
12        A.    I grieved it all.  I also put in
13   medicals.
14        Q.    Okay.
15        A.    It's all there.
16        Q.    So of those times one of them was the
17   time with Gavin.
18        A.    Yeah.
19        Q.    Was there any other time that you
20   were thrown down, or were the others falls?
21        A.    With Tapia on the third floor.
22        Q.    Okay.
23        A.    With Reyes August 18th, 2016, 5:30
24   p.m.
```

Plaintiff's Exhibit 13 Page 21

85

```
1        Q.    Okay.
2        A.    Fourth floor.
3        Q.    Have you ever -- I'm sorry.  So you
4   wrote a grievance about falling out of your
5   chair.  Have you ever fallen out of your chair
6   just by being in your chair, or was it the time
7   that you were thrown out when you were snatched
8   from your --
9        A.    That's an ambiguous question.
10       MR. MORRISSEY:  I object to the form of the
11  question.  You can answer it if you can.
12  BY MS. CARROLL:
13       Q.    Let me rephrase.
14             Have you ever fallen out of your
15  wheelchair?
16       A.    Willfully?  Is that what you're
17  asking me?
18       Q.    On your own.
19       A.    Well, I'm asking you to make plain
20  what you're saying because it's ambiguous what
21  you're saying.
22       Q.    Have you ever just been sitting on
23  your wheelchair and fallen off of your
24  wheelchair?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

86

```
1        A.    Yeah, I did that.
2        Q.    When was that?
3        A.    At about 3:30 in the morning I'm at
4   the nurses' station, and a sheriff comes on the
5   tier that I used to sell drugs for his family --
6        Q.    Um-hmm.
7        A.    -- and started a bunch of nonsense.
8   And they were gonna remove me, and they weren't
9   gonna remove me.  No, they weren't gonna remove
10  me because I asked that man -- that I grieved it
11  that that man should stay away from me.
12       Q.    Okay.
13       A.    All right?  He's a drug enforcer and
14  he works here at Cook County, and I used to give
15  him money.  Yes, I stayed there until the
16  sergeant same to address the issue.  Corruption
17  in this damn place.
18       Q.    But you fell?  I don't understand
19  when you fell in --
20       A.    I'm saying that they were gonna drag
21  me and I refused to go.
22       Q.    So you purposefully --
23       A.    I turned around and slid myself off
24  that chair on purpose.  I refused to be locked up
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

87

```
1   until it was addressed because I had been asking
2   them for months to get that man away from me.
3        Q.    Okay.  Which man is this?
4        A.    Huh?
5        Q.    What is his name?
6        A.    Cross, sorry.  Cross.
7        Q.    Okay.
8        A.    I don't know his first name.
9        Q.    Okay.  So --
10       A.    But the cartel -- the Cross Cartel,
11  from Indiana to Illinois, I sold drugs for them.
12  All right?  Cross --
13       MR. MORRISSEY:  I don't think there's a
14  question pending, okay?
15       THE WITNESS:  Thank you, man.  Thanks, man.
16  BY MS. CARROLL:
17       Q.    I guess I hadn't realized that you
18  had sold drugs too.  I knew you did drugs.
19       A.    Man, listen, if you in the activity,
20  you in the activity.
21       Q.    Okay.  Now, you wrote a grievance
22  once, and if you want, I could show it to you,
23  but I'm going to ask right now about inmates
24  using parts of their wheelchairs as weapons.  Do
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

88

```
1   you remember that?
2        A.    No, I don't remember that.  May I see
3   it?
4        Q.    Yes.  We'll mark this as Exhibit No.
5   1.
6             (Deposition Exhibit No. 1,
7              Witness Roberts, was marked
8              for identification
9              12/09/2016.)
10            Is this your grievance?
11       MR. MORRISSEY:  Take your time and read it.
12  BY MS. CARROLL:
13       Q.    And does this look familiar to you?
14       A.    Yeah.
15       Q.    Is this your handwriting or someone
16  else's?
17       A.    It's mine, no question.
18       Q.    Okay.  And that's your signature?
19       A.    Yeah.
20       Q.    And that's from March 14, 2015?
21       A.    In fact, it's the same guy that did
22  all that lawsuit nonsense for me, the 50,000,000
23  and -- Joseph Felton.
24       Q.    Oh, so Felton wrote this, not you?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

89

```
1        A.    I wrote this.
2        Q.    Oh, you wrote this?
3        A.    I wrote it because Felton came at me
4   with the armrest.
5        Q.    Oh, Felton is the one who came at you
6   with the armrest?
7        A.    With the armrest at 4:30 in the
8   morning at medication.
9        Q.    Okay.
10       A.    I wrote it against him.
11       Q.    Okay.  I'm having trouble reading
12  this.  What were you saying in this?
13       A.    I was on my walker, all right?  I was
14  using my prosthetic.  Felton turned around and
15  played a con game on me, and him and I got into a
16  disagreement about $15 that he owed me.  And he
17  came out -- first I was let out because Cell 10
18  doors are -- that's the way I was going.  I came
19  out for my medication.  I was going back to the
20  cell with my walker, and Felton takes the armrest
21  off the wheelchair and is swinging at me with the
22  armrest.  And I had to lift my walker up to block
23  the armrest from hitting me and being struck by
24  Felton.  That's why that grievance is there.
```

91

```
1        A.    All over the -- all the divisions.
2        Q.    Okay.  But you've never done that?
3        A.    No, not when I know I'm gonna throw a
4   blood clot.  The first issue with blood clots I
5   had was in my lungs.
6        Q.    Okay.
7        A.    All right?  That's like someone
8   taking a shotgun and blowing your chest out or a
9   butcher knife and stabbing you.  No.  No.  I'd be
10  a fool to do something like that.
11       Q.    Okay.  Now, do you remember falling
12  on March 15th, 2015?
13       A.    I don't know.
14       Q.    Okay.
15       A.    I don't remember.
16       Q.    Do you remember falling on April 5th,
17  2015?
18       A.    Do you have more details than what
19  you're just doing right now?  I mean 'cause like
20  that's nothing what you're doing.
21       Q.    I'm just asking.  Based on the
22  medical records there was a fall on that day.
23       A.    I don't remember.
24       Q.    Okay.
```

90

```
1        Q.    Now, you say something that says,
2   "Inmates are falling out of wheelchairs for law
3   sues on purpose."
4        A.    Yeah.
5        Q.    What does that mean?
6        A.    A lot of guys deliberately do that.
7   They deliberately want to set up Cook County for
8   a lawsuit.  I'm not about that.
9        Q.    Have you witnessed that personally?
10       A.    Yeah, I watched it.  I watched it and
11  I've heard the inmates tell me that I should do
12  it.  I know better than to do it especially with
13  my medical condition.
14       Q.    Which inmates have you --
15       A.    It doesn't matter.
16       Q.    No, I'm asking.  Which inmates told
17  you that?
18       A.    It doesn't matter.  It doesn't
19  matter.
20       Q.    Okay.
21       A.    I respect that that's their choice,
22  that that's not my business.
23       Q.    Okay.  So that's something that's
24  done on the RTU?
```

92

```
1        A.    I have to see my writing and then I'd
2   be able to tell you.
3        Q.    Okay.  Now, how long do you think you
4   would go without seeing a medical doctor?  Have
5   you ever had problems not seeing a medical
6   doctor?
7        A.    Over nine months.
8        Q.    You've gone over nine months without
9   seeing a doctor?
10       A.    Absolutely.
11       Q.    And during that time did you see
12  nurses?
13       A.    I see nurses seven days a week.
14       Q.    Okay.
15       A.    Three times a day.
16       Q.    Now, what's the difference between
17  Cell 10 in 3E versus 3A?
18       A.    They're the same except the grab bar.
19       Q.    And which one has the grab bar to the
20  right side of the toilet?
21       A.    3A has it to the right.
22       Q.    And is that the one that's better for
23  you or worse for you?
24       A.    It's half and half, because with the
```

Plaintiff's Exhibit 13 Page 23

93

```
 1   poor lighting 3E is better for me because the
 2   security lights from the outside come into the
 3   cell and makes it a little easier for my
 4   visibility.
 5       Q.   Okay.
 6       A.   Because they won't change the fixture
 7   and give me a separate light switch because of
 8   what other guys have done setting the place on
 9   fire.
10       Q.   People have set the place on fire?
11       A.   Division 10 and the other divisions
12   had separate light switch at one point, but the
13   inmates would turn around and spark them and
14   started fires, so I'm being discriminated against
15   because of what somebody else did.
16       Q.   Okay.  Do you remember having an
17   altercation with someone in June of 2015?
18       A.   How many days are in that month?
19       Q.   Did you have many altercations?
20       A.   I don't remember.  I mean that's why
21   I'm asking you, because what you're telling to me
22   is very vague.
23       Q.   Well, do you remember -- how many
24   altercations have you gotten into with inmates
```

94

```
 1   since being at the CCDOC?
 2       A.   Actually maybe like three.
 3       Q.   Three?
 4            Was one of them with Felton?
 5       A.   I just told you, yes.  I grieved it.
 6       Q.   Okay.  What were the other two?
 7       A.   I don't remember.
 8       Q.   Okay.  Now, have you been given
 9   special classes like yoga and art therapy?
10       A.   That just started.  Art therapy --
11   yes, art therapy has been going on for awhile.
12       Q.   And yoga?
13       A.   Yes, that just started.
14       Q.   Okay.
15       A.   What about -- what about --
16   MR. MORRISSEY:  There's no question
17   pending.
18   THE WITNESS:  Thanks.
19   BY MS. CARROLL:
20       Q.   Now, do you know who Nurse
21   I-m-a-n-l-i-n-h-e-n is, Imanlinhen?  Does that
22   sound familiar?
23       A.   I don't know.
24       Q.   Have you ever had issues with a
```

95

```
 1   nurse, an altercation with a nurse?
 2       A.   No.  I spoke my mind.
 3       Q.   What do you mean?
 4       A.   Just what I said, I spoke my mind.
 5       Q.   Did you call her a bitch?
 6       A.   No, I don't call anybody a bitch.
 7       Q.   Okay.
 8       A.   That's not a part of the pimp's game.
 9       Q.   Okay.  At some point did you get a
10   new prosthetic leg?
11       A.   Yes.
12       Q.   When did you get the new prosthetic
13   leg?
14       A.   Last year.
15       Q.   Okay.  And how long did you use that
16   prosthetic leg?
17       A.   Until I couldn't use it any longer.
18       Q.   And when was that?
19       A.   I don't remember.  It was a few
20   months after.  Because I was supposed to go back
21   to have it adjusted and Dr. McCarthy declined to
22   have it adjusted.  They made me the first
23   prosthetic at 401 Harris.  I was able to praise
24   dance, and the prosthesis breaks right there in
```

96

```
 1   the office.  I had to sit and wait with the
 2   sheriffs for five hours for them to make me a new
 3   one.  And the person that made it told me to come
 4   back in two weeks.  Dr. McCarthy refused to let
 5   me go back.
 6       Q.   And this was last year?
 7       A.   Whatever date it was that they made
 8   the prosthetic, yes.  Because at that same time
 9   I put my old prosthesis in Property.
10       Q.   Okay.  So have you had a prosthetic
11   limb since?
12       A.   I got a prosthetic upstairs now, the
13   original one that I came in here with.  I can't
14   use it.
15       Q.   I thought you said you put it in
16   Property.  Did you get it back?
17       A.   I put the old one in Property, yes.
18   Sabrina had to bring it back.  ADA had to bring
19   it back.
20       Q.   When did she bring it back?
21       A.   A few months ago, but I can't use it.
22       Q.   Why can't you use it?
23       A.   Because there's severe swelling.
24       Q.   Okay.
```

Plaintiff's Exhibit 13 Page 24

97

```
1        A.    They're gonna have to make me another
2   one.  If they'd addressed my issues right, they
3   wouldn't have to go through these nonsense.
4        Q.    Okay.  When is the last time you used
5   your prosthetic leg?
6        A.    When Sabrina went and got it out of
7   Property.  I think that was about three months
8   ago or longer.  I went to court that day and she
9   met me downstairs in the bullpen area.
10       Q.    Okay.  Let's switch over to court.
11             How often do you go to court?
12       A.    That depends upon whether or not they
13  wanna bullpen me.
14       Q.    What do you mean by that?
15       A.    Bullpen therapy.  Promise you
16  something and violate your rights.
17       Q.    Okay.  Do you go to court
18  approximately once a month?
19       A.    No.
20       Q.    Last time?
21       A.    The last time I went to court was
22  approximately about three months ago.
23       Q.    Okay.  Which courtroom are you
24  assigned?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

99

```
1        A.    I learned to bring my own toilet
2   paper --
3        Q.    Okay.
4        A.    -- because they don't have it in the
5   bullpens, nor soap.
6        Q.    And I saw that you have -- do you
7   bring soap?
8        A.    I was bringing soap, yes.
9        Q.    Okay.  And it looks like a handheld
10  catheter type of bottle?
11       A.    I've got three of 'em.
12       Q.    You have three of them?  And did you
13  bring those to court?
14       A.    All the time.
15       Q.    Okay.
16       A.    'Cause my medical problems.
17       Q.    Okay.  Does your medical problems
18  cause you to use the bathroom more frequently or
19  less frequently?
20       A.    It depends upon -- it depends upon my
21  sugar level, my blood flow level.
22       Q.    Okay.  What is the procedure you use
23  when going to court in order to use the bathroom?
24       A.    Bowel movement, urinal.  I go into
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

98

```
1        A.    I'm assigned Judge Nicholas R. Ford,
2   702.
3        Q.    Are you in a wheelchair every time
4   you go to court?
5        A.    Yes.
6        Q.    Is that the same wheelchair that
7   you're using right now?
8        A.    No.
9        Q.    What's the difference?
10       A.    Harvey, he said I had his wheelchair.
11  It was a smaller chair than this.  It was a much
12  smaller chair.  But Harvey's like five foot
13  something, and this chair was too big for him, so
14  him and I exchanged chairs.
15       Q.    Harvey is the last name or first
16  name?
17       A.    It's his last name.
18       Q.    Okay.  The wheelchair that you use
19  for court, does it have toilet paper on it?  Do
20  you have -- right now you have toilet paper
21  attached?
22       A.    Um-hmm.
23       Q.    Does the wheelchair you use when you
24  go to court have toilet paper attached?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

100

```
1   the disabled part and use the urinal.  I dump it
2   out, wash it out with water and place it back.
3        Q.    Okay.  Where do you go?  Is that
4   Bullpen 34 or 5, or do you know what it's called?
5        A.    They've changed it all around because
6   I'm administrative.
7        Q.    Okay.
8        A.    I'm administrative, I'm protective
9   custody and I'm also disciplinary.  I don't
10  understand how I'm all three of those at the same
11  time, but I am.
12       Q.    Okay.  So are you -- you're housed
13  alone in a bullpen in the lower level of
14  Leighton?
15       A.    I was in RDC at first in the
16  accessible bullpen.  Then they started moving me
17  around to where new inmates come in, they're
18  still in their street clothes, and the bullpen --
19  the bullpen has no toilet.  It has nothing.  The
20  toilets are broken over in that area.  So then
21  they turned around now and I go downstairs to the
22  basement to Bullpen 17, depending upon whatever
23  they -- the officers feel like doing, or Bullpen
24  16 or Bullpen 26.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 25

*101*

```
 1      Q.   Okay.  Have you ever had an accident
 2  on yourself at court?
 3      A.   Yes.
 4      Q.   How many times?
 5      A.   About four.
 6      Q.   Do you remember when?
 7      A.   No.  I try to blank that out because
 8  of humiliation.
 9      Q.   Well, I'm going to need to ask some
10  questions about it.
11      A.   I'm telling you I don't remember the
12  dates.
13      Q.   Okay.  Do you remember what happened
14  the first time?
15      A.   How about diarrhea and feces -- and
16  urination.
17      Q.   And where were you specifically
18  located at the time?
19      A.   I was in the bullpen.
20      Q.   Which bullpen, behind the court or
21  lower level?
22      A.   Lower level.
23      Q.   And what happened before that?  Had
24  you asked to use the bathroom?
```

*102*

```
 1      A.   I was in a bullpen where there was
 2  accessible toilet.
 3      Q.   Okay.  But you still went on
 4  yourself?
 5      A.   Yes.
 6      Q.   Okay.  And then did they -- did any
 7  guards help you get a new uniform or anything?
 8      A.   No.
 9      Q.   No.
10           Did you go to court that day?
11      A.   I don't remember.
12      Q.   Okay.  The second time where were you
13  located when it happened?
14      A.   You know, I don't remember.
15      Q.   Okay.  Was it urination or defecation
16  or both?
17      A.   Sometimes the food is slop and it's
18  probably both.
19      Q.   Okay.  You don't remember
20  specifically?
21      A.   No.  For over a year I had diarrhea
22  three or four times a week because of the food.
23      Q.   And so even if you had a cell that
24  had handrails, would you still have a problem?
```

*103*

```
 1      A.   I'm in a cell now with handrails.
 2      Q.   Do you still have problems with the
 3  diarrhea?
 4      A.   Not as bad as I used to have.
 5      Q.   Okay.
 6      A.   I learned what not to eat.
 7      Q.   Okay.  Did you have diapers any of
 8  the times that you went to court and this
 9  happened to you?
10      A.   No, because they did a cell search
11  and they took all the medical supplies as
12  contraband and threw them in the garbage and then
13  recharge you for them when you have to get them
14  again.
15      Q.   What do you mean they charge you for
16  them?
17      A.   They double bill you.  It's all false
18  statistics in here, corruption.
19      Q.   They charge you for diapers?
20      A.   They turn around and mark you up for
21  it, yeah, all your medical supplies.
22      Q.   How do they charge you?
23      A.   Like, for example now, the foot
24  cream, okay, the foot cream you can't get it any
```

*104*

```
 1  longer.  You got to go through commissary.  All
 2  right?  But they turn around and the system is
 3  now that they're supposed to be taking it out of
 4  your trust fund account.  Different medical
 5  supplies and stuff like this here is being taken
 6  out of your trust fund account.
 7      Q.   Do they charge you for your
 8  appointments with doctors?
 9      A.   I don't know.  All I know is that
10  I've been in Cermak, and I watch 150 guys in 20
11  minutes refuse to go for medical in Cermak.
12      Q.   They're refusing medical?
13      A.   Yeah.  I don't blame 'em.
14      Q.   Do you refuse medical?
15      A.   No.  I want to go but they won't take
16  me.  They won't let me out of the cell.
17      Q.   Have you ever refused having your
18  vital signs taken?
19      A.   No.
20      Q.   Have you ever refused any other type
21  of medical --
22      A.   No.  No.  Absolutely not.
23      Q.   Okay.  Have you ever refused insulin?
24      A.   Yeah, I stopped taking insulin.
```

Plaintiff's Exhibit 13 Page 26

105

```
1        Q.    Okay.
2        A.    I definitely stopped taking insulin.
3   The reason being --
4        MR. MORRISSEY:  She didn't ask you.
5   BY MS. CARROLL:
6        Q.    How many times have you -- why did
7   you stop taking insulin?
8        A.    Okay.  The reason being my sugar
9   plummeted.  I had my sugar drop to 37, all right?
10       Q.    Okay.
11       A.    That's at diabetic coma, stroke
12  level.
13       Q.    Okay.
14       A.    When you take your insulin -- I've
15  taken insulin in the real world and I've taken
16  insulin in here, so I know the difference between
17  the two.
18       Q.    Okay.
19       A.    All right?  Everyone that takes that
20  insulin is overly hungry and no food.
21       Q.    Okay.
22       A.    You get half the allotted amount of
23  food.
24       Q.    Let's go back to on days that you
```

Dawn M. Lombardo, C.S.R.
(708) 296-7979

106

```
1   went to court.
2        A.    Yes, ma'am.
3        Q.    Did you ever have an accident when
4   you were up behind the courtroom?
5        A.    No.
6        Q.    Okay.
7        A.    No, because I go in and come right
8   out.
9        Q.    Okay.  So did officers take you
10  immediately upstairs for your court and then back
11  down?
12       A.    Yeah, after the waiting process and
13  whenever they would finish with the prior
14  inmates.
15       Q.    Okay.  Do sheriffs help you up and
16  down the ramp at Leighton?
17       A.    It depends upon which sheriff it is.
18       THE COURT REPORTER:  Are you saying --
19       MS. CARROLL:  Leighton, L-e-i-g-h-t-o-n.
20       THE WITNESS:  Where is Leighton?
21  BY MS. CARROLL:
22       Q.    The 26th and Cal Criminal Courthouse
23  next door.
24       A.    I got a letter from the Public
```

Dawn M. Lombardo, C.S.R.
(708) 296-7979

107

```
1   Defender, from Shelley Blair --
2        MS. CARROLL:  Don't give me any
3   information --
4        MR. MORRISSEY:  Don't talk about your
5   relationship with your attorney.
6        THE WITNESS:  But it's answering her
7   question, though, about not getting to court at
8   all because of no transportation.  I got
9   documentation.
10  BY MS. CARROLL:
11       Q.    So are you saying that there are
12  times that you didn't go to court because people
13  didn't take you up and down the ramps to --
14       A.    Months and months of that.
15       Okay.  How often do you use your
16  prosthetic when you go to court?
17       A.    If I could wear it, I'd wear it every
18  day.
19       Q.    But if not, then you just use a
20  regular wheelchair?
21       A.    (Indicating.)
22       Q.    Okay.  Have you ever told anyone that
23  you would get millions of dollars by suing the
24  Jail?
```

Dawn M. Lombardo, C.S.R.
(708) 296-7979

108

```
1        A.    No.
2        Q.    Has anyone ever told you you would
3   get millions of dollars by suing the Jail?
4        A.    (Indicating.)
5        MR. MORRISSEY:  He's already asked and
6   answered that question.
7        MS. CARROLL:  Well, I'm asking him again.
8   BY MS. CARROLL:
9        Q.    I'm asking.  Has anyone told you
10  that?
11       A.    No.
12       Q.    Okay.  You've never --
13       A.    I'm not interested in suing.  I'm
14  more interested in doing what God asks me to do.
15       Q.    Have you ever bragged to other people
16  that you could get millions of dollars by suing
17  the Jail?
18       A.    That is not my intention.  My
19  intention is to get the hell out of here.
20       Q.    Have you ever bragged about it?
21       A.    No.
22       Q.    Even to your brother on a phone
23  recording?
24       A.    Oh, yeah.  That's my brother, that's
```

Dawn M. Lombardo, C.S.R.
(708) 296-7979

Plaintiff's Exhibit 13 Page 27

109

```
 1   my family.
 2       Q.   Okay.
 3       A.   Because I see -- I see -- I see the
 4   corruption in this place.
 5       Q.   Okay.  And have you told him that you
 6   were going to get millions of dollars by suing
 7   the Jail?
 8       A.   Probably so.
 9       Q.   Okay.
10       A.   Because I wanted him to probably send
11   me some money.
12       Q.   Okay.  So have you heard of the Lacy
13   case?
14       A.   I don't even know what you're talking
15   about.
16       Q.   Have you heard of a bunch of people
17   in the wheelchairs suing the Jail?
18       A.   No.
19       Q.   Okay.  Does the name Marque Bowers
20   sound familiar to you?
21       A.   Yeah.  Bowers was in the same tier I
22   was.
23       Q.   Okay.  Have you talked to Bowers
24   about lawsuits?
```

110

```
 1       A.   No.
 2       Q.   What about Kevin Dawson?
 3       A.   Who?
 4       Q.   Kevin Dawson?
 5       A.   I don't even know who you're talking
 6   about.
 7       Q.   Harold Vaughan?
 8       A.   Vaughan -- Vaughan is in the same
 9   tier I was in.
10       Q.   Have you talked to him about
11   lawsuits?
12       A.   No.
13       Q.   Kenneth Farris?
14       A.   I don't even know who you're talking
15   about.
16       Q.   Maurice Boston?
17       A.   I don't even know who you're talking
18   about.
19       Q.   Okay.  Keith Martin?
20       A.   No.  No, I've never talked to Keith
21   about no lawsuits.  Keith and I were in the same
22   housing area, yes.
23       Q.   What about Nicholas Potter?
24       A.   I was in the bullpen with Potter
```

111

```
 1   yesterday.
 2       Q.   Okay.  Now, in any of the times that
 3   you have fallen did anyone ever witness the
 4   actual falls?  Not the times with the two
 5   officers, but the times where you just fell in
 6   your cell or --
 7       A.   Yeah, the sheriff staff and the
 8   nursing staff.
 9       Q.   Okay.  Any other inmates?
10       A.   Yeah, 'cause -- when I was in Cell 7,
11   3A, yes.
12       Q.   Who is the person that witnessed that
13   fall?
14       A.   I don't remember.  Definitely it was
15   witnessed by the whole tier.
16       Q.   Whole tier?
17       A.   The whole tier.
18       Q.   Any other time that anyone ever
19   witnessed you fall?
20       A.   I don't remember.
21       Q.   Okay.  When you defecated on yourself
22   at court, was there anybody -- you said you were
23   in a cell alone, is that correct, or was there
24   anyone in the cell with you?
```

112

```
 1       A.   When I had the accident?
 2       Q.   Yeah.
 3       A.   I was in with other inmates.  I was
 4   in mixed population which I shouldn't have been
 5   in.
 6       Q.   Do you remember any of the people?
 7       A.   I don't remember people like that.
 8       Q.   Okay.
 9       MS. CARROLL:  I don't have any other
10   questions.  Patrick?
11           EXAMINATION
12   BY MR. MORRISSEY:
13       Q.   Did you have a court appearance
14   yesterday, Mr. Roberts?
15       A.   Yes.
16       Q.   Okay.  Tell us about that.
17       A.   I went for a psych eval yesterday.
18       Q.   Where were you held prior to your
19   evaluation?
20       A.   I was held between where the ramp
21   goes up, and the area -- there's an area there
22   it's a big bullpen, and I was held on the
23   outside.
24       Q.   Approximately how long were you held
```

Plaintiff's Exhibit 13 Page 28

113

```
 1   on the outside?
 2       A.    For over an hour and a half.
 3   MS. HUFF:  How long?
 4   THE WITNESS:  Over an hour and a half.
 5   MS. HUFF:  I'm sorry?
 6   THE WITNESS:  Over one hour and a half.
 7   MS. HUFF:  Thank you.
 8   BY MR. MORRISSEY:
 9       Q.    Is there a ramp that leads up to the
10   courthouse?
11       A.    Yes, there is.
12       Q.    Describe the ramp for us.
13       A.    It's got maybe a .45 degree incline
14   and then maybe 150 to 200 feet going up.
15       Q.    Have you ever went up the ramp
16   without assistance?
17       A.    Yes, I have.
18       Q.    Have you ever maneuvered down the
19   ramp without assistance?
20       A.    Yes, I have.
21       Q.    Ever been times when you attend court
22   where you were required to get out of your
23   wheelchair?
24       A.    Yes.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

115

```
 1   is and lean myself on the railing to lower myself
 2   to the toilet.  And then I gotta do the same
 3   thing in reverse to get back up.
 4       Q.    Did the grab bars help you to
 5   transfer to the toilet when you were in --
 6       A.    I couldn't do anything if they
 7   weren't there.
 8       Q.    All right.  There have been times
 9   when you were in cells on the third floor of the
10   RTU that did not have grab bars?
11       A.    Yes.
12       Q.    And did you fall -- did you have
13   falls while trying to transfer to a toilet
14   without --
15       A.    Yes, I did.
16       Q.    Did you ever file grievances about
17   these falls when attempting to toilet?
18       A.    Yeah.  Yeah, I did.  I don't know
19   whether or not they were processed though.
20       Q.    What do you mean?
21       A.    The C.R.W. department is corrupt, all
22   right?  The C.R.W. worker, she's -- I don't know
23   if she's here.  They may have moved her to
24   another division, I don't know.  Justine, she
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

114

```
 1       Q.    Tell us about that.
 2       A.    I was going upstairs for a psych
 3   eval, my leg wasn't swollen.  The transportation
 4   officer is not using diligence or discipline, and
 5   we go down, we leave the bullpen area and go
 6   about 500 feet, and there's a -- there's a
 7   stairwell that goes down, and he's got the other
 8   inmates with him and we're going upstairs to the
 9   tenth floor.  And we take -- there's stairs.  We
10   go down the stairs.  I have to walk down the
11   stairs while other inmates carry the wheelchair.
12   And I grieved it, and the answer that I got --
13   never mind.
14       Q.    On the third floor are there two
15   cells, to your knowledge, with grab bars there?
16       A.    Yes.
17       Q.    Describe how you use the grab bars
18   when you're in a cell with grab bars, the toilet.
19       A.    I have to go like this, reach like
20   this here, lock my chair, reach like this, all
21   right, push myself up, all right, and stand on my
22   leg and balance -- and balance on the wall, all
23   right (indicating).  And then I have to maneuver
24   and hop and turn myself to where the other rail
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

116

```
 1   took over 500 of my grievances, took them out of
 2   the grievance box, and I never got them back for
 3   over a year.  She stole over 500 of my
 4   grievances.
 5   MR. MORRISSEY:  All right.  Thank you.  Let
 6   me just review my notes, Mr. Roberts.  I think
 7   I'm almost done.
 8   THE WITNESS:  Sure.
 9   BY MR. MORRISSEY:
10       Q.    Mr. Roberts, do you remember being
11   housed on 3E, Cell 6?
12       A.    Yes.
13       Q.    Did that cell have grab bars?
14       A.    No.
15       Q.    Do you recall being housed on 3A,
16   Cell 7?
17       A.    Yes.
18       Q.    Do you know whether that cell has
19   grab bars in the toilet?
20       A.    No.
21       Q.    Do you recall being assigned to Cell
22   3A -- I'll rephrase it.
23           Do you recall being assigned to
24   Tier 3A, Cell 6?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 29

117

```
1       A.    Yeah.
2       Q.    Do you recall whether that cell had
3  grab bars?
4       A.    It had no grab bars, and the way the
5  toilet -- the way the toilet design is I
6  couldn't -- I couldn't -- I couldn't use the
7  toilet at all.  The only way I was able to manage
8  to use the toilet was with the wheelchair.  The
9  minute they took the wheelchair away from me they
10 had to transfer me out of the cell because I used
11 the wheelchair to pull up to transfer.
12      MR. MORRISSEY:  I have nothing further.
13      MS. CARROLL:  A couple questions.
14              EXAMINATION
15 BY MS. CARROLL:
16      Q.    Have you ever fallen while going to
17 court?
18      A.    No.
19      Q.    Have you ever fallen down the ramp?
20      A.    No.
21      Q.    Now, you said something about walking
22 down the stairs?
23      A.    Yes.
24      Q.    Were you able to walk down those
```

119

```
1       Q.    Did you ever -- is there a ring bell
2  or a buzzer that you can ring to --
3       A.    Yes, I rang it.  Trust me, I rang it.
4       Q.    Okay.  How often did this happen?
5       A.    It happened quite a bit.
6       Q.    Okay.  So in the time that you've
7  been incarcerated since 2014 to date, are you
8  saying that you're not allowed out of your cell
9  into the dayroom for an extended period of time?
10      A.    I am allowed out of my cell now.
11      Q.    Okay.
12      A.    Sergeant Bogenhagen (phonetic) that
13 just brought my lunch --
14      THE COURT REPORTER:  What was the name?
15      THE WITNESS:  Sergeant Bogenhagen, he just
16 brought my lunch.
17           The toilet backed up, all right,
18 3E, Cell 6.  They have a plumbing problem.  The
19 toilet backed up.  I'm complaining to them.
20 They're saying that I'm gonna sabotage and flood
21 the deck, which doesn't even make no sense not in
22 my medical condition, all right?  Every time I
23 fall I develop blood clots within two weeks.  You
24 asked me.  Please --
```

118

```
1  stairs?
2       A.    Sorry?
3       Q.    Were you able to walk down those
4  stairs?
5       A.    Yes.  My leg wasn't swollen.
6       MS. CARROLL:  Okay.  Nothing further.
7              EXAMINATION
8  BY MS. HUFF:
9       Q.    When you were on the third level in
10 either 3E or 3A, how often were you allowed out
11 of your cell?
12      A.    Sometimes I wasn't allowed out for 72
13 hours to 80 hours.
14      Q.    Now, what was a typical day like?
15      A.    18 hours of reading the bible.
16      Q.    Okay.  It's my understanding that
17 there's six hours out, is that correct, or no?
18      A.    It wasn't for me.
19      Q.    Okay.  How many hours were you
20 allowed out in a day?
21      A.    None.
22      Q.    Ever?
23      A.    I couldn't even use the accessible
24 toilets.
```

120

```
1       Q.    Well, I guess that you're not
2  responding to my question.
3       A.    What is your question?
4       Q.    On a typical day how many hours are
5  you allowed out of your cell?
6       A.    I wasn't allowed out at all for
7  weeks, for months.
8       Q.    When was that?
9       A.    And then -- I grieved it.
10      Q.    I understand that.  When was this to
11 the best of your recollection?
12      A.    I was -- I don't remember the dates
13 now.
14      Q.    On a typical day are you allowed out
15 of the cell into the dayroom?
16      A.    Yes, now I am.  Now I am.
17      Q.    How long has that been going on?
18      A.    Since I transferred over from A to E.
19 Because of my grieving process Superintendant
20 Brown had to back down off that administrative
21 nonsense.
22      Q.    Okay.  And you said there's
23 accessible toilets in the bathrooms on 3E and 3A?
24      A.    In the dayroom.
```

Plaintiff's Exhibit 13 Page 30

121

```
 1        Q.    In the dayroom?
 2        A.    Yeah.
 3        Q.    And there are buzzers for inmates to
 4   use?
 5        A.    Yeah, but the officers don't respond
 6   to them.
 7        Q.    Do you have any specific officers
 8   that you're aware of that don't respond to those
 9   buzzers?
10        A.    Yeah, Barine (phonetic) didn't.
11        Q.    Okay.  And was Barine a male or a
12   female?
13        A.    Male.
14        Q.    And what shift does Barine work?
15        A.    Barine -- it depends if they're
16   working overtime.  Barine would work -- Barine
17   rotates at times.  Barine --
18        THE COURT REPORTER:  Are you saying Barine
19   or Varine?
20        THE WITNESS:  I think it's Barine.
21             It was from 7:00 to 3:00.
22   BY MS. HUFF:
23        Q.    Okay.  And how often did Barine deny
24   you the ability to get out of your cell?
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

123

```
 1        Q.    The white shirt doesn't like that you
 2   sing that?
 3        A.    Pena didn't like it.
 4        Q.    The officer?  So she would deny you
 5   the ability to come out --
 6        A.    He.
 7        Q.    He would deny you the ability to come
 8   out of your cell?
 9        A.    And he relayed it to the chain of
10   command, and the chain of command would because
11   of my religious rights.
12        MS. HUFF:  I have no further questions.
13        MS. CARROLL:  I have nothing.
14        MR. MORRISSEY:  We'll waive.
15        MS. CARROLL:  Okay.
16        MS. HUFF:  Thank you for your time.
17        THE WITNESS:  Thank you.
18             FURTHER DEPONENT SAITH NOT .....
19
20
21
22
23
24
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

122

```
 1        A.    It wouldn't have to be Barine.  It
 2   would be multiple officers depending upon the
 3   white shirt that was over them.
 4        Q.    Okay.  Do you know any other officers
 5   by name that denied you the ability to get out of
 6   your cell?
 7        A.    Yes, Pena.
 8        Q.    Okay.
 9        A.    I don't know.  It's a Mexican guy.  I
10   don't remember -- oh, Corona, Aguilar or
11   something like that.  I don't remember how to
12   spell his name.
13        Q.    And what white shirt would be over
14   them?
15        A.    Bogenhagen, the one that just brought
16   me my lunch.
17        Q.    And what did that white shirt have
18   against you?
19        A.    What Pena had said about me and my
20   praise and worship.
21        Q.    And what is that?
22        A.    Hallelujah, hallelujah, hallelujah,
23   hallelujah, hallelujah, hallelujah, hallelujah.
24   I could go on and on.
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

124

```
 1   STATE OF ILLINOIS      )
                            )  SS:
 2   COUNTY OF C O O K      )
 3        I, Dawn M. Lombardo, Certified
     Shorthand Reporter in and for the County of Cook
 4   and State of Illinois, do hereby certify that
     JAMES ROBERTS was duly sworn by me to testify the
 5   whole truth, and that the foregoing deposition
     was recorded stenographically by me and was
 6   reduced to computerized transcript under my
     direction, and that the said deposition
 7   constitutes a true record of the testimony given
     by said witness.
 8
 9        I further certify that the reading
     and signing of the deposition was waived by the
10   deponent's counsel.
11        I further certify that I am not a
     relative or employee or attorney or counsel of
12   any of the parties, or a relative or employee of
     such attorney or counsel, or financially
13   interested directly or indirectly in this action.
14        IN WITNESS WHEREOF, I have hereunto set
     my hand at Chicago, Illinois, this 19th day of
15   December, A.D. 2016.
16
17
18
19
20
21
22
23   _____
          Illinois CSR License 084-001879
24
```

*Dawn M. Lombardo, C.S.R.*
*(708) 296-7979*

Plaintiff's Exhibit 13 Page 31

Inter-Agency Agreement

Between

The Office of the Sheriff of Cook County

And

The Cook County Health and Hospitals System

### Introduction

The Sheriff of Cook County, an elected official, is responsible for operating the Cook County Department of Corrections (CCDOC), which includes the Cook County Jail (CCJ). The Cook County Health and Hospitals System (CCHHS), through its affiliate, Cermak Health Services of Cook County (Cermak), is responsible for provision of health care and mental health care services to detainees incarcerated in the CCDOC jail complex at 26th and California. This is exclusive of non-resident programs. The Facilities Management Department of Cook County is responsible for renovation and maintenance of CCJ's physical plant. This Department is subsidiary to the County's Department of Capital Planning.

The scope of this agreement shall be limited to Cermak's operations at the CCDOC. The mission of CCDOC is "to ensure the safety of the citizens of Cook County, correctional staff and detainees; to provide a central location for the screening and classification of all defendants and a safe, secure, humane, positive, efficient and constitutionally-operated corrections department with a highly qualified, well-trained and dedicated staff." The mission of Cermak is "to provide quality, timely, and cost-efficient [health care] services to the detainees at the Cook County Department of Corrections … in accordance with acceptable community standards, accreditation, and regulatory requirements." These health care services include medical, mental health, and dental care.

Cermak, for its part, agrees to comply with the security rules and regulations of the CCDOC. CCDOC, for its part, agrees to respect the medical autonomy of Cermak. Further, Cermak and CCDOC acknowledge their mutual responsibility and interdependence in meeting the health care needs of detainees consistent with the safety and security of detainees and staff. The two parties also acknowledge their mutual responsibility and interdependence in meeting the pertinent standards of accrediting bodies, including the National Commission on Correctional Health Care and the American Correctional Association, as well as all applicable local, state and federal laws and regulations.

Although health care and security issues require a degree of separation in all correctional facilities, inter-agency collaboration is essential to effective operations in each of these two areas. The purpose of this agreement is to delineate mutual responsibilities and to promote coordinated action of two partnering agencies of Cook County government, CCDOC and Cermak, in providing health care services to detainees of the Cook County Jail.

Plaintiff's Exhibit 14 Page 1

## Definitions

"CCJ" or "the facility" shall refer to the Cook County Jail and shall include Divisions I-XI, Cermak Infirmary, the Receiving, Classification, and Diagnostics Center ("RCDC") , as well as any facility that is built, leased, or otherwise used on the CCJ compound to replace or supplement any of these existing buildings.

"Detainee" or "detainees" or "inmate" shall be construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at either the existing facility or any institution that is built or used to replace CCJ or any part of CCJ.

"Cermak Administration" shall refer to the Chief Operating Officer and the Chief Medical Officer of Cermak Health Services.

"Cermak Services" shall refer to medical care, dental care or mental health services provided on site at the CCJ by Cermak Staff.

"Cermak Staff" for purposes of this Agreement, shall include employees, contractors, trainees, volunteers and students.

"CCDOC Administration" shall refer to the Executive Director of CCDOC or his designee.

## Scope of Cermak's Services and Obligations

Cermak, including any contract providers to it, is the sole entity responsible for the delivery of health care to detainees of CCDOC. Cermak will design, organize, manage, direct, and supervise, under the terms of this Agreement, the health care delivery system for detainees, in order to provide access for detainees to medical, mental health, and dental care, in compliance with all applicable laws, regulations, and standards, as well as the provisions of this Agreement. Matters of medical, mental health, and dental judgment are the sole province of the responsible Cermak professional.

The Chief Operating Officer of Cermak is the designated health authority and is responsible for providing quality health services to detainees at CCJ who require such services while in custody. Final medical judgment rests with Cermak's Chief Medical Officer, a licensed physician who is the responsible physician for the facility.

The services to be provide by Cermak and the obligations of Cermak include, but are not limited, to the following:
- Operate a system of delivery of medical, mental health, and dental care to detainees that meets all federal, state, and local laws and regulations, as well as applicable consent decrees and agreed orders;
- Develop mutually acceptable policies and procedures to accommodate both security requirements and clinical needs for professional practice;

Plaintiff's Exhibit 14 Page 2

- Screen each detainee entering the CCDOC at time of intake for medical or mental health issues;
- Designate the level of health services appropriate for each detainee to CCDOC in order to house each individual in an appropriate living unit that can meet his or her health care needs;
- Evaluate the health status of detainees placed in segregation and determine whether health needs require special accommodation or contraindicate the placement;
- Coordinate with the Office of the Sheriff to plan and review new-officer and in-service trainings for CCDOC personnel in areas such as suicide prevention, first aid and cardiopulmonary resuscitation, recognition of acute manifestations of certain medical and mental health problems, precautions and procedures with respect to communicable diseases, and procedures for appropriate referral of detainees with health complaints to health staff;
- Collaborate with CCDOC on its health and mental health training needs;
- Collaborate with CCDOC and Department of Capital Planning in capital planning and facility design for clinical service areas and medical support areas;
- Collaborate with CCDOC in design and implementation of information systems;
- Provide CCDOC with reports and information needed for statistical purposes;
- Conduct mission-oriented research studies on the health status and needs of the correctional population, in order to improve the health care services to be provided in the future;
- Provide environmental services for designated medical work areas;
- When medically necessary, provide a medical attendant to accompany correctional escort for inmate movement;
- Inform CCDOC in advance of any prospective changes in Cermak's operations that have the potential to affect CCDOC operations or that may affect, directly or indirectly, access to care or the delivery of health care services;
- Provide timely medical evaluation and information to the CCDOC related to use-of-force allegations in a standardized format;
- In cooperation with public health authorities, conduct outbreak investigations for facility wide contagious disease outbreaks;
- Notify CCDOC of persons with communicable diseases including ectoparasite infestations that may pose a threat to the health of other detainees or staff;
- Provide initial emergency-only medical care to officers and refer them to an appropriate level of follow up care;
- Provide utilization review of transfers, specialty consultations, hospitalizations and internal movement associated with Cermak services so that unnecessary movement can be eliminated;
- Provide utilization review of special diets on a regular basis;
- Monitor medication utilization by detainees in order to reduce hoarding and abuse of medication;
- Require that all Cermak employees adhere to CCDOC security rules and regulations;
- Participate in CCDOC meetings as requested;
- Notify CCDOC regarding any breach of security rules by Cermak staff;

Plaintiff's Exhibit 14 Page 3

- Develop mutual policy and procedure with CCDOC to maintain sharps, tool, and key control in accordance with CCDOC security needs;
- Cermak will require, in cooperation with the CCDOC, training to all Cermak staff in security precautions to provide services in the jail environment;
- Cermak shall establish a policy and procedure for requesting health care services; and
- Consistent with applicable law, provisions of the Agreed Order, and lawful court orders, Cermak shall provide CCDOC all information and assistance necessary for responding to a detainee grievance in a full and timely manner.
- Cermak will prescribe medically necessary aids to impairment based on a physical evaluation of the inmate. Where the use of a specific aid to impairment is contraindicated for security concerns, alternatives will be developed in collaboration with CCJ so the health needs of the inmate are met.

### Scope of CCDOC's Services and Obligations

CCDOC is the sole entity responsible for the custody of detainees, which includes their physical safety and security, housing, transportation, nutrition, recreation, and education, among others.

The Executive Director of the CCDOC, acting on behalf of the Cook County Sheriff, is the custodian of the CCJ and is responsible for working cooperatively with Cermak to provide access to quality health services to those detainees at CCJ who require such services in a manner that is consistent with the safety and security of staff and detainees. Final judgment with regard to safety and security matters rests with the CCDOC Executive Director.

The services to be provided by CCDOC and the obligations of CCDOC include, but are not limited, to the following:
- Provide security to detainees and to Cermak staff  as well as to their property and equipment;
- Present each detainee entering the CCDOC at time of intake for medical and mental health screening;
- CCDOC will provide, in cooperation with Cermak, training toCermak staff in security precautions needed to provide services in the jail environment;
- Provide access and security sufficient to permit Cermak staff to deliver safe and effective health services in a manner that complies with the Agreed Order dated May 13, 2010 in the matter of United States of America vs. Cook County, Illinois, et al., Civil No. 10 C 2946 and applicable accreditation and regulatory standards;
- Accommodate reasonable Cermak timekeeping systems and provide timely employee entrance screening so as to not unduly delay the employee starting their shift;
- Provide reasonable privacy to Cermak staff when they are conducting medical interviews and evaluations of detainees;
- When CCDOC personnel are assigned to health care areas they will respect medical privacy, adhere to medical or mental health procedures within that unit, will be stationed at the security post and will be respectful of the medical decorum on the unit.
- Participate with Cermak in a coordinated approach to the delivery of health care to detainees;

Plaintiff's Exhibit 14 Page 4

- Develop mutually acceptable policies and procedures to accommodate both security requirements and clinical needs for professional practice;
- Provide detainees with access to health services during lockdowns for medical emergencies, urgent medical visits, off-site specialty visits, chronic illness visits, and medication distribution;
- CCDOC will accommodate secure locked boxes in each living unit, and make readily available forms provided by Cermak, for use by detainees in making health care service requests;
- House detainees in living units that that will accommodate their medical or mental health condition as designated by Cermak staff;
- Develop policies and procedures for timely notification of Cermak when detainees with high acuity medical and mental health conditions are transferred from one living unit to another;
- Provide notice of planned shipment to an IDOC facility as soon as possible after the planned shipment is known to CCDOC so that appropriate medical notification can be provided to IDOC;
- Escort detainees and health care staff as needed in a timely manner:
  - detainees moving to health care areas for appointments, visits, tests, treatments, and other purposes, both inside and outside the compound of CCJ;
  - health staff making rounds or passing medications on living units, including segregation areas;
- In the event that an inmate decides to refuse scheduled health care services, escort the inmate to the medical unit so that health care personnel can inform the inmate of potential health consequences of refusal; however, if an inmate refuses to be escorted to the medical unit, no cell extraction shall occur but an incident report shall be provided to Cermak and a disciplinary ticket shall be issued to the inmate, subject to amendment of the CCDOC disciplinary code;
- Provide adequate space within which Cermak can provide health care, dental care and mental health services, including space for clinical areas, programming areas, medical support areas, and administrative areas, including office space for staff;
- Provide special medical diets for detainees who may require them, as ordered by medical or dental staff, or as required by Court Order;
- Provide adequate hygiene supplies for detainees, including such items as toothpaste and toothbrushes, soap, towels, and toilet paper, as well as access to grooming aids such as nail clippers;
- Provide extra changes of uniforms, linens, and bedding for detainees with ectoparasite infestation, as ordered by Cermak staff members;
- Upon notice from Cermak that a determination has been made that an aid to impairment is medically necessary to a detainee, CCDOC shall permit detainees to retain and use canes, crutches, walkers, wheelchairs, and other such aids to impairment, as ordered and periodically reviewed by Cermak staff members. Where the use of a specific aid to impairment is contraindicated for security concerns, alternatives will be developed in collaboration with Cermak so the health needs of the inmate are met.
- Collaborate with Cermak in capital planning and facility design for clinical service areas and medical support areas;
- Collaborate with Cermak in design and implementation of information systems;

Plaintiff's Exhibit 14 Page 5

- Facilitate data transfer to Cermak information systems to include information necessary for provision of Cermak services;
- Permit reasonable access to the correctional information system;
- Conduct disciplinary hearings when detainees use abusive or disrespectful language to a Cermak employee, contractor, or volunteer;
- Inform Cermak in advance of any prospective changes in CCDOC's operations that may affect, directly or indirectly, the provision of health services. Such changes may include, but are not limited to,
  - Change in mission of a housing unit that may affect health care delivery;
  - Plans to build a new housing unit or to deactivate an existing unit;
  - Plans to rehabilitate or refurbish a housing unit or tier;
  - Changes in detainee schedules that may interfere with medication administration, meal times, or other aspects of the medical regimen;

It is jointly understood by Cermak and CCDOC that a third agency of Cook County government, Facilities Management, is responsible to maintain, repair, or remodel the physical plant as needed to support operations of both Cermak and CCDOC.


**Forensic Testing, Custody Functions, and Restraints**

Unless requested by the subject and approved by the Cermak COO, Cermak staff will not be asked to engage in forensic testing. Cermak will not be asked to assist in restraining any detainee physically or chemically for custody purposes. Medical restraints (restraints used by health providers for health care purposes) shall only be applied and used under the supervision and orders of appropriate medical staff. Consistent with each agency's directives on use of force and restraints, custody staff will assist medical staff upon request in the application of medical restraints when needed.

**Contracting**

In order to provide health care services to detainees, Cermak may utilize CCHHS providers or may contract for certain services rather than providing them directly. Cermak will require that all contractors and volunteers who work within the CCJ compound comply with security regulations.

CCDOC will not appoint or contract with any other entity, public or private, to provide any health care services that are provided by Cermak under the present Agreement.

**Policies and Procedures; General Orders**

Cermak and CCDOC each will make available to the other agency its complete manual of institutional policies and procedures (termed General Orders in the case of CCDOC). Each agency will deliver to its counterpart all revisions to individual policies or General Orders as they are issued.

Plaintiff's Exhibit 14 Page 6

For new or revised General Orders that involve or affect health care operations, CCDOC will consult with Cermak Administration before finalization. Similarly, for new or revised Policies and Procedures that involve or affect custody operations, Cermak will consult with CCDOC Administration before finalization. Both parties shall work cooperatively to develop mutually consistent policies which address issues requiring communication and cooperation between the parties such as a Medication Administration and Distribution.

Cermak and CCDOC will each adopt a zero tolerance policy relating to sexual abuse.

**Forums for Communication and Coordination**

Leadership of CCDOC and Cermak will meet together at least quarterly, or more frequently if necessary, to address and resolve issues of joint concern. Also, each party, CCDOC and Cermak, will invite a representative of the other agency to standing and special meetings of its own leadership team. CCDOC and Cermak will jointly establish an Inter-Agency Quality Improvement Committee that will meet monthly to monitor this agreement and to focus on areas where interdisciplinary collaboration between custody and health care staff has been identified to be important, including a Suicide Prevention Committee. This Quality Committee will invite the Department of Facilities Management to these meetings to monitor facility issues of concern related to this agreement.

CCDOC and Cermak will develop a mechanism for rapidly and simultaneously disseminating essential information to both custody and health care staff through CCDOC superintendents and Cermak department heads.

Each party acknowledges its duty to negotiate in good faith on all matters relating to this Agreement, including resolution of any dispute that may arise in the performance of the Agreement. Whenever possible, disputes related to a party's performance of its obligations will be discussed and resolved immediately at their point of origin through open and frank discussion of the issues in a sincere attempt to find resolution. If resolution is not possible at the point of origin, each party may use the chain of command for its agency so that resolution can be achieved between corresponding individuals at a higher level. In the unlikely event that a dispute cannot be resolved at any lower level, final resolution will take place at the level of the Sheriff of Cook County and the Chief Executive Officer of CCHHS.

**Role of the Medical Advocate**

The Sheriff of Cook County or the Executive Director of CCDOC may designate one or more staff members to serve as health care ombudsmen or medical advocates. The principal duties of this position will be to identify health care concerns, to identify systems issues, to gather pertinent information from a detainee, groups of detainees, or others concerned on a detainee's behalf, to notify appropriate parties at Cermak regarding these concerns, and to assist detainees in understanding their rights and responsibilities regarding health care. In this capacity, the medical advocate(s) will serve as a liaison between CCDOC and Cermak for resolution of these health care concerns. Cermak recognizes the positive role of the medical

Plaintiff's Exhibit 14 Page 7

advocate. The medical advocate(s) will work collaboratively with Cermak staff in performing their duties and Cermak staff will likewise work collaboratively with the medical advocate(s).

## Grievances

CCDOC and Cermak will collaborate in the grievance process so that all health related grievances lodged by detainees are responded to in a timely manner. CCDOC will promptly deliver to Cermak, and Cermak will promptly respond to, all health related grievances lodged by detainees.

## Disclosure of Protected Health Information and Security Information

The parties to this agreement will comply with all applicable federal, state and local laws and regulations and lawful court orders with regard to the disclosure and use of a detainee's health information, including but not limited to the Health Insurance Portability and Accountability Act (HIPAA) and applicable Illinois statutes such as 735 ILCS 5/8-802.

Consistent with and subject to these laws, applicable provisions of the Agreed Order, and lawful court orders, Cermak shall disclose to the CCDOC the relevant protected health information for use in safeguarding the health and safety of detainees, officers, employees and others at the CCJ for, but not limited to, the following purposes:

- Provision of health care to inmates
- Determining medically appropriate classification, housing, and work assignments;
- Determining a detainee's ability to participate in programmatic activities;
- Determining whether an detainee is dangerous to self or others;
- Investigating and responding to grievances from an individual detainee regarding his health care services;
- Investigating and responding to complaints from a third party about the health care services provided to an detainee;
- Performing contact tracing for suspected exposure to communicable diseases within the jail;
- Transporting or transferring detainees from CCJ to another correctional facility;
- Investigating incidents of use of force by correctional officers and incidents of detainee-on-detainee violence;
- Conducting multidisciplinary morbidity and mortality reviews for quality improvement;
- Maintaining the safety, security, and good order of CCJ;
- Information necessary on the use of force report; and
- Evaluation of detainees for segregation status or special housing status.

Any protected health information shared among the parties pursuant to this Agreement may not be further disclosed to other parties except as permitted by law. Any party disclosing any protected health information in violation of this clause and/or the applicable laws and regulations will bear the full legal responsibility for said disclosure.

Plaintiff's Exhibit 14 Page 8

The medical advocate will be authorized to review health records of a detainee if the detainee has signed a written release of health information or if release of such records is otherwise permitted under applicable law.

The parties shall work together to develop policies and procedures as needed to articulate and achieve compliance with the patient confidentiality provisions described in this Agreement, including the provision of appropriate training and documentation.

CCDOC will disclose to Cermak reports necessary to conduct appropriate mortality review.

Cermak will not disclose appointment dates to detainees.

**Medical Disaster Plan**

CCDOC and Cermak agree to prepare jointly a medical disaster plan to address the medical aspects of disasters such as riots, mass arrests, tornado, fire, flooding, and/or lack of power or water for extended periods of time. The Medical Disaster Plan will make provisions for the following:
- Staffing
- Communications
- Safety and security of detainees and staff
- Triage areas and procedures
- Access to medical records
- Transportation
- Evacuation procedures

Cermak and CCDOC will cooperate with the organization and execution of any types of drills and trainings necessary for readiness to implement the Medical Disaster Plan effectively.
Cermak and CCDOC will periodically review the Medical Disaster Plan and agree on any changes necessary to same. Any such changes will be in writing and amply distributed to all involved personnel.

**Term of agreement**

This Agreement will commence with the date of approval by the Sheriff of Cook County and the Board of Directors of the Cook County Health & Hospitals System and shall continue until terminated by at least six months' written notice of either party. It shall be reviewed by both parties and shall be revised annually or more frequently if necessary, based on joint agreement between the two parties.

Plaintiff's Exhibit 14 Page 9

**IN WITNESS WHEREOF, THE PARTIES HEREBY EXECUTE THIS AGREEMENT:**

**COOK COUNTY HEALTH AND HOSPITALS SYSTEM:**
*This Agreement was approved by the Board of Directors*
*Of the Cook County Health and Hospitals System on January 28, 2011:*

William T. Foley
Chief Executive Officer
Cook County Health & Hospitals System

Acknowledged:

Michael A. Puisis, DO
Chief Operating Officer
Cermak Health Services of Cook County

**OFFICE OF THE SHERIFF OF COOK COUNTY, ILLINOIS**
**COOK COUNTY DEPARTMENT OF CORRECTIONS**

~~Salvador Godinez~~   GARY HICKERSON
Executive Director
Cook County Department of Corrections

Plaintiff's Exhibit 14 Page 10

Transcript of the Testimony of
**DANIEL MORECI**

**Date:** June 9, 2015

**Case:** BRANDON BROWN VS. THOMAS DART, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

DANIEL MORECI
June 9, 2015

Page 2

```
 1
 2   PRESENT:
 3        THOMAS MORRISSEY, LTD.,
          10150 South Western Avenue
 4        Chicago, Illinois 60643
          (773) 233-7900, by:
 5        PATRICK W. MORRISSEY, ESQUIRE,
          Patrickmorrissey1920@gmail.com,
 6
              appeared on behalf of the Plaintiff;
 7
          ANITA ALVAREZ, STATE'S ATTORNEY OF COOK
 8        COUNTY, ILLINOIS,
          500 Richard J. Daley Center
 9        Chicago, Illinois 60602
          (312) 603-5440, by:
10        MICHAEL J.A. PASQUINELLI, ESQUIRE,
          Michael.Pasquinelli@cookcountyil.gov,
11            appeared on behalf of Defendant
              Thomas Dart, Sheriff of Cook County.
12
13
14   ALSO PRESENT:
15        GEORGE J. VOURNAZOS, ESQUIRE
16
17
18
19
20
21
22
23
24   REPORTED BY:  KATHLEEN M. DUFFEE, CSR
          TOOMEY REPORTING   (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

BRANDON BROWN,              )
                            )
         Plaintiff,         )
                            )
    v.                      )  No. 14 CV 7945
                            )
THOMAS DART, SHERIFF OF     )
COOK COUNTY, et al.,        )
                            )
         Defendants.        )
```

         The deposition of DANIEL K. MORECI,
designated Rule 30(b)(6) representative, called by
the Plaintiff for examination, taken pursuant to the
Federal Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before KATHLEEN M. DUFFEE, a Notary
Public within and for the County of Cook, State of
Illinois, and a Certified Shorthand Reporter of said
state, at 500 Richard J. Daley Center, Chicago,
Illinois, on the 9th day of June, A.D. 2015 at
2:22 p.m.

         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 3

```
 1              I N D E X
 2   WITNESS                        EXAMINATION
 3   DANIEL K. MORECI
 4      By Mr. Morrissey               4, 83
 5      By Mr. Pasquinelli             58
 6
 7
 8
 9            E X H I B I T S
10   NUMBER                       MARKED FOR ID
11   Plaintiff's Exhibit No. 1         4
12      No. 2                          8
13      No. 3                         23
14
15   Defendant's Exhibit No. 1        64
16      No. 2                         67
17      No. 3                         77
18      No. 4                         79
19
20
21
22
23
24
```

         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 1

DANIEL MORECI
June 9, 2015

Page 4

1     (WHEREUPON, the witness was

2     duly sworn.)

3     MR. MORRISSEY:  This is a 30(b)(6) deposition

4  in Brown v. Dart taken pursuant to notice, continued

5  to this date, taken at the State's Attorney's Office

6  at their request.

7     My name is Pat Morrissey.  I represent

8  the plaintiff, Brandon Brown.

9     Why don't we mark this as Exhibit 1.

10     (WHEREUPON, Plaintiff's Exhibit

11     No. 1 was marked for

12     identification as of 06/09/2015.)

13     MR. MORRISSEY:  Showing Exhibit 1 to your

14  attorney, I'll ask:  Are you prepared to produce this

15  designee for paragraph 1, subsections (b) through (g)?

16     MR. PASQUINELLI:  Correct.

17     DANIEL K. MORECI,

18  designated Rule 30(b)(6) representative, called as a

19  witness herein by the Plaintiff, having been first duly

20  sworn, was examined and testified as follows:

21     EXAMINATION

22  BY MR. MORRISSEY:

23     Q.  Sir, can you please state your name for the

24  record?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 6

1     Q.  Prior to holding that position, what was your

2  title?

3     A.  Superintendent.

4     Q.  Of which division?

5     A.  Division IX.

6     Q.  Approximately which years was that?

7     A.  I believe it was 2009 to 2011.

8     Q.  Prior to that position, what was your title?

9     A.  Superintendent of Division XI.

10     Q.  In which years?

11     A.  For 2008 to 2009.

12     Q.  Prior to Division XI, what was your position?

13     A.  Chief of Operations, Division IX.

14     Q.  Which years was that?

15     A.  2008.  I was there less than a year.

16     Q.  What were your responsibilities as Chief of

17  Operations in Division IX?

18     A.  Oversee the daily operations of Division IX.

19     Q.  When you were there, was there only one Chief

20  of Operations for Division IX?

21     A.  Yes.

22     Q.  What's your highest level of education?

23     A.  A high school diploma.

24     Q.  Where did you attend?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 5

1     A.  Daniel Moreci.

2     Q.  Sir, are you currently employed?

3     A.  Yes.

4     Q.  Where do you work?

5     A.  The Sheriff's Department.

6     Q.  What's your title?

7     A.  First Assistant Executive Director.

8     Q.  Currently, what are your responsibilities?

9     A.  Oversee security operations at the Cook County

10  Jail.

11     Q.  How long have you worked for the Sheriff's

12  Department?

13     A.  24 years.

14     Q.  Prior to being named a First Assistant

15  Executive Director, what was your position?

16     A.  Assistant Executive Director.

17     Q.  What were your responsibilities in that

18  position?

19     A.  I oversaw maximum security, External

20  Operations, Division I, Division IX, emergency response

21  team, criminal investigations intelligence unit.

22     Q.  For approximately which years were you

23  Assistant Executive Director?

24     A.  I would say 2011 to 2012.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 7

1     A.  Morton East.

2     Q.  Do you have any military experience?

3     A.  No.

4     Q.  What year did you graduate high school?

5     A.  1984.

6     Q.  What did you review in preparation for this

7  deposition?

8     A.  Just some of the papers, the transfer

9  documents, logbooks.

10     Q.  Do you recall which transfer documents and

11  logbooks?

12     A.  The transportation logbook, the Cermak

13  cancellation logbook, External Operations logbook.

14     Q.  Did you review Exhibit 1, which is the Notice

15  of Deposition?

16     A.  Yes.

17     Q.  When did you review that document?

18     A.  A few days ago.

19     Q.  Presently, who do you report to?

20     A.  Executive Director, Nneka Jones.

21     Q.  Where is your office?

22     A.  In Division V, second floor.

23     Q.  Presently, are you familiar with the procedure

24  to temporarily house detainees in the Sheriff's custody

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 2

DANIEL MORECI
June 9, 2015

Page 8

1   at outlying jail facilities?
2       A.  Yes.
3       Q.  Are there General Orders that address this
4   procedure?
5       A.  Yes.
6       Q.  What are the General Orders that you're aware
7   of?
8       A.  What are they?
9       Q.  Yes.
10      A.  Can you explain?
11          MR. MORRISSEY:  Why don't we mark this as
12  Exhibit 2.
13              (WHEREUPON, Plaintiff's Exhibit
14               No. 2 was marked for
15               identification as of 06/09/2015.)
16  BY MR. MORRISSEY:
17      Q.  Sir, I'm showing you what's marked Exhibit 2.
18  It's a General Order, Number 13.3.  Do you see that?
19      A.  Yes.
20      Q.  Have you seen this document before?
21      A.  Yes.
22      Q.  What is your understanding of this document?
23      A.  It's just a procedure how to transfer inmates
24  to outlying counties.
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 9

1       Q.  This became effective November 16, 2007?
2       A.  Yes.
3       Q.  Other than this document, Exhibit 2, are you
4   aware of any other documents or policies that describe
5   the policies for housing inmates in other
6   jurisdictions?
7           MR. PASQUINELLI:  Objection to the form of the
8   question.
9           THE WITNESS:  Can you reword the question?
10  BY MR. MORRISSEY:
11      Q.  Sure.  Currently, is the Sheriff's Department
12  require to follow General Order 13.3?
13      A.  Yes.
14      Q.  Are there any amendments to General Order 13.3
15  that you're aware of?
16      A.  Not that I'm aware of, no.
17      Q.  Do you understand that you are speaking for the
18  Sheriff's Office today as a 30(b)(6) witness?
19      A.  Yes.
20      Q.  As a First Assistant Executive Director, do you
21  send any memos?
22      A.  Pardon me?
23      Q.  Do you disseminate memos as a First Assistant
24  Executive Director?
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 10

1       A.  Yes.
2           MR. PASQUINELLI:  Objection to the form of the
3   question.
4   BY MR. MORRISSEY:
5       Q.  Do you review memos as a First Assistant
6   Executive Director?
7       A.  Yes.
8       Q.  From 2012 to the present, are you aware of
9   any memos that address housing inmates in other
10  jurisdictions?
11      A.  No.
12      Q.  From August 1, 2012, to the present, which
13  other jurisdictions outside the Cook County Department
14  of Corrections can house inmates remanded to the
15  Sheriff?
16      A.  I don't know all of them.  There's probably,
17  I think, about ten.
18      Q.  Can you identify the jail facilities that
19  you're aware of?
20      A.  Kankakee, Livingston, DeWitt, Piatt, Moultrie,
21  Jefferson County, Henry County.  Yeah, that's about
22  all I think I know where they are.
23      Q.  Does the Sheriff presently send inmates
24  remanded to his custody to Kankakee?
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 11

1       A.  Yes.
2       Q.  How does the Sheriff's Office identify inmates
3   temporarily reassigned to Kankakee?
4       A.  We go by security concerns, overcrowding, high
5   risk, high profile.
6       Q.  Who within the Sheriff's Office is responsible
7   for identifying inmates that are potentially eligible
8   for a transfer?
9       A.  I am.
10      Q.  How long have you had that responsibility?
11      A.  Approximately three years.
12      Q.  In March of 2013 were you responsible for
13  identifying prisoners for relocation?
14      A.  Yes.
15      Q.  Okay.  How do you go about identifying eligible
16  prisoners?
17      A.  I review the disciplinary history, talk with
18  the investigations unit.
19      Q.  Do you conduct this inquiry for each individual
20  eligible for relocation?
21      A.  Yes.
22      Q.  Do you document this investigation?
23      A.  No.
24      Q.  Is there a specific division within the Cook
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 3

**DANIEL MORECI**
**June 9, 2015**

Page 12

1  County Jail that you primarily look to when you're

2  looking to reassign a prisoner?

3  **A.** No.

4  **Q.** In March of 2013 what computer system did the

5  jail use?

6  **A.** CCOMs. It might have been, it might have been

7  IMACS. I'm not sure the exact date we switched over.

8  **Q.** In March of 2013 would you look into the

9  computer system when you're investigating whether to

10 reassign a prisoner?

11 **A.** Yes.

12 **Q.** In March of 2013 did the computer system

13 identify specific alerts for prisoners?

14 **A.** Yes.

15 **Q.** What are alerts to your knowledge?

16 **A.** What are alerts?

17 **Q.** Correct.

18 **A.** Just to let someone know if there's an issue

19 with an inmate: security; threat; medical concerns.

20 **Q.** What types of medical concerns are you aware

21 of?

22 **A.** They label them as P1, P2, P3, P4, or M1, M2,

23 M3, M4.

24 **Q.** What is P1?

TOOMEY REPORTING   (312) 853-0648

---

**DANIEL MORECI**
**June 9, 2015**

Page 13

1  **A.** It's a psych term. I couldn't tell you what

2  each level is. That's what Medical decides.

3  **Q.** Do you know what "M1" means?

4  **A.** Medical. "P" is psych. "M" is medical.

5  **Q.** As a representative of the Sheriff, you're not

6  aware of the distinction between M1 and M4?

7  **A.** I'm not a doctor. The Medical people decide

8  whether they're a P1, 2, 3 or an M1, 2, or 3.

9  **Q.** The Sheriff's Office doesn't make a distinction

10 between M1 and M4?

11 **A.** No.

12 **Q.** Are people with M1 classifications eligible to

13 be relocated to Kankakee?

14 **A.** It's Medical. That's their decision.

15 **Q.** The question is: If a computer alert

16 identified a prisoner with an M1 alert, as the person

17 from the Sheriff's Office responsible for relocating

18 people, can that person be eligible to be moved to

19 Kankakee?

20     MR. PASQUINELLI: Objection, form of the

21 question.

22 BY THE WITNESS:

23 **A.** Medical would determine whether or not that

24 inmate can go to Kankakee.

**TOOMEY REPORTING   (312) 853-0648**

---

**DANIEL MORECI**
**June 9, 2015**

Page 14

1  BY MR. MORRISSEY:

2  **Q.** The question is: If the alerts in the computer

3  system reflected "M1," as a representative of the

4  Sheriff could the Sheriff still send that person to

5  Kankakee?

6      MR. PASQUINELLI: Objection. It's been asked

7  and answered.

8  BY THE WITNESS:

9  **A.** Medical will make the decision whether the

10 inmate can go to Kankakee or not.

11 BY MR. MORRISSEY:

12 **Q.** Can Medical override the Sheriff's

13 recommendation to transfer somebody to an outside

14 jurisdiction?

15 **A.** Yes.

16 **Q.** How are you aware that Medical can override the

17 Sheriff's decision?

18 **A.** We'll send the list of names to Medical, and

19 they send the list back stating which ones can or

20 cannot go.

21 **Q.** In March of 2013 how frequently was this list

22 sent to Medical?

23 **A.** Every week.

24 **Q.** How many eligible names would be on this list?

TOOMEY REPORTING   (312) 853-0648

---

**DANIEL MORECI**
**June 9, 2015**

Page 15

1  **A.** Could be one. Could be 30.

2  **Q.** What is this list called?

3  **A.** It's a list.

4  **Q.** Is there a title on this list?

5  **A.** Not that I'm aware of.

6  **Q.** Do you prepare the list?

7  **A.** I send the names in an email. There's not a

8  document or special form.

9  **Q.** Who do you email these names to?

10 **A.** To Cermak.

11 **Q.** Is there a specific email within Cermak?

12 **A.** Connie Mennella.

13 **Q.** How long does Dr. Mennella have to respond to

14 your email?

15 **A.** There's not a set time, but she usually

16 responds pretty quickly, within a day or so.

17 **Q.** How long has Dr. Mennella been the Chief

18 Medical Officer at Cermak?

19 **A.** I don't know.

20 **Q.** Typically, what does Dr. Mennella's list she

21 sends back to you contain?

22 **A.** It will just say which inmates can go and which

23 ones can't.

24 **Q.** Does she explain why?

TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 4

DANIEL MORECI
June 9, 2015

Page 16

1    **A.** No.

2    Q. When did you start sending this list to

3  Dr. Mennella of potential transfers?

4    **A. That always took place as long as I've been**

5  **doing it.**

6    Q. Do you have meetings with Dr. Mennella

7  regarding this procedure?

8    **A.** No.

9    Q. Did you ever have an in-person discussion with

10  Dr. Mennella regarding this procedure?

11    **A.** Yeah.

12    Q. Do you regularly meet with Dr. Mennella?

13    **A. Once a week we meet at the jail management**

14  **meeting.**

15    Q. What is a jail management meeting?

16    **A. It's just the weekly meeting that we discuss**

17  **issues and concerns throughout the jail.**

18    Q. Who runs that meeting?

19    **A.** Doctor/Director Nneka Jones.

20    Q. Where is this meeting located?

21    **A. It could be the Division V conference room, or**

22  **it could be in the Division V training room.**

23    Q. And you discuss the procedures to select

24  inmates for housing at outside jurisdictions at this

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 17

1  meeting?

2    **A. Not at this meeting unless there's an issue**

3  **with it.**

4    Q. Has there ever been an issue with the procedure

5  the Sheriff follows to transfer inmates to outside

6  jurisdictions?

7    **A.** No.

8    Q. In addition to Ms. Jones, who attends this jail

9  management meeting?

10    **A. All the superintendents, directors, Facilities**

11  **Management, Cermak personnel.**

12    Q. And how long have these meetings been taking

13  place?

14    **A.** I'd say at least five years.

15    Q. Do you attend any other regular meeting with

16  Dr. Mennella?

17    **A. Occasionally I do a, uhm, it's called a morning**

18  **huddle, that they do every morning in Cermak Hospital.**

19    Q. What is discussed in the morning huddle?

20    **A. The incidents from the day prior.**

21    Q. Other than the jail management meeting and the

22  morning huddle, any other meetings you regularly have

23  with Dr. Mennella?

24    **A.** No.

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 18

1    Q. Do you meet weekly at South Campus with members

2  of the jail staff?

3    **A.** No.

4    MR. PASQUINELLI: Objection to the form of the

5  question.

6  BY THE WITNESS:

7    **A.** No.

8  BY MR. MORRISSEY:

9    Q. Do you attend the Sheriff's meetings held at

10  the South Campus weekly?

11    **A.** Yes.

12    Q. Dr. Mennella attends those meetings; correct?

13    **A.** No.

14    Q. Over the last three years, you're not aware

15  that Dr. Mennella attends those meetings?

16    MR. PASQUINELLI: Objection to the form of the

17  question. Objection, asked and answered. You can

18  answer it.

19    THE WITNESS: Could you rephrase the question?

20  BY MR. MORRISSEY:

21    Q. Does Dr. Mennella attend the weekly Sheriff's

22  meetings held at the South Campus?

23    **A.** No.

24    Q. Do the Sheriff's meetings ever discuss the

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 19

1  transfer of prisoners to outside jurisdictions?

2    **A. Occasionally.**

3    Q. What is discussed in the Sheriff's meetings

4  about that issue?

5    **A. About that issue?**

6    Q. Correct.

7    **A. The Sheriff will ask me how has it been going**

8  **with the outlying counties.**

9    Q. What do you tell him?

10    **A. Good.**

11    Q. Do you report to the Sheriff anything other

12  than that it's going well?

13    **A.** No.

14    Q. Senior management of Cermak also attends those

15  weekly Sheriff's meetings; right?

16    **A.** No.

17    Q. After receiving an email from Dr. Mennella

18  saying that a prisoner is eligible to be moved to an

19  outside facility, what do you do?

20    MR. PASQUINELLI: Objection to the form of

21  the question.

22  BY THE WITNESS:

23    **A. He gets put on a transfer list. Then he gets**

24  **transferred in the next run.**

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 5

DANIEL MORECI
June 9, 2015

Page 20

1  BY MR. MORRISSEY:
2      Q.  How frequently are the runs?
3      **A.  Weekly.**
4      Q.  Are you aware of any other -- strike that.
5              After a prisoner is entered -- strike
6  that.
7              Do you enter the prisoners on the
8  transfer list?
9      **A.  No.**
10     Q.  Who does that?
11     **A.  An officer.**
12     Q.  And in March of 2013 did an officer enter the
13  prisoners onto the transfer list?
14     **A.  Yes.**
15     Q.  Generally, which officer is responsible for
16  making this transfer list?
17     **A.  Officer Nava.**
18     Q.  How do you spell his last name?
19     **A.  She.  N-A-V-A.**
20     Q.  How long has Officer Nava been responsible for
21  the transfer list?
22     **A.  As long as I've been doing it.**
23     Q.  Does Officer Nava have responsibility or
24  involvement in identifying prisoners for relocation?
              TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 21

1      **A.  No.**
2      Q.  Why do you delegate to Officer Nava the
3  responsibility for completing the transfer list?
4          MR. PASQUINELLI:  Objection to the form of
5  the question.  Objection, relevance.  You may answer
6  the question, Director.
7          THE WITNESS:  Could you reword it?
8  BY MR. MORRISSEY:
9      Q.  Did you delegate the responsibility to Officer
10  Nava to create the transfer list?
11     **A.  Yes.**
12     Q.  Does she have discretion of which prisoners are
13  entered onto the transfer list?
14     **A.  No.**
15     Q.  How do you communicate to Officer Nava who
16  should be included on the transfer list?
17     **A.  I send her an email.**
18     Q.  After Officer Nava enters information onto
19  the transfer list, what is the next step in assigning
20  a prisoner to an outside jurisdiction?
21     **A.  Officer Nava will send emails to the divisions**
22  **where the inmates are housed, to the transportation**
23  **unit, and to the External Operations superintendent.**
24     Q.  What is included within these emails?
              TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 22

1      **A.  The transfer list.**
2      Q.  The transfer list is emailed to each of those
3  three entities?
4      **A.  Yes.**
5      Q.  Why is the email list -- strike that.
6              Why is the transfer list e-mailed to
7  the External Ops office?
8      **A.  Because the transportation unit falls under**
9  **External Operations.**
10     Q.  What is the next step in reassigning a prisoner
11  to another jurisdiction?
12     **A.  Can you reword that?**
13     Q.  Sure.  After this transfer list is e-mailed to
14  the three entities --
15     **A.  Uhm-hmm.**
16     Q.  -- what is the next step in moving a person to
17  an outside jurisdiction?
18     **A.  The next step is them getting transferred.**
19     Q.  Are you aware of any other documents that are
20  created when the Sheriff decides to move a prisoner
21  to an outside jurisdiction?
22     **A.  No.**
23     Q.  Are you aware of a form called an Interagency
24  Health Inquiry Form?
              TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 23

1      **A.  No.**
2          MR. MORRISSEY:  Why don't we mark this as 3.
3              (WHEREUPON, Plaintiff's Exhibit
4              No. 3 was marked for
5              identification as of 06/09/2015.)
6  BY MR. MORRISSEY:
7      Q.  Sir, I'm showing you what's marked Exhibit 3.
8  Take a moment to look at it and let me know when you're
9  done.
10     **A.  Okay.**
11     Q.  Exhibit 3, the title is Cook County Department
12  of Corrections Housing Placement Notification.  Do you
13  see that?
14     **A.  Yes.**
15     Q.  Have you seen this form before, this type of
16  form?
17     **A.  Yes.**
18     Q.  Tell me what it is.
19     **A.  It's just a form that let's us know who's at**
20  **the outlying county.**
21     Q.  Is this form generally created prior to a body
22  moving to an outside facility?
23     **A.  Yes.**
24     Q.  When is -- strike that.
              TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 6

DANIEL MORECI
June 9, 2015

Page 24

1     When are forms like Exhibit 3 created?

2  **A.  After the approval.**

3     Q.  Would that be after you approve them for

4  transfer?

5  **A.  No.  After the Medical approves.**

6     Q.  Would that be before the transfer list is

7  created?

8  **A.  Yes.**

9                        **(WHEREUPON, there was a brief**

10                       **interruption.)**

11       MR. PASQUINELLI:  Can we have a brief moment?

12                       (WHEREUPON, a recess was had from

13                       2:49 p.m. to 3:02 p.m.)

14  BY MR. MORRISSEY:

15     Q.  We just had a break.  We were talking about

16  Exhibit 3, and when in the process of reassigning a

17  prisoner to an outside facility is it created?

18  **A.  After Medical clears them to go.**

19     Q.  Who from the -- strike that.

20                       Is Exhibit 3 a Sheriff's Department

21  document?

22  **A.  Yes.**

23     Q.  Who within the Sheriff's Department is

24  responsible for creating this document?

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 26

1     Q.  What is overcrowding at the Cook County Jail?

2  **A.  When we don't have room to put an inmate in a**

3  **bed.**

4     Q.  In March of 2013 what was the capacity for male

5  inmates at the jail?

6  **A.  I don't have that off the top of my head.**

7     Q.  In March of 2013 what criteria would you use

8  to determine whether the jail was overcrowded and

9  a prisoner should be relocated to an outside facility?

10  **A.  I would get a call from the classification**

11  **unit.**

12     Q.  Where is the classification unit located?

13  **A.  In Division VIII RTU.**

14     Q.  In March of 2013 where was the classification

15  unit located?

16  **A.  In Division V.**

17     Q.  Is there any written policy or procedure that

18  describes how you as the First Assistant Executive

19  Director is required to complete the Housing Placement

20  Notification?

21  **A.  No.**

22     Q.  Have you received any training on how to

23  complete the Housing Placement Notification?

24  **A.  No.**

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 25

1  **A.  Can you rephrase that?**

2     Q.  Are you responsible for inputting the

3  information into the Housing Placement Notification?

4  **A.  Yes.**

5     Q.  Do other members of the Sheriff's Office

6  besides yourself input this information?

7  **A.  Yes.**

8     Q.  Who could they be?

9  **A.  Officer Nava.**

10     Q.  Is the Housing Placement Notification created

11  prior to the creation of the transfer list?

12  **A.  Yes.**

13     Q.  The Housing Placement Notification has a column

14  for Reason for New Housing Placement.  Do you see that?

15  **A.  Yes.**

16     Q.  And Exhibit 3 checks overcrowding; right?

17  **A.  Yes.**

18     Q.  Who determines which entry to select under that

19  box?

20  **A.  Me.**

21     Q.  What factors do you consider when determining

22  whether the jail is overcrowded and a prisoner should

23  be reassigned to an outside facility?

24  **A.  Can you rephrase that?**

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 27

1     Q.  Why do you include the next court date on the

2  inmate checklist?

3  **A.  Because if the inmate is going to go out, say**

4  **Saturday, if he has a court date next week, he won't**

5  **go.**

6     Q.  Would that be a factor in deciding whether

7  to temporarily relocate a prisoner to an outside

8  jurisdiction?

9  **A.  Sometimes.**

10     Q.  What other criteria would you use to determine

11  whether it's appropriate to move a prisoner temporarily

12  to another jail?

13  **A.  Can you go further into that?**

14     Q.  You said that if a prisoner has a court date

15  the following week and it's a Saturday --

16  **A.  Uhm-hmm.**

17     Q.  -- that might weigh in not moving that person

18  to another jurisdiction; right?

19  **A.  Yes.**

20     Q.  Are there any other criteria that you would

21  use in determining whether to move somebody to an

22  outside facility?

23  **A.  If Medical says they can't go.**

24     Q.  Anything else you can think of?

TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 7

DANIEL MORECI
June 9, 2015

Page 28

1    A.  If the county that's receiving the inmate
2    decides they don't want a certain inmate.
3    Q.  Anything else in your experience?
4    A.  That's all I can think of right now.
5    Q.  Are there any automatic disqualifiers the
6    Sheriff has that prohibit the temporary relocation of
7    a prisoner?
8    A.  Just medical.
9    Q.  If a prisoner had a cast on his arm, under
10   the Sheriff's criteria could that person still be
11   temporarily relocated outside the jail?
12   A.  Possibly.
13   Q.  Would the answer be the same if there was a
14   wheelchair-using detainee?
15   MR. PASQUINELLI:  Objection.  Irrelevant to the
16   subject matter.  Answer the question.
17   THE WITNESS:  Can you reword the question?
18   BY MR. MORRISSEY:
19   Q.  If you have a wheelchair-using detainee and
20   you are deciding whether to temporarily relocate that
21   person, would it be possible for the Sheriff to still
22   move that person to an outside jail?
23   A.  Possibly.
24   Q.  Below that, it says Medical Approval.  Do you
     TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 29

1    see that?  Exhibit 3.
2    MR. PASQUINELLI:  (Indicating.)
3    BY THE WITNESS:
4    A.  Yes.
5    BY MR. MORRISSEY:
6    Q.  As the First Assistant Executive Director,
7    are you required to complete that portion of this form?
8    A.  Yes, but we don't do that part anymore.
9    Q.  What is an Interagency Health Inquiry Form?
10   A.  I don't know.
11   Q.  Have you ever seen an Interagency Health
12   Inquiry Form?
13   A.  I may have.
14   Q.  In March of 2013 were you required to complete
15   the Medical Approval portion of Exhibit 3?
16   A.  No.
17   Q.  When did the Sheriff's Office stop completing
18   the Medical Approval portion of the Housing Placement
19   Notification?
20   A.  I don't remember.
21   Q.  Why did the Sheriff's Office stop completing
22   that portion of the Housing Placement Notification?
23   A.  Medical didn't want us to have all the reasons
24   why an inmate could be okayed or refused.
     TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 30

1    Q.  Who from Medical made that decision?
2    A.  I don't know.
3    Q.  When was that decision -- strike that.
4        When was that conveyed to the Sheriff's
5    Office?
6    A.  I don't know.
7    Q.  Was it discussed in an interagency meeting at
8    Cermak?
9    A.  Not that I'm aware of because I'm not at their
10   meetings.
11   Q.  Was it discussed at any meeting you regularly
12   attend at Cermak?
13   A.  No.
14   Q.  Did Cermak explain why they didn't want the
15   Sheriff's Office to have the information about the
16   person's health?
17   A.  As far as I know, it's the law.
18   Q.  Who told you it's the law?
19   A.  Medical.
20   Q.  Below that, it says Discipline Clearance.  Do
21   you see that?
22   A.  Yes.
23   Q.  Is the Sheriff's Department required to
24   complete the Discipline Clearance section of the
     TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 31

1    Housing Placement Notification form?
2    A.  Yes, if the inmate mainly had discipline.
3    Q.  Who is required to complete that portion of
4    the form?
5    A.  I am.
6    Q.  Below that, it says Educational Clearance.  Do
7    you see that?
8    A.  Yes.
9    Q.  What does that mean?
10   A.  Well, if an inmate is registered in our high
11   school program or GED program, we will not transfer
12   an inmate and disrupt his educational needs.
13   Q.  How did you determine or how does the Sheriff's
14   Office determine whether a prisoner has an educational
15   clearance?
16   A.  Well, mostly likely he would be on the school
17   tier.
18   Q.  Would it be reflected in the computer database?
19   A.  Yes.
20   Q.  And is the Sheriff required to mark yes or no
21   in response to that?
22   A.  If it applies to that inmate.
23   Q.  If the clearance does not apply to the inmate,
24   is the Sheriff required to select "no"?
     TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 8

DANIEL MORECI
June 9, 2015

Page 32

1    A.  Yes.

2    Q.  And who within the Sheriff's Office would be

3 responsible for making that designation?

4    A.  I would be.

5    Q.  Below that, it says Special Court Orders or

6 Other Legal Instructions.  Do you see that?

7    A.  Yes.

8    Q.  What does that mean in the Sheriff's Office?

9    A.  A court order.  If the inmate has any current

10 court orders on file.

11    Q.  And how would you conduct that inquiry?

12    A.  Through the Records Office.

13    Q.  Do you contact Superintendent Queen to make

14 that inquiry?

15    A.  Not necessarily.

16    Q.  Who from the Sheriff's Office is required to

17 sign the Housing Placement Notification?

18    A.  Myself and the superintendent of the living

19 unit where the inmate is located.

20    Q.  Is the inmate required to sign the Housing

21 Placement Notification?

22    A.  No.

23    Q.  When are members of the Sheriff's Department

24 required to sign the Housing Placement Notification?

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 33

1    A.  Whenever the original placement form is filled

2 out.

3    Q.  What next happens to the Housing Placement

4 Notification?

5    A.  It gets put in a file.

6    Q.  Where is that file maintained?

7    A.  In Officer Nava's office.

8    Q.  Is the form given to the receiving

9 jurisdiction?

10    A.  No.

11    Q.  Is the Sheriff required to put the next court

12 date on the form?

13    A.  Yes.

14    Q.  When a prisoner is relocated to an outside

15 jurisdiction, when does the relocation end?

16    A.  It depends.

17    Q.  Is it fair to say most detainees in your

18 custody attend court once a month?

19    A.  I don't have that information.  I couldn't

20 tell you.

21    Q.  Prisoners at the jail are generally pretrial

22 detainees; right?

23    A.  Yes.

24    Q.  And most, if not all, pretrial detainees attend

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 34

1 court; right?

2    A.  Yes.

3    Q.  And prisoners that are temporarily assigned to

4 outside prisons must periodically come back to Cook

5 County to attend court; right?

6    A.  Yes, unless they're county sentenced.

7    Q.  I'm talking about pretrial detainees who are

8 housed in outside jurisdictions.  They do attend court

9 at frequent intervals in Cook County; right?

10    A.  Yes.

11    Q.  And the Sheriff's Office is responsible for

12 transporting the prisoner from the outside jail back

13 to Cook County; right?

14    A.  Yes.

15    Q.  After the prisoner attends court, are they

16 reincarcerated in the Cook County Jail?

17    MR. PASQUINELLI:  Objection to the form of the

18 question.

19 BY THE WITNESS:

20    A.  Sometimes.

21 BY MR. MORRISSEY:

22    Q.  How does the Sheriff's Office determine who

23 stays in the Cook County Jail after a court appearance

24 and who returns back to an outside jail?

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 35

1    A.  The majority of the inmates that go out will

2 be there at the Cook County Jail for a week.  They'll

3 come in on a Saturday and they'll leave the following

4 Saturday, but some inmates do go to court and return

5 directly to Kankakee depending on their security

6 classification.

7    Q.  Which prisoners attend court at Cook County

8 and are sent directly back to the outside jail?

9    A.  Could be security issues, some HRNs, some high

10 profiles.

11    Q.  Which category of prisoners return back to

12 the jail and are sent back out to the outside facility

13 the following week?

14    A.  All categories.

15    Q.  When a prisoner is moved to another

16 jurisdiction, what documents does the Sheriff send to

17 that accepting facility regarding the prisoner?

18    A.  Just a list of the names.

19    Q.  Does the Sheriff send the -- for example, does

20 the Sheriff send Kankakee any other information

21 regarding a specific prisoner?

22    A.  Just disciplinary if we need to.

23    Q.  Any other information?

24    A.  It depends.  If it's a high profile, we'll let

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 9

DANIEL MORECI
June 9, 2015

Page 36

1  them know what exactly is going on with that certain

2  inmate.

3      Q.  Any other information the Sheriff would send

4  to Kankakee for a prisoner the Sheriff is temporarily

5  relocating?

6      A.  No, not that I can think of.

7      Q.  Does the Sheriff send that prisoner's mitt?

8      A.  No.

9      Q.  In March of 2013 would the Sheriff's Office

10 send Kankakee that prisoner's mitt?

11     A.  No.

12     Q.  In March of 2013 the Sheriff's computer

13 database identified a prisoner's future move; correct?

14     MR. PASQUINELLI:  Objection to the form of the

15 question.

16 BY THE WITNESS:

17     A.  No.

18 BY MR. MORRISSEY:

19     Q.  In March of 2013 were you familiar with the

20 Sheriff's computer database?

21     A.  Yes.

22     Q.  After a prisoner returned from court, would

23 the computer reflect that prisoner's next court date?

24     A.  Sometimes.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 37

1      Q.  On what occasion would the computer not reflect

2  it?

3      A.  If the courts didn't put it in there.

4      Q.  Isn't it true the Records Office is responsible

5  for updating the Sheriff's computer?

6      A.  Yes.

7      Q.  And the Records Office is responsible for

8  inputting into the jail system when that prisoner has

9  to attend court next?

10     A.  Yes.

11     Q.  And that would be reflected on the jail's

12 computer database; correct?

13     A.  Yes.

14     Q.  And that's how you would determine when the

15 prisoner next had to attend court when you were

16 considering whether to transfer him to another jail?

17     A.  Yes.

18     Q.  That same computer database can also identify

19 future medical appointments; right?

20     A.  No.

21     Q.  How does the Sheriff's Office determine whether

22 a prisoner who has a -- strike that.

23          How does the Sheriff's Office determine

24 whether a prisoner whom he is considering to temporarily

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 38

1  relocate to an outside jail has a future medical

2  appointment at Stroger?

3      A.  We don't determine that.

4      Q.  In March of 2013 could the Sheriff's Office

5  identify when a prisoner had a future medical

6  appointment at Stroger Hospital?

7      A.  Can you reword that?

8      Q.  In March of 2013 could the Sheriff find out

9  when a prisoner in his custody had a future court

10 date -- strike that.

11          In March of 2013 could the Sheriff's

12 Office identify when a prisoner in his custody had

13 a future medical appointment at Stroger Hospital?

14     A.  How far in the future?

15     Q.  Two months in the future.

16     A.  No.

17     Q.  One month in the future?

18     A.  No.

19     Q.  When is the Sheriff's Office made aware of

20 a prisoner's future medical appointment at Stroger?

21     MR. PASQUINELLI:  Objection, foundation.

22 Objection, form.

23     THE WITNESS:  Can you reword the question?

24     MR. MORRISSEY:  I'll ask a preliminary

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 39

1  question.

2  BY MR. MORRISSEY:

3      Q.  As a member of the Sheriff's Department,

4  you're aware that inmates are transferred at times to

5  Stroger Hospital for medical appointments; correct?

6      A.  Yes.

7      Q.  When does the Sheriff's Office learn that a

8  prisoner has a future medical appointment at Stroger?

9      MR. PASQUINELLI:  Objection to the --

10 BY THE WITNESS:

11     A.  The day of.

12     MR. PASQUINELLI:  -- form of the question.

13 BY THE WITNESS:

14     A.  The day of.

15 BY MR. MORRISSEY:

16     Q.  How does the Sheriff's Office become aware of

17 future medical appointments?

18     A.  Cermak sends an appointment sheet.

19     Q.  In March of 2013 was that the only way for

20 the Sheriff's Office to become aware of a future

21 medical appointment at Stroger?

22     A.  Yes.

23     Q.  So in determining whether a prisoner was

24 eligible for relocation in March of 2013, did you

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 10

DANIEL MORECI
June 9, 2015

Page 40

consider whether a prisoner had a future medical
appointment at Stroger Hospital?

MR. PASQUINELLI: Objection. That's been asked
and answered. Objection, form.

THE WITNESS: Can you reword it?

BY MR. MORRISSEY:

Q. Assuming a prisoner was identified on March 7,
2013, to be relocated to Kankakee Jail, and at the
time the person had a scheduled Stroger appointment
on April 8, 2013, would the Sheriff's Office be aware
of that future medical appointment?

A. **We would be aware that day, April 8th.**

Q. Wouldn't you be aware April 7th, the day before
the scheduled medical appointment?

A. **No.**

Q. So in March of 2013 the Sheriff became aware
of a prisoner's future medical appointment the day of
the medical appointment at Stroger?

A. **Yes.**

Q. So to answer the question: March 7, 2013,
when considering whether to relocate a prisoner who
had a future medical appointment on April 8, 2013,
at Stroger, the Sheriff's Office would not have any
information regarding that visit; correct?

TOOMEY REPORTING (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 41

A. **Correct.**

Q. From August 1, 2012, to the present, have you
discussed that issue with members of Cermak?

A. **No.**

Q. Have you discussed that issue with members of
the Sheriff's Department?

A. **No.**

Q. Why not?

A. **I don't know why I would.**

Q. Does the Sheriff's Office send the medical
records of prisoners relocated to Kankakee?

A. **No.**

Q. Do you know who -- do you know whether those
records are sent to Kankakee when a prisoner from
the jail is relocated to Kankakee?

A. **Yes.**

Q. Who sends them?

A. **Cermak.**

Q. Do you know how they're sent?

A. **Electronically.**

Q. Were they sent electronically in March of 2013?

A. **I would say so.**

Q. Do you have personal knowledge whether they
were sent electronically in March of 2013?

TOOMEY REPORTING (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 42

A. **Yeah, I would say they were.**

Q. Do you know when Cermak sends the electronic
medical records to Kankakee?

A. **No.**

Q. Do you know who within Cermak sends the medical
records?

A. **No.**

Q. When a prisoner is reassigned to Kankakee, what
are the Sheriff's responsibilities for that prisoner
after receipt by Kankakee?

A. **Can you be more specific?**

Q. Is the Sheriff responsible for transporting the
prisoner from the jail to Kankakee?

A. **Yes.**

Q. How are they transported?

A. **In a bus or a van. Sometimes a car.**

Q. Where does Kankakee receive the prisoners?

A. **In their receiving area.**

Q. Do Sheriff's employees hand paperwork to
Kankakee Sheriff's employees at that point?

A. **Possibly.**

Q. Are prisoners entitled to bring any personal
properly with them to Kankakee?

MR. PASQUINELLI: Objection to relevance.

TOOMEY REPORTING (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 43

Answer the question, Director.

THE WITNESS: Can you be specific?

BY MR. MORRISSEY:

Q. After the Sheriff transports the prisoners to
Kankakee, do Sheriff's officers generally transport
prisoners back to Cook County?

A. **Yes.**

Q. Why would the Sheriff's Office be transporting
prisoners from Kankakee to Cook County?

MR. PASQUINELLI: Objection to the form of the
question.

THE WITNESS: Can you reword that?

BY MR. MORRISSEY:

Q. How does the Sheriff's Office know who to
collect from Kankakee and bring back to Cook County?

A. **They'll get a list of the names who has to come
back.**

Q. Who determines who has to come back?

A. **Officer Nava.**

Q. What are the reasons for prisoners returning
back to Cook County?

A. **To come back for court or -- it can be numerous
reasons why.**

Q. Other than court, what other reasons?

TOOMEY REPORTING (312) 853-0648

---

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 11

DANIEL MORECI
June 9, 2015

Page 44

1    A.  A trial could be coming up and they want to
2  visit daily or every other day or whatever they do
3  with their attorney to prepare for trial.  Uhm,
4  special visits, medical.
5    Q.  And it's Officer Nava's responsibility for
6  identifying the prisoners from Kankakee to come back
7  to the jail?
8    A.  Yes.
9    Q.  And how does she determine which prisoners
10  should come from Kankakee to Cook County with medical
11  issues?
12    A.  She would be advised from someone from Cermak.
13    Q.  Who from Cermak would advise her?
14    A.  I don't know.
15    Q.  Are you involved in that process?
16    A.  Well, she would let me know.
17    Q.  Does the Sheriff collect prisoners from
18  Kankakee and bring them back to Cook County with
19  scheduled medical appointments?
20    A.  Occasionally.
21    Q.  When does the Sheriff's Office learn of the
22  scheduled medical appointments?
23    MR. PASQUINELLI:  Objection, form of the
24  question.  Objection, it's been asked and answered.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 46

1  officers that day to Kankakee to collect the prisoner
2  for his medical appointment at Stroger?
3    A.  Not always.
4    Q.  What does the Sheriff's Office do if they don't
5  have the resources?
6    MR. PASQUINELLI:  Objection to the form of the
7  question.  It assumes facts not in evidence, but answer
8  the question, Director.
9    THE WITNESS:  Can you reword the question?
10  BY MR. MORRISSEY:
11    Q.  You said that the Sheriff's Office does not
12  always have resources the day of the medical
13  appointment to send an officer in a vehicle to Kankakee
14  to bring that individual to Stroger; right?
15    A.  Yes.
16    Q.  What does the Sheriff's Office do if that
17  situation arises?
18    A.  If we really had to make the transport, we
19  would have to call somebody in from home.
20    Q.  Are you aware of that happening?
21    A.  Not too often.
22    Q.  From 2013 to the present, has the Sheriff's
23  Office requested greater notice when a prisoner that's
24  relocated to an outside jail has a scheduled medical

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 45

1  BY THE WITNESS:
2    A.  The day of the appointment.
3  BY MR. MORRISSEY:
4    Q.  And which days -- strike that.
5    Is there one day that the Sheriff's
6  Office transports prisoners from Kankakee to Cook
7  County?
8    A.  It's no specific day, but it can be more
9  than two, three times a week sometimes.
10    Q.  What time -- strike that.
11    What hours do you work at the jail?
12    A.  Anywhere from 6:00 a.m. to 10:00 at night.
13    Q.  What are Officer Nava's hours at the jail?
14    A.  It could be --
15    MR. PASQUINELLI:  The objection is relevance.
16  I don't think that that information is requested in
17  the 30(b)(6), but answer the question, Director.
18  BY THE WITNESS:
19    A.  6:00 to 2:00 or 7:00 to 3:00.
20  BY MR. MORRISSEY:
21    Q.  And the Sheriff learns of the medical
22  appointments the day of?
23    A.  Yes.
24    Q.  Does the Sheriff have resources to send

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 47

1  appointment?
2    A.  Not to my knowledge.
3    Q.  When the Sheriff's Office collects a prisoner
4  from Kankakee and brings him back to the jail, what
5  documents are routinely given to the Sheriff's
6  employees?
7    A.  None that I'm aware of.
8    Q.  Does Kankakee give the Sheriff's employees
9  the prisoners' medical records while he's incarcerated
10  in Kankakee?
11    A.  No.
12    Q.  Is the Sheriff's Office made aware of medical
13  records that were created when that prisoner was in
14  Kankakee?
15    A.  Not to my knowledge.
16    Q.  Do you know whether the medical records from
17  Kankakee are given to Cermak when the Sheriff collects
18  the prisoner?
19    A.  I believe so.
20    Q.  What's the basis for your belief?
21    A.  Well, I would think if the inmate had some
22  issue or something in Kankakee medically, I would
23  assume Kankakee would share that with Cermak.
24    Q.  Do you know who within Cermak Kankakee shares

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 12

DANIEL MORECI
June 9, 2015

Page 48

1   it with?

2       A.  No.

3       Q.  Have you discussed that procedure with the

4   Sheriff's Office or with Cermak?

5       A.  No.

6       Q.  In April of 2013 did the Sheriff's Office

7   determine which outside facility a prisoner was

8   located at?

9       A.  Yes.

10      Q.  How would they do that?

11      A.  Availability, security issue.

12      Q.  The question is:  In April of 2013 the Sheriff

13  had a computer system; right?

14      A.  Yes.

15      Q.  Assuming a prisoner was temporarily relocated

16  to Kankakee, could a member of the Sheriff's Department

17  look on the Sheriff's computer system to determine

18  where that prisoner is located?

19      A.  Yes.

20      MR. PASQUINELLI:  Objection to the form of the

21  question.

22  BY THE WITNESS:

23      A.  Yes.

24

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 50

1       Q.  Who was responsible for inspecting Kankakee?

2       A.  It could be myself, or it could be an Assistant

3   Director, a superintendent, my lieutenants from the

4   emergency response team.

5       Q.  Do you recall conducting any inspection between

6   February of 2013 and June of 2013 in Kankakee?

7       A.  Between what months again?

8       Q.  February of 2013 and June of 2013.

9       A.  I can't give you a specific date, but I'm sure

10  I probably was out there.

11      Q.  What would you do when you conducted an

12  inspection of Kankakee?

13      A.  I would make rounds in the jail, mainly to

14  the tiers where our inmates were located.

15      Q.  And what would consist of your inspection?

16      A.  I'd walk on the tier; look for cleanliness;

17  talk to the inmates; talk to the staff.

18      Q.  Would you make a round to determine whether

19  Cook County inmates were receiving proper medical care?

20      A.  I would go in to their dispensary, yes.

21      Q.  What would you do when you went to the

22  dispensary?

23      A.  I would just ask the nurse if there was any

24  issues with our inmates.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 49

1   BY MR. MORRISSEY:

2       Q.  And assuming that the prisoner was in Kankakee,

3   would the Sheriff's computer system in April of 2013

4   reflect that information?

5       A.  Yes.

6       Q.  Would all sworn members of the Sheriff

7   Department have access to that information through the

8   computer system?

9       A.  Yes.

10      Q.  In March of 2013 when a prisoner was relocated

11  to Kankakee would the Sheriff have any responsibility

12  for medical care for that individual?

13      MR. PASQUINELLI:  Objection to the form of the

14  question.  It calls for a conclusion, but answer the

15  question, Director.

16      THE WITNESS:  Can you be specific?

17  BY MR. MORRISSEY:

18      Q.  Sure.  In March of 2013 who was the Assistant

19  Executive Director of Operations?

20      A.  Myself.

21      Q.  Did you inspect Kankakee on a monthly basis?

22      A.  Myself, no.

23      Q.  Did you designate anybody to inspect Kankakee?

24      A.  Yes.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 51

1       Q.  And would the nurses in Kankakee give you that

2   information freely?

3       A.  They mainly would talk about behavioral issues.

4       Q.  And based on that information, what would you

5   do?

6       A.  It depends what their issues were.

7       Q.  Did you make -- did you document the

8   inspections?

9       A.  Possibly if it was something I felt needed to

10  be documented.

11      Q.  In 2013 did the Sheriff's Office have

12  discretion whether to document the outside visits that

13  were conducted monthly?

14      A.  Yes.

15      Q.  Did you review medical records when you visited

16  the Kankakee dispensary?

17      A.  No.

18      Q.  Did the Sheriff's Office in 2013 have any

19  person who would review medical records in the Kankakee

20  dispensary for Cook County inmates?

21      A.  No.

22      Q.  Do you know whether Cermak had a designee to

23  review medical records of prisoners from Cook County

24  temporarily relocated in Kankakee?

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 13

DANIEL MORECI
June 9, 2015

Page 52

1    A.  I wouldn't know that.

2    Q.  Presently, what does Cook County pay to have a

3 prisoner in Kankakee?

4    A.  I don't know the exact amount.  I'm not

5 involved in the decisions.

6    Q.  Do you know approximately how much?

7    A.  I think it's $75 a day or something.

8        MR. PASQUINELLI:  I'm going to just object

9 at this time.  I believe the question is not covered

10 under the 30(b)(6), but answer it subject to my

11 objection, Director.

12        I believe, counsel, your request on the

13 30(b)(6) was the entity responsible for payment of

14 medical expenses, not the amount.

15        MR. MORRISSEY:  Okay.  Thank you.

16        MR. PASQUINELLI:  But my objection stands with

17 respect to that.

18 BY MR. MORRISSEY:

19    Q.  In 2013 who was responsible for paying the

20 costs of housing a prisoner in Kankakee?

21    A.  I would imagine Cook County.

22    Q.  In 2013 who was responsible for payment of

23 medical expenses for prisoners in Kankakee?

24    A.  Cook County.

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 53

1    Q.  Do you know how Cook County was billed for the

2 services?

3    A.  No.

4    Q.  Do you review the bills?

5    A.  No.

6    Q.  In 2013 if a prisoner had a scheduled medical

7 appointment at Stroger and at the time the Sheriff

8 became aware of it the prisoner was housed in Kankakee,

9 what would be Sheriff's Office do?

10       MR. PASQUINELLI:  Objection to the form of the

11 question.  Objection, outside the scope of 30(b)(6).

12            Subject to those objections, please

13 answer the question, Director.

14 BY THE WITNESS:

15    A.  We would advise Cermak that the inmate was

16 located at another living unit.

17 BY MR. MORRISSEY:

18    Q.  And how would the Sheriff advise Cermak in

19 2013?

20    A.  A phone call.

21    Q.  And who at Cermak would the Sheriff advise?

22    A.  Someone from Transportation would call probably

23 someone in their scheduling department.

24    Q.  Was that the policy, to call the scheduling

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 54

1 department in 2013?

2    A.  It's basically procedure.  I don't know if it's

3 on policy, but, yeah, that's what they would do.

4    Q.  And after Transportation made that phone call

5 to Scheduling, would the Sheriff do anything else?

6    A.  We would stand by to hear if Cermak needed us

7 to go get him, but they would tell us he would be

8 rescheduled.

9    Q.  Did the Sheriff make any documentation of that?

10   A.  Yes.

11   Q.  How was it documented?

12   A.  In the refusal or the -- Transportation has a

13 log of inmates that they transport.  It would be in

14 that logbook.

15   Q.  In looking at Exhibit 3, how long was Mr. Brown

16 scheduled to be in Kankakee?

17   A.  He wasn't scheduled for any time span.

18   Q.  In looking at Exhibit 3, when would you expect

19 Mr. Brown to next return to Cook County?

20   A.  The week before his next court date.

21   Q.  Is there anything in writing that would

22 describe the Sheriff's expectation that a person would

23 be returned from Kankakee a week before their court

24 date?

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 55

1    A.  No.

2    Q.  What document would the Sheriff maintain in

3 2013 to identify when a prisoner in Kankakee would come

4 back to the jail?

5        MR. PASQUINELLI:  Objection.  That's been asked

6 and answered.

7        THE WITNESS:  Can you rephrase the question?

8 BY MR. MORRISSEY:

9    Q.  How does the Sheriff know when to collect a

10 prisoner from Kankakee and bring him back to the jail?

11       MR. PASQUINELLI:  Objection.  This has been

12 asked and answered.

13 BY THE WITNESS:

14   A.  It would depend on his court date.

15 BY MR. MORRISSEY:

16   Q.  And would the Sheriff make a record or put a

17 person's name on a list when he should be transported

18 from Kankakee back to the jail in anticipation of

19 court?

20   A.  It would be an email.

21   Q.  And who would this email be sent to?

22   A.  To the External Operations superintendent,

23 Transportation supervisors, the division the inmate

24 will be returning back to's superintendent.

TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 14

DANIEL MORECI
June 9, 2015

Page 56

1    Q.  And what would be the next step in collecting
2  that prisoner from Kankakee and bringing him back to
3  the jail?
4    **A.  Go and get him.**
5    Q.  Does the Sheriff need any official document to
6  collect a body from Kankakee and bring him back to Cook
7  County?
8    **A.  No.**
9    Q.  Is there any paperwork that the Sheriff must
10  complete when they accept a body and bring him back
11  from Kankakee to the jail?
12    MR. PASQUINELLI:  Objection.  That's been asked
13  and answered.
14    THE WITNESS:  Can you reword that?
15  BY MR. MORRISSEY:
16    Q.  Does the Sheriff have to sign any document from
17  Kankakee acknowledging receipt of the body when he's
18  brought back to the jail?
19    **A.  I'm not aware of one.**
20    Q.  Can the Sheriff override Cermak's objection to
21  relocate a prisoner to an outside jail facility?
22    MR. PASQUINELLI:  Objection, foundation.
23  Objection, form.
24
              TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 57

1  BY THE WITNESS:
2    **A.  No.**
3  BY MR. MORRISSEY:
4    Q.  Does the Sheriff's Office have anything in
5  writing that explains the responsibility it delegates
6  to Cermak regarding the review of potential prisoners
7  for temporary relocation?
8    **A.  Not to my knowledge.**
9    Q.  Did you discuss with Dr. Mennella the
10  procedures to relocate prisoners to Kankakee or other
11  jails in the morning huddles?
12    MR. PASQUINELLI:  Objection to the form of the
13  question.  Objection.  This has been previously covered
14  by my client's testimony.  Answer the question.
15  BY THE WITNESS:
16    **A.  Not that I recall.**
17  BY MR. MORRISSEY:
18    Q.  Does the Sheriff's Office have knowledge on how
19  specifically Cermak notifies Kankakee that a prisoner
20  might have an ongoing medical condition requiring
21  treatment?
22    **A.  No.**
23    Q.  Did you review Exhibit 3 in preparation for
24  this deposition?
              TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 58

1    **A.  Yes.**
2    MR. MORRISSEY:  I don't have anything further.
3    MR. PASQUINELLI:  Can we take a quick break?
4  I just want to go over my notes, and the witness has
5  been going for a while.
6    (WHEREUPON, a recess was had from
7    2:52 p.m. to 2:58 p.m.)
8    EXAMINATION
9  BY MR. PASQUINELLI:
10    Q.  Director, real quick.  In March of 2013
11  through June of 2013 can you tell me which counties
12  were accepting prisoners from the Cook County
13  Department of Corrections for relocation?  Just from
14  that time period in 2013.
15    **A.  Kankakee, Piatt, Moultrie, DeWitt.  Uhm,**
16  **there's more.  I just don't know them all offhand.**
17  **Henry County, Jefferson County.**
18    Q.  Okay.  In your review of the record for the
19  plaintiff in this case, Brandon Brown, was he scheduled
20  or was he transferred to any other outlying counties
21  other than Kankakee County?
22    **A.  Not that I'm aware of, no.**
23    Q.  You talked a little bit about how the Sheriff's
24  Office would go about picking up a transferee or a
              TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 59

1  relocated detainee at Kankakee County.  I want to touch
2  a little more on that.
3    You said that typically you would make
4  arrangements or the Sheriff's Office would make
5  arrangements to pick up that individual approximately
6  a week prior to their next court date.  Do you recall
7  that testimony?
8    **A.  Yes.**
9    Q.  And when you say approximately a week, that
10  would be what you would -- that's just how it is in
11  general, correct, and there would be times when
12  perhaps it would be a little bit less than a week?
13    **A.  Yes.**
14    Q.  So when you testified previously about that
15  it was approximately a week, that was what it
16  typically was based upon your working in the jail
17  for the years that you've been working there; correct?
18    **A.  Yes.**
19    Q.  And there are, again, occasions when it might
20  be a little bit less than a week or it might be a
21  little bit more than a week.  True?
22    **A.  Yes.**
23    Q.  Mr. Morrissey had asked you questions about how
24  a detainee or how detainees in general are identified
              TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 15

DANIEL MORECI
June 9, 2015

Page 60

1   for relocation.  Do you recall that --

2      **A.  Yes.**

3      Q.  -- those questions?

4          Okay.  Director, if you can kind of run

5   me briefly through.  How are you notified if there's

6   an issue with overcrowding?

7      **A.  Classification unit.**

8      Q.  Classification notifies you?

9      **A.  Yes.**

10      Q.  And then what do you then do after you're

11   notified by the classification unit?

12      **A.  They usually tell me, you know, it looks**

13   **like we're getting an abundance of some type of**

14   **inmates, maximum, medium, or whatever, and we can't**

15   **house them.  So we need to make some room.**

16      Q.  Okay.  And your next step then would be to

17   contact the various superintendents from the various

18   divisions and ask for individuals to be transferred;

19   correct?

20      **A.  Yes.**

21      Q.  And then once you get that list of names from

22   the various superintendents, you then provide that

23   list to Cermak for Cermak to determine if there's any

24   sort of medical reason that they cannot be relocated.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 61

1   Would that be fair?

2      **A.  Yes.**

3      Q.  And then Cermak then has an opportunity to

4   review the list of names to determine if there's a

5   medical reason why they cannot be relocated to an

6   outlying county.  Would that be fair to say?

7      **A.  Yes.**

8      Q.  Now, Mr. Morrissey asked briefly about when

9   the Sheriff's Office is notified about a future date

10   for medical treatment for a detainee, okay, and you

11   had indicated that we are not -- that the Sheriff's

12   Office is not notified; correct?

13      **A.  Yes.**

14      Q.  However, you do -- strike that.

15          You are notified, though, the day of

16   that a particular detainee needs to be transferred

17   to Stroger Hospital or another location for treatment;

18   correct?

19      **A.  Yes.**

20      Q.  And although you don't get specific

21   notification of it and you're not informed of it, you

22   do send this list to Cermak Hospital to review to

23   determine if the individual detainee can be relocated

24   to an outlying county; correct?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 62

1      **A.  Yes.**

2      Q.  And you rely upon Cermak Health Services'

3   medical judgment in making that determination; correct?

4      **A.  Yes.**

5      Q.  You're not a medical doctor; am I correct, sir?

6      **A.  Yes.**

7      Q.  You don't -- Cook County Department of

8   Corrections does not have doctors per se on staff

9   providing health care to inmates.  Is that true?

10      **A.  Yes.**

11      Q.  Okay.  You rely upon Cook County Health

12   Services to provide those services for the jail;

13   correct?

14      **A.  Yes.**

15      Q.  And you defer to their judgment with respect

16   to, in the evaluation of an inmate's medical records,

17   to determine if that individual can be properly

18   relocated to an outlying county; correct?

19      **A.  Yes.**

20      Q.  And, sir, are there times when the outlying

21   county refuses to accept a detainee?

22      **A.  Yes.**

23      Q.  And under what circumstances would they decline

24   to accept a detainee?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 63

1      **A.  If they're familiar with them and their**

2   **behavioral problem.  They can't treat him.**

3      Q.  Okay.  So you have been aware, you've been made

4   aware in your capacity in the jail as one of the First

5   Assistant Directors of the jail, you've been notified

6   by an outlying county, specifically Kankakee County,

7   that an inmate that's been identified by the Sheriff's

8   Office to be relocated will not be accepted to Kankakee

9   County.  Would that be true?

10      **A.  Yes.**

11      Q.  And Kankakee County then would have reviewed

12   the medical records of an individual detainee to make

13   that determination.  Would that be fair to say?

14      MR. MORRISSEY:  Speculation.

15   BY THE WITNESS:

16      **A.  Yes.**

17   BY MR. PASQUINELLI:

18      Q.  And again, it's your understanding that after

19   you provide the information to Cermak and Cermak

20   clears or approves a detainee to be transferred to an

21   outlying county, Cermak then forwards the medical

22   history of an individual detainee to the outlying

23   county; correct?

24      **A.  Yes.**

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 16

DANIEL MORECI
June 9, 2015

Page 64

1    Q.  And then the outlying county then has an
2  opportunity to independently review the medical history
3  of the detainee, and then they determine if they are
4  going to accept a detainee.  Would that be fair to say?
5    A.  Yes.
6    Q.  Now, is there a contract that Cook County Jail,
7  Cook County Department of Corrections or Cook County
8  has with the outlying jail which would determine what
9  sort of level of care the outlying county would
10  provide for detainees?
11    A.  Yes.
12    Q.  And why don't we just get to this one now.
13  I'm showing you what is being marked as -- we're going
14  to go backwards.  I apologize.  Okay.  Director, I'm
15  showing you what's going to be marked as --
16    MR. PASQUINELLI:  Counsel, this is Brown Supp 5
17  through 8.  Excuse me.  Brown Supp 5 through 9.
18    If we can mark this Defendant's Exhibit
19  No. 1, please.
20    (WHEREUPON, Defendant's Exhibit
21    No. 1 was marked for
22    identification as of 06/09/2015.)
23  BY MR. PASQUINELLI:
24    Q.  Director, I'm showing you what has been marked

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 66

1    Q.  Director, the policy that you just described
2  for me, and again you described that for Mr. Morrissey
3  as well and I just tried to summarize it a little bit
4  more, but that policy that you described, was that
5  specific policy, the email communications back and
6  forth and the communication with Cermak Health Services
7  and so on prior to a detainee being relocated, was that
8  policy, technical policy ever discussed with Sheriff
9  Dart at the weekly Sheriff's meetings that you've had
10  with him?
11    A.  Not that I'm aware of.
12    Q.  And was that specific policy that we just
13  talked about, has that policy ever been discussed at
14  the, uhm, I believe you said Division V management
15  meeting that involves Cermak?
16    A.  Not that I'm aware of.
17    Q.  And those are two meetings that you personally
18  attend; correct?
19    A.  Yes.
20    Q.  And throughout your experience in being
21  involved in those meetings, you don't recall ever the
22  procedure that you just described for us ever being
23  brought up as a topic of conversation or it should
24  be modified or things of that nature; correct?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 65

1  as Brown -- strike that.
2    I'm showing you what has been marked as
3  Defendant's Exhibit No. 1 for purposes of this
4  deposition.  Director, do you recognize what that is?
5    A.  Yes.
6    Q.  And can please tell me?  Director, isn't that
7  a copy of the Intergovernmental Agreement Between
8  Kankakee County and Cook County, Illinois, with respect
9  to the relocation of detainees?
10    A.  Yes.
11    Q.  And, sir, does that describe on the second
12  page, Brown Supp 6, paragraph D, subsection 4, it
13  describes the medical services, and within there it
14  does indicate that the outlying county, Kankakee
15  County, shall provide all necessary medical services
16  to the Cook County detainees; correct?
17    A.  Yes.
18    Q.  And, Director, you rely upon the medical
19  professionals within Cook County Health Services and
20  the medical professionals within the Kane County
21  system to determine if an inmate can be properly
22  relocated and accepted for relocation.  Would that be
23  fair to say?
24    A.  Yes.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 67

1    A.  Yes.
2    Q.  Director, I want to now direct your attention
3  to now, just generally, Director, when a -- based
4  upon your experience in working in the jail, when a
5  detainee requires to be treated off the jail campus
6  at an outside location how is the Sheriff's Office
7  notified that a detainee requires to be treated off
8  site?  Who tells you?
9    A.  Someone from Cermak.
10    Q.  And you described that -- well, let's talk a
11  little bit more about that process.  I want to show
12  you what's being marked now as defense exhibit --
13    MR. PASQUINELLI:  Counsel, this is marked as
14  Exhibit 1 --
15    MR. MORRISSEY:  Sure.
16    MR. PASQUINELLI:  -- currently, but I'm just
17  going to rename this as Defense 2.  It spans from
18  COOK 279, 280, 281, 282, 283 through Brown Supp 26
19  through Brown 34 and it's inclusive of Brown Supp 2.
20    (WHEREUPON, Defendant's Exhibit
21    No. 2 was marked for
22    identification as of 06/09/2015.)
23  BY MR. PASQUINELLI:
24    Q.  Director, I'm showing you what has been marked

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 17

DANIEL MORECI
June 9, 2015

Page 68

1    as Defense 2.  The first page, Director, that first
2    page, that's not a page that the Sheriff's Office ever
3    reviews; correct?
4         A.  Yes.
5         Q.  Okay.  Let's turn the page now to COOK 280
6    through COOK 2 -- I'm sorry, COOK 283.  Director,
7    I'm showing you those Bates-stamped pages, and up
8    on top it says Patients Scheduled For Offsite
9    Treatment.  It's dated Friday, February 8, 2013.
10   Do you see that?
11        A.  Yes.
12        Q.  Okay.  Is this form the form that's provided
13   to the Sheriff's Office to notify the Sheriff's Office
14   when a particular detainee is scheduled for offsite
15   treatment?
16        A.  Yes.
17        Q.  And is there any other form other than this
18   form that's provided to the Sheriff's Office to notify
19   the Sheriff's Office when a detainee is scheduled for
20   offsite treatment?
21        A.  No.
22        Q.  This is the only form; correct?
23        A.  Yes.
24        Q.  And, again, you receive that form the day of
                TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 69

1    a particular inmate requiring treatment; correct?
2         A.  Yes.
3         Q.  And we're looking at, this is the form for
4    Friday, February 8, 2013, and we see an individual by
5    the name of Brandon Brown; correct?
6         A.  Yes.
7         Q.  And these forms, these forms are kept in the
8    regular course of business at the Sheriff's Office.
9    True?
10        A.  Yes.
11        Q.  And these are forms that are relied upon by
12   you and your staff throughout the operations of the
13   jail system; correct?
14        A.  Yes.
15        Q.  And, again, we see the plaintiff in this case,
16   Brandon Brown's name as the name here.  True?
17        A.  Yes.
18        Q.  And we also see a, turning to page -- counsel,
19   it's COOK 281 -- a patient scheduled for offsite
20   treatment; date Monday, April 8, 2013.  Do you see
21   that?
22        A.  Yes.
23        Q.  And there's another one there, it says Patient
24   Brandon Brown is scheduled for treatment on that day.
                TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 70

1    Do you see that?
2         A.  Yes.
3         Q.  And it also has a "CT" that's next to the date.
4    What does that mean?
5         A.  Court.
6         Q.  And, Director, when there's a situation where
7    there's a court date and a date for treatment, what
8    does the jail do?
9         A.  Take the inmate to court.
10        Q.  And is that because there's a court order
11   requiring the detainee's presence at a court
12   proceeding?
13        A.  Yes.
14        Q.  And you're required under law to follow that
15   court order?
16        A.  Yes.
17        Q.  And so you then, in the instance when you have
18   a court order requiring the Sheriff of Cook County to
19   bring a detainee before a particular court, you follow
20   that lawful order; correct?
21        A.  Yes.
22        Q.  I want to also turn the page to Monday, May 6,
23   2013.  We see the name of plaintiff, Brandon Brown,
24   there as well?
                TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 71

1         A.  Yes.
2         Q.  And there's no indication over here that
3    Mr. Brown did not make that appointment; correct?
4         A.  Yes.
5         Q.  As a matter of fact, it does indicate that he
6    did make that appointment.  Is that true?
7         A.  Yes.
8         Q.  Turning the page to Friday, June 14, 2013,
9    we see the name of Brandon Brown there as well;
10   correct?
11        A.  Yes.
12        Q.  And, again, that record there indicates that
13   Mr. Brandon Brown was properly transported to the
14   area where he was -- where Cermak requested him to
15   be transported to; correct?
16        A.  Yes.
17        Q.  And there's no indication on that record
18   that Mr. Brandon Brown was not transported to Stroger
19   on that day; correct?
20        A.  Yes.
21        Q.  And then we turn to the pages continuing.  This
22   is Brown Supp 26.  Again, that says Friday, February 8,
23   2013.  This may be cumulative of the other stuff that
24   we saw previously, Director, but this also indicates,
                TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 18

DANIEL MORECI
June 9, 2015

Page 72

1  though, February 8th Mr. Brandon Brown was scheduled
2  for treatment at Stroger Hospital; correct?
3      A.  Yes.
4      Q.  And we also have Friday, March 8, 2013, that
5  Mr. Brandon Brown was scheduled; is that correct?
6      A.  Yes.
7      Q.  And so on and so forth:  April 8th, May 6th,
8  June 14th.
9          Now I want to turn to the last page
10  where it says Monday, June 3, 2013.  Do you see that
11  page there, Director?
12      A.  Yes.
13      Q.  And you have had an opportunity and I represent
14  to counsel that currently all the names have been
15  redacted; correct?
16      A.  Yes.
17      Q.  And the various detainee numbers are redacted
18  as well.  Is that true?
19      A.  Yes.
20      Q.  Both on Brown Supp 31, Supp 32, Supp 33, and
21  Supp 34; correct?
22      A.  Yes.
23      Q.  And, again, these are the -- the title of this
24  is Patients Scheduled For Offsite Treatment; is that

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 73

1  right?
2      A.  Yes.
3      Q.  And this is the same manifest that we
4  previously had looked at which identifies individual
5  detainees that are transported to outlying facilities
6  for medical treatment; correct?
7      A.  Yes.
8      Q.  And these are the orders that you receive from
9  Cook County or from the Cook County Health Services
10  the day of those various treatments dates.  Is that
11  true?
12      A.  Yes.
13      Q.  And again, Director, these are all blacked out,
14  but you had the opportunity to review an unredacted
15  version of this; is that right?
16      A.  Yes.
17      Q.  And within that unredacted version, was the
18  name Mr. Brandon Brown identified on any of the Cermak
19  Health Services orders informing the Sheriff's Office
20  on June 3, 2013, that Mr. Brown was required to be at
21  Stroger on that day?
22      A.  No.
23      Q.  And the last page is Brown Supp 2.  Director,
24  this page, counsel had basically asked you a lot of

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 74

1  questions about this page.  Specifically, I want to
2  direct your attention to the Interagency Health
3  Inquiry section (indicating).
4          You had indicated that there was not
5  an interagency health inquiry that is completed.
6  Do you recall that testimony?
7      A.  Yes.
8      Q.  However, Director, you do, as you've
9  previously noted for us, you do send a copy of the
10  list of inmates to Cermak Health Services for them
11  to review and determine medically if an individual
12  inmate can be transferred or relocated to an outlying
13  county; correct?
14      A.  Yes.
15      Q.  So, in essence, that is an interagency inquiry.
16  True?
17      MR. MORRISSEY:  I object.  That's
18  mischaracterizing what interagency is.
19  BY MR. PASQUINELLI:
20      Q.  Okay.  But basically what we're getting at
21  is that previously you had indicated on the form the
22  various bases for why Cermak or why the health
23  department would deny a particular inmate relocation.
24  Would that be fair to say?

TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 75

1      A.  Yes.
2      Q.  And they would provide that information to you?
3      A.  Yes.
4      Q.  Okay.  And what sort of inquiry would you make
5  to them, asking them about the particular inmate?
6  Would you ask them, hey, is there any issue with
7  Inmate A or Inmate B?
8      A.  We would just send the list.
9      Q.  Okay.
10      A.  Then they would just respond if they can or
11  can't go.
12      Q.  So at one time Cermak was sending back to
13  you the medical reasons why a various inmate could
14  not be relocated; correct?
15      A.  Not specifically what the medical reason was.
16      Q.  Okay.
17      A.  But that they wouldn't go for medical reasons.
18      Q.  Okay.  And they would list that.  They would
19  say that to you; right?
20      A.  Yes.
21      Q.  Okay.  But at some point you identified in
22  your deposition that that practice changed and they
23  no longer were providing those specific bases to you
24  as to why a particular inmate was not going to be

TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 19

## Page 76

DANIEL MORECI
June 9, 2015

1 permitted to be relocated; correct?

2    A. Yes.

3    Q. Okay. In March of 2013 through July of 2013

4 was Cermak providing you with specific information as

5 to why an inmate could not be relocated to an outlying

6 county?

7    A. No.

8    Q. And they had informed you or your understanding

9 is that the law prohibits you from having that

10 information; is that correct?

11    A. Yes.

12    Q. Okay. But where it says "inquiry form," can

13 we agree that the Sheriff does make an inquiry to

14 Cermak by allowing them to review a patient's medical

15 history prior to being relocated or prior to being

16 relocated to an outlying county, can we agree that

17 the Sheriff's Office does request Cermak to either

18 approve or disapprove of the medical situation of a

19 detainee prior to relocation?

20    A. Yes.

21    Q. And we talked a little bit about, okay,

22 we discussed the issue with transportation. Let's

23 take a look at what's been previously marked as --

24      MR. PASQUINELLI: Counsel, I'm going to, I

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 77

DANIEL MORECI
June 9, 2015

1 think I have to change this exhibit number too.

2 Let's take a look at Brown Supp 21 through Brown Supp

3 25, and if in the court reporter could please mark

4 this as Defense Exhibit No. 3.

5      (WHEREUPON, Defendant's Exhibit

6      No. 3 was marked for

7      identification as of 06/09/2015.)

8      MR. PASQUINELLI: Are you there, counsel, on

9 the different pages?

10      MR. MORRISSEY: Yes.

11 BY MR. PASQUINELLI:

12    Q. Okay. Director, this is Defendant's Exhibit

13 No. 3, and can you please tell me what this exhibit

14 is, what this contains?

15    A. It's the logbook for Transportation.

16    Q. Okay. And that was the logbook that you talked

17 to counsel about during part of your deposition;

18 correct?

19    A. Yes.

20    Q. And also the second page is an External

21 Operations logbook as well; is that right?

22    A. Yes.

23    Q. And these two pages that you're looking at,

24 these several pages that you're looking at, one's

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 78

DANIEL MORECI
June 9, 2015

1 from Fantus cancellations from April 8, 2013. Do

2 you see that?

3    A. Yes.

4    Q. And there is the name Brandon Brown there as

5 well. Do you see that?

6    A. Yes.

7    Q. And what is the reason indicated on that

8 Scheduled Fantus Cancellations Notification form for

9 why Mr. Brown's appointment was canceled?

10    A. Court at Markham.

11    Q. Okay. And then if we turn the page to Brown

12 Supp 22 (indicating), the External Operations logbook,

13 this is the Ex Ops' logbook from April 8, 2012 [sic];

14 is that right?

15    A. Yes.

16    Q. And this is the 0600 to --

17    A. 1400.

18    Q. -- 1400 shift?

19    A. Yes.

20    Q. All right. And if we turn the page to Brown

21 Supp 23, we see "Brandon Brown"; is that correct?

22    A. Yes.

23    Q. And we see his ID number as 12-1102219; is

24 that correct?

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 79

DANIEL MORECI
June 9, 2015

1    A. Yes.

2    Q. And the reason or the location where it

3 specifies for him is? What does that say there, sir?

4    A. Court.

5    Q. Okay. So based upon your review of what's

6 contained in this particular exhibit, which is Defense

7 Exhibit No. 3, sir, where was Mr. Brandon Brown on

8 April 8, 2013?

9    A. He was at court.

10    Q. Okay. I want to show you also, sir, what has

11 been marked, previously marked as Defense Exhibit

12 No. 4.

13      MR. PASQUINELLI: Counsel, this is Brown 1 and

14 Brown 2.

15      Ms. Court Reporter, if you could mark

16 these exhibits as well.

17      (WHEREUPON, Defendant's Exhibit

18      No. 4 was marked for

19      identification as of 06/09/2015.)

20 BY MR. PASQUINELLI:

21    Q. Okay. Director Moreci, I'm showing you what's

22 been marked as Defendant's Exhibit No. 4. Do you

23 recognize what this exhibit is?

24    A. Yes, a booking card.

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 80

1    Q.  Okay.  And there's various information that's
2  contained in this booking card; is that correct?
3    A.  Yes.
4    Q.  And one of the pieces of information that's
5  contained within this card is the date that a
6  particular inmate is released; is that correct?
7    MR. MORRISSEY:  Well, I object to the extent
8  this isn't covered by my 30(b)(6).  What you're
9  expanding on is fine if you give me the courtesy.
10    MR. PASQUINELLI:  No.  I believe it goes to
11  the allegations.
12      Just for the record, I'd just like to
13  note that you had indicated in your pleadings that
14  due to the Sheriff's policy and practice of failing
15  to transport, your client was not transported to
16  several surgery dates in July, I believe, through
17  November of 2013, and I'm establishing the fact for
18  the record that Director Moreci will testify based
19  upon his review of the documentation as to the
20  release date of Mr. Brandon Brown in this case.
21    MR. MORRISSEY:  I'm fine as long as you give
22  me the same courtesy to explore other areas.
23    MR. PASQUINELLI:  You're free to ask questions
24  about what we've just discussed; so...

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 81

1    MR. MORRISSEY:  And all other reasonable
2  follow-up questions.
3    MR. PASQUINELLI:  Well, counsel, we'll get
4  there when we get there.  Please let me just finish
5  mine.
6    MR. MORRISSEY:  I'm just letting you know
7  you're opening up some territory here.
8    MR. PASQUINELLI:  Well, I would just like to
9  finish.
10    MR. MORRISSEY:  Fine.
11    MR. PASQUINELLI:  I gave you a lot of courtesy
12  in your examination.
13    MR. MORRISSEY:  Fine.
14    MR. PASQUINELLI:  I would expect the same
15  courtesy with mine.
16    MR. MORRISSEY:  Okay.
17    MR. PASQUINELLI:  I would appreciate it if
18  you just please allow me to finish my examination.
19  Thank you.
20  BY MR. PASQUINELLI:
21    Q.  So, Director, just showing you what has been
22  marked as Defendant's Exhibit No. 4, for
23  identification, again this is a Cook County Jail
24  History Card; is that right?

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 82

1    A.  Yes.
2    Q.  And this contains some information on there as
3  to the date Mr. Brandon Brown was released; is that
4  correct?
5    A.  Yes.
6    Q.  And that date was July 15, 2013; is that right?
7    A.  Yes.
8    Q.  And the second page, Brown Supp 2, that record
9  also indicates that he was transferred or remanded to
10  the custody of the Illinois Department of Corrections
11  on July 15, 2013; is that right?
12    A.  Yes.
13    Q.  There's an allegation, Director, that's been
14  made in this case, there's been several allegations
15  that have been made in the case that the Sheriff's
16  Office lacks the necessary resources to -- strike
17  that.
18    MR. PASQUINELLI:  I'm going to withdraw that
19  question.  I'm going to withdraw that line of
20  questioning altogether.  If I could have one moment,
21  please?
22      (WHEREUPON, a brief recess was
23      had.)
24    MR. PASQUINELLI:  Okay.

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 83

1    MR. MORRISSEY:  Are you done?
2    MR. PASQUINELLI:  Yes.  I don't have any more
3  questions.
4      FURTHER EXAMINATION
5  BY MR. MORRISSEY:
6    Q.  You have no personal knowledge what an
7  Interagency Health Inquiry Form is; right?
8    A.  Yes.
9    Q.  That's correct?
10    A.  Yes.
11    Q.  And you're not aware of what documentation the
12  Sheriff's Office is required to make in that form?
13    A.  Can you rephrase that?
14    Q.  I just want to make it clear when you were
15  testifying previously, you were asked questions
16  about -- strike that.
17      Do you know if the Sheriff is required
18  to input any information into an Interagency Health
19  Inquiry Form?
20    A.  I'm not aware of that.
21    Q.  Are you aware that the jail is under federal
22  monitors?
23    A.  Yes.
24    Q.  Are you aware that part of the monitoring

TOOMEY REPORTING  (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 21

DANIEL MORECI
June 9, 2015

Page 84

1  requires the Sheriff to use Interagency Health Inquiry
2  Forms?
3      A.  No.
4          MR. PASQUINELLI:  Object.  I believe this is
5  outside the scope of 30(b)(6).  Answer the question.
6  BY MR. MORRISSEY:
7      Q.  You were looking at some documents titled
8  Patients Scheduled for Offsite Treatment, and you
9  reflected on a page from May 6, 2013, where you said --
10  strike that.
11          Monday, April 8, 2013, you testified
12  there was a Patients Scheduled for Offsite Treatment
13  form reflecting Mr. Brown had court that day; right?
14      A.  What day was it?
15      Q.  April 8, 2013.
16          MR. PASQUINELLI:  Right here (indicating).
17  BY THE WITNESS:
18      A.  Yes.
19  BY MR. MORRISSEY:
20      Q.  Would one of the Sheriff's employees make that
21  entry that he was in court?
22      A.  Yes.
23      Q.  Did the Sheriff make any entry into his
24  computer database that Mr. Brown didn't attend his
          TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 85

1  medical visit that day because he was in court?
2      A.  No.
3      Q.  Does the Sheriff of Cook County ever challenge
4  Cermak's judgment regarding the delivery of medical
5  care to prisoners at the jail?
6          MR. PASQUINELLI:  Objection to the form of the
7  question.
8          THE WITNESS:  Can you reword that?
9  BY MR. MORRISSEY:
10      Q.  Does the Sheriff challenge Cermak's judgment
11  regarding providing medical care to the prisoners at
12  the jail?
13          MR. PASQUINELLI:  Objection to the form of the
14  question.
15          THE WITNESS:  I still don't understand it.
16  BY MR. MORRISSEY:
17      Q.  You testified when Mr. Pasquinelli asked you
18  questions that you rely on Cermak, the Sheriff relies
19  on Cermak when deciding whether to move somebody to
20  an outside jail; right?
21      A.  Yes.
22      Q.  And you also said, I believe, that Cermak's
23  the individual or the entity responsible for health
24  care for the prisoners at the jail?
          TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 86

1          MR. PASQUINELLI:  I don't believe he testified
2  to that.  Objection.
3          MR. MORRISSEY:  All right.
4  BY MR. MORRISSEY:
5      Q.  Is the Sheriff responsible for providing
6  prisoners at the jail health care?
7          MR. PASQUINELLI:  Objection, outside the
8  scope of the 30(b)(6); outside the scope of the
9  testimony.  Objection, calls for a conclusion.
10  Objection, form.
11  BY THE WITNESS:
12      A.  Cermak Health Services is responsible for
13  the health care of the inmates.
14  BY MR. MORRISSEY:
15      Q.  So would you agree that the Sheriff is not
16  responsible for providing health care to the prisoners
17  at the jail?
18          MR. PASQUINELLI:  Same objections.  This is
19  outside the scope of the 30(b)(6).
20  BY THE WITNESS:
21      A.  I believe the County is responsible.
22  BY MR. MORRISSEY:
23      Q.  Have you ever observed the Sheriff of Cook
24  County challenge Cermak's delivery of health care
          TOOMEY REPORTING   (312) 853-0648

---

DANIEL MORECI
June 9, 2015

Page 87

1  to prisoners at the jail?
2      A.  No.
3      Q.  Have you ever observed the Sheriff override
4  a decision by Cermak regarding nursing staffing?
5          MR. PASQUINELLI:  Objection.  This is way
6  outside the scope of the 30(b)(6).  Objection, form,
7  but answer the question subject to that, Director.
8          THE WITNESS:  I don't understand the question.
9  BY MR. MORRISSEY:
10      Q.  You're aware that the RTU opened within the
11  past year; right?
12      A.  Yes.
13      Q.  And Cermak is responsible for staffing the RTU;
14  correct?
15      A.  Yes.
16      Q.  Have you ever observed the Sheriff encourage
17  Cermak to spread the staffing in the RTU?
18          MR. PASQUINELLI:  Objection, form.  Objection,
19  foundation.  Objection, outside of scope.  Objection,
20  relevance.
21          THE WITNESS:  Can you reword that question?
22  BY MR. MORRISSEY:
23      Q.  Sure.  Have you ever observed Sheriff Dart
24  discuss with Cermak the staffing of nursing care at
          TOOMEY REPORTING   (312) 853-0648

Plaintiff's Exhibit 15 Page 22

DANIEL MORECI
June 9, 2015

Page 88

1  the RTU?

2       MR. PASQUINELLI:  Same objections, outside the

3  scope of the 30(b)(6).  Objection, form.

4  BY THE WITNESS:

5       A.  No.

6  BY MR. MORRISSEY:

7       Q.  Who sets the weekly meetings with Sheriff Dart?

8       MR. PASQUINELLI:  Objection.  I believe that's

9  been asked and answered, but answer the question.

10  BY THE WITNESS:

11      **A.  I would believe his secretary does.**

12  BY MR. MORRISSEY:

13      Q.  Does Sheriff Dart run the Sheriff's meetings

14  that are held weekly?

15      MR. PASQUINELLI:  Objection.  This is outside

16  the scope of the 30(b)(6).  Answer the question.

17  BY THE WITNESS:

18      **A.  Yes.**

19  BY MR. MORRISSEY:

20      Q.  Does the Sheriff ever set on the agenda the

21  relocation of prisoners to outside jails?

22      **A.  No.**

23      MR. PASQUINELLI:  Same objections, but answer

24  the question.
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 89

1  BY MR. MORRISSEY:

2       Q.  Are there minutes kept of the Sheriff's weekly

3  meetings?

4       **A.  I'm not aware.**

5       Q.  How are you notified of the Sheriff's weekly

6  meetings?

7       **A.  How am I notified?**

8       Q.  Correct.

9       **A.  With an email.**

10      Q.  Who emails you?

11      **A.  His secretary.**

12      Q.  And what's the secretary's name?

13      **A.  Right now it's Tim Kaufman.**

14      Q.  In front of you is Defendant's Exhibit No. 2.

15  Do you see that?

16      **A.  Yes.**

17      Q.  As a member of the Sheriff's Department, have

18  you ever seen that document before?

19      MR. PASQUINELLI:  I'm sorry.  I'd object to

20  that.  What specific page are the referring to,

21  Counsel?

22      MR. MORRISSEY:  I'm looking at the first page

23  of Exhibit 2, which is COOK 279.

24      THE WITNESS:  Can you repeat the question?
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 90

1  BY MR. MORRISSEY:

2       Q.  Have you ever seen this document before or are

3  you familiar with reading this document, Exhibit 2,

4  which is Bates-stamped COOK 279?

5       **A.  Not before today, no.**

6       Q.  Do you know where are appointments

7  scheduled in August and September for Mr. Brown when

8  you previously testified he was outside the Cook

9  County Sheriff's custody?

10      **A.  Can you repeat that?**

11      Q.  Do you remember previously testifying Mr. Brown

12  left the Sheriff's custody in July of 2013?

13      **A.  Yes.**

14      Q.  Do you know what Exhibit 2 in front of you is,

15  this printout?

16      MR. PASQUINELLI:  Objection.  That's been asked

17  and answered.

18  BY THE WITNESS:

19      **A.  You just told me it was the scheduling.**

20  BY MR. MORRISSEY:

21      Q.  Before I told you, did you know it was a

22  schedule document?

23      **A.  I could have figured it out.**

24      Q.  Do you know why there were scheduling entries
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 91

1  for Mr. Brown in August and September 2013?

2       **A.  Yeah, because they don't know when he's going**

3  **to leave.**

4       Q.  Does the Sheriff tell Cermak when a prisoner

5  leaves?

6       **A.  Not that I'm aware of.  They probably do.  I**

7  **don't know.**

8       MR. MORRISSEY:  Nothing further.

9       MR. PASQUINELLI:  Okay.  We'll reserve the

10  Director's testimony.

11      FURTHER DEPONENT SAITH NOT.

12

13

14

15

16

17

18

19

20

21

22

23

24

            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 23

DANIEL MORECI
June 9, 2015

Page 92

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
    BRANDON BROWN,                  )
 4                                  )
            Plaintiff,              )
 5                                  )
        v.                          )  No. 14 CV 7945
 6                                  )
    THOMAS DART, SHERIFF OF         )
 7  COOK COUNTY, et al.,            )
                                    )
 8          Defendants.             )

 9          I hereby certify that I have read the

10  foregoing transcript of my deposition, consisting of

11  pages 1 through 91, given at the time and place

12  aforesaid, taken before KATHLEEN M. DUFFEE, CSR, and

13  I do again subscribe and make oath that the same is a

14  true, correct, and complete transcript of my deposition

15  so given as aforesaid and includes changes, if any,

16  so made by me.

17

18                     _____
                          DANIEL K. MORECI
19

20  SUBSCRIBED and sworn to

21  before me this     day

22  of             .

23  _____

24      Notary Public
        TOOMEY REPORTING    (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 94

```
 1  this action.

 2          IN WITNESS WHEREOF, I do hereunto set my hand

 3  and affix my seal of office at Chicago, Illinois, this

 4  19th day of June, 2015.

 5

 6                    _____

 7                       KATHLEEN M. DUFFEE
                         Notary Public, Cook County, Illinois
 8                       My commission expires September 25, 2018

 9

10

11

12  CSR Certificate No. 084-003497

13

14

15

16

17

18

19

20

21

22

23

24          TOOMEY REPORTING    (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 93

```
 1  STATE OF ILLINOIS   )
                        )  SS:
 2  COUNTY OF COOK      )

 3          I, KATHLEEN M. DUFFEE, a Notary Public within

 4  and for the County of Cook, State of Illinois, and a

 5  Certified Shorthand Reporter of said state, do hereby

 6  certify:

 7          That previous to the commencement of the

 8  examination of the witness, DANIEL K. MORECI,

 9  designated Rule 30(b)(6) representative, he was first

10  duly sworn to testify the whole truth concerning the

11  matters herein;

12          That the foregoing deposition transcript was

13  reported stenographically by me, was thereafter reduced

14  to typewriting via computer-aided transcription under

15  my personal direction, and constitutes a true record of

16  the testimony given and the proceedings had;

17          That the said deposition was taken before me at

18  the time and place specified;

19          That the reading and signing by the witness of

20  the deposition transcript was not waived;

21          That I am not a relative or employee of

22  attorney or counsel, nor a relative or employee of such

23  attorney or counsel for any of the parties hereto, nor

24  interested directly or indirectly in the outcome of
            TOOMEY REPORTING    (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 1

| A | | | | |
|---|---|---|---|---|
| abundance | 82:20 | 47:1 53:7 | asking 75:5 | 18:14 20:4 | basically |
| | alvarez 2:7 | 71:3,6 78:9 | assigned 34:3 | 22:19,23 | 54:2 73:24 |

*Index page — word index with columns A and B.*

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 24

DANIEL MORECI
June 9, 2015
Page 2

| brief 24:9,11 | 4:18 15:2 | 39:18 41:3 | chicago 1:18 | 25:21 40:1 |
|---|---|---|---|---|
| 82:22 | 17:17 22:23 | 41:18 42:2 | 2:3,8 94:3 | 66:6 |
| briefly 60:5 | calls 49:14 | 42:5 44:12 | 6:19 15:17 | communica... |
| 61:8 | 86:9 | 44:13 47:17 | 6:6:5 | 37:16,24 |
| bring 42:22 | campus 18:1 | 47:23 | complete | 40:21 |
| 43:15 44:18 | 62:10 | 48:4 51:22 | 26:19,23 | consist 50:15 |
| 46:14 55:10 | 67:5 | 53:15,18,21 | 29:7,14 | completing |
| 56:6,10 | canceled 78:9 | 54:6 57:19 | 52:16,17,18 | 74:5 |
| 70:19 | cancellation | 57:19 60:23 | 56:10 92:14 | 92:10 |
| bringing 56:2 | 7:13 | 60:11 | constitutes | considering |
| brings 47:4 | cancellations | classification | 93:15 | |
| brought | 78:1,8 | 26:10,12,14 | contact 32:13 | |
| 56:18 66:23 | cancel 15:23 | 35:6 60:7,8 | 60:17 | |
| brown 1:3 | 61:22 62:2 | 60:11 | contain 15:21 | |
| 4:4,8 54:15 | 63:19,19,21 | classificati... | contained | |
| 54:19 58:19 | 66:6,15 | 13:12 | 79:6 80:2,5 | |
| 64:16,17 | 67:9 71:14 | cleanliness | contains | |
| 65:1,12 | 73:18 74:10 | 50:16 | 77:14 82:2 | |
| 67:18,19,19 | 74:22 75:12 | clear 83:14 | continued | |
| 69:5,24 | 76:4,14,17 | clearance | 4:4 | |
| 70:23 71:3 | 85:18,19 | 30:20,24 | continuing | |
| 71:9,13,18 | 86:12 87:4 | 31:6,15,23 | 93:10 | |
| 71:22 72:1 | 87:13,17,24 | clears 24:18 | contract 64:6 | |
| 72:5,20 | 91:4 | 63:20 | conversation | |
| 73:18,20,23 | cermaks | client 80:15 | 66:23 | |
| 77:2,2 78:4 | 56:20 85:4 | clients 57:14 | conveyed | |
| 78:11,20,21 | 85:10,12 | collect 43:15 | 93:14 | |
| 79:7,13,14 | 86:24 | 44:17 46:1 | cook 1:6,16 | |
| 80:20 82:3 | certain 28:2 | 55:9 56:6 | 2:7,11 5:9 | |
| 82:8 84:13 | 36:1 | collecting | 10:13 11:24 | |
| 84:24 90:7 | certificate | 56:1 | 23:11 26:1 | |
| 90:11 91:1 | 94:12 | collects 47:3 | 34:4,9,13 | |
| 92:3 | certified 1:17 | 47:17 | 34:16,23 | |
| browns 69:16 | 93:5 | column 25:13 | 35:2,7 43:6 | |
| 78:9 | certify 92:9 | com 2:4 | 43:9,15,21 | |
| bus 42:16 | 93:6 | come 34:4 | 44:10,18 | |
| business 69:8 | challenge | 34:16,18 | 45:6 50:19 | |
| **C** | 85:3,10 | 43:18,22 | 51:20,22,24 | |
| call 26:10 | 86:24 | 44:6,10 | 52:2,21,24 | |
| 46:19 53:20 | change 77:1 | 55:3 | 53:1 54:19 | |
| 53:22,24 | changed | coming 44:1 | 56:6 58:12 | |
| 54:4 | 75:22 | commence... | 62:7,11 | |
| called 1:11 | changes | 93:7 | 64:6,7,7 | |
| | 92:15 | commission | 65:8,16,19 | |
| | checklist | 94:8 | 67:18 68:5 | |
| | 27:2 | communica... | 68:6,6 | |
| | checks 25:16 | consider | | |

DANIEL MORECI
June 9, 2015
Page 4

| designee 4:15 | different | 16:23 18:24 | 90:2,3,22 | cast 7:1 | 22:14 |
|---|---|---|---|---|---|
| 51:22 | 77:9 | 57:9 87:24 | documented | eastern 1:2 | entitled |
| detainee | diploma 6:23 | direct 67:2 | 54:9 80:19 | 92:2 | 42:22 |
| 28:14,19 | direct 67:2 | 17:19 19:3 | 83:11 | education | entity 52:13 |
| 59:1,24 | 74:2 | 30:7,11 | documented | 6:22 | 85:23 |
| 61:10,16,23 | direction | 68:8,13 | 51:10 54:11 | educational | entries 90:24 |
| 62:21,24 | 93:15 | 66:8,13 | documents | 31:6,12,14 | entry 25:18 |
| 63:12,20,22 | directly 35:5 | 76:22 80:24 | 16:9 | effective 9:11 | 60:22 |
| 64:3,4 66:7 | 35:8 93:24 | discussion | 47:5 84:7 | either 76:17 | esquire 2:4,9 |
| 67:5,7 | director 5:7 | 16:9 | doesnt 13:9 | electric 42:2 | 2:15 |
| 68:14,19 | 5:15,16,23 | dispensary | doing 16:5 | electronica... | essence 74:15 |
| 70:19 72:17 | 7:20 9:20 | 50:20,22 | 20:22 | 41:20,21,24 | establishing |
| 76:19 | 9:24 10:6 | 51:16,20 | disqualifiers | 67:16 | 60:17 |
| detainees | 16:19 21:6 | disrupt 31:12 | 28:5 | eligible 11:7 | et 1:6 92:7 |
| 7:24 33:17 | 26:19 29:6 | disseminate | dont 4:9 8:10 | 11:15,20 | evaluation |
| 33:22,24 | 43:1 45:17 | 68:2 | 10:16 15:19 | 13:12,18 | 62:16 |
| 34:7 59:24 | 46:8 49:19 | 9:23 | 23:22,6,6 | 14:24 19:18 | evidence 46:7 |
| 64:10 65:9 | 49:19 50:3 | 87:16 | 29:10,20 | 39:24 | ex 78:13 |
| 65:16 70:11 | 52:11 53:13 | 53:10 60:4 | 30:6 | email 15:7,9 | exact 52:1 |
| 73:5 | 58:10 60:4 | 13:6 | 33:19 38:3 | 15:11,14 | exactly 36:1 |
| 74:11 | 64:14,24 | distinction | 41:9 44:14 | 19:17 21:17 | examination |
| determinat... | 65:4,6,18 | 58:5 | 45:16 46:4 | 22:5 55:20 | 1:12 3:2 |
| 62:3 63:13 | 66:1 67:2,3 | division 1:2 | 52:4 54:2 | 55:21 66:5 | 43:12 58:6 |
| determine | 67:24 68:1 | 5:20,20 6:4 | 58:2,16 | 89:9 | 81:12,18 |
| 13:23 26:8 | 68:6 70:6 | 6:5,9,12,13 | 61:20 62:7 | emailed 22:2 | 81:12,18 |
| 27:10 31:13 | 71:24 72:11 | 6:17,18,20 | 64:12 66:21 | 22:6,13 | 83:4 93:8 |
| 31:14 34:22 | 73:13,23 | 7:22,11,24 | 83:2 85:15 | emails 21:21 | examined |
| 38:3 44:9 | 74:8 77:12 | 16:21,22 | 86:1 87:8 | 21:24 89:10 | 4:20 |
| 48:7,17 | 79:21 80:18 | 26:13,16 | 91:2,7 | emergency | example |
| 50:18 60:23 | 81:21 82:13 | 55:23 66:14 | dr 15:13,17 | 5:2,6,9 | 55:9 |
| 61:4,22 | 85:9 87:8 | 17:10 63:5 | 15:20 16:3 | employed 5:2 | excuse 64:17 |
| 62:17 64:3 | directors | divisions | 16:6,10,12 | 5:15,16,23 | executive 5:7 |
| 64:8 65:21 | 17:10 63:5 | 21:21 60:18 | 17:6,18,21 | employee | 7:20 9:20 |
| 74:11 | 91:10 | doctor 13:7 | 18:12,15,21 | 93:21,22 | 9:24 10:6 |
| determines | disappear | 16:19 62:5 | 19:17 57:9 | employers | 16:19 72:17 |
| 25:18 43:18 | 76:18 | 16:19 62:5 | due 80:14 | 42:19,20 | 9:24 10:6 |
| disciplinary | 7:17 8:20 | 2:24 92:12 | duffee 1:15 | 84:20 | exhibit 3:11 |
| 25:21 27:21 | 11:17 35:22 | 93:3 94:7 | 2:24 92:12 | encourage | 3:15 8:18 |
| 39:23 | discipline | duly 4:2,19 | 93:3 94:7 | 87:16 | 3:13 4:9,10 |
| dewitt 10:20 | 30:20,24 | 55:15 | 3:1:2 | enter 20:7,12 | 4:13 7:14 |
| 58:15 | 31:2 | 58:15 | **E** | entered 20:5 | 8:12,13,17 |
| didnt 29:23 | discretion | 51:7,12 | e 3:1,9 | 21:13 | 9:23 18:24 |
| 30:14 37:3 | 21:12 51:12 | 55:2 56:5 | | enters 21:18 | 23:11 24:1 |
| 84:24 | discuss 16:16 | 56:16 89:18 | | entities 22:3 | 24:16,20 |

DANIEL MORECI
June 9, 2015
Page 3

| 69:19 70:18 | 69:18 72:14 | 27:1,4,14 | currently 5:2 | 62:10,12,17 | 86:24 |
|---|---|---|---|---|---|
| 73:9,9 | 73:24 76:24 | 32:5,9,10 | 5:8 9:11 | 44:2 45:2,5 | deny 74:23 |
| 81:23 85:3 | 77:8,17 | 33:11,18 | 67:16 72:14 | 45:8,22 | department |
| 86:23 89:23 | 79:13 81:3 | 34:1,5,8,15 | custody 7:24 | 46:1,12 | 5:5,12 9:11 |
| 90:4,8 92:7 | 89:21 93:22 | 35:7 36:22 | 10:24 13:18 | 52:7 61:15 | 10:13 23:11 |
| 93:2,4 94:7 | 93:23 | 35:7 36:22 | 38:9,12 | 62:8 64:16 | 24:20,23 |
| cookcountyil | counties 8:24 | 36:23 37:9 | 82:10 90:9 | 71:19 73:10 | 30:23 32:23 |
| 2:10 | 19:8 58:11 | 37:15 38:9 | cv 1:5 92:5 | 73:21 84:13 | 39:3 41:6 |
| copy 65:7 | 58:20 | 43:22,24 | | 84:14 85:1 | 48:16 49:7 |
| 74:9 | county 1:6,16 | 54:20,23 | **D** | 92:21 94:4 | 53:23 54:1 |
| correct 4:16 | 2:7,11 5:9 | 55:14,19 | d 1:19 3:1 | days 7:18 | 56:18 62:7 |
| 12:17 18:12 | 10:13,21,21 | 59:6 70:5,7 | 65:12 | 45:4 | 64:7 74:23 |
| 19:6 36:13 | 12:1 23:11 | 70:9,10,11 | daily 6:18 | decide 13:7 | 82:10 89:17 |
| 37:12 39:5 | 23:20 26:1 | 70:15,18,19 | 44:2 | decides 13:22 | depend 55:14 |
| 40:24 41:1 | 28:1 34:5,6 | 77:3 78:10 | daley 1:18 | 22:20 28:2 | depending |
| 59:11,17 | 34:9,13,16 | 79:4,9,15 | 2:8 | deciding 27:6 | 35:5 |
| 60:19 61:12 | 34:23 35:2 | 84:13,21 | daniel 1:10 | 28:20 85:19 | depends |
| 61:18,24 | 35:7 43:6,9 | 85:1 92:1 | 3:3 4:17 5:1 | decision | 33:16 35:24 |
| 62:3,5,13 | 43:15,24 | courtesy 80:9 | 92:18 93:8 | 13:16 14:17 | 51:6 |
| 63:18 63:23 | 44:10 48:18 | 92:18 93:8 | 93:23 | 14:17 30:1 | deponent |
| 65:16 66:18 | 45:7 50:19 | 81:15 | dart 1:6 2:11 | 30:3 87:4 | 91:11 |
| 66:24 68:3 | 51:20,23 | courts 1:14 | 1:6,17 18:20 | decisions | deposition |
| 68:22 69:1 | 52:2,21,24 | 4:4 66:9 | 4:4 66:9 | 52:5 | 1:10 4:3 7:7 |
| 69:5,13 | 53:1 54:19 | 87:23 88:7 | 20:5 27:14 | decline 62:23 | 7:15 57:24 |
| 70:20 71:3 | 56:7 58:12 | 88:13 92:6 | 31:18 36:13 | defendant | 65:4 75:22 |
| 71:10,15,19 | 58:17,17,21 | database | 36:20 37:12 | 1:7,8 | 77:17 92:10 |
| 72:2,5,15 | 59:1 61:6 | 31:18 36:13 | 37:18 84:24 | defendants | 92:14 93:12 |
| 72:21 73:6 | 61:24 62:7 | 23:21 24:1 | 24:7,17 | 1:7,3 15 | 93:17,20 |
| 74:13 75:14 | 62:11,18,21 | 24:7,17 | 27:14 28:1 | dart 4:5 12:17 | depositions |
| 76:1,10 | 63:6,9,11 | 25:10 47:13 | 33:12 36:23 | 6:4 18:20 | 1:15 |
| 77:18 78:21 | 63:21,23 | 33:12 36:23 | 38:10 50:9 | 63:5 67:20 | describe 9:4 |
| 78:24 80:2 | 64:1,6,7,7,9 | 38:10 50:9 | 54:20,24 | 77:5,12 | 54:22 65:11 |
| 80:6 82:4 | 65:8,16,19 | 54:20,24 | 55:14 59:6 | 81:22 89:14 | described |
| 83:9 87:14 | 65:15,16,19 | 55:14 59:6 | 61:9 69:20 | 87:2 | 66:1,2,4,22 |
| 88:9 92:14 | 65:20 70:18 | criminal 5:21 | 70:3,7,7 | defense 67:12 | 67:10 |
| corrections | 73:6,6 | criteria 26:7 | 80:5,20 | 67:17 68:1 | describes |
| 10:14 23:12 | 74:13 76:6 | 27:10,20 | 82:3,6 | 77:4 79:6 | 26:18 65:13 |
| 58:13 62:8 | 76:16 81:23 | 28:10 | dated 68:9 | 79:11 | designate |
| 64:7 82:10 | 85:3 86:21 | csr 2:24 | delegate 21:2 | defer 62:15 | 49:23 |
| costs 52:20 | 86:24 90:9 | 92:12 94:12 | 21:9 | delegated 2:7 | designated |
| couldnt 13:1 | 92:7 93:2,4 | et 70:3 | daily 1:19 | 21:9 | 1:11 4:18 |
| 33:19 | 94:7 | cumulative | 16:12 17:20 | delegates | 93:9 |
| counsel 52:12 | course 69:14 | 71:23 | 39:11,14 | 57:5 | designation |
| 64:16 67:13 | 92:7 93:2,4 | current 32:9 | | delivery 85:4 | 32:3 |
| | court 1:1 | | | | |

DANIEL MORECI
June 9, 2015
Page 5

| 25:16 29:11 | 25:23 26:9 | floor 7:22 | 63:21 | 47:5,17 | 85:23 86:6 |
|---|---|---|---|---|---|
| 29:15 54:15 | 27:22 35:12 | follow 9:12 | foundation | 92:11,15 | 86:12,13,16 |
| 54:18 57:23 | 35:17 48:7 | 70:14,19 | 38:21 56:22 | 93:16 | 86:24 |
| 64:18,20 | 56:21 | following | 87:19 | gmail 2:4 | hear 54:6 |
| 67:14,20 | first 7:6 | 27:15 35:3 | free 80:2,22 | 11:4,15 | held 18:9,22 |
| 77:1,4,5,12 | 80:17 | 35:13 | freely 51:2 | 13:24 14:10 | 88:14 |
| 77:13 79:6 | factor 27:6 | follows 4:20 | frequent 34:9 | 14:20 15:22 | henry 10:21 |
| 79:7,11,17 | factors 25:21 | 52:7 61:15 | frequently | 24:18 27:3 | 58:17 |
| 79:22,23 | facts 46:7 | followup | 14:21 20:2 | 27:5,13,23 | hereto 93:23 |
| 81:22 89:14 | failing 80:14 | 81:2 | friday 68:9 | 35:1,4 | hereunto |
| 90:3 90:13 | fair 33:17 | foregoing | 69:4 71:8 | 50:20 54:7 | 94:2 |
| 90:14 | 61:6 | 92:10 93:12 | 71:22 72:4 | 56:4 58:4 | hes 47:9 |
| exhibits | 63:13 64:4 | form 9:7 10:2 | front 89:14 | 56:17 91:2 | high 6:23 7:4 |
| 79:16 | 65:23 74:24 | 13:20 15:8 | 90:14 | 75:11,17 | 11:4,5 |
| expanding | 80:9 | 18:4,16 44:2 | further 27:13 | 76:24 80:8 | 31:10 35:9 |
| 80:9 | familiar 7:23 | 19:20 22:23 | 58:2 83:4 | going 19:7,12 | 31:10 35:9 |
| expect 54:18 | 36:19 63:1 | 22:23,24 | 91:8,11 | 27:3 36:1 | hire 75:6 |
| 81:14 | 90:3 | 23:21 29:7 | 52:8 58:5 | 52:8 58:5 | held 18:9 |
| expectation | fantus 78:1,8 | 23:21 29:7 | **G** | 64:4,13,15 | highest 1:12 |
| 54:22 | far 30:17 | 29:9,12 | g 4:15 | 67:17 75:24 | history 11:17 |
| expenses | february | 31:1,4 33:1 | ged 31:11 | 76:24 82:18 | 63:22 64:2 |
| 52:14,23 | 50:6,8 68:9 | 34:17 36:14 | general 8:3,6 | 82:19 91:2 | 74:5,15,17 |
| experience | 69:4 71:22 | 34:17 36:14 | 8:18 9:12 | good 19:10 | home 46:19 |
| 7:2 28:3 | 72:1 | 40:2,4 41:10 | 9:14 59:11 | gov 2:10 | hospital |
| 62:10 67:4 | federal 1:13 | 40:4 43:24 | management | graduate 7:4 | 17:18 38:6 |
| expires 94:8 | 83:21 | 48:20 49:13 | 8:19 21:13 | greater 46:23 | 38:13 39:5 |
| explain 8:10 | felt 51:9 | 53:10 56:23 | 68:12,17,18 | **H** | 40:2 61:17 |
| 9:14 59:11 | field 20:17 | 57:5,80 | 68:22,24 | h 3:9 | 61:22 72:2 |
| explains 57:5 | file 32:10 | 72:11,17 | 69:3 74:21 | hand 42:19 | hours 45:11 |
| explorer 80:22 | 33:5,6 | 68:22,24 | 76:12 78:8 | 94:2 | 45:13 |
| extent 80:17 | filled 33:1 | 69:3 74:21 | 79:4 84:4 | happening | house 7:24 |
| external 5:19 | find 38:5 | 76:12 78:8 | 85:10 | 94:20 | 10:14 60:15 |
| 7:13 21:23 | fine 80:9,21 | 79:4 84:4 | generally | happens 33:3 | housed 21:22 |
| 22:7,9 | 81:10,13 | 83:7,12,19 | 20:15 23:21 | head 26:6 | 34:8 53:8 |
| 80:11,14 | 84:13 85:6 | 85:10 | 33:21 43:5 | health 22:24 | housing 9:5 |
| 81:18 | 87:6,18 | **F** | 67:3 | 29:9,11 | 10:9 16:24 |
| 78:12 | first 4:19 5:7 | 88:3 | george 2:15 | 30:16 62:2 | 23:12,20,23 |
| | 5:14 9:20 | forms 24:1 | 60:13 74:20 | 63:2,22 | 25:10,13,14 |
| facilities 8:1 | 26:18 29:6 | 60:13 74:20 | 81:9,11 | 65:19 66:6 | 26:9 29:20 |
| 10:18 17:10 | 64:3 68:1,3 | forth 66:6 | give 47:8 | 73:9,19 | 29:21 |
| 73:5 | 63:4 68:1,1 | 72:7 | 50:9 51:1 | 74:2,5,10 | 39:18 |
| facility 19:19 | 89:22 93:9 | forwards | 80:9,21 | 74:23 80:24 | 31:12 32:17 |
| 23:22 24:17 | five 17:14 | | given 33:8 | 83:18 84:1 | 33:3 52:20 |

Plaintiff's Exhibit 15 Page 25

DANIEL MORECI
June 9, 2015

Page 6

hrns 35:9
huddle 17:18
17:19,22
huddies
57:11

**I**
id 3:10 17:14
50:16 78:23
80:12 89:19
identificati...
4:12 8:15
23:5 64:22
67:22 77:7
79:19 81:23
identified
13:16 36:13
40:7 59:24
63:7 73:18
75:21
identifies
73:4
identify
10:18 11:2
12:13 37:18
38:5,12
55:3
identifying
11:7,13,15
20:24 44:6
ill 4:14 38:24
illinois 1:1,17
1:19 2:3,7,8
65:8 82:10
92:1 93:1,4
94:3,7
im 8:17 9:16
12:7 13:7
15:5 23:7
30:9,9 34:7
47:7 50:9
52:4,8
56:19 58:22
64:13,14,24

65:2 66:11
66:16 67:16
67:24 68:6
68:7 76:24
79:21 80:17
82:18,19
83:20 89:4
89:19,22
91:6
imacs 12:7
imagine
52:21
incarcerated
47:9
incidents
17:20
include 27:1
included
21:16,24
includes
92:15
inclusive
67:19
independe...
64:2
indicate
65:14 71:5
indicated
61:11 74:4
74:21 78:7
80:13
indicates
11:2,12
82:9
indicating
29:2 74:3
78:12 84:16
indication
71:2,17
indirectly
93:24
individual
11:19 46:14

49:12 59:5
61:23 62:17
63:12,22
69:4 73:4
74:11 85:23
individuals
60:18
information
21:18 25:3
25:6 30:15
33:19 35:20
35:23 36:3
40:24 45:16
49:4,7 51:2
51:4 63:19
75:2 76:4
76:10 80:1
80:4 82:2
83:18
informed
61:21 76:8
informing
73:19
inmate 12:19
13:24 14:10
26:27:2,3
28:1,2
29:24 31:2
31:10,12,22
31:23 32:9
32:19,20
36:2 47:21
53:15 55:23
63:7 65:21
69:1 70:9
74:12,23
75:5,7,13
76:4 76:5
80:6
inmates 8:23
9:5 10:9,14
10:23 11:2
11:7 15:22
16:24 17:15

21:22 26:5
61:23 62:17
50:14,17,19
50:24 51:20
54:13 60:14
62:9,16
74:10 86:13
input 25:6
83:18
inputting
25:2 37:8
inquiry 11:19
22:24 29:9
32:14 74:3
74:5,15
75:4 76:12
76:13 83:7
83:19 84:1
inspect 49:21
49:23
inspecting
50:1
inspection
50:5,12,15
inspections
51:8
instance
70:17
instructions
32:6
intelligence
22:23
interagency
22:23 29:9
29:11 30:7
74:2,5,15
91:5 10:9,14
85:10 44:8
interested
93:24
intergover...

65:7
interruption
24:10
intervals
34:9
investigating
12:9
investigation
11:22
37:8,16
38:1 40:8
41:15 42:13
44:7 45:11
45:13 46:24
47:4 50:13
55:4,10,18
56:3,11,18
56:21 59:16
62:12 63:4
63:5 64:6,8
67:4,5
69:13 70:8
81:23 83:21
85:5,12,20
85:24 86:6
86:17 87:1
jails 37:11
57:11 88:21
jefferson
10:21 58:17
jones 7:20
16:19 17:8
judgment
62:3,15
65:4,10
july 76:3
80:16 82:6
82:11 90:12
june 1:19
50:6,8
58:11 71:8
72:8,10
73:20 94:4
jurisdiction
14:14 21:20

17:8,21
18:2 25:22
26:1,5,8
27:12 28:11
28:22 33:21
34:12,16,23
34:24 35:2
35:8,12
37:8,16
38:1 40:8
41:15 42:13
44:7 45:11
45:13 46:24
47:4 50:13
55:4,10,18
56:3,11,18
56:21 59:16
62:12 63:4
63:5 64:6,8
67:4,5
69:13 70:8

**J**
j 1:18 2:8,9
2:15
jail 5:10 8:1
10:18 12:1
12:5 16:13
73:20 94:4

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 8

75:15,17
76:14,18
85:1,4,11
medically
47:22 74:11
medium
60:14
meet 16:12
16:13 18:1
meeting
16:14,15,16
16:18,20
17:1,2,9,15
17:21 30:7
30:11 66:15
meetings
15:20
member 39:3
48:16 89:17
members
18:1 25:5
32:23 41:3
41:5 49:6
mennella
15:12,13,17
16:3,6,10
16:12 17:16
17:23 18:12
18:15,21
19:17 57:9
mennellas
15:20
michael 2:9
2:10
military 7:2

mine 81:5,15
minutes 89:2
mischaract...
74:18
mitt 36:7,10
modified
66:24
moment 23:5
24:11 82:20
monday
69:20 70:22
72:10 84:11
monitoring
83:24
monitors
83:22
month 33:18
38:17
monthly
49:21 51:13
months 38:15
50:7
moreci 1:10
91:8;
morton 7:1
moultrie
10:20 58:15
move 22:20
27:11,21
28:22 36:13
85:19
moved 13:18
19:18 35:15
moving 22:16
23:22 27:17

45:20 46:10
49:1,17
52:15,18
53:17 55:8
55:15 56:15
nava 20:17
57:3 58:23
61:8 63:14
66:24
66:2 67:15
74:17 77:10
80:7,21
81:1,6,10
81:16 81:19
83:11 84:6
84:19 85:9
86:4,14,22
90:11 91:8
91:22 94:1
99:1,20
**N**
n 3:1
name 4:7,8
7:14 46:23
20:18 55:17
69:5,16,16
70:23 71:9
73:18 78:4
79:22
89:12
named 5:14
names 14:18

78:8
notified 60:5
60:11 61:9
61:12,15
63:5 67:7
89:5,7
notifies 57:19
60:8
notify 68:1
68:18
november
9:1 80:17
number 3:10
8:18 77:1
78:23
numbers
72:17
numerous
43:22
**O**
oath 92:13
object 52:8
74:17 80:7
84:4 89:19
objection 9:7
10:12 13:20
14:6 18:4
18:16,17
19:20 21:4
21:5 28:15
34:17 36:14

55:11
56:12,20,22
56:23 57:12
57:13 85:6
85:9 86:2
86:7,9,10
87:5,6,18
87:18,19,19
88:3,8,15
90:16
objections
53:12 86:18
88:23
observed
86:23 87:3
occasion 37:1
occasionally
17:17 19:2
44:20
occasions
52:13 73:5
offhand
58:16
office 4:5
7:21 9:18
11:2,6 13:9
13:17 22:7
25:5 29:17
30:15 31:14
32:2,8,12
32:16 33:7
34:11,22
36:9 37:4,7
37:21,23
38:4,12,19
39:16,20
40:10,23
43:14 44:21
46:11,16,23
47:3,12

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 7

22:11,17,21
27:8,18
33:9,15
35:16
jurisdictions
9:6 10:10
10:13 16:24
17:6 19:1
34:8
**K**
k 1:10 3:3
4:17 92:18
93:8
kane 65:20
kankakee
10:20,24
11:13 13:13
13:19,24
14:5,10
35:5,20
36:4,10
40:3 41:11
41:14,15
42:3,8,10
42:13,17,20
42:23 43:5
43:9,15
44:6,10,18
45:6 46:1
46:13 47:4
47:8,10,14
47:17,22,23
47:24 48:16
49:2,11,21
49:23 50:1
50:6,12
51:1,16,19
51:24 52:3
52:20,23
53:8 54:16
54:23 55:3
55:10,18
56:2,6,11

56:17 57:10
57:19 58:15
58:21 59:1
63:6,8,11
63:13 94:7
kathleen 1:15
2:24 92:12
93:3 94:7
kaufman
89:13
kept 69:7
89:2
kind 60:4
know 10:16
10:22 12:18
13:3 15:19
23:8,19
29:10 30:2
30:6,17
36:1 41:9
41:13,13,19
42:2,5
43:14 44:14
44:16 47:16
47:24 51:22
51:24 52:1,4
53:1 54:2
55:9 58:16
56:13,17
60:6 62:12
74:10 75:18
75:18
little 58:23
59:2,12,20
59:21 66:3
67:11 76:21
living 32:18
10:20
located 16:20
26:12,15
32:19 48:8
48:18 50:14
53:16
location

learn 39:7
44:21
learns 45:21
leave 35:3
91:3
leaving 37:13
54:14 77:15
77:16,21
78:12,13
legbooks 7:9
7:11
length 7:1
10:11:10 15:13
15:17 16:4
17:12 20:20
20:22 54:15
80:21
length 78:23
look 12:1,8
23:8 48:17
50:16 76:23
77:2
looked 73:4
looking 12:2
54:15,18
69:3 77:23
77:24 84:7
78:18
looks 60:12
lot 73:24
81:11
**M**
m 1:15 2:20
2:24 13:4
24:13,13
45:17 58:7
58:7 92:12
93:2 94:7
mad 12:22
13:3,6,8,10
13:12,16
14:3
m3 12:23

61:17 67:6
79:2
log 54:13
logbook 7:12
7:13,13
54:14 77:15
77:16,21
78:12,13
logbooks 7:9
7:11
long
11:10 15:13
15:17 16:4
17:12,20
17:9,11,21
manifest 73:3
march 11:12
12:4,8,12
24:8 48:17
26:4,7,14
29:14 36:9
36:12,19
38:4,8,11
39:19,24
40:7,16,20
49:10,18
58:10 72:4
76:3
mark 4:9
8:11 23:2
31:20 64:18
73:7 79:15
marked 3:10
4:11 8:14
8:17 23:4,7
64:13,15,21
67:12,13,21
67:24 76:23
77:6 79:11
79:11,18,22
81:22
markham

78:10
matter 28:16
71:5
matters
93:11
maximum
5:19 60:14
mean 31:9
32:8 70:4
means 13:2
medical
12:13,20
13:2,4,4,7
14:3,12
14:9,12,16
14:18,22
14:18,23
15:8 24:5
15:24 24:8
25:8,13
26:20,23
29:19,22
31:1 32:17
73:18 78:4
89:12
named 5:14
names 14:18

personally
66:17
personnel
17:11
persons
30:16 55:17
pertaining
2:14
phone 53:20
54:4
piatt 10:20
58:3
pick 59:5
picking 58:24
pieces 80:4
place 16:4
17:13 92:11
93:18
placement
23:12 25:3
25:10,13,14
26:19,23
29:18,22
31:1 32:17
32:21,24
33:6 37:1
37:21,23
41:18 42:20
43:14 44:21
46:11,16,23
47:3,12

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 9

48:4,6
51:11,18
53:9 57:4
57:18 58:24
may 6:19
61:12 63:8
67:6 68:2
68:13,13,18
68:19 69:8
73:19 76:17
82:16 83:12
99:3
officer 15:18
20:11,12,15
20:17,22,23
21:2,9,15
21:18,21
25:9 33:7
45:13 46:13
officers 43:5
46:1
official 56:5
offsite 68:8
68:14,20
69:19 72:24
84:8,12
okay 11:15
23:10 62:5
58:18 60:4
60:16 61:10
62:11 63:3
64:6 64:18
68:10 69:24
84:21 11:15

33:18 60:21
ones 14:19
15:23 77:24
27:7,22
28:11,22
33:14 34:4
34:8,12,24
35:8,12
38:1 46:24
66:17,18,20
86:8,19
87:6,19
88:21,24
89:1
overcrowded
25:22 26:8
overcrowdi...
11:4 25:16
26:1 60:6
override
14:12,16
23:6 29:18
pasquinelli
4:16 9:7
pardon 9:22
part 29:8
77:17 83:24
particular
61:16 68:14
99:8
part 4:7
pat 4:7
patient 69:19
74:23 75:5
75:24 79:6
84:8,12
parties 93:23
passing...
2:4
pay 52:2
people 13:7
13:12,18
period 58:14
59:12 88:6

23:22 24:17
25:23 26:9
27:7,22
28:11,22
33:14 34:4
34:8,12,24
35:8,12
38:1 46:24
66:17,18,20
86:8,19
87:6,19
88:21,24
89:1
overcrowded
25:22 26:8
overcrowdi...
11:4 25:16
26:1 60:6
override
14:12,16
23:6 29:18
**P**
p 1:20 13:4
24:13,13
58:7,7
p1 12:22,24
13:8
p2 12:22
14:13,24
46:6
page 65:12
65:13,18,23
66:11,12,22
67:12 68:1,5
76:16
outside 10:13
14:13 16:24
17:5 19:1
72:11 73:23
73:24 74:1
74:16,23
67:13,16,23
once 16:13

78:20 82:8
84:9 89:20
89:22
71:21 77:9
77:23,24
78:16,21
80:10,23
81:3,8,11
81:14,17,20
82:18,24
82:24 83:2
83:4 84:1
84:16 85:6
85:13,17
86:1,7,18
85:23 88:3
88:2,8,15
88:23 89:19
90:16 91:9
part4:7
patient 69:19
74:23 75:5
75:24 79:6
84:8,12
parties 93:23
passing...
2:4
pay 52:2
people 13:7
13:12,18
period 58:14
59:12 88:6
periodically
76:1
persons 15:6
personal
41:23 42:22
83:6 93:15

74:19 76:24
77:8,11
79:13,20
80:10,23
81:3,8,11
81:14,17,20
82:18,24
83:2 84:4
84:16 85:6
85:13,17
86:1,7,18
85:23 88:3
88:2,8,15
88:23 89:19
90:16 91:9
piatt 10:20
58:3
placement
23:12 25:3
plaintiff 1:4
1:12 2:5 4:8
4:19 58:19
plaintiffs
3:11 4:10
8:13 23:3
64:12 64:24
80:1
please 42:15
43:13 44:9
pleadings
80:1
point 42:20
75:21
policies 94:5

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 26

DANIEL MORECI
June 9, 2015

Page 10

policy 26:17
53:24 54:3
66:1,4,5,8,8
66:12,13
80:14
portion 29:7
29:15,18,22
31:3
position 5:15
5:18 6:1,8
6:12
possible
28:21
possibly
28:12,23
42:21 51:9
potential
16:3 57:6
potentially
11:7
practice
75:22 80:14
preliminary
25:22 26:9
preparation
7:6 57:23
prepare 15:6
44:3
prepared
4:14
presence
70:11
present 2:1
2:14 10:8
10:12 41:2
46:22
presently
7:19,23
10:23 52:2
pretrial
33:21,24
34:7
pretty 15:16
previous 93:7

previously
91:4
prisoners
11:13,16
12:13 19:1
20:7,13,24
21:12 33:21
34:3 35:7
35:11 36:7
36:10,13,23
38:20 40:17
41:11 42:17
42:22 43:4
43:6,9,20
44:6,9,17
45:6 47:9
51:23 52:23
57:6,10
58:12 85:5
85:11,24
86:6,16
87:1 88:21
prisons 34:4
probably
10:16 50:10
53:22 91:6
problem 63:2
procedure
34:12,15
35:15,17,21
36:4,22
37:8,15,22
37:24 38:5
38:9,12
39:8,23
40:1,7,21
41:14 42:8
42:9,13
46:1,23
47:3,13,18
48:7,15,18
49:2,10
52:3,20
53:6,8 55:3
55:10 56:2
56:21 57:19

91:4
profiles
35:10
program
31:11,11
prohibit 28:6
prohibits
76:9
proper 50:19
properly
42:23 62:17
65:21 71:13
provide
60:22 62:12
63:19 64:10
65:15 75:2
provided
68:12,18
providing
62:9 75:23
psych 13:1,4
public 1:16
92:24 93:3
94:7
purpose
65:3
pursuant
1:12 4:4
put 19:23
26:2 33:5
33:11 37:3
35:16

Q
queen 32:13
question 9:8
9:9 10:3
13:15,21
14:2 18:5
18:17,19
19:21 21:5
21:6 28:16

35:24
36:15 38:23
39:1,12
40:20 43:1
43:11 44:24
45:17 46:7
46:8,9
48:12,21
49:14,15
52:9 53:11
53:13 55:7
57:13,14
82:19 84:5
85:7,14
87:7,8,21
88:9,16,24
89:24
questioning
82:20
questions
59:23 60:3
74:1 80:23
81:2 83:3
83:15 85:18
quick 58:3,10
quickly 15:16

R
read 92:9
reading 90:3
93:19
real 58:10
really 46:18
reason 25:14
60:24 61:5
75:15 78:7
79:2
reasonable
81:1
reasons
29:23 43:20
43:23,24
75:13,17
reassign 12:2

28:17 34:18
36:15 38:23
39:1,2
41:13 44:24
45:17 46:7
46:8,9
48:12,21
50:5 57:16
59:6 60:1
66:21 74:6
receipt 42:10
56:17
receive 42:17
68:24 73:8
received
26:22
receiving
19:17 28:1
33:8 42:18
90:19
recess 24:12
58:6 82:22
recognize
14:13
record 4:24
55:16 58:18
71:12,17
80:12,18
82:8 93:15
records 32:12
37:4,7
41:11,14
42:3,6 47:9
47:13,16
51:15,19,23
62:16 63:12
reduced
72:15,17
reduced
93:13
referring
89:20

12:10
reassigned
11:3 25:23
49:18
reassigning
22:10 24:16
recall 7:10
50:5 57:16
59:6 60:1

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 11

reflect 36:23
37:1 49:4
reflected 14:3
31:18 37:11
84:9
reflecting
84:13
refusal 54:12
refused 29:24
refuses 62:21
regarding
16:7,10
35:17,21
40:24 57:6
85:4,11
87:4
registered
31:10
regular 17:15
69:8
regularly
16:12 17:22
30:11
reincarcera...
34:16
relative 93:21
93:22
release 80:20
82:3
relevance
21:5 42:24
45:15 87:20
relied 69:11
relies 85:18
relocate 27:7
28:20 38:1
40:21 56:21
57:10
relocated
13:13 26:9
28:11 33:14
40:8 41:11
41:15 46:24

48:15 49:10
51:24 59:1
60:24 61:5
61:23 62:18
63:8 65:22
66:7 74:12
75:14 76:1
76:5,15,16
relocating
13:17 36:5
relocation
11:13,20
20:24 28:6
33:15 39:24
57:7 58:13
60:1 65:9
65:22 74:23
76:19 88:21
remanded
49:24 50:24
82:9
remember
29:20 90:11
rename 67:17
repeat 89:24
90:10
rephrase
18:19 25:1
25:24 55:7
83:13
report 7:19
75:24 76:24
77:24 78:24
81:24 82:24
89:24 90:24
91:24 92:24
report 67:18
responsibl...
11:10 20:23

9:24 10:24
11:24 12:24
13:24 14:24
15:24 16:24
19:24 20:24
21:24 22:24
23:24 24:24
24:24 25:24
27:24 28:24
29:24 30:24
31:24 32:24
33:24 34:24
37:24 38:24
39:24 40:24
41:24 42:24
43:24 44:24
45:24 46:24
47:24 48:24
49:24 50:24
51:24 52:24
53:24 54:24
55:24 56:24
57:24 58:24
59:20 69:1
70:11,18
71:14
require 9:12
required
26:19 29:7
29:14 30:23
87:13
requires 67:5
67:7 84:1
requiring
review 7:6,14
7:17 10:5
11:17 51:15
reviewed
63:1
reviews 68:3
reword 9:9
21:7 22:12
responded
31:16
response
5:20 31:21
50:4
rescheduled
50:8
reserve 91:9
resources
45:24 46:5
46:12 82:16
respect 52:17
62:15 65:8
respond 61:1
reviews 68:3
responsibl...
11:10 20:23

72:13
representat...
1:11 4:18
13:5 14:3
91:9
request 4:6
52:12 76:17
requested
45:16 46:23
71:14
require 9:12
52:19,22
85:23 86:5
86:12,16,21
87:13
returned
32:16,20,24
33:11 70:14
73:20 83:12
83:17
requires 67:5
67:7 84:1
returns 34:24
rule 6:14,6
review 7:6,14
7:17 10:5
11:17 51:15
51:19,23
53:4 53:5
53:6 57:23
61:4,22
64:23 74:24
74:11 76:14
79:5 80:19
reviewed
63:1
reviews 68:3
reward 9:9
21:7 22:12
28:17 38:7
38:23 40:5
43:12 46:9
saw 71:24
saying 19:18
says 27:23
28:24 30:20
31:6 32:5
68:8 69:23

21:3 9:44 5
49:11 57:5
responsible
11:6,12
11:17 20:15
20:20 24:24
25:2 32:3
34:11 37:4
37:7 42:12
50:1 52:13
52:19,22
85:23 86:5
86:12,16,21
87:13
risk 11:5
room 16:21
16:22 26:2
60:15
round 50:18
rounds 30:13
routinely
47:5
rta 26:13
87:10,13,17
88:1
rule 6:14,6
4:18 93:9
rules 1:13
run 19:24
60:4 88:13
runs 16:18
20:2

S
s 3:9
saith 91:11
saturday
27:4,15
35:3,4
saw 71:24
saying 19:18
says 27:23
28:24 30:20
31:6 32:5
68:8 69:23

25:16 27:18
28:4 33:22
34:1,5,9,13
37:19 46:14
48:13 73:1
73:15 75:19
77:21 78:14
78:20 81:24
82:6,11
83:7 84:13
84:16 85:20
86:3 87:11
89:13
risk 11:5
room 16:21
16:22 26:2
60:15
round 50:18
rounds 30:13
routinely
47:5
rta 26:13
87:10,13,17
88:1
rule 6:14,6
4:18 93:9
rules 1:13
run 19:24
60:4 88:13
runs 16:18
20:2

S
s 3:9
saith 91:11
saturday
27:4,15
35:3,4
saw 71:24
saying 19:18
says 27:23
28:24 30:20
31:6 32:5
68:8 69:23

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 12

71:22 72:10
76:12
scheduled
90:22
scheduled
40:14
44:19,22
46:24 53:6
54:16,17
58:19 68:8
68:14,19
69:19,24
72:1,5,24
78:8 84:8
84:12 90:7
scheduling
15:23
52:24
54:5 90:19
90:24
school 6:23
7:4 31:11
31:16
scope 53:11
84:5 86:8,8
86:19 87:6
87:19 88:3
88:16
se 62:8
seal 94:3
second 7:22
67:1 71:20
82:8
secretary
88:11 89:11
secretarys
89:12
section 30:24
74:3
security 5:9
5:19 11:4
55:9,15
35:9 48:11
see 8:18
23:13 25:14

29:1 30:21
31:7 32:6
68:4,8,9
69:15,18,20
70:1,23
78:2,5,21
78:23 89:15
seen 8:20
23:15 29:11
89:18 90:2
select 16:23
25:18 31:24
send 9:21
10:23 14:4
send 27:1
31:24 33:11
35:16,19,20
36:3,4,7
sending 16:2
75:12
sends 15:21
16:4 45:17
42:2,5
senior 19:14
sent 14:22
35:8,12
41:14,19,21
41:24 55:21
sentenced
91:4 92:6
september
90:7 91:1
91:24
services 53:2
62:2,12,12
65:13,15,19
66:6 73:9
73:19 74:10
86:12

set 15:15
88:20 94:2
sets 88:7
share 47:23
shares 47:24
sheet 39:18
sheriff 1:6
2:11 10:15
10:23 13:5
14:4,4 17:5
19:7,11
22:20 28:6
28:21 31:20
31:24 33:11
35:16,19,20
35:23 41:8
42:19,20
43:5,8,14
44:17 45:21
45:24 47:17
47:17,21
47:23 48:4
48:12 49:6
49:11 53:7
51:11,18
53:9 54:22
54:5 95:2
58:23 59:4
61:9,11
63:7 66:9
67:6 68:2
68:13,13,18
68:19 69:8
77:5,16,23
77:16,23
80:14 82:15
83:12 84:20
85:7,17
89:5,17
90:9 92:3
91:4 92:6
94:15
sheriffs 5:9
11:7 7:24
9:11,18
11:2,6 13:9
13:17 14:12
14:17 18:9
18:21,24
19:3,15
24:20,23
64:13,15,24

65:2 67:24
29:17,21
39:7,10
30:4,15,23
31:13 32:2
32:8,16,23
34:11,22
36:9,12,20
37:5,21,23
38:4,11,19
39:3,7,16
40:10 42:9
42:19,20
43:5,8,14
45:24
46:17 70:6
76:18
somebody
51:5
somewhat
14:13 27:21
46:19 85:19
sorry 68:4
sort 60:24
64:9 75:4
south 2:2
18:1,10,22
span 54:17
spans 67:17
speaking
9:17
special 15:8
32:5 44:4
specific 11:24
12:13 15:11
35:21 42:11
43:2 45:8
44:16 45:24
46:17 70:6
69:12
staff 18:7,12
50:17 62:8
69:12
staffing 87:4
87:13,17,24
stand 54:6
43:23 76:18
start 16:2
state 1:16,18
1:23 91:1
2:7 4:5 92:1
staying 11:19
stays 34:23
stenograph...
93:13
step 21:19
22:10,16,18
56:1 60:16
stop 29:17,21
strike 20:4,5
22:5 23:24
26:4 52:14
61:14 65:1
61:23 66:13
84:10
stronger 38:2
38:6,13,20
39:6,12
stuff 71:23

65:2 67:24
29:17,21
30:4,15,23
sir 76:13
sir 32:17,20
32:24 56:16
sign 32:17,20
signing 93:19
sir 4:23 5:2
8:17 23:7
62:5,20
65:11 79:3
79:7,10
63:6,8 77:9
situation
46:17 70:6
76:18
somebody
51:5
sorry 68:4
sort 60:24
64:9 75:4
south 2:2
18:1,10,22
span 54:17
spans 67:17
speaking
9:17
special 15:8
specific 11:24
specifically
44:3 62:16
40:23 46:2
44:3 63:7
64:11 71:18
72:2 73:21
specified
93:18

specifies 79:3
speculation
sp... 6:3,6
31:4 46:14
34:15,23
31:13 32:2
sic 78:13
spell 20:18
spread 87:17
ss 93:1
staff 18:2
50:17 62:8
69:12
staffing 87:4
87:13,17,24
stand 54:6
43:23 76:18
start 16:2
state 1:16,18
1:23 91:1
states 1:1,13
2:7 4:5 92:1
stating 11:19
stays 34:23
stenograph...
93:13
step 21:19
22:10,16,18
56:1 60:16
stop 29:17,21
strike 20:4,5
22:5 23:24
26:4 52:14
61:14 65:1
61:23 66:13
84:10
stronger 38:2
38:6,13,20
39:6,12
stuff 71:23

TOOMEY REPORTING
312-853-0648

---

DANIEL MORECI
June 9, 2015

Page 13

subject 28:16
52:10 53:12
87:7
subscribe
92:13
subscribed
92:20
subscription
65:12
subsections
4:15
summarize
66:3
superinten...
32:13,18
50:3 55:22
55:24
superinten...
1:7 10:60 17
60:22
supers 5:23
55:23
supp 64:16
64:17 65:12
65:16 70:9
71:22 72:20
72:20,20,21
73:23 77:2
77:2 78:12
78:21 82:8
sure 9:11
12:7 22:13
49:18 50:9
67:15 87:23
surgery
80:16
switched
12:7
sworn 4:12,10
49:6 92:20
93:10
system 12:2,9
12:12 14:3

37:8 48:13
48:17 49:3
49:8 65:21
69:13
T
t 3:9
take 23:8
58:3 70:9
76:23 77:2
taken 1:12,15
4:4,5 92:12
talk 11:17
50:17,17
51:3 67:10
28:1,4
37:14 40:3
talked 58:23
66:13 76:21
77:16
talking 24:15
34:7
team 5:21
50:4
technical
66:8
tell 13:1 19:9
23:18 33:20
54:7 58:11
60:12 65:6
60:16,17
77:13 91:4
tells 67:8
temporarily
70:7,10
71:2,17
80:1 82:13
temporary
28:6 57:7
ten 10:17
term 13:11
territory 81:7
12:12 14:3

37:8 48:13
59:14 84:11
85:17 86:1
90:8
testify 80:18
thread 12:19
testifying
83:15 90:11
18:14 22:3
testimony
57:14 59:7
74:6 80:9
91:10 93:16
thank 52:15
81:19
thats 10:21
13:2,14
28:1,4
37:14 40:3
47:22 58:24
59:10 63:7
theres 10:16
12:18 15:7
15:15 17:2
58:16 60:5
60:23 61:4
69:23 70:6
2:24 3:24
8:24 9:24
there 5:6,12
14:6 24:5
6:13 81:5
80:1 82:13
82:23 83:9
43:16
14:22 15:24
16:14 24:9
18:24 19:24
22:19,24
24:24 25:24
28:4 36:6
28:24 29:24

45:16 47:21
52:7 77:1
thomas 1:6
34:24 35:24
34:24 35:24
37:19,24
thread 12:19
three 1:11
18:14 22:3
22:14 45:9
44:24 47:24
44:24 47:24
46:16,24
tier 31:17
50:16
tiers 50:14
tim 89:13
time 15:15
40:9 45:10
52:9 53:14
54:24 55:24
56:24 57:24
tim 89:13
time 15:15
50:14
times 39:4
45:9 59:11
64:24 65:24
66:24 67:24
titled 84:7
78:24 79:24
83:24 84:24
84:24 85:24
85:24 86:24
told 30:18
90:19,21
toomey 1:24
2:24 3:24
4:24 5:24
top 24:6 68:8
topic 66:23
theyll 35:2,3
24:24 13:24
14:24 15:24

30:24 31:24
34:24 35:24
transfer 7:8
7:10 8:23
11:8 14:13
17:5 19:1
25:23 20:13
25:13 26:21
24:6
transferee
58:24
transferred
19:24 22:18
39:4 58:20
60:18 61:16
64:24 65:24
66:24 67:24
68:24 81:16
82:9
transfers
16:3
transport
43:5 46:18
54:13 80:15
transportat...
74:24 75:24
7:12 21:22
22:8 53:22
64:24 65:24
55:23 56:24
77:15
transported
42:15 55:17
71:13,15,18
73:5 80:15
transporting
34:12 42:12
43:8
transports
43:4 45:6
treat 63:2
treated 67:5
67:7
treatment

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 27

DANIEL MORECI
June 9, 2015

Page 14

| | | | | |
|---|---|---|---|---|
| 57:21 61:10 | 9:17 85:15 | 2:15 | 82:18,19 | **Y** |
| 61:17 68:9 | 87:8 | | **witness** 3:2 | **yeah** 10:21 |
| 68:15,20 | **understand...** | **W** | 4:1,19 9:9 | 16:11 42:1 |
| 69:1,20,24 | 8:22 63:18 | **w** 2:4 | 9:18 13:22 | 54:3 91:2 |
| 70:7 72:2 | 76:8 | **waived** 93:20 | 14:8 18:6 | **year** 6:15 7:4 |
| 72:24 73:6 | **unit** 5:21 | **walk** 50:16 | 18:19 19:22 | 87:11 |
| 84:8,12 | 11:18 21:23 | **want** 28:2 | 21:7 28:17 | **years** 5:13,22 |
| **treatments** | 22:8 26:11 | 29:23 30:14 | 29:3 34:19 | 6:6,10,14 |
| 73:10 | 26:12,15 | 44:1 58:4 | 36:16 38:23 | 11:11 17:14 |
| **trial** 44:1,3 | 32:19 53:16 | 59:1 67:2 | 39:10,13 | 18:14 59:17 |
| **tried** 66:3 | 60:7,11 | 67:11 70:22 | 40:5 43:2 | **youre** 8:6 |
| **true** 37:4 | **united** 1:1,13 | 72:9 74:1 | 43:12 45:1 | 9:15 10:19 |
| 59:21 62:9 | 92:1 | 79:10 83:14 | 45:18 46:9 | 12:1,9 13:5 |
| 63:9 69:9 | **unredacted** | **wasnt** 54:17 | 48:22 49:16 | 18:14 23:8 |
| 69:16 71:6 | 73:14,17 | **way** 39:19 | 53:14 55:7 | 39:4 60:10 |
| 72:18 73:11 | **updating** | 87:5 | 55:13 56:14 | 61:21 62:5 |
| 74:16 92:14 | 37:5 | **week** 14:23 | 57:1,15 | 70:14 77:23 |
| 93:15 | **use** 12:5 26:7 | 16:13 27:4 | 58:4 63:15 | 77:24 80:8 |
| **truth** 93:10 | 27:10,21 | 27:15 35:2 | 84:17 85:8 | 80:23 81:7 |
| **turn** 68:5 | 84:1 | 35:13 45:9 | 85:15 86:11 | 83:11 87:10 |
| 70:22 71:21 | **usually** 15:15 | 54:20,23 | 86:20 87:8 | **youve** 59:17 |
| 72:9 78:11 | 60:12 | 59:6,9,12 | 87:21 88:4 | 63:3,5 66:9 |
| 78:20 | | 59:15,20,21 | 88:10,17 | 74:8 |
| **turning** | **V** | **weekly** 16:16 | 89:24 90:18 | |
| 69:18 71:8 | **v** 1:5 4:4 7:22 | 18:1,10,21 | 93:8,19 | **Z** |
| **two** 38:15 | 16:21,22 | 19:15 20:3 | 94:2 | |
| 45:9 66:17 | 26:16 66:14 | 66:9 88:7 | **wont** 27:4 | **0** |
| 77:23 | 92:5 | 88:14 89:2 | **work** 5:4 | **00** 45:12,12 |
| **type** 23:15 | **van** 42:16 | 89:5 | 45:11 | 45:19,19,19 |
| 60:13 | **various** 60:17 | **weigh** 27:17 | **worked** 5:11 | 45:19 |
| **types** 12:20 | 60:17,22 | **went** 50:21 | **working** | **02** 24:13 |
| **typewriting** | 72:17 73:10 | **western** 2:2 | 59:16,17 | **06** 4:12 8:15 |
| 93:14 | 74:22 75:13 | **weve** 80:24 | 67:4 | 23:5 64:22 |
| **typically** | 80:1 | **whats** 5:6 | **wouldnt** | 67:22 77:7 |
| 15:20 59:3 | **vehicle** 46:13 | 6:22 8:17 | 40:13 52:1 | 79:19 |
| 59:16 | **version** 73:15 | 23:7 47:20 | 75:17 | **0600** 78:16 |
| | 73:17 | 64:15 67:12 | **writing** 54:21 | **08** 4:003497 |
| **U** | **viii** 26:13 | 76:23 79:5 | 57:5 | 94:12 |
| **uhm** 17:17 | **visit** 40:24 | 79:21 89:12 | **written** 26:17 | **09** 4:12 8:15 |
| 44:3 58:15 | 42:1 85:1 | **wheelchair...** | | 23:5 64:22 |
| 66:14 | **visited** 51:15 | 28:14,19 | **X** | 67:22 77:7 |
| **uhmhmm** | **visits** 44:4 | **whereof** 94:2 | **x** 3:1,9 | 79:19 |
| 22:15 27:16 | 51:12 | **whos** 23:19 | **xi** 6:9,12 | |
| **understand** | **vournazos** | **withdraw** | | **1** |

TOOMEY REPORTING
312-853-0648

DANIEL MORECI
June 9, 2015

Page 15

| | | | | | | |
|---|---|---|---|---|---|---|
| 26:4,7,14 | 68:5 | 28:24 29:24 | 49 24:13 | 85 30 648 1:24 | 88:24 89:24 |
| 29:14 36:9 | 281 67:18 | 30:24 31:24 | | 2:24 3:24 | 90:24 91:24 |
| 36:12,19 | 69:19 | 32:24 33:24 | **5** | 4:24 5:24 | 92:24 93:24 |
| 38:4,8,11 | 282 67:18 | 34:24 35:24 | 5 64:16,17 | 6:24 7:24 | 94:24 |
| 39:19,24 | 283 67:18 | 36:24 37:24 | 500 1:18 2:3 | 8:24 9:24 | 8th 40:12 |
| 40:8,10,16 | 68:6 | 38:24 39:24 | 52 58:7 | 10:24 11:24 | 72:1,7 |
| 40:20,22 | | 40:24 41:24 | 58 3:5 58:7 | 12:24 13:24 | |
| 41:21,24 | **3** | 42:24 43:24 | | 14:24 15:24 | **9** |
| 46:22 48:6 | 3 3:13,17 | 44:24 45:24 | **6** | 16:24 17:24 | 9 64:17 |
| 48:12 49:3 | 8:18 9:12 | 46:24 47:24 | 6 1:11 4:3,18 | 18:24 19:24 | 91 92:11 |
| 49:10,18 | 9:14 13:8,8 | 48:24 49:24 | 9:18 45:12 | 20:24 21:24 | 9th 1:19 |
| 50:6,6,8,8 | 23:2,4,7,11 | 50:24 51:24 | 45:17,19 | 22:24 23:24 | |
| 51:11,18 | 24:1,13,16 | 52:24 53:24 | 52:10,13 | 24:24 25:24 | |
| 52:19,22 | 24:20 25:16 | 54:24 55:24 | 53:11 65:12 | 26:24 27:24 | |
| 53:6,19 | 29:1,15 | 56:24 57:24 | 70:22 80:8 | 28:24 29:24 | |
| 54:1 55:3 | 45:19 54:15 | 58:24 59:24 | 84:5,9 86:8 | 30:24 31:24 | |
| 58:10,11,14 | 54:18 57:23 | 60:24 61:24 | 86:19 87:6 | 32:24 33:24 | |
| 68:9 69:4 | 72:10 73:20 | 62:24 63:24 | 88:3,16 | 34:24 35:24 | |
| 69:20 70:23 | 77:4,6,13 | 64:24 65:24 | 93:9 | 36:24 37:24 | |
| 71:8,23 | 79:7 | 66:24 67:24 | 60 35 440 2:9 | 38:24 39:24 | |
| 72:4,10 | 30 1:11 4:3 | 68:24 69:24 | 600 60 2:2 8 | 40:24 41:24 | |
| 73:20 76:3 | 4:18 9:18 | 70:24 71:24 | 600 63 2:2 3 | 42:24 43:24 | |
| 76:3 78:1 | 15:1 45:17 | 72:24 73:24 | 64 3:15 | 44:24 45:24 | |
| 79:8 80:17 | 52:10,13 | 74:24 75:24 | 67 3:16 | 46:24 47:24 | |
| 82:6,11 | 53:11 80:8 | 76:24 77:24 | **6th** 72:7 | 48:24 49:24 | |
| 84:9,11,15 | 84:5 86:8 | 78:24 79:24 | | 50:24 51:24 | |
| 90:12 91:1 | 86:19 87:6 | 80:24 81:24 | **7** | 52:24 53:24 | |
| **2015** 1:19 | 88:3,16 | 82:24 83:24 | 7 40:7,20 | 54:24 55:24 | |
| 4:12 8:15 | 93:9 | 84:24 85:24 | 45:19 | 56:24 57:24 | |
| 23:5 64:22 | 31 72:20 | 86:24 87:24 | 75 52:7 | 58:24 59:24 | |
| 67:22 77:7 | 312 1:24 2:9 | 88:24 89:24 | 77 3:17 | 60:24 61:24 | |
| 79:19 94:4 | 2:24 3:24 | 90:24 91:24 | 773 2:3 | 62:24 63:24 | |
| 2018 94:8 | 4:24 5:24 | 92:24 93:24 | 79 3:18 | 64:24 65:24 | |
| 21 77:2 | 6:24 7:24 | 94:24 | 79 45 1:5 92:5 | 66:24 67:24 | |
| 22 1:20 78:12 | 8:24 9:24 | 32 72:20 | **7th** 40:13 | 68:24 69:24 | |
| 23 3:13 78:21 | 10:24 11:24 | 33 72:20 | | 70:24 71:24 | |
| 23 37 900 2:3 | 12:24 13:24 | 34 67:19 | **8** | 72:24 73:24 | |
| 24 5:13 | 14:24 15:24 | 72:21 | 8 3:12 40:10 | 74:24 75:24 | |
| 25 77:3 94:8 | 16:24 17:24 | | 40:22 64:17 | 76:24 77:24 | |
| 26 67:18 | 18:24 19:24 | **4** | 68:9 69:4 | 78:24 79:24 | |
| 71:22 | 20:24 21:24 | 4 3:4,11,18 | 69:20 71:22 | 80:24 81:24 | |
| 279 67:18 | 22:24 23:24 | 65:12 79:12 | 72:4 78:1 | 82:24 83:24 | |
| 89:23 90:4 | 24:24 25:24 | 79:18,22 | 78:13 79:8 | 84:24 85:24 | |
| 280 67:18 | 26:24 27:24 | 81:22 | 84:11,15 | 86:24 87:24 | |
| | | | 83 3:4 | | |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 15 Page 28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNELL FLORA, | ) | 15 C 1127 |
| | ) | |
| Plaintiff, | ) | Honorable Judge |
| | ) | Matthew F. Kennelly |
| vs. | ) | |
| | ) | |
| THOMAS J. DART, et al., | ) | ***Jury Demanded*** |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF DANIEL MORECI

I, Daniel Moreci, being first duly sworn under oath, depose and state that the following is based upon my personal, firsthand knowledge that I can testify to, and that if I were called to testify, my testimony would be limited to the following topics:

**1.** I am currently employed as First Assistant Executive Director with the Cook County Department of Corrections ("CCDOC"). I have been employed by CCDOC since March 1, 1991.

**2.** As First Assistant Executive Director with CCDOC, I oversee Divisions I, and IX of the Cook County Jail, as well as CCDOC's External Operations, Emergency Response Team, and Criminal Intelligence and Investigation Division. In my current position and prior positions with the CCDOC, I attended the "Sheriff's Meetings" described in Paragraph 5 of *Plaintiff's Notice of Rule 30(b)(6) Deposition*, dated October 5, 2015. (Attached hereto as Exhibit A.)

**3.** I have been designated by Sheriff Dart, pursuant to F.R.C.P. 30(b)(6), for the limited purpose of providing testimony responsive to the topics described in Paragraph 5 of *Plaintiff's Notice of Rule 30(b)(6) Deposition*, dated October 5, 2015, attached hereto as Exhibit A.

Plaintiff's Exhibit 16 Page 1

**SHERIFF'S MEETINGS, GENERALLY**

**4.** I attended the weekly "Sheriff's Meetings" described in Paragraph 5 of Exhibit A, starting in 2009. The purpose of the weekly meetings was to discuss various issues related to the management of the Cook County Jail.

**NOTIFICATION PROCEDURES**

**5.** Based on my personal knowledge and recollection, the weekly "Sheriff's Meetings" occurred at the same date and time every week. Attendees were not notified in advance of each meeting, because they occurred at the same day and time each week.

**AGENDA AND MINUTES**

**6.** Agendas for each "Sheriff's Meeting" were not disseminated prior to or during each meeting.

**7.** Minutes for each "Sheriff's Meeting" not generated during or after each meeting.

**TOPICS OF DISCUSSION**

**8.** Based on my personal knowledge and recollection of the "Sheriff's Meetings," the following topics were not discussed:

    **a.** assignments of wheelchair using detainees to various cells/living units at Cook County Jail;

    **b.** renovations at the Cook County Jail relating to compliance with the Americans with Disabilities Act;

    **c.** accommodations for wheelchair using detainees attending court at the various Cook County criminal court buildings located throughout Cook County, Illinois; and

    **d.** the assignment of detainees with mobility issues to the Residential Treatment Unit in August 2014.

Dated: December 10, 2015.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT

Daniel Moreci
First Assistant Executive Director
Cook County Department of Corrections

OFFICIAL SEAL
JANICE A YOST
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 05/09/17

Subscribed and sworn to before me
this /o𝘁ʰday of December, 2015

Notary Public

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Donnell Flora, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 15-cv-1127 |
| *-vs-* | ) | |
| | ) | |
| Thomas Dart, Sheriff of Cook | ) | *(Judge Kennelly)* |
| County, and Cook County, Illinois, | ) | |
| | ) | |
| *Defendants.* | ) | |

# NOTICE OF RULE 30(b)(6) DEPOSITION

Defendant Sheriff of Cook County is hereby notified and requested pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure to identify and designate an individual or individuals to be deposed in regards to the following matters at 1:00 p.m. on October 20, 2015 at the Law Offices of Thomas G Morrissey at 10150 S. Western Ave, Rear Suite, Chicago, IL 60643:

1.     From May 1, 2014 to August 5, 2014, plaintiff Flora was assigned to Div8-3N-DR. For this period, identify each hospital room (or cell) plaintiff was housed. For each hospital room (or cell) describe, with reasonable

particularly, the physical accommodations provided to plaintiff to toilet and access the sink.

2.    From August 30, 2014 to the present, describe the physical features for each cell located on Tier 3-A of the Residential Treatment Unit that make each appropriate to assign a detainee who requires the use of a wheelchair. A copy of the blue print for the third floor of the Residential Treatment Unit is attached to this notice as exhibit 1.

3.    From August 30, 2014 to the present, describe the policy and procedure to assign wheelchair using detainees to Tiers 3C, 3G, and 3F of the Residential Treatment Unit, including:

      a. The number of wheelchair using detainees permitted to be assigned to each living unit at one time;

      b. The physical accommodations in each tier to accommodate wheelchair using detainees; and

      c. The written policy and/or procedure regarding the assignment of wheelchair using detainees to these tiers.

4.    In response to each housing assignment, please identify all physical accommodations provided to plaintiff Flora to shower and to access the toilet/sink combination located in each cell:

    a. From May 1, 2014 to August 5, 2014 when plaintiff was assigned to Div8-3N-DR;

    b. From August 6, 2014 to August 10, 2014 when plaintiff was assigned to Div8-3S-3123-1;

    c. From August 10, 2014 to August 21, 2014 when plaintiff was assigned to Div8-3S-3125;

    d. From September 4, 2014 to September 23, 2014 when plaintiff was assigned to Div08-3A-3-7-2;

5.    Thomas Dart, the Sheriff of Cook County, holds weekly meetings with jail leadership. First Assistant Executive Director Daniel Moreci testified in *Brown v. Dart*, 14 C 7945, these meetings are held at South Campus and run by Sheriff Dart. Similarly, Matthew Burke testified in *Roland v. Dart*, 14 C 10161, these meetings are attended by two to four people with Sheriff Dart. From January 1, 2013 to the present, identify the following information regarding these weekly meetings attended by Sheriff Dart:

    a. How participants are notified of each meeting.

    b. Whether any agenda is disseminated prior to or during the meeting and, if so, the individual in possession of the agendas.

c. Whether minutes are generated from each meeting and the individual or individuals in possession of the minutes.

d. The discussion, if any, of the assignment of wheelchair using detainees to various cells and/or living units.

e. The discussion, if any, of the 2014 ADA renovations at the Cermak Infirmary.

f. The discussion, if any, of accommodations for wheelchair using detainees attending court at Leighton, Markham, Bridgeview, Rolling Meadows, Skokie, and Maywood.

g. The movement of most wheelchair using detainees to the Residential Treatment Unit in August 2014.

6. There is a "Jail Management Meeting" held weekly at the executive director's conference room or the training area on the second floor of Division 5, according to Matthew Burke. The jail's leadership attends these meetings. From January 1, 2013 to the present, produce a designee to discuss the following information regarding the "Jail Management Meeting":

a. How participants receive notice of the meeting and location;

b. The agenda for each meeting;

c. The minutes generated for each meeting, and the individual or individual who maintains these minutes;

d.  The attendance for each meeting;

e.  Discussion, if any, regarding the assignment of living units to wheelchair using detainees;

f.  Discussion, if any, regarding the movement of most wheelchair using detainees to the Residential Treatment Unit in August 2014;

g.  Discussion, if any, regarding the physical barriers wheelchair using detainees encounter when attending court at Leighton, Bridgeview, Markham, Rolling Meadows, Skokie, and Maywood; and

h.  Discussion, if any, regarding the physical alterations of the Cermak Infirmary in 2014.

7.   From January 1, 2013 to the present, the Sheriff of Cook County's oversight of ADA issues at the Cook County Jail, including:

a.  The physical renovations to the Cermak Infirmary in 2014.

b.  The relocation of most wheelchair using detainees to the Residential Treatment Unit in August 2014, including the individuals involved in making this decision.

c.  The review of monitoring reports filed in *United States v. Cook County*, 10-cv-2946, relating to ADA issues.

d.  The change in policy and/or procedure, if any, as a result of the monitoring reports filed in *United States v. Cook County*, 10-cv-2946, relating to physical barriers for wheelchair using detainees either at the jail or on occasion when he (or she) attends court.

e.  Pursuant to General Order 24.15.8.8, adopted in August 2014, the person (or persons) responsible for maintaining "a list of cells and/or living units that can appropriately accommodate individuals with qualified disabilities" and the location of this list.

_____

Patrick W. Morrissey
Thomas G. Morrissey, Ltd.,
10150 S. Western Ave.
Suite Rear
Chicago, IL 60643
(773) 233-7900

*An attorney for plaintiff*

Plaintiff's Exhibit 16 Page 10

Exhibit 1




## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2015 I sent the foregoing by E-mail to James Nichols, 500 Richard J. Daley Center and David Condron, 69 W. Washington, Suite 2030, Chicago, Il 60602

_____

Patrick W. Morrissey
Thomas G. Morrissey, Ltd.
10150 S. Western Ave.,
Suite Rear
Chicago, IL 60643
(773) 233-7900

*An attorney for plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

**TO:**    Joel Flaxman                  David Condron
           Law Offices of Kenneth Flaxman P.C.     Assistant State's Attorney
           200 S. Michigan, Ste. 201               Conflicts Counsel Unit
           Chicago, IL 60604                    69 W. Washington, Suite 2030
           jaf@kenlaw.com                      Chicago, IL 60602
                                            david.condron@cookcountyil.gov

**PLEASE TAKE NOTICE** that I, James E. Nichols, Assistant State's Attorney, hereby certify that I sent a copy of the attached *Affidavit of Daniel Moreci* to the above-listed counsel at the above-stated addresses via electronic mail on December 11, 2015.

                                       */s/ James E. Nichols*
                                       James E. Nichols

Transcript of the Testimony of
**DAVID MORECI**

**Date:** January 10, 2017

**Case:** UNITED STATES OF AMERICA v. COOK COUNTY, ILLINOIS, ET AL

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com



DAVID MORECI
January 10, 2017

Page 2

1   APPEARANCES:
2
3       Mr. Thomas G. Morrissey
        (Thomas G. Morrissey, Ltd.)
        10249 South Western Avenue
4       Chicago, Illinois  60643
        Phone:  (773) 233-7900
5       tgmorrissey@gmail.com
6           On behalf of the Plaintiff;
7       Mr. Thomas E. Nowinski
        (ASA Civil Actions Bureau)
8       Cook County States Attorney
        500 Daley Center
9       Chicago, Illinois 60602
        Phone:  (312) 603-4327
10      thomas.nowinski@cookcountyil.gov
11          On behalf of the Defendant Cook County Sheriff
            Thomas Dart;
12
13      Ms. Jacqueline B. Carroll
        (ASA Civil Actions Bureau)
        Cook County States Attorney
14      500 Daley Center
        Chicago, Illinois  60602
15      Phone:  (312) 603-5450
        jcarroll@cookcountygov.com
16
17          On behalf of the Defendant Cook County,
            Illinois.
18
19
20          *    *    *    *    *    *
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 1

        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )  No. 10 C 2946
                                 )
COOK COUNTY, ILLINOIS; THOMAS    )
DART, COOK COUNTY SHERIFF (in    )
his official capacity); TODD H.  )
STROGER, COOK COUNTY BOARD       )
PRESIDENT (in his official       )
capacity); COOK COUNTY BOARD OF  )
COMMISSIONERS (in their official )
capacity);                       )
                                 )
            Defendants.          )

        The deposition of DAVID MORECI, called by the
Plaintiff for examination, taken pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the taking of
depositions, taken before Shelley M. Bostetter, Certified
Shorthand Reporter and Notary Public, at
500 Daley Center, 5th Floor, Chicago, Illinois,
commencing at 11:10 a.m. on the 10th day of January,
A.D., 2017.

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 3

1                I N D E X
2   WITNESS                              PAGE
3   DAVID MORECI
4       Direct Examination by Mr. Morrissey  ..   4
5       Cross-Examination by Ms. Carroll  .....  95
6
7              E X H I B I T S
8   MORECI DEPOSITION EXHIBIT            PAGE
9       No. 1  ...............................   26
10      No. 2  ...............................   32
11      No. 3  ...............................   70
12      No. 4  ...............................   43
13      No. 5  ...............................   47
14      No. 7  ...............................   72
15      No. 11 ...............................   80
16      No. 12 ...............................   90
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 1

## Page 4

DAVID MORECI
January 10, 2017

Page 4

(Witness sworn.)

WHEREUPON:

DAVID MORECI,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORRISSEY:

Q.   Would you state your full name for the record,
please.

A.   **Daniel Kenneth Moreci.**

MR. MORRISSEY:  This is the discovery deposition of
Daniel Moreci taken pursuant to notice and taken at the
States Attorney's office at the request of the States
Attorney.

BY MR. MORRISSEY:

Q.   Sir, I'm going to ask you a series of questions
in regards to the Division 1 and the Cook County Jail.
I'm going to ask you to answer the questions orally so
the court reporter can take down your responses.  Is that
understood?

A.   **Yes.**

Q.   If at any time you don't understand one of my
questions, please stop me and I'll attempt to rephrase
it.  Is that understood?

TOOMEY REPORTING
312-853-0648

## Page 5

DAVID MORECI
January 10, 2017

Page 5

A.   **Yes.**

Q.   If you answer the question, then I'll assume
you understood the question.  Is that understood?

A.   **Yes.**

Q.   What is your current position with the Cook
County Department of Corrections?

A.   **First assistant executive director.**

Q.   For how long have you held that position?

A.   **About four years.**

Q.   Prior to that were you an assistant executive
director?

A.   **Yes.**

Q.   When did you become an assistant executive
director?

A.   **I believe it was in 2011.**

Q.   To about 2013?

A.   **Yes.**

Q.   In the year 2012, were you an assistant
executive director?

A.   **Yes.**

Q.   Were part of your responsibilities to supervise
Division 1?

A.   **I didn't have Division 1.**

Q.   As an assistant executive director, did you

TOOMEY REPORTING
312-853-0648

## Page 6

DAVID MORECI
January 10, 2017

Page 6

ever have responsibilities over Division 1?

A.   **No.**

Q.   What were your responsibilities as an assistant
executive director?

A.   **I overseen [sic] Division 9, the criminal
investigations intelligence division and our emergency
response team.**

Q.   I'm going to show you -- Do you recall being
deposed in a case called Brandon Brown versus Thomas
Dart?

A.   **No.**

Q.   That was a deposition on June 9th, 2015.  It
was taken by a Patrick Morrissey.  And you were
represented at that deposition, I believe, by a
Mr. Michael Pasquinelli.  Does that refresh your memory?

A.   **No.**

Q.   And there was an attorney also for the Sheriff
by the name of George Vernasis (phonetic) there.  Does
that refresh your memory?

A.   **No.**

Q.   Do you know a person by the name of George
Vernasis?

A.   **Yes.**

Q.   I'm going to show you Page 5 of your deposition

TOOMEY REPORTING
312-853-0648

## Page 7

DAVID MORECI
January 10, 2017

Page 7

that day, and I'd ask you to look at the questions that
were asked of you on Page 5 and your responses.

A.   **(Witness complying.)  Uh-uh.**

Q.   Have you had an opportunity to read the
questions and answers in your deposition of June 9th,
2015?

A.   **Yes.**

Q.   And prior to that deposition, were you placed
under oath?

A.   **Yes.**

Q.   The same oath you took today?

A.   **Yes.**

Q.   And during that deposition, you told the truth,
correct?

A.   **Yes.**

Q.   Does that refresh -- Was this question asked of
you and did you give this response:

"QUESTION:  Prior to being named
first assistant executive director,
what was your position?
ANSWER:  Assistant executive director."

Was that question asked of you and did you give
that response?

A.   **Yes.**

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 2

DAVID MORECI
January 10, 2017

Page 8

1  Q.  And was that accurate?

2  **A.  Yes.**

3  Q.  And the follow-up question was:

4  "QUESTION:  What were your

5  responsibilities in that position?

6  ANSWER:  I oversaw maximum security

7  external operations, Division 1,

8  Division 9, emergency response team,

9  criminal investigations and intelligence."

10  Was that question asked of you and did you give

11  that response in the deposition?

12  **A.  Yes.**

13  Q.  And was that -- And does that refresh your

14  memory that as an assistant executive director at the

15  jail, your responsibilities included overseeing maximum

16  security?

17  **A.  Yes.**

18  Q.  And it also included Division 1?

19  **A.  Yeah.  At that 2015 time.  Yes.**

20  Q.  Now, you were not an assistant executive

21  director in 2015?

22  **A.  Correct.**

23  Q.  You were the first assistant?

24  **A.  Correct.**

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 10

1  **A.  Correct.**

2  Q.  In December of 2012 -- Well, let me ask you

3  again.

4  As assistant executive director, did you ever

5  have responsibilities for Division 1?

6  **A.  Yes.**

7  Q.  And what period of time did you have

8  responsibilities for Division 1?

9  **A.  I don't know the exact dates.  When I first**

10  **made assistant director I didn't have Division 1.  It was**

11  **later given to me right before I became the first**

12  **assistant executive director.**

13  Q.  And you became first assistant in December of

14  2012, to the best of your recollection?

15  **A.  Yes.**

16  Q.  And in the year 2012, was Division 1 a maximum

17  security division?

18  **A.  Yes.**

19  Q.  What is a maximum security division?

20  **A.  It's classic-issue.  It deals with either the**

21  **inmates' charges, criminal history or history done within**

22  **the jail.**

23  Q.  Are there any divisions that have a higher

24  level than maximum security?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 9

1  Q.  So as an assistant executive director, your

2  responsibilities included Division 1?

3  **A.  It's hard to explain because when I first made**

4  **first assistant director, I didn't have Division 1.  It**

5  **was later given to me in 2014, I believe.**

6  Q.  But as assistant executive director -- The

7  question at the deposition was, prior to being named a

8  first assistant executive director, what was your

9  position.  Your answer was assistant executive director.

10  And that was true, correct?

11  **A.  Yes.**

12  Q.  And as an assistant executive director, your

13  responsibilities included Division 1, correct?

14  **A.  Yes.**

15  Q.  So in the year 2012, part of your

16  responsibilities were Division 1?

17  **A.  No.**

18  Q.  Were you an assistant director in 2012?

19  **A.  Yes.**

20  Q.  And you became a first assistant director when?

21  **A.  In 2000- -- the end of 2012.  I believe,**

22  **December.**

23  Q.  So in December of 2012, you became a first

24  assistant director?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 11

1  **A.  No.**

2  Q.  So Division 1 was the highest level of security

3  at the jail?

4  **A.  Divisions 1 and 9.**

5  Q.  Are you familiar with a report by the Justice

6  Department in July of 2008?

7  **A.  Report referring to ...**

8  Q.  The Cook County Department of Corrections by

9  the Department of -- United States Department of Justice.

10  **A.  Yes.**

11  Q.  And that is approximately a 98-page report,

12  correct?

13  **A.  I'm not sure.**

14  Q.  And in 2008, were you in a supervisory

15  position?

16  **A.  Yes.**

17  Q.  What was your position in 2008?

18  **A.  I was a chief.**

19  Q.  In which division?

20  **A.  In 2008 -- I was in Division 9 for some part of**

21  **the division in 2008, and then I was later transferred to**

22  **Division 9 [sic].**

23  Q.  You're familiar with the fact that the sheriff

24  in Cook County entered into an agreed order with the

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 3

## DAVID MORECI
### January 10, 2017

Page 12

1   United States?

2     **A.  Yes.**

3     Q.  That was in 2010, correct?

4     **A.  I don't know the exact time.**

5     Q.  And you're aware of the fact that after the

6   agreed order was entered into, there have been monitors

7   at the Cook County Jail?

8     **A.  Yes.**

9     Q.  And there's monitors for healthcare, correct?

10     **A.  Yes.**

11     Q.  And there's monitors for sanitation?

12     **A.  Yes.**

13     Q.  There's monitors for security?

14     **A.  Yes.**

15     Q.  And was there a monitor by the name of

16   Ms. Campbell?

17     **A.  Yes.**

18     Q.  And periodically the monitors write reports?

19     **A.  Yes.**

20     Q.  And you, as a first assistant and as an

21   assistant executive director, review those reports when

22   they come out by the monitors?

23     **A.  Yes.**

24     Q.  What are your responsibilities currently as

## DAVID MORECI
### January 10, 2017

Page 13

1   first assistant?

2     **A.  I oversee Division 9, the criminal**

3   **investigations, intelligence division and emergency**

4   **response team.**

5     Q.  Who is the current executive director?

6     **A.  Micah Jones.**

7     Q.  In the organizational chart next to Ms. Jones,

8   are you the highest ranking sworn officer at the jail?

9     **A.  No.**

10     Q.  Who is the highest ranking sworn officer at the

11   Cook County Jail?

12     **A.  Micah Jones.**

13     Q.  Is she a sworn officer?

14     **A.  I guess.**

15     Q.  After Micah Jones, are you second in charge at

16   the Cook County Department of Corrections?

17     **A.  No.**

18     Q.  Who is?

19     **A.  There's three people at the level of chief.**

20     Q.  What are their names?

21     **A.  Matthew Burke, Terry Williams and Jane Groupser**

22   **(phonetic).**

23     Q.  Jane?

24     **A.  Jane Groupser.**

## DAVID MORECI
### January 10, 2017

Page 14

1     Q.  How do you spell it?

2     **A.  I'm not sure of the spelling.**

3     Q.  Is Matt Burke, is he a sworn officer?

4     **A.  I'm not sure.**

5     Q.  You're a sworn officer, correct?

6     **A.  Yes.**

7     Q.  What did you do to become a sworn law

8   enforcement officer in the State of Illinois?

9     **A.  I went through the academy.**

10     Q.  Did you -- Are you -- Were you required to take

11   an oath?

12     **A.  Yes.**

13     Q.  Are there three chiefs you mentioned -- is it

14   Terry Williams?

15     **A.  Yes.**

16     Q.  Are they on the same level as you are?

17     **A.  No.**

18     Q.  Do they report to you?

19     **A.  No.**

20     Q.  Do you report to them?

21     **A.  Yes.**

22     Q.  For how long has Matt Burke been a chief at the

23   Cook County Department of Corrections?

24     **A.  I'd say about five or six years.**

## DAVID MORECI
### January 10, 2017

Page 15

1     Q.  How long has Terry Williams been a chief?

2     **A.  Probably a little over a year.**

3     Q.  What are his responsibilities?

4     **A.  I report to him.  I don't know exactly what he**

5   **does other than what I do with him.**

6     Q.  Do you know what Jane Groupser's

7   responsibilities are?

8     **A.  I believe she oversees programs.**

9     Q.  How long has she been in that position?

10     **A.  Probably about six months.**

11     Q.  Was she previously at the Department of

12   Corrections?

13     **A.  Not to my knowledge.**

14     Q.  Was Terry Williams, before he became a chief,

15   was he previously at the Department of Corrections?

16     **A.  Illinois Department of Corrections.**

17     Q.  In the year -- In December of 2012, was there a

18   gentleman at the jail named Gary Hickerson?

19     **A.  No.**

20     Q.  Do you know who Gary Hickerson is?

21     **A.  Yes.**

22     Q.  Who is he?

23     **A.  He was the former executive director of the**

24   **jail.**

Plaintiff's Exhibit 17 Page 4

DAVID MORECI
January 10, 2017

Page 16

1    Q.    When did he leave the Cook County Department of
2    Corrections?
3    A.    In December.
4    Q.    Of what year?
5    A.    2012.
6    Q.    So in 2012 he was the executive director?
7    A.    I believe his last day was November 31st [sic]
8    because I got promoted December 1st and he wasn't the
9    executive director.
10   Q.    Was Ms. Jones the executive director then?
11   A.    No.
12   Q.    Who was?
13   A.    John Murphy.
14   Q.    Was there a Superintendent Martinez in Division
15   1 in December of 2012?
16   A.    He was in Division 1, but I don't know the
17   exact dates that he was there.
18   Q.    His first name is Salvador?
19   A.    Salomon.
20   Q.    Is he still with the Department of Corrections?
21   A.    Yes.
22   Q.    What position?
23   A.    Superintendent.
24   Q.    In what division?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 17

1    A.    Division 2.
2    Q.    When did Division 1 close down?
3    A.    I don't know the exact date.  I would say three
4    years now -- two, three years maybe.
5    Q.    Division 1 didn't close in the first part of
6    2016?
7    A.    I don't know the exact date.
8    Q.    So it could have been last year?
9    A.    It's very possible.
10   Q.    Give me a definition of cross-watching?
11   A.    On officer watches more than one tier.
12   Q.    What is vertical cross-watching?
13   A.    I don't know.
14   Q.    Never heard of the term vertical
15   cross-watching?
16   A.    No.
17   Q.    After the agreed order was executed by the
18   Sheriff, the County and the U.S. Department of Justice in
19   2010, did the Sheriff maintain a practice of
20   cross-watching at the Cook County Department of
21   Corrections?
22   MR. NOWINSKI:  Objection, form, speculation.
23         You can answer, if you can.
24

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 18

1    BY THE WITNESS:
2    A.    Yeah.  I can't recall when we exactly stopped.
3    Q.    In December of 2012, did the Department of
4    Corrections have a practice of cross-watching?
5    A.    No.
6    Q.    How did you know that?
7    A.    It was discussed in meetings.
8    Q.    You're familiar with the Sheriff's meetings?
9    MR. NOWINSKI:  Object to form.
10   BY THE WITNESS:
11   A.    Which meetings?
12   Q.    Pardon?
13   A.    Which meetings?
14   Q.    Meetings that are held weekly with Tom Dart and
15   Matt Burke and yourself?
16   A.    Yes.
17   Q.    And Ms. Jones, correct?
18   A.    Yes.  They're not weekly though.
19   Q.    How frequently do you -- What do you call those
20   meetings?
21   A.    I don't even know if they have a name.  It's a
22   jail meeting with the Sheriff.
23   Q.    Who attends these jail meetings with the
24   Sheriff currently?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 19

1    A.    Myself, Micah Jones, Matt Burke, Terry
2    Williams, Jane Groupser, Brad Curry, sometimes Cara
3    Smith, Ellen Burke.  That's about it.
4    Q.    Who is Helen Burke?
5    A.    She -- I believe her title is bureau chief.  I
6    don't know her exact title.
7    Q.    Is she with the Department of Corrections?
8    A.    No.  She's with the Sheriff's department.
9    Q.    How long has she been attending these Sheriff's
10   meetings?
11   A.    Always been there.  Well, on and off.  She's
12   not at every one.
13   Q.    At some point in time, did more employees of
14   the Sheriff attend these meetings with Tom Dart?
15   MR. NOWINSKI:  Object to form.
16   BY THE WITNESS:
17   A.    Not these meetings.  No.
18   Q.    Were there other meetings that you attended
19   with Tom Dart where there was a broader group of
20   Sheriff's employees?
21   MR. NOWINSKI:  Objection to foundation.
22         You can answer.
23   BY THE WITNESS:
24   A.    Yes.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 20

1    Q.  And who would attend those meetings?

2    **A.**  **Well, there was a lot of people there.  I**

3 **couldn't name everybody that was there.**

4    Q.  Would it be the superintendents that would meet

5 with Tom Dart?

6    **A.**  **Yes.**

7    Q.  And Matt Burke would be there too?

8    **A.**  **Yes.**

9    Q.  And this was prior to Ms. Jones being the

10 executive director?

11    **A.**  **Yes.**

12    Q.  During these meetings with Tom Dart where there

13 was a smaller group of people, Micah Jones, Burke,

14 Williams, Groupser and Brad Curry, did the topic of

15 cross-watching ever come up?

16    **A.**  **Not that I recall.**

17    Q.  Prior to Micah Jones becoming executive

18 director, at these meetings with Tom Dart, did the issue

19 of cross-watching ever -- was it ever discussed?

20    **A.**  **Not that I can recall.**

21    Q.  You mentioned you were uncertain when

22 cross-watching stopped at the Cook County Department of

23 Corrections?

24    **A.**  **Yes.**

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 21

1    Q.  After the agreed order was entered, to your

2 knowledge, was there ever cross-watching -- was there a

3 practice of cross-watching in the maximum security

4 divisions?

5    **A.**  **No.**

6    Q.  Was there any particular reason, after the

7 agreed order was entered, that cross-watching was not

8 permitted in the maximum security divisions?

9    MR. NOWINSKI:  Object to speculation.

10      You can answer, if you know.

11 BY THE WITNESS:

12    **A.**  **Can you repeat that -- rephrase that?**

13    Q.  Sure.  After May of 2010, when the agreed order

14 was entered into with the Justice Department, why was

15 cross-watching not a practice in the maximum security

16 divisions?

17    MR. NOWINSKI:  Object to speculation.

18      You can answer, if you can.

19 BY THE WITNESS:

20    **A.**  **From what I recall, we stopped it before that.**

21 **And it wasn't just the maximum security division.  It was**

22 **the whole jail.**

23    Q.  Going back to your meetings with Tom Dart,

24 either before or after Ms. Jones became the executive

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 22

1 director, was there ever a discussion that on certain

2 holidays that there was a large number of employees that

3 would call in sick or absent at holidays?

4    **A.**  **There might have been.  I remember discussions,**

5 **but I can't say for sure.**

6    Q.  Are you personally aware, as the first

7 assistant, that on certain holidays, such as, for

8 instance, Mother's Day, Father's Day, maybe New Year's

9 Eve, that there's a tendency for a lot of members of the

10 Department of Corrections to call in sick?

11    MR. NOWINSKI:  Object to form.

12 BY THE WITNESS:

13    **A.**  **I don't think Mother's Day is one of them, but**

14 **I would say Christmas.  And I can't remember another**

15 **holiday that might be popular.  But I know Christmas is a**

16 **popular one.**

17    Q.  Is New Year's Eve also a popular day when

18 correctional officers call in sick?

19    **A.**  **It might be a little bit more, but it's not a**

20 **big one.**

21    Q.  How about Super Bowl Sunday?  Was that a big

22 one?

23    **A.**  **That's a big one.  Yeah.**

24    Q.  You mentioned that that's been a subject

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 23

1 with -- during your Sheriff's meetings with Tom Dart,

2 that there's a high level of absenteeism on certain days

3 of the year -- calendar days of the year?

4    **A.**  **Can you repeat that?**

5    MR. MORRISSEY:  Can you read it back?

6      (Record read as requested.)

7    MR. NOWINSKI:  Objection.  Misstates his testimony.

8 BY THE WITNESS:

9    **A.**  **It might have been discussed.  I can't recall**

10 **offhand exactly when or how.**

11    Q.  At the Sheriff's meetings or -- At the

12 Sheriff's meetings, has there been any policy discussed

13 in regards to dealing with high absenteeism on specific

14 calendar dates that fall on Christmas or New Year's Eve

15 or other dates?

16    MR. NOWINSKI:  Object to foundation.

17 BY THE WITNESS:

18    **A.**  **Yeah.  There might have been some discussion.**

19    Q.  What policy changes were discussed at the

20 Sheriff's meetings to address high absenteeism on certain

21 calendar dates during the year?

22    MR. NOWINSKI:  Object to form, foundation.

23 BY THE WITNESS:

24    **A.**  **The only policy I think that we can -- I recall**

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 6

Page 24

1    of anything was the -- our -- they had an absenteeism
2    program where there was a group of people that monitored
3    staffs' attendance.  Attendance review committee or
4    something.
5        Q.    Who was in charge -- Who was on that committee?
6    Was that a committee at the Cook County Jail?
7        A.    Yeah.  I believe so.  I didn't have a lot to do
8    with it, so I don't have a lot of knowledge of that.
9        Q.    Who was on the committee?
10       A.    I couldn't even recall back then.
11       Q.    In December of 2012, if an employee assigned to
12   Division 1 wanted to call in for whatever reason, a
13   specific date, how would they do that?
14       A.    Call the medical line.
15       Q.    What is the medical line?
16       A.    It's where you call when you let us know you're
17   not going to make it to work.
18       Q.    Is that a supervisor within Division 1 that you
19   would call?
20       A.    No.
21       Q.    Who staffs the medical line?
22       A.    In 2012 I believe the calls were taken in
23   external operations.
24       Q.    If a person called in on New Year's Eve in

Page 26

1        Q.    How?  What would the superintendent have to do?
2        A.    If the employee had a pattern.
3        Q.    What do you mean by "a pattern"?
4        A.    Calls in every first day back or last day back
5    or on holidays.
6        Q.    In the year 2012 in Division 1, do you know of
7    any officer that was disciplined for calling in on a
8    holiday that they were sick?
9        A.    Not to my knowledge.
10       Q.    Did the Department of Corrections keep
11   statistics in regards to the number of employees that
12   called in on a holiday like Christmas Eve or New Year's
13   Eve in December of 2012?
14       MR. NOWINSKI:  Object to speculation.
15           You can answer, if you can.
16   BY THE WITNESS:
17       A.    Yes.  I believe they do.
18       Q.    What kind of records did the Department of
19   Corrections maintain in December of 2012 of employees
20   that called in sick on, let's say, Christmas Day or New
21   Year's Eve?
22       A.    I'm not familiar with that.
23       Q.    I'm going to show you Exhibit No. 1.  Showing
24   you Exhibit No. 1, it's an excerpt from the agreed order

Page 25

1    2012, what would he or she have to do to alert the
2    Sheriff that they weren't coming in?
3        A.    To specifically alert the Sheriff.
4        Q.    To alert the Department of Corrections that
5    they weren't going to come in.
6        A.    They would call the medical line.
7        Q.    In December of 2012, did Sheriff's employees
8    receive a certain number of medical days a year?
9        A.    Yes.
10       Q.    How many medical days?
11       A.    12.
12       Q.    Could a -- Was there any penalty if a person
13   called in, let's say, on Christmas or New Year's Eve in
14   December of 2012 and just said, I've got the flu?
15       A.    If they had a day to cover it, there was no
16   penalty, to my knowledge.
17       Q.    Did they have to have a doctor's excuse if they
18   called in for one day on Christmas Day and New Year's
19   Eve?
20       A.    No.
21       Q.    Could their superintendent in Division 1
22   discipline a person if they called in, say, on Christmas
23   Day and say that they were sick?
24       A.    Possibly.

Page 27

1    that was filed on May 26th, 2010 in the United States of
2    America versus Cook County, Illinois and Thomas Dart.
3    I'd ask you to take a look at what will be Page 14 of
4    that agreement.  14 under 33.  I'd like you to read that
5    for a moment where it says absent exigent circumstances.
6        A.    (Witness complying.)
7        Q.    Have you had an opportunity to read it?
8        A.    Uh-huh.
9        Q.    You have to answer yes or no.
10       A.    Yes.
11       Q.    Do you agree that the definition of
12   cross-watching involves a CCDOC practice allowing one
13   correctional officer to simultaneously supervise two
14   housing units from the control center in one of the
15   units?  Is that an accurate definition of cross-watching?
16       A.    I think the statement is vague, and I don't
17   really understand what it's saying.
18       Q.    Again, how would you expand on that definition
19   of cross-watching?
20       A.    All I know is we didn't -- we don't
21   cross-watch.
22       Q.    If in Division 1, which is a maximum security
23   unit -- if one officer was assigned to watch, let's say,
24   H2 and G2 at the same time, would that provide any

Plaintiff's Exhibit 17 Page 7

DAVID MORECI
January 10, 2017

Page 28

1  security risks?
2       MR. NOWINSKI:  Object to form.
3  BY THE WITNESS:
4       A.   No more than any other time.
5       Q.   Well, the question is in Division 1 -- Division
6  1 is broken into towers, correct?
7       A.   Yes.
8       Q.   And there's four towers?
9       A.   Yes.
10      Q.   And on Floors 2 through 4, across the hall
11 there are two tiers, right, on each floor?
12      A.   Yes.
13      Q.   If in Division 1, an officer for whatever
14 reason -- let's say the officer in G2 called in sick, and
15 the officer in H2 was asked to watch during the 3:00 to
16 11:00 shift both the H2 and G2 tiers, would that cause
17 any security risks in your -- to your knowledge, as the
18 first assistant at the Cook County Department of
19 Corrections?
20      MR. NOWINSKI:  Object to form, asked and answered.
21      You can answer.
22 BY THE WITNESS:
23      A.   He wouldn't be asked to watch two tiers.
24      Q.   Why not?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 30

1       Q.   And is it feasible for one officer to supervise
2  two tiers at the same time in Division 1?
3       MR. NOWINSKI:  Object to form.
4       You can answer.
5  BY THE WITNESS:
6       A.   In my opinion it is.
7       Q.   And if one officer supervises two tiers in
8  December of 2012, does that create any security risks?
9       MR. NOWINSKI:  Object to form.
10 BY THE WITNESS:
11      A.   Security risks as to how?
12      Q.   Well, does that present -- if one officer is
13 left to supervise two tiers in Division 1 in December of
14 2012, does that create a potential risk to the officer?
15      A.   No.
16      Q.   If one officer is assigned to watch two tiers
17 in December of 2012, does that present a danger to the
18 inmates within either tier?
19      MR. NOWINSKI:  Object to form.
20 BY THE WITNESS:
21      A.   There's a danger to inmates whether there's an
22 officer there or not.
23      Q.   Well, does that create -- Is there an enhanced
24 danger to inmates if one officer, in December of 2012,

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 29

1       A.   We would find somebody and assign them to the
2  tier if the officer called in medical.
3       Q.   Why wouldn't one officer be assigned to watch
4  two tiers in Division 1?
5       A.   Because every -- we have an officer assigned
6  for every tier.
7       Q.   Why is that your express policy?
8       MR. NOWINSKI:  Object to form.
9       Go ahead.
10 BY THE WITNESS:
11      A.   Because it's an assignment.
12      Q.   My question is, what rational or reason in
13 Division 1 is there for assigning an officer to each
14 tier?
15      MR. NOWINSKI:  Object to form.
16 BY THE WITNESS:
17      A.   There's an officer assigned to every tier in
18 the Cook County Jail, not just Division 1.
19      Q.   I'm asking in regards to Division 1.  Being a
20 maximum security division, why is it required to have an
21 officer assigned to each tier?
22      MR. NOWINSKI:  Object to form, asked and answered.
23 BY THE WITNESS:
24      A.   To supervise the tier.

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 31

1  was assigned to supervise two tiers?
2       A.   I couldn't even answer that.
3       Q.   Why not?
4       A.   Because I just don't -- The enhanced danger is
5  there is none.  There's an enhanced danger if there's no
6  officer up there.
7       But an officer can properly see and hear in
8  Division 1 unlike any other division if he's up there on
9  the floor.  There's not only sight, there's sound too.
10      Q.   So in December of 2012, one officer assigned to
11 supervise H2 and G2 could hear any commotion in either
12 tier?
13      MR. NOWINSKI:  Objection, form, incomplete
14 hypothetical.
15 BY THE WITNESS:
16      A.   Yes, he could.
17      Q.   And if one officer was assigned to the H2 or G2
18 tiers, and at one point -- let's say he was in Tier G2,
19 he could see into H2 to prevent any type of injury to --
20 potential injury to an inmate in H2?
21      MR. NOWINSKI:  Object to form.
22      Go on.
23 BY THE WITNESS:
24      A.   Can you define as to how he was in the tier?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 8

DAVID MORECI
January 10, 2017

Page 32

1 Q. Well, let's say in H2 and G2, both tiers have
2 an officer desk, correct?
3 A. Yes.
4 Q. And let's assume that there was only one
5 officer for both G2 and H2, and the officer is sitting at
6 his or her desk in G2. Would that officer be able to see
7 into the dayroom in H2?
8 A. Yes.
9 Q. And he or she would be able to properly
10 supervise the activities in the H2 dorm from the G2 tier?
11 MR. NOWINSKI: Object to form.
12 BY THE WITNESS:
13 A. Yes.
14 Q. Do officers, in December of 2012 in Division 1,
15 were they permitted to have a lunch break?
16 A. If we had coverage.
17 Q. I'm going to show you what's been marked as
18 Plaintiff's Exhibit No. 2. It's been produced by the
19 defendants as Sheriff's Bates-stamp 004871. It's a
20 multiple-page document, and it's entitled Multilevel
21 Vertical Relief Program dated November 10th -- I'm
22 sorry -- November of 2010, resubmitted July 2011. Have
23 you seen this document before?
24 A. Yes.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 33

1 Q. Do you know a Commander Michael Dembosz?
2 A. Yes.
3 Q. How do you know him?
4 A. By working at the jail.
5 Q. In December -- When this was authored in
6 November of 2010, do you know what his position was at
7 the jail?
8 A. Captain or commander, maybe.
9 Q. Was there a division called administration in
10 the programs at that time, 2010?
11 A. There might have been.
12 Q. Is he still with the jail?
13 A. No.
14 Q. When did he retire?
15 A. I'd say, I think, in '13 or '14.
16 Q. Is he still in the Chicago area?
17 A. I don't know where he's at.
18 Q. When was the last time you saw him?
19 A. Probably the day he retired.
20 Q. Do you know an Antonio Imhof?
21 A. Yes.
22 Q. Was he a lieutenant at the Cook County
23 Department of Corrections?
24 A. Yes.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 34

1 Q. Was he in Division 1?
2 A. Yes.
3 Q. And was Dembosz in Division 1?
4 A. Yes.
5 Q. Did you supervise both of those gentlemen?
6 A. No.
7 Q. When was the first time you saw this document,
8 Multilevel Vertical Relief Program?
9 A. Probably last week.
10 Q. In preparation for this deposition, what
11 documents did you look at?
12 A. This (indicating).
13 Q. By "this," you mean the Multilevel Vertical
14 Relief Program?
15 A. Yes.
16 Q. Any other documents?
17 A. And an OPR investigation.
18 Q. Do you know an Officer Rottar?
19 A. Yes.
20 Q. He was in Division 1 in December of 2012,
21 correct?
22 A. I believe so.
23 Q. Did you review Officer Rottar's deposition?
24 A. No.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 35

1 Q. Do you know who authored Exhibit 2?
2 A. I believe Commander Dembosz.
3 Q. Do you know who Commander Dembosz worked for in
4 November 2010 and July 2011?
5 A. No.
6 Q. During your Sheriff's meetings with Tom Dart,
7 either the smaller group or the larger group, was the
8 issue of vertical link program ever discussed?
9 A. Not that I can recall.
10 Q. Are there minutes or documents that are
11 exchanged during the Sheriff's meetings?
12 A. Not that I know of.
13 Q. Are you familiar with the term premium lunch
14 pay?
15 A. Yes.
16 Q. What is that?
17 A. If an officer does not take his lunch, he
18 receives a one-hour compensation.
19 Q. Is that at one and a half times his or her
20 normal pay?
21 A. Yes.
22 Q. Is that pursuant to the union contract?
23 A. Yes.
24 Q. Have you -- In December of 2012, were

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 9

DAVID MORECI
January 10, 2017

Page 36

1   superintendents required to approve premium lunch pay?
2       A.   Yes.
3       Q.   Did superintendents, in December of 2012, have
4   to report to you or any other administrator at the jail
5   in regards to how many premium lunch pay they had
6   authorized?
7       A.   It was an overtime report completed weekly.
8       Q.   Would that be prepared by the superintendent of
9   each division?
10      A.   Yes.
11      Q.   This report -- Are those reports maintained in
12  the normal course of business?
13      MR. NOWINSKI:  Object to speculation.
14  BY THE WITNESS:
15      A.   Can you rephrase that?
16      Q.   Sure.  Those reports are official documents in
17  the Department of Corrections --
18      A.   Yes.
19      Q.   -- the overtime -- is it just called an
20  overtime report?
21      A.   I'm not sure of the exact name for it.
22      Q.   Did they have those reports in 2012?
23      A.   To my knowledge, yes.
24      Q.   Do they have them currently?

DAVID MORECI
January 10, 2017

Page 38

1       Q.   Currently what are Michael Holmes'
2   responsibilities?
3       A.   He works in case review.
4       Q.   During your meetings with Thomas Dart in 2012,
5   was there ever any discussion in regards to these
6   overtime reports?
7       A.   Not that I can recall.
8       Q.   In 2010 and 2011, was there ever any
9   discussions with Thomas Dart in regards to overtime pay
10  at the Department of Corrections?
11      A.   Not that I remember.
12      Q.   In your meetings with the executive director in
13  2010 and 2011, were there ever any discussions in regards
14  to overtime pay?
15      A.   Yes.
16      Q.   Who did you discuss that issue with in 2010 and
17  2011?
18      A.   To the best of my knowledge, I'd say with the
19  directors and the superintendents.
20      Q.   Were there weekly meetings between the
21  directors and the superintendents in the period between
22  2010 and 2012?
23      A.   Yes.
24      Q.   Are those held -- Were those meetings held on

DAVID MORECI
January 10, 2017

Page 37

1       A.   Yes.
2       Q.   Are they still prepared weekly by the
3   superintendent of each division?
4       A.   Yes.
5       Q.   And after a superintendent prepares this
6   overtime report, where does he or she send it?
7       A.   To the director's office.
8       Q.   In 2012, was there a director that was
9   responsible for receiving those overtime reports?
10      A.   I believe Mike Holmes did, but I'm not
11  positive.
12      Q.   Is Mike Holmes still at the Department of
13  Corrections?
14      A.   Yes.
15      Q.   What was his title in 2012?
16      A.   I believe he was an assistant director.
17      Q.   So is he still an assistant director?
18      A.   He's a first assistant director.
19      Q.   Your title is first assistant director?
20      A.   Uh-huh.  Yes.
21      Q.   How many people with the title of first
22  assistant director are there at the Cook County
23  Department of Corrections?
24      A.   To my knowledge, just me and Mike Holmes.

DAVID MORECI
January 10, 2017

Page 39

1   the second floor of Division 5?
2       A.   Yes.
3       Q.   There was a conference room there, correct?
4       A.   Yes.
5       Q.   And is that still the case today, that you
6   still have weekly meetings with the superintendents and
7   the directors on the second floor of Division 5?
8       A.   No.
9       Q.   Are there still meetings with the
10  superintendents and the directors on a weekly basis?
11      A.   No.
12      Q.   On a regular basis, are there meetings between
13  the directors and the superintendents?
14      A.   What's a regular basis?
15      Q.   Well, I mean, is it once a month, once every
16  two weeks?
17      A.   I don't even recall the last time we had one.
18      Q.   When did this practice of having weekly
19  meetings with the directors and the superintendents at
20  the jail cease?
21      A.   I'd say a year over a year ago.
22      Q.   So in 2012, during these weekly meetings with
23  the management and policymakers at the jail, were there
24  discussions in regards to with overtime with the

Plaintiff's Exhibit 17 Page 10

DAVID MORECI
January 10, 2017

Page 40

1  superintendents?

2      MR. NOWINSKI:  Object to form, foundation.

3      You can answer.

4  BY THE WITNESS:

5      A.    Yes.

6      Q.    And in 2012, was there any emphasis on cutting

7  back on overtime pay at the Department of Corrections?

8      A.    There's always talk of trying to cut overtime.

9      Q.    And was -- In 2012, at these policy-maker

10 meetings with the superintendents, was the issue of

11 premium pay for lunch ever discussed?

12     MR. NOWINSKI:  Object to form, foundation.

13 BY THE WITNESS:

14     A.    I'm sure it was.

15     Q.    To what extent could -- in the year 2012, could

16 a superintendent of division -- Let me rephrase that.

17         Under what circumstances could a superintendent

18 in the division in 2012 approve premium lunch pay?

19     A.    If there was no staff to do lunch reliefs.

20     Q.    In December of 2012 in Division 1, was there a

21 person or persons assigned on each shift to provide lunch

22 relief to the tier officers when they went for their

23 break?

24     MR. NOWINSKI:  Object to speculation.

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 41

1         You can answer, if you know.

2  BY THE WITNESS:

3      A.    There was a few.

4      Q.    And what would -- And in Division 1, there are

5  various posts in Division 1 in December of 2012 in

6  addition to being a tier officer, correct?

7      A.    I didn't understand that question.

8      Q.    Sure.  In Division 1 in December of 2012, there

9  were assigned posts, correct?

10     A.    Yes.

11     Q.    And there were employees that were assigned for

12 different functions other than providing security for

13 tiers, correct?

14     A.    Yes.

15     Q.    In the G and -- H and G tower in December of

16 2012, what officer or post would be used to provide lunch

17 relief?

18     A.    In 2012 I didn't have nothing to do with

19 Division 1, so I can't really answer a lot of these

20 questions having that knowledge.  I could speculate.

21     Q.    You mentioned that in 2012 you did have

22 responsibilities at some point for Division 1?

23     A.    Yes.

24     Q.    During the time in 2012 when you were a

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 42

1  supervisor in Division 1, what officer or officers would

2  be used to provide relief in the H and G towers?

3      A.    An activity officer, a movement officer, a

4  Cermak officer, possibly a post officer.

5      Q.    When correctional officers came into work on

6  the 3:00 to 11:00 shift in December of 2012, do they

7  appear at rollcall?

8      A.    Yes.

9      Q.    And that would be conducted by the lieutenant?

10     A.    A commander.

11     Q.    Do you know a Sergeant Futser (phonetic)?

12     A.    Yes.

13     Q.    Is she still at the Cook County Department of

14 Corrections?

15     A.    I don't believe she is.  I haven't seen her in

16 a while.

17     Q.    Did she retire?

18     A.    She might have.

19     Q.    During rollcall, after -- Strike that.

20         During rollcall, were officers assigned to

21 provide relief for tier officers who were going to go to

22 lunch that day or afternoon?

23     A.    It depends who held rollcall.

24     Q.    Whose responsibility in Division 1 was it to

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 43

1  assign officers to provide relief for tier officers going

2  to lunch?

3      MR. NOWINSKI:  Object, foundation and form.

4  BY THE WITNESS:

5      A.    The sergeant.

6      Q.    Would the sergeant also inform the tier officer

7  in regards to what time during his or her shift they

8  would go to lunch?

9      A.    Yes.

10     Q.    I'm going to show you what's being marked as

11 Plaintiff's Exhibit No. 4, a general order that was

12 issued on October 31st, 2014 -- general order of

13 24.1.25.1.  It's Bates-stamped Sheriff 1, and it's a

14 multiple-page document.  What is a general order?

15     A.    Centralized Roster Management and Staffing

16 Analysis.

17     Q.    The question is, what is a general order at the

18 Department of Corrections?

19     A.    It's orders put out by the Department that we

20 have to follow.

21     Q.    Prior to October of 2014, was there a previous

22 general order that dealt with centralized roster

23 management and staff analysis?

24     A.    There was a roster management order, and I'm

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 44

1    not sure about the staffing analysis.

2        MR. MORRISSEY:  We asked for that document.  I'm

3    renewing my demand for the general order that pertained

4    to the centralized roster management in December of 2012

5    which was part of our production request.

6        MR. NOWINSKI:  Okay.

7    BY MR. MORRISSEY:

8        Q.   What is a master roster?

9        A.   It's the form that's produced every 90 days

10   to show the officers where they're assigned.

11       Q.   Does the -- And that's a form that comes out

12   every 90 days in Division 1 in 2012?

13       A.   In every division.

14       Q.   So in 2012 there was a form called a master

15   roster for Division 1?

16       A.   Yes.

17       Q.   Does the master roster form reflect if an

18   officer or officers call in sick, let's say, on Christmas

19   Day?

20       A.   I don't understand that.

21       Q.   Sure.  Does the master roster reflect -- Strike

22   that.

23            The master roster would have the names of

24   specific officers assigned to Division 1, correct?

---

DAVID MORECI
January 10, 2017

Page 45

1        A.   Yes.

2        Q.   And would it further indicate what tier on

3    officer might be assigned to during that 90-day period?

4        A.   Yes.

5        Q.   Does the master roster reflect, during that

6    90-day period, whether an officer might have called in

7    sick or not?

8        A.   No.

9        Q.   What is the form called daily roster?

10       A.   Payroll.

11       Q.   Pardon?

12       A.   Payroll.

13       Q.   What information is on the daily roster?

14       A.   All the officers that are assigned that day,

15   supervisors who are assigned.

16       Q.   Does the daily roster come out a week or two

17   beforehand?

18       A.   No.

19       Q.   How frequently are the daily rosters issued?

20       A.   Daily.

21       Q.   Do you see on Page 4 under 3B, it says, the

22   daily roster shall be prepared on a biweekly schedule and

23   at least one week in advance to accommodate anticipated

24   leave scheduling?

---

DAVID MORECI
January 10, 2017

Page 46

1        A.   Yes.

2        Q.   Is that the policy at the Department of

3    Corrections that the daily roster comes out at least one

4    week in advance?

5        A.   Yes.

6        Q.   So that if today is January 10th, 2017, the

7    daily roster for January 17th, 2017 has already been

8    issued?

9        A.   Yes.

10       Q.   And the daily roster -- So how much -- What is

11   the practice as far as how much time in advance are the

12   daily rosters issued?

13       A.   A daily roster, how I was saying was done

14   daily, is like today, I don't know who's going to call in

15   sick until I get to work.  So the daily roster is done

16   that day when I come in.  So it's already -- There's

17   already a posted roster who's supposed to be there, but

18   we prepare a daily roster when we first walk in the door.

19   Because you have to see who called in medical, if there

20   was any transfers or somebody sent for training.  So it's

21   actually done daily specifically for that day.

22       Q.   But just to narrow this down, you have the

23   daily roster in advance, correct?  You can pull up the

24   people that are supposed to be in next week assigned on

---

DAVID MORECI
January 10, 2017

Page 47

1    January 17th, 2017, correct?

2        A.   Yes.

3        Q.   And then on a specific day there's another

4    alteration of that daily roster which reflects the people

5    that actually may have called in sick or had some type of

6    leave?

7        A.   Yes.

8        Q.   And who's responsible within a division on a

9    specific day to take the pre-prepared daily roster and

10   change it to reflect who actually came in during a shift?

11       A.   The shift commander.

12       Q.   And what do you call the actual altered daily

13   roster which reflects those people that called in sick or

14   were excused for whatever medical or family reason?

15       A.   It's the daily roster along with the payroll.

16   It's all one report together.

17       Q.   Let me try to clarify.  I'm showing you what is

18   marked as Plaintiff's Exhibit No. 5.  It's been

19   Bates-stamped by the Sheriff, 5385.  It's a multipage

20   document.  It's for December 31st, 2012.  Take a look at

21   it for a moment.

22       A.   (Witness complying.)

23       Q.   Looking at this document, does this appear to

24   be a document that was prepared in advance of

Plaintiff's Exhibit 17 Page 12

DAVID MORECI
January 10, 2017

Page 48

1 December 31st, 2012?

2 A. Yes.

3 Q. And it hasn't been altered to reflect whether

4 or not specific employees of the Sheriff came in or

5 didn't come in on that date?

6 A. I wouldn't know by looking at it.

7 Q. Well, take a look at the back. It's a

8 multipage document.

9 A. If they redid it, I wouldn't know.

10 Q. Does it reflect whether or not there were any

11 absences on December 31st, 2012?

12 A. Yes.

13 Q. And where does it reflect that?

14 A. There's no page number on it. 005388.

15 Q. Does it reflect whether or not anybody called

16 in with a medical absence on December 31st, 2012?

17 A. No.

18 Q. Would it be unusual within a division for no

19 one to call in sick on a particular day?

20 A. No.

21 Q. So there are days when nobody calls in sick?

22 A. Yes.

23 Q. So this reflects that on December 31st, 2012 in

24 Division 1, there wasn't anybody that called in sick?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 49

1 A. According to this.

2 Q. So you don't know whether or not this is the

3 final daily roster or not?

4 A. No, I do not know.

5 Q. Is there a procedure on a daily basis where the

6 daily roster and the payroll are put together by an

7 officer or supervisor?

8 A. It's prepared by them and reviewed by the shift

9 commander.

10 Q. So what paperwork in each division is prepared

11 in December of 2012 to reflect the attendance?

12 A. This is the paperwork.

13 Q. So you have Exhibit 5, correct?

14 A. Yes.

15 Q. Any other documents?

16 A. It depends on the shift commander. I did like

17 a rough draft on the side where I would get the list of

18 the medicals and I would have a rough draft. And then I

19 would prepare this off of my draft, and then the draft

20 would get destroyed.

21 Q. Do officers or supervisors in the division use

22 this preprinted daily roster sheet to reflect changes if

23 an officer comes in or calls in sick or not or for

24 instance, an officer is reassigned from one post to

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 50

1 another post?

2 A. Yes.

3 Q. Does looking at the first two pages, does it

4 reflect that there are any changes on this form that

5 reflects that maybe an officer's post was changed or tier

6 was changed?

7 A. No.

8 Q. But what becomes -- So, generally, is it the

9 superintendent or the commander that turns in the final

10 daily roster at the end of the shift or at the end of the

11 day?

12 A. Yes.

13 Q. Who would turn in that document?

14 A. It would be forwarded to external operations.

15 Q. And would it be forwarded by somebody in the

16 security office, or would it be forwarded by the

17 superintendent in the division to the external

18 operations?

19 A. The shift commander would sign off on it,

20 review it and then have somebody run it over to external

21 operations.

22 Q. So for each shift, the commander on duty has to

23 sign off on it, correct?

24 A. Yes.

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 51

1 Q. And where on the form would they sign off?

2 A. There's a signature page, I believe, is missing

3 out of this. They sign in the place of the

4 superintendent.

5 THE WITNESS: Can I take a break?

6 MR. MORRISSEY: Sure. Take whatever break you want.

7 (A short break was had.)

8 BY MR. MORRISSEY:

9 Q. Looking at Exhibit 5, does it appear that a

10 commander or a superintendent signed off on this

11 document?

12 A. No.

13 Q. Under your general order, Exhibit No. 4, are

14 daily rosters maintained in the divisional file for at

15 least five calendar years?

16 A. Yes.

17 Q. So the actual daily roster for December 31st,

18 2012 should be in Division 1's records?

19 A. Well, division 1 is closed, so I believe that's

20 all sent to the warehouse.

21 Q. But there should be a document which reflects

22 the actual attendance on December 31st, 2012 in Division

23 1?

24 A. Yes.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 13

DAVID MORECI
January 10, 2017

Page 52

1  MR. MORRISSEY:  Again, we're going to make a demand
2  for that document.
3  BY MR. MORRISSEY:
4      Q.  Is there also a document in each division
5  called a daily attendance sheet?
6      A.  Yes.
7      Q.  What information is on the daily attendance
8  sheet?
9      A.  **The amount of officers assigned, the amount of**
10 **officers worked, the benefit time.**
11     Q.  Did they have attendance -- daily attendance
12 sheets in December of 2012?
13     A.  **Yes.**
14     Q.  Who in Division 1 would have been responsible
15 for preparing the daily attendance sheets?
16     A.  **The shift commander.**
17     Q.  So each shift has a commander, correct --
18     A.  **Yes.**
19     Q.  -- in Division 1?  And the shift commander, in
20 December of 2012, was responsible for preparing a daily
21 attendance sheet?
22     A.  **Yes.**
23     Q.  And where are those daily attendance sheets --
24 Where were the daily attendance sheets maintained in

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 53

1  Division 1?
2      A.  **Superintendent's office.**
3      Q.  For what period of time were the daily
4  attendance sheets maintained in Division 1?
5      A.  **I couldn't say for sure.**
6      Q.  Were they maintained in the same place in the
7  superintendent's office as the daily roster sheets?
8      A.  **I would guess.**
9      MR. MORRISSEY:  We will make a demand, again, for
10 the daily attendance sheet for December of 2012 in
11 Division 1.
12 BY MR. MORRISSEY:
13     Q.  What different information is maintained on the
14 daily attendance sheet in Division 1 from the roster
15 sheet?
16     A.  **I would have to look at it.  I don't know off**
17 **the top of my head.**
18     Q.  On the daily attendance sheet, would they
19 reflect overtime?
20     A.  **Yes.**
21     Q.  You mentioned that the premium lunch pay was
22 discussed periodically at the superintendent's meetings
23 with the directors?
24     A.  **Yes.**

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 54

1      Q.  Was there any procedure where the directors at
2  the jail would monitor the premium lunch pay that was
3  authorized by each superintendent?
4      A.  **What do you mean by "procedure"?**
5      Q.  Well, I mean, was there any accountability for
6  a superintendent if they authorized premium lunch pay?
7      MR. NOWINSKI:  Object to foundation.
8  BY THE WITNESS:
9      A.  **It's on the paperwork.**
10     Q.  I know.  But my question is, you mentioned that
11 there was a concern in the year 2012 about overtime at
12 the jail?
13     A.  **There's a concern about overtime all the time.**
14     Q.  How did the Sheriff and the executive directors
15 try to cut back on overtime at the jail in December of
16 2012?
17     A.  **I wasn't involved a lot with the overtime**
18 **discussions at all because it didn't fall under me.  But**
19 **we did have discussions about trying to figure out how to**
20 **get officers to come to work, you know, bringing up**
21 **morale and there were certain posts that we talked about**
22 **that could be closed.**
23     Q.  In particular, were there discussions in
24 regards to this premium lunch pay during the

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 55

1  superintendent's meetings?
2                  (A short interruption.)
3  BY MR. MORRISSEY:
4      Q.  You need the question read back?
5      A.  **Yes, please.**
6                  **(Record read as requested.)**
7  BY THE WITNESS:
8      A.  **I'm sure there was, but nothing I can recall**
9  **specifically time and day.**
10     Q.  Going back to the exhibit about the vertical --
11 multilevel vertical relief program, Exhibit No. 2, you
12 mentioned you read that, correct?
13     A.  **Yes.**
14     Q.  And you acknowledged that Dembosz and Imhof
15 were supervisors in Division 1, correct?
16     A.  **Yes.**
17     Q.  And division -- This proposal reflected that
18 there could be substantial cost savings to the Sheriff's
19 office if they implemented this multilevel vertical
20 relief program with the intent of eliminating premium
21 lunch pay, correct?
22     A.  **Yes.**
23     Q.  To your knowledge, was there any attempt made
24 by the management at the jail to eliminate premium lunch

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 14

DAVID MORECI
January 10, 2017

Page 56

1  pay?

2      MR. NOWINSKI:  Object to foundation.

3  BY THE WITNESS:

4      A.  **We always try to eliminate lunch pay if we can.**

5      Q.  What steps do you recall being taken by the

6  Sheriff's office to eliminate premium lunch pay in, let's

7  say, the year 2012?

8      A.  **I would say possibly closing some posts,**

9  **managing your movement a little better.  There's a lot of**

10 **ways you can try to, you know, take care of lunch**

11 **premiums.**

12     Q.  Could you assign -- Could you have, in a tower,

13 in December of 2012, for instance, have a procedure where

14 one officer could relieve three other tiers during a

15 one-hour period?

16     MR. NOWINSKI:  Object to foundation and speculation,

17 incomplete hypothetical.

18 BY MR. MORRISSEY:

19     Q.  Do you understand the question?

20     A.  **It doesn't make sense.**

21     Q.  Well, let me rephrase it for you.  You've read

22 this proposal by your commanders and lieutenants,

23 correct?

24     A.  **Yes.**

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 57

1      Q.  And they proposed a setup where, let's say, the

2  G and H tower, that maybe the officer working in H1 could

3  relieve, vertically, for lunch, the officers that were in

4  H2, H3 and H4, correct, during a one-hour period?

5      A.  **I don't think it specifically states they**

6  **relieve three officers.**

7      Q.  Well, if we look at the proposal -- and I think

8  it starts on Bates-stamped 004875, it states, is it

9  correct, in December of 2015, there were four approved

10 meal periods for staff on the 1500 to 2300 shifts?

11     A.  **Yes.**

12     Q.  And then if we look at -- go down a step, it

13 says, at the start of the first meal period, the officers

14 assigned to the 2nd, 3rd and 4th floors of A, C, E and G

15 block will be assigned mealtimes.  If they're assigned

16 mealtimes, that means to you that they're free to go for

17 that hour period?

18     A.  **Yes.**

19     Q.  They could leave their posts, correct?

20     A.  **Yes.**

21     Q.  And then it goes on, the first floor officer

22 assigned to the tiers on these blocks will continuously

23 rotate upwards throughout the block providing backup to

24 the officer across the hall on the B, D, E -- I'm

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 58

1  sorry -- B, D, F and H towers and/or detainees

2  observation via the catwalk every seven minutes so that

3  30-minute detainee observation can be maintained with

4  Illinois Jail Standards, comma, American Correctional

5  Association (ACA) Consent Decree mandates.  Do you see

6  that?

7      A.  **Yes.**

8      Q.  Does that mean that during that one-hour

9  period, one officer would be assigned to, in essence,

10 observe four tiers at one time?

11     A.  **No.**

12     Q.  What does it mean?

13     A.  **That one officer would conduct -- would back up**

14 **the other officer while they conduct a visual check**

15 **within the 30-minute timeframe.**

16     Q.  So the officer, for instance, on the H block,

17 if he or she was assigned to H1, would go up to the

18 second floor, correct, during that hour break, correct?

19     A.  **Yes.**

20     Q.  The H2 officer would be gone for lunch,

21 correct?

22     A.  **Yes.**

23     Q.  So that block, that cell or tier, H2, would be

24 absent during that one-hour period, correct?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 59

1      A.  **Other than when they're making the half-hour**

2  **check.**

3      Q.  And your understanding would be is that the

4  officer at H1 would go up to the second floor of G and H

5  tower, correct?

6      A.  **Yes.**

7      Q.  And then he would go into the G2 tier, correct?

8      A.  **Yes.**

9      Q.  And at that time there would be an officer in

10 G2, correct?

11     A.  **Yes.**

12     Q.  Because the H2 -- vertically, all the H tiers

13 in that tower were empty except for the one officer,

14 correct?

15     A.  **Okay.**

16     Q.  And during a -- every 15 minutes there has to

17 be a security check?

18     A.  **30 minutes.**

19     Q.  Every 30 minutes.  And there's a catwalk in

20 each of the tiers in Division 1, correct?

21     A.  **Yes.**

22     Q.  And does there always have to be an officer

23 inside the bubble or inside the officer's station to

24 provide backup when an officer walks into the catwalk

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 15

DAVID MORECI
January 10, 2017

Page 60

```
1   area?
2       A.    Yes.
3       Q.    So in order to do the 30-minute security check,
4   there has to be two officers in a tier?
5       A.    Yes.
6       Q.    One walking around the catwalk and the other
7   person out at the desk area?
8       A.    Yes.
9       Q.    While that's going on, the H1 or H2 tier is
10  empty, correct, as far as having a correctional officer
11  physically in the tier, correct?
12      A.    Yes.
13      Q.    And, furthermore, the H1 tier wouldn't have an
14  officer, correct?
15      A.    Yes.
16      Q.    Because the H1 officer is up providing backup
17  to the G2 tier officer doing the 30-minute check,
18  correct?
19      A.    Yes.
20      Q.    And at the same time, there wouldn't be an
21  officer in H3 during the time the H1 officer is providing
22  the backup for the G2 officer that's doing the catwalk
23  check, correct?
24      A.    Yes.
```

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 61

```
1       Q.    And the H4 tier also would be empty during that
2   one-hour period when the tier officer from H1 is
3   providing backup to the G2 officer doing the 30-minute
4   check, correct?
5       A.    Yes.
6       Q.    Does that process or practice provide any
7   security risks to the inmates in H1, H2, H3 and H4?
8       MR. NOWINSKI:  Object to form.
9   BY THE WITNESS:
10      A.    No more than any other time.
11      Q.    Why is that?
12      A.    There's security risks all the time.  Anything
13  can happen at any time.
14      Q.    So is there a need, in your opinion -- as a
15  first assistant at the Cook County Jail, is there a need
16  to have a tier officer inside the tier during the entire
17  shift?
18      A.    Inside the tier as to where?
19      Q.    Well, either at the desk or at the catwalk.
20  I'm saying inside, let's say, the H2 tier.  Is there a
21  need to have a tier officer inside the H2 tier during the
22  3:00 to 11:00 shift in December of 2012?
23      A.    There's a need to have an officer assigned to
24  every tier.  Yes.
```

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 62

```
1       Q.    So my question is, physically, does an officer
2   need to be inside the tier -- inside the H2 tier, for
3   instance, in December of 2012 to provide security for the
4   inmates?
5       A.    My opinion?  No.
6       Q.    What do you base that opinion on?
7       A.    I've been in Division 1, and I know when I was
8   an officer, I could probably view them tiers two tiers at
9   one time and not being any different than if there was
10  two officers there.  You have full visual sight and
11  sounds of both sides.
12      Q.    Have you ever worked as a tier officer in
13  Division 1?
14      A.    No.
15      Q.    Would it be permissible in December of 2012 for
16  a superintendent to provide -- Strike that.  Strike that
17  question.
18          If a superintendent in December of 2012 decided
19  to implement this procedure, which is laid out in
20  Plaintiff's Exhibit 2, to cut down on lunch pay and
21  provide for a vertical relief program during the lunch
22  period, could that superintendent be disciplined by the
23  Sheriff or by the executive staff at the jail?
24      MR. NOWINSKI:  Object as to speculation, incomplete
```

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 63

```
1   hypothetical.
2   BY MR. MORRISSEY:
3       Q.    Do you understand?
4       A.    Be disciplined for what, for coming up with
5   this?
6       Q.    Well, assuming that the superintendent in
7   December of 2012 made his decision that he or she was
8   going to implement this vertical relief program during
9   the lunch period which is explained in Exhibit No. 2.
10      A.    The superintendent wouldn't --
11      Q.    Just let me finish my question.
12      A.    Okay.
13      Q.    Could the superintendent be disciplined?
14      MR. NOWINSKI:  Object to speculation, incomplete
15  hypothetical.
16  BY THE WITNESS:
17      A.    He wouldn't implement it without the approval
18  of the director.
19      Q.    By "the director," you mean Gary Hickerson or
20  John Murphy in 2012?
21      A.    Gary Hickerson, I would say -- John Murphy
22  didn't take over until December 1st, so it probably would
23  have been John Murphy.
24      Q.    So if a vertical relief program was implemented
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 16

DAVID MORECI
January 10, 2017

Page 64

1  by the superintendent of Division 1 in December of 2012,
2  it would have been with the approval of the executive
3  director at that time?
4      MR. NOWINSKI:  Object to speculation.
5      You can answer.
6  BY THE WITNESS:
7      A.  It could have been approved by an assistant
8  director of the division too.
9      Q.  And an assistant director would be at your
10 level or above?
11     A.  It was below me at that time.
12     Q.  Pardon?
13     A.  It was below me at that time.
14     Q.  Because you were a first assistant at that
15 time?
16     A.  Yes.
17     Q.  So it could have been by an assistant executive
18 director.  And who were the assistant executive directors
19 in December of 2012?
20     A.  Mike Holmes, Mike Miller.  I could speculate
21 because I don't know what date they were having, but I
22 believe Debbie Becker was an assistant director.
23     Q.  Is she still with the jail?
24     A.  Yes.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 65

1      Q.  What's her position?
2      A.  She is still an assistant executive director.
3      Q.  Is Mike Miller still an assistant?
4      A.  Yes.
5      Q.  He's not a first assistant?
6      A.  No.
7      Q.  What are incident reports at the jail?
8      A.  It's a report generated after an incident takes
9  place.
10     Q.  Who receives -- In December of 2012, how would
11 an officer generate an incident report?
12     A.  Go on the computer and report an incident after
13 it happened.
14     Q.  By the "computer," you're talking about the
15 jail management computer?
16     A.  Yes.
17     Q.  What was the computer system at the time in
18 December of 2012?
19     A.  I believe it was IMac.
20     Q.  If a tier officer generated an incident report
21 in December of 2012, did that require somebody within the
22 supervisory rank to respond to it?
23     A.  Yes.
24     Q.  And who normally would respond in Division 1 to

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 66

1  an incident report?
2      MR. NOWINSKI:  Objection, foundation, speculation.
3  BY THE WITNESS:
4      A.  The shift commander.
5      Q.  After the shift commander responded to an
6  incident report, would those incident reports go to the
7  superintendent?
8      A.  Yes.
9      Q.  How would the superintendent receive copies of
10 the incident reports?
11     A.  Usually they put it in a folder.  And depending
12 on the division, you either slide it under the supe's
13 door or he might have an inbox to put them in.
14     Q.  Under what circumstances would the assistant
15 directors receive incident reports?
16     A.  We would get an oral notification via the
17 phone.
18     Q.  So each time there was an incident report,
19 there would be an oral notification to either an
20 assistant director or the executive director of the jail?
21     A.  Depending on the incident and the director,
22 specifically.
23     Q.  Would the assistant director document receipt
24 of an incident report?

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 67

1      A.  No.
2      Q.  Did the Sheriff, Tom Dart, receive notification
3  of incident reports?
4      MR. NOWINSKI:  Object to foundation, speculation.
5  BY THE WITNESS:a
6      A.  I wouldn't know.
7      Q.  Just to summarize it.  Each time there was an
8  incident report, the shift commander has to respond to
9  it, correct?
10     A.  Yes.
11     Q.  The superintendent would receive a copy of --
12 a physical copy of the incident report in Division 1?
13     A.  Yes.
14     Q.  And generally an assistant director would be
15 notified?
16     A.  Yes.  Depending on the seriousness of the
17 incident.
18     Q.  Who makes the decision whether or not the
19 assistant director is notified of an incident report?
20     A.  It depends on the time of day.
21     Q.  Have you reviewed incident reports in regards
22 to this vertical cross-watching in December of 2012?
23     A.  I've reviewed them, but I don't know if it was
24 in December of 2012.  I've seen them on the IMac.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 17

DAVID MORECI
January 10, 2017

Page 68

1  Q.   When was the last time you reviewed those
2  incident reports?
3  A.   From when?
4  Q.   In December of 2012 they were generated by tier
5  officers alerting the jail to this vertical
6  cross-watching practice.
7  A.   Yesterday.
8  Q.   You may or may not have seen those at the time
9  the reports were generated in December of 2012?
10  A.   I may have.
11  Q.   Do you recall doing anything in December of
12  2012 when tier officers complained about the practice of
13  vertical tier [sic] watching during the lunch period?
14  A.   I wasn't -- At that time I wasn't over in
15  Division 1.  So I remember discussions at the
16  superintendent's meeting about it.  That's about all I
17  know.
18  Q.   You're aware that Officer Rottar -- Strike
19  that.
20       Did you ever hear of the term Town Hall
21  meetings?
22  A.   Yes.
23  Q.   What is a Town Hall meeting?
24  A.   It's a meeting with staff to get everybody

---

DAVID MORECI
January 10, 2017

Page 70

1  one.
2  Q.   Do you recall whether or not vertical
3  cross-watching came to a halt after that Town Hall
4  meeting in Division 1?
5  A.   I don't recall.
6  Q.   Is there anything that would refresh your
7  memory?
8  A.   I've been to so many Town Hall meetings, and I
9  probably wouldn't remember.
10  Q.   Did you ever discuss with superintendents, the
11  practice of vertical cross-watching in Division 1?
12  A.   No.
13  Q.   Do you know in Division 1 a person by the name
14  of Brady?  He's a supervisor.
15  A.   Brady?
16  Q.   Brady.
17  A.   No.
18  Q.   A lieutenant by the name of Brady?
19  A.   No.
20  Q.   Showing you what has been marked as Plaintiff's
21  Exhibit No. 3, it's a two-page document.  I'll ask you to
22  take a look at it.  Actually, look at the second page of
23  it.
24  A.   (Witness complying.)

---

DAVID MORECI
January 10, 2017

Page 69

1  together to go over concerns or issues within the
2  division.
3  Q.   Isn't it true that you attended a Town Hall
4  meeting after December 31st, 2012 in Division 1 in
5  regards to the vertical cross-watching practice?
6  A.   I have attended Town Hall meetings in Division
7  1, but I don't recall one specifically about the vertical
8  relief program.
9  Q.   Do you recall being with Gary Hickerson in
10  January of 2013 at a Town Hall meeting with Peter -- you
11  know who Peter Kramer is?
12  A.   Yes.
13  Q.   Do you recall being at a Town Hall meeting with
14  Peter Kramer in 2013?
15  A.   No.
16  Q.   Do you recall being in a Town Hall meeting with
17  Gary Hickerson in 2013?
18  A.   Gary Hickerson wasn't an employee at the
19  Department in 2013.
20  Q.   Do you recall being in a Town Hall meeting with
21  other members of the executive staff in regards to the
22  vertical cross-watching?
23  A.   I may have been.  I've been in so many, I
24  couldn't tell you specifically if I was at that specific

---

DAVID MORECI
January 10, 2017

Page 71

1  Q.   Have you seen this report before?
2  A.   No.
3  Q.   Take a few moments and read it.
4  A.   (Witness complying.)  Okay.
5  Q.   Have you had a chance to read it?
6  A.   Yes.
7  Q.   Was there a pamphlet in December of 2012 issued
8  by the jail for multilevel vertical relief program?
9  A.   I don't recall.
10  Q.   Is that -- Is the practice or policy that's
11  laid out in the second page of Exhibit 3 similar to what
12  your commander or -- Commander Dembosz and Lieutenant
13  Imhof back in 2010 and 2011 proposed?
14  A.   Yes.
15  Q.   Does it appear to you that the pamphlet was
16  described in Exhibit No. 2?
17  MR. NOWINSKI:  Object to speculation.
18  BY THE WITNESS:
19  A.   Yes.
20  Q.   Did you ever discuss with Superintendent
21  Martinez why he implemented this multilevel vertical
22  relief program in December of 2012?
23  A.   No.
24  Q.   Do you know if he did implement this multilevel

Plaintiff's Exhibit 17 Page 18

Page 72

1 vertical relief program in December of 2012?

2 **A.** No.

3 Q. Do you know whether or not, in December of

4 2012, if Superintendent Martinez implemented this

5 multilevel vertical relief program, whether or not it was

6 against the policy and practice of the Cook County Jail?

7 **A.** No.

8 Q. I'm going to show you what is marked as Exhibit

9 No. 7 -- Plaintiff's Exhibit No. 7. It looks like two

10 news releases. One release looks like 2016 on Father's

11 Day and after Game 7 of the NBA Championship game. And

12 the other one looks like it was released also on a

13 holiday in 2016. I'd ask you to take a look at these

14 news releases.

15 **A. (Witness complying.)**

16 Q. Do you know a Cara Smith?

17 **A. Yes.**

18 Q. Who is Cara Smith?

19 **A. She works for the Sheriff. She's, I believe,**

20 **like a bureau chief also.**

21 Q. Was she once the executive director or acting

22 executive director?

23 **A. Yes.**

24 Q. And when was that?

Page 73

1 **A. I want to say 2014 into 2015.**

2 Q. Did you work for her?

3 **A. Yes.**

4 Q. Directly?

5 **A. Yes.**

6 Q. So she would know about the propensity for

7 Sheriff's employees to call in sick during certain

8 holiday days, correct?

9 MR. NOWINSKI: Object to form, speculation.

10 BY THE WITNESS:

11 **A. I would guess.**

12 Q. And they have a statement here on Plaintiff's

13 Exhibit No. 7 about during one shift, 21.3 percent of the

14 workers called in sick on the morning shift, and then on

15 the afternoon shift, 167 called in sick, correct?

16 **A. Yes.**

17 Q. Now, it does happen, you acknowledge, at the

18 jail, on certain holidays, this is a common occurrence,

19 correct?

20 MR. NOWINSKI: Object to form.

21 BY THE WITNESS:

22 **A. Yes.**

23 Q. What procedure, given the fact that you as a

24 first assistant and the other directors at the jail know

Page 74

1 this is going to occur on certain holiday days, what do

2 you do to provide appropriate staffing on Christmas Day

3 or New Year's Eve Day?

4 **A. We don't know that it's going to happen. We**

5 **assume that it's it's going to happen.**

6 Q. So with the assumption that these government

7 employees would call in sick on a holiday, do you then

8 overstaff on New Year's Day or New Year's Eve to insure

9 that there are adequate guards to come into work on those

10 days?

11 **A. What do you mean by "overstaff"?**

12 Q. Well, if there's -- Cara Smith is mentioning

13 that the morning shift, I guess, after the NBA Game 7,

14 150 of the 702 employees called in sick. That's unusual,

15 correct?

16 **A. Yes.**

17 Q. That's not common to have 21 percent of your

18 employees not show up on a day, correct?

19 **A. Yes.**

20 Q. Given that Christmas Day or New Year's Eve also

21 could be considered peak days when employees tend to call

22 in sick, does the Sheriff then schedule more people to

23 work on those days?

24 MR. NOWINSKI: Object to foundation.

Page 75

1 BY THE WITNESS:

2 **A. We don't schedule more people, but we will ask**

3 **people if they're willing to come in work because we**

4 **don't know how many we'll need. So we'll hold people**

5 **over from the previous shift to work.**

6 Q. So you'll have overtime, correct?

7 **A. Yes.**

8 Q. Do you lock down the entire building on

9 Christmas Day or New Year's Eve given that you might have

10 a staff shortage?

11 MR. NOWINSKI: Objection, incomplete hypothetical.

12 BY THE WITNESS:

13 **A. We have.**

14 Q. Do you know if, on December 31st, 2012 in

15 Division 1, whether or not they locked down the jail

16 because they weren't enough employees on the 3:00 to

17 11:00 shift?

18 **A. I don't recall that day.**

19 Q. Is there any record that would reflect that the

20 jail was locked down on those days?

21 **A. Yeah. There should be a record of it.**

22 Q. Would tier records -- tier logs reflect if the

23 inmates were locked down on the 3:00 to 11:00 shift on

24 December 31st, 2012?

Plaintiff's Exhibit 17 Page 19

DAVID MORECI
January 10, 2017

Page 76

A.    Yes.

Q.    Did you look at the tier record for the H2 tier on December 31st, 2012 on the 3:00 to 11:00 shift?

A.    Did I look at it?

Q.    Yeah.  In preparation for this dep?

A.    No.

Q.    If 21 percent of the officers failed to show up on the 3:00 to 11:00 shift on December 31st, 2012 in Division 1, how would the Sheriff adequately staff the tiers?

A.    We would hold overtime from the previous shift.

Q.    If the workers on the previous shift didn't want to work, what would they do?

A.    We would mandate them to work.

Q.    Going back to the roster sheet that was prepared in advance of December 31st, 2012, if we look at the roster sheet for the 3:00 to 11:00 shift, why isn't there a person assigned to the 3:00 to 11:00 shift on G2 on December 31st, 2012?

A.    On which tier?

Q.    On the G2 tier.

A.    Probably because the officers put in for benefit time.

Q.    So the daily roster sheet reflects that there

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 77

was nobody working at that time, correct?

MR. NOWINSKI:  Objection, mischaracterization.

BY MR. MORRISSEY:

Q.    Let me rephrase that.  This document, the daily roster Division 1 sheet that was tendered by the Sheriff, does not reflect that there was an officer assigned to G2 on the 3:00 to 11:00 shift?

A.    It doesn't say who was assigned to G2, but I'm sure somebody was assigned there.

Q.    But looking at this, you can't tell me that there was a person that was assigned to it?

A.    Correct.

Q.    And the same is true for December 31st, 2012, as far as a person assigned to G3?  On the 3:00 to 11:00 shift, there was nobody assigned to G3?

A.    Correct.

Q.    So we would need to look at the attendance sheet to determine if there was an officer actually assigned to G2 and G3 on the 3:00 to 11:00 shift?

A.    Yes.

Q.    Tier records -- living unit records, are they maintained in the division for five years?

A.    Yes.

Q.    So in Division 1, there should be living unit

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 78

records for December of 2012 maintained by the Sheriff?

A.    Yes.

MR. MORRISSEY:  Again, we're going to make a demand for all the tier sheets -- or the living unit sheets for the period in December of 2012, which have not been produced.  Some have been produced, but most have not. So, again, we're going to make a demand for those documents.

BY MR. MORRISSEY:

Q.    Are you familiar with Cermak -- Division 8, Cermak, in the year 2013 to the present?

MR. NOWINSKI:  Object to form.

BY THE WITNESS:

A.    Yes.

Q.    Let me rephrase the question.  As a first assistant director of the jail, you're familiar with the third floor of Cermak, correct?

A.    Yes.

Q.    And are you familiar with the fact that in -- Go back.

You're familiar with the consent decree, correct, which came out in May of 2012?  I'm sorry.

You're familiar with the consent decree that came out in May of 2010, correct?

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 79

MS. CARROLL:  Objection, form.

BY THE WITNESS:

A.    Yes.

Q.    And the consent decree in May of 2010, in that consent decree, the Sheriff agreed to place inmates with disabilities in appropriate housing at the jail, correct?

MR. NOWINSKI:  Object to speculation.

You can answer, if you know.

BY THE WITNESS:

A.    Yes.

Q.    And you're familiar also, as a first assistant at the jail, that the Justice Department issued a letter or report in May of 2012 bringing to the attention of the Sheriff that disabled people in wheelchairs were not being placed in cells which accommodated their disability?

A.    I've heard of that, but I'm not real familiar with that order.

Q.    Are you familiar with the fact that subsequently to that letter coming out by the Justice Department in May of 2012, that the Sheriff entered into an agreement with the Department of Justice called the implementation plan?

A.    I'm not familiar with that one.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 20

DAVID MORECI
January 10, 2017

Page 80

1    Q.   During your -- I'll show you what's been marked
2  as Plaintiff's Exhibit No. 11.  It's a document that was
3  tendered by the Sheriff through a Freedom of Information
4  Act request.  It's called Implementation Plan:
5  Accessibility Provisions of Agreed Order.  It's a
6  multiple-page document with the signature of Cara Smith
7  as the director of the Cook County Department of
8  Corrections on the signature page.  Take a look at it.
9    A.   (Witness complying).
10   Q.   You're aware that the plaintiff in this case is
11 confined to a wheelchair?
12   A.   Yes.
13   Q.   And at the Cook County Jail, the medical staff
14 at Cermak provides an alert to Sheriff's employees when
15 an inmate is disabled?
16   MS. CARROLL:  Objection to the phrasing.
17 BY THE WITNESS:
18   A.   Yes.
19   Q.   And if a doctor or a medical provider at Cermak
20 provides information to the Sheriff through IMac or CCom
21 come or whatever, that a person is assigned to a
22 wheelchair, the Sheriff's officers receive that
23 information, correct?
24   A.   Not specifically the officers.

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 81

1    Q.   Well, it's in the IMac or CCom jail management
2  data system that a prisoner is provided his -- has a
3  prescription for a wheelchair, correct?
4    A.   Yes.
5    Q.   In 2013, to your knowledge, what procedures
6  were in place for a wheelchair-assisted prisoner like
7  Mr. Bowers to be placed in a cell in Cermak that had grab
8  bars and an accessible toilet?
9    A.   It wouldn't have to be in Cermak.  We have ADA
10 cells throughout the whole compound.
11   Q.   My question pertains to, let's say 3 West in
12 2013.  What provisions -- What did the Sheriff's offices
13 do in 2013 to insure that a wheelchair-assisted prisoner
14 like Mr. Bowers was placed in an accessible cell on the
15 third floor of Cermak?
16   MR. NOWINSKI:  Object to foundation, speculation.
17        You can answer, if you can.
18 BY THE WITNESS:
19   A.   Cermak would make the request, and to my
20 knowledge, we never refused an inmate housing there.
21   Q.   My question is, what steps did the Sheriff's
22 office -- and by the Sheriff's office, I mean the
23 Department of Corrections -- take if a gentleman like
24 Mr. Bowers, who's the plaintiff in this case, was

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 82

1  prescribed a wheelchair by Cermak?  What steps did the
2  Sheriff take to insure that Mr. Bowers was placed in a
3  cell on the third floor of Cermak which had an accessible
4  toilet and sink?
5    MR. NOWINSKI:  Same objection.
6  BY THE WITNESS:
7    A.   From my dealings with it personally, if Cermak
8  said he had to be there, he was there.  We didn't take
9  steps.  Cermak medical says if he has to go to 3 West in
10 the cell, he's going to go there.
11   Q.   But my question is, in 2013 in 3 West, for
12 instance, were all the living units accessible for a
13 wheelchair-assisted prisoner?
14   A.   I'm not familiar with all the cells, but I do
15 know they have them.
16   Q.   In 2013, they had accessible cells in 3 West?
17   A.   Yes.
18   Q.   Are you aware of the requirements under the ADA
19 for a toilet and a sink to be accessible?
20   A.   Yes.
21   Q.   You're aware that a toilet requires grab bars,
22 for instance?
23   A.   Yes.
24   Q.   And that the toilet has to be a certain

TOOMEY REPORTING
312-853-0648

DAVID MORECI
January 10, 2017

Page 83

1  elevation?  The seat level has to be between 17 and
2  19 inches high?
3    A.   I know it has to be a certain height.  I don't
4  know the specific heights.
5    Q.   So what steps were taken by the Sheriff after
6  Cermak prescribed a wheelchair for Mr. Bowers, for
7  instance, to insure that he was placed in a room in 3
8  West or some other room on the third floor of Cermak that
9  had an ADA accessible toilet and sink?
10   MR. NOWINSKI:  Same objection, and asked and
11 answered.
12 BY THE WITNESS:
13   A.   When I've dealt with Cermak with these issues,
14 they were put there.  Cermak requested he has to be in
15 this tier in this specific cell, and he's there.  There's
16 no other step.
17   Q.   So if Mr. Bowers, in 2013 and 2014, was not
18 placed in a room that had an accessible toilet and sink
19 on the third floor of Cermak, it wasn't the Sheriff's
20 fault; it was Cermak's?
21   MR. NOWINSKI:  Misstates his testimony.
22        Go ahead.
23 BY MR. MORRISSEY:
24   Q.   Do you understand it?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 21

DAVID MORECI
January 10, 2017

Page 84

1    A.   In my dealings, yeah.  Cermak didn't tell us he
2 needed to be there.
3    Q.   So unless -- So if the facts came out that
4 Mr. Bowers was not in an accessible room on the third
5 floor of Cermak during the year 2013 and up until August
6 of 2014, that would have been because Cermak either
7 required him to be placed in a different room or didn't
8 inform the Sheriff that he needed to be in an accessible
9 room?
10    MR. NOWINSKI:  Object to incomplete hypothetical.
11 BY THE WITNESS:
12    A.   It could be.  All I can say is my dealings.  I
13 didn't have a lot of deals with Cermak.  My main
14 responsibility in the jail throughout my career has been
15 security, investigations.
16    Q.   When you were at these Dart meetings -- Thomas
17 Dart meetings with Burke and other high ranking members
18 of the Sheriff's staff, in 2013 and 2014, was there ever
19 any discussion in regards to the Justice's -- Department
20 of Justice's letter of May of 2012 saying that the
21 Sheriff wasn't providing accessibility for disabled
22 people?
23    A.   Not that I recall.
24    Q.   Do you know whether or not there were -- other

---

DAVID MORECI
January 10, 2017

Page 85

1 than the third floor of Cermak, whether wheelchair
2 detainees were housed in any other place in the
3 Department of Corrections in 2013 and 2014?
4    A.   They were housed other places.
5    Q.   Division 2 --
6    A.   Yes.
7    Q.   -- would have been one?  Any other places other
8 than the M and N tiers in Division 2?
9    A.   None that I can recall.
10    Q.   In the year 2013, did the jail have sufficient
11 living units that were accessible for wheelchair-bound
12 detainees to house people like Mr. Bowers who was
13 prescribed a wheelchair?
14    MR. NOWINSKI:  Objection, speculation, form, calls
15 for a legal conclusion.
16 BY THE WITNESS:
17    A.   To my knowledge, yes.
18    Q.   Do you know what a count sheet is?
19    A.   A what?
20    Q.   Daily count sheet.
21    A.   Oh.  Yes.
22    Q.   What is a daily count sheet?
23    A.   It's the counts that were made at shift change
24 and the three specific counts of the day.

---

DAVID MORECI
January 10, 2017

Page 86

1    Q.   In 2013 and 2014, were daily count sheets
2 computer generated?
3    A.   I believe so.
4    Q.   And were tier officers given daily count
5 sheets?
6    A.   No.
7    Q.   Were they asked to sign off on daily count
8 sheets --
9    A.   No.
10    Q.   -- tier officers?
11    A.   No.
12    Q.   Who received the daily count sheets?
13    A.   Security office.
14    Q.   Where were the daily -- Would the daily count
15 sheets, in 2013 and 2014, reflect the names of inmates
16 housed in a tier?
17    A.   No.
18    Q.   No?  Why not?
19    A.   It's just specifically the count.
20    Q.   Perhaps we're not discussing the same document.
21 I understand that at the start of each shift there's a
22 count, correct?
23    A.   Yes.
24    Q.   And at the end of the shift, there's a count,

---

DAVID MORECI
January 10, 2017

Page 87

1 correct?
2    A.   Yes.
3    Q.   My question is more focused.  In regards to the
4 names of the inmates inside a particular tier, is there a
5 document prepared by the Sheriff's office that lists the
6 names of the inmates in a particular tier?
7    A.   Yes.
8    Q.   What is that document called?
9    A.   Either -- Back then I believe it was a tier
10 sheet or housing sheet.  And on IMac I'm not sure what it
11 was specifically called.  Living unit sheet or something.
12    Q.   So does the Sheriff maintain such a record
13 today?
14    A.   Yes.
15    Q.   What is it called today?
16    A.   It's a -- What's it's called?  The cell census
17 report.
18    Q.   Does a cell census report list all the names of
19 the prisoners inside a particular tier?
20    A.   Yes.
21    Q.   And as long as you have been at the Cook County
22 Department of Corrections, there has always been a
23 document that specifies the names of the prisoners
24 assigned to a particular tier on a day?

Plaintiff's Exhibit 17 Page 22

DAVID MORECI
January 10, 2017

Page 88

1    MR. NOWINSKI:  Object to foundation.
2  BY THE WITNESS:
3    A.   Yes.
4    Q.   Does the tier -- When did that sheet or report
5  become computer generated?
6    A.   When we went to CCom.
7    Q.   Prior to that, when you had the other general
8  management system, was there a physical sheet?
9    A.   IMac printed it out and the officers signed it.
10  And then before that, we did a manual sheet where the
11  officer actually wrote every name in.
12    Q.   So on the third floor of Cermak in 2013, there
13  should be a daily list of the names of the inmates in
14  each of the living units, correct?
15    A.   There should be, but I don't have a lot of
16  dealings with Cermak, so I can't say for sure.
17    Q.   And the officer back in 2013 was using IMac?
18    A.   Pardon me?
19    Q.   In 2013 you were using the IMac system?
20    A.   Yeah.  I believe so.
21    Q.   So the tier officer on the third floor of
22  Cermak, say they were assigned to 3 West, would have a
23  list of all the inmates in 3 West, correct?
24    A.   Like I said, to my knowledge in Cermak, at

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 90

1  two to three years.
2    Q.   Is there any policy or practice at the Cook
3  County Jail in regards to what you now call the cell
4  census reports?
5    A.   I'm not sure.
6    Q.   Would those daily living sheets or cell census
7  reports reflect the number of prisoners that are in a
8  certain cell -- tier?
9    A.   Yes.
10    Q.   I'm showing you what's been marked as
11  Plaintiff's Exhibit No. 12.  It's previously been
12  Bates-stamped as 16 through 19.  Do you recognize the
13  first page of Exhibit No. 12 as the officer's living unit
14  log?
15    A.   Yes.
16    Q.   And this is for the H2 tier on 12/31/2012 on
17  the 3:00 to 11:00 shift?
18    A.   Yes.
19    Q.   Does it reflect that during that entire 3:00 to
20  11:00 shift, that the entire tier was locked down for the
21  entire period?
22    A.   No.
23    Q.   If the G and H tiers were short of staff on the
24  3:00 to 11:00 shift on December 31st, 2012, would it have

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 89

1  times I've gone up there, there's a board behind the
2  officer with all the IDs and it shows what cell they're
3  in.
4    Q.   And if there are additional inmates inside a
5  living unit, they would be handwritten on the IMac sheet?
6    A.   I'm not familiar with Cermak, how they did it
7  then.
8    Q.   At the end of a shift, would those IMac sheets
9  be collected?
10    A.   They should be.
11    Q.   And where would they be deposited?
12    A.   In the superintendent's office.
13    Q.   And what would -- Where would they be
14  maintained after the sheets were sent to the
15  superintendent's office?
16    A.   I believe in a file in the superintendent's
17  office.
18    Q.   And would they be maintained also for a
19  five-year period?
20    MR. NOWINSKI:  Objection, speculation.
21    MR. MORRISSEY:  I'm asking.
22  BY THE WITNESS:
23    A.   I'm not sure what the requirements are on the
24  tier sheets.  I think those were more along the lines of

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 91

1  been appropriate to lock down the entire cellblock
2  because of staff shortages?
3    MR. NOWINSKI:  Objection, incomplete hypothetical,
4  speculation.
5  BY THE WITNESS:
6    A.   That doesn't make sense.  Just Tier H2 would be
7  short, not the rest of the division.
8    Q.   If the entire division, Division 1, on New
9  Year's Eve between 3:00 and 11:00 that night was short of
10  staff, one of the ways of managing the shortage would
11  have been to lock down the entire building?
12    A.   You could if you felt there was a security
13  concern.
14    Q.   What other steps could have been taken on the
15  3:00 to 11:00 shift on December 31st, 2012 if there was a
16  severe staff shortage?
17    A.   Cut down to limited movement, emergency
18  movement only.  Cut visiting down.  Possibly stop
19  visiting.  No recreation.  No barber shop.  Stuff like
20  that.
21    Q.   Now, on the -- If the entire building was
22  locked down on the 3:00 to 11:00 shift, would the watch
23  commander's log reflect that?
24    A.   It should.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 23

Page 92

1    Q.   Looking at Bates-stamp 16, is that the watch
2    commander log for that time?
3    A.   16.  I don't see where --
4    Q.   On the third page of the document.
5    A.   I don't see a 16 on there.  Yeah.  That's a
6    watch commander's log.
7    Q.   Does it reflect if there was a staff shortage?
8    Let me ask you a preliminary question.  If there was a
9    staff shortage in Division 1 on that shift, should it
10   have been noted in the watch commander's log?
11   A.   Yeah.  On the back page.
12   Q.   Do we have a back page?
13   A.   Yes.  The next page.  That should be documented
14   in the unusual incidents or comments section.
15   Q.   I don't know if I asked you.  Do you know this
16   Lieutenant Dahmen?
17   A.   Yes.
18   Q.   Is Lieutenant Dahmen still living in Chicago?
19   A.   I don't know?
20   Q.   Is he retired?
21   A.   Yes.
22   Q.   Do you know Commander Anderson?
23   A.   Yes.
24   Q.   Is he still with the Sheriff?

Page 93

1    A.   She.
2    Q.   She.  Is she still with the Sheriff?
3    A.   Yes.
4    Q.   Does this reflect the second page of the watch
5    commander's log that there were no tiers on lockdown?
6    A.   Yes.
7    Q.   Does the watch commander's log reflect whether
8    or not the division was fully staffed?
9    A.   No.
10   Q.   Does it reflect anything about the staffing?
11   A.   No.
12   Q.   It does reflect that there was a prisoner that
13   was taken to Cermak for medical, correct?
14   A.   Yes.
15   Q.   If a prisoner like Mr. Bowers was injured on
16   the 3:00 to 11:00 shift, what reports would have been
17   prepared in the normal course of business by the Sheriff?
18   A.   Incident report, disciplinary report, if
19   that -- they felt inmates need to be disciplined.
20   Q.   I haven't asked you this, but when did Division
21   1 -- when was Division 1 equipped with cameras?
22   A.   I don't know the exact date, but I think we
23   went lie in '15, maybe.
24   Q.   So at the time of this incident, there were no

Page 94

1    cameras in the tiers?
2    A.   No.
3    Q.   Were there any cameras in the building?
4    A.   Not to my knowledge.
5    Q.   The only cameras -- Did you see the film clip
6    of Mr. Bowers after the incident?
7    A.   No.
8    Q.   Were sergeants and lieutenants equipped with
9    the hand-held cameras back in December of 2012?
10   A.   The divisions were issued cameras.
11   Q.   So after the fact, the sergeants and
12   lieutenants would have access to a camera to film an
13   incident, correct?
14   A.   Yes.
15   Q.   Do you have any personal knowledge of what
16   happened to Mr. Bowers?
17   A.   No.
18   Q.   Did you ever talk to Superintendent Martinez
19   about whether or not he had permitted this vertical
20   cross-watching during lunch hours?
21   A.   No.
22   Q.   Did you talk to any officers or supervisors in
23   regards to the vertical cross-watching in Division 1 in
24   December of 2012?

Page 95

1    A.   No.
2    Q.   Do you know if anybody was ever disciplined
3    because in Division 1 they had a practice of doing this
4    vertical cross-watching?
5    A.   Not to my knowledge.
6    MR. MORRISSEY:  I have no further questions at this
7    time.
8    MS. CARROLL:  I just have a couple.
9            CROSS-EXAMINATION
10   BY MS. CARROLL:
11   Q.   I know you said you did not do a lot of
12   dealings with Cermak.
13   Do you know what role an inmate security
14   classification played in placement in different cells or
15   different tiers on Cermak?
16   A.   Can you rephrase that?
17   Q.   Did security classification, like someone who's
18   in maximum security, did that play a role in where he
19   could be placed on the third floor of Cermak?
20   A.   Yes.
21   Q.   Do you remember which tiers were considered
22   okay for someone at maximum security to be placed?
23   A.   I'm not familiar with Cermak.
24   MS. CARROLL:  Okay.  That's it.

Plaintiff's Exhibit 17 Page 24

DAVID MORECI
January 10, 2017

Page 96

1    MR. NOWINSKI:  We'll reserve.

2                    (Witness excused.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 98

1    UNITED STATES OF AMERICA      )
     NORTHERN DISTRICT OF ILLINOIS )
2    EASTERN DIVISION              )  SS.
     STATE OF ILLINOIS             )
3    COUNTY OF COOK                )

4

5         I, Shelley M. Bostetter, Certified Shorthand

6    Reporter and Notary Public, do hereby certify that DAVID

7    MORECI was first duly sworn by me to testify to the whole

8    truth and that the above deposition was reported

9    stenographically by me and reduced to typewriting under

10   my personal direction.

11        I further certify that the said deposition was

12   taken at the time and place specified and that the taking

13   of said deposition commenced on the 10th day of January,

14   A.D., 2017, at 11:10 o'clock a.m.

15        I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   or financially interested directly or indirectly in this

19   action.

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 97

1         IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3    UNITED STATES OF AMERICA,       )
4              Plaintiff,            )
                                     )
5         vs.                        )   No. 10 C 2946
                                     )
6    COOK COUNTY, ILLINOIS; THOMAS   )
     DART, COOK COUNTY SHERIFF (in   )
7    his official capacity); TODD H. )
     STROGER, COOK COUNTY BOARD      )
8    PRESIDENT (in his official      )
     capacity); COOK COUNTY BOARD OF )
9    COMMISSIONERS (in their official)
     capacity);                      )
10                                   )
             Defendants.             )
11

12

13        I, DAVID MORECI, state that I have read the
     foregoing transcript of the testimony given by me at my
14   deposition on the 10th day of January, 2017, and that
     said transcript constitutes a true and correct record of
15   the testimony given by me at said the deposition except
     as I have so indicated on the errata sheets provided
16   herein.

17

18                    DAVID MORECI

19   No corrections (Please initial)
     Number of errata sheets submitted      (pgs.)
20   SUBSCRIBED AND SWORN to
     before me this      day
21   of           , 2017.

22

23        NOTARY PUBLIC

24

TOOMEY REPORTING
312-853-0648

---

DAVID MORECI
January 10, 2017

Page 99

1         In witness whereof, I have hereunto set my hand

2    and affixed my seal of office at Chicago, Illinois, this

3    17th day of January, A.D., 2017.

4

5

6

7

8

9

10

11                    SHELLEY M. BOSTETTER, CSR
                      TOOMEY REPORTING
12                    (312) 853-0648

13   CSR No. 084-004410

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 17 Page 25

## List of wheelchair accessible beds in CCDOC

1. RTU
   a. 2nd Floor
      i. 2A – Cell #10
      ii. 2B – Beds X2 and X3
      iii. 2E – Cell #10
      iv. 2F – Beds X2 and X3
      v. 2G – Beds X5 and X6

   b. 3rd Floor
      i. 3A – Cell #10
      ii. 3B – Beds X2 and X3
      iii. 3C – Beds X5 and X6
      iv. 3D – Beds X2 and X3
      v. 3E – Cell #10
      vi. 3F – Beds X2 and X3
      vii. 3G – Beds X5 and X6
      viii. 3H – Beds X2 and X3

   c. 4th Floor
      i. 4A – Cells #6, #10
      ii. 4B – Beds X2 and X3
      iii. 4C – Beds X5 and X6
      iv. 4D – Beds X2 and X3
      v. 4E – Cells #6, #10
      vi. 4F – Beds X2 and X3
      vii. 4G – Beds X5 and X6
      viii. 4H – Beds X2 and X3

   d. 5th Floor
      i. 5A – Cells #6, #10
      ii. 5B – Beds X2 and X3
      iii. 5C – Beds X5 and X6
      iv. 5D – Beds X2 and X3
      v. 5E – Cells #6, #10
      vi. 5F – Beds X2 and X3
      vii. 5G – Beds X5 and X6
      viii. 5H – Beds X2 and X3

Plaintiff's Exhibit 18 Page 1

COOK COUNTY SHERIFF'S OFFICE
*(Oficina del Alguacil del Condado de Cook)*

INMATE GRIEVANCE FORM
*(Formulario de Queja del Preso)*

704888

☐ GRIEVANCE  ☑ NON-GRIEVANCE (REQUEST)

CONTROL #

N/A

**( This section is to be completed by Program Services staff - ONLY ) ( ! Para ser llenado solo por el personal de Program Services !)**

GRIEVANCE FORM PROCESSED AS:

☐ EMERGENCY GRIEVANCE
☐ GRIEVANCE
☑ NON-GRIEVANCE (REQUEST)

*Program Services Supervisor Approving Non-Grievance (Request) Signature*

REFERRED TO:

☐ CERMAK HEALTH SERVICES
☐ SUPERINTENDENT:
☑ OTHER. DOC ADMIN

**INMATE INFORMATION** *(Información del Preso)*

PRINT- INMATE LAST NAME *(Apellido del Preso):* Roberts

PRINT - FIRST NAME *(Primer Nombre):* James

ID Number *(# de Identificación):* 704888
2014 0910003

DIVISION *(División):* DIV 8 RTU 3E

LIVING UNIT *(Unidad):* DIV 8 RTU 3E

DATE *(Fecha):* 11.5.2014

**INMATE'S BRIEF SUMMARY OF THE COMPLAINT** *(Breve Resumen de los Hechos del Preso):*

* An inmate wishing to file a grievance is required to do so within 15 days of the event he/she is grieving.
* Inmate Disciplinary Hearing Board decisions cannot be grieved or appealed through the use of an Inmate Grievance Request/Response/Appeal Form.
* When a grievance issue is processed as a NON-GRIEVANCE (REQUEST), an inmate may re-submit the grievance issue after 15 days to obtain a "Control Number" if there has been no response to the request or the response is deemed unsatisfactory.

* Un preso que desea llenar una queja, se le requiere que lo haga dentro de los 15 días después del incidente.
* Las decisiones del Comité Disciplinario de los presos, no podrán ser cuestionadas o Apeladas a través del uso del Formulario de Quejas/Respuesta/Forma de Apelación.
* Cuando una Queja se procesa como una QUEJAS NO (PETICION), un preso podría re-someter una Queja después de los 15 días para recibir un "Número de Control", ya sea porque no hay una respuesta o porque la respuesta es insatisfactoria.

PLEASE INCLUDE:    Date of Incident  -  Time of Incident  -  Specific Location of Incident.
*(Por Favor, Incluya: Fecha Del Incidente - Hora Del Incidente - Lugar Específico Del Incidente)*

I am in Cell Number 6, I can not use the Toilet
Because There Are no Rails or Bars To pull up
with. The Officer (I could not get his name
was out of the Unit or Team) For over an Hour I
need To go To the Bathroom, I ring the Butto
For over an Hour No respond To my ring
The Button. No officer I Band on The Door
My Cellee was Angry I told his That, I had to
go To the Bathroom, But I could not use the Toilet
in Cell 6

ACTION THAT YOU ARE REQUESTING *(acción que esta solicitando)*:  Pull up Bars And Rails Place in
The Right Place For people with Disability

NAME OF STAFF OR INMATE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
*(Nombre del personal o presos que tengan información):*

INMATE SIGNATURE *(Firma del Preso):*
James Roberts

**SUPERINTENDENTS/DIRECTORS/DESIGNEES OF A DIVISION/UNIT MUST REVIEW AND SIGN ALL GRIEVANCES ALLEGING STAFF USE OF FORCE, STAFF MISCONDUCT, AND EMERGENCY GRIEVANCES. IF THE INMATE GRIEVANCE IS OF A SERIOUS NATURE, THE SUPERINTENDENT MUST INITIATE IMMEDIATE ACTION.**

CRW/PLATOON COUNSELOR *(Print):* PG11

SIGNATURE: C

DATE CRW/PLATOON RECIEVED: 11.7.14

SUPERINTENDENT/DIRECTOR/DESIGNEE *(Print):*

SIGNATURE:

DATE REVIEWED:

COOK COUNTY SHERIFF'S OFFICE
(Oficina del Aiguacil del Condado de Cook)

INMATE GRIEVANCE FORM
(Formulario de Queja del Preso)

☐ GRIEVANCE   ☐ NON-GRIEVANCE (REQUEST)

CONTROL #

704888   N/A

**( This section is to be completed by Program Services staff - ONLY )** **( Para ser llenado solo por el personal de Program Services )**

GRIEVANCE FORM PROCESSED AS:

☐ EMERGENCY GRIEVANCE
☐ GRIEVANCE
☑ NON-GRIEVANCE (REQUEST)

2472

REFERRED TO:

☐ CERMAK HEALTH SERVICES
☐ SUPERINTENDENT:
☑ OTHER: DOC Admin

Program Services Supervisor Approving Non-Grievance (Request) Signature

**INMATE INFORMATION** (Información del Preso)

PRINT - INMATE LAST NAME (Apellido del Preso):  Roberts
PRINT - FIRST NAME (Primer Nombre):  James
ID Number (# de Identificación):  2014 0110003   704888

DIVISION (División):  DIV 8 RTU 3E
LIVING UNIT (Unidad):  DIV 8 RTU 3E
DATE (Fecha):  11-16-2014

**INMATE'S BRIEF SUMMARY OF THE COMPLAINT** (Breve Resumen de los Hechos del Preso):

* An inmate wishing to file a grievance is required to do so within 15 days of the event he/she is grieving.
* Inmate Disciplinary Hearing Board decisions cannot be grieved or appealed through the use of an Inmate Grievance Request/Response/Appeal Form.
* When a grievance issue is processed as a NON-GRIEVANCE (REQUEST), an inmate may re-submit the grievance issue after 15 days to obtain a "Control Number" if there has been no response to the request or the response is deemed unsatisfactory.

* Un preso que desea llenar una queja, se le requiere que lo haga dentro de los 15 días después del incidente.
* Las decisiones del Comité Disciplinario de los presos, no podrán ser cuestionadas o Apeladas a través del uso del Formulario de Quejas/Respuesta/Forma de Apelación.
* Cuando una Queja se procesa como una QUEJAS NO (PETICION), un preso podría re-someter una Queja después de los 15 días para recibir un "Número de Control",
ya sea porque no haya una respuesta o porque la respuesta es insatisfactoria.

PLEASE INCLUDE:    Date of Incident  -  Time of Incident  -  Specific Location of Incident
(Por Favor, Incluye:  Fecha Del Incidente  -  Hora Del Incidente  -  Lugar Específico Del Incidente)

I Am DisAblable I have one Leg. AT The Change of Shift I Need to go to The BathRoom The Officer FINish his count And Let me out of The cell to use The Bathroom I could Not use The Toilet Because The RAILs Are iN The wrong PLace I were A Fast Leg The could Not Put on My Right Leg Because my Leg was Swollen. I Am IN A cell withA toilet ThAt I can Not use This is cell 6 I WAS iN cell 10 And I could use The toilet I WAS Move d cell.

ACTION THAT YOU ARE REQUESTING (Acción que esta solicitado):

Cell with BARs or RAILs iN The Right Place Hospital Bed RAise My Legs Stop Swollen

NAME OF STAFF OR INMATE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
(Nombre del personal o presos que tengan información):
Officer HASKell

INMATE SIGNATURE (Firma Del Preso):
James Robers

SUPERINTENDENTS/DIRECTORS/DESIGNEES OF A DIVISION/UNIT MUST REVIEW AND SIGN ALL GRIEVANCES ALLEGING STAFF USE OF FORCE, STAFF MISCONDUCT, AND EMERGENCY GRIEVANCES. IF THE INMATE GRIEVANCE IS OF A SERIOUS NATURE, THE SUPERINTENDENT MUST INITIATE IMMEDIATE ACTION.

CRW/PLATOON COUNSELOR (Print):  Bull
SIGNATURE:
DATE CRW/PLATOON COUNSELOR RECEIVED:  11-7-14

SUPERINTENDENT/DIRECTOR/DESIGNEE (Print):
SIGNATURE:
DATE REVIEWED:

CN-47 (NOV 11)   (WHITE COPY - PROGRAM SERVICES)   (YELLOW COPY - CRW/PLATOON COUNSELOR)   (PINK COPY - INMATE)

CCSAO_Roberts_00 Plaintiff's Exhibit 19 Page 2

**COOK COUNTY SHERIFF'S OFFICE**
(Oficina del Aguacil del Condado de Cook)
**INMATE GRIEVANCE RESPONSE / APPEAL FORM**
(Petición de Queja del Preso/Respuesta/Forma de Apelación)

☐ GRIEVANCE ☐ NON-GRIEVANCE (REQUEST)

CONTROL #:

N/A

## INMATE INFORMATION

INMATE LAST NAME (Apellido del Preso): **Roberts**

INMATE FIRST NAME (Primer Nombre): **James**

ID Number (# de Identificación): **2014 091 0003**

## GRIEVANCE / NON-GRIEVANCE (REQUEST) REFERRAL & RESPONSE
(EMERGENCY GRIEVANCES ARE THOSE INVOLVING AN IMMEDIATE THREAT TO THE WELFARE OR SAFETY OF AN INMATE)

CRW/PLATOON COUNSELOR'S SUMMARY OF THE COMPLAINT:
**O/U A.D.A Issues**

IMMEDIATE CRW/PLATOON COUNSELOR RESPONSE (if applicable):
**N/A**

CRW/PLATOON COUNSELOR REFERRED THIS GRIEVANCE/REQUEST TO (Example: Superintendent, Cermak Health Services, Personnel): **D.O.C. Admin**

DATE REFERRED: **11.7.14**

RESPONSE BY PERSONNEL HANDLING REFERRAL:
**Mr. Roberts requires a wheelchair for long distances only per his medical alerts. Mr. Roberts should not have a wheelchair on the living unit. As a reminder the bathroom in the dayroom has rails.**

PERSONNEL RESPONDING TO GRIEVANCE (Print): **Marlene Fuentes**

SIGNATURE: **Marlene Fuentes**

DIV./DEPT.:

DATE: **11.14.14**

*Superintendents of a division/unit must review all responses to grievances alleging staff use of force, staff misconduct and emergency grievances.*

SUPERINTENDENT/DIRECTOR/DESIGNEE (Print):

SIGNATURE:

DIV./DEPT.:

DATE:

NON-GRIEVANCE (REQUEST) SUBJECT CODE (Check applicable box):

☐ GRIEVANCE SUBJECT CODE: _____

☐ NON GRIEVANCE SUBJECT CODE: _____

INMATE SIGNATURE (Firma del Preso): **James Roberts**

DATE RESPONSE WAS RECEIVED:
(Fecha en que la respuesta fue recibida):
**11/19/2010**

## INMATE'S REQUEST FOR AN APPEAL (Solicitud de Apelación del Preso)

* To exhaust administrative remedies, appeals must be made within 14 days of the date the inmate received the response.

* Las apelaciones tendrán que ser sometidas dentro del los 14 días; a partir que el preso recibió la respuesta para agotar todas las posibles respuestas administrativas.

DATE OF INMATE'S REQUEST FOR AN APPEAL: (Fecha de la solicitud de la apelación del detenido:) _____

INMATE'S BASIS FOR AN APPEAL: (Base del detenido para una apelación:)

ADMINISTRATOR/DESIGNEE'S ACCEPTANCE OF INMATE'S APPEAL?
(¿ Apelación del detenido aceptada por el administrador o/su designado(a)?)

Yes (Si) ☐    No ☐

ADMINISTRATOR/DESIGNEE'S DECISION OR RECOMMENDATION: (Decisión o recomendación por parte del administrador o/su designado(a):)

ADMINISTRATOR/DESIGNEE (Administrador o/su Designado(a)):

SIGNATURE (Firma del Administrador o/su Designado(a)):

DATE (Fecha):

INMATE SIGNATURE (Firma del Preso):

DATE INMATE RECEIVED APPEAL RESPONSE:
(Fecha en que el preso recibió una respuesta a su apelación:)

FCN 48(Nov 11)

(WHITE COPY – PROGRAM SERVICES)    (YELLOW COPY – C.R.W./PLATOON COUNSELOR)    (PINK COPY – INMATE)

CCSAO Roberts 000 Plaintiff's Exhibit 19 Page 3

COOK COUNTY SHERIFF'S OFFICE
(Oficina del Alguacil del Condado de Cook)

INMATE GRIEVANCE FORM
(Formulario de Queja del Preso)

☐ GRIEVANCE   ☑ NON-GRIEVANCE (REQUEST)

CONTROL #
N/A

**!This section is to be completed by Program Services Staff - ONLY! (¡ Para ser llenado solo por el personal de Program Services !)**

GRIEVANCE FORM PROCESSED AS:

☐ EMERGENCY GRIEVANCE
☐ GRIEVANCE
☑ NON-GRIEVANCE (REQUEST)

Program Services Supervisor Approving Non-Grievance (Request) Signature

REFERRED TO:

☐ CERMAK HEALTH SERVICES
☐ SUPERINTENDENT: _____
☑ OTHER: D.O.C Admin

**INMATE INFORMATION (Información del Preso)**

PRINT - INMATE LAST NAME (Apellido del Preso):
Roberts

PRINT - FIRST NAME (Primer Nombre):
James

ID Number (# de identificación): 704888
2014091000 3

DIVISION (División):
Div 8 RTU 3E

LIVING UNIT (Unidad):
Div 8 RTU 3E

DATE (Fecha):
11-15-2014

**INMATE'S BRIEF SUMMARY OF THE COMPLAINT (Breve Resumen de los Hechos del Preso):**

* An inmate wishing to file a grievance is required to do so within 15 days of the event he/she is grieving.
* Inmate Disciplinary Hearing Board decisions cannot be grieved or appealed through the use of an Inmate Grievance Request / Response / Appeal Form.
* When a grievance issue is processed as a NON-GRIEVANCE (REQUEST), an inmate may re-submit the grievance issue after 15 days to obtain a "Control Number" if there has been no response to the request or the request is deemed unsatisfactory.

* Un preso que desea llenar una queja, se le requiere que lo haga dentro de los 15 días después del incidente.
* Las decisiones del Comité Disciplinario de los preso, no podrán ser cuestionadas o apeladas a través del uso del Formulario de Quejas / Respuesta / Forma de Apelación.
* Cuando una queja se procesa como una QUEJAS NO (PETICIÓN), un preso podría re-someter una Queja después de los 15 días para recibir un "Numero de Control", ya sea porque no hay una respuesta o porque la respuesta es insatisfactoria.

PLEASE INCLUDE:      Date of Incident -     Time of Incident -     Specific Location of Incident
(Por Favor, Incluya:   Fecha Del Incidente -   Hora Del Incidente -   Lugar Específico Del Incidente)

I cannot use The Toilet Because There are No Bars or Rails to pull up with I cannot get up or Down on the Toilet The Bed is to Small for me I am Afraid every Night That I am going to Fall I have Blood clots Because of Falling I cannot Sleep At Night, My Legs Swollen Because I cannot Raise My Legs, I cannot See At Night Because the Cell is Dark I have A High Rise of Falling I Loose My Balance Because I am Not Getting Enough Oxygen to My Brain I cannot use the Desk Because I cannot Reach it so I cannot Ride.

ACTION THAT YOU ARE REQUESTING (Acción que esta solicitando):

I need Bars or Rails to pull up I need A Wider Bed I need A Larger Mattress I need to Raise my Feet and Legs I need a Desk At I can use with the Seat in the way

NAME OF STAFF OR INMATE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
(Nombre del personal o presos que tengan información):

INMATE SIGNATURE (Firma del Preso):
James Roberts

**SUPERINTENDENTS / DIRECTORS / DESIGNEES OF A DIVISION/UNIT MUST REVIEW AND SIGN ALL GRIEVANCES ALLEGING STAFF USE OF FORCE, STAFF MISCONDUCT, AND EMERGENCY GRIEVANCES. IF THE INMATE'S GRIEVANCE IS OF A SERIOUS NATURE, THE SUPERINTENDENT MUST INITIATE IMMEDIATE ACTION.**

CRW / PLATOON COUNSELOR (Print):
Paul

SIGNATURE:

DATE CRW/PLATOON COUNSELOR RECEIVED:
11 18 14

SUPERINTENDENT / DIRECTOR / DESIGNEE (Print):

SIGNATURE:

DATE REVIEWED:

CN-47 (Rev. 09/14)

WHITE COPY - PROGRAM SERVICES      YELLOW COPY - CRW / PLATOON COUNSELOR      PINK COPY - INMATE

COOK COUNTY SHERIFF'S OFFICE
(Oficina del Aguacil del Condado de Cook)

INMATE GRIEVANCE RESPONSE / APPEAL FORM
(Petición de Queja del Preso/Respuesta/Forma de Apelación)

☐ GRIEVANCE ☐ NON-GRIEVANCE (REQUEST)

CONTROL #:
N/A

## INMATE INFORMATION

INMATE LAST NAME (Apellido del Preso): Roberts

INMATE FIRST NAME (Primer Nombre): James

ID Number (# de Identificación): 2014011 0003

## GRIEVANCE / NON-GRIEVANCE (REQUEST) REFERRAL & RESPONSE
(EMERGENCY GRIEVANCES ARE THOSE INVOLVING AN IMMEDIATE THREAT TO THE WELFARE OR SAFETY OF AN INMATE)

CRW/PLATOON COUNSELOR'S SUMMARY OF THE COMPLAINT:
OTO ADA Accomodation Issues

IMMEDIATE CRW/PLATOON COUNSELOR RESPONSE (if applicable):
N/A

CRW/PLATOON COUNSELOR REFERRED THIS GRIEVANCE/REQUEST TO (Example: Superintendent, Cermak Health Services, Personnel):
D.O.C Admin

DATE REFERRED: 11, 18, 14

RESPONSE BY PERSONNEL HANDLING REFERRAL:
Mr. Roberts requires a wheelchair for long distances only per his Medical alerts. However, Mr. Roberts is currently housed in a cell with grab bars. Please submit a medical request form for all medical concerns.

PERSONNEL RESPONDING TO GRIEVANCE (Print): Marlene Fuentes

SIGNATURE: Marlene Fuentes

DIV./DEPT.:

DATE: 11, 25, 14

Superintendents of a division/unit must review all responses to grievances alleging staff use of force, staff misconduct and emergency grievances.

SUPERINTENDENT/DIRECTOR/DESIGNEE (Print):

SIGNATURE:

DIV./DEPT.:

DATE:

NON-GRIEVANCE (REQUEST) SUBJECT CODE (Check applicable box):
☐ GRIEVANCE SUBJECT CODE: _____
☐ NON-GRIEVANCE SUBJECT CODE: _____

INMATE SIGNATURE (Firma del Preso):
X James Roberts

DATE RESPONSE WAS RECEIVED:
(Fecha en que la respuesta fue recibida):
X 12 5, 2014

## INMATE'S REQUEST FOR AN APPEAL ( Solicitud de Apelación del Preso)

* To exhaust administrative remedies, appeals must be made within 14 days of the date the inmate received the response.

* Las apelaciones tendrán que ser sometidas dentro del los 14 días; a partir que el preso recibió la respuesta para agotar todas las posibles respuestas administrativas.

DATE OF INMATE'S REQUEST FOR AN APPEAL: (Fecha de la solicitud de la apelación del detenido:) ___/___/___

INMATE'S BASIS FOR AN APPEAL: (Base del detenido para una apelación:)

ADMINISTRATOR/DESIGNEE'S ACCEPTANCE OF INMATE'S APPEAL?
(¿ Apelación del detenido aceptada por el administrador o/su designado(a)?)

Yes (Si) ☐     No ☐

ADMINISTRATOR/DESIGNEE'S DECISION OR RECOMMENDATION: (Decisión o recomendación por parte del administrador o/su designado(a):)

ADMINISTRATOR/DESIGNEE (Administrador o /su Designado(a)):

SIGNATURE (Firma del Administrador o/su Designado(a)):

DATE (Fecha):
___/___/___

INMATE SIGNATURE (Firma del Preso):

DATE INMATE RECEIVED APPEAL RESPONSE
___/___/___

(14 48)(NOV 11)     (WHITE COPY - PROGRAM SERVICES)     (YELLOW COPY - C.R.W./PLATOON COUNSELOR)     (PINK COPY - INMATE)



# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

**Toni Preckwinkle**          President, Board of Cook County Commissioners

**Affiliates**

| | |
|---|---|
| Ambulatory & Community Health Network of Cook County | Provident Hospital of Cook County |
| Cermak Health Services of Cook County | Oak Forest Health Center of Cook County |
| Cook County Department of Public Health | Ruth M Rothstein CORE Center |

John H. Stroger, Jr. Hospital of Cook County

Patient Name: ROBERTS, JAMES
Patient Type:  Clinic Outpatient          Admission Date:  11/14/2014          MRN: 005007433c; 00704888z
Birth Date:                               Discharge Date:  11/14/2014
Gender: Male                                                                    CMRN: 1012697414
FIN:  0749857785

---

## Amputee Outpt

Document Type:                    Amputee Outpt
Service Date/Time:                11/14/2014 09:05 CST
Result Status:                    Auth (Verified)
Perform Information:              MCCARTHY DO,THERESA M (11/14/2014 09:27 CST)
Sign Information:                 MCCARTHY DO,THERESA M (11/19/2014 21:53 CST)

**R BKA problems**

Patient:  **ROBERTS, JAMES**          **MRN: 005007433c**          **FIN: 0749857785**
Age:  **66 years**   Sex: **Male**   DOB:
Associated Diagnoses:  **None**
Author:  **MCCARTHY DO, THERESA M**

**Visit Information**
   **Visit type**:  New patient evaluation.
   **Accompanied by**:  DOC Officers.
   **Source of history**:  Self, Medical record.
   **History limitation**:  None.

**Chief Complaint**
   66 y/o with right BKA due to blood clots at Weiss memorial about 9 months ago.   Was a street evangulist, social worker
   prior to blood clots.  Made at continental NH, south of foster and western.  Now under DOC and 'pain with walking'

**History of Present Illness**
      The patient presents with loose fitting prosthesis, short on right.

**Review of Systems**
   **Constitutional**:  Decreased activity.
   **Eye**:  Negative.
   **Ear/Nose/Mouth/Throat**:  Negative.
   **Respiratory**:  Shortness of breath, Cough.
   **Cardiovascular**:  No chest pain.
   **Gastrointestinal**:  Negative.
   **Genitourinary**:  Negative.
   **Hematology/Lymphatics**:  Bruising tendency, Bleeding tendency.

Report Request ID:  37971537                Page 2 of 6                Facility:  ACHN
                                                                      Location:  Amputee (SC)

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby
notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this
communication in error, please notify the appropriate party immediately.

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Clinic Outpatient
Birth Date:
Gender: Male
FIN: 0749857785

Admission Date: 11/14/2014
Discharge Date: 11/14/2014

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

| **Amputee Outpt** |
|---|

**Endocrine**: Negative except as documented in history of present illness.
**Musculoskeletal**: Negative except as documented in history of present illness.
**Integumentary**: Negative except as documented in history of present illness.
**Neurologic**: Negative except as documented in history of present illness.

**Health Status**
  **Allergies**:
    <u>Allergic Reactions (Selected)</u>
      No Known Medication Allergies
  **Current medications**: (Selected)
    <u>Outpatient Medications</u>
      *Ordered*
        acetaminophen: 650 MG, 2 TAB, PO, Q 8 Hr, PRN: Pain
        emollients, topical cream: 1 APP, Topical, Daily kop
        enalapril: 20 MG, 1 TAB, PO, Daily
        insulin lispro: 8 UNITS, 0.08 ML, SQ, TID with meals
        prenatal multivitamin: 1 TAB, PO, Daily
        sodium chloride 0.65% nasal spray: 1 SPRAY, Nostril, Both, Q 1 Hr, PRN: Nasal Congestion
        supplemental insulin, regular: ss dose, SQ, TID AC & bedtime, PRN: Other - See Instruction to Nursing
        warfarin: 4 MG, 1 TAB, PO, Bedtime
        warfarin: 5 MG, 1 TAB, PO, Bedtime
      *Pending Complete*
        insulin Lantus: 20 UNITS, 0.2 ML, SQ, Bedtime
  **Problem list**:
    <u>All Problems</u>
      DVT (deep venous thrombosis) / 194647015 / Confirmed
      Diabetes / 121589010 / Confirmed
      HTN (hypertension) / 1215744012 / Confirmed

**Histories**
  **Past Medical History**: DM, HTN, DVT, clotting problems
  **Family History**:
    No family history items have been selected or recorded.
  **Procedure history**:
    No active procedure history items have been selected or recorded.
  **Social History**
    DOC detainee, prostheis is copoly socket, locking liner with pin, external socks (maker unknown), prosthesis is short.

**Physical Examination**
  **VS/Measurements**
  Vital Signs

---

Report Request ID: 37971537        Page 3 of 6        Facility: ACHN
                                                      Location: Amputee (SC)

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 2                       **Roberts v Dart 7063**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Clinic Outpatient
Birth Date:  8
Gender: Male
FIN: 0749857785

Admission Date:    11/14/2014       MRN: 005007433c; 00704888z
Discharge Date:    11/14/2014

CMRN: 1012697414

| Amputee Outpt |
|---|

| 11/13/2014 09:37 | Temperature Oral | 97.3 DegF |
|---|---|---|
| | Pulse Rate | 63 bpm |
| | Respiratory Rate | 18 breaths/min |
| | Oxygen Saturation | 96 % |
| | Oxygen Delivery Device | Room air |
| | **Systolic Blood Pressure** | **152 mmHg  HI** |
| | Diastolic Blood Pressure | 75 mmHg |
| | NIBP Site | Arm, Left |

**General**:  Alert and oriented, No acute distress.
**Cardiovascular**:       Edema: Left, Pretibial, Ankle, Foot, 1+.
**Musculoskeletal**:
   Mobility/ gait: antalgic gait on right, large step down.
   Lower extremity exam: Lower leg ( Right, Strength  5 /5, distal stump with pressure area on skin from weight bearing but skin intact ), All other lower extremities are normal.
**Neurologic**:  No focal deficits.

**Review / Management**
   **Laboratory Results**
   Reviewed labs

**Impression and Plan**
   **Diagnosis**
   S/p BKA (below knee amputation) unilateral : ICD9 V49.75, Discharge DX, Medical.
   **Patient Instructions**:  THERESA MCCARTHY , only if needed.
    Counseled: Patient, Regarding diagnosis, Regarding medications, Activity, Verbalized understanding, Added stump socks, added extra insole to shoe as prosthesis is short.  Much improved, patient walked without pain at clinic.

*Electronically Authored On:   19-Nov-14 21:53*
*Electronically Signed By: MCCARTHY DO, THERESA M*
 *PAGER BUS: 708 319 6407*

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 3                          **Roberts v Dart 7064**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

### Outpt PT-OT-CHS

---

_x_Gym Treatment plan as follows: Focus on Bil LE strengthening (Especially hip abductors/extensors), balance, core strengthening, amb with cane or crutch.
**Ext/ Pager**:
#44970

*Electronically Authored On: 05-Feb-15 19:07*
*Electronically Signed By: STOPKA, JOHN*
*SH - OT/PT - Physical Therapist*

---

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Outpt PT-OT CHS
3/11/2015 17:43 CDT
Auth (Verified)
LASSA,PATRICE (3/11/2015 17:44 CDT)
LASSA,PATRICE (3/11/2015 18:33 CDT)

### Outpatient Physical Therapy Note

__Initial Evaluation    _x_Daily Note __Progress Report __Other:
**Reason for Referral**: Pt. is a 66 y/o with right BKA due to blood clots at Weiss memorial over a year ago.  Seen in November, adjustments made to prosthesis and socks added.  Now wrapping and adding 4x4's to tighten socket as dropping in too far. Wearing OWW large liner with locking pin.
**Diagnosis**: Right BKA
**PMH**: DM, HTN, DVT, clotting problems.
**Date of onset/date of surgery**: "Approximately 2014"
**I.D. x 2**: _x_ Name  _x_ DOB __ MR # __ Other:

**S**: Reports that he needs to get as strong as possible because he is on a "mission in Jesus' name"  Requesting more soap, a shrinker and a taller walker.  Pt reported a number times that he was being discriminated against due to his handicap, size and religious beliefs. Instructed pt to speak to social work re complaints; pt verbalized understanding. This therapist had to calm pt down and explained to him re PT intervention/POC.
(EVAL)Patient reports he has increased pain over the right side of his knee (fibular head) from the compression by the socket.  Patient reports he needs the prosthesis corrected.
**Pain scale (0= none, 10= worst)**: 3-5/10 VAS(EVAL); no pain currently
**Level of function prior to onset**: Independent with use of walker
**Impact of current symptoms on function**: Requires use of right LE prosthesis (Silicone sleeve with interlocking pin).
**Pt goal**: To be able to walk well without a device. To correct prosthesis.

**O**:
(EVAL)
**Primary language**: _x_English ___ Spanish ___ Polish ___ Other:

Report Request ID:  36447402

Page 2,083 of 6,855

Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

## 1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

**Interpreter present if needed**: ___Yes   __No   _x_No Need
**Observation**: Patient entered PT dept with walker and RLE prosthesis donned.
**Cognitive**: A&O x3. Follows all commands.
**ROM/Strength**: WFL BUE and BLE except as indicated

| Motion | L | PROM (degrees) | AROM (degrees) | Strength (out of 5) | R | PROM (degrees) | AROM (degrees) | Strength (out of 5) | Comments |
|--------|---|---------------|----------------|---------------------|---|---------------|----------------|---------------------|----------|
| Hip flex | | | | 4+/5(EVAL) | | | | 4/5(EVAL) | |
| Hip Abd | | | | 3+/5(EVAL) | | | | 3/5(EVAL) | |
| Hip Ext | | | | 3+/5(EVAL) | | | | 3/5(EVAL) | |
| Knee Ext | | | | 4+/5(EVAL) | | | | 4/5(EVAL) | |
| Knee Flex | | | | 4+/5(EVAL) | | | | 4/5(EVAL) | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**(EVAL)**
**Neurological assessments**: Sensation: Intact to light touch of Bil LEs.
**Other**: Calcium deposit of medial aspect of right knee (3" length)
Right fibular head redness with tenderness to palpation.
**Functional skill level/mobility testing**
**Bed mobility**: independent
**Transfers**: independent

**Balance**: Static: WNL with walker       Dynamic: WNL with walker.

**Gait**: No deviations except as indicated in table

| Mark if present | Deviation | | Left | Right | Deviation |
|-----------------|-----------|---|------|-------|-----------|
| | Decreased cadence | | | | Decreased stride length |
| x | Decreased trunk rotation | | | x | Decreased weight shift |
| x | Forward flexed posture | | x | x | Decreased arm swing |
| | Decreased balance | | | x | Trendelenberg |
| | | | | x | Decreased stance time |

Report Request ID:   36447402          Page 2,084 of 6,855          Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

| Outpt PT-OT-CHS |
|---|

|  |  |  | x | Decreased push off |
|---|---|---|---|---|

**Gait Device Used**: Walker with right LE prosthesis.

**Patient/caretaker were instructed in and/or performed**:
(If no reps or comments are indicated, activity was not performed during this session.)

| Specific intervention/exercises performed | Added to HEP | * Assist /skilled intervention required | Reps | *PR | Comments |
|---|---|---|---|---|---|
| Quadsets | x | VCs | 10 | 4 | |
| Bridging through left LE | x | VCs | 10 | 4 | |
| Supine Hip add | x | VCs | 10 | 4 | |
| Sidelying Hip Abd | x | VCs | 10 | 4 | |
| Sidelying hip Ext | x | VCs | 10 | 4 | |
| | | | | | |
| Plank on knees and sidelying plank on knees | x | vc, ba | 10 secs x 3 | 2,4 | |
| Push ups on knees | x | vc, ba | 10 secs x 3 | 2,4 | |
| Sit<>stand in 30secs with UE support | x | vc | 9 reps | 2,4 | goal to increase cardio and to perform 15-18 reps; poor eccentric control |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 6

Roberts v Dart 2085

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:  Visit CHS
Birth Date:
Gender:  Male

Admission Date:    9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

KEY:  * Assistance/Skilled intervention required

**VC**= Verbal cues

**TC**= Tactile cues

**PE** = Physiologic effect

**AR** = Anatomical review

**BA** = Body alignment

Key: * Patient Response (PR)

**1** = Complaint of pain

**2** = Complaint of fatigue

**3** = Decreased symptoms

**4** = Performs independently

**5** = Unable to perform
**6** = Other (specify)

**Education**:
__Precautions
_x_PT role/plan of care/discharge recommendations
_x_Anatomy with posters/models
_x_Written home exercise program handouts issued and instructed to perform exercises 3 times a day.
_x_Patient/caregiver demonstrate/verbalize understanding of principles taught today.
__Patient &/or patient's family/caretaker does not demonstrate/verbalize understanding of principles taught today & requires further education and assistance.

**Equipment issued**: HEP handouts,  RLE tubigrip x2, Please proviode patient with extra bar of soap to be able to keep prosthesis and tubigrip hygienic.

**A**:
(EVAL)
Pt. is a 66 y/o with right BKA due to blood clots at Weiss memorial over a year ago.  Seen in November, adjustments made to prosthesis and socks added.  Now wrapping and adding 4x4's to tighten socket as dropping in too far.   Wearing OWW large liner with locking pin.

**Fall risk**: No

**Appointments attended**: 2/8          **Missed/rescheduled appointments**: 0

**Primary problems/impairments/limitations**:

|  |  |  |  |
|---|---|---|---|
|  | Decreased tissue mobility/ range of motion |  | Impaired posture |
| x | Decreased strength |  | Poor body mechanics |
| x | Impaired balance |  | Impaired coordination |
|  | Impaired sensation |  | Cognitive deficits/knowledge deficits |
|  | Impaired endurance |  | Impaired functional mobility |
|  | Edema | x | Pain |

Report Request ID:   36447402              Page 2,086 of 6,855          Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

| | Abnormal tone | | | Muscle guarding |
|---|---|---|---|---|
| | Decreased core stability | | | Other: |

Specific skilled physical therapy interventions (noted in the therapy plan section of the clinical note) are required to achieve the functional goals.

**Patient's Progress**: 3/11/15 very motivated, good response to increase of ther ex and good recall of HEP indicating that pt is performing. **MD- please place an order for pt to have extra soap to keep prosthesis and tubigrip clean, tall extensors for walker and may benefit from a shrinker to be worn at night to management edema in stu**mp.

(EVAL) Patient presents with independent bed mobility, transfers, and ambulation with use of walker and right lower extremity prosthesis. Patient presents with obvious abnormal gait pattern due to strength deficits and pain from report of improper fit of prosthesis. PT provided patient with guaze to pad areas of pressure (right fibular head and medial aspect of tibia) in addition to tubigrip to control edema in the evening as patient reports he does not have a stump shrinker.

**P**:

**Functional Long Term Goals**: To be met in _8_ treatments starting __2/5/15 (eval date) and ending in _8_ weeks.
_1._Increase strength(specify): of right knee flex/ext: 4+/5; Hip flex/Ext/Abd: 4+/5
__Increase AROM (specify):
__Patient able to perform bed mobility independently.
__Patient able to perform transfers independently.
_2._Patient able to ambulate 150 feet independently with cane.
__Patient able to negotiate 4 stairs independently with least assist device and with one rail.
__Patient able to ambulate at least __block(s) with __assistive device independently with pain at ___/10.
__Patient able to understand & perform proper body mechanics to decrease pain and risk for future injury.
_3._Patient/family able to perform home exercise program independently to maintain/further improve functional gains attained in P.T.
__Other:

**Goal status/progress**: Initial

**Intervention plan**:

Continue therapy to address problems and work toward goals set. Planned interventions at time of evaluation are marked

| | Treatment intervention | | | Treatment intervention | | | Treatment intervention |
|---|---|---|---|---|---|---|---|
| x | 97110 - Ther exercise | | | 97760 - Orthotic mgmt/fit/train | | | 97032 - Estim – attended |
| x | 97530 - Ther activity | | | 97762 - Orth/prosth check-out | | | 97014 - Estim – unattend |
| | 97150 - Ther group | | | 97761 - Prosthetic training | | | 97035 - Ultrasound |
| | 97112 - Neuromusc re-ed | | | 97542 - W/C mgmt training | | | 97022 - Fluidotherapy |
| x | 97116 - Gait training | | | 97532 - Cognitive training | | | 97010 - Hot/cold pack |
| | 97140 - Manual therapy | | | 97750 - Perform testing | | | 97535 - ADLs |

_x_Endorse to OP PT staff therapist following existing plan (if still applicable)
_x_Endorse to PTA with supervision of original physical therapist.

Report Request ID: 36447402

Page 2,087 of 6,855

Facility: CHS
Location: 084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## Outpt PT-OT-CHS

__Continue same treatment plan.
__DC OP PT
_x_Gym Treatment plan as follows: Focus on Bil LE strengthening (Especially hip abductors/extensors), balance, core strengthening, amb with cane or crutch.
**Ext/ Pager:**
#44970

*Electronically Authored On: 11-Mar-15 18:33*
*Electronically Signed By: LASSA, PATRICE*
 *CHS - Medicine - PTA*

---

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Outpt PT-OT CHS
4/22/2015 12:50 CDT
Auth (Verified)
LASSA,PATRICE (4/22/2015 12:51 CDT)
LASSA,PATRICE (4/22/2015 12:51 CDT)

### No Show Note

Patient did not show for today's scheduled appointment; will reschedule.

*Electronically Authored On: 22-Apr-15 12:51*
*Electronically Signed By: LASSA, PATRICE*
 *CHS - Medicine - PTA*

---

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Outpt PT-OT CHS
4/29/2015 14:25 CDT
Auth (Verified)
LASSA,PATRICE (4/29/2015 14:26 CDT)
LASSA,PATRICE (4/29/2015 14:26 CDT)

---

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 9          **Roberts v Dart 2088**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency          Admission Date:    3/14/2015          MRN: 005007433c; 00704888z
Birth                            Discharge Date:    3/15/2015
Gender: Male                                                          CMRN: 1012697414
FIN: 0755399730

| ED Note - Physician |
|---|

Document Type:                    ED Note-Physician
Service Date/Time:                3/14/2015 21:00 CDT
Result Status:                    Auth (Verified)
Perform Information:              LEE MD,MOSES S (3/14/2015 21:04 CDT)
Sign Information:                 LEE MD,MOSES S (3/14/2015 22:41 CDT)

**[X]Falls**

Patient:  **ROBERTS, JAMES**      **MRN: 005007433c**      **FIN: 0755399730**
Age: **66 years**   Sex: **Male**   DOB:
Associated Diagnoses:  **None**
Author:  **LEE MD, MOSES S**

**Basic Information**
  **ED Provider Contact Time:**
  LEE MD, MOSES S                03/14/15 19:51
  .
**Time seen:** Date & time 03/14/2015 21:00:00.
**History source:** Patient.
**Arrival mode:** Walking.
**History limitation:** None.
**Additional information:** Chief Complaint from Nursing Triage Note : Chief Complaint

| | | | |
|---|---|---|---|
| 3/14/2015 20:05 | Primary Chief Complaint | Back pain 724.5 | |
| | Secondary Chief Complaint | Neck pain 723.1 | |
| | Chief Complaint Additional Info | PT ARRIVE VIA ATI FOR NECK AND BACK PAIN S/P FALL | |
| 3/14/2015 18:29 | Primary Chief Complaint | In Error | (In Error) |
| 3/14/2015 18:04 | Primary Chief Complaint | Medical problem V70.9 | |
| | Chief Complaint Additional Info | Pt. sts. c/o fall BHT | |

  .
**Ebola/ILI Screen:**

| | | |
|---|---|---|
| 3/14/2015 19:49 | Have you had a fever recently? | No |
| | Travel to West Africa/Ebola contact? | No |
| 3/14/2015 19:49 | Do you have a cough? | No |

  .

**History of Present Illness**

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 10                    **Roberts v Dart 7014**

**Cook County Health and Hospitals System**

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Emergency           Admission Date:    3/14/2015          MRN: 005007433c; 00704888z
Birth Date:                         Discharge Date:    3/15/2015
Gender: Male                                                             CMRN: 1012697414
FIN: 0755399730

| ED Note - Physician |
|---|

  The patient presents following 66 yo M with h/o HTN, DM, right BKA< psychiatric disorder, who fell when his right protheses was not working, as per Cermak, no LOC, now with neck pain and headache.  he was mildlu psychotic upon arrivla that was well copntrolled with ativan.  denies any otehyr injury, no numbness or weakness..

**Review of Systems**
  **Constitutional symptoms:**  Negative except as documented in HPI.
  **Skin symptoms:**  Negative except as documented in HPI.
  **Eye symptoms:**  Negative except as documented in HPI.
  **ENMT symptoms:**  Negative except as documented in HPI.
  **Respiratory symptoms:**  Negative except as documented in HPI.
  **Cardiovascular symptoms:**  Negative except as documented in HPI.
  **Gastrointestinal symptoms:**  Negative except as documented in HPI.
  **Genitourinary symptoms:**  Negative except as documented in HPI.
  **Musculoskeletal symptoms:**  Negative except as documented in HPI, right BKA.
  **Neurologic symptoms:**  Negative except as documented in HPI.
  **Psychiatric symptoms:**  Negative except as documented in HPI.
  **Endocrine symptoms:**  Negative except as documented in HPI.
  **Hematologic/Lymphatic symptoms:**  Negative except as documented in HPI.
  **Allergy/immunologic symptoms:**  Negative except as documented in HPI.
   **Additional review of systems information:** All other systems reviewed and otherwise negative.

**Health Status**
  **Allergies:**
    <u>Allergic Reactions (All)</u>
      *Severity Not Documented*
        Morphine- No reactions were documented.
    <u>Canceled/Inactive Reactions (All)</u>
        No Known Medication Allergies.

**Past Medical/ Family/ Social History**

  **Medical history**
    Reviewed as documented in chart.
    Past Medical History from Triage : Past Medical History

| | | | |
|---|---|---|---|
| 3/14/2015 20:05 | Past medical history | Anemia, Diabetes, Hypertension | |
| 3/14/2015 18:29 | Past medical history | In Error | (In Error) |
| 3/14/2015 18:04 | Past medical history | Anemia, Diabetes, Hypertension | |

    .
    Cardiovascular: hypertension.

Report Request ID:  37971536                 Page 12 of 57                  Facility:  Stroger
                                                                            Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 11                                   **Roberts v Dart 7015**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency      Admission Date: 3/14/2015      MRN: 005007433c; 00704888z
Birth Date:     8      Discharge Date: 3/15/2015
Gender: Male      CMRN: 1012697414
FIN: 0755399730

---

## ED Note - Physician

**Surgical history:** Reviewed as documented in chart.
**Family history:** Reviewed as documented in chart.
**Social history:** Reviewed as documented in chart.
**Problem list:**
    All Problems
        Cocaine abuse / 129874012 / Complaint of
        DVT (deep venous thrombosis) / 194647015 / Confirmed
        Diabetes / 121589010 / Confirmed
        HTN (hypertension) / 1215744012 / Confirmed.

**Physical Examination**

### Vital Signs
Measurements

| | | | |
|---|---|---|---|
| 3/14/2015 09:00 | BMI | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Abdominal Circumference | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| 3/13/2015 09:39 | BMI | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Abdominal Circumference | Not Done: Patient/Family/Guardian Refused | (Not Done) |

.
**General:** Alert.
**Skin:** Warm.
**Head:** Atraumatic.
**Neck:** Supple, vague cervical tenderness, no step down or deformity..
**Eye:** Pupils are equal, round and reactive to light, extraocular movements are intact, normal conjunctiva.
**Ears, nose, mouth and throat:** Tympanic membranes clear, oral mucosa moist, no pharyngeal erythema.
**Cardiovascular:** Regular rate and rhythm, No murmur, Normal peripheral perfusion, No edema.
**Respiratory:** Lungs are clear to auscultation, respirations are non-labored, breath sounds are equal, Symmetrical chest wall expansion.
**Chest wall:** No tenderness, No deformity.
**Back:** Nontender, Normal range of motion, Normal alignment, no step-offs.
**Musculoskeletal:** Normal ROM, normal strength, no tenderness.
**Gastrointestinal:** Soft, Nontender, Non distended, Normal bowel sounds, No organomegaly.
**Genitourinary:** No tenderness, no discharge, normal external genitalia, no lesions.
**Neurological:** Alert and oriented to person, place, time, and situation, No focal neurological deficit observed.

Report Request ID: 37971536      Page 13 of 57      Facility: Stroger
     Location: SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 12          **Roberts v Dart 7016**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

| ED Note - Physician |
| --- |

**Medical Decision Making**
    **Differential Diagnosis:** Fall.
    **Plan:** CT head/cervical spine.

**Reexamination/ Reevaluation**
Vital signs
  Basic Oxygen Information

| | | |
|---|---|---|
| 3/14/2015 20:53 | CT Cervical Spine w/o Contrast | (In Progress) |
| | CT Head w/o Contrast | (In Progress) |
| 3/14/2015 20:14 | ED Assessment | ED Nursing Progress Note |
| 3/14/2015 20:05 | Temperature Oral | 97.3 DegF |
| | Heart Rate | 87 bpm |
| | Respiratory Rate | 17 breaths/min |
| | Oxygen Saturation | 96 % |
| | **Systolic Blood Pressure** | **168 mmHg >HHI** |
| | **Diastolic Blood Pressure** | **94 mmHg HI** |
| | Pain, Unable to Self Report | Unable to use pain scale |
| | Fevers? | No |
| | Hemoptysis? | No |
| | Night Sweats? | No |
| | Previous Treatment? | No |
| | Recent Weight Loss? | No |
| | Afraid of your partner/family member | No |
| | Forced sexual activities? | No |
| | Partner emotionally or physically abused | No |
| | Mode of Arrival | Ambulance |
| | Accompanied By | Police |
| | Primary Chief Complaint | Back pain 724.5 |
| | Secondary Chief Complaint | Neck pain 723.1 |
| | Chief Complaint Additional Info | PT ARRIVE VIA ATI FOR NECK AND BACK PAIN S/P FALL |
| | Visit Reason | NECK AND BACK PAIN |
| | Past medical history | Anemia, Diabetes, Hypertension |
| | Last Tetanus | Unknown |
| | Triage Destination | Blue Team |

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 13        **Roberts v Dart 7017**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency      Admission Date: 3/14/2015      MRN: 005007433c; 00704888z
Birth Date:      Discharge Date: 3/15/2015
Gender: Male      CMRN: 1012697414
FIN: 0755399730

---

## ED Note - Physician

| | | | |
|---|---|---|---|
| | Ambulance Type | Private Ambulance | |
| | Meets Influenza CDC Guidelines | No | |
| | SAD PERSONS Scale | S = Sex (Male), S = Sickness, chronic disease | |
| | ED Triage | ED Triage | |
| 3/14/2015 20:00 | lorazepam | 2 MG MG | |
| 3/14/2015 19:49 | Have you had a fever recently? | No | |
| | Travel to West Africa/Ebola contact? | No | |
| 3/14/2015 19:49 | Do you have a cough? | No | |
| 3/14/2015 19:08 | Acknowledgments | 3A/RTU MH Rounds | |
| 3/14/2015 18:29 | Temperature Oral | In Error DegF | (In Error) |
| | Pulse Rate | In Error bpm | (In Error) |
| | Respiratory Rate | In Error breaths/min | (In Error) |
| | Oxygen Saturation | In Error % | (In Error) |
| | Oxygen Delivery Device | In Error | (In Error) |
| | Systolic Blood Pressure | In Error mmHg | (In Error) |
| | Diastolic Blood Pressure | In Error mmHg | (In Error) |
| | NIBP Site | In Error | (In Error) |
| | Mode of Arrival | In Error | (In Error) |
| | Accompanied By | In Error | (In Error) |
| | Primary Chief Complaint | In Error | (In Error) |
| | Past medical history | In Error | (In Error) |
| | Last Tetanus | In Error | (In Error) |
| | ER CHS | Cermak ED Triage | (In Error) |
| 3/14/2015 18:23 | Nursing Infirmary | Cermak Vital Signs/Resp/Measurements | |
| 3/14/2015 18:04 | Temperature Oral | 98.8 DegF | |
| | Pulse Rate | 88 bpm | |
| | Respiratory Rate | 20 breaths/min | |
| | Oxygen Saturation | 100 % | |
| | Oxygen Delivery Device | Room air | |
| | Systolic Blood Pressure | 116 mmHg | |
| | Diastolic Blood Pressure | 80 mmHg | |
| | NIBP Site | Arm, Left | |
| | Mode of Arrival | Walked | |
| | Accompanied By | Police | |
| | Primary Chief Complaint | Medical problem V70.9 | |
| | Chief Complaint Additional Info | Pt. sts. c/o fall BHT | |

Report Request ID: 37971536      Page 15 of 57      Facility: Stroger
Location: SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 14      **Roberts v Dart 7018**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency      Admission Date:   3/14/2015      MRN: 005007433c; 00704888z
Birth Date:      Discharge Date:   3/15/2015
Gender: Male      CMRN: 1012697414
FIN: 0755399730

---

## ED Note - Physician

| | | | |
|---|---|---|---|
| | Past medical history | Anemia, Diabetes, Hypertension | |
| | Last Tetanus | Unknown | |
| | ER CHS | Cermak ED Triage | (Modified) |
| 3/14/2015 17:43 | insulin glargine | 12 UNITS UNITS | |
| | insulin regular | 5 UNITS UNITS | |
| 3/14/2015 15:53 | **Bedside Glucose** | **206 mg/dL  HI** | (Modified) |
| 3/14/2015 11:14 | Nursing Infirmary | Cermak Vital Signs/Resp/Measurements | |
| 3/14/2015 11:13 | Bedside Glucose | 97 mg/dL | (Modified) |
| 3/14/2015 10:00 | insulin regular | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| 3/14/2015 09:00 | Temperature Axillary | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Axillary | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Oral | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Oral | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Pulse Rate | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Rate | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Oxygen Saturation | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Oxygen Delivery Device | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow | Not Done: Patient/Family/Guardian Refused | (Not Done) |

---

Report Request ID:   37971536      Page 16 of 57      Facility:   Stroger
Location:   SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 15      **Roberts v Dart 7019**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Emergency
Birth Date:  8
Gender: Male
FIN: 0755399730

Admission Date:    3/14/2015          MRN: 005007433c; 00704888z
Discharge Date:    3/15/2015

CMRN: 1012697414

---

## ED Note - Physician

| Date/Time | Item | Value | Status |
|---|---|---|---|
| | Systolic Blood Pressure | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Diastolic Blood Pressure | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | NIBP Site | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | BMI | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Abdominal Circumference | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory FiO2 | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | CHS Vital Signs/Respiratory/Measurements | Not Done | (Not Done) |
| | Respiratory Oxygen Flow | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow Pre Treatment | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow Post Treatment | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| 3/14/2015 08:21 | emollients, topical | 1 APP APP | |
| | enalapril | 20 MG MG | |
| | hydrochlorothiazide | 25 MG MG | |
| | multivitamin, prenatal | 1 TAB TAB | |
| 3/14/2015 04:48 | insulin regular | Not Given: Patient/Family/Guardian Refused | (Not Done) |
| 3/14/2015 04:47 | Nursing Infirmary | Cermak Vital Signs/Resp/Measurements | |
| 3/13/2015 19:06 | insulin regular | 5 UNITS UNITS | |
| | insulin regular | 2 UNITS UNITS | |
| 3/13/2015 18:35 | enalapril | 20 MG MG | |

---

Report Request ID:   37971536              Page 17 of 57              Facility:  Stroger
                                                                      Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 16                          **Roberts v Dart 7020**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

### ED Note - Physician

| | | | |
|---|---|---|---|
| | insulin glargine | 12 UNITS UNITS | |
| 3/13/2015 17:17 | Nursing Infirmary | Cermak Vital Signs/Resp/Measurements | |
| 3/13/2015 16:13 | **Bedside Glucose** | **164 mg/dL  HI** | (Modified) |
| 3/13/2015 13:53 | Outpt Nursing CHS | CHS Segregation Rounds | |
| 3/13/2015 11:44 | Bedside Glucose | 98 mg/dL | (Modified) |
| 3/13/2015 10:00 | insulin regular | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| 3/13/2015 09:39 | Temperature Axillary | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Axillary | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Oral | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Temperature Oral | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Pulse Rate | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Rate | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Oxygen Saturation | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Oxygen Delivery Device | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Systolic Blood Pressure | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Diastolic Blood Pressure | Not Done: Patient/Family/Guardian Refused | (Not Done) |

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 17                    **Roberts v Dart 7021**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date:   3/14/2015
Discharge Date:   3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## ED Note - Physician

| | | | |
|---|---|---|---|
| | NIBP Site | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | BMI | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Abdominal Circumference | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory FiO2 | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | CHS Vital Signs/Respiratory/Measurements | Not Done | (Not Done) |
| | Respiratory Oxygen Flow | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow Pre Treatment | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| | Respiratory Peak Flow Post Treatment | Not Done: Patient/Family/Guardian Refused | (Not Done) |
| 3/13/2015 09:00 | emollients, topical | 1 APP APP | |
| | enalapril | 20 MG MG | |
| | hydrochlorothiazide | 25 MG MG | |
| | multivitamin, prenatal | 1 TAB TAB | |
| 3/13/2015 04:43 | insulin regular | Not Given: Patient/Family/Guardian Refused | (Not Done) |
| | Nursing Infirmary | Cermak Vital Signs/Resp/Measurements | |

**Impression and Plan**
  **Diagnosis**
    Closed Head Trauma, cervical strain
  **Staffed**
    **Staffed with EM attending, Dr.:** LEE, MOSES.
  **Plan**
    **Condition:** Improved, Stable.

Report Request ID:   37971536

Page 19 of 57

Facility:  Stroger
Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 18

**Roberts v Dart 7022**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## ED Note - Physician

**Follow up with:**
**Scheduled Appointments**

| Date | Location | / Resource | / Type |
|------|----------|-----------|--------|
| 03/19/15 01:00 pm CONFIRMED | 08 Medical RTU 3rd F / CHS Podiatry Div 08 / CHS Podiatry | | |
| 03/23/15 01:00 pm CONFIRMED | 08 Mental Health RTU / CHS Psychiatry Div 0 / CHS Psychiatry | | |
| 03/31/15 08:00 am CONFIRMED | 08 Medical RTU 3rd F / CHS PCC Div 08 RTU 3 / CHS Primary Care | | |
| 04/08/15 08:30 am CONFIRMED | 08 Medical RTU 3rd F / CHS Anti-Coag Div 08 / CHS Anti-Coagulation | | |
| 04/13/15 09:00 am CONFIRMED | SC ENT Clinic D / Red (UIC) Resident 2 / MC | | |
| 05/13/15 09:00 am CONFIRMED | Cermak Basement / CHS Ophthalmology / CHS Ophthalmology | | |

.
**Counseled:** Patient.
**Disposition:** Patient care transitioned to: Time: 03/14/2015 23:00:00, on coming team.

*Electronically Authored On: 14-Mar-15 22:41*
*Electronically Signed By: LEE MD, MOSES S*
*PAGER BUS: 312 760 3791*

---

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 19                    **Roberts v Dart 7023**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## ED Note - Physician

Document Type:                            ED Note-Physician
Service Date/Time:                        3/15/2015 00:56 CDT
Result Status:                            Auth (Verified)
Perform Information:                      KIMBALL MD,DEBORAH (3/15/2015 00:57 CDT)
Sign Information:                         KIMBALL MD,DEBORAH (3/15/2015 08:32 CDT)

### ED - Med Addendum

Patient:  **ROBERTS, JAMES**      **MRN: 005007433c**      **FIN: 0755399730**
Age: **66 years**   Sex: **Male**   DOB:
Associated Diagnoses:  **None**
Author:  **KIMBALL MD, DEBORAH**

**Basic Information**
   **Addendum:** Time of addendum:: 03/15/2015 00:56:00 , Assumed care from: LEE MD, MOSES S, Pertinent history: pt c/o hungry ow no c/o
   awaiting ct head / neck for clearance back to cermak.

**Physical Examination**

   **Vital Signs**
Vitals Last 24 hrs

### Vital Signs Last 24 Hours

| Vital | Last Result | | Minimum Result | Maximum Result |
|---|---|---|---|---|
| Temperature Oral | 97.3 MAR-14 20:05 | 97.3 MAR-14 20:05 | 97.3 MAR-14 20:05 | |
| Heart Rate | 87 MAR-14 20:05 | 87 MAR-14 20:05 | 87 MAR-14 20:05 | |
| Respiratory Rate | 17 MAR-14 20:05 | 17 MAR-14 20:05 | 17 MAR-14 20:05 | |
| Oxygen Saturation | 96 MAR-14 20:05 | 96 MAR-14 20:05 | 96 MAR-14 20:05 | |
| Systolic Blood Pressure | 168 MAR-14 20:05 | 168 MAR-14 20:05 | 168 MAR-14 20:05 | |
| Diastolic Blood Pressure | 94 MAR-14 20:05 | 94 MAR-14 20:05 | 94 MAR-14 20:05 | |

.
   **General:** Alert, no acute distress.
   **Skin:** Warm, dry.

**Medical Decision Making**
   **Radiology results:** Radiologist's interpretation: : Radiology Results
   3/15/2015 00:54      CT Head w/o Contrast      IMPRESSION  (Transcribed) , med by:KUMAR MD, GIRISH on March
         15, 2015 01:21

---

Report Request ID:  37971536                   Page 21 of 57                   Facility:  Stroger
                                                                               Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender:   ale
FIN: 0755399730

Admission Date:   3/14/2015
Discharge Date:   3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

### ED Note - Physician

Encounter info:        0755399730, Stroger, Emergency, 3/14/2015 - 3/15/2015

## * Preliminary Report *

**Reason For Exam**
5-Trauma

**FINDINGS**
Indication: Trauma

Technique: Noncontrast head CT

Comparison: No prior studies available

Findings: No acute intracranial hemorrhage.

A lacunar type infarct in the left basal ganglia, likely subacute to chronic.
      Periventricular and deep subcortical white matter changes reflect chronic small
      vessel ischemia.

No cerebral edema, hydrocephalus or midline shift.

No acute fractures.

**IMPRESSION**
Impression: No acute intraparenchymal hemorrhage.  No acute fractures.

_____

Electronically signed by resident: GIRISH KUMAR
Date:                                 03/15/15
Time:                                 01:27

**Signature Line**
This is a Preliminary Report.

Report Request ID:   37971536                Page 22 of 57                Facility:  Stroger
                                                                          Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 21                          **Roberts v Dart 7025**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Emergency
Birth Date:  8/
Gender: Male
FIN: 0755399730

Admission Date:   3/14/2015          MRN: 005007433c; 00704888z
Discharge Date:   3/15/2015

CMRN: 1012697414

---

| ED Note - Physician |
| --- |

Transcribed Date/Time:  03/15/2015 1:28 am
Resident:  KUMAR MD, GIRISH

.

**Radiology results:** Radiologist's interpretation: : Radiology Results

3/15/2015 00:54        CT Cervical Spine w/o Contrast          IMPRESSION  (Transcribed) , Result date:March 15, 2015
                00:54

| | |
| --- | --- |
| Result status: | Transcribed |
| Result title: | CT Cervical Spine w/o Contrast |
| Performed by: | KUMAR MD, GIRISH on March 15, 2015 01:42 |
| Encounter info: | 0755399730, Stroger, Emergency, 3/14/2015 - 3/15/2015 |

# * Preliminary Report *

**Reason For Exam**
Trauma

**FINDINGS**
Indication: Trauma

Technique:  Noncontrast CT of cervical spine with multiplanar reformats

Comparison: No prior studies available for comparison

Findings: Alignment is within normal limits. Vertebral body heights and intervertebral
    disc spaces are preserved. No acute fractures or dislocations.  Paravertebral soft
    tissues are unremarkable.  Mild multilevel degenerative disc and uncovertebral
    joint disease.  Mild emphysematous changes in the lung apices.

**IMPRESSION**
Impression:
No acute fracture or dislocation.

---

Report Request ID:   37971536                    Page 23 of 57                    Facility:  Stroger
                                                                                 Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

**Roberts v Dart 7026**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

| ED Note - Physician |
|---|

Electronically signed by resident: GIRISH KUMAR

Date:                                           03/15/15

Time:                                           01:49

### Signature Line
This is a Preliminary Report.

Transcribed Date/Time: 03/15/2015 1:50 am
Resident: KUMAR MD, GIRISH
                .

## Reexamination/ Reevaluation
Vital signs

### Vital Signs Most Recent in Last 24 Hours
20:05   20:05   20:05   20:05   20:05

| BP | HR | RR | O2Sat | Oral Temp | Rectal Temp |
|---|---|---|---|---|---|
| 168/94 | 87 | 17 | 96 | 97.3 | |

## Impression and Plan
### Diagnosis
closed head injury
### Staffed
**Staffed with EM attending, Dr.:** KIMBALL MD, DEBORAH.
### Plan
**Condition:** Stable.
**Disposition:** Medically cleared, Discharged: to cermak.
**Patient was given the following educational materials:** HEAD INJURY, No Wake-Up (Adult).
**Follow up with:** 3 Follow Up with your PCP Within 1 to 2 weeks,
### Scheduled Appointments

| Date | Location | / Resource | / Type |
|---|---|---|---|
| 03/19/15 01:00 pm CONFIRMED | 08 Medical RTU 3rd F | / CHS Podiatry Div 08 | / CHS Podiatry |
| 03/23/15 01:00 pm | 08 Mental Health RTU | / CHS Psychiatry Div 0 | / CHS Psychiatry |

Report Request ID:  37971536                    Page 24 of 57                    Facility:  Stroger
                                                                                Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 23                                    **Roberts v Dart 7027**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Emergency
Birth Date:
Gender: Male
FIN: 0755399730

Admission Date: 3/14/2015
Discharge Date: 3/15/2015

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

### ED Note - Physician

CONFIRMED

03/31/15 08:00 am     08 Medical RTU 3rd F / CHS PCC Div 08 RTU 3 / CHS Primary Care
CONFIRMED

04/08/15 08:30 am     08 Medical RTU 3rd F / CHS Anti-Coag Div 08 / CHS Anti-Coagulation
CONFIRMED

04/13/15 09:00 am     SC ENT Clinic D     / Red (UIC) Resident 2 / MC
CONFIRMED

05/13/15 09:00 am     Cermak Basement     / CHS Ophthalmology   / CHS Ophthalmology
CONFIRMED

.

**Plan:** BHT no LOC
CT head / cspine neg
DC back to cermak.

*Electronically Authored On:  15-Mar-15 08:32*
*Electronically Signed By: KIMBALL MD, DEBORAH*
*PAGER BUS:  312 390 1396*

---

### ED Patient Summary

Document Type:                          Patient Summary
Service Date/Time:                      3/15/2015 00:57 CDT
Result Status:                          Auth (Verified)
Perform Information:                    KIMBALL MD,DEBORAH (3/15/2015 00:57 CDT)
Sign Information:                       KIMBALL MD,DEBORAH (3/15/2015 00:57 CDT)

**Patient Summary**

Report Request ID:   37971536              Page 25 of 57              Facility:  Stroger
                                                                      Location:  SHCC ED

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 24                              **Roberts v Dart 7028**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:  Visit CHS
Birth Date:
Gender:  Male

Admission Date:    9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

### Outpt PT-OT-CHS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| x | 97530 - Ther activity | | | 97762 - Orth/prosth check-out | | | 97014 - Estim – unattend |
| | 97150 - Ther group | | | 97761 - Prosthetic training | | | 97035 - Ultrasound |
| | 97112 - Neuromusc re-ed | | | 97542 - W/C mgmt training | | | 97022 - Fluidotherapy |
| x | 97116 - Gait training | | | 97532 - Cognitive training | | | 97010 - Hot/cold pack |
| | 97140 - Manual therapy | | | 97750 - Perform testing | | | 97535 - ADLs |

_x_Endorse to OP PT staff therapist following existing plan (if still applicable)
_x_Endorse to PTA with supervision of original physical therapist.
__Continue same treatment plan.
__DC OP PT
_x_Gym Treatment plan as follows: Focus on Bil LE strengthening (Especially hip abductors/extensors), balance, core strengthening,
**Ext/ Pager**:
#44970

*Electronically Authored On:  04-Aug-15 15:56*
*Electronically Signed By: LASSA, PATRICE*
*CHS - Medicine - PTA*

---

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Outpt PT-OT CHS
8/4/2015 15:57 CDT
Auth (Verified)
LASSA,PATRICE (8/4/2015 15:57 CDT)
LASSA,PATRICE (8/7/2015 11:13 CDT)

### Outpatient Physical Therapy Note

__**Initial Evaluation**    _x_**Daily Note**  __**Progress Report** x__**Other**: Discharge
**Reason for Referral**: Pt. is a 66 y/o with right BKA due to blood clots at Weiss memorial over a year ago.  Seen in November, adjustments made to prosthesis and socks added.  Now wrapping and adding 4x4's to tighten socket as dropping in too far. Wearing OWW large liner with locking pin.
**Diagnosis**: Right BKA
**PMH**: DM, HTN, DVT, clotting problems.
**Date of onset/date of surgery**: "Approximately 2014"
**I.D. x 2**: _x_ Name  _x_ DOB  __ MR #  __ Other:

**S**: Reports that he is still using 4qty- 5 ply socks and some 4x4 for additional padding.  Upon observation; good skin;  no skin breakdown/discoloration/edema noted; min pain with palpation at anterion knee/patella tendon.   Offered pt to be trained on crutches and pt reclined due to reports that he likes his wheelchair/walker.

Report Request ID:  36447402

Page 2,105 of 6,855

Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Visit CHS
Birth Date:                    
Gender:  Male

Admission Date:     9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

| **Outpt PT-OT-CHS** |
|---|

**Pain scale (0= none, 10= worst)**: No pain currently.
**Level of function prior to onset**: Independent with use of walker
**Impact of current symptoms on function**: Requires use of right LE prosthesis (Silicone sleeve with interlocking pin).
**Pt goal**: To be able to walk well without a device. To correct prosthesis.

**O**:  Dr. McCarthy present for session and observed stump; observed pt walk.  D/w with patient that he will need a new socket. (EVAL)
**Primary language**: _x__English ___ Spanish ___ Polish ___ Other:
**Interpreter present if needed**: ___Yes __ No __x_No Need
**Observation**: Patient entered PT dept with walker and RLE prosthesis donned.
**Cognitive**: A&O x3. Follows all commands.
**ROM/Strength**: WFL BUE and BLE except as indicated

| Motion | L | PROM (degrees) | AROM (degrees) | Strength (out of 5) | R | PROM (degrees) | AROM (degrees) | Strength (out of 5) | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Hip flex | | | | 4+/5(EVAL)/5/5/ (current) | | | | 4/5(EVAL)/4+/5 (current) | |
| Hip Abd | | | | 3+/5(EVAL)/4-/5(current) | | | | 3/5(EVAL)/4-/5 (current) | |
| Hip Ext | | | | 3+/5(EVAL)/4+/5 (current) | | | | 3/5(EVAL)/4-/5 (current) | |
| Knee Ext | | | | 4+/5(EVAL and current) | | | | 4/5(EVAL)/4+/5 (current) | |
| Knee Flex | | | | 4+/5(EVAL and current) | | | | 4/5(EVAL and current) | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**(EVAL)**
**Neurological assessments**: Sensation: Intact to light touch of Bil LEs.
**Other**: Calcium deposit of medial aspect of right knee (3" length)
Right fibular head redness with tenderness to palpation. 6/9/15: no redness noted today.

Report Request ID:   36447402                    Page 2,106 of 6,855            Facility:  CHS
                                                                                Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date: 8
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

| Outpt PT-OT-CHS |
|---|

### Functional skill level/mobility testing
**Bed mobility**: Independent
**Transfers**: Independent

**Balance**: Static: WNL without walker short distance with CGA.      Dynamic: WNL without walker short distance with CGA.

**Gait**: No deviations except as indicated in table

| Mark if present | Deviation | | Left | Right | Deviation |
|---|---|---|---|---|---|
| | Decreased cadence | | | | Decreased stride length |
| x | Decreased trunk rotation | | | x | Decreased weight shift |
| x | Forward flexed posture | | x | x | Decreased arm swing |
| | Decreased balance | | | x | Trendelenberg |
| | | | | x | Decreased stance time |
| | | | | x | Decreased push off |

**Gait Device Used**: Walker with right LE prosthesis.

### Patient/caretaker were instructed in and/or performed:
(If no reps or comments are indicated, activity was not performed during this session.)

| Specific Intervention/exercises performed | Added to HEP | * Assist /skilled Intervention required | Reps | *PR | Comments |
|---|---|---|---|---|---|
| SLR with #4lb ankle weight | x | reviewed and continue | 10 | 4 | |
| Bridging through left LE | x | reviewed and continue | 10 | 4 | |
| Supine Hip add | x | reviewed and continue | 10 | 4 | |
| Sidelying Hip Abd | x | reviewed and continue | 10 | 4 | |
| Sidelying hip Ext | x | reviewed and continue | 10 | 4 | |
| Prone Hip Ext | x | reivwewed and continue | 10 | 4 | |

Report Request ID: 36447402      Page 2,107 of 6,855      Facility: CHS
Location: 084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

     **Roberts v Dart 2107**

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:  Visit CHS
Birth Date:
Gender: Male

Admission Date:    9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

| | | | | | |
|---|---|---|---|---|---|
| Plank on knees and sidelying plank on knees | x | vc, ba | 10 secs x 3 | 2,4 | |
| Push ups on knees | x | vc, ba | 10 secs x 3 | 2,4 | |
| Sit<>stand in 30secs with UE support with R prothesis; without prosthesis from raised table of 22 inches | x | vc, bc | 10reps | 2,4 | goal to increase cardio and to perform 15-18 reps; req cues with set up, sequence, hand/body placement |
| Gait training on level ground without A.D.; R prosthesis | | vc | 10 mins | 4 | Instruction re pacing, to decreased hip/trunk compensatory movements, to equal WB, postural corrections; quality vs quantity. |
| | | | | | |
| Don/doff 3qty of 5 ply socks (cotton/wool material) | | vc | 15 mins | 3 | Instructed pt re skin care;  check stump at least 5 times daily and to use less socks if stump swells |
| | | | | | |
| Standing lat step, hip abd/ ext | x | reviewed and continue | | | Instrution re pacing and to decrease compensatory movements |
| | | | | | |
| sidestepping Bil, Amb forward & reverse x2 bouts with no devicein front of wall; S | x | VC | x2 bouts | 4 | instruction re pacing, decreased compensatory movements; + LOB twice- able to recover without A |
| Recumbent bike | | vc | 10 mins | | |
| | | | | | |

KEY:  * Assistance/Skilled intervention required

**VC**= Verbal cues

**TC**= Tactile cues
fatigue

Key: * Patient Response (PR)

**1** = Complaint of pain

**2** = Complaint of

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 28

Roberts v Dart 2108

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:  Visit CHS
Birth Date:  8
Gender:  Male

Admission Date:  9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## Outpt PT-OT-CHS

**PE** = Physiologic effect symptoms

**AR** = Anatomical review independently

**BA** = Body alignment

(specify)

**3** = Decreased

**4** = Performs

**5** = Unable to perform
**6** = Other

**Education**:
__Precautions
_x_PT role/plan of care/discharge recommendations
_x_Anatomy with posters/models
_x_Written home exercise program handouts issued and instructed to perform exercises 3 times a day; education re safe exercise technique and progression; walking program- slow pace to decrease compensatory movements; stump skin care.
_x_Patient/caregiver demonstrate/verbalize understanding of principles taught today.
__Patient &/or patient's family/caretaker does not demonstrate/verbalize understanding of principles taught today & requires further education and assistance.

**Equipment issued**: HEP handout reissued with all ther ex reprinted; 3 qty of 5 ply socks

**A**:

Pt. is a 66 y/o with right BKA due to blood clots at Weiss memorial over a year ago.  Seen in November, adjustments made to prosthesis and socks added.  Now wrapping and adding 4x4's to tighten socket as dropping in too far.   Wearing OWW large liner with locking pin.

**Fall risk**: No

**Appointments attended**: 6/8          **Missed/rescheduled appointments**: 0

**Primary problems/impairments/limitations**:

|   | | | |   |
|---|---|---|---|---|
|   | Decreased tissue mobility/ range of motion | | | Impaired posture |
| x | Decreased strength | | | Poor body mechanics |
| x | Impaired balance | | | Impaired coordination |
|   | Impaired sensation | | | Cognitive deficits/knowledge deficits |
|   | Impaired endurance | | | Impaired functional mobility |
|   | Edema | | x | Pain |
|   | Abnormal tone | | | Muscle guarding |

Report Request ID:  36447402                Page 2,109 of 6,855          Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

| **Outpt PT-OT-CHS** |
|---|

| Decreased core stability | | Other: |
|---|---|---|

Specific skilled physical therapy interventions (noted in the therapy plan section of the clinical note) are no longer required to achieve the functional goals.
**Patient's Progress**: 8/4/15 Pt has progressed with strength, gait pattern and actvity tolerance; pt is I with HEP. Pt verbalizes and demonstrates safe exercise technique and progression. Feel at this time that pt has reached max potential of PT and rec d/c.

Once pt receives a new socket, please send a new referral for PT.

P:
**Functional Long Term Goals**: starting __2/5/15 (eval date) and ending in _8_ weeks.
_1._Increase strength(specify): of right knee flex/ext: 4+/5; Hip flex/Ext/Abd: 4+/5
__Increase AROM (specify):
__Patient able to perform bed mobility independently.
__Patient able to perform transfers independently.
_2._Patient able to ambulate 150 feet independently with cane.
__Patient able to negotiate 4 stairs independently with least assist device and with one rail.
__Patient able to ambulate at least __block(s) with __assistive device independently with pain at ___/10.
__Patient able to understand & perform proper body mechanics to decrease pain and risk for future injury.
_3._Patient/family able to perform home exercise program independently to maintain/further improve functional gains attained in P.T.
__Other:
**Goal status/progress**: Partially met/good

_x_DC OP PT

**Ext/ Pager**:
#44970

*Electronically Authored On: 07-Aug-15 11:13*
*Electronically Signed By: LASSA, PATRICE*
*CHS - Medicine - PTA*

Report Request ID: 36447402

Page 2,110 of 6,855

Facility: CHS
Location: 084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

**Roberts v Dart 2110**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date: 8/
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

### Outpt PT-OT-CHS

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Outpt PT-OT CHS
1/27/2016 09:30 CST
Auth (Verified)
CROTHERS,JAMIE A (1/27/2016 13:13 CST)
CROTHERS,JAMIE A (1/27/2016 13:13 CST)

#### Outpatient Physical Therapy Note

_x_Initial Evaluation __Daily Note __Progress Report __Other:

**Reason for Referral**: h/o amputation, problems with prosthesis, back in WC
**PMH**: DM, HTN, DVT, clotting problems.
**Date of onset/date of surgery**: BKA ~2013, ill fit to prosthesis mid-December
**I.D. x 2**: _x_ Name _x_ DOB __ MR # _x_ Other: ID card and officer
*movement officer remains present and insight throughout session*

**S**: Patient reports "problems with this $25,000 leg" then promptly removed device and tossed it on the floor. Patient reports "microvascular abrasions" and "slipping" while in his prosthesis. Previously wearing 3ply sock without problem per last outpatient rehab appointment however now wearing 2x3 ply socks. Patient tangential with speech and medical compliants however able to redirect with stern instructions and reference made to Rehab MD who has worked with patient in the past. Denied any acute pain at this time however rather frustations "with being persecuted because I don't have a leg." Patient confirmed previoulsy ambulating independently but now has been using the WC.
**Pain scale (0= none, 10= worst)**: Denied pain at this time
**Level of function prior to onset**: Previously ambulating independently with straight cane and 3-ply sock
**Impact of current symptoms on function**:Patient requiring use of manual WC for all ambulation needs.
**Pt goal**: "get what is justly mine"

**O**:
**Primary language**: _x_English ___ Spanish ___ Polish ___ Other:
**Interpreter present if needed**: ___Yes __No _x_No Need
**Observation**: Patient arrived to department shouting religious prayers, disrupting ongoing care. Patient eventally agreed to remain silent while waiting and then made several references to multiple lawyers, educational degrees and religious calling. Patient wearing 3 jail house tops, non-skid socks as elbow pads, 1 pair of tradiitonal issued pains, 2 ripped white-undershirts and a bedsheet as a scraf. High-top sneakers noted with laces in placed on the R however no laces in place on the L shoe. L LE swelling noted primarilly below knee joint which appears to be a turnicate-like effect with TED hose rolling past knee joint and stopping. 1+ pitting noted at this time. Residual limb on R side intact with no areas of redness however patient pointing to "microvascular abrasions" which were note appreciated upon visual assessment by this therapist.
**Cognitive**: A,O,C -- perseverates on religious calling and IDOC conflicts
**ROM/Strength**: WFL BUE and BLE
**_x_ Trunk __ Cervical mobility**

|  | ROM | Comments |
|---|---|---|
| Flexion | WFL |  |
| Extension | WFL |  |

---

Report Request ID: 36447402

Page 2,111 of 6,855

Facility: CHS
Location: 084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

| Right lateral flexion | WFL | |
|---|---|---|
| Left lateral flexion | WFL | |
| Right rotation | WFL | |
| Left rotation | WFL | |

**Neurological assessments**: intact
**Special tests**: n/a
**Other**:
**Functional skill level/mobility testing**
**Bed mobility**: independent
**Transfers**: independent

**Balance**: Static: intact          Dynamic: intact

**Gait**: no deviations except as indicated in table

| Mark if present | Deviation | | Left | Right | Deviation |
|---|---|---|---|---|---|
| | Decreased cadence | | | | Decreased stride length |
| | Decreased trunk rotation | | | | Decreased weight shift |
| | Forward flexed posture | | | | Decreased arm swing |
| | Decreased balance | | | | Trendelenberg |
| x | dropping into socket with 6 ply sock | | | | Decreased stance time |
| | | | | | Decreased push off |

**Gait Device Used**: RW for short distances as testing additional sock ply
**Stairs**: NT

**Patient/caretaker were instructed in and/or performed:**
(If no reps or comments are indicated, activity was not performed during this session.)

| Specific intervention/exercises performed | Added to HEP | * Assist /skilled intervention required | Reps | *PR | Comments |
|---|---|---|---|---|---|
| Gait Training | | | 20 min | 4 | 8 ply sock worked to assist with minimizing dropping or slipping; 3 pl and 5 ply |
| Bridges --> SL | | | | | all exercises listed were provided on HEP handouts (x5 copies per request) with patient confirming |

Report Request ID: 36447402

Page 2,112 of 6,855

Facility: CHS
Location: 084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:   Visit CHS
Birth Date:
Gender: Male

Admission Date:    9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

| | | | | | independence and declining additional instructions at this time |
|---|---|---|---|---|---|
| 3-way hope | | | | | |
| prone hip extension with knee flexed | | | | | |
| hooklyne rotation/ AKTC / DKTC | | | | | |
| sit -> stand without UE support | | | | | |
| unsupported squat --> SL with hand support | | | | | |
| modified push-ups | | | | | |
| modified plank | | | | | |
| standing lunges | | | | | |
| wall slides | | | | | |
| HS stretching | | | | | |
| upright bike | | | 10 min | 4 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

KEY:  * Assistance/Skilled intervention required

**VC**= Verbal cues

**TC**= Tactile cues

**PE** = Physiologic effect

**AR** = Anatomical review

**BA** = Body alignment

Key: * Patient Response (PR)

**1** = Complaint of pain

**2** = Complaint of fatigue

**3** = Decreased symptoms

**4** = Performs independently

**5** = Unable to perform
**6** = Other (specify)

Report Request ID:   36447402

Page 2,113 of 6,855

Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 33

Roberts v Dart 2113

# Cook County Health and Hospitals System

### 1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type:  Visit CHS
Birth Date:
Gender:  Male

Admission Date:  9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

---

## Outpt PT-OT-CHS

---

**Total direct contact time**: _60_minutes

**Education**:
__Precautions
_x_PT role/plan of care/discharge recommendations
__Anatomy with posters/models
_x_Written home exercise program handouts issued and instructed to perform exercises _3_times a day.
_x_Patient/caregiver demonstrate/verbalize understanding of principles taught today.
__Patient &/or patient's family/caretaker does not demonstrate/verbalize understanding of principles taught today & requires further education and assistance.

**Equipment issued**: 5 ply sock for residual limb, 5 copies of HEP exercises

**A**:
**Pt is a**:  67 y/o male referred to PT with prosthesis fitting issues limiting ambulatory status
**Fall risk**:  No with properly fit prosthesis

**Appointments attended**:        1/3        **Missed/rescheduled appointments**:

**Primary problems/impairments/limitations**:

| | | | | |
|---|---|---|---|---|
| Decreased tissue mobility/ range of motion | | | | Impaired posture |
| Decreased strength | | | | Poor body mechanics |
| Impaired balance | | | | Impaired coordination |
| Impaired sensation | | | | Cognitive deficits/knowledge deficits |
| Impaired endurance | | | | Impaired functional mobility |
| Edema | | | | Pain |
| Abnormal tone | | | | Muscle guarding |
| Decreased core stability | | x | | Other:  prosthesis fitting needs |

Specific skilled physical therapy interventions (noted in the therapy plan section of the clinical note) are required to achieve the functional goals.
**Patient's Progress**: Patients current ambulatory decline is related to the fit and additional sock ply required for R resdiual limb. Able to acheve good fit with 8 ply (5 + 3) with patient having a second 3 ply in his possession to assist on fuller days. Appointment made for follow-up with PMR clinic d/t patient requesting additional blowing out of knee socket d/t discomfort and skin break down. At this time no open or red areas noted however would recommend formal assessment to ensure congruency. Home exercise handouts provided mirroring previously prescribed HEP which patient was appreciative. Patient also requested to attempt to improve ambulatory status with walk when not used prosthesis d/t urination needs a night

---

Report Request ID:  36447402

Page 2,114 of 6,855

Facility:  CHS
Location:  084A; 10; 2

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

# Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: ROBERTS, JAMES
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 9/10/2014
Discharge Date:
FIN: 20140910003

MRN: 005007433c; 00704888z

CMRN: 1012697414

## Outpt PT-OT-CHS

therefor will schedule 2 follow-up appointment to assist with additional gait training however stressed importance to use prosthesis at all times with standing activites d/t larger body habitus and height compromising his ability to manage his center of gravity with single leg ambulation.

P:
**Functional Long Term Goals**: to be met in _3_ treatments starting _01/27/16_(eval date) and ending in _20_ weeks.
_x_Patient able to ambulate 2x100 feet independently with walker and no prosthesis on R LE, hopping
_x_Patient able to negotiate 4 stairs independently with least assist device and with one rail.
_x_Patient able to understand & perform proper body mechanics to decrease pain and risk for future injury.
_x_Patient/family able to perform home exercise program independently to maintain/further improve functional gains attained in P.T.
__Other:
**Goal status/progress**:  initial evaluation
**Intervention plan**: gait training (hopping) without prosthesis) to address evening ambulation needs for toileting
Continue therapy to address problems and work toward goals set. Planned interventions at time of evaluation are marked

| | Treatment intervention | | Treatment intervention | | Treatment intervention |
|---|---|---|---|---|---|
| | 97110 - Ther exercise | | 97760 - Orthotic mgmt/fit/train | | 97032 - Estim – attended |
| | 97530 - Ther activity | | 97762 - Orth/prosth check-out | | 97014 - Estim – unattend |
| | 97150 - Ther group | x | 97761 - Prosthetic training | | 97035 - Ultrasound |
| | 97112 - Neuromusc re-ed | | 97542 - W/C mgmt training | | 97022 - Fluidotherapy |
| X | 97116 - Gait training | | 97532 - Cognitive training | | 97010 - Hot/cold pack |
| | 97140 - Manual therapy | | 97750 - Perform testing | | 97535 - ADLs |

_x_Endorse to OP PT staff therapist following existing plan (if still applicable)
_x_Endorse to PTA with supervision of original physical therapist.
__Continue same treatment plan.
__DC OP PT
__Modify Treatment plan as follows:
**Ext/ Pager**: 4970

*Electronically Authored On:  27-Jan-16 13:13*
*Electronically Signed By: CROTHERS, JAMIE A*
*CHS - PT/OT - Manager*

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Plaintiff's Exhibit 20 Page 35

**Roberts v Dart 2115**

Case: 1:15-cv-05560 Document #: 35-2 Filed: 04/19/17 Page 544 of 561 PageID #:209
Case: 1:15-cv-00049 Document #: 35-2 Filed: 02/05/16 Page 209 of 293 PageID #:429

Case: 1:14-cv-06259 Document #: 125-1 Filed: 03/25/15 Page 2 of 4 PageID #:3611

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | |
|---|---|
| JOHNATHAN LACY, KENNETH FARRIS, MARQUIS BOWERS and MAURICE BOSTON, individually and for all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) | No. 14-cv-6259 |
| ) | (Judge Gettleman) |
| -vs- ) | |
| ) | (Magistrate Judge Martin) |
| THOMAS DART, Sheriff of Cook County, COOK COUNTY, ILLINOIS, SGT. JOHNSON, CORRECTIONAL OFFICER NAWARA, CORRECTIONAL OFFICER LOPEZ, and CORRECTIONAL OFFICER WILSON, ) ) ) ) ) ) | |
| Defendants. ) | |

**AFFIDAVIT OF MICHAEL GUMM REGARDING ADA
CONSTRUCTION AT THE COOK COUNTY COURTHOUSES**

I, Michael Gumm, ADA Compliance Director for the County of Cook, under penalty as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, state that if called to testify, I would state the following:

1. As set forth on the attached chart, the contracts for the ADA improvements in the suburban courthouses have all been signed. Four of the five contracts have the actual Purchase Order number which means the supply and material has been ordered and as soon as they are received the installations and ADA modifications will be made.

2. We are looking into the improvements for the ramps on the suburban locations that are indicated on the attached chart but no conclusions have been made to date.

3. The ADA sink has been received by Facilities Management. Today during my visit to the DOC Campus I spoke with the Supervisor from Facilities Management and the

Plaintiff's Exhibit 21 Page 1

Case: 1:15-cv-05560 Document #: 232 Filed: 04/19/17 Page 545 of 561 PageID #:210
Case: 1:15-cv-06045 Document #: 35 Filed: 02/05/16 Page 205 of 293 PageID #:428

Case: 1:14-cv-06259 Document #: 125-1 Filed: 03/25/15 Page 3 of 4 PageID #:3612

sink will be installed tomorrow in Bullpen 34/5. The installation will complete the
ADA improvements in this area.

4.  A Request for Proposal to procure Architecture/Engineering services for the design of
Leighton Criminal Courts Building Holding Cells ADA Renovation were sent to six
design firms, with proposals due March 25, 2015. As of today, March 25, 2015 all but
one proposer has declined to submit causing Cook County to reissue the RFP to
another prequalified pool of A/E design firms, extending the procurement process 3-4
weeks. If the single proposer's submission was accepted, Capital Planning would be
required to procure an independent firm to study the current market rate of the
proposed services from which the County could compare costs to determine if the
offering was fair and reasonable, further delaying the project by 3-4 months. Re-
issuing the RFP is the shortest route to procuring the required services for the
improvements at Leighton Criminal Courts Building. The County Board has already
approved the funding for the project.

FURTHER AFFIANT SAYETH NOT

_Michael Gumm_
Michael Gumm

Subscribed and sworn to before me
this 25th day of March, 2015

_Notary Public_
Notary Public

OFFICIAL SEAL
ANDREW P KRUZEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/08/16

Case: 1:15-cv-05560 Document #: 262 Filed: 04/19/17 Page 546 of 561 PageID #:261
Case: 1:15-cv-05560 Document #: 364 Filed: 02/08/18 Page 106 of 338 PageID #:4781

Case: 1:07-cv-03889 Document #: 322  Filed: 09/17/10 Page 1 of 1 PageID #:3627

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Derrick Phipps, et al., | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *-vs-* | ) | No. 07 CV 3889 |
| | ) | |
| Sheriff of Cook County and Cook County, | ) | *(Judge Bucklo)* |
| | ) | |
| *Defendants.* | ) | |

## ORDER

The Court has reviewed the proposed settlement of this class action and, having held a hearing on the fairness of the settlement, finds that notice of the proposed settlement has been provided to all class members by first class mail to his (or her) last known address and that the proposed settlement is fair, reasonable, and adequate. Accordingly,

IT IS ORDERED that the proposed settlement be, and the same hereby is, approved.

IT IS FURTHER ORDERED:

The time for class members to submit claims is extended to November 15, 2010.

Defendant Cook County shall, within 30 days, pay incentive awards in the amount of $25,000 to James Grant, Kenneth Courtney, and Derrick Phipps, $15,000 to Kevin House, and $10,000 to David Eldefonso.

Defendant Cook County shall pay to attorneys Kenneth N. Flaxman and Thomas G. Morrissey the sum of $35,000 as reimbursement for expenses and $700,000 as compensation for attorneys fees, the fees to be paid in two installments as set out in the settlement agreement.

The Court reserves jurisdiction to September 1, 2011 to enforce the terms of the settlement agreement.

ENTER

*9/17/2010*
*Elaine E. Bucklo*
*United States District Judge*

Plaintiff's Exhibit 22 Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| James Roberts, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 16-cv-5560 |
| -*vs*- | ) | |
| | ) | Judge Lee |
| Thomas Dart, Sheriff of Cook County, | ) | |
| and Cook County, Illinois, | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

# PLAINTIFF'S RESPONSE TO DEFENDANT COOK COUNTY'S FIRST SET OF INTERROGATORIES

Plaintiff James Roberts, by counsel, responds to defendant Cook County's first set of interrogatories:

1. State your full name, present residence address, date and place of birth, your social security number, your driver's license number and, if you have ever been known by any other name, please state all of the names by which you have been known, the dates of use of each such name and the reasons for any change of name.

**ANSWER:** James Samuel Roberts, Born 8/18/48 in New York City, social security number is 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 and I am currently incarcerated at Cook County Jail located at 2600 S. California Ave. Chicago, IL 60608.

2. If you have ever pleaded guilty to or been convicted of a crime punishable as either a misdemeanor or felony, the date of each prosecution or conviction, the nature of each court and judge, and the location of each Court where the prosecution or conviction took place, and a full description of any and all sentences imposed.

**ANSWER:** I have been convicted of crimes including but not limited to approximately 4.5 months in Queenshouse for assault approximately 30 years ago. Counsel for plaintiff directs defendant to review plaintiff's Certified Copy of

Plaintiff's Exhibit 23 Page 1

Convictions maintained by the Clerk of the Circuit Court of Cook County pursuant to Rule 33(d) of the Federal Rule of Civil Procedure.

3.   Identify any person, including parties to this case, who has, or claims to have knowledge of the facts concerning the occurrences complained of, or who were, or claim to have been witnesses to the occurrences complained of (if incarcerated please include inmate number and name of institution).

**ANSWER:**      Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. Notwithstanding this objection plaintiff responds as follows: I believe the following correctional officers assigned to 3E of the RTU may have knowledge of some facts being complained of: Officer Corrona, Officer Clark, Officer Adams, Sergeant Bogenhagen, Sergeant Moore, Officer Salamon, and Officer Randall. In addition, I believe Sabrina Rivero-Canchola, Dr. Paul, Glen Trammel, and the nursing staff may also have information. Finally, I believe the following individuals who have been incarcerated at the Cook County Jail may also have information about the facts complained of: Harold Vaughn, Nicholas Potter, Keith Martin, and Joseph Felton. Counsel for plaintiff also directs defendant to the individuals disclosed pursuant to Rule 26(a)(1). Investigation continues.

4.   State whether you or your attorneys or agents or anyone acting on your behalf have taken statements, signed or unsigned, oral or written, or have in their possession any such statements, or know of the existence of any such statements, from or by any person who has, or claims to have, knowledge of the facts concerning the incidents complained of; if so, state the identity and present or last known address of each such person together with the present whereabouts and number of such statements.

**ANSWER:** Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. Notwithstanding this objection plaintiff responds as follows: I filed many grievances and health service request forms. Additionally,

Plaintiff's Exhibit 23 Page 2

counsel for plaintiff directs defendant to documents produced in discovery in this case. Investigation continues.

5.  Describe the evidence in your possession, (including documents, witnesses and communications), which supports the claims or allegation in your complaint. Please include any oral or written statements or communications made to the Defendants or their agents. Please also include the street, street number, city and state of every witness known to you or to your attorneys who has any knowledge regarding the facts and circumstances surrounding the happening of the incident(s), including but not limited to eyewitnesses to such event(s), as well as medical witnesses and other persons having knowledge thereof. Please also state whether any witnesses you propose to use at trial are related to the plaintiff and the nature of the relationship. If any of the above-described individuals have information or documents or have made statements pertaining to the occurrences involved in this litigation, please attach a copy to these answers to interrogatories.

**ANSWER:**       Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. Notwithstanding this objection plaintiff responds as follows: I filed many grievances, health service request forms, and I believe there is video maintained by the Sheriff of my living unit. In addition, counsel for plaintiff directs defendant to review documents disclosed pursuant to Rule 26(a)(1), including the summary judgment material in *Clemons v. Dart*, 13 C 2356, *Crockwell v. Dart*, 15 C 825, *Lacy v. Dart*, 14-C 6259 and *Flora v. Dart*, 15 C 1127. Investigation continues.

6.  Please identify any declarations against interest you contend have been made by or with respect to Defendant, Cook County, Illinois.

**ANSWER:**       Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. In addition, this interrogatory asks plaintiff Roberts to formulate a legal conclusion. Notwithstanding this objection plaintiff responds as follows: I complained to defendants about the various non-ADA

Plaintiff's Exhibit 23 Page 3

compliant living units at the Jail, the courthouse, and my substantial hearing impairment and need for an accommodation.

7. Describe the condition of your prosthetic leg, when you started having problems with it, who you told and when you told them.

**ANSWER**:      Counsel for plaintiff objects to the vague and overly broad interrogatory that is not limited to time. Notwithstanding this objection plaintiff responds as follows: About one or two months after my incarceration at the jail my leg began to swell, develop microscopic legions, and calcium deposits near my knee which hit my nerves. This made it very difficult for me to put on the prosthetic and move from place to place due to significant pain. I complained in writing and told Drs. Paul and McCarthy about my problems. About 10 months ago I was fitted with a new prosthetic which did not fit after some time. I was given back my original prosthetic leg on October 4, 2016 by Sabrina Rivero-Canchola. Pursuant to Rule 33(d), counsel for plaintiff directs defendants to review plaintiff's medical records.

8. Describe the condition of your hearing, when you started having problems with it, who you told and when you told them.

**ANSWER:**      Counsel for plaintiff objects to the overly broad nature of this interrogatory. Subject to and notwithstanding this objection plaintiff responds as follows: about 9 months to 1 year after intake at the jail my hearing started causing me substantial problems. This condition caused me to be unable to distinguish sounds, made me feel nervous, anxious, fearful, unable to engage in normal conversations in the dayroom, and substantially interfered with my ability to hear and understand the television in the dayroom. I wrote health service request forms and grievances and spoke with Dr. Paul and Glen Trammel. Counsel for plaintiff directs

Plaintiff's Exhibit 23 Page 4

defendant to review plaintiff's medical records pursuant to Rule 33(d) of the Federal

Rule of Civil Procedure. Investigation continues.

9. Have you ever been injured by not being placed in an ADA compliant room? If so, please describe the injury in detail, please also provide the date who you told and if you received a diagnosis from it.

**ANSWER:** Counsel for plaintiff objects to the overly broad interrogatory.

Subject to and notwithstanding this objection plaintiff responds as follows: during

most of my incarceration I was not assigned to an ADA compliant cell that had grab

bars near the toilet. I fell approximately 9 times from attempting to use the toilet. At

times members of the correctional staff helped me off the follow. I recall Officer

Clark and Officer Sandoval helped me. I broke my two front teeth after one fall and

went immediately to the dentist. Counsel for plaintiff directs defendant to review

plaintiff's medical records and review the architectural layout of each of plaintiff's

cells pursuant to Rule 33(d).

10. State by date the locations within the Cook County Department of Corrections, Plaintiff was assigned to. Please include a description of the living units Plaintiff was assigned to and the accommodations made for his alleged impairment.

**ANSWER:** Pursuant to Rule 33(d), counsel for plaintiff directs defendants to

review plaintiff's bed assignments and architectural drawings for each bed

assignment. Subject to and notwithstanding this objection plaintiff responds as

follows: To the best of my recollection I have been assigned to the following tiers in

the RTU: 3E, 3A, 3E, 4A, and 4E.

11. Have you suffered any personal injury (physical or psychological) prior to entering the Cook County Department of Corrections? If so, state when, where, and how you were injured and describe the injuries suffered.

Plaintiff's Exhibit 23 Page 5

**ANSWER**: Counsel for plaintiff objects to this overly broad and impermissibly vague interrogatory. Moreover, plaintiff is currently a pretrial detainee at the Cook County Jail and answering this question in full is protected by the Fifth Amendment. Subject to and notwithstanding this objection, plaintiff responds by providing the following personal injuries he suffered at the time of entering the Cook County Jail in September of 2014. At the date of intake at the jail I suffered from the following conditions: depression, diabetes, dementia, hypertension, DVT from head trauma, and major circulation conditions.

12. If the answer to the preceding question is yes, please state the name and address of each doctor, surgeon, technician, physician, psychiatrist, psychologist or counselor who and each hospital, laboratory, or clinic that examined, tested or treated you for any condition and the reason, condition, or complaint for which this was necessary.

**ANSWER:** Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. Pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, counsel directs defendant to review plaintiff's medical records maintained by Stroger Hospital and Cermak. Notwithstanding this objection, plaintiff responds as follows: I have been treated at Weiss Hospital at 4646 N. Marine Dr, Chicago, IL 60640 and Norwegian Hospital at 1044 N. Francisco Ave., Chicago, IL 60622. Investigation continues.

13. Have you ever filed any suit or claim for personal injuries or a violation of your constitutional rights, other than the present lawsuit? If so as to each claim or lawsuit set forth (a) the date and place of the occurrence; (b) the parties or the person or person(s) against whom the claim was made; (c) the full name of the lawsuit including court room number, court and year of filing.

**ANSWER:** A pro se complaint was received by the clerk of the court on October 28, 2016 and assigned to Judge Coleman. It was assigned case number 16 C 10191. Counsel for plaintiff directs defendant to the complaint filed as ECF No. 1.

Plaintiff's Exhibit 23 Page 6

14. List and itemize all sources of income being received by the plaintiff on the date of the alleged acts or omissions by the defendants, including, but not limited to employment compensation, social security payments, pension from former employers, and financial support furnished by any person.

**ANSWER**: I was incarcerated at the Cook County Jail on the dates of the alleged acts and therefore did not have a job. On occasion, my brother, Jerome gives me money for commissary.

15. State any and all expenses or losses claimed as a result of the alleged acts or omissions by the defendants.

**ANSWER**: Plaintiff objects to this interrogatory to the extent it is overly broad, impermissibly vague, and plaintiff is not, at this time, able to precisely calculate all expenses or losses as a result of the alleged act by defendants. Subject to and without waiving these objections, plaintiff states as follows: As described above, I have fallen numerous times because I was not assigned to an ADA compliant cell. I also suffered significant pain and limited mobility because my prosthetic leg did not fit well and defendant did not provide me a wheelchair at all time to move around on my tier. In addition I suffered physical and emotional injuries because I was not accommodated for my substantial hearing impairment which caused physical symptoms including blurry vision and dizziness. Also, when I attended court there have been occasions when I was required to roll up and down the ramp to the courthouse. This was very difficult for me in my wheelchair. As described above, this has caused me to suffer mental distress.

16. With respect to the allegations of injury or damage, please itemize each element of damage and the dollar amount assigned to each element of damage, state the manner in which you determined or computed damages, and if you have not yet determined specific dollar amounts of your damages, state the method, formula or theory by which you will compute your alleged damages.

**ANSWER:** Plaintiff objects to this interrogatory to the extent it is overly broad, impermissibly vague, and plaintiff is not, at this time, able to precisely calculate all expenses or losses as a result of the alleged act by defendants. Subject to and without waiving these objections, plaintiff states as follows: I plan to allow a jury to decide an appropriate level of compensatory damages.

17. State the names and addresses of all physicians, surgeons, technicians, medically trained persons, or experts in any scientific field who have been contacted for expert opinion (excluding purely consulting experts) by you, your attorney or anyone acting on your behalf, regarding any aspect of the alleged acts or omissions by defendant, causation, injuries, or damages. As to each person, state the following:
   a) Name and address;
   b) Area of expertise;
   c) Identify, with particularly, any and all records, statements reports, films, letters, tape recordings, photographs, memoranda, or documentation of any type provided to or furnished by each expert.

**ANSWER:** Objection, premature. Plaintiff has not retained an expert to formulate an expert opinion in this case pursuant to Rule 26(a)(2). Plaintiff reserved the right to retain an expert and will seasonally supplement this disclosure pursuant to the Federal Rules.

18. State and describe, in detail any and all requests, grievances, appeals, administrative proceeding(s), law suits or procedures that Plaintiff has pursued and/or filed either prior to filing this subject Complaint or at any time whatsoever that in anyway pertains, relates or deals with this cause of action and the results thereof.

**ANSWER:** Counsel for plaintiff objects to the overly broad and unduly burdensome nature of this interrogatory. Pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, counsel directs defendant to review plaintiff's health service request forms maintained by Cermak and grievances kept by Cook County Sheriff.

20. State when you were prescribed a prosthetic leg and provide the name and address of the prescribing doctor.

Plaintiff's Exhibit 23 Page 8

**ANSWER:**    My right leg was amputated at Weiss Hospital approximately 3 years ago, I was also treated at Continental Nursing Home. I do not recall the name of the medical provider who prescribed a prosthetic leg.

21.  Describe with specificity whether you need a wheelchair to ambulate when wearing your prosthetic leg.

**ANSWER:**    Counsel for plaintiff objects to the overly broad and unduly burdensome interrogatory. Subject to and notwithstanding this objection, plaintiff responds as follows: If the skin on my leg is healthy and not swollen, and my prosthetic leg fits, I generally do not require a wheelchair or scooter to move around. However, when my prosthetic leg hits my nerve and/or does not fit well, shooting pain develops and I need a wheelchair to move around.

22. State how often you utilize your prosthetic leg on a daily basis.

**ANSWER:**    Counsel for plaintiff objects to the overly broad and unduly burdensome interrogatory. Additionally, counsel for plaintiff incorporates plaintiff's response to the above interrogatory by reference. Subject to and notwithstanding this objection plaintiff responds as follows: the use of my prosthetic leg varies depending on the condition of my right leg and the fit of the prosthetic leg. My use of the leg varies day to day. There has been about an approximate three month period at the jail when I did not use the prosthetic leg at all.

23.  State whether you are able to ambulate without the need of a wheelchair when utilizing your prosthetic leg.  Provide any detail of difficulty in ambulating.

**ANSWER:**    Counsel for plaintiff objects to the overly broad and unduly burdensome interrogatory. Additionally, counsel for plaintiff incorporates plaintiff's response to the above interrogatories by reference. Subject to and notwithstanding

Plaintiff's Exhibit 23 Page 9

this objection plaintiff responds as follows: it depends on the condition of my leg and

the prosthetic leg. Sometimes I am able to move short distances without a wheelchair

and other times I am not.

24. State whether you entered CCDOC with a wheelchair. If the answer is in the affirmative, state how long you had been utilizing a wheelchair prior to your most recent arrest.

**ANSWER:** I did not enter CCDOC with a wheelchair.

_____
*An attorney for plaintiff*

Thomas G. Morrissey, Ltd.
ARDC 6309730
10150 S. Western Ave., Suite Rear
Chicago IL 60643
(773)233-7900

Plaintiff's Exhibit 23 Page 10

<u>Verification</u>

     I, James Roberts, state under penalty of perjury, the foregoing response to Defendant Cook County's First Set of Interrogatories are, to the best of my knowledge true and correct.

Date _11, 7 16_____

_James Roberts_

James Roberts

Plaintiff's Exhibit 23 Page 11

## CERTIFICATE OF SERVICE

I, Patrick W. Morrissey, state that I served the foregoing on the undersigned attorney for defendants by Email on November 8, 2016.

Andrea Huff
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602

Jacqueline Carroll, ASA
69 W. Washington, Suite 2030
Chicago, IL 60602

_____

Patrick W. Morrissey
Thomas G. Morrissey, Ltd.
10150 S. Western Ave.,Suite Rear
Chicago, IL 60643
(773)-233-7900

Plaintiff's Exhibit 23 Page 12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Donnell Flora, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) 15-cv-1127 |
| -*vs*- | ) |
| | ) Judge Kennelly |
| Thomas Dart, Sheriff of Cook | ) |
| County, and Cook County, | ) |
| Illinois, | ) |
| | ) |
| *Defendants.* | ) |

## PLAINTIFF'S INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Dart's Response to Plaintiff's First Request to Admit |
| 2 | Agreed Order in *United States v. Cook County*, 10-cv-2946 |
| 3 | Cook County's Response to Plaintiff's First Request to Admit |
| 4 | Uniform Federal Accessibility Standards |
| 5 | 1991 ADA Standards for Accessible Design |
| 6 | United States Department of Justice, Civil Rights Division, ADA/Section 504 Design Guide: Accessible Cells in Correctional Facilities |
| 7 | Nondiscrimination Based on Handicap in Federally Assisted Programs – Implementation of Section 504 of the Rehabilitation Act of 193 and Executive Order 11914, 45 Fed. Reg. 37620-36 (June 3, 1980) |
| 8 | Department of Justice, Enforcing the ADA: A Status Report from the Department of Justice |
| 9 | Michael Gumm Deposition in *Wade v. Dart*, 15-cv-10644 |
| 10 | Defendant Cook County's Rule 26(a)(2)(C) Disclosure |
| 11 | Sabrina Rivero-Canchola as Sheriff's Rule 30(b)(6) designee |
| 12 | Matthew Burke as Sheriff's Rule 30(b)(6) designee dated September 23, 2016 |
| 13 | Monitor Ronald Shansky's Report No. 7 in *United States v. Cook County*, 10-cv-2946 |
| 14 | Dr. Andrew Ting's Deposition in *Clemons v. Dart*, 13-cv-2356 |
| 15 | Daniel Moreci as Sheriff's Rule 30(b)(6) designee in *Brown v.* |

| | Dart, 14-cv-7945 |
|---|---|
| 16 | Daniel Moreci Affidavit |
| 17 | Donnell Flora Deposition |
| 18 | Accessibility Analysis of Cermak Health Services by MRA Architects, Ltd. |
| 19 | "ADA Equipt Rooms in Cermak" |
| 20 | Dart's Stipulation of Facts Regarding Certain Records |
| 21 | Daily Dorm Count Sheets for Cermak during Plaintiff's Incarceration |
| 22 | Historical Bed Assignment Associated View for plaintiff Flora |
| 23 | Dr. Connie Mennella e-mail dated August 20, 2014 |
| 24 | Affidavit of Michael Gumm Regarding ADA Construction at the Cook County Courthouses |
| 25 | Plaintiff's ADA Grievances Concerning Courthouse Accessibility |
| 26 | Order in Phipps v. Sheriff, 07-cv-3889 |
| 27 | Order in Clemons v. Dart, 13-cv-2356 |
| 28 | May 10, 2012 Justice Department Letter, to be filed under seal |
| 29 | Excerpt of Matthew Burke Deposition dated June 30, 2016, to be filed under seal |

Court Minutes Associated View

| Status | Inmate | Case | Court Date | Court | Court Room | Clothes |
|---|---|---|---|---|---|---|
| Active | James Roberts | 14CR6005801 | 7/22/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 6/15/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 6/6/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 5/12/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 4/25/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 3/28/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 2/22/2016 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 1/22/2016 9:30 PM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 12/4/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 11/6/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 10/2/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 8/20/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 7/21/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 7/7/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 6/25/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 5/28/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 4/24/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 3/20/2015 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 3/19/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 2/23/2015 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 2/13/2015 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 2/4/2015 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 1/26/2015 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 1/13/2015 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 12/22/2014 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 11/21/2014 9:00 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 11/13/2014 9:30 AM | Criminal Courts Building | 702 | Jail |
| Inactive | James Roberts | 14CR6005801 | 10/9/2014 9:00 AM | Criminal Courts Building | 101 | Jail |
| Inactive | James Roberts | 14CR6005801 | 10/3/2014 9:00 AM | Branch 64 | 302 | Jail |
| Inactive | James Roberts | 14CR6005801 | 9/15/2014 9:00 AM | Branch 64 | 302 | Jail |

CCSAO ROBERTS 004

Plaintiff's Exhibit 25 Page 1